UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF NEW YORK

**REDACTED**

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL No. 1720<br><br>Docket No. 05-md-01720 (BMC-JAM) |

This Document Relates To:

BARRY'S CUT RATE STORES INC.; DDMB, INC. d/b/a EMPORIUM ARCADE BAR; DDMB 2, LLC d/b/a EMPORIUM LOGAN SQUARE; BOSS DENTAL CARE; RUNCENTRAL, LLC; CMP CONSULTING SERV., INC.; TOWN KITCHEN, LLC d/b/a TOWN KITCHEN & BAR; GENERIC DEPOT 3, INC. d/b/a PRESCRIPTION DEPOT; and PUREONE, LLC d/b/a SALON PURE,

　　　　　　　　　Plaintiffs,

　v.

VISA, INC.; MASTERCARD INCORPORATED; MASTERCARD INTERNATIONAL INCORPORATED; BANK OF AMERICA, N.A.; BA MERCHANT SERVICES LLC (f/k/a DEFENDANT NATIONAL PROCESSING, INC.); BANK OF AMERICA CORPORATION; BARCLAYS BANK PLC; BARCLAYS BANK DELAWARE; BARCLAYS FINANCIAL CORP.; CAPITAL ONE BANK, (USA), N.A.; CAPITAL ONE F.S.B.; CAPITAL ONE FINANCIAL CORPORATION; CHASE BANK USA, N.A.; CHASE MANHATTAN BANK USA, N.A.; CHASE PAYMENTECH SOLUTIONS, LLC; JPMORGAN CHASE BANK, N.A.; JPMORGAN CHASE & CO.; CITIBANK (SOUTH DAKOTA), N.A.; CITIBANK N.A.; CITIGROUP, INC.; CITICORP; and WELLS FARGO & COMPANY,

　　　　　　　　　Defendants.

**DECLARATION OF EQUITABLE RELIEF CLASS COUNSEL IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF AMENDED SETTLEMENT AGREEMENT**

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION AND OVERVIEW ...................................................................... 1

II.    THE DEFENDANTS AND THE STRUCTURE OF THE CREDIT CARD INDUSTRY 7

III.   HISTORY OF THE LITIGATION ......................................................................... 9

  A.   THE INITIAL COMPLAINTS............................................................................... 9

  B.   THE NEW RULE 23(B)(2) ACTION AND THE COURT'S APPOINTMENT OF EXPERIENCED
       EQUITABLE CLASS COUNSEL ........................................................................ 12

  C.   ERCPS' EQUITABLE RELIEF CLASS ACTION COMPLAINT AND SUCCESSFUL OPPOSITION TO
       BANK DEFENDANTS' MOTION TO DISMISS ..................................................... 15

  D.   ERCPS' EFFORTS TO BUILD AND UPDATE THE DISCOVERY RECORD ................ 16

    1.   Discovery From Defendants and Third Parties............................................... 17

    2.   Discovery From ERCPs.............................................................................. 19

    3.   Expert Discovery ....................................................................................... 20

    4.   Supplemental Discovery from Defendants .................................................... 23

  E.   THE COURT'S CERTIFICATION OF A RULE 23(b)(2) CLASS................................ 23

  F.   ERCPS' SUCCESSFUL OPPOSITION TO DEFENDANTS' *DAUBERT* MOTIONS.......... 27

  G.   PARTIES' SUMMARY JUDGMENT MOTIONS ...................................................... 28

  H.   ERCC'S EFFORTS TO MONITOR INDUSTRY DEVELOPMENTS, GOVERNMENT
       INVESTIGATIONS, AND LEGISLATIVE REFORMS RELATING TO PAYMENT CARDS ..... 30

  I.   COMMUNICATIONS WITH ERCPS AS CLASS REPRESENTATIVES............................ 31

IV.    TRIAL PREPARATION ...................................................................................... 31

V.     RENEWED SETTLEMENT DISCUSSIONS ....................................................... 36

VI.    AMENDED SETTLEMENT RELIEF .................................................................. 40

  A.   THE HONOR ALL CARDS RULE IS SUBSTANTIALLY MODIFIED .......................... 41

  B.   NEW COMPETITIVE-RATE STANDARD CARDS INCREASE INCENTIVES ................ 42

  C.   SURCHARGING UP TO THE COST OF ACCEPTANCE WITH NO LEVEL PLAYING FIELD ........ 43

  D.   ISSUER-LEVEL DISCOUNTING AND COMPETITION ............................................ 47

  E.   IMMEDIATE RATE RELIEF UNTIL COMPETITIVE FORCES LOWER INTERCHANGE RATES .... 49

  F.   TESTING OF NON-ACCEPTANCE AND OTHER STEERING PROGRAMS .................. 50

  G.   DIFFERENT STEERING METHODS MAY BE USED AT DIFFERENT OUTLETS UNDER SAME
       BANNER ....................................................................................................... 52

  H.   NEW INCENTIVES TO FORM MERCHANT BUYING GROUPS ................................ 53

  I.   COMPLETE ELIMINATION OF HONOR ALL WALLETS RULE ................................ 54

J.    MERCHANT EDUCATION PROGRAM AT NO COST TO MERCHANTS..................................... 55

K.    INCREASED DEMAND FOR EFFICIENT STANDARD CARDS..................................... 56

L.    EIGHT-YEAR EXTENSION OF DOJ CONSENT ORDER ON PERMISSIBLE DISCOUNTS AND
STEERING................................................................................................................. 56

M.    LEVERAGE FROM THE THREAT OF STEERING AND NON-ACCEPTANCE.............................. 57

N.    RELIEF FOR MERCHANTS IN STATES WITH SURCHARGING RESTRICTIONS ......................... 58

O.    EXTENDED DURATION OF THE RELIEF ................................................................. 61

P.    SCENARIOS TO ELIMINATE UNCERTAINTY IN GRAY AREAS ............................................ 61

Q.    CURED DEFECTS OF THE 2012 SETTLEMENT AGREEMENT ............................................ 62

R.    CURED DEFICIENCIES OF THE PRIOR SETTLEMENT AGREEMENT..................................... 67

S.    ATTORNEY FEES, EXPENSES, AND SERVICE AWARDS ....................................................... 69

VII.    THE AMENDED SETTLEMENT SATISFIES RULE 23(e)......................................... 70

VIII.    NOTICE TO THE CLASS ............................................................................................... 71

Linda P. Nussbaum, of Nussbaum Law Group, P.C.; Steve D. Shadowen, of Hilliard Shadowen LLP; Michael J. Freed, of Freed Kanner London & Millen LLC; and Robert G. Eisler, of Grant & Eisenhofer, P.A. (together, "Equitable Relief Class Counsel"), pursuant to 28 U.S.C. § 1746, hereby declare as follows:

## I.   INTRODUCTION AND OVERVIEW

1.   Equitable Relief Class Counsel ("ERCC") jointly submit this Declaration in support of Equitable Relief Class Plaintiffs'[1] Motion for Preliminary Approval of a proposed settlement with the Network Defendants.

2.   ERCC submit this Declaration based on personal, firsthand knowledge, and if called upon and sworn as witnesses, could and would testify competently to the facts contained herein.  ERCC are counsel for class representatives and the Rule 23(b)(2) equitable relief class certified by Chief Judge Brodie on September 27, 2021 (the "Equitable Relief Class").

3.   Plaintiffs seek preliminary approval of the Superseding and Amended Class Settlement Agreement of the Rule 23(b)(2) Class Plaintiffs and the Defendants ("Amended Settlement") on behalf of a non-opt-out, certified class, defined as follows, as modified by Chief Judge Brodie:

> The Rule 23(b)(2) class consists of all persons, businesses, and other entities that accept Visa and/or Mastercard credit and/or debit cards in the United States at any time during the period between December 18, 2020 and the date of preliminary settlement approval.

*DDMB, Inc. v. Visa, Inc.*, No. 1:05-md-01720-MKB-VMS, ECF. No. 8647 at 98–99 (E.D.N.Y. Sep. 17, 2021); 2021 WL 6221326, at *40 (E.D.N.Y. Sep. 27, 2021), definition modified by *In re:*

---

[1]   PureOne, LLC d/b/a Salon Pure ("PureOne"); RunCentral, LLC ("RunCentral"); CMP Consulting Serv., Inc. ("CMP"); Generic Depot 3, Inc. d/b/a Prescription Depot ("Generic Depot"); and Boss Dental Care PLLC ("Boss Dental") (collectively, "ERCPs").

*Payment Card Interchange Fee and Merchant Discount Antitrust Litig*., No. 05-md-01270 (MKB) (E.D.N.Y. June 25, 2024), ECF Nos. 9333 and 9342 at 76; 2024 WL 3236614, at *35 (E.D.N.Y. Jun. 28, 2024) ("Op.").

4.     This Declaration discusses the following documents attached as exhibits to the Declaration of Linda P. Nussbaum:

Exhibit A:     Superseding and Amended Class Settlement Agreement of the Rule 23(b)(2) Class Plaintiffs and the Defendants, dated November 10, 2025 (the "Amended Settlement").

Exhibit B:     Declaration of Cameron Azari, Sr. Vice President of Epiq Class Action & Claims Solutions, Inc. on Proposed Class Notice Plan, dated November 9, 2025 ("Azari Decl.").

Exhibit C:     Declaration of Liz Lambert, Sr. Managing Director – National Settlement Team of Huntington National Bank in Support of Equitable Relief Plaintiffs' Motion for Appointment of Escrow Agent, dated November 10, 2025 ("Lambert Decl.").

Exhibit D:     Declaration of Joseph E. Stiglitz, Ph.D. and Keith B. Leffler, Ph.D. dated November 9, 2025 ("Stiglitz Decl.").

Exhibit E:     Declaration of Hon. James Orenstein (Ret.) dated November 7, 2025.

5.     This Declaration summarizes the factual and procedural history of this litigation, starting with the initial complaints filed in 2005 and the appointment of ERCC and continuing through the events leading up to this Settlement.  ERCPs and ERCC have: (a) been fully engaged in this litigation; (b) gained a full understanding and appreciation of all the risks to the Equitable Relief Class if the case were to proceed to trial; (c) gained a full understanding of how Defendants' conduct caused injury to the Equitable Relief Class; and (d) conducted settlement negotiations at arm's length and in the best interests of the Equitable Relief Class.

6.     The Amended Settlement is the culmination of twenty years of litigation and vigorous opposition by the Defendants, including the two dominant payment card networks in the

United States and *all of the largest banks* in the United States, and their counsel – some of the most formidable defense firms in the country.

7.      Under the leadership of ERCC, the Amended Settlement achieves significant rule reforms; the removal of barriers to competition in the merchant acceptance side of the payment card industry; and interchange rate caps and rollbacks for a sufficient period of time to permit the rules relief to bring about competitive pressure and force down interchange rates substantially toward the competitive level.

8.      The relief provided for the Equitable Relief Class in the Amended Settlement is substantial and brings about impactful changes to Visa's and Mastercard's rules. Among other things, the Amended Settlement provides for important changes to Visa's and Mastercard's network rules that will, for the first time, give merchants the ability to not accept high-cost and high-rewards Premium consumer credit and Commercial credit cards while accepting low-cost credit cards that both merchants and cardholders will find efficient, convenient, and cost effective.

9.      In addition, the Amended Settlement will increase merchants' ability to differentially surcharge credit cards either by product or brand up to the merchant's cost of acceptance with no level playing field requirements; permit merchants to offer issuer-level discounts on credit card purchases to steer to particular bank issuers; ensure the continuation of merchants' ability to steer customers to lower-cost payment cards by means achieved in previous Department of Justice litigation, but which injunctive relief expired; permit merchants to test out various acceptance and steering methods in pilot programs before full adoption in all their outlets; and incentivize merchants to form buying groups for the negotiation of interchange fees with the issuers and networks.

10.     The Amended Settlement provides for interchange rate caps and rollbacks valued

3

in the many billions of dollars for a period of years sufficient for all merchants of every type and size to test out and adopt the new steering options of their choice and bring competitive forces to bear on interchange rates. The Amended Settlement enforces the rules and competitive changes through an important, effective anti-circumvention provision. Finally, the Amended Settlement creates a fulsome merchant education program run by an independent third party that will help merchants take full advantage of the changes to the networks' rules.

11.     This total relief package in the Amended Settlement will bring competition to the market for the merchant acceptance of credit cards, which in turn will exert competitive downward pressure on merchant interchange rates, for the first time since the first Diners Club Card was introduced in 1950[2] or the first general purpose BankAmericard (now Visa) was introduced in 1958.[3]  *See, e.g.*, Stiglitz Decl. at ¶ 8 ("The Amended Settlement is a frontal assault on the Merchant Restraints."); *id.* at ¶ 9 ("The Amended Settlement … eliminates nearly all restraints on merchant efforts to steer customers …"); *id.* at ¶14 ("relaxation of the Merchant Restraints … will significantly reduce transaction costs, is likely to significantly increase competition, and has the potential to drive the total price of Visa and Mastercard credit transactions towards a more competitive level"); *id.* at ¶ 59 ("[t]he Amended Settlement substantially reforms nearly every restraint that has bedeviled this market for decades,"); *id.* at ¶ 60 ("The Amended Settlement provides the first substantive changes to the honor-all-cards rules ... since the birth of Visa and

---

[2]  *See*
https://www.dinersclubus.com/home/about/dinersclub/story#:~:text=It%20all%20began%20with%20a,world's%20first%20multipurpose%20charge%20card.

[3]  *See*
https://americanhistory.si.edu/collections/object/nmah_1444151#:~:text=Description:,d5fa%2D704b%2De053%2D15f76fa0b4fa.

Mastercard."); *id*. at ¶ 89 ("The new competitive card has the potential to disrupt the 'rewards' paradigm" and "[a]s rewards become merchant-centric and merchant-variable, cardholders' perceptions of their banks offering 'free' rewards … will be changed to a realization that . . . rewards have a cost"); *id*. at ¶ 102 ("The Merchant Restraints have substantially impaired competition in the credit card services market on the merchant side for decades. The reforms enacted by the Amended Settlement will help restore competitive conditions."); *id*. at ¶ 121 ("The goal is that cardholders make their payment means decisions facing prices that *more accurately* reflect the cost of the decision."); *id*. at ¶ 124 ("Competitive pressures unleashed on the merchant-side of the credit card services market should end the upward spiral of interchange fees."); *id*. at ¶ 125 ("Here, we are concerned with opening the doors to market competition.  The unfettering of steering opportunities available under the Amended Settlement, boosted by other provisions such as the reduction in the interchange on standard cards, provides that opportunity.  In addition, the Settlement guarantees significant rate relief to all merchants while the enhanced competitive opportunities begin to take hold in the market.").

12.    Plaintiffs' expert economist, Nobel laureate Joseph E. Stiglitz, estimates that the reforms are expected to save merchants hundreds of billions of dollars in interchange fees.[4]

13.    Plaintiffs' economic experts believe that the "Amended Settlement's sweeping changes to the Merchant Restraints should, by themselves, suffice to ensure an increase in competition, significantly lowering costs to merchants, even with the retention of the restraints on issuer-level acceptance and issuer-level surcharging."[5]

14.    ERCPs and ERCC have adequately represented the Equitable Relief Class through

---

[4]  Stiglitz Decl. at ¶ 111.

[5]  Stiglitz Decl. at ¶ 117.

this particularly challenging litigation and reform effort that was opposed by both Defendants and other third parties. Among other things, ERCC prepared complex and sophisticated pleadings, retained renowned experts, and successfully opposed repeated efforts by large Direct Action Plaintiff merchants ("DAPs") and others to defeat the mandatory Rule 23(b)(2) litigation class certified by Chief Judge Brodie.

15.     In addition to successfully litigating ERCPs' class certification motion, ERCC also successfully defended against a motion to dismiss, *Daubert* motions, and multiple summary judgment motions, prevailing at each step of this litigation in the face of formidable opposition from Defendants and their counsel. ERCC also coordinated with other plaintiff groups in an efficient manner with respect to shared discovery efforts and other pretrial matters.

16.     The Amended Settlement was negotiated at arm's length and with the assistance of the Honorable James Orenstein ("Judge Orenstein"), a retired United States Magistrate Judge, who has substantial experience with this litigation and now is a mediator at JAMS.

17.     The relief provided for the Equitable Relief Class is far beyond adequate, taking into account the costs, risks, obstacles, and delay of a trial and appeal, and especially considering a recent, adverse, binding Supreme Court decision addressing anti-steering rules in this industry.

18.     The proposed award of attorneys' fees and other costs of administration of the Amended Settlement will be paid by Defendants, subject to Court approval, under the terms of the Amended Settlement.

19.     Finally, the Amended Settlement treats all members of the Equitable Relief Class equitably relative to each other.

20.     This Declaration describes the effort, dedication, and expense put forth by ERCC and ERCPs to bring this challenging and highly complex case for equitable relief to a successful

conclusion in the Amended Settlement.

21.     Under all the circumstances discussed below, the Amended Settlement is well within the range of reasonableness required in the Second Circuit to warrant notice to the Equitable Relief Class and preliminary approval by the Court, because the Court is likely to grant final approval as required by Rule 23(e).

22.     Unless otherwise defined, all capitalized terms have the meanings prescribed to them in the Amended Settlement.

## II.     THE DEFENDANTS AND THE STRUCTURE OF THE CREDIT CARD INDUSTRY

23.     The Visa and Mastercard networks facilitate credit and debit card transactions by operating a payment system comprising: (i) cardholders; (ii) banks that issue cards to cardholders (the "issuing banks"); (iii) the merchants' banks (the "acquiring banks"); and (iv) the merchants.[6] Neither Visa nor Mastercard issues payment cards.[7]  Instead, each of Visa and Mastercard connects the issuing banks with the acquiring banks.  The networks require the issuing and acquiring banks to be members of the network.[8]  They require the member banks to, in turn, require merchants to abide by the merchant restraints and to process the transfer of funds between issuers and acquirers.[9]   The following illustration depicts a typical transaction:[10]

---

[6]  ECF No. 8474-4 Ex. 4 (VISA00109997, at VISA00110001 "Visa Inc. Overview"); ECF 8474-5 Ex. 5 (MCW_MDL_01411992, at slide 2 "The Mastercard Worldwide network).

[7]  *Id.*

[8]  ECF No. 8474-4 Ex. 4 (VISA00109997, at VISA00110000).

[9]  *See* ECF No. 8474-4 Ex. 4 (VISA00109997, at VISA00110000).

[10]  ECF No. 8474-6 Ex. 6 (Alan Frankel and Allan Shampine, "The Economic Effects of Interchange Fees," 73 ANTITRUST LAW JOURNAL No. 3, 2006, p. 630).



24.     In a typical payment transaction, when a cardholder presents a Visa or Mastercard card for payment, the merchant contacts its acquiring bank electronically to request authorization for the purchase.[11]  That request, including the transaction amount and identity of the cardholder, is then sent to either Visa or Mastercard, which in turn relays it to the cardholder's issuing bank for approval.[12]  The issuing bank either approves or rejects the request based on the cardholder's available credit limit or bank account balance.  That decision is then transmitted electronically to the merchant.  If approved, the transaction is completed.

25.     Once the transaction is authorized, the issuing bank sends payment on behalf of its cardholder, less its interchange fee, to the acquirer through the Visa or Mastercard network.  The acquirer in turn credits the merchant, less the "Merchant Discount Fee," which is comprised of the interchange fee and any additional amount determined by the acquirer.  The network sets the

---

[11]     *See* ECF No. 8474-7 Ex. 7 (VUSAMDL1-06308785, at VUSAMDL1-06308789 "Interchange Overview").

[12]     *See* ECF No. 8474-4 Ex. 4 (VISA00109997, at 10001); ECF 8474-8 Ex. 8 (Van Ryn Ex. 2, § 5.7 & 5.8, "Mastercard Rules 2016").

"default" interchange fee that applies in the absence of a different rate negotiated by either (i) the merchant with either the network or the issuing bank or (ii) the acquiring bank and the issuing bank. The default interchange rates vary across different merchant industry categories. Typically, issuing and acquiring banks pay fees to Visa and Mastercard for transactions that are processed over the networks.[13] The issuing banks also often provide "rewards" to their premium cardholders.

## III.  HISTORY OF THE LITIGATION

26.     This sprawling, 20-year long multi-district litigation ("MDL") currently has almost 10,000 entries on the docket; many dozens of formidable litigants including the largest banks in the United States; over 70 published decisions; and approximately 12 million U.S. merchants in its certified class. The MDL was first assigned to the Honorable Judge John Gleeson from October 20, 2005 to December 17, 2014; then reassigned to the Honorable Judge Margo K. Brodie on December 17, 2014[14] to September 5, 2025; and then reassigned to Your Honor on September 5, 2025.[15]

### A.    THE INITIAL COMPLAINTS

27.     This litigation began in June 2005, when various merchants filed cases, including class actions, against Visa, Mastercard, and certain banks (collectively defined above as "Defendants"). Those cases were consolidated into MDL 1720. The merchant plaintiffs alleged that Defendants violated the antitrust laws by imposing supracompetitive interchange fees for acceptance of Visa and Mastercard branded payment cards. Judge Gleeson appointed interim co-

---

[13]  ECF No. 8474-1 Ex. 1 (Dennis Carlton Liability Report, ¶ 24).

[14]  ECF Nos. 6357, 6359.

[15]  ECF No. 9666.

lead counsel to represent the class plaintiffs.[16]

28.    Since October 20, 2005, merchants in this MDL have alleged that they are forced to pay artificially inflated merchant interchange fees to accept Visa and Mastercard payment cards. Defendants are alleged to have undertaken a uniform course of unlawful conduct by requiring merchants to comply with anticompetitive restraints, which are incorporated (along with other network operating rules) into the contracts between banks and their merchant customers.

29.    In April 2006, a single consolidated amended class complaint was filed on behalf of two classes: one seeking monetary damages under Rule 23(b)(3) and the other seeking equitable relief under Rule 23(b)(2).[17]  The same counsel represented both classes.

30.    The merchants alleged that these restraints facilitated Defendants' imposition and collection of supracompetitive prices on Visa and Mastercard transactions in violation of the antitrust laws.[18]

31.    The first stage of this litigation (the "First Stage Litigation") settled in 2012 (the "2012 Settlement Agreement").  Judge Gleeson approved the 2012 Settlement Agreement, which divided merchants into two classes: a Rule 23(b)(3) class, consisting of merchants that accepted Visa and Mastercard from January 1, 2004 to November 27, 2012; and a Rule 23(b)(2) class consisting of merchants that accepted Visa and Mastercard as of November 27, 2012 and into the

---

[16]  *See* ECF No. 279.

[17]  *See* ECF No. 317.

[18]  *See* ECF No. 6125; ECF No. 317 (First Consolidated Amended Class Action Complaint); *Photos Etc. Corp. v. Visa U.S.A. Inc.*, No. 3:05-cv-1007 (D. Conn. June 22, 2005), ECF No. 1, at ¶ 55 (initial complaint seeking certification of nationwide merchant class for purposes of both damages and equitable relief).

future.[19]

32.    Under the 2012 Settlement Agreement, the Rule 23(b)(3) class received monetary relief, while the Rule 23(b)(2) class received injunctive relief in the form of changes to various Visa and Mastercard rules.[20]  Judge Gleeson certified the Rule 23(b)(2) injunctive relief merchants as a mandatory settlement class (*i.e.*, no opt-out rights).[21]  Some large merchants, as well as several merchant associations, opted out of the Rule 23(b)(3) settlement class and objected to the Rule 23(b)(2) settlement class as improperly certified.[22]

33.    DAPs are merchants, including 7-Eleven, Home Depot, Target, and Amazon, that opted out and opposed the 2012 Settlement Agreement before filing individual actions in the MDL beginning in June 2013.[23] .  During most of the first three years of their participation in the MDL, initially as objectors to the 2012 Settlement Agreement, DAPs' cases were essentially stayed, due to the pending appeal of Judge Gleeson's approval of the 2012 Settlement Agreement.

34.    In 2016, the Second Circuit reversed the district court's approval of the 2012 Agreement and remanded, holding, *inter alia*, that the damages and equitable relief classes required separate counsel.  On June 30, 2016, the Second Circuit vacated Judge Gleeson's approval of the 2012 Settlement Agreement, noting, *inter alia,* that there was an inherent conflict of interest

---

[19]  *See* ECF No. 1745 ¶¶ 5-6; ECF No. 6125 at 6 n.3; *In re Payment Card*, 2012 WL 12929536, at *1–2 (E.D.N.Y. Nov. 27, 2012); *In re Payment Card*, 986 F. Supp. 2d at 213 n.3.  Both classes were represented by a single set of counsel.

[20]  *See* ECF No. 1745; *In re Payment Card*, 2012 WL 12929536, at *1.

[21]  *See* ECF No. 1745 ¶ 6; ECF No. 6125 at 52 n.20; *In re Payment Card*, 986 F. Supp. 2d at 239 n.20.

[22]  *See* ECF No. 6125 at 36–52; *In re Payment Card,* 986 F. Supp. 2d at 230–39.

[23]  *See, e.g.*, ECF No. 2442 (7-Eleven objection); ECF No. 2605 (Amazon objection); *The Home Depot, Inc. v. Visa Inc.*, No. 1:16-cv-05507 (E.D.N.Y.) (filed June 13, 2016); *7-Eleven, Inc. v. Visa Inc.*, No. 1:13-cv-4442 (S.D.N.Y.) (filed June 26, 2013) (7-Eleven and Amazon).

in the appointment of a single set of counsel to represent two classes of plaintiffs separately seeking monetary and injunctive relief.[24] The Court further concluded that the substantive injunctive relief in that agreement was "so unreasonable that it evidences inadequate representation."[25]

35. The Second Circuit noted that the settlement did not include any Honor-All-Cards ("HAC") relief, and its "level-playing-field" rule (which the Court called a "most-favored nation clause") prevented merchants that accepted American Express cards from surcharging (in any amount) Visa or Mastercard credit cards.[26] Moreover, statutes in certain states prevented merchants from surcharging there.[27]

36. The Second Circuit found that the combination of the absence of HAC relief, the level-playing-field provision, and the state no-surcharge statutes made the settlement's surcharge-related relief "virtually worthless to vast numbers of class members."[28] That combination also resulted in "unequal intra-class treatment" between those merchants that did, and those that did not, accept American Express cards or those that operated in no-surcharge states.[29]

### B. THE NEW RULE 23(B)(2) ACTION AND THE COURT'S APPOINTMENT OF EXPERIENCED EQUITABLE CLASS COUNSEL

37. Following remand from the Second Circuit, Chief Judge Brodie invited the parties to submit proposals for representation of the proposed classes going forward.[30] Multiple groups

---

[24] *In re Payment Card*, 827 F.3d 223, 229, 234–35 (2d Cir. 2016).

[25] *Id.* at 236.

[26] *Id*. at 238.

[27] *Id*.

[28] *Id*.

[29] *Id*.

[30] ECF No. 6654 (Aug. 11, 2016 Minute Entry).

of attorneys moved for appointment as lead counsel for either the Rule 23(b)(2) or Rule 23(b)(3) putative classes.

38.    DAPs objected to the formation of a mandatory Rule 23(b)(2) class, and by extension, to any representation of their interests by counsel for the Rule 23(b)(2) class.[31]  Former Magistrate Judge Orenstein rejected DAPs' arguments and, on November 30, 2016, appointed two sets of Interim Class Counsel—one for each putative class under Rules 23(b)(2) and 23(b)(3).[32]

39.    In appointing ERCC to represent the Rule 23(b)(2) class on an interim basis, Judge Orenstein concluded that ERCC were "in the best position to represent the interest of the Putative Injunctive Relief Class," in part, because certain of the firms had been "steeped in this litigation since its inception."[33]  Ms. Nussbaum and her co-counsel filed a complaint challenging the network rules and interchange fees under the antitrust laws of the United States on August 29, 2005 (No. 1:05-cv-04131), and Mr. Shadowen and his co-counsel filed a similar complaint on November 14, 2005 (No. 1:05-cv-05352).  Ms. Nussbaum and Mr. Shadowen successfully settled those cases, and, in doing so, gained valuable knowledge of the background and facts of this complex litigation, which Judge Orenstein credited in his appointment.[34]

40.    Judge Orenstein further found that the four ERCC firms had "demonstrated their ability to work cooperatively with each other, with the court, and with numerous non-lead counsel

---

[31]  *See, e.g.*, ECF No. 6662 (Target submission); ECF No. 6663 (Home Depot submission); ECF No. 6668 (7-Eleven submission); ECF No. 6686 (Target submission); ECF No. 6687 (Home Depot submission); ECF No. 6694 (7-Eleven submission).

[32]  *See* ECF No. 6754 at 4–5.

[33]  *See* ECF No. 6754 at 6; *In re Payment Card*, 2016 WL 8138988, at *3 (E.D.N.Y. Nov. 30, 2016).

[34]  *See* ECF No. 6754 at 6; *In re Payment Card*, 2016 WL 8138988, at *3.

representing plaintiffs with very significant interest in this litigation."[35]    Moreover, Judge Orenstein concluded that "the participation in the leadership team of a firm that had extensive experience in the litigation but has no client relationship with any current member of the putative class heightens the likelihood that holders of future claims will have an effective voice in debates about how best to represent the putative class."[36]

41.    Four months after the interim appointment of ERCC, DAPs moved to amend Judge Orenstein's Order, requesting a declaration that ERCC do not represent DAPs and are not authorized to act, discuss, or negotiate a settlement with Defendants on behalf of DAPs.[37]    Judge Orenstein denied DAPs' motion and DAPs appealed to the District Court.[38]    Chief Judge Brodie rejected those arguments and affirmed Judge Orenstein's interim appointment of ERCC, finding that DAPs' motion was effectively an untimely request for reconsideration because DAPs had previously opposed the appointment of *any* counsel to represent a Rule 23(b)(2) class, which "would have rendered the same result that DAPs now seek."[39]

42.    By October 13, 2017, DAPs' attempts to oppose certification of a Rule 23(b)(2) class had been rejected three times.

43.    On September 21, 2021, after additional analysis, Chief Judge Brodie officially appointed the undersigned and their firms as ERCC and certified the Equitable Relief Class over

---

[35]   *See* ECF No. 6754 at 6; *In re Payment Card*, 2016 WL 8138988, at *3.

[36]   *Id.*

[37]    *See* ECF No. 6897 (DAPs motion); ECF No. 6908 (ERCC opposition); ECF No. 6909 (Walmart joining DAPs' motion); ECF No. 6911 (Visa opposition).

[38]   *See* ECF No. 7068 (status conference transcript); *see also* ECF No. 6929; ECF No. 6947; ECF No. 6957; ECF No. 6958 (Visa opposition); ECF No. 7076.

[39]   *Id.* at 9–10.

similar objections.  Judge Brodie found that since their appointment, ERCC had "filed the operative Rule 23(b)(2) class Complaint, successfully defended against Bank Defendants' motions to dismiss, conducted extensive discovery, briefed opposition to Intervenors' motions to intervene, pursued the instant motion for class certification, and briefed summary judgment and *Daubert* motions in addition to defending against Defendants' summary judgment and *Daubert* motions."[40]

### C. ERCPS' EQUITABLE RELIEF CLASS ACTION COMPLAINT AND SUCCESSFUL OPPOSITION TO BANK DEFENDANTS' MOTION TO DISMISS

44.    On February 8, 2017, ERCPs tendered a Proposed Equitable Relief Class Action Complaint (the "Complaint"), which was later filed under seal on March 31, 2017.[41]  The Complaint challenged Defendants' collusive practices that harm competition and impose upon merchants supracompetitive, exorbitant, and collectively-fixed prices in violation of Sections 1 and 2 of the Sherman Act and the California Cartwright Act.[42]  ERCPs brought their claims under Section 16 of the Clayton Act, seeking equitable relief to prevent and restrain violations of the Sherman Act and the California Cartwright Act.[43]  Network Defendants answered the Complaint on November 15, 2018; Bank Defendants served a motion to dismiss on January 16, 2019.[44]

45.    On April 18, 2019, Bank Defendants filed their motions to dismiss the Complaint for failure to state a claim and lack of jurisdiction, which ERCPs opposed.[45]

---

[40]  ECF No. 8647 at 90–91; *DDMB, Inc. v. Visa, Inc.*, 2021 WL 6221326, at *38 (E.D.N.Y. Sep. 27, 2021).

[41]  *See* ECF No. 6858 and 6892.

[42]  *See* ECF No. 6858.

[43]  *See id.*

[44]  ECF Nos. 7293, 7296, and 7356.

[45]  *See* ECF No. 7399; ECF No. 7402; ECF No. 7403; ECF No. 7408; ECF No. 7414.

46.     On November 20, 2019, the Court denied Bank Defendants' motion to dismiss.[46]

47.     In denying Bank Defendants' motion to dismiss, Chief Judge Brodie held that ERCPs "pled sufficient facts to suggest that it is likely, and not merely speculative, that relief from the Court against Bank Defendants could partially redress [ERCPs'] alleged injury" and "if [ERCPs] were to succeed on the merits in this action, Bank Defendants could be found liable and subject to injunctive relief requiring them to stop adhering to particular restraints."[47]  Chief Judge Brodie further held that "relief to [ERCPs] could theoretically take many forms, including placing obligations upon or otherwise enjoining the actions of Bank Defendants, and still be substantially likely to partially redress [ERCPs'] alleged injury, which stems from paying supra-competitive fees that Bank Defendants count as revenue."[48]

### D.     ERCPs' EFFORTS TO BUILD AND UPDATE THE DISCOVERY RECORD

48.     ERCC were appointed 12 years into the MDL, after significant discovery had already occurred.[49]  Upon their appointment, Class Counsel reviewed and analyzed the existing, massive discovery record, worked cooperatively with counsel for the Rule 23(b)(3) Class and DAPs in connection with ongoing discovery, and engaged in separate discovery specific to the equitable relief claims, including depositions, interrogatories/responses, document requests/production, extensive document and data review and complex expert discovery.

49.     Immediately after being appointed as interim counsel for the proposed Rule 23(b)(2) class, ERCC also began working on behalf of ERCPs to supplement the factual record

---

[46]  *See* ECF No. 7790; *Barry's Cut Rate Stores Inc. v. Visa, Inc.*, 2019 WL 7584728, at *34 (E.D.N.Y. Nov. 20, 2019).

[47]  ECF No. 7790 at 32; *Barry's Cut Rate Stores Inc.*, 2019 WL 7584728, at *16.

[48]  ECF No. 7790 at 32; *Barry's Cut Rate Stores Inc.*, 2019 WL 7584728, at *16.

[49]  *See* ECF No. 6754 at 4-5.

amassed in the First Stage Litigation, which had a fact-discovery-cutoff date in 2010. The discovery record from the First Stage Litigation was outdated and required updating for trial.

### 1. Discovery From Defendants and Third Parties

50. In the period between the Second Circuit's decision in July 2016 and the appointment of ERCC in November 2016, Defendants and DAPs had negotiated various agreements and schedules to govern the next phase of discovery. During this same period, over one million pages of documents (not including native files) were produced in the MDL, and counsel for DAPs, along with counsel for the Rule 23(b)(3) class who had been involved in the MDL since inception, were preparing to begin deposition discovery.

51. On November 30, 2016—the day they were appointed by Chief Judge Brodie—ERCC joined the discovery in progress—immediately coordinating scheduling and coverage of relevant depositions and gaining access to document depositories. ERCC then prepared for and attended depositions within weeks of their appointment.

52. In addition to cooperating and participating in these joint and unified discovery efforts with the other plaintiff groups, which Defendants requested, such as the negotiation of search terms, ERCC served Defendants with ERCPs' additional requests for production of documents tailored to ERCPs' equitable-relief claims.

53. ERCC approached discovery strategically and with an eye toward efficiency. Their work focused on mining the prior discovery record from the First Stage Litigation, which included 60 million pages of documents and over 400 deposition transcripts, for issues relevant to ERCPs' equitable-relief claims. Going forward, ERCC participated in the depositions strategically, focusing on those witnesses that were likely to possess important information to prove the equitable relief class claims. ERCC examined witnesses in over 50 depositions, attended and monitored many more, and took key roles in the depositions concerning the relevant merchant

17

restraints.  ERCC organized, coordinated, and completed their independent document review and analysis of the millions of pages of documents produced by Defendants to prepare for the relevant defendant and third-party fact depositions that were taken between December 1, 2016 and June 15, 2018.

54.     In addition, ERCC strategically organized their document discovery efforts to update and supplement the discovery record with respect to specific issues or network rules, and to prepare for several rule-focused depositions.  ERCC had independent economic experts Dennis W. Carlton of Lexecon and Joseph E. Stiglitz focused on the ERCP discovery efforts and the information they needed for their expert analysis.

55.     Furthermore, during the discovery phase, ERCC ensured that all key facts supporting ERCPs' claims were updated and developed.  For example, when it became apparent that important information regarding the 2012 Settlement Agreement's surcharging-related terms was not in the record, ERCC established critical facts about the interplay of those terms with other Visa, Mastercard, and American Express rules at depositions of Visa executives.  Those facts confirmed that while the 2012 Settlement Agreement *appeared* to allow merchants to surcharge, the confluence of Visa's and Mastercard's level-playing-field rules, remaining Visa and Mastercard surcharging-related restraints, and American Express's restraints in fact put more than ██% of credit card transaction dollar volume beyond the ability of merchants to surcharge.  At one deposition, an ERCC attorney requested and obtained a list of all waivers of surcharging rules that Visa granted to any merchant from 2009 to 2017, which information was then used in subsequent depositions.

56.     In sum, ERCC's participation in discovery was carefully considered, efficient, and focused on what was needed to prosecute this case on behalf of the Class.

## 2.    Discovery From ERCPs

57.    On June 15, 2017, Defendants served their first set of document requests on ERCPs.

58.    ERCPs served formal responses and objections to 87 individual document requests from Defendants and collected responsive documents.  ERCC also engaged in extensive discussions with defense counsel on behalf of ERCPs and oversaw substantial productions of documents responsive to Defendants' requests.  For example, CMP collected and produced over 1.3 million pages of documents by March 7, 2018.  Other ERCPs similarly collected and produced significant volumes of documents, including supplemental productions on November 9, 2023.

59.    ERCC worked with ERCPs to prepare responses and objections to 59 interrogatories and subparts served by Defendants on June 15, 2017 and responses and objections to numerous contention interrogatories served by Bank Defendants on February 7, 2020.

60.    In January 2018, Defendants served Rule 30(b)(6) deposition notices on each of the ERCPs.  ERCC objected to and negotiated the scope of the topics for those depositions on behalf of ERCPs.

61.    In January 2018, DAPs also served notices for individual third-party depositions of one witness from each ERCP, for a total of two seven-hour depositions.  This led to a dispute among ERCPs, Defendants, and DAPs, and Defendants filed a motion to compel on February 15, 2018.[50]  Following negotiations with DAPs, ERCPs agreed to be deposed for a total of eight hours on a single day, allowing one hour of additional questioning by DAPs.[51]  Defendants withdrew their motion to compel on February 22, 2018.[52]

---

[50]  *See* ECF No. 7149.

[51]  *See* ECF No. 7151.

[52]  *See* ECF No. 7153.

62.     ERCC then prepared ERCPs' designated Rule 30(b)(6) witnesses and defended the depositions of Hal Goldman for Generic Depot on April 4, 2018; Carlos Perez for RunCentral on April 10, 2018 and CMP on April 12, 2018; Heather Boyd Smith for PureOne on April 30, 2018; and Arthus Boss, Jr. for Boss Dental on April 20, 2018.

### 3.     Expert Discovery

63.     ERCPs served expert reports from two renowned economists:  Professor Dennis W. Carlton ("Prof. Carlton"), the David McDaniel Keller Professor of Economics at the University of Chicago Booth School of Business and Senior Managing Director of Compass Lexecon; and Dr. Joseph E. Stiglitz ("Dr. Stiglitz"), Professor at Columbia University in the Departments of Economics, Finance and School of International and Public Affairs, recipient of the 2001 Nobel Prize in Economics; and former Chairman of the Council of Economic Advisers to President Clinton, amongst his many honors and prestigious positions in economics over the past 58 years.

64.     In his expert report, Dr. Stiglitz explained the role payment mechanisms play in the U.S. economy in reducing transaction costs.  He analyzed the relevant economic market and the extent to which Visa and Mastercard exert market power.  He focused on the significance of Visa and Mastercard in setting merchant prices for all banks that issue credit cards that are horizontal competitors in other aspects, and the role of network anti-steering rules or merchant restraints in protecting those prices from competition.  Finally, he analyzed how various merchant restraints impact economic efficiency and consumer welfare.[53]

65.     Dr. Stiglitz concluded, *inter alia*, that various alternative payments, such as credit cards, are central to the efficient functioning of a modern economy.  He observed that electronic

---

[53] *See* ECF No. 8474-2 at 3.

funds transfers (EFTs) are an established and low-cost means of payment, with costs that continue to fall as technology advances.  An efficient modern system of EFTs in the U.S. can connect every bank with every large merchant.  Visa and Mastercard can perform additional functions for merchants and customers, and those who value such services should be willing to pay for them. "This would incentivize cardholders to use the most cost-efficient system for their transactions, one in which added features are provided at the least cost and only if the costs exceed the benefits," thus promoting overall efficiency.[54]  Dr. Stiglitz's other conclusions included the following:

- Sufficient competition among EFT networks would result in combined prices to merchants and consumers that would be expected to approach the average costs of providing the services.

- The observed pattern of prices to cardholders and merchants is distinctively different from that expected in a standard two-sided market.  There is no overall balancing of prices on the two sides.

- The networks' anti-steering rules support and maintain supracompetitive total prices by prohibiting merchants from steering customers to low-cost electronic means of payment and result in a number of inefficiencies, including total prices and merchant prices above the competitive level, creating significant barriers to entry, impeding the introduction and growth of more efficient payments systems, preventing merchants from sharing cost savings with customers from the selection of low-cost payment means, preventing cardholders from having any incentive to choose an efficient low-cost payment means, and increasing the resource costs on accomplishing transactions relative to the benefits received, thereby reducing consumer welfare.

- The restraints result in higher prices of goods and services to all consumers who are forced to subsidize the high-cost cardholders, lower merchant acceptance, reduced output of credit card transactions, and reduced overall transactions for goods and services.

- Visa and Mastercard had sufficient market power to impose the anti-steering rules since the inception of the networks.

---

[54] *Id*. at 4.

21

Dr. Stiglitz recommended the elimination of the restraints to the extent possible.[55]

66.    Prof. Carlton evaluated Visa's and Mastercard's restrictions on the ability of merchants to provide accurate price signals to their own customers.  Prof. Carlton concluded that such restrictions harm competition, result in supracompetitive prices to merchants and an increase in the "net price," and reduce output.  Like Dr. Stiglitz, Prof. Carlton recommended eliminating the restrictions to the extent possible.[56]

67.    Prof. Carlton and Dr. Stiglitz both submitted reply expert reports in October 2019 responding to the arguments of Defendants' and DAPs' experts.  Each of those reports required substantial effort by ERCC in working with the experts and analyzing a massive discovery record. ERCC defended Prof. Carlton and Dr. Stiglitz when they were deposed in December 2019 and February 2020, respectively.

68.    ERCPs also retained Dr. Keith B. Leffler ("Dr. Leffler"), Emeritus Associate Professor of Economics at the University of Washington, to opine on issues related to certification of a mandatory Rule 23(b)(2) class.  Dr. Leffler prepared a report supporting class certification and relief for ERCPs' proposed Rule 23(b)(2) class.  Dr. Leffler analyzed the competitive impact of the Visa and Mastercard restraints, offered an opinion as to whether that analysis was based on class-wide evidence, and evaluated the economic impacts of allowing merchants to opt out of the class.  Dr. Leffler concluded that economic analysis of the competitive effects of the restraints was based on evidence common to the proposed class.[57]  He also concluded that allowing merchants to opt out of the proposed Rule 23(b)(2) class would create perverse incentives for merchants and

---

[55] *See* ECF No. 8474-2 at 3–9.

[56] *See* ECF No. 8474-1 at 5–7.

[57] *See* ECF No. 8474-3 at 2.

Visa/Mastercard, to the detriment of the Rule 23(b)(2) class as a whole.[58]  ERCC also defended

Dr. Leffler when he was deposed in February 2021.

69.     Drs. Stiglitz and Leffler submitted additional declarations in support of the prior

agreement[59] and a combined declaration in support of the Amended Settlement.

### 4.     Supplemental Discovery from Defendants

70.     On November 12, 2021, ERCPs served requests for supplemental discovery from

Defendants.  ERCPs' experts required updated data and documents on the network restraints and

associated rules, including their impact, to continue analyzing the payment industry and prepare

for trial on behalf of the Equitable Relief Class.  Defendants also requested supplemental discovery

from ERCPs.  Over the next two years, ERCPs, Defendants, and DAPs negotiated the scope of

supplemental productions and produced responsive documents.

71.     The Defendants produced more than 575,000 documents in response to ERCPs'

requests for supplementation, which ERCC reviewed and analyzed.

### E.     THE COURT'S CERTIFICATION OF A RULE 23(b)(2) CLASS

72.     On December 18, 2020, the Class plaintiffs moved for certification of a Rule

23(b)(2) class.[60]  Among other things, ERCPs argued that their equitable-relief claims were ideally

suited for class certification because Defendants' conduct was market-wide, rather than specific to

individual merchants, and was substantially identical as to the millions of merchants in the

proposed class.  ERCPs argued that to the extent Defendants are required to reform their conduct

---

[58]  *See id*.

[59]  ECF Nos. 9179-5, 9179-6, 9289 Exhibit U, 9295 Exhibit U (under seal), 9297 Exhibit U
(redacted version).

[60]  ECF Nos. 8444, 8446 (redacted), 8447 (under seal).

because of a judgment or settlement, those reforms will also be market-wide and substantially identical, as a practical and legal matter, as to all merchants.[61]

73.    In support of their motion, ERCPs asserted that beginning no later than 2004 and continuing to the present, the evidence shows that Defendants undertook a uniform course of unlawful conduct that requires merchants accepting their payment cards to comply with various "restraints" (*e.g.*, Visa's and Mastercard's level-playing-field and honor-all-cards rules) intended to facilitate Defendants' imposition and collection of supracompetitive "total prices" on Visa and Mastercard transactions. Visa's and Mastercard's member banks originally owned the networks, and the subsequent IPOs of both Visa and Mastercard were structured to effectively maintain that status quo.[62]

74.    The liability expert reports of Prof. Carlton and Dr. Stiglitz attached to ERCPs' class-certification motion, along with the class-certification report of Dr. Leffler, further detailed how the restraints prevent merchants from, among other things, (1) setting prices that reflect the costs of their payment card acceptance, or (2) steering customers to lower-cost forms of payment.[63]

75.    The ability of Defendants to maintain the market power necessary to profitably raise and maintain total prices above competitive levels, and successfully enforce the restraints, is critical to maintaining the conspiracy. ERCPs and their experts described the evidence showing that market power was reflected in Defendants' ability to (1) profitably maintain total prices far above the competitive level, (2) impose inefficient price pairs (the "balance" between the price paid by the merchant and that paid by the cardholder), (3) reduce output below what it would be

---

[61]  *See* ECF No. 8447 at 1, 5.

[62]  *See* ECF No. 8447 at 1–2.

[63]  *See* ECF No. 8447 at 2–3.

under competitive conditions, (4) create and enhance barriers to entry, and (5) force inefficient cross-subsidization among other shoppers who do and do not use Defendants' payment cards.[64]

76.    The key to a mandatory Rule 23(b)(2) class is the indivisible nature of the injunctive and declaratory remedy and the notion that the conduct is such that it can be enjoined or declared unlawful only as to all class members or none of them.  For that reason, ERCPs requested certification of a Rule 23(b)(2) class with no opt-out rights.[65]

77.    Defendants did not oppose certification of a mandatory Rule 23(b)(2) class. Defendants agreed that the class should include all types of merchants that accept Visa and Mastercard credit or debit cards, including branded operators and franchisees and those that opted out of the Rule 23(b)(3) class.[66]

78.    Various DAPs and trade groups opposed certification of a mandatory, non-opt-out class or sought leave to intervene for the purpose of doing so.[67]

79.    On April 30, 2021, May 4, 2021, and August 27, 2021, ERCPs served several response briefs addressing all of the issues raised by those opposing the certification of a mandatory Rule 23(b)(2) class.[68]  Among other things, ERCPs noted that DAPs should not be free to monetize for themselves the value of other merchants' injunctive relief claims under Rule 23.[69] Only a non-opt-out class could optimize the merchants' collective interest in reforming the rules.

---

[64]  *See* ECF No. 8447 at 3–4.

[65]  *See* ECF No. 8447 at 5–6.

[66]  *See* ECF No. 8460 at 1-2.

[67]  *See, e.g.*, ECF Nos. 8411-8413, ECF No. 8454 at 1–2, ECF No. 8467, ECF No. 8468-1, ECF No. 8479, ECF No. 8623, ECF No. 8464.

[68]  ECF Nos. 8457, 8470, 8631.

[69]  *See* ECF No. 8457 at 2–3, 15.

Otherwise, opt-out plaintiffs could monetize for themselves the value of the class-wide injunctive relief.[70]  Notably, there is no indication that any of the more than 21 opt-out cases that had previously settled with Defendants included any injunctive relief benefiting any other merchant.[71] The same is true of the additional 21 settlements that have occurred since class certification was granted.[72]

80.    Defendants served their response on May 4, 2021.[73]  Between May and August 2021, the DAPs and trade groups served additional papers opposing class certification.[74]  In total, ERCPs filed, analyzed, and/or responded to over 70 legal briefs and other filings relating to class certification.

81.    On September 27, 2021, the Court issued a Memorandum and Order certifying a Rule 23(b)(2) class consisting of "all persons, businesses and other entities that accept Visa and/or Mastercard credit and/or debit cards in the United States at any time during the period between December 18, 2020 and the date of entry of Final Judgment in this case" and declined to permit opt-outs.[75]

82.    The Court further approved certain ERCPs to proceed as class representatives for the Equitable Relief Class and appointed ERCC as co-lead counsel for the Equitable Relief Class. The Court appointed interim co-lead counsel as Class Counsel and Boss Dental Care, Runcentral,

---

[70]  ECF No. 8477 at 2, 15.

[71]  ECF Nos. 7203, 7646, 7750, 7857, 7884-88, 7917, 7921-23, 7965-67, 8001, 8004, 8006, 8421, 8478.

[72]  ECF Nos. 8673, 8676, 8685, 8698, 8705, 8733, 8740, 8754, 8764, 8767-71, 8808, 8813, 8903, 8985, 9034, 9071, 9145.

[73]  ECF No. 8460.

[74]  ECF Nos. 8449-8456, 8463-8468, 8469-8472, 8476, 8479-8481, 8616-8623.

[75]  *See* ECF No. 8647; *DDMB, Inc. v. Visa, Inc.*, 2021 WL 6221326 (E.D.N.Y. Sep. 27, 2021).

LLC, CMP Consulting Serv., Inc., Generic Depot 3, Inc. d/b/a Prescription Depot, and Pureone, LLC d/b/a Salon Pure as Class Representatives.[76]

83.     The 122-page opinion concluded that a non-opt-out class prevents free-riding by individual merchants, thereby ensuring fairness and increasing the value of the injunctive relief to all merchants.[77]  Moreover, the challenged restraints applied to all merchants and therefore the relief would be effectuated on a class-wide basis.[78]  Differences in how individual merchants are affected do not negate the facts that Defendants acted on grounds generally applicable to the class and each merchant in the class stands to benefit from equitable relief related to the restraints.[79]  No fundamental conflict exists between the class and the opponents, and the mandatory class would not threaten, compromise, jeopardize, or improperly confiscate individualized monetary claims or injunctive relief claims.[80]

## F.    ERCPs' SUCCESSFUL OPPOSITION TO DEFENDANTS' *DAUBERT* MOTIONS

84.     Defendants filed multiple *Daubert* motions seeking to exclude certain expert opinions and testimony submitted by Prof. Carlton and Dr. Stiglitz.[81]  Specifically, Defendants sought to exclude Prof. Carlton's opinion that "Visa and Mastercard's prices for network services are elevated as a result of the Network Restrictions" and related testimony.[82]  Separately,

---

[76]  2021 WL 6221326, at *50.

[77]  *Id.* at 46, 49.

[78]  *Id.* at 44.

[79]  *Id.* at 45; *see also id.* at 48 ("Due to the nature of the relief being sought, all merchants – regardless of whether they would choose to opt out of the class or not – would benefit from the equitable relief provided.").

[80]  *Id.* at 47.

[81]  *See* ECF No. 8074; ECF No. 8076 (Stiglitz); ECF No. 8086; ECF No. 8087 (Carlton).

[82]  ECF No. 8087 at 18.

Defendants moved to exclude Dr. Stiglitz's opinions on mature markets, supracompetitive pricing, and certain measures of output beyond the alleged credit card market.[83]

85.    ERCPs successfully opposed both motions.[84]    Of Prof. Carlton's numerous opinions and analyses, the Court excluded only his opinion that Mastercard's giving interchange reductions to merchants in exchange for not surcharging following the 2012 Settlement Agreement caused "overall merchant fees and net fees to decline."[85]    Similarly, the Court excluded only Prof. Stiglitz's opinion that a two-sided analysis of the credit card market is inappropriate, leaving the great bulk of his opinions and analyses intact.[86]

### G.    PARTIES' SUMMARY JUDGMENT MOTIONS

86.    In December 2020, ERCPs filed a motion for partial summary judgment against Defendants, and Defendants filed four motions for summary judgment and/or partial summary judgment against ERCPs.  Defendants' motions included: (i) Mastercard and Bank Defendants' Motion for Summary Judgment Based on Mastercard's Lack of Market Power; (ii) Defendants' Motion for Summary Judgment under *Ohio v. American Express* ("*Amex*"), 585 U.S. 529 (2018); (iii) Defendants' Motion for Summary Judgment on Plaintiffs' Post-IPO Conspiracy Claims; and (iv) Visa and Bank Defendants' Motion for Summary Judgment on Plaintiffs' Monopolization Claims.  The motions were the subject of extensive briefing.[87]

---

[83]  *See* ECF No. 8076 at 7–18.

[84]  *See* ECF No. 8727; ECF No. 8730; *In re Payment Card*, 2022 WL 15053250 (E.D.N.Y. Oct. 7, 2022); *In re Payment Card*, 2022 WL 15044626 (E.D.N.Y. Oct. 8, 2022).

[85]  ECF No. 8730 at 133; *In re Payment Card*, 2022 WL 15044626, at *28.

[86]  ECF No. 8727 at 130; *In re Payment Card*, 2022 WL 15053250, at *60.

[87]  *See, e.g.*, ECF Nos. 8067-8069; ECF No. 8071; ECF No. 8073; ECF No. 8088; ECF No. 8089; ECF No. 8091; ECF No. 8103; ECF No. 8106; ECF No. 8111; ECF No. 8150; ECF Nos. 8152-8157; ECF Nos. 8167-8172; ECF No. 8174; ECF No. 8175; ECF No. 8206; ECF No. 8208.

87.     On January 8, 2024, the Court denied Mastercard and Bank Defendants' motion for summary judgment as to Mastercard's lack of market power, holding that "Plaintiffs have adduced sufficient direct evidence of anticompetitive effect to defeat Defendants' summary judgment motion,"[88] and noting that "Plaintiffs' evidence suffices to raise a triable issue of fact as to whether they have met their prima facie burden through direct evidence of anticompetitive effect."[89]  The Court granted in part[90] and denied in part Defendants' motion for summary judgment under *Amex*, holding that "Plaintiffs have adduced sufficient direct evidence of anticompetitive effect to defeat Defendants' summary judgment motion."[91]

88.     On February 22, 2024, the Court denied Defendants' arguments with respect to the post-IPO conspiracy claims, finding triable questions of fact as to whether Defendants effectively withdrew from the pre-IPO conspiracies.[92]  Moreover, the challenged restraints "were readopted" and "remained in effect" and every member bank knew that every other member would be bound by those restraints—before and after the IPOs.[93]  Whether the restraints are unreasonable and whether any anticompetitive effects were outweighed by procompetitive effects, are material disputes to be decided by the factfinder.[94]  Separately, the Court granted Visa's motion for summary judgment as to ERCPs' monopolization claims, with respect to both credit cards and

---

[88]  ECF No. 9042 at 37.

[89]  *Id.* at 38.

[90]   The Court granted summary judgment in favor of Defendants only to the extent that ERCPs' claims were based on a one-sided market theory.  *See* ECF No. 9042 at 78.

[91]  ECF No. 9042 at 37.

[92]  *See* ECF No. 9140 at 42–43.

[93]  *Id.* at 51–56.

[94]  *See id.* at 56–57.

debit cards.[95]

89.     On March 11, 2024, the Court denied ERCP's motion for partial summary judgment, which had attempted to dismiss an alleged procompetitive justification that depended on an analysis of only one side of the two-sided market. The Court denied the motion, holding that it would be more appropriately brought later in the form of a motion *in limine*.[96]

### H.     ERCC'S EFFORTS TO MONITOR INDUSTRY DEVELOPMENTS, GOVERNMENT INVESTIGATIONS, AND LEGISLATIVE REFORMS RELATING TO PAYMENT CARDS

90.     ERCC researched, analyzed, and monitored industry developments, government investigations, and various legislative reforms relating to the payment card industry—not only in the U.S. but also in Australia, Canada, the European Union, and elsewhere—that might affect the equitable relief sought by ERCPs.  Such developments include, for example, the Credit Card Competition Act of 2023 and Congressional Hearings before the U.S. Senate Committee on the Judiciary held in May 2022.

91.     ERCC also researched, analyzed, and monitored developments in the payments industry and new alternative payments forms, including Buy Now Pay Later, eCommerce payment solutions, mobile payments, peer-to-peer digital payment applications, cryptocurrency, digital wallets, and mobile wallets.

92.     ERCC's work further included research, analysis, and monitoring of: (i) developments in the payment processing and fintech industries that can enable and facilitate merchant surcharging; (ii) developments in state "no-surcharge" statutes; and (iii) legislation and litigation in non-U.S. markets, including Canada, the European Union, Australia, Singapore, and

---

[95]  ECF No. 9200.

[96]  *See* ECF No. 9152, ECF No. 9200.

the United Kingdom.

## I.    COMMUNICATIONS WITH ERCPS AS CLASS REPRESENTATIVES

95.    ERCC maintain regular written and telephonic communication with ERCPs as appointed class representatives for the Equitable Relief Class.  Subject to the limitations of the Protective Order, ERCC consistently updated ERCPs on discovery progress, orders of the Court, and the progress of mediation sessions and status of settlement negotiations with the Network Defendants.  All of the ERCPs support the Amended Settlement.

## IV.    TRIAL PREPARATION

93.    On June 25, 2024 the Court denied ERCPs' motion for preliminary approval of the prior agreement.[97]

94.    ERCC then began to focus on preparing for trial, at the same time as the parties continued to pursue a mediated settlement.  While ERCC's vigorous settlement efforts have resulted in an agreement providing meaningful benefits to all class members, ERCC could not, and did not, take that for granted.  Accordingly, over the last year and a half, ERCC settlement efforts and trial preparations continued on parallel tracks.

95.    Starting in July 2024, ERCC assiduously worked to gear up for the trial of the equitable relief claims.  Among other things, ERCC reviewed the voluminous factual record of this decades-old litigation and updated its discovery and factual research.  ERCC has also consulted with potential fact and expert witnesses and worked to formulate an appropriate trial strategy and draft the requisite pre-trial submissions, including the identification of potential Trial

---

[97]  *In* re*: Payment Card Interchange Fee & Merch. Disc. Antitrust Litig*., No. 05-md-01270 (MKB) (E.D.N.Y. Jun. 25, 2024), ECF Nos. 9333 and 9342; 2024 WL 3236614 (E.D.N.Y. June 28, 2024) ("Op.").

Exhibits and Deposition Designations.

96.     Specifically, ERCC's work in preparation for trial included the following:

A.     Development and updating of key factual and expert research concerning the following topics and activities relevant to proving liability:

i.     Meetings with economic experts and payment industry experts and consultants in preparation for trial and the selection of potential trial witnesses;

ii.     Extensive work with expert economists to update data and analyses regarding current total prices and other network and bank data;

iii.     Extensive work with economists regarding developing a model of the effect of discounting and surcharging;

iv.     Study of potentially analogous price-obscuring practices;

v.     Study of ways of calculating total price and their basic convergence;

vi.     Visa's and Mastercard's Honor All Cards and other Core Rules outside the United States;

vii.     Visa's and Mastercard's bank issuer profitability in the European Union, the United Kingdom, Australia, and other regulated markets outside the United States;

viii.     Large merchant acceptance agreements;

ix.     Large merchant interchange rate negotiations with the networks;

x.     American Express interchange fees in Australia;

xi.     Defendants' analyses of the effects of surcharging in Australia;

xii.     Defendants' prior statements regarding their expectations of the effects of the rule changes;

xiii.     The frequency and impact of surcharging in Australia, the European

32

Union, United Kingdom, and the United States;

      xiv.      International interchange rates; and

      xv.      Studies regarding recent empirical evidence of merchant pass-through of interchange costs, relevant to merchant pass-through of interchange rate cap savings.

      B.      Supplementation of formal discovery, including negotiation with Bank Defendants and networks regarding supplemental data production, and the review and analysis of Defendants' supplemental data and document productions.

      C.      Updating legal research, including:

      i.      Review and analysis of Supreme Court and Second Circuit case law; and

      ii.      Analysis of the unconstitutionality of state no-surcharge statutes in light of *Expressions Hair Design* decision.[98]

      D.      Monitoring U.S. and Foreign governmental regulatory developments impacting merchant interchange fees, including:

      i.      Analysis of recent Reserve Bank of Australia reports on interchange regulation in Australia;

      ii.      Analysis of Federal Reserve studies concerning rewards programs;

      iii.      Analysis of Senate Judiciary Committee Hearing testimony and

---

[98] *See Expressions Hair Design v. Schneiderman*, No. 13-cv-3775-JSR, 2013 WL 7203883 (S.D.N.Y. Nov. 4, 2013) (permanently enjoining defendants from enforcing New York General Business Law § 518); *Expressions Hair Design v. Schneiderman,* 975 F.Supp.2d 430 (S.D.N.Y. 2013), *vacated* 808 F.3d 118 (2d Cir. 2015)*, vacated and remanded,* 581 U.S. 27 (2017); *on remand,* 877 F.3d 99 (2d Cir. 2017) (question certified); 32 N.Y. 3d 382 (2018) (New York Court of Appeals holding that higher prices charged to credit card users must be posted in total dollars and cents, rather than as a surcharge).

written submissions concerning interchange and the Credit Card Competition Act of 2023 (S.

1838) and 2025;

        iv.      Extensive analysis of Department of Justice complaint regarding

Visa debit card monopolization[99]; and

        v.      Analysis of developments in the Durbin Amendment provision of

the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, codified in various

titles of the U.S. Code, regulating merchant debit interchange rates by the Federal Reserve System.

        E.      Monitoring the status of the DAP actions and settlement of their damages

claims with Defendants:

        F.      Extensive review of the record, including:

        i.      Analysis of all class certification, summary judgment, and *Daubert*

materials to develop exhibit lists and potential witnesses;

        ii.      Analysis of *American Express* trial transcript, Order of Proof,

proposed findings of fact and conclusions of law, etc.;

        iii.      Analysis of all plaintiff groups' expert reports regarding

surcharging, discounting, and non-acceptance;

        iv.      Analysis of Phase I and Phase II deposition testimony given by

merchant representatives concerning the impact of state no-surcharging statutes on their business

operations, Honor All Cards rules, discounting, surcharging, acceptance, negotiations with

issuers, and testing; and

---

[99]  *See United States v. Visa, Inc.*, No. 1:24-cv-07214-JGK (S.D.N.Y.) (Visa's motion to
dismiss denied by Judge Koeltl on June 23, 2025, ECF No. 89), available at
https://www.justice.gov/atr/case/us-v-visa-inc-2024.

        v.        Analysis of Phase I and Phase II defendant and third-party deposition testimony on surcharging, discounting, and non-acceptance.

        G.      Preparation of trial materials, including:

        i.        Identifying potential trial exhibits and related review and analysis of the parties' document productions, summary judgment papers and exhibits, class certification papers and exhibits, *Daubert*, deposition exhibits, and Expert Reports and materials cited;

        ii.        Collecting, reviewing and analyzing Visa, Mastercard and merchant deposition transcripts for the preparation of Deposition Designations for trial;

        iii.        Discussion and analysis regarding the selection and employment of potential document vendors;

        iv.        Development of a computerized system to collate Rule 56 Statements of Undisputed Facts and exhibits by topic;

        v.        Drafting a potential Stipulation of Undisputed Facts; and

        vi.        Drafting an order of proof and various trial outlines for the planned, logical sequence of presenting the evidence at trial, including the witnesses, the order of witnesses, the trial exhibits, the order of the exhibits, ensuring a clear and organized progression and a coherent narrative for establishing the equitable relief claims, responding to defenses, and meeting the burden of proof, including application of the rule of reason.

        97.      On July 26, 2024, Plaintiffs and Defendants jointly wrote to Chief Judge Brodie requesting that trial of the equitable relief claims be set for April-May of 2025. Plaintiffs requested a trial of four to six weeks, whereas Defendants believed a total of eight weeks would be necessary

for the trial.  The parties agreed to meet and confer on interim deadlines for the trial.[100]

## V.    RENEWED SETTLEMENT DISCUSSIONS

98.    In July 2024, the parties discussed the possibility of exploring a new settlement that would address the concerns that the Court had expressed in denying approval of the prior agreement, and that would take account of other developments in the litigation.  The Parties approached Judge Orenstein at JAMS to see if he would mediate the parties' renewed settlement efforts.

99.    Judge Orenstein had been the assigned Magistrate Judge for this MDL from November 2005 through November 6, 2020.  During that time, he oversaw fact and expert discovery, participated in settlement conferences (along with District Judge Gleeson and outside mediators), resolved numerous contested motions, and recommended to Judge Gleeson the resolution of several dispositive motions.  The parties sought out Judge Orenstein because of his familiarity with the subject matter, the legal issues and the complex history of this litigation, and the strengths and weaknesses of the parties' claims.

100.    After ensuring that the Court had no objection, Judge Orenstein informed the parties that he would act as the mediator on July 24, 2024.

101.    Between July 2024 and October 2025, the parties engaged in continuous, productive negotiations. ERCC continued to work to obtain a settlement that treats equitable relief class members equally—large, national retailers and small, local merchants alike—and that would overhaul Visa's and Mastercard's anti-steering rules. As discussed more specifically below, these efforts included numerous in-person and Zoom meetings and multiple exchanges of detailed,

---

[100]  *See* ECF No. 9362.

financial data and documents pertinent to the claims, expert economic analysis of that data, additional disclosures by the Defendants, and several proposed term sheets, before finally arriving at the agreement executed on November 10, 2025.

102.    On August 1, 2024, the parties had an initial call with Judge Orenstein to discuss logistics and scheduling.

103.    On August 8, 2024, ERCC had a preliminary Zoom session with Judge Orenstein; the Network Defendants' counsel had a similar Zoom session with Judge Orenstein the following day.

104.    On August 28, 2024 and September 9, 2024, with the parties attending via Zoom, Judge Orenstein conducted joint mediation sessions.  The parties agreed to continue their discussions in person.

105.    On October 1, 2024 and November 7, 2024, the parties met in Boston for all-day mediation sessions conducted by Judge Orenstein.  During these sessions, the parties discussed their respective views on changes to the networks' rules to address the concerns raised by the Court in its Preliminary Approval Opinion and by the objectors regarding the prior agreement.  To better understand the potential impact of the rule changes discussed at the mediation sessions, ERCC continuously conferred with Dr. Leffler, one of their economic experts.

106.    On November 1, 2024, ERCPs provided the Network Defendants with their initial proposal and term sheet for a revised settlement.

107.    In mid-January 2025, ERCC discussed various settlement issues with Judge Orenstein in advance of the next joint mediation session.

108.    On January 24, 2025, the parties attended a Zoom meeting to discuss settlement concepts for the upcoming in-person mediation session.

109.    On January 28, 2025, ERCC had another call with Judge Orenstein to discuss the upcoming in-person mediation session.

110.    On January 30, 2025, the parties met in Boston for a mediation session conducted by Judge Orenstein.  In response to ERCC's demands, the Network Defendants' counsel presented ERCC with a new settlement proposal.

111.    After the January 30, 2025 mediation session, ERCC conferred with Dr. Leffler to analyze the potential impact of the Network Defendants' new settlement proposal and consider possible modifications.

112.    From February 2025 through April 2025, ERCC had several Zoom calls with Judge Orenstein to discuss ways to improve upon the Network Defendants' proposal; ERCC also had numerous calls with the Network Defendants' counsel by Zoom and telephone to discuss the Network Defendants' settlement proposal.  Throughout this time, ERCC continued to confer with their economists to discuss the impact of the proposed settlement terms, as well as possible modifications.

113.    As part of the negotiation process, ERCC consulted class members, industry experts, and associations in order to ascertain their positions and suggestions as to the new and expanded relief contemplated by the Amended Settlement.

114.    On April 17, 2025, the parties had a joint mediation session via Zoom with Judge Orenstein.  During this session, the parties started to come closer to agreeing on a general structure for a new settlement, but were still at odds regarding specific terms.  On April 29, 2025, the Network Defendants sent ERCC a proposed term sheet incorporating ERCC's suggested changes.

115.    On May 1, 2025, the parties had a joint mediation session via Zoom with Judge Orenstein to discuss the Network Defendants' proposed term sheet.  Although the parties did not

reach an agreement, it was a productive session, and the parties continued discussions throughout the month.  The parties also exchanged data and had Zoom calls to ensure that they had the correct data inputs necessary for analyzing the proposed settlement structure; additionally, the parties exchanged proposed revisions to the term sheet.

116.    On May 21, 2025, ERCCs sent the Network Defendants a revised term sheet and proposal for a new settlement.

117.    On May 27, 2025, the parties had a Zoom call to discuss the latest version of the term sheet and confirm that both sides were on the same page vis-à-vis the terminology and definitions contained therein.

118.    On May 28, 2025, ERCC had a Zoom call with Judge Orenstein to discuss ERCC's perspective of the proposed term sheet, including what provisions the parties seemed to agree on and remaining open issues.

119.    On May 29, 2025, the parties had an in-person mediation session in Boston with Judge Orenstein.  After a full day of negotiation with the assistance of Judge Orenstein, the parties reached an agreement in principle that includes, among other relief, significant reforms to the Honor-All-Cards rules, rate caps, additional surcharging relief, additional reforms to the Honor-All-Wallets rules, and significant and competitively important rate reductions on certain cards. These additional and expanded reforms—together with the terms that are part of the prior agreement—provide material relief from the Network Defendants' anti-steering rules to all Class Members.

120.    In all, the parties held five all-day, in-person mediation sessions, and seven Zoom or telephonic mediation sessions.  Judge Orenstein also conducted more than 30 ex parte calls and Zoom sessions in support of the parties' good-faith efforts to consider each other's positions and

achieve a fair, reasonable, and adequate settlement.

121.    After exchanging several drafts, and many more Zoom conferences in continued negotiation over the terms of the written settlement agreement between June 2025 and November 2025, on November 10, 2025, the parties executed the Amended Settlement.

122.    As described above, the Amended Settlement is the culmination of almost sixteen months of vigorous, arm's-length negotiations between the parties, with numerous mediation sessions conducted by Judge Orenstein.  Critically, as illustrated by the brief, and discussed in depth, *infra*, the Amended Settlement includes all the relief achieved in the prior agreement plus significant additional relief that resolves nearly *all* of the concerns articulated by Chief Judge Brodie and objectors.

123.    ERCC believe that the Amended Settlement, building on the gains made in the prior agreement, and adding a great deal to them, is in the best interest of the Equitable Relief Class.

## VI.    AMENDED SETTLEMENT RELIEF

124.    As explained in the accompanying memorandum of law and Stiglitz Declaration, the relief provided for the Equitable Relief Class in the Amended Settlement described below is significant, including modifications to the networks' rules relating to Honor All Cards, surcharging to the cost of acceptance with no level-playing-field requirements, issuer-level discounting, pilot-program testing, Honor All Wallets, DOJ Consent Order steering, rate caps and rollbacks, merchant buying groups, and merchant education.  The highlights of the settlement are outlined below.  The Amended Settlement "***eliminates nearly all restraints*** on merchant efforts to steer customers to low-cost payments via pricing."[101]

---

[101]  Stiglitz Decl. at ¶ 9 (emphasis added).

## A.    THE HONOR ALL CARDS RULE IS SUBSTANTIALLY MODIFIED

125.    The HAC rules promulgated by Visa and Mastercard require any merchant that accepts Visa or Mastercard credit cards to accept all credit cards that are issued on that network. The merchant must accept all of the network's credit cards bearing that brand, regardless of the issuer, rewards, type of card (standard credit, premium credit, or commercial, for example), and importantly, regardless of the interchange rate or total price associated with that card. The consequence of the HAC rules is that a merchant may not refuse to accept a high-cost Visa or Mastercard card in favor of a lower cost card.

126.    Under the Amended Settlement, merchants can now choose to accept "Standard" lower-cost consumer credit cards, without having to accept high-cost, high-rewards "Premium" consumer credit cards ("Premium") and/or high-cost commercial credit cards ("Commercial").[102]

127.    Previously in the 75-year history of the payment card industry, if a merchant wanted to accept *any* credit cards at all, it had to accept *all* of them, no matter how high the interchange fees charged to the merchant.[103]

128.    Under the Amended Settlement, merchants will now be permitted to choose to

---

[102]    Amended Settlement ¶¶ 22, 71; Stiglitz Decl. at ¶¶ 60–63. For Visa, the Traditional and Traditional Rewards consumer credit card product categories or any similar Visa credit card would fall under "standard," while the Signature, Signature Preferred, and Infinite categories would fall under "premium." For Mastercard, the Core and Enhanced Value consumer credit card product categories would fall under "standard," while the World, World High Value, World Legend, and World Elite Categories would fall under "premium." Amended Settlement ¶ 1(nn) and (z). For Visa, "commercial" cards include Corporate, Business, Small Business, Platinum Business, Signature Business, Infinite Business, Purchasing or Fleet. For Mastercard, "commercial" cards include Business, Executive Business, Business Plus, Professional World Mastercard for Business, World Elite Mastercard for Business, Corporate Executive, Public Sector Commercial, Purchasing, and Fleet. Amended Settlement ¶ 1(k).

[103]    Stiglitz Decl. at ¶ 60.

41

accept only consumer credit cards and decline to accept the higher-interchange-fee Commercial credit cards, which typically have the highest interchange rates.  Merchants can also combine both of the foregoing reforms, accepting only Standard consumer credit cards and declining both high-interchange types of credit cards—Premium and Commercial.[104]

129.    The cards within the Premium and Commercial categories will be readily identifiable, both visually and electronically at the point-of-sale, facilitating the merchants' decision to choose which cards they will agree to accept from their customers.[105]

130.    HAC rules reform has been long-sought by merchants.[106]

131.    The changes to Visa's and Mastercard's HAC rules ensure that all Equitable Relief Class members—from large national retailers to small, local merchants—have substantially more choice regarding the credit cards they wish to accept, allowing them to steer customers away from higher-cost cards or negotiate for lower interchange fees by simply not accepting Premium cards.

**B.    NEW COMPETITIVE-RATE STANDARD CARDS INCREASE INCENTIVES**

132.    Currently, the interchange rates on the Network Defendants' Premium cards and

---

[104] Amended Settlement ¶¶ 22, 71.

[105] Amended Settlement ¶¶ 26-27, 75-76.

[106] *See, e.g.,*



Senate Hearing Testimony of Doug Kantor 11/19/2024 at 8 ("[b]ecause the fees are so much higher for some cards than others, merchants very sensibly might want to accept some of them but not others …") available at https://www.judiciary.senate.gov/imo/media/doc/2024-11-19_-_testimony_-_kantor.pdf.

their Standard cards are "compressed," with a narrow gap of just ██ bps between the interchange rates for Premium cards and Standard cards.[107]

133.    This compression in rates for Premium and Standard cards substantially reduces the merchants' incentives to discount for using the Standard cards, to differentially surcharge the Premium cards (to surcharge only the Premium cards, not the Standard cards), or to not accept the Premium cards.[108]

134.    The Amended Settlement will make merchants' non-acceptance of Premium and Commercial credit cards more economically viable by significantly decreasing the interchange rates on Standard consumer credit cards.  The interchange rates on the Standard cards will be capped at 125 basis points for eight years, over 100 bps lower than the average interchange on premium cards.  The resulting gap in rates between the Standard cards versus Premium and Commercial cards could, for example, enable merchants to offer their customers a 1% discount— a discount from the merchant, at the point-of-sale, on the merchants' goods or services—for using the lower-cost cards.  The discounts can be at the type level (*e.g.*, all Visa Standard credit cards) or the issuer level (*e.g.*, Chase-issued Visa Standard credit cards).[109]

C.    **SURCHARGING UP TO THE COST OF ACCEPTANCE WITH NO LEVEL PLAYING FIELD**

135.    The Visa and Mastercard networks each promulgate a "No Surcharge Rule" that severely limits merchants' ability to surcharge cardholders' credit-card transactions to reflect cost

---

[107]  Stiglitz Decl. at ¶ 12, 57, 85.

[108]  Stiglitz Decl. at ¶¶ 28, 55–57, 85–87.

[109]  *See* Amended Settlement ¶¶ 50, 99; Stiglitz Decl. at ¶¶ 13, 28, 61, 86, 88, 101 n. 99 ("The 125 bps cap on standard cards remains in effect for eight years."). This excludes transactions in which a higher interchange rate applies for failure to meet data quality standards that promote the secure and sound operation of the Networks.

differences among various payment methods. In practical terms, this means merchants are substantially prohibited from surcharging cardholders who use a Visa credit card rather than a Discover-branded credit card or use a Premium credit card rather than a Standard credit card or even use a credit card rather than another form of payment such as a debit card.

136.    As a result of the now-vacated 2012 settlement in this matter, the Network Defendants do nominally permit surcharging for credit card transactions, but only in certain, very limited circumstances, such that merchants have generally been unable to take advantage of those settlement provisions. Under the current rules, Visa and Mastercard constrain merchants' ability to charge for use of high-cost payment means through their so-called level-playing-field rules.[110] A merchant that accepts another credit card brand that limits surcharging (*e.g.*, American Express) must follow that brand's surcharging rules in surcharging Visa or Mastercard credit cards.[111] The American Express rules prohibit the merchant from surcharging American Express credit cards unless the merchant also surcharges all "Other Payment Products"—a term that American Express

---

[110]    *See* Visa Rule 5.5.1.7 (Oct. 18, 2025), *available at* https://usa.visa.com/content/dam/VCOM/download/about-visa/visa-rules-public.pdf; Mastercard Rule 5.12.2 (June 2025), *available at* https://www.mastercard.us/content/dam/public/mastercardcom/na/global-site/documents/mastercard-rules.pdf. The Visa rule is formally titled "Similar Treatment of Visa Transactions." Like the misuse of the term "surcharging," Visa and Mastercard have also used other distracting language that impairs understanding of the workings of the credit-card markets. Visa and Mastercard's "level-playing-field" rules actually perpetuate a *tilted* playing field; American Express's "no-discrimination" rule requires that merchants *discriminate* – set prices unrelated to costs. Stiglitz Decl. at ¶¶ 19 n. 9 and 74 n. 66.

[111]    *See e.g.*, Visa Rule 5.5.1.7.

defines to include *debit cards*.[112]  The Visa and Mastercard rules forbid surcharging debit cards.[113]  Thus, for merchants that accept American Express, the Visa and Mastercard level-playing-field rules effectively prohibit merchants from surcharging Visa and Mastercard *credit cards*.[114]

137.    The Amended Settlement altogether repeals the level-playing-field rules, eliminating restraints that prevented █████████% of Visa and Mastercard credit-card transactions from being surcharged.  Under the Amended Settlement, all merchants (regardless of whether they accept American Express or other cards) will now be able to surcharge at the brand or product level, up to the lesser of the full cost of acceptance or 3%.  For all practical purposes, the 3% level enables most merchants to recover the full cost of interchange fees, if they choose to surcharge their customers who pay with Visa or Mastercard.[115]

138.    Merchants may choose to differentially surcharge Premium cards rather than discount the Standard cards.  Or the merchant could do both—surcharge the Premium cards and discount the Standard cards.  The reduced interchange rate on the Standard cards substantially increases the merchant's economic incentive to do either or both.[116]

139.    Merchants can use surcharging to steer customers to lower-cost payment means.  The discovery record reveals that surcharging is a very effective way to steer cardholders to lower-cost payment mechanisms.  Or they can surcharge without attempting to steer, and instead simply

---

[112]    *See* American Express Merchant Reference Guide (Oct. 2023), Rule 3.2 ("Treatment of the American Express Brand") and Glossary (definition of "Other Payment Products"), *available at* https://icm.aexp-static.com/content/dam/gms/en_us/optblue/us-mog.pdf.

[113]    *See* Visa Rule 1.5.5.2, 5.5.1.10; Mastercard Rule 5.12.2.

[114]    *See* Stiglitz Decl. at ¶¶ 39-40.

[115]    Amended Settlement ¶¶ 39-41, 88-90; Stiglitz Decl. at ¶¶ 73-76 and n.72.

[116]    Amended Settlement ¶¶ 42(e), 91(e).

use the surcharge to recover the cost of acceptance.  Notably, the Amended Settlement defines the "cost of acceptance" to include not only the interchange fee but also the fees levied by the networks and the acquiring bank (the bank that processes the transaction for the merchant).[117]

140.    The Amended Settlement provides incentives for Visa and Mastercard to develop the technology necessary to provide sufficient data in real time at the point-of-sale to inform merchants of the product type being presented that is necessary for merchants to surcharge by product type, by allowing merchants to surcharge up to 3% regardless of their actual cost of acceptance unless or until the networks make the actual cost information instantly available to merchants at the point-of-sale.[118]

141.    The Amended Settlement also simplifies the rules for surcharging, notice to customers, and disclosure.  Under the Amended Settlement, regardless of whether the merchant accepts American Express or other competing cards, or how much the merchant pays them, the merchant can surcharge Visa and/or Mastercard credit cards up to the cost of acceptance or 3%, whichever is less.  No computation of what the merchant pays for competing cards is required.[119]

142.    The Amended Settlement will also modify the notice and disclosure requirements, to the merchants' benefit.  The Amended Settlement provides that the merchant can give the customer truthful information as to why the merchant is applying a charge for credit card use—*i.e.*, that the merchant is surcharging because the customer's selected card costs the merchant more to accept.[120]

---

[117]    *See* Amended Settlement ¶¶ 41(b)(ii), 89(b)(ii); Stiglitz Decl. at ¶ 77.

[118]    *See* Amended Settlement ¶¶ 41(b)(ii), 89(b)(ii); Stiglitz Decl. at ¶ 78.

[119]    *See* Amended Settlement ¶¶ 42, 91; Stiglitz Decl. at ¶ 79.

[120]    Amended Settlement Appendix H ¶¶ 7, 8, 11; Stiglitz Decl. at ¶ 80.

143.     The Amended Settlement expressly provides that "disparagement does not include a merchant's accurate statement in words or substance that the merchant prefers or requests that a cardholder pay with a Credit Card or Debit Card that has a lower cost of acceptance to the merchant than the payment card presented for payment by the cardholder."  For example, under the new rules the following notice will be permissible: "We impose a charge of 3% for the use of Visa and Mastercard premium credit cards because of the high costs those cards impose on us."[121]

144.     Merchants are also expressly permitted to use a dual pricing scheme in which they disclose one purchase price for a credit-card transaction and a separate purchase price for a cash transaction.[122]

145.     Under the Amended Settlement, Visa and Mastercard are now prohibited from retaliating against a merchant that surcharges.[123]

### D.     ISSUER-LEVEL DISCOUNTING AND COMPETITION

146.     Until the 2011 settlement between the Department of Justice, seventeen states, and Visa and Mastercard, the Network Defendants' restraints prevented merchants from offering a discount to a customer who paid with another brand of payment card or a competing brand of credit card if that discount was not available to a consumer who used a Visa Credit Card.[124]

147.     The DOJ Consent Order (which expired in July 2021) permitted merchants to offer a discount to encourage customers to use a particular card brand or type of card, but not a particular

---

[121]  Amended Settlement ¶¶ 42(b), 91(b); Stiglitz Decl. at ¶ 80 n. 79.

[122]  Amended Settlement ¶¶ 42(d), 91(d); Stiglitz Decl. at ¶ 80.

[123]  Amended Settlement ¶ 43(f), 92(f); Stiglitz Decl. at ¶¶ 41, 81.

[124]  Stiglitz Decl. at ¶ 36.

bank issuer.[125]  Visa recently permitted discounting by issuer, but without the Amended

Settlement, could revert back at any time.[126]  Mastercard still implements a No-Discount Rule to

prohibit discounting by issuer.  But for the No-Discount Rule, merchants across the board could

use issuer-specific discounts to generate more issuer competition for the merchants' business.

148.    Under the Amended Settlement, merchants can now offer, for the first time, issuer-

level discounting, *i.e.*, merchants can offer discounts to customers for paying with a Visa or

Mastercard credit card issued by a particular bank), thus enabling merchants to steer customers to

their preferred bank issuers.[127]  This relief will introduce direct issuer competition for the first time

in the history of the credit card industry.

149.    Merchants can also use the HAC relief that places a 125-basis point interchange fee

cap on Standard cards to generate competition among issuers by offering to promote a particular

issuer's Standard cards, in exchange for a reduced interchange rate or other consideration.[128]

150.    Prior to the Amended Settlement, Visa voluntarily allowed issuer-discounting,

---

[125] Stiglitz Decl. at ¶¶ 36, 42.  As part of the DOJ Consent Order, Visa and MasterCard (and "all other Persons in active concert or participation with any of them") agreed not to adopt or enforce any Rule or other agreement that would prohibit a merchant from: (1) offering a discount or rebate to a customer for using a particular brand or type of credit card or a particular form of payment (each, a "Payment Type"); (2) offering a free or discounted product for use of a particular Payment Type; (3) offering a free, discounted, or enhanced service for use of a particular Payment Type; (4) offering an incentive or other benefit for use of a particular Payment Type; (5) expressing a preference of Payment Type; (6) promoting a particular Payment Type (such as a sign expressing a preference using varied size or prominence for different Payment Types); (7) communicating the costs of a Payment Type or cost relative to other Payment Types; or (8) doing the substantial equivalent of any of the above (collectively, the "Payment Type Preferences").  Final Judgment as to Defendants MasterCard International Incorporated and Visa Inc. (No. CV-10-4496, E.D.N.Y. July 20, 2011), available at http://www.justice.gov/atr/whatsnew.html.

[126] Stiglitz Decl. at ¶ 84.

[127] Amended Settlement ¶¶ 19, 68; Stiglitz Decl. at ¶ 84.

[128] Stiglitz Decl. at ¶ 88 and n. 86.

although the rules did not so state, so no merchants knew that they would be permitted to discount by issuer. The network rules now must clearly state that issuer-level discounting is permitted.[129]

151.     Providing a discount for the customer's use of a particular credit card can be an especially attractive competitive tool for merchants by enhancing the merchant's relationships with its customers. Unlike issuer supplied rewards for card use, which cardholders view as being given by the networks or the banks (but are paid for by the merchants), cardholders will view such discounts as being given by the merchants. And unlike many rewards, discounts on the purchases of the merchant's goods or services can have an immediate, known, quantifiable value.[130]

152.     The Amended Settlement also provides several mechanisms for merchants to generate competition among issuers. It permits merchants to discount by issuer; use dual pricing to steer by issuer; steer by issuer in the grey area between surcharging and discounting; and cut deals with an issuer to promote the new competitive "value" credit card.[131]

### E.     IMMEDIATE RATE RELIEF UNTIL COMPETITIVE FORCES LOWER INTERCHANGE RATES

153.     All merchants will benefit from a 10-basis point reduction in systemwide average effective interchange rates for five years. Merchants that currently have lower negotiated rates will get a *pro rata* reduction on those rates, so that all merchants will directly benefit from the rate reductions.[132]

154.     Under the Amended Settlement, Visa and Mastercard are prohibited from raising their posted rates from the March 2025 levels for five years, beginning when the Average Effective

---

[129] Amended Settlement ¶¶ 18, 68; Stiglitz Decl. at ¶ 84.

[130] Stiglitz Decl. at ¶ 82.

[131] Stiglitz Decl. at ¶ 116.

[132] Amended Settlement ¶¶ 49, 98; Stiglitz Decl. at ¶¶ 15, 101, 103.

Rate Limit goes into effect.[133]

155.    The 125-bps rate cap on Standard consumer credit cards will remain in effect the full eight-plus years of the Amended Settlement.[134]

156.    The overall rate reduction and Standard card rate cap will remain in effect until merchants can test the alternative steering methods and then implement their chosen methods, when the interchange rates will be reduced by the resulting competitive pressure.[135]

157.    In addition to the interchange rate reduction from competition, the Amended Settlement offers immediate rate relief in the form of a 10-bps rate reduction of the overall average effective interchange rate that Dr. Stiglitz estimates will save merchants over $38 billion in interchange fees by 2031.[136]

158.    The cap on the posted rates at the March 2025 level for five years, which applies to about 85% of transactions, will reduce the average interchange fees paid by those merchants paying posted rates by 6 bps by 2031.[137]

### F.    TESTING OF NON-ACCEPTANCE AND OTHER STEERING PROGRAMS

159.    The current HAC rules force the merchant to make the accept/reject decision without data regarding how its decision may impact sales or how the merchant might mitigate any lost sales. A merchant with multiple outlets that wants to accept the network's credit cards must accept all of them, everywhere, all at once.[138]

---

[133]    Amended Settlement ¶¶ 51, 100: Stiglitz Decl. at ¶ 101.

[134]    Amended Settlement ¶¶ 50, 62, 99, 111; Stiglitz Decl. at ¶ 101 n. 99.

[135]    Stiglitz Decl. at ¶¶ 13-14, 16, 102-104.

[136]    Stiglitz Decl. at ¶¶ 15, 103.

[137]    Stiglitz Decl. at ¶ 15.

[138]    Stiglitz Decl. at ¶ 71-72.

160.    Testing programs are very important tools for all merchants, where merchants seek to test out any change with a small sample of outlets, stores, and customers, before making the final decision to make a permanent change and on a large scale.  Most merchants would not make any change of any kind to their operations without first conducting a test.  Visa's and Mastercard's old rules forbid testing.[139]

161.    Under the Amended Settlement, merchants will be permitted to conduct non-acceptance or other steering testing no more than once a year, for a period not to exceed 180 days, at up to 20% of a given merchant's outlets operating under the same name, before making their final decision on steering methods to apply to all outlets.  Alternatively, if the merchant operates in at least five states, the merchant can conduct non-acceptance or other steering testing in no more than two states, where the outlets in those states account for no more than 50% of the merchant's outlets.[140]

162.    The benefits from these pilot programs are even greater given the Amended

---

[139] *See* deposition testimony concerning merchant complaints about the limited ability to test and the importance of testing in the retail industry:

████████████████████████████████████████████████████████████████████████

.  *See also* Stiglitz Decl. at ¶¶ 67, 69 (explaining why merchants seek to test potential gains and losses from disfavoring premium cards), 70 ("The data generated by well-designed experiments can be valuable to the merchant ...").

[140] Amended Settlement ¶¶ 32, 81; Stiglitz Decl. at ¶¶ 67-70.

Settlement's reforms to the HAC rules as they relate to Commercial credit cards and Premium consumer credit cards. A merchant can craft a narrow pilot program to a particular category of credit cards, experimenting with, for example, non-acceptance of just a network's Commercial credit cards or its premium consumer credit cards, and in just a subset of its outlets. A failed experiment involving a subset of sales is simply another business expense; the prospect of a failed experiment involving all of the network's credit cards in all its outlets could be such a disaster that the merchant would never undertake it. Merchants attest to the value of pilot-test programs.[141]

163.    Merchants can now test on a sample of outlets within the same banner or trade name the non-acceptance of Premium cards, while accepting Standard cards; the non-acceptance of Commercial cards, while accepting Premium or Standard cards or both, in addition to testing any combination of non-acceptance, surcharging, discounting, preference, signage, or any other steering methodology otherwise permitted under the rules.

### G.    DIFFERENT STEERING METHODS MAY BE USED AT DIFFERENT OUTLETS UNDER SAME BANNER

164.    Visa's and Mastercard's current rules are silent on whether merchants that operate outlets under different banners are permitted to accept Visa and Mastercard at outlets operated under one banner but not at outlets operated under a different banner. In addition, the rules do not address whether a merchant's steering policies (*e.g.*, surcharging) must be the same at all outlets operating under the same banner or name.[142]

165.    The Amended Settlement requires the Network Defendant to modify their rules to clarify that a merchant may engage in different types of steering in its various outlets operating

---

[141] Stiglitz Decl. at ¶ 69.

[142] Stiglitz Decl. at ¶ 43.

under the same banner or name (*e.g.*, surcharge in its stores in one state but discount in its stores in another state).  Or the merchant may decline acceptance of Premium consumer credit cards at its outlets operating under one banner, but accept them at its outlets operating under a different banner.[143]  The vacated 2012 settlement required this reform, but the networks never reflected the requirement in their rules.

### H.    NEW INCENTIVES TO FORM MERCHANT BUYING GROUPS

166.    Although merchants were permitted under the old rules to form Merchant Buying Groups, no merchants chose to do so, because *there was no reason to*.  An individual merchant or buying group had no leverage to negotiate interchange rates with the networks or bank issuers, so the exercise was pointless.[144]

167.    The Amended Settlement's HAC, surcharging, and issuer-level discounting relief will give merchants, for the first time, *an incentive* to form and join a Merchant Buying Group, because the relief has created practical, achievable, and attainable steering methods that any and every merchant can implement.  Now both major merchants and Merchant Buying Groups composed of smaller merchants, or merchants of any size, type, or category, will have leverage to use in negotiations with Visa, Mastercard, and the major issuers for better interchange rates.[145]

168.    The Amended Settlement will revive provisions from the vacated 2012 settlement that would have required the networks to bargain in good faith with merchant buying groups.  Merchants and buying groups can invoke a streamlined process to resolve any claim that the

---

[143]  Amended Settlement ¶¶ 33, 82.

[144]  Stiglitz Decl. at ¶¶ 92-94.

[145]  Stiglitz Decl. at ¶¶ 92-94.

networks are not meeting their obligations to bargain in good faith.[146]

169.    The buying groups will be eligible for negotiated rates that will count toward the mandated reductions in the networks' systemwide average effective interchange rates. Some of the merchant education funds will be specifically designated to facilitate and provide information about the formation of buying groups.[147]

## I.    COMPLETE ELIMINATION OF HONOR ALL WALLETS RULE

170.    Under Visa's and Mastercard's interpretations of their current HAC rules, merchants that have enabled the technology for digital payments must accept any digital wallet that contains the network's credit card or debit card. This eliminates the merchant's leverage to negotiate with the digital wallet purveyor over whether and the terms on which the merchant will accept the wallet.[148]

171.    The HAC rules previously required merchants to accept all digital wallets, a new and rapidly developing way to pay for purchases. In 2023, 15% of point-of-sale payments and 37% of online payments in the United States were made with digital wallets. By 2027, 31% of point-of-sale payments and 51% of online payments in the United States are expected to be made with digital wallets.[149]

172.    The prior settlement agreement eliminated the rule, except for digital wallets owned and operated by Visa or Mastercard. Under the Amended Settlement, merchants are no longer prohibited from declining acceptance of digital wallets owned or operated by Visa or Mastercard

---

[146] Amended Settlement ¶¶ 44-47, 93-96.

[147] Amended Settlement ¶¶ 56(d), 57, 105(d), 106.

[148] Stiglitz Decl. at ¶ 65.

[149] Stiglitz Decl. at ¶ 64.

or any other digital wallet operator.[150]  This will put the merchant in a position to negotiate with digital-wallet purveyors, who will no longer be guaranteed merchants' acceptance by inclusion of a single Visa and Mastercard issuer.[151]

### J.   MERCHANT EDUCATION PROGRAM AT NO COST TO MERCHANTS

173.   The Amended Settlement also boosts steering by providing funds to educate merchants about the new competitive tools that the Amended Settlement provides.  In the current market environment, in which Visa and Mastercard have altered the competitive landscape through decades-long imposition of the merchant restraints, it will be important to prod the market towards a more competitive outcome.  The Amended Settlement therefore provides a $21 million fund for merchant education.[152]

174.   The merchant education program will provide merchants (at no cost to the merchants) with information, education, and training to help them take advantage of the new competitive steering tools, *e.g.*, card acceptance, surcharging, discounting, and other steering methods), as well as the importance of forming and joining Merchant Buying Groups.  The program will also include technical and other support designed specifically for merchants located in states that restrict or ban surcharging.  The merchant education program will be operated by an independent third-party expert in the payments industry.[153]

175.   These funds may be used to inform and educate merchants on: (i) the benefits and use of merchant steering under the new rules; (ii) how merchants can best use the new steering

---

[150] Amended Settlement ¶¶ 34-36, 83-85.

[151] Stiglitz Decl. at ¶ 65.

[152] Amended Settlement ¶ 9; Stiglitz Decl. at ¶ 95.

[153] Amended Settlement ¶¶ 56-67, 105-106.

tools to motivate customers to lower-cost payment methods; (iii) how merchants can steer in states
that restrict surcharging; (iv) the benefits to merchants of joining merchant groups for negotiations
with Visa and Mastercard; (v) the value of threats of steering in negotiating lower interchange; and
(vi) how merchants can educate customers as to the impact of using high-cost cards on prices.[154]

### K.    INCREASED DEMAND FOR EFFICIENT STANDARD CARDS

176.    The Amended Settlement also works to provide merchants with enhanced ways to
generate competition among the issuing banks.

177.    As noted above, the substantially reduced interchange rates on the networks'
Standard credit cards will stimulate demand for increased issuance of those cards.  That increased
demand provides merchants with a new opportunity to partner with a particular issuing bank to
encourage the merchants' customers to sign up for that bank's cards.[155]

### L.    EIGHT-YEAR EXTENSION OF DOJ CONSENT ORDER ON PERMISSIBLE DISCOUNTS AND STEERING

178.    While this case was proceeding, in 2010 the Department of Justice and certain states
filed lawsuits against Visa, Mastercard, and American Express challenging the networks' rules
that prohibit merchants from steering cardholders to lower-cost payment methods.  On the same
day the DOJ case was filed, Visa and Mastercard settled the DOJ's claims against them by entering
into a consent decree.  The consent decree required Visa and Mastercard to modify their rules to
allow merchant discounts or other incentives for using a particular card network brand, using a
lower-cost card product within a particular brand, or using another form of payment.  The consent
decree did not require the networks to modify their rules to allow merchants to offer discounts at

---

[154] Stiglitz Decl. at ¶ 96; Amended Settlement ¶¶ 56, 105.

[155] Stiglitz Decl. at ¶ 88 n. 86.

the issuer level. The consent decree also did not address the networks' rules prohibiting merchants from surcharging credit card transactions.[156]

179.    Under the Amended Settlement, the networks must maintain their "no discounting" and "non-discrimination" rules consistent with the terms of the DOJ's consent decree issued on July 20, 2011 for at least eight years and an additional three years beyond that provided under the prior settlement agreement.[157]

180.    Thus, under the Amended Settlement, for the next eight years, the networks may not prohibit merchants from: (a) offering an immediate discount at the point-of-sale for using a particular brand or type of card or payment form; (b) offering a free or discounted product, enhanced service, incentive, encouragement, or benefit for using a particular brand or type of card or payment form; (c) expressing a preference for the use of a particular brand or type of card or payment form; (d) promoting a particular brand or type of card or payment form through posted information, size, prominence, or sequencing of payment choices or other communications to the customer; (e) communicating the reasonably estimated or actual costs incurred by the merchant for using the different brands or types of cards or payment forms to customers; or (f) engaging in other similar steering practices.[158]

### M.    LEVERAGE FROM THE THREAT OF STEERING AND NON-ACCEPTANCE

181.    Finally, the HAC, surcharging, issuer-level discounting, other steering extended

---

[156] *See United States v. American Express, Mastercard International Incorporated and Visa, Inc.*, No. 1:10-cv-04496-NGG-RER, ECF No. 143 (E.D.N.Y. Jul. 20, 2011). The Consent Order expired on July 20, 2021. *Id.* at 15; Stiglitz Decl. at ¶ 36.

[157] Stiglitz Decl. at ¶ 83; Amended Settlement ¶¶ 18, 67.

[158] *See United States v. American Express, Mastercard International Incorporated and Visa, Inc.*, No. 1:10-cv-04496-NGG-RER, ECF No. 143, at 6–7 (E.D.N.Y. Jul. 20, 2011).

from the DOJ Consent Order, and Honor-All Wallets ("HAW") relief under the Amended Settlement will give merchants tremendous leverage in interchange rate negotiations with issuers and networks.[159]

182.    Dr. Stiglitz predicts that, under the Amended Settlement, significantly more merchants, as well as Merchant Buying Groups, and significantly greater transaction volume than the current ███, will negotiate interchange rates and receive reduced credit card interchange rates.[160] Before the Amended Settlement, both individual merchants and Merchant Buying Groups had "little to bargain with" and merchants had "no reason to join a buying group."[161] The Amended Settlement "fundamentally changes that calculation" and merchants of all sizes now have the competitive tools necessary to negotiate for and receive reduced rates and a "reason to join" a buying group.[162]

183.    Dr. Stiglitz specifically concludes that merchants who already have negotiated interchange rates will also receive enhanced negotiating power from the Amended Settlement. The increased negotiating leverage from the reforms to steering will benefit all merchants.[163]

**N.    RELIEF FOR MERCHANTS IN STATES WITH SURCHARGING RESTRICTIONS**

184.    Objectors were concerned that the prior settlement agreement, with its emphasis on surcharging reform, did not adequately offer relief to merchants with outlets and facilities located in states that limit surcharging.[164] The Amended Settlement solves that concern in numerous ways.

---

[159]  Stiglitz Decl. at ¶¶ 90-91.

[160]  Stiglitz Decl. at ¶¶ 90-91.

[161]  Stiglitz Decl. at ¶ 92.

[162]  Stiglitz Decl. at ¶ 93.

[163]  Stiglitz Decl. at ¶ 109.

[164]  *See* Op. at 7, 80, 82.

185.    State laws in Connecticut, Maine, Massachusetts, and Puerto Rico purport to prohibit merchants in those states from surcharging credit card transactions.  However, the no-surcharge statutes in those places are materially indistinguishable from the California, Florida, Texas, and Kansas statutes that courts have declared unconstitutional in recent years.  Given the Amended Settlement's expansion of merchants' ability to surcharge, its elimination of the level-playing-field rules, and the educational funds explaining merchants' rights, merchants in Connecticut, Maine, Massachusetts, and Puerto Rico will now have a significant incentive to challenge the no-surcharge statutes in those states as well.[165]

186.    In denying preliminary approval of the prior agreement, this Court also noted that Kansas and New Jersey have statutes that "impose various constraints on surcharging."[166] Today, merchants in Kansas can surcharge credit-card transactions if they post notice of the surcharge at the point-of-sale or point-of-entry.[167]  In New Jersey, merchants are permitted to surcharge credit-card transactions up to the merchant's actual cost of acceptance.[168]

187.    Dr. Stiglitz explains how merchants in New York state, with statutory surcharge pricing restrictions, may use a "dual pricing system" and "Electronic Shelf Labels" to comply with the state statute, if they choose to, for example, accept Premium cards and surcharge those cards.[169]

188.    The Court was nevertheless concerned that the New York statute might make

---

[165]  Stiglitz Decl. at ¶ 97.

[166]  Op. at 7–8 n.12.

[167]   Kan. Stat. Ann. § 16a-2-403.  The prior version of Kansas's statute, which prohibited surcharging credit cards, was found unconstitutional in 2021. *See CardX, LLC v. Schmidt*, 522 F. Supp. 3d 929, 946 (D. Kan. 2021).

[168]  N.J. Stat. Ann. §§ 56:8-156.1, 56:8-156.2.

[169]  Stiglitz Decl. at ¶¶ 98-99.

surcharging "functionally impossible" because it prohibits surcharging above the merchant's cost of acceptance, and the merchant cannot know the specific cost of accepting *that customer's* card for *that transaction* until the point-of-sale and therefore cannot have posted the pay-with-credit-card price on the shelf. Op. at 7 n.12. There is no basis to believe, however, that New York officials would interpret the statute in a way that would make it impossible for merchants to comply with it. A reasonable interpretation is that the statute prohibits merchants from surcharging above the *average cost* of accepting the type of credit cards that the merchant surcharges. If New York officials were to interpret the statute in a way that would make compliance unduly burdensome, then the statute would be unconstitutional for the same reasons as other statutes that prohibit surcharging credit cards.

189. The Amended Settlement provides significant relief to merchants in these states even beyond surcharging. The Amended Settlement substantially modifies the HAC rules, permitting merchants to selectively decline acceptance of the networks' Commercial credit cards and/or their Premium consumer credit cards. It expands discounting to permit issuer-level discounting and extends the DOJ Consent Order discounting and other steering at the point-of-sale. It makes discounting Standard cards and selective non-acceptance of Premium cards more viable by widening the spread between the interchange rates on premium and standard cards—allowing merchants to offer a 1% discount to customers for using a Standard card; and it enlarges the scope of permissible pilot programs so that merchants can test using these new tools. Merchants in states that restrict surcharging will directly benefit from all the alternatives to surcharging, as well as the immediate rate relief.[170]

---

[170] Stiglitz Decl. at ¶ 100; Amended Settlement ¶¶ 56(e), 105(e).

190.    The Amended Settlement also provides additional Merchant Education funds to be used specifically to help merchants in these states maximize their use of methods other than surcharging to steer customers to lower-cost payment means.[171]  Upon preliminary approval of the Amended Settlement, ERCC will send out requests for proposal for independent vendors and payments industry experts to run a detailed education program for merchants in those states.

## O.    EXTENDED DURATION OF THE RELIEF

191.    The Amended Settlement extends the duration of essentially every aspect of relief. The rate caps and the 10-bps average-effective rate cuts are extended to five years from the time the average-effective-rate commitment goes into effect.  The rules reforms (including the new rate cuts on the networks' standard credit cards and 125-bps rate) are extended to at least eight years. The duration of the release is coterminous with the duration of the changes to the networks' rules.[172]

## P.    SCENARIOS TO ELIMINATE UNCERTAINTY IN GRAY AREAS

192.    The Amended Settlement eliminates uncertainty by expressly identifying circumstances, in certain gray areas, in which the Defendant networks have now agreed that the HAC rules or other rules do not prohibit merchants from differentially steering transactions among the networks' issuing banks (e.g., steering transactions to only Chase-issued Visa cards).  For example, the Network Defendants have agreed that HAC rules do not prohibit a merchant from preferring a particular issuer (e.g., Chase Visa credit cards) on a website landing page or on a dedicated check-out lane in a brick-and-mortar store.  The Amended Settlement identifies 19 of

---

[171]  Amended Settlement ¶¶ 56(e), 105(e).

[172]  Amended Settlement ¶¶ 62, 111; Stiglitz Decl. at ¶¶ 15, 101 and n. 99.

these specific, permissible ways to steer in gray areas.[173]

**Q.    CURED DEFECTS OF THE 2012 SETTLEMENT AGREEMENT**

193.    The Amended Settlement cures the fatal defects of the 2012 Settlement Agreement and delivers unprecedented benefits to *all* merchants in the Equitable Relief class.  The Second Circuit found that the "incremental value and utility" of the surcharging relief was limited because "many states, including New York, California, and Texas, prohibit surcharging as a matter of law."[174]  The Second Circuit held that there was "unequal intra-class treatment" for merchants who operated in states that permit surcharging.[175]  A "significant proportion" of the class was legally unable to benefit from the primary relief, making the surcharging relief under the 2012 Settlement Agreement "virtually worthless."[176]

194.    The Amended Settlement is substantially different.  Merchants in states with surcharge restrictions may take advantage of modifications to the networks' rules relating to HAC, issuer-level discounting, testing, HAW, DOJ Consent Order steering, interchange rate caps and rollbacks, merchant buying groups, and merchant education.[177]  No member of the Equitable Relief Class will receive relief that is "virtually worthless."  This objection is completely resolved.

195.    The Second Circuit also found that under the most-favored-nation clause of the 2012 Settlement Agreement (essentially, the level-playing-field rule), merchants who accepted American Express could not avail themselves of surcharging relief, because American Express

---

[173] Amended Settlement Appendix H, ¶¶ 1-19.

[174] *In re Payment Card*, 827 F.3d at 229, 238.

[175] *Id*. at 238.

[176] *Id.* at 238.

[177] *See supra* ¶¶ 125-191.

effectively prohibits surcharging, and the agreement permits surcharging Visa and Mastercard only if the merchant also surcharges for use of American Express Cards.[178]  The Second Circuit held that there was "unequal intra-class treatment" for merchants who did not take American Express and, thus, were permitted to surcharge.[179]  A "significant proportion" of the class was commercially unable to benefit from the primary relief, making that relief "virtually worthless."[180]

196.    Under the Amended Settlement, merchants who accept American Express can surcharge Visa and/or Mastercard credit cards up to 3% without imposing any surcharge on the use of American Express.  No level playing field requirement remains after the Amended Settlement.  This objection is completely resolved.

197.    This is very powerful relief for merchants.  Dozens of mega-merchants, such as Amazon, Costco, Target, Home Depot, Lowe's, TJ Maxx, Walmart, Walgreens, CVS, Best Buy, and the U.S. Postal Service, have "partnerships" with Visa and have likely received interchange reductions with the threat of surcharging *any* amount, as well as the threat of ceasing to accept Premium cards or selective discounting for certain issuers.

198.    For example, when Amazon imposed a modest 0.5% surcharge on Visa in Australia and Singapore beginning on November 1, 2021, *a small fraction* of the amount of the permitted surcharge under the Amended Settlement, Amazon and Visa negotiated and reached a final global agreement by February 17, 2022.[181]  Amazon will be free to take this same approach in the United States under the terms of the Amended Settlement, which would have tremendous impact on U.S.

---

[178]  *In re Payment Card*, 827 F.3d at 230, 238.

[179]  *Id*. at 238.

[180]  *Id.*

[181]  *See, e.g.*, https://www.cnbc.com/2022/02/17/amazon-and-visa-reach-global-truce-over-credit-card-fees.html.

cardholders' and merchants' resistance to surcharging.

199.    In short, the Amended Settlement is a vast improvement over the 2012 Settlement Agreement.  It greatly expands the ability of merchants to not accept Premium cards for the first time in history, and to surcharge up to the full amount of acceptance costs at the point-of-sale.  In addition, it expands discounting at the issuer level; eliminates the level-playing-field and honor-all-wallets rules including for digital wallets owned and operated by Visa or Mastercard; educates merchants on how to maximize their rights (including via buying groups); allows for various non-acceptance experiments and testing; and provides both rolling back and capping interchange rates for a sufficient time for competitive forces in the market to lower interchange rates as the result of merchant steering or non-acceptance of Premium cards or the threat of merchant steering or non-acceptance of Premium cards.  No merchant under the Amended Settlement will receive relief that is "virtually worthless."

200.    Pointing to another fatal flaw in the 2012 Settlement Agreement, the Second Circuit noted that all injunctive relief expired on July 20, 2021, yet the release had no end date and operated in perpetuity, provided that Visa and Mastercard only kept in place several modified rules, including those permitting merchants to surcharge.  However, "regardless of what Visa or Mastercard did with their network rules after July 20, 2021, no merchant will ever be permitted to bring claims arising out of the network rules that are unaffected by the Settlement, including most importantly, the honor-all-cards rule or existence of default of interchange fee."[182]  For all Plaintiffs, Defendants were "permanently immunized" from any "future antitrust litigation based

---

[182]  *In re Payment Card*, 827 F.3d at 230, 239.

on their honor-all-cards rules and their default interchange rules."[183]

201.    Unlike the overly broad release in the 2012 Settlement Agreement, the release here is limited to five years from the time the average-effective-rate commitment goes into effect, after which any merchant will have the ability to bring claims against Visa or Mastercard without limitation.[184] And in exchange for releasing claims during the five-plus-year period, *all* merchants in the United States, regardless of size, will receive the substantial and valuable relief described above.[185]  The rate caps (other than on Standard cards) are effective for five years.  The 125-bps cap on Standard cards is effective for at least eight years.  Importantly, no Defendant is "permanently immunized" from anything related to any network rule.

202.    Another defect in the 2012 Settlement Agreement arose from class counsel representing both the (b)(3) and (b)(2) classes.  As the Second Circuit noted, where monetary damages and injunctive relief are combined into a single settlement, "[p]roblems arise when the (b)(3) and (b)(2) classes do not have independent counsel, seek distinct relief, have non-overlapping membership, and (importantly) are certified as settlement-only."[186]  The Second Circuit held that there was a clear conflict between merchants of the (b)(3) class and merchants in

---

[183]  *Id.* at 239; *see also id.* at 241 (concurring opinion stating that temporarily abandoning challenged practices in return for a "release *forever*" of all future claims by existing or future merchants not yet in existence amounted to "confiscation.").

[184]  Amended Settlement ¶ 82(a).

[185]  The release does not bind any future merchants—the class includes (and the release binds) only merchants that accept Visa or Mastercard cards any time from December 2020 through the date the Court grants preliminary approval of the Superseding and Amended Class Settlement Agreement of the Rule 23(b)(2) Class Plaintiffs and the Defendants.  Merchants that come into existence after that date will benefit from the injunctive relief provided by the Amended Settlement, but will not be bound by the release.

[186]  *In re Payment Card,* 827 F.3d at 235.

the (b)(2) class, where the former would want to maximize cash compensation, and the latter would want to maximize restraints on the network rules. This conflict required separate, independent representation of the classes.[187]

203.    Here, a Rule 23(b)(3) settlement negotiated by separate counsel was previously approved by this Court. Accordingly, there is no risk "that [ERCC] will trade the interests of one class for another."[188] Similarly, the Court previously certified the Equitable Relief Class as a Rule 23(b)(2) litigation class. Because the injunctive relief under the Amended Settlement is distinct from the monetary relief obtained in the Rule 23(b)(3) settlement, there is no "allocation" among classes to be made.[189] And ERCC will be compensated for work performed solely on behalf of the Equitable Relief Class subject to the Court's approval.

204.    The Second Circuit held that settlements approved simultaneously with class certification are especially vulnerable to conflicts of interest, where the pressures of the settlement process can influence the definition of the classes and allocation of relief, and where the parties may trade one claim for another or the interests of one class for another to reach the settlement.[190] This is not an issue here. First, after the Second Circuit vacated the 2012 Settlement Agreement, the Rule 23(b)(2) and Rule 23(b)(3) claims were bifurcated into separate cases. Thus, there is no potential conflict of interest. With separate representation of the classes, there was no possibility that damages would be traded for injunctive relief, that the (b)(3) class would be favored, or that

---

[187] *Id.* at 233.

[188] *Id*. at 236.

[189] *See id*. at 235–36. Nor is there any "non-overlapping membership" concern given the unrelated Rule 23(b)(2) and Rule 23(b)(3) settlements negotiated independently by separate counsel on behalf of two distinct classes, one backward-looking and one forward-looking.

[190] *See id.* at 235–36.

any "structural defect" "sapped class counsel of the incentive to zealously represent" the Rule 23(b)(2) class.[191]  Second, the Amended Settlement was reached years after the Court certified the Equitable Relief Class.  There was no possibility of the settlement discussions influencing the class definition.

205.    In the 2012 Settlement Agreement, the Second Circuit found that the Rule 23(b)(2) class was targeted for worse treatment than the (b)(3) class.[192]  Here, the injunctive relief of the rollback alone is valued at over $38 billion in interchange fee savings from the 10 bps rate reduction by 2031, considerably more than the $5.6 billion approved for the Rule 23(b)(3) settlement.[193]

206.    The Amended Settlement has "no obvious deficiencies" and is an excellent result for the Equitable Relief Class, far exceeding the equitable relief provided by the 2012 Settlement Agreement.  It is fair, reasonable, and adequate, and warrants preliminary approval under Rule 23(e).

### R.    CURED DEFICIENCIES OF THE PRIOR SETTLEMENT AGREEMENT

207.    The Amended Settlement has similarly cured the deficiencies in the prior settlement agreement that were pointed out by the Court in the June 25, 2024 Memorandum and Order denying the motion for preliminary approval, as well as by the objectors to that settlement.

208.    Although the Court found that the prior agreement satisfied some elements of Rule 23(e)(2)(C)(i), she ultimately denied preliminary approval because she found the relief, which did

---

[191]  *See id.* at 236.

[192]  *Id.* at 237.

[193]  *See Fikes Wholesale, Inc. v. Visa U.S.A., Inc.*, 62 F.4th 704, 712 (2d Cir. 2023); Stiglitz Decl. at ¶ 103.

not contain major HAC relief, was inadequate in large part because it relied upon surcharging relief that many merchants did not want and merchants in states with statutes that limited surcharging could not utilize.[194]

209.    This objection has been completely cured.  The relief in the Amended Settlement now gives merchants: (a) the ability to not accept high-cost, high-rewards Premium cards (the ultimate tool to steer customers to lower-cost cards), without losing the ability to accept low-cost consumer credit cards that customers desire to use for convenience and to take advantage of the interest free period and the ability, if they choose, to pay back the charges over time with interest; (b) the ability to not accept high-cost Commercial Cards, without losing the ability to accept low-cost consumer credit cards that customers desire to use for convenience and to take advantage of the interest free period and the ability, if they choose, to pay back the card over time with interest; (c) the ability to steer with discounts at the issuer level, in order to steer customers to the credit card of a preferred issuer who might have offered the merchant a lower interchange rate; (d) the ability to test out and experiment with all sorts of steering methods to choose the best methods for each particular merchant before having to make the final decision; (e) the ability to receive interchange rate rollbacks of 10 bps valued at over $38 billion in savings through 2031 until the time when the new steering relief can impact competition and force down interchange rates; (f) the ability to benefit from the lower interchange rate capped at 125 bps for Standard Cards to make steering to Standard Cards more worthwhile; (g) the ability to join a Merchant Buying Group with a professional payments manager to negotiate interchange rates on behalf of the members, where there is now actual achievable steering tools to use as leverage in the negotiations; and (h) the

---

[194]  Op. at 50–62.

ability to receive no cost Merchant Education by an independent payment industry professional on how to use the new steering relief to reduce merchant costs and lower interchange rates.

210.    For merchants not residing in states or jurisdictions with a statute that purports to restrict surcharging, the Amended Settlement relief offers merchants the ability to surcharge up to the lesser of 3% or their cost of acceptance, as was sought by many objecting merchants.  There is no longer any requirement of a level playing field which would require merchants to surcharge all credit card brands in the same amount.  Thus, surcharging is a much more worthwhile, effective, and efficient tool for merchants to steer customers to the lower cost, capped-rate Standard Cards.

211.    As fully explained in the ERCPs' memorandum of law in support of the Amended Settlement, this substantial relief fully responds to all of the Court's concerns with the prior agreement, even while acknowledging the litigation risks that the Class would incur if they were to proceed to trial, appeal, and potential Supreme Court review.

### S.    ATTORNEY FEES, EXPENSES, AND SERVICE AWARDS

212.    ERCC discussed attorney fees, expenses, and service awards for ERCP named class representatives with the Network Defendants only after reaching final agreement on all substantive terms of the Amended Settlement.  Ultimately, in connection with the settlement negotiations regarding the prior settlement agreement, Defendants agreed to pay attorneys' fees and expenses up to $170 million (including any service awards for ERCPs as class representatives).  Defendants have agreed to pay an additional $36 million in compensation to ERCC to cover the work performed and expenses incurred in the past year in trial preparation and the effort to reach an approvable settlement, and fees and expenses which will be incurred in implementing the Amended Settlement.

213.    Although ERCC intend to seek this Court's approval of a total of $206 million in attorney fees, expenses and service awards. That amount will be paid by the Defendants; none of

it will come out of any funds that would otherwise go to the Class. Moreover, the parties to the Amended Settlement did not discuss fees and expenses until after all of the substantive settlement terms had been agreed.

214.    ERCC intend to file a motion seeking Court approval of these amounts by no later than thirty (30) days after the Court's entry of the Amended Settlement Notice and Order, annexed to the Amended Settlement as Appendix E (the "Amended Settlement Notice and Order").

## VII.    THE AMENDED SETTLEMENT SATISFIES RULE 23(e)

215.    The relief provided for the Equitable Relief Class is adequate, considering the costs, risks, and delay of trial and appeal and the terms of the proposed award of attorneys' fees, which will be paid by Defendants, subject to Court approval.  Further, as described above, the Amended Settlement treats all members of the Equitable Relief Class equitably relative to each other.

216.    This Declaration describes the vigorous, arm's-length negotiations over the past 16 months that brought this challenging and highly complex case for equitable relief to a successful conclusion via the Amended Settlement.

217.    Throughout the negotiation process, ERCC had the benefit of the views of a number of class members, large and small.  Their views, together with those of ERCPs' economists and industry experts, help shape the relief that ERCC demanded and, ultimately, obtained.

218.    Under all the circumstances discussed herein, the Amended Settlement is well within the range of reasonableness to warrant notice to the Equitable Relief Class and preliminary approval by the Court.

219.    The Amended Settlement is the only agreement between the parties.  There are no other agreements required to be identified under Rule 23(e)(3).

220.    Through the Amended Settlement, the Equitable Relief Class receives the certainty of substantial relief via rule changes and interchange rate caps and rollbacks pending the

merchants' adoption of those rule changes in the market, instead of enduring the risk of delay and the possibility of receiving no equitable relief if their claims are litigated through trial and post-trial proceedings, including likely appeals to the Second Circuit and the Supreme Court.

221.    In the collective judgment of ERCC, the Amended Settlement satisfies the applicable legal standard of being fair, reasonable, and adequate for all merchants in the Equitable Relief Class.

## VIII.   NOTICE TO THE CLASS

222.    Before filing for preliminary approval of the Amended Settlement, ERCC worked together with Cameron Azari, Senior Vice President of Epiq Class Action & Claims Solutions, Inc. ("Epiq"), to draft the proposed Notices and Notice Plan.  ERCC worked extensively with Epiq and the Network Defendants to craft a Notice Plan that would exceed the due process requirements under the U.S. Constitution and Federal Rule of Civil Procedure 23.[195]

223.    The proposed Notice Plan, which is based on Epiq's extensive prior experience and research into the notice issues particular to the Amended Settlement, includes: (i) Notices placed in National Business Publications, National Trade and Specialty Publications, Local Business Journals, Specialty Language and Targeted Newspapers, and U.S. Territory Newspapers; (ii) an all-encompassing  Digital Notice Campaign utilizing banner display notices, social media, podcast and streaming TV advertisements, and targeted website placements; (iii) audio advertisements over Streaming and Satellite Radio; (iv) a Case Website containing all pertinent information and documents related to the settlement, as well as a toll-free number, email and postal address to contact for information regarding the Amended Settlement; (v) Sponsored Search Listings on the

---

[195]  *See* Azari Decl. at ¶ 5(a).

three most highly visited search engines that will include links to the Case Website; and (vi) a nationwide Informational Release that will include the Case Website address and the toll-free number to call for information about the Amended Settlement.[196]

224.    The proposed Notice Plan is designed to reach the greatest practicable number of the Rule 23(b)(2) Amended Settlement Class Members.  Given its experience with similar notice efforts, Epiq expects the proposed Notice Plan media notice efforts will reach approximately 82.2% of all U.S. Business Owners with an average frequency of 4.5 times, and 84.8% of all U.S. Adults in Business and Finance Occupations with an average frequency of 4.1 times.[197]

225.    The Digital Notice Campaign alone will generate approximately 745 million impressions.  Clicking on the digital Notices will link the readers to the Case Website, where they can easily obtain detailed information about the Rule 23(b)(2) Amended Settlement.[198]

226.    The Notices, a short-form Publication Notice for the print and digital publications, and a long-form, more-detailed, Website Notice for the Case Website (copies of which are annexed to the Amended Settlement as Appendix D) provide reasonable and appropriate notice to members of the Class of the terms of the Amended Settlement and of their rights to object and be heard.

227.    The Notices and the Notice Plan meet the procedural and substantive requirements of Rule 23 and constitutional due process and are appropriate under the circumstances of this case.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

---

[196]  Azari Decl. ¶¶ 9–12, 21–46.

[197]  Azari Decl. ¶ 21.

[198]  Azari Decl. ¶ 34.

Executed on November 10, 2025
New York, New York

_/s/ Linda P. Nussbaum_
Linda P. Nussbaum

Executed on November 10, 2025
Austin, Texas

_/s/ Steve D. Shadowen_
Steve D. Shadowen

Executed on November 10, 2025
Wilmington, Delaware

_/s/ Robert G. Eisler_
Robert G. Eisler

Executed on November 10, 2025
Lincolnshire, Illinois

_/s/ Michael J. Freed_
Michael J. Freed