**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION**<br><br>**This Document Applies to:**<br><br>***Barry's Cut Rate Stores, Inc., et al. v. Visa, Inc., et al.***, No. 05-md-01720 (E.D.N.Y.) **(BMC) (JAM), also now known as *DDMB, Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM)** | **No. 05-md-01720 (BMC) (JAM)** |

**NETWORK DEFENDANTS' MEMORANDUM IN SUPPORT OF PRELIMINARY APPROVAL OF THE RULE 23(b)(2) CLASS SETTLEMENT AGREEMENT**

## <u>TABLE OF CONTENTS</u>

**Preliminary Statement**................................................................................................ **1**

**Background** ................................................................................................................. **4**

**Legal Standards** ........................................................................................................ **7**

**Argument** .................................................................................................................... **9**

I.    Plaintiffs Face Significant Risks in Establishing Liability. ............................... 9

   A.    Plaintiffs Will Not Be Able to Prove a Conspiracy. .................................... 10

   B.    Plaintiffs Will Not Be Able to Satisfy Their Burdens Under the Rule of Reason........ 11

   C.    Plaintiffs' Risks of Establishing Liability Will Persist Post-Trial. .............................. 21

II.    The Reasonableness of the Settlement in Light of the Best Possible Recovery and All Attendant Risks of Litigation Weighs in Favor of Settlement.................................................. 23

   A.    The Settlement Agreement Provides Ample Relief to the Class. ................................. 23

   B.    The Settlement Compares Favorably to Plaintiffs' "Best Possible Recovery." ........... 26

III.    The Settlement Agreement Treats Class Members Equitably Relative to Each Other. 29

IV.    Visa and Mastercard Likely Could Not "Withstand a Substantially Greater Judgment" and Remain Viable Four-Party Networks.................................................................. 30

**Conclusion** ............................................................................................................... **33**

## TABLE OF AUTHORITIES

Page(s)

Cases

*1-800 Contacts, Inc. v. Fed. Trade Comm'n*,
  1 F.4th 102 (2d Cir. 2021) ...........................................................................................11, 12

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018) ................................................................................................ *passim*

*Arsberry v. Illinois*,
  244 F. 3d 558 (7th Cir. 2001) ................................................................................................27

*Banyai v. Mazur*,
  2007 WL 927583 (S.D.N.Y. Mar. 27, 2007) ....................................................................9

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F. 2d 263 (2d Cir. 1979) ................................................................................................27

*Calibuso v. Bank of Am. Corp.*,
  299 F.R.D. 359 (E.D.N.Y. 2014) .......................................................................................31

*Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
  95 F.3d 593 (7th Cir. 1996) ................................................................................................27

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) ................................................................................................7

*In re Coordinated Pretrial Proceedings in Petrol. Prods. Antitrust Litig.*,
  906 F. 2d 432 (9th Cir. 1990) ................................................................................................27

*In re Currency Conversion Fee Antitrust Litig.*,
  263 F.R.D. 110 (S.D.N.Y. 2009) .......................................................................................22

*Dover v. British Airways, PLC*,
  2018 WL 11412431 (E.D.N.Y. Oct. 9, 2018) ....................................................................9

*In re Facebook, Inc.*,
  343 F. Supp. 3d 394 (S.D.N.Y. 2018) ...............................................................................22

*FTR Consulting Grp., Inc. v. Advantage Fund II, Ltd.*,
  2005 WL 2234039 (S.D.N.Y. Sep. 13, 2005) ....................................................................22

*Garcia v. Pancho Villa's of Huntington Vill., Inc.*,
  2012 WL 5305694 (E.D.N.Y. Oct. 4, 2012) ...............................................................9, 22

*United States v. Google*,
   2025 WL 2523010 (D.D.C. Sep. 2, 2025) ...........................................................21

*Karic v. Major Auto. Cos.*,
   2015 WL 9433847 (E.D.N.Y. Dec. 22, 2015) .........................................................9

*Keller v. Potomac Elec. Power Co.*,
   261 U.S. 428 (1923)...........................................................................................27

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
   233 F.R.D. 306 (E.D.N.Y. 2006) ........................................................................22

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008)...............................................................................10

*Nat'l Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*,
   779 F.2d 592 (11th Cir. 1986) ............................................................................20

*In re Payment Card*,
   986 F. Supp. 2d 207 (E.D.N.Y. 2013) ...............................................17, 20, 23, 27

*In re Payment Card*,
   827 F.3d 223 (2d Cir. 2016)..........................................................................2, 23, 24

*In re Payment Card*,
   2021 WL 6221326 (E.D.N.Y. Sep. 27, 2021).......................................................26

*In re Payment Card*,
   2024 WL 1014159 (E.D.N.Y. Mar. 8, 2024) ........................................................11

*In re Payment Card*,
   729 F. Supp. 3d 298 (E.D.N.Y. 2024) ................................................................10

*In re Payment Card*,
   2024 WL 3236614 (E.D.N.Y. June 28, 2024) ............................................. *passim*

*Prentis v. Atlantis Coast Line Co.*,
   211 U.S. 210 (1908)...........................................................................................27

*United States v. Trenton Potteries Co.*,
   273 U.S. 392 (1927)...........................................................................................27

*US Airways, Inc. v. Sabre Holdings Corp.*,
   938 F.3d 43 (2d Cir. 2019).................................................................................12

*United States v. Visa U.S.A. Inc.*,
   163 F. Supp. 2d 322 (S.D.N.Y. 2001).................................................................18

*In re Vitamin C. Antitrust Litig.*,
  2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) ........................................................................31

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005) ........................................................................................2, 10

*Wright v. Stern*,
  553 F. Supp. 2d 337 (S.D.N.Y. 2008) ........................................................................21

## <u>Statutes</u>

Sherman Act Section 1, 15 U.S.C. § 1 ........................................................................10

Sherman Act Section 2, 15 U.S.C. § 2 ........................................................................10

Fed. R. Civ. P. 23(e) ........................................................................................7, 8, 9

## PRELIMINARY STATEMENT

The proposed settlement submitted by the Rule 23(b)(2) Plaintiffs requires Defendants Visa and Mastercard to make unprecedented changes to the network rules challenged in this action. Those rules changes—which grant merchants new options to accept certain Visa and Mastercard products without accepting others, as well as additional options for steering consumers to alternative payment forms and managing merchants' costs of acceptance—will provide immediate benefits to millions of merchants nationwide, and comprehensively address the issues the parties have been litigating for two decades. Absent this settlement, the Rule 23(b)(2) Plaintiffs will have to prove at trial, and defend on appeal, the existence of antitrust violations in transaction markets that have seen exploding output, falling prices, and flourishing innovation and quality—outcomes that are the hallmarks of a competitive marketplace. And even if Plaintiffs could establish that an antitrust violation occurred, any relief they might win is not only unlikely to be superior to the relief offered in the settlement (including because some of the proposed settlement relief would be unavailable to Plaintiffs after trial), but also years away, and fraught with risk and uncertainty. Visa and Mastercard respectfully submit that the Court should approve the proposed settlement as fair, reasonable, and adequate.

Visa and Mastercard make this submission to emphasize how the factors this Court identified as weighing against approval of the 2024 Rule 23(b)(2) settlement now weigh strongly in favor of the revised settlement. The networks show that Plaintiffs will face significant risks in establishing liability; that the settlement provides ample relief to class members that compares favorably to (and in important respects exceeds) their best possible recovery at trial; that the settlement treats class members equitably and provides tangible relief to all merchants; and that the Defendants likely could not withstand a judgment that modifies their rules any further. This submission incorporates evidence from the existing record and includes written testimony from

1

the Senior Vice President for Global Interchange and Pricing of Visa, William Knupp, and the Co-President, United States, for Mastercard, Chiro Aikat. All of this evidence supports the fairness, reasonableness, and adequacy of the following network concessions provided in the settlement:

**First**, the settlement makes significant, historic changes to the networks' respective Honor-All-Cards rules, under which merchants must accept all credit cards issued under the Visa or Mastercard brands if they accept any of them. These rules were last revised in 2003, under a settlement in the *In re Visa Check* litigation that allowed merchants to accept credit products without accepting debit products, and vice versa. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 102, 103 (2d Cir. 2005). This settlement proposes to further relax the Honor-All-Cards rules by giving merchants unprecedented options and flexibility in selecting the types of credit card products their customers can use to pay. Specifically, the settlement would allow merchants to accept standard consumer credit products without accepting premium consumer credit products, and vice versa, and to accept consumer credit products without accepting commercial credit products, and vice versa. To further enable merchants to benefit from these changes, merchants will be able to test the favorability of these options through increasingly flexible non-acceptance pilots. These changes to the Honor-All-Cards rules will confer "a real and palpable benefit" to **all** class members. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,[1] 827 F.3d 223, 238 (2d Cir. 2016).

**Second**, the settlement allows merchants to recover their costs of acceptance on Visa and Mastercard credit cards and to steer their customers to other payment forms through expanded surcharging options. Merchants will be able to surcharge credit transactions up to 3%, at the brand level (i.e., by surcharging either (or both) all Visa or all Mastercard credit cards) or the product

---

[1] The names of all decisions from this MDL are abbreviated simply to "*In re Payment Card*."

level (e.g., by surcharging only premium products associated with higher interchange rates), *regardless* of whether they surcharge competitor networks like American Express. With this concession, Visa and Mastercard would be giving up all vestiges of the "level playing field" principles on surcharging, which were originally instituted to protect their ability to compete with American Express and other networks. The networks agreed to make these substantial changes even though the surcharging restrictions of the other competitor networks will remain in place.

*Third*, the settlement provides for interchange rate changes that reinforce and support all of these rules changes. To ensure the availability of low-cost credit cards that merchants can encourage customers to use, the settlement imposes a cap for standard consumer interchange rates that creates a significant disparity in the interchange rates associated with standard versus premium consumer credit cards. The settlement likewise provides for a 10-basis point reduction in the combined systemwide average effective interchange rate for credit transactions, as well as five-year rate caps on current published rates that will provide merchants with significant cost certainty, giving time for these significant rules changes to take effect. This rate relief would not be available to the class following a trial on its injunctive relief claims.

This Settlement Agreement is the product of a hard-fought, year-long mediation conducted by the Honorable James Orenstein (retired) and would provide finality to both sides after decades of litigation. The class will receive the certainty of rules reforms that compare favorably to what it could obtain even if it overcame substantial hurdles in its case theories and prevailed at trial, as well as interchange rate relief that it could not obtain in any judicial proceeding. In exchange, Defendants will receive an appropriate limited-duration release that provides litigation peace only for so long as the rules commitments remain in effect, but not beyond.

3

In sum, this settlement gives merchants unprecedented options and flexibility, as well as concrete rate relief in the near term.  The alternative is a complex trial fraught with risk for the Plaintiffs, who will need to prove that consumer-friendly rules that have caused transactions to skyrocket, two-sided prices to fall, and innovation to flourish have somehow created adverse effects on competition.  Even if they were to meet their burden on liability, Plaintiffs are unlikely to obtain remedies superior to these following any trial, as going any further in changing these rules would require dismantling the foundations on which the networks were built and continue to operate today.  And all of those efforts, even if successful, would be followed by an appeal where Defendants will be able to obtain review of prior legal rulings they believe were made in error.

The proposed settlement provides meaningful, market-changing relief for which merchants—including prior objectors—have long been advocating.  Visa and Mastercard respectfully submit that the proposed settlement should be preliminarily, and then finally, approved.

## **BACKGROUND**

Visa and Mastercard each operates a global payments network that enables credit and debit card transactions by connecting financial institutions, merchants, and cardholders.  Each network maintains rules that deliver value to all network participants, including a number of rules that address the conduct of both merchant and bank customers.  For example, the rules include merchant acceptance rules, such as the Honor-All-Cards rules, which protect cardholders' expectations of universal acceptance and frictionless transactions.  The Honor-All-Cards rules that apply to general purpose credit cards require merchants that choose to accept any type of Visa credit card or Mastercard credit card to accept all such cards from that network, regardless of the category of card (commercial, premium, standard) or the issuing bank.  Each network has had an Honor-All-Cards rule since its inception.  ECF No. 8539-7, SJDX 1232 (Murphy Rep.) ¶¶ 115,

277; ECF No. 8526-12, SJDX 388 (Elzinga Rep.) at 155–56, 186.[2]  Relatedly, each network also has maintained Honor-All-Merchants and Honor-All-Paper rules, which require issuing banks to honor all validly presented transactions, and prohibit acquiring banks or issuing banks from discriminating against any merchants in processing and authorizing transactions.  Knupp Decl. ¶ 29; Aikat Decl. ¶ 14.

Each network has also established a fee structure for services provided in its system, including default rates for the fees paid by acquiring (merchant) banks to card-issuing (cardholder) banks in connection with payment card transactions, known as "interchange," and the fees paid both by acquiring banks and issuing banks to the network, known as "network fees."  The default interchange structures are the underpinning of the networks' ability to service thousands of banks and millions of merchants, and thereby provide the greatest utility to consumers.  By establishing a default fee structure understood in advance by all system participants, the networks can incentivize banks, both large and small, to issue the networks' branded cards with confidence that the banks will receive a revenue stream to compensate them for their own investments as lenders to cardholders, including the cost of cardholder rewards and the credit risk the banks undertake if cardholders fail to pay their bills.  And merchants are incentivized to accept payment cards knowing in advance the cost of securing the benefits of payment card acceptance, including the obligation by issuing banks to guarantee payment to merchants for every transaction, regardless of whether cardholders pay their bills.  Through their transparent and efficient structures, which facilitate tens of billions of frictionless transactions over each network every year, Visa and

---

[2]    Where possible, Defendants cite to the summary judgment exhibits already in the record and submitted to the Court, which are denoted by the prefix "SJDX" and identified by ECF Nos., and to the Defendants' 56.1 statement of material facts in support of summary judgment describing such evidence.

Mastercard are better able to compete against each other and other networks and payment systems. Knupp Decl. ¶¶ 20–28; Aikat Decl. ¶¶ 17–21.

To be clear, it is card issuing banks, not the networks, that receive interchange. The networks make revenue from network fees, which are charged based in large part on transactions or volume running over each network. The networks thus are incentivized, by their own profit structures, to maximize the output of transactions that run over their networks. Knupp Decl. ¶ 8; Aikat Decl. ¶ 11. The more valuable a network's card offerings are to merchants and cardholders, the more transactions the network wins, to the benefit of itself and its stockholders.

The networks also have other cardholder-protecting rules, including rules limiting the surcharges that can be applied to cardholders who choose to use Visa or Mastercard cards. The surcharging rules, as currently written, allow Visa and Mastercard credit cards to be surcharged at the brand level (i.e., all Visa credit cards or all Mastercard credit cards) or the product level (i.e., premium products associated with higher interchange rates), but only if the transactions of more expensive competitors (like American Express) are surcharged too. This rule, known as the "level playing field" for surcharges, protects Visa and Mastercard cardholders from being discriminated against vis-à-vis consumers who choose to use other payment options. Knupp Decl. ¶ 35; Aikat Decl. ¶ 41.

The rules of competitor American Express function to limit merchants' ability to surcharge Visa and Mastercard credit cards, because they prohibit merchants from surcharging American Express transactions unless **all** other credit and debit transactions are surcharged. Neither Visa nor Mastercard allows debit products to be surcharged, including because the interchange associated with debit products issued by large banks is capped by regulation (namely the Durbin Amendment to the Dodd Frank Act). Thus, the networks' so-called "level playing field"

6

protections, in combination with American Express's rules, have had the practical effect of limiting a merchant's ability to surcharge consumers consistent with the networks' rules. *In re Payment Card*, 2024 WL 3236614, at \*7 (E.D.N.Y. June 28, 2024); Knupp Decl. ¶ 39; Aikat Decl. ¶ 41.

In March 2024, following years of hard-fought litigation and negotiations, the Rule 23(b)(2) Plaintiffs submitted a proposed class action settlement to the Court, which included revisions to some of the above rules along with rate relief. ECF No. 9179. The Court denied preliminary approval in June. *In re Payment Card*, 2024 WL 3236614, at \*2.

Beginning in August 2024, the Rule 23(b)(2) Plaintiffs and Visa and Mastercard began negotiating a new settlement. The resulting proposal makes unprecedented changes to network rules and interchange rates—and any further changes would be fundamentally damaging to the networks' ability to compete with other networks and payment forms. The proposed changes are discussed further below, along with the relevant factors to be considered on preliminary approval.

## LEGAL STANDARDS

The Rule 23(b)(2) Plaintiffs' brief covers in full the relevant factors the Court will consider in assessing their motion. The networks do not intend to duplicate that analysis, and instead focus on limited factors that the Court found lacking in the 2024 settlement.

In determining whether to approve a settlement under Federal Rule of Civil Procedure 23(e)(2), courts consider, among other things, whether the settlement provides adequate relief for the class, including in light of "the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C)(i). This factor in turn overlaps with several factors enumerated in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974):

- "the complexity, expense, and likely duration of the litigation";
- "the risks of establishing liability";
- "the risks of maintaining the class through trial"; and

- "the range of reasonableness of the settlement fund in light of the best possible recovery and in light of all the attendant risks of litigation."

*In re Payment Card*, 2024 WL 3236614, at *21.

This Court already found that one of these factors—"the complexity, expense, and likely duration of the litigation"—supports approval. That continues to be true: as the Court previously recognized, this case, brought on behalf of every merchant in the United States, now has been actively litigated for two decades, and it presents immensely complex legal and economic issues. *Id.* at *22. Accordingly, it will "continue to require [] costly counsel and experts, as well as a wealth of time from all parties." *Id.* Further, absent settlement, the case will continue to require significant judicial resources, as evidenced by the "numerous decisions from both district and appellate courts" that the case has already necessitated. *Id.* And the complexity of any trial cannot be overstated. It would require, among other things, the analysis of numerous legal issues the Court reviewed on summary judgment over the course of hundreds of pages of decisions (and ultimately left for trial), and presentation of factual issues not raised on summary judgment; testimony from dozens of witnesses, including fact and expert witnesses; and careful review of an evidentiary record spanning decades and implicating the foundation of U.S. commerce.

Additionally, the Court previously found that the factor regarding maintaining a class through trial was neutral, as there is "no basis to think that continued litigation would lead to disputes over class certification." *Id.* at *23. That continues to be true as well.

As discussed below, the two other factors that the Court previously found to weigh against preliminary approval now heavily support it. These are "the risks of establishing liability" and "the range of reasonableness of the settlement [] in light of the best possible recovery and . . . all the attendant risks of litigation." *Id.* at *22, *24. The Court's 2024 decision also found that another Rule 23(e)(2) factor—whether the proposed settlement "treats class members equitably relative to

each other"—weighed against settlement approval. *Id.* at *39. The networks demonstrate below why that factor likewise supports approval here.

Finally, the networks discuss a final *Grinnell* factor that does not overlap with the Rule 23(e)(2) factors, namely, whether the defendants are able to withstand a greater judgment. Although the Court found that factor weighed against approval of the prior settlement, *id.* at *41, the networks show that Visa and Mastercard could not "withstand a substantially greater judgment" than this Settlement Agreement provides with respect to the challenged rules.

## ARGUMENT

### I.    Plaintiffs Face Significant Risks in Establishing Liability.

While the Rule 23(b)(2) Plaintiffs' claims have largely survived summary judgment, *In re Payment Card*, 2024 WL 3236614, at *22–23, Plaintiffs nevertheless face substantial risks in establishing Defendants' liability at trial. Establishing liability will "require significant factual development and favorable outcomes at trial and on appeal, both of which are inherently uncertain and lengthy." *Garcia v. Pancho Villa's of Huntington Vill., Inc.*, 2012 WL 5305694, at *5 (E.D.N.Y. Oct. 4, 2012). "[T]he primary purpose of settlement is to avoid the uncertainty of a trial on the merits." *Id.*

Accordingly, where, as here, complex and contested factual and legal issues remain after summary judgment rulings, courts routinely find that the "risks of establishing liability" weigh in favor of settlement.[3] Indeed, in affirming a prior settlement involving Visa, Mastercard, and some

---

[3]    *See, e.g.*, *Dover v. British Airways, PLC*, 2018 WL 11412431, at *1, *5 (E.D.N.Y. Oct. 9, 2018) (factor weighed in favor of class settlement approval; court previously denied parties' cross motions for summary judgment); *Karic v. Major Auto. Cos.*, 2015 WL 9433847, at *10 (E.D.N.Y. Dec. 22, 2015) (factor weighed in favor of settlement approval; court previously granted summary judgment to plaintiffs "on many of plaintiffs' claims"); *Garcia*, 2012 WL 5305694, at *5 (factor weighed in favor of settlement approval; court previously denied defendants' summary judgment motions in full, and granted plaintiffs' motion in part as to multiple of defendants' affirmative defenses); *Banyai v. Mazur*, 2007 WL 927583, at *8–10

*(footnote continued on next page)*

of the same rules at issue here, where the settlement followed the denial of Defendants' summary judgment motions, the Second Circuit relied on the district court's holding that "establishing liability 'was no sure thing' for the plaintiffs," including because the Honor-All-Cards rules have "at least some pro-competitive features." *In re Visa Check*, 396 F.3d at 102, 118.

At trial, to prevail on their Sherman Act Section 1 claims,[4] Rule 23(b)(2) Plaintiffs will need to prove, among other things, a contract, combination, or conspiracy in restraint of trade. Plaintiffs will not be able to meet their burdens, as demonstrated by the evidence described briefly below, which merely previews the extensive evidence that Defendants would present at trial.

### A.    Plaintiffs Will Not Be Able to Prove a Conspiracy.

Plaintiffs' theory is that the rules that each network unilaterally imposes on all of its member banks—both on the acquiring/merchant side and on the issuer/cardholder side—constitute unlawful restraints of trade. This theory stems from Visa's and Mastercard's histories as joint ventures of their member banks, when those banks had ownership stakes in the networks and employees of banks sat on the networks' boards of directors.

There is nothing inherently unlawful or anticompetitive about operating as a joint venture, which can create efficiencies and allow firms to do together that which none of them could accomplish alone. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 316 (2d Cir. 2008). That is how both Visa and Mastercard separately came to be—groups of banks agreed to issue cards under shared acceptance brands, and to contract with merchants to accept that brand's cards for payments, regardless of issuing bank. The joint venture structure allowed the incipient

---

(S.D.N.Y. Mar. 27, 2007) (factor weighed "heavily" in favor of settlement approval; court previously granted in part and denied in part parties' motions for summary judgment).

[4] Plaintiffs also alleged a violation of Section 2 of the Sherman Act against Visa, but the Court granted summary judgment to Visa on that claim. *See In re Payment Card*, 729 F. Supp. 3d 298, 337 (E.D.N.Y. 2024).

networks to address the "network effects" inherent in the payment card business, referring to the reality that merchants do not want to accept cards that are not widely used, and cardholders do not want to carry cards that are not widely accepted. ECF No. 8539-7, SJDX 1232 (Murphy Rep.) ¶¶ 69–77, 323; ECF Nos. 8068, 8262 (Defs.' 56.1 in Supp. of Summ. J. Mot.) ¶¶ 12–24. The core rules that the Rule 23(b)(2) class challenges now—Honor-All-Cards and default interchange— formed the foundation for and have existed from the nascent stages of the networks, when no one claims they had any market power. ECF No. 8539-7, SJDX 1232 (Murphy Rep.) ¶¶ 114–116, 296–299; ECF No. 8526-12, SJDX 388 (Elzinga Rep.) at 186. Plaintiffs will be unable to show that those rules resulted from any conscious commitment to an unlawful scheme.

In any event, Mastercard became a public company in 2006, and Visa in 2008. *See* ECF No. 8524-13, SJDX 1027 (Mastercard May 25, 2006 Prospectus); ECF No. 8524-13, SJDX 1028 (Visa Mar. 19, 2008 Prospectus). The networks are each owned and controlled by public shareholders. The networks themselves, not the banks with which the Plaintiffs accuse the networks of conspiring, make all decisions concerning the networks' operation, management, and rules. The banks, meanwhile, are the networks' *customers*. Knupp Decl. ¶ 9; Aikat Decl. ¶ 6.

### B.    Plaintiffs Will Not Be Able to Satisfy Their Burdens Under the Rule of Reason.

#### 1.    *Rule of Reason:  No Adverse Effects on Competition*

Plaintiffs also will need to prove at trial that the networks' rules unreasonably restrain trade under the rule of reason. *In re Payment Card*, 2024 WL 1014159, at *25 (E.D.N.Y. Mar. 8, 2024). Plaintiffs will bear the initial burden to show "that the challenged action has had an actual adverse effect on competition as a whole in the relevant market." *1-800 Contacts, Inc. v. Fed. Trade Comm'n*, 1 F.4th 102, 114 (2d Cir. 2021). Even if Plaintiffs satisfy this burden, Defendants will have the opportunity to show "procompetitive justifications for the agreement." *Id.* If Defendants provide such proof, "the burden shifts back to the plaintiffs to show that any legitimate competitive

benefits offered by defendants could have been achieved through less restrictive means." *Id.* Further, as the Supreme Court concluded in confirming the legality of American Express network rules similar to those at issue here, Plaintiffs will have to take into account ***both sides*** of the relevant transaction market, meaning both the merchant side and the cardholder side. *Ohio v. Am. Express Co.*, 585 U.S. 529, 544–45 (2018) ("*Amex*"). As a matter of law, transaction platforms "must ***always*** receive two-sided treatment." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 57 (2d Cir. 2019).

The hallmarks of adverse effects on competition are reduced output, increased prices, and blunted quality and innovation. *1-800 Contacts*, 1 F.4th at 118. Plaintiffs' alleged markets, the markets for credit transactions and debit transactions, have seen the exact opposite over the relevant period (beginning in 2004): skyrocketing output, falling prices, and flourishing quality and innovation.

As of Defendants' summary judgment filings (assessing the 2004–2017 time period), the dollar volume and number of credit transactions in the United States had approximately doubled, and the dollar volume and number of debit transactions had more than tripled. ECF Nos. 8071, 8277 (Defs.' Summ. J. Mot. under *Ohio v. Am. Express*) at 11–12, 31–32. The Supreme Court placed great emphasis on this growth (which has only increased since then) in confirming the legality of American Express's rules in 2018. *Amex*, 585 U.S. at 549 (discussing that "the output of credit-card transactions grew dramatically from 2008 to 2013," which is consistent with increased demand, a procompetitive outcome). At the same time, two-sided transaction prices have fallen, as the growth of cardholder rewards and benefits has far outpaced any increases in merchant fees. ECF Nos. 8898, 8912 (Defs.' Reply to Pls.' Supp. Mem. Regarding Proof of Anticompetitive Effects) at 10, 17. And innovation has flourished, as the market has seen the

proliferation of payment choices and the improvement of payments themselves, including increasingly varied rewards cards, *see Amex*, 585 U.S. at 550–51 (noting, as an example of improved quality, that "Amex's business model spurred Visa and Mastercard to offer new premium card categories with higher rewards"); chip cards, biometric authentication, and tokenization, all of which contribute to transaction security; Buy-Now-Pay-Later products; digital wallets like Apple Pay; and NFC or "tap to pay" technology, among others.  Put simply, transactions are quicker, safer, and more varied than ever, and those innovations either result directly from network innovation or were built on the foundations that the networks have invested in over decades.[5]

> 2.    *Rule of Reason:  The Challenged Rules Have Procompetitive Benefits.*

Defendants will prove at trial the procompetitive nature of each of the challenged rules.

***Default Interchange.***  Substantial evidence demonstrates that each network's default interchange rates are set in response to competitive considerations, and that the networks' default interchange rules are fundamental not only to their existence, but also to their ability to ensure successful, seamless transactions, which in turn makes the networks' products valuable to both merchants and cardholders.

---

[5]    Because the Rule 23(b)(2) Plaintiffs will fail to meet their burden of showing anticompetitive effects through such direct evidence, they will need to rely on indirect evidence, namely a showing of market power plus some evidence of harm to competition.  *Amex*, 585 U.S. at 542. While the Court left the issue for trial, Mastercard maintains that it lacks the market power necessary to cause anticompetitive effects, given that Mastercard's market share consistently remained below 30% in both the credit and debit markets during the relevant period; that virtually every other payment card network has the same challenged rules, which Mastercard adopted when no one claims Mastercard had any market power; and that, instead of restricting output or raising prices, Mastercard has continually sought to grow its transaction volumes and reduce two-sided costs of acceptance based on new and innovative product offerings.  *See* ECF Nos. 8073, 8278 (Mastercard's Mem. in Supp. of Summ. J. Mot. Based on Lack of Market Power) at 12–27.

In setting default interchange, the networks have no motive to do anything other than maximize output over their networks. Substantial evidence thus shows that the networks seek to incentivize both increased merchant acceptance and increased issuance of their cards. *See* Knupp Decl. ¶ 10; Aikat Decl. ¶¶ 11, 18.[6] This constant goal may be achieved through different means in different circumstances, including raising interchange fees to incentivize the issuance and use of rewards cards (making Visa and Mastercard more effective competitors against American Express, and each other); lowering interchange fees to gain acceptance in new merchant categories that historically relied on cash, checks, or ACH, including supermarkets, fast food restaurants, and rent and utilities; and negotiating individual deals with large merchants that exercise their substantial bargaining power to obtain lower interchange rates. *See* Knupp Decl. ¶¶ 11–15; Aikat Decl. ¶ 19.[7] Notably, none of these attempts to balance the interests of various network

---

[6]   As senior Visa executives have long explained, Visa sets default interchange fees "in the best interest of Visa . . . so as to optimize the throughput of the Visa system." ECF No. 8520-11, SJDX 280 (Sheedy 2008 Dep.) at 213:9–20; *see also* ECF No. 8520-10, SJDX 170 (Jenkyn Dep.) at 61:7–62:2 ("Everything that we do is trying to balance continued acceptance, acceptance growth, and I can assure you there's an equal amount of pressure, not just on interchange, but on economics and other considerations that are equal on both sides"); ECF No. 8520-11, SJDX 291 (Steele Dep.) at 28:20–29:9 (testifying that Visa's "overall objective in managing interchange" was "maximizing Visa volume and revenue growth" and that Visa's "focus was on throughput to the system"). Mastercard similarly sets interchange to "incent both the widespread issuance and acceptance of Mastercard cards." ECF Nos. 8526-5, 8526-6, SJDX 370 (MCW_MDL_11958758) at -762–63; *see also* ECF No. 8520-10, SJDX 176 (Jonas Dep.) at 31:21–32:24 (Mastercard sets interchange fees to "achieve issuer, cardholder sales and/or expand acceptance in new categories."); ECF No. 8520-10, SJDX 181 (Kapteina Dep.) at 66:3–13 (similar).

[7]   ECF No. 8527-2, SJDX 423 (VISA14MDL1-00113603) (Acceptance and Co-Brand Incentive Agreement between Visa and a retailer merchant); ECF No. 8527-1, SJDX 422 (VISA14MDL-00115476) (Acceptance Agreement between Visa and another retailer merchant); ECF No. 8532-12, SJDX 530 (VISA14MDL1-16698064) (Co-Branded Credit Card Network Agreement between Visa and an e-commerce merchant); ECF Nos. 8516-12, 8516-13, SJDX 899 (VISA14MDL-00110751) at -779 (Visa Board minutes reflecting that the reactions of Visa issuing banks to certain interchange reductions granted to a merchant were "strong" and "negative," including a threat by one bank "to move a meaningful proportion of their business from Visa to Mastercard"); *see also* ECF Nos. 8068, 8262 (Defs.' 56.1 in Supp. of Summ. J. Mot.) ¶ 253 (citing SJDX 224 (McInerney Dep.) at 232:1–22, 235:1–3 (after Visa won exclusive acceptance at a retailer by offering the most attractive deal, including lower

*(footnote continued on next page)*

14

participants has involved revisions to the basic structure of default interchange, given the impossibility of operating a successful network without it. *See* Knupp Decl. ¶¶ 20–27; Aikat Decl. ¶¶ 17–21.

Each network's default interchange rule ensures that transactions among millions of merchants and thousands of financial institutions—amounting to nearly 150 billion credit and debit transactions per year—run smoothly and reliably. ECF No. 8524-13, SJDX 1026 (2019 Visa Form 10-K) at 4; ECF No. 8524-6, SJDX 1020 (2019 Mastercard Form 10-K) at 6–9, 16; ECF No. 8531-10, SJDX 1129 (Visa Rules, Apr. 2020) at 50; ECF No. 8529-14, SJDX 1052 (Mastercard Rules, Dec. 2019) at 15. Without a default interchange rule, thousands of card-issuing banks would need to negotiate with thousands of acquiring banks, or with millions of merchants, for individual agreements regarding the fees that would apply to each transaction. *See* Knupp Decl. ¶¶ 22–23; Aikat Decl. ¶ 20. In a system requiring so many bilateral negotiations, many participants undoubtedly would not be successful in reaching agreement, destroying the fundamental assurance of a well-functioning and reliable network, and preventing at least some segment of banks and merchants from participating in the payment system—or limiting or delaying their ability to do so.

---

interchange rates, issuing banks had "very mixed points of view" and did not like the ultimate rate)); *id.* ¶ 254 (citing SJDX 268 (Schneider Dep.) at 107:19-24–110:7 (former executive at a U.S. issuer testified that the issuer was losing money at a retailer due to that merchant's deal with Visa); ECF No. 8520-9, SJDX 118 (Como Dep.) at 239:22–23 ("Yeah, we were expecting issuers would be incredibly upset at the low interchange rate [that Visa agreed to with an individual merchant."); ECF No. 8532-17, SJDX 543 (MCW_MDL_28028026) (Debit Card Network Incentive Agreement between Mastercard and a retailer merchant); ECF No. 8545-7, SJDX 625 (MCW_MDL_28027754) (Merchant Acceptance Agreement between Mastercard and a restaurant chain); ECF No. 8520-13, SJDX 328 (MCW_MDL_03337272) (U.S. issuer communicating to Mastercard their displeasure with "the decisions [Mastercard] made around" the interchange rate applicable in the agreement reflected in SJDX 625); ECF No. 8540-1, SJDX 555 (MCW_MDL_19403322) (similar communications from another U.S. issuer)); ECF No. 8545-8, SJDX 642, (MCW_MDL_00946869) (similar communications from a third U.S. issuer).

The result would be to degrade the networks' product offerings and depress output.  *See* Knupp Decl. ¶ 24; Aikat Decl. ¶ 20.

The time and expense involved in negotiating those agreements also would drive up the costs of Visa and Mastercard payment card transactions for banks, merchants, and cardholders, and thereby reduce their competitiveness with other payment methods.  *See* Knupp Decl. ¶¶ 25–26; Aikat Decl. ¶ 21.[8]  Indeed, the Supreme Court found in *Amex* that Visa and Mastercard have competed with American Express by setting relatively ***lower*** interchange fees than American Express and thereby gaining broader, near-universal merchant acceptance.  585 U.S. at 549–50.

On the issuing side, small banks and credit unions would be hit hard by the cost of individual negotiations and would lack leverage in at least some instances to negotiate interchange fees that adequately incentivize them to issue cards, forcing those smaller competitors to abandon Visa and Mastercard card issuance, thereby reducing consumer choice.  *See* Knupp Decl. ¶¶ 24, 27; Aikat Decl. ¶ 21.  It is a matter of common sense that small merchants (and many larger merchants) likewise would lack resources to negotiate with thousands of issuing banks.  And, to the extent that some of the largest merchants could reach deals with some of the largest banks, there would be no guarantee of uninterrupted service while they negotiated.  Without default interchange, the inevitable result is a weakened network that is less useful to cardholders and to merchants, and struggles to compete with other, more reliable networks and forms of payment.

***Honor-All-Cards.***  Compelling evidence also establishes that Visa's and Mastercard's Honor-All-Cards rules are procompetitive.  In approving the 2012 class settlement in MDL 1720, this Court previously concluded that the Visa and Mastercard "Honor-all-Cards

---

[8]    *See also* ECF No. 8520-10, SJDX 189 (Knupp Dep.) at 16:9–17:15, 115:2–9, 119:3–120:8 (Visa strives to price its services to be competitive with those offered by other competing payment card networks and other forms of payment); ECF No. 8520-11, SJDX 297 (Swain Dep.) at 168:5–10, 190:6–23 (same for Mastercard).

rules . . . undeniably have significant procompetitive effects." *In re Payment Card*, 986 F. Supp. 2d 207, 227 (E.D.N.Y. 2013), *rev'd on other grounds*, 827 F.3d 223 (2d Cir. 2016).  The Court emphasized that "[a] number of courts and economists have found the Honor-all-Cards rule and similar rules to be *procompetitive* under the Rule of Reason." *Id.* at 227–28.  There is no reason to deviate from that conclusion now.

Like default interchange, the Honor-All-Cards rules are defining features of the Visa and Mastercard networks:  they allow a wide variety of banks to issue cards under the Visa or Mastercard brands and thereby create competing card products that the thousands of issuing banks could not offer individually.  Knupp Decl. ¶¶ 29–32; Aikat Decl. ¶¶ 12–16.  Just as default interchange eliminates the need for millions of bilateral negotiations on rates, Honor-All-Cards provides cardholders and issuers, including small issuing banks that would never be able to negotiate acceptance with millions of merchants, with assurance that their cards will be widely accepted.  Knupp Decl. ¶¶ 29–32; Aikat Decl. ¶¶ 12–16; *see also* ECF No. 8526-12, SJDX 388 (Elzinga Rep.) at 151–52.

As the Supreme Court found in *Amex*, there is nothing "inherently anticompetitive" about network provisions that ensure "welcome acceptance" and "the promise of a frictionless transaction."  585 U.S. at 551.  If cardholders have no certainty as to whether their cards will be accepted, those cards will become less valuable to them; cardholders will use them less; and merchants will in turn be less motivated to accept cards that not as many cardholders want to use. In the Supreme Court's words, "[a] lack of welcome acceptance at one merchant makes a cardholder less likely to use" a particular payment network's cards "at all other merchants.  This externality endangers the viability of the entire" payment network.  *Id.*  It is for precisely this reason that the Supreme Court found that rules ensuring "welcome acceptance" "actually stem

negative externalities in the credit-card market and promote interbrand competition," which is the kind of competition that the antitrust laws are designed to protect.  *Id.* at 551–52.

**Surcharging Rules.**  Visa's and Mastercard's rules placing limits on a merchant's ability to surcharge its cardholders likewise promote competition, as they protect cardholders from penalties and negative experiences when making a payment.  *See* Knupp Decl. ¶¶ 34–35; Aikat Decl. ¶ 43.[9]  Absent these rules, merchants could opportunistically punish cardholders who lacked other payment alternatives—such as cardholders in taxis or cardholders making purchases with cards pre-loaded on a merchant's app (Uber, Grubhub, etc.)—and force the merchants' preferred method of payment upon cardholders, effectively undermining Honor-All-Cards rules and default interchange through surcharges, and depriving cardholders of choices.  *See* Knupp Decl. ¶¶ 37–38; Aikat Decl. ¶ 43.  These effects, inarguably harmful to consumers, would also degrade Visa's and Mastercard's ability to compete with other networks (that have similar non-discrimination rules) and payment forms.  Knupp Decl. ¶ 40; Aikat Decl. ¶ 43.

Importantly, banks that issue Visa and Mastercard cards are free to issue American Express and Discover credit cards.[10]  Visa and Mastercard thus fiercely compete against each other, American Express, and Discover for banks' card-issuing business.  *See* Knupp Decl. ¶¶ 5, 45–46;

---

[9]  *See also*, *e.g.*, ECF No. 8520-9, SJDX 102 (Buse Dep.) at 249:5–9 ("[P]roviding a surcharge on a Visa card is a penalty that would cause consumers to use their . . . Visa card less."); ECF No. 8520-11, SJDX 282 (Sheedy Dep.) at 144:19–25 (If merchants were permitted to surcharge and, in particular, surcharge by issuer, "I think the system would be smaller" and "less valuable" and "that it would be bad for our business."); ECF No. 8520-9, SJDX 133 (Doyle Dep.) at 84:8–15 ("The business rationale [for the surcharging rules] is about a cardholder experience, and about a positive cardholder experience, that a cardholder goes into a merchant, they're told what something costs, and they pay what it costs.  And they shouldn't be specifically targeted, because they're using Mastercard, to pay extra.").

[10]  This result was mandated by the decision in *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001).

Aikat Decl. ¶¶ 22–32.[11]  If Visa and Mastercard cannot set their own rules to protect their issuers' cardholders, and thereby ensure that their cards are valuable to cardholders, banks could easily shift issuance away from Visa or Mastercard to American Express or Discover, *see* Knupp Decl. ¶¶ 43–47; Aikat Decl. ¶¶ 28–32, where their cardholders would be assured the "frictionless transaction" that the Supreme Court found to "promote interbrand competition," *Amex*, 585 U.S. at 551.

*                    *                    *

In sum, the erosion of Visa's and Mastercard's consumer-friendly rules—default interchange, Honor-All-Cards, and the surcharging rules—heightens the risk that each network will lose volume, both from issuers moving their card portfolios to other networks and from cardholders using their Visa and Mastercard cards less.  This would, in turn, reduce the value of each network to merchants and make the networks less attractive to accept.  Overall, these changes would diminish each network's ability to compete and provide value to their stakeholders.

### 3. *Rule of Reason:  No Less Restrictive Alternatives*

Visa and Mastercard will establish at trial that the procompetitive benefits created by their rules could not be achieved without them.

There is no factual evidence suggesting that the networks would be able to function without a default interchange rule.  Plaintiffs may point to countries where networks operate without setting interchange, but there, default rates are set by regulators, and thus serve the same function as default interchange by providing predictable economics to network participants.  Nowhere are

---

[11]  *See also*, *e.g.*, ECF No. 8522-6, SJDX 948 (WFINTCHG000289011) (Wells Fargo considering issuance of American Express cards and a "long term strategic partner[ship]" with American Express); ECF Nos. 8068, 8262 (Defs.' 56.1 in Supp. of Summ. J. Mot.) ¶ 154 (citing SJDX 255 (Reid Dep.) at 259:19–260:6 (Mastercard executive testifying that the environment for card issuance is "ferociously competitive" with Visa, American Express, and Discover)).

payment card rates left to thousands of individual negotiations between merchants and issuers. Moreover, the Honor-All-Cards rules ensure "universality of acceptance," which is "the key element to a national payment system." *See Nat'l Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 779 F.2d 592, 602 (11th Cir. 1986); *see also* Knupp Decl. ¶¶ 29–33; Aikat Decl. ¶¶ 12–13. Indeed, there is no evidence of a single payment network in the world that does not have such a rule.[12]

It is also notable that government enforcers have never challenged Visa's or Mastercard's setting of default interchange fees or Honor-All-Cards rules. *See In re Payment Card*, 986 F. Supp. 2d at 227 (noting the Department of Justice's "decision not to challenge default interchange rules despite entreaties by Class Counsel that it do so"). In fact, when it entered a Consent Decree with Visa and Mastercard regarding the networks' non-discrimination rules in 2010, the Department of Justice expressly agreed that the honor-all-issuers aspect of the Honor-All-Cards rules should remain in place.[13]

Substantial modifications to the default interchange and Honor-All-Cards rules beyond those offered by this settlement would eliminate the procompetitive benefits of those rules and make Visa and Mastercard weaker competitors against other networks like American Express and Discover, whose rules will not be affected by this litigation. Those networks, with non-

---

[12] ECF No. 8526-12, SJDX 388 (Elzinga Rep.) at 159 ("I am not aware of any payment-card system that does not have HAC rules or something like them to ensure 'equal treatment' of cards."); ECF No. 8539-7, SJDX 1232 (Murphy Rep.) ¶ 34 ("As an empirical matter, the HAC rule is so central to the efficient operation of payment card systems that I know of no system anywhere or at any time that did not include it."); ECF No. 8520-9, SJDX 98 (Bright Dep.) at 63:12–17, 90:7–9 (American Express's 30(b)(6) representative testifying about American Express's non-discrimination provisions); *see also* ECF Nos. 8068, 8262 (Defs.' 56.1 in Supp. of Summ. J. Mot.) ¶ 422 (citing SJDX 238 (Parsons Dep.) at 232:20–233:18 (Discover's 30(b)(6) representative testifying about Discover's equal treatment rule)); *id.* ¶ 423 (citing SJDX 243 (Piparo (STAR) Dep.) at 388:13–15 (STAR's Honor-All-Cards rule)); ECF No. 1542 (Pls.' Reply 56.1 in Supp. of Summ. J. Mot.) at 178 n.277 (citing and attaching RSFEX920 (R. Pomerleau Dep.) at 84:8–87:7 (Wright Express's Honor-All-Cards rule)).

[13] *See United States v. Am. Express, et al.*, No. 10-cv-4496 (E.D.N.Y. 2010), ECF No. 143 (Final Judgment as to Defendants Mastercard International Incorporated and Visa Inc.) at § IV.B.4.

discrimination rules intact, could offer greater value to network participants—both in purely economic terms and in terms of their assurances of widely accepted, frictionless transactions. Issuers of Visa and Mastercard cards could (and would) move their business to American Express or Discover.[14]  Knupp Decl. ¶¶ 43–47; Aikat Decl. ¶¶ 28–32, 49.  Those networks are already formidable competitors:  American Express now has a non-discrimination rule endorsed by the Supreme Court,[15] and the Discover network has now combined forces with Capital One, a large issuer, to create an even more significant competitive threat.  If interbrand competition is to persist, Visa and Mastercard must each be able to maintain the rules that form the foundations of their respective networks.

### C.    Plaintiffs' Risks of Establishing Liability Will Persist Post-Trial.

Even if Plaintiffs succeed at the liability phase, they face numerous risks post-trial and on appeal.  The remedies phase would be lengthy and complicated, and Plaintiffs would have no assurance of receiving the full remedies they seek given the substantial negative consequences of rules changes on the cardholder side of the market.  For example, in the recent Google search litigation, the court denied many of the remedies sought by the Department of Justice, including those that would have adverse consequences to users of Google's search engine.  *United States v. Google*, 2025 WL 2523010, at *2–3 (D.D.C. Sep. 2, 2025).  A similar risk here weighs in favor of settlement.  *See Wright v. Stern*, 553 F. Supp. 2d 337, 344 (S.D.N.Y. 2008) (settlement favored where "remedial phase would have been complex and protracted").

---

[14]    This shift might serve to *increase* merchants' costs, as American Express tends to be more expensive for merchants than either Visa or Mastercard.  *Amex*, 585 U.S. at 539.

[15]    American Express's non-discrimination rules, similar to those at issue here, were again recently found not to violate the antitrust laws by a jury in this District, further underscoring both the risks that Plaintiffs face here and the protection that Defendants' competitors rely upon to run their networks based on their own unilateral decisions. *Moskowitz, et al. v. Am. Express Co.*, No. 19-cv-566 (E.D.N.Y. 2019), Tr. of Jury Trial (Aug. 28, 2025) at 2700:10–2701:1.

Further, as this Court noted in its 2024 decision, the various legal issues in this case are "complex" and "would likely be raised again on appeal." *In re Payment Card*, 2024 WL 3236614, at *22. Those issues include this Court's legal rulings at summary judgment,[16] as well as the evidentiary issues that will be presented at trial and in a remedies phase. The appellate risks and uncertainty arising from these "complex" issues weigh strongly in favor of settlement, as numerous courts have found. *See, e.g.*, *In re Facebook, Inc.*, 343 F. Supp. 3d 394, 412 (S.D.N.Y. 2018) ("Even if Plaintiffs overcame [certain] defenses and others, lengthy appeals could tie up, delay, or ultimately preclude recovery for the class."); *Garcia*, 2012 WL 5305694, at *12–13 (noting that obtaining a favorable outcome on appeal is "inherently uncertain" and a "lengthy" process).[17] As one example, the Supreme Court's *Amex* decision in 2018 reversed a trial result in favor of plaintiffs in 2015. 585 U.S. at 539–40.

In finding that the risks to Plaintiffs of establishing liability weighed against settlement approval in 2024, the Court focused on its then-recent denial of Defendants' *Daubert* and summary judgment motions. *In re Payment Card*, 2024 WL 3236614, at *22–23. But the fact that Plaintiffs have been allowed to proceed to trial does nothing to undermine the risks they continue to face over several additional years of litigation in multiple courts. When weighed against the risks to

---

[16]  As just two examples, the Court declined to grant summary judgment under *Illinois Brick* even though acquirers—not merchants—are the only network participants that pay interchange fees directly to issuers, and the Court declined to grant summary judgment under *Amex* even though Plaintiffs have failed to provide any direct proof of anticompetitive effects in a two-sided market with skyrocketing output, falling prices, and thriving innovation and quality. ECF Nos. 8174, 8350 (Defs.' Mem. in Supp. of Summ. J. Mot. Based on *Illinois Brick*); ECF Nos. 8071, 8277 (Defs.' Mem. in Supp. of Summ. J. Mot. Based on *Amex*).

[17]  *See also*, *e.g.*, *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 123 (S.D.N.Y. 2009) (noting that "[t]he complexity of Plaintiff's claims *ipso facto* creates uncertainty"); *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 312–13 (E.D.N.Y. 2006) ("Defendants would have pursued these and other legal issues in post-trial motions and on appeal. The risks of establishing liability and collecting judgment were substantial."); *FTR Consulting Grp., Inc. v. Advantage Fund II, Ltd.*, 2005 WL 2234039, at *3 (S.D.N.Y. Sep. 13, 2005) (noting "that Plaintiff faces the possibility of 'winning at trial and then perhaps losing' on appeal").

Plaintiffs, the certain and sweeping relief offered by the Settlement Agreement should be approved.

## II.    The Reasonableness of the Settlement in Light of the Best Possible Recovery and All Attendant Risks of Litigation Weighs in Favor of Settlement.

The Settlement Agreement provides ample relief to the class, and that relief compares favorably to Rule 23(b)(2) Plaintiffs' "best possible recovery" at trial.  As a result, this *Grinnell* factor weighs in favor of approval.

### A.    The Settlement Agreement Provides Ample Relief to the Class.

In its 2024 decision, the Court faulted the parties for focusing on surcharging (and not going further on surcharging relief), and for not providing adequate relief as to the other challenged rules—primarily, the Honor-All-Cards rules, and what the Court called "high interchange rates."[18] *In re Payment Card*, 2024 WL 3236614, at *28.  The Court likewise explained that its "concerns with the adequacy of the Settlement are similar to the concerns the Second Circuit expressed regarding" a prior 2012 settlement with the Rule 23(b)(2) Class.[19]  *Id.* at *38.  The Court highlighted that many merchants could not "fully avail themselves of the benefits of surcharging in this [2024] Settlement" because they operate in states that "expressly or functionally prohibit surcharging" or "because they accept American Express cards."  *Id.*  The Court further noted that "other forms of relief would likely have been more beneficial to merchants," and quoted the Second Circuit's statement that "[a]lternative forms of relief might have conferred a real and

---

[18]    The supposedly "high interchange rates" of which Plaintiffs complain are an alleged <u>effect</u> of the challenged rules.  As discussed further below, even if liability were found, the Court does not have authority to regulate the level of interchange rates.

[19]    While the District Court approved this earlier settlement, *In re Payment Card*, 986 F. Supp. 2d at 241, the Second Circuit reversed that decision based primarily on adequacy of representation concerns, because the Rule 23(b)(2) class was, unlike now, combined with and led by the same counsel as the Rule 23(b)(3) class, *In re Payment Card*, 827 F.3d at 236.

palpable benefit, such as remedies that affected the default interchange fee or honor-all-cards rule." *Id.* (quoting *In re Payment Card*, 827 F.3d at 238).

Heeding the Court's instructions, Visa and Mastercard have now agreed to make sweeping, historic changes to their Honor-All-Cards rules. Unlike the 2024 settlement (and the 2012 settlement before it), this Settlement Agreement broadly revises the Honor-All-Cards rules to allow merchants to decline the categories of credit cards that carry the highest interchange rates. In particular, the networks have agreed to revise their Honor-All-Cards rules applicable to credit cards, allowing merchants (i) to accept consumer credit cards without accepting commercial credit cards, and vice versa, and (ii) to accept standard consumer credit cards without accepting premium consumer credit cards, and vice versa. Settlement Agreement ¶¶ 22, 71. In doing so, the settlement would answer a longstanding complaint of merchants that the networks' Honor-All-Cards rules give merchants an "all-or-nothing" choice and force them to accept more expensive cards where they might want to accept only lower-cost cards.[20]

At the same time, Visa and Mastercard have agreed to allow merchants to surcharge their credit cards up to the cost of acceptance or 3% (300 basis points, sufficient to recoup interchange fees applicable to the vast majority of transactions), ***without regard to whether the merchant also surcharges any other credit card*** (including a more expensive competitor credit card like American Express). *Id.* ¶¶ 40–41, 43(c), 89–90, 92(c). And while some objectors to the 2024

---

[20] While the Court's inquiry should focus on the relief sought and arguments made by the Rule 23(b)(2) Plaintiffs—not the opt-outs from the Rule 23(b)(3) damages class whose counsel will not be present at trial and whose experts will not testify—this point has been repeated by *all* merchants in MDL 1720, in both their complaints and expert reports. *See, e.g.*, *Target Corp., et al. v. Visa Inc., et al.*, No. 13-cv-3477 (S.D.N.Y. 2013), ECF No. 197 (Third Am. & Suppl. Compl.) ¶ 117 (alleging that the Honor-All-Cards rules "require merchants, as a condition of accepting any Visa-branded or Mastercard-branded credit cards, to accept higher-cost cards such as rewards cards or commercial cards"); ECF Nos. 8196, 8329 (Direct Action Pls.' Counterstatement of Material Facts) ¶ 1083 (similar); ECF No. 8526-17, SJDX 400 (Hausman Rep.) ¶ 92 (similar).

settlement suggested that surcharging relief may not be useful, *In re Payment Card*, 2024 WL 3236614, at *37 n.52, the reality is that surcharging is already taking hold.  A recent survey found that 34% of small businesses in the United States now add surcharges for purchases made with credit cards.[21]  The elimination of the networks' long-standing "level playing field" for surcharging will only advance these trends.

Merchants will also benefit from the changes to default interchange required by the Settlement Agreement.  To ensure the existence of low-cost standard consumer credit cards that merchants can encourage their customers to use, the Settlement Agreement would create an interchange rate cap for the standard (non-premium) consumer credit card category, making those rates over 100 basis points lower than rates for premium credit products.  *See* Settlement Agreement ¶¶ 50, 99.  And to give all of these and other rules changes sufficient time to take hold while providing merchants with cost certainty, the settlement would impose systemwide limits on credit card interchange rates—in the form of posted interchange rate caps (meaning, no increases in published rates) and an overall average effective rate limit that is 10 basis points lower than the current level—for a period of five years.[22]  *Id.* ¶¶ 48, 51, 97, 99.  All of these changes to the Honor-All-Cards rules, surcharging, and default interchange structures should be considered together in comparing the relief to the Rule 23(b)(2) Plaintiffs' "best possible recovery" at trial.

---

[21]  J.D. Power, *Many Small Businesses Add Card Payment Surcharges to Customer Purchases as Point-of-Sale Payment Methods Proliferate* (Jan 14, 2025), available at https://www.jdpower.com/sites/default/files/file/2025-01/2025002%20U.S.%20Merchant%20Services.pdf.

[22]  Merchants with custom interchange rate agreements will receive a reduction in the interchange rates applicable to their transactions in proportion to the 10 basis-point reduction received by the rest of the Rule 23(b)(2) class.  Settlement Agreement ¶¶ 49, 98.

**B.**     **The Settlement Compares Favorably to Plaintiffs' "Best Possible Recovery."**

There remains only a narrow gap between the "best possible recovery" that the Rule 23(b)(2) Plaintiffs seek and the concessions the networks have made, and on rate relief the Settlement Agreement <u>exceeds</u> what Plaintiffs could recover at trial.

In its 2024 decision, the Court raised the question of "whether the *objecting plaintiffs* would successfully argue" for the elimination of Honor-All-Cards (and other) rules at trial.  *In re Payment Card*, 2024 WL 3236614, at *27 (emphasis added).  But the objecting plaintiffs who opted out of the Rule 23(b)(3) class to pursue individual damages claims will not be presenting their own case theories at the Rule 23(b)(2) trial, and they will not be able to obtain injunctive relief in their own cases in any event, given that their injunctive relief claims have been subsumed by this mandatory class action.  As the Court has underscored, Rule 23(b)(2) Plaintiffs and their counsel adequately represent the entire class of Rule 23(b)(2) merchants (including every merchant that opted out of the damages class).  *Id.* at *14–19; *In re Payment Card*, 2021 WL 6221326, at *18–38 (E.D.N.Y. Sep. 27, 2021).  This Court's "best possible recovery" analysis therefore should be framed by the Rule 23(b)(2) Plaintiffs' claims, evidence, and arguments that would be presented at an injunctive relief trial, as discussed below.

***Best Possible Recovery as to Default Interchange and Honor-All-Cards.***  Rule 23(b)(2) Plaintiffs have never advocated for a full repeal of the default interchange or the Honor-All-Cards rules, presumably given the lack of likelihood of success on this radical position.  Instead, Plaintiffs' experts proposed (i) eliminating default credit interchange *only* for the large national banks already subject to debit interchange regulation under the Durbin Amendment; and (ii) eliminating the Honor-All-Cards rules *only* in those few states where surcharging is

prohibited.[23]  Even if fully granted, these requests would nonetheless leave the default interchange

rule in place for the vast majority of financial institutions in the United States, and leave the Honor-

All-Cards rules in place in the vast majority of states.

Moreover, even if they prevailed at trial, the Rule 23(b)(2) Plaintiffs could not obtain the

interchange rate reductions required by the Settlement Agreement.  Specific rates are an effect of

the challenge rules and could not be part of a rules-based, post-trial remedy.  The Supreme Court

has repeatedly stated that courts lack the power to set rates or regulate prices.  *Prentis v. Atlantis*

*Coast Line Co.*, 211 U.S. 210, 226 (1908) ("The establishment of a rate is the making of a rule for

the future, and therefore is an act legislative, not judicial, in kind."); *accord Keller v. Potomac*

*Elec. Power Co.*, 261 U.S. 428, 440–42 (1923) (holding that it exceeds the Article III case or

controversy requirement to vest federal courts with rate valuation authority).[24]  Accordingly, the

Second Circuit has acknowledged that rate setting is better left to regulatory agencies.  *Berkey*

*Photo, Inc. v. Eastman Kodak Co.*, 603 F. 2d 263, 294 (2d Cir. 1979) (rejecting "judicial oversight

of pricing policies [that] would place the courts in a role akin to that of a public regulatory

commission").  Stated differently, any comparison of the Settlement Agreement to the Rule

23(b)(2) Plaintiffs' "best possible recovery" as to interchange rates must start with a benchmark

---

[23]  *See* ECF No. 8526-19, SJDX 416 (Stiglitz Rep.) ¶¶ 7.R, 132–80.

[24]  *See also United States v. Trenton Potteries Co.*, 273 U.S. 392, 397 (1927) ("The reasonable price fixed today may through economic and business changes become the unreasonable price of tomorrow."); *Arsberry v. Illinois*, 244 F. 3d 558, 562 (7th Cir. 2001) (noting a "historical antipathy to rate setting by courts" and referring to rate setting as "a task [courts] are inherently unsuited to perform competently"); *In re Coordinated Pretrial Proceedings in Petrol. Prods. Antitrust Litig.*, 906 F. 2d 432, 445 (9th Cir. 1990) ("The federal courts generally are unsuited to act as rate-setting commissions."); *Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996) ("The district court's opinion concerning the fee reads like the ruling of an agency exercising a power to regulate rates.  Yet the antitrust laws do not deputize district judges as one-man regulatory agencies."); *In re Payment Card*, 986 F. Supp. 2d at 218 (confirming that "regulation of interchange fees" is relief "that this Court could not order even if the plaintiffs obtained a complete victory on the merits"), *rev'd on other grounds*, 827 F.3d 223 (2d Cir. 2016).

of zero interchange rate relief following trial, compared to the direct 10 basis-point reduction in systemwide average effective rates in the proposed Settlement Agreement, including the significant reductions in standard consumer credit rates complementary to the bifurcation of premium consumer credit acceptance from standard consumer credit acceptance.

***Best Possible Recovery as to Surcharging and Steering.*** Rule 23(b)(2) Plaintiffs' lead economists largely focused on rules that restrain surcharges, *see generally* ECF No. 8526-19, SJDX 416 (Stiglitz Rep.) *and* ECF No. 8526-11, SJDX 386 (Carlton Rep.), and agreed that it would be reasonable to maintain a rule that provides that surcharges "cannot exceed the charge imposed on the merchant," ECF No. 8526-19, SJDX 416 (Stiglitz Rep.) ¶ 131—which is exactly what the Settlement Agreement preserves. In this respect, the Settlement Agreement—which allows merchants to surcharge credit cards up to 3% or the cost of acceptance, whichever is lower—would essentially match what the Rule 23(b)(2) Plaintiffs' experts would opine is reasonable at trial.

The only type of surcharging relief the settlement does not provide is the ability to surcharge based on issuer. That possibility, however, has to be weighed against the network fragmentation that would result from giving merchants the ability to single out particular issuers. As discussed above, the benefit an issuer receives from joining a network is the ability to issue cards that are widely used and accepted, and not discriminated against vis-à-vis other cards issued under the same network brand. Issuer-level surcharging would gut that basic premise and drive issuers away from Visa and Mastercard, thereby weakening interbrand competition based on the merchants' desire to engender intrabrand competition. Knupp Decl. ¶ 36; Aikat Decl. ¶¶ 42, 45. That is not something the antitrust laws are designed to do. *Amex*, 585 U.S. at 552.

In any event, the Settlement Agreement does provide for a form of issuer differentiation. It memorializes principles for <u>positive</u> steering among issuers, which is far less likely to alienate the networks' issuing banks and cardholders, and expressly identifies and incorporates into the settlement 19 permissible issuer-differentiation scenarios. Settlement Agreement at App'x H. The Settlement Agreement also requires Mastercard to revise its rules to allow issuer-level discounting (something Visa already allows in practice). *Id.* ¶ 68. This is consistent with the best possible recovery Plaintiffs could obtain at trial and maintain through any potential appeals.

**III.    The Settlement Agreement Treats Class Members Equitably Relative to Each Other.**

As this Court has recognized, "different class members can benefit differently from an injunction—but no matter what, they *must* stand to benefit (it cannot be the case that some members receive no benefit while others receive some)." *In re Payment Card*, 2024 WL 3236614, at *36. However, "[a] Rule 23(b)(2) class member need not avail herself of the benefit of a settlement to be deemed to have benefit[ted] from it." *Id.* at *39 n.53.

The Settlement Agreement provides broad and uniform nationwide reforms to the networks' Honor-All-Cards rules, interchange rates, and other point-of-sale rules applicable to all merchants, such that all merchants—regardless of size, location, payment mix, or other factors— stand to benefit. Importantly, merchants will be able to accept less expensive categories of credit cards while declining more expensive categories, and merchants will benefit from the interchange rate relief provided, including the significant reductions to standard consumer credit rates, which merchants can utilize to drive volume to those cards and away from premium consumer credit cards. Merchants can likewise test their new acceptance options through more flexible non-acceptance pilots, allowing them to test non-acceptance at a portion of their stores for up to six months per year, and thereafter decide based on their own data whether accepting particular cards is profitable for them. *See* Settlement Agreement ¶¶ 32, 81. Additionally, merchants will benefit

from interchange rate caps lasting for five years, giving them cost certainty.  And in the states that allow it, merchants will also have a right to surcharge Visa or Mastercard credit cards at the brand or product level, unconstrained by whether the merchant also surcharges American Express or other cards.[25]

In its 2024 decision, this Court further concluded that the benefits of the settlement were likely to flow disproportionately to small merchants like the Class Representatives, in part because large merchants "do not pay posted rates, [and] they are unlikely to receive any benefit from the 'rate caps and rollbacks.'"  *In re Payment Card*, 2024 WL 3236614, at *37.  The Settlement Agreement addresses this concern head-on:  merchants with custom credit interchange rate agreements with Visa and Mastercard—which have already succeeded in leveraging their bargaining power to obtain favorable deals—will receive reductions in their negotiated rates proportional to the reduction received by the class.  Settlement Agreement ¶¶ 49, 98.

The Settlement Agreement provides all merchants with new options to manage their acceptance costs and steer their customers to lower-cost forms of payment.  Thus, regardless of whether or how merchants choose to avail themselves of these options, this factor weighs in favor of settlement approval.

## IV. **Visa and Mastercard Likely Could Not "Withstand a Substantially Greater Judgment" and Remain Viable Four-Party Networks.**

Visa and Mastercard could not "withstand a substantially greater judgment" than the rules changes and interchange caps and reductions required by the Settlement Agreement.  To the extent

---

[25]  While the Court previously noted that large national merchants would be unable to partake of surcharging relief because some states prohibit surcharging and large merchants operate nationwide, the reality is that these merchants will be able to surcharge—or threaten to surcharge to obtain some concession—in the vast majority of states, which allow surcharging. *In re Payment Card*, 2024 WL 3236614, at *37.

this factor applies given that no monetary relief is sought,[26] the key question in evaluating it is whether Visa and Mastercard could survive competitively as four-party networks if a judgment by this Court significantly curtailed the challenged rules in ways beyond the changes proposed.  *See In re Payment Card*, 2024 WL 3236614, at *40 (explaining that "the vast majority of injunctive relief" ordered by courts after finding a violation of law "will impose some costs on the defendant, short of requiring its dissolution").

In rejecting the 2024 settlement, the Court suggested that Visa and Mastercard could "withstand a greater judgment" by pointing to specific levels of interchange rates in comparison with the value of the previously proposed interchange rate caps and rollbacks.  *Id.* at *41.  To be clear, the networks do not earn revenues from interchange rates, although their ability to compete for issuing banks' business by setting interchange rates attractive to the banks does impact the networks' survival.  In any event, as discussed above, interchange rate relief would not be available to an injunctive relief class after trial.  The focus for this inquiry should be on whether the networks could withstand different or more extensive rule changes, not deeper interchange rate cuts.  On that question, the answer is no.

Through this settlement, the networks have agreed to unprecedented changes to their Honor-All-Cards and surcharging rules, as well as a reduction to credit interchange rates.  To be sure, these changes will diminish the networks' ability to compete.  Cardholders trying to use their

---

[26] As the Court previously explained, "[s]ome courts have decided that the range of reasonableness factors—along with several other *Grinnell* factors—do not apply where no monetary relief is sought."  *In re Payment Card*, 2024 WL 3236614, at *26; *see also Calibuso v. Bank of Am. Corp.*, 299 F.R.D. 359, 367 n.15 (E.D.N.Y. 2014) ("[W]here only non-monetary relief is being sought, more than one district court has suggested that 'the ability of the defendants to withstand a greater judgment' is not relevant to its determination.").  Further, courts have observed that "in any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the [] settlement."  *In re Vitamin C. Antitrust Litig.*, 2012 WL 5289514, at *6 (E.D.N.Y. Oct. 23, 2012).

preferred Visa or Mastercard card may find, for the first time, that they cannot do so because a merchant has decided not to accept their small business card or their preferred rewards card. Cardholders may attribute a negative checkout experience to the networks if their Visa or Mastercard card is surcharged but their American Express card is not. The interchange rate changes limit Visa's and Mastercard's ability to compete for issuing banks' business through increased interchange rates designed to compensate issuers for generous, innovative rewards programs. All of these are significant concessions the networks are making to resolve this litigation in the near term.

What the networks cannot do is unravel the foundations on which they were built and continue to operate. They cannot eliminate the Honor-All-Cards rules or their surcharging rules at the issuer level and thereby undermine the very premise for an issuer joining a network. Knupp Decl. ¶¶ 33, 41, 45–47; Aikat Decl. ¶¶ 37, 42.[27] They cannot abolish default interchange and leave the basic price of a network transaction—and the reliability of that transaction—to the capricious negotiations of millions of merchants and thousands of issuers. Knupp Decl. ¶¶ 20–27, 45–47; Aikat Decl. ¶¶ 20–21.[28] Simply put, Visa and Mastercard do not issue their own credit cards. Once issuing cards over those networks is no longer an attractive proposition for issuing banks—including because those cards are no longer valuable to cardholders—the networks cannot succeed. That is not a risk that the antitrust laws ask the networks to bear because it is antithetical to competition, not conducive to it.

---

[27]  *See also* ECF No. 8526-12, SJDX 388 (Elzinga Rep.) at 159 ("If an issuer can issue cards over a widely accepted network that maintains HAC rules, the issuer is far less likely to issue cards over a network that does not have HAC rules because the issuer would have no confidence that its cards would be accepted by every merchant.").

[28]  *See also* ECF No. 8539-7, SJDX 1232 (Murphy Rep.) ¶ 488 (explaining that "significant fragmentation of existing card networks" would result from the elimination of the Honor-All-Cards rules).

## **CONCLUSION**

The proposed settlement provides for sweeping changes for which merchants have long advocated, which will allow them greater flexibility both in choosing which payment forms to accept and in managing their costs of acceptance.  The Court should find that the settlement is likely to be finally approved, and preliminarily approve the Settlement Agreement.

Dated:  November 10, 2025

Respectfully submitted,

**ARNOLD & PORTER KAYE SCHOLER LLP**

By: */s/ Matthew A. Eisenstein*
Anne P. Davis
Matthew A. Eisenstein
Rosemary Szanyi
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
(202) 942-5000
anne.davis@arnoldporter.com
matthew.eisenstein@arnoldporter.com

Robert J. Vizas
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
(415) 471-3100
robert.vizas@arnoldporter.com

**HOLWELL SHUSTER & GOLDBERG LLP**

Michael S. Shuster
Demian A. Ordway
Blair E. Kaminsky
425 Lexington Avenue
New York, NY 10017
(646) 837-5151
mshuster@hsgllp.com
dordway@hsgllp.com
bkaminsky@hsgllp.com

*Counsel for Defendants Visa Inc., Visa U.S.A. Inc., and Visa International Service Association*

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By: */s/ Kenneth A. Gallo*
Kenneth A. Gallo
Donna M. Ioffredo
2001 K Street, NW
Washington, DC 20006-1047

Tel.: (202) 223-7300
Fax: (202) 223-7420
kgallo@paulweiss.com
dioffredo@paulweiss.com

William B. Michael
Brette Tannenbaum
Nina Kovalenko
1285 Avenue of the Americas
New York, NY 10019-6064
Tel.: (212) 373-3000
Fax: (212) 757-3990
wmichael@paulweiss.com
btannenbaum@paulweiss.com
nkovalenko@paulweiss.com

*Counsel for Defendants Mastercard Incorporated and Mastercard International Incorporated*