**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

---

IN RE PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

Civil Action No.: 05-md-01720 (BMC) (JAM)

This document applies to:

*Barry's Cut Rate Stores, Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM), *also now known as DDMB, Inc., et al. v. Visa, Inc., et al.*, No. 05-md01720 (E.D.N.Y.) (BMC) (JAM)

---

<u>**NATIONAL ASSOCIATION OF CONVENIENCE STORES' AND CIRCLE K'S OBJECTION TO EQUITABLE CLASS PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**</u>

## TABLE OF CONTENTS

Page

Table of Authorities ........................................................................................................ ii

Introduction .................................................................................................................... 1

Background ..................................................................................................................... 4

    A.   Visa and Mastercard have fixed credit card interchange fees by denying merchants the ability to negotiate rates with individual card issuers. ........................... 4

    B.   NACS and Circle K have opposed inadequate settlement proposals from the beginning. ................................................................................................................. 6

        1.   NACS and Circle K successfully opposed the 2012 Settlement because it did not provide meaningful prospective relief from the anticompetitive interchange fee conspiracy. ...................................................................... 6

        2.   NACS and Circle K opted out of the (b)(3) class to ensure meaningful relief for its damages claims but could not opt out of the (b)(2) class. ..................... 7

        3.   The Court rejected the 2024 settlement of the (b)(2) class in part because the "limited" settlement did not provide most "forms of relief sought" by class members like NACS. ................................................................. 8

    C.   The proposed 2025 settlement again provides inadequate relief. ................................ 10

Standard ........................................................................................................................ 12

Argument ...................................................................................................................... 13

    I.   The proposed 2025 settlement provides inadequate relief because, like the 2024 settlement, it does not provide meaningful relief from the core features and harms of the anticompetitive scheme. .......................................................... 13

        A.   The proposed 2025 settlement will, in practice, require merchants to "honor all cards." ................................................................................. 13

        B.   The proposed 2025 settlement ensconces exorbitant interchange fees that would collapse if exposed to true competition. ....................................... 17

            1.   The proposed settlement offers merchants only a negligible reduction in interchange fees. ..................................................................... 17

            2.   The ability to impose surcharges and offer discounts cannot substitute for meaningful relief. ...................................................................... 20

    II.   NACS and Circle K have a due process right to opt out of the proposed settlement. .............................................................................................. 22

    III.   The proposed settlement is unenforceable because it not only perpetuates ongoing and future restraints of trade but also immunizes that anticompetitive scheme from antitrust scrutiny. ........................................................... 24

Conclusion .................................................................................................................... 27

Certificate of Service .................................................................................................... 29

Certificate of Compliance ............................................................................................. 30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Express Co. v. Italian Colors Res.*,
570 U.S. 228 (2013) ........................................................................................................25

*In re Am. Express Merchs. Litig.*,
634 F.3d 187 (2d Cir. 2011) ...........................................................................................25

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974) ...........................................................................................12

*DDMB, Inc. v. Visa, Inc.*,
2021 WL 6221326 (E.D.N.Y. Sept. 27, 2021) ........................................................7, 23, 24

*Fox Midwest Theatres v. Means*,
221 F.2d 173 (8th Cir. 1955) ..........................................................................................25

*Hecht v. United Collection Bureau, Inc.*,
691 F.3d 218 (2d Cir. 2012) ...........................................................................................23

*Int'l Salt Co. v. United States*,
332 U.S. 392 (1947) ........................................................................................................27

*Lawlor v. Nat'l Screen Serv. Corp.*,
349 U.S. 322 (1955) ..................................................................................................25, 26

*Logan v. Zimmerman Brush Co.*,
455 U.S. 422 (1982) ........................................................................................................23

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985) ...................................................................................................4, 24

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2024 WL 3236614 (E.D.N.Y. June 28, 2024) ............................................................. *passim*

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
714 F. Supp. 3d 65 (E.D.N.Y. 2024) ...............................................................................18

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
827 F.3d 223 (2d Cir. 2016) ..................................................................................... *passim*

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
986 F. Supp. 2d 207 (E.D.N.Y. 2013) ...............................................................................6

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985)................................................................................................23

*Target Corp. et al v. Visa Inc.*,
    1:13-cv-03477 (S.D.N.Y. July 16, 2025)......................................................10, 27

*Three Rivers Motors Co. v. Ford Motor Co.*,
    522 F.2d 885 (3d Cir. 1975)....................................................................................25

*United States v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003)......................................................................................4

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)................................................................................................23

**Other Authorities**

*Credit Card Competition Act*, NACS (July 29, 2025), https://perma.cc/3YV2-
    AGWH ......................................................................................................................5

Fed. R. Civ. P. 23(e) ......................................................................................................6, 12

Fumiko Hayashi et al., *Credit and Debit Card Interchange Fees in Various
    Countries*, Federal Reserve Bank of Kansas City (August 2025),
    https://perma.cc/9ZA4-Z3ML ...................................................................................2

J. Craig Shearman, *Credit and Debit Card 'Swipe' Fees Hit New Record of 187.2
    Billion, Driving Up Prices for American Families,* Merchant Payments
    Coalition (Mar. 18, 2025), https://perma.cc/ND8Y-G6UG ...................................10

J Craig Shearman, *Merchants Say Reported Credit Card Swipe Fee Settlement
    Proposal 'Fails Once Again and Should be Rejected'* (Nov. 9, 2025),
    https://perma.cc/R9NS-7ZCY;................................................................................24

NACS, *State of the Industry Annual Report of 2024 Data*, available at
    https://perma.cc/PW23-XQJU ..................................................................................5

*National Grocers Association Opposes Settlement Proposed by Credit Card
    Duopoly Visa and Mastercard* (Nov. 10, 2025), https://perma.cc/BF2A-
    9HYS;.......................................................................................................................24

*NFIB: Latest Credit Card Anti-Trust Settlement Still Not Good Enough* (Nov. 10,
    2025), https://perma.cc/Q7XR-TW7R;...................................................................24

Nicholas Economides, *Competition Policy Issues in the Consumer Payments
    Industry* 122, available at https://perma.cc/44KD-SSEA .......................................17

*The Now and Future of Convenience Stores*, NIQ (July 25, 2025),
    https://perma.cc/2XJH ............................................................................16

*Retailers Call Reported Swipe Fee Settlement with Visa and Mastercard 'All
    Window Dressing and No Substance,'* National Retail Federation (Nov. 9,
    2025), https://perma.cc/K2D5-2Z82-...................................................24

Transcript, *Mastercard at KBW Fintech Payments Conference: Strategic Insights
    and Future Plans* (November 12, 2025), https://perma.cc/8LVH-3YZH ..........................2, 11

*U.S. Merchant Surcharge Q and A*, Visa, https://perma.cc/ERU6-QPVH...................................21

United States Government Accountability Office, *Rising Interchange Fees Have
    Increased Costs for Merchants* (Nov. 2009), https://perma.cc/K9PN-2E37 ..........................15

*Visa USA Interchange Reimbursement Fees* (October 18, 2025),
    https://perma.cc/TM9G-VDJW ............................................................16

## INTRODUCTION

Interchange fees are far above what they would be in a competitive market primarily because (1) the two card networks that control nearly 80% of the credit card market set the fees, which issuing banks all adopt, and (2) these networks and banks have agreed to require merchants to honor all cards from every issuer if they accept any of them. Because issuers need not compete for merchants' business, they have little reason to offer fees lower than those set by Visa and Mastercard. The proposed settlement leaves that anticompetitive agreement in place. The Court should reject that proposal rather than force objecting class members to accept continued violations of antitrust laws.

Class members have litigated for *two decades*, at significant expense, to abolish the anticompetitive scheme. From the beginning, NACS, Circle K, and other class members have insisted on elimination of the honor-all-cards rule. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 228 (2d Cir. 2016). Because "few merchants can afford to accept no[]" Visa and Mastercard credit cards, these card networks can set an "artificially inflated" "default interchange fee" that "merchants have little choice but to accept." *Id.* at 228-29. So long as that rule remains in place, merchants will continue to pay more than $111 billion in inflated interchange fees every year. Nilsen Rep. at 8, Issue 1281 (Mar. 2025).

Class members have defeated motions to dismiss, summary judgment motions, *Daubert* motions, and more in their quest for enduring relief. But rather than pursue a trial, where the class could have obtained such relief, class counsel and the card networks have instead repeatedly proposed settlements that protect, not abolish, the core features of the interchange fee conspiracy. Worse, after the settlement period expires, class members will be back at square one having to start litigation afresh, rather than go to trial in the near future. The settlement thus puts class

members in a *worse* position than they are now. That cannot be considered a fair, adequate, or reasonable settlement.

Judge Brodie rejected the 2024 settlement proposal because, among other problems, it did not adequately address the anticompetitive conditions in the card market. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *21 (E.D.N.Y. June 28, 2024). The relief offered by the settlement was "too limited to justify approval of a settlement." *Id.* at *27. It did not "eliminat[e] the Honor All Cards rules," which class members have "continuously argued for." *Id.* The 2024 proposal instead "focus[ed] primarily" on "surcharging relief." *Id.* But that relief would not produce "competition among issuing banks" because the settlement "still prohibit[ed] surcharging at the issuer level." *Id.* And although the 2024 settlement promised to lower "average effective interchange rate[s]" by "seven basis points," *id.* at *28, Visa and Mastercard charge average rates of over 200 basis points. The 2024 proposal thus would have left interchange fees in the United States among the highest in the world. *See* Fumiko Hayashi et al., *Credit and Debit Card Interchange Fees in Various Countries*, Federal Reserve Bank of Kansas City (August 2025), https://perma.cc/9ZA4-Z3ML.

Class counsel and Defendants have now proposed another settlement with no meaningful changes. As Mastercard's CEO has boasted, "[m]ost importantly," the proposed 2025 settlement "preserves the honor all cards rule" on the issuer level, meaning Mastercard's "competitive positioning" will "hold." Transcript, *Mastercard at KBW Fintech Payments Conference: Strategic Insights and Future Plans* (November 12, 2025), https://perma.cc/8LVH-3YZH. Under the proposal, merchants must decide to honor or reject all cards that fall within broad categories common to all issuers—the largest of which comprises *nearly* ▮ of consumer credit transaction volume. That proposed change to the "honor all cards" rule would put merchants to the same,

anticompetitive choice: accept essentially all consumer cards or none of them. The proposed settlement also gives the Defendants complete discretion to move cards from one category to another, meaning the "Standard" consumer cards category could soon be virtually empty. Whether they take that action or not, Visa, Mastercard, and the banks will retain the anticompetitive leverage to levy exorbitant interchange fees from merchants. The proposal thus offers only illusory relief from the honor-all-cards rule.

Nor does the current settlement proposal offer meaningful reductions to the current interchange fees. The proposed settlement would reduce the "average Effective Interchange Rate" by *ten* basis points, a trifling increase from the *seven* basis-point reduction Judge Brodie rejected last year. In fact, it's a step backward because average interchange rates increased by *nine* basis points between 2024 and 2025. The proposed settlement would thus leave rates approximately where they were in 2023, nearly two decades after this litigation began, and at a higher rate than the 2024 proposed settlement. "Where the evidence indicates that, absent the allegedly anticompetitive conduct, credit-card interchange rates could be more than 100 basis points lower than they currently are," a ten-point reduction "is insufficient." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *25.

Little else has changed since last year's attempted settlement. Like the 2024 settlement, the proposed 2025 settlement also offers merchants a limited ability to surcharge certain cards. But once again, the settlement prohibits merchants from imposing targeted surcharges on specific banks, meaning it will not provoke any competition among banks to reduce their rates. And although the settlement clarifies merchants can discount certain cards, that was also true of the 2024 proposal. This Court should not approve a settlement that offers the same inadequate relief Judge Brodie found inadequate last year.

The proposed settlement is also in conflict with due process and the antitrust laws the Court is required to uphold. The proposed settlement does not abolish the honor-all-cards or the default interchange rules, which NACS and Circle K have sought from the beginning. Yet it extinguishes their claims seeking that relief and, worse, releases *future* claims. That is inconsistent with due process. If this Court approves the settlement, it should at minimum permit objectors to opt-out.

Nor can the settlement release—which immunizes existing and ongoing restraints of trade from challenge—be squared with the antitrust laws. "[P]rospective waiver[s] of a party's right to pursue statutory remedies for antitrust violations" are unenforceable "as against public policy." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985). Yet the proposed settlement both perpetuates the interchange fee conspiracy *and* forbids nearly every merchant in the country from challenging it as an antitrust violation in future years. That is antithetical to the intended operation of the antitrust laws.

The Court should not approve a settlement that unfairly and unreasonably leaves in place illegal restraints of trade, forbids class members from opting out, and then extinguishes current and future claims for relief from the ongoing antitrust conspiracy.

## BACKGROUND

### A.    Visa and Mastercard have long fixed credit card interchange fees by denying merchants the ability to negotiate rates with individual card issuers.

This case involves a decades-long price fixing conspiracy that began when a vast network of banks created Visa and Mastercard. *See United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 235 (2d Cir. 2003). Today, Visa and Mastercard, along with their member banks, establish non-competitive "interchange fees"—a charge for "every transaction on the network" which is paid by the merchant to the bank that issued the credit card. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 228. In 2024 alone, U.S. merchants paid more than $111 billion

4

in fees to accept Visa and Mastercard credit cards. Nilsen Rep. at 8, Issue 1281 (Mar. 2025). That is a steep increase from 2010, when the fees totaled $26 billion. *Credit Card Competition Act*, NACS (July 29, 2025), https://perma.cc/3YV2-AGWH. NACS' members alone paid over $21 billion in interchange fees in 2024. NACS, *State of the Industry Annual Report of 2024 Data*, available at https://perma.cc/PW23-XQJU.

Visa and Mastercard have established several "network rules" that "work[] in tandem" to "allow the issuing banks to impose an artificially inflated interchange fee that merchants have little choice but to accept." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 228. "The 'honor-all-cards' rule requires merchants to accept all Visa or MasterCard credit cards if they accept any of them, regardless of the differences in interchange fees." *Id.* Because "few merchants can afford to accept no[]" Visa and Mastercard credit cards, the honor-all-cards rule forces merchants to accept premium credit cards from every issuer, which "give consumers generous rewards, and typically charge a higher interchange fee than cards that offer few rewards or none." *Id.* Visa and Master Card also set a "default interchange fee," which "applies to every transaction on the network" unless the "merchant and issuing bank have entered into a separate agreement." *Id.* (quotation marks omitted). In addition, merchants cannot impose surcharges on cards or banks with particularly high interchange fees. *Id.* These "anti-steering rules prohibit [merchants] from nudging consumers toward cheaper forms of payment." *Id.*

The upshot is that the credit card industry is "free to set interchange fees at a supra-competitive rate." *Id.* at 228-29. "[T]he default interchange fee" is "effectively locked in" and "the issuing banks have little incentive to deviate from it." *Id.* at 229.

**B.    NACS and Circle K have opposed inadequate settlement proposals from the beginning.**

Litigation over the Visa and Mastercard interchange fees dates back to 2005. In NACS's original complaint, NACS sought damages for the billions of dollars of supra-competitive interchange fees its members have been paid. *See* Complaint, ECF 1 at 57, *NACS v. Visa U.S.A., Inc.*, No. 1:05-cv-04521-BMC-JAM (E.D.N.Y. Sept. 23, 2005). It also sought declaratory and injunctive relief designed to dismantle the anti-competitive network rules that have led to exorbitant interchange fees. *See id.* At every stage of the litigation, NACS and Circle K have opposed proposed settlements that would leave in place the core rules that prevent banks from competing to offer lower interchange fees.

**1.    NACS and Circle K successfully opposed the 2012 Settlement because it did not provide meaningful prospective relief from the anticompetitive interchange fee conspiracy.**

Class counsel first attempted to settle this litigation in July 2012, which would have resolved both Rule 23(b)(2) class claims for damages and Rule 23(b)(3) class claims for injunctive relief. Judge Gleeson approved that settlement over objections from NACS and others. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 213 (E.D.N.Y. 2013); Objection of NACS, ECF 2561. NACS explained that "[f]rom the beginning of this litigation, [NACS's] principal concern has been to obtain meaningful reforms of the rules set by Visa and Mastercard." Objection of NACS, ECF 2561 at 1. The proposed settlement, however, left the centralized interchange fee-setting, "honor all cards," and other rules the networks use to "limit competition" in place. *Id.* at 6.

The Second Circuit rejected the proposed 2012 settlement. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 240. The fundamental problem was that "same counsel represented both the (b)(3) and the (b)(2) classes." *Id.* at 234. Class counsel had an

6

enormous financial incentive to maximize the cash settlement for the (b)(3) class, which created "unacceptable incentives for counsel to trade" relief that would have benefited the (b)(2) injunctive relief class for increased compensation to the (b)(3) damages class. *Id.* The resulting settlement not surprisingly failed to offer the putative (b)(2) class "remedies that affected the default interchange fee or honor-all-cards rule." *Id.* at 238. The prospective relief that the 2012 settlement *did* include—a limited "ability to surcharge at the point of sale"—was "virtually worthless to vast numbers of class members," many of which could not impose surcharges. *Id.*

### 2.    NACS and Circle K opted out of the (b)(3) class to ensure meaningful relief for its damages claims but could not opt out of the (b)(2) class.

On remand, the court appointed separate class counsel for the (b)(2) equitable relief classes and the (b)(3) damages classes. NACS, Circle K, and 600 other class members exercised their due process right to opt out of the (b)(3) damages class. But the court did not permit NACS or Circle K to opt out of the (b)(2) prospective relief class even though they opposed certification of a mandatory class. *See DDMB, Inc. v. Visa, Inc.*, 2021 WL 6221326, at *49 (E.D.N.Y. Sept. 27, 2021). NACS, Circle K, and other unwilling members of the (b)(2) class argued that opt out should be available because "these cases challenge a mix of complex rules and practices that affect merchants differently." *Id.* at *41 (citation omitted). The court rejected that argument because "Plaintiffs seek equitable relief from the bundle of Restraints that together result in the supracompetitive interchange fees," and "equitable relief . . . that tackles these Restraints" would be "proper as to all merchants." *Id.* at *48. NACS, Circle K, and other class members argued that class counsel seemed focused on "surcharging relief as opposed to relief from rules like the honor-all-cards rules," but the court also rejected those concerns as "speculative." *Id.* at *20, *22. Unfortunately, those concerns have proven to be well-founded.

**3.      The Court rejected the 2024 settlement of the (b)(2) class in part because the "limited" settlement did not provide most "forms of relief sought" by class members like NACS.**

As feared, in 2024 class counsel proposed a mandatory settlement of the (b)(2) class claims that did not include relief from the "honor-all-cards" rule or the interchange fee-setting. Visa and Mastercard instead agreed to ineffectual relief that centered on a modest, time-limited average rate reduction, a purported increase in the ability of merchants to surcharge, and clarification of card network policies on discounting and collective negotiation. In exchange, the mandatory class would release any claim "that relates to any conduct that was or could have been alleged or raised in this case." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *9. The release covered past claims and all future claims that would have accrued for five years. *Id.*

NACS and Circle K again opposed the proposed settlement. *See* Objections of 7-Eleven Plaintiffs, ECF 9230. They argued that the settlement was fundamentally flawed, that due process required the right to opt out, and that the proposed settlement codified a per se unlawful price-fixing agreement, while denying class members meaningful long-term relief from the honor-all-cards and default interchange rules that formed the core of the anticompetitive conspiracy.

Judge Brodie rejected the 2024 settlement without even giving it preliminary approval. She based her ruling largely on the conclusion that the proposed 2024 settlement did not provide adequate relief for the class. She noted that the case was "ready for trial," meaning the settlement came "at a relatively late stage." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *23. And because "Plaintiffs' claims have survived numerous *Daubert* and summary judgment motions," the class reasonably expected significant relief. *Id.* Yet the proposed settlement did "not provide most . . . forms of relief sought by [the] Class Members." *Id.* at *27.

In particular, Judge Brodie pointed out that "initial certification of the mandatory class . . . was premised" in large part on the fact that the class complaint challenged the "honor-all-cards" rule and the default interchange fees rule. *Id.* at *24. Yet rather than dismantle the honor-all-cards rule, the proposed settlement "focus[ed] primarily" on expanding merchants' ability to surcharge credit cards. *Id.* at *27. Under the settlement, merchants could surcharge Visa or Mastercard (but not differential surcharges for individual banks) up to the cost of acceptance, so long as the merchant also surcharged competing networks at the same level. Judge Brodie held that this "surcharging relief is too limited to justify approval of a settlement." *Id.* Among other problems, "the surcharging provisions would still prohibit surcharging at the issuer level, meaning that merchants still have no way to use surcharging (or credible threats thereof) to urge competition among issuing banks." *Id*. The fundamental anticompetitive dynamic would persist.

The proposed 2024 settlement also provided illusory relief from the existing interchange fees. The settlement would have lowered "all posted rates by at least four basis points," and the "effective average interchange rate by at least seven basis points." *Id.* at *28. But most current interchange rates are over *200* basis points, and the interchange fees typically increase by about one basis point per year. *See id.* The proposed relief would have thus frozen "interchange rates" at levels "*above* those in place while this litigation was ongoing" and which "plaintiffs had already challenged as the result of anticompetitive restraints." *Id.* (emphasis added). And there was strong evidence that the networks could maintain competitive "viability" at far lower rates—including that the networks operated profitably in Australia, the United Kingdom, and the European Union, where interchange rates at capped at 50 basis points or less. *Id.* at *41. Judge Brodie held that the proposed fee reductions thus fell "short of the 'best possible' recovery" the class could expect. *Id.* at *27 (citation omitted).

9

**C.    The proposed 2025 settlement again provides inadequate relief.**

After Judge Brodie rejected the proposed 2024 settlement, class counsel did not pursue a trial that could have provided full and final relief. They of course could have; in fact, Circle K is on the verge of trial on its (b)(3) damages claims. *See* Scheduling Order, *Target Corporation et al v. Visa Inc. et al*, No. 1:13-cv-03477, ECF 260 (S.D.N.Y.  July 16, 2025) (scheduling trial for April 2026). Class counsel instead pursued another settlement. But the proposed 2025 settlement largely provides the same type of relief as the proposed 2024 settlement that was rejected by Judge Brodie and the 2012 settlement that was rejected by the Second Circuit.

*First*, as before, the proposed 2025 settlement allows merchants to surcharge up to the cost of acceptance. Proposed 2025 Settlement, ECF 9692-2 ¶ 40. The only change is that now merchants may impose surcharges even if they do not surcharge competing networks at the same level. *Id.* ¶ 39. But most crucially, as with the 2024 proposal, merchants may not engage in differential surcharging by issuer. *Id.* ¶ 40. In short: issuing banks will not compete on fees.

*Second*, the 2025 proposal again offers limited rate reduction. Now, Visa and Mastercard commit to reduce the "average Effective Interchange Rate" by *ten* basis points, as compared to the *seven* basis-point reduction in the 2024 proposal. *Id.* ¶ 48. But that increased reduction (three points) is *less* than the amount that Visa and Mastercard's rates *increased* during the year between the 2024 proposed settlement and the 2025 proposed settlement (nine points). *See* J. Craig Shearman, *Credit and Debit Card 'Swipe' Fees Hit New Record of $187.2 Billion, Driving Up Prices for American Families,* Merchant Payments Coalition (Mar. 18, 2025), https://perma.cc/ND8Y-G6UG. Visa and Mastercard also commit to cap the interchange rates for "Standard Consumer Credit Cards" at 125 basis points. But "Standard Consumer Credit Cards" comprise only about ██ of consumer card transaction volume for Visa and Mastercard. Stiglitz

10

Decl., ECF 9692-5 at 33 ¶ 88  n.84. In addition, these minimal rate reductions will last only five years. Proposed 2025 Settlement, ECF 9692-2 ¶ 48. So although the price has changed, the price fixing has not: Again, issuing banks will not compete on fees.

*Third*, like the 2024 proposal, the proposed 2025 settlement requires Visa and Mastercard to "continue to maintain" rules that permit "discounting at the issuer level." *Id.* ¶¶ 18-19, 67-68.

*Fourth*, the proposed 2025 settlement would allow merchants to accept or reject *categories* of cards. Merchants could, for instance, accept only "Standard Consumer Credit Cards," while refusing to accept "Commercial Credit Cards" or "Premium Consumer Credit Cards." Proposed 2025 Settlement, ECF 9692-2 ¶¶ 22, 80. This is a merely cosmetic change to the "accept-all-cards" rule because "Premium" credit cards account for the large majority of existing consumer transaction volume. *See* Stiglitz Decl., ECF 9692-5 at 19 (Table 1) (showing that, in 2024, ██ of Visa's consumer credit transactions and ██ of Mastercard's consumer credit transactions came from "Premium" consumer cards). The proposed settlement thus in practice still requires merchants to honor or reject the entire class of consumer cards that account for essentially all transaction volume *and* that are associated with the highest interchange rates. In addition, the proposed settlement gives Defendants significant incentives to reclassify all (or most) of their Standard consumer credit cards as Premium cards—a practice that is already commonplace. As the Mastercard CEO bragged, the proposed settlement "preserves the honor all cards rule" and under it merchants will have no greater options to push issuing banks to compete on fees—"that will not be a choice" merchants have. *See* Transcript, *Mastercard at KBW Fintech Payments Conference: Strategic Insights and Future Plans*, *supra*.

In exchange for this purported relief, class members will "expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release . . . any and all manner of claims,

demands, actions, suits, and causes of action" that any class member "ever had, now has, or hereafter can, shall, or may have" for equitable relief. Proposed 2025 Settlement, ECF 9692-2 ¶ 116(a). That release will bar any equitable claims that accrue until the later of eight years after the settlement is approved or five years after the last appeal of the settlement ends. *Id.* This includes claims "arising out of or relating to a continuation or continuing effect of any such conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act" at issue in this case. *Id.* The release in the proposed 2025 settlement is thus broader than the release in the proposed 2024 settlement, which lasted only for five years.

## STANDARD

Class counsel may settle a class action only if the settlement is approved by the district court. *See* Fed. R. Civ. P. 23(e). The court must be satisfied that the settlement is "fair, reasonable, and adequate" for all class members. Rule 23(e)(2). "[C]ourts in the Second Circuit have traditionally considered the[se] nine factors" to assist in determining whether a settlement is substantively "fair, reasonable, and adequate":

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *12 (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)).

## ARGUMENT

I. **The proposed 2025 settlement provides inadequate relief because, like the 2024 settlement, it does not provide meaningful relief from the core features and harms of the anticompetitive scheme.**

The newly proposed settlement does not provide fair, reasonable, or adequate relief. Like the settlement Judge Brodie rejected last year, the current settlement proposal leaves the honor-all-cards rule and the excessive interchange fees in place. It instead offers illusory relief—the ability for merchants to reject certain categories of cards. But the largest (and growing) category, with the highest fees, comprises nearly ███ of all consumer credit card transactions. Merchants will thus, in practice, be forced once again to accept all cards or none. And, worse, the proposed settlement does not offer meaningful rate relief. Like the 2024 proposal, this settlement would leave interchange fees at levels *three times* what free and competitive market conditions would produce. The proposed settlement thus offers only sham relief from the antitrust conspiracy that NACS and Circle K have litigated for decades.

### A. The proposed 2025 settlement will, in practice, require merchants to "honor all cards."

Judge Brodie found that the 2024 proposal fell "short of the 'best possible' recovery" the class could obtain because it offered "a significantly limited form of the relief that . . . the objecting Class Members" have "continuously argued for": "elimination of the Honor All Cards rules." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *27. The proposed 2025 settlement proposal suffers from the same flaw.

The proposed 2025 settlement retains the existing bar on merchants refusing "acceptance of a particular issuer's credit cards." Stiglitz Decl., ECF 9692-5 ¶ 115. The requirement to accept cards from all issuers is the essential element of the anticompetitive interchange fee conspiracy. If merchants could deny some or all credit cards from a particular bank, it could use that denial as

leverage to negotiate competitive rates with those particular banks (as opposed to only dealing with Visa or Mastercard, who act on behalf of all issuers). *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 229. Banks would compete with each other to offer merchants lower interchange fees. But if merchants must accept all cards that are part of the Visa or Mastercard network regardless of bank, networks will continue to "set interchange fees at a supra-competitive rate." *Id*. at 228-29.

As Judge Brodie previously recognized, merchants "do not have the leverage to compel Visa and Mastercard to strike fair and reasonable agreements with them." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *28 (citation omitted). The "honor-all-cards rule forces merchants to accept all Visa and Mastercard credit cards," and "few merchants can afford to accept none," so interchange "rate[s are] effectively locked in via the default interchange fee." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 228-29 (quotations omitted). Thus, "issuing banks have little incentive" to voluntarily reduce their interchange rates. *Id.* at 229.

The proposed settlement perpetuates this problem. Rather than allowing merchants to reject cards from a particular issuer to incentivize issuers to compete, the proposed 2025 settlement only allows merchants to reject categories of cards common to all issuers. It allows merchants to choose whether to honor or reject "Debit Cards," "Standard Consumer Credit Cards," "Commercial Credit Cards," and "Premium Consumer Credit Cards," but it prohibits merchants from distinguishing between issuing banks within those categories. Proposed 2025 Settlement, ECF 9692-2 ¶¶ 22, 80. This change is practically meaningless because it groups all Premium Consumer Credit Cards into

14

a single category,[1] which have the highest consumer interchange fees and which comprise the vast majority of consumer card transactions. *See* Stiglitz Decl., ECF 9692-5 at 19 (Table 1). So merchants will remain stuck accepting the consumer credit cards with the highest fees or accepting virtually no consumer credit cards at all.

In 2024, ███ of Visa's consumer credit transactions came from "Premium" consumer cards. *See id.* (showing that Visa's consumer credit transactions accounted for ███ of its total transactions and Visa's premium consumer cards alone accounted for ███ of total transactions). Similarly, for Mastercard, ███ of its consumer credit transactions came from its "Premium" consumer cards in 2024. *Id.* (showing that Mastercard's consumer credit transactions accounted for ███ of its total transactions and Mastercard's premium consumer cards alone accounted for ███ of total transactions). And interchange fees on these "premium" cards is growing at a much faster rate than "basic cards." United States Government Accountability Office, *Rising Interchange Fees Have Increased Costs for Merchants* at 16 (Nov. 2009), https://perma.cc/K9PN-2E37.

Worse, the settlement creates strong incentive for the Defendants to push even more consumers to the "Premium" cards because the larger that category, the more merchants will be forced to accept those cards and their associated higher interchange fees. This shift has already been occurring. As Visa and Mastercard have themselves admitted, "[b]etween 2004 and 2016, the share of Visa's consumer credit card purchase volume on rewards cards increased from ███ in 2004 to ███ in 2016, and the share of Mastercard's consumer credit card purchase volume on

---

[1] A "Premium Consumer Credit Card" is a credit card from "one of the following product types: Signature, Signature Preferred, or Infinite (for Visa-Branded Credit Cards), or World, World High Value, World Legend, or World Elite (for Mastercard-Branded Credit Cards), or any similar Visa Credit Card or Mastercard Credit Card" issued during the settlement term. Proposed 2025 Settlement, ECF 9692-2 ¶ 1(z).

rewards cards increased from ▮ in 2004 to ▮ in 2016." Defs.' 56.1 Stmt., ECF 8262 ¶ 177 (citing Hausman Report, ECF 8526-17, ¶ 200). For instance, in 2010, only ▮ of consumer credit transactions came from Visa Signature Preferred cards, one of the Premium card categories. Pathak Supp. Rep. at 18 ¶ 40, *7-Eleven et al. v. Visa Inc. et al.*, 13-cv-4442 (S.D.N.Y. Oct. 1, 2024). By 2023, "▮ of consumer credit volume was on either a Signature or Signature Preferred card." *Id.* The practical reality is that a huge and growing majority of credit cards are "Premium," which will force merchants to accept all consumer cards or none of them. Merchants cannot afford to reject the cards used in nearly ▮ of consumer credit transactions.

The ability to reject "categories" of cards offers especially illusory relief to NACS and Circle K. Convenience stores sell almost exclusively to consumers, not businesses, and so the ability to reject "Commercial" credit cards is not impactful. *See The Now and Future of Convenience Stores*, NIQ (July 25, 2025), https://perma.cc/2XJH.  In addition, Visa charges the same interchange rates for all fuel transactions, no matter the category of card used. *See Visa USA Interchange Reimbursement Fees* at 7 (October 18, 2025), https://perma.cc/TM9G-VDJW. So the ability for gas stations to reject "Premium" cards will only eliminate the cards used for most fuel transactions, without actually lowering the fees the merchant pays. Where a settlement fails to offer some class members any "appreciable benefit," the settlement is inadequate. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 238.

The core feature of the Honor All Cards rule remains under the proposed settlement: merchants cannot distinguish between *issuer* on which cards they will accept, so they cannot induce competition among issuers by rejecting cards from the *issuers* with the highest fees. The proposed settlement, like the 2024 proposal, is inadequate because it "falls short of the 'best possible' recovery" by failing to provide the primary relief that NACS and Circle K "seek:

elimination of the Honor All Cards rules." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *27 (citation omitted). This Court should reject it.

**B.    The proposed 2025 settlement ensconces exorbitant interchange fees that would collapse if exposed to true competition.**

In addition to leaving the anticompetitive honor-all-cards scheme in place, the proposed settlement also retains the existing system's price fixing. Price fixing on behalf of card-issuing banks by the card networks is not necessary for the credit card industry to operate. *See* Nicholas Economides, *Competition Policy Issues in the Consumer Payments Industry* 122, available at https://perma.cc/44KD-SSEA. This proposed settlement nonetheless protects rather than ends that practice without making any meaningful change to the artificially high fees the networks set.

**1.    The proposed settlement offers merchants only a negligible reduction in interchange fees.**

The proposed settlement would reduce the "average Effective Interchange Rate" by "ten basis points." Proposed 2025 Settlement, ECF 9692-2 ¶ 48. But Visa's and Mastercard's "typical" interchange rates are currently "between 200 and 300 basis points." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *28 (citation omitted); *id.* at *41 (same). In 2024, Visa's average default rate across all cards was ▇▇▇. Stiglitz Decl., ECF 9692-5 at 19 (Table 1). For Mastercard, that rate was ▇▇▇. *Id.* The proposed settlement would thus reduce the average interchange rate by a mere ▇▇. The motions to approve the settlement do not even try to explain why that 10-point basis reduction is a fair, reasonable, and adequate outcome.

Last year, Judge Brodie rejected as inadequate a proposal to reduce the "average Effective Interchange Rate" by seven basis points. She explained that "each network's average rate of credit interchange increases over the last [ten] years have been about one basis point per year." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *28

(quoting Stiglitz Decl., ECF 9692-5 ¶ 40) (alteration in original). That proposed reduction was thus inadequate because it would simply "maintain interchange rates" at the level "in place" when the litigation was commenced—rates "many plaintiffs had . . . challenged as the result of anticompetitive restraints." *Id.* The current proposal, which offers an additional reduction of only 3 hundredths of one percent, is inadequate for the same reasons. A ten-basis point reduction would temporarily reduce rates to approximately their 2023 levels—nearly two decades *after* the first lawsuits challenging Visa's and Mastercard's price fixing were filed—and far above the already-high 2005 rates that precipitated this litigation. *See* Shearman, *supra*.

The proposed 2025 settlement would also "keep interchange significantly above" the "'upper limit' on what interchange fees might have been in the absence of the challenged competitive restraints." *Id.* (citation omitted). In a truly competitive market, interchange rates would be significantly less than 100 basis points. Professor Hausman, for instance, has "calculate[d] a competitive benchmark rate of 72 basis points." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 105 (E.D.N.Y. 2024). Dr. Kohler opined that "[e]ven at an interchange rate that is 20% of the actual weighted average interchange rate . . . credit card issuing would still be profitable." *Id.* at 110 (citation omitted). Merchants in the United States pay interchange rates that are "higher than virtually all other countries." Pathak Supp. Rep. ¶ 39. Indeed, as of 2018, the United States was the *only country in the world* with interchange rates over 200 basis points. *See id.* (citing a statement from Visa CEO Al Kelly). "In the United Kingdom and the European Union, interchange fees are capped at 30 basis points." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *41. "[I]n Australia, interchange fees are capped at 50 basis points." *Id.* But card issuers operate profitably in both regions. *See id.*

The proposed ten basis-point reduction reflects an inconsequential reduction. It would temporarily leave rates at approximately *three times* what a competitive market would set, while immunizing Visa and Mastercard from challenges to those rates for years. That is plainly inadequate relief compared to the "best possible" recovery that would be available at trial. *Id.* at *28.

Nor does it matter that the proposed settlement would cap the interchange rate for "Standard" consumer credit cards at 125 basis points. *See* Proposed 2025 Settlement, ECF 9692-2 ¶ 50. "Standard" consumer credit cards account for a small (and dropping) portion of total transactions. In 2024, "Standard" cards subject to posted rates accounted for only ▮▮▮▮ of Visa's total transactions and only ▮▮▮▮ of Mastercard's total transactions. Stiglitz Decl., ECF 9692-5 at 19 (Table 1). Those numbers reflect a successful, decades-long effort by banks to shift consumers from Standard cards to Premium cards—which will only likely accelerate because of the Settlement. *See* Pathak Supp. Rep. at 18. And, regardless, that cap leaves the baseline interchange rate at least 50 basis points higher than the rates that a competitive market would produce. *See supra* p. 18. The 125 basis-point cap for "Standard" cards is thus illusory relief.

Even setting aside the inadequate degree of rate relief, the proposed settlement also fails to ensure the relief will be evenly distributed across the class. The settlement permits Visa and Mastercard to achieve the ten basis-point reduction in the "average Effective Interchange Rate" in whatever manner it wishes. *See* Proposed 2025 Settlement, ECF 9692-2 ¶ 48. The networks could, for instance, reduce interchange rates for *commercial* cards while leaving interchange rates for *consumer* cards essentially unchanged. *See* Patel Decl., ECF 9154-12 ¶ 15. That would benefit merchants "with a high share of commercial card transactions," but offer no meaningful relief for "merchants with mostly consumer transactions," like NACS's members and Circle K. *Id.* The card

networks could also reduce the "average Effective Interchange Rate" by negotiating "interchange reductions" with a few large merchants, while leaving the vast majority of retailers, most of which are small, single-store operators, with no rate relief. *See* Proposed 2025 Settlement, ECF 9692-2 ¶ 1(o). And if the consumers continue moving from Standard cards to Premium cards, merchants that "do not currently have a high proportion of premium cards" might end up paying *more* for interchange fees, even if the overall "Average Effective Interchange Rate" drops by ten basis points. Patel Decl., ECF 9154-12 ¶ 16.

### 2. The ability to impose surcharges and offer discounts cannot substitute for meaningful relief.

Like the deficient 2024 proposal, the proposed 2025 settlement allows merchants to surcharge customers up to the cost of acceptance, so long as the surcharge does not exceed 3%. Proposed 2025 Settlement, ECF 9692-2 ¶¶ 39, 88. The only change from the 2024 proposal is that now merchants may surcharge Visa and Mastercard cards at a higher level than they surcharge other networks, like American Express. In practice, this means that some merchants that had been limited to surcharging a maximum of 1% (because of "American Express' rules that prohibit surcharging" above that level) will now be able to surcharge up to 3%. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *27.

But still, this "surcharging relief is too limited to justify approval of a settlement that does not provide most other forms of relief sought by other Class Members." *Id*. The ability for some merchants[2] to surcharge up to 3% does not address the fundamental problem: that the proposed 2025 settlement, like 2024 proposal, "prohibit[s] surcharging at the issuer level." *Id*. Merchants may choose to "add the same surcharge to all Visa Credit Card Transactions" (a "Brand Level"

---

[2] As Judge Brodie noted, many states have laws that prohibit merchants from surcharging. *Id.* at 57 n.38.

surcharge) or "add the same surcharge to all Visa Credit Card Transactions of the same product type" (a "Product Level" surcharge). Proposed 2025 Settlement, ECF 9692-2 ¶¶ 40-41, 89-90. But the surcharge must be imposed "regardless of the card's issuer." *Id.* ¶¶ 41, 90. Like with the rejected 2024 proposal, "merchants still have no way to use surcharging (or credible threats thereof) to urge competition among issuing banks." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *27. A 3% surcharge versus a 1% surcharge does not incentivize banks to reduce interchange fees if it applies equally to their competitors, too. And, in any event, surcharging is inconsistent with the business practices of NACS's members, which pride themselves on providing low prices. *See* Decl. of Kwik Trip, Inc., ECF 2436 at 2, 4; Decl. of Speedway LLC, ECF 2532 at 3.[3]

The proposed 2025 settlement also offers merchants no greater ability to discount than the inadequate 2024 settlement. The "No-Discounting" provisions in the proposed 2025 settlement are materially identical to the "No-Discounting" provisions in the defective 2024 settlement. *Compare* Proposed 2025 Settlement, ECF 9692-2 ¶¶ 18-20, 67-69 *with* Proposed 2024 Settlement, ECF 9179-2 ¶¶ 18-20, 50-52. Both settlements sought to "***clarify*** that discounting at the issuer level— i.e., providing discounts that vary by the issuing financial institution . . . —is permitted." Proposed 2025 Settlement, ECF 9692-2 ¶¶ 19, 68 (emphasis added); Proposed 2024 Settlement, ECF 9179-2 ¶¶ 19, 51. The discounting relief did "not weigh in favor of" approval in 2024, and it does not now. As Judge Brodie explained, these "terms of the Settlement" merely clarify "rules that already

---

[3] There are also practical reasons why the surcharging relief will be ineffectual. Visa, for instance, requires merchants to report surcharges "within a dedicated data field (labelled Field 28) in the transaction message." *U.S. Merchant Surcharge Q and A*, Visa, https://perma.cc/ERU6-QPVH. Merchants rely on third-party processors to process these transactions, and many processors have informed merchants that reporting information in Field 28 is technically infeasible. Those technical limitations will prevent many merchants from surcharging Visa transactions.

exist or practices that the Settlement acknowledges are already permissible under Visa's and Mastercard's existing rules." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *28.

Real-world experience demonstrates that discounting does not reduce excessive interchange fees. Visa has permitted discounting by card issuer since February 2013, but "there has been no evidence that change impacted interchange or resulted in meaningful competition between issuers for merchant preference." Hausman Rep., ECF 8526-17 ¶ 481. That is likely because discounting means that the merchants, rather than the consumer, bear the cost of the interchange fee. The bank receives the interchange fees regardless, so it has no incentive to reduce them. If issuers do not "reduce their costs of acceptance," discounts merely increase merchant costs, and so merchants do not offer them. *Id.* Discounting is simply too weak a mechanism to induce competition among banks.

*    *    *

The proposed settlement thus offers illusory relief. It does nothing to change the rule that requires honoring cards from every issuer if accepted from one, which allows banks to levy exorbitant interchange fees without competition. It ratifies interchange fees of over 200 basis points—among the highest in the world. And it otherwise provides merchants with no new tools to push banks to compete for business by reducing interchange fees. Judge Brodie rejected as inadequate the 2024 settlement because it "left unchanged" the "anticompetitive" restraints and harms being challenged. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *28. This Court should do the same.

## II.    NACS and Circle K have a due process right to opt out of the proposed settlement.

Given the severe infirmities in the proposed settlement, the Court should reject it. If, instead, the Court grants approval, then it should allow NACS, Circle K, and other class members

to opt-out if the settlement is approved, despite being denied that choice earlier in this litigation. *See DDMB, Inc.*, 2021 WL 6221326, at *49. Due process requires it.

The Supreme Court has long held that "due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). *Shutts* limited that holding to "class actions which seek to bind known plaintiffs concerning claims wholly or predominately for money judgments." *Id.* at 811 n.3. The question "whether the right to notice and an opportunity to opt out applies even when monetary claims do not predominate" remains open today. *Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 222 (2d Cir. 2012).

The Supreme Court has noted "the serious possibility" that due process requires a right to opt out of *all* class actions. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 363 (2011). This Court should hold that due process does require a right to opt out of all class actions. "[A] cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). But mandatory class actions "extinguish . . . forever" a property right—the individual cause of action—without recourse. *Shutts*, 472 U.S. at 807. The mandatory class settlement thus violates due process by destroying NACS's and Circle K's individual claims.

There is special need for opt-out here, where the proposed settlement fails to provide the core relief that NACS and Circle K have sought from the beginning. "[T]he Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members." *Id.* at 812. Judge Brodie previously denied opt-out rights because "Plaintiffs seek equitable relief from the bundle of Restraints that together result in the

supracompetitive interchange fees." *DDMB, Inc.*, 2021 WL 6221326, at \*48. Because "equitable relief . . . that tackles these Restraints is proper as to all merchants," Judge Brodie found opt-outs were unnecessary. *Id.* But class counsel did not negotiate a settlement providing that equitable relief. Class counsel instead proposed a settlement that virtually all merchant trade groups oppose.[4] The proposed settlement simply *does not* eliminate the underlying anticompetitive restraints. It perpetuates them. *See supra* pp. 13-17. The proposed settlement thus not only extinguishes NACS's and Circle K's future claims, but it also denies them meaningful equitable relief from the anticompetitive conditions that they have been litigating for over a decade. That cannot be squared with due process. NACS, Circle K, and the many other class members who oppose the settlement have a right to their day in court, and a settlement approval they cannot opt out of violates the Fifth Amendment's Due Process Clause.

**III.    The proposed settlement is unenforceable because it not only perpetuates ongoing and future restraints of trade but also immunizes that anticompetitive scheme from antitrust scrutiny.**

Worse yet, the proposed settlement will not only leave in place anticompetitive restraints of trade but also immunize those restraints from future challenge. That is the sort of "prospective waiver of a party's right to pursue statutory remedies for antitrust violations" that the Supreme Court has expressed "little hesitation in condemning . . . as against public policy." *Mitsubishi Motors Corp.*, 473 U.S. at 637 n.19 (1985).

Courts have long recognized that agreements that eliminate private claims for future antitrust violations violate the antitrust laws. Even "a partial immunity from civil liability for future

---

[4] *See, e.g.*, J Craig Shearman, *Merchants Say Reported Credit Card Swipe Fee Settlement Proposal 'Fails Once Again and Should be Rejected'* (Nov. 9, 2025), https://perma.cc/R9NS-7ZCY; *NFIB: Latest Credit Card Anti-Trust Settlement Still Not Good Enough* (Nov. 10, 2025), https://perma.cc/Q7XR-TW7R; *National Grocers Association Opposes Settlement Proposed by Credit Card Duopoly Visa and Mastercard* (Nov. 10, 2025), https://perma.cc/BF2A-9HYS; *Retailers Call Reported Swipe Fee Settlement with Visa and Mastercard 'All Window Dressing and No Substance,'* National Retail Federation (Nov. 9, 2025), https://perma.cc/K2D5-2Z82-.

violations" of the antitrust laws is against public policy. *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955). "Any contractual provision" that "absolve[s] one party from liability for future violations of the anti-trust statutes" is itself a contract "in restraint of trade," and thus illegal. *Fox Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955). Prospective waivers of private antitrust claims are thus prohibited by the letter of the antitrust laws. *See Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 896 n.27 (3d Cir. 1975). Any "agreement which in practice acts as a waiver of future liability under the federal antitrust statutes is void." *In re Am. Express Merchs. Litig.*, 634 F.3d 187, 197 (2d Cir. 2011).[5]

Yet the proposed settlement immunizes the networks from ongoing and future antitrust violations. It releases "any and all manner of claims" that any class member "ever had, now has, or hereafter can, shall, or may have" for five years after the last appeal of the settlement is exhausted. Proposed 2025 Settlement, ECF 9692-2 ¶ 116(a). The release expressly immunizes Visa and Mastercard from claims for the "continuing effect of any such conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act" that "could have been alleged." *Id.* So although the settlement purports to lower interchange fees by a trivial amount, it does so in exchange for an agreement to waive claims. That makes the settlement agreement *itself* an agreement in restraint of trade by agreeing to keep in place anticompetitive restraints and by quite literally fixing prices (the interchanges fee), albeit at a slightly lower price than currently persists.

---

[5] *In re Am. Express Merchants' Litig.* involved whether a mandatory arbitration provision that precluded class action litigation of an antitrust claim in effect deprived "plaintiffs of the statutory protections of the antitrust laws." *Id.* at 198. The Supreme Court explained that an arbitration provision that made it more expensive to seek a remedy "does not constitute the elimination of the *right to pursue* that remedy." 570 U.S. 228, 236 (2013). Here, the release directly eliminates NACS's right to pursue future antitrust remedies.

Worse, that release will extend for *years* beyond when the proposed settlement's (inadequate) reductions on interchange fees will end. The proposed settlement agrees to reduce "average Effective Interchange Rate" fees by ten basis points for five years, "[c]ommencing no earlier than four months following the Settlement Approval Date." *Id.* ¶ 48(a). But the release will extend for *eight* years after approval, or *five* years after the last appeal of the settlement is exhausted. And even after that period ends, the settlement could be interpreted to still waive claims "arising out of or relating to a continuation or continuing effect of any such conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act." *Id.* ¶ 116(a). But under black letter antitrust law, each act in furtherance of a continuing anticompetitive conspiracy that injures a plaintiff creates a new factual predicate for a new claim, even if the basic nature of the conspiracy remains unaltered. *See Lawlor*, 349 U.S. at 327-28. So NACS and Circle K fear the networks may argue that future lawsuits challenging continuing effects of the current anticompetitive scheme are barred in perpetuity. Regardless, the release not only violates the antitrust laws, it also means the settlement is not fair, reasonable, or adequate for the same reasons that the proposed 2012 settlement was defective. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 239 (rejecting settlement in part because the parties "remain[ed] bound to the release" even after the relief had expired).

The settlement agreement forces nearly every merchant in the country to surrender their right to critical remedies eliminating future antitrust violations—whether they want to or not. For over ten years, NACS, Circle K, and other class members, have insisted that only elimination of the honor-all-card rule and excessive interchange rate will provide meaningful relief. The settlement eliminates their right to seek and obtain that relief. At best, NACS's members and Circle K will have no ability to obtain relief until the eight-year release expires and the *next* interchange

fee class action is litigated to final judgment. But, if this case is any guide, that will take decades: this case has already spanned over twenty years.

In that sense, the settlement agreement puts class members in a ***worse*** position than they are today. Today, decades of litigation has class members "ready for trial." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *23. Indeed, Circle K is on the verge of trial on its damages claims. *See Target Corp. et al v. Visa Inc.*, 1:13-cv-03477 (S.D.N.Y.  July 16, 2025).  But if the settlement is approved, eight years from now class members will no longer benefit from any provision in the settlement *and* will have to start decades-long litigation on their equitable claims all over again: motions to dismiss, class certifications, summary judgment proceedings, *Daubert* motions, and challenges to flawed settlements will all need to recur. Even then, class members will face the prospect of Defendants claiming those claims are barred in perpetuity. That is highly prejudicial, violates federal antitrust laws, and confirms the settlement is not fair, reasonable, or adequate. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *23 (weighing against settlement approval the fact that the 2024 settlement came "at a relatively late stage in this litigation"). NACS's members and Circle K should not need to wait another twenty years, and pay hundreds of billions more in interchange fees, before they can "pry open to competition a market that has been closed by defendants' illegal restraints." *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947).

## CONCLUSION

The proposed mandatory settlement should be rejected, or, in the alternative, NACS and Circle K should be permitted to opt out of the (b)(2) class. **NACS and Circle K request that this Court hold a hearing on preliminary approval and that it grant argument time to NACS and Circle K.**

Dated: December 12, 2025

Respectfully submitted,

*/s/ Mithun Mansinghani*

**Mithun Mansinghani**
LEHOTSKY KELLER COHN LLP
629 W. Main Street
Oklahoma City, OK 73102
(512) 693-8350
mithun@lkcfirm.com

**Drew F. Waldbeser**
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
drew@lkcfirm.com

**CERTIFICATE OF SERVICE**

I certify that on December 12, 2025, I served a true and correct copy of the foregoing document, with information covered by the protective order redacted, on counsel of record via e-filing. I also served a true, correct, and unredacted copy of the foregoing on counsel of record via email.

*/s/ Mithun Mansinghani*
Mithun Mansinghani

**CERTIFICATE OF COMPLIANCE**

I certify that this document complies with the word-count limitation in Local Rule 7.1(c) because it contains 8,746 words, excluding those portions of the document exempted by Local Rule 7.1(c).

/s/ Mithun Mansinghani
Mithun Mansinghani