# EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP

JONATHAN S. ABADY
MATTHEW D. BRINCKERHOFF
ANDREW G. CELLI, JR.
RICHARD D. EMERY
DEBRA L. GREENBERGER
DIANE L. HOUK
DANIEL J. KORNSTEIN
JULIA P. KUAN
HAL R. LIEBERMAN
ILANN M. MAAZEL
KATHERINE ROSENFELD
ZOE SALZMAN
SAM SHAPIRO
EARL S. WARD
O. ANDREW F. WILSON

ATTORNEYS AT LAW
ONE ROCKEFELLER PLAZA
8TH FLOOR
NEW YORK, NEW YORK  10020

TEL: (212) 763-5000
FAX: (212) 763-5001
www.ecbawm.com

DANIEL M. EISENBERG
VASUDHA TALLA

CLAIRE Z. ABBADI
ERIC ABRAMS
NICK BOURLAND
HANNAH BRUDNEY
SARA LUZ ESTELA
BIANCA HERLITZ-FERGUSON
LAURA S. KOKOTAILO
SONYA LEVITOVA
HAFSA S. MANSOOR
SANA MAYAT
DANIEL A. PEÑA
VIVAKE PRASAD
MAX SELVER
MAGGIE TURNER
EMILY K. WANGER
RACHAEL WYANT
SYDNEY ZAZZARO

December 12, 2025

**Via ECF**

The Honorable Brian M. Cogan
United States District Judge
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

>   Re:  *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation* (MKB) (JAM), No. 05-MD-1720

Dear Judge Cogan:

We represent the National Retail Federation ("NRF") and the Retail Industry Leaders Association ("RILA"), trade associations for thousands of large and small merchants across the retail industry.  Together, NRF and RILA, the "Merchant Trade Groups," are permissive intervenors in the above-captioned matter, and each of their members (and NRF and RILA themselves) is part of the certified Rule 23(b)(2) class.  *See* Dkt. 8605 (June 28, 2021 Mem. & Order).  NRF is the world's largest trade association of retailers both large and small, representing stores in every retail sector across the United States.  RILA is the trade association for retailers that have earned leadership status by virtue of their sales volume, innovation, or aspiration; its members include the largest and fastest growing companies in the industry.

The Merchant Trade Groups have merchant members that account for over $2.7 trillion in annual retail sales, millions of American jobs, and hundreds of thousands of stores, manufacturing facilities, and distribution centers domestically and abroad.  Their position is informed by their in-depth knowledge of the merchant community and, particularly, merchants' experiences with interchange fees: interchange fees are among merchants' highest costs and directly impact their bottom line.  Chief Judge Margo K. Brodie cited the Merchant Trade Groups' concerns (among many others') in denying preliminary approval of the 2024 proposed settlement.  *See, e.g.*, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No.

EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
Page 2

05-MD-1720, 2024 WL 3236614, at *35 (E.D.N.Y. June 28, 2024) ("June 28, 2024 Order") ("Finally, the Court agrees with the Merchant Trade Groups that the release is likely to violate the due process rights of future class members who come into existence and join the class between the deadline to raise objections and final settlement approval.") (citation omitted)).

We write pursuant to the Court's November 18, 2025, Order to object to preliminary approval of the proposed (b)(2) class settlement agreement (the "proposed settlement"). The proposed settlement should not be approved. As Chief Judge Brodie recognized in denying preliminary approval of the 2024 proposal, maintaining the Honor-All-Cards ("HAC") and default interchange rates enshrines the anti-competitive rules that animated the filing of this lawsuit in the first place. And yet, the proposed settlement, like the earlier inadequate 2013 and 2024 versions, materially reforms neither. It functionally preserves the HAC rule. It does not even tinker with default interchange or materially alter Defendants' ability to impose inflated, anti-competitive interchange rates on merchants. Mastercard's CEO candidly admitted as much last month in touting the virtues of the proposed settlement to Mastercard's stockholders.[1] And when the proposed settlement's so-called relief expires, Defendants can return to their anti-competitive ways.

What this settlement will provide (if approved) is what Defendants have long desired: continuation of their extremely profitable,[2] but plainly anti-competitive behavior while obtaining an extraordinarily broad, mandatory, class-wide release. And, in turn, Equitable Relief Class Plaintiffs ("Class Plaintiffs") and their counsel ("Class Counsel") will avoid a trial that their actions suggest they have no interest in pursuing while garnering a staggering $206 million attorney fee award. Dkt. 9692-2 (proposed settlement) ¶ 11. This is Defendants' third attempt to make this lawsuit go away at a cut-rate price that ensures their bottom line is preserved. This attempt, like the prior two, should be rejected.

In this letter, we highlight the proposed settlement's key deficiencies without prejudice to our submission of formal objections should the Court preliminarily approve it. *First*, we detail how the proposed settlement agreement fails to approach adequate relief to the Class Members, particularly at a time where they should have maximum leverage: the Court has denied all motions for summary judgment by Defendants Visa and Mastercard concerning the Class Plaintiffs' anti-competition claims and the case is on the (relative) eve of trial. June 28, 2024 Order, 2024 WL 3236614, at *5. The core issue in this case is that Defendants have engaged in anti-competitive behavior by setting arbitrarily high default interchange rates while at the same time requiring merchants to accept all cards through the HAC rules, thereby disincentivizing any downward competitive behavior on interchange rates. But the proposed settlement does nothing

---

[1] Investing.com, *Mastercard at KBW Fintech Payments Conference: Strategic Insights and Future Plans* (Nov. 12, 2025), https://www.investing.com/news/transcripts/mastercard-at-kbw-fintech-payments-conference-strategic-insights-and-future-plans-93CH-4352728.

[2] Visa's net profit margin as of September 30, 2025 was 50.15%. *See Visa Profit Margin 2011-2025*, Macrotrends, https://www.macrotrends.net/stocks/charts/V/visa/profit-margins (last accessed Dec. 11, 2025). Mastercard's net profit margin as of September 30, 2025 was 45.28%. *See* Mastercard Profit Margin 2011-2025, Macrotrends, https://www.macrotrends.net/stocks/charts/MA/mastercard/profit-margins (last accessed Dec. 11, 2025).

to address this core problem. In fact, the proposed agreement would do the exact *opposite* by enshrining the very anti-competitive behavior at the core of this lawsuit.

*Second*, we explain how the proposed settlement's illusory relief is tied to a faulty process. Representing one of the largest mandatory classes in the history of Rule 23(b)(2), including nearly every merchant in the country, are a collection of five tiny businesses—a hair salon, pharmacy, dentist, and like entities. June 28, 2024 Order, 2024 WL 3236614, at *17. These businesses plainly lack the necessary experience or judgment to tie the *entire* merchant community's hands. Under the proposed settlement agreement, nearly every merchant in the country, through the mandatory release, would lose their rights to pursue meaningful reforms to Defendants' anticompetitive practices. Not only are the Class Plaintiffs' Representatives not, themselves, well situated to negotiate mandatory class-wide relief, but they have inexplicitly frozen out of the negotiation process entities like the Merchant Trade Groups, whose members are responsible for one of the largest categories of credit card transactions in the United States and can help craft adequate relief.

The end result is a proposed settlement that provides illusory relief for the merchants completely untethered to the procedural posture of the case or Defendants' potential exposure. And, should the Court approve the proposed settlement agreement as drafted, our members will be bound by its unfavorable terms for years. The mandatory and inadequate terms of the proposed settlement are incompatible with Rule 23(e) and the due process rights of absent Class Members.

## I. The Proposed Settlement Does Not Provide Adequate Relief to Class Members

Neither the structure nor the terms of the settlement provide adequate and meaningful relief to the Class Members. As the Second Circuit has made clear, a proposed settlement's purported relief must be judged through the lens of both the procedural posture of the case and the scope of potential recovery. *See Moses v. N.Y. Times Co.*, 79 F.4th 235, 244 (2d Cir. 2023) ("To evaluate the fairness, reasonableness, and adequacy of a class settlement, we have historically applied the nine factors set out in *Grinnell Corp.*, 495 F.2d at 463."). The Court has denied all of Defendants' summary judgment motions on Class Plaintiffs' anti-competition claims and this case is ready for trial. June 28, 2024 Order, 2024 WL 3236614, at *23. The Class Plaintiffs have strong claims and Defendant's potential exposure is significant. *See id.* ("Plaintiffs' claims have survived numerous *Daubert* and summary judgment motions, and while the issues addressed at summary judgment would likely be raised again at trial, what remains to be determined is only the sufficiency of the evidence, rather than the legal sufficiency of Plaintiffs' theories of liability. Stated differently, Plaintiffs' case is ready for trial—and this Settlement comes at a relatively late stage in this litigation."). The proposed settlement is completely untethered to this reality.

The Court must also subject this proposed settlement agreement to a searching review under Rule 23(e) due to the risks posed by misaligned incentives. Here, by convincing Class Plaintiffs to agree to illusory reforms, Defendants get (if approved) litigation peace through a broad release without having to materially change their anti-competitive behavior that animated

the filing of this lawsuit in the first place. Class Counsel, in turn, can receive up to $206 million in fees and need not incur the time and expense of trial if the Court approves the settlement. Dkt. 9692-2 ¶ 11.

Finally, the proposed settlement offers little more than lip service to flaws in the 2024 proposal that Chief Judge Brodie identified. Even a cursory review of the proposed settlement demonstrates that the terms do not protect the Class Members and will have little, if any, practical effect on Defendants' anti-competitive behavior. Rather, the proposed settlement would enshrine the very anti-competitive behavior that gave rise to this lawsuit. Class Counsel's decision to barrel towards settlement on the (relative) eve of trial, with terms that are substantially similar to those that were been rejected by the Court last year, deprives the Merchant Trade Groups' members of an opportunity to leverage the strength of their claims as to Defendants' anti-competitive conduct into meaningful reforms. It is yet another way that the Merchant Trade Groups are receiving illusory relief due to their denial of due process.

### a. The Proposed Settlement Effectively Preserves the Honor-All-Cards Rule, Which Remains at the Heart of the Anticompetitive Action

The Merchant Trade Groups have already made clear in their objections to the 2013 Rule (b)(2) settlement and since—including during the Court's preliminary review of the 2024 proposed settlement agreement—that Defendants' antitrust violations cannot be remediated unless the HAC and default interchange rules are eliminated or substantially modified. Chief Judge Brodie agreed. In denying preliminary approval to the 2024 iteration of the proposed settlement agreement, Chief Judge Brodie reasoned that the proposed relief—which would have maintained HAC rules despite making some changes to the Honor-All-Wallets rules—was inadequate and fell far short of the "best possible" recovery. At the end of the day, "merchants would still be saddled with another all-or-nothing choice among card products." June 28, 2024 Order, 2024 WL 3236614, at *27 (citation omitted).

The proposed settlement agreement does little to change this all-or-nothing choice. To be sure, on its surface, as both Class Counsel and Defendants have argued, the proposed settlement *does* modify the HAC rule: it allows merchants to selectively accept cards by brand and product. In practice, however, this change does not benefit merchants nor redress the anti-competitive problem that is at the heart of this lawsuit. For example, a merchant could choose to not accept Visa branded "premium" consumer credit cards, which usually carry a higher interchange fee. But if a merchant wanted to accept *any* premium card issued by any bank within a card network, the merchant must accept *all* premium cards issued by *all* banks within that network. This term has the practical effect of enshrining the HAC rules. It also does nothing to put downward competitive pressure on interchange, especially because Visa and Mastercard classify nearly all cards as "premium" cards. If a merchant were to refuse a particular premium card, the customer's backup card is also likely to be a premium card, as very few current cards are classified as "standard" cards. As a result, should a merchant opt out of premium cards, it would also be opting out of credit cards altogether, which is not viable in today's marketplace.

In contrast, meaningful reform would permit merchants to pick-and-choose among

premium cards, or at the very least, decline to accept cards by issuer (such as Chase or Bank of America). If a merchant could refuse, say, Visa's Chase Sapphire cards because it has particularly exorbitant interchange fees, the customer almost certainly has another credit card he or she can use to complete the transaction. That merchant choice to refuse cards with the highest rates would naturally create real competitive pressure on interchange rates, because all credit cards want to be "front of wallet," i.e., the card a customer reaches for first.

What's more, merchants cannot avail themselves of these new HAC rules because they are unworkable. For example, the settlement proposes that "Visa and Mastercard will ensure that their 'Commercial' and 'Premium' cards—with higher interchange fees—are readily identifiable visually and electronically at the point-of-sale, so that merchants can, if they choose, selectively decline them from their customers." Dkt. 9692 (Class Pls.' Br.) at 4. As Class Plaintiffs and Defendants must surely know, point-of-sale is far too late in the process to be declining cards. Any time a merchant rejects a card it needs to consider the customer experience, balancing the "customer friction" of rejection with the benefit of pressuring exorbitant credit cards to reduce their rates. The only way to feasibly manage those tensions is to have clear and consistent signage—e.g., "We accept only these standard credit cards [LISTING CARDS] because they charge merchants' lower swipe fees and will pass those savings onto you!"

But no such signage is possible. Not only (as detailed above) would the list of standard cards be too small to be meaningful, but there is also no set list of standard cards. Under the settlement, Defendants retain the discretion to move cards from the standard to premium category as they wish. The upshot is that even if point-of-sale software could keep up with the shifting categories of cards, it is unclear how merchants would be able to comply with the notice requirement under the proposed settlement.

And, to further enshrine their anticompetitive behavior, the proposed settlement agreement allows Visa and Mastercard to lower interchange rates for merchants who agree to accept all cards. Dkt. 9692-2 ¶¶ 30(a), 79(a). It is all but guaranteed that the HAC rule will, in practical effect, stay exactly the same under the proposed settlement agreement as it operates today.

The real-world deficiencies of this proposed settlement appear to be by design, crafted to enable Defendants to preserve their anti-competitive business practices. The CEO of Mastercard admitted as much at an investor conference on November 12, 2025—just two days after the Class Plaintiffs and Defendants moved for preliminary approval of their proposed settlement. In response to a question from a panel moderator on whether Mastercard's "competitive positioning" will hold given the proposed settlement's changes to the HAC rules, Mastercard CEO Michael Mieback stated:[3]

> Yeah. You know, it holds for a number of reasons. First of all, the

---

[3] Investing.com, *Mastercard at KBW Fintech Payments Conference: Strategic Insights and Future Plans* (Nov. 12, 2025), https://www.investing.com/news/transcripts/mastercard-at-kbw-fintech-payments-conference-strategic-insights-and-future-plans-93CH-4352728.

EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
Page 6

> way that the agreement was reached is to say, honor all cards on a level of issuer basis, that will not be a choice. But you can say you're going to take premium cards or not. You think about, if you're a merchant, what are you trying to do? You're trying to sell. When you think about the proportional level of sales that are related to premium cards, we've seen this in Europe. This really did not play out because the merchant wants that customer in their shop and have a predictable experience. You do not go on and off or left and right.
>
> I think the balance struck about standard cards, premium cards, and commercial cards is just very sensible so that the overall user experience will hold. I think overall, that makes a lot of sense. The overall acceptance level is there. That beats any other alternative payments. The protections are there. The cybersecurity, all these other things that are built into the cards ecosystem, in particular, zero liability. When you take the category of cards overall versus other alternatives, that anyway holds.

In other words, Mastercard's own CEO admitted that this settlement will not inject new competition—as one should expect from a settlement of antitrust claims—or fundamentally change the "overall user experience." His admission belies Plaintiffs' claims to this Court that the proposed settlement "will enact sweeping changes to the HAC rules." Dkt. 9692 at 2. Mastercard CEO Mieback admitted that because premium cards are such a high "proportion[]" of all cards, it is not feasible for merchants to refuse all premium cards. He also admitted there was another, more meaningful reform that, apparently, Defendants refused: permitting merchants to decide, on an issuer-by-issuer basis (what he calls the "level of issuer basis"), which credit cards to accept. As a result, the settlement does not change the fundamental anti-competitive HAC rules, as detailed above: if a merchant decides to accept any Visa cards, it still must accept *all* premium Visa cards.

In Chief Judge Brodie's view, eliminating—or at least fundamentally changing—HAC was almost a precondition for settlement given the allegations and posture of this case. June 28, 2024 Order, 2024 WL 3236614, at *27 ("Regardless of whether the objecting plaintiffs would successfully argue for the elimination of the Honor All Cards rule if allowed to proceed to trial, the fact that such relief has been continuously argued for, and would offer significantly more choice to all Class Members, suggests that the relief offered in the Settlement falls short of the 'best possible' recovery."). Thus, while offering the appearance of modifying the HAC cards rule, as Mastercard's CEO admitted, the proposed settlement will have no real-world impact on the HAC rules at all.

### b. The Settlement Does Not Alter Default Interchange and the Temporary Interchange Fee Caps Are Negligible and Time-Limited

There are other aspects of the proposed settlement agreement that also do not pass muster

under Chief Judge Brodie's "adequacy" and "best possible relief" analysis. More notably, Plaintiffs admit that the proposed settlement "leaves in place" the setting of default interchange rates, which is the practice where "Visa and Mastercard each sets what it terms 'default' interchange rates, which the merchant must pay in the absence of an agreement between the merchant and the network or the issuing bank for a different rate." Dkt. 9692 at 37. Class Plaintiffs raised a "significant" challenge that default interchange is anti-competitive because the "nominally 'default' rates [turn] into de facto fixed rates, extracting supracompetitive interchange rates from each merchant segment." *Id.* at 12-13. But faced with the prospect of settlement, Plaintiffs lost their commitment to changing this core anti-competitive practice. In short, the Class Plaintiffs have folded a winning hand.

Additionally, while Visa and Mastercard agreed to lower their average system-wide interchange fees, these rollbacks would (1) still maintain interchange fees at inflated rates, and (2) most merchants would see *no* reduction in their interchange rates because the proposed reduction takes into account side-deals between Defendants and individual merchants. At the end of the day, these rates would be well *above* those in place when the litigation started, and even above those assessed by Visa and Mastercard as recently as 2023.[4] *See* Dkt. 9692-2 ¶¶ 48(a), (c)(ii), 97(a). Further, reducing average Visa and Mastercard credit card interchange rates by 10 basis points for a period of eight years is not meaningful. Most of Visa and Mastercard's current rates average 235 basis points.[5] In fact, the reduction would barely exceed Visa's and Mastercard's recent rate increases.[6]

There are other aspects of the rollbacks that offer essentially meaningless relief. For example, while the proposed settlement agreement sets a temporary interchange rate cap of 1.25% for eight years for so-called "standard" consumer credit cards, those cards are an exceedingly small fraction of the marketplace, as detailed above. *See* Dkt. 9692-2 ¶¶ 50, 99. And credit card companies would be able to freely recategorize cards out of this category to avoid the rate cap. In exchange for this small temporary rate reduction, the agreement broadly bars all merchants—even those who strongly object to this proposed settlement—from challenging any of Visa's and Mastercard's merchant fees and rules in court. Similarly, the proposed settlement only reduces (albeit temporarily) the fees that Visa and Mastercard set on behalf of banks—not the network fees that go directly to Visa and Mastercard. As soon as the settlement goes into effect, Visa and Mastercard could raise their own network fees, passing those costs to the merchants and customers, and then discounting what the banks pay to handle transactions.

---

[4] CMSPI, *State of the Industry Report*, The Playbook for Smarter Payments (Sept. 2025), https://insights.cmspi.com/soir-2025.

[5] Press Release, *Credit and Debit Card 'Swipe' Fees Hit New Record of $187.2 Billion, Driving Up Prices for American Families*, Merchants Payments Coalition (March 18, 2025), https://www.merchantspaymentscoalition.com/credit-and-debit-card-swipe-fees-hit-new-record-1872-billion-driving-prices-american-families.

[6] CMSPI, *State of the Industry Report*, The Playbook for Smarter Payments (Sept. 2025), https://insights.cmspi.com/soir-2025.

### c. Permitting Merchants to Surcharge Offers Negligible and Inconsistent Relief

The proposed settlement would marginally increase merchants' ability to impose surcharges on consumer purchases up to 3% without being required to surcharge competitive cards (i.e., American Express). *See* Dkt. 9692-2 ¶¶ 43(f), 92(f). But this confers little benefit to merchants in practice. As a threshold matter, surcharges are altogether illegal in a handful of states and, for most states, they are capped to 2 to 3% and must be accompanied by varying and complicated surcharge disclosures at the point of sale or before.[7] Allowing merchants to surcharge is illusory when such practices are barred by state law.

But the proposed settlement's surcharge changes are problematic for another reason: they are not designed to benefit the full range of Class Members. Some Class Members may operate in single states that allow merchants to surcharge. Other Class Members may operate in single states that bar surcharging. And yet others may operate in multiple states, and as such, must craft surcharge policies that are compatible with multiple regulatory regimes. It remains to be seen whether consumers will continue to patronize businesses that impose bespoke surcharges for different cards at the point of sale, which would be both a sharp departure from consumer shopping expectations and risk merchants incurring consumer ire as merchants attempt to mitigate the harm caused by Visa and Mastercard. But the proposed settlement mitigates none of this.

This is representative of a fundamental conflict within the Class. Those Class Members based in states permitting surcharging without restraint may view surcharging as potentially valuable, while this relief has less (or no) value for Class Members in states with statutory surcharging restrictions. *See* June 28 Order, 2024 WL 3236614, at *36 ("It bears emphasis that Rule 23(e)(2)(D) requires that class members be treated *equitably*, not identically.") (quoting *Moses v. New York Times Co.*, 79 F.4th 235, 245 (2d Cir. 2023)). "[D]ifferent class members can benefit differently from an injunction—but no matter what, they *must* stand to benefit (it cannot be the case that some members receive no benefit while others receive some." *Id.* (quoting *Berni v. Barilla S.p.A.*, 964 F.3d 141, 147 n.28 (2d Cir. 2020)) (alteration in original).

### d. The Proposed Settlement Agreement Enshrines the Anticompetitive Pricing at the Heart of the Class Plaintiffs' Claims

As soon as the settlement goes into effect, Visa and Mastercard could raise their own network fees, passing costs to the merchants and customers, and then discounting what the banks pay to handle transactions. This proposed settlement agreement permits Visa and Mastercard to

---

[7] Gabriela Jhean, *Credit card surcharge laws by state explained for 2025*, 8AMLAWPAY (Oct. 24, 2025), https://www.lawpay.com/about/blog/credit-card-surcharge-rules/. This form of relief would not even be possible in certain states that require posting of surcharges on each item prior to sale, which is unknowable until the merchant learns of the interchange fee for a specific credit card from Defendants. *See, e.g.*, N.Y. Gen. Bus. Law § 518 (McKinney) ("Any seller in any sales transaction imposing a surcharge on a customer who elects to use a credit card in lieu of payment by cash, check, or similar means shall clearly and conspicuously post the total price for using a credit card in such transaction, inclusive of surcharge . . .").

continue their anti-competitive pricing model. Visa and Mastercard would still be allowed to dictate interchange fees to the banks, thereby precluding competition among the banks on pricing. *See, e.g.*, Dkt. 9692-2 ¶ 30 ("This provision is not intended to prohibit the Mastercard Defendants from establishing default interchange rate structures . . .").

Preserving their market dominance has harmful, downstream effects that make other purported relief in the proposed settlement agreement illusory—such as allowing merchant buying groups to negotiate fees with Defendants. The buying groups confer no additional leverage in an anti-competitive market. The 2024 version of the settlement agreement had these same flaws. As Chief Judge Brodie explained, that agreement claimed to "remove any restrictions" from the Merchant Buying Group provisions, but these changes did not "offer merchants any more bargaining leverage than they previously had." *See* June 28, 2024 Order, 2024 WL 3236614, at *28. The parties have not addressed this issue in their latest proposal.

Rather than changing the fundamentals of this monopolistic market, the proposed settlement enshrines them. It locks in Visa's and Mastercard's dominant position and, via its release and waiver provisions, cuts off the legal rights of any other merchant or group to challenge the credit card cartel pricing model. *See* Dkt. 9692-2 ¶¶ 116(a), (b).

At the end of the day, this proposed settlement agreement benefits Defendants at the expense of the merchant community. Thus, it is unsurprising that this is the rare case where the Defendants *supported* class certification. *See* Dkt. 8449 (Defendants' response to motion for class certification) ("For the purpose of this motion only, defendants do not oppose certification of the non-opt out Rule 23(b)(2) class that plaintiffs have proposed."). The reason is clear: by providing what amounts to token relief, Defendants will secure releases for future equitable claims, and with that, essentially carte blanche to continue to mandate acceptance and to fix interchange rates.

## II.     The Settlement Agreement Binds the Largest Rule 23(b)(2) Class in History to a Bad Result Caused by Bad Process

For years, the Merchant Trade Groups have attempted to work with Class Counsel—whose clients are just a handful of small businesses purportedly representing one of the largest classes in the history of Rule 23(b)(2)—to explain what relief would be meaningful to merchants. But despite our unique position representing both large and small merchants which account for over $2.7 trillion in annual sales, extensive resources, and relationships to the merchant community, Class Counsel have effectively frozen us out. For reasons that are entirely unclear, Class Counsel refused our many offers to share our expertise about proposed settlement terms. The Merchant Trade Groups only learned of the proposed settlement when it was publicly announced.

The result is a settlement that serves the Defendants' desire for "litigation peace" in exchange for illusory relief for the merchants. And now, should the Court approve the settlement agreement as drafted, our members will be bound by its unfavorable terms. Both the substance of the settlement agreement and process rights afforded to the Merchant Trade

Groups' members are incompatible with the protections set forth in Rule 23(c).

### a. The Merchant Trade Groups and Similarly Situated Class Member Representatives Have Been Cut Out of the Process

By way of background, beginning in mid-2017, counsel and representatives from the Merchant Trade Groups began discussions with appointed Class Counsel—whom the Merchant Trade Groups understood were appointed to represent *all* merchants in the class, including the Merchant Trade Groups and their members, not just the Class Plaintiffs. The Merchant Trade Groups sought to share privileged information with their putative appointed counsel about their views regarding the appropriate certification of any Rule 23(b)(2) class and what equitable relief would be meaningful to the broad merchant community beyond the Class Plaintiffs. The Merchant Trade Groups sought to bridge vast disparity in collective resources and knowledge between the merchants represented by the Merchant Trade Groups on the one hand (who, together, represent thousands of merchants that account for the vast majority of merchant transactions in the country), and the five merchants that are the named Rule 23(b)(2) class representatives on the other. These discussions included in-person meetings where the Merchant Trade Groups brought member retail representatives with deep experience with the payment industry to share their views with Class Counsel.

During that time, the Merchant Trade Groups offered to enter into a confidentiality/non-disclosure agreement to permit Class Counsel to share information freely. While Class Counsel initially expressed a willingness to engage, they ultimately refused. Repeatedly, the Merchant Trade Groups informed Class Counsel that any settlement that preserves HAC and default interchange would not be meaningful. Repeatedly, we asked to be kept apprised so we can provide support and share our resources. Yet Class Counsel never sought nor accepted our multiple offers of assistance. They never consulted with us on the settlement they were negotiating with Defendants despite our willingness to preserve confidentiality. Once the Merchant Trade Groups objected to the last proposed settlement agreement, Class Counsel never spoke with us again. Then, the Merchant Trade Groups only learned of this proposed settlement agreement when it was publicly filed.

### b. It Would Be Manifestly Unfair and Violate Due Process to Deprive Class Members of an Opt-Out from a Settlement that Does Not Afford Them Appropriate Relief

While this Court has already certified this Rule 23(b)(2) class over the Merchant Trade Groups' objections, the Court should provide additional process protections to Class Members at this stage to mitigate the harm otherwise imposed by the proposed mandatory settlement. Although Rule 23(b)(2) classes are mandatory by default, "'the language of Rule 23 is sufficiently flexible to afford district courts discretion to grant opt-out rights in . . . (b)(2) class actions.'" *Batalla Vidal v. Wolf*, No. 16-CV-4756 (NGG) (VMS), 2020 WL 6695076, at *12 (E.D.N.Y. Nov. 14, 2020) (quoting *McReynolds v. Richards-Cantave*, 588 F.3d 790, 800 (2d Cir. 2009)); *Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997) ("Like the Second Circuit, we view Rule 23(d)(5) to be broad enough to permit the court to allow individual class members to

EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
Page 11

opt-out of a (b)(1) or (b)(2) class when necessary to facilitate the fair and efficient conduct of the litigation.") (citing *Cty. of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1304 (2d Cir. 1990)). *See also In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 146-47 (2d Cir. 2001).

Under the Due Process Clause, Rule 23(b)(2) classes involving individualized money damages *must* contain opt-out rights. *See* 6 Newberg and Rubenstein on Class Actions § 4:36 (citing *In re Monumental Life Ins. Co.*, 365 F.3d 408, 416-17 (5th Cir. 2004)). This case is ultimately about the merchant community's bottom line—how much they spend to accept credit cards—and opt-out rights must be afforded to Class Members. While Class Plaintiffs seek only injunctive relief, their claims—and other Class Members' potential claims—are essentially about the amount of money Defendants can extract from merchants over the course of their business relationships. Had Plaintiffs succeeded at trial, Defendants would have required to reform the anti-competitive policies—particularly HAC and default interchange—they use to extract inflated interchange fees from merchants, resulting in merchants paying less in interchange fees. Moreover, the relief in the proposed settlement is a (small) reduction in interchange fees, which is monetary relief. Indeed, Defendants seek to avoid a trial because they recognize that if these anti-competitive rules are eliminated, competition will increase and interchange rates will fall, impacting Defendants' (substantial) profits. Absent Class Members must have the right, under the Due Process Clause, to choose their own course on whether to accept a settlement for an issue that directly impacts their bottom line.

Permitting Class Members to opt-out of this proposed settlement would mitigate the due process concerns that arise from having the remaining five Class Plaintiffs' Representatives—including a hair salon, pharmacy, dentist, and like entities[8]—to impose relief and a broad release on one of the largest mandatory classes in the history of Rule 23(b)(2)—approximately 20 million merchants including nearly every merchant in the country that exists today. Class Members are merchants of all sizes, from individual solo proprietorships to multi-billion-dollar corporations. They use cards differently and vary by size and location. Some operate nationwide; some within single states; some within multiple states, each with unique surcharge regulatory regimes. Merchants vary in terms of the percentage of sales in cash or by card; the percentage of card sales by premium and regular cards; and the percentage of sales by digital wallet. A small handful have had the economic power to negotiate limited deals with Visa and Mastercard as to the fees they pay to accept cards; most do not. Many merchants are legally sophisticated entities with their own general counsel and professionals with payments expertise that make decisions about how to engage with—or to bring suit against—Visa and Mastercard as business decisions. Some merchants want to accept new payment mechanisms existing now or emerging soon, while others only accept traditional cards.

The implication of these endemic differences is that "the relief sought" in this proposed settlement will *not* in fact "perforce affect the entire class at once," as is required for mandatory classes. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360-61 (2011) ("Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of

---

[8] *See* Dkt. 6910 ¶¶ 10–18.

EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
Page 12

the class."). Each member of the class will not necessarily benefit from the rule changes secured by this proposed settlement. Because this is not a case where "a single injunction . . . would provide relief to each member of the class" (which is no surprise given the breadth and variety of the proposed class, the complexity of the payment industry, and the vast Visa and Mastercard rules that limit competition), opt out rights would permit merchants to decide their preferred approach for themselves. *Id.* These economic actors should be permitted to make their own business decisions about what is best for them, their employees, and their customers without being bound by the judgments of *other* businesses about what is best for *them*.

This principle is especially applicable here, where relief is not unitary. There are many ways to correct Defendants' anticompetitive practices to address the harm inflicted on the breadth of Class Members. And yet, Class Plaintiffs adhere to essentially the same framework as the Court rejected in 2024: a one-size approach that fits no one. It is deeply concerning for a trillion dollar marketplace—comprised of what may be the largest Rule 23 (b)(2) class in history—to be bound by the decisions of five small businesses. Opt-out rights are required by the Due Process Clause, or, at a minimum, more than warranted in the Court's discretion.

### c. The Settlement Agreement's Release of Equitable and Injunctive Claims is Virtually Limitless in Scope

The proposed settlement forces all Class Members to accept a release of future claims against Defendants. The release states in pertinent part:

> (a) The Rule 23(b)(2) Class Releasing Parties hereby expressly and irrevocably . . . release the Rule 23(b)(2) Class Released Parties from any and all manner of claims, demands, actions, suits, and causes of action, . . . whether known or unknown, suspected or unsuspected, in law or in equity that any Rule 23(b)(2) Class Releasing Party ever had, now has, or hereafter can, shall, or may have and that have accrued as of the Settlement Approval Date or accrue no later than the longer of five years after the Settlement Final Date or eight years after the Settlement Approval Date, arising out of or relating to any conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act of any Rule 23(b)(2) Class Released Party **that are or have been alleged or otherwise raised in the Action, or that could have been alleged or raised in the Action relating to the subject matter thereof, or arising out of or relating to a continuation or continuing effect of any such conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act.**

Dkt. 9692-2 ¶ 116(a) (emphasis added).

While we would expect there to be a release of claims arising from Defendants' misconduct challenged in this lawsuit, this release is so much broader than that, bestowing upon

E<small>MERY</small> C<small>ELLI</small> B<small>RINCKERHOFF</small> A<small>BADY</small> W<small>ARD</small> & M<small>AAZEL</small> <small>LLP</small>
Page 13

Defendants yet another windfall. This release insulates Defendants from any future litigation that "could have been alleged or raised" in this one, no matter how distant from the allegations in the complaint. *Id.* The scope of claims that "could have been alleged or raised" in this litigation does not appear to have limits.

But it does not stop there. The release also waives all claims for conduct "arising out or related to" any issues that could have been raised. *Id.*

Further, the proposed settlement agreement precludes current and future Class Members from bringing claims for injunctive relief under the federal antitrust laws that accrue after the settlement's effective date. *See* Dkt. 9692-2 at D2-7. The proposed settlement includes just such a future waiver: it requires "Visa and Mastercard [to] make changes to their rules and practices . . . [that] will remain in effect for at least eight years." *Id.* In exchange, the Class Members release Defendants and non-parties from, *inter alia*, all "declaratory, injunctive, or equitable relief" claims "that have accrued as of the Settlement Approval Date or accrue no later than five years after the commencement of the [equitable relief negotiated therein]." *Id.* at D2-18, D2-19.

Once again in this settlement agreement, Defendants have obtained much more than what is fair and reasonable: insulation from future claims over their misconduct, claims that could have been raised, and claims that relate to any claims that could have been raised. It is unconscionable for this settlement agreement to impose these terms on mandatory Class Members.

For the reasons above, this Court should deny preliminary approval of the proposed settlement agreement.

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP


By: \_\_\_\_/s/_____
Debra L. Greenberger
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorney for Merchant Trade Groups*