UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | ) ) ) |
| | ) |
| This Document Applies To: | ) |
| ————————————————— | ) |
| | ) |
| *Barry's Cut Rate Stores, Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM), also now known as *DDMB, Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM). | ) ) ) ) ) ) |
| ————————————————— | ) |

No. 05-md-01720 (BMC) (JAM)

**WALMART'S OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL
OF PROPOSED AMENDED SETTLEMENT AGREEMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS .....................................................................................................3

ARGUMENT .........................................................................................................................6

I.   The Proposed Settlement Offers No Meaningful Relief to Walmart.....................................6

II.  The Proposed Settlement's Broad Prospective Release of Antitrust Claims Contravenes Public Policy ...............................................................................................................14

III. The Proposed Settlement Fails Under Standards the Court Previously Applied................17

IV. Class Plaintiffs and Counsel Have Not Adequately Represented the Class......................19

V.  The Proposed Settlement Violates Rule 23(b)(2) by Offering Divisible Relief that Is Useless to an Entire Category of Class Members .............................................................22

VI. The Court Should Grant Class Members the Opportunity to Opt-Out or Redefine the Class to Carve Out Large Merchants ..............................................................................24

CONCLUSION.....................................................................................................................26

WORD COUNT CERTIFICATION ......................................................................................28

CERTIFICATE OF SERVICE ...............................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prod., Inc. v. Windsor*,
   521 U.S. 591 (1997) ................................................................................................... 19

*AT&T Mobility LLC v. Fisher*,
   2011 WL 5169349 (D. Md. Oct. 28, 2011) ................................................................ 15

*Batalla Vidal v. Wolf*,
   501 F. Supp. 3d 117 (E.D.N.Y. 2020) ....................................................................... 24

*Berni v. Barilla S.p.A.*,
   964 F.3d 141 (2d Cir. 2020) ....................................................................................... 18

*Biediger v. Quinnipiac Univ.*,
   2010 WL 2017773 (D. Conn. May 20, 2010) ............................................................ 24

*California v. Am. Stores Co.*,
   495 U.S. 271 (1990) ................................................................................................... 15

*Coleman v. GMAC*,
   296 F.3d 443 (6th Cir. 2002) ..................................................................................... 22

*DDMB, Inc. v. Visa, Inc.*,
   2021 WL 6221326 (E.D.N.Y. Sept. 27, 2021) ..................................................*Passim*

*Fowler v. Birmingham News Co.*,
   608 F.2d 1055 (5th Cir. 1979) ................................................................................... 24

*Fox Midwest Theatres, Inc. v. Means*,
   221 F.2d 173 (8th Cir. 1955) ............................................................................... 15, 16

*Fuller v. Fruehauf Trailer Corp.*,
   168 F.R.D. 588 (E.D. Mich. 1996) ............................................................................ 25

*Harris v. Union Pac. R.R. Co.*,
   953 F.3d 1030 (8th Cir. 2020) ................................................................................... 22

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977) ................................................................................................... 15

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
   407 F. Supp. 3d 422 (S.D.N.Y. 2019) ....................................................................... 21

*In re Glob. Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ................................................................... 17

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  299 F. Supp. 3d 430 (S.D.N.Y. 2018) ........................................................... 21

*In re Literary Works in Elec. Databases Copyright Litig.*,
  654 F.3d 242 (2d Cir. 2011) ......................................................................... 20

*In re MTBE Prod. Liab. Litig.*,
  209 F.R.D. 323 (S.D.N.Y. 2002) ................................................................... 23

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  05-md-01270 (MKB) (E.D.N.Y. June 25, 2024) ............................................. 1

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  714 F. Supp. 3d 65 (E.D.N.Y. 2024) ............................................................... 6

*In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig*,
  2018 WL 4158290 (E.D.N.Y. Aug. 30, 2018) ................................................. 6

*In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig*,
  827 F.3d 223 (2d Cir. 2016) ................................................................. *Passim*

*In re Visa Check/MasterMoney Antitrust Litig*.,
  297 F. Supp. 2d 503 (E.D.N.Y. 2003) ........................................................... 25

*Jianmin Jin v. Shanghai Original, Inc*.,
  2019 WL 11816612 (E.D.N.Y. July 10, 2019) ............................................... 19

*Jin v. Shanghai Original, Inc*.,
  990 F.3d 251 (2d Cir. 2021) ......................................................................... 19

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
  634 F.3d 883 (7th Cir. 2011) ....................................................................... 22

*Lawlor v. National Screen Serv. Corp*.,
  349 U.S. 322 (1955) ..................................................................................... 15

*McReynolds v. Richards-Cantave*,
  588 F.3d 790 (2d Cir. 2009) ......................................................................... 24

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*,
  473 U.S. 614 (1985) ..................................................................................... 15

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999) ............................................................................... 18, 21

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ............................................................................................ 25

*Redel's, Inc. v. General Elec. Co.*,
    498 F.2d 95 (5th Cir. 1974) ............................................................................... 15

*Scholtisek v. Eldre Corp.*,
    229 F.R.D. 381 (W.D.N.Y. 2005) ...................................................................... 24

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .......................................................................... 22, 23, 24, 26

*Wexler v. AT&T Corp.*,
    2019 WL 4874746 (E.D.N.Y. Sept. 30, 2019) .................................................. 20

## Rules

Fed. R. Civ. P. 23 ......................................................................................... 18, 19, 24

Fed. R. Civ. P. 23(e)(2)(A) ..................................................................................... 19

Rule 23(b)(2) .................................................................................................. *Passim*

Rule 23(c)(1)(C) ....................................................................................................... 26

Rule 23(e)(2)(D) ................................................................................................. 5, 18

## Other Authorities

Alex Rolfe, Payments Card & Mobile, *EC opens new Scheme Fee investigation into Visa and Mastercard* (Nov. 8, 2024) ............................................................................... 13

CMSPI, *State of the Industry Report:* The Playbook for Smarter Payments (Sept. 2025) ................ 13

Peter Lucas *Mastercard Plans a Network Fee Hike for Later this Month. Merchants Aren't Happy* (Apr. 3, 2024) ............................................................................................. 12

Intervenor Walmart Inc. ("Walmart") respectfully submits this Opposition to Class Plaintiffs' Motion for Preliminary Approval of Amended Settlement Agreement.[1]

## PRELIMINARY STATEMENT

Class Plaintiffs, with the assistance of their Counsel, have yet again sold out their fellow class members. It follows that the Court should not only reject their proposed settlement but also decertify the class. Alternatively, the Court should grant class members the right to opt out of the mandatory class or redefine the class so as to carve out large national merchants.

Last spring, these same Plaintiffs, a handful of small local merchants, proposed a settlement for preliminary approval that the Court rejected for failing to account for the interests of large national merchants in their mandatory class. In the Court's words, that proposed settlement offered "the least benefit to the merchants with the most valuable claims." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 05-md-01270 (MKB) (E.D.N.Y. June 25, 2024) [Doc. 9342] ("Op.") at 80. Walmart opposed the settlement on the grounds that these Plaintiffs had completely sold out the interests of large national merchants, trading away the latter's claims and needed relief for remedies that only benefitted small local merchants like themselves. The Court repeatedly cited Walmart's objections in its opinion rejecting the settlement. *See id*. at 80-81.

Despite the Court's admonition that Class Plaintiffs had to treat large national merchants equitably, Class Counsel's subsequent treatment of Walmart showed they had no intention of doing so. Walmart approached Class Counsel in good faith to share its deep expertise about the payments industry and to discuss what terms should be included in a proper settlement agreement. But Class Counsel refused to share with Walmart any information about its settlement negotiations with

---

[1] Walmart hereby incorporates by reference its submissions in support of its intervention [Docs. 8464, 8465, 8471]; in opposition to the certification of a 23(b)(2) litigation class [Doc. 8617]; and in opposition to Plaintiffs' prior proposed settlement [Doc. 9225].

Defendants, which underscored that they did not welcome Walmart's involvement in the settlement process.  Furthermore, Class Counsel conditioned any potential discussion with Walmart on terms that would have precluded Walmart from disclosing their discussion's substance to the Court if Walmart objected to a future deficient settlement.  Walmart did not agree to these terms, although it sent Class Counsel a number of settlement concerns in writing.  *See* Moff Decl., Ex. A.

Now Class Plaintiffs present the Court with yet another settlement that fails to offer Walmart and other large merchants meaningful redress from Defendants' anticompetitive conduct. Instead, the proposed settlement offers only illusory relief from Defendants' Honor All Cards rules (the single most important anticompetitive practice at issue in this litigation); surcharging and discounting remedies that conflict with Walmart's business model and are therefore useless; equally useless remedies relating to buying groups and merchant education that Class Plaintiffs admit are specifically meant to benefit "[s]maller merchants"; and time-limited rate caps that Defendants could circumvent (just as they have circumvented rate caps in Europe).  In exchange for this mere mirage of relief, the settlement would force Walmart and millions of other merchants in the mandatory class to release their antitrust claims, along with future claims against Defendants for violating antitrust laws, for a period of eight years.  This would lock in anticompetitive conduct that has persisted for over thirty years and that, after twenty years of litigation, remains unremedied.  In short, the settlement is a gift to Defendants that lets them continue to restrain trade without fear of being challenged by large national merchants in exchange for narrow relief that only benefits a different subgroup within the class.

Because the current proposed settlement fails to address fatal flaws the Court found with the last settlement, it should likewise be rejected.  Among other things, it treats large national merchants inequitably relative to small local merchants, and it ignores the best possible relief that

the class stands to obtain if the pending antitrust claims (which have already survived summary judgment) are vindicated at trial.

Furthermore, Class Counsel's treatment of Walmart while negotiating this proposed settlement, and the terms of the settlement itself, illustrate Class Plaintiffs' persistent disregard for the interests of large national merchants and their eagerness to sell out these interests for their own benefit. Class Plaintiffs and Counsel have a fundamental conflict of interest that makes it impossible for them to adequately represent the class; and the class lacks the cohesion required to remain certified under Rule 23(b)(2). In sum, the Court should reject this latest settlement attempt by Class Plaintiffs, decertify the class, or alternatively grant class members opt-out rights or redefine the class, for the following reasons:

- The proposed settlement offers no meaningful relief to Walmart;

- The proposed settlement's broad prospective release of antitrust claims contravenes public policy;

- The proposed settlement fails under standards the court previously applied;

- Class Plaintiffs and Counsel have not adequately represented the class; and

- The proposed settlement offers divisible relief that does not benefit an entire category of class members.

## STATEMENT OF FACTS

This multidistrict litigation concerns antitrust claims brought on behalf of millions of merchants against Defendants Visa U.S.A. Inc. ("Visa"), Mastercard International Incorporated ("Mastercard") and various banks for violating the Sherman Act. In September 2021, the Court certified (over Walmart's objections) a mandatory equitable-relief class under Rule 23(b)(2) comprised of all merchants that had accepted Visa and/or Mastercard's credit and/or debit cards in the U.S. since December 18, 2020. *See DDMB, Inc. v. Visa, Inc.*, 2021 WL 6221326, at *40 (E.D.N.Y. Sept. 27, 2021). This class includes Walmart and is represented by Class Plaintiffs.

Walmart is a large national merchant with more than 5,200 U.S. locations and comprehensive ecommerce websites, all of which accept Defendants' payment cards. Walmart's transaction volumes and frequency of customer visits make it uniquely positioned to negotiate directly with issuer banks with respect to interchange rates – were this not prevented by Defendants' Honor All Cards ("HAC") rules, which force Walmart to accept all issuers and cards issued on a given network. Walmart's unique procedural history in this litigation (e.g., opposing proposed settlements and class membership and litigating separately) reflects its consistent opposition to Defendants' anticompetitive conduct and its resistance to being trapped in classes that would not protect its interests.[2] Class Plaintiffs are small local merchants, including a dental practice, an IT support/internet provider, a pharmacy, and a beauty salon. These Plaintiffs unsurprisingly have interests and priorities radically different from Walmart's, a fact that was apparent in their prior (failed) proposed settlement and is just as obvious from their current proposed settlement, as explained further below.

The Court rejected Class Plaintiffs' previous settlement principally due to its failure to provide adequate relief to large national merchants such as Walmart. The Court anchored its ruling on several factors the Second Circuit uses to assess a class settlement's fairness ("*Grinnell* factors"), making clear that a settlement that did not address large national merchants' basic

---

[2] Unlike Class Plaintiffs, Walmart opted out of the first proposed Rule 23(b)(3) settlement class in this case and also objected to the proposed mandatory Rule 23(b)(2) settlement. Visa then filed a declaratory judgment action against Walmart in this MDL, and Walmart brought its own antitrust action against Visa challenging its anticompetitive practices (including HAC rules), which was transferred to this MDL. In 2017, Walmart dismissed its antitrust action against Visa and Visa dismissed its declaratory judgment action against Walmart. This Court granted Walmart's intervention in this action in 2021, and Walmart opposed Class Plaintiffs' motion to certify the Rule 23(b)(2) litigation class. This Court ultimately certified the class on September 27, 2021. [Doc. 8647.] Walmart subsequently objected to the Class Plaintiffs' prior proposed settlement [Doc. 9225], and the Court rejected this settlement [Doc. 9342].

concerns could not be substantively fair, reasonable, or adequate.  The Court also considered whether the settlement treated different class members equitably, as required by Rule 23(e)(2)(D), and gave heavy weight to its inequitable treatment of large national merchants.  In particular, the Court found that the prior proposed settlement treated large national merchants inequitably relative to smaller merchants by providing "the least benefit to the merchants with the most valuable claims."  Op. at 80.

From December 2024 through February 2025, Walmart reached out to Class Counsel in hopes of discussing what kind of relief would address the interests of large national merchants in any future class settlement.  Walmart and Class Counsel discussed entering a nondisclosure agreement, with Walmart requesting terms prohibiting Class Counsel from sharing Walmart's views with Defendants.  Class Counsel refused to share with Walmart any information about its past or ongoing settlement negotiations with Defendants, which they insisted on keeping confidential.  Furthermore, Class Counsel insisted that the nondisclosure agreement include terms that would have prohibited Walmart from disclosing the contents of their discussions to the Court if Walmart objected to a future settlement, expressly stating that they would only converse with Walmart subject to such terms.  Walmart declined, making clear that it needed the ability to tell the Court what it had proposed to Class Counsel if the latter presented another settlement for approval that lacked terms materially facilitating competition.  Walmart sent Class Counsel its concerns in writing, *see* Ex. A, stressing that HAC rules (and their underlying "Honor All Issuers" policy) were the single most important issue to address in any settlement.

Class Plaintiffs now present the Court with a new proposed settlement that doubles down on the fundamental flaws from their prior proposed settlement that the Court previously rejected, fails under standards the Court previously applied, and again sells out the interests of large national

merchants like Walmart while offering them no meaningful relief in return for a release they cannot escape.

## ARGUMENT

### I.    The Proposed Settlement Offers No Meaningful Relief to Walmart.

The forms of relief that the proposed settlement offers remain inequitable to large national merchants; the proposed relief is either entirely meaningless to Walmart or else impractical for Walmart to implement.

***Honor All Cards.***  Defendants' HAC rules force merchants to accept all Visa or Mastercard credit cards, from all issuers, if they accept any of them.[3]  The proposed settlement fails to reform the HAC rules because it does nothing to address a pernicious core component: that merchants must ***Honor All Issuers***.

The HAC rules flagrantly violate the antitrust laws, and they are the central anticompetitive practice that harms Walmart and other large national merchants.  *See In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig*, 827 F.3d 223, 239 (2d Cir. 2016) (recognizing that "the honor-all-cards and default interchange rules" were "perhaps most important[]" of the claims that settlement classes sought to release); Cook Decl. [Doc. 2644] ¶¶ 8, 48-50 (explaining how HAC rules give Defendants power over merchants and harm competition).  These rules' requirement that merchants accept all issuers of a given network's cards ("**Honor All Issuers**") is a focus in this case,[4] and Walmart specifically identified this to Class Counsel as the most

---

[3] Declaration of Michael A. Cook ("Cook Decl.") [Doc. 2644] ("Honor All Cards rules require merchants to accept all Visa and MasterCard cards that are defined by the networks as 'credit' or 'debit,' regardless of cost *or issuing bank*" (emphasis added)).

[4] *See, e.g.*, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 79 (E.D.N.Y. 2024) ("[Plaintiffs] challenge the 'honor all cards' ('HAC') and 'honor all issuers' ('HAI') rules, which, together, require merchants to accept all Visa or Mastercard credit or debit cards if they accept any of them"); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust*

important problem to address. *See* Ex. A. While Class Plaintiffs claim that their settlement allows merchants to reject certain products or types of cards on a network, they admit that their proposed settlement preserves "the HAC rule at the issuer level." Mot. at 37. This means the proposed settlement protects Honor All Issuers and thus provides no relief at all.

The HAC rules allow issuing banks to unjustly benefit from Defendants' collective price fixing. Sadly, the proposed modification of these rules is utterly hollow. Merchants may "choose whether to accept *a network's* higher-cost Premium and Commercial cards, even if they already accept that network's lower-cost cards." Mot. at 34 (emphasis added). But what this means is that merchants must accept all "Premium" cards on a network (regardless of issuer) if they accept any of them; all "Commercial" cards on a network (regardless of issuer) if they accept any of them; and all "Standard" cards on a network (regardless of issuer) if they accept any of them. This would simply replace a single HAC rule with three new HAC rules, without addressing the core problem that merchants *cannot reject particular issuers* and must accept all banks that issue a given card type. Allowing large national merchants to reject certain card types, but not issuers, still precludes any competition between issuers for merchant acceptance. Thus, the proposed settlement leaves merchants without the necessary negotiating power to pit issuers against one-another for their business, or to require issuers to compete with each other for merchant acceptance of their cards, which would drive down interchange rates to competitive levels. The Court has noted the importance of giving merchants this negotiating power with issuers; one reason the Court found

---

*Litig.*, 2018 WL 4158290, at *12 (E.D.N.Y. Aug. 30, 2018) (Defendants' challenged rules included "the Honor All Cards Rule . . . [and] the Honor All Issuers Rule"); *see also* Cook Decl. [Doc. 2644] ¶ 10 (stressing that Defendants "squelch competition in the current payment marketplace" by, *inter alia*, "requir[ing] merchants to 'honor all cards' from all issuers").

the prior settlement proposal's surcharging relief inadequate was that it did not give merchants the leverage to "urge competition among issuing banks." *See* Op. at 57.[5]

Importantly, Honor All Issuers rests on a faulty premise. By compelling merchants to treat every issuing bank the same, it ignores the basic reality that issuers do not behave in the same manner. Issuers' authorization practices, fraud-control protocols, and chargeback procedures vary dramatically. For merchants, these issuer-specific differences translate into substantial differences in approval rates, fraud exposure and operational burdens and collectively subject merchants to billions of dollars of losses due to unnecessarily declined transactions, chargebacks and fraud every year. But Honor All Issuers deprives merchants of any ability to address these issuer-specific harms. Merchants cannot negotiate with underperforming issuers, refuse to accept cards from issuers whose practices impose disproportionate fraud or chargeback risk, or otherwise protect themselves through ordinary competitive means. Instead, merchants must absorb these issuer-created costs without recourse, entrenching the anticompetitive conditions this litigation was meant to remedy.

To achieve a market compliant with the antitrust laws, Walmart must be able to negotiate interchange rates directly with issuing banks, bargaining for lower rates in exchange for Walmart's business. Such negotiations remain impossible so long as Walmart is categorically required to accept any issuer's cards *ex ante*, which is the status quo that the proposed settlement would perpetuate. So long as issuers are guaranteed that their cards must be accepted at Walmart stores because Walmart must Honor All Issuers, they have no incentive to negotiate directly with Walmart, as they can hide behind the aggregated power of all other issuers in the Visa or

---

[5] *See* Op. at 57 ("As Target Plaintiffs point out, for example, the surcharging provisions would still prohibit surcharging at the issuer level, meaning that merchants still have no way to use surcharging (or credible threats thereof) to urge competition among issuing banks.").

Mastercard networks.  *See* Cook Decl. [Doc. 2644] ¶ 50.[6]  If merchants could reject issuers, they would have the leverage to spur competition and drive down interchange rates.  Such negotiations could result in the continued widespread acceptance of issuers' cards, but at a lower cost to merchants who would pass the savings on to their customers.

By contrast, Walmart has no use for the ability to reject entire card types (which the proposed settlement purports to offer).  As a practical matter, no large national merchant can afford to drop Premium (i.e., rewards) cards.  The vast majority of credit card transactions at Walmart are made with such cards, and this is undoubtably true for other large national merchants.[7] Thus, giving large national merchants the right to reject Premium cards but accept other card types is meaningless because they cannot credibly threaten this to negotiate lower interchange rates with Defendants.  Class Plaintiffs' proposed HAC reform, in short, is useless.

Class Plaintiffs' lack of interest in giving large national merchants negotiating power with issuers is also reflected by their settlement's failure to address ***No-Bypass rules***, another challenged restraint that Walmart highlighted in its correspondence with Class Counsel.  *See* Ex. A.  Visa and Mastercard use No-Bypass rules to force issuers to process credit card transactions through that particular card network, preventing or discouraging them from settling transactions directly with merchants (or through a third-party network).[8]  Removing these rules would create an avenue for large national merchants to negotiate directly with issuers and ultimately lower

---

[6] *See id*. ¶ 50 ("The Honor All Cards rules are harmful to competition . . . they prevent the banks that issue Visa and MasterCard products . . . from competing for merchant acceptance. Walmart has tried to get the banks to compete for its business, but because of the impact of this rule, Walmart's overtures have never been successful.").

[7] Class Plaintiffs' motion compares the credit-card transaction volumes of different card types.  *See* Mot. at 14, 23.

[8] *See* Cook Decl. [Doc. 2644] ¶ 8 ("[N]o-bypass rules prevent competition between issuing banks or from alternative networks").

interchange fees. But securing such relief is not Class Plaintiffs' priority, which makes their failure to address these rules or meaningfully reform the HAC rules unsurprising.

The proposed settlement does not roll back HAC rules in any way that helps large national merchants or enables competition. The relief it offers is illusory.

***Surcharging.*** The ability to surcharge customers who use certain cards is useless to Walmart. Surcharging would conflict with Walmart's business model, including its Every Day Low Price pricing strategy, under which Walmart's pricing is consistent across all forms of payment. Adopting this "remedy" would undermine Walmart's commitment to its customers to afford them consistent, transparent pricing; as the Court previously recognized, surcharging "would be contrary to [Walmart's] brand image" in this regard. Op. at 81 n.51.[9] Walmart must take this risk more seriously than small local merchants like Class Plaintiffs given that it competes with a wide breadth of retailers and works to offer the lowest possible prices to its customers. Consumers generally attribute surcharges to the merchant, and not the card network or the issuer, and thus surcharging forces merchants to exhaust goodwill with customers while the issuers and card networks profit.[10] Furthermore, given its high-volume business, Walmart requires uniform processes across its 5,200 stores to streamline the checkout process, and surcharging would require process changes that would undermine uniformity and increase wait times.

Moreover, multiple states have laws that prohibit or discourage surcharging, as the Court has acknowledged (*see* Op. at 7 n.12), which negates any potential benefit that it could have for

---

[9] For this reason, Walmart respectfully disagrees that it would benefit from having "the option to surcharge, should [it] so choose." *Id.*

[10] *See* Op. at 52 (noting one small merchant's complaint that surcharging "makes me look like I am collecting a fee for credit card companies [or] that I am just inventing these fees[,] rather than being forced to do so by Visa and Mastercard" (citation omitted)).

10

Walmart in those states (and heightens the problems with deploying it in other states[11]). For example, as the Court previously noted, New York law nominally permits surcharging but makes it "functionally impossible," leaving merchants in New York "likely . . . unable to avail themselves" of surcharging relief. Op. at 7 n.12.[12] But even were it more possible to implement, Walmart is not interested in penalizing its customers with higher prices (in the form of surcharges) instead of finding ways to lower their prices. Ultimately, Walmart does not surcharge and opposes surcharging (a position shared by other large merchants), and it is unreasonable to see it as meaningful relief.

The inefficacy of surcharging for large national merchants like Walmart belies Class Plaintiffs' assertions about the overall value of the proposed settlement. For example, Class Plaintiffs suggest that the ability to surcharge will translate into a form of rate relief with significant savings for merchants. *See* Mot. at 44 (arguing that "if just 10% of the posted-rate transaction volume is surcharged at 3%, the average total price systemwide will be reduced by 30 bps"). But this assumes that merchants will surcharge. Since surcharging is not a viable option for large national merchants, the value of the settlement is drastically overstated.

**Discounting.** The ability to offer discounts to customers who use a particular card is similarly valueless to Walmart. Just as with surcharging, discounting by card brand, product, or issuer introduces differentiated pricing that conflicts with Walmart's uniform Every Day Low Price

---

[11] *See* Cook Decl. [Doc. 2644] ¶ 35 ("Card acceptance practices that vary state by state would only add to the confusion and inconvenience for Walmart's customers, sales staff, and point-of-sale systems. Even if Walmart was inclined to surcharge, it would be hesitant to engage in a practice that would not be applicable across all of its stores.").

[12] Surcharging relief fails for other reasons as well. For example, while Class Plaintiffs assert that merchants will be able to surcharge up to 3%, *see* Mot. at 18, there are card transactions with interchange fees greater than 3%. In these cases, surcharging will not cover all costs caused by interchange fees, and merchants will not be made whole.

strategy. Furthermore, Walmart cannot practically display differentiated pricing for products based on payment method or issuer given that its typical supercenter carries over 140,000 SKUs.

***Buying Group Reforms/Merchant Education.*** In rejecting the previous proposed settlement, the Court stressed that large national merchants were unlikely to benefit from remedies focused on buying groups and merchant education. Op. at 81. Class Plaintiffs now do not even suggest otherwise; rather, they argue that their settlement will allow "[s]maller merchants" to form buying groups and will provide funds to educate merchants about the new "tools" their settlement offers them. Mot. at 24. These purported remedies are useless to Walmart.[13]

***Rate Relief.*** Class Plaintiffs claim that their settlement will cap or roll back interchange rates for five to eight years. Mot. at 5, 7, 27-28. They further stress that large merchants who pay negotiated rates will receive a pro rata reduction of those rates. *Id.* at 7, 23-24. This purported relief is inadequate on its face, and Defendants will be able to negate its benefits.

First, Defendants can potentially circumvent the settlement's rate relief and leave merchants paying the same or more to accept their cards.[14] Although Defendants are prohibited from circumventing their requirements in order to intentionally benefit issuers,[15] they are not

---

[13] Furthermore, unless merchants are permitted to negotiate directly with issuers, e.g., reject issuers' cards, banks and networks will lack incentive to negotiate with buyers' groups.

[14] *See* Peter Lucas, *Mastercard Plans a Network Fee Hike for Later this Month. Merchants Aren't Happy* (Apr. 3, 2024) (describing a Mastercard's plan – after announcing the 2024 proposed settlement's rate cap – that was "expected to increase merchants' network fees by $259.1 million annually"), https://www.digitaltransactions.net/mastercard-plans-a-network-fee-hike-for-later-this-month-merchants-arent-happy/#:~:text=Merchants%20Aren't%20Happy,-Peter%20Lucas%20April&text=Mastercard%20merchants%20will%20see%20a,0.14%25%2C%20effective%20April%2015

[15] Specifically, Defendants have promised to "not circumvent or attempt to circumvent" their requirements or "implement[] practices that have the equivalent object or effect of interchange," and that they "will not defeat the benefits that merchants receive" from the settlement by "increasing other network fees or Merchant Fees to restore the revenues that issuers lost from the interchange commitments herein." Am. Settlement ¶¶ 55, 103. However, they are permitted

actually prevented from increasing network fees in the ordinary course of business to benefit their own bottom lines. Network fees have sharply increased in countries where interchange rates are capped by regulations,[16] leading regulators to investigate whether Defendants have increased fees to circumvent regulations.[17] There is no reason to expect Defendants to behave differently, here.

Second, Class Plaintiffs nowhere suggest that their proposed rate caps and reductions will bring U.S. interchange rates in line with those of other countries, even though the lower rates in other countries was a key reason the Court found the previous settlement's rate relief inadequate. Op. at 86-87. The Court noted that interchange fees are capped at 30 basis points in the United Kingdom and the European Union. *Id.* This is a far more significant limit than the 125 basis-point cap in the current settlement for "Standard" consumer credit card transactions. *See* Mot. at 27.

Third, the rate relief offered is inadequate. The Court found the last settlement's supposed $6 billion annual haircut in interchange fees "paltry compared to the $100 billion that merchants paid in interchange fees on [Defendants'] transactions in 2023." Op. at 86. Class Plaintiffs argue that the current settlement's rate relief will "save merchants over $38 billion in interchange fees through 2031." Mot. at 27 n. 77. But over six years, this would only be approximately $6.3 billion in annual savings, which is dwarfed by the $100 billion that merchants reportedly paid in interchange fees on Defendants' transactions in 2023 (Op. at 86). Class Plaintiffs are offering yet another "paltry" haircut like the one the Court previously rejected.

---

"reasonably necessary flexibility" to "respond to market conditions in the ordinary course of business." *Id.*

[16] *See* CMSPI, *State of the Industry Report: The Playbook for Smarter Payments* (September 2025), at 80, *available at* https://insights.cmspi.com/soir-2025.

[17] *See* Alex Rolfe, Payments Card & Mobile, *EC opens new Scheme Fee investigation into Visa and Mastercard* (Nov. 8, 2024), *available at* https://www.paymentscardsandmobile.com/ec-opens-new-scheme-fee-investigation-into-visa-and-mastercard/.

Finally, the proposed settlement's rate caps and reductions are all temporary, and they do nothing to stop Defendants from using anticompetitive means to raise rates again once the relief expires. Interchange rates have increased significantly over the course of this 20-year litigation,[18] and they would never have risen this high but for Defendants' decades of anticompetitive conduct. Temporary rate relief is a small price for Defendants to pay to protect the HAC and Honor All Issuers rules that can keep rates at their maximum under the settlement and push them higher once the relief sunsets. Significantly, Defendants can resume certain rate increases even before merchants will be allowed to challenge them; certain rate caps and rollbacks extend for only five years, Mot. at 7, whereas the proposed settlement's release runs for at least *eight* years (as discussed below). Only meaningful rules relief can protect merchants from supracompetitive interchange rates, and that is not what the proposed settlement offers.[19] Although Walmart values rules relief, it was not given the opportunity to negotiate that relief for itself or with a subclass of other large national merchants. Instead, Class Plaintiffs negotiated on Walmart's behalf, over Walmart's objection and to Walmart's detriment.

## II.    The Proposed Settlement's Broad Prospective Release of Antitrust Claims Contravenes Public Policy.

The proposed settlement requires class members to release their claims challenging Defendants' existing rules, as well as claims against "substantially similar" rules Defendants may implement in the future, for eight years after the settlement receives final approval (or longer

---

[18] *See id.* (explaining that interchange fees "have grown significantly from 2006 to today" and that "U.S. merchants have paid a total average of over $1.1 trillion in Visa and Mastercard interchange fees from July 19, 2006 to November 19, 2024.)

[19] Class Plaintiffs essentially admit that rules relief is superior to rate relief, noting the "most substantial value th[e] settlement generates" comes from "rules relief" (e.g., their purported HAC and surcharging reforms). *Id.* at 27. The emptiness of their rules relief underscores that the settlement is meager compared to merchants' best possible recovery, which weighs against approving the settlement, as explained below.

depending on appeals). *See* Am. Settlement ¶ 116(a, c).[20] It thus immunizes nakedly anticompetitive ongoing practices against judicial scrutiny (e.g., HAC at the issuer level), along with unknown future practices, over the objections of large national merchants in the class who get nothing of value in return. This broad, prospective release of antitrust claims is contrary to public policy and underscores the degree to which Walmart's interests have been unfairly traded away.

Private enforcement of the antitrust laws is "an integral part of the congressional plan for protecting competition." *California v. Am. Stores Co*., 495 U.S. 271, 284 (1990).[21] The Supreme Court has expressed "little hesitation in condemning" an agreement that "operate[s] . . . as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations" as "against public policy." *Mitsubishi*, 473 U.S. at 637 n.19. Private agreements that confer even "a partial immunity from civil liability for future violations" of the antitrust laws violate the Sherman Act and the public policy underlying it. *Lawlor v. National Screen Serv. Corp*., 349 U.S. 322, 329 (1955). Courts have repeatedly reaffirmed that settlements which include a release or waiver of future antitrust claims are void as against public policy.[22] Permitting such prospective waivers

---

[20] The release extends to the longer of eight years after the "Settlement Approval Date" or five years after the "Settlement Final Date," and the latter date considers appeals. *See id*. ¶¶ 1(ll, mm), 116(a, c). By its terms, the release should only extend this far and not indefinitely; however, given its intentional breadth, the Court should not consider approving the settlement without expressly finding the release time-limited and demanding that Defendants admit that it is so.

[21] *See also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 635 (1985) ("central role"); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 755 (1977) ("paramount role").

[22] *See, e.g., Redel's, Inc. v. General Elec. Co.*, 498 F.2d 95, 99 (5th Cir. 1974) ("The prospective application of a general release to bar private antitrust actions arising from subsequent violations is clearly against public policy."); *Fox Midwest Theatres, Inc. v. Means*, 221 F.2d 173, 180 (8th Cir. 1955) ("Any contractual provision which could be argued to absolve one party from liability for future violations of the antitrust statutes against another would to that extent be void as against public policy."); *AT&T Mobility LLC v. Fisher*, 2011 WL 5169349, at *5 (D. Md. Oct. 28, 2011)

"would have impact, not simply between the parties, but upon the public as well." *Fox Midwest Theatres, Inc.*, 221 F.2d at 180. That is especially important here, where Walmart is not consenting to the release except by virtue of a mandatory class.

The Court found that the prior settlement's release was not overbroad because it would have only released claims that had an "identical factual predicate" to existing claims or were based on a continuation of the conduct already at issue. Op. at 74. However, neither that settlement nor this one actually states these limitations. Instead, the current settlement broadly releases claims against "substantially similar" future rules. *See* Am. Settlement § 116(a-c). And "rule" is defined to mean "any rule, by-law, policy, standard, guideline, operating regulation, practice, procedure, activity, or course of conduct" relating to any Visa or Mastercard cards. *Id.* ¶ 1(aa). It also broadly releases any claims based on the "continuing effect" of conduct that plaintiffs "*could* have alleged," including "*any* Merchant Fee." *Id*. § 116(a-b) (emphasis added). The Court should not find that the release passes the "identical factual predicate" test absent language showing it actually does. The current release is also significantly longer than the one in the prior settlement (at least eight years instead of five, *see* Op. at 19), thus aggravating the violation of public policy still further.

Finally, the release underscores how Class Plaintiffs have bargained away the interests of class members without taking these interests into account. As explained further below, this evidences that the class has been inadequately represented, which is fatal to the settlement and its release. *See In re Payment Card*, 827 F.3d at 236-37 (class plaintiffs' authority to release claims is "limited by the 'identical factual predicate' *and 'adequacy of representation'* doctrines"

---

(noting a waiver of "the right to a particular remedy under the antitrust acts (or even to bring an antitrust action at all) . . . might violate public policy and be unenforceable").

(emphasis added)).  Decertifying the class, or at least granting an opt-out right, will allow objectors to police future antitrust violations and thus vindicate public policy.

### III.    The Proposed Settlement Fails Under Standards the Court Previously Applied.

Factors from *Grinnell* and Rule 23(e) that led the Court to reject the last proposed settlement support rejecting the current proposed settlement.  Just as before, this proposed settlement is substantively unfair and inequitable towards large national merchants.  Class Plaintiffs have failed to properly address the Court's concerns.

***Risks of Establishing Liability.***  In assessing the substantive fairness of a class settlement, courts consider whether plaintiffs face "significant legal and factual obstacles to proving their case."  Op. at 48 (quoting *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004)).  As the Court previously noted, the claims here have survived multiple *Daubert* and summary judgment motions, which weighs against approving the settlement.  *See id*.  This remains the case.

***Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and All the Attendant Risks of Litigation.***  The Court must compare the settlement's terms with the likely rewards of litigation and with complete victory for the class on liability and damages (the "best possible recovery").  Op. at 55-56.  The prior proposed settlement's failure to provide HAC relief led the Court to find it deficient under this standard, and the Court should find likewise, here.  *Id*. at 58-62.  The elimination of HAC rules is a reasonable outcome to expect given the Court's finding on summary judgment that there is a triable case that this conduct is anticompetitive and illegal.  *See* Op. at 61-62.  And large national merchants have no use for the relief the settlement actually offers – relief that fails to effectuate the goals of antitrust laws – which underscores that the proposed settlement falls far short of offering the best possible relief.

17

*Inequitable Treatment of Class Members Relative to One-Another.* As with its failed predecessor, the proposed settlement is nakedly inequitable to large national merchants. A class settlement should not be approved where differently-situated class members are treated inequitably relative to one-another. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 857 (1999) (rejecting a settlement that treated all claimants equally although some plaintiffs had claims that were more valuable) (cited Op. at 79). "[E]quitable treatment" pursuant to Rule 23(e)(2)(D) "include[s] whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. "[D]ifferent class members can benefit differently from an injunction — but no matter what, they must stand to benefit (it cannot be the case that some members receive no benefit while others receive some)." *Berni v. Barilla S.p.A.*, 964 F.3d 141, 147 n.28 (2d Cir. 2020). Here, as before, the settlement treats class members inequitably by "provid[ing] the least benefit to the merchants with the most valuable claims," e.g., large national merchants like Walmart. Op. at 80. In particular, it fails to offer meaningful HAC relief (while pretending otherwise).

Put simply, the settlement is inequitable under Rule 23(e)(2)(D) for the same reason the Second Circuit rejected the proposed 2013 settlement in this litigation – it offers certain class members (i.e., large national merchants) relief that is useless to them instead of relief they need:

> There is no basis for this unequal intra-class treatment: the more valuable the right to surcharge (a point the parties vigorously dispute), the more unfair the treatment of merchants that cannot avail themselves of surcharging . . . . Alternative forms of relief might have conferred a real and palpable benefit, such as remedies that affected the default interchange fee or honor-all-cards rule . . . . This is a matter of class counsel trading the claims of many merchants for relief they cannot use: they actually received nothing.

*In re Payment Card*, 827 F.3d at 238 (cited Op. at 82-83). Here, rather than exclude the small number of merchants that negotiate directly with Visa or Mastercard, Class Counsel has apparently

18

negotiated on their behalf (and, in Walmart's case, over its objection) for rate relief that is "proportional" to that of the Class. Walmart and any other class member that wishes to opt out should have the right to decide for itself whether this relief is in its best interest.

## IV.    Class Plaintiffs and Counsel Have Not Adequately Represented the Class.

The Court must also consider whether "the class representatives and class counsel have adequately represented the class" with respect to the proposed settlement. Fed. R. Civ. P. 23(e)(2)(A). The adequacy inquiry, which is required by Rule 23 and the Due Process Clause,[23] "serves to uncover conflicts of interest between named parties and the class they seek to represent" and analyzes, among other things, the "conflicts of class counsel." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625, 626 n.20 (1997). Although the Court previously found representation adequate when it certified the class and subsequently evaluated the previous proposed settlement, it has a "continuing duty to monitor the adequacy of representation." *Jianmin Jin v. Shanghai Original, Inc.*, 2019 WL 11816612, at *3 (E.D.N.Y. July 10, 2019) (decertifying class due to inadequacy of representation), *aff'd sub nom. Jin v. Shanghai Original, Inc.*, 990 F.3d 251 (2d Cir. 2021). Accordingly, the Court should recognize that Class Plaintiffs and their Counsel are inadequate representatives given the terms of their new proposed settlement and their treatment of Walmart while negotiating the settlement.

For a second time, Class Plaintiffs have proposed a settlement that offers large national merchants no meaningful relief (and forces them to abandon their right to seek such relief) but gives themselves remedies they apparently value (e.g., the power to surcharge). What's more, Class Counsel has only confirmed their disregard for large merchants' interests by refusing to brief Walmart on the status of settlement negotiations and conditioning any discussion with Walmart on

---

[23] *See In re Payment Card*, 827 F.3d at 231.

19

Walmart gagging itself afterwards. An adequate class representative "must have no interests antagonistic to the interests of other class members." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011). The Second Circuit cautioned, while rejecting a prior settlement in this same multidistrict litigation, that adequacy is absent where different groups seek conflicting forms of relief, incentivizing class counsel to trade away one group's interests in settlement. *See In re Payment Card*, 827 F.3d at 234 (finding inadequate representation where there were "unacceptable incentives for counsel to trade benefits to one class for benefits to the other in order to somehow reach a settlement"); *id.* at 240 (finding that merchants that cannot surcharge "suffer an unreasonable tradeoff between relief and release that demonstrates their representation did not comply with due process").[24] Class Plaintiffs and Counsel are antagonistic to large national merchants' interests because they are determined to sell out these interests to secure their preferred relief. This fundamental conflict of interest disqualifies them to represent a class that includes large merchants.[25]

While the Second Circuit was concerned with separate classes having the same conflicted representation, it also stressed the "fault line[s]" within the Rule 23(b)(2) class there, finding that (b)(2) class members who would not benefit from the 2013 settlement's injunctive relief were "denied due process." *See In re Payment Card*, 827 F.3d at 238. The same conflict that court

---

[24] *See also In re Literary Works*, 654 F.3d at 252 (fundamental conflict among class subgroups precluded class certification where "[t]he selling out of one category of claim for another [was] not improbable"); *Wexler v. AT&T Corp.*, 2019 WL 4874746, at *2 (E.D.N.Y. Sept. 30, 2019) ("A proposed representative may be an inadequate if . . . [they] would . . . permit a settlement on terms less favorable to absent class members." (emphasis added)).

[25] *See In re Payment Card*, 827 F.3d at 238 (noting with disapproval that class counsel "knew at the time the Settlement Agreement was entered into that [its primary] relief was virtually worthless to vast numbers of class members" and that "[a]lternative forms of relief might have conferred a real and palpable benefit, such as remedies that affected the default interchange fee or honor-all-cards rule").

observed exists within this mandatory class, where the class representatives have no interest in fully pursuing relief for their fellow class members. This visible intra-class conflict evidences Class Plaintiffs' inadequacy. *See Ortiz*, 527 U.S. at 856 (present and future claimants in the same mandatory class required subclasses with separate representation "to eliminate conflicting interests of counsel"); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 407 F. Supp. 3d 422, 439-40 (S.D.N.Y. 2019) (class representatives were inadequate who "lack[ed] sufficient incentives to prove that their counterparties were injured by Defendants' conduct"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 539 (S.D.N.Y. 2018) (adequacy lacking where differences between class members "undermine[d] the class representatives' incentive to fully pursue the class's claims").

In *Ortiz*, an asbestos litigation, the Court held that a mandatory settlement that treated all class members the same reflected inadequate class representation where different groups had conflicting interests and some stood to be shortchanged by the deal. *Ortiz*, 527 U.S. at 856-67. The conflicting groups included plaintiffs with present and future injuries; they also included plaintiffs whose claims were more or less valuable depending on when they accrued (i.e., before or after certain insurance coverage expired). *Id*. at 857-58 ("The very decision to treat [these groups] all the same is itself an allocation decision with results almost certainly different from the results that those with immediate injuries or claims of indemnified liability would have chosen."). *Id*. Similarly here, large national merchants and small local merchants have claims of vastly different value[26], are differently impacted by Defendants' conduct[27], and have different needs that

---

[26] Op. at 80 (rejecting the prior settlement as inequitable to large national merchants because it gave "the least benefit to the merchants with the *most valuable* claims" (emphasis added)).

[27] *See DDMB*, 2021 WL 6221326, at *45 (certifying this class) ("The Court recognizes that merchants are likely impacted in a variety of ways by the Restraints.").

the proposed settlement does not reconcile.  Class Plaintiffs have shown that they will leave large national merchants with nothing so that they can get relief, demonstrating that they are inadequate class representatives.  This warrants rejecting the proposed settlement and decertifying the class.

## V. The Proposed Settlement Violates Rule 23(b)(2) by Offering Divisible Relief that Is Useless to an Entire Category of Class Members.

The proposed settlement fails to benefit an entire category of class members (large national merchants).  This is the opposite of what a Rule 23(b)(2) class settlement is meant to accomplish, since the Rule "applies only when a single injunction or declaratory judgment would provide relief to *each member* of the class."  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) (emphasis added).  The settlement should therefore be rejected.  Furthermore, the class should be decertified for lacking the cohesion and unity of interests required by the Rule.  Class Plaintiffs' repeated attempts to sell out the interests of large national merchants demonstrates that the latter should not be trapped in this mandatory class and forced to release their claims.

A prerequisite for a Rule 23(b)(2) class is that class members have indivisible interests and do not require individualized relief.  *See id.* ("The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" (citation omitted)).[28]  This indivisibility of interests is why such classes are mandatory and the right to opt out is not considered necessary.  *See Coleman v. GMAC*, 296 F.3d 443, 447-48 (6th Cir. 2002) (opt outs are "unnecessary for a Rule 23(b)(2) class because its requirements are

---

[28] *See also Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030, 1033 (8th Cir. 2020) ("The touchstone of a 23(b)(2) class is that the class claims must be cohesive."); *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 n.8 (7th Cir. 2011) ("Where a class is not cohesive such that a uniform remedy will not redress the injuries of *all* plaintiffs, class certification is typically not appropriate.").

designed to permit only classes with homogenous interests"). In turn, the need for cohesion is particularly great in a mandatory class because class members lack opt-out rights and will be bound by an action's outcome. *In re MTBE Prod. Liab. Litig.*, 209 F.R.D. 323, 343 (S.D.N.Y. 2002) ("The hallmark of the (b)(2) action is homogeneity," and greater cohesiveness is required in a (b)(2) class because of its mandatory nature than in a (b)(3) class). But indivisible interests are lacking, here, as demonstrated by Class Plaintiffs trading-away Walmart's interests for a settlement that serves their own.

As a result, the proposed settlement's injunctive relief does not "apply to and benefit the class as a whole," even though that was the premise for certifying this mandatory class. *DDMB*, 2021 WL 6221326, at *44.[29] For example, the settlement offers (large national) merchants who pay negotiated rates a pro rata reduction of those rates, thus providing *individualized* remedies distinct from those for small local merchants. The settlement's rate relief is divisible, applying differently to different class members and resembling an attempt to write separate contracts for different groups of merchants rather than provide relief to all of them. Class Plaintiffs' labeling their settlement as a "toolbox of options" reflects this disjointed approach. And most importantly, the rate relief and other remedies are meaningless to large national merchants without substantive HAC relief, leaving such merchants uniquely unable to benefit from the proposed settlement. They cannot practically gain from surcharging, discounting, buying groups, or merchant education; the settlement's purported classwide remedies are meant for other class members. In short, the injunctive relief is not "appropriate respecting the class as a whole," as Rule 23(b)(2) requires. Fed. R. Civ. P. 23(b)(2). Different groups within the class require different injunctions, *see Dukes*,

---

[29] *See id*. at *43 ("[C]ohesion is inherent in a properly certified Rule 23(b)(2) class action because class members' claims are inherently intertwined and relief to anyone in the group would be relief to the group as a whole").

564 U.S. at 360[30]; and the settlement's release will preclude large merchants from seeking the injunction they need (a rollback of HAC rules).

The settlement's failure to benefit the class as a whole requires the Court to reject it under Rule 23(b)(2). And the class's lack of cohesion warrants decertifying the class entirely.

## VI.    The Court Should Grant Class Members the Opportunity to Opt-Out or Redefine the Class to Carve Out Large Merchants.

For the reasons explained above, the proposed settlement should be rejected, and the mandatory class should be decertified. In the alternative, if the Court decides to grant the proposed settlement preliminary approval, it should, at minimum, give class members notice and an opportunity to opt out, or redefine the class in a way that excludes large national merchants.

Multiple courts have recognized that a district court has discretion to permit class members to opt out of Rule 23(b)(2) classes where fundamental fairness so requires. *See McReynolds v. Richards-Cantave*, 588 F.3d 790, 800 (2d Cir. 2009) ("'[T]he language of Rule 23 is sufficiently flexible to afford district courts discretion to grant opt-out rights in (b)(1) and (b)(2) class actions.'" (citation omitted)).[31] Granting an opt-out right is particularly appropriate to remedy a conflict between competing interests among groups of class members. *See Fowler v. Birmingham News Co.*, 608 F.2d 1055, 1059 (5th Cir. 1979) (noting "[a]ny antagonistic interests involved [in the Rule 23(b)(2) class] were ameliorated by the provision for notice in the decree with an opportunity to

---

[30] *See Dukes*, 564 U.S. at 360 (the Rule "does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant").

[31] *See also Batalla Vidal v. Wolf*, 501 F. Supp. 3d 117, 137 (E.D.N.Y. 2020) (quoting *McReynolds*); *Biediger v. Quinnipiac Univ.*, 2010 WL 2017773, at \*7 (D. Conn. May 20, 2010) ("[A]ny members who do not want to be represented in the [Rule 23(b)(2)] class, or who believe they are erroneously included in the class, may opt out if they so choose."); *Scholtisek v. Eldre Corp.*, 229 F.R.D. 381, 393 n.10 (W.D.N.Y. 2005) (a "district court has discretion to permit opt-outs in a (b)(1) or (b)(2) action").

opt out of the class"); *Fuller v. Fruehauf Trailer Corp.*, 168 F.R.D. 588, 604 (E.D. Mich. 1996) (granting opt-out rights to members of a Rule 23(b)(2) class). Here, allowing objecting class members to opt out prevents their interests from being steamrolled by giving them the option to pursue meaningful injunctive relief that they would abandon under the proposed class settlement.

Furthermore, granting an opt-out right is appropriate since the injunctive relief here is effectively monetary. Due process requires notice and opt-out rights to be given where a class seeks monetary relief. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985). The injunctive relief here targets rules and practices under which Defendants cause class members monetary harm, and they include money-related remedies such as surcharges and rate caps[32], which logically evoke the same due process concerns. The Second Circuit has held that it is improper to approve a settlement that compromises class members' interests in monetary relief without permitting them to opt out. *In re Payment Card*, 827 F.3d at 238-39. From a due process standpoint, the same rule should apply to a settlement that precludes absent class members from challenging anticompetitive practices (for eight years) that will cost them millions of dollars.[33]

The Court previously expressed concerns that allowing class members to opt out would disincentivize settlement or result in contradictory equitable relief. *DDMB*, 2021 WL 6221326, at *49. However, the Court only gave weight to these concerns because it was satisfied that the class would be adequately represented, *see id*. at *49 n.39; which has not turned out to be the case. As the Second Circuit has stressed, "[T]he benefits of litigation peace do not outweigh class members'

---

[32] Prior rulings by this Court have recognized rate reductions as compensatory relief. *See In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 508-09 (E.D.N.Y. 2003).

[33] Moreover, regardless of whether the relief offered here is monetary, due process demands permitting merchants to opt out in order to protect their rights to their injunctive-relief claims. The *Shutts* Court did not consider, and did not preclude, finding that class members have a constitutional property interest in their claims for injunctive relief. Such property interests can be forfeit in a non-cohesive class that releases their claims for nothing in return.

due process right to adequate representation." *In re Payment Card*, 827 F.3d at 240.  Furthermore, permitting class members to opt out could facilitate settlement and a final resolution by mitigating the risk that an objector will appeal the settlement's approval (e.g., on the grounds that the class lacks cohesion under *Wal-mart v. Dukes*).

The Court could alternatively exercise its discretion to redefine the class in such a way that carves out large national merchants.  This Court recognized its discretion to redefine the class when it certified it.  *See DDMB*, 2021 WL 6221326, at *40 ("The Court recognizes that it has authority to modify a proposed class definition or consider a renewed motion for certification pursuant to Rule 23(c)(1)(C), and exercises its discretion to carve out an appropriate class from the overbroad class proposed by Plaintiffs." (citations omitted)).  Excluding large national merchants like Walmart from the mandatory class (and the settlement) is clearly warranted given that they are not being represented by Class Plaintiffs and Counsel and their interests are plainly not being addressed.

## CONCLUSION

For all of the foregoing reasons, the Court should deny preliminary approval to the proposed settlement and decertify the Rule 23(b)(2) class.  Alternatively, the Court should grant class members the right to opt out of the class or redefine the class so as to carve out large national merchants.

Dated: December 12, 2025                    Respectfully submitted,

                                             /s/ Paul H. Schoeman
                                            Paul H. Schoeman
                                            Jason M. Moff
                                            HERBERT SMITH FREHILLS KRAMER (US) LLP
                                            1177 Avenue of the Americas
                                            New York, New York 10036
                                            (212) 715-9100

pschoeman@kramerlevin.com
jmoff@kramerlevin.com

James F. Bennett MO 46826
DOWD BENNETT LLP
7676 Forsyth Blvd., Ste. 1900
Saint Louis, MO 63105
(314) 889-7300
jbennett@dowdbennett.com

*Attorneys for Walmart*

27

## **WORD COUNT CERTIFICATION**

I hereby certify that the foregoing memorandum of law complies with the Local Rules of this Court. This memorandum of law was prepared using Microsoft Word, with Times New Roman typeface. The main body of the memorandum is in 12-point font. The memorandum of law contains 8750 words as calculated by the word-processing system used to prepare the document.

*/s/ Paul H. Schoeman*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December 12, 2025, a true and correct copy of the foregoing was filed electronically using the Court's electronic filing system. By operation of that system a notice of electronic filing will be served upon all counsel of record in the case.

*/s/ Paul H. Schoeman*