# EXHIBIT B

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 00-01334-MD-MORENO**

IN RE: MANAGED CARE LITIGATION

_____/

## ORDER GRANTING CIGNA'S RENEWED MOTION TO ENFORCE SETTLEMENT AGREEMENT

This proceeding originates from Managed Care Advisory Group's (MCAG) failure to

provide class members with settlement funds paid by Cigna Healthcare (Cigna). As noted by the

Eleventh Circuit in *Managed Care Adv. Grp. v. Cigna Healthcare, Inc.*, 939 F.3d 1145, 1163

(11th Cir. 2019), "[t]his litigation has been ongoing for almost twenty years, but it appears that

most of the money Cigna paid to MCAG for the class members has not been distributed."

Pursuant to the Eleventh Circuit's directive, this Court appointed a Special Accounting Master to

conduct an accounting of all funds Cigna paid to MCAG for the benefit of class members. The

Special Accounting Master Soneet R. Kapila conducted an accounting finding that MCAG failed

to properly document the use of class funds and paid its own operational expenses from them.

Mr. Kapila's detailed and lengthy report not only traced MCAG's use of class settlement funds

but also outlined his different document requests and MCAG's failure to provide documentation

to justify its use of class funds. Cigna filed a renewed motion to enforce the settlement

agreement to ensure that class members receive that which they are owed. This Court conducted

an evidentiary hearing to evaluate the expert accounting reports and MCAG's various

justifications for its actions in handling the Cigna class settlement funds. After reviewing the

evidence, the Court concludes that MCAG violated its fiduciary and contractual obligations to

class members. The Court therefore grants Cigna's renewed motion to enforce the settlement

agreement and orders disgorgement of the Cigna class funds and interest as set forth in this

Order.

## I.  FINDINGS OF FACT

This case originated over 25 years ago when medical providers filed class action lawsuits

against managed care insurance companies, including Cigna Healthcare, Inc. The suits alleged

that the insurers mishandled claims for payment and were consolidated before this Court in a

multidistrict litigation. The class and Cigna reached a Settlement Agreement, which this Court

approved. *See* Settlement Agreement at Exh. 2 (ECF 2308); Order Granting Preliminary

Approval of Settlement (ECF 2320); Order Approving Settlement (ECF 2900). The Court

retained jurisdiction to enforce the settlement. *Id.* at Exh. 2 at §§ 8.5, 19.7; *see* Order Approving

Settlement (ECF 2900) ("[T]his Court hereby retains jurisdiction as to all matters relating to (a)

the interpretation, administration, and consummation of the Agreement[.]"). The settlement

included monetary relief to the class members as well as the ability to either (1) participate in a

$30,000,000 fund that would be distributed to class members or (2) seek recovery from an

uncapped fund for claims that were previously denied or reduced. Following the settlement, the

American Medical Association recruited MCAG to help class members obtain compensation

from the class settlement. MCAG entered into Physician Agreements with each of its clients.

These agreements generally provide that MCAG would deduct its retention fees (25-30%) before

distributing net recoveries to class members. *See* Sample Physician Agreements (ECF 6520-1;

6685-25). The retention fees vary from agreement to agreement. Soon after, MCAG and Cigna

disputed how to process claims under the Settlement Agreement. In particular, MCAG and Cigna

disputed the handling of Category Two claims, which were claims seeking redress from the

uncapped fund. To resolve this dispute, Cigna and MCAG entered into an arbitration agreement,

which the Court approved. *See* Binding Arbitration Agreement (ECF 6110-1); Supplemental Agreement to Binding Arbitration Agreement (ECF 6787-19).

There are two categories of Cigna class funds that are at issue in this Order. The first are the pre-arbitration class funds. Before the arbitration even began, Cigna paid MCAG approximately $11.6 million in class funds to cover claims that were not in dispute and not at issue in the arbitration; these funds totaling approximately $11.6 million are referred to in this Order as pre-arbitration class funds. The second category are the post-arbitration class funds that were paid to compensate claims that were subject of the arbitration. In the Supplemental Arbitration Agreement (ECF 6787-19), Cigna and MCAG agreed to a high-low agreement, requiring Cigna to make an advance payment of $7.5 million (the low end of the claims value). The parties agreed the high end to be $67 million, meaning that Cigna would not have to pay more than $67 million for successful claims in the arbitration. It is also undisputed that Cigna paid MCAG $14,189,066 during the arbitration, which includes the advance payment of $7.5 million in November 2005. The $14.2 million is referred to in this order as the post-arbitration class funds.

The arbitration proceeded for almost 15 years. MCAG secured the recovery of $14.2 million from Cigna, as noted, but admits to not paying class members and to using those monies to pursue a full recovery. It claims that it spent $12,321,506 in legal fees, expert fees, and arbitral costs in the hopes of securing the upper limit of the arbitration agreement (*i.e.* $67 million). The arbitration addressed the processing and payment of Proofs of Claims submitted by MCAG. The primary processing of claims occurred between 2007-2010 under Retired Judge Edward B. Davis and then Thomas Schultz as arbitrators. The final payment on the $14.2 million paid by Cigna to MCAG for the benefit of class members in arbitration occurred in 2014. The $14.2 million was

payment for the so-called post-Arbitration class members' claims that were resolved during the 2007-2010 arbitration. Those arbitration claims preceded the second arbitration of claims before Joseph Matthews that took place from June 2020 through 2021. During the second arbitration, Mr. Matthews ordered Cigna to pay an additional $16 million for the claims that were the subject of that proceeding. This Court subsequently vacated that arbitral award of $16 million, and that order is currently on appeal before the Eleventh Circuit.

The issue in this current proceeding stems from the directive issued by the Eleventh Circuit Court of Appeals in *Managed Care Adv. Grp., LLC*, 939 F.3d 1145. During the Eleventh Circuit oral argument on October 4, 2018, MCAG admitted that "it distributed to class members only $7.5 million of the $11 million Cigna paid for claims that were not the subject of the arbitration" (*i.e.* the pre-arbitration claims). *Id.* at 1163. The Eleventh Circuit stated that "[a]t a minimum, this discrepancy indicates that class members have not received approximately $3.5 million of the [pre-arbitration] funds to which they are entitled under the Settlement Agreement." *Id.* MCAG also admitted during oral argument that "it has not distributed any of the [$14.2] million Cigna paid to MCAG for Category Two claims" that were the subject of the arbitration (*i.e.* the post-arbitration funds). *Id.* At the time of the oral argument, MCAG admitted that "only approximately $4.5 million remains of that $14 million Cigna paid to MCAG for class members' Category Two claims." *Id.* The Eleventh Circuit reasoned that "[a]n accounting will provide information regarding how settlement proceeds have been distributed because there is no formal record of what MCAG did with approximately $3.5 million in paid claims that were not the subject of the arbitration and $9.5 million in paid Category Two claims that should have gone to class members under the Settlement Agreement." *Id.*

This Court then appointed Special Accounting Master Soneet R. Kapila, who conducted an accounting. The Court's Order required a full accounting to determine exactly what MCAG did with the pre- and post-arbitration class funds Cigna paid for the benefit of the class members. Following Mr. Kapila's report, Cigna filed a renewed motion to enforce the settlement agreement and MCAG filed objections to the report.[1] Now, the issue is whether MCAG appropriately paid class members, or whether it misused class settlement funds paid by Cigna. Notably, MCAG did not seek nor obtain approval of this Court under Federal Rule of Civil Procedure 23 for any Physician Agreement that allowed MCAG to retain class funds.

This Court conducted an evidentiary hearing to determine the issues at hand. MCAG argues that it had authority from class members to use the class funds to finance the litigation against Cigna and that indemnity provisions in the Physician Agreements allowed MCAG to retain Cigna's settlement monies. MCAG also argued that it was not acting as a fiduciary for class members and therefore, did not have fiduciary obligations. Cigna maintains that MCAG misappropriated $14.2 million of Cigna's settlement funds, plus another $1.2 million in interest. Cigna also argues that MCAG failed to properly document its use of pre-arbitration class funds and as a result, there is no way for it to justify its decision to retain $3.5 million of those funds. MCAG's decision to retain the $3.5 million was also not approved by this Court under Rule 23, which Cigna argues renders it void *ab initio*.

Before examining the evidentiary record, the Court notes that Cigna has paid MCAG approximately $25.8 million in aggregate for the benefit of class members, comprising of $11.6 million of pre-arbitration Class Member Funds and $14.2 million of post-arbitration Class

---

[1] MCAG filed objections to the Special Accounting Master's Report (ECF 6712). The Court granted MCAG's request that it be allowed to cross-examine Mr. Kapila at the evidentiary hearing. The Court, however, overrules MCAG's objections requesting the Court reject Mr. Kapila's findings.

Member Funds for the Category Two claims that were the subject of the arbitration. *See* Special

Accounting Master (SAM) Report at ¶ 5, § VII B (ECF 6680-3).[2]

A. *Special Accounting Master Soneet R. Kapila's Report and Testimony*

The Court appointed Mr. Soneet R. Kapila as a neutral Special Accounting Master. Mr.

Kapila's 147-paragraph report (ECF 6680-3) provides his findings after conducting a renewed

accounting based on the Eleventh Circuit's mandate for an accounting to "provide information

regarding how settlement proceeds have been distributed because there is no formal record of

what MCAG did with approximately $3.5 million in paid claims that were not the subject of the

arbitration and $9.5 million in paid Category Two claims that should have gone to class members

under the Settlement Agreement." *Managed Care Adv. Grp.*, 939 F.3d at 1163. At the time of the

Eleventh Circuit's directive, Mr. Kapila had already been conducting an accounting of the post-

arbitration funds, and following the Eleventh Circuit's mandate, this Court issued an order

expanding the scope of his accounting to include $11.6 million paid by Cigna to MCAG prior to

the arbitration, the pre-arbitration class member funds. The objective of the renewed accounting

was to "trace the pre-arbitration class member funds and post-arbitration class member funds

paid by Cigna to MCAG and determine how MCAG utilized such funds." SAM Report at 2

(ECF 6680-3). Another objective was to quantify MCAG's retention from class member funds

and the amount of interest earned. *Id.* It is undisputed that at no time did MCAG attribute interest

to class members on the funds it held.[3]

Mr. Kapila's findings did not favor MCAG. His report reiterates that Cigna paid MCAG

---

[2] Mr. Kapila's report was admitted at the evidentiary hearing as Cigna Exhibit 3.
[3] At a hearing before the arbitrator on January 11, 2018, MCAG Chief Executive Officer Mr. Schmidt testified that MCAG retained the interest earned on Cigna settlement funds because it belonged to MCAG. Pre-Evidentiary Hr'g. Tr. at 815-16 (ECF 6685-4). He also added that MCAG did not apply to the federal court who ordered the settlement for authority to take interest earned on Cigna settlement funds. *Id.*

over $25.8 million in aggregate for class members. MCAG did not segregate the funds for the

benefit of the class members. It commingled the settlement funds with funds in existing bank

accounts and funds from other sources including other class action settlements it was

administering. Hr'g Tr. at 101(ECF 7004).[4]

      For the pre-arbitration funds, Mr. Kapila was not able to validate MCAG's position that it

had completely distributed $8 million (net after withholding retention) to the pre-arbitration class

members. He was not able to fully determine how the pre-arbitration class member funds

correlated with those claims,[5] verify the retention that MCAG alleges it was entitled to with

physician agreements, nor was he able to confirm that payments for pre-arbitration class

members were for the correct amounts (value of claim minus retention per a Physician

Agreement). He testified to be "precise, the bottom line of the report is that I was not able to

determine the actual recipients of the $8 million, and the primary reason for that was, in all the

productions, the canceled checks were not available, which is the hard-core proof of who the

payee is." Hr'g Tr. at 46 (ECF 7004). Given the absence of the canceled checks, which dated

back over 15 years before Mr. Kapila's accounting, Mr. Kapila tried to compare the check

register to the bank statements. In addition, Mr. Kapila found that MCAG did not maintain

adequate accounting, banking or financial records to trace the use of the remaining approximate

$3.5 million of pre-arbitration class funds.

      For post-arbitration class member funds, Mr. Kapila again encountered difficulty

reconciling records. His report indicates that MCAG was not able to provide a list of the specific

---

[4] At the evidentiary hearing, MCAG's counsel indicated that there is no dispute that MCAG commingled these funds and that Mr. Kapila had also found that as well. Hr'g Tr. at 101 (ECF 7004)

[5] Indeed, in paragraph 87 of his report, Mr. Kapila explains that he was able to match $4.1 million or 35.6% of the pre-arbitration class member claims. Mr. Kapila and his team deduced this after receiving 44 excel spreadsheets from MCAG without a roadmap as to how to decipher them. Hr'g Tr. at 50 (ECF 7004). At another point in the report, Mr. Kapila says he was able to trace $2,363,748 in class member checks to check registers. *Id.* at 55.

post-arbitration class members related to the $14.2 million that was funded.  MCAG indicated

that neither Cigna, nor EPIQ were able to provide complete lists. SAM Report at 35 (ECF 6680-

3). EPIQ is the claims administrator for the Cigna class action settlement. MCAG submitted its

claims to EPIQ for approval. In response to Mr. Kapila's request for information, MCAG

produced what he deemed a "data dump" of hundreds of Excel files that appear to be lists of

claims as well as piecemeal spreadsheets containing what appears to be denied claims data,

random narratives regarding submissions of claims to Cigna, and a Powerpoint presentation for

training MCAG employees. *Id.* This "data dump" was not useful to Mr. Kapila to glean

meaningful information. His report indicates that although EPIQ provided periodic

reconciliations summarizing the payments and approved claims to MCAG, MCAG indicated to

Mr. Kapila that it did not have a complete set of reconciliations. *Id.* at 36. MCAG also did not

provide Mr. Kapila with email communication with EPIQ, the claims administrator, to facilitate

his understanding of what transpired. He opined that MCAG, as the disbursing agent, should

have kept a complete set of reconciliation documents as provided by EPIQ to determine the

correct amount of retention. *Id.* Mr. Kapila testified that the "fee is prescribed in the Retention

Agreements with the clients, and it is prescribed there, and as I am sure you'll agree, there are

God knows how many agreements and each one stands on its own and has different terms within

it." Hr'g Tr. at 57 (ECF 7004). He added that "[i]f you start looking at these Physician

Agreements, you will find that they're all different, the terms are different, often times all the

information is not complete within it. They don't tell you whether they are an [American

Medical Association] member or they're not. The percentages are blank. . .. [B]roadly, there

were several issues with trying to determine compliance with the agreements, and yes, of course,

you have to know what the claim is because entitlement to the retention is based on the payment

of the claim." *Id.* at 59-60.

Mr. Kapila concluded that MCAG did not pay any of the $14.2 million to post-arbitration class members. His report indicates the difficulty in determining where MCAG spent the $14.2 million as it failed to maintain adequate accounting, banking or financial records to trace the use of the money. SAM Report at 37-39 (ECF 6680-3). Because no monies were paid to post-arbitration class members, he calculated interest to be $1.4 million had the monies been segregated at the time of his September 24, 2020 report. *Id.* at 44. Again, it is undisputed that MCAG did not attribute interest earned on these class funds to class members.

At the evidentiary hearing, MCAG also took the position that Cigna's initial payment in 2005 of $7.5 million to MCAG that was part of the high-low agreement the parties reached was not payable to class members but was meant to compensate MCAG. Mr. Kapila did not agree with that position stating the money was "meant to be for the purpose of paying to the claimants" once those claims were processed. Hr'g Tr. at 62 (ECF 7004). To trace the $14.2 million, Mr. Kapila testified that MCAG provided hundreds of spreadsheets without guidance on how to make sense of their contents. *Id.* at 66. MCAG takes the position that EPIQ and Cigna created these spreadsheets identifying claimants, but that it, like Mr. Kapila, could not make heads or tails of what class members were entitled to payment. MCAG's counsel, however, admitted at the evidentiary hearing that MCAG had information to indicate what class member was owed what, and how to contact that person. Hr'g Tr. at 136-37 (ECF 7005)[6]; *Bouchner Decl.* at 8 (ECF 6685-19) ("For the vast majority of claims, it is clear that MCAG was in possession of sufficient

---

[6]At the evidentiary hearing, counsel confirmed MCAG has data on the class members. Below is the exchange:
 Mr. Gutchess (Counsel for MCAG): Your Honor, we already have the list of all the –
The Court: So that's easy.
Mr. Gutchess: -- clients where it goes. Yeah, we already have the spreadsheet and everything. Now, it is true that some of them may no longer be alive after 20 years, but we know who they all are. Hr'g Tr. at 136 (ECF 7005).

information to identify both the amount of each claim and the [claimant] numbers identifying who was to be paid.").[7]

Mr. Kapila also examined MCAG's financial well-being. He notes that MCAG incurred more than $18 million in losses since 2005 while making distributions to its partners totaling more than $9.5 million from 2005 to 2018. SAM Report at 45 (ECF 6680-3). Its payroll to its officers totaled more than $11 million during the years 2005 through 2019. *Id.* Mr. Kapila states that MCAG was insolvent as of December 31, 2019. *Id.* at 45.

In Mr. Kapila's opinion, MCAG did not follow appropriate fiduciary obligations by failing to maintain adequate records and failing to properly account for the receipt and disbursement of class funds. *Id.* at 5, 22 (ECF 6680-3). He testified that given the context, it was particularly important to have "canceled checks which have cleared the bank, to know who got the money. . .. [T]he fact that several million dollars were used for other purposes, which were not paid to the claimants, one tends to say I need canceled checks to know where the money is going." Hr'g Tr. at 54 (ECF 7004). MCAG denies that it acted as a fiduciary with ensuing obligations. However, Mr. Kapila testified that "MCAG by the nature of [its] business of disbursing sizable funds for settlement funds, holds those funds when it receives them for the benefit, in this case for claimants or whoever the beneficiaries may be overall in their business, and I think that lends itself to an expectation that those funds would be held segregated. They would be managed appropriately and preserved, and to the extent they belong to these parties, they would be interest bearing and that equates into a fiduciary responsibility. So I believe, yes, they have a fiduciary role. They take on funds, which are held in trust effectively for other parties, not for their own benefit, and they have a contractual arrangement to make a fee from it."

---

[7] Scott M. Bouchner is a Cigna accounting expert, who is a Director at Berkowitz, Pollack & Brant.

*Id.* at 73-74; SAM Report at 22, 44 (ECF 6680-3).

Finally, Mr. Kapila traced where MCAG spent Cigna's funds to the best of his ability considering deficiencies in MCAG's records. His report emphasizes that "[s]ufficient records are not available . . . to perform a complete tracing analysis to determine precisely how MCAG utilized the funds, as further addressed in Appendices 2, 3, and 4. . . [I]t is undisputed that the funds were not segregated, MCAG did not pay the Class Members and instead used the funds to pay its operating expenses[.]" *Id.* at 37. Put succinctly, Mr. Kapila found that MCAG used the class member funds to pay operating expenses, a litigation settlement in an unrelated case with a former partner called RNP Investments, distributions to MCAG's shareholders, and as collateral for MCAG's lines of credit. *Id.* at 40, App'ces 2, 3, 4.

### B. *Tracing and Reconciling the Pre-Arbitration Funds*

As to the $11,565,988 in pre-arbitration funds from Cigna, the Special Accounting Master requested records that tied MCAG's retention fee to each Physician Agreement and contemporaneous records of proof of payment to class members, such as canceled checks, wires, etc. Mr. Kapila's report indicates that MCAG deposited the pre-arbitration funds into an MCAG operating account and the funds were not segregated, meaning they were immediately commingled. *Id.* at 24. Mr. Kapila attempted to reconcile the retention amounts with the Physician Agreements and found that it had to be done on a case-by-case basis as the agreements contained differing retentions and varying percentages depending on the type of claim a physician was filing. *Id.* at 25-26. MCAG provided Mr. Kapila with 44 excel spreadsheets, which Mr. Kapila attempted to reconcile with the Recovery Summary that MCAG also gave him. *Id.* at 27. The Recovery Summary identified the payments from Cigna to MCAG totaling

$11,565,671[8] attributable to pre-arbitration class member funds. Of the 44 spreadsheets, Mr. Kapila was only able to reconcile 27. *Id.*

Although Mr. Kapila could not correlate the pre-arbitration class member claims to the class-member funds, he requested MCAG provide information supporting the amount of claims paid and retention withheld. MCAG provided Mr. Kapila with a check register, which lists dates, check numbers, client names and recovery type. *Id.* at 28. The register indicates the total checks written for pre-arbitration claims was $8,035,107 and the MCAG and Partner Retention was $3,530,564 (30.52%) for a total of $11,565,671. Mr. Kapila notes, however, that there were variances between the pre-arbitration payment database and the pre-arbitration check register. *Id.* at 29. He attributed these variances in part because the Physician Agreements typically covered groups of physicians and it is possible that not every member filing a claim was eligible for a reduced retention if that physician was not part of the American Medical Association.

Mr. Kapila concluded that of the $11,565,671 in pre-arbitration funds from Cigna, the check register showed payments totaling $8,068,223. Of that $8 million figure, Mr. Kapila was only able to verify $2,363,748 in payments to class members. *Id.* at 30. This was due to MCAG's failure to provide canceled checks, a complete set of Physician Agreements to verify retention amounts, and sufficient banking records or IRS 1099 forms showing the verified payments on the register. *Id.* at 33. Although Mr. Kapila requested the physician agreements to tie MCAG's retention of $3.5 million to those agreements, MCAG did not provide the necessary records to reconcile the retention fee. *Id.* ("A complete set of physician agreements for the allowed Class Member claims were not available to confirm the amount of Retention for which MCAG may be entitled to receive.").

---

[8] The recovery summary references $11,565,671 instead of the $11,565,988.

MCAG's expert, Jeffrey Bukhajian, was able to tie more of the pre-arbitration funds to payments to class members, but he admitted he could not tie the fee categories in the Physician Agreements to the amounts taken by MCAG as retention fees. Hr'g Tr. 36 (ECF 7005) ("As I have previously testified, I was unable to fully reconcile those amounts which is why my ultimate opinion was that the range of fees calculated by the Special Accounting Master in his report is consistent with the range of recovery fees that I see in these Physician Agreements, but I was not able to reconcile all of those retention amounts for those funds, those pre-arbitration funds[.] [B]ut my understanding is that a specific percentage would apply to each Physician Agreement."). Mr. Bukhajian acknowledged that he was provided data or records from MCAG that Mr. Kapila and Cigna's experts, Mr. Richard Pollack and Mr. Scott Bouchner, did not receive. *Id.* at 56, 86; Bukhajian Decl. at ¶ 22, MCAG Exh. 15 (ECF 6712-3).

At one point in this proceeding, Doug Perry, MCAG's former Chief Financial Officer, filed a sworn declaration on MCAG's behalf indicating that MCAG distributed the over $11 million in pre-arbitration funds to class members. Perry Decl. at ¶¶ 7-8 (ECF 6517-1); *Managed Care Advisory Grp.*, 939 F.3d at 1163. Contrary to Mr. Perry's affidavit, Mr. Bukhajian agreed that MCAG kept $3,530,565 of the pre-arbitration funds as retainage. Bukhajian Decl. at ¶ 13(a), MCAG Exh. 15 (ECF 6712-3).

### C. The Post-Arbitration Funds

Unlike the pre-arbitration funds, Mr. Kapila found, and it was undisputed at the evidentiary hearing, that MCAG did not remit any portion of the Cigna post-arbitration funds totaling $14.2 million to class members. Mr. Kapila traced MCAG's actions with respect to these funds.

*1.  The $7.5 million advance payment*

Upon Cigna's advance payment of $7.5 million, MCAG immediately deducted and paid itself a retention fee of $1.8 million. SAM Report at 14 (ECF 6680-3). MCAG argues that subject to Class Member approval (but not this Court's) the $7.5 million was meant to finance the arbitration of claims. MCAG's current position is at odds with its original understanding. In its own Supplemental Response to Cigna's Interrogatories in 2013, MCAG indicated its understanding that "[a]fter approximately $1.8 million of the $7.5 million identified by the propounding party [Cigna] was paid to MCAG and its partner Misys pursuant to contract, the remaining $5.7 million was transferred into a number of CDs and money-market accounts among various banks for the purpose of putting the money into short-term interest bearing accounts until a resolution in this matter was reached. The *money due to Class members* remained in MCAG's control throughout these transactions. . .MCAG has not been able to disburse any portion of the $7.5 million that is due to class members because a determination regarding the validity of claims has not yet been made by the arbitrator due to Cigna's continued interference in the process." Supp. Resp. to Cigna's Interrogatories dated 11/4/2013 at 4 (D.E. 6545-9)(emphasis added).

MCAG's position has changed from that response. From agreeing that the $7.5 million was due to class members, it then took the position, which it now maintains, that that the $7.5 million was not meant to pay for claims as they were approved, but rather was reserved for payment until completion of the arbitration. Therefore, MCAG took the position that it could use this money to finance the arbitration against Cigna with its clients' permission. SAM Report at 34 (ECF 6680-3).

In its written closing argument, MCAG goes beyond arguing that the $7.5 million was meant to finance the arbitration. The written closing argues that the $7.5 million was not "class member funds." The written closing states that "[t]his $7.5 million was not 'class member funds' when paid nor is it 'class member funds' now. The $7.5 million was not related in any way to any single claim that was submitted by any of MCAG's clients. It was not related to any claim that was processed by Cigna or by the Settlement Administrator. Rather, it was a payment to MCAG in the event MCAG lost the Arbitration—a typical high-low agreement." MCAG Written Closing Argument (ECF 7008 at 6). MCAG's position contradicts the language of the Supplemental Arbitration Agreement, which states that if "the Arbitrator awards MCAG less than $7.5 million, Cigna Healthcare agrees that it will pay MCAG $7.5 million. This payment will *constitute a full settlement of all Category Two Claims* submitted by MCAG." Supplemental Arbitration Agreement at ¶ 2 (ECF 6787-19). MCAG's position also contradicts the evidence that upon receiving the $7.5 million advance payment, MCAG deducted $1.8 million in "retainage," which is MCAG's percentage of the recovery for class members' claims as agreed in the Physician Agreements. SAM Report at App'x 1 ¶ 16 & App'x 2 ¶ 4 (ECF 6680-3); *see also* MCAG Summary, Cigna Exh. 21 (ECF 6685-2) (showing retainage being deducted in 2005 from the $7.5 million; this chart indicates that the retainage was $1,410,000). MCAG also argues that because this Court vacated Arbitrator Joseph Matthews' final arbitral award, an order currently on appeal, that MCAG is entitled to retain the entire $7.5 million as per the terms of the Supplemental Arbitration Agreement. MCAG states: "[i]n other words, the Final Award, once vacated, did not result in any claims to be paid to class members for which this $7.5 million could be applied." MCAG Written Closing at 7 (ECF 7008). The primary processing of claims, however, occurred in this case between 2007 and 2010 under Retired Judge Edward B. Davis

and then Thomas Schultz as arbitrators. The final payment on the $14.2 million paid by Cigna to MCAG for the benefit of class members in arbitration occurred in 2014. The $14.2 million was paid for the so-called post-arbitration claims that were resolved during the 2007-2010 arbitration. Those arbitration claims preceded the second arbitration of claims before Mr. Matthews that took place from June 2020 through 2021. Mr. Matthews' order resulted in Cigna paying an additional $16 million. This Court vacated Mr. Matthews' order, and this Court's order vacating the arbitral award is now on appeal before the Eleventh Circuit. This evidence is consistent with the November 21, 2014 Arbitration Order that reached the conclusion that the $7.5 million advance payment constituted, at least in part, compensation for approved claims. Arbitrator Schultz acknowledged that perhaps at the outset the parties intended the "[p]ayment by Cigna . . .to be held by MCAG and at the conclusion of reprocessing and the resulting determination of a compensable amount, credited pursuant to the Final Award. The above assumptions of expected circumstances. . .changed when Judge Davis, prior to a final determination of compensable claims, ordered an immediate processing of claims prior to a Final Award at the end of the proceeding." Arbitrator Schultz Order of Nov. 21, 2014 (ECF 6732-19). Given the ambiguity of the parties' agreement, Arbitrator Schultz relying on the parties' course of conduct, found that "[t]aken as a whole, this evidence satisfactorily establishes that the fund created by the $7.5 million Cigna payment was utilized (by way of credit) as compensation for approved claims, as well as payment of an undetermined portion of MCAG's attorneys' fees." *Id.* Although MCAG relies on this order, it does not support MCAG's position that it was entitled to keep the entire $7.5 million. Again, the evidence shows that MCAG never paid any portion of this $7.5 million for approved claims, which is what the Arbitrator supposed in his Order.

Mr. Bukhajian's testimony also conceded that the $7.5 million should have been applied to claims that were approved. Hr'g Tr. 43-44 (ECF 7005). He acknowledged having seen an EPIQ analysis, which states that with respect to the $7.5 million, "we have initiated payment requisition batch 4 for payment per the arbitrator's order dated April 9, 2010. The total value of the payment batch is $10,863,856.48 and after applying the remaining funds from the $7.5 million deposit and reconciling payment batches 1 through 3, the wire payment to MCAG will be $2,719,735.64." *Id.* Mr. Bukhajian did not deny that the $7.5 million paid in November 2005 applied to approved claims. *Id.* at 45.

### 2. *Tracing MCAG's use of $14.2 million*

As noted, the Special Accounting Master reports the difficulty in tracing the post-arbitration funds given the lack of documentation and the commingling of the $14.2 million with MCAG's operating accounts. "Tracing funds that have been commingled is a complex task at best and further compounded with an extensive number of bank accounts and the length of the time period involved." SAM Report at 38 (ECF 6680-3). Mr. Kapila determined that the Cigna post-arbitration funds were deposited or transferred into 18 different bank accounts and he requested MCAG provide information regarding all 85 of its accounts to determine the flow of the funds. *Id.*

The appendices to the Special Accounting Master's Report provide an accounting detailing, to the extent possible, MCAG's use of the $14.2 Cigna funds. At the evidentiary hearing, there was no dispute with the Special Accounting Master's conclusion that it was very difficult to trace the $14.2 million because the Cigna funds were commingled into other accounts and from those other accounts MCAG paid its operating expenses, an unrelated litigation settlement with a former partner RNP Investments, fund distributions to MCAG's shareholders,

liens, and use as collateral for MCAG's lines of credit. SAM Report at 40 (ECF 6680-3); Pollack

Report at 27, Cigna Trial Exh. 4 (ECF 6685-6) (containing list of 17 categories of payments from

MCAG accounts containing Cigna funds). MCAG's expert, Mr. Jeffrey Bukhajian, did not

dispute that MCAG's commingled accounts containing Cigna funds were used to pay MCAG's

operating expenses, a litigation settlement, distributions to shareholders, etc. Hr'g Tr. at 60-65

(ECF 7005).

      Also not in dispute is that MCAG used class funds to pay a settlement in an unrelated

matter. On May 14, 2012, MCAG and its principals entered a settlement to resolve litigation with

RNP Investments, an MCAG former business partner. The RNP litigation was brought against

MCAG and its principals individually. The settlement required MCAG and its principals to pay

its former business partner $6.2 million. MCAG paid the $6.2 million settlement to RNP in May

2012 with at least $4.8 million funded directly by Cigna settlement funds.[9] SAM Report at 45,

App'x 2 at 7-8 (ECF 6680-3). The remainder of the $6.2 million settlement was paid from

MCAG's commingled accounts that contained Cigna settlement funds. Both Mr. Kapila and Mr.

Pollack, Cigna's accounting expert, performed an analysis of the use of Cigna settlement funds

to pay the settlement in the RNP case and confirmed that MCAG used Cigna class funds to pay

it, even though it is unrelated to this litigation. *Id.*; Pollack Report at 26 (ECF 6685-6). At the

evidentiary hearing, MCAG argued that the $4.8 million it used to pay the RNP settlement was

replenished in MCAG's account with other monies within the year during 2012. Hr'g Tr. at 67-

77, 120-134 (ECF 7005). Even if the money was eventually replenished, there is no dispute that

the "replenishment" went to MCAG's operating account as no portion was ever paid to class

members.

---

[9] In his testimony, MCAG expert Mr. Bukhajian acknowledged that $4.8 million was not "nominal" despite his prior
statement to that effect in his declaration. Hr'g Tr. at 67-68 (ECF 7005).

At the Court's evidentiary hearing, MCAG presented summary charts, such as Cigna Exhibit 21, which purport to indicate where the settlement monies were spent. MCAG prepared the summary chart in response to an Arbitral Order. Notably, this chart does not show a payment for the settlement in the unrelated case. Again, MCAG's position here has been that money is fungible and it could use the class funds to pay for other matters as long as the monies were replenished. The summary chart, however, indicates that MCAG used the monies to pay *its* expenses and not solely the litigation expenses of class members as MCAG maintained at the hearing. For example, the MCAG Recovery Summary indicates that Cigna money was used for salaries and benefits, legal fees, and partner retention. MCAG Recovery Summary (ECF 6685-2). There were no contemporaneous records produced by MCAG supporting the allocation of payroll or salary for MCAG employees or principals as depicted in the charts. *See* Pollack Report at 17-18 (ECF 6685-6). The financial statements that MCAG produced in another case (the RNP action) confirm that MCAG treated operating expenses as MCAG's and not class member expenses. *Id.* at 20. Mr. Kapila agreed with Mr. Pollack and determined that MCAG's summary charts were incomplete. Hr'g Tr. at 106-07 (ECF 7004). Mr. Pollack also examined MCAG's financial records produced in the RNP litigation and concluded that those records were at odds with the summary charts MCAG produced here such as MCAG's Recovery Summary. He concluded MCAG used corporate assets, including the Cigna settlement class funds to collaterize personal loans, and to satisfy non-Cigna related obligations such as payments or distributions to MCAG partners, business development and marketing activities, technology expenses, salaries, entertainment expenses and meals, payments on lines of credit, lease and rent payments, utility costs, insurance expenses, tax payments, office supply costs, and the RNP settlement. *See* Pollack Report at 24-28 (ECF 6685-6).

MCAG's summary chart unequivocally shows that legal expenses were paid from the Cigna class settlement funds. MCAG's position is that it obtained class members' consent to do so. It also relies, at times, on an indemnity provision in the Physician Agreements, which it claims allows it to use class funds for legal expenses. It is undisputed that this Court never authorized the use of class funds to pay for the costs of arbitration, much less a settlement of an unrelated litigation.

In 2018, MCAG through its Chief Executive Officer Tim Schmidt for the first time claimed that it took class funds pursuant to an indemnification provision in the Physician Agreements that reads as follows:

> Client agrees to indemnify MCAG for any losses or liabilities incurred as a result of the inaccuracy or veracity of claims data submitted by client to MCAG for review.

Cigna Exh. 72 (Sample Physician Agreement) (ECF 6685-25). Both the Special Accounting Master and Cigna's expert Mr. Pollack opined there was no basis to claim indemnification. SAM Report at 17-19 (ECF 6680-3); Pollack Report at 7-8, 28 (ECF 6685-6). At the evidentiary hearing before this Court, MCAG did not call Mr. Schmidt to testify to provide support for this argument.[10] In reading the provision, MCAG would have to show evidence of inaccurate records or data produced by class members that caused losses to MCAG, which is the underlying criteria necessary to make the indemnity claim. MCAG produced no such records at the evidentiary hearing. MCAG's expert, Mr. Bukhajian, also did not provide support for this argument. Hr'g Tr. at 139 (ECF 7005).[11] The Special Accounting Master requested MCAG provide

---

[10] The Court notes that Mr. Schmidt was present at the evidentiary hearing and MCAG's counsel had represented he would testify. But he did not provide testimony.

[11] Mr. Bukhajian testifying:

"Q: Second, the judge just raised an issue about attorney's fees and whether they were appropriate or not. You've read Mr. Schmidt's testimony where he has testified that everything other than the retention was justified under the so-called indemnity clause in the Physician's Agreement, correct?

contemporaneous records supporting any indemnity claim. His report states that "MCAG has produced no evidence that these expenses result from 'inaccuracy or veracity of claims data submitted.'" SAM Report at 18 (ECF 6680-3). He concludes that MCAG was not entitled to charge the Class Member Funds to pay its legal fees because under the Physician Agreements it was not entitled to receive reimbursement exceeding the retention unless the accuracy or veracity of the claims submitted by the clients was questionable for which he found no evidence. *Id.* 9-10. Mr. Kapila added that he "did not see how MCAG connects the language regarding indemnity for clients who submit inaccurate information to MCAG with claims Cigna allowed and paid. The two simply do not correlate. MCAG's position effectively penalizes the claimants who did submit accurate and complete claims data (since the claims were allowed and paid by Cigna) by using their Class Member Funds to pay its own operating expenses and to pay legal fees associated with Class Member claims that were allegedly denied by Cigna." *Id.* at 18.

Mr. Kapila also examined the use of Cigna funds for legal fees. He found that MCAG allocated $5,483,031 for legal fees incurred in connection with this proceeding to the class member funds. *Id.* at 19. That figure in legal fees equates to almost 40% of the post-arbitration class member funds. *Id.* On December 31, 2018, as part of the arbitration, the Arbitrator entered an order indicating that the parties agreed that certain law firms were excluded. Mr. Pollack opined that "[o]f the approximate $5.5 million of legal fees paid, $2.4 million was paid to the excluded law firms." *Id.* Mr. Pollack added that MCAG did not provide "a basic detailed ledger or the underlying supporting documentation that identified the dates, payees, and amounts of the

---

A: I have said a few times now that I've seen excerpts of Mr. Schmidt's testimony. I don't recall everything that he said.
Q: Okay. But you do recall because you've attended hearings where those excerpts have been played or read into the record, correct?
A: I've heard you say it, but I don't have an opinion on the indemnity clause from a legal perspective." Hr'g Tr. at 139 (ECF 7005).

payments comprising this total, nor had it produced supporting information substantiating the business purpose for those legal fees, how these legal services had benefited Class Members and the relationship of these legal services to the Arbitration." Pollack Report at 42 (ECF 6685-6). Mr. Kapila likewise concluded that "MCAG incurred and paid the legal fees in connection with the arbitration proceeding and the district court proceeding and has allocated the legal fees as a reduction to the amounts due to the class members in the MCAG summary." *Id.* This analysis was not performed by MCAG's expert, Mr. Bukhajian, who testified that he had not performed an independent analysis of expenditures from the $14.2 million. Hr'g Tr. at 54 (ECF 7005) ("Q: [D]id you do an accounting of exactly what MCAG spent the $14.2 million on? A: I did not do an independent analysis of the cash that was received and used at the time."). Simply put, "[p]ayments to attorneys that were not representing MCAG in the Arbitration were made, but no explanation given for these payments. In addition, there was no explanation of why MCAG did not pay fees out of its retention, instead of taking additional Cigna settlement funds." Pollack Report at 42 (ECF 6685-6).

  D. *Permission from class members*

  At the evidentiary hearing, the Court allowed MCAG to present the testimony of class members in support of its position that they authorized MCAG to use the class settlement funds to finance the arbitration and litigation with Cigna in the hopes of securing a greater outcome. MCAG presented the testimony of Genevieve Parm and Matthew Katz.

  Genevieve Parm is the retired manager of one of MCAG's class member the Florida Eye Clinic that consists of twenty-four doctors. Hr'g Tr. at 187, 199-200 (ECF 7004). Florida Eye Clinic received a payment of $55,000 on its Category One claims. Parm testified that she knew about MCAG and Cigna's ongoing arbitration regarding the Category Two claims. *Id.* at 188.

While she served as a manager at the Florida Eye Clinic, the Clinic contracted with MCAG to pursue its Category Two claims against Cigna. *Id.* at 190. She kept in contact with MCAG every couple of months for years. *Id.* Ms. Parm testified that she knew that there were legal costs to pursuing the claims and that the Florida Eye Clinic did not object. *Id.* at 197. She understood that MCAG's fees would come out of the recovery as set forth in the agreement. *Id.* For example, if MCAG recovered $10 million and spent $8 million on legal fees, she testified the remaining $2 million would be split in accordance with the agreement. *Id.* at 198.[12] The physician agreements did not accord with Ms. Parm's understanding. The agreement provides that client would pay MCAG in accordance with a fee schedule, limiting fees to a fixed filing fee and a percentage recovery fee. There is no provision that allows for any additional expenses to be paid out of recoveries to the physicians. There is also no authority allowing MCAG to take a retention from class settlement funds and then pay operating expenses and unrelated legal settlements from class settlement funds.

Although Ms. Parm testified that she routinely received updates from MCAG, she testified that that she was not informed that Cigna paid MCAG $14.2 million dollars to address class members' claims, and she did not know how MCAG spent that money. She testified that she did not have knowledge that MCAG used monies beyond what was agreed in the contract. *Id.* at 208. She also did not know how MCAG accounted for interest but agreed that some portion would be due to the Florida Eye Clinic. *Id.* at 209. Ms. Parm also agreed that the Florida Eye Clinic did not receive any compensation for Category Two claims. She did not know that MCAG spent class money on its own compensation, salaries, leases, lines of credit and

---

[12] At the evidentiary hearing, the Court accepted into evidence the physician agreement between MCAG and the Clinic. Physician Agreement (Cigna Exh. 82).

operational expenses. *Id.* at 211. Finally, she had no knowledge as to whether MCAG requested approval from the Florida Eye Clinic for those expenses. *Id.*

Matthew Katz was initially employed by the American Medical Association and then served as the President of the Connecticut State Medical Society, while also serving as a Board Member for the Physicians Advocacy Institute. While employed with the American Medical Association, his role was to engage with MCAG to address the collections tied to the Cigna Settlement. Hr'g Tr. at 141 (ECF 7005). After moving to the Connecticut State Medical Society and then to the Physicians Advocacy Institute, Mr. Katz continued to receive updates on the status of the claims. He understood and "personally felt that [MCAG] should use the full value of the funding to fight for everything that the class members were due." *Id.* at 143. He communicated with class members in his role and the class members he represented knew MCAG was using funds to fight in court against Cigna for the full value of the claims. *Id.* at 144. Mr. Katz's understanding was that "[a]fter the appropriate expenses, . . . the remainder go[es] to the class and then MCAG based upon their agreements with class members." *Id.*

Mr. Katz never sent out a blast email or information to class members advising of Cigna's payments totaling $14.2 million. *Id.* at 154. Mr. Katz felt that MCAG's use of class funds to finance the pursuit of a greater recovery was justifiable. *Id.* at 156. He agreed, however, that he would not think it appropriate for MCAG to use the class settlement monies to fund an unrelated litigation settlement. *Id.* at 156.

### E. Court Authorization of Expenditures

Aside from arguing that the class members authorized MCAG's use of class funds, MCAG also maintains this Court authorized the use of the $14.2 million to pay for legal fees and costs of the arbitration. It relies on an order dated February 4, 2020, from Magistrate Judge

O'Sullivan denying Cigna's motion to restrict any further use of class settlement funds. Order
(ECF 6641). Careful with its use of ellipses, MCAG fails to note that Magistrate Judge John
O'Sullivan's order denied the motion as moot with leave to re-file as necessary. In that same
order, Magistrate Judge O'Sullivan granted Cigna's motion to compel requiring MCAG provide
Cigna and the Special Accounting Master any and all documents the Special Accounting Master
requested. Moreover, this order post-dates the Eleventh Circuit opinion requiring the accounting.
It can hardly be said that it provides authority to MCAG for the expenditure of the $14.2 million
on arbitration costs.

The question that also arose in the evidentiary hearing is whether Arbitrator Schultz
authorized the use of funds in his June 26, 2018 Partial Interim Order. Hr'g Tr. at 50 (ECF
7005).[13] That order reads as follows:

> While awaiting the issuance of the said Accounting Report, it is expected
> that MCAG will protect and preserve the CMC funds it holds from
> unauthorized invasion in conformity with a conventional lockbox
> arrangement required by the MCAG Physician's Agreement. *Other than
> payments to third parties for historically paid costs and expenses of this
> Arbitration proceeding*, future dimunition of CMC funds by MCAG
> payments to itself for executive salaries and unrelated operating costs will
> be viewed with disfavor as this arbitration proceeds to conclusion.

*Id.* MCAG's expert, however, did not do "an independent analysis of the cash [the $14.2 million
of post-arbitration funds] that was received and used" to determine if any portion was used as a
"payment to third parties for historically paid costs and expenses of this Arbitration proceeding."
Hr'g Tr. at 54 (ECF 7005). It is also undisputed that MCAG was a party to the arbitration and
not a third party. *Id.* at 51. And the Order does not speak to whether those payments to third
parties should be funded by MCAG's retainage, its percentage of the recovery. Certainly, Mr.

---

[13]The Court accepted the Partial Interim Order into evidence as MCAG Exhibit 56.

Schultz's Order views with disfavor MCAG's practice of using class monies for salaries and

unrelated operating expenses. Mr. Kapila opined on this issue stating that per the Physician

Agreements "MCAG is not entitled to receive reimbursement for expenses in excess of

Retention unless the accuracy or veracity of the claims submitted by the clients is questionable.

There is no evidence for this cause." SAM Report at 10 (ECG 6680-3). Mr. Pollack agreed citing

the fee schedule attached to the physician agreements, which states that MCAG's fee was limited

to a fixed "filing fee" and a "% recovery fee," with no provision allowing for any additional

expenses to be paid out of the recoveries to the physicians. Pollack Report at 42 (ECF 6685-6).

 *F. Interest*

MCAG did not attribute to class members any interest earned on the class members'

funds. *Id.* at 43; Pollack Report at 30 (ECF 6685-6). Mr. Schmidt, MCAG's Chief Executive

Officer, admitted that he treated the interest earned on the class settlement funds as MCAG's

own money. SAM Report at 44-45 (ECF 6680-3); 1/11/18 Pre-evidentiary Hr'g Tr. at 816 (ECF

6685-4).[14] Genevieve Parm of the Florida Eye Clinic confirmed at the evidentiary hearing that

the clinic did not receive any interest. Hr'g Tr. at 209 (ECF 7004). Mr. Katz also testified that he

believed interest on the class member funds would be due at least in part to class members. Hr'g

Tr. at 163 (ECF 7005) ("My belief would be if there's interest, which I believe there should be,

that it would be given to MCAG and the clients based on whatever the contractual breakdown

was."); *see also* SAM Report at 43-44 (ECF 6680-3). Other than Mr. Schmidt's position, the

accounting experts did not agree that an agent of class members, whose duty it was to file claims

on their behalf, has an independent right to the interest earned on those class-members' funds.

---

[14] Testimony of Mr. Schmidt: "Q: So it's your testimony that the interest earned on the Cigna class action settlement funds belong to MCAG? Is that your testimony? A. Yes." Pre-Evid. Hr'g Tr. at 815 (ECF 6685-4).

The Special Accounting Master performed an analysis of the interest and determined that the Cigna settlement funds should have earned approximately $1.4 million in interest as of 2020. SAM Report at 44 (ECF 6680-3); Hr'g Tr. at 72-73 (ECF 7004). There was no interest payment to class members. The Special Accounting Master, Mr. Kapila, states in his report that financial accounting would have required that the interest should be segregated and preserved to be paid to class members. *Id.*

## II. CONCLUSIONS OF LAW

"In a class action, the district court has a duty to class members to see that any settlement it approves is completed, and not merely to approve a promise. . . to pay the relief to which it has decided class members are entitled."*Alexander v. Chicago Park. Dist.*, 927 F.2d 1014, 1023 (7th Cir. 1991) (quoting *In re Corrugated Antitrust Litig.*, 752 F.2d 137, 141 (5th Cir. 1985)). The Eleventh Circuit in *Managed Care Adv. Grp.*, 939 F.3d at 1162, indicated that this Court properly retained jurisdiction consistent with its responsibility under Federal Rule of Civil Procedure 23 to protect the interests of class members.

As a corollary to the Court's responsibility, it is necessary that any person or entity that holds class settlement funds has an obligation to account for those funds and to distribute those settlement funds to class members. Having found "there is no formal record of what MCAG did with approximately $3.5 million in paid claims that were not the subject of the arbitration and $9.5 million in paid Category Two claims that should have gone to class members" the Eleventh Circuit issued its directive to this Court to order an accounting. To excuse its failure to account for class funds and its failure to distribute them to class members, MCAG maintains in this proceeding that it is not a fiduciary and therefore, its actions with respect to the Cigna class funds were proper and authorized by class members to finance its ongoing efforts to obtain a greater

27

recovery on their behalf. MCAG also claims that it entered Physician Agreements with class members, which included an indemnity provision that authorized MCAG to spend class funds. It is undisputed that MCAG never sought this Court's approval of the Physician Agreements or the expenditures.

Following the Eleventh Circuit's directive, this Court ordered an accounting recognizing that class members had not received that to which they were entitled under the Settlement Agreement. Where one party is entrusted with funds, has the exclusive responsibility to maintain information regarding disposition of those funds, and has a substantial incentive to withhold information from the other party, a court-ordered accounting is the proper remedy. *Zaki Kulaibee Establishment v. McFliker*, 771 F.3d 1301, 1315 (11th Cir. 2014). The Special Accounting Master's findings are already delineated in this Order. Unequivocally, MCAG did not pay class members $3,530,564 in pre-arbitration funds, which it claims is proper retainage under the Physician Agreements. Also beyond dispute is that MCAG did not pay any of the $14.2 million in post-arbitration funds to the class members. Rather, it maintains that with the approval of the class members it properly spent nearly $12,321,506 in fees for lawyers, arbitrators, vendors, and accountants "for the benefit of the class members." It blames Cigna for these high costs claiming that Cigna's scorched-earth litigation tactics and abandonment of the settlement's claims-processing procedures required MCAG to endure an exhaustive adversary arbitration proceeding and litigation before this Court now spanning over fifteen years.

At issue in this proceeding is whether MCAG had an obligation to pay Cigna funds to class members as a fiduciary or whether it is a mere debt collector with no fiduciary obligations to class members. Second, the parties dispute whether there was a breach of that duty given MCAG's position that it acted on the authority of class members, even though it did not seek

Court approval. Finally, the Court must determine the proper remedy. In this case, Cigna has indicated that it does not seek a reverter of the funds.

### A. Is MCAG a fiduciary to class members?

The Florida Supreme Court has long emphasized that "the term 'fiduciary relation' is a broad term, embracing both technical fiduciary relations and informal ones." *The Florida Bar v. Adorno*, 60 So. 3d 1016, 1027 (2011) (citing *Quinn v. Phipps*, 93 Fla. 805 (1927)). The Supreme Court has "refrained from defining particular instances of fiduciary relation in such a manner that other and perhaps new cases might be excluded." *Id.* (quoting *Beach v. Wilton*, 244 Ill. 413 (1910)). A fiduciary relationship may be either express or implied. *Hogan v. Provident Life & Acc. Ins. Co.*, 665 F. Supp. 2d 1273, 1287 (M.D. Fla. Oct. 15, 2009). Express fiduciary relationships are created by contract or legal proceedings. *Id.* Implied fiduciary relationships "are premised upon the specific factual situation surrounding the transaction and the relationship of the parties" and exist where "confidence is reposed by one party and a trust accepted by the other." *Id.* (quoting *Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 519 (Fla. 3d DCA 1994)). "An implied fiduciary relationship will lie when there is a degree of dependency on one side and an undertaking on the other side to protect and/or benefit the dependent party." *Masztal v. City of Miami*, 971 So. 2d 803, 809 (Fla. 3d DCA 2007).

In *Adorno*, 60 So. 3d at 1027-28, the Florida Supreme Court found that an attorney who represented a putative class had a fiduciary duty to the putative class members even though the court had not yet certified the class. The attorney negotiated a settlement with the City of Miami on behalf of class members, but then used the money to compensate only named representatives of the class. This led to the named representatives and the attorney receiving a greater share of the $7 million settlement to the detriment of putative class members. The Supreme Court

affirmed the Bar Referee's recommendation that the attorney breached the fiduciary duty he

owed to putative class members. *Id.* at 1029, 1037.

Before reaching the issue of whether MCAG served as a fiduciary to class members, the

Court notes there is agreement that MCAG functioned as an agent of class members. MCAG's

Chief Executive Officer Tim Schmidt admitted as such in the arbitration. Pre-Evid. Hr'g Tr. Vol.

II dated Jan. 10, 2018 at 580 (ECF 6685-11). Kevin Love, MCAG's prior counsel, also admitted

that "MCAG was an agent for the class members that it purported to represent." Pre-Evid. Hr'g

Tr. Vol. IV, dated Jan. 12, 2018 at 1041, 1042 (ECF 6685-7). There is also no dispute that

MCAG had contractual obligations to the class members created by the many Physician

Agreements it entered. The Physician Agreements provide that MCAG will use its "best efforts"

to "help the Client" collect historical claims data and "submit those claims for reimbursement . . .

and to collect and distribute the funds that may be due Client from the Settlement." *See*

Physician Agreements (ECF 6520-1; 6685-25).

Although MCAG agrees it served as an agent for class members with whom it contracted,

MCAG states "it is purely an academic question of whether it was – or was not – technically a

fiduciary to the class members or whether it was bound by any other contractual or common law

duty of care." MCAG Written Closing at 51 (ECF 7008). This Court disagrees that this is an

academic question and instead finds it to be one with very real implications as to how MCAG

should have handled class settlement funds. Rather than address this very real question, MCAG

instead relies on *Managed Care*, 939 F.3d 1145 at 1162, arguing that the Eleventh Circuit *only*

found this Court to have the "role as a fiduciary" to "ensure the class members receive that to

which they are entitled under the Settlement Agreement." *Id*. (citing *United States v. City of*

*Miami*, 614 F.2d 1322, 1331 (5th Cir. 1980)). Certainly, this Court owes a duty to class members

to ensure proper distribution of class funds, but that does not mean that an agent holding class funds does not also have fiduciary obligations.

Like the attorney in *Adorno*, MCAG had a fiduciary duty to ensure that class funds are dispersed to class members. In *Adorno*, the attorney used the class funds to overcompensate the named plaintiffs and himself. The Florida Supreme Court reasoned that even though the class was not yet certified, the fiduciary relation is broad embracing formal and informal relationships. This case is even more compelling than *Adorno* to find a fiduciary relation exists. Here, MCAG's contract with the class members indicated that it would distribute class settlement funds to class members. Even if this express language is not enough, the Court finds an implied fiduciary relationship because there is a degree of dependency where the class members depended on MCAG to obtain and distribute class funds and an undertaking by MCAG to benefit them as dependent parties.

Therefore, this Court agrees with the expert testimony of Mr. Kapila and Mr. Pollack, both of whom opined that MCAG has fiduciary obligations to class members. At the evidentiary hearing, Mr. Kapila testified that "MCAG by the nature of their business of disbursing sizable funds for settlement funds, holds those when it receives them for the benefit, in this case for claimants or whoever the beneficiaries may be overall in their business, and I think that lends itself to an expectation that those funds would be held segregated. They would be managed appropriately and preserved, and to the extent they belong to these parties, they would be interest bearing and that equates to a fiduciary responsibility." Hr'g Tr. at 73-74 (ECF 7004).

The Court also separately finds that the Cigna class funds that are part of the settlement of this case qualify as ERISA funds under 29 U.S.C. § 1002 since this case originated under ERISA. In this case, both doctors and patients sued numerous health insurance companies under

ERISA for denying claims. Funds that are intended to benefit service providers, such as the class members here, are considered funds under an ERISA plan and cannot be used for any purpose but to benefit beneficiaries and their providers. *In re: GS Consulting, Inc. v. Bradley*, 414 B.R. 454, 461-62 (N.D. Ind. 2009). A person including a corporation is a fiduciary under ERISA if he exercises any discretionary authority or discretionary control respecting management of such a plan or exercises any authority or control respecting management or disposition of its assets. *Id.* at 458-59 (citing 29 U.S.C. § 1002(21)(A)). GS Consulting performed services as a third-party administrator of health-care claims, much like MCAG's role here. In that case, the court found GS Consulting met the criteria under ERISA to be a fiduciary. The *GS Consulting* court, like the Supreme Court in *Adorno*, broadly construed the term fiduciary as individuals or entities who exercise any discretionary authority or control over funds. *Id.*; *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251 (1993) (stating that anyone who exercises discretionary control over an ERISA plan's assets is an ERISA fiduciary). In so holding the *GS Consulting* court states that "[t]he measure of whether a person is a fiduciary is not whether that person is formally designated as such. Instead, a fiduciary should be viewed 'in functional terms of control and authority over the plan." *GS Consulting*, 414 B.R. at 459 (quoting *Ruiz v. Cont'l Cas. Co.*, 400 F.3d 986, 990 (7th Cir. 2005)).

MCAG argues, as GS Consulting did, that it is merely a claims-processing agent with purely ministerial duties. *GS Consulting*, 414 B.R. at 459. That court did not agree with GS Consulting's position and followed Supreme Court precedent to find that one who exercises any discretionary authority over assets of a plan is a fiduciary even if some of its actions might seem ministerial. The court held that GS Consulting's status as a fiduciary is even more compelling because GS Consulting exercised unauthorized control over the assets, which constituted

exercising authority or control respecting disposition of assets under ERISA. *Id.* at 459-60. The court held that GS Consulting acted as an ERISA fiduciary because it controlled funds in certain accounts that originated from ERISA plans. *Id.* at 460. In this case, MCAG has undisputedly exercised authority and control over the dispositions of ERISA class action funds. Therefore, the Court finds that MCAG is not only a fiduciary as an agent of class members, but also an ERISA fiduciary.

Having found that MCAG has fiduciary obligations, the Court next examines whether MCAG breached those duties with respect to its handling of pre-arbitration and post-arbitration class settlement funds.

### B. Did MCAG breach fiduciary obligations?

The Court's factual findings in this Order can dictate no conclusion other than that MCAG flagrantly breached its fiduciary obligations and failed to obtain Court approval on its use of Cigna's settlement funds in accordance with Federal Rule of Civil Procedure 23. MCAG's defenses that it replenished the Cigna settlement funds, relied on the indemnity provisions in the physician agreements, and obtained class member approval to use the settlement to finance the arbitration fall short of excusing its actions. The Court must determine based on the evidence before it to what extent MCAG violated its duties.

### 1. What are MCAG's duties as an agent and a fiduciary under ERISA and otherwise?

Via the numerous Physician Agreements, MCAG contractually obligated itself to distribute Cigna funds to class members. As an example, the Physician Agreements state that: "Client authorizes MCAG to file claims, collect recoveries through a secure Lock Box, extract

the service fees outlined below from the recoveries, and return net recoveries to Client."[15]  *See* Sample Physician Agreements (ECF 6520-1; 6685-25). Not only did the Physician Agreements create this obligation, MCAG represented as such to Magistrate Judge O'Sullivan in Court on December 16, 2016.[16] The Settlement Agreement and the Binding Arbitration Agreement also required MCAG to account for and distribute funds to class-member clients, whose claims were approved. *See generally* Settlement Agreement (ECF 2308) (establishing framework for payment of class members' claims); Binding Arbitration Agreement (ECF 6695-3) (stating that MCAG submitted claims seeking compensation on behalf of class members and agreeing to arbitration to determine the compensability of those claims). MCAG, however, has taken the position that because of the way arbitration proceeded that it was not so simple to send the monies out to class members. Rather, MCAG claims that it used the Cigna class funds to finance its efforts to obtain a greater overall recovery from Cigna. The view was that at the end of the arbitration there would be an award and at that point MCAG would reconcile the claims with the individual awards. In the meantime, throughout the over 15-year arbitration, MCAG did not distribute any monies for claims that it knew were valid. MCAG maintains this posture that it was waiting for a final recovery to distribute monies even though by 2014 the Arbitrator was taking a different stance. On November 21, 2014, Arbitrator Schultz acknowledged that perhaps at the outset of the arbitration the parties intended the "[p]ayment by Cigna . . .to be held by MCAG and at the

---

[15] The Physician Agreements also state that the "client will pay MCAG for services rendered according to the fee schedule regardless of the ultimate recovery." MCAG's position is that it was entitled to keep retainage no matter what recovery it got for the class member. The agreement, however, fashions a percentage retainage from the recovery. The Court must give this contractual language its plain meaning and a percentage recovery implies that there is some recovery for the class member for MCAG to secure retainage.  Certainly, the fixed filing fee would be due under the terms of the contract regardless of the ultimate recovery for that class member.

[16] The transcript of the December 16, 2016 hearing reads as follows:

       THE COURT: Did you bind yourself to a course of conduct with your clients and distribute the funds as soon as receiving them, or shortly after receiving them?

       MR. GREENBERG (Then Counsel for MCAG): I think that's an accurate statement, yes, distributing shortly after receiving. Hr'g Tr. at 17 (ECF 6529).

conclusion of reprocessing and the resulting determination of a compensable amount, credited

pursuant to the Final Award. The above assumptions of expected circumstances. . .changed when

Judge Davis, prior to a final determination of compensable claims, ordered an immediate

processing of claims prior to a Final Award at the end of the proceeding." Arbitrator Schultz

Order of Nov. 21, 2014 (ECF 6732-19).

Beyond its failure to distribute class member funds, MCAG breached its fiduciary

obligations in several ways. First, it used the Cigna class funds for its own purposes. The record

does not establish, as MCAG suggests, that it only used the class funds in the class members'

best interest to finance the arbitration. Nor does the record establish, as MCAG contends, that it

communicated with all class members and obtained their consent to proceed as it did. MCAG

also failed to properly account for the use of the funds. Its commingling of the funds and failure

to segregate them also made an accounting more difficult. MCAG also failed to attribute interest

to the class funds and instead, kept any interest earned on the funds. *See Goldberg for Jay Peak,*

*Inc. v. Raymond James Fin., Inc.*, No. 16-21831, 2017 WL 7791564, *4 (S.D. Fla. Mar. 27,

2017) (recognizing a claim for breach of fiduciary duty where defendant commingled and

misused investor funds, diverted funds to pay for other projects, and converted investor funds

into collateral for personal loans); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006)

(holding that commingling of client funds constitutes a breach of fiduciary duty); *Phillips v.*

*Andrews*, 332 F. Supp. 2d 797, 807 (D.V.I. 2004) ("[O]nce it is proved an agent held funds for a

principal, it is the agent's burden to prove those funds were properly put to their intended

purpose."); *FDIC v. Floridian Title Grp. Inc.*, 972 F. Supp. 2d 1289, 1297 (S.D. Fla. 2013)

(denying summary judgment on breach of fiduciary duty claim where agent failed to disclose all

material facts relevant to its transactions with the plaintiff); *see also* Restatement (Third) of

Agency § 8.01 (2006) ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship."). As more fully detailed below, MCAG's actions qualify in all such categories.

Under ERISA one of the main fiduciary duties is the duty of undivided loyalty to plan participants. 29 U.S.C. § 1104. The duty of loyalty consists of an obligation to discharge fiduciary duties solely in the interest of plan participants and the beneficiaries. *Id.* ("[A] fiduciary shall discharge his duties with respect to a plan *solely* in the interest of the participants and beneficiaries and – (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries.") (emphasis added). This duty is sometimes referred to as the Exclusive Benefit Rule.

### 2. Did MCAG breach its fiduciary duty in its handling of pre-arbitration funds?

The evidence establishes that MCAG paid a portion of the $11,565,988 pre-arbitration funds to class members for approved claims. The question is what portion. It is undisputed that the $11,565,988 was deposited into MCAG's general accounts and commingled with other monies. It is also undisputed that MCAG "retained" anywhere between $3,262,408 and $3,530,564 pursuant to its Physician Agreements. SAM Report at 29 Table 4 (ECF 6680-3) (discrepancy arises from comparison of MCAG's Pre-Arbitration Payment Database and MCAG's Pre-Arbitration Check Register). The question is how much of the remaining approximately $8 million was actually paid to class members.

Mr. Kapila noted that payments to class members per MCAG's pre-arbitration payment database were $8,068,223. *Id.* He attempted to trace these checks to class members with MCAG's bank records. As such, he was only able to verify payments to Class Members totaling $2,363,748 by cross-referencing the checks to MCAG's check register. *Id.* at 30. As an

alternative to corroborate payments to class members, Mr. Kapila noted that class members receiving payment would have an IRS Form 1099 in 2005. *Id.* He was only able to confirm that the correct payment was made to several class members that filed Category A claims using the Form 1099 data. *Id.* Mr. Kapila also struggled to verify the appropriate retention for MCAG pursuant to the Physicians' Agreements. "A complete set of Physician Agreements for the allowed Class Member claims were not available to confirm the amount of retention for which MCAG may be entitled to receive." *Id.* at 33. The Physician Agreements Mr. Kapila examined did not contain adequate information to determine the retention because the applicable service fee was not indicated or designated on many of the agreements. *Id.*

The commingling of class settlement funds and the inadequate documentation also made it difficult to determine if MCAG paid class members as it was required to do as a fiduciary. As an agent, it was MCAG's obligation to maintain specific records of the receipt and disposition of a principal's funds and account to the class members for those funds. *Phillips*, 332 F. Supp. 2d at 806 ("The agent's duty ordinarily includes not only the duty of stating to his principal the amount that is due, but also a duty of keeping an accurate record of the persons involved, of the dates and amounts of things received, and of payments made. The agent has a duty to take such receipts as are customarily taken in business transactions."). The Restatement of Agency emphasizes that "once it is proved an agent held funds for a principal, it is the agent's burden to prove those funds were properly put to their intended purpose." *Id.* at 807 (citing Restatement § 382 cmt.). Here, it is undisputed that MCAG's disbursements and retainage records could not be entirely reconciled. Indeed, MCAG could not even produce all the Physician Agreements for its clients. MCAG's expert, Mr. Bukhajian, attempts to excuse this deficiency because of the passage of time. The Court, however, agrees with Mr. Kapila's testimony that given the ongoing

litigation and arbitration, a reasonable fiduciary would have at the least been able to meet its

burden to produce its Physician Agreements to justify its retainage. Hr'g Tr. at 95 (ECF 7004).[17]

      Unlike the post-arbitration funds, which MCAG used for its own purposes, there is no

evidence to show that MCAG used these pre-arbitration monies to cover something other than to

pay class members. And the $3.5 million in retainage is approximately in the range of what the

evidence shows the parties understood the retainage to be. That being said, there remains a

question as to whether the commingling of those funds and the inability to tie the retainage to the

physician agreements justifies a ruling by this Court ordering MCAG to disgorge the $3.5

million that was not paid to class members, especially where, as here, it is also undisputed that

MCAG failed to obtain Court approval consistent with Federal Rule of Civil Procedure 23.

      *3. Did MCAG breach its fiduciary duty in its handling of post-arbitration funds?*

      MCAG undoubtedly breached its fiduciary and contractual obligations in its handling of

post-arbitration funds. The Special Accounting Master's tracing of the $14.2 million, although

frustrated by the lack of records, confirmed that MCAG violated its fiduciary obligations to class

members. The accounting showed, and it is undisputed that MCAG did not segregate the Cigna

class funds and instead, commingled them into as many as 85 bank accounts over a 14-year

period from 2005 to 2019. MCAG did not provide Mr. Kapila with a full set of bank records,

claiming they were no longer available. Using the records available to him, Mr. Kapila

concluded that "[l]ittle, if any, of the post-arbitration class member funds remain in the MCAG

bank accounts. Class Member Funds were utilized to fund MCAG's operating expenses, pay

---

[17] Mr. Kapila testified as follows:
"Q. So you would have expected [MCAG], holding class funds on behalf of class members, to reconcile the retention [it] took to the specific terms in the contracts? A. Yes. Q. Did you see that? A. No, sir. Q: Did they provide that to you? A. No, sir. . . .Q. And in your world as an expert witness in litigation do parties in litigation have to keep records during the pendency of litigation? A. That's my understanding of it, yes. Q. And do persons or entities who hold funds for others as an agent, do they have to retain records to demonstrate their receipt and disposition of funds? A. Yes." Hr'g Tr. at 95-96 (ECF 7004).

litigation settlements unrelated to CIGNA, fund distributions to MCAG's shareholders and as

collateral for MCAG's lines of credit." SAM Report at 40 (ECF 6680-3).

 Appendix 2 to the Special Accounting Master's Report provides a detail tracing of the

funds. He starts by examining the initial $7.5 million advance payment, which was immediately

commingled. Next, MCAG moved $5.7 million to another account, "effectively keeping the $1.8

million" as retainage. *Id.* at App'x 2 at 1-2. That left $5.7 million in a Huntington Bank

Account. In May 2012, MCAG transferred $4.8 million from those funds to a Waterford bank

account, which was used to pay a $6.2 million settlement for litigation with a former partner

RNP Investments. *Id.* at App'x 2 at 8, Exh. 2A. In December 2012, MCAG replenished the Cigna

settlement account by transferring in $4.8 million. *Id.* at App'x 2 at 9-10. In January 2013,

MCAG filed a response to interrogatories saying that $5.7 million ($7.5 million minus MCAG's

retainage) was being held in a Waterford interest bearing account. *Id.* In April 2013, MCAG

made a distribution payment of $441,070 to MCAG partner Doug Perry and $480,829 to MCAG

partner Tim Schmidt. *Id.* at App'x 2 at 12.

 On May 7, 2013, Cigna then paid $646,630, which was deposited in the same Waterford

account. *Id.* From June 2013 to December 2013, approximately $962,000 was transferred out of

this Waterford account and commingled with other MCAG funds to pay operations. *Id.* at App'x

2 at 13. The balance was then approximately $4,000,000 in December 2013. *Id.* At that point,

MCAG transferred $1 million out of the account to a First Republic account, which was used as

collateral for another loan.  In February 2014, MCAG transferred approximately $3 million that

remained in the Waterford account to the First Republic account as additional collateral for an

MCAG loan. *Id.* In August 2015, the First Republic account was closed and MCAG transferred

approximately $4.5 million to a JP Morgan Chase account. *Id.* at App'x 2 at 15. In September

2016, MCAG closed the JP Morgan accounts and moved $4.5 million to Key Bank and $1,287.85 to a Key Bank account called Cigna Arb. Settlement Account. *Id.* at App'x 2 at 16. Mr. Kapila also determined that MCAG did not attribute any interest earned on the post-arbitration funds in the MCAG accounting. In essence, it kept all interest on the monies. *Id.* at 43-44.

Appendix 3 of the Special Accounting Master's Report traces MCAG's use of the Cigna's 2010 payments – one for $2,719,736 and another for $331,709. Mr. Kapila traced the funds as MCAG commingled them with other funds through various bank accounts. He determined that from June 2010 to April 2012, MCAG paid about $3.4 million in operating expenses from the Huntington bank account where this money was deposited. In May 2012, the balance that remained of $834,000 was put in a Waterford bank account. *Id.* at App'x 3, Exh. 3A.

Appendix 4 of the Special Accounting Master's Report traces MCAG's use of $2,990,990 that Cigna paid on May 7, 2014. Mr. Kapila determined that MCAG paid $260,000 to Allscripts, an MCAG partner, in May 2014. The remaining $2,700,000 was put into a First Republic account and all of it was used to pay operating expenses. *Id.* at App'x 4, Exh. 4A.

MCAG's commingling to funds, failure to keep records, failure to pay any of the $14.2 million of post-arbitration funds to class members, failure to account for interest due to class members, its payment of an unrelated settlement for $4.8 million, and its use of the class funds to pay partners, legal expenses, and operational costs amount to breaches of fiduciary obligations and a breach of the duty of loyalty under ERISA. *See Goldberg for Jay Peak, Inc.*, 2017 WL 7791564, at *4 (recognizing a claim for breach of fiduciary duty for commingling, diverting investor funds, and using investor funds for personal loan collateral); *Lerner*, 459 F.3d at 294

(finding commingling of client funds constitutes a breach of fiduciary duty); *Phillips*, 332 F.

Supp. 2d at 807 (finding it is agent's burden to prove funds were put to their intended purpose);

*FDIC v. Floridian Title Grp. Inc.*, 972 F. Supp. 2d 1289, 1297 (S.D. Fla. 2013) (recognizing

breach of fiduciary duty claim where agent failed to disclose information); 29 U.S.C. § 1104

(providing ERISA standard).

     MCAG raises three arguments as to why it should not be held accountable for these

breaches. First, it argues its actions were taken with the permission of class members, who

purportedly agreed to allow MCAG to use class funds to finance the arbitration against Cigna in

the hopes of getting a greater recovery in the future. The Court does not find the evidence

supports this defense, even if it is indeed a viable one. The only two persons who testified on this

issue are Genevieve Parm and Matthew Katz, neither of whom are current class members. Both

Ms. Parm and Mr. Katz believed that MCAG could use the money to pay legal expenses to gain

a greater recovery from Cigna for class members. Their understanding, however, was not

documented in the Physician Agreement, which only provides for a retainage based on a percent

of the recovery and a filing fee. The Agreements do not allow MCAG to keep a retainage and

pay for legal expenses out of the remaining class settlement funds. Neither Ms. Parm nor Mr.

Katz agreed that monies could be used for purposes unrelated to the arbitration, and in this case,

the overwhelming evidence shows that MCAG used the monies for a myriad of purposes that did

not relate to the financing of the arbitration. Accordingly, even if this Court were to find that Ms.

Parm and Mr. Katz could speak for the thousands of class members that MCAG represented,

their testimony is still insufficient to establish that the class members authorized MCAG's

breaches.

MCAG's defense that it replenished the monies also falls short. Mr. Bukhajian tried to justify the taking of $4.8 million for payment of the unrelated RNP settlement by saying that MCAG replenished those funds within the year. Hr'g Tr. at 68 (ECF 7005). At the evidentiary hearing, however, Mr. Bukhajian had no "reason to dispute" Mr. Kapila's finding that Cigna's funds were indeed used to pay an unrelated settlement. *Id.* The so-called replenishment went to MCAG, not to the class members as Mr. Bukhajian agreed that MCAG did not distribute any of the $14.2 million to class members. *Id.* at 77. ("As I have stated, and again there is no dispute over this I can say with absolute certainty, MCAG did not distribute to class members the $14.2 million. It was ultimately spent pursuing these claims).

MCAG's final argument is that the indemnification clauses in the Physician Agreements allowed it to use the monies to litigate. The indemnification clauses in the Physician Agreements are limited to instances where the class member failed to provide enough information on the claim. There is no evidence showing MCAG instituted indemnification actions against class members due to their failure to provide sufficient documentation for their claims. The indemnification provisions in the Physician Agreements also fail to justify MCAG's breaches.

   **C.  *What is the effect of MCAG's failure to present the Physician Agreements to this Court for approval?***

This Court approved the Binding Arbitration Agreement between Managed Care Advisory Group on behalf of Certain Class Members and Cigna Healthcare (ECF 6110-1) and the Supplemental Agreement to Binding Arbitration Between Managed Care Advisory Group on Behalf of Certain Class Members (ECF 6787-19), both dated November 15, 2005.

The question is whether the Court's approval of this arbitration at the outset was sufficient to relieve MCAG of further responsibility for securing Court approval of its handling of funds. Namely, MCAG claims that during the arbitration it had obtained the consent of class

members to use class funds to continue to finance the arbitration in the hopes of obtaining more claims approved. The Court finds MCAG had a continuing obligation to apprise this Court of the use of class funds if it was going to use those funds for a purpose other than payment of class members. Without question, MCAG did not seek court approval of the Physician Agreements nor did it seek approval of its verbal agreements with class members to use class funds to pay arbitration and legal expenses. Rule 23(e) requires district courts to scrutinize any fee agreements that relate to a class settlement. *Alexander*, 927 F.2d at 1024. Rule 23(e) provides that "[t]he claims, issues, or defenses of a certified class – or a class proposed to be certified for purposes of settlement – may be settled, voluntarily dismissed, or compromised only with the court's approval.

The seminal case dealing with class-settlement claims processors is *Jack Faucett Assocs. Inc. v. Am. Tel. & Tel. Co.*, No. 81-1804, 1985 WL 25746 (D.D.C. Oct. 18, 1985). *Jack Faucett* involved two claims processors, who solicited class members to prepare claims and collect class-settlement payments in exchange for a contingency fee. *Id.* at *1. In that case, the claims processors never obtained class funds, and thus, never misappropriated class monies, yet the court found the claims processors' actions would have the effect of depriving class members of the amounts they would receive under the settlement agreement. *Id.* at 4-6. The court declared those agreements null and void prohibiting payment of class funds to the claims processor and the ensuing deduction of any fees. *Id.* at *6; *see also In re Synthroid Mktg. Litig.*, 197 F.R.D. 607, 610 (N.D. Ill. 2000) (precluding claims processor from sending letter to class members indicating that it would pursue the class member's claim in exchange for a 22% retainage of the recovery and stating claims processor could not deduct any fees from the class members' settlement funds without prior approval of the court).

The Court finds that its initial approval of the arbitration agreement does not constitute a

blanket permission for MCAG to have continued its handling of class funds in the manner

described in this Order. Agreements with class members that are not presented to and approved

by the class Court are void and unenforceable. *Alexander*, 927 F.2d at 1023-24 (cited with

approval in *Managed Care*, 939 F.3d at 1162). *Alexander* is instructive here because the court

became concerned when certain disbursements from the settlement fund appeared questionable.

The settlement was approved in May of 1988, and in January 1990 the lawyers had not

distributed the funds to class members. *Id.* at 1022. The court ultimately found the lawyer had

not met his burden of showing the expenditures from the class funds to be reasonable and held

the lawyer in civil contempt. *Id.* Like the counsel in *Alexander,* MCAG is also not entitled to

enforce fee arrangements reached with various class members after the settlement is approved by

the class court. *Id.* at 1023 ("In a class action, the district court has a duty to class members to

see that any settlement it approves is completed, and not merely to approve a promise . . . to pay

the relief to which it has decided class members are entitled.") (quoting *In re: Corrugated*

*Container Antitrust Litig.*, 752 F.2d at 141). This is exactly the situation that the Manual on

Complex Litigation foretold when it states:

> The court and counsel should be alert to the possibility of persons
> soliciting class members after the settlement and offering to
> provide "collection services" for a percentage of the claims. Such
> activities might fraudulently deprive class members of benefits
> provided by the settlement and impinge on the court's
> responsibility to control fees in class actions.

Manual on Complex Litigation, Fourth § 21.662 at 334.

In class actions, where there is a Rule 23 settlement, courts must approve fees. Here,

MCAG's position belies this longstanding premise. Its position is that the Court need not

approve the Physician Agreements that explained how MCAG would be paid. MCAG also

incorrectly asserts that those Agreements allowed it to charge legal expenses for the arbitration in addition to its retainage. That position, in and of itself, runs contrary to its own Physician Agreements. Moreover, MCAG's position that the Court need not approve the verbal agreements with class members to use class funds to finance the arbitration is contrary to Rule 23, *Alexander*, and *Jack Faucett*. Therefore, the Court finds that MCAG's agreements with class members are invalid, at least to the extent that MCAG claims that these agreements allowed it to use class funds in the manner described in this order.

### D.  Remedy

#### 1.  Disgorgement/Restitution

The Court has the authority to impose a variety of remedies in cases of fiduciary breach and the mishandling of class/ERISA funds. The equitable remedy of disgorgement is appropriate where there has been a misappropriation of class funds. *Alexander v. Chicago Park Dist.*, No. 79-C-2242, 1989 WL 121288 *6 (N.D. Ill. Oct. 4, 1989), *aff'd* 927 F.2d 1014 (7th Cir. 1991) (ordering payment of class members) (cited with approval *Managed Care Adv. Grp.*, 939 F.3d at 1162). When fiduciaries misappropriate funds, the Court has inherent authority to sanction the persons who misappropriate the funds. *See also FTC v. Gem. Merch. Corp.*, 87 F.3d 466, 469 (11th Cir. 1996) ("[T]he district court's equitable powers are extensive. Among the equitable powers of a court is the power to grant restitution and disgorgement.").

The Court orders MCAG to disgorge $14,189,066 in post-arbitration funds as the evidence establishes that MCAG used that money for unauthorized purposes and did not pay any class members any portion of the funds. The Court also orders MCAG to disgorge the interest to date on the $14,189,066. Counsel shall provide an updated interest amount as of the date of this order by **December 5, 2025**. MCAG shall mail proper payment to each class member it represents to

compensate for approved claims. MCAG shall also file a report with the Court by no later than **January 30, 2026**, providing the list of class members and proof of payment. To the extent MCAG is unable to provide proof of payment for a class member, MCAG shall deposit that payment into the Court registry and notify the Court of the status of that payment in its report filed by January 30, 2026.[18] MCAG shall provide notice of this Order to all class members and post this Order on its website to advise class members of their entitlement to recovery.

For the pre-arbitration funds, the evidence shows that MCAG retained $3,530,565 as its retention fee despite a previous affidavit of its Chief Financial Officer Doug Perry submitting to this Court that the entire $11.6 million pre-arbitration funds were distributed to class members. *Managed Care Advisory Grp.*, 939 F.3d at 1163; *see also* Perry Aff. at ¶¶ 7-8 (ECF 6517-1). MCAG never sought this Court's approval for the individual Physician Agreements that allowed MCAG to keep retainage that would diminish class member recoveries by as much as 30%. For the pre-arbitration claims, these claims were not in dispute nor subject to the arbitration. Even if MCAG had obtained approval of those Agreements as is required by Rule 23, MCAG's inability to provide proof of payments made to class members and its failure to produce a complete set of Physician Agreements made it very difficult, if not impossible to reconcile payments to class members with retention rates in those agreements. Based on these failures, the Court orders MCAG to disgorge $3,530,564 for the pre-arbitration funds. MCAG is instructed to file a report by **January 30, 2026**, including the proof of payment to each class member. To the extent MCAG is unable to provide proof of payment for a class member, MCAG shall deposit that payment into the Court registry and notify the Court of the status of that payment in its report filed by January 30, 2026.

---

[18] The Court notes that Cigna has waived its right to reverter of funds.

The Court also exercises its discretion to remove MCAG as an agent of the class members. An agent that breaches its fiduciary duty to its principals forfeits the agency. *Maples v. Thomas*, 565 U.S. 266 (2012) ("[T]he authority of an agent terminates if, without knowledge to the principal, he acquires adverse interests or if he is otherwise guilty of a serious breach of loyalty to the principal.") (quoting 1 Restatement (Second) of Agency § 112 (1957)); *Int'l Airport Ctr. LLC v. Citrin*, 440 F.3d 418, 420-21 (7th Cir. 2006) ("Violating the duty of loyalty, or failing to disclose adverse interests voids the agency relationship.") (citation omitted). Therefore, MCAG may not proceed as the class members' agent.

Finally, the Court will allow Cigna to move for attorney's fees and costs against MCAG. Cigna may file a motion for attorney's fees by **December 17, 2025**.

DONE AND ORDERED in Chambers in Miami, Florida on this 10th day of November 2025.

*Federico A. Moreno*

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies Provided:
Counsel of Record