FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ DEC 16 2025 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------x
                       :

In re PAYMENT CARD INTERCHANGE  :
FEE AND MERCHANT DISCOUNT    :     No. 05-md-01720 (BMC) (JAM)
ANTITRUST LITIGATION           :
                       :
--------------------------------------------------------x
This Document Applies to:        :
                       :

*Barry's Cut Rate Stores, Inc., et al v. Visa*  :
*Inc., et al, No. 05-md-01720 (E.D.N.Y)*   :
(BMC) (JAM) also now known as      :
*DDMB, Inc., et al. v. Visa, Inc., et al.,*    :
*No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM)*  :              :
--------------------------------------------------------x

**OBJECTION OF AMERICAN ECONOMIC LIBERTIES PROJECT, CONSUMER
REPORTS, DEMAND PROGRESS EDUCATION FUND, SMALL BUSINESS
MAJORITY, AND UNITED STATES PUBLIC INTEREST RESEARCH GROUP TO
MOTION FOR PRELIMINARY APPROVAL OF PROPOSED AMENDED CLASS
SETTLEMENT**

American Economic Liberties Project, Consumer Reports, Demand Progress Education

Fund, Small Business Majority, and United States Public Interest Research Group submit this

Objection to the proposed amended settlement of the Rule 23(b)(2) Class Plaintiffs and the

Defendants in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*

(the "proposed settlement"). Each of our organizations is a member of the Rule 23(b)(2) Class

due to our organizations' acceptance of Visa and Mastercard payments and the proposed

settlement's prohibition on Class members opting out. The reasons supporting this Objection are

set forth below and are grounded in our organizations' support for greater competition and

consumer welfare, which this proposed settlement does not adequately achieve.

1

## INTEREST IN THE PROPOSED SETTLEMENT

American Economic Liberties Project ("AELP") is an independent nonprofit organization that works to promote competition, combat monopolistic corporations, and advance economic liberty for all. It advocates for policies that address today's crisis of concentration through legislative efforts and public policy debates. AELP is non-profit and non-partisan and does not accept any funding from corporations. It has been accepting donations via credit cards since its founding in 2020.

Founded in 1936, Consumer Reports (CR) is an independent, non-profit and nonpartisan organization that works with consumers to create a fair and just marketplace. CR is included in the two merchant classes in this litigation as it has in the past accepted, and continues to accept, MasterCard and Visa credit card payments from its subscribers and donors. Known for its rigorous testing and ratings of products, CR advocates for laws and company practices that put consumers first. CR is dedicated to amplifying the voices of consumers to promote safety, digital rights, financial fairness, and sustainability. The organization surveys millions of Americans every year, reports extensively on the challenges and opportunities for today's consumers, and provides ad-free content and tools to over 5 million members across the U.S.

Demand Progress Education Fund (DPEF) is a 501(c)(3) charitable organization that educates and mobilizes its members and the general public about matters pertaining to the democratic nature of our nation's communications infrastructure and governance structures, and the impacts of corporate power over our economy and democracy. DPEF is non-profit, non-partisan, and accepts donations through credit cards.

Small Business Majority is a national small business organization that empowers America's diverse entrepreneurs to build a thriving and equitable economy. It engages its

network of more than 85,000 small businesses and 1,500 business and community organizations to deliver resources to entrepreneurs and advocate for public policy solutions that promote inclusive small business growth. Its work is bolstered by extensive research and deep connections with the small business community that enable it to educate stakeholders about key issues impacting America's entrepreneurs, with a special focus on the smallest businesses and those facing systemic inequities and barriers to entry. Small Business Majority has a general interest in seeing pro-competitive swipe fee reform happen.

United States Public Interest Research Group (U.S. PIRG) is a leading consumer advocacy group with broad knowledge about the history of credit cards. U.S. PIRG has accepted credit cards from its members for many years. U.S. PIRG is a 501(c)(4) independent, non-partisan organization that advocates for the public interest. We speak out for the public and stand up to special interests on problems that affect the public's health, safety and wellbeing. U.S. PIRG has long advocated on the issue of swipe fee reform. U.S. PIRG believes that cash customers should not pay more to subsidize credit card reward programs and supports efforts to make the costs of credit transparent to consumers. We believe that the interests of our organization and all consumers are not advanced by this proposed settlement, and we object.

Each of the organizations submitting this Objection has a strong interest in achieving meaningful interchange fee reform that corrects the anticompetitive fee-fixing system established by Visa, Mastercard, and their card-issuing banks and that reduces excessive card transaction fees that are inflating the cost of the goods and services consumers buy. Our organizations support vigorous, fair, and effective marketplace competition as key to advancing affordability and other consumer, independent business, and worker interests. Visa and Mastercard, however,

3

have structured their interchange fee systems to insulate fees from normal marketplace competition, which has had harmful impacts on card acceptors, workers, and consumers alike.

Our organizations have a strong interest in the fairness of the proposed settlement, since the resolution of litigation over Visa and Mastercard's interchange fees would have significant impacts on our own organizations as well as on the consumers, workers, and independent businesses for whom we advocate. We believe that the current proposed settlement, just like the substantially similar proposal put forward and rejected in court last year, falls far short of a fair and reasonable outcome as it fails to sufficiently address anticompetitive behavior or promote competition in the interchange fee system. Visa and Mastercard's anticompetitive centralized fixing of interchange fee rates and "honor all cards" rules would not be meaningfully corrected by this proposed settlement, and in fact would become further entrenched due to the settlement's inadequate relief and due to the broad mandatory release of claims that the settlement would impose upon all acceptors of Visa and Mastercard cards. While the proposed settlement does contain some reforms that have been modified from the proposal put forward last year, we believe those provisions are relatively easy for the card networks and banks to manipulate or circumvent and are unlikely to work effectively in promoting competition or producing more reasonable fees. Additionally, if the proposed settlement is approved, we anticipate that the card network and bank defendants will assert that the settlement's release-of-claims provisions provide them with liability immunity that is far broader and longer than generally understood. In our view, exchanging inadequate relief for sweeping and potentially unending legal immunity is a bad deal for competition and for consumer interests.

Each of the organizations submitting this Objection is also a member of the Rule 23(b)(2) Class, which Paragraph 1(ff) of the proposed settlement defines as:

4

all persons, businesses, and other entities that accept Visa-Branded Cards and/or Mastercard-Branded Cards in the United States at any time during the period between December 18, 2020 and the date of preliminary settlement approval, and from which no exclusions are permitted.

Each organization submitting this Objection has accepted, and continues to accept, Visa and Mastercard card payments from donors or contributors whose support sustains the organization's work. As a result, each of our organizations has had interchange fees deducted from transaction amounts paid to the organization via Visa and Mastercard cards. Because the Rule 23(b)(2) Class permits no exclusions, each of our organizations would continue to bear the cost of excessive Visa and Mastercard interchange fees going forward, and we would also be bound by the settlement's sweeping liability release provisions that would immunize Visa, Mastercard, and 15 of their largest card-issuing banks from fee-related claims. This would be the case even though our organizations have never been consulted by class counsel about the proposed settlement, nor are we aware of any other consumer or worker advocacy organizations that have been consulted by class counsel about the proposal's impact on consumer or worker interests.

Because our organizations are dedicated to advocating for competition and the rights of consumers, workers, and independent businesses, and because we are payors of interchange fees and members of the Rule 23(b)(2) Class, we have a strong interest in the proposed settlement and therefore seek to assist the Court in evaluating what we see as major shortcomings in its fairness.

## BASES OF OBJECTION

I.    **THE REFORMS PROPOSED IN THIS AMENDED SETTLEMENT ARE NOT LIKELY TO WORK EFFECTIVELY TO INCREASE COMPETITION OR TO PROVIDE MEANINGFUL RELIEF FROM EXCESSIVE FEES.**

As advocates for a more competitive and fair electronic payments system that better protects consumers, workers, independent businesses, and acceptors of card payments from

5

excessive fees, and as entities that would ourselves be bound by the terms of this settlement if it is approved, we are deeply concerned by the inadequacies we see in the proposed settlement that was negotiated between the defendant card networks, the defendant giant banks, and class counsel. In evaluating this proposed settlement, we have focused primarily on whether the settlement's proposed reforms would actually work and would provide relief that is sufficient to justify trading away the legal rights of all acceptors of Visa and Mastercard cards (including the millions of acceptors who were not at the negotiating table) to seek to hold the card industry accountable in court. Viewed from this perspective, it is not a close call: the proposed settlement falls short. While we recognize that this latest settlement proposal includes some changes from the proposal that was denied preliminary approval last year, our assessment is that these modified provisions are too insubstantial and too susceptible to undermining by Visa, Mastercard, and card issuers to work effectively and thus are unlikely to meaningfully address the excessive fees and lack of competition that characterize the interchange fee system. We discuss several key concerns below.

A. **The proposed settlement entrenches Visa and Mastercard's anticompetitive role in dictating fee rates and rules for card transactions while only making meager and temporary interchange rate reductions and not constraining network fees at all.**

As with the proposal put forward and rejected last year, the current proposed settlement largely leaves in place the structurally anticompetitive aspects of the interchange fee system that prompted this litigation in the first place 20 years ago. This is troubling, especially considering that the inflationary effect of this anticompetitive system has contributed to severe affordability challenges for consumers.

Visa and Mastercard, which control approximately 80% of the credit and debit card network markets, have created several fees that are deducted from the transaction amount

whenever a card bearing a Visa or Mastercard logo is used for a purchase. These fees include network fees, which Visa and Mastercard keep for themselves, and interchange fees, which Visa and Mastercard establish but which are retained by the banks that issue cards. Whereas every other type of fee received by banks (late fees, annual fees, interest rates, etc.) is set in a competitive market environment where each bank sets its own rate, interchange fees within the Visa and Mastercard systems are centrally fixed by the card network companies on behalf of all of the thousands of financial institutions that issue Visa- and Mastercard-branded cards. Visa and Mastercard each have established a uniform schedule of interchange fee rates that all the card-issuing financial institutions within the Visa and Mastercard networks use, with Visa and Mastercard typically setting rates to include a percentage-based fee component plus a flat fee component (e.g., 2.30% plus $0.10 per transaction). The card-issuing financial institutions in the Visa and Mastercard networks thus receive fees that they do not set for themselves, and they do not have to compete with one another over the fees they receive.

By insulating interchange fee rates from normal marketplace competition, Visa and Mastercard's centralized fee-fixing causes serious market distortions. For example, their fee-fixing reduces the incentive for card-issuing banks to manage their operational and fraud costs efficiently, because the banks are guaranteed to receive the same amount of network-fixed interchange fees as every other bank in the network, no matter how efficient or inefficient they are or how much fraud occurs on their issued cards. Also, Visa and Mastercard each impose network rules that require merchants to accept all cards bearing their network logos, even though the interchange fee rates they set for some cards, such as premium rewards cards, are significantly higher than others. The combination of centrally-fixed rates and "honor all cards" tying rules gives Visa and Mastercard incentive to set high interchange fee rates in order to

7

encourage banks to issue more cards, and since Visa and Mastercard collect network fees for themselves on every transaction, they profit as more cards are issued and used. Given Visa and Mastercard's market dominance, there is little that card acceptors can do to restrain these high fees, as it is difficult for businesses or donation-based organizations to operate without accepting Visa and Mastercard.

As a result of these factors, card acceptors have been forced to pay ever-rising interchange fees that are not tethered to any card-issuing bank's actual costs and that subsidize bank inefficiencies. Visa and Mastercard interchange and network fees often combine to take away more than 3% of the transaction amount that merchants receive on a sale, thus compelling merchants, who generally have low single-digit profit margins, to raise retail prices to cover the fees' cost. This means that all consumers, including those who do not pay with cards, ultimately bear these fees in the form of higher prices. In fact, by their design, Visa and Mastercard's current interchange fee rates serve as inflation accelerators, with the percentage-based fee component generating more revenue when prices of the underlying goods and services increase. Interchange fees also significantly impact worker interests, both because workers are consumers and because excessive interchange fees take away resources and revenue that merchants could otherwise invest in their workforce. Excessive interchange fees thus have the effects of inflating prices and reducing jobs in the retail sector, which is one of the most critical sectors of our nation's economy.

According to industry analyst The Nilson Report, a staggering total of over $187 billion in fees was charged to U.S. merchants on credit and debit card transactions in 2024,[1] and according to the Merchants Payments Coalition, these fees increased retail prices by an average

---

[1] The Nilson Report, "Merchant Processing Fees in the United States- 2024," Issue 1281 (March 2025) at p. 8.

of nearly $1,200 per American family.[2]  The Nilson Report also found that the fees charged to merchants on Visa and Mastercard credit card transactions increased from an average of 2.26% in 2023 to 2.35% in 2024—an increase of 0.09% in one year.[3]  The credit card fee rates paid by U.S. merchants are now the highest in the world, as many other countries have taken regulatory action to rein in these excessive fees, often after years-long antitrust investigations; for example, in the European Union, credit card interchange fees are capped at 0.3%.[4]  But in the United States, credit card interchange fees remain both unregulated and unconstrained by marketplace competition.

Unfortunately, the proposed settlement does not meaningfully address the two main structurally anticompetitive aspects of this system: Visa and Mastercard's role in centrally fixing fee rates on behalf of all of their card-issuing banks and Visa and Mastercard's anticompetitive "honor all cards" tying rules.  The proposed settlement does nothing whatsoever to change the fact that Visa and Mastercard centrally fix interchange rates for card-issuing banks that otherwise compete with each other.  That is a major shortcoming that this proposed settlement shares with the proposal put forward just last year.  It has long been demonstrated that the highly consolidated marketplace for card issuance does not require centralized fee-fixing.[5]  While at one time centralized price-setting might have been justified based on shortcomings in real-time communications among banks, technology has rendered that function unnecessary.  Not just banks but individual consumers now freely exchange data rapidly millions of times per day

---

[2] Merchants Payments Coalition press release, "Credit and Debit Card 'Swipe' Fees Hit New Record of $187.2 Billion, Driving Up Prices for American Families," March 18, 2025.

[3] The Nilson Report, "Merchant Processing Fees in the United States- 2024," Issue 1281 (March 2025) at p. 8.

[4] Kalle Radage, "Statistics on How Much Merchants Pay for Payment Processing in 2024," Clearly Payments, August 14, 2024.

[5] *See, e.g.*, Nicholas Economides, "Competition Policy Issues in the Consumer Payments Industry," at 122 in R. Litan & M. Baily, Moving Money: The Future of Consumer Payment, Brookings Institution (2009) available at https://www.neconomides.com/uploads/Economides_Competition_Policy_Payments_Industry.pdf.

sending not only messages but monetary value. The proposed settlement should correct the clear antitrust problem of centralized fee-setting among competitors, but it does not.

The tying problem of "honor all cards" is similarly left intact by the proposed settlement. While the proposed settlement makes a small, inadequate concession to this problem, which we discuss in the next section, it largely reinforces the central problem hidden behind the terminology for this rule – that all card-issuing banks must be treated as a single entity when deciding whether and which cards to accept rather than card acceptors being able to treat those banks as what they are (or should be): competitors.

Not only does the proposed settlement entrench the anticompetitive role and rules that Visa and Mastercard have established for fixing interchange rates, but it also fails to meaningfully reduce the rates Visa and Mastercard have fixed. The proposed settlement would direct Visa and Mastercard to reduce their credit card interchange rates by 0.10% for a period of five years—a reduction representing a tiny fraction of Visa's and Mastercard's current rate levels that average between 2% and 3%, and barely more than the 0.09% that Visa's and Mastercard's fees increased just between 2023 and 2024. And because the proposed settlement does not change Visa's and Mastercard's role of centrally fixing fee rates on behalf of banks, Visa and Mastercard would be able to resume raising interchange fee rates to even higher levels without meaningful restraint after the five-year settlement period ends.

The proposed settlement also fails to constrain Visa and Mastercard from increasing network fees or establishing new types of merchant fees, meaning that any interchange fee savings that might be achieved during the five-year settlement period could be cancelled out by Visa and Mastercard's increases in other fees. This is because the proposed settlement's provisions in Paragraphs 54 and 103 preserve Visa and Mastercard's ability to raise network fees

and other merchant fees "to respond to market conditions." Even slight increases in those fees or the introduction of new merchant fees could erase any benefits merchants might achieve from the temporary 0.10% interchange fee reduction. Further, a large loophole in Paragraphs 54 and 103 appears to undermine the goal of preventing Visa and Mastercard from using network fee or other merchant fee increases to functionally reimburse issuers for the five-year 0.10% reduction in interchange fees. Those paragraphs preserve Visa and Mastercard's ability to set issuer "fee programs" and to negotiate "custom fee incentives" with sets of issuers, which means that under the proposed settlement, Visa and Mastercard can claim that they need to increase network fees or impose new merchant fees "to respond to market conditions" and then give issuers incentives or discounts within any other "fee programs" that Visa and Mastercard charge to issuers within their contractual relationships. The loopholes in the proposed settlement's provisions actually provide a roadmap for how Visa and Mastercard can successfully circumvent the settlement's fee reductions.

In short, the proposed settlement does not change the structurally anticompetitive centralized fee-fixing role that Visa and Mastercard perform in their interchange fee systems and does not meaningfully reduce the rates themselves. There are many reasonable approaches the proposed settlement could have taken to address the structural problems with Visa and Mastercard's centralized fixing of uniform interchange fee schedules—not only by ending fee-fixing entirely but, for example, by allowing Visa and Mastercard to continue fixing fee schedules on behalf of smaller card-issuing community banks and credit unions but not fix fees on behalf of giant financial institutions with significant economies of scale. But the proposed settlement does not take any such approaches, though it does immunize Visa, Mastercard and their biggest bank issuers from further legal action over this fee-fixing. And, as we discuss

11

below, the other reforms contained in the proposed settlement do not provide meaningful constraints on Visa and Mastercard's centralized fixing of excessively high fee rates.

**B.** <u>**The proposed settlement's honor-all-cards reforms will prove ineffective because the settlement leaves networks and issuers in control of categorizing which cards are "premium" and "standard."**</u>

While the proposed settlement touts reforms to Visa and Mastercard's honor-all-cards rules that would allow merchants to refuse to accept "Premium Consumer Credit Cards," the settlement defeats the potential benefit of this reform by leaving Visa, Mastercard, and bank issuers firmly in control of determining whether a card will remain within the settlement's definition of "standard" or "premium" cards. Allowing merchants to choose whether to decline to accept all "Premium Consumer Credit Cards" (a category defined to include Visa and Mastercard's most widely-used rewards card programs) in reality is not much of a choice at all. This is because the overwhelming majority of credit card transactions today involve rewards cards; according to the Consumer Financial Protection Bureau, "[a]s of 2019, more than 90 percent of general purpose credit card spending occurred on rewards cards."[6] A merchant that declines to accept "premium" consumer credit cards would functionally be declining to accept Visa or Mastercard consumer credit cards altogether—a choice that merchants cannot realistically make given the Visa-Mastercard duopoly's 80% card network market share.

Also, the proposed settlement does not change the fact that card-issuing banks can easily upgrade consumers' credit cards into higher rewards categories at the consumers' request or at the issuer's own volition.[7] Indeed, it is not uncommon for consumers to be surprised to learn that their issuer has shifted the consumer's credit card into a higher-rewards category or has

---

[6] Consumer Financial Protection Circular 2024-07, "<u>Design, marketing, and administration of credit card rewards programs</u>," Dec. 18, 2024

[7] *See, e.g.*, Citi, "<u>How to Upgrade Your Credit Card</u>," Oct. 29,2025, viewed on Nov. 28, 2025 ("Some cards are upgraded automatically.").

reissued the consumer's card as a higher-rewards card. Since the proposed settlement allows card issuers to continue recategorizing "standard" cards as "premium" cards (or as some other third category of cards) whenever they want, a merchant that chooses to only accept "standard" consumer cards may quickly find that issuers have the ability and incentive to make such cards unavailable in the marketplace, thereby forcing the merchant to accept higher-fee "premium" cards if they want to accept consumer cards at all.

Allowing merchants to decline "premium" cards can only be effective if networks and issuers are <u>not</u> able to control and freely manipulate whether and when consumers' cards fall into the "standard" or "premium" categories. The proposed settlement does not solve that issue, nor does it even acknowledge it. If the proposed settlement were approved, it would be feasible and logical for networks and issuers to make sure that the "standard" card category—which already represents a small and declining subset of credit cards—further shrinks to become functionally insignificant in the marketplace, thus undermining the benefit of any relief.

C. <u>The proposed settlement's interchange rate cap for "standard" cards is also easily defeated because card issuers are free to recategorize cards out of the "standard" category.</u>

The card network and bank defendants also tout the proposed settlement's provision imposing a temporary 1.25% interchange rate cap on so-called "standard" consumer credit cards," but this provision is unlikely to be effective as it is unlikely to apply to many, if any, transactions. While we find it noteworthy that, with this 1.25% rate cap provision, the credit card industry has finally recognized and conceded that interchange rate caps can be a reasonable solution to excessive swipe fees, such caps will only be effective if the universe of cards subjected to them represents a meaningful portion of the marketplace and if those cards cannot be converted into other categories. However, the proposed settlement does nothing to stop

issuers from converting a "standard" consumer card into a "premium" card (or into a new third category of card that fits neither definition) whenever the issuer feels like it—and card issuers will have significant incentive to do so because they will receive higher interchange fee rates when transactions are not subject to the "standard" card rate cap. Thus, the benefit of the proposed settlement's rate cap for "standard" cards is illusory.

**D.** **The proposed settlement's surcharging provisions are consumer-unfriendly and are undermined by the settlement allowing networks to impose higher interchange rates and network fees on merchants that surcharge.**

The proposed settlement also purports to increase merchants' options for surcharging on credit card transactions, but we believe these surcharge provisions represent a consumer-unfriendly and flawed approach to addressing the problems with the Visa and Mastercard systems. Surcharges do not fix the core anticompetitive problems of centralized fee-fixing or "honor-all-cards" tying arrangements or reduce fee rates; they simply pass along the excessive fees generated by those problems in a more visible way to consumers. Surcharges thus make merchants bear the ire of consumers for the high fees that Visa and Mastercard impose and make the merchants risk a consumer backlash for serving as the card industry's toll collector. We believe consumers would be better served by pro-competitive reforms that reduce rates and obviate the need for any surcharges to cover excessive fees.

Even if we did agree that surcharges should be made available as a cost-effective option for merchants to pass along credit card transaction fees to credit card purchasers without raising overall prices, the proposed settlement makes it possible for Visa and Mastercard to ensure that surcharging will be cost-prohibitive for merchants to use. For example, the proposed settlement says that surcharge amounts must be limited to the lesser of 3% or the merchant's credit card cost of acceptance, but the settlement does not take any steps to prevent Visa or Mastercard from

14

increasing network fees or imposing new fees on merchants that surcharge. Visa and Mastercard could easily increase such fees so that merchants who wish to surcharge would face a level of fees that exceeds the permissible 3% surcharge amount, thus making surcharging cost-prohibitive. Also, after the five-year settlement period ends, Paragraphs 43(f) and 92(f) of the proposed settlement protect Visa and Mastercard's ability to establish "differential rate structures" in which lower interchange rates are made available to merchants that do not surcharge but higher interchange rates are assessed upon merchants that do surcharge. Visa and Mastercard could use this "differential rate structures" loophole to raise interchange rates on merchants that surcharge to a level that exceeds the permissible surcharge amount, again making surcharging cost-prohibitive. Thus, the surcharging provisions of the proposed settlement are not likely to be available in a cost-effective way for merchants.

E.  **The other reform provisions in the proposed settlement are not likely to be effective.**

There are several other provisions in the proposed settlement that purport to offer meaningful reforms but that we believe will not meaningfully benefit competition or consumers. We briefly discuss these provisions below.

Buying groups: The proposed settlement allows merchants to organize buying groups to negotiate fees with Visa and Mastercard. However, the option of forming buying groups is already available to merchants today, but such groups do not have the leverage to compel Visa and Mastercard to strike fair and reasonable agreements with them and the proposed settlement would not obligate Visa and Mastercard to make any such agreements. Instead, the proposed settlement would only obligate Visa and Mastercard to negotiate in good faith and to exercise business judgment in considering the buying groups' proposals. Thus, this provision is unlikely to have any noticeable effect.

Discounting: With respect to discounting, we appreciate that discounting can be a consumer-friendly way for merchants to differentiate prices between payment options and encourage consumers to use more cost-efficient payment methods, but we are concerned that the proposed settlement leaves too much power in Visa and Mastercard's hands over merchants' options for discounting.  For example, we note that the settlement fails to define either "discount" or "surcharge," apparently leaving it to Visa and Mastercard network rules to determine whether a merchant's posting of a list price and a deviation from that list price constitutes a discount or a surcharge.  This has practical impacts under the proposed settlement; for example, the settlement allows discounting on the basis of an issuer but does not allow surcharging on the basis of an issuer, and by letting Visa and Mastercard network rules ultimately determine whether a merchant's differential price scheme treats the higher or lower price as the list price and thus constitutes a permissible "discount" or an impermissible "surcharge," the proposed settlement gives Visa and Mastercard the ability to stymie merchant efforts to incentivize consumers to pay with cards issued by certain issuers and, accordingly, stymies merchant efforts to create market incentives for the centralized fee-setting bodies to reduce fees.

Additionally, we are concerned that in the unique context of debit cards, which are subject to federal regulation under the 2010 Durbin Amendment, the proposed settlement would revise Visa and Mastercard's rules to the benefit of giant banks by allowing merchants to discriminate against debit cards issued by smaller financial institutions.  The 2010 Durbin Amendment was carefully crafted to reform the debit interchange system and limit the debit fee rates fixed by Visa and Mastercard on behalf of large banks, while protecting the ability of small banks and credit unions to compete in the debit card issuance market by allowing those smaller issuers to receive far higher interchange fee rates than regulated big bank issuers while

16

disallowing merchants from discriminating between debit cards within a payment network on the basis of the issuer that issued the card. The proposed settlement would undermine this structure and encourage merchants to offer consumers discounts to pay with lower-fee big-bank debit cards instead of higher-fee cards issued by small banks and credit unions. This aspect of the proposed settlement would reaffirm the close alliance between Visa and Mastercard and the giant banks that are their co-defendants in this litigation, while undermining small banks' and credit unions' ability to remain viable competitors in the debit card issuance market. Over the long term, consumers will be negatively impacted if the giant debit card issuers are able to use this provision of the proposed settlement to reduce their competition in the debit issuance market.

Pilot programs: The proposed settlement also allows merchants to engage in pilot programs to test out certain acceptance, surcharging or discounting options at some outlets. While giving the ability for merchants to pilot reforms without penalty from Visa or Mastercard is helpful in concept, the opportunity to conduct pilot programs cannot salvage pro-competitive or pro-consumer benefits from reform provisions that are loophole-ridden and not capable of working effectively.

In short, the provisions that purport to reform Visa and Mastercard's fees and rules are flawed in ways that significantly undermine any benefit the provisions might provide to competition or to the interests of consumers, workers, or independent businesses. These flaws alone form a sufficient basis for us to object to the proposed settlement, but they are particularly troubling when considered alongside the proposed settlement's liability release provisions.

## II.    THE PROPOSED SETTLEMENT'S LIABILITY RELEASE PROVISIONS APPEAR TO SWEEP FAR MORE BROADLY THAN REPRESENTED.

Because the proposed settlement, if approved by the Court, would be mandatory and would apply without exclusion to all acceptors of Visa and Mastercard payment cards, careful

17

scrutiny must be given to the settlement's provisions ordering the release of legal claims against the defendant card networks and banks. Upon review, we are deeply concerned that these release-of-claims provisions sweep far more broadly than class counsel have represented and would immunize the defendants from claims involving more types of conduct and for a longer period of time than is generally understood.

As a baseline, Paragraph 116(a) of the proposed settlement requires all card acceptors, without exception, to "fully, finally and forever" release the defendants from any and all claims seeking declaratory, injunctive, or equitable relief in several circumstances. Determining which claims are covered by this release is a critical exercise, but the proposed settlement is both vague and deceptive on this point. Paragraph 116(a) states that claims that have accrued as of the settlement approval date, or that accrue within the longer of five years after the settlement final date or eight years after the settlement approval date, are released and cannot be brought in court. The paragraph also states that any claims that were alleged in the current lawsuit "or that could have been alleged or raised in [the current lawsuit] relating to the subject matter thereof" are released. And the paragraph further releases and precludes claims "arising out of or relating to a continuation or continuing effect of any such conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act" at issue in the current litigation. This "continuation or continuing effect" language is particularly troubling because the paragraph's language allowing claims that accrue after the five-to-eight year settlement period to be brought does not appear to allow claims to be brought after five-to-eight years if the claims arise out of or relate to a continuation or continuing effect of conduct that was raised, or could have been raised, in the current litigation. This means that the defendants will likely argue that future lawsuits by card acceptors regarding any continuing effects of the current interchange system's structure, fees, or

18

rules are disallowed even if those suits are filed beyond the five-to-eight-year window. And because the proposed settlement entrenches the current Visa and Mastercard interchange system with its centralized fee-fixing and network-imposed rules largely intact, there will almost certainly be continuing effects from that system beyond the five-to-eight-year period. We fear those claims would end up barred in perpetuity, and under the proposed settlement neither we nor any other card acceptors can opt out or otherwise be excluded from this bar.

To tip the scales even further in favor of the defendants, clauses (i) through (vi) of Paragraph 116(b) itemize many specific aspects of the current interchange system that the settlement would deem to be released as "claims that were or could have been alleged" in the current litigation. These clauses mention claims that involve not only interchange fees, payment system rules, or anticompetitive agreements, but also that involve "any Merchant Fee" imposed by any card network or bank relating to any Visa or Mastercard card transactions. This waiver of claims involving "any Merchant Fee" is alarming, as the term "Merchant Fee" is broadly defined in Paragraph 1(u) of the settlement to include

> any amount that reduces from the face amount of a transaction the funds that a merchant receives in the settlement of a Credit Card or Debit Card transaction or is otherwise charged to or paid by a merchant, or any interchange fee, network fee or assessment, or acquirer, issuer, or processor fee, including Visa's Fixed Acquirer Network Fee.

In other words, the "any Merchant Fee" language means all card acceptors would be forced to waive all claims against Visa, Mastercard, and bank issuers regarding not only interchange fees but any and all other card transaction fees or other fees that networks or banks have created, or might someday create, that are "charged to or paid by a merchant." This loophole offers ample opportunity for Visa, Mastercard and banks to creatively design other fees that will undermine interchange fee relief or steer the behavior of card acceptors in the networks' and issuers'

19

preferred direction while enjoying lawsuit immunity.[8]  The immunity from liability for "any Merchant Fee" would at minimum last for the next five-to-eight years under the proposed settlement, but as discussed earlier, we are concerned that the settlement could be construed to immunize such "Merchant Fee" claims for longer than the five-to-eight year window.  This is because Paragraph 116(b) treats claims involving "any Merchant Fee" as claims that "could have been alleged in this Action" and Paragraph 116(a) seems to immunize the defendants in perpetuity from claims "arising out of or relating to a continuation or continuing effect" of conduct that was raised or could have been raised in the litigation.

And that's not all.  Paragraph 116(a) also says that the release-of-claims shall extend to "the fullest extent permitted by federal law," and Paragraph 117 requires acceptors of cards to forever and irrevocably waive any claims they may have which "may limit the extent or effect of the release."  Paragraph 120(b) further prohibits any acceptor of cards from assisting any third party (such as a consumer or a new consumer organization who hasn't yet accepted donations made by credit card and is not bound by the mandatory settlement) from bringing a civil lawsuit against the networks or banks "related in any way to any claim released herein," thus limiting the ability of organizations like ours to weigh in in support of potential future claims.[9]

---

[8] The fact that the settlement's definition of "Merchant Fee" specifically mentions Visa's Fixed Acquirer Network Fee (FANF)—a fee that was highlighted in the Department of Justice's antitrust complaint against Visa as a "lever that Visa uses to lock-up merchant debit volume"—shows why the settlement's waiver of claims for "any Merchant Fee" creates enormous opportunity for networks and banks to engage in fee innovation that imposes costs on merchants and their customers without fear of liability.

[9] Note also that in our view, Paragraph 122, which purports to clarify the scope of the settlement's release provisions, actually confuses the matter further.  For example, Paragraph 122 states that the release provisions are intended to bar all card acceptors from seeking or obtaining relief in court until the end of the five-to-eight year window, but only "with respect to any Rule of any Visa Defendant or any Mastercard Defendant."  Paragraph 122 does not affirmatively establish that card acceptors are free to sue with respect to Rules after the five-to-eight year window, nor does it clarify what happens, either during the five-to-eight year window or afterwards, to claims involving any other conduct listed in Paragraph 116(b)(i)-(vi) which is not explicitly a Rule, such as interchange fee rates, other "Merchant Fees," or any anticompetitive agreements that networks or banks may have made with each other.

We note that the class counsel have asserted in their declaration that "the release here is limited to five years from the time the average-effective-rate commitment goes into effect, after which any merchant will have the ability to bring claims against Visa or Mastercard without limitation."[10]  Unfortunately, based on our review, we do not share their confidence that that is what the settlement text actually says.  And we are concerned that the defendants and class counsel in their proposed Publication Notice describe a much more sweeping view on what claims are released, stating:

> The Settlement will resolve and release any claims by payment card acceptors against Visa, Mastercard and other defendants that were or could have been alleged in the lawsuit, including any claims based on interchange or other fees, no-surcharge rules, no-discounting rules, honor-all-cards rules, and any other network rules. The Settlement will also resolve any payment card acceptor claims based upon the future effect of any Visa or Mastercard rules not modified by the Settlement, as of MM DD, 202Y, the modified rules provided for in the Settlement, or any other rules substantially similar to those rules.[11]

This characterization of an expansive scope for the release provision does not give us comfort.

In short, we do not believe the interests of consumers, independent businesses, and workers are well-served by these release-of-claims provisions, which are at best deeply ambiguous and likely to prompt future disputes over their terms and scope, and which at worst will immunize anticompetitive conduct and excessive fees in perpetuity.  The troubling concerns we have identified in our review of the release provisions further reaffirm the importance of this Court not moving forward with preliminary approval of the proposed settlement.

## III.    CONCLUSION

It would be one thing if the proposed settlement's sweeping release-of-claims provisions were accompanied by airtight reform provisions that offer meaningful relief from the

---

[10] Declaration of Equitable Relief Class Counsel in Support of Motion for Preliminary Approval of Amended Settlement Agreement, Paragraph 201.
[11] Paragraph D of Appendix D1 of the proposed settlement.

anticompetitive aspects and excessive fees of the current interchange system. But that is not the case. The proposed settlement instead offers minimal and temporary credit card interchange rate reductions and loophole-ridden changes to Visa and Mastercard's rules that will not meaningfully reform the system and that in no way justify the sweeping and mandatory extinguishing of rights for all card acceptors. We fear that if this proposed settlement is approved, it will firmly entrench Visa and Mastercard's anticompetitive fees and rules and immunize them from liability in perpetuity. In our view, the proposed settlement falls far short of being a fair and reasonable deal, and if it is approved, consumers, workers, and independent businesses will ultimately pay the price.

The lawyers who negotiated the proposed settlement did not adequately represent the interests of the organizations that have joined this Objection. For these reasons, we respectfully object to the proposed settlement.

[Signed]

Nidhi Hegde
Executive Director, American Economic Liberties Project
2001 Pennsylvania Ave. NW,
Washington DC, 20006
Suite 540
nhegde@economicliberties.us
(925) 378-9180

Chuck Bell
Consumer Reports
607 14th St. NW,
Washington, D.C. 20005
Suite 725 (7th Floor)
chuck.bell@consumer.org
(914) 378-2507

Sean Vitka
Executive Director, Demand Progress Education Fund
700 Pennsylvania Ave. 2nd Fl

Washington DC, 20003
info@demandprogresseducationfund.org
(202) 642-6001

Alexis D'Amato Falvey
Government Affairs Director
1015 15th st. NW
Suite 450
Washington, DC 20005
adamato@smallbusinessmajority.org
(202) 967-0995

Mike Litt
Director, Consumer Campaign, United States Public Interest Research Group
1543 Wazee St.
Denver CO, 80202
Suite 460
mlitt@pirg.org
(202) 461-3835