**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION**<br><br>**This Document Applies to:** | **No. 05-md-01720 (BMC) (JAM)** |
| ***Barry's Cut Rate Stores, Inc., et al. v. Visa, Inc., et al.***, No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM), also now known as ***DDMB, Inc., et al. v. Visa, Inc., et al.***, No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM) | |

**NETWORK DEFENDANTS' REPLY MEMORANDUM**
**IN SUPPORT OF PRELIMINARY APPROVAL**
**OF THE RULE 23(b)(2) CLASS SETTLEMENT AGREEMENT**

# TABLE OF CONTENTS

**Preliminary Statement**......................................................................................................... 1

**Argument** ................................................................................................................................. 5

   I.  The Settlement Is Fair, Reasonable, and Adequate in Light of Plaintiffs' Litigation Risks and Best Possible Recovery at Trial. ................................................................. 5

   A.  Plaintiffs Face Significant Risks at Trial and on Appeal. ................................................ 5

   B.  The Settlement Provides Significant Benefits to Merchants and Compares Favorably to Plaintiffs' Best Possible Recovery at Trial. ................................................. 7

   C.  The Other Applicable Factors Also Confirm That Preliminary Approval Is Warranted... ................................................................................................................................. 16

   II.  The Court Properly Certified a Mandatory Class and Should Not Permit Opt-Outs........ 17

   A.  Class Members Are Adequately Represented............................................................... 19

   B.  Due Process Does Not Require Opt-Out Rights Here. .................................................. 21

   III. The Release Is Appropriately Limited. .......................................................................... 23

   A.  The Release Is Limited by the Identical Factual Predicate Doctrine and Limited to the Time Period of the Relief; Further Questions About Its Scope Are Premature............ 23

   B.  The Release Does Not Interfere with the *Old Jericho* Plaintiffs' Damages Claims...... 27

   IV. The *Visa Debit* Objectors' Arguments Are Without Merit............................................. 27

   A.  The *Visa Debit* Objectors Ignore This Court's Prior Decisions Pertaining to Class Certification and Adequacy of Representation. ............................................................. 28

   B.  The *Visa Debit* Objectors' Preference for Different Forms of Injunctive Relief Is Not a Valid Objection to Approval. ...................................................................................... 31

   C.  The *Visa Debit* Objectors' Arguments About the Scope of the Release Are Premature and Wrong in Any Event. .............................................................................................. 35

**Conclusion** ............................................................................................................................. **40**

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018).................................................................................................... *passim*

*United States v. Am. Express Co.*,
  838 F.3d 179 (2d Cir. 2016)........................................................................................11

*In re Am. Express Merchs.' Litig.*,
  634 F.3d 187 (2d Cir. 2011).........................................................................................26

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F. 2d 263 (2d Cir. 1979).......................................................................................14

*Berry v. Schulman*,
  807 F.3d 600 (4th Cir. 2015) ........................................................................................22

*In re Blue Cross Blue Shield Antitrust Litig.*,
  85 F.4th 1070 (11th Cir. 2023) ..............................................................................24, 26

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974)..............................................................................2, 5, 33

*Cohen v. Brown Univ.*,
  16 F.4th 935 (1st Cir. 2021)..........................................................................................5

*DDMB, Inc. v. Visa, Inc.*,
  2021 WL 6221326 (E.D.N.Y. Sept. 27, 2021) ............................................... *passim*

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
  62 F.4th 704 (2d Cir. 2023) ...............................................................................4, 23, 24

*Glover v. Conn. Gen. Life Ins. Co.*,
  2024 WL 4036721 (D. Conn. Sept. 4, 2024) ........................................................33

*Joel A. v. Giuliani*,
  218 F.3d 132 (2d Cir. 2000).........................................................................................5

*Lane v. Facebook, Inc.*,
  696 F.3d 811 (9th Cir. 2012) .......................................................................................5

*Lawlor v. National Screen Service Corp.*,
  349 U.S. 322 (1955)......................................................................................................26

*In re Literary Works in Elec. Databases Copyright Litig.*,
654 F.3d 242 (2d Cir. 2011)...................................................................26

*McAdams v. Robinson*,
26 F.4th 149 (4th Cir. 2022) .................................................................25

*In re NFL Players Concussion Inj. Litig.*,
821 F.3d 410 (3d Cir. 2016)...............................................................1, 5

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999)................................................................................22

*In re Payment Card*,
986 F. Supp. 2d 207 (E.D.N.Y. 2013) ....................................................7

*In re Payment Card*,
827 F.3d 223 (2d Cir. 2016)............................................................ *passim*

*In re Payment Card*,
330 F.R.D. 11 (E.D.N.Y. 2019) .............................................................33

*In re Payment Card*,
2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019) ......................................24

*In re Payment Card*,
2022 WL 15044626 (E.D.N.Y. Oct. 26, 2022)......................................39

*In re Payment Card*,
714 F. Supp. 3d 65 (E.D.N.Y. 2024) ...............................................26, 39

*In re Payment Card*,
729 F. Supp. 3d 298 (E.D.N.Y. 2024) .............................................29, 30

*In re Payment Card*,
2024 WL 3161774 (E.D.N.Y. June 25, 2024) .......................................19

*In re Payment Card*,
2024 WL 3236614 (E.D.N.Y. June 28, 2024) ............................... *passim*

*In re Payment Card*,
2024 WL 3249365 (E.D.N.Y. July 1, 2024).........................................39

*In re Payment Card*,
2025 WL 2412033 (E.D.N.Y. Aug. 20, 2025)..................................37, 38

*Prentis v. Atlantis Coast Line Co.*,
211 U.S. 210 (1908).................................................................................14

*Three Rivers Motors Co. v. Ford Motor Co.*,
   522 F.2d 885 (3d Cir. 1975)................................................................26

*In re Visa Check/Mastermoney Antitrust Litig.*,
   297 F. Supp. 2d 503 (E.D.N.Y. 2003) ................................................7

*In re Visa Debit Antitrust Litig.*,
   2025 WL 3019893 (S.D.N.Y. Oct. 28, 2025) .....................................30

*In re Vitamin C. Antitrust Litig.*,
   279 F.R.D. 90 (E.D.N.Y. 2012)..........................................................19

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)......................................................................18, 22

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005)......................................................... *passim*

## Statutes

Fed. R. Civ. P. 23 ................................................................................ *passim*

5 U.S.C. § 1693o-2 ..................................................................................33

## Other Authorities

12 C.F.R. § 235.7(a)................................................................................33

87 FR 61,230 (Oct. 11, 2022) ................................................................33

88 FR 78,100 (Nov. 13, 2023) ...............................................................33

## PRELIMINARY STATEMENT

After 20 years of hard-fought litigation, the Rule 23(b)(2) Plaintiffs, Visa, and Mastercard have agreed to a settlement that makes unprecedented and sweeping reforms to the networks' business practices, offers class members significant relief, and avoids the need for a trial and further appeals that Plaintiffs could—and, the networks respectfully submit, in all likelihood would—lose.  The proposed settlement addresses all key aspects of Plaintiffs' complaints regarding the challenged network rules.  It allows merchants to reject higher-cost credit cards while accepting lower-cost cards, and to surcharge Visa or Mastercard credit cards without doing the same to each network's competitors.  These and other provisions provide relief that compares favorably to, and in some cases exceeds, Plaintiffs' best possible recovery after trial and appeal. The settlement also materially enhances each aspect of prior settlements that the Court found to be insufficient.

Still, "[i]t is the nature of a[ny] settlement that some will be dissatisfied with the ultimate result." *In re NFL Players Concussion Inj. Litig.*, 821 F.3d 410, 447 (3d Cir. 2016).  The objections to the proposed settlement reflect only a handful of repetitive, boilerplate arguments from a tiny fraction of the many millions of merchants in the class.  Those objectors argue that the settlement does not go far enough in dismantling the networks' business models because it does not completely eliminate the default interchange structure or the Honor-All-Cards and surcharging rules at the issuer level.  The objectors also argue that the Court should permit opt-outs from the mandatory class and that the release should be modified.  None of these arguments withstands analysis.

*First*, the objectors' challenges to the substance of the relief misinterpret the legal standards for settlement approval and mischaracterize the significant relief offered by the settlement.  During

1

preliminary approval, this Court examines whether the settlement is likely "fair, reasonable, and adequate" taking into account the costs, risks, and delay of further litigation for the plaintiffs, and their best possible recovery at trial.  Fed. R. Civ. P. 23(e); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).  The objectors either ignore this standard or pay it lip service.  Their submissions rely on hyperbole about additional relief that Plaintiffs have little chance of obtaining at trial—including because their proposed relief would destroy the foundations on which the Mastercard and Visa networks are built, thus harming instead of advancing competition.

Unlike the objectors, this Court, in evaluating the settlement, will need to account for Plaintiffs' substantial burden and litigation risks at trial and on appeal—including, among others, Plaintiffs' (and the objectors') persistent failure to contend with the cardholder side of the two-sided market, and Plaintiffs' uphill burden to prove that network rules that have resulted in increased output, falling two-sided prices, and flourishing innovation and quality nonetheless could be found to have produced substantial anticompetitive effects.  Indeed, the Supreme Court and the Second Circuit previously overturned a verdict in favor of plaintiffs challenging analogous rules of American Express, precisely because the markets for card transactions have seen only expanding output and improved quality, and because cardholder-friendly and brand-protecting rules promote rather than inhibit "interbrand competition" among payment card networks.  *Ohio v. Am. Express Co.*, 585 U.S. 529, 549–51 (2018) ("*Amex*").  Plaintiffs' risks at trial and on appeal, which would take years of additional litigation, put in stark focus the substantial and immediate relief this settlement provides to merchants.

At the same time, the objectors unfairly dismiss the settlement's significant real-world benefits.  The settlement proposes fundamental changes to each of the major disputed practices in this litigation, from which all merchants nationwide—regardless of size, industry, or location—

will benefit equitably.  For the first time, the networks have agreed to relax their Honor-All-Cards rules applicable to credit cards by bifurcating commercial from consumer credit acceptance, and premium from standard credit acceptance.  While many of the objectors discount the value of the Honor-All-Cards relief, arguing that they may not want to reject premium cards given cardholders' increasing use of those cards, they ignore that the relief is provided alongside multiple other tools that make the Honor-All-Cards concessions "real and palpable," *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 238 (2d Cir. 2016),[1] including substantial cuts to standard credit interchange rates (giving merchants ample room to incentivize cardholders to make increasing use of those cards, including by discounting), full freedom to steer cardholders to standard cards by surcharging premium cards, and increased flexibility for merchants to test the viability of these options through pilot programs.  In any event, merchants need not take advantage of all forms of relief offered to benefit from the optionality provided by the settlement.  To the extent merchants wish to honor cardholder choice by accepting all cards and declining to surcharge, that reflects thriving competition in the two-sided transaction markets and the value each network provides to cardholders and merchants—*not* a reason to reject the proposed settlement.

*Second*, the objectors argue that the mandatory injunctive relief class certified by this Court in 2021 should be de-certified or modified to allow opt-outs.  Here, they rehash the same arguments that this Court has analyzed and rejected multiple times, without any serious attempt to explain why the Court should revisit these decisions.  The Court's prior conclusions apply equally now.  The nature of the class and the merchant class members' interests have not changed—merchants continue to seek "indivisible" injunctive relief that can be granted or denied only as to all class

---

[1]    The names of decisions from this MDL are abbreviated as "*In re Payment Card*."

members or none. *DDMB, Inc. v. Visa, Inc.*, 2021 WL 6221326, at *46–49 (E.D.N.Y. Sept. 27, 2021); *In re Payment Card*, 2024 WL 3236614, at *18 (E.D.N.Y. June 28, 2024).

*Third*, while some objectors challenge the scope of the settlement's release, the release is identical to that approved by both this Court and the Second Circuit on multiple occasions. The release is appropriately limited both in substance (by the identical factual predicate doctrine) and temporally (as it extends approximately eight years after final approval, coterminous with the rules relief). *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 714–15 (2d Cir. 2023); *In re Payment Card*, 2024 WL 3236614, at *34.

*Finally*, merchants pursuing claims against Visa in *In re Visa Debit Card Antitrust Litigation*, No. 24-cv-7435 (S.D.N.Y.) ("*Visa Debit*"), object to the settlement in connection with debit claims against Visa. As Visa shows below, those objectors do not dispute that they will benefit from the credit card-related relief. Their preference for more debit-focused relief from Visa, and their request to carve out their debit-related claims from the release, fail for similar reasons as the other objections. Visa separately responds to their specific arguments in Section IV.

In short, in order to resolve this long-standing litigation, Visa and Mastercard have agreed to sweeping concessions for which Plaintiffs have long advocated, allowing merchants greater flexibility both in choosing which payment forms to accept and in managing their costs of acceptance. The proposed settlement accords with, and in certain ways exceeds, Plaintiffs' best possible recovery at trial, while allowing merchants to obtain relief immediately and without any of the delay, costs, and risks associated with prolonged litigation. It should be approved.

4

## ARGUMENT

I.    **The Settlement Is Fair, Reasonable, and Adequate in Light of Plaintiffs' Litigation Risks and Best Possible Recovery at Trial**.

As discussed in the networks' opening brief, when evaluating a proposed class settlement, the Court asks whether it is "fair, reasonable, and adequate," considering, among other things, the "costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2).  This test is further informed by several related factors, including "the complexity, expense and likely duration of the litigation"; "the risks of establishing liability"; and "the range of reasonableness of the settlement fund in light of" both "the best possible recovery" and "all the attendant risks of litigation." *Grinnell Corp.*, 495 F.2d at 463.  Courts have emphasized that a proposed settlement "does not have to be perfect" to receive judicial approval, "just reasonable, adequate and fair." *Joel A. v. Giuliani*, 218 F.3d 132, 144 (2d Cir. 2000).[2]  The proposed settlement easily meets this standard and should be approved; nothing in the objections shows otherwise.

A.    **Plaintiffs Face Significant Risks at Trial and on Appeal**.

None of the objectors contends with the risk that Plaintiffs face in meeting their high burden at trial—where Plaintiffs must prove that the challenged rules "unreasonably restrain trade" in the two-sided transaction markets that serve both merchants and cardholders. *Amex*, 585 U.S. at 544–45, 522; *see* ECF No. 9693, Networks' Br. at 9–21.  Nor do they contend with the difficulties Plaintiffs would face defending any recovery on appeal, let alone the time and expense it would take to litigate this matter to conclusion.

Instead, without addressing the rules' benefits and their role in promoting interbrand competition in the relevant two-sided markets, the objectors simply assume that (i) Plaintiffs would

---

[2]    *Accord Cohen v. Brown Univ.*, 16 F.4th 935, 953 (1st Cir. 2021); *In re NFL Players Concussion Inj. Litig.*, 821 F.3d at 447–48; *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012).

prevail at trial because Plaintiffs withstood some summary judgment and *Daubert* motions, and (ii) following trial, the Court would throw out the rules in their entirety. *See, e.g.*, ECF No. 9722, Circle K & National Association of Convenience Stores ("NACS") Obj. at 1–2, 8; ECF No. 9729, Walmart Obj. at 17; ECF No. 9727, National Retail Federation ("NRF") & Retail Industry Leaders Association ("RILA") Obj. at 3.  That is not the proper lens through which to view the settlement.

As the networks demonstrated in their opening brief, the fact that Plaintiffs' case has been permitted to proceed to trial, and that Plaintiffs' experts may testify as to most of their opinions, does nothing to minimize the risk that Plaintiffs would face in proving a contract, combination, or conspiracy in unreasonable restraint of trade.  Networks' Br. at 9–10 & n.3.  The hurdles standing between Plaintiffs and any recovery include (but are not limited to) the following:

- Plaintiffs would not be able to prove that the networks participated in any unlawful conspiracy either before or after their IPOs.  The Visa network and the Mastercard network each formed as a joint venture of member banks to accomplish something that no firm could accomplish by itself: the creation of a widely accepted payment brand highly attractive to thousands of issuing banks, millions of merchants, and tens of millions of cardholders nationwide.  And following Mastercard's IPO in 2006 and Visa's IPO in 2008, the networks have each operated as a public company creating value for its stockholders, and making decisions about its rules and interchange rates independent of its bank customers.  *Id.* at 10–11.

- Plaintiffs would not be able to prove that any of the rules they challenge have substantial adverse effects on competition in the two-sided markets for credit transactions and debit transactions.  Both markets, over the entire relevant period, have seen exploding output, *decreasing* two-sided prices, and consistent innovation—indicators of healthy competition, not restrictions on competition.  *Id.* at 11–13.

- Each of the challenged network rules has extensive procompetitive benefits, which cannot be achieved without those rules:

    1. Both networks set default interchange rates to maximize the output of transactions, incentivizing both merchant acceptance on one side of the two-sided market and issuance and cardholder use on the other side.  Default interchange obviates the need for thousands or millions of bilateral negotiations between card issuing banks, on the one hand, and either acquiring banks or merchants, on the other, thereby decreasing transaction costs and ensuring reliable, seamless transactions where every participant knows in advance the costs and benefits of card use.  *Id.* at 13–16.

2.  Each network's Honor-All-Cards rule has allowed it to build trust with cardholders that their particular Visa card or Mastercard card will be accepted at any merchant that chooses to accept those brands, regardless of what kind of card it is or which bank issued the card. *Id.* at 16–18. As the Supreme Court has recognized: "A lack of welcome acceptance at one merchant makes a cardholder less likely to use" a particular brand's card "at all other merchants. This externality endangers the viability of the entire" payment network. *Amex*, 585 U.S. at 551. Numerous other courts, including this one, have likewise recognized the procompetitive benefits of the Honor-All-Cards rules.[3]

3.  Each network's rules limiting merchants' ability to surcharge, particularly at the issuer level, protect cardholders from discrimination based on their preferred form of payment. Given that issuing banks have a choice as to whether or not to issue their cards over the Visa network or the Mastercard network—or whether to shift issuance to another network that has more cardholder-friendly rules—network rules that protect frictionless transactions promote strong interbrand competition among Visa, Mastercard, and other payment networks, which is "the primary purpose of the antitrust laws." *Id.* at 551–52 (citations omitted); Networks' Br. at 18–19.

In sum, an assessment of the risks that Plaintiffs would face in further litigation—both in establishing liability and seeking their desired remedies at trial, and in defending any wins on appeal, Networks' Br. at 21–23—establishes that the certain and valuable relief provided in the proposed settlement should be approved.

**B.    The Settlement Provides Significant Benefits to Merchants and Compares Favorably to Plaintiffs' Best Possible Recovery at Trial**.

The objectors attempt to minimize the significant relief that the settlement affords. That relief compares favorably to, and in some cases exceeds, Plaintiffs' best possible recovery following trial. This factor thus weighs in favor of settlement approval as well.

---

[3]    *In re Payment Card*, 986 F. Supp. 2d 207, 219, 227–28 (E.D.N.Y. 2013) (noting that both the Honor-All-Cards and default interchange rules "undeniably have significant procompetitive effects," and that "[a] number of courts and economists have found the Honor-all-Cards rule and similar rules to be *procompetitive* under the Rule of Reason"), *rev'd on other grounds*, 827 F.3d 223 (2d Cir. 2016); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 511 (E.D.N.Y. 2003) (noting "procompetitive features of the 'Honor All Cards' rule"); *see also* ECF No. 8539-7, SJDX 1232 (Murphy Rep.) ¶¶ 281–95 (explaining procompetitive effects of Honor-All-Cards); ECF No. 8526-12, SJDX 388 (Elzinga Rep.) at 148–55 (same); ECF Nos. 8068, 8262, Defs.' 56.1 in Supp. of Summ. J. Mot. ¶¶ 216, 236 (summarizing evidence regarding same).

1.   *The Settlement Provides Merchants with Substantial Benefits*.

The settlement's proposed relief on Honor-All-Cards provides "a real and palpable benefit" to merchants. *In re Payment Card*, 827 F.3d at 238. The settlement proposes to break up, for the first time, each network's Honor-All-Cards rules applicable to credit cards on multiple levels, allowing merchants to reject Visa and/or Mastercard commercial cards, or premium consumer credit cards, or both—without affecting their ability to accept Visa or Mastercard standard consumer credit cards, which carry the lowest cost of credit card acceptance for merchants. ECF No. 9692-2, Settlement Agreement ¶¶ 22, 71. This relief directly heeds the previous direction from the Second Circuit and this Court calling for concessions pertaining to the Honor-All-Cards rules. *In re Payment Card*, 827 F.3d at 238; *In re Payment Card*, 2024 WL 3236614, at *27; *see also* ECF No. 9692-6, Orenstein Decl. ¶ 15. It also addresses head-on a core complaint of merchants, including that of the objectors, that they are forced to accept "higher-priced rewards cards"—i.e., commercial credit cards and premium consumer credit cards—"when consumers would otherwise have spent the same amount using lower-cost credit cards."[4]

In trying to minimize the significance of this relief, the objectors largely ignore that the settlement—in addition to mandating these rules reforms—provides multiple tools facilitating merchants' ability to benefit from this relief if they choose to do so. It creates and maintains, for the full term of the release, a substantial delta (over 100 basis points) between the interchange fees associated with standard cards (capped at 125 basis points) and premium cards, which allows merchants to incentivize the use of standard cards by offering targeted rewards or discounts to

---

[4]    *7-Eleven, Inc., et al. v. Visa Inc., et al.*, No. 13-cv-5746 (E.D.N.Y.), ECF No. 183, Sixth Am. Compl. ¶ 236 (alleging that "rewards cards have harmed merchants"); *see also* MDL 1720, ECF Nos. 8196, 8329, Direct Action Pls.' Counterstatement of Material Facts ¶ 1083 (asserting that merchants are forced to accept both rewards cards and commercial cards). Two of the objectors, Circle K and NACS, are members of the plaintiffs' groups that submitted these filings.

cardholders.  Networks' Br. at 24–25; Settlement Agreement ¶¶ 50, 99; ECF Nos. 9692-5, 9694-2, Stiglitz Decl. ¶¶ 85–87.  Further, by making surcharging simpler and more easily implemented, the proposed settlement allows merchants to use surcharging to shift demand from premium to standard cards and also to recoup the cost of accepting credit cards.  In particular, the settlement allows merchants to surcharge credit cards at the product level (e.g., commercial or premium) up to the lower of 3%[5] or the cost of acceptance, regardless of whether merchants surcharge other competitors' cards.[6]  Networks' Br. at 24–25; Stiglitz Decl. ¶¶ 74–77, 88–89.  These rules changes, taken together, "confer[] a real and palpable benefit" that warrants settlement approval.  *In re Payment Card*, 827 F.3d at 238.

The rules relief is likewise complemented by interchange rate relief—which, as explained below, could not be awarded following trial—that allows for cost savings and certainty for merchants while the rules changes take hold in the market.  The 125-basis-point cap on standard credit cards (effective for the entire agreement period) is part of a 10-basis-point reduction (effective for five years following settlement approval) in the networks' combined systemwide average effective interchange rate for credit transactions.  Settlement Agreement ¶¶ 48, 50, 97, 99.  Merchants with existing custom interchange rate agreements—negotiated with either network

---

[5]  The 300-basis-point cap would allow merchants to recoup the entire interchange fee amount on the vast majority of transactions.  *See In re Payment Card*, 2024 WL 3236614, at *28 (noting that Visa's and Mastercard's "typical" credit interchange rates are currently "between 200 and 300 basis points"); *see also* Stiglitz Decl. at 19 (Table 1, listing Visa and Mastercard interchange rates by card type as of 2024).

[6]  When previously denying preliminary approval, in addition to highlighting the interplay between the (now completely eliminated) level-playing-field rule and American Express's anti-steering rule (which was upheld by the U.S. Supreme Court), the Court also noted that some merchants operate in states that have statutory restrictions on surcharging.  *In re Payment Card*, 2024 WL 3236614, at *27 n.38.  However, those restrictions would be in place even if Plaintiffs win on surcharging after trial.  And in any event, in addition to providing significant additional forms of relief beyond surcharging relief, the settlement specifically provides for funding dedicated to advising merchants that operate in those states about how to navigate their surcharging and steering options.  Settlement Agreement ¶ 56(f).

based on those merchants' substantial bargaining power—will directly benefit as well, as they will receive a reduction from their custom rate that is proportional to the 10-basis-point reduction in the systemwide average effective rate. *Id.* ¶¶ 49, 98.[7]  Merchants will also benefit from a cap on all published interchange rates for a five-year term. *Id.* ¶¶ 51, 100; Networks' Br. at 25.  These substantial rate-based benefits for all merchants, which are outside the scope of post-trial judicial remedies and thus *exceed* Plaintiffs' best possible recovery at trial, further confirm that the settlement should be approved.

> 2.    *The Objectors' Attempts to Dismiss the Benefits of the Settlement Ignore the Facts and the Law*.

The objectors' attempts to undermine these material benefits are based on distorted views of the facts and the law.  *First*, some objectors claim that it is not realistic for merchants to reject premium consumer credit cards because those cards "account for the large majority of existing consumer transaction volume."  *See, e.g.*, Circle K & NACS Obj. at 11.  That argument is misleading for multiple reasons.

As an initial matter, the argument ignores the tools that merchants will have to shift volume from premium to standard cards—including surcharging premium cards, and utilizing the large delta in the interchange rates associated with premium vs. standard cards to offer discounts to cardholders for using lower-cost cards.  *Supra* § I.B.1.  Further, the objectors also ignore that, according to Plaintiffs' expert, more than 40% of consumer credit cards in circulation are standard cards, Stiglitz Decl. ¶ 88 n.84, meaning many consumers already hold those standard cards and can be incentivized to use them more if merchants find it worthwhile to do so.  The objectors' own

---

[7]    Walmart argues that it "should have the right to decide for itself whether this relief is in its best interest," but there is no authority supporting Walmart's desire for additional special treatment, beyond the relief that the class plaintiffs negotiated for the class and beyond the benefits that Walmart already secures for itself as the largest U.S. merchant.  Walmart Obj. at 18–19.

experts have recognized this reality, arguing that the average cardholder carries multiple cards and can be influenced to use a card that was not their first choice.[8]  To the extent merchants do not want to make use of these tools because it is more profitable to honor cardholder choice and a frictionless checkout process, that would be a result of consumer preference and demand—which the Second Circuit has held is a marker of competition, not evidence of an unlawful exercise of market power.  *United States v. Am. Express Co.*, 838 F.3d 179, 202–03 (2d Cir. 2016).[9]

*Second*, and similarly, now that the networks have agreed to surcharging relief that substantially addresses the Court's concerns with the scope of the prior surcharging relief, the objectors claim that *any* "surcharging and discounting remedies" would "conflict with [their] business model" or are otherwise "inconsistent with [their] business practices."  Walmart Obj. at 2; Circle K & NACS Obj. at 21.  As those objectors describe it, merchants do not want to surcharge (or otherwise steer) because doing so "would be contrary to [those merchants'] brand image" and would "exhaust [those merchants'] goodwill with customers," as "[i]t remains to be seen whether consumers will continue to patronize businesses that impose bespoke surcharges for different cards

---

[8]    ECF No. 8526-17, SJDX 400 (Hausman Rep.) ¶ 338; *see also id.* ¶ 458.  Prof. Hausman's report was filed on behalf of the *7-Eleven* plaintiffs, which include objectors Circle K and NACS.

[9]    In this context, two groups of objectors also mischaracterize Mastercard's CEO's statements on an investor call following the announcement of the settlement.  Circle K & NACS Obj. at 2, 11; NRF & RILA Obj. at 5–6.  Instead of "boast[ing]" that the settlement leaves the Honor-All-Cards rules intact, Mr. Miebach explained that it is in merchants' interests to accept premium cards in order to provide cardholders with "a predictable [shopping] experience" and because those cards bring high-value customers into their stores.  Tr., *Mastercard at KBW Fintech Payments Conference: Strategic Insights and Future Plans* (Nov. 12, 2025), *available at* https://www.investing.com/news/transcripts/mastercard-at-kbw-fintech-payments-conference-strategic-insights-and-future-plans-93CH-4352728.

Mr. Miebach further explained that the settlement's proposed relief as to Honor-All-Cards strikes a "very sensible" balance, as it protects cardholders' "overall user experience" while providing merchants with "more choice on what cards to accept."  *Id.*  To the extent Mr. Miebach represented that he believed the settlement also preserved Mastercard's ability to stay competitive as a four-party network, that is a positive outcome under antitrust law, *not* a reason to reject the proposed settlement.  *See Amex*, 585 U.S. at 551 (upholding challenged practices that "promote interbrand competition").

11

at the point of sale, which would be both a sharp departure from consumer shopping expectations and risk merchants incurring consumer ire."  Walmart Obj. at 10, NRF & RILA Obj. at 8.

Far from being a reason to reject this settlement, those objectors' arguments reveal fundamental defects underlying Plaintiffs' claims, which make *any* recovery (let alone remedies more expansive than those provided by this settlement) uncertain at best.  The networks maintain, and would show at trial, that their current rules do not result in adverse effects on competition and have procompetitive benefits in the two-sided transaction markets, which include both merchants *and* cardholders.  For example, the rules limiting surcharging protect the cardholder experience, resulting in more transactions (higher output) overall, a procompetitive outcome.  The reason some merchants may not want to surcharge (or selectively accept cards) is precisely because steering at the point of sale may be unfriendly to cardholders.  If a merchant decides that a particular practice, like surcharging, is so unfriendly to cardholders that it suppresses output (i.e., results in fewer transactions) and is thus not worth implementing, that is a direct beneficial effect of competition in the two-sided nature of the market.  Nevertheless, the settlement gives merchants the option to make that assessment and to take advantage of rules changes (or threaten to do so[10]) if a merchant concludes that it is net beneficial.

Plaintiffs have strenuously advocated for surcharging relief throughout this matter—and, in reality, the practice is becoming increasingly more popular.[11]  Regardless, to the extent a

---

[10]  Despite what they say now, during the litigation, experts for the objectors posited that merchants would use rules changes to negotiate continued acceptance on better terms, by threatening to take advantage of those changes.  *See* ECF No. 8526-17, SJDX 400 (Hausman Rep.) ¶¶ 348–49 (advocating for merchants' ability to have "the *potential* to" selectively accept certain cards).

[11]  *See* Stiglitz Decl. ¶ 106; Networks' Br. at 25; ECF No. 8526-11, SJDX 386 (Carlton Rep.) at 37 ("Price competition such as surcharging at the point-of-sale is immediate and effective."); *id.* ¶¶ 8, 112–16 (surcharging listed as the first relief sought); ECF No. 8526-19, SJDX 416 (Stiglitz Rep.) ¶¶ 130–33 (same).

particular merchant chooses "not [to] avail herself" of this rule change, that merchant nevertheless can "be deemed to have benefit[ted] from it." *In re Payment Card*, 2024 WL 3236614, at *39 n.53.

The objectors' apparent apprehension about taking advantage of selective acceptance or surcharging at the product level also underscores that the additional relief that some objectors claim they want—the ability to reject or surcharge cards at the issuer level—would cause even more friction and confusion for cardholders and thus would be more difficult for Plaintiffs to obtain at trial. And while some objectors argue that they only need to "credibly threaten" issuers about potentially engaging in surcharging or non-acceptance in order to gain leverage in rate negotiations, *see, e.g.*, Walmart Obj. at 9, that argument extends equally to the forms of surcharging and non-acceptance relief provided by the settlement, which give the objectors leverage in securing benefits from the networks. Indeed, Walmart has been among the most successful in threatening to implement non-acceptance or surcharging following past litigation-based rules changes.[12]

*Third*, the objectors' arguments that the rate relief in the proposed settlement does not go far enough also misses the mark. As a threshold matter, even if Plaintiffs prevail at trial, they

---

[12] Another group of objectors argue that increased options for merchants to discount and steer under this settlement would "allow[] merchants to discriminate against debit cards issued by smaller financial institutions"—since, under the Durbin Amendment, large debit issuers' interchange fees are capped whereas smaller debit issuers were left free to charge higher interchange fees on debit transactions—with the ultimate result of negative impacts on consumers due to "reduce[d] . . . competition in the debit issuance market." ECF No. 9762, American Economic Liberties Project, *et al.*, Obj. at 16–17. This objection makes no sense. It ignores that merchants have been advocating for precisely such an ability to steer to lower-interchange cards in this lawsuit for decades. It also highlights and confirms *the networks' argument* that default interchange, Honor-All-Cards, and anti-discrimination rules are beneficial and essential to healthy competition in the two-sided transaction markets, including because these rules protect small issuers that may lack the leverage and resources to negotiate with and attract merchants and cardholders absent clear and predictable network rules. Networks' Br. at 13–19.

would receive *no* rate relief; the law is clear that courts cannot set or otherwise directly regulate rates. Networks' Br. at 27–28; *see also, e.g.*, *Prentis v. Atlantis Coast Line Co.*, 211 U.S. 210, 226 (1908); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F. 2d 263, 294 (2d Cir. 1979). This is the baseline against which any rate relief must be assessed. Because no rate relief would be available following trial, here the settlement provides *greater* relief than the "best possible recovery" at trial. *In re Payment Card*, 2024 WL 3236614, at *21.

*Lastly*, contrary to the objectors' speculation, the networks cannot and will not circumvent the relief provided in the settlement. The networks and issuers cannot undermine the interchange rate and Honor-All-Cards relief on standard consumer cards by simply re-designating cards from "standard" to "premium." *See, e.g.*, NRF & RILA Obj. at 5. As defined in the settlement, both terms map onto specific card types. Settlement Agreement ¶¶ 1(z), 1(nn). Each network maintains requirements for the rewards levels for premium card types, as they must to attract cardholders and compete with other networks offering premium products.[13] Accordingly, should issuers convert card portfolios from standard to premium, they will have to meet these requirements and fund the corresponding rewards. The suggestion that converting cards to premium constitutes a windfall for issuers thus makes no sense.

Equally importantly, the argument ignores that it is up to merchants, with the tools the settlement makes available to them, to incent the use and thus the issuance of standard cards. In other words, the settlement gives merchants the tools they need to drive consumer demand for standard cards, which will ensure that issuers will continue to provide them. *See* Stiglitz Decl. ¶¶ 88–89. Additionally, given that the settlement imposes a limit on the systemwide average

---

[13]   ECF Nos. 8068, 8262, Defs.' 56.1 in Supp. of Summ. J. Mot. ¶¶ 170–77; ECF No. 8539-7, SJDX 1232 (Murphy Rep.) ¶¶ 78–82.

effective credit interchange rate, which will be volume-weighted, if premium transaction volume grows, the networks will have to further reduce these or other interchange rates to stay below the rate cap. *See* Settlement Agreement ¶¶ 48, 51, 97, 99. These terms, taken together, ensure that the merchants' benefits from the interchange rate relief will not be circumvented.

Contrary to the objections, moreover, the networks also have no incentive to increase network fees to recoup decreases in interchange fees "to benefit their own bottom lines," Walmart Obj. at 12–13. Networks do not receive interchange fees—issuers do—so there are no interchange fee losses for the networks to recoup. If the claim is that the networks could increase network fees and then pass on the difference to issuers to make up for reduced interchange, *see, e.g.*, NRF & RILA Obj. at 7–8, that is also wrong. The settlement dictates that the networks cannot "defeat the benefits that merchants receive" from the settlement, including by "increasing other network fees or Merchant Fees to restore the revenues that issuers lost from the interchange commitments herein." Settlement Agreement ¶¶ 54, 103. The Settlement Agreement also includes specific mechanisms for class counsel to monitor and enforce the interchange reductions, with oversight by the Court. *See id.* ¶¶ 1(p), 48, 52–53, 97, 101–02, 140 (discussing Independent Auditor).

The settlement likewise prohibits the networks from circumventing any rules relief by "target[ing]" or "penaliz[ing]" any merchant for utilizing the non-acceptance or surcharging options made available under the settlement. This again confirms that the objectors' speculation about the "loophole[s]" of the settlement is unfounded. *Compare* American Economic Liberties Project, *et al.*, Obj. at 14–15, *with* Settlement Agreement ¶¶ 30, 43(f), 79, 92(f).

*       *       *

For some of the objectors, nothing short of dismantling the Visa and Mastercard networks and the foundations on which they were built—including repealing the Honor-All-Cards rules at

15

the issuer level (relief for which Plaintiffs do not even advocate[14]), and abolishing the setting of default interchange—would be sufficient.  *See, e.g.*, Circle K & NACS Obj. at 1, 4, Walmart Obj. at 6–7.  Those are not—and cannot be—the standards for settlement approval.  *In re Payment Card*, 2024 WL 3236614, at *28 n.40.  What matters instead is that the proposed settlement grants significant, immediate relief to merchants that compares favorably to Plaintiffs' best possible recovery at trial, while addressing the Second Circuit's and this Court's concerns about prior settlements, including by providing major concessions on Honor-All-Cards, completely eliminating the level-playing-field restrictions on surcharging, and ensuring that the interchange rate relief is complementary to the rules concessions and benefits both large and small merchants.  Networks' Br. at 6–7, 23–25, 29; *In re Payment Card*, 2024 WL 3236614, at *26–27; Orenstein Decl. ¶¶ 6, 14–18.  The settlement thus merits preliminary approval.

### C.    The Other Applicable Factors Also Confirm That Preliminary Approval Is Warranted.

As shown in the networks' opening brief, the two other *Grinnell* factors that the Court previously found to weigh against approval of the 2024 settlement now both counsel in favor of approval—namely, Visa and Mastercard likely could not "withstand a substantially greater judgment" after trial, and the settlement treats all merchant class members equitably relative to each other.  Networks' Br. at 29–32.   The objectors raise no meaningful argument on the first point—nor could they, given that the core rules the settlement maintains are ones that underlie the networks' ability to facilitate commerce and to compete against other payment brands and payment forms to provide value to network participants.  *Id.* at 30–32.  The objectors' argument on the second point, that the settlement does not treat class members equitably, is without merit.

---

[14]    Plaintiffs' expert does not propose a full-scale repeal of the Honor-All-Cards rules, only that they be relaxed for "large banks" and in states where surcharging is prohibited.  ECF No. 8526-19, SJDX 416 (Stiglitz Rep.) ¶¶ 7.R, 134–35.

In particular, Walmart repeats its previous objection that the settlement "treats large national merchants inequitably relative to small local merchants," citing to the Court's criticisms of the 2024 settlement for its focus on surcharging relief. Walmart Obj. at 2, 4–5, 18–19. But that argument cannot be squared with the additional, broader relief offered in the current settlement. Like small merchants, large merchants will now enjoy substantial interchange rate reductions across standard credit transactions (as well as additional rate reductions for those large merchants that already have negotiated rate deals). Settlement Agreement ¶¶ 49, 98. Large merchants will also be able to reject premium consumer credit cards or commercial cards or both, the two credit card categories typically associated with higher interchange fees, or to steer customers away from using those cards—or to use their own substantial purchase volume and the threat of implementing those tools to negotiate concessions from the networks. Stiglitz Decl. ¶¶ 8–9, 60–72, 87–89. And large merchants will be able to test non-acceptance and steering options through more flexible pilot programs at a portion of their locations. Settlement Agreement ¶¶ 32, 81.

As explained above, regardless of whether large merchants avail themselves of these tools or not—depending on which action is most profit-maximizing for them—"[a] Rule 23(b)(2) class member need not avail herself of the benefit of a settlement to be deemed to have benefit[ted] from it." *In re Payment Card*, 2024 WL 3236614, at *39 n.53.

## II.    <u>The Court Properly Certified a Mandatory Class and Should Not Permit Opt-Outs</u>.

This Court properly certified a mandatory Rule 23(b)(2) class and has repeatedly reaffirmed that decision. The objectors nevertheless again seek opt-out rights based on arguments already considered and rejected—namely, that (i) their interests were not adequately represented, and (ii) a mandatory class violates due process. Walmart Obj. at 24–26; NRF & RILA Obj. at 10–12; Circle K & NACS Obj. at 22–24; *see also* ECF No. 9726, 7-Eleven Pls.' Resp. at 2. Neither of these arguments provides any valid justification for reversing course.

17

In 2021, this Court certified an injunctive relief class without opt-out rights, reasoning that "[d]ue to the nature of the relief being sought, all merchants—regardless of whether they would choose to opt out of the class or not—would benefit from the equitable relief provided." *DDMB*, 2021 WL 6221326, at *48. The Court explained that "[t]he key to the (b)(2) class is the 'indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Id.* (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011)). Here, where the relief sought is changes to Visa's and Mastercard's network rules—applicable to *all* merchants—a mandatory class is the proper procedural vehicle. *Id.* at *44–45. Importantly, the Court arrived at this conclusion after considering the same arguments, raised by many of the same objectors, that are now again before the Court.[15] *Id.* at *46–47.

Although the Court rejected the proposed 2024 settlement, it explicitly disagreed with the argument, raised by many of the same objectors, that the mandatory nature of the (b)(2) class should be modified to permit opt-out rights:[16] "All class members have the same interests to eliminate the rules that permit Defendants to maintain" what the objectors and class plaintiffs argue are "supracompetitive interchange fees." *In re Payment Card*, 2024 WL 3236614, at *17. Further, in response to the networks' concern that certain individual plaintiffs would seek equitable relief while pursuing their damages claims upon remand from MDL 1720, this Court reiterated that all merchant-plaintiffs "remain members of the certified Rule 23(b)(2) Class and will be bound by

---

[15] *See, e.g.*, ECF No. 8465, Ex. A to Decl. of Paul H. Schoeman (Walmart Memo. in Opp'n to Equitable Relief Pls.' Mot. for Class Cert.) at 20; ECF No. 8450, Direct Action Pls.' Memo. in Opp'n to Equitable Relief Pls.' Mot. for Class Cert. at 23; ECF No. 8468-1, Ex. 1 to Decl. of Debra L. Greenberger (Merchant Trade Groups' Memo. in Opp'n to Equitable Relief Class Pls.' Mot. for Class Cert.) at 7.

[16] ECF No. 9225, Walmart Obj. to 2024 Settlement at 10–11; ECF No. 9222, NRF & RILA Obj. to 2024 Settlement at 4; *see also* ECF No. 9224, 7-Eleven Pls.' Obj. to 2024 Settlement at 27.

this Court's judgments and orders with respect to the Class," such that those plaintiffs cannot "seek an inconsistent judgment [as to injunctive relief] in another jurisdiction." *In re Payment Card*, 2024 WL 3161774, at *5 (E.D.N.Y. June 25, 2024). The Court's prior reasoning is consistent with the established law of this Circuit, and there is no reason to depart from it. *See, e.g.*, *In re Vitamin C. Antitrust Litig.*, 279 F.R.D. 90, 115 (E.D.N.Y. 2012) ("Rule 23(b)(2) does not provide an opportunity for class members to opt out.").

Class members' interests have not changed since the Court's prior decisions, and the proposed settlement, if approved, would provide "indivisible" relief to be implemented with a single injunction ordering class-wide remedies. This Court should therefore again "decline[] to grant an opt-out right from the Rule 23(b)(2) class" because adequate representation "obviates the need for [doing so]," and because the mandatory nature of the class is consistent with due process. *DDMB*, 2021 WL 6221326, at *47; *In re Payment Card*, 2024 WL 3236614, at *17.

## A.    Class Members Are Adequately Represented.

There are no concerns regarding adequacy of representation that warrant permitting opt-outs from a mandatory class. This Court has explained that "[d]etermination of adequacy typically 'entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'" *In re Payment Card*, 2024 WL 3236614, at *15 (citations omitted); *see also DDMB*, 2021 WL 6221326, at *19–24, *37–38. Nothing has changed since this Court previously applied this test and twice held that the Rule 23(b)(2) class here is adequately represented by the class plaintiffs and counsel—other than the fact that, in response to the Court's prior concerns as to the substance of the 2024 settlement, class counsel negotiated a more sweeping settlement that provides additional and deeper relief to merchants. The objectors' attempts to retread the same ground do not justify revisiting this result.

First, the objectors offer no reason to revisit this Court's finding of no intra-class conflict. "Notwithstanding the many differences between small, local and large, national merchants, *all* Plaintiffs seek the same type of redress for the same type of harms." *In re Payment Card*, 2024 WL 3236614, at *17. The objectors cannot and do not meaningfully dispute this conclusion. For example, Walmart admits that it is possible to secure relief "that will benefit *all* merchants—both large and small, in-store and online—in the United States"; it just (mistakenly) believes that Walmart is best positioned among all merchants to define and secure that relief. ECF No. 9729-2, Ex. A to Walmart Obj. at 3. Walmart's disagreement with class counsel's strategic judgments does not create an intra-class conflict. As this Court previously explained, the "decision to reach a settlement on the proposed terms represents a difference in litigation strategy that does not amount to a fundamental conflict of interest and does not render Class Plaintiffs inadequate to represent the class." *In re Payment Card*, 2024 WL 3236614, at *19.

This Court also has twice examined class counsel's representation of the class and found that "Class Counsel ably briefed oppositions to several *Daubert* and summary judgment motions, which were largely decided in favor of the Rule 23(b)(2) Class," and "actively worked on behalf of the Class in its extensive negotiations to reach" the 2024 settlement. *Id.* (citing *DDMB*, 2021 WL 6221326, at *37). With respect to the latest round of negotiations, the Honorable James Orenstein, who presided over this litigation for 15 years before his retirement as a magistrate judge, attested "without reservation" that the Rule 23(b)(2) class was "represented throughout this process by exceptionally experienced and qualified" counsel who advocated "strongly" for the class's interests. Orenstein Decl. ¶¶ 15, 19. At bottom, the objectors' complaints about class counsel's representation of the class are the same misguided objections that they make to the

adequacy of the proposed settlement, repackaged in a procedural light.  Section I above explains why these objections are meritless.

In addition, Walmart's argument that it should be allowed to opt out because it did not individually participate in the mediation is baseless.  Walmart Obj. at 5.[17]  Walmart's participation is not a prerequisite to approving a class settlement, just as its disagreement with class counsel's litigation strategy is not a reason to find intra-class conflict.  Walmart's interests were adequately represented by class counsel, Orenstein Decl. ¶¶ 12–19—and, to the extent it disagrees with the outcome, it will be fully heard by this Court through the settlement approval process.  Nothing more is required.  Indeed, if every individual merchant in this nationwide class must participate in every litigation and settlement decision made by class counsel, the entire purpose of 23(b)(2) classes would be destroyed.  *Cf.* Fed. R. Civ. P. 23(e), advisory committee's note to 2003 Amendment (noting that Rule 23(e)'s notice requirements and settlement approval process are designed "to assure adequate representation of class members who have *not participated* in shaping the settlement" (emphasis added)).

This Court has previously concluded twice that all the class representatives and class members "have the same incentive to obtain relief from the challenged rules," and that "the class representatives and class counsel have adequately represented the class."  *In re Payment Card*, 2024 WL 3236614, at *15–16.  The Court should reach the same conclusion now.

**B.    Due Process Does Not Require Opt-Out Rights Here**.

Some objectors erroneously argue that "due process requires a right to opt out of *all* class actions" and that "[t]here is a special need for opt-out here, where the proposed settlement fails to

---

[17]    A few merchants submitted similar boilerplate objections claiming that Rule 23(b)(2) class counsel "did not coordinate with . . . the vast majority of merchants."  *See, e.g.*, ECF No. 9736, ABC Stores Obj. at 2; ECF No. 9720, Energy Marketers of America Obj. at 3.

provide the core relief that [the objectors] have sought."  Circle K & NACS Obj. at 23.  Other objectors argue that "[d]ue process requires notice and opt-out rights to be given where a class seeks monetary relief," and that "the injunctive relief here is effectively monetary."  Walmart Obj. at 25; *accord* NRF & RILA Obj. at 11.  Both arguments, from many of the same objectors, were already rejected by this Court and should be rejected again.

The Court's certification of a mandatory class is consistent with the Supreme Court's holdings that "[Rule 23](b)(2) does not require that class members be given . . . opt out rights," and that this complies with due process. *Dukes*, 564 U.S. at 363.  The denial of opt-out rights is particularly warranted where, as here, merchants challenge uniformly applicable rules, and individual suits may result in inconsistent injunctions. *DDMB*, 2021 WL 6221326, at *46–49. Further, permitting opt-out rights in this context would discourage settlements, as defendants "will not agree to settlements like this one if they cannot buy something approaching global peace." *Id.* at *49 (quoting *Berry v. Schulman*, 807 F.3d 600, 613 (4th Cir. 2015)).

This Court likewise previously rejected the argument that the proposed 2024 settlement provided "monetary relief" requiring opt-out rights, and should do so again here.  While the 2024 settlement, like this one, included prospective interchange rate caps and reductions with an easily quantifiable value (alongside several other rules reforms), this was still prospective relief and not "individualized monetary relief."  *In re Payment Card*, 2024 WL 3236614, at *18.  As the Court explained, "[w]hile it is possible to ascribe a dollar value to nearly any form of injunctive relief, the ability to do so does not transform it *ipso facto* into monetary relief." *Id.*

Walmart also cites *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 857 (1999), arguing that a mandatory class action is inappropriate because "large national merchants and small local merchants have claims of vastly different value [or] are differently impacted by Defendants'

22

conduct." Walmart Obj. at 18, 21 (citations omitted). However, this Court already concluded that "the issues that motivated the Supreme Court[] in *Ortiz* are not present in this case: this settlement does not involve (1) monetary damages in (2) a Rule 23(b)(1) action where (3) the class will make claims against a 'limited fund.'" *In re Payment Card*, 2024 WL 3236614, at *18. That remains true.

### III. **The Release Is Appropriately Limited**.

Some objectors argue, as they have before, that the release in the proposed settlement is improperly broad as to the substance it covers and how long it extends. Both arguments are wrong and ignore that both the Second Circuit and this Court have rejected them. *Fikes*, 62 F.4th at 714–15, 720; *In re Payment Card*, 2024 WL 3236614, at *34. The release is appropriately narrow because it is limited by the identical factual predicate doctrine and because it will extend approximately eight years after final approval, no longer than the settlement's substantial rules reforms will be in effect.

> **A. The Release Is Limited by the Identical Factual Predicate Doctrine and Limited to the Time Period of the Relief; Further Questions About Its Scope Are Premature**.
>
> *1. The Substantive Scope of the Release Is Proper*.

Some objectors argue that the release "is [v]irtually [l]imitless in [s]cope" and would "insulate[] Defendants from any future litigation . . . no matter how distant from the allegations in the complaint." NRF & RILA Obj. at 12–13. As some of these objectors expressly admit, *see* Walmart Obj. at 16, these same objections were made in response to the substantively identical releases contained in prior proposed settlements, which both the Second Circuit and this Court have approved. Specifically, as with the proposed 2024 settlement and the Rule 23(b)(3) settlement that this Court approved in 2019 and the Second Circuit upheld in 2023, the release here is limited by the identical factual predicate doctrine, which will apply in any future disputes about

its scope. The release thus comports with established law and does not need to be modified, and this Court need not and should not resolve its precise contours as part of settlement approval proceedings.

Under the identical factual predicate doctrine, "[c]lass actions may release claims, even if not pled, when such claims arise out of the same factual predicate as settled class claims." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 108 (2d Cir. 2005).[18] This should end the inquiry here, where the settlement expressly provides that its "release shall extend to, but only to, the fullest extent permitted by federal law." Settlement Agreement ¶ 116(a). This Court and the Second Circuit approved the identical language in the Rule 23(b)(3) release as comporting with the identical factual predicate doctrine. *Fikes*, 62 F.4th at 714–15, 720; *In re Payment Card*, 2019 WL 6875472, at *22–26 (E.D.N.Y. Dec. 16, 2019). This Court did the same when finding that the proposed 2024 settlement's release was not overly broad, "because it [was] constrained by the 'identical factual predicate' test," and thus did "not impermissibly cover future violations of the antitrust laws." *In re Payment Card*, 2024 WL 3236614, at *34 (citation omitted). The same is true here.

Importantly, in evaluating objections to the release in the 2024 proposed settlement, this Court concluded that a "holding as to the proper scope of the release . . . can await a case in which the issue would directly affect the proceedings." *Id.* (citation omitted). The Second Circuit (and this Court) handled concerns about future applications of the Rule 23(b)(3) release the same way, determining that, in approving the settlement, the court had "no occasion to decide these questions." *Fikes*, 62 F.4th at 720. This approach is consistent with the fundamental principle that

---

[18] The doctrine applies in the context of class actions under both Rule 23(b)(2) and Rule 23(b)(3). *See In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070, 1084, 1090–91 (11th Cir. 2023) (applying the identical factual predicate doctrine to a settlement agreement covering both a Rule 23(b)(2) and a Rule 23(b)(3) class).

a court does not predetermine the preclusive effect of its own judgment; those questions are left to subsequent proceedings where the judgment is enforced. *See, e.g.*, *McAdams v. Robinson*, 26 F.4th 149, 160–61 (4th Cir. 2022) (explaining that predetermining the "outer limit of the release's scope" in response to an objection to a class settlement "would be advisory"); Fed. R. Civ. P. 23(c)(3) advisory committee's note to 1966 amendment ("[T]he court conducting the [Rule 23] action cannot predetermine the *res judicata* effect of the judgment; this can be tested only in a subsequent action.").

2.    *The Release's Time Limitation Is Proper*.

Some objectors also note that the release may extend a few years longer than the prior proposed release (up to five years after all appeals from final approval are resolved, or eight years after final approval, whichever is longer, *see* Settlement Agreement ¶ 116(a)).  Walmart Obj. at 16; *accord* Circle K & NACS Obj. at 26; NRF & RILA Obj. at 12–13.  But, as this Court explained, the law does not limit "how far into the future claims can be released, as long as the" release is limited by the identical factual predicate doctrine, as it is here.  *In re Payment Card*, 2024 WL 3236614, at *33.  In any event, the eight-year release addresses the Second Circuit's previous concern when it rejected a proposed combined Rule 23(b)(2) and Rule 23(b)(3) class settlement that would have released claims from all merchants that accept Visa or Mastercard cards in the future "onwards" and "forever."  *In re Payment Card*, 827 F.3d at 229, 239.  It also heeds this Court's direction in 2024, where it noted that the release's scope should exclude merchants that accept Visa or Mastercard cards *after* the date of preliminary approval but before final approval, as these merchants were "future class members" that did not belong to the class as of the time of preliminary approval.  *In re Payment Card*, 2024 WL 3236614, at *35.  Here, the release does not apply to merchants that begin accepting Visa or Mastercard cards only after preliminary approval. Settlement Agreement ¶ 1(ff).

The objectors also argue that the release is unenforceable because it does not protect class members from future effects of the continuation of substantially similar conduct. *See* Circle K & NACS Obj. at 24–27; NRF & RILA Obj. at 13; Walmart Obj. at 14–16. But these objectors erroneously rely on authority addressing contracts prospectively waiving antitrust claims. *See, e.g.*, *In re Am. Express Merchs.' Litig.*, 634 F.3d 187, 189 (2d Cir. 2011) ("[T]he only issue before us is the narrow question of whether the class action waiver provision contained in the contract between the parties should be enforced."); *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 896 n.27 (3d Cir. 1975).[19] These cases do not address releases in class settlement agreements or waivers regarding future antitrust violations under the factual predicate doctrine. They thus have no applicability here. Accordingly, this Court previously rejected these same arguments in 2024, recognizing that settlement releases constrained by the identical factual predicate doctrine are acceptable "where the future claims release[d] are those based on a continuation of conduct at issue and underlying the original claims." *In re Payment Card*, 2024 WL 3236614, at *34 (citation omitted).[20]

---

[19] The objectors further note that in *Lawlor v. National Screen Service Corp.*, 349 U.S. 322 (1955), the Supreme Court suggested that "a partial immunity from civil liability for future violations" would be "consistent with neither the antitrust laws nor the doctrine of res judicata." *Id.* at 329. But in *Lawlor*, the Supreme Court declined to apply *res judicata* to bar claims based on the conduct there because—unlike the continuing conduct released in this case—it was *different* conduct "all subsequent to the . . . judgment," "which did not even then exist and which could not possibly have been sued upon in the previous case." *Id.* at 328.

[20] *See also In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 248 (2d Cir. 2011) (finding objectors' argument that the release impermissibly released future conduct "unavailing," because the released future conduct fell "squarely within the factual predicate underlying . . . claims"); *In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th at 1088 (finding that "releases of future claims are an important part of many [antitrust] settlement agreements" and such "releases are commonly approved and enforced in class actions" (citing *Walmart*, 396 F.3d at 106)); *see also id.* at 1089–90 (explaining that while perpetual releases of *per se* violations might be overly broad, the same concern does not apply when the alleged underlying antitrust violations are governed by the rule of reason); *cf. In re Payment Card*, 714 F. Supp. 3d 65, 88–89 (E.D.N.Y. 2024) (finding that the conduct challenged in MDL 1720 is governed by the rule of reason).

**B.     The Release Does Not Interfere with the *Old Jericho* Plaintiffs' Damages Claims**.

Plaintiffs in the *Old Jericho* damages action—branded gas retailers seeking damages in *Illinois Brick* repealer states—filed a limited-scope objection arguing that the release may be interpreted as interfering with their damages claims.  ECF No. 9725, Old Jericho Pls.' Obj. at 1–4.  Their concern is without merit.  The proposed release states that it "shall not release" claims "seeking monetary damages."  Settlement Agreement ¶ 119(c).  And to the extent the proposed preliminary approval order stays aspects of other actions, the stay applies only "to the extent that [other plaintiffs] seek declaratory, injunctive, or equitable relief against the Defendants that is being released."  *Id.* ¶ 126(d); *accord* ECF No. 9692-23, Proposed Class Settlement Notice & Scheduling Order ¶ 21.  The stay provision allows damages claims to proceed, as this Court has previously held.  *See In re Payment Card*, 2024 WL 3236614, at *39 n.54 (citing ECF No. 9330, Hr'g Tr. at 47:6–12, 55:17–56:7 (June 13, 2024)); *see also* 7-Eleven Pls.' Resp. at 3–4 (acknowledging this Court's prior holding that the release does "not apply to damages claims").

## IV.     The *Visa Debit* Objectors' Arguments Are Without Merit.[21]

The *Visa Debit* objectors are six named "Merchant Plaintiffs in the *Debit Card Litigation* . . . pending before Judge Koeltl in the Southern District of New York," a private copycat case to an action filed in the fall of 2024 by the Department of Justice ("DOJ") alleging monopolization of debit markets.  *See* ECF No. 9728, *Visa Debit* Obj. at 2.[22]  These six merchants assert that the Rule 23(b)(2) class "cannot be certified," because the Rule 23(b)(2) class

---

[21]   This section is Visa's alone; Mastercard does not join it.

[22]   Because no class has been certified in the *Visa Debit* action, the *Visa Debit* objectors are just the six merchants named as plaintiffs in the *Visa Debit* complaint.  *See Visa Debit*, No. 24-cv-7435 (S.D.N.Y.), ECF No. 38, Consolidated Class Action Compl. (hereinafter the "*Debit* Compl.") ¶¶ 27–32.  A seventh merchant plaintiff, R&N Productions LLC d/b/a SewRobQnE, dismissed its claims and thus is not an objector.  *See Visa Debit*, No. 24-cv-7435 (S.D.N.Y.), ECF No. 176, Notice of Withdrawal.

representatives and counsel failed to adequately develop claims against Visa's conduct in a debit market. *Id.* at 2–3, 9–11. These objectors also argue that the settlement lacks any debit-related relief, *id.* at 3, 5–8, and seek a carveout from the release to "exclude all forms of equitable relief that overlap with or are currently being pursued in the *Debit Card Litigation*." *Id.* at 12–13. These arguments are baseless.

A.    **The *Visa Debit* Objectors Ignore This Court's Prior Decisions Pertaining to Class Certification and Adequacy of Representation**.

The *Visa Debit* objectors assert that the Rule 23(b)(2) class "cannot be certified" because the Rule 23(b)(2) class representatives and counsel "did not meaningfully pursue" their alleged debit-market monopolization theory by "developing the expert and factual record necessary to support it" past summary judgment. *Visa Debit* Obj. at 2–3, 9–10. The *Visa Debit* objectors thus criticize the Rule 23(b)(2) class's pursuit of this theory over the course of many years, yet separately concede they had no concerns with Visa's debit practices prior to the filing of their *Visa Debit* complaint in the fall of 2024.[23]

The *Visa Debit* objectors have no basis to assert that the Rule 23(b)(2) class did not meaningfully pursue a debit monopolization theory against Visa. The Rule 23(b)(2) plaintiffs' complaint alleged, among other theories, that Visa monopolized a debit market and sought specifically to "enjoin Visa's FANF [Fixed Acquirer Network Fee]," which *Visa Debit* objectors now say is "at the center of" their concerns. *Compare* ECF Nos. 6892, 6910, Equitable Relief Class Action Compl. ¶¶ 414–18 (Ninth Claim for Relief) & Prayer for Relief ¶ D, *with Visa Debit* Obj. at 1–2. The Rule 23(b)(2) plaintiffs actively developed this theory through fact and expert discovery, alongside other MDL 1720 plaintiffs (certain "Direct Action Plaintiffs") who

---

[23]    The *Visa Debit* objectors' complaint alleges that, prior to the fall of 2024, they had no understanding that any of Visa's debit practices were potentially "anticompetitive." *Debit* Compl. ¶ 231.

prosecuted their own debit monopolization claims against Visa beginning as far back as 2013.  *See, e.g.*, *7-Eleven, Inc. v. Visa Inc.*, No. 13-cv-5746 (E.D.N.Y.), ECF No. 1, Compl. ¶¶ 239–54 (Ninth through Eleventh Claims for Relief), Prayer for Relief ¶ C ("enjoin Visa's FANF"); *The Home Depot, Inc. v. Visa Inc.*, No. 16-cv-5507 (E.D.N.Y), ECF No. 1, Compl. ¶¶ 261–76 (Counts 9 through 11), Prayer for Relief ¶ C ("enjoin Visa's FANF").  Indeed, as this Court found at summary judgment, and contrary to *Visa Debit* objectors' assertions (*Visa Debit* Obj. at 10), the Rule 23(b)(2) class marshalled "much of the same evidence" as those Direct Action Plaintiffs with respect to Visa's debit-related "post-Durbin Amendment conduct."  *In re Payment Card*, 729 F. Supp. 3d 298, 337 (E.D.N.Y. 2024).

Ignoring this history, the *Visa Debit* objectors now argue that the Rule 23(b)(2) class "cannot be certified."  *Visa Debit* Obj. at 9.  But none of these six merchants objected in 2021, when the Court certified the non-opt-out Rule 23(b)(2) class consisting of all "entities that accept Visa and/or Mastercard credit and/or debit cards in the United States," *DDMB*, 2021 WL 6221326, at *50, which included the *Visa Debit* objectors.  At that time, the Court overruled objections from Direct Action Plaintiffs—including those who had brought their own debit monopolization claims against Visa—who sought to opt out of the Rule 23(b)(2) class, defeat class certification, and carve out their own equitable relief claims.  *See id.* at *46–49.  As discussed above, the Court explained that the class representatives and the Direct Action Plaintiffs (and other class members) were "similarly incentivized to prove the defendants' liability under antitrust law."  *Id.* at *20.

Given the Court's refusal to allow exceptions for Direct Action Plaintiffs who had been litigating Visa's practices in alleged debit markets for years, there is no justification for giving special treatment to the last-in-time filers who are admittedly *less informed* about Visa's debit practices than other merchants in the Rule 23(b)(2) class.  *See supra* § II.  The Johnny-come-lately

complaint by these six merchants should not upend the Court's prior certification and adequacy of representation decisions or thwart this Rule 23(b)(2) settlement that will bring to close decades of litigation relating to Visa's payment card practices for millions of merchants. That is especially so as the *Visa Debit* objectors affirmatively allege in their complaint that all merchants that incur Visa debit fees "are similarly affected" and their "interests are coincident with and typical of, and not antagonistic to, those of the other members of the [putative] Class." *Debit* Compl. ¶¶ 244–45.

The *Visa Debit* objectors also emphasize that the Rule 23(b)(2) plaintiffs' debit monopolization claim did not survive summary judgment. *Visa Debit* Obj. at 3, 10–11. But the *Visa Debit* objectors cite no authority to support the notion that losing a dispositive motion could defeat adequacy of representation under Rule 23. Nor could they, given that it would doom their own ability to represent the putative class in their separate action.[24] Critically, moreover, the Court had already issued its summary judgment ruling against the Rule 23(b)(2) plaintiffs' debit monopolization claim when, in 2024, it praised the quality of class counsel's representation, noting that summary judgment motions were "*largely* decided in [their] favor" and finding that "nothing has cast doubt on Class Counsel's ability to adequately represent the Class." *In re Payment Card*, 2024 WL 3236614, at *19 (emphasis added). The *Visa Debit* objectors ignore this conclusion by the Court, which applies equally now.[25]

---

[24] The *Visa Debit* plaintiffs lost the putative class's damages claims in approximately half of states when Judge Koeltl dismissed their Sherman Act damages claims under *Illinois Brick*. *See In re Visa Debit Card Antitrust Litig.*, 2025 WL 3019893, at *10 (S.D.N.Y. Oct. 28, 2025).

[25] The *Visa Debit* objectors contrast the *7-Eleven* Plaintiffs' survival of summary judgment on their debit monopolization claim with the Rule 23(b)(2) plaintiffs' loss. *Visa Debit* Obj. at 9–10. The Court's summary judgment decision concluded that *7-Eleven* Plaintiffs adduced sufficient evidence that Visa's challenged debit-related conduct may have harmed the *7-Eleven* Plaintiffs individually for purposes of their *individual damages claims*, whereas the Rule 23(b)(2) class did not have sufficient evidence to show a violation warranting forward-looking *injunctive relief for the class as a whole*. *In re Payment Card*, 729 F. Supp. 3d at 311–12, 325–27, 337. That does nothing to undermine the Court's separate (and repeated) conclusion that the Rule 23(b)(2) class was adequately represented.

**B.  The *Visa Debit* Objectors' Preference for Different Forms of Injunctive Relief Is Not a Valid Objection to Approval**.

The *Visa Debit* objectors further try to challenge the adequacy of representation by misrepresenting the relief provided by the settlement and by questioning the strategic judgments of the class representatives and counsel.  These arguments fail.  The objectors' assertion that the settlement gives them "nothing," *Visa Debit* Obj. at 9, is obviously false.  These six merchants cannot dispute that they will benefit from credit-related relief as acceptors of Visa credit cards.  Indeed, the settlement will give ***all*** class members—including the six *Visa Debit* objectors—the same wide range of options to lower their cost of accepting Visa-branded payment cards.

The *Visa Debit* objectors also incorrectly argue that the settlement releases debit-related conduct while "providing no debit-related relief."  *Id.* at 8.  That is also demonstrably wrong.  The proposed settlement provides the Rule 23(b)(2) class with multiple forms of relief related to debit, including for example:

- Modifications to Visa's "no discounting" and "non discrimination" rules to permit discounts that vary by the issuing financial institution of Visa-Branded Debit Cards. Settlement Agreement ¶¶ 18–19.

- Modifications to Visa's "Honor All Cards" rules to permit merchants to accept or decline acceptance of (i) all Visa-Branded Debit Cards, (ii) all Visa-Branded Commercial Credit Cards, (iii) all Visa-Branded Standard Consumer Credit Cards, and/or (iv) all Visa-Branded Premium Consumer Credit Cards. *Id.* ¶¶ 21–22.

- Modifications to Visa's "All Outlets" rules to permit a merchant to make different acceptance decisions regarding Visa-Branded Cards of a particular product category (including Visa-Branded Debit Cards) for outlets that operate under a different trade name or banner. *Id.* ¶ 31.

- Modifications to Visa's "All Outlets" Rules to permit a merchant to pilot declining acceptance of (i) all "Visa POS Debit Devices," (ii) all Visa-Branded Debit Cards, (iii) all Visa-Branded Commercial Credit Cards, (iv) all Visa-Branded Standard Consumer Credit Cards, and/or (v) all Visa-Branded Premium Consumer Credit Cards, at some but not all outlets that operate under the same trade name or banner in the United States. *Id.* ¶ 32.

- Modifications to Visa's "Honor All Wallets" requirement to permit merchants to accept some digital wallets (which could include Visa-Branded Debit Cards) at brick-and-mortar locations, but decline others. *Id.* ¶¶ 34–38.[26]

- Modification of Visa's rules concerning "Merchant Buying Groups" to permit merchants to form buying groups to negotiate merchant fees related to both credit and debit cards. *Id.* ¶¶ 44–47.

- Establishment of the "Merchant Education Program" to include information about the benefits of the settlement agreement and steering to reduce costs of acceptance, including as to debit cards. *Id.* ¶ 56.

- Extension of Visa's consent decree with the DOJ related to both credit and debit cards. *Id.* ¶ 18.

The *Visa Debit* objectors ignore all of these terms.

Ultimately, the six *Visa Debit* objectors would prefer a settlement with more relief related to debit cards. But, as discussed above, and as this Court explained in connection with the prior 2024 settlement, the Rule 23(b)(2) "Plaintiffs' decision to reach a settlement on the proposed terms" that may be different than what objectors may have sought "represents a difference in litigation strategy that does not amount to a fundamental conflict of interest and does not render Class Plaintiffs inadequate to represent the class." *In re Payment Card*, 2024 WL 3236614, at *19; *see also DDMB*, 2021 WL 6221326, at *23 ("a different perspective on the specific form of injunctive relief" does "not constitute a conflict sufficient to defeat adequacy of representation"). That continues to be true now.

Indeed, a settlement focused on rules relief pertaining to credit cards—typically a more costly aspect of merchants' overall payment acceptance costs than debit cards—is neither

---

[26] The *Visa Debit* objectors also distort the settlement by asserting that it "forecloses rigorous judicial oversight." *Visa Debit* Obj. at 11–12. The settlement expressly calls for the Court to receive relevant information, and authorizes the Court to take steps to implement, administer, and enforce the settlement. *See, e.g.*, Settlement Agreement ¶¶ 101–02, 139–40.

unreasonable nor unfair.[27]  Nor is it unreasonable or unfair for the class settlement to reflect the different and changing regulatory environment as to debit,[28] as this Court previously recognized in approving the settlement of the damages class.  *See In re Payment Card*, 330 F.R.D. 11, 39 (E.D.N.Y. 2019) (reasoning that the Durbin Amendment's regulatory changes introduced additional debit-related litigation risk and weighed in favor of granting final approval of the Rule 23(b)(3) class settlement).  That reasoning applies even more strongly to forward-looking injunctive relief claims.

The summary judgment ruling against the Rule 23(b)(2) class on debit monopolization also supports the settlement's focus on credit relief.  Courts consider adverse outcomes on dispositive motions in finding reduced relief in a settlement to be fair and reasonable.  *See, e.g.*, *Grinnell Corp.*, 495 F.2d at 460–61 (holding the "base liability figure against which the District Court measured the settlement offer was in all respects . . . adequate and fair," in part, because of the operation of the summary judgment ruling on the possibility of recovery at trial); *Glover v. Conn. Gen. Life Ins. Co.*, 2024 WL 4036721, at *10 (D. Conn. Sept. 4, 2024) (considering actual "summary judgment ruling" in assessing *Grinnell Corp.* factors including possible recovery at trial in light of litigation risks).  In short, compromising equitable relief claims made weaker by intervening regulations and court rulings is not inadequate representation.

---

[27]  Average interchange rates for credit cards "range from 1.15% to 3.15%," while interchange fees on most debit cards are capped by federal regulation at $0.21 plus 0.05%.  *See* Settlement Agreement at D2-5 (proposed class notice).

[28]  Six years into MDL 1720, Congress adopted the Durbin Amendment to impose debit price controls and required issuers to enable at least two unaffiliated networks on debit cards.  *See* 5 U.S.C. § 1693o-2(a) ("Reasonable interchange . . . for . . . debit transactions"), (b)(1)(A)–(B) ("Limitation on payment card network restrictions for . . . debit transaction" or "debit cards").  Effective July 2023, the Federal Reserve adopted further regulations of the debit industry pursuant to its authority under the Durbin Amendment.  *See* 12 C.F.R. § 235.7(a), as amended 87 FR 61,230 (Oct. 11, 2022).  And the Federal Reserve is finalizing a proposal to further lower regulated interchange rates on debit cards.  *See* 88 FR 78,100 (Nov. 13, 2023).

33

The *Visa Debit* objectors specifically object to Visa's FANF—a monthly fee based, in part, on a merchant's number of locations. *Visa Debit* Obj. at 1–2, 6–7. But the *Visa Debit* objectors do not specifically seek to enjoin FANF in their own case. *Debit* Compl. ¶ 829(g). *Visa Debit* objectors similarly complain that the proposed settlement "does nothing to terminate, modify, or prohibit enforcement of the anticompetitive terms in the many dozens of agreements." *Visa Debit* Obj. at 8. The objectors do not specify which terms in which agreements should have been targeted for additional equitable relief. It is telling that the six *Visa Debit* objectors—out of the millions in the class—are the *only* merchants that have raised any specific concerns about the adequacy of debit-related relief at this juncture.[29]

Ultimately, *Visa Debit* objectors' adequacy arguments boil down to the contention that the Rule 23(b)(2) class "left significant claims on the table." *Wal-Mart*, 396 F.3d at 109–10 (internal quotation marks omitted; alteration in original). Those arguments are "baseless" because "adequate representation is not solely an assessment of effort" but "[r]ather, an examination of the interests of the settling plaintiffs and of the Settlement's effect on those who would be bound by it." *Id.* at 110. There is an alignment of interests here because, as in *Wal-Mart*, "the lead plaintiffs" in the Rule 23(b)(2) action "are necessarily a part of the [putative *Visa Debit*] class[] and their interests are, therefore aligned with the interests in [that putative] class[]," and "every claimant in [*Visa Debit*] benefits from the settlement," as discussed above. *See id.* at 111–12.

---

[29] The *Visa Debit* objectors also cite a statement from Senator Dick Durbin criticizing the proposed settlement. *See Visa Debit* Obj. at 8. Notably, Senator Durbin criticizes only the relief as to credit cards and offers no critique of the proposed settlement's debit relief. *See* Press Release, Dick Durbin: U.S. Sen. for Ill., Durbin Statement Rejecting Proposed Settlement Between Visa, Mastercard & Merchants (Nov. 17, 2025), available at https://www.durbin.senate.gov/newsroom/press-releases/durbin-statement-rejecting-proposed-settlement-between-visa-mastercard-and-merchants. Senator Durbin's criticisms of the credit relief are without merit for the reasons discussed in Section I.

C.    **The *Visa Debit* Objectors' Arguments About the Scope of the Release Are Premature and Wrong in Any Event**.

The *Visa Debit* objectors seek a carveout to the release to "exclude all forms of equitable relief that overlap with or are currently being pursued in the *Debit Card Litigation*."  *Visa Debit* Obj. at 12–13.  But this is simply a request to relitigate the Court's decision declining to allow opt-outs from the Rule 23(b)(2) class.  *DDMB*, 2021 WL 6221326, at *49.  The Court explained that allowing opt-outs would create a free-rider problem, with plaintiffs incentivized to opt out so that they could pocket any injunctive relief obtained for the class and then pursue additional relief at no risk.  *Id.*  It would be especially inequitable to create a special, good-for-the-*Visa-Debit*-objectors-only opt-out procedure.  Visa has negotiated this settlement—including providing substantial debit relief even though the class lost on the debit monopolization claims at summary judgment—based on the understanding that it was a non-opt-out settlement that would create global peace.  And the possibility that a class release releases claims in another pending case—including a parallel putative class action—is commonplace and not a valid objection.  *See, e.g.*, *Wal-Mart*, 396 F.3d at 110 (approving *Wal-Mart* class release that would cover *NuCity* and *Reyn's* class actions).

Alternatively, *Visa Debit* objectors ask the Court to hold that the injunctive relief claims in *Visa Debit* will not be barred by the proposed release because (they claim) the identical factual predicate doctrine would not be satisfied.  *Visa Debit* Obj. at 13–17.  That request is entirely premature.  As discussed above, the release is expressly limited by the identical factual predicate doctrine, as discussed above.  *See supra* § III.A.

Moreover, as shown by the proceedings in the context of the Rule 23(b)(3) settlement, this Court need not determine the effect of the release on any particular case prior to the entry of final judgment and subsequent motion practice (if any).  *See Fikes*, 62 F. 4th at 720 (affirming approval

of settlement and noting that "[a] holding as to the proper scope of the release . . . can await a case in which the issue would directly affect the proceedings"). That approach is particularly appropriate here. The Court should not decide the question on limited argument at the tail end of briefing focused on settlement approval. Nor is there any urgency: the Rule 23(b)(2) class is *not* an opt out class, so the *Visa Debit* objectors do not have any decision to make that requires guidance now as to the outer scope of the release before entry of a final judgment. Those objectors will gain all benefits of the proposed settlement and retain any injunctive relief claims not covered by the identical factual predicate doctrine.

In addition, the Second Circuit is presently considering the question of whether the similar Rule 23(b)(3) release with identical pertinent language extends to *Visa Debit* claims under the same identical factual predicate doctrine. The outcome of that appeal should inform how the parties and the Court approach application of the Rule 23(b)(2) release to *Visa Debit* injunctive relief. Nor do the schedule and procedural status of *Visa Debit* require a decision on any issue now. Fact discovery in *Visa Debit* is proceeding and will continue through much of 2026, followed by expert discovery; and discovery occurring in parallel with both the government's case and the cardholders' case in *Visa Debit*—both of which seek injunctive relief and related discovery. Thus, nothing will be held up in *Visa Debit* pending a resolution of the Rule 23(b)(3) release appeal and a possible future enforcement proceeding as to the Rule 23(b)(2) release.[30]

In the event that this Court is inclined to predetermine the limits of the release beyond confirming that the release is expressly limited by the identical factual predicate doctrine, the *Visa*

---

[30] This procedural posture in *Visa Debit* distinguishes it from *Wal-Mart*, in which the Second Circuit decided the scope of the *Wal-Mart* release because one of the parallel class actions (*Reyn's*) had already been dismissed following final judgment in *Wal-Mart*, and based on an "order by the [*NuCity*] district court," that case "remain[ed] in limbo pending the outcome of this appeal." *Wal-Mart*, 396 F.3d at 104–05. Nothing similar about *Visa Debit* makes a decision on the scope of the release ripe at this time.

*Debit* objectors' arguments about the identical factual predicate doctrine are wrong.  They rely principally on the Court's conclusion that their damages claims were not precluded by the Rule 23(b)(3) settlement.  *In re Payment Card*, 2025 WL 2412033, at *7 (E.D.N.Y. Aug. 20, 2025) (denying enforcement of Rule 23(b)(3) release against certain plaintiffs in *Visa Debit*).  In that decision, the Court held that the identical factual predicate test turned on an analysis of what the Rule 23(b)(3) complaint "center[ed] on."  *Id.*  Visa is arguing on appeal to the Second Circuit that "center[ing]" is not the right standard and that the Rule 23(b)(3) complaint did center on the same basic conduct alleged in *Visa Debit*, but in any event, the Court's analysis of what the Rule 23(b)(3) complaint "center[ed] on" cannot possibly be dispositive of what a different complaint "centered on."  Indeed, the Court did not mention the Rule 23(b)(2) complaint in its prior decision.  *Id.*

Here, *Visa Debit* objectors summarize their theories underlying *Visa Debit*:

- Visa's "Fixed Acquirer Network Fee ('FANF') . . . is at the center of" *Visa Debit*. *Visa Debit* Obj. at 1–2.

- "Visa's . . . incentive-laden deals . . . discourage or prevent issuers from enabling rival debit networks."  *Id.* at 16.

- "Visa forecloses rival debit networks" with "routing agreements and volume-commitment contracts."  *Id.*

- Visa's "'disintermediation' strategy, and agreements with companies like Apple [and] PayPal" are "designed to neutralize emerging competitive payment rails." *Id.* at 13, 16.

Each theory is asserted in the Rule 23(b)(2) class's complaint or was advanced by the Rule 23(b)(2) class in opposition to summary judgment.

As to FANF and other network fees, the Rule 23(b)(2) complaint asserted a claim for Visa's monopolization of a debit market and alleged that Visa imposed supracompetitive network fees in that market.  *See* Equitable Relief Class Action Compl. ¶¶ 414–18 ("Visa . . . exercised monopoly power with respect to Debit Card Interchange Fees . . . and the total price imposed on Merchants");

37

*see also id.* ¶ 259 ("The imposition of the FANF represents a significant, *unilateral* price increase by Visa." (emphasis added)).  The complaint expressly sought to enjoin the FANF.  *See id.* at Prayer for Relief ¶ D.  In addition to FANF, in opposing summary judgment, the Rule 23(b)(2) class argued that "Visa unlawfully obtained, and continues to exercise, monopoly power in the debit transactions market . . . by excluding competition that might undermine Visa's unchallenged dominance and reduce" not only "Interchange Fees" but also "other costs to Merchants."  *See* ECF Nos. 8169, 8332, Equitable Relief Class Pls.' Opp'n to Mot. for Summ. J. at 1.  Thus, the Court's reasoning that the separate Rule 23(b)(3) action arose from interchange fees instead of network fees does not apply to the Rule 23(b)(2) action.  *See In re Payment Card*, 2025 WL 2412033, at *7–8.[31]

As to the "incentive-laden deals," "routing agreements," and "volume-commitment contracts," the Rule 23(b)(2) complaint alleged that "Visa entered into agreements with Issuers to incent or require them not to implement PINless debit from PIN Debit Card Networks, such as STAR and PULSE"—just as the *Visa Debit* complaint does.  *Compare* Equitable Relief Class Action Compl. ¶ 268, *with Debit* Compl. ¶¶ 108–16; *see also Visa Debit* Obj. at 16.  The Rule 23(b)(2) class also offered the same theory as the *Visa Debit* complaint in opposition to summary judgment—that Visa's "volume discounts incentivize Merchants to route transactions over Visa's networks rather than competing networks."  *Compare* Equitable Relief Class Pls.' Opp'n to Mot. for Summ. J. at 7–8 (Visa targeted "fee reductions" to specific "Merchants that represented about

---

[31]  Even as to interchange fees on debit transactions, the *Visa Debit* complaint's focus on whether Visa's "high rack rates" are exclusionary also relates to interchange fees.  *See, e.g.*, *Debit* Compl. ¶¶ 94 ("listed pricing for network fees and interchange"), 98 ("Visa sometimes uses credit interchange discounts to win debit routing;" "rack rates (*i.e.*, list prices)"), 99 ("Visa will impose its high rack rates," but "merchants and acquirers that make a routing commitment to Visa receive substantial network fee, interchange, and cash concessions, but *only if* they meet their volume commitments." (emphasis in original)), 100 ("Visa's rack rates are frequently higher than the PIN networks' rack rates.").

40% of all Visa transactions," and offered "incentive concessions" to be paid to "Merchants that saw [network] fee increases" following FANF), *with Debit* Compl. ¶¶ 95–107; *see also Visa Debit* Obj. at 16.

As to Visa's agreements with digital wallet companies, the Rule 23(b)(2) complaint alleged that "Visa's anticompetitive scheme in the mobile-payments space has prevented firms that offer digital wallets from leveraging ACH networks" and that, for example, "Visa and Apple agreed that Apple would not allow ACH payment capability in Apple Pay" or otherwise disintermediate Visa. *See* Equitable Relief Class Action Compl. ¶ 298. The Court also *denied* summary judgment as to Section 1 claims, in part based on those digital wallet issues. *See In re Payment Card*, 714 F. Supp. 3d at 117–18. And the Court issued an extensive *Daubert* decision about Visa's agreements with digital wallet providers including Apple and PayPal. *See In re Payment Card*, 2022 WL 15044626, at *28–50 (E.D.N.Y. Oct. 26, 2022) (addressing Mr. Stephen Mott's opinions about Apple and PayPal digital wallet agreements). The Court's subsequent conclusion that judicial efficiency would not be served by accepting transfer of the *Mirage* case to MDL 1720 because the Court itself had not parsed the Apple Pay agreement to determine whether it actually contains anticompetitive provisions (*Visa Debit* Obj. at 14 (citing *In re Payment Card*, 2024 WL 3249365, at *5 (E.D.N.Y. July 1, 2024))) does not change that Visa's agreements with digital wallet providers were (i) expressly addressed in the Rule 23(b)(2) complaint in furtherance of the same digital wallet theory alleged in *Visa Debit*, (ii) part of extensive factual discovery in MDL 1720, including in the Rule 23(b)(2) action, (iii) part of extensive expert discovery in MDL 1720,

39

(iv) part of the basis for this Court denying summary judgment in favor of the Rule 23(b)(2) class and other MDL 1720 plaintiffs, and (iv) addressed at length in the Court's *Daubert* decisions.[32]

In sum, while the appeal of the Rule 23(b)(3) enforcement motion should inform the application of the proposed Rule 23(b)(2) release to claims in *Visa Debit*, it will not necessarily control given the differences between the Rule 23(b)(2) and Rule 23(b)(3) class actions, and the specific lack of daylight between the factual predicate specifically underlying the Rule 23(b)(2) action and *Visa Debit*. But the Court need not address this issue in an advisory fashion, especially prior to further guidance from the Second Circuit.

## **CONCLUSION**

The Court should find that the settlement is likely to be finally approved, and grant preliminary approval.

---

[32] A key issue on appeal in the Rule 23(b)(3) action is whether the identical factual predicate doctrine turns on what specific inquiries the Court itself has made or the factual predicate underlying the complaint, elucidated in discovery, and addressed in motions. Thus, judicial efficiency will be served by awaiting guidance from the Second Circuit on this legal question.

Dated:  January 14, 2026

Respectfully submitted,

**ARNOLD & PORTER KAYE SCHOLER LLP**

By: */s/ Matthew A. Eisenstein*
Anne P. Davis
Matthew A. Eisenstein
Rosemary Szanyi
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
(202) 942-5000
anne.davis@arnoldporter.com
matthew.eisenstein@arnoldporter.com
rosemary.szanyi@arnoldporter.com

Robert J. Vizas
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
(415) 471-3100
robert.vizas@arnoldporter.com

**HOLWELL SHUSTER & GOLDBERG LLP**

Michael S. Shuster
Demian A. Ordway
Blair E. Kaminsky
425 Lexington Avenue
New York, NY 10017
(646) 837-5151
mshuster@hsgllp.com
dordway@hsgllp.com
bkaminsky@hsgllp.com

*Counsel for Defendants Visa Inc., Visa U.S.A. Inc., and Visa International Service Association*

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By: */s/ William B. Michael*
William B. Michael
Brette Tannenbaum
Nina Kovalenko

41

Crystal L. Parker
1285 Avenue of the Americas
New York, NY 10019-6064
Tel.: (212) 373-3000
Fax: (212) 757-3990
wmichael@paulweiss.com
btannenbaum@paulweiss.com
nkovalenko@paulweiss.com
cparker@paulweiss.com

Paul D. Brachman
Donna Ioffredo
2001 K Street, NW
Washington, DC 20006-1047
Tel.: (202) 223-7300
Fax: (202) 223-7420
pbrachman@paulweiss.com
dioffredo@paulweiss.com


*Counsel for Defendants Mastercard
Incorporated and Mastercard International
Incorporated*