**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL No. 1720<br><br>Docket No. 05-md-01720 (BMC-JAM) |
| This Document Relates To:<br><br>BARRY'S CUT RATE STORES INC.; DDMB, INC. d/b/a EMPORIUM ARCADE BAR; DDMB 2, LLC d/b/a EMPORIUM LOGAN SQUARE; BOSS DENTAL CARE; RUNCENTRAL, LLC; CMP CONSULTING SERV., INC.; TOWN KITCHEN, LLC d/b/a TOWN KITCHEN & BAR; GENERIC DEPOT 3, INC. d/b/a PRESCRIPTION DEPOT; and PUREONE, LLC d/b/a SALON PURE,<br><br>    Plaintiffs,<br>  v.<br><br>VISA, INC.; MASTERCARD INCORPORATED; MASTERCARD INTERNATIONAL INCORPORATED; BANK OF AMERICA, N.A.; BA MERCHANT SERVICES LLC (f/k/a DEFENDANT NATIONAL PROCESSING, INC.); BANK OF AMERICA CORPORATION; BARCLAYS BANK PLC; BARCLAYS BANK DELAWARE; BARCLAYS FINANCIAL CORP.; CAPITAL ONE BANK, (USA), N.A.; CAPITAL ONE F.S.B.; CAPITAL ONE FINANCIAL CORPORATION; CHASE BANK USA, N.A.; CHASE MANHATTAN BANK USA, N.A.; CHASE PAYMENTECH SOLUTIONS, LLC; JPMORGAN CHASE BANK, N.A.; JPMORGAN CHASE & CO.; CITIBANK (SOUTH DAKOTA), N.A.; CITIBANK N.A.; CITIGROUP, INC.; CITICORP; and WELLS FARGO & COMPANY,<br><br>    Defendants. | **EQUITABLE RELIEF CLASS PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF AMENDED SETTLEMENT AGREEMENT**<br><br>HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER FILED UNDER SEAL |

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................ 1

II. THE COURT SHOULD PRELIMINARILY APPROVE THE AMENDED
    SETTLEMENT BECAUSE IT SATISFIES ALL THE REQUIREMENTS OF RULE
    23(e)(1). ............................................................................................................ 6

    A.  Disagreement About Strategy or Relief Does Not Make the Amended Settlement
        Unreasonable........................................................................................................ 6

    B.  Objectors' Complaints about Class Representatives and Counsel Are Repackaged
        Arguments About Strategy and Relief. ................................................................ 7

    C.  Objectors' Complaints About Equitable Treatment Are Repackaged Arguments About
        Strategy and Relief. ........................................................................................... 10

    D.  Objectors' Requests to Opt Out Are Repackaged Arguments About Strategy and Relief.
        ............................................................................................................................ 11

III. THE AMENDED SETTLEMENT'S REFORMS ARE DESIGNED TO INCREASE
     COMPETITION. ............................................................................................... 13

    A.  The Reforms Allow Merchants to Decline High-Cost Credit Cards. .............. 14

        1.  Commercial Credit Cards .......................................................................... 15

        2.  Premium Credit Cards................................................................................ 15

    B.  The Reforms Allow Merchants to Use Surcharging to Steer Transactions or to Simply
        Reduce Their Effective Acceptance Costs to $0.............................................. 18

        1.  The Surcharging Relief is Broad and Effective. ....................................... 20

        2.  The New Surcharging Rules Will Be Simple and Effective........................ 23

        3.  The Amended Settlement Effectively Deals with State No-Surcharge Statutes........... 23

        4.  The Surcharging Relief Is Not Undermined by Customer "Friction." ......... 24

    C.  The Reforms Provide Many Tools to Generate Competition Among Issuers. ................. 25

        1.  Discounting................................................................................................. 26

        2.  Issuer Differentiation ................................................................................ 29

        3.  Digital Wallets .......................................................................................... 31

        4.  Discounting to Standard Cards ................................................................. 31

        5.  Pilot Programs............................................................................................ 32

IV. THE MAGNITUDE, STRUCTURE, AND DURATION OF THE RATE CAPS AND
    ROLLBACKS ARE APPROPRIATE................................................................. 33

    A.  The Caps And Rollbacks Are Not Damages..................................................... 33

    B.  The Court Is Not A Regulator............................................................................ 36

i

C.  The Caps/Rollbacks Benefit All Merchants. ..................................................... 37

D.  The Amended Settlement Effectively Limits Network Fees. ............................. 38

V.  THE CLASS FACES SUBSTANTIAL LITIGATION RISK AS TO BOTH LIABILITY AND THE SCOPE OF ANY RELIEF. ............................................. 39

A.  The Class Faces Substantial Risk That It Would Not Establish Liability. ...................... 39

B.  The Class Faces Substantial Risk That It Would Not Obtain The Requested Relief. ...... 41

VI.  THE AMENDED SETTLEMENT PROPERLY RELEASES ALL CLAIMS THAT WERE OR COULD HAVE BEEN PLED AGAINST DEFENDANTS AND IS NOT OVERBROAD. ........................................................................................ 45

A.  Broad Class Releases, Subject to the Identical Factual Predicate Doctrine, Are Common. ......................................................................................... 45

B.  The Amended Settlement's Release Is Not Overbroad. ..................................... 46

1.  The Amended Settlement Releases Only Claims That Arise From the Identical Factual Predicate as the Settled Claims. ................................................... 46

2.  The Amended Settlement Does Not Improperly Release Future Antitrust Claims. ...... 48

3.  The Length of the Release Is Proper. .......................................................... 49

4.  Future Merchants Will Not Be Harmed. ...................................................... 50

5.  The Amended Settlement Does Not Impact Any Rule (b)(2) Class Member's Claim for Damages. ................................................................................... 51

VII.  THE COURT SHOULD OVERRULE THE *VISA DEBIT* PLAINTIFFS' OBJECTION. ..................................................................................... 51

A.  The *Visa Debit* Plaintiffs' Objection Depends on an Unresolved Question Regarding the Scope of the Release. ..................................................................... 53

B.  The *Visa Debit* Plaintiffs Have Been Adequately Represented. ......................... 54

1.  Class Plaintiffs' Interests Were Aligned with Those of the *Visa Debit* Plaintiffs. ....... 56

2.  Class Plaintiffs Obtained Debit Relief. ...................................................... 59

VIII.  CONCLUSION ................................................................................. 60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amara v. CIGNA Corp.*,
  775 F.3d 510 (2d Cir. 2014)......................................................................................10

*Anwar v. Fairfield Greenwich Ltd.*,
  133 F. Supp. 3d 560 (S.D.N.Y. 2015).......................................................................52

*Berni v. Barilla S.p.A.*,
  964 F.3d 141 (2d Cir. 2020).............................................................................4, 10, 12

*Bhatia v. Piedrahita*,
  756 F.3d 211 (2d Cir. 2014).......................................................................................52

*Bldg. & Realty Inst. of Westchester & Putnam Cntys., Inc. v. New York*,
  2020 WL 5667181 (S.D.N.Y. Sept. 23, 2020)............................................................7

*In re Blue Cross Blue Shield Antitrust Litig.*,
  85 F.4th 1070 (11th Cir. 2023) ..................................................................................47

*BNP Paribas v. N.M. State Inv. Council*,
  2025 WL 1443654 (2d Cir. May 20, 2025) ...............................................................53

*Chang v. Philips Bryant Park LLC*,
  2019 WL 8105999 (S.D.N.Y. Oct. 23, 2019) ..............................................................8

*Chavarria v. New York Airport Serv., LLC*,
  875 F. Supp. 2d 164 (E.D.N.Y. 2012) .......................................................................53

*Copley v. Bactolac Pharm., Inc.*,
  2023 WL 2470683 (E.D.N.Y. Mar. 13, 2023) ............................................................6

*DDMB, Inc. v. Visa, Inc.*,
  2021 WL 6221326 (E.D.N.Y. Sept. 27, 2021) ............................................... *passim*

*Expressions Hair Design v. Schneiderman*,
  2014 WL 3014566 (2d Cir. June 20, 2014) ...............................................................19

*Expressions Hair Design v. Schneiderman*,
  2016 WL 6994876 (S. Ct. Nov. 21, 2016)..................................................................19

*Expressions Hair Design v. Schneiderman*,
  581 U.S. 37 (2017)......................................................................................................22

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
    62 F.4th 704 (2d Cir. 2023) ...........................................................32, 44, 46, 47

*Fox Midwest Theatres v. Means*,
    221 F.2d 173 (8th Cir. 1955) ...................................................................47

*In re Global Crossing Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ...............................................................37

*In re GSE Bonds Antitrust Litigation*,
    414 F. Supp. 3d 686 (S.D.N.Y. 2019)..........................................................8

*Haar v. Allen*,
    687 F. App'x 93 (2d Cir. 2017) ............................................................3, 6, 7

*Handschu v. Special Services Div.*,
    787 F.2d 828 (2d Cir. 1986)......................................................................7

*Keepseagle v. Vilsack*,
    102 F. Supp. 3d 205 (D.D.C. 2015) ...........................................................12

*Laumann v. Nat'l Hockey League*,
    105 F. Supp. 3d 384 (S.D.N.Y. 2015)......................................................1, 12

*In re Literary Works in Electronic Databases Copyright Litig.*,
    654 F.3d 242 (2d Cir. 2011).....................................................................45

*Marble v. Halo Innovations, Inc.*,
    2025 WL 3273813 (S.D.N.Y. Oct. 14, 2025) ...........................................45, 46

*Martens v. Thomann*,
    273 F.3d 159 (2d Cir. 2001).....................................................................37

*Massiah v. MetroPlus Health Plan, Inc.*,
    2012 WL 5874655 (E.D.N.Y. Nov. 20, 2012)..................................................6

*Maywalt v. Parker & Parsley Petroleum Co.*,
    67 F.3d 1072 (2d Cir.1995)......................................................................53

*Melito v. Experian Mktg. Sols.*,
    923 F.3d 85 (2d Cir. 2019).................................................................44, 46

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985)..............................................................................47

*Mobley v. Five Gems Mgmt. Corp.*,
    2018 WL 1684343 (S.D.N.Y. Apr. 6, 2018)....................................................51

iv

*Moses v. New York Times Co.*,
   79 F.4th 235 (2d Cir. 2023) ...................................................................................10, 12

*Moskowitz, et al. v. Am. Express Co.*,
   No.19-cv-566 (E.D.N.Y. 2019) ...............................................................................38

*In re NASDAQ Market-Makers Antitrust Litigation*,
   184 F.R.D. 506 (S.D.N.Y. 1999) ...............................................................................8

*NCAA v. Alston*,
   594 U.S. 69 (2021)......................................................................................35, 41, 42

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018).....................................................................................5, 33, 38

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*
   2019 WL 6875472 ........................................................................................ *passim*

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   2024 WL 3236614 (E.D.N.Y. June 28, 2024) ............................................. *passim*

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   330 F.R.D. 11 (E.D.N.Y. 2019)................................................................................57

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   714 F. Supp. 3d 65 (E.D.N.Y. 2024) ......................................................................38

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   729 F. Supp. 3d 298 (E.D.N.Y. 2024) ....................................................55, 56, 57

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
   2025 WL 2412033 (E.D.N.Y. Aug. 20, 2025).......................................................51

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
   827 F.3d 223 (2d Cir. 2016).......................................................................... *passim*

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
   986 F. Supp. 2d 207 (E.D.N.Y. 2013) ...................................................13, 35, 38

*Redel's Inc. v. General Electric Co.*,
   498 F.2d 95 (5th Cir. 1974) .....................................................................................47

*Rexam, Inc. v. United Steel Workers of Am.*,
   2007 WL 2746595 (D. Minn. Sept. 17, 2007).....................................................55

*Rowell v. Pettijohn*,
   2015 WL 3819553 (5th Cir. June 16, 2015) .........................................................19

*Sweet v. Cardona*,
  641 F. Supp. 3d 814 (N.D. Cal. 2022) ...............................................................11

*Sykes v. Mel S. Harris & Assocs. LLC*,
  780 F.3d 70 (2d Cir. 2015)..........................................................................4, 10

*TBK Partners, Ltd. v. W. Union Corp.*,
  675 F.2d 456 (2d Cir. 1982)................................................................50, 53, 54

*United States v. Aluminum Co. of America*,
  148 F.2d 416 (2d Cir. 1945)..........................................................................39

*United States v. Am. Express Co.*,
  838 F.3d 179 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 585
  U.S. 529 (2018).........................................................................................5, 38

*United States v. Am. Express Co.*,
  88 F. Supp.3d 143 (E.D.N.Y. 2015) ...............................................................22

*United States v. American Express, Mastercard International Incorporated and
  Visa, Inc.*,
  No. 1:10-cv-04496-NGG-RER (E.D.N.Y. 2011) .............................22, 24, 39, 42

*United States v. City of New York*,
  198 F.3d 360 (2d Cir. 1999)............................................................................7

*United States v. Google LLC*,
  2025 WL 2523010 (D.D.C. Sept. 2, 2025) ......................................................41

*United States v. Visa*,
  344 F.3d 229 (2d Cir. 2003)..........................................................................39

*United States v. Visa*,
  No. 24-cv-7214, (S.D.N.Y. Sept. 24, 2024).....................................................39

*Van Gemert v. Boeing Co.*,
  590 F.2d 433 (2d Cir. 1978) (*en banc*), *aff'd*, 444 U.S. 472 (1980) ......................13

*In re Volkswagen "Clean Diesel" Mktg., Sales, Pracs., and Prods. Liab. Litig.*,
  895 F.3d 597 (9th Cir. 2019) ........................................................................52

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)..................................................................................4, 10

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005)................................................................ *passim*

*Williams v. Gen. Elec. Capital Auto Lease, Inc.*,
  159 F.3d 266 (7th Cir. 1998) ................................................................................................50

In re Yahoo Mail Litig.,
  308 F.R.D. 577 (N.D. Cal. 2015) ..........................................................................................11

*Yan Won Liao v. Holder*,
  691 F. Supp. 2d 344 (E.D. N.Y. 2010) ..................................................................................13

**Statutes**

Fed. R. Civ. P. 23 ................................................................................................... *passim*

## I.    INTRODUCTION

The Amended Settlement secures most of the relief Plaintiffs sought in this litigation and could have realistically expected to obtain through trial and on appeal. It includes substantial relief from the Honor-All-Cards ("HAC") rules, allowing merchants to decline Premium credit cards, Commercial credit cards, and digital wallets that contain the networks' cards. It includes the ability to surcharge up to 3% or the full cost of acceptance; to use "dual pricing" to facilitate surcharging in certain no-surcharge states; to discount at the brand, type, product, and issuer level (to incentivize competition among issuing banks); and to test steering methods using robust pilot programs. The relief provided gives merchants' fulsome ability to steer transactions, rendering the default-interchange rules competitively innocuous. The Amended Settlement also supports buying groups; provides merchant education; reduces the interchange rate for Standard (non-Premium) cards to 125 bps; caps all posted rates; provides pro rata rate reductions for merchants with negotiated rates; and mandates a 10-bps overall rate reduction. These remedies and rule changes will result in immediate cost savings for all merchants, big and small, and will drive the market toward competitive fees.

The Objectors ignore and diminish the Amended Settlement's benefits and instead focus on the few items that were not achieved. Their arguments highlight that in every complex litigation there is more than one strategy and solution. Those differences are not a reason to deny preliminary approval to a settlement that brings such significant benefits to all merchants and accomplishes most of the aims Plaintiffs set out to achieve when they filed their case. *DDMB, Inc. v. Visa, Inc.*, 2021 WL 6221326, at *23 (E.D.N.Y. Sept. 27, 2021) ("[C]ourts considering the issue routinely hold that different perspectives as to the appropriate form of injunctive relief or as to litigation strategy do not constitute a conflict sufficient to defeat adequacy of representation."); *Laumann v.*

*Nat'l Hockey League*, 105 F. Supp. 3d 384, 400 (S.D.N.Y. 2015) (it is the existence of a common injury—not agreement over how best to respond to it—that drives the Rule 23 analysis).

The Amended Settlement provides a comprehensive set of competitive tools from which all merchants can pick and choose to steer their customers to lower-cost payment mechanisms or to altogether reject the networks' highest-cost credit cards. It provides substantial and immediate relief to all members of the Class, including:

*Honor-All-Cards Reforms*. The Amended Settlement delivers groundbreaking HAC reforms. For the first time, merchants can decline the networks' high-cost Premium and Commercial credit cards. They can decline digital wallets that include the networks' cards. They can receive real-time information at the point-of-sale to enable that non-acceptance, and they can conduct pilot programs to determine which cards they can profitably decline.

*Expansive Surcharging*. The Amended Settlement vastly expands surcharging, altogether repealing the level-playing-field rules that effectively prohibited surcharging by merchants that also accepted American Express. Merchants can surcharge up to 3% at the brand (*e.g.*, Visa), type (*e.g.*, Visa Premium), or product (*e.g.*, Visa Signature) level—and they can discount at all those levels, plus at the issuer level. They also can use dual pricing to steer transactions in certain no-surcharge states and use the buying group and merchant education provisions to effectively wield these new competitive tools.

*Competition Among Issuers*. Merchants will have many tools to require the issuing banks to lower interchange rates.

- Discounting—For the first time, both networks will permit discounting based on the issuing bank.

- Issuer Differentiation—Merchants can prefer a particular issuer's credit card in strategic ways, including prominence in online sales platforms.

- Discounting to Standard Cards—Merchants can partner with a particular issuer to promote its non-Premium cards (or any other type of cards).

- Pilot Programs—A merchant need not use the same steering methods in all its stores, so it can test the various methods in different types of stores or locations.

For five years, while these reforms take hold in the market, the Amended Settlement caps all posted credit card interchange rates, provide a pro rata reduction for merchants that pay negotiated rates, and mandates a 10-bps overall average rate reduction—relief that alone will immediately eliminate a significant part of the current gap between the actual and competitive total price of credit card transactions.

The Objectors' principal theme is that this extensive suite of reforms is inadequate because it does not also include the ability to decline a particular issuer's cards (*e.g.*, decline Chase-issued Visa credit cards).[1] That objection fails to recognize that "settlements are compromises that do not provide either side with all that they might have hoped to obtain in litigation." *Haar v. Allen*, 687 F. App'x 93, 95 (2d Cir. 2017). The nature of compromise means that a settlement can still be fair and adequate even if it does not resolve "all of [the Objectors'] grievances to their satisfaction." *Id.* Likewise, "Plaintiffs' decision to reach a settlement on the proposed terms represents a difference in litigation strategy that does not amount to a fundamental conflict of interest and does not render Class Plaintiffs inadequate to represent the class." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *19 (E.D.N.Y. June 28, 2024) ("*Payment Card*") (citing *DDMB*, 2021 WL 6221326, at *23). Nor does a conflict arise because some Class

---

[1] This memorandum's discussion of the honor-all-issuers rules also encompasses the default interchange rules because: (1) it is conceded that default interchange rates are likely necessary if there is an honor-all-issuers rule; and (2) default interchange rates are competitively benign (and likely procompetitive) if the anti-steering restraints are eliminated. *See* Declaration of Steve D. Shadowen ("Shadowen Dec.") (filed herewith), Ex. 1, Rebuttal Declaration of Joseph E. Stiglitz, Ph.D and Keith B. Leffler, Ph.D., dated January 14, 2026 ("Stiglitz Reply Dec.") ¶ 29.

members benefit more from particular aspects of the relief while others benefit more from different aspects. *Berni v. Barilla S.p.A.*, 964 F.3d 141, 147 n.28 (2d Cir. 2020) ("different class members can benefit differently from an injunction."). And whether certain Class members choose not to use the relief is irrelevant. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011); *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 98 (2d Cir. 2015). These legal principles dispose of the objections.

The record, including merchant testimony, expert analysis, and the networks' internal documents, also fully supports the Amended Settlement's reforms. The Objectors ignore that record, and their attacks on these reforms are internally inconsistent or factually inaccurate. For example, they say they cannot decline Premium cards because the transaction volume is too great, but they insist on the right to decline cards of individual issuers whose transaction volume is similarly substantial. They say that the ability to decline Commercial cards is "especially illusory" for convenience stores because they "sell almost exclusively to consumers, not businesses;" when in fact, about ██% of credit card transaction volume in convenience stores is on Commercial cards.

Objectors fail to realistically consider the litigation risks that the Class would face absent a settlement. No regulator or judicial body anywhere in the world has ever found the honor-all-issuers rules to be anticompetitive, and the U.S. Department of Justice expressly left them in place when resolving the government's case. Even if the Class succeeded on liability, the networks would likely contend that eliminating the honor-all-issuers rules and associated default-interchange rules would be tantamount to ordering a breakup of the networks. Worse, any effort to try to secure that additional relief would put at risk the entire suite of significant agreed reforms. Even success at trial on both liability and injunctive relief could be undone by the Second Circuit

4

or the Supreme Court—precisely what happened in *United States v. Am. Express Co.*, 838 F.3d 179 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 585 U.S. 529 (2018).

Additional objections are mostly recycled arguments that Chief Judge Brodie previously rejected. The release does not extinguish future claims—releasing claims based on continuing conduct that was at issue in the litigation is inherent in the ability to settle a Rule 23(b)(2) case. Nor does the release extinguish the claims of future merchants; those merchants are not in the Class definition and thus are not subject to the release. And the release extends no further than permitted by the identical factual predicate doctrine.

Similarly baseless are some Objectors' suggestion that Class Counsel did not sufficiently educate themselves about the industry or some merchants' views. Not only did Class Counsel regularly seek advice from multiple economists and industry consultants, but from the beginning rounds of negotiations in 2023 through the signing of the Amended Settlement in November 2025, Class Counsel also consulted, directly or through merchants' counsel, with scores of merchants—small, medium, and large. In the most recent round of negotiations, Class Counsel also had the benefit of the written objections to the 2024 proposed settlement agreement, supplemented, at least as to Walmart, by a letter it sent to Class Counsel with a list of its desired reforms.

As for the *Visa Debit* Plaintiffs, their fundamental premise—that the Amended Settlement provides no relief on debit cards—is factually incorrect. The Amended Settlement provides substantial relief directly applicable to debit card transactions, including extension of the DOJ consent decree, reforms of the honor-all-wallets and All-Outlets rules, and provisions for buying groups and merchant education. Moreover, merchants can use the reforms directed to credit card transactions to pressure the networks on debit cards too. Ultimately, the *Visa Debit* Plaintiffs cannot (and do not) dispute that they will benefit from the Amended Settlement.

The Amended Settlement delivers most of the significant reforms for which the Class litigated for over twenty years, and it secures them in the face of very substantial risks that the Class could fail to establish liability and, if they got a liability verdict, fail to get the additional relief that Objectors seek and to maintain that relief on appeal. The Court should grant preliminary approval and set a schedule for a hearing on final approval.

## II. THE COURT SHOULD PRELIMINARILY APPROVE THE AMENDED SETTLEMENT BECAUSE IT SATISFIES ALL THE REQUIREMENTS OF RULE 23(e)(1).

### A. DISAGREEMENT ABOUT STRATEGY OR RELIEF DOES NOT MAKE THE AMENDED SETTLEMENT UNREASONABLE.

For all the reasons set forth in Class Plaintiffs' opening brief, the Amended Settlement merits preliminary approval. A settlement need not satisfy all litigation goals to be approved. *See Copley v. Bactolac Pharm., Inc.*, 2023 WL 2470683, at *10 (E.D.N.Y. Mar. 13, 2023). Moreover, when evaluating a proposed class action settlement, all litigation risks must be considered. *See Massiah v. MetroPlus Health Plan, Inc.*, 2012 WL 5874655, at *2 (E.D.N.Y. Nov. 20, 2012) (Cogan, J.).

Objectors effectively ask the Court to reject the Amended Settlement because it does not deliver every form of relief that they desire. We note that the Amended Settlement is substantially improved from the settlement rejected by Chief Judge Brodie and closely follows the path that she laid out for approval. A settlement's fairness is not undermined—and no conflict with class representatives is created—simply because it reflects compromise rather than idealized outcomes. As the Second Circuit has explained, "settlements are compromises that do not provide either side with all that they might have hoped to obtain in litigation." *Haar*, 687 F. App'x at 95. The nature of compromise means that a settlement can still be fair and adequate even if it does not resolve "all of [the Objectors'] grievances to their satisfaction." *Id.*; *see also Handschu v. Special Servs.*

*Div.*, 787 F.2d 828, 833 (2d Cir. 1986) (affirming district court's comparison of "the terms of the compromise with the likely rewards of litigation" to approve settlement). Specifically with respect to the absence of relief from the honor-all-issuers rules, Chief Judge Brodie held that "elimination of these rules cannot be the 'standard' for approving the Settlement." *Payment Card*, 2024 WL 3236614, at *28 n.40.

### B. OBJECTORS' COMPLAINTS ABOUT CLASS REPRESENTATIVES AND COUNSEL ARE REPACKAGED ARGUMENTS ABOUT STRATEGY AND RELIEF.

The issue of adequate representation by the class representatives and Class Counsel has been settled for years. "Plaintiffs' decision to reach a settlement on the proposed terms represents a difference in litigation strategy that does not amount to a fundamental conflict of interest and does not render Class Plaintiffs inadequate to represent the class." *Payment Card*, 2024 WL 3236614, at *19 (citing *DDMB*, 2021 WL 6221326, at *23); *see also Bldg. & Realty Inst. of Westchester & Putnam Cntys., Inc. v. New York*, 2020 WL 5667181, at *5 (S.D.N.Y. Sept. 23, 2020) ("[R]epresentation is not inadequate simply because they have different ideas about how best to achieve these goals") (citing *United States v. City of New York,* 198 F.3d 360, 367 (2d Cir. 1999)).

Some Objectors complain that Class Counsel did not specifically consult with them regarding the Amended Settlement.[2] Class Counsel was not obligated to include the Objectors in the settlement process, and Objectors cite no cases to suggest otherwise. Unnamed class members have no right to control a class litigation or the settlement process. Instead, Rule 23 provides them

---

[2] Walmart Obj., ECF 9225 at 19-20; RILA and NRF Obj., ECF 9727 at 10; National Association of College Stores Obj., ECF 9719 at 5.

with notice and objection rights after a settlement is proposed. Fed. R. Civ. P. 23(e)(1); *see also In re NASDAQ Market-Makers Antitrust Litigation*, 184 F.R.D. 506, 512 (S.D.N.Y. 1999).[3]

That is not to say that Class Counsel failed to consider the interests and perspectives of large class members, like Walmart, or trade groups. They absolutely did. Indeed, some of the most important provisions of the Amended Settlement reflect Class Counsel's arduous efforts to address the issues raised by Objectors to the proposed 2024 settlement.

When the Court appointed Class Counsel, it found that they possessed the requisite experience and skills to adequately represent the Class. *Payment Card*, 2024 WL 3236614, at *19. Notably, even though Chief Judge Brodie determined that the prior 2024 agreement did not merit preliminary approval, she emphasized that Class Counsel has adequately represented the Class throughout this litigation. Class Counsel are acutely aware of their fiduciary duty to *all* Class members.

Although the Court was not required to permit objections at the preliminary approval stage,[4] it did so, ensuring that Class members would be able to share their opinions with the Court.

---

[3] Rule 23(e)(2) requires courts to find that "the class representatives and class counsel have adequately represented the class" before approving any settlement. Fed. R. Civ. P. 23(e)(2). Courts examine whether named plaintiffs' interests were "antagonistic to the interest of other members of the class" and whether "plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 692 (S.D.N.Y. 2019) (citation and quotation marks omitted). The adequacy inquiry focuses on the quality of representation, not whether unnamed members were consulted. And, although the Court determined that the proposed 2024 settlement did not merit preliminary approval, it nevertheless held that Class Counsel have adequately represented the class. *Payment Card*, 2024 WL 3236614, at *19.

[4] *See Chang v. Philips Bryant Park LLC*, 2019 WL 8105999, at *7 (S.D.N.Y. Oct. 23, 2019), adopted by 2020 WL 104812 (S.D.N.Y. Jan. 9, 2020) ("Preliminary approval of a settlement agreement requires only an 'initial evaluation' of the fairness of the proposed settlement based on written submissions and an informal presentation by the settling parties. The court determines 'whether notice of the proposed settlement ... should be given to class members in such a manner as the court directs, and an evidentiary hearing scheduled to determine the fairness and adequacy of the settlement.'") (internal citations omitted).

Class Counsel consulted with representatives of Walmart and the various trade groups, directly or through their counsel, about their views concerning this litigation. Further, these Class members articulated their views in their objections to the prior agreement. Thus, while Objectors were not included in the settlement negotiations, Class Counsel carefully considered their views when negotiating the Amended Settlement.

In December 2024, Walmart's counsel sent a letter to Class Counsel stating that any settlement that was primarily based on surcharging relief and did not contain HAC relief would not be acceptable.[5] In fact, the Amended Settlement includes significant limitations on the HAC rules, and unlike the 2024 settlement, surcharging—while vastly improved—is not the single focus of the relief.

The Merchant Trade Groups admit that beginning in mid-2017, Class Counsel engaged in multiple extensive discussions with representatives from those groups. During these in-person meetings, and through additional written correspondence and other communications, the Merchant Trade Groups expressed their views regarding the facts, the legal issues, and potential equitable relief.[6] Indeed, in the 2023-2024 negotiations, "[a]t various points and to the extent possible, [Class Counsel] coordinated settlement efforts" with certain of the Direct Action Plaintiffs—more than 70 large and national merchants—and their counsel.[7] Class Counsel also regularly sought advice from other large merchants, multiple economists and industry consultants.

---

[5] *See* Walmart Obj., ECF 9729 at 2-3.

[6] *See* Equitable Relief Plaintiffs' Reply to Walmart's and Merchant Trade Groups' Oppositions to Motion for Class Certification, ECF 8631 at 2 n.5 (internal citation omitted). "Merchant Trade Groups" collectively refers to the National Retail Federation ("NRF") and the Retail Industry Leaders Association ("RILA").

[7] Declaration of Equitable Relief Class Counsel in Support of Motion for Preliminary Approval of Settlement, ECF 9179-3 ¶ 118.

C.    **OBJECTORS' COMPLAINTS ABOUT EQUITABLE TREATMENT ARE REPACKAGED ARGUMENTS ABOUT STRATEGY AND RELIEF.**

Walmart asserts that the Amended Settlement "disadvantages" large national merchants.[8] Its assertion rests on a fundamentally flawed premise—that Rule 23(e) requires each remedial mechanism to deliver identical utility to every class member. It does not. "Rule 23(e)(2)(D) requires class members be treated *equitably*, not identically." *Payment Card*, 2024 WL 3236614, at *36 (quoting *Moses v. N.Y. Times Co.*, 79 F.4th 235, 245 (2d Cir. 2023)).

While every class member must receive "beneficial" relief, they can experience that relief differently. *See id.*; *Sykes*, 780 F.3d at 97; *see also Berni*, 964 F.3d at 147 n.28 ("That means that different class members can benefit differently from an injunction."). While a class member must stand to benefit from a settlement, "some" benefit is enough. *Sykes*, 780 F.3d at 98 (citing *Amara v. CIGNA Corp.*, 775 F.3d 510, 522 (2d Cir. 2014)). An injunction that sweeps broadly to "provide relief to each member of the class" passes muster for approval; just because a class member cannot or will not take advantage of every aspect of relief does not render the settlement inadequate. *Wal-Mart Stores*, 564 U.S. at 360; *Sykes*, 780 F.3d at 98; *Amara*, 775 F.3d at 522.

The Court held that notwithstanding differences between local merchants and large, national merchants, "*all* Plaintiffs seek the same type of redress for the same type of harms." *Payment Card*, 2024 WL 3236614, at *17 (citing *In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x 760, 765 (2d Cir. 2020)); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 113 (2d Cir. 2005) (adequate representation depends on an alignment of interests, not necessarily the "vigorous pursuit" of all claims).

---

[8] *See generally* Walmart Obj., ECF 9729 at 6-14.

Walmart's objection concerning the No-Bypass rule[9] reflects a disagreement over preferred remedies rather than any defect in the Amended Settlement. *See DDMB*, 2021 WL 6221326, at *23-24 (citing *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 596 (N.D. Cal. 2015) (non-opt-out Rule 23(b)(2) class)). That rule prohibits merchants and member banks from bypassing the Visa system to clear, authorize, or settle credit card transactions. Eliminating the No-Bypass rule would not create meaningful interchange competition because it does not give merchants a practical, scalable way to avoid Visa fees. Interchange is constrained by the Amended Settlement's reforms to the key restraints, not by tinkering with a narrow theoretical bypass that cannot operate as a market-wide alternative. Regardless, the Amended Settlement need not dismantle every challenged network rule to provide meaningful, classwide relief.

The Amended Settlement does not improperly favor small (or large) merchants. While certain provisions, such as buying groups or merchant education, may be more attractive to smaller merchants, they impose no burden on large merchants, do not diminish the relief available to them, and in fact work to reinforce the relief available by increasing the number of merchants likely to take advantage of the modified rules. "Rule 23(e)(2)(D) . . .  requires the settlement to treat class members equitably relative to one another, not for each class member to receive identical relief." *Sweet v. Cardona*, 641 F. Supp. 3d 814, 832 (N.D. Cal. 2022).

### D. OBJECTORS' REQUESTS TO OPT OUT ARE REPACKAGED ARGUMENTS ABOUT STRATEGY AND RELIEF.

Chief Judge Brodie certified the Equitable Relief Class as a mandatory, non-opt-out class pursuant to Rule 23(b)(2) in September 2021 over the objections of, among others, Walmart and Circle K. *DDMB*, 2021 WL 6221326, at *46-50. When denying the request for preliminary

---

[9] Walmart Obj., ECF 9729 at 9.

approval of the prior agreement, the Court again rejected those Objectors' arguments for opt-out rights, reaffirming that the Class was properly certified as a non-opt-out class. *Payment Card*, 2024 WL 3236614, at *16-19, 39.

Walmart's and Circle-K's arguments fare no better the third time. Where the relief sought is classwide and indivisible, "neither notice nor an opportunity to opt out is required for classes certified pursuant to Rule 23(b)(2)." *Id*. at *47. Instead, permitting opt-outs would risk inconsistent equitable relief, permit free-riding, and substantially diminish the Class's leverage to get a fair settlement for the entire Class.

Disagreement over the form or scope of proposed injunctive relief does not change the rationale for the Court's prior rulings. Class members need not value the relief identically. *Moses*, 79 F.4th at 245; *Berni*, 964 F.3d at 147 n.28. Differences in business models, bargaining power, or preferred competitive strategies do not convert disagreement over remedies into a due process problem. *See DDMB*, 2021 WL 6221326, at *23; *Wal-Mart Stores, Inc.*, 396 F.3d at 113.

Courts reject attempts to repackage dissatisfaction with the scope of relief as an intra-class conflict or a basis for opt-out rights. *See Keepseagle v. Vilsack*, 102 F. Supp. 3d 205, 214 (D.D.C. 2015). Objectors do not contend that the proposed relief is unlawful or unavailable as a matter of law; they argue only that it does not align with their preferred litigation strategy. Their argument "confuses the question of whether a common injury unites the class with the distinct question of whether all class members agree about how best to *respond* to the injury. It is the former, not the latter, that drives the Rule 23 analysis[.]" *Laumann*, 105 F. Supp. 3d at 400 (emphasis in original) (also noting that divergent interests within the class militate in favor of mandatory non-opt-out certification—because certification gives affected parties a greater voice in the litigation).

12

Finally, permitting opt-outs in a Rule 23(b)(2) settlement would frustrate the Rule's core purposes. Because injunctive relief necessarily operates market wide, opt-out merchants would receive the benefits of classwide reforms regardless—creating free-rider and hold-up problems and risking inconsistent obligations. The Court has already recognized those dangers in rejecting opt-out rights here, explaining that opt-outs would invite contradictory equitable relief and disincentivize settlement. *DDMB*, 2021 WL 6221326, at *49; *see also Van Gemert v. Boeing Co.*, 590 F.2d 433, 439 n.14 (2d Cir. 1978) (*en banc*) (lack of opt-out privilege "reflects the conclusion of those who drafted the Rules that individual choice should be subordinated to the interests of the class as a whole to avoid inconsistent judgments or prejudice to absent class members"), *aff'd*, 444 U.S. 472 (1980); *accord Yan Won Liao v. Holder*, 691 F. Supp. 2d 344, 354 (E.D.N.Y. 2010); *see also In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 986 F. Supp. 2d 207, 236 (E.D.N.Y. 2013) ("To allow [merchants] to opt out and pursue their own rules-based injunctive relief would eliminate the incentive to settle that Rule 23(b)(2) was designed in part to create.").

The absence of opt-out rights is not a defect, but an essential feature of a Rule 23(b)(2) resolution in this long-running case.

## III. THE AMENDED SETTLEMENT'S REFORMS ARE DESIGNED TO INCREASE COMPETITION.

The Objectors contend that the proposed reforms are "worthless." Professors Stiglitz and Leffler conclude otherwise: given the Amended Settlement's broad suite of reforms, eliminating the rules highlighted by the Objectors' would provide "minimal" if any incremental benefit.[10] The

---

[10] Shadowen Dec., Ex. 2, Declaration of Joseph E. Stiglitz Ph.D. and Keith B. Leffler, Ph.D. (Nov. 10, 2025), ECF 9692-5 ("Stiglitz Dec.") ¶¶ 17, 114.

experts' conclusion is fully supported by merchant testimony, other plaintiff-side expert testimony, and Defendants' business records.

## A.     THE REFORMS ALLOW MERCHANTS TO DECLINE HIGH-COST CREDIT CARDS.

For years, merchants,[11] trade associations,[12] and experts[13] have clamored for the right to decline the networks' highest-cost payment cards—Commercial and Premium credit cards. The

---

[11] *See, e.g*., Walmart Obj., ECF 9225 at 5-6 (Walmart "particularly has an interest in eliminating or rolling back Defendants' Honor All Cards rules, which require Walmart to accept for payment all manner of Defendants' cards, including those that have interchange fees that are substantially higher than other cards"); Shadowen Dec., Ex. 3, Lowe's (30(b)(6)) Dep. 234-235 (redacted) (

); Shadowen Dec., Ex. 4, Kamer (Thorntons) Dep. 100-101 (PX228, redacted) (

); Shadowen Dec., Ex. 5, Van Meter (Target 30(b)(6)) Dep. 80 (PX407) (

); Shadowen Dec., Ex. 6, Williams (The Home Depot 30(b)(6)) Dep. 95-96 (PX422, redacted) (

).

[12] Testimony of Doug Kantor (General Counsel, National Association of Convenience Stores) before the U.S. Senate Committee on the Judiciary Hearing on "Breaking the Visa-Mastercard Duopoly: Bringing Competition and Lower Fees to the Credit Card System," at 8 (Nov. 19, 2024), *available     at*     https://www.judiciary.senate.gov/imo/media/doc/2024-11-19_-_testimony_-_kantor.pdf ("[b]ecause the fees are so much higher for some cards than for others, merchants very sensibly might want to accept some of them but not others …").

[13] *See, e.g*., Shadowen Dec., Ex. 7, Expert Report of Dr. Robert G. Harris (Oct. 5, 2018) ("Harris Report") ¶ 813 (

); Report of Professor Jerry Hausman (May 28, 2013), ECF 2670-5 ¶ 107 (

); Shadowen Dec., Ex. 8, Expert Report of Professor Jerry Hausman (Oct. 5, 2018) ("Hausman Report") ¶ 176 (

) (emphasis added). The Target Plaintiffs on whose behalf Professor Harris offered testimony are identified at Harris Report ¶ 9 n.1. The Home Depot and the 7-Eleven Plaintiff Group on whose behalf Professor Hausman offered testimony are identified at Hausman Report ¶ 10 n.1.



14

Amended Settlement delivers those reforms, and they are indeed "unprecedented and meaningful changes to the Honor All Cards rules."[14]

### 1. Commercial Credit Cards

The Amended Settlement reforms the HAC rules by, among other things, allowing merchants to decline Commercial credit cards of one or both networks.[15] Those cards carry the highest interchange rates and comprised ██% of credit card transaction volume in 2024.[16] Merchants that reject these cards will dramatically reduce their interchange fees on these transactions by between ██ bps and ██ bps.[17]

Circle K asserts that this reform is "especially illusory" to convenience-store firms because they "sell almost exclusively to consumers, not businesses."[18] Not so. Commercial credit card volume for non-fuel sales at convenience stores[19] is about ██% of overall credit card volume on average.[20] Thus, the opportunity for a convenience store to reject these high-priced cards is a substantial reform. Convenience stores, like all class members, will also benefit from the Amended Settlement's full array of other reforms.

### 2. Premium Credit Cards

---

[14] Shadowen Dec., Ex. 9, Declaration of Hon. James Orenstein (Ret.), ECF 9692-6 ("Orenstein Dec.") ¶ 15.

[15] Amended Settlement ¶¶ 22, 71, 81.

[16] Stiglitz Dec. ¶ 48, Table 1.

[17] Stiglitz Reply Dec. ¶ 19 n.33.

[18] Circle K Obj., ECF 9722 at 16.

[19] Objectors acknowledge that convenience stores pay different, lower interchange rates on fuel sales. *See, e.g.*, Circle K Obj., ECF 9722 at 16.

[20] Stiglitz Reply Dec. ¶ 19 n.34

Merchants that reject a network's expensive Premium credit cards also will dramatically reduce their interchange fees, by between ■ bps and ■ bps.[21] Objectors contend that merchants cannot as a practical matter decline Premium cards because they account for too great a share of their Visa and Mastercard credit card transaction volume.[22] Again, this objection has no merit.

Objectors' focus on the current volume of Premium card transactions is a narrow, *static* analysis. The Amended Settlement allows merchants to make non-acceptance of Premium cards a *process* rather than a one-time, abrupt decision. Merchants can start reducing their Premium card volume by offering discounts to customers to use the new 125-bps Standard cards.[23] Or merchants can reduce Premium card volume by discounting for debit card payments.[24] Or they can surcharge Premium cards or use some combination of these tools.[25] After reducing transaction volume on Premium credit cards—and maybe also conducting the pilot programs that the Amended Settlement provides[26]—a merchant can then decline Premium cards or threaten to do so. Amazon recently used an analogous process—involving surcharging, discounting, and threatening non-acceptance—outside the U.S. as part of an effort to achieve substantially lower rates from Visa.[27]

---

[21] Stiglitz Reply Dec. ¶ 2 n.4.

[22] *See, e.g.*, RILA and NRF Obj., ECF 9727 at 4-6; Circle K Obj., ECF 9722 at 11.

[23] *See* Section III.C.4, *infra*.

[24] *See* Section III.C.1, *infra*.

[25] Stiglitz Reply Dec. ¶ 18; *see also* Section III.B-C, *infra*.

[26] Amended Settlement ¶¶ 31-32, 80-81.

[27] In 2021 in Singapore and Australia, Amazon simultaneously levied a surcharge on Visa credit cards and offered a discount to switch to lower-cost options. Then in early 2022 it announced to its UK customers that it would no longer accept Visa credit cards, offering affected customers a $27 USD reward for deleting the card from their accounts. A month later, Amazon and Visa announced a worldwide agreement providing for the acceptance of Visa in all jurisdictions, with no surcharging. *See* Jenn Shelby, *Amazon and Visa resolved dispute over credit card fees,* The

Another example is Kroger, which dropped (or threatened to drop) acceptance of Visa credit cards in certain stores in the United States, also in an effort to obtain lower cost of acceptance.[28]

Objectors' assertions about the insignificance of the Premium card reforms are meritless even under a static rather than dynamic analysis. To illustrate, Objectors insist that it is essential that they have the ability to decline the credit cards of certain issuers such as Chase, Citibank, and Capital One. Those issuers comprise approximately ██%, ██%, and ██%, respectively, of merchants' total Visa and Mastercard credit card transaction volume[29] By comparison, Mastercard's Premium card volume comprises an average of about ██% of merchants' Visa and Mastercard total credit card transaction volume.[30] Objectors cannot explain how the ability to decline Mastercard Premium cards is purportedly useless while the ability to decline particular issuers' cards with comparable transaction volume is essential.[31]

---

Guardian, Feb. 17, 2022, https://www.theguardian.com/technology/2022/feb/17/amazon-visa-resolve-credit-card-dispute-global-deal-payments; Isobel Asher Hamilton, Amazon is paying UK customers $27 to delete their Visa credit card as a payment option, Business Insider, Nov. 18, 2021, https://www.businessinsider.com/amazon-paying-uk-customers-to-delete-visa-credit-card-202111#:~:text=According%20to%20an%20Amazon%20spokesperson%2C%20the%20company,facing%20high%20costs%20for%20accepting%20card%20payments.

[28] "Kroger Announces Second Division to Stop Accepting Visa Credit Cards Due to Excessive Transaction Fees," Kroger Company Release, March 1, 2019, available at https://ir.kroger.com/news/news-details/2019/Kroger-Announces-Second-Division-to-Stop-Accepting-Visa-Credit-Cards-Due-to-Excessive-Transaction-Fees/default.aspx; and Green, Dennis, "Kroger is considering a ban on one of its most common forms of payment," Business Insider, August 1, 2018, https://www.businessinsider.com/kroger-not-accepting-visa-at-foods-co-stores-2018-8.

[29] Stiglitz Reply Dec. ¶ 17 n.29.

[30] Stiglitz Reply Dec. ¶ 17 n.28.

[31] Changing tacks, Circle K also asserts that the new Standard cards will be so successful that issuers will try to switch even more cardholders from Standard cards to Premium cards. Circle K Obj., ECF 9722 at 15-16. To the contrary, for issuing banks Standard cards will continue to generate more interchange revenue, net of rewards expense, than Premium cards—██ bps versus ██ bps, respectively. *See* Stiglitz Reply Dec. ¶ 23. The banks issue Premium cards not to generate

17

Moreover, the Objectors' narrow focus on the percentage of transaction volume is misplaced. While Standard credit cards in 2024 accounted for only about █% of each network's consumer credit card *volume*, those cards have accounted for more than █% of the networks' *issued cards*.[32] That means that many customers who use Premium cards also carry a network's Standard card. More than █% of consumers carry two or more payment cards.[33] Thus, the risk to merchants from declining a particular card is greatly reduced.

The ability to decline the networks' high-cost cards would be a substantial reform even if it were the only relief provided. It is all the more valuable as part of a comprehensive set of competitive tools that allow merchants to steer customers to lower-cost networks, issuers, or payments methods.

### B.    THE REFORMS ALLOW MERCHANTS TO USE SURCHARGING TO STEER TRANSACTIONS OR TO SIMPLY REDUCE THEIR EFFECTIVE ACCEPTANCE COSTS TO $0.

Major retailers testified in this litigation that they want the ability to surcharge "to attempt to persuade customers to use one card over another or to make potential pricing changes from one card to another based upon the interchange rate of that card."[34] Under the Amended Settlement,

---

more net interchange revenue, but to sign up more cardholders; nothing in the Amended Settlement changes that dynamic. Nor could the issuers arbitrarily reclassify cards even if they had an economic motive to do so. *Contra* Circle K Obj., ECF 9722 at 11. The networks have card-product standards that they enforce by audits, and if the networks' audits did not halt any such efforts, the Amended Settlement's anti-circumvention clause would.

[32] Stiglitz Dec. ¶88 n. 84.

[33] Stiglitz Reply Dec. ¶ 18 n.30. The █% figure is likely understated because the data treat a mobile wallet as one card, when in fact the wallet itself might (and likely does) contain more than one payment card. *Id.*

[34] Shadowen Dec., Ex. 10, Witt (Office Depot 30(b)(6)) Dep. 229. *See also, e.g.*, Shadowen Dec., Ex. 11, Isaac (Grubhub) Dep. 210 (███████████████████████████████████████████████████████████████████████████████████████); Shadowen

merchants will be permitted to surcharge at the brand (*e.g.*, Visa or Mastercard), type (*e.g.*, Visa Premium), or product (*e.g.*, Visa Signature) level, up to the lesser of the full cost of acceptance or 3%, regardless of whether they accept or surcharge American Express or other competitive cards.[35]

---

Dec., Ex. 12, Peck (7-Eleven) Dep. 223 (████████████████████████████████████████ ██████████████████); Shadowen Dec., Ex. 13, Kennedy (Target) Dep. 19 (████████████████████████████████████████); Shadowen Dec., Ex. 5, Van Meter (Target 30(b)(6)) Dep. 80 (████████████████████████████████"); Shadowen Dec., Ex. 14, Huxel (Macy's 30(b)(6)) Dep. 191-192 (████████████████ ████████████████████); Shadowen Dec., Ex. 15, Gates (Beall's) Dep. 138 (redacted) (████████████████████████████████████████); Witness Statement of Charles Symons on behalf of IKEA, *The Commissioner of Competition and Visa Canada Corporation, et al.*, CT-2010-010, no. 234 (Canada Comp. Tribunal Mar. 13, 2012, ECF 5939-4 at Exhibit N ¶¶ 47-48 (IKEA avowing that no-surcharge rules are anticompetitive because they prevent IKEA from "send[ing] appropriate signals to customers" or "constrain[ing]…or reduc[ing] Card Acceptance Fees"); *id*. ¶ 53 (avowing that customers are used to paying surcharges because they willingly paid extra for services such as delivery or assembly that were not part of the standard IKEA product offering); *id*. ¶¶ 54-57 (detailing IKEA's six-year history of surcharging in the United Kingdom where it successfully reduced its card-acceptance costs, steered consumers to cheaper forms of payment, and passed the savings along to customers).

[35] *See* Amended Settlement ¶¶ 40-41, 89-90. Walmart was among the merchants that extolled the virtues of the right to surcharge. *See* Shadowen Dec., Ex. 16, Cook (Walmart) Dep. 144 (████ ████████████████████); Walmart First Amended Complaint, 14-MD-01720, ECF 82 ¶¶ 89-93 (alleging that, with surcharging and discounting, "Wal-Mart and other merchants could have steered some customers into different payment products and could have negotiated more favorable terms from Visa or from individual Issuers"); *see also* Witness Statement of Mario De Armas on behalf of Wal-Mart Stores, Inc., *The Commissioner of Competition and Visa Canada Corporation, et al.*, CT-2010-010, no. 234 (Canada Comp. Tribunal Mar. 6, 2012), ECF 5939-4 at Exhibit M ¶ 52 (Walmart avowing that no-surcharge rules "eliminate a significant source of leverage that Walmart Canada would otherwise have in negotiating with Visa and MasterCard"). Walmart now asserts that it will not avail itself of the surcharging relief because it would conflict with Walmart's Every Day Low Price strategy. Walmart Obj., ECF 9729 at 10. Leaving aside the economic sense of Walmart's assertion (see Stiglitz Reply Dec. ¶ 14), although Walmart purports not to "value the relief afforded by the Settlement, it is incontrovertible that they benefit from the Settlement insofar as the changes to Visa's and Mastercard's rules apply with equal force to them," and "[a] Rule 23(b)(2) class member need not avail herself of the benefit of a settlement to be deemed to have benefit from it." *Payment Card*, 2024 WL 3236614, at *39 n.53 (citing *Amara v. CIGNA Corp.*, 775 F.3d 510, 522 (2d Cir. 2014)). Another Objector that has sought surcharging relief is U.S. PIRG, which filed amicus briefs in the Supreme Court, the Second Circuit, and the Fifth Circuit promoting the efficacy of surcharging and opposing no-surcharge statutes, arguing: "As consumer advocates have long argued, if consumers knew about the costs of using credit they might choose to avoid those costs by using less-expensive payment methods. …That, in turn, would drive competition to lower swipe fees, leading to lower prices and—in the

This is a very significant improvement over the prior agreement, which limited surcharges to 1% for American Express-accepting merchants, and it addresses one of the chief concerns of merchants with respect to surcharging. A merchant that chooses to surcharge for its full cost of acceptance up to 3% will potentially reduce its costs on those transactions to 0 bps.

### 1.    The Surcharging Relief is Broad and Effective.

Some Objectors erroneously contend that the reforms of the no-surcharge rules are too limited.[36] The Amended Settlement repeals the level-playing-field rules, eliminating restraints that prevented merchants from imposing surcharges on more than ██% of Visa and Mastercard credit card transactions.[37] It eliminates one of the Court of Appeals' principal criticisms of the 2013 proposed settlement. *See In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 827 F.3d 223, 238 (2d Cir. 2016).

As the payments market has evolved, surcharging has become more prevalent and accepted by merchants and consumers alike, and it is a highly effective means of steering cardholders to lower-cost payment mechanisms.[38] The Amended Settlement's surcharging reforms are a game

---

long run—happier consumers." U.S. PIRG Amicus Br., filed in *Expressions Hair Design v. Schneiderman*, 2016 WL 6994876, at *9-10 (S. Ct. Nov. 21, 2016); *see also* U.S. PIRG Amicus Br., filed in *Rowell v. Pettijohn*, 2015 WL 3819553, at *5 (5th Cir. June 16, 2015) (surcharging is a "valuable tool that could [in the absence of state anti-surcharge laws] be utilized to help remedy the grossly inefficient and anticompetitive system of payment that now drastically and detrimentally affects American consumers"); U.S. PIRG Amicus Br., filed in *Expressions Hair Design v. Schneiderman*, 2014 WL 3014566, at *5 (2d Cir. June 20, 2014) (same).

[36] Circle K Obj., ECF 9722 at 20-21; National Association of College Stores Obj., ECF 9719 at 4; American Booksellers Association Obj., ECF 9752 at 3; Energy Marketers of America Obj., ECF 9720 at 2; The Cigarette Store LLC Obj., ECF 9735 at 2; Global Partners LP Obj., ECF 9754 at 2.

[37] *See* Amended Settlement ¶¶ 39-41, 88-90 (prior level-playing-field rule not included in new surcharging rules).

[38] *See* ECF 8307 at 8-10 (Class's brief in opposition to Defendants' summary judgment motion, with a section entitled "Surcharging Works"); *see also* Shadowen Dec., Ex. 17, Buse (former Visa executive) Dep. 199 ("if consumers were given a penalty for using their payment of choice, which

changer.[39] Like the Class's experts, the large merchants' economists in MDL 1720 emphasized the current inability to "steer their customers to lower cost forms of payment,"[40] including not just to other credit card issuers and networks,[41] but also to much less expensive debit card and ACH transactions.[42]

---

I view a surcharge to be, then they would be discouraged from using the payment type that was being penalized"); Shadowen Dec., Ex. 18, AMEXNDR11867968-70 (███████████████████ ██████████████); Peter Lucas, *Merchants Are Turning to Credit Card Surcharges As Processor Satisfaction Declines, J.D. Power Finds* (Jan. 23, 2025), https://www.digitaltransactions.net/merchants-are-turning-to-credit-card-surcharges-as-processor-satisfaction-declines-j-d-power-finds/ ("surcharging is also prompting consumers to use alternative payment methods to avoid the levies, with 81% of respondents saying they have used an alternate payment at one time to avoid a surcharge"); Cheryl Winokur Munk, *Credit card surcharging is rising: What banks need to know* (Feb. 18, 2025), https://www.americanbanker.com/payments/news/banks-face-new-threats-from-credit-card-surcharging (41% of credit card users decided not to pay with a credit card at a large or small business because of a surcharge).

[39] *See Could Credit Card Surcharges Trigger A Mass Exodus From Premium Cards?*, Forbes (Nov. 13, 2025), https://www.forbes.com/sites/rogerdooley/2025/11/13/could-credit-card-surcharges-trigger-a-mass-exodus-from-premium-cards (Under the Amended Settlement, "[s]uddenly, those airline points aren't free anymore. You're buying them, transaction by transaction. When people have to consciously pay for rewards, they stop wanting them."); Justin Price, *Chase Sapphire, Amex and More May Be Rejected by Merchants as Visa and Mastercard Strike Historic Dea*l, International Business Times (Nov. 11, 2025), https://www.ibtimes.co.uk/chase-sapphire-amex-more-may-rejected-merchants-visa-mastercard-strike-historic-deal-1754174 (Amended Settlement may "reshap[e] how Americans use rewards cards," potentially "upending the landscape for cardholders" who rely on rewards cards. "Rewards programmes themselves face an uncertain future under the new regime.").

[40] Shadowen Dec., Ex. 7, Harris Report ¶ 747; *see also* Shadowen Dec., Ex. 19, Roy Epstein Report (Oct. 5, 2018) ("Epstein Report") ¶ 186 (███████████████████████████████████ █████████████████). The merchants for which Professor Epstein testified are identified at *id*. ¶ 10.

[41] Harris Report ¶¶ 954-956.

[42] Harris Report ¶¶ 60, 391, 575, 612, 1079; Shadowen Dec., Ex. 20, Reply Expert Report of Professor Jerry Hausman (Oct. 11, 2019) ("Hausman Reply Report") ¶ 167.

Although the Amended Settlement does not allow for issuer-level surcharging,[43] the impact of such additional relief would be, in Professors Stiglitz's and Leffler's words, "minimal" in light of the full suite of other reforms.[44] Under the Amended Settlement, merchants can surcharge to generate competition among credit card networks, to steer customers to a lower-cost payment method, such as debit cards which have an average interchange rate of █ bps, or to simply recover the entire cost of the transaction, effectively reducing the cost of acceptance to 0 bps.

Merchants in this litigation testified that they want to secure negotiating leverage specifically against *the networks*, not just against issuers.[45] In the litigation against American Express, the surcharging at issue was at the brand level (surcharging all American Express cards), not at the issuer level (very few American Express cards are issued by banks rather than by American Express). Major merchants lined up in the *American Express* litigation to demand the right to surcharge at the brand level.[46] To get the ability to surcharge Visa and Mastercard at the brand level, merchants litigated against state no-surcharge statutes all the way to the Supreme Court, and then further.[47]

---

[43] Circle K Obj., ECF 9722 at 20-21; National Association of College Stores Obj., ECF 9719 at 4; American Booksellers Association Obj., ECF 9753 at 3; Energy Marketers of America Obj., ECF 9720 at 2; The Cigarette Store LLC Obj., ECF 9735 at 2; Global Partners LP Obj., ECF 9754 at 2.

[44] Stiglitz Dec. ¶¶ 114-117.

[45] *See, e.g.*, Shadowen Dec., Ex. 21, Craycraft (Abercrombie) Dep. 254; Shadowen Dec., Ex. 22, Schockling (Chico's 30(b)(6)) Dep. 248; Shadowen Dec., Ex. 23, Ward (JCPenney 30(b)(6)) Dep. 279; Shadowen Dec., Ex. 24, Carrothers (Kohl's 30(b)(6)) Dep. 119-120; Shadowen Dec., Ex. 25, Bloebaum (Luxottica 30(b)(6)) Dep. 114-115; Shadowen Dec., Ex. 26, Rentfrow (Luxottica) Dep. 54; Shadowen Dec., Ex. 11, Witt (Office Depot 30(b)(6)) Dep. 133; Shadowen Dec., Ex. 27, Jackson (Target) Dep. 158-159.

[46] *See, e.g.*, *United States v. Am. Express Co.*, 88 F. Supp.3d 143, 152 (E.D.N.Y. 2015) (referring to testimony of "nearly twenty" merchant witnesses).

[47] *See generally Expressions Hair Design v. Schneiderman*, 581 U.S. 37 (2017).

### 2.    The New Surcharging Rules Will Be Simple and Effective.

Objectors complain that surcharging is inherently complicated and time-consuming.[48] But "[t]he new proposed rule is much simplified and easier to use compared to the surcharging relief offered in the [prior agreement]."[49] The Amended Settlement also provides merchant education programs to explain the rules and how to use them, at Defendants' expense. It further incentivizes the networks to provide better point-of-sale data to assist product-level surcharging.[50]

### 3.    The Amended Settlement Effectively Deals with State No-Surcharge Statutes.

Objectors complain that certain states prohibit surcharging.[51] But they fail to address the fact that courts have struck down statutes materially indistinguishable from those in Connecticut, Maine, Massachusetts, and Puerto Rico, and that the Amended Settlement's surcharging expansions can motivate merchants in those states to get those statutes invalidated too.[52] The Class's opening papers also anticipated the Objectors' contention that complying with New York's

---

[48] Walmart Obj., ECF 9729 at 10-11; Maine Energy Marketers Association Obj., ECF 9740 at 4; RILA and NRF Obj., ECF 9727 at 8.

[49] Orenstein Dec. ¶ 17.

[50] Amended Settlement ¶¶ 40(b)(ii), 41(b)(ii), 89(b)(ii), 90(b)(ii). In addition, Visa and Mastercard will be prohibited from retaliating against a merchant that surcharges or uses the threat of surcharging in fee negotiations with Defendants. Amended Settlement ¶¶ 43(f), 92(f).

[51] Walmart Obj., ECF 9729 at 10-11; RILA and NRF Obj., ECF 9727 at 8.

[52] Equitable Relief Class Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Approval of Amended Settlement, ECF 9692 ("Opening Brief") at 25; *see also* Epstein Report ¶ 138 (███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████).

dual-pricing statute might be "functionally impossible."[53] It is not reasonable to construe the statute to require the merchant to post the cost of accepting a *particular customer's card* rather than the merchant's average cost of accepting *that type of card*, thus preventing the merchant from posting the price before the point-of-sale.[54] If New York were to interpret the statute that way, it would be unlawful for the same reasons that courts have struck other statutes that prohibit or effectively prohibit surcharging.[55]

### 4.      The Surcharging Relief Is Not Undermined by Customer "Friction."

Objectors assert that merchants might face "consumer ire" or "friction" at the point-of-sale if they surcharge.[56] In 2026 that is no longer the concern that it once may have been. Merchants are already increasingly surcharging customer purchases.[57] Merchants are becoming more comfortable surcharging due to the "increasingly ubiquitous presence of service fees, tips, and

---

[53] Walmart Obj., ECF 9729 at 11 (quoting *Payment Card*, 2024 WL 3236614, at *7).

[54] Declaration of Equitable Relief Class Counsel in Support of Motion for Preliminary Approval of Amended Settlement Agreement, ECF 9692-10 ("Class Counsel Dec.") ¶¶ 187-188 (responding to *Payment Card*, 2024 WL 3236614, at *3 n.12).

[55] *Id.*

[56] RILA and NRF Obj., ECF 9727 at 8; Walmart Obj., ECF 9729 at 10-11; Maine Energy Marketers Association Obj., ECF 9740 at 4.

[57] J.D. Power, *Many Small Businesses Add Card Payment Surcharges to Customer Purchases as Point-of-Sale Payment Methods Proliferate* (Jan. 14, 2025), https://www.jdpower.com/sites/default/files/file/2025-01/2025002%20U.S.%20Merchant%20Services.pdf; *see* Peter Lucas, *Merchants Are Turning to Credit Card Surcharges As Processor Satisfaction Declines, J.D. Power Finds* (Jan. 23, 2025), https://www.digitaltransactions.net/merchants-are-turning-to-credit-card-surcharges-as-processor-satisfaction-declines-j-d-power-finds/ ("Some 34% of merchants surveyed are adding surcharges for credit card transactions, the study says."). The growth of surcharging has been accompanied by an expanding ecosystem of surcharge/cash-discount software solutions as merchants seek automated tools to navigate varying state rules and card-network requirements. *See* Market Intelo, *Cash Discount Program Platform Market Research* Report, https://marketintelo.com/report/cash-discount-program-platform-market.

other extra charges that consumers now encounter," and therefore merchants are "creating an environment where businesses can also afford to gamble with card surcharges."[58]

As for "[c]onsumers generally attribut[ing] surcharges to the merchant,"[59] the Amended Settlement eases the notice and disclosure requirements, permitting merchants to give their customers truthful information to explain why a surcharge is being imposed.[60]

Objectors fail to explain how surcharging cards would cause any more customer "friction" than selectively declining particular issuers' cards. Fundamental economics says that providing an option to a customer (you can use the card, but you will have to pay) is better than not providing that option ("I don't take that card").[61] That is why the merchants in MDL 1720 have demanded the right to surcharge; why merchants demanded the same in the *American Express* litigation; and why merchants litigated against various state no-surcharge statutes. The Amended Settlement delivers the broad, fulsome, effective surcharging relief that merchants have long sought.

### C.    THE REFORMS PROVIDE MANY TOOLS TO GENERATE COMPETITION AMONG ISSUERS.

The Amended Settlement provides a full complement of methods for merchants to spark competition among the issuing banks. Together with the selective non-acceptance and surcharging

---

[58] Peter Lucas, *Merchants Are Turning to Credit Card Surcharges As Processor Satisfaction Declines, J.D. Power Finds* (Jan. 23, 2025), https://www.digitaltransactions.net/merchants-are-turning-to-credit-card-surcharges-as-processor-satisfaction-declines-j-d-power-finds/.

[59] Walmart Obj., ECF 9729 at 10.

[60] Amended Settlement ¶¶ 42(b), 91(b).

[61] Stiglitz Reply Dec. ¶ 9. ███████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████ Shadowen Dec., Ex. 28, Foster (TJX 30(b)(6)) Dep. 122.

addressed above, these additional issuer-direct tools will allow merchants to steer transactions between networks, between Defendants' credit cards and debit cards, and also between the issuers within a network or between those issuers and other networks or forms of payment.

### 1. Discounting

The Amended Settlement requires that the networks permit merchants to provide/withhold discounts to cardholders based on the issuing bank.[62] The power of issuer-level discounting is reflected in issuing banks' resistance to it. Mastercard does not allow issuer-level discounting today precisely because, in response to Visa's allowing it (though not putting it in its publicly available rules), some issuers pressured Mastercard to resist the entreaties of merchants and a minority of issuers that would have welcomed another significant avenue for competition:

- *Mastercard executives recognized that the discounting would be good for merchants, cardholders, and Mastercard itself*: ███████████████████ ███████████████████[63]

- *Mastercard permits issuer-level discounting in other nations and concluded that permitting it here would create additional competition among issuers*: ███████ ███████████████████████

---

[62] Some Objectors make a cryptic complaint that the Amended Settlement "empowers Visa and Mastercard" to continue existing agreements with merchants. *See* Energy Marketers of America Obj., ECF 9720 at 2; American Booksellers Association Obj., ECF 9753 at 3-4; National Restaurant Associations and Restaurant Law Center Obj., ECF 9756 at 4. If the objection is that the Amended Settlement will lead to more merchant-specific deals, that is not a valid criticism— lower rates can come from discounting or surcharging or from negotiating lower rates in exchange for not discounting or surcharging. If the objection is that some merchants may have current contracts that make it difficult to renegotiate and take advantage of the Amended Settlement's reforms, that is not a circumstance that the Amended Settlement can (or perhaps even should) take into account.

[63] Shadowen Dec., Ex. 29, Bausch (Mastercard) Dep. 72-73; *see also* Shadowen Dec., Ex. 30, Bausch Ex. 3 (███████████████████████████████████████ ███████████████████████████████████████████).

███████████████████████████████████████████████████████████ [65]

- *Forward-looking issuers wanted it*: "███████████████████████████████████████████████████████████ [66]

- *A group of issuing banks resisted it (successfully) because it threatened their interchange revenue*: ███████████████████████ [67]

Professors Stiglitz and Leffler explained that the ability to discount an issuer's card allows merchants to "negotiate for discounted interchange rates with the major issuers in addition to the two networks."[68] During the course of this litigation, so did the large merchants' experts.[69] For

---

[64] "A/CB" refers to an Affinity (*i.e.*, merchant loyalty) card or Co-Brand card (a credit card co-sponsored by the merchant).

[65] Shadowen Dec., Ex. 31, SJDX 325 at '411 (████████████████████████████████████████); *see also* Shadowen Dec., Ex. 32, Bausch (Mastercard) Dep. 53-54 (██████████████████████████████); Shadowen Dec., Ex. 29, Bausch (Mastercard) Dep. Ex. 12 (████████████████████████████████).

[66] Shadowen Dec., Ex. 31, SJDX 325 at '410 (████████████████████████████████████).

[67] Shadowen Dec., Ex. 31, SJDX 325 at '413-15; *see also* Shadowen Dec., Ex. 34, Kirkpatrick (Mastercard) Dep. Ex. 14 (MCW_MDL_15627615 at '615) (████████████████████████████████); SJDX 325 at '411 (████████████████████████████████████████).

[68] Stiglitz Dec. ¶ 84.

[69] Hausman Reply Report ¶ 77 (████████████████████████████████); Harris Report ¶¶ 1103, 1207 (████████████████████████████████); *id.* ¶ 60 (████████████████████████████████████████

example, Professor Harris explained that ████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████ [70] Some merchants might prefer to surcharge rather than discount, but ███████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████ [71]

Consistent with the experts' opinions, merchants testified that they want the ability to steer

transactions to or from particular issuers' cards, including by discounting. [72]

---

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████ ).

[70] Harris Report ¶ 1067; *see also id.* at ¶¶ 60, 1103, 1207; Shadowen Dec., Ex. 34, Reply Expert Report of Dr. Robert G. Harris ("Harris Reply Report") ¶¶ 636-637.

[71] Harris Report ¶ 1067. Even under the current rules, discounting is substantial. *See, e.g.*, Federal Reserve Bank of Atlanta, Research Data Report, 2023 Survey and Diary of Consumer Payment Choice: Summary Results, at 19, https://www.atlantafed.org/-/media/documents/banking/consumer-payments/survey-diary-consumer-payment-choice/2023/sdcpc_2023_report.pdf.

[72] *See, e.g.*, Shadowen Dec., Ex. 35, Scully (Target) Dep. 197-202 (███████████████████
████████████████████████ ); Shadowen Dec., Ex. 5, Van Meter (Target 30(b)(6)) Dep. 80 (████████████████████████████████████████████ ");
Shadowen Dec., Ex. 14, Huxel (Macy's 30(b)(6)) Dep. 191-192 (████████████████████████
████████████████████████████████████████████████████████████████████ );
Shadowen Dec., Ex. 36, Pohmer (P.C. Richard 30(b)(6)) Dep. 14-15 (redacted) (███████████████
████████████████████████████████████ ); Shadowen Dec., Ex. 16, Gates (Beall's)
Dep. 138 (redacted) (████████████████████ ); Shadowen Dec., Ex. 10, Witt (Office Depot 30(b)(6)) Dep. 229 (███████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████ ).

Certain Objectors assert that the Amended Settlement merely clarifies the networks' existing rules, which, Objectors contend, already allow issuer-level discounting.[73] That assertion is incorrect. Visa started (quietly) allowing issuer-level discounting in 2013, but it has never amended its publicly available rules—the rules that merchants actually read and rely on—to state that Visa permits issuer-level discounting.[74] Mastercard has never permitted issuer-level discounting—it has doggedly resisted it. The Amended Settlement will require Mastercard to allow it for the first time after more than a decade of merchant demands and will require Visa to put issuer-level discounting in its rules.

### 2. Issuer Differentiation

The Amended Settlement allows merchants to differentiate among particular issuers' cards in 19 recurring, commercially important circumstances.[75] Today about ██% of Visa and Mastercard credit card transactions are "Card Not Present," *i.e.*, online transactions.[76] These issuer-differentiation reforms, which Class Counsel crafted in close consultation with major retailers and their counsel and the Class's industry consultants,[77] are broadly applicable to all Class members and are indisputably consequential.[78]

---

[73] *See, e.g.*, Circle K Obj., ECF 9722 at 21-22.

[74] *See* Opening Brief at 21; Class Counsel Dec. ¶ 147. Some of even the most sophisticated merchants were unaware that Visa permits discounting by issuer. *See* Stiglitz Reply Dec. ¶ 12 n.18.

[75] Amended Settlement ¶¶ 19, 68, and Appendix H.

[76] Stiglitz Reply Dec. ¶ 27.

[77] Class Counsel Dec. ¶¶ 113, 192.

[78] *See, e.g.*, Shadowen Dec., Ex. 37, Bardon (Amazon) Dep. 95 (redacted) (███████████████████████████████████████████

More generally, "preferencing" of certain products, services, search results, etc. in online platforms is already a huge commercial phenomenon.[79] Vendors pay to be listed first in online search results, to be listed on the first page of results, to be highlighted on the checkout page of the online marketplace, and on and on.[80] The Amended Settlement ensures that merchants can harness these techniques to prefer particular issuers' cards in exchange for reduced interchange rates or other consideration.

---

██████████████████████████████████); Shadowen Dec., Ex. 38, Schulz (Visa) Dep. Ex. 11 (VISA14MDL1-06382556)    (██████████████████████████████████████████ (VISA14MDL1-06382558) ██████████████████████████████████████████████████); Shadowen Dec., Ex. 39, Smith (Chase) Dep. 37-38 (███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████); Shadowen    Dec.,    Ex.    40,    Sullivan    (Chase    ChaseNet    30(b)(6))    Dep.    Ex.    5 (██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████); Shadowen Dec., Ex. 41, Fischer (Chase) Dep. 148-149. *See generally* Shadowen Dec., Ex. 9, Hausman Report ¶ 387 (████████████████████████████████████████████████████████████████████████████████); Shadowen Dec., Ex. 8, Harris Report ¶ 1090 (█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████); Harris Report ¶ 1073 (██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████).

[79] Stiglitz Reply Dec. ¶ 28.

[80] *Id.*

### 3. Digital Wallets

The Objectors likewise ignore the significance of the Amended Settlement's reforms with respect to digital wallets. In 2023, about 15% of point-of-sale payments and 37% of online payments in the United States were made with digital wallets. Those numbers are expected to grow to 31% and 51%, respectively, by 2027.[81] Issuing banks can and increasingly will sponsor their own digital wallets. The Amended Settlement eliminates the honor-all-wallets aspect of the networks' HAC rules, allowing merchants to decline a digital wallet regardless of whether it contains the networks' cards.[82] Instead, the merchant can accept a digital wallet sponsored by a particular issuer, or containing a particular issuer's card, and decline others.[83]

Digital wallets will soon represent close to half of all relevant commerce. The Amended Settlement positions merchants to effectively engage in selective issuer acceptance with respect to those wallets.

### 4. Discounting to Standard Cards

The Amended Settlement effectively creates a new "Standard" or "Value" card with a maximum interchange rate of 125 bps. Today only about ██% of credit card transaction volume is on Standard cards.[84] Merchants can generate competition among the issuing banks by partnering

---

[81] Stiglitz Dec. ¶ 64, citing Capital One Shopping Research, *Digital Wallet Statistics* (July 23, 2025), https://capitaloneshopping.com/research/digital-wallet-statistics/.

[82] Amended Settlement ¶¶ 34-38, 83-87.

[83] *See* Stiglitz Reply Dec. ¶¶ 25-26.

[84] Stiglitz Dec., Table 1.

with one of them—in exchange for even lower interchange rates—to promote the issuance of the favored issuer's Standard cards.[85]

Objectors assert that some merchants already have posted rates on Standard cards below 125 bps.[86] That is true for less than ██% of the networks' credit card transactions, and ████████ ██████████████████████████████████.[87] The Amended Settlement makes this strategy available to all merchants, ████████████████████████████████████████████████████ ████████████████████████.

### 5. Pilot Programs

To enhance merchants' ability to use the forms of steering described above, the Amended Settlement permits unrestricted pilot programs to test steering techniques.[88] A merchant need not engage in the same steering programs in all of its stores.[89] The value of this relief, unacknowledged by any of the Objectors, is substantial.[90]

---

[85] Opening Brief at 21, 31.

[86] RILA and NRF Obj., ECF 9727 at 7.

[87] Stiglitz Reply Dec. ¶ 21 n.39.

[88] Amended Settlement ¶¶ 33, 82.

[89] This is in addition to allowing and setting the criteria for pilot programs for *non-acceptance* of the networks' credit cards and debit cards. *See* Amended Settlement ¶¶ 31-32, 80-81.

[90] *See, e.g.*, Harris Report ¶ 1071 (



).

## IV.    THE MAGNITUDE, STRUCTURE, AND DURATION OF THE RATE CAPS AND ROLLBACKS ARE APPROPRIATE.

Objectors raise four principal concerns about the Amended Settlement's caps on posted interchange rates and its mandated 10-bps rollbacks on the networks' systemwide average effective credit interchange rate.

### A.    THE CAPS AND ROLLBACKS ARE NOT DAMAGES.

Comparing the 10-bps rate rollbacks to the average interchange rates of about ███ bps, Objectors call the rollbacks "paltry."[91] Their implicit argument is that the rollbacks should compensate merchants for (some undefined amount of) overcharges.

But this is not a damages case. The role of the Rule 23(b)(2) Class is to reform the rules going forward, not to compensate merchants for past overcharges. The caps/rollbacks are an *adjunct to*, not a substitute for, damages. The Court previously approved the release on the damages claims.[92] Objections about inadequate compensation are "more properly directed at the (b)(3) settlement." *Payment Card*, 2024 WL 3236614, at *39.

As to objections made in 2024 that the Court lacks authority to impose any rate caps or rollbacks at all,[93] the Court may order such relief for the limited purpose of supplementing the rules relief and protecting merchants from further rate increases during a period of transition to increased competition.[94] As Judge Orenstein noted, the rate relief "function[s] to support

---

[91] Walmart Obj., ECF 9729 at 13.

[92] *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704 (2d Cir. 2023).

[93] *See, e.g.*, Circle K Obj., ECF 9230 at 30-46 (arguing that court-ordered price caps are unlawful price fixing).

[94] *See* ECF 9179-1 at 29 (Class Plaintiffs' brief in support of prior agreement, citing cases supporting permissible role of limited price caps/rollbacks).

merchants' ability to take advantage of the rules changes in the near term, rather than simply serving as a form of cost recoupment."[95]

The caps and rollbacks serve that permissible, limited function by capping and modestly rolling back rates during a five-year period when the rules reforms can start to generate competition. The details of the 10-bps rollback confirm its role of supplementing the rules relief. First, about 45% of the 10 bps will be devoted to reducing the rates on Standard cards, the purpose of which is to make surcharging/discounting/declining Premium cards more viable for merchants.[96] Second, the Amended Settlement emphasizes this purpose of the Standard cards by providing that the rate reduction on those cards runs for the same term as the other *rules reforms*— a minimum of eight years rather than the five years for rate relief. Third, the Amended Settlement does not dictate how the remainder of the 10 bps will be allocated—it will be allocated as competition determines.

The 10-bps rollback is, conservatively, about ██% of the gap between the actual and the *competitive total price*,[97] which the Supreme Court has emphatically identified as the relevant metric.[98] The ability to surcharge and discount, which merchants can do immediately, will close all or a substantial part of the remaining gap.[99] After the total price reaches the competitive level,

---

[95] Orenstein Dec. ¶ 16.

[96] *See* Stiglitz Reply Dec. ¶¶ 30 n.26; *see* Orenstein Dec. ¶ 16 (reduced rate on Standard cards "has the potential to complement and advance the Honor All Cards rule revisions").

[97] Opening Brief at 43; Stiglitz Dec. ¶ 119.

[98] *See Ohio v. Am. Express*, 585 U.S. at 546-47 (affirming reversal of judgment that rested on plaintiffs' evidence of only merchant-side price rather than total price).

[99] Opening Brief at 43; Stiglitz Dec. ¶ 119. Chief Judge Brodie found the rate relief in the prior proposed agreement to be insufficient because she believed, given the terms of that agreement, the rules relief did not have substantial value. *Payment Card*, 2024 WL 3236614, at *27-28, 36-37.

further reductions in interchange rates may well result in reductions in cardholder rewards or increases in their annual card fees.[100] The Amended Settlement appropriately relies on the rules reforms—on competition, not further Court-ordered interchange reductions—to bring about the expected adjustment in the balance between the prices on the merchant and cardholder sides of the network platforms.[101]

Circle K asserts that "Visa and Mastercard's rates increased during the year between the 2024 proposed settlement and the 2025 proposed settlement (nine points)."[102] Circle K cites only to a press release[103] that discusses a purported increase from *2023 to 2024*—not "the year between the 2024 proposed settlement and the 2025 proposed settlement"—of *all* "*swipe fees*," which include not just the Visa and Mastercard network fees and interchange fees, but also acquirer fees, third-party processor fees, and fees for *optional* value-added services. No such 9-bps increase occurred on the Visa or Mastercard network fees or interchange fees; the actual increase was less than 1 bps historical norm.[104]

---

[100] Opening Brief at 44-45; Stiglitz Dec. ¶ 120.

[101] *See* Orenstein Dec. ¶ 14 (noting need to avoid "unintended effects of reducing industry-wide competition or harming cardholders").

[102] Circle K Obj., ECF 9722 at 10. Other Objectors allege a 9 bps increase but provide no citation whatsoever. *See* Maine Energy Marketers Association Obj., ECF 9740 at 3; National Lumber and Building Material Dealers Association Obj., ECF 9742 at 2; NATSO Obj., ECF 9744 at 2.

[103] *See* J. Craig Shearman, *Credit and Debit Card 'Swipe' Fees Hit New Record of $187.2 Billion, Driving Up Prices for American Families, Merchant Payments Coalition* (Mar. 18, 2025), https://perma.cc/ND8Y-G6UG.

[104] Stiglitz Reply Dec. ¶ 6 n.13.

Another Objector asserts that the Amended Settlement's mandated 10 bps reduction would barely exceed the networks' "recent rate increases."[105] The cited report shows increases in *amount* of fees, not in the *rate* of the fees, and expressly notes that the increases it shows—which in any event are only "estimates"—are "primarily driven by *volume increases and* rises in unregulated network and interchange fees."[106]

## B. THE COURT IS NOT A REGULATOR.

Some Objectors complain that even with the rollbacks, the interchange rates will be far above the rate caps that other nations set by governmental regulation.[107] Class Counsel are not regulators or legislators, and this is an antitrust case, not a regulatory proceeding.[108] The Objectors ignore that "judges make for poor 'central planners' and should never aspire to the role." *NCAA v.*

---

[105] RILA and NRF Obj., ECF 9727 at 7.

[106] Shadowen Dec. Ex. 42, CMSPI, State of the Industry Report (2025), at 72 (emphasis added).

[107] Walmart Obj., ECF 9729 at 12-13.

[108] Some objections reflect a preference for legislative relief rather than any form of injunctive relief that could be achieved through the Amended Settlement. *See, e.g.*, National Lumber and Building Material Dealers Association Obj., ECF 9742 at 2 ("NLBMDA has consistently informed lawmakers" about complaints regarding the structure of the credit card market and "will continue these advocacy efforts"); National Restaurant Association and Restaurant Law Center, ECF 9756 at 1 n.2 (the Restaurant Law Center's "expressed purpose is to promote laws and regulations"); American Economic Liberties Project Obj., ECF 9762 at 2 (similar); Jonathan Stempel, *Visa, Mastercard reach $38 billion swipe fee settlement, draw opposition*, Reuters (Nov. 10, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/visa-mastercard-reach-revised-swipe-fee-settlement-with-merchants-2025-11-10/ (Doug Kantor, general counsel of the National Association of Convenience Stores, expressing similar views). In fact, certain Objectors contend that they would *only* be satisfied with legislation. *See, e.g.*, Maine Energy Marketers Association Obj., ECF 9755 at 4 ("Meaningful reform will require rejecting this agreement and supporting real policy solutions such as the Credit Card Competition Act."). These complaints are misplaced. This is a class action lawsuit, not a proposal for legislation before Congress, and the issue before the Court is whether the Amended Settlement is fair, adequate, and reasonable. It is. In any event, the Amended Settlement does not prevent legislation or stop merchants from lobbying Congress in any way.

*Alston,* 594 U.S. 69, 102-03 (2021) (citation omitted). Consequently, the Court "cannot regulate interchange fees"—it is a "form[] of relief … that this Court could not order even if plaintiffs obtained a complete victory on the merits." *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 986 F. Supp. 2d 207, 218-219 (E.D.N.Y. 2013), *rev'd and vacated on other grounds*, 827 F.3d 223 (2d Cir. 2016). Again, the rate caps and rollbacks here are adjuncts to the rules relief—the relief that the Amended Settlement appropriately relies on to drive down interchange rates.

### C.    THE CAPS/ROLLBACKS BENEFIT ALL MERCHANTS.

Some Objectors assert that the caps and rollbacks deliver different degrees of relief to different merchants.[109] Every class member will directly benefit; only the degree of benefit differs. It is permissible for "different class members [to] benefit differently from an injunction." *Payment Card*, 2024 WL 3236614, at *36 (quoting *Berni*, 964 F.3d at 147 n.28). Moreover, the differences in the degree of benefit are in the service of enhancing competition.

The Amended Settlement's caps apply to all posted rates. And unlike under the prior agreement, merchants that pay negotiated rather than posted rates will get a pro rata reduction in their negotiated rates. Thus, every merchant directly benefits.

As noted above, the 10-bps rollbacks will fund the 125-bps caps on the new Standard cards, which are a significant feature of the rules reforms,[110] with the remainder of the rollbacks distributed as competition dictates. The Objectors complain, in effect, that the rollbacks' benefits

---

[109] Walmart Obj., ECF 9729 at 12-14; RILA and NRF Obj., ECF 9727 at 6-7; Circle K Obj., ECF 9722 at 19.

[110] In addition to being directly connected to competition-enhancing rules reform, the Standard cards are likely accepted by all or almost all merchants. No Objector has contended otherwise. So this aspect of the 10-bps rate rollbacks also directly benefits all merchants.

are directly tied to competition-enhancing rules relief or will be distributed by competition. Those are virtues, not defects.

### D.    THE AMENDED SETTLEMENT EFFECTIVELY LIMITS NETWORK FEES.

Objectors contend that the Amended Settlement leaves the networks free to raise their network fees (which are less than a tenth the magnitude of interchange fees) and that they will do so in response to the expected reductions in interchange fees.[111]

Objectors implicitly assert that putting competitive pressure on interchange fees—which go entirely to the issuing banks—will somehow increase the profit-maximizing price that the networks charge for their services. The Objectors' economic proposition is not correct: nothing about reducing interchange rates will increase the profit-maximizing price for the networks' services.[112]

Walmart cites to an "inquiry" by the European Commission ("EC") into whether Visa and Mastercard raised their network fees after regulators capped interchange rates.[113] The EC inquiry is just that—an inquiry. There has been no finding that the networks took unusual fee increases.

Regardless, merchants in the EU do not have the complement of reforms that the Amended Settlement provides. If the networks were to (try to) raise their fees, merchants could use all the same competitive tools that the Amended Settlement provides against interchange rates, e.g., discounting other cards, surcharging the offending network's cards (merchants can surcharge the

---

[111] Walmart Obj., ECF 9729 at 2, 12-13; RILA and NRF Obj., ECF 9727 at 8-9.

[112] Stiglitz Reply Dec. ¶¶ 32-33. (As Chicago-school economists are fond of saying, "If they could profitably raise their prices, they would have already done it.")

[113] *See* Walmart Obj., ECF 9729 at 13 (citing Alex Rolfe, *Payments Card & Mobile, EC opens new Scheme Fee investigation into Visa and Mastercard* (Nov. 8, 2024), available at https://www.paymentscardsandmobile.com/ec-opensnew-scheme-fee-investigation-into-visa-and-mastercard/).

lesser of 3% or the merchant's cost of acceptance, which specifically includes the cost of network fees), use dual pricing, selectively decline high-cost cards, etc. Finally, if Visa or Mastercard attempted to raise network fees and channel those funds, directly or indirectly, to issuers, the Amended Settlement's anti-circumvention clause would expressly prohibit that attempt.[114]

## V.    THE CLASS FACES SUBSTANTIAL LITIGATION RISK AS TO BOTH LIABILITY AND THE SCOPE OF ANY RELIEF.

None of the Objectors grapple with the litigation risks that the Class would face if this case proceeded. Class representatives and their counsel are not permitted to take those litigation risks lightly.[115] In evaluating fairness, the Court must account for the substantial risk that continued litigation could yield materially less relief, or none at all, a reality the Objectors simply ignore. *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004) (discussing fourth *Grinnell* factor).

### A.    THE CLASS FACES SUBSTANTIAL RISK THAT IT WOULD NOT ESTABLISH LIABILITY.

Although Class Counsel successfully opposed Defendants' multiple summary judgment motions, proving antitrust liability is far from certain. The Class would face very substantial risk in trying to establish that the default interchange rules and the honor-all-issuers aspects of the networks' HAC rules are anticompetitive. Worse, to try to establish liability on those rules, the Class would also incur the risk of failing to establish liability on the networks' no-surcharge, no-discount, honor-all-wallets, and honor-all-products (Commercial and Premium) rules. That risk is

---

[114] Amended Settlement ¶¶ 54, 103.

[115] *See Martens v. Thomann,* 273 F.3d 159, 173 (2d Cir. 2001); Orenstein Dec. ¶ 19 (Amended Settlement "was the hard-fought result of the parties' best professional efforts and judgments, taking into account the risks of continued litigation, the strengths and weaknesses of their respective positions").

substantial. Two sets of plaintiffs challenged American Express's rules prohibiting surcharging or discounting in favor of other credit cards or debit cards, and both lost on the ground, among others, that the restraints are not anticompetitive.[116]

Regarding the default interchange and honor-all-issuer rules, this Court previously concluded that "Honor-all-Cards rules . . . undeniably have significant procompetitive effects" and that "[a] number of courts and economists have found the Honor-all-Cards rule and similar rules to be *procompetitive* under the Rule of Reason." *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig*, 986 F. Supp. 2d 207, 227-28 (E.D.N.Y. 2013). So a finding of liability would require a conclusion that the rules' anticompetitive effects outweigh their procompetitive benefits.[117]

In fact, those rules were concededly necessary to create and establish the networks in their infancy.[118] Establishing liability in these circumstances would not be impossible—the Class would

---

[116] *United States v. Am. Express Co.*, 838 F.3d 179 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 585 U.S. 529 (2018); *Moskowitz, et al. v. Am. Express Co.*, No.19-cv-566 (E.D.N.Y. 2019), Tr. of Jury Trial (Aug. 28, 2025), at 2700-2701.

[117] *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 83 (E.D.N.Y. 2024). Ironically, Objector Circle K quotes Mastercard CEO's statement to a stock analyst that the Amended Settlement "preserves the honor all [issuers] rule, which is at the core of the user experience." Circle K Obj., ECF 9722 at 2 (quoting a portion of this sentence). It is hardly surprising that a CEO would tout the preservation of a rule that even Plaintiffs acknowledge has some procompetitive benefits. As for his statement that Mastercard's competitive position "holds" (*id.*), he said it holds because, in his view, his firm's credit cards are a superior product for merchants, so merchants will not decline or steer away from them: "That beats any other alternative payments. The [fraud] protections are there. The cybersecurity, all these other things that are built into the cards ecosystem… When you take the category of cards overall versus other alternatives, that anyway holds." Transcript, *Mastercard at KBW Fintech Payments Conference: Strategic Insights and Future Plans* (Nov. 12, 2025), https://perma.cc/8LVH-3YZH. The CEO was not asserting that the Amended Settlement fails to engender competition, but that Mastercard will prevail in the competition that it engenders.

[118] *See, e.g.*, Stiglitz Dec. ¶ 30.

contend that the economic circumstances have changed to such an extent that rules that were previously necessary are now anticompetitive. But Defendants would dispute the economic facts and would likely invoke the law that "the successful competitor, having been urged to compete, must not be turned upon when he wins." *United States v. Aluminum Co. of America*, 148 F.2d 416, 430 (2d Cir. 1945) (L. Hand, J.).

No regulator or tribunal anywhere in the world has concluded that the honor-all-issuers rules are anticompetitive. The DOJ has been (and currently is) very active in this industry,[119] but it has never challenged the honor-all-issuers rules or the accompanying default interchange rates. Instead, when settling with Visa and Mastercard on the merchant restraints, it expressly preserved those rules.[120]

On these facts, the Class would face a substantial possibility of failing to obtain a finding that those rules are anticompetitive. Further, the effort to obtain such a finding would put at risk the *agreed* elimination of the networks' anti-steering rules, the reforms of the honor-all-wallets and honor-all-products aspects of the HAC rules, and the whole suite of other reforms available through the Amended Settlement.

### B. THE CLASS FACES SUBSTANTIAL RISK THAT IT WOULD NOT OBTAIN THE REQUESTED RELIEF.

---

[119] *See, e.g.*, Complaint, *United States v. Visa*, No. 24-cv-7214, ECF 1 (S.D.N.Y. Sept. 24, 2024); DOJ, *Comments of the United States Dept. of Justice: Debit Card Interchange Fees & Routing* (Aug. 11, 2021), https://www.justice.gov/atr/page/file/1424591/dl?inline; https://www.justice.gov/archives/opa/pr/justice-department-sues-block-visas-proposed-acquisition-plaid; *United States v. American Express, Mastercard International Incorporated and Visa, Inc.*, No. 1:10-cv-04496-NGG-RER (E.D.N.Y. 2011).

[120] Final Judgment as to Defendants Mastercard International Incorporated and Visa Inc., No. CV-10-4496 (E.D.N.Y. July 20, 2011); https://www.justice.gov/atr/case-document/final-judgmentdefendants-mastercard-international-incorporated-and-visa-inc.; *United States v. Visa*, 344 F.3d 229 (2d Cir. 2003).

Even if the Class established liability, it would still face a very substantial possibility that the honor-all-issuers and related default interchange rules would not be eliminated.

The Class and other plaintiff groups in MDL 1720 have not contended that default interchange itself is anticompetitive, only that it is anticompetitive in the presence of the other merchant restraints.[121] That is, the other restraints prevent the merchants from getting the networks or issuing banks to reduce the rates from the "default" rates; the restraints turn the nominally "default" rates into *de facto* fixed rates.[122]

Regarding honor-all-issuers: eliminating the rule is not necessary to generate competitive total prices and interchange rates. Reforming the merchant restraints is sufficient.[123]

Moreover, Defendants intend to assert at trial that eliminating the honor-all-issuers rules would effectively break up each network. Instead of the network, e.g., Visa, negotiating for merchants to accept "Visa cards" and setting the default rate, each issuing bank would separately negotiate for acceptance of *its cards* and negotiate the rate that the merchant would pay. The bank would issue the cards to the cardholders and set the price to them. Visa and Mastercard contend that, in effect, they would no longer be networks of issuing banks, but would be merely the providers of the infrastructure on which each of thousands of banks run their own credit card businesses.[124]

---

[121] *See, e.g.*, Stiglitz Report ¶¶ 87 n. 134, 136-137; Shadowen Dec., Ex. 43, Expert Report of Dennis W. Carlton (Oct. 4, 2018) ¶ 61; Harris Report ¶¶ 204 n.189, 321, 708 n.807, 723-725, 729; Hausman Report ¶¶ 96, 615 & n.845.

[122] *See id.*

[123] *See* Stiglitz Dec. ¶ 17, 114.

[124] Network Defendants' Memorandum in Support of Preliminary Approval, ECF 9693 at 31-32.

Defendants would likely point to principles counseling against relief that is tantamount to divestiture or breakup. Plaintiffs seeking such a remedy must meet a "heavy burden to warrant the 'radical structural' remedy of a forced divestiture," which, in any case, "courts have ordered … *only after determining that less severe remedies likely would prove inadequate.*" *United States v. Google LLC*, 2025 WL 2523010, at *57 (D.D.C. Sept. 2, 2025) (emphasis added). Whether presented by the Plaintiffs in the liability phase or by the Defendants in any remedies phase, substantial trial evidence would show the efficacy of the suite of remedies (discounting, surcharging, honor-all-products reforms, etc.) short of repeal of the honor-all-issuers rules. Given the litigation record outlined above, it is not at all clear that Class Plaintiffs could both get a liability verdict that no-surcharge, no-discounting, and honor-all-products rules are anticompetitive yet meet a "heavy burden" of showing that *only* repeal of the honor-all-issuers rules can restore competition.[125]

Nor would it matter whether the Court accepted Defendants' characterization of the relief as a break-up or divestiture. In all antitrust cases, "courts must give wide berth to business judgments before finding liability. … Similar considerations apply when it comes to the remedy. [Judicial] decrees themselves may unintentionally suppress procompetitive innovation…. Judges must be wary, too, of the temptation to specify the proper price, quantity, and other terms of

---

[125] Plaintiffs would have other significant hurdles to clear. Specifically with respect to *network* monopolies, "a 'breakup' that divides a network into multiple parts is almost always a poor choice [for a remedy]. Rather, the tribunal should search for remedies that preserve the network intact while seeking to increase competition within the network." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 653(a) (5th ed. 2026). And "[w]hile the law permits divestiture as a remedy in private antitrust suits, as a practical matter this remedy has only been applied, if at all, in public enforcement actions." Spencer Weber Waller, *The Past, Present, and Future of Monopolization Remedies*, 76 Antitrust L.J. 11, 15-16 (2009).

dealing—cognizant that they are neither economic nor industry experts." *NCAA v. Alston*, 594 U.S. at 102.

Defendants would likely contend that, under these principles, fulsome relief on the merchant restraints prevents the Class from getting relief on default interchange or honor-all-issuers. Default interchange concededly is anticompetitive only in combination with the merchant restraints. Reforming the merchant restraints can deliver competitive total prices and interchange rates without eliminating the honor-all-issuers rules. At a minimum, the Defendants would likely contend, eliminating those rules is not the first remedy that the Court sitting in equity should try, but the second or last remedy, because "when it comes to fashioning an antitrust remedy, … caution is key." *Id*. at 106.[126]

The Class has the elimination of the merchant restraints—and much else in addition—in hand, subject only to this Court's approval. The Class should not put that relief at risk in an effort to get additional relief that, regarding default interchange, is entirely unnecessary, or, regarding honor-all-issuers, is likely unnecessary, marginal at best, and the most intrusive (and therefore least expected) remedy even if Plaintiffs prevail on liability.

Finally, Objectors ignore the near certainty that a liability verdict plus the Objectors' preferred remedy would be the start, not the end, of the litigation journey, as the appellate reversal in *American Express* potently reminds. The appeals and further litigation would likely go on for years. The Amended Settlement will bring this litigation to a fair, reasonable, and adequate resolution, and the Court should preliminarily approve it.

---

[126] *See* Orenstein Dec. ¶ 15 (networks "consider [the honor-all-issuers rules] to be the most fundamental of rules that have allowed their networks to function as effective competitors and to revolutionize commerce through innovation").

## VI.    THE AMENDED SETTLEMENT PROPERLY RELEASES ALL CLAIMS THAT WERE OR COULD HAVE BEEN PLED AGAINST DEFENDANTS AND IS NOT OVERBROAD.

Some Objectors argue that the Amended Settlement's release provisions are, among other things, too broad.[127] These objections are the *same* ones they raised regarding the 2024 agreement and the 2019 Rule 23(b)(3) damages settlement, which the Court previously considered and rejected. *See Payment Card*, 2024 WL 3236614, at *29-35.

### A.    BROAD CLASS RELEASES, SUBJECT TO THE IDENTICAL FACTUAL PREDICATE DOCTRINE, ARE COMMON.

"'[B]road class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country.'" *Payment Card*, 2024 WL 3236614, at *31, quoting *In re Payment Card Interchange Fees & Merchant Discount Antitrust Litig.* ("*Interchange Fees II*"), 827 F.3d 223, 240 (2d Cir. 2015) (quoting *Wal-Mart Stores*, 396 F.3d at 106). Class action plaintiffs may release claims that were or could have been pled in exchange for settlement relief if those claims arise from the identical factual predicate as the settled conduct. *Interchange Fees II*, 827 F.3d at 236-37; *Wal-Mart Stores*, 396 F.3d at 106. The law does not restrict "how far into the future claims can be released, as long as the released claims are based on the 'identical factual predicate' of the action at issue." *Payment Card*, 2024 WL 3236614, at *33 (quoting *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 2019 WL 6875472, at *25); *see also Payment Card*, 2024 WL 3236614, at *31 ("'[T]he law is well established in this Circuit and others that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct.'")

---

[127] *See, e.g.*, Walmart Obj., ECF 9729 at 14-17; RILA and NRF Obj., ECF 9727 at 12-13; Old Jericho Obj., ECF 9725 at 2-5; Circle K Obj., ECF 9722 at 24-26.

(quoting *Melito v. Experian Mktg. Sols.*, 923 F.3d 85, 95 (2d Cir. 2019), quoting *Wal-Mart Stores*, 396 F.3d at 107).

**B.    THE AMENDED SETTLEMENT'S RELEASE IS NOT OVERBROAD.**

Objectors collectively raise several arguments to support their contention that the release provisions in the Amended Settlement are too broad. As discussed below, the Court previously considered and rejected these arguments and there is no basis to revisit those rulings.

**1.    The Amended Settlement Releases Only Claims That Arise From the Identical Factual Predicate as the Settled Claims.**

Some Objectors assert that the Amended Settlement's release is too broad because it (1) does not specifically state that it releases only claims arising from the identical factual predicate as the conduct at issue, and (2) releases "claims based on the 'continuing effect' of conduct that plaintiffs '*could* have alleged[.]'"[128] Neither objection has any merit.

First, there is no requirement—and Objectors cite no case law to the contrary—that a class settlement release must expressly refer to the identical factual predicate. The release here expressly provides that it extends only to "the fullest extent permitted by federal law." Amended Settlement ¶ 116(a). Both the Court and the Second Circuit found that identical language in the Rule 23(b)(3) release incorporated and comported with the identical factual predicate doctrine. *Fikes*, 62 F.4th at 714–15; *Payment Card*, 2019 WL 6875472, at *22-23. The Court did so again in finding that the same language in the proposed 2024 settlement's release ensured that it was not overly broad, "because it [was] constrained by the 'identical factual predicate' test." *Payment Card*, 2024 WL 3236614, at *34. Moreover, the Court found that the specific conduct enumerated in the proposed 2024 settlement's release satisfied the identical factual predicate test. *Id.*.

---

[128] Walmart Obj., ECF 9729 at 16 (emphasis in original); *see also* RILA and NRF Obj., ECF 9727 at 12-13.

Second, there is no merit to the assertion that the release "does not appear to have limits." The Amended Settlement makes clear that the release applies to only claims "arising out of or relating to any conduct … alleged or otherwise raised in the Action, or that could have been alleged or raised in the Action relating to the subject matter thereof, or arising out of or relating to a continuation or continuing effect of any such conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act." Amended Settlement ¶ 116(a). And, as noted, the release overall is limited by the identical factual predicate doctrine.[129] Although the relief provided by the Amended Settlement is more expansive than that in the prior agreement, the release provisions in the two agreements are the same. Accordingly, there is no basis for revisiting the Court's prior determination that the release is properly limited by the identical factual predicate doctrine.

Third, there is nothing improper about releasing claims arising from the identical factual predicate that could have been alleged or raised. Indeed, that type of standard language is regularly approved by courts considering the breadth of settlement releases. *See, e.g.*, *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 247 (2d Cir. 2011) (class action plaintiffs may release claims that could have been pled); *Marble v. Halo Innovations, Inc.*, 2025 WL 3273813, *2-3 (S.D.N.Y. Oct. 14, 2025) (approving settlement that included release of claims that were or

---

[129] Notably, the Amended Settlement specifically excludes unrelated conduct from its release provisions. *See, e.g.*, Amended Settlement ¶ 119(a) (excluding from the release claims "based on standard commercial disputes arising in the ordinary course of business under contracts or commercial relations regarding loans, lines of credit, or other related banking or credit relations, individual chargeback disputes, products liability, breach of warranty, misappropriation of cardholder data or invasion of privacy, compliance with technical specifications for a merchant's acceptance of Visa-Branded Credit Cards or Debit Cards, or Mastercard-Branded Credit Cards or Debit Cards, and any other dispute arising out of a breach of any contract"); *id.* ¶ 119(b) (excluding from the release claims "based only on an injury suffered as (i) a payment card network competitor of the Visa Defendants or the Mastercard Defendants, or (ii) an ATM operator that is not owned by, or directly or indirectly controlled by, one or more of the Rule 23(b)(2) Class Released Parties.").

could have been asserted in the action). Moreover, that precise language was already deemed appropriate by the Court in connection with the proposed 2024 settlement. *Payment Card*, 2024 WL 3236614, at *31, quoting *Melito*, 923 F.3d at 95 (quoting *Wal-Mart Stores*, 396 F.3d at 107).

### 2.    The Amended Settlement Does Not Improperly Release Future Antitrust Claims.

Objectors contend that the Amended Settlement improperly requires class members to release claims challenging Defendants' existing rules, as well as claims regarding "substantially similar" rules Defendants may implement in the future.[130] The Court has rejected this precise objection twice before. Initially, it did so in connection with the Rule 23(b)(3) Class settlement. *See Payment Card*, 2024 WL 3236614, at *33, citing *In re Payment Card*, 2019 WL 6875472, at *22 ("Court approved the 2019 Settlement over objections that it impermissibly released 'future violations of the antitrust laws.'"). The Court held that the released claims were based on the same factual predicate as the settled claims and added that it "was 'not persuaded by the argument that the release [was] void due to public policy protection of antitrust cases.'" *Payment Card*, 2024 WL 3236614, at *35, citing *In re Payment Card*, 2019 WL 6875472, at *25. The Court's approval was affirmed by the Second Circuit. *Fikes*, 62 F.4th 704 at 714.

The Court again rejected the Objectors' "future claims" argument during the preliminary approval process for the 2024 settlement:

> "Consistent with the Court's interpretation of the 2019 Settlement's release, the Court rejects the objectors' contentions that the release is overly broad, because it is constrained by the 'identical factual predicate' test. (*See, e.g.*, 7-Eleven Objs. 23 (contending that the Settlement 'releases claims against … all of the policies in Defendants' massive rulebooks, their unwritten policies and practices, and any future rules, policies, or practices that are "'substantially similar'"); Merch. Trade Gp. Objs 5 (contending that the release 'does not appear to have limits').) Similarly, the Court finds that the release does not impermissibly cover future violations of

---

[130] *See, e.g.*, Walmart Obj., ECF 9729 at 14-17; RILA and NRF Obj., ECF 9727 at 12-13; Circle K Obj., ECF 9722 at 24-27.

the antitrust laws. (*See, e.g.*, Walmart Objs. 3 (arguing that the Settlement forces merchants 'to release future claims – both for continuing violations of the antitrust laws, and for as-yet-unknown future rules and conduct that violate the antitrust laws for a period of five years after final approval of the [S]ettlement' (emphasis omitted)).) *As noted in approving the 2019 Settlement, '[s]uch releases are acceptable where the future claims releases are those based on a continuation of conduct at issue and underlying the original claims.' Payment Card*, 2019 WL 6875472, at \*25." *Payment Card*, 2024 WL 3236614, at \*34.

As was the case with the 2024 agreement, the Amended Settlement releases only claims for conduct that has the identical factual predicate as the settled conduct. Moreover, as the Second Circuit held, "whether [a] future release violates federal law – can await a case in which the issue would directly affect the proceedings." *Fikes*, 62 F.4th at 720. Accordingly, the Court should reject the Objectors' "future claims" argument for a third time.[131]

### 3.    The Length of the Release Is Proper.

Objectors correctly note that the term of the release is the longer of eight years after the "Settlement Approval Date" or five years after the "Settlement Final Date," but suggest that the language is ambiguous and may somehow permit the release to be "indefinite"[132] or allow for the

---

[131] Ignoring this Court's decisions and *Fikes*, Objectors misplace reliance on several inapplicable cases. For example, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985), did not involve a settlement release and is obviously inapplicable. Similarly inapplicable is *Fox Midwest Theatres v. Means*, 221 F.2d 173 (8th Cir. 1955). That case considered whether a settling party could waive its right to pursue claims for future antitrust violations. Contrary to the Objectors' suggestion, that is not the issue here. The release in the Amended Settlement does not insulate Defendants from liability for violations of the antitrust laws that occur after the class period; it releases them from future claims relating to conduct that occurred **during** the class period that arises from the identical factual predicate as the settled claims. As the Eleventh Circuit aptly recognized in *In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070, 1088 (11th Cir. 2023), "releases of future claims are an important part of many settlement agreements." Moreover, unlike the release at issue in *Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95 (5th Cir. 1974), the *Blue Cross* release was limited to the claims of private individuals to sue Blue Cross and did not affect the ability of the government to enforce the antitrust laws. That is exactly the situation here. *See* Amended Settlement ¶ 118.

[132] Walmart Obj., ECF 9729 at 15 n.20.

waiver of claims after the period ends.[133] These objections were previously considered by the Court and rejected. *Payment Card*, 2024 WL 3236614, at *34.

Moreover, the length of the release is not ambiguous: the period of the release will terminate "no later than the longer of five years after the Settlement Final Date [after all appeals are exhausted] or eight years after the Settlement Approval Date [after district court final approval]."[134] Further, the length of the release is coterminous with the expiration of the rules changes provided by the Amended Settlement.

### 4. Future Merchants Will Not Be Harmed.

Objectors argue that the rights of future merchants to assert claims against the Defendants will be improperly released by the Amended Settlement.[135] This is incorrect. Future merchants (*i.e.*, those merchants that come into existence after preliminary approval) will not be bound. Although the Court held that the release provisions of the proposed 2024 agreement were "likely to violate the due process rights of future class members who come into existence and join the class between the deadline to raise objections and final settlement approval," the Court resolved that issue by amending the end-date of the class definition from "the date of entry of Final Judgment" to "the date of preliminary settlement approval." *Payment Card*, 2024 WL 3236614, at *17, 35. The Amended Settlement incorporates the amended class definition language, thereby eliminating any issues pertaining to future merchants: they are not in the Class so obviously are not bound by the release.

---

[133] Circle K Obj., ECF 9722 at 26.

[134] Amended Settlement ¶ 116(a), 1(mm) & (ll).

[135] RILA and NRF Obj., ECF 9727 at 13.

5.      **The Amended Settlement Does Not Impact Any Rule (b)(2) Class Member's Claim for Damages.**

Although the 7-Eleven Plaintiffs did not submit an "objection" to preliminary approval, they filed a "Response" seeking a determination that the Amended Settlement's stay provision[136] will not impact their upcoming trial against the Defendants.[137] The Old Jericho Plaintiffs similarly do not object to preliminary approval but seek to ensure that the Amended Settlement does not release their damages claims.[138] The Amended Settlement expressly excludes damages claims from being released.[139] Moreover, as the 7-Eleven Plaintiffs' Response acknowledges, the Court made clear when it considered the identical stay provision in the 2024 agreement that Objectors' monetary damages claims will not be impacted whether the settlement is preliminarily or finally approved. *See Payment Card*, 2024 WL 3236614, at *39, n.54.

## VII.   THE COURT SHOULD OVERRULE THE *VISA DEBIT* PLAINTIFFS' OBJECTION.

The *Visa Debit* Plaintiffs do not dispute that the settlement will in fact benefit them. Their objection fails for a fundamental reason: regardless of how the scope of the release is ultimately resolved, the release does not provide a basis to deny approval of the proposed Amended Settlement. Rule 23(e) does not require the Court to resolve contingent, future disputes over the outer bounds of a release, nor does it permit Objectors to derail an otherwise fair, reasonable, and

---

[136] Amended Settlement ¶ 21.

[137] 7-Eleven Response, ECF 9726 at 3-4. Although the 7-Eleven Plaintiffs do not object to preliminary approval, they maintain their position regarding their inclusion in the mandatory class and reserve all rights concerning final approval of the Amended Settlement. *Id.* at 4.

[138] Old Jericho Obj., ECF 9725 at 2-4.

[139] *See* Amended Settlement ¶ 119(c).

adequate settlement based on speculation about how materially similar language might later be construed in a different procedural posture.[140]

If the Rule 23(b)(2) Amended Settlement's release does not reach the *Visa Debit* Plaintiffs' claims, their objection is moot, they remain free to litigate those claims elsewhere, and approval of the Amended Settlement causes them no legal prejudice. If, on the other hand, a future court were to conclude that the release does encompass those claims, the objection would still fail because the Class Plaintiffs adequately represented the interests at issue. Moreover, any residual relevance of the *Visa Debit* Plaintiffs' objection is further diminished by the independent fact that merchants that begin accepting debit cards after preliminary approval of the Amended Settlement are not bound by the release and remain free to pursue whatever relief the *Visa Debit* Plaintiffs seek in that action.

Accordingly, the *Visa Debit* Plaintiffs' concerns regarding the scope of the release are moot, speculative, premature, or too attenuated to justify denial of approval—particularly where the *Visa Debit* action was filed nearly two decades after this MDL began and well after the Class Plaintiffs had litigated and initially sought settlement of substantially the same conduct last year.

---

[140] It is well established that a class action settlement may release claims that were presented, not presented, or "even those which could not have been presented" in the action. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 107 (2d Cir. 2005). A settlement may release claims of non-parties, *id.* at 109, and may extend into the future. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *25 (E.D.N.Y. Dec. 16, 2019); *Williams v. Gen. Elec. Capital Auto Lease, Inc.*, 159 F.3d 266, 274 (7th Cir. 1998). This authority is limited by two related doctrines: (1) the "identical factual predicate" doctrine, and (2) the requirement of adequate representation. *Wal-Mart Stores*, 396 F.3d at 106-09; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.* ("Interchange Fees I"), 827 F.3d 223, 236-37 (2d Cir. 2016); *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982). Thus, a settlement release may not clearly extinguish claims that do not arise from the same factual predicate as the settled conduct, and any released claims must have been adequately represented for purposes of Rule 23(e).

## A.    THE *VISA DEBIT* PLAINTIFFS' OBJECTION DEPENDS ON AN UNRESOLVED QUESTION REGARDING THE SCOPE OF THE RELEASE.

The identical factual predicate doctrine bars settlement approval only where a release clearly and unambiguously surrenders claims that do not arise from the same factual predicate as the settled conduct. *Compare Interchange Fees II*, 827 F.3d at 236-37, *with Mobley v. Five Gems Mgmt. Corp.*, 2018 WL 1684343, *6 (S.D.N.Y. Apr. 6, 2018) (denying settlement where release extinguished claims not within same factual predicate as settled conduct). *Mobley* illustrates this principle because there the Court rejected a settlement precisely because the "plain language of the release clause covers all claims that Plaintiff might have against Defendants, not simply those that relate to the [settled conduct]." *See Mobley*, 2018 WL 1684343, at *6.

On the one hand, *Visa Debit* Plaintiffs assert that the Rule 23(b)(2) settlement release "can be read expansively" to encompass their equitable relief claims.[141] On the other hand, they previously, and in the district court successfully, argued the opposite with respect to the *Payment Card* Rule 23(b)(3) Class. When Visa sought to enforce that release against the *Visa Debit* Plaintiffs, Chief Judge Brodie rejected that effort, holding that Visa failed to demonstrate that the settlement released the *Visa Debit* claims because the two actions arose from different factual predicates. *See In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 2025 WL 2412033, *7 (E.D.N.Y. Aug. 20, 2025) ("The Court therefore concludes that Visa Debit Plaintiffs' claims are not only based on a different legal theory but also on a different set of core facts that were not subject to the Release.").

*Visa Debit* Plaintiffs cite no authority reconciling this contradiction—namely, why the 23(b)(3) class settlement did not release their claims, but the 23(b)(2) class settlement purportedly

---

[141] Visa Debit Obj., ECF 9728 at 1-2.

does. Their position is further undermined by the fact that the *Payment Card* 23(b)(2) and 23(b)(3) settlement releases contain materially identical language, including the provisions they now claim are problematic. *See infra*, comparing the release language of Rule 23(b)(2) and (b)(3) settlement agreements.

The *Visa Debit* Plaintiffs' objection appears to be driven by Visa's pending appeal of Chief Judge Brodie's order holding that the Rule 23(b)(3) *Payment Card* settlement did not release the *Visa Debit* claims. The potential effect of any appellate reversal on the release language is addressed below in connection with adequacy of representation. The prospect of reversal remains speculative—and speculative harm is insufficient to defeat settlement approval. *Anwar v. Fairfield Greenwich Ltd.*, 133 F. Supp. 3d 560, 563 (S.D.N.Y. 2015) ("This argument is speculative and thus not sufficient to demonstrate formal legal prejudice . . . The Court therefore finds that the Trustee does not have standing to object to the Proposed [ ] Settlement."); *see also Bhatia v. Piedrahita*, 756 F.3d 211, 218 (2d Cir. 2014) ("Nothing in the Final [Settlement] Order precludes the [Objectors] from asserting in the district court or in other litigation any claims or defenses that may be available to them."); *In re Volkswagen "Clean Diesel" Mktg., Sales, Pracs., and Prods. Liab. Litig.*, 895 F.3d 597, 616-17 (9th Cir. 2019) (the "central premise [of the objection] . . . is wholly speculative . . . . The district court did not abuse its discretion in finding the settlement fair and reasonable over [the objection.]").

## B. THE *VISA DEBIT* PLAINTIFFS HAVE BEEN ADEQUATELY REPRESENTED.

If the Second Circuit were to reverse Chief Judge Brodie's "no identical factual predicate" determination and conclude that the Rule 23(b)(3) settlement release reaches the *Visa Debit* Plaintiffs' claims, the relevant inquiry would shift. The inquiry here would then be whether the *Visa Debit* Plaintiffs were adequately represented for purposes of due process, an inquiry that is satisfied here. *Wal-Mart Stores, Inc.*, 396 F.3d at 106-07, 109-13.

54

In the settlement context, adequate representation "is established mainly by showing an alignment of interests between class members, not by proving vigorous pursuit of [all extinguished] claim[s]." *Id.* at 107. Where, as here, Objectors merely seek better outcomes for a subset of claims, representation remains adequate as a matter of law. *Id.* at 113; *see also BNP Paribas v. N.M. State Inv. Council*, 2025 WL 1443654, at *3 (2d Cir. May 20, 2025) ("Adequate representation of a particular claim is established mainly by showing an alignment of interests between class members, not by proving vigorous pursuit of that claim."). So long as the Class Plaintiffs had an interest in pursuing the same types of claims as the *Visa Debit* Plaintiffs, the adequacy requirement is satisfied. *See id.* Here, the *Visa Debit* Plaintiffs and the Rule 23(b)(2) Plaintiffs are each a member of the putative or certified class in each case, and the *Visa Debit* Plaintiffs allege in their complaint that all merchants that incur Visa debit fees "are similarly affected" and their "interests are coincident with and typical of, and not antagonistic to, those of the other members of the [putative] Class." *See Visa Debit*, No. 24-cv-7435 (S.D.N.Y.), ECF 38 (Consolidated Class Action Compl.), ¶¶ 244-45.

Adequate representation does not require the "vigorous pursuit" of every claim or theory to the same degree. *See Wal-Mart Stores, Inc.*, 396 F.3d at 113. The *Visa Debit* Plaintiffs therefore rely on an incorrect legal standard when they argue that the Class Plaintiffs fail Rule 23(e) merely because they did not separately or successfully litigate every debit-related equitable claim.[142] What matters for purposes of Rule 23(e) is that "the settlement, taken as a whole, is fair, reasonable and adequate." *Chavarria v. New York Airport Serv., LLC*, 875 F. Supp. 2d 164, 171 (E.D.N.Y. 2012) (citing *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir.1995)); *see also TBK Partners*, 675 F.2d at 460 ("As long as the overall settlement is found to be fair and class

---

[142] Visa Debit Obj., ECF 9728 at 2-3.

members were given sufficient notice and opportunity to object . . . we see no reason why the judgment upon settlement cannot bar a claim[.]).

Consistent with that principle, courts routinely approve settlements that release individual claims "even though the claim was not presented and might not have been presentable in the class action," so long as doing so serves the goal of a comprehensive resolution. *TBK Partners*, 675 F.2d at 460. Under settled law, Class Plaintiffs could permissibly release the *Visa Debit* claims even if those claims were never litigated—let alone whether Class Plaintiffs ultimately prevailed on them. *See id.*[143]

Here, the controlling inquiry is whether Class Plaintiffs' interests were aligned with those of the *Visa Debit* Plaintiffs. They were. Class Plaintiffs alleged the same underlying debit-related conduct, litigated those claims, and obtained settlement relief addressing it. The *Visa Debit* Plaintiffs identify no conflict of interest and allege no facts suggesting divergent incentives. Therefore, as a matter of law they cannot establish inadequate representation.

### 1.    Class Plaintiffs' Interests Were Aligned with Those of the *Visa Debit* Plaintiffs.

Class Plaintiffs' interests were aligned with those of the *Visa Debit* Plaintiffs because both pursued materially similar claims and benefit from overlapping relief under the Rule 23(b)(2) Amended Settlement. Most merchants accept both credit and debit cards; as a result, such merchants are members of the Rule 23(b)(2) class and are also putative members of the *Visa Debit* class. Those merchants therefore experienced the alleged anticompetitive effects of Visa's conduct in both markets and stand to benefit from injunctive relief that applies across credit and debit

---

[143] *Interchange Fees I* does not counsel a different conclusion, as the *Visa Debit* Plaintiffs assert. Visa Debit Obj., ECF 9428 at 9. There, inadequacy was not evident from relief but rather resulted from "a fundamental conflict between the (b)(3) and (b)(2) classes and sapped class counsel of the incentive to zealously represent the latter." *See* 827 F.3d at 236.

transactions. The *Visa Debit* Plaintiffs identify no facts suggesting that their named plaintiffs fail to benefit from the Amended Settlement. To the contrary, publicly available information on their respective websites shows that named *Visa Debit* Plaintiffs, in fact, accept credit cards in addition to debit cards.[144]

*Visa Debit* Plaintiffs nevertheless contend that Class Plaintiffs' loss at summary judgment on certain debit claims proves that Class Counsel failed to meaningfully develop the expert and factual record.[145] That contention is wrong as a matter of law and fact. The ability to secure substantial settlement relief following an adverse merits ruling reflects adequate representation, not its absence. *See, e.g.*, *Rexam, Inc. v. United Steel Workers of Am.*, 2007 WL 2746595, at *2 (D. Minn. Sept. 17, 2007) ("The most important reason why the proposed settlement is fair, reasonable, and adequate is that the NCC Class has already lost its case before this Court."); *see also Payment Card*, 2024 WL 3236614, at *19 (finding Class Counsel adequately represented the Class, and that "Class Counsel ably briefed oppositions to several *Daubert* and summary judgment motions, which were largely decided in favor of the Rule 23(b)(2) Class"). Here, the Class Plaintiffs not only obtained meaningful relief as part of a comprehensive settlement, but also secured relief directed specifically at debit-related conduct. *See infra*, Section VII.B.2.

---

[144] Plaintiff Subaru World of Hackettstown, a car dealership, states that it accepts credit and debit cards on its website. *See* https://www.subaruworldhackettstown.com/offerdetails-Used-Hackettstown-New-Jersey-Pre-Owned-Specials-1360763?utm. Plaintiff NDA Aesthetics of Moorestown, New Jersey, a spa and medical aesthetics vendor, accepts credit and debit cards, as demonstrated by the payment and check-out function on its website. *See generally*, https://ndamedicalspa.com/. Plaintiff Yabla, Inc. of Union City, New Jersey, an immersive language-learning provider, similarly has a "Pay by Credit Card" option on its website. *See* https://www.yabla.com/subscribe_group.php.

[145] Visa Debit Obj., ECF 9728 at 10.

The *Visa Debit* Plaintiffs further mischaracterize the summary judgment record. As Chief Judge Brodie observed, Class Plaintiffs "point[ed] to much of the same evidence as the 7-Eleven and Home Depot Plaintiffs [with respect to their pre-Durbin Amendment debit claims], including: the FANF, PAVD, and EMV." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 729 F. Supp. 3d 298, 337 (E.D.N.Y. 2024). Class Plaintiffs also presented evidence of Visa's dominant market share, significant barriers to entry in the debit market, and expert testimony addressing Visa's allegedly exclusionary restraints. *See id.* Even if the *Visa Debit* Plaintiffs could identify material gaps in the record (they do not), Class Plaintiffs expressly incorporated the direct-action plaintiffs' evidence and arguments: "Visa's liability arguments, as contested herein and by the DAPs, present issues for the trier of fact, not a basis for summary judgment," and "[a]s shown below (and, as to debit, more completely in the DAPs' opposition brief), the record evidence is replete with factual details and expert opinion supporting substantial market power, exclusionary tactics, and anticompetitive effects in both the debit and credit markets."[146]

The different summary judgment outcomes between Class Plaintiffs and the DAPs reflect differences in how the competition theories were framed—Class Plaintiffs presented a unified theory arguing that the merchant restraints on credit card transactions prevented steering those transactions to debit cards and thus diminished the market for the latter, disincentivizing entry and expansion.[147] The different outcomes did not result from any failure to pursue discovery or develop the record. Chief Judge Brodie did not see the economic logic of Class Plaintiffs' argument. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 729 F. Supp. 3d 298, 337

---

[146] *See* Class Plaintiffs Opp'n, ECF 8332 at 2, 5 (emphases added).

[147] *See id.* at 10, 14.

(E.D.N.Y. 2024). Her conclusion, right or wrong, was not based on a deficient factual record or inadequate advocacy. *Id.*

### 2. Class Plaintiffs Obtained Debit Relief.

In addition to the substantial relief with respect to credit cards, the Amended Settlement also provides benefits with respect to debit cards. And it provides the relief with respect to Mastercard as well as Visa. These benefits include:

- A merchant can surcharge (or threaten to surcharge) the network's credit cards if the network does not reduce rates on debit cards as well as credit cards;

- The extension of the DOJ consent decree applies to debit cards as well as credit cards (Amended Settlement at ¶¶ 18, 67);

- Debit cards are included in the relief regarding selective acceptance at store banners (*id.* at ¶¶ 31-33, 80-82);

- The all-outlets reforms apply to debit cards (*id.*);

- The digital wallets reforms apply to debit cards (*id.* at ¶¶ 34-38, 83-87);

- Debit cards are included in the merchant buying group provisions (*id.* at ¶¶ 44-47, 93-96); and

- Debit cards are part of the merchant education relief (*id.* at ¶¶ 56, 105).

To the extent the *Visa Debit* Plaintiffs contend that the relief afforded to debit transactions is disproportionate to that provided with respect to credit cards, any such disparity simply reflects the relative cost of accepting credit versus debit cards and the corresponding magnitude of anticompetitive harm. For example, in 2025, interchange revenues on Visa and Mastercard credit card transactions were nearly ███ times greater than interchange revenues on Visa's unregulated debit card transactions.[148] The disparity in relief also reflects that after MDL 1720 was

---

[148] Stiglitz Reply Dec. ¶ 3 n.7.

commenced, Congress instituted numerous statutory reforms on debit card transactions—an intervening factor the Court considered in approving the Rule 23(b)(3) settlement. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 39 (E.D.N.Y. 2019).

For the reasons stated in detail above, the Amended Settlement provides meaningful and substantial relief overall. Consistent with the other Objectors, the fact that the *Visa Debit* Plaintiffs may not have achieved everything they wanted for their specific claims does not mean that the Amended Settlement as a whole is unfair or fails to satisfy Rule 23(e).

## VIII.    CONCLUSION

For the foregoing reasons, and those stated in the Class Plaintiffs' opening papers, the Court should approve giving notice to the Class.

Dated:  January 14, 2026                                            Respectfully submitted,

                                                                            */s/ Robert G. Eisler*
                                                                            Robert G. Eisler
                                                                            Chad B. Holtzman
                                                                            GRANT & EISENHOFER P.A.
                                                                            485 Lexington Ave., 29th Floor
                                                                            New York, NY 10017
                                                                            (646) 722-8500
                                                                            reisler@gelaw.com
                                                                            choltzman@gelaw.com

                                                                            Steve D. Shadowen
                                                                            Tina J. Miranda
                                                                            HILLIARD & SHADOWEN LLP
                                                                            1717 W. 6th Street, Suite 290
                                                                            Austin, TX 78703
                                                                            (855) 344-3298
                                                                            steve@hilliardshadowenlaw.com
                                                                            tmiranda@hilliardshadowenlaw.com

Michael J. Freed
William H. London
Robert J. Wozniak
FREED KANNER LONDON
& MILLEN LLC
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
(224) 632-4500
mfreed@fklmlaw.com
wlondon@fklmlaw.com
rwozniak@fklmlaw.com

Linda P. Nussbaum
Susan R. Schwaiger
Lauren M. Kostman
NUSSBAUM LAW GROUP, P.C.
1133 Avenue of the Americas, 31st Fl.
New York, NY 10036
(917) 438-9189
lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com
lkostman@nussbaumpc.com

*Equitable Relief Class Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 14, 2026, a true and correct copy of the foregoing
document, declaration in support, and accompanying exhibits were filed under seal and in redacted
form electronically through the Court's ECF system. I further certify that the foregoing document,
declaration in support, and accompanying exhibits were served electronically through File & Serve
Express upon all counsel of record.

*/s/ Robert G. Eisler*
Robert G. Eisler
