**UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF NEW YORK**

_____

| |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL No. 1720<br>Docket No. 05-md-01720-BMC-JAM |

_____

BARRY'S CUT RATE STORES INC.; DDMB, INC. d/b/a EMPORIUM ARCADE BAR; DDMB 2, LLC d/b/a EMPORIUM LOGAN SQUARE; BOSS DENTAL CARE; RUNCENTRAL, LLC; CMP CONSULTING SERV., INC.; TOWN KITCHEN, LLC d/b/a TOWN KITCHEN & BAR; GENERIC DEPOT 3, INC. d/b/a PRESCRIPTION DEPOT; and PUREONE, LLC d/b/a SALON PURE,

Plaintiffs,
-v-

VISA, INC.; MASTERCARD INCORPORATED; MASTERCARD INTERNATIONAL INCORPORATED; BANK OF AMERICA, N.A.; BA MERCHANT SERVICES LLC (f/k/a DEFENDANT NATIONAL PROCESSING, INC.); BANK OF AMERICA CORPORATION; BARCLAYS BANK PLC; BARCLAYS BANK DELAWARE; BARCLAYS FINANCIAL CORP.; CAPITAL ONE BANK, (USA), N.A.; CAPITAL ONE F.S.B.; CAPITAL ONE FINANCIAL CORPORATION; CHASE BANK USA, N.A.; CHASE MANHATTAN BANK USA, N.A.; CHASE PAYMENTECH SOLUTIONS, LLC; JPMORGAN CHASE BANK, N.A.; JPMORGAN CHASE & CO.; CITIBANK (SOUTH DAKOTA), N.A.; CITIBANK N.A.; CITIGROUP, INC.; CITICORP; and WELLS FARGO & COMPANY,

Defendants.
_____

| |
|---|
| HIGHLY CONFIDENTIAL—<br>SUBJECT TO PROTECTIVE ORDER |

**REBUTTAL DECLARATION OF JOSEPH E. STIGLITZ, PH.D. AND KEITH B. LEFFLER, PH.D.**

1

1. <u>Introduction.</u>  We filed a Declaration analyzing the likely competitive impact of the November 2025 proposed Amended Settlement Agreement ("Amended Settlement").[1]  In that Declaration we concluded that "the Amended Settlement will have substantial economic impact, with the potential to unlock significant competition on the merchant side of the credit card services market."[2]

2. We also explained that the competitive and efficiency problem in the market for credit card services concerns both the total price and the distribution of the total price between that paid by cardholders (a negative price) and that paid by merchants (a high interchange).[3]  The reforms of the Amended Settlement are designed to and intended to promote increased competition on the merchant side that can reduce both the merchant price and the total price.[4]

---

[1] Declaration of Joseph E. Stiglitz, Ph.D. and Keith B. Leffler, Ph.D., November 9, 2025 ("Initial Declaration").  Professor Stiglitz previously filed a merits report, a merits rebuttal report, and a declaration in support of the 2024 proposed settlement agreement.  Professor Stiglitz's qualifications and background are detailed in the merits report.  Professor Leffler previously filed a report related to class, and a declaration and rebuttal declaration in support of the 2024 settlement.  His qualifications are summarized therein.

[2] Initial Declaration ¶ 16.

[3] Because of the relatively unrestrained competition on the cardholder-issuer side of the market, the total credit card price has been competed to a level much closer to the competitive level than the merchant price.  The total price of about ▮ bps is composed of a high merchant price, about ▮ bps, and a negative cardholder price, about ▮ bps (from Table in the 1 Initial Declaration).  We have estimated that the competitive credit card services total price is "less than 60 bps." *Id.* ¶ 119.  Holding the cardholder price constant, the overall 10 bps rate reduction provisions of the Amended Settlement will alone substantially reduce that supracompetitive price component of the total price.  But as we have emphasized, effective reforms must be directed towards competition that will impact the merchant price.

[4] Initial Declaration ¶¶ 14, 51-52.  We provided examples of how the reforms to the merchant restraints in the Amended Settlement have the potential to generate significant issuer competition on the merchant side of the market resulting in a substantial reduction in the merchant price.  We estimated that if only 10% of Visa and Mastercard transactions were surcharged, the average net merchant interchange would fall by ▮ bps. *Id.* ¶ 110.  If the reforms lead to 10% of transactions being switched to debit, another 10% switching from premium to standard cards, and another 10% from posted to negotiated rates, the average merchant interchange would fall by ▮ bps. *Id.* ¶ 110.  If merchants paying posted rates rejected premium cards, they would save ▮ bps on every transaction dollar switched to regulated debit and ▮ bps if switched to standard cards.  See Initial Report Table 1 and ¶ 50.

2

3. We focus on the objections to the Amended Settlement filed by Walmart[5] and Circle K-National Association of Convenience Stores[6] ("Objectors").[7]  The Objectors assert that *only* elimination of the honor-all-cards rule, allowing for rejection of the cards of specific issuers, will deliver more competitive interchange rates and total prices.[8]  Our analysis was and is to the contrary.  As we further explain in this Rebuttal Declaration, the reforms of the Amended Settlement provide multiple avenues for merchants to generate competition well beyond what might be available from the ability to reject the cards of particular issues.

4. The Objectors also ignore the rapidly changing market for payment mechanisms, particularly, the rapid increases in online transactions, in the use of digital wallets, and in the ability of merchants to offer multi-level pricing though Electronic Shelf Labels.  The Amended Settlement includes reforms that are specifically directed to eliciting increased competition in these growing segments of payments, with the expectation that increased competition lowering these merchant fees will then permeate the entire credit card services market.

5. We find the objections to be based on an incomplete understanding of how the reforms of the Amended Settlement considered together will increase the ability of merchants to steer consumers to lower cost payment means.  It is this increased ability to impact card usage

---

[5] Walmart's Opposition to Plaintiffs' Motion for Preliminary Approval of Proposed Amended Settlement Agreement, December 12, 2025 ("Walmart Opposition").

[6] National Association of Convenience Stores' and Circle K's Objection to Equitable Class Plaintiffs' Motion for Preliminary Approval of Settlement, December 12, 2025 ("Circle K Objection").

[7] We understand other trade groups and a set of academics have also filed objections to the proposed Amended Settlement and that the Walmart and Circle K objections incorporate the major arguments made in those objections.  We are also aware of the Visa debit plaintiffs.  We have not addressed their objections, other than to note that all merchants accepting Visa and Mastercard credit cards benefit from the credit relief on which we focus in this declaration.  To put the debit issue in perspective, in 2024, Visa and Mastercard US domestic credit interchange fees totaled $█ billion.  For fiscal year 2025, interchange fees on Visa's unregulated debit transactions were $██ billion.

[8] Walmart Opposition p.2 ("[T]he proposed settlement offers only illusory relief from Defendants' Honor All Cards rules (*the single most important anticompetitive practice at issue in this litigation*." Emphasis added.); p. 18 ("Alternative forms of relief might have conferred a real and palpable benefit, such as remedies that affected the default interchange fee or honor-all-cards rule . . ." quoting *In re Payment Card* 827 F.3d at 238).  Circle K Objection p. 13 ("The requirement to accept cards from all issuers is the essential element of the anticompetitive interchange fee conspiracy."); p. 1 ("So long as that rule [default interchange fee] remains in place, merchants will continue to pay more than $110 billion in inflated interchange fees every year").

3

depending on the price charged to the merchant that underlies the increase in competition that is expected to result from the Amended Settlement.[9]

6. As noted, the essence of the objections is the failure of the Amended Settlement to eliminate the honor-all-cards rule and default interchange rates.[10]  Implicitly, the Objectors argue that without these provisions, there will be little (or at least insufficient) movement of charges towards a competitive level.  In addition, Walmart asserts that the Amended Settlement mainly benefits small merchants (though Circle K claims little or no benefit for small merchants),[11] that "the surcharging and discounting remedies  . . . conflict with Walmart's business model and are therefore useless . . .,"[12] and that the rate caps are time limited and can be circumvented.  Circle K also emphasizes the failure to eliminate honor-all-cards and the default rates, adding that Visa and Mastercard will evade the rate caps and eviscerate the benefits of the lowered rates on standard cards because Visa and Mastercard retain "complete discretion to move cards from one category to another, meaning the 'Standard' consumer cards category could soon be virtually empty."[13]

7. We do not find an economic basis for these objections.  Most importantly, in our opinion, the Objectors fail to take account of how the host of steering mechanisms available under the

---

[9] In normal competitive markets, consumers self-steer in response to lower prices.  In the credit card services market, the merchant restraints have prevented merchants from imposing prices leaving no incentive for customers to self-steer and little ability for merchants to steer their customers to lower cost payment means.  Worse, the rewards encourage consumers to choose a payments mechanism with a higher total price.

[10]  *See* footnote 8 above.

[11] Walmart Opposition p. 1 (Noting that the Amended Settlement, like the 2024 rejected settlement, sells "out the interests of large national merchants, trading away the latter's claims and needed relief for remedies that only benefitted small local merchants . . ."); p. 2 (The Amended Settlement "treats large national merchants inequitably relative to small merchants.")  Circle K Objections p. 20 ( ". . . leaving the vast majority of retailers, most of which are small, single-store operators, with no rate relief.")

[12] *Id.*, p. 2.

[13] Circle K Objection, p. 2. *See also,* p. 15 (" . . . the settlement creates strong incentive for the Defendants to push even more consumers to the 'Premium' cards . . .").  As previously reported, from 2010 through 2023 the average annual effective interchange rates for Visa and Mastercard increased by about 1 bps.  Leffler Declaration March 24, 2024, ¶ 24.  The actual increase in the average interchange from 2024 to 2025 was less than this historical average annual increase.  Information from Visa and Mastercard.

4

Amended Settlement can be combined to accomplish merchant steering in segments of the credit card services market, and that such steering will, over time, impact the entire market.

8. Surcharging.  An essential element for an efficient market system is for prices to signal the cost and value of alternative goods and services.  With prices reflecting costs, consumers will take account of the cost of their decisions when making product or service choices.  For the services of payment mechanisms, efficiency requires that more costly payment means have higher prices.  Thus, charging customers for the cost imposed by their payment choices is efficient (and charging for the use of high-cost credit cards is presumptively more efficient than rejecting high-cost payment means).  This fundamental economic fact has been obscured for decades by Visa and Mastercard preventing merchants from pricing this fundamental service.

9. In addition, absent the confusion engendered by the entrenched culture of "free" rewards, merchants should be more likely to impose charges than to reject high-cost cards.  This is because charging allows customers to choose to pay the cost of their preferred card choice or to "self-reject" use of that payment means.  Thus, charging for the use of high-cost credit cards provides the customer with the same options available with card rejection plus the added option of paying.  Therefore, charging is expected to result in less lost business than from card rejection as some customers will prefer to pay the cost of using their favored payment means.  This is true even if consumers value the rewards more highly than would rationally be the case.

10. Customers have many years of experiencing "free" payment means.  This leads Walmart and other objectors to argue that the "ability to surcharge customers who use certain cards is useless . . ..  Surcharging would conflict with Walmart's business model, including its Every Day Low Price pricing strategy . . ."[14]  But an Every Day Low Price strategy is inconsistent with not charging customers for service choice decisions that impose extra costs.  Indeed, because

---

[14] Walmart Opposition p. 10.  The quoted section goes on to assert that "[a]dopting this 'remedy' [surcharging] would undermine Walmart's commitment to its customers to afford them consistent, *transparent* pricing." (Empasis added)  However, charging customers the same prices whether they use a low- or a high cost payment means creates an absence of transparency in which low-cost customers pay higher prices because other customers select to use apparently free high-cost rewards credit cards.

Walmart customers perceive that using their high-cost credit cards is free, they will use these cards even when the value of such use is less than the actual cost.  As a consequence, this "low price" strategy increases Walmart's cost of doing business, and presumably increases the average prices charged.  It is, thus, a high-cost strategy.

11. Customers' long experience of getting something for nothing (i.e., apparently "free" credit card rewards) has likely led to some customers to have the expectation that free rewards are deserved.[15]  Such expectations will increase the extent to which customers will blame the merchant if prices are charged for use of premium credit cards, and this can result in increased expected loss of business from charging the cost of choosing premium cards.  Walmart notes that "[c]ustomers generally attribute surcharges to the merchant and not the card network or the issuer and thus surcharging forces merchants to exhaust goodwill with customers . . .."[16]  The Amended Settlement recognizes this problem.  It includes Merchant Education funds that can assist merchants in educating their customers as to the adverse economic impact of premium card use on merchants' costs, and on who pays for this "free-riding" by customers fortunate enough to have premium cards.  Thus, we do not agree with Walmart that "large national merchants . . . cannot practically gain from . . . merchant education."[17]

12. <u>Discounting.</u>  The Amended Settlement requires Mastercard to allow discounting based on card type, network, issuer, and any combination of those.  The Amended Settlement also requires Visa to formalize and make part of its rules merchants' abilities to discount by card type and/or network and/or issuer.[18]  However, the inability of merchants to know at the point

---

[15] Visa's and Mastercard's calling the price for using expensive payment means "surcharging" adds to customers' dismay with pricing this service.  "Surcharging" implies an *extra* charge.  But charging for the use of premium cards is a charge for extra services, no different than charging more for a prime steak than for a choice steak.  Merchants imposing charges in Australia and elsewhere do not refer to them as surcharges, but rather clearly state that that are passing along (a part of) the costs imposed by the credit card networks.

[16] Walmart Opposition p. 10.  However as we explained in our Initial Declaration ¶ 106, " . . . surcharging has become far more accepted and common, and that trend seems likely to continue."  Therefore, we expect customers to continue to evolve their understanding of the economic rationale and justification for charging for customer choices that impose higher cost on merchants.

[17] Walmart Opposition p. 23.

[18] The failure of Visa to formally approve and incorporate into its rules merchants' abilities to discount by card type/network/issuer has apparently led to merchant uncertainty as to what is allowed.  For

of sale the costs incurred in any credit card transaction effectively limits the ability of merchants to discount.[19]  The Amended Settlement addresses this issue, requiring Visa and Mastercard to provide visual identifiers allowing merchants to determine the card type at the point of sale, and creating incentives for the networks to electronically provide information regarding the cost of acceptance at the time of the transaction.  These changes will allow the merchants to inform their customers of the cost of alternative credit cards and the basis for price differences among them.[20]

13. Discounting is the flip side of charging for high-cost card use by having a lower price for low-cost cards is analogous to having a higher price for high-cost cards.  In either case, discounting or charging, customers are confronted with prices that reflect the cost of their payment means choices.  However, unlike charging, discounting has the disadvantage of reducing prices for customers that already select low-cost cards.[21]  In this aspect, charging is superior to discounting.

14. Walmart suggests that the "ability to offer discounts to customers who use a particular card is . . . valueless to Walmart . . . [because] discounting by card brand, product, or issuer introduces differentiated pricing that conflicts with Walmart's uniform Every Day Low Price strategy."[22]  This objection to discounting makes no economic sense.  Merchants, including

---

example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Van Meter 30(b)(6) dep., p. 80.

[19] *See, e.g.* Kohl 30(b)(6) dep. of Carrothers p. 133 (▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮).  S*ee also* Abercrombie 30(b)(6) dep., at 203-04.

[20] Amended Settlement ¶¶ 26, 28, 55, 75, 77, 104.

[21] With surcharging, only customers using the high-cost payment means pay that charge.  With discounting, those using the high-cost means give up the discount effectively paying the cost, but those customers that already use the low-cost cards will also get the discount, thereby representing additional cost to the merchant from offering a discount.  For this reason, holding constant any lost business from disfavoring high-cost cards (charging) versus favoring low-cost cards (discounting), the merchant would prefer charging to discounting.  With perfect pricing transparency and rational consumers, none of this would make any difference; there is a two tier price structure, depending on whether one uses a low or high cost payments mechanism.  But in certain markets, behavioral economics effects may be significant.  In particular, customers facing a charge may react more negatively than from giving up a discount.  As noted above, the education funds of the Amended Settlement should help alleviate the negative reactions to merchants charging more for more costly services.

[22] Walmart Opposition p. 11.

Walmart, charge different prices for products with different costs.  Large eggs are sold at higher prices than small eggs; prime steaks are sold at higher prices than choice steaks.  There is no rational economic reason that customers "buying" premium credit card payment services should not pay more than customers "buying" lower quality standard credit card payment services.  The economic reality is that an Every Day Same Price for all cardholders results in higher, not lower prices.  We think the Court should not prevent all merchants from getting the indisputable economic benefits of discounting and surcharging just because some merchants may choose, for whatever reason, not to use them.[23]

15. Walmart also claims that it "cannot practically display differentiated pricing for products based on payment method or issuer given that its typical supercenter carries over 140,000 SKUs."[24]  However, in most states, a merchant can simply inform customers that a discount of X% is available to customers using that merchant's favored payment means.[25]  In addition, Walmart is a leader in the adoption of digital shelf labels that make the costs of differential pricing trivial.[26]  And contrary to its supposed single pricing policy, Walmart, like most grocery retailers, has a loyalty program, "Walmart+", offering discounts and rewards to its members, including differential pricing.[27]

16. <u>Discounting and surcharging.</u>  We believe merchants in the U.S. are innovative and clever, and that the Objectors fail to consider possible creative merchant responses to the increased steering opportunities that are available under the Amended Settlement.  While the Amended Settlement does not allow merchants to reject or impose differential charges for the credit cards of a particular issuer, it does allow rejection of or charging of a network's premium

---

[23] We note that not every provision of the Amended Settlement will be as relevant for every merchant/merchant category.  However, the bundle of reforms should be of benefit to essentially all merchants, and in a way which is fair (neutral), not unduly favoring one group, say large merchants, over others.

[24] *Id.*

[25] For charging, the notice could simply announce that a fee of X% is levied on customers using high-cost premium credit cards to offset the extra cost incurred by the merchant.

[26] *See, e.g.,* <u>Walmart Accelerates Digital Shelf Labels Rollout | Path to Purchase Institute</u> (Walmart ". . . will ramp up installations [of digital shelf labels] across all of Walmart's 4,600 stores in the U.S.").

[27] *See* <u>Walmart+ Membership - Walmart.com</u>

8

cards, and the rejection or charging of commercial cards, and it allows merchants to discount the premium cards of an issuer.  It also allows other forms of steering.  If a merchant wishes to favor the premium cards of a particular issuer, it could, for example, impose a surcharge of 3% on all premium cards while also offering customer advantages such as faster check out or other amenities for the use of the premium cards of the favored issuer or a discount.  Offering the right to be the favored premium card creates a substantial incentive for issuers to compete to be that card by offering reduced interchange.  Indeed, we would expect this alternative to have interchange reduction incentives comparable to the threat of not accepting the premium cards of an issuer, while providing greater flexibility.

17. Selective card rejection.  The Amended Settlement allows merchants to not accept, or threaten to not accept, a network's premium cards or a network's commercial cards. Mastercard's premium cards accounted for about ██% of the average merchant's transactions volume in 2024.[28]  This compares to Chase's credit card share of all transactions volume of 8.5%.[29]  The Objectors emphasize the significance of being able to credibly threaten to reject an issuer's cards in obtaining more competitive negotiated rates.  The threat of rejecting Mastercard's premium cards (or all Mastercard cards) would be as credible as the threat of rejecting a large issuer's cards.  Mastercard, like an issuer, would be expected to respond to such a threat by lowering its interchange to retain its volume.

18. A merchant would then be expected to steer its customers to the now lower cost Mastercard credit cards.[30]  There are a variety of ways that it could do this, all allowed within

---

[28] Mastercard's premium cards accounted for ██% of Visa and Mastercard transactions volume. *See* Table 1 Initial Declaration.  Visa and Mastercard account for about 75% of credit card transactions volume, and credit cards account for about 35% of all transactions volume. *See e.g.,* Credit Card Statistics (2025) | SellersCommerce; Credit Card Market Share by Network (2026).  The Mastercard premium card share of all transactions is estimated as ██% X 75% X 35%.  Including all Mastercard credit transactions increases Mastercard's share of all transactions to about ██%.

[29] Calculated as in footnote 28.  Chase accounts for about 24.5% of credit card transactions, Citibank about 11.2%, and Capital One about 11.1%. *See e.g.,* Visa and Mastercard Cards in the US — 2024 - Nilson Report; Credit Card Market Share by Issuer (2026).  Chase's premium cards would account for about ██% of the average total transactions volume.

[30] Multi-homing (consumers carrying multiple payment cards) is substantial, with more than ██% of consumers today carrying two or more payment cards. Information from Vida.  The ██% figure is likely

the proposed settlement.  For example, a merchant could now impose a surcharge on Visa premium cards with the expectation of a minimal loss in business, as customers could avoid the surcharge by switching to a Mastercard premium card retaining their high rewards.  A merchant could negotiate an even lower rate with a particular Mastercard issuer in return for discounting or offering merchant rewards on that issuer's Mastercards and promoting that issuer's cards.  Visa would be expected to react to this threat to its credit card market share by offering more favorable Visa fees.  Over time, the opening of such competition would likely permeate the market.[31]  This is an example of how the proposed settlement induces competition which will lower both the costs to merchants and the total price of the card.

19. The same logic is applicable to commercial cards.  Visa commercial cards account for about ██% of all Visa and Mastercard credit card transactions volume, and about ██% of all transactions volume.[32]  If threatening rejection of an issuer's premium cards would be credible and effective in negotiating lower interchange in return for continued acceptance (as the Objectors assume), then threatening to not accept Visa commercial cards should be equally effective.[33]  And if lower commercial interchange fees were obtained, this would place competitive pressure on the excluded network's commercial fees and all consumer card fees as merchants attempt to steer users to the now favored commercial cards.[34]

---

understated because the data treat a mobile wallet as one card, when in fact the wallet itself might (likely does) contain more than one payment card.

[31] As we expand upon below, in evaluating the likely impact of the Amended Settlement reforms to the anti-steering merchant restraints, it is important to consider the reforms as a whole.  The example in the text demonstrates this by the merchant initially taking advantage of the new ability to reject a network's premium cards which can lead to lower negotiated rates for the merchant on those cards, then combining this with discounting a favored accepted card.  This can then make profitable actions such as surcharging or card rejection for the other network because of the reduced expected loss of business for those actions.

[32] Initial Declaration Table 1 and footnote 28.

[33] If a merchant rejects commercial cards, the merchant would reduce the interchange rate on commercial transactions that switched to debit by ██ bps, and by ██ bps for those switched to standard cards.

[34] Circle K claims that the "ability to reject 'categories' of cards offers especially illusory relief to NACS [National Association of Convenience Stores] and Circle K [because] [c]onvenience stores sell almost exclusively to consumers, not businesses, and so the ability to reject 'Commercial' cards is not

10

20.  <u>Standard card 125 bps rate cap.</u>  The Objectors fail to understand the potential competitive impact of the 125 bps rate cap on standard cards.  The purpose of this change is not so much as a rate reduction[35] as the posted rate cap and the overall rate rollback of the Amended Settlement directly addresses this.[36]  Rather the purpose is to provide merchant and issuer incentives to encourage customers to shift to lower cost cards.[37]  As noted in our Initial Declaration, currently the differential in interchange between standard and premium credit cards is only about █ bps.[38]  This provides little incentive for merchants to steer from premium cards to standard cards.  For merchants paying posted rates, by moving transactions from a premium to a standard card, the customers lose about █ bps in rewards,[39] but the merchant achieves a savings of only █ bps.

21. The 125 bps cap on standard cards creates a standard-premium interchange differential of nearly 100 bps.  This allows a merchant to offset much of the rewards loss from a customer switching to a standard card by offering significant merchant rewards (including a discount at



impactful."  Circle K Objections, p. 16.  In fact, commercial cards accounted for about █% of convenience stores' Visa non-fuel credit card transactions.  Information from Visa.

[35] Circle K argues that the 125 bps cap "leaves the baseline interchange rate at least 50 basis points higher than a competitive market would produce. . . . The 125 basis-point cap for 'Standard' cards is thus illusory relief."  *Id.,* p. 19.  The Walmart Opposition p. 13 compares the 125 standard card rate cap to the regulated rate caps in the UK and the EU.

[36] Holding constant the proportion of transactions that are made with standard cards, about 45% of the overall 10 bps rate reduction will be from implementing the competitive tool of reducing the standard card rate.  As merchants use the opportunity to steer to standard cards as incentivized by the Amended Settlement, this percentage is expected to increase.

[37] The Amended Settlement seeks to achieve a balance between direct regulation (e.g. rate caps) and indirect regulation, ensuring that competitive market forces are at play.   Standard economics puts a preference on the latter, because it doesn't require a regulator assessing what the competitive costs might look like, which could and are like to change over time.

[38] Initial Declaration ¶ 85.

[39] The average rewards on premium cards are about █ bps and on standard cards about █ bps.  Calculated from Table 1 Initial Declaration.  We understand that some objectors assert that some merchants already have interchange rates below 125 bps on Standard cards.  However, any such rates are taken account of in the average Standard card posted rate of █ bps.  In addition, a mere █% of Visa posted-rate transaction volume on those cards is at rates below 125 bps, and only about █% of all Visa transaction volume on standard cards are at rates below 125 bps.  Information from Visa.

11

the POS) funded from the reduced interchange fees.[40]  In conjunction with the ability to target discounts to a particular issuer, a merchant can then steer card transactions from premium cards to standard cards with little fear of losing substantial business.  The ability to steer business to a favored standard card issuer provides a competitive incentive for the issuers to offer rates even lower than 125 bps in order to become the favored standard card provider.

22. Consider an example.  If a customer uses a standard card of the merchant's preferred issuer rather than the customer using their favored premium card, a merchant offers the customer rewards in the form of desirable merchandise with value to the customer (at the merchant's retail prices) of 1.5% of the transaction's amount.[41]  By switching to the standard card, the customer gets rewards of about ▮ bps (the 1.5% in merchant rewards plus ▮ bps in issuer rewards).[42]  At a typical retailer margin of about 40%, the cost to the merchant of the merchant rewards would be about ▮ bps.  The customer benefits by receiving total rewards valued at about ▮ bps rather than the rewards on their premium card of ▮ bps (the average rewards on premium cards).  In addition, holding constant for the moment the interchange rate on the standard card at 125 bps, the merchant benefits by ▮ bps, incurring a rewards cost of ▮ bps, which is more than offset by a ▮ bps reduction in interchange.[43]

23. The example continues because issuers will be motivated to be the favored standard card provider.  As we noted in our Initial Declaration, at 125 bps, issuers have a substantially higher margin on standard cards (▮ bps) than on premium cards (▮ bps).[44]  In addition, some customers would be expected to switch from other issuers' premium cards to the favored standard card because of the attractive merchant rewards offer.  The benefits from being the favored standard card issuer should generate substantial competition among issuers to be the

---

[40] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  See e.g., Fisher (Chase) dep., 37-38, 148-49; WFINT0000069858, 861 (Wells Fargo).

[41] Merchants with loyal shopper programs will have detailed data on their customers shopping patterns allowing the merchant to develop individualized customer rewards programs.

[42] On average, standard cards have rewards of about ▮ bps of the transaction amounts.  See Initial Declaration Table 1.

[43]  The example is for a merchant paying posted rates.  The average interchange on posted rate premium card transactions is 232 bps,  From Initial Declaration Table 1.

[44] Initial Declaration ¶ 89.

12

favored provider.  Indeed, at any standard card interchange rate above █████, the issuer would be better off with the transactions being on standard cards rather than premium cards.  And, in addition, the favored standard card issuers will get added benefits from customers switching transactions from other issuers' premium cards.

24. The Objectors have emphasized that standard cards account for a small percentage of all transactions.  But according to network data, standard cards have been about 45% of all issued cards,[45] so a non-trivial fraction of a merchant's customers will have ready access to a standard card.  More importantly, this percentage is a static observation.  Currently there is little reason for customers qualifying for premium cards to use a standard card.[46]  But when creative merchants begin offering significant merchant rewards for the use of standard cards, those cards and their use will become more prevalent.  In addition, merchants would be able to and are expected to partner with a preferred standard card provider to promote acquisition of that issuer's cards by, for example, having applications at hand at the cash registers.  In addition, the current low use of standard cards is helpful in motivating merchants to pursue a program outlined in the example as there is little entrenched base problem.[47]

25. Digital wallets.  As we noted in our Initial Declaration, digital wallets are increasingly used as a means of payment and their use is expected to continue to increase to nearly a third of all in-store payments and over half of online payments by 2027.[48]  The current Visa and Mastercard interpretation of the honor-all-cards rules includes honor-all-digital-wallets.  That is, if a merchant enables the technology to accept digital wallets that include Visa or Mastercard cards, it is required to accept all digital wallets that include Visa or Mastercard cards of any issuer.

---

[45] From data provided by Visa and Mastercard (VISA14MDL-Product Mix and Cards00210318 – HIGHLY CONFIDENTIAL, MC Product Mix and Min Rewards (26279075.2)).

[46] Premium cards typically have an annual fee.  If customers desire to have a backup card in case of card approval glitches, a "free" standard card is a likely option.

[47] The entrenched base problem was described above.  In this context, it is the cost of offering lower prices (discounts) to customers that already use the standard cards.

[48] Initial Declaration ¶ 64. *See also,* Digital wallets to overtake debit cards in stores: report | Payments Dive ("Digital wallet use in the U.S. is projected to overtake debit cards in transaction value for in-store payment by 2027.")

26. The Amended Settlement includes very important changes to this interpretation.  Under the Amended Settlement, a merchant can choose to accept only digital wallets that include favored issuer(s), for example, Chase cards.  Likewise, the merchant can refuse to accept a digital wallet sponsored by an issuer unless the merchant gets a favorable rate for accepting the wallet. The ability to decline digital wallets regardless of whether they include the network's cards, or which ones they include, provides merchants tools to reach creative and rate-lowering deals.

27. <u>Online transactions.</u>   Online transactions are another area of substantial growth.  In 2024, nearly ▮% of Visa and Mastercard transactions volume was for "card-not-present" transactions.[49]  Under the Amended Settlement, online and remote payments offer an important area for merchants to institute issuer competition, by increasing steering options. The Amended Settlement allows online merchants to have an initial payment page listing a single issuer.  That page could include a link to an application for that issuer's card if the customer does not have one.  Alternatively, if a user has multiple credit cards stored in the merchant's system, the merchant can choose to have its preferred issuer's card be on the payment landing page.

28. Experience in online markets shows the importance of the initial listing in e-commerce.  For example, merchants pay large amounts to be the first listed seller when customers do product searches on Amazon.[50]  The ordering of search results for Online Travel Agencies confirms the importance of placement in gaining business.[51]  "Around 75% of users never scroll past the

---

[49] From the backup data to Table 1 Initial Declaration.  Card-not-present transactions include online, phone, and mail transactions.  However, the majority are expected to be online.  *See e.g.*, <u>Card-present vs. card-not-present transactions | Stripe</u>.  Online payments currently account for over 20% of all transactions, with that percentage growing.  *See e.g.*, <u>US ecommerce sales in 2024 more than double those of 2019</u>; <u>2025 Diary of Consumer Payment Choice Reveals Trends in Consumer Cash Usage | Federal Reserve Financial Services</u>.  On-line payments are not made with cash, checks, or ACH, such that the percentage of all credit card transactions that are online will exceed the percent all transactions that are online.

[50] <u>How to Get Your Product on the First Page of Amazon: 5 Simple Tips</u> ("The most successful sellers are the ones that fight it out and get on the first page of the search results.) <u>Listing on Amazon: What Makes a Great Amazon Listing?</u> ("listing optimization is crucial to break through the noise on Amazon")

[51] <u>How to Optimize OTA Listings So Your Hotel Ranks Higher and Gets More Bookings - By Femke Nollet</u> (". . . your ranking on those [OTAs] sites matters more than almost anything else.")

14

first page of search results.  This means securing a top spot in search rankings is vital for visibility and conversions."[52]  The ability of merchants to favor a particular issuer's credit cards on their website as allowed under the Amended Settlement should aid in the promotion of significant issuer competition.

29. <u>Honor-all-cards and default rates</u>.  Proper evaluation of the honor-all-cards and default interchange rates must begin by recognizing that, with the honor-all-card rule in place, a default interchange rate can have significant procompetitive impact.  Firstly, a default rate eliminates the merchants' need to negotiate with scores of issuers.  More importantly, if a merchant accepting Visa or Mastercard is required to accept all issuers' cards and there is no default rate, absent the ability to charge an issuer's card, as issuer faces no cost of setting a high interchange fee.[53]  Given this connection between these two rules, we focus on honor-all-cards.[54]

30. The Objectors argue that because of the honor-all-cards rule, issuers have no incentive to negotiate directly with merchants.[55]  However, issuers' incentive to make deals with merchants flows from merchants' ability to steer their customers to an issuer's card.  Rejecting an issuer's cards is only one method to impose costs on an issuer to motivate negotiation of lower issuer fees, and it is likely to be no more effective than the opportunities created by the Amended Settlement as discussed above.

31. While the Amended Settlement does not allow selective rejection based on issuer, the "Pilot Program" reforms in conjunction with the relaxed honor-all-cards rules allow selective rejection for specific merchant outlets, for premium consumer cards of a network, and/or commercial cards of a network.[56]  Such outlet specific and card type rejection opportunities

---

[52] <u>SEO Outsourcing Statistics 2025: Key Trends and Insights</u>.

[53] Initial Declaration ¶ 114.

[54] If it is concluded (as we conclude) that the honor-all-cards rule has limited competitive impact given the other steering opportunities unleashed by the Amended Settlement, then the procompetitive aspects of the default interchange rule and the honor-all-card rule can dominant any remaining anticompetitive impact.

[55] See Walmart Opposition p. 8.

[56] A merchant can choose outlets for which the loss of business from card rejection is expected to be low.

15

availed under the Amended Settlement (or the threat of such rejection) will stimulate competition among the networks, while retaining any benefits of well developed Visa and Mastercard networks.

32. <u>Will the issuers evade the rate caps and rate reductions?</u>  Both Circle K and Walmart argue that issuers will easily circumvent the rate reductions and rate caps, including the 125 bps on standard cards, by moving cards from standard categories to premium categories.[57]  We do not believe this to be a problem.  Firstly, we discussed above how the 125 bps standard card interchange cap is designed to and expected to generate issuer competition that will expand the use of the standard cards.  In addition, any shifting of transactions to higher-cost cards must be offset by reductions elsewhere to meet the required overall rate reduction.  And finally, and importantly, the Amended Settlement includes explicit requirements of continued court supervision and anti-circumvention provisions.[58]  The competitive forces that the Amended Settlement should unleash should mean that circumvention will not be the problem; the problem that could arise is collusion among issuers and/or networks—a new antitrust issue that Court oversight and the antitrust laws would need to deal with.  In any antitrust settlement, there is the possibility of circumvention through renewed collusion, perhaps in a different form.

33. <u>Will Visa and Mastercard offset the rate reductions by increasing network fees?</u>  Walmart suggests that Visa and Mastercard will offset any reductions in interchange fees by increasing their network fees.[59]  We do not expect this to be an issue.  Firstly, the anti-circumvention

---

[57] Circle K Objections p. 2 ("The proposed settlement also gives the Defendants complete discretion to move cards from one category to another, meaning the 'Standard' consumer cards category could soon be virtually empty."), p. 11 (". . . the proposed settlement gives Defendants significant incentives to reclassify all (or most) of their Standard consumer credit cards as Premium cards . . .."), p. 15 (". . . the settlement creates strong incentive for the Defendants to push even more consumers to the "Premium" cards . . ."). Walmart Opposition p. 2 (". . . rate caps that Defendants could circumvent.").  As we explained above, we find the claim that the issuers will be motivated to move standard cards to premium to be a very static argument that ignores the issuer competition incentives that will be created to expand the use of these cards.

[58] We understand that such attempts to evade the intent of the Amended Settlement are subject to court review.

[59] Walmart Opposition pp. 12-13, (Defendants "are not . . . prevented from increasing network fees in the ordinary course of business to benefit their own bottom lines.")

16

provisions in the Amended Settlement note that "Defendants will refrain from implementing practices that have the equivalent object or effect of interchange rates . . ."[60]  Regardless of the applicability of this obligation, competitive pressures among the networks U.S. should constrain Visa and Mastercard's network fees.

34. Objectors do not dispute that Visa and Mastercard compete on the cardholder side for the allegiance of cardholders and issuing banks.[61]  The network fees charged by Visa and Mastercard to the issuing banks are the result of that competition, with a current average network fee of less than ▮% of the average interchange.  We have no economic reason to expect the extent of competition on the network-issuer-cardholder side to be reduced because of the reforms to the merchant restraints.  We have described how the ability of merchants to reject a network's premium or commercial cards, to steer using prices, to utilize pilot programs, and take advantage of the other reforms in the Amended Settlement will increase network competition for both issuance and merchant acceptance.  And it is the extent of that competition that determines the network fees.

---

[60] Amended Settlement ¶ 102.

[61] Initial Declaration ¶ 21.

17

Joseph E. Stiglitz, Ph.D.

1/14/2026
Date

Keith B. Leffler, Ph.D.

1/14/2026
Date