# Exhibit 2

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

_____

IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION

_____

BARRY'S CUT RATE STORES INC.; DDMB, INC. d/b/a EMPORIUM ARCADE BAR; DDMB 2, LLC d/b/a EMPORIUM LOGAN SQUARE; BOSS DENTAL CARE; RUNCENTRAL, LLC; CMP CONSULTING SERV., INC.; TOWN KITCHEN, LLC d/b/a TOWN KITCHEN & BAR; GENERIC DEPOT 3, INC. d/b/a PRESCRIPTION DEPOT; and PUREONE, LLC d/b/a SALON PURE,

Plaintiffs,

-v-

VISA, INC.; MASTERCARD INCORPORATED; MASTERCARD INTERNATIONAL INCORPORATED; BANK OF AMERICA, N.A.; BA MERCHANT SERVICES LLC (f/k/a DEFENDANT NATIONAL PROCESSING, INC.); BANK OF AMERICA CORPORATION; BARCLAYS BANK PLC; BARCLAYS BANK DELAWARE; BARCLAYS FINANCIAL CORP.; CAPITAL ONE BANK, (USA), N.A.; CAPITAL ONE F.S.B.; CAPITAL ONE FINANCIAL CORPORATION; CHASE BANK USA, N.A.; CHASE MANHATTAN BANK USA, N.A.; CHASE PAYMENTECH SOLUTIONS, LLC; JPMORGAN CHASE BANK, N.A.; JPMORGAN CHASE & CO.; CITIBANK (SOUTH DAKOTA), N.A.; CITIBANK N.A.; CITIGROUP, INC.; CITICORP; and WELLS FARGO & COMPANY,

Defendants.

_____

| MDL No. 1720

| Docket No. 05-md-01720-BMC-JAM

**DECLARATION OF JOSEPH E. STIGLITZ, PH.D. AND KEITH B. LEFFLER, PH.D.**

## I) Qualifications

1) Professor Joseph Stiglitz is University Professor at the Columbia University School of International and Public Affairs.  Professor Stiglitz previously filed an initial report on October 5, 2018 ("Stiglitz Merits Report"),[1] a rebuttal report on October 11, 2019 ("Stiglitz Merits Rebuttal"),[2] and a report in support of the prior settlement agreement on March 25, 2024.  His qualifications and background are detailed in the Merits Report.  In brief, Professor Stiglitz has been elected to numerous academic and scientific societies in the United States and abroad, including the National Academy of Sciences, the Royal Society, the American Academy of Arts and Sciences, the American Philosophical Society, and the British Academy.  In 1979, he was awarded the John Bates Clark Medal by the American Economic Association, and, in 2001, he received a Nobel Memorial Prize in Economics.

2) Professor Keith Leffler is Professor Emeritus, Department of Economics, University of Washington.  Professor Leffler previously issued a report in this case on December 18, 2020 concerning class certification of the Equitable Relief Class, and a report and rebuttal reports, on March 25, 2024 and May 13, 2024 in support of the prior settlement agreement.  His qualifications and background are detailed in those reports.  Professor Leffler specializes in the economics of competition and antitrust.  He has studied the electronic payments industry for over twenty years.

3) We have been asked by counsel for the Equitable Relief Class to assess the likely economic impact of the Superseding and Amended Class Settlement Agreement of the Rule 23(b)(2) Class Plaintiffs and the Network Defendants (the "Amended Settlement" or "Settlement").  We have reviewed the terms of the Amended Settlement, including those related to Honor-All-Cards, merchant steering, rate caps, and rate rollbacks.  This joint declaration ("Declaration") details our preliminary assessment of how the Amended Settlement will likely impact competition in the credit card services market and the interchange fees paid by merchants.  To perform the analysis summarized in this Declaration, we have obtained and

---

[1] ECF 8474-2 (under seal).

[2] ECF 8474-23.

relied on data and documents produced by Visa, Mastercard, and defendant banks in addition to other materials referenced herein.[3]

4) We understand that if the Court preliminarily approves the Amended Settlement, we will have an opportunity to provide a more complete economic assessment of the Settlement.

**II) Summary**

5) Visa and Mastercard dominate the market for credit card services with a combined market share of about 76%.[4]  For decades, Visa and Mastercard have imposed rules on merchants that restrain them from steering their customers towards the merchant's preferred means of payment ("Merchant Restraints").  These Merchant Restraints include the Honor-All-Cards rule, which requires a merchant that wants to accept low-merchant-cost Visa and/or Mastercard credit cards to also accept their higher-cost cards.  The Merchant Restraints also include no-steering rules restricting merchants' ability to levy prices or discounts to their customers to reflect and signal the costs to the merchant of the customer's choice of payment method.

6) In well-functioning markets, the costs facing consumers (prices) are the guide to efficient consumer choices.  When prices reflect the costs of alternative choices, as they will in relatively competitive markets, consumers will make their product choices based on how they value the alternatives compared to the costs as reflected in the prices.  Such value-cost based choices lead to more efficient outcomes.  The Merchant Restraints interfere in the price mechanism and lead to inefficient consumer choices of the means of payment and consequently to a loss of consumer and social welfare.

---

[3] Visa and Mastercard supplied monthly data on all their credit card transaction volume and interchange fees on those transactions.  This Visa data covered 2010 through November 2023; the Mastercard data began in 2011 and is also through November 2023.  The data was separated into consumer and commercial card types.  Visa and Mastercard also supplied data for 2024 providing the transaction volumes and interchange fees for all transactions by card type that would form the basis of the Average Effective Rate Limit as defined in the Amended Settlement.

[4] *See* Daniel Vidal, *The state of credit cards in 2025: 50 stats you need to know*, Expensify (Apr. 4, 2025), https://use.expensify.com/blog/credit-card-statistics; Christy Rodriguez, *U.S. Credit Card Market Share by Network & Issuer – 2024 Facts & Statistics*, Upgraded Points (May 7, 2025), https://upgradedpoints.com/credit-cards/us-credit-card-market-share-by-network-issuer/; Peter Westberg, *Visa and Mastercard: The Global Payment Duopoly*, Quartr (Sept. 22, 2025), https://quartr.com/insights/edge/visa-and-mastercard-the-global-payment-duopoly.

Amended Settlement in light of the economic tools needed to induce increased competition.  We also provide a quantification of the likely impact of the rate rollbacks and caps, and the 10-bps overall mandated rate reduction.  Those savings are substantial and benefit all merchants.  However, we expect that under reasonable assumptions the savings from the rule reforms will be far greater.

17) We note that the Amended Settlement does not eliminate default interchange rates nor allow issuer level non-acceptance or surcharging.  However, as we explain below, given the scope of the reforms from the Amended Settlement, there is a reasonable expectation that these few remaining restraints will have limited anticompetitive impacts.

18) We conclude this Declaration with a discussion of the balancing of the merchant and cardholder prices.

### III) The Competitive Problem

19) The Amended Settlement addresses the Visa and Mastercard Merchant Restraints that impede the ability of merchants to influence their customers' choices of their means of payment.  Visa and Mastercard offer credit cards with varying levels of interchange fees. Under the current rules, a merchant must either accept all of the network's credit cards, including high-cost, high-rewards credit cards and high-cost commercial credit cards, or accept none of its credit cards. While these cards may differ from the perspective of the customer, with some offering more rewards (with higher merchant fees) than others, from the perspective of the merchant, they are equivalent: the card for which the merchant must pay a higher fee doesn't deliver better transaction performance.  Thus, the merchant might like to accept only the card with the low fee but not ones with high fees.  The Honor-All-Cards rules prohibits that choice.  Adding to the power of these Honor-All-Cards rules are "no steering rules" that limit merchants' ability to steer customers to lower-cost payments means.[11]  The no-steering rules interfere with merchants' ability to impose costs on

---

[11] These no-steering rules are sometimes called "no-discrimination rules" because they prevent merchants from discriminating in price to shift customers to alternative payment means that impose lower costs on merchants.  As explained in the Stiglitz Merits Report, ¶ 145 & n.218, these rules are actually "you must discriminate" rules, in that charging the same price for goods of different costs (implying differences in the ratio of price to marginal cost) is the definition of price discrimination.  The "no-discrimination" rules result in the use of high-cost credit cards for

7

B) the all-outlets rules,

C) the level-playing-field rules, and

D) the prohibition on issuer-level discounting (for Mastercard).

As discussed in detail below, the Amended Settlement eliminates all these impediments to merchant steering, thereby increasing the net expected value of non-acceptance or steering away from high-cost cards. This makes steering more likely and makes the threat of steering far more credible.

## IV) Evolution of the Merchant Restraints

30) *Historical Restraints.* Until the mid-2000s, Visa and Mastercard were, in effect, joint ventures of competing banks (i.e., the credit card issuers), with the networks setting the collective default prices. From inception, Visa and Mastercard imposed a number of restraints on merchants that wished to accept their credit cards. Most significant were the networks' respective Honor-All-Cards rules. If a merchant wanted to accept Visa or Mastercard, it was required to accept all that network's cards. This restraint was arguably helpful for the developing networks to solve the "what comes first" or "chicken and egg" problem. Becoming part of a payment system is of value to merchants only if many of its customers want to use the system, and the system is of value to customers only if many of their preferred merchants accept the card.

31) The economic problem is how to simultaneously achieve substantial customer use and substantial merchant acceptance when each depends on the other. Customers become knowledgeable of acceptance through experience and promotion. When customers had no or little knowledge of Visa and Mastercard, if card acceptance were by card type or by issuer customers would have had difficulty understanding the new card's value. The Honor-All-Cards rule simplified this informational problem – if the merchant accepted Visa, it would accept whichever Visa card the customer had. However, this chicken-egg problem was solved decades ago. Visa and Mastercard are mature networks with millions of card users and millions of accepting merchants.

32) Visa and Mastercard also prevented merchants from discounting or charging for using their cards. When these networks were just beginning and customers were uncertain of the

12

values of Visa or Mastercard credit card usage, having different prices at different merchants for different cards would create consumer uncertainty of the value of card acquisition and use.  Also, if merchants considering whether to accept the cards had to then negotiate with many issuing banks, the value of acceptance would be reduced.[20]  The default interchange rates addressed this.

33) *Challenging the Restraints.*  Approximately ten years after the Visa and Mastercard credit card networks were created, debit cards were introduced as a means of payment.[21]  To increase merchant acceptance of their debit cards, Visa and Mastercard interpreted their Honor-All-Cards rules as including debit cards issued on their respective networks.  In 1996, a class of plaintiffs challenged Visa's and Mastercard's Honor-All-Cards rules, alleging that requiring merchants that accepted Visa and Mastercard credit cards to accept also Visa and Mastercard debit cards was an illegal tying arrangement.[22]  The plaintiffs also alleged that Visa and Mastercard were using their market power in credit cards, along with the Honor-All-Cards rules, to monopolize the debit card market.  In a 2003 settlement, Visa and Mastercard agreed to amend their Honor-All-Cards rules such that merchants accepting Visa and Mastercard credit cards are not required to also accept Visa and Mastercard debit cards, and vice versa.

34) In 1998, the U.S. Department of Justice ("DOJ") brought a civil enforcement action against Visa and Mastercard, alleging that the networks conspired to restrain trade by, among other things,[23] enacting and enforcing "exclusionary rules" prohibiting their member banks from issuing American Express or Discover cards.  The district court held that these Visa and Mastercard exclusionary rules violated the Sherman Act, ordering that those rules be

---

[20] We discuss below at ¶ 114 possible procompetitive benefits of the default interchange rules related to issuer bank free-riding.

[21] Dan Miller, *When Were Debit Cards Invented?*, SoFi Learn (July 30, 2024), https://www.sofi.com/learn/content/when-were-debit-cards-invented/?msockid=2e0773bd74b368a92deb66dc757e6978.

[22] *In re Visa Check/MasterMoney Antitrust Litig.*, No. 96–cv–5238 (E.D.N.Y.).

[23]  The DOJ also challenged Visa's and Mastercard's rules permitting a member-owner of one network to function as a director of the other network (also known as "dual governance").  Although the district court held that the networks' dual governance arrangement did not violate the Sherman Act, Mastercard and Visa in 2006 and 2008, respectively, converted the networks from consortiums of competitor banks into single-entity, publicly traded companies.

13

repealed. In addition, Visa and Mastercard were enjoined from enacting any future rules prohibiting issuers from issuing credit or debit cards of other networks.[24]

35) In October 2005, this case was filed.[25] Several class actions and individual actions asserting similar antitrust claims against Visa, Mastercard, and several issuing banks were consolidated. In April 2006, class action plaintiffs filed a consolidated amended class complaint alleging that Visa, Mastercard, and the issuing banks conspired to fix interchange fees and to restrict merchants from charging for use of high-cost credit cards.

36) While this case was proceeding, in 2010 the DOJ and certain states filed lawsuits against Visa, Mastercard, and American Express, challenging the networks' rules that prohibit merchants from steering cardholders to lower-cost payment methods.[26] On the same day the DOJ case was filed, Visa and Mastercard settled the DOJ's claims against them by entering into a consent decree.[27] The consent decree required Visa and Mastercard to modify their rules to allow merchant discounts or other incentives for using a particular card network brand, using a lower-cost card product within a particular brand, or using another form of payment. The consent decree did not require the networks to modify their rules to allow merchants to offer discounts at the issuer level. The consent decree, which expired in July 2021, also did not address the networks' Honor-All-Cards rules or the rules prohibiting merchants from surcharging credit card transactions.

---

[24] *See United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001); *United States v. Visa U.S.A., Inc.*, 183 F. Supp. 2d 613 (S.D.N.Y. 2001).

[25] *In re Payment Card Interchange Fee &Merchant Discount Antitrust Litig.,* No. 1:05-md-01720; *Barry's Cut Rate Stores, Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) (MKB) (JAM), also now known as *DDMB, Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM).

[26] The DOJ challenged rules prohibiting merchants from "encouraging consumers to use lower-cost payment methods when making purchases." *See* Press Release, U.S. Department of Justice, Office of Public Affairs, *Justice Department Sues American Express, Mastercard and Visa to Eliminate Rules Restricting Price Competition; Reaches Settlement with Visa and Mastercard* (Oct. 4, 2010), https://www.justice.gov/archives/opa/pr/justice-department-sues-american-express-mastercard-and-visa-eliminate-rules-restricting.

[27] *See* Andrew Martin, *U.S. Reaches Deal in Credit-Card Antitrust Suit*, N.Y. Times (Oct. 4, 2010), https://www.nytimes.com/2010/10/05/business/05card.html. American Express did not settle with the DOJ and the States, and the case was litigated in a bench trial with Judge Garaufis, who found that American Express's anti-steering rules were anticompetitive. *See United States v. Am. Express Co.*, 88 F. Supp. 3d 143 (E.D.N.Y. 2015). The Second Circuit reversed that ruling, concluding that the district court had improperly failed to conduct a two-sided-market analysis. *See United States v. Am. Express Co.*, 838 F.3d 179 (2d Cir. 2016). The Supreme Court affirmed the Second Circuit in 2018. *See Ohio v. American Express Co.*, 585 U.S. 529 (2018).

14

37) About two years after Visa and Mastercard settled with DOJ, the class in this case agreed to a settlement.  In addition to settling the class's damages claim, the settlement provided for certain reforms to Visa's and Mastercard's network rules.  Most importantly, under that settlement, the rules were to be modified to permit merchants to surcharge Visa or Mastercard credit card transactions at the brand or product levels, provided that the merchant also surcharge American Express.  The settlement did not include any relief from the Honor-All-Cards rules.  The settlement was approved by the district court, but, in 2016, the court of appeals overturned the settlement.[28]

### V) Some Details of the Current Merchant Restraints

38) *The Honor-All-Cards Rules.*  Under Visa's and Mastercard's current rules, merchants that accept any Visa and/or Mastercard credit card must accept all Visa and/or Mastercard credit cards.  This includes all consumer and commercial credit cards, all premium and standard credit cards, and all digital wallets that include Visa and/or Mastercard credit cards (if the merchant enabled the technology to accept those wallets).  The rules also require the merchant to accept Visa and Mastercard at all of its stores.  Thus, the Honor-All-Cards rules prohibits merchants from testing the customer response to non-acceptance of credit cards or particular types of credit cards by running a pilot program in a single location or a subset of locations.

39) *The Level-Playing-Field Rules and Surcharging.*  Under the current Visa and Mastercard rules, if a merchant surcharges Visa or Mastercard, then it must surcharge all "competitive brands" that cost the same or more to accept than Visa and Mastercard.[29]  American Express and Discover are competitive brands, and Visa's and Mastercard's rules define each other as competitive brands.[30]  While Visa and Mastercard agreed after the vacated 2012 settlement to allow only one of the brands to be surcharged, the posted rules do not include

---

[28] The Rule 23(b)(3) damages class settled its claims in 2018.

[29] *See* Visa Rule 5.5.1.6; Mastercard Rule 5.12.2.  The networks' current rules nominally allow surcharging at the brand or the product level.  See Visa Rule 5.5.1.7 (Oct. 18, 2025), https://usa.visa.com/content/dam/VCOM/download/about-visa/visa-rules-public.pdf; Mastercard Rule 5.12.2 (June 3, 2025), https://www.mastercard.com/content/dam/mccom/shared/business/support/rules-pdfs/mastercard-rules.pdf.

[30] See Visa Glossary; Mastercard Rule 5.12.2.

44) *Buying Groups.*  The Visa and Mastercard rules do not require the networks to recognize or negotiate with groups of merchants with respect to the interchange rates imposed by Visa and Mastercard.

45) *Default Interchange Rates.* Each network sets the "default" posted interchange rates for categories of merchants.[32]  The networks' schedules of rates, which run to more than 10 pages for each network,[33] result in significant price discrimination by merchant size and type.  The complex default rates allow Visa and Mastercard to fine tune the merchant fees to attempt to set those fees to levels just below those at which merchants in that category would refuse to accept the network's credit cards.

## VI) The Competitive Effects of the Merchant Restraints

46) Visa and Mastercard are the dominant providers of credit card services.  In 2024, Visa credit cards accounted for about ▇▇▇▇▇ in transactions in the U.S.[34]  In 2024, Mastercard processed about ▇▇▇▇▇ in credit card transactions.[35]  Together Visa and Mastercard have about a 76% share of all U.S. credit card transactions.[36]  Visa's and Mastercard's credit card transaction volumes have been increasing at about 9% per year since 2011.[37]

47) *Supracompetitive Total Prices.*  Chart 1 (below) shows the Visa and Mastercard overall average interchange fees for 2011-2024.  Visa's average interchange rate was ▇ bps in 2010, rising to ▇ bps by 2024.  Mastercard's average interchange rate was ▇ bps in 2011, increasing to ▇ bps by 2024.  On average, over the 14 years, the effective interchange paid has increased by over 1 bps per year.  Given the increasing reliance on

---

[32] Stiglitz Merits Report ¶ 35.  As shown in Table 1, about ▇% of Visa and Mastercard credit card transactions by purchase volume are at negotiated rates.

[33] Amended Settlement, Appendix J and Appendix K.

[34] From data provided by Visa.  [file FRE 408 – visa B2 Data Questions May 2025 Responses.]

[35] From data provided by Mastercard.  [2025.05.19 – Mastercard Responses to B2 Data Questions, sheet Responses.]

[36] *See* Adam McCann, *Market Share by Credit Card Network*, WalletHub (Feb. 26, 2025), https://wallethub.com/edu/cc/market-share-by-credit-card-network/25531; Jack Caporal, *Credit and Debit Card Market Share by Network and Issuer*, Motley Fool Money (July 28, 2025), https://www.fool.com/money/research/credit-debit-card-market-share-network-issuer/.

[37] See Table 2, Impact of Rate Rollbacks.  Since the beginning of Covid, the growth in credit card transaction volume has been over 10% per year.

negotiated rates, the average effective rates for merchants paying posted rates have increased by significantly more than the overall increase.



2011  2012  2013  2014  2015  2016  2017  2018  2019  2020  2021  2022  2023  2024

48) Table 1 shows the Visa and Mastercard average interchange rates by card type for merchants paying posted rates and paying negotiated rates in 2024.[38]  The Table also shows the percentage of the network's transaction dollar volume, the estimated value of the rewards on those transactions, and the implied total prices.[39]

---

[38] The transactions percentages and interchange rates are from data supplied by Visa and Mastercard.

[39] We have only limited information on the overall rewards levels by card type.  The rewards data in Table 1 is from rewards expense information from Bank of America, Capital One, Chase, and Wells Fargo, and information from Visa and Mastercard on minimum rewards levels by card type.  The Total Prices in Table 1 are interchange minus rewards.

18

| TABLE 1 INTERCHANGE RATES 2024 | | | | |
|---|---|---|---|---|
| Card Type | Posted Rates | | | |
| | %Transactions | Interchange | Rewards | TotalPrice |
| Visa Traditional | ■ | ■ | ■ | ■ |
| Visa Traditional Rewards | ■ | ■ | ■ | ■ |
| Visa Signature | ■ | ■ | ■ | ■ |
| Visa VSP/Infinite | ■ | ■ | ■ | ■ |
| Visa Commercial | ■ | ■ | ■ | ■ |
| Visa Standard | ■ | ■ | ■ | ■ |
| Visa Premium | ■ | ■ | ■ | ■ |
| Visa Consumer | ■ | ■ | ■ | ■ |
| Visa All Posted Rates | ■ | ■ | ■ | ■ |
| Mastercard Core | ■ | ■ | ■ | ■ |
| Mastercard Enhanced | ■ | ■ | ■ | ■ |
| Mastercard World | ■ | ■ | ■ | ■ |
| Mastercard World High/Elite | ■ | ■ | ■ | ■ |
| Mastercard Commercial | ■ | ■ | ■ | ■ |
| Mastercard Standard | ■ | ■ | ■ | ■ |
| Mastercard Premium | ■ | ■ | ■ | ■ |
| Mastercard Consumer | ■ | ■ | ■ | ■ |
| Mastercard All Posted Rates | ■ | ■ | ■ | ■ |
| | Negotiated Rates | | | |
| Visa All Negotiated Rates | ■ | ■ | ■ | ■ |
| Mastercard All Negotiated Rates | ■ | ■ | ■ | ■ |
| | All Rates | | | |
| Visa Consumer | ■ | ■ | ■ | ■ |
| Visa Commercial | ■ | ■ | ■ | ■ |
| Visa All Cards and Rates | ■ | ■ | ■ | ■ |
| Mastercard Consumer | ■ | ■ | ■ | ■ |
| Mastercard Commercial | ■ | ■ | ■ | ■ |
| Mastercard All Cards and Rates | ■ | ■ | ■ | ■ |

49) The overall average effective rates for merchants paying posted rates are ■ bps and ■ bps, respectively, for Visa and Mastercard. In contrast, the average effective negotiated rates are ■ bps and ■ bps. The volume of transactions at negotiated rates is ■ ■ of all Visa and Mastercard credit transactions. Nonetheless, the data demonstrate that merchants with sufficient bargaining power get significant interchange reductions from Visa and Mastercard.

19

rate differential is ▮ bps.  Large potential savings should be available to merchants from their increased bargaining power from their ability to reject (or steer customers away from) commercial cards.

64) *Honor-All-Cards Rules: Digital Wallets.* The Amended Settlement gives merchants greater control over emerging digital-wallet payments. In 2023, about 15% of point-of-sale payments and 37% of online payments in the United States were made with digital wallets. By 2027, 31% of point-of-sale payments and 51% of online payments in the United States are expected to be made with digital wallets.[57]

65)  Under Visa's and Mastercard's interpretations of their current Honor-All-Cards rules, merchants that have enabled the technology for digital payments must accept any digital wallet that contains the network's credit card.  This eliminates the merchant's leverage to negotiate with digital wallet purveyors over whether and the terms on which the merchant will accept the wallet.  However, under the Amended Settlement, merchants can choose not to accept any particular digital wallet, regardless of whether it contains Visa or Mastercard credit cards or debit cards, or is owned or operated by Visa or Mastercard.[58]  This will put the merchant in position to negotiate with digital-wallet purveyors, who will no longer be guaranteed merchants' acceptance by inclusion of a single Visa and Mastercard issuer.

66) *Honor-All-Cards Rules: Preferring Issuers.* As part of the Amended Settlement, the networks have agreed not to construe their Honor-All-Cards rules to prohibit certain merchant conduct that prefers one (or more) particular issuer's credit cards over others.  The Amended Settlement states the general principles governing issuer preferencing, and then identifies 19 specific circumstances that, the networks agree, shall be deemed to not violate the Honor-All-Cards rule or any other network rule.  We understand that the permissible circumstances were selected based on consultations with groups of merchants.  The circumstances include, for example, a merchant preferring a particular issuer (e.g., Chase

---

[57] *See* Capital One Shopping Research, *Digital Wallet Statistics* (July 23, 2025), https://capitaloneshopping.com/research/digital-wallet-statistics/.

[58] Amended Settlement ¶¶ 34-36, 83-85.

25

82) *Discounting Reforms.*  Providing a discount or merchant-specific rewards for the customer's use of a particular credit card can be an especially attractive competitive tool for merchants by enhancing the merchant's relationships with its customers.  Unlike issuer-supplied rewards for card use, which cardholders view as being given by the networks or the banks (but are actually paid for by the merchants and their customers), cardholders will associate the discounts or merchant-specific rewards with the merchants.  And unlike many rewards, "discounts" on the purchases of the merchant's goods or services can have an immediate, known, quantifiable value.

83) The Amended Settlement requires Visa and Mastercard to keep in place the rule changes of the 2011 Consent Decree.  The 2011 Consent Decree allowed merchants to discount (or offer enhanced services) by card brand and/or by product, but it expired in July 2021.  While Visa and Mastercard have voluntarily maintained the rule changes, they are free to revert to the more onerous pre-2011-Consent-Decree terms at any time.  The Amended Settlement extends these rules changes for at least eight additional years.[79]

84) Moreover, the 2011 Consent Decree did not require Visa and Mastercard to allow a merchant to discount a particular *issuer's* cards (e.g., discount for use of a Chase Traditional Visa credit card).  Visa voluntarily permitted some issuer-level discounting, but Mastercard did not.  This limited merchants from unleashing what could be intense competition among the many banks that issue Visa and Mastercard credit cards to become a merchant's favored credit card issuer.  The Amended Settlement rectifies this problem, allowing merchant discounting at every level—brand, product, and/or *issuer*.  The Amended Settlement requires that Visa and Mastercard explicitly clarify in their rules that merchants may discount by issuer, as well as by brand and/or product.[80]  With the ability to discount a particular issuer's cards, merchants will be able to negotiate for discounted interchange rates with the major issuers in addition to the two networks.

85) *New "Value" Card.*  A major distortion in the current market is the significant compression between interchange rates on the networks' premium credit cards as compared to the rates

---

[79] Amended Settlement ¶¶ 18, 67.

[80] Amended Settlement ¶¶ 19, 68.

on their standard credit cards.  Presently, the gap between the average posted interchange rates on Visa and Mastercard standard consumer credit cards and premium consumer credit cards is ██ bps.[81]  That relatively modest gap provides limited incentive for merchants to take advantage of the Amended Settlement's steering tools by, for example, discounting standard cards.  Indeed, such steering is profitable only if the discount (or the costs of other merchant-supplied cardholder benefits) is less than █ basis points, a discount that is unlikely to motivate cardholders to give up as much as █ bps in rewards.

86) The Amended Settlement responds to this economic reality by mandating that the networks lower the posted rates on standard consumer credit cards to a maximum of 125 bps.  This will ensure that most posted-rate consumer Visa and Mastercard credit card transactions will have a gap (at current rates) of more than 100 bps between the premium and standard cards (or that the networks substantially lower the premium rates).[82]

87) Together with the Amended Settlement's other reforms, the increased gap in merchant costs between standard and premium cards makes steering to standard consumer credit cards a powerful competitive tool.  It increases the merchant's economic incentive to steer and allows merchants to mute any adverse customer response by passing on some of the cost savings to the customer.  For example, merchants considering declining premium cards can ease customers' concerns by simultaneously offering them a discount on the merchant's goods/services at the point-of-sale, for using a standard credit card.  Creative merchants can design their own rewards plans that cater to their customers' preferences as revealed in purchase patterns.  Unlike rewards programs designed by and associated with issuing banks, merchant-customer specific "rewards" programs will solidify the merchant-customer relationship and change the culture of "free" credit-card rewards.[83]

---

[81] Calculated from Table 1.

[82] The lowest level of premium cards, Visa Signature and Mastercard World, have 2024 interchange of ██ and ██ bps respectively.  These cards account for ██% and ██% of Visa and Mastercard credit card transactions.  Visa Signature Preferred and Infinite and Mastercard World High Value and World Elite have interchange rates of ██ bps and ██ bps and account for ██% and ██% of Visa and Mastercard transaction volumes, respectively.  *See* Table 1.

[83] With merchants' increased incentives to offer merchant-specific rewards, there is some danger that increased firm loyalty results which would reduce price elasticities and therefore increase mark-ups.  Regardless, by allowing

88) When merchants are motivated to steer their customers to standard cards, issuers will be incentivized to compete to become a merchant's preferred "value" card, and to partner with merchants to steer customers to the issuer's standard card.  Such steering is profitable to both the banks and the merchants.[84]  Some creative bank(s) could embrace this opportunity to shift customers' focus away from nebulous, after-the-fact rewards to quantifiable, get-it-today discounts on the goods and services that they buy.  A merchant could promote the standard cards of a partner bank in return for an interchange fee that is lower than the 125-bps industrywide standard card rate.  To encourage use of the partner card, merchants could profitably pass-on some of their cost savings in merchant-designed rewards (e.g., "we offer quadruple loyalty points or a 1% cash discount when you use a Chase Value credit card.  Pick up an application from your cashier!").

89) The new competitive card has the potential to disrupt the "rewards" paradigm. Even with the 125-bps cap on standard-card interchange rates, an issuing bank will still receive a significantly higher total price for standard consumer credit cards than for premium consumer credit cards, about ▓ bps for standard consumer credit cards compared to ▓ bps for premium consumer credit cards.  As rewards become merchant-centric and merchant-variable, cardholders' perceptions of their banks offering "free" rewards for particular card usage will be changed to a realization that network/bank issued rewards have a cost.

90) *Increased Leverage in Negotiating Rates.*  Currently, about ▓% of Visa and Mastercard transactions are at negotiated, reduced credit-card interchange rates.[85]  These negotiated rates were obtained under the current onerous no-steering Merchant Restraints.  The

---

competition among merchants by their catering to their customers' preferences, we expect a more efficient result than that generated by issuing banks' control of rewards.

[84] The ability of merchants to discount an individual issuer's standard card and encourage customers to acquire such a card will encourage competition among the issuing banks. Data provided by Visa and Mastercard show that the standard cards have represented about ▓% of Visa and Mastercard posted rate consumer card transaction volume.  But that data also shows that standard cards are over ▓% of the outstanding consumer cards. The merchants' and the issuing banks incentives to push the standard cards will create demand for banks to issue more of those cards or to promote their use.  Merchants can reach deals with an issuing bank to provide standard card interchange fees below the 125-bps cap in exchange for the merchant's encouraging its customers to apply for and use that bank's standard card.

[85] *See* Table 1.

types of customers whose merchants are in the group.  In short, while merchants have previously had the right to join a buying group, the Amended Settlement provides economic reasons to do so.

94) The Amended Settlement encourages the formation of buying groups by expressly requiring Visa and Mastercard to negotiate with them in good faith and providing a pathway to challenge any alleged failure of good faith.[87]  The Settlement also provides dedicated funds to educate merchants about buying groups and to facilitate their formation.[88]

95) *Merchant Education Program.*  The Amended Settlement also boosts steering by providing funds to educate merchants about the new competitive tools that the Settlement provides. In the current market environment, in which Visa and Mastercard have altered the competitive landscape through decades-long imposition of the Merchant Restraints, it will be important to prod the market towards a more competitive outcome.  The Amended Settlement therefore provides a $21 million fund for merchant education.

96) These funds may be used to inform and educate merchants on:  i) the benefits and use of merchant steering under the new rules, ii) how merchants can best use the new steering tools to motivate customers to use lower-cost payment methods, iii) how merchants can steer in states that restrict surcharging, iv) the benefits to merchants of joining merchant groups for negotiations with Visa and Mastercard, v) the value of threats of steering in negotiating lower interchange, and vi) how merchants might mitigate the adverse effects of steering by educating customers about the impact of high-cost cards on the prices of goods and services.[89]

97) *Relief in States with Surcharging Restrictions.*  Notwithstanding the expanded surcharging relief in the Amended Settlement, we understand that state laws in Connecticut, Maine, Massachusetts, and Puerto Rico purport to prohibit merchants in those states from

---

[87] Amended Settlement ¶¶ 45, 94. The Settlement provides that the Court will retain jurisdiction over the Settlement and will resolve any disputes over whether the networks have acted in good faith with respect to the buying-group negotiations. *Id.* ¶¶ 46, 95.

[88] The negotiated rates these groups achieve will count toward the mandated 10 bps systemwide rate reduction.

[89] Amended Settlement ¶¶ 56, 105.  More generally, these funds can be used for any purposes approved by the Court—with only lobbying, trade association activities, and disparagement of Visa, Mastercard, issuing banks, and card products explicitly precluded. *Id.*

bps.  Switching 10% of posted rate transactions to negotiated rates would result in a ▮ bps reduction in the total price and the merchant price.  Switching transactions from commercial cards to standard cards or debit would yield additional price reductions.

111) The reforms are expected to save merchants hundreds of billions of dollars in interchange fees.  For example, if an average of only a 20-bps reduction in the interchange fees results from the reforms, merchants would save about $112 billion in interchange fees over the 8-year period of the Settlement.[108]  If the reforms reduced the merchant fees by 40 bps, the merchant savings would double to $224 billion.

112) The Amended Settlement will help to reshape merchant and customer expectations and actions.  Each merchant will use the competitive strategy that best fits its business and its customers.  The expected outcome is the use of combinations of the new steering opportunities leading to a total price much closer to a competitive level.  It is reasonable to expect that some combination of shifts in customer and merchant behavior will significantly reduce the gap between actual and more competitive total prices.

## IX) The Remaining Merchant Restraints

113) The Amended Settlement eliminates or substantially reforms nearly all of the Merchant Restraints, but not all of them.  The default interchange rates will remain; merchants will not be permitted to decline acceptance based on the issuer; and merchants will not be allowed to surcharge at the issuer level.  These remaining restraints must be evaluated in the context of their purposes and of the numerous other restraints that the Amended Settlement does eliminate.

114) *Default Interchange.*  The Amended Settlement does not prohibit the networks from continuing to set "default" interchange rates, i.e., the rates that will prevail in the absence of a specific agreement between a merchant (or a buying group of merchants) and the network.  While the default rate is justified with standard arguments over "free riding," and while critics of the default rate worry that it is anticompetitive, for the reasons we have

---

[108] We assume that, absent the Settlement, interchange fees and credit card transactions volumes would continue to grow at the historical rates of 1 bps and 10.2% respectively per year.

41

discussed above, the Amended Settlement has the potential to unleash competitive forces, likely making any anticompetitive effects of the default rate limited, perhaps even minimal, a conclusion consistent with opinions put forward by economists for other plaintiffs' groups previously in this litigation.[109]

115) *Issuer Level Honor-All-Cards and No Issuer Level Surcharging.*  The Amended Settlement leaves in place the Honor-All-Cards rule at the issuer level (i.e., merchants may not selectively refuse acceptance of a particular issuer's credit cards) and the prohibition on surcharging at the issuer level (i.e., merchants may not selectively surcharge only a particular issuer's credit cards).  Having "universal acceptance" (if a merchant accepts Visa, it will accept my Visa) undoubtedly provided significant benefit to cardholders as the networks evolved, allowing cardholders to carry one preferred credit card and receive one monthly bill.

116) The Amended Settlement enacts significant Honor-All-Cards reforms, permitting merchants to decline acceptance of commercial credit cards; decline acceptance of premium credit cards; decline acceptance of digital wallets that contain the network's cards; conduct pilot non-acceptance programs; and accept the networks' cards, or the permitted subsets of them, in some store banners but not others.  The Amended Settlement also provides many mechanisms for merchants to generate competition among issuers.  It permits merchants to discount by issuer; use dual pricing to steer by issuer; steer by issuer in the grey area between surcharging and discounting; and cut deals with an issuer to promote the new competitive "value" credit card.  Merchants will also have an unrestrained ability to discount and enhanced ability to surcharge (or selectively not accept premium cards) to steer customers to a new competitive card, and surcharge at the brand, type, and/or product level.  These steering tools provide merchants with many varied and powerful competitive tools to drive prices toward competitive levels independent of the ability to not accept cards at the issuer level.

---

[109] *See, e.g.,* Expert Report of Roy J. Epstein (Oct. 5, 2018) ¶ 186 ("[t]he Honor All Cards Rule would not be objectionable if surcharging were allowed").

42

117) The Amended Settlement's sweeping changes to the Merchant Restraints should, by themselves, suffice to ensure an increase in competition, significantly lowering costs to merchants, even with the retention of the restraints on default interchange, issuer-level acceptance and issuer-level surcharging.

## X) The Balance Between Interchange Fees and Rewards

118) As noted, the Merchant Restraints have four principal anticompetitive effects: (a) a supracompetitive total price, (b) an inefficient balance between the merchant-side price and the cardholder-side price, (c) distorted relative prices for different types of cards, and (d) an inefficient and unfair subsidizing of customers who use high-priced cards.

119) With respect to total price, we noted a variety of benchmarks indicating that today the gap between the Visa and Mastercard actual total price and a "competitive" total price is conservatively estimated to be something ████████ bps.[110]  Under reasonable assumptions, the Amended Settlement's reforms will significantly reduce that gap.

120) After the Amended Settlement's reforms narrow the gap between the actual and benchmark competitive total prices, how much further the merchant price should drop will be determined by competition in the market.  With the more competitive total prices, the networks and issuers may respond to merchants' continuing competitive pressure by reducing rewards, raising cardholders' annual fees, raising interest rates, or achieving lower issuer profits.  The proper role of antitrust law is to eliminate restraints impeding competition and to let the market work.  It is not to dictate the outcome.

121) Under the Amended Settlement, issuer rewards levels will result from a more competitive process.  The goal is that cardholders make their payment means decisions facing prices that *more accurately* reflect the cost of the decision.  The Amended Settlement certainly moves the credit card service market in this direction.  If card users value their rewards more than the costs, then even with surcharging they will pay the "price" and receive their rewards.

---

[110] We refer to the payment mechanism functions of credit cards and not the credit functions.  In addition, by competitive price we refer to the expected price absent the anticompetitive Merchant Restraints.  Given the economies of scale for payment networks and the entrenched positions of Visa and Mastercard, reforming the Merchant Restraints will not lead to a classic competitive market with many sellers offering homogeneous goods.