**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL No. 1720 (BMC)(JAM) |
| This Document Relates To:<br><br>ALL ACTIONS. | |

**CASCADE SETTLEMENT SERVICES LLC'S**
**MOTION FOR AN ORDER**
**DIRECTING THE SETTLEMENT ADMINISTRATOR**
**TO PROVIDE REGULAR PUBLIC REPORTING**

# **TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................. 1

II. BACKGROUND .................................................................................................................. 1

    A. The Role of Spectrum ................................................................................................. 1

    B. Settlement Administration as of August 2025 ............................................................ 2

    C. The Special Master Logjam ........................................................................................ 3

    D. The Fee Challenge Backlog and Indefinite Postponement of the Audit Process ....... 4

    E. The Initial Partial Distribution ................................................................................... 5

III. ARGUMENT ....................................................................................................................... 7

    A. Best Practices Require Periodic Reporting of the Settlement Administration ........... 7

    B. Monthly Reporting is Necessary to Monitor and Assess the Ongoing Non-Compliance with Court-Ordered Timelines ................................................................................... 8

    C. Reporting Is Necessary to Assess the Progress of Fee Disputes ................................ 9

    D. The Proposed Reporting is Minimally Burdensome ................................................ 10

IV. CONCLUSION .................................................................................................................. 14

# TABLE OF AUTHORITIES

**Cases**

*Contant v. AMA Capital, LLC*, 66 F.4th 59 (2d Cir. 2023) ........................................................ 2, 7

*Grant v. Bethlehem Steel Corp.*, 823 F.2d 20 (2d Cir. 1987) ........................................................ 7

*Grice v. Pepsi Beverages Company*, 363 F.Supp.3d 401 (S.D.N.Y. 2019) ................................... 7

*In re Holocaust Victim Assets Litig.*, 424 F.3d 132 (2d Cir. 2005) ............................................... 7

*In re Payment Card Interchange Fee and Merchant Disc. Antitrust Litig.*, 789 F.Supp.3d 242 (E.D.N.Y. 2025) ........................................................................................................................ 7

*In re Visa Check/Mastermoney Antitrust Litigation,* No. CV-96-5238-JG (E.D.N.Y.) ................. 2

*Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002) .................................................. 7

*Rothstein v. American International Group, Inc.*, 837 F.3d 195 (2d Cir. 2016) ............................ 2

**Rules**

Fed. R. Civ. P. 23(d) ................................................................................................................... 1, 7

**Treatises**

*Manual for Complex Litigation* (Fourth) § 21.661. ................................................................. 8, 14

I.      INTRODUCTION

The proper administration of a multi-billion-dollar settlement requires transparency. Claim filing opened over two years ago, and the February 2025 filing *deadline* passed more than a year ago. While the first partial distribution occurred this month, it excluded many of the larger and more complex claims. This raises a question: if it took a full year to pay the easiest claims, how many years will it take to administer the more complex claims that were excluded from this initial payout? The Settlement Administrator, Epiq Class Action & Claims Solutions, Inc. ("Epiq" or the "Administrator"), has refused to provide information that would allow Class Members and this Court to understand when the majority of these claims will be cleared and paid, and whether the claims administration process is proceeding with reasonable diligence, asserting generally that the information is "not publicly available."

The Court cannot manage what it cannot see. Even accounting for the reserves set aside for the *Lanning* and *Old Jericho* appeals, about $1.5 billion sits idle in the settlement fund, with no published timeline for release. Cascade Settlement Services LLC ("Cascade") submits this motion to respectfully request that this Court exercise its inherent equitable authority and its specific supervisory powers under Rule 23(d) to compel the Administrator to file regular, detailed, public monthly reports regarding the progress, any bottlenecks, and timeline of the claims administration process.

II.     BACKGROUND

   A.      The Role of Spectrum

Since 2012, Cascade has acquired recovery rights of numerous Class Members in this

1

Settlement.[1] (Declaration of David Morgenstein ("Morgenstein Decl.") ¶ 3.) Spectrum Settlement Recovery ("Spectrum") is the d/b/a for the third-party claims filer and agent for Cascade and hundreds of merchants claiming hundreds of millions of dollars of interchange fees. (*Id.* ¶ 4.) Spectrum (including its predecessors) has been in business since 2003 and has worked in dozens of large class action settlements, including *In re Visa Check/Mastermoney Antitrust Litigation,* No. CV-96-5238-JG (E.D.N.Y.). (*Id.*) Many of Spectrum's Fortune 500 clients have been with Spectrum for over a decade. (*Id.*) Spectrum operates in this case as an agent for Class Members and claim purchasers, like Cascade, to file claims, respond to deficiency and conflict notices, analyze transaction data, and engage in the multi-step dispute resolution process established by the Plan of Administration. (*Id.* ¶ 5.) Spectrum remains in regular contact with Class Counsel and the Administrator. (*Id.*)

Though an initial, relatively small distribution was made this month, many Class Members received nothing. Most of Spectrum's clients—many of whom have large or complex claims—were excluded from the payout, including hundreds where no facts remain in dispute because they accepted the Administrator's fee determinations before the February 2025 deadline. (Morgenstein Decl. ¶ 6.) Based on Spectrum's communications with the Administrator, as set forth below, it appears that these Class Members are not likely to be paid any time soon.

B.  **Settlement Administration as of August 2025**

The only meaningful report to date about the progress of this settlement administration accompanied the August 2025 motion for a partial distribution. According to the Administrator's own declarations, as of August 12, 2025, there were 1,424,566 unique Taxpayer Identification

---

[1] Because it has a direct, concrete and particularized interest in the administration of this Settlement, Cascade has standing to seek the relief requested herein. *See, e.g., Rothstein v. American International Group, Inc.*, 837 F.3d 195, 204 (2d Cir. 2016) (class action claimants have standing to appeal); *Contant v. AMA Capital, LLC*, 66 F.4th 59, 65 (2d Cir. 2023) (same.)

2

Numbers (TINs) with submitted claims.[2] (Declaration of Loree Kovach, ECF No. 9648-3 ("Kovach Decl.") ¶ 8.) Many of these TINs are caught up in bottlenecks to be resolved by Epiq and/or the Special Master, including:

- 193,230 research requests challenging fee calculations (*Id.* ¶ 10(b)); and
- 339,696 alternative data submissions (*Id.* ¶ 10(c).)

These figures demonstrate that over 500,000 claims—more than a third of all submitted TINs—will have to go through a multi-step process that involves submitting data or briefing, awaiting Epiq's and/or the Special Master's review, and potentially triggering successive thirty-day response windows. (Kovach Decl. ¶ 11.) As confirmed by the Administrator, all or most of these claims need to be resolved before audits will even begin. (Morgenstein Decl. Ex. A.)

### C.  The Special Master Logjam

To resolve disputes arising from the Plan of Administration, this Court appointed the Honorable James Orenstein (Ret.) as Special Master on September 3, 2024. (Revised Order Appointing Special Master, ECF No. 9403 ¶ 1.) The Court's Revised Order mandates that the Special Master's report and recommendation on disputes must be "served on any affected parties no later than 30 days after the reply papers have been received by the Special Master." (*Id.* ¶ 4.) However, due to the apparent high volume of conflicts, the Administrator has implemented an internal procedure that effectively bypasses the Court's timeline.

On February 3, 2026, Spectrum requested an update from the Administrator regarding conflicts for which reply papers were submitted in September 2025. (Morgenstein Decl. Ex. A.) The Administrator responded, "Because of the volume of appeals, in particular those related to conflicts, [the Special Master] has asked that Epiq send him [the reply papers] on a rolling basis.

---

[2] Another 692,872 unique TINs have been registered but held up in a pre-claim process. (Kovach

3

Accordingly, you'll hear back from him within 30 days of appeals being sent to him by Epiq." (*Id.*)

The Administrator gave no indication of when Spectrum's conflicts would be forwarded to the Special Master. When Spectrum requested the total number of conflicts pending in the internal queue (as of August 12, 2025, these conflicts numbered 25,358), the Administrator refused to provide an answer, stating: "No, this isn't publicly available information." (Morgenstein Decl. Ex. A.)

Class Members, who have waited nearly half a year for the resolutions that the Court intended to be delivered in thirty days, remain without any visibility into the size of the backlog, the rate of transmission, or their position in the queue.

### D. The Fee Challenge Backlog and Indefinite Postponement of the Audit Process

Multi-step fee disputes make up the biggest category of claims in the Administrator's backlog. Putting aside conflicts already in the Special Master queue, over 500,000 claims will go through the multi-step fee challenge process, comprising 193,230 research requests and 339,696 alternative data submissions. (Kovach Decl. ¶ 10, *supra*.)

The processing of these alternative submissions is moving at a glacial pace. As per the Plan of Administration, Spectrum submitted alternative interchange fee values for roughly 9,000 claims. (Morgenstein Decl. ¶ 8.) The Administrator has requested supporting documents for only about 250 of these, which Spectrum provided. (*Id.*) Spectrum has heard nothing on any of the other 8,750. (*Id.*)

There are over 300,000 other claims in this exact situation, and over 190,000 additional

---

Decl. ¶ 9.)

claims where the claim value has not been finalized for other reasons—a considerable number of claims still to be processed.

Furthermore, once Epiq completes its initial review of these alternative data submissions, many of those determinations will inevitably be contested. This next wave of appeals—which has yet to even begin—will create a further, perhaps more serious jam at the Special Master level.

But there is more. The Plan of Administration requires the Administrator to develop and execute an Audit Plan to ensure the integrity of the claims. (Kovach Decl. ¶ 20.) Rather than conduct audits in parallel with the fee disputes, the Administrator has stated that "audits [will] take place after all claims are processed" and that "all fee challenges of any sort submitted to Epiq would need to be resolved before audits can commence." (Morgenstein Decl. Ex. A.)

This sequencing threatens to cause indefinite delay. For example, Spectrum explicitly accepted Epiq's interchange fee determinations for roughly 950 claims prior to the February 2025 deadline. (Morgenstein Decl. ¶ 9.) Despite timely accepting the Administrator's own data, only one-third of these undisputed claims were scheduled for the initial partial distribution. (*Id.*) When Spectrum asked if the remaining two-thirds were selected for audit, the Administrator refused to confirm or deny, stating it is "neither customary nor appropriate to provide claimants with advanced information on audits." (Morgenstein Decl. Ex. A.) Because audits cannot begin until half a million fee disputes are resolved, it could be years before further distributions are authorized.

E.     **The Initial Partial Distribution**

In late 2025, the Court authorized the initial, partial distribution of settlement funds. The Administrator identified 605,472 claims eligible for this distribution, representing an allocation

5

of $426,063,670.16. (Kovach Decl. ¶ 28.) While this distribution is a welcome development for the subset of eligible claimants, it highlights a larger problem affecting the largest claimants—the possibility of years more delay before their claims are paid.

Even accounting for the $2.9 billion reserve for the *Lanning* appeal and a $450 million reserve for the *Old Jericho* appeal, over $1.5 billion is available for distribution. But it sits idle, with no timeline or schedule for subsequent distributions. When asked for a timeline, the Administrator explicitly stated: "There are no plans to provide a schedule for future payments at this time." (Morgenstein Decl. Ex. A.)

The initial distribution criteria excluded any claim with a pending dispute, conflict, or deficiency.[3] (Kovach Decl. ¶ 17(d)-(e).) The Administrator further excluded claims falling within the preliminary Audit Plan populations, which captured high-value claims above a designated threshold and a percentage of claims submitted by third-party filers.[4] (Kovach Decl. ¶¶ 17(f), 21.) While it is expected that larger, high-value claims require additional scrutiny, their exclusion highlights a critical timing problem. If it required a full year of administration to process and pay the simplest, entirely undisputed claims, it follows that clearing the complex, high-value claims currently stranded in the audit queue will take years.

Before these complex claims can even be considered for payment, a series of bottlenecks must be cleared: the Special Master must first resolve tens of thousands of existing conflicts, the Administrator must then adjudicate over 300,000 alternative fee submissions, 190,000 research

---

[3] The population of claims included in the initial partial distribution was limited to those that were timely, associated with a valid TIN, and in agreement with the fees calculated by Epiq and reflected on the pre-populated claim forms or the Merchant Portal. (*See generally* Kovach Decl.)
[4] Ironically, it also excluded any claims where the claimant submitted general data to Epiq as part of a "Research Request," even if the claimant accepted Epiq's valuation prior to the filing deadline. In these cases, the claimant tried to help Epiq locate other interchange fee records, only to be penalized for this step by being excluded from the initial distribution.

6

requests and finally, the Special Master must resolve the inevitable wave of secondary appeals arising from those fee determinations. Based on the limited data provided in the Administrator's August 2025 declaration, the only reasonable inference is that it will take years to pay the remainder of the claims.

The Court and the Class cannot be left to guess at this timeline. The Administrator should publish regular, public reporting now.

**III.    ARGUMENT**

    **A.    Best Practices Require Periodic Reporting of the Settlement Administration**

Federal Rule of Civil Procedure 23(d) vests the district court with broad, ongoing authority to manage class actions and protect the interests of absent class members. This Court possesses "both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *In re Payment Card Interchange Fee and Merchant Disc. Antitrust Litig.*, 789 F.Supp.3d 242, 252 (E.D.N.Y. 2025); *see also In re Holocaust Victim Assets Litig.*, 424 F.3d 132, 146 (2d Cir. 2005) (affirming the district court's "broad supervisory powers with respect to the administration and allocation of settlement funds"); *Contant*, 66 F.4th at 65 ("[d]istrict courts enjoy broad supervisory powers over the administration of class-action settlements to allocate the proceeds among the claiming class members equitably").

The necessity for judicial oversight continues through the settlement administration phase. The district court acts as a fiduciary for the class, bearing a "high duty of care" to ensure the settlement fund is distributed efficiently. *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002) (citing *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 22 (2d Cir. 1987); *see also Grice v. Pepsi Beverages Company*, 363 F.Supp.3d 401, 408 (S.D.N.Y. 2019) ("in the

7

Rule 23 context the Court acts as a fiduciary that must 'serve as a guardian of the rights of absent class members'").

Transparency is essential to a court's exercise of its fiduciary duty. Indeed, best practices require periodic administrative reports detailing "distributions made, interest earned, allowance and disallowance of claims, the progress of the distribution process... and other matters involving the status of administration." *Manual for Complex Litigation* (Fourth) § 21.661.

Black box administration is fundamentally incompatible with these objectives. Yet, as discussed above, when asked for basic data regarding the number of conflicts referred to the Special Master, the Administrator refused. When asked about audit parameters and timelines, the Administrator refused. When asked for a schedule regarding distribution of the $1.5 billion available in the settlement fund, the Administrator refused.

Class Members have already complained about the lack of transparency and the slow pace of this administration.[5] Neither the Court nor the Class can assess the administration of this multi-billion-dollar trust without receiving periodic reporting of the Administrator's progress. By mandating the proposed monthly reporting, the Court will obtain the data necessary to determine what, if any, administrative corrections must be ordered, while providing the Class with confidence and trust in how the settlement funds are being administered.

### B. Monthly Reporting Is Necessary to Monitor and Assess the Ongoing Non-Compliance with Court-Ordered Timelines

As discussed above, the Administrator is maintaining an undisclosed internal queue and holding back conflicts—including conflicts fully briefed since September 2025—from the Special Master. This backlog has resulted in non-compliance with the Revised Order Appointing

---

[5] *See, e.g.*, ECF No. 9797, Letter to Judge Brodie from Sherly Havered dated 1/26/2026 ("small businesses are exhausted by nauseate delays from outside settlement vetting operations . . . *why*

8

Special Master, converting a strict 30-day Special Master decision period into an indefinite administrative stay.

The Court requires data to assess the extent of this backlog. A monthly report detailing the number of disputes fully briefed, transmitted to the Special Master, successfully resolved, and held in the Administrator's internal queue is the only mechanism to learn more about this backlog. If it is unmanageable, the proper remedy is for the Court to appoint additional neutrals, allocate additional resources, or formally modify the timelines in its Order—not for the Administrator to silently and indefinitely toll this Court's deadline.

### C. Reporting Is Necessary to Assess the Progress of Fee Disputes

The Administrator has conditioned the commencement of audits upon the complete resolution of hundreds of thousands of pending data challenges. As noted above, this queue includes 193,230 research requests and 339,696 alternative fee submissions. Resolving these individualized disputes requires iterative correspondence, database re-queries, document review, and successive 30-day appeal windows. While there may be administrative logic to this sequential approach, the Court cannot assess whether this process is reasonable without reporting. By the Administrator's own admission, not a single audit on the remainder of the class—including the largest claims in the Class—can begin until these disputes are cleared. Regular reporting on the clearance rate of these challenges will allow the Court and the Class to project a timeline for completion. If the reporting reveals that the current pace will delay distributions for years, the Court will possess the objective data necessary to consider administrative remedies, such as ordering a bifurcation to allow audits of undisputed claims to proceed in parallel.

---

*has not staffing been increased.*").

9

### D. The Proposed Reporting Is Minimally Burdensome

The proposed reporting imposes no material burden on the Administrator. The requested metrics—claim counts and interchange fee volumes categorized by status—rely exclusively on basic data flags Epiq necessarily tracks in its claims database and likely already reports to Class Counsel. Extracting and publishing these metrics requires no disclosure of confidential identities, proprietary algorithms, or sensitive financial data.

This request is neither novel nor overreaching. This Court already routinely requires Class Counsel to file monthly reports monitoring third-party filers; it possesses equal authority to compel basic operational transparency from the Administrator tasked with distributing a $5 billion fund.

Cascade proposes that the Administrator's monthly report include a tabulated breakdown of (1) Number of Claims, (2) Interchange Fees (Administrator Database), and (3) Alternative Interchange Fees Submitted,[6] across the following specific claim statuses and reflecting the month over month change in each:

| Status Type | Description of Claim Status | Rationale for Judicial Oversight |
|---|---|---|
| **Type 1** | Claims are in conflict with other claims – resolution still pending | Tracks the backlog of the 25,358 TINs in conflict, ensuring parties are moving toward resolution. |
| **Type 2** | Claims may have been submitted by Excluded | Monitors the status of claims flagged as dismissals |

---

[6] Applies only to Types 4, 5 and 6.

10

|  | parties – resolution still pending | or opt-outs seeking reentry. |
|---|---|---|
| **Type 3.a** | Claimant filed on time, accepted Epiq's IF value, and a partial payment issued | Establishes the baseline of successfully processed and paid claims. |
| **Type 3.b** | Claimant filed on time, accepted Epiq's IF value, but was excluded from the initial payment | Highlights the claims that were held back despite claimant agreement with Epiq's data. |
| **Type 4.a** | Claimant filed on time and submitted an alternative IF or sales data | Tracks the macro-level volume of the challenge process. |
| **Type 4.b** | Claimant filed on time and submitted an alternative IF or sales data and Epiq has not requested supporting docs from claimant | Identifies Epiq's internal bottleneck in initiating review of alternative data. |
| **Type 4.c** | Claimant filed on time and submitted an alternative IF or sales data. Epiq has requested supporting docs and is waiting for their receipt | Identifies delays attributable to class member inaction. |
| **Type 4.d** | Claimant filed on time and submitted an alternative IF or sales data. Epiq has received the supporting documents but has not responded to claimant | Highlights Epiq's backlog in reviewing submitted evidence. |

| Type 4.e | Claimant filed on time and submitted an alternative IF or sales data. Epiq has reviewed the data and approved the higher IF value | Measures the throughput and success rate of the challenge process. |
|---|---|---|
| Type 4.f | Claimant filed on time and submitted an alternative IF or sales data. Epiq has reviewed the data and rejected the higher IF value | Measures the rejection rate, forecasting future Special Master appeals. |
| Type 5 | Claimant submitted the claim after the filing deadline | Tracks the volume of untimely claims requiring exceptional circumstance review. |
| Type 6.a | Claimant was not able to resolve the conflict with the other claimant and submitted briefing materials for the Special Master | The total universe of escalated disputes. |
| Type 6.b | Claimant submitted briefing materials for the Special Master but Epiq has not sent them to the Special Master | Tracks the size of Epiq's internal "rolling basis" shadow queue. |
| Type 6.c | Claimant submitted briefing materials for the Special Master and Epiq has sent them to the Special Master | Tracks transmission rate to the Special Master. |
| Type 6.d | The Special Master has reviewed the claimant's | Measures the Special |

12

|  | materials and made a determination | Master's clearance rate. |
|---|---|---|
| **Type 6.e** | The Special Master is still reviewing the claimant's materials and has not made a determination | Monitors compliance with the Court's 30-day resolution mandate. |

This reporting framework provides a needed view of the settlement administration.[7] By tracking the progress of claims across statuses—for example, from Type 4.b (awaiting Epiq request) to Type 4.d (awaiting Epiq review) to Type 6.b (sitting in Epiq's Special Master queue)—the Court can pinpoint exact operational bottlenecks. If, for example, 150,000 claims remain stalled in Type 4.d month after month, the Court could order Epiq to dedicate additional staffing to review documents. Furthermore, this transparency is essential for managing the nearly $5 billion remaining in the distribution fund. The Class is entitled to understand what progress is being made and what still needs to be done before subsequent distributions are authorized.

Cascade proposes that the Administrator's monthly report also includes a summary accounting of the settlement funds, reflecting the total balance and total interest earned both cumulatively and during the reporting period. Given the years-long wait since this case was settled in 2018, it is no surprise that Class Members are writing to the Court asking if the settlement funds are earning interest. *See, e.g.*, ECF No. 9797, Letter to Judge Brodie from Sherly Havered dated January 26, 2026 ("I would respectfully ask your Honor to elucidate the matter of interest accrual for the 5.5 billion dollar financial settlement for [the] case . . . "); ECF No. 9560, Letter to Judge Brodie from Robert Jay Davis dated January 21, 2025 (concerns

---

[7] While these categories are most relevant to assessing the progress of claims administration, the specific form and content of the report can be modified or optimized to meet the needs of the Court, the Class, and the Administrator.

13

include "interest on the settlement"); ECF No. 9509, Letter to Judge Brodie from David Christianson dated November 26, 2024 ("Transparency: That the Settlement Administrator provide an itemized report detailing the current administrative costs, interest accrued on escrowed funds, and the expected timeline for finalizing distributions"). In the interests of transparency, the Court should order regular public accounting of the settlement funds. *See Manual for Complex Litigation* (Fourth) § 21.661.

## IV.     CONCLUSION

The sheer scale of this settlement cannot serve as an excuse for administrative secrecy; rather, it amplifies the necessity for public judicial oversight. For the foregoing reasons, Cascade respectfully requests that the Court grant this motion and direct the Administrator to file monthly status reports on the public docket containing the aggregated claim metrics detailed herein.

Dated:  February 26, 2026            */s/ Kassra P. Nassiri*
                                     Kassra P. Nassiri
                                     NASSIRI & JUNG LLP
                                     1700 Montgomery Street, Suite 207
                                     San Francisco, California 94111
                                     kass@njfirm.com
                                     (415) 762-3100
                                     *Attorney for Cascade Settlement Services LLC*

## Certificate of Compliance

Pursuant to Local Civil Rule 7.1(c) and the Individual Practices of Judge Brian M. Cogan, the undersigned hereby certifies that this memorandum of law complies with the word-count limitation and does not exceed 8,750 words.

Dated: February 26, 2026

/s/ *Kassra P. Nassiri*
Kassra P. Nassiri
NASSIRI & JUNG LLP
1700 Montgomery Street, Suite 207
San Francisco, California 94111
kass@njfirm.com
(415) 762-3100
*Attorney for Cascade Settlement Services LLC*