------------------------------------------------------- x

IN RE MDL 1720 DAMAGES CLASS
SETTLEMENT DISPUTES

REPORT AND
RECOMMENDATION
OF SPECIAL MASTER

------------------------------------------------------- x

1:24-MC-03415-BMC-JAM

IN RE MDL 1720 DAMAGES CLASS
SETTLEMENT APPEAL OF
REGISTRANT NO. 19181782

1:26-MC-01019-BMC-JAM

------------------------------------------------------- x

**Parties**: Teleflora LLC ("Teleflora") is the sole registrant that is a party to this dispute.

**Counsel**:

> Johnny Traboulsi
> Roll Law Group
> 11444 West Olympic Boulevard
> Los Angeles, CA 90064
> (310) 966-8400
> johnny.traboulsi@roll.com
> Counsel for Teleflora LLC

I.      Background

On May 9, 2024, Teleflora registered 35,310 Taxpayer Identification Numbers ("TINs")

with the Class Administrator ("CA") based on the transactions of 35,909 florists.[1] Teleflora

---

[1] Before submitting a claim to receive the settlement proceeds corresponding to the payment card transactions of a merchant member of the Rule 23(b)(3) Settlement Class (the "Class"), a party must first register that merchant's Taxpayer Identification Number ("TIN") with the CA. The registrant (here, Teleflora) must provide proof that it is the owner (or authorized representative of the owner) of the claim corresponding to that merchant TIN. In the absence of supporting documentation, this requirement can also be satisfied by providing the Claimant ID and Control Number printed on the original prepopulated claim forms that were mailed to known class members. Once the registrant establishes such authority, the CA updates the registrant's status to "approved." If there is only one approved registrant for a given TIN, the registrant may submit a claim for that TIN. In cases where multiple parties have registered the same TIN, the CA

describes itself as "among other things, … a floral clearinghouse provider which receives and transmits orders for flowers to and from member florists throughout the country." Ex. A at 1 (letter dated Dec. 24, 2024, from Teleflora's counsel to CA) ("Letter").[2] The CA initially designated approximately 1,400 of those TINs to be in conflict status because, in each such case, some other filer had registered the same TIN. The CA initially designated Teleflora's remaining TINs as being under review pending the submission of additional information and documentation including proof of authority to act on behalf the relevant merchants. *Id*. at 2.

Teleflora also describes itself as a "Payment Facilitator." Letter at 5. Its status as such is pertinent here because on June 3, 2024, Judge Brodie ruled that two other payment facilitators – Block, Inc., f/k/a Square, Inc. ("Square"), and Intuit Inc. and Intuit Payment Solutions, LLC (collectively, "Intuit") – had not "accepted" payment cards used to pay for goods and services sold by their merchant clients and therefore were not members of the Class. *See In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 735 F. Supp. 3d 249, 252 (E.D.N.Y. 2024), *reconsideration denied*, 2025 WL 2490442 (E.D.N.Y. Aug. 29, 2025) ("*PayFac*").[3]

Soon after *PayFac* was decided, the CA reclassified Teleflora's registrations and requested additional information. As the CA explained to Teleflora's counsel:

> The Court found that merchant-customers, not the Payment Facilitators, accepted payment cards and are therefore members of the Rule 23(b)(3) Class….

---

designates the TIN as being in "conflict" and does not permit any registrant to submit a claim until the conflict is resolved.

[2] Teleflora's Letter included a 390-page exhibit listing all of the TINs it had registered and the name of the merchant associated with each. To protect sensitive information while making public as much of the record, I have designated the Letter alone (without the list of TINs) as Exhibit 1 to be filed on the public docket and the list of TINs as Exhibit 1-A to be filed under seal.

[3] As of this writing, an appeal of the *PayFac* decision is under review by the Second Circuit.

> As a result of this decision, the Class Administrator is requiring all Registrants to provide a list of Taxpayer Identification Numbers (TINs) that were registered by or on behalf of Payment Facilitators which belong to their merchant-customers….
>
> You must provide this list even if it is your position that the payment facilitator is the class member entitled to file a claim for the interchange fees paid.

Ex. 2 at 2 (email exchange dated July 10-11, 2024, between CA and Teleflora's counsel). Teleflora promptly provided the requested information while reserving its right to challenge *PayFac* and its potential impact on the claims it sought to file. *See id.* at 1.

On September 5, 2024, the CA issued its determination that, as a Payment Facilitator, Teleflora was not a member of the Class and therefore could not participate in the settlement. The CA included in that notice instructions for disputing the determination. *See* Ex. 3 at 3 (email exchange dated Sept. 5-Dec. 4, 2024, between CA and Teleflora's counsel); Letter at 2.

Teleflora submitted its objection to the CA's determination on December 4, 2024. It argued that Judge Brodie's *PayFac* decisions did not preclude all Payment Facilitators, including Teleflora, from participating in the settlement. *See* Letter at 3-4.[4] It went on to distinguish the terms of its agreements with merchant clients from those at issue in *PayFac* and argued that under those terms, "Teleflora is and was a direct purchaser of card acceptance services from Visa and Mastercard, paid the interchange fees for the claims at issue during the Class Period, and therefore remains a member of the Rule 23(b)(3) Settlement Class." Letter at 4; *see id.* at 4-7.

By email to Teleflora's counsel dated May 22, 2025, the CA provided a further opportunity for Teleflora to submit information in support of its claim. In particular, the CA advised:

---

[4] I agree with Teleflora that *PayFac* does not necessarily preclude the claims of all payment facilitators and does not collaterally estop Teleflora in particular. *PayFac* is, however, both the law of this case and persuasive precedent upon which the Court can and should rely.

> For the Special Master to proceed with his review of these PayFac disputes, you must provide the contract(s) between you and each Merchant/TIN, including any contract(s) with affiliated entities, predecessors, and subsidiaries, Acquirers, Issuers, and Sellers, that establishes your rights and obligations to act on behalf of the Merchant and to the Merchant's Settlement Interchange Fees. These contracts must include the date each contract was signed and date the contract ended.

Ex. 4 at 2 (email exchange dated May 22-June 20, 2025, between CA and Teleflora's counsel) (footnote omitted).[5]

Teleflora responded by email on June 20, 2025. Rather than providing all of the relevant contracts as directed by the CA, it provided thirteen sample merchant contracts that it described as representative of the rest, along with copies of some of its contracts with "Global Payments Direct, Inc. ('Global Payments') and Elavon, Inc. ('Elavon'), … which served as the acquiring banks and/or credit card processors for Teleflora for the periods of April 2003 and February 2011 and February 2011 to the present[.]" Ex. 6 at 1 (email dated June 20, 2025, from Teleflora's counsel to CA).[6] As Teleflora wrote,

> Given its submission of almost 34,000 separate claims involving its member florists and deadline imposed, Teleflora cannot reasonably and realistically upload each and every merchant agreement for those member florists for the entire class of period of 2004 to 2019. In lieu of submitting thousands of duplicative and/or identical agreements, Teleflora submits the 13 attached and representative

---

[5] The CA's request for proof of Teleflora's authority with respect to each TIN was not unique to this registration. *See* Ex. 5 (form CA deficiency notice requiring documentation of registrant's authority to act on behalf of a merchant).

[6] *See* Exs. 6-A through 6-M (sample merchant contracts); Ex. 6-N (2003 Amended and Restated Merchant Agreement with Global Settlements); Ex. 6-O (2005 Second Amendment to Amended and Restated Merchant Service Agreement); Ex. 6-P (undated and partially executed "Payment Device Processing Agreement" with Elavon with header reading, in part, "Teleflora comments 2/28/11); Ex. 6-Q (2018 Elavon Master Services Agreement). Although it appears that Teleflora entered into agreements with Global Processing and Elavon during the relevant period that it has not submitted here (including the 2004 first amendment to the agreement with Global Settlements mentioned in Ex. 6-O and the final, executed version of its 2011 agreement with Elavon), the absence of such documents from the record does not affect my recommendations. I assume for purposes of analysis that Teleflora has accurately described its agreements with Global Settlements and Elavon.

> merchant agreements which governed the relationship between Teleflora and those member florists during and throughout the class period.

> To the extent the Claims Administrator requests specific or further information related to any of the agreements, Teleflora welcomes the opportunity to respond and respectfully requests an extension of time to furnish such information for the Special Master's consideration.

Ex. 6 at 1.

For the reasons that follow, I disagree with Teleflora's attempt to distinguish *PayFac* and with Teleflora's contention that the sample merchant contracts it has supplied establish its class membership. Instead, I conclude that, like Square and Intuit in *PayFac*, Teleflora was not the party that "accepted" payment cards in transactions involving its merchant customers – it was the merchants who did so. I therefore respectfully recommend that the Court find that Teleflora has not demonstrated that it is a member of the Class and that the CA has therefore properly declined to authorize the company to submit claims for the thousands of TINs at issue here. I also disagree with Teleflora's suggestion that it may properly withhold the vast majority of its merchant contracts from the CA. It is on the basis of those contracts that Teleflora purports to displace thousands of merchants from the Class and to claim the right to collect the settlement proceeds attributable to the millions of sales in which those merchant were involved. Accordingly, I further respectfully recommend that the Court find that Teleflora – like any other entity seeking to participate in the Settlement Fund – was obliged to provide proof of its authority to represent each of the merchant TINs it registered.

II.     Analysis

    A.     <u>Teleflora Did Not Accept Payment Cards and Therefore is Not a Class Member</u>

        1.     <u>Teleflora's effort to distinguish *PayFac* is unpersuasive.</u>

In *PayFac*, Square and Intuit asserted claims against the Visa and Mastercard networks as well as various banks "based on transactions in which Square or Intuit served as a 'payment

facilitator' for their merchant customers." 735 F. Supp. 3d at 252. The defendants moved to enforce the Settlement Agreement or in the alternative dismiss those claims.

Judge Brodie granted the motion based on a finding that Square and Intuit had not "accepted" payment cards in the relevant transactions within the meaning of the Settlement Agreement and therefore were not members of the Class. Instead, it was the "Sellers" – that is, the merchant customers of Square and Intuit – who had "accepted" the cards in those transactions. *Id*. at 258-66. As explained below, I conclude that for reasons similar to Judge Brodie's in *PayFac*, it is Teleflora's merchant customers, rather than Teleflora itself, that "accepted" payment cards and are therefore Class members.

Teleflora purports to establish its class membership with reference to four criteria: (1) "the Payfac's contracts with the underlying merchants, the acquiring bank, and/or the networks;" (2) "whether the networks set the price for card acceptance services based on the Payfacs' or the merchants' demand for those services;" (3) "whether the Payfac or the merchant are [sic] responsible for compliance with the networks' rules;" and (4) "the flow of funds among the various players in a Payfac-merchant transaction." Letter at 4; *see id*. at 4-6 (addressing each).[7]

As a threshold matter, Teleflora applies those criteria to the wrong question. Teleflora asserts that it is a class member because it "is and was a direct purchaser of *card acceptance services from Visa and Mastercard*" and that it "*paid the interchange fees* for the claims at issue[.]" Letter at 4 (emphasis added). But class membership is not based on who purchased card

---

[7] Teleflora does not contend that those are the criteria Judge Brodie applied in *PayFac*. Instead it reports that "Class Counsel has set forth [those] criteria to inform the decision of whom 'accepted' payment cards[.]" Letter at 4. As the following discussion illustrates, they do not precisely track – and omit an important part of – Judge Brodie's reasoning.

acceptance services from the network defendants or who paid interchange fees; it turns on who accepted payment cards. As Judge Brodie noted in *PayFac*,

> The Settlement Agreement defines the Damages Class as "all persons, businesses, and other entities that have accepted any Visa-Branded Cards and/or Mastercard-Branded Cards in the United States at any time from January 1, 2004 to the Settlement Preliminary Approval Date [of January 24, 2010]." (Settlement Agreement ¶ 4, annexed to Rule 23(b)(3) Class Pls.' Mot. for Class Settlement Preliminary Approval as Ex. 1, Docket Entry No. 7257-2.) The Settlement Agreement further provides that each class member who files a claim will receive a *pro rata* share of the settlement fund "in accordance with the relative economic interests of the [class member] as measured by the Interchange Fee amounts attributable to their Visa- and Mastercard-Branded Card transactions during the Class Period." (*Id.* § I-2.).[8]

735 F. Supp. 3d at 254 (brackets in original). The distinction is important because Teleflora does not assert anywhere in its submissions that it accepted payment cards as that term is used in both the class definition and Judge Brodie's *PayFac* opinion.

Even if the criteria Teleflora discusses were the relevant ones, Teleflora's arguments would lack merit. Teleflora contends that the "first factor … strongly supports a finding that Teleflora was the direct purchaser of card-acceptance services from Visa and Mastercard" for the following reasons:

> For the transactions and claims at issue, Teleflora is the entity that negotiated and entered into the relevant contracts with the acquiring banks that allowed Teleflora to "accept" Visa and Mastercard cards as the "merchant of record." Teleflora also negotiated and entered into contracts with the acquiring banks that set the price of Teleflora's card acceptance—*i.e.*, interchange fees owed and paid by Teleflora. By contrast, Teleflora's member florists did **not** contract with the acquiring banks and/or networks to purchase card-acceptance services. Teleflora's member florists did not pay any interchange fees to the acquiring bank or networks. Rather, Teleflora buys card acceptance services from acquiring banks and Teleflora then sells a bundle of goods and services to its member florists, including supported hardware and software as well as card acceptance services, for which it charges its

---

[8] The reference to a preliminary approval date of "January 24, 2010" is a typographical error. The correct date is January 24, 2019.

member florists a single, fixed rate on each transaction, no matter what brand or
card type.

Letter at 4. What that argument omits is the fact that Square and Intuit made, and Judge Brodie rejected, essentially the same argument in *PayFac*. *See* 735 F. Supp. 3d at 259 ("Square argues that Sellers are not direct purchasers of card-acceptance services because Square is listed as the 'merchant of record' for all transactions at issue in which a Seller used Square's platform to facilitate a transaction"); *id*. at 256 (for merchants who "may not want to contract directly with Acquirers to accept payment cards[,]" Square and Intuit enter contracts with Acquirers, Square provided hardware and serve as intermediary for transactions"); *id*. at 267 (Intuit argued that it was legally responsible to pay interchange fees). Accordingly, Teleflora's argument about the nature of its contracts does not support the proposition that Teleflora is a Class member.

> Teleflora's next argument is that
>
> the networks unilaterally set the interchange fees for Teleflora transactions based on the agreements the networks signed with the acquiring banks. The acquiring banks and Teleflora then negotiated and entered into separate agreements in which Teleflora agreed to pay the interchange fee. By contrast, the networks did not set prices for Teleflora's individual member florists, and the member florists did not pay interchange fees to the networks.

Letter at 5. This merely restates Teleflora's reliance on the fact that it, rather than its merchant customers, entered into contracts with acquiring banks. I therefore disagree with the company's assertion that this criterion supports its position. Moreover, the assertion that Teleflora "was the direct purchaser" again focuses on the wrong issue. To be a Class member, Teleflora must establish that it accepted payment cards for the relevant transactions, not that it made direct payment of the associated interchange fees.

The third argument Teleflora offers to demonstrate its Class membership starts with the assertion that "[a]s a Payment Facilitator, Teleflora serves as the master merchant or merchant of record on all transactions it facilitates." Letter at 5. As a result, the company argues, it is

"directly responsible for compliance with the networks' rules, including rules that obligate Teleflora to, among other things, pay the applicable interchange fee and the Honor All Cards Rules." *Id*. Here again, Teleflora cites a fact that also applied to Square and Intuit in *PayFac*. Because the latter companies contracted with the acquiring banks, they too had to comply with network rules.

In its argument about network rules, Teleflora omits a salient fact: Judge Brodie discussed those rules in *PayFac* and found that they undermined rather than supported the proposition that payment facilitators like Square and Intuit – and, here, Teleflora – are Class members. The Court explained each network's rules for distinguishing payment facilitators from their merchant customers (described as "Sellers" in the opinion) and concluded that, under Visa's rules "the evidence suggests that Sellers accept payment cards because (1) Sellers, not Square, represent themselves as selling the goods or services to cardholders; (2) Sellers use their names to identify themselves to cardholders; and (3) Sellers provide recourse to cardholders in the event of a dispute." 735 F. Supp. 3d at 265-66.[9] Likewise, the court held "together, the Mastercard

---

[9] Judge Brodie quoted the pertinent portion of Visa's rules:

> An entity that deposits a Transaction, receives settlement from, or contracts with an Acquirer on behalf of a Merchant is classified as a Merchant if all of the following apply: (1) The entity represents itself as selling the goods or services to the Cardholder; (2) [t]he entity uses its name primarily to identify its Merchant Outlet to the Cardholder; and (3) [t]he entity provides recourse to the Cardholder in the event of a dispute. Otherwise, the entity is classified as a Payment Facilitator.

*Id*. at 255; *see also id*. at 269 ("[Visa's] rules … provide that merchants who utilize a Payment Facilitator's services are to be 'treated as a Merchant of its Payment Facilitator's Acquirer,' likening their position to those of merchants that do not use Payment Facilitators."). Judge Brodie went on to dismiss Square's argument that an entity can act as both a payment facilitator and a merchant by noting that under Visa's rules, "an entity cannot *simultaneously* act as both payment facilitator and merchant." *Id.* Similar to Square and Intuit in *PayFac*, Teleflora does not contend that, with respect to the transactions of its merchant customers at issue here, it was a Merchant rather than a Payment Facilitator under Visa's rules.

rules provide that Sellers (*i.e.*, "Submerchants") 'accept' payment cards pursuant to their agreements with Square and Intuit (*i.e.*, the 'Payment Facilitators')." *Id.* at 266.

Teleflora's fourth and final substantive argument is that it is a "direct purchaser" because it "directly pays the interchange fee for each transaction. Teleflora's member florists are not part of this flow of funds. Rather, pursuant to their contracts with Teleflora, the member florists separately pay Teleflora fees set by Teleflora for a bundle of hardware, software, and services that Teleflora provided to them." Letter at 6. Yet again, Teleflora ignores the fact that the same was true in *PayFac*. *See* 735 F. Supp. 3d at 256 (generally describing services offered by payment facilitators like Square and Intuit); *id.* at 267 ("Intuit argues that Sellers, by contrast, 'had no involvement in interchange payments' and that the higher fees they paid to Intuit 'account[ed] for the other portions of the PayFac service Intuit provided.'").

Thus, none of Teleflora's substantive arguments support the proposition that it "accepted" payment cards for the relevant transactions and is therefore a Class member, largely because they simply restate arguments that Judge Brodie already rejected when made by Square and Intuit in *PayFac*. Teleflora also ignores an important facet of Judge Brodie's reasoning:

> In addition, the way real-world transactions are conducted supports the conclusion that Sellers "accept" payment cards. In the prototypical transaction, the cardholder hands her card to a Seller, who "accepts" it for payment at the point of sale, just as the Seller could have instead accepted cash from a customer. This interpretation of "accept" comports with its plain-English meaning to "take or receive (something offered) willingly." ... [C]ontrary to Square's and Intuit's arguments, it would strain the meaning of the word "accepted" to interpret it to mean that Square or Intuit "accepts" a payment card, but the Seller "accepts" cash, for two otherwise identical transactions.

735 F. Supp. 3d at 264-65 (footnotes and citations omitted). Teleflora makes no attempt to argue that "the way real-world transactions are conducted" between its merchant customers and the cardholders to whom they sell goods and services distinguishes it in any way from Square and Intuit.

Teleflora's failure to address real-world transactions may mask an important difference between Teleflora and the payment facilitators Judge Brodie considered in *PayFac*. Specifically, the record before me neither supports nor forecloses the possibility that with respect to some transactions involving its merchant customers, the cardholder making an online flower purchase presented a payment card directly to Teleflora, which then arranged for a merchant customer in the recipient's vicinity to deliver the flowers in exchange for a fee payment by Teleflora for that delivery service. To the extent transactions occurred in that manner (as distinct from transactions in which the cardholder went to the merchant customer's store or website to purchase flowers, presented a payment card to the merchant, and Teleflora's role was limited to processing the payment), Teleflora would have a stronger argument that in some instances it "accepted" payment cards for purposes of the Settlement Agreement. On the record before me, however, such an argument would rest on speculation rather than evidence. Moreover, even if the record supported that view of some transactions, it would support a potential claim for settlement proceeds under Teleflora's own TIN, rather than those of the thousands of merchant customers whose TINs Teleflora has registered.

2.     <u>Teleflora's sample merchant contracts undermine its position</u>.

In an email supplementing its Letter, Teleflora submitted documents that it described as "13 attached and representative merchant agreements which governed the relationship between Teleflora and those member florists during and throughout the class period." Ex. 6 at 1; *see* Exs. 6-A through 6-M. The following chart identifies those documents.

| Exhibit | Contract date | Document title |
|---|---|---|
| 6-A | Nov. 17, 1987 | Teleflora Technologies<br>Schedule of Prices, Fees, and Charges<br>Teleflora CreditLine |
| 6-B | Mar. 10, 1989 | Teleflora Technologies<br>Schedule of Prices, Terms, Rates and Conditions for CreditLine<br>Credit Card System |
| 6-C | July 5, 1991 | Teleflora Technologies CreditLine Credit Card System<br>Schedule of Prices, Terms, Rates, and Conditions |
| 6-D | June 24, 1993 | Teleflora Credit Card and  CreditLine Credit Card System<br>Schedule of Prices, Terms, Rates, and Conditions |
| 6-E | Oct. 4, 1994 | Teleflora CreditLine Credit Card System<br>Schedule of Prices, Terms, Rates, and Conditions |
| 6-F | Oct. 28, 1999 | Teleflora CreditLine Credit Card System<br>Schedule of Prices, Terms, Rates, and Conditions |
| 6-G | Jan. 17, 2001<br>Mar. 18, 2002<br>Apr. 9, 2003[10] | Teleflora CreditLine Credit Card System<br>Schedule of Prices, Terms, Rates, and Conditions |
| 6-H | Dec. 7, 2004 | Teleflora Electronic Credit Card Processing Services Agreement<br>Schedule of Prices, Terms, Rates and Conditions |
| 6-I | Oct. 30, 2006<br>Dec. 6, 2007 | Teleflora Electronic Credit Card Processing Services Agreement<br>Schedule of Prices, Terms, Rates and Conditions |
| 6-J | Nov. 23, 2007 | Teleflora Electronic Credit Card Processing Services Agreement<br>Schedule of Prices, Terms, Rates and Conditions |
| 6-K | July 2, 2010 | Teleflora Electronic Credit Card Processing Services Agreement<br>Schedule of Prices, Terms, Rates and Conditions |
| 6-L | Sept. 30, 2014 | Teleflora Electronic Credit Card Processing Services Agreement |
| 6-M | Dec. 12, 2018 | Teleflora Electronic Credit Card Processing Services Agreement |

Those documents make no reference to the terms that Teleflora cites in the Letter as reasons to find it is a member of the Class. Instead, some of the documents recite that the signing merchant is accepting terms set forth in a variety of other documents and websites, none of which are included in the documents Teleflora has submitted here.

For example, some of the documents include the following language:

---

[10] Exhibit 6-G includes three copies of what appears to be the same contract form executed at different times by different merchants. Exhibit 6-I likewise includes two iterations of the same form agreement.

By signing and delivering to Teleflora LLC ("Teleflora") this Schedule of Price, Terms, Rates, and Conditions (this "Schedule"), the undersigned merchant ("you" or Merchant") are [sic] agreeing to be bound by the terms and conditions of the Teleflora Electronic Credit Card Processing Services Agreement (the "Agreement"), including the terms and conditions on this Schedule, and Teleflora's credit card processing policies, procedures and instructions published in the Teleflora Guide to Credit Card Processing and on www.myteleflora.com (or other such website[s] as Teleflora may establish for its members' use), in each case, as may be amended from time to time (collectively, "the Guide").

Exs. 6-H through 6-M. Nothing in that language, or any other part of the sample contracts Teleflora has submitted, supports the propositions that:

- "Teleflora … sells a bundle of goods and services to its member florists, including supported hardware and software as well as card acceptance services, for which it charges its member florists a single, fixed rate on each transaction, no matter what brand or card type." Letter at 5.

- Teleflora's "member florists did not pay interchange fees to the networks." *Id*.

- Teleflora is the "merchant of record" for transactions involving the merchant customer. *Id*.

- Teleflora is "financially responsible for all 'chargebacks' arising from unauthorized credit card use or disputes between buyers and sellers over the delivery of goods or services. Teleflora is accountable for and assumes all risks for all card payment transaction costs at its own expense, which include interchange, assessment, and processing fees." *Id*. at 6.[11]

In particular, not one of the sample contracts specifies that when Teleflora processes a transaction involving the merchant, it is Teleflora that "accepts" payment. To the contrary, one of the samples explicitly refers to the fact that it is the *merchant* that "accepts" payment. *See* Ex. 6-E at 1 (discussing circumstances in which a merchant "must not accept [a card] for payment[,]"

---

[11] In apparent tension with that assertion, Exhibit 6-E provides the merchant with guidance "to help reduce your chargeback risk." Similarly, Exhibits 6-F and 6-G include a provision that "[i]f a merchant has a large number of retrieval requests or chargebacks, Teleflora has the right to switch Direct Deposit to Check Plan without notification." While the provision is consistent with Teleflora's assertion that it is "financially responsible" for chargebacks, it is also consistent with the possibility that the merchant, having accepted a card for payment, pays the chargeback and then seeks reimbursement from Teleflora.

"may not want to accept the credit card as payment."). The record in *PayFac* likewise included instances of the payment facilitators acknowledging – contrary to their arguments – that their merchant customers "accepted" payment cards. After citing the evidence that "Square and Intuit hold themselves out as enabling Sellers to 'accept' payment cards," Judge Brodie wrote that "Square and Intuit cannot now disclaim the plain meaning of a term they have used to induce Sellers to utilize their services." 735 F. Supp. 3d at 264-65.

Another aspect of the sample merchant contracts that undermines Teleflora's position is the fact that those signed during the relevant period (2004-2019) all contain, with only immaterial wording variations, the following provision: "Address Verification prompting is incorporated in Teleflora's credit card processing system. The surcharge for bypassing this security feature is 0.4% of the transaction value." Exs. 6-H through 6-K; *see also* Exs. 6-K & 6-M (same except for replacing "Address Verification" with "AVS").[12] The fact that the merchant can exercise discretion about whether to verify the cardholder's address means that it is the merchant who decides in the first instance whether or not to accept the proffered card for payment. If Teleflora were "accepting" the payment card within the meaning of the Settlement Agreement, there would be no reason to vest that discretion in the merchant – Teleflora could simply decline to accept the card if the address could not be verified.

---

[12] As an earlier sample contract explains, "

> Address Verification Service is a tool for combating telephone order credit card fraud, the most common source of fraudulent transactions. AVS asks a merchant to manually key in a customer's billing street address and zip code. If either or both do not match the address information stored by the bank issuing the credit card, you may not want to accept the credit card as payment. To try to avoid accepting unauthorized credit card phone orders, you must take precautions, of which AVS is one, to help reduce your chargeback risk.

Ex. 6-E at 1.

*     *     *

For the reasons set forth above, I have no legal or factual basis to conclude that there is any material difference between Teleflora (which explicitly acknowledges it is a payment facilitator, *see* Letter at 5) and the payment facilitators before Judge Brodie in *PayFac*. I therefore respectfully recommend that the Court find that Teleflora has not demonstrated that it is a member of the Class with respect to the transactions at issue here,[13] and that the Class Administrator has therefore correctly determined that Teleflora lacks authority to file claims.

B.       <u>Alternatively, Teleflora Should Submit Its Contract With Each Merchant</u>

If the Court accepts the foregoing recommendation, it need proceed no further. In the event the Court rejects or modifies the recommendation, I further respectfully recommend that the Court uphold the Class Administrator's requirement that, with respect to each of its merchant TINs, Teleflora must submit the contracts with the merchant and others (or comparable evidence) that establish its right to recover the amount  attributable to that merchant's transactions. *See* Ex. 4 at 2.

In its supplemental email Teleflora provided the sample merchant contracts discussed above as well as its agreements with entities that "served as the acquiring banks and/or credit card processors for Teleflora for the periods of April 2003 and February 2011 and February 2011 to the present, respectively," but declined to provide all of the contracts with its merchant customers. *See* Ex. 4 at 1. Teleflora argued that

---

[13] To the extent Teleflora may have accepted payment cards as payment from merchants or others for goods and services that it sold to them, such transactions are not at issue here. As with Square and Intuit, Teleflora may well be a member of the Class with respect to such transactions. *Cf. Payfac*, 735 F. Supp. 3d at 265 n.25 (noting the same distinction and acknowledging that "the Settlement Agreement does not cover claims brought by Square and Intuit in their capacities as merchants because they properly opted-out of the Settlement Class for such transactions.").

15

Given its submission of almost 34,000 separate claims involving its member florists and deadline imposed, Teleflora cannot reasonably and realistically upload each and every merchant agreement for those member florists for the entire class of period of 2004 to 2019. In lieu of submitting thousands of duplicative and/or identical agreements, Teleflora submits the 13 attached and representative merchant agreements which governed the relationship between Teleflora and those member florists during and throughout the class period.

To the extent the Claims Administrator requests specific or further information related to any of the agreements, Teleflora welcomes the opportunity to respond and respectfully requests an extension of time to furnish such information for the Special Master's consideration.

Ex. 4 at 1.[14]

Notwithstanding Teleflora's assertion that the sample contracts governed its relationships with merchant customers "during and throughout the class period" of 2004 to 2019, seven of the thirteen samples predate that period. *See* Exs. 6-A through 6-G. Moreover, as discussed above, while the documents explicitly recite that they reflects such matters as "pricing, fees, and charges" they do not set forth the terms that Teleflora argues demonstrate its membership in the Class. Instead, the samples all refer to pages or documents the Teleflora has not supplied. *See* Exs. 6-A through 6-M. Thus even with the sample contracts, the CA lacks sufficient information to verify that Teleflora's relationship with *any* merchants sufficed to make Teleflora a Class member.

There is a more fundamental problem with Teleflora's position. First, without the contract signed by the merchant involved in a given claim, the CA is unable to determine whether the terms Teleflora describes apply to all of the merchant's payment card transactions

---

[14] Although Teleflora objected to the requirement in part based on the 30-day deadline that the CA had imposed, Teleflora has not thus far sought an extension, suggested a time period within which it could submit all of the required contracts, or submitted any additional contracts.

within the relevant period, or only some of them.[15] If a merchant used Teleflora's services during only part of the relevant period, and entered into its own agreements with acquiring banks during other parts, Teleflora's submission of a claim for the transactions associated with that merchant's TIN would be overinclusive – but the CA would not know and act accordingly. Without the contract specific to a given merchant, the CA is likewise unable to determine if the contract was executed by someone with authority to act on that merchant's behalf.

The Settlement Agreement provides that the CA "shall effectuate and administer … the claims process[.]" Settlement Agreement ¶ 3(i); *see also id*. App'x I (Plan of Administration and Distribution) (authorizing CA to disseminate a Claim Form, the completion and return of which is a requirement for submitting a valid claim). The CA cannot properly fulfill that mandate if it outsources to a non-merchant registrant the responsibility of determining that the registrant has a legal right to recover settlement funds attributable to the merchant's transactions. For that reason, I respectfully recommend that the Court should find that the CA acted within its authority in requiring that Teleflora, like any other registrant, must submit the documentation establishing its legal entitlement to submit a claim for each merchant TIN it registers.

III.     Recommendation

For the reasons set forth above, I respectfully recommend that the Court find that Teleflora is not a member of the Class and that the Class Administrator therefore need not grant

---

[15] For present purposes I assume that the six sample contract from the relevant period that Teleflora has submitted (Exs. 6-H through 6-M), together with the pages and documents setting forth the terms and conditions Teleflora has described but not yet submitted, were presented to and signed by all of the merchants at issue here without material variation. Teleflora appears to have intended to make such a representation, although the precise wording of its supplemental email does not quite do so. Teleflora's description of the samples as "representative" and its assertion that "thousands" of the agreements (out of more than 35,000 instances) are "duplicative and/or identical" do not foreclose the possibility that in some cases Teleflora's agreement with a merchant included provisions that differed in important respects from those in the samples.

it authority to submit its claims. Alternatively, I further respectfully recommend that the Court require Teleflora to comply with the Class Administrator's requirements for proving authority to represent the merchant TINs it registered as a prerequisite to filing its claims, including the requirement that Teleflora submit the relevant contract for each merchant TIN it registered.

IV.     Objections

This Report and Recommendation will be served on all registrants who are parties to the instant conflict via the Court's ECF system, and the CA will also promptly provide a copy to all such registrants.[16] Any interested party shall have 21 days from today's date to file objections to the Special Master's report and recommendation with the Court. Such objections should be filed only on the dispute-specific miscellaneous docket (1:26-MC-01019-BMC-JAM). Any responses to objections may be filed within 21 days thereafter. No replies regarding objections shall be filed without the Court's permission. If any party objects to this Report and Recommendation, the evidence considered by the Special Master in making or recommending any findings of fact shall be filed on the dispute-specific miscellaneous docket. Such evidence may be filed under seal to protect confidentiality and the identities of claimants, as appropriate. The Court shall

---

[16] In this case, where the issue is a single registrant's status rather than a conflict between two or more registrants, the only party to be served in the first instance is Teleflora. While the thousands of merchants associated with the TINs Teleflora has registered (or their successors in interest) may have a potential interest in the outcome here, neither the CA nor I (nor the Court) has contact information for all of them. If the Court adopts the foregoing recommendations, the lack of notice will not prejudice any such merchant. However, in the event the Court rejects or modifies the recommendation and finds that the CA should not designate Teleflora as a "PayFac," the CA may at some point classify Teleflora as an authorized registrant as to some TINs. In some such cases, Teleflora's registration of a TIN may be in conflict with other filers' registrations of the same TINs. I respectfully recommend that where such conflicts arise, the CA should provide a copy of the Court's decision and this report and recommendation to all parties to the conflict. I further recommend that merchants involved in such conflicts retain the right to contest Teleflora's class membership on the ground that it did not accept payment cards within the meaning of the Settlement.

review the Special Master's reports and recommendations *de novo*. *See* Revised Order

Appointing Special Master, 1:24-MC-03415-BMA-JAM, ECF 1, ¶ 4.

Dated: March 17, 2026

*/s/ James Orenstein*
Special Master

**APPENDIX OF CONSIDERED EXHIBITS**

In preparing this Report and Recommendation, I have considered the evidence summarized below. If any party objects to the Report and Recommendation, that evidence shall be filed on the dispute-specific docket under seal (unless otherwise specified below) to protect confidentiality and the identities of claimants. *See* Revised Order Appointing Special Master, 1:24-MC-03415-BMA-JAM, ECF 1, ¶ 4.

| Exhibit No. | Description |
|---|---|
| 1 | Letter dated Dec. 24, 2024, from Teleflora's counsel to CA |
| 1-A | List of merchants and TINs appended to Letter dated Dec. 24, 2024, from Teleflora's counsel to CA |
| 2 | Email exchange dated July 10-11, 2024, between CA and Teleflora's counsel |
| 3 | Email exchange dated Sept. 5-Dec. 4, 2024, between CA and Teleflora's counsel |
| 4 | Email exchange dated May 22-June 20, 2025, between CA and Teleflora's counsel |
| 5 | Form CA deficiency notice |
| 6 | Email dated June 20, 2025, from Teleflora's counsel to CA |
| 6-A | Sample merchant contract provided by Teleflora dated Nov.17, 1987 |
| 6-B | Sample merchant contract provided by Teleflora dated Mar. 10, 1989 |
| 6-C | Sample merchant contract provided by Teleflora dated July 5, 1991 |
| 6-D | Sample merchant contract provided by Teleflora dated June 24, 1993 |
| 6-E | Sample merchant contract provided by Teleflora dated Oct. 4, 1994 |
| 6-F | Sample merchant contract provided by Teleflora dated Oct. 28, 1999 |
| 6-G | Three sample merchant contracts provided by Teleflora dated, respectively, Jan.17, 2001, Mar. 18, 2002, and Apr. 9, 2003 |
| 6-H | Sample merchant contract provided by Teleflora dated Dec. 7, 2004 |
| 6-I | Two sample merchant contracts provided by Teleflora dated, respectively, Jan.17, 2001, Mar. 18, 2002, and Apr. 9, 2003 |
| 6-J | Sample merchant contract provided by Teleflora dated Nov. 23, 2007 |
| 6-K | Sample merchant contract provided by Teleflora dated July 2, 2010 |

| | |
|---|---|
| 6-L | Sample merchant contract provided by Teleflora dated Sept. 30, 2014 |
| 6-M | Sample merchant contract provided by Teleflora dated Dec. 12, 2018 |
| 6-N | Contract provided by Teleflora titled "2003 Amended and Restated Merchant Agreement with Global Settlements" |
| 6-O | Contract provided by Teleflora titled "2005 Second Amendment to Amended and Restated Merchant Service Agreement" |
| 6-P | Contract provided by Teleflora titled "Payment Device Processing Agreement" |
| 6-Q | Contract provided by Teleflora titled "2018 Elavon Master Services Agreement" |