UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | x | |
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | : : : | MDL No. 1720(BMC)(JAM)<br><br>Civil No. 05-5075(BMC)(JAM) |
| | : | |
| | : | RULE 23(b)(3) CLASS PLAINTIFFS' |
| This Document Relates To: | : | MEMORANDUM OF LAW IN |
| | : | OPPOSITION TO CASCADE |
| ALL ACTIONS. | : | SETTLEMENT SERVICES LLC'S MOTION |
| | : | FOR AN ORDER DIRECTING THE |
| | : | SETTLEMENT ADMINISTRATOR TO |
| | x | PROVIDE REGULAR PUBLIC |
| | | REPORTING |

4904-4346-5625.v1

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ...................................................................................................1

II.    THE SETTLEMENT ADMINISTRATION IS PROCEEDING APACE ..........................1

       A.    Spectrum Practically Ignores the Pending Appeals.................................................3

       B.    Complaints About the Special Master Process are Unfounded ..............................4

       C.    The Audit Process in the Plan of Allocation is Being Followed ............................5

       D.    Spectrum Mischaracterizes Statistics to Support An Inapt Conclusion...................7

       E.    Spectrum Seeks to Replace Its Judgment for Epiq's and Class Counsel's
             Judgment ................................................................................................................8

             1.    Spectrum's Proposed Reporting Plan is Unnecessary, Costly, and
                   Unhelpful ......................................................................................................8

             2.    Significant Problems are Likely to Arise if Spectrum's Reporting
                   Plan is Mandated...................................................................................10

III.   CONCLUSION..................................................................................................11

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Grice v. Pepsi Beverages Co.*,
　363 F. Supp. 3d 401 (S.D.N.Y. 2019)..................................................................1, 2

*Reynolds v. Beneficial Nat'l Bank*,
　288 F.3d 277 (7th Cir. 2002) ...............................................................................1

4904-4346-5625.v1

## I.      INTRODUCTION

Third-party claims filing company Cascade Settlement Services LLC d/b/a Spectrum Settlement Recovery ("Spectrum") seeks to force the Claims Administrator ("Epiq") to publicly file periodic reports – at the Class's expense – without any showing that the requested information would be relevant or helpful to class members.[1]  It blithely proclaims such reporting would "impose[] no material burden" on Epiq, but this is not so.  Motion at 10.  The Motion is riddled with false assumptions and seeks to impose Spectrum's judgment in place of Epiq and Rule 23(b)(3) Class Counsel ("Class Counsel").  At bottom, the Motion is an attempt by a third party to insert itself into a process to move up its position in the queue and get paid sooner than it may otherwise.

The settlement is proceeding properly and Spectrum's insistence that it is entitled to details of every aspect of the administration process has no basis in law.[2]  Moreover, its claims are based on numerous misunderstandings regarding the administration process.

Further, Spectrum's proposed list of reporting categories, will not be helpful to class members and may serve only to confuse, particularly in this case where multiple bad actors have provided false and misleading information to class members regarding the settlement.  Epiq and Class Counsel strongly believe that this has been a transparent and highly successful settlement administration.  Spectrum's proposal, on the other hand, imposes needless burdens on Epiq and Class Counsel and poses a very real possibility of causing confusion.

Spectrum's Motion should be denied in full.

## II.      THE SETTLEMENT ADMINISTRATION IS PROCEEDING APACE

Class Counsel and Epiq have worked tirelessly to get settlement funds into the hands of class members.  More than 560,000 class members have received settlement benefits – totaling over $393

---

[1]      *See* Cascade Settlement Services LLC's Motion for an Order Directing the Settlement Administrator to Provide Regular Public Reporting (ECF 9799-1) (the "Motion").

[2]      None of the cases cited in the Motion impose any reporting requirements, but rather stand for the unremarkable proposition that the Court acts as a fiduciary for the class. *See, e.g.*, *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002); *Grice v. Pepsi Beverages Co*., 363 F. Supp. 3d 401, 408 (S.D.N.Y. 2019).

4904-4346-5625.v1

million – as of March 17, 2026.[3] The remainder of the fund, which is earning interest, must wait to be distributed until the Second Circuit appeals process and other outstanding issues, including planned audits, are completed. March Kovach Decl., ¶10. In August 2025, when Class Counsel moved to begin the process of an initial partial distribution, a declaration from Epiq Senior Vice President Loree Kovach provided extensive details regarding the process by which the initial partial distribution population was determined. *See* Declaration of Loree Kovach Regarding Ongoing Claims Process and Initial Partial Distribution (ECF 9652-3) (the "August Kovach Decl."). That declaration also provided insight into the factors that necessitated an initial partial distribution at that time, as opposed to the entire fund being distributed.[4] The Court approved the plan on October 30, 2025 and checks began being distributed to class members in December 2025.[5] The factors that required only initial partial payments to class members remain. The March Kovach Declaration further details the current distribution process and accompanies this Opposition. The March Kovach

---

[3]   *See* Declaration of Loree Kovach in Response to Cascade Settlement Services LLC's Motion for an Order Directing the Settlement Administrator to Provide Regular Public Reporting (the "March Kovach Decl."), ¶9, filed concurrently. The remaining approximately 43,000 claims identified as eligible for the initial distribution will be paid as fraud prevention measures conclude. *Id.*

[4]   "To reach the initial partial distribution milestone, Epiq engaged in significant data analysis, validation, risk segmentation, and scenario modeling in furtherance of efforts to identify a payable population. While such efforts are often undertaken in complex antitrust matters to expedite payment where possible, this effort was further complicated by the far-reaching impact of the PayFac and Branded Operator appeals. In its work to identify a payable population, between March and August 2025, Epiq staff devoted more than 2,500 work hours to this analysis, as well as to drafting recommendations and decision memoranda for Class Counsel and the Court." *See* March Kovach Decl., ¶12.

[5]   Spectrum complains that most of its clients were excluded from the initial partial distribution. Motion at 2. Spectrum claims that in many of these cases "no facts remain in dispute." *Id.* It ignores the possible reasons those claims were not included, including because they may have been associated with a payment facilitator ("PayFac") or branded operator ("Branded Operator") or are part of an audit population. March Kovach Decl., ¶16 (describing population of claims that could be included in an initial partial distribution).

4904-4346-5625.v1

Declaration also provides updated figures related to the status of claims administration. *See* March Kovach Decl., ¶14.[6]

Epiq is in near daily contact with Class Counsel to discuss all settlement-related issues. *Id.*, ¶46. Epiq provides monthly reporting on every aspect of the settlement administration process to Class Counsel. Epiq and Class Counsel also meet in-person quarterly to oversee and discuss all issues related to settlement administration. *See id.*, ¶45; Declaration of Alexandra S. Bernay in Support of Rule 23(b)(3) Class Plaintiffs' Memorandum of Law in Opposition to Cascade Settlement Services LLC's Motion for an Order Directing the Settlement Administrator to Provide Regular Public Reporting (the "Bernay Decl."), ¶¶3-5, filed concurrently. Class Counsel, in turn, provides the Court with monthly reports regarding third party-related issues. Bernay Decl., ¶7. Those reports often touch upon the administration of the settlement. This process is working well. To the extent settlement issues need to be escalated to Class Counsel and the Court, they are done so expeditiously.

A.      **Spectrum Practically Ignores the Pending Appeals**

In its Motion, Spectrum gives short shrift to the pending appeals. But the appeals before the Second Circuit relate to PayFacs and Branded Operators and are a major reason that the decision was made to hold back $2.9 billion (PayFacs-related claims) and $450 million (Branded Operator-related claims) and not distribute those funds until a determination is made by the Second Circuit. March Kovach Decl., ¶10. As the Court is aware, the Second Circuit does not have a deadline by which it must issue orders in this or any other cases. Because of this, Epiq and Class Counsel are unable to provide a timeline for distribution for the entire population of claims.[7]

Spectrum claims Epiq has refused to provide information that would allow class members to understand when the majority of claims will be paid and whether the claims process is proceeding

---

[6]   The August Kovach Declaration provided metrics as of August 12, 2025. August Kovach Decl., ¶9.

[7]   Also, depending on the results in the Second Circuit, parties may seek *certiorari* from the U.S. Supreme Court which may further impact the ability to provide a timeline.

4904-4346-5625.v1

with reasonable diligence. Motion at 1. But Epiq and Class Counsel have provided detailed information to the Court and public regarding claims in this action, including a lengthy explanation of claim status, including where in the process claims are, including conflicts, research requests, Special Master matters and details regarding holdback of funds related to PayFacs and Branded Operators as well as a proposed plan for the nearly 100,000 low-dollar (under $5.00) claims that otherwise would have met the criteria for payment in the initial partial distribution. *See generally* August Kovach Declaration.

Spectrum also complains about $1.5 billion that it claims "sits idle in the settlement fund." Motion at 1. First, the money is not "idle" but is earning interest. Second, as Epiq explains, at this time, more than half of the amount being held back in the fund is attributable to claims expected to receive payments of less than $5.00, claims involving active Tax Identification Numbers conflicts, and the remaining *pro rata* amount for claims included in the initial partial distribution. March Kovach Decl., ¶38. Additionally, 40% of the amount held back in connection with the outstanding appeals relates solely to claims with a research request where the claimant disagrees with the Administrator's interchange fees. *See id.*

B. **Complaints About the Special Master Process are Unfounded**

Among its grievances, Spectrum claims there is a "logjam" related to the Special Master process. Motion at 3-4. Not true. Spectrum also claims that an internal procedure related to work flow from Epiq to the Special Master has "effectively bypass[ed] the Court's timeline." Motion at 3. Contrary to Spectrum's statement, the procedure between the Special Master and Epiq where conflicts are presented on a rolling basis is aligned with the Order appointing the Special Master. To the extent the Court believes it is not, an amendment to the Order can be presented. The Special Master process has worked exceedingly well to date, with thousands of conflicts being resolved. Spectrum claims the conflicts process created a "logjam" awaiting referral to or decision by the Special Master. Motion at 3-4. That characterization is inaccurate and ignores the substantial number of conflicts that have been resolved since the claim-filing period opened. Since the inception of the administration, Epiq, often with guidance from the Special Master, has resolved

- 4 -

more than 98% of all conflicts generated, through registrant agreement, withdrawal, or administrative resolution described further below. *See* March Kovach Decl., ¶35.

Epiq administers conflicts pursuant to a structured, sequential process designed to promote early resolution and minimize the need for Special Master involvement. March Kovach Decl., ¶36. When a conflict is created, Epiq notifies the affected registrants and provides a 30-day period for the registrants to confer and reach agreement as to which registrant will proceed and which registrant(s) will withdraw. *Id.* Many conflicts are resolved at this initial stage without further action. *Id.* If a conflict remains unresolved after that period, Epiq, acting at the direction of the Special Master, issues a second notice affording the registrants an additional 30 days to either: (i) submit proof of an agreed resolution; or (ii) file a dispute outlining the basis for their claim. *Id.* Where a dispute is submitted (or the registrants advise that they are at an impasse), there is a further opportunity for the affected registrants to submit documentation to the Special Master to consider. *Id.*, ¶37. The number of conflicts at this final submission stage is currently 593. *Id.*

Spectrum may want to know when its particular conflicts will be forwarded to the Special Master, but as Epiq explained, that information is not publicly available. Nor need it be. Once the matter is sent from Epiq to the Special Master, claimants hear back from the Special Master within 30 days. *Id.* This is an appropriate period, giving claimants time for any next steps before the Special Master.

### C. The Audit Process in the Plan of Allocation is Being Followed

Spectrum makes a number of inapt arguments regarding the required audit process. As Spectrum correctly notes, the Plan of Administration and Distribution requires Epiq to develop and execute an Audit Plan. Motion at 5. But, Spectrum complains about the timing of the audit process – a standard process in class-action settlement administration. As it does throughout its Motion, Spectrum seeks to replace its judgment with that of Epiq's and Class Counsel's judgment. While a simplified audit was conducted of the low-risk claims identified for the initial partial distribution, Epiq has determined that there are no other claims with low enough risk profiles such that they can be excluded from the formal Audit Plan required by the Plan of Allocation. *See* March

- 5 -

Kovach Decl., ¶15.[8] Epiq explains that any attempt "to partially implement the full Audit Plan at this stage would be premature, as tens of thousands of claims remain unresolved either with pending response deadlines, document review, or Special Master appeal resolution." *Id.*, ¶16. If such an audit were required, it would "eliminate the ability to identify and address trends across the entire final claim population, a key factor in the success of a holistic audit." *Id.*

The process of developing an appropriate audit plan remains an iterative process with Epiq and Class Counsel discussing the identification of various populations and scenarios for inclusion as claims processing progresses. As Epiq explains: "Each such population and scenario is presented to and discussed with Class Counsel for potential inclusion as we work toward finalizing the overall Audit Plan once claims processing is complete." March Kovach Decl., ¶17; *see also id.*, ¶18.

Even if all audit populations could be defined today, Epiq does not yet know which claims fit within them, and will not know that until all claims are finalized. March Kovach Decl., ¶18. Attempts to select a sample from even the known audit populations now "would result in samples that are both too small and not fully representative of the entire population." *Id.* Importantly, doing so would go against standard best practices for conducting audits in class action settlements. *Id.*

Finally, it is not possible to finalize the audit populations until the Branded Operator and PayFac appeals are finalized, as resolution of those could impact class membership. *Id.*, ¶19.[9]

Spectrum insists that following this standard practice threatens to cause "infinite delay." Motion at 5. It makes a number of leaps in logic to come to this conclusion. Because it wanted to know in advance whether certain of its claims were in the audit population (information that Epiq

---

[8]    Epiq has explained that some claims included in the initial partial distribution may still be included in an audit request prior to final payment, because Epiq and Class Counsel determined that any issue identified as a result of such review could be remedied by adjusting the claimant's final payment. March Kovach Decl., ¶15.

[9]    Moreover, should the current class definition be revised or refined as a result of those appeals, some claimants may be removed from or added to the population of claims eligible for payment. "For instance, if the PayFac appeal results in a finding that the payment facilitators, rather than their submerchant clients, are Class Members, the population of eligible claimants would change dramatically." March Kovach Decl., ¶19.

4904-4346-5625.v1

does not provide to any parties) it determined that not knowing that information somehow results in "years before further distributions are authorized." *Id.* This statement is simply incorrect.

### D. Spectrum Mischaracterizes Statistics to Support An Inapt Conclusion

Spectrum's Motion mischaracterizes statistics in the August Kovach Declaration to create the impression of a "bottleneck" of 500,000 claims that will be forced to go through the multi-step dispute process in the future. Motion at 6-7. Spectrum cites this figure throughout the Motion as a significant backlog that is a primary factor impacting the timeline within which the remaining claims will be paid. This is an incorrect conclusion drawn from the statistics cited, both because the number does not represent the backlog Spectrum claims it does, and because the remaining claims still within the various processing steps are not the primary factor impacting payment timing. As has been explained, the pending appeals are the primary factor causing delay.

As an example, Spectrum mischaracterizes the 339,696 claims identified in the August Kovach Declaration, ¶10.c., which it refers to as "alternative data submissions." Motion at 3. Although Spectrum indicates that these claims will also be required to engage in a future, multi-step resolution process, it overlooks the fact that this count expressly includes claims that were pending a deadline to take action to dispute their fees. Now that the deadline to do so has passed, only 60,727 claims actually responded to engage in the process. March Kovach Decl., ¶¶28-29. Other examples are set forth in the March Kovach Declaration. *Id.*, ¶¶26-29.

Spectrum also incorrectly characterizes the status of its own claims not included in the initial distribution, in an effort to support its allegations of a "logjam." Motion at 3-4. This argument also fails. It claims Spectrum submitted "alternative interchange fees" for "roughly 9,000 claims," yet has not received a response on 8,750 of those claims. *Id.* at 4. However, according to Epiq "the vast majority of Spectrum's claims are awaiting action by Spectrum, not by the Administrator." March Kovach Decl., ¶31. Epiq has provided details showing Spectrum's incorrect or mistaken understanding as it relates to its claims. *Id.*

4904-4346-5625.v1

**E.  Spectrum Seeks to Replace Its Judgment for Epiq's and Class Counsel's Judgment**

**1.  Spectrum's Proposed Reporting Plan is Unnecessary, Costly, and Unhelpful**

Spectrum claims without basis that its reporting proposal "imposes no material burden on the Administrator." Motion at 10. Untrue. As Ms. Kovach explains in her declaration, Spectrum has no actual experience in administering a case of this complexity, which involves over one trillion rows of interchange data and millions of claim-related data points. March Kovach Decl., ¶43. As Epiq explains to do what Spectrum suggests would "require new, bespoke data pipelines, expanded and time-consuming quality assurance efforts before the release of each report, and dedicated review mechanisms, diverting specialized personnel and slowing core claims. *Id.* Spectrum provides no facts to the contrary.

Critically, Spectrum's suggested data fields are either unhelpful, irrelevant, or suggested merely to help claims-buying entities gain additional information related to pricing.

Spectrum proposes 16 fields, each of which it suggests should have a "tabulated breakdown" containing the number of claims, the interchange fees associated in the administrator's database and "[a]lternative [i]nterchange [f]ees [s]ubmitted."[10] Motion at 10-11. A few examples demonstrate why Spectrum's Motion should be denied in its entirety.

- Type 4.b – "Claimant filed on time and submitted an alternative IF or sales data and Epiq has not requested supporting docs from claimant." Motion at 11.

This metric invites false inferences about delay or inaction that may be entirely procedural or strategic. The proposed statistic counts claims where alternative interchange fees or sales data were submitted, but where Epiq has not yet requested supporting documentation. Standing alone, that number tells the public nothing about: (i) whether the submission is facially sufficient; (ii) whether the submission is being compared against existing datasets; or (iii) whether Epiq has intentionally deferred document requests to avoid unnecessary claimant burden. Without that context, a growing

---

[10]  This last item apparently only applies to 12 of the suggested fields.

4904-4346-5625.v1

or static "Type 4.b" number will almost certainly be interpreted by the public as evidence of Epiq's delay, even though no inference about delay is warranted.

- Type 4.c – "Claimant filed on time and submitted an alternative IF or sales data. Epiq has requested supporting docs and is waiting for their receipt." Motion at 11.

This metric primarily reflects claimant behavior, not Epiq's performance. Spectrum's memorandum itself acknowledges that this category captures "delays attributable to class member inaction." From a public-interest perspective, publishing a monthly count of claims stalled due to claimant non-response provides no actionable insight and does not assist the Court in supervising Epiq's conduct.

In addition, Spectrum is seeking to require what it calls "a summary accounting of the settlement funds, reflecting the total balance and total interest earned both cumulatively and during the reporting period." *Id.* at 13. It provides no basis for this other than citing a few class members asking whether interest is being earned. *Id.* at 13-14. Class Counsel assured class members that interest is accruing. Requiring this type of reporting involves the work of the settlement bank, Class Counsel, and Epiq, and a monthly public reporting requirement would necessitate additional resources being spent.

In sum, none of the data points that Spectrum believes should be reported monthly are actually relevant or helpful to class members. Spectrum does not explain what value any of its proposed data points provide apart from a claim that reporting figures is "necessary to assess the progress of fee disputes." Motion at 9. Knowing the numbers, however, does not tell much. And knowledge of total numbers, for example of pending research requests, is not particularly helpful to the vast majority of class members. Would it make a difference to class members to know there were 1,000 pending requests one month and 850 the next? Without knowing the details of each research request, the total number is not particularly relevant to any class member.

4904-4346-5625.v1

Spectrum refers to "administrative secrecy" in its Motion.[11]  Motion at 14.  It points to no case where the types of details it demands are ever provided on the public docket.  Details regarding the administration of a class settlement in the form Spectrum demands seems to be an invention of its own making.  No cases could be found where this type of information was required to be provided on the public docket during the active administration of a settlement.

To the extent the Court were to require periodic reporting *in camera*, neither Epiq nor Class Counsel would object.

### 2. Significant Problems are Likely to Arise if Spectrum's Reporting Plan is Mandated

As the Court is aware, this case has resulted in significant satellite litigation regarding false and/or misleading information being shared with class members by a variety of third parties.  Despite significant efforts, some unscrupulous actors continue to prey on class members.  The suggested mandated reporting, particularly as Spectrum suggests, may allow third parties to use the information to gain an informational advantage over class members.  It is also expected that should this reporting be required it will lead to a significant volume of calls and emails from class members to Epiq.  Epiq and Class Counsel believe the metrics Spectrum seeks would not meaningfully support claims administration and, instead, would create concrete risks.  As Epiq explains: "Publishing statistics that relate to the total interchange fees claimed which are inclusive of unvetted, unsubstantiated 'alternative' fee numbers submitted by claimants, including numbers from some claimants that are so large as to be preposterous, add no value for Class Members or the Court." March Kovach Decl., ¶48.  Instead, providing such number would "invite claim purchasers and other third parties to speculate on the ultimate total value of all claims, and thus on the value of individual claims, putting those parties at an advantage over less-knowledgeable individual claimants.  Such

---

[11]  Epiq explains that Spectrum's argument that the Court can only assess the appropriateness of the sequential, iterative nature of the process via reporting is inaccurate.  "Large datasets and sequential processes (fee challenges, conflicts, appeals to the Special Master with attendant reply windows) require a measured cadence to ensure accuracy, parity across claimants, and auditability.  Those are features of complex and careful administration, not evidence of noncompliance."  March Kovach Decl., ¶44.

4904-4346-5625.v1

information invites market inferences about the value of individual claims or the posture of reserves, encouraging unnecessary disputes, potential spread of misinformation, and the expansion of a secondary market for claims." *Id.*

Also, such statistics would invite an increase in questions from class members as they seek to identify the category into which their claim falls or to argue the adjudication of their claim vis-à-vis other unrelated claims, based on their interpretation of the public reporting. *Id.*, ¶49. Class Counsel and Epiq already field a large volume of communications from class members and the addition of Spectrum's proposed data reports "would serve only to increase incoming communication volume and administrative costs, and would not aid a Class Member in complying with the various steps in the claims process." *Id.*

## III. CONCLUSION

The proposed demands for reporting seek to impose Spectrum's wishes on a carefully constructed, Court-approved process based on suppositions and misunderstandings. Epiq, Class Counsel and the Special Master have worked diligently to get settlement funds into the hands of class members in the most efficient and fair manner possible. Nothing in Spectrum's Motion should change the current settlement administration processes developed over the course of years. The Motion should be denied in its entirety.

DATED: March 23, 2026

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN
ALEXANDRA S. BERNAY

s/ Alexandra S. Bernay
ALEXANDRA S. BERNAY

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

- 11 -

ROBINS KAPLAN LLP
K. CRAIG WILDFANG
THOMAS J. UNDLIN
RYAN W. MARTH
2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN 55402-2015
Telephone: 612/349-8500
612/339-4181 (fax)

BERGER MONTAGUE PC
H. LADDIE MONTAGUE, JR.
MERRILL G. DAVIDOFF
MICHAEL J. KANE
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: 215/875-3000
215/875-4604 (fax)

Co-Lead Counsel for Plaintiffs

**CERTIFICATE OF WORD COUNT**

I hereby certify that the foregoing memorandum of law complies with the formatting and word-count limitations pursuant to Rule 7.1(c) of the United States District Court for the Southern District of New York as it contains 3,905 words.

s/ Alexandra S. Bernay
ALEXANDRA S. BERNAY