**UNITED STATE DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION**<br><br>**This Document Applies to: All Cases.** | **No. 05-MD-1720 (BMC) (JAM)** |

## DECLARATION OF LOREE KOVACH IN RESPONSE TO CASCADE SETTLEMENT SERVICES LLC'S MOTION FOR AN ORDER DIRECTING THE SETTLEMENT ADMINISTRATOR TO PROVIDE REGULAR PUBLIC REPORTING

**I, LOREE KOVACH, declare and state as follows:**

1. I am a Senior Vice President for Epiq Class Action & Claims Solutions, Inc. ("Epiq"), the Class Administrator in the above-captioned case. In this capacity, I am authorized to make the following Declaration on behalf of Epiq. The following statements are based upon my personal knowledge, information provided to me by associates and staff under common supervision, and upon a review of the business records maintained by Epiq.

2. This declaration addresses statements and allegations made by Cascade Settlement Services LLC d/b/a Spectrum Settlement Recovery ("Spectrum") in its motion filed on February 26, 2026 (Dkt 9799).

## INTRODUCTION

3. Spectrum's filing rests on material factual misunderstandings and selective characterizations of the administration process. Most notably, it overlooks the practical and legal effects of the Payment Facilitator and Branded Operator appeal issues, the two most significant factors impacting the timing of payments and population of payees. In addition, Spectrum's filing

minimizes the sequencing and dependency of multiple, overlapping review processes and audit safeguards.

4.      Spectrum also misstates the status of its own claims in an attempt to bolster its allegation that the failure to pay claims now is due to Administrator inaction.  In reality, the majority of Spectrum's claims are awaiting action by Spectrum, rather than by Epiq.

5.      Imposing broad public monthly reporting, as proposed by Spectrum, would divert critical resources away from claim evaluation and quality controls to reporting tasks that offer no value to the class nor increase the speed with which the remaining claims can be adjudicated and paid.  In fact, such reporting would slow claims processing and create avoidable confusion among claimants and third-party filers, generating increased phone and email communications.  The reporting requested by Spectrum would also compromise the integrity and independence of ongoing review and audit processes.  In requesting reporting above and beyond what is required in the settlement documents and what has been requested by Settlement Class Counsel, Spectrum attempts to substitute its judgement for that of Class Counsel, Epiq, and the Court.

**THE INITIAL DISTRIBUITON AND STATUS OF THE ADMINISTRATION**

6.      The Court authorized an initial partial distribution in late 2025, and the distribution commenced on December 19, 2025.

7.      Epiq identified 605,472 claims eligible for the initial partial distribution, for a total allocation of $426,063,670.16, consistent with the Court-approved criteria for inclusion in the distribution. The *Declaration of Loree Kovach Regarding Ongoing Claims Process and Initial Partial Distribution* dated August 19, 2025 (Dkt. 9652-3) (the "Initial Distribution Declaration") detailed the status of all claims as well as recommended criteria for inclusion in and exclusion from the initial distribution, which was adopted by the Court.

8.      While Spectrum characterizes this distribution as "relatively small," in fact, over 40% of claimants were included in the initial distribution. Moreover, as discussed in ¶39, infra, pursuant to the Court's PayFac and Branded Operator Orders, 63% of the net settlement funds were set aside in trusts.  That the Administrator and Class Counsel were able to achieve payment of more than 21% of currently-distributable funds (i.e. the portion of the net settlement fund not subject to appeal-related set-asides) to more than 40% of claimants is not an insignificant feat.  Spectrum attempts to cast aspersions on the length of time it took to pay these claims, but the fact that a partial payment was made to over 40% of claimants within the same year as the filing deadline is virtually unheard of in a case of this complexity.[1]

9.      As of the date of this declaration, $393,914,231 has been paid to 562,361 merchants since December 2025. Payments are being issued on a rolling basis as various fraud prevention measures are concluded, including payment account validations and telephonic verification for large wire transfers.

10.      As indicated in the Initial Distribution Declaration, Epiq and Class Counsel recommended, and the Court approved, a set-aside of $2,900,000,000 in relation to the PayFac Appeal, and a set-aside of $450,000,000 in relation to the Branded Operator Appeal.  *See,* Initial Distribution Declaration, ¶12 - ¶13.  To arrive at these numbers, Epiq utilized the proxy methodology

---

[1] See *In re Automotive Parts Antitrust Litig*. (End-Payor Actions), No. 2:13-cv-02311 (E.D. Mich.) (settlements totaling approx. $1.2 billion; claims deadlines in 2020; partial distributions beginning Dec. 2024);; *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789 (S.D.N.Y.) (settlements exceeding $2.3 billion; claims deadline in 2018; pro rata distributions beginning in 2022); *In re Libor-Based Financial Instruments Antitrust Litigation* (Bondholder Settlements), Master File No. 1:11-md-2262-NRB (S.D.N.Y) (settlements totaling $70 million; initial settlements claim filing deadline in Dec. 2020; subsequent settlements claim filing deadline in February 2023; initial distribution in September 2024); *Fund Liquidation Holdings LLC, et al. v. Credit Suisse Group AG, et al*., Docket No. 15-cv-00871 (HS) (S.D.N.Y.) ($73.9 million settlement; claim filing deadline in October 2023; Order approving initial distribution in February 2026)

described in the Declaration to identify claims which could potentially be subject to either appeal. *Id.* Because the funds for these claims are to be held in trust, the claims themselves cannot be included in any distribution unless and until the relevant appeal is resolved in a manner that maintains the claimant's membership in the Class. Ultimately, more than 450,000 claims were excluded because of the PayFac and Branded Operator appeals.

11. To the extent any of these claims are still active due to conflicts or fee disputes, they have been and will continue to progress through those processes so that payment can happen as soon as practicable upon resolution of the appeals.

12. To reach the initial partial distribution milestone, Epiq engaged in significant data analysis, validation, risk segmentation, and scenario modeling in furtherance of efforts to identify a payable population. While such efforts are often undertaken in complex antitrust matters to expedite payment where possible, this effort was further complicated by the far-reaching impact of the PayFac and Branded Operator appeals. In its work to identify a payable population without risking misallocation of settlement funds, between March and August 2025, Epiq staff devoted more than 2,500 work hours to this analysis, as well as to drafting recommendations and decision memoranda for Class Counsel and the Court. During the course of this initiative, Epiq conducted numerous in-person meetings and teleconference with Class Counsel to refine criteria, provide data-driven options for the distribution, maximize results for Class Members, and align on guardrails consistent with the Plan of Administration and other relevant documents. Epiq remains confident that these extensive and well-researched efforts identified the only practical and risk-free payable population given the various factors at play in the administration.

13. The Settlement administration involves more than 1.4 million claims spanning decades of transactions; large volumes of different but overlapping types of disputes (e.g., proof of

4

authority to file, conflicts between different registrants, research requests, sales data submissions and other steps for challenging interchange fees in Epiq's data, etc.); sequential response deadlines and review windows; and reserved audit populations. Many outstanding items remain with other parties for action or resolution—not with Epiq—such as conflict determinations and other appeals currently before the Special Master.

14. What follows are updates to key statistics provided to the Court in August related to the status of the administration, all of which are current as of March 17, 2026.

 a. There are 1,113,921 registrant accounts in Epiq's records. These 1,113,921 registrants have linked 2,122,574 TINs to their accounts.

 b. Claims have been submitted for 1,465,353 unique TINs. These claims currently represent over 48% of all interchange fees in the data available to Epiq.

 c. 16,005 TINs are in conflict because they have been registered by two or more parties purporting to have authority to act on behalf of the TIN.[2]

 d. There are 949,111 TINs for which claims have been filed where the Class Member agreed with the fees in Epiq's records. As of the date of this declaration, the interchange fees associated with this population account for approximately 54% of all claimed fees.

 e. There are 266,836 TINs for which claims have been filed where the Class Member disagreed with the fees provided by Epiq and submitted a research request.

---

[2] As of March 17, 2026, a total of 162,547 TINs have been registered by more than one registrant and have entered the conflict process. As of the date of this declaration, approximately 98% of all conflicts have been resolved. This is a reduction of 9,353 conflicts since August 2025.

15.     The requirement in the Plan of Administration and Distribution that the Administrator create and execute an Audit Plan is another barrier to payment of additional claims. While a simplified audit was conducted of the low-risk claims identified for the initial partial distribution, there are no other claims with low enough risk profiles such that they can be excluded from the formal Audit Plan.  In fact, some claims included in the initial partial distribution may still be included in an audit-related information request prior to final payment, because the Administrator and Class Counsel determined that any issue identified as a result of such review could be remedied by adjusting the claimant's final payment.

16.     The Audit Plan required by the Plan of Administration and Distribution can only be finalized, and audits conducted pursuant to it, once all claims-processing activities have concluded. *Id at* ¶20 - ¶21. Attempting to partially implement the full Audit Plan at this stage would be premature, as tens of thousands of claims remain unresolved either with pending response deadlines, document review, or Special Master appeal resolution. To do so would eliminate the ability to identify and address trends across the entire final claim population, a key factor in the success of a holistic audit.

17.     Developing an appropriate audit plan is an iterative process, and Epiq has continued to identify various populations and scenarios for inclusion as claims processing progresses.  Each such population and scenario is presented to and discussed with Class Counsel for potential inclusion as we work toward finalizing the overall Audit Plan once claims processing is complete.

18.     By definition, an Audit Plan for a case of this complexity would identify populations of claims that have common characteristics related to particular areas of identified risk.  From each population, a sample of claims would be selected, and those claimants would be asked to provide

additional documentation or information relevant to that risk area. If any issues are identified in a particular sample, the entire population may be re-reviewed to ensure any issues are addressed. Even if all audit populations were able to be defined today, we don't yet know which claims fit within them, and will not know that until all claims are finalized. Accordingly, attempting to select a sample from even the known audit populations now would result in samples that are both too small and not fully representative of the entire population. Doing so would go against standard best practices for conducting audits in class action settlements.

19. Moreover, irrespective of the status of claims processing, finalizing the audit populations themselves is not possible until the Branded Operator and PayFac appeals are finalized, as resolution of those could impact class membership. Should the current class definition be revised or refined as a result of those appeals, some claimants may be removed from or added to the population of claims eligible for payment. For instance, if the PayFac appeal results in a finding that the payment facilitators, rather than their submerchant clients, are Class Members, the population of eligible claimants would change dramatically. This would have an impact on the size of many audit populations and thus on the size of the samples selected from each.

## THE PROCESS FOR DISPUTING INTERCHANGE FEES

20. As required by the Plan of Administration and Distribution and described in prior Declarations I have executed, Class Members who disagree with the interchange fees in the Administrator's records can engage in a multi-step dispute process to challenge those fees. *Id. at* ¶10. While Class Members were afforded the opportunity to provide a corrected total interchange fee amount for the Settlement Class Period on their Claim Form, because these amounts often varied significantly from the fees in the Administrator's records, most Class Members were subsequently directed by the Administrator to engage in the formal multi-step dispute process to

validate the corrected number they provided. The steps in the process are sequential rather than concurrent in an effort to ensure class member are treated equitably and the most structured, consistent dispute methodologies are exhausted first, prior to a Class Member being allowed to submit its own theory of how fees should be calculated.

21. The first step is submission of a research request, whereby the claimant provides certain data points, including merchant ID, acquirer, and operational addresses, which allow the Administrator to search its records and attempt to identify missing transactions. This step is first because it is of minimal burden to the Class Member and, should the Administrator find additional transactional data, maintains consistency in the calculation of the Class Member's interchange fees because it continues to use the transaction data in the Administrator's possession. Such data represents the vast majority of all interchange fees incurred during the Settlement Class Period. The Class Member is informed of any results that are identified via this research, and their fee amounts updated if appropriate.

22. If a Class Member disagrees with the results of this step, the second step of the process requires submission of yearly Visa sales data, payment card sales data, or retail sales data. Those values are then subjected to a methodology described in the Plan of Allocation to derive estimated interchange fee amounts from the sales figures. Based on the results of this calculation, the Administrator may identify certain years for which sales data was submitted where it requires the Class Member submit documentation of the sales figures provided. Any such responsive documentation will be reviewed by the Administrator. A formulaic approach, applied equally across Class Members based on specific sales figures, is the second most favorable approach for calculating Class Member fees, as it again ensures consistency in the calculation across the Class. As with the prior step, the Class Member will be informed of the results of this stage of the process.

8

23. If a Class Member still disagrees with its interchange fees after the second step in the process, it may engage in the third step, in which it would submit a narrative and supporting documentation indicating how it thinks its fees should be determined and why. Interchange fee calculations should be based on a bespoke, Class Member-specific theory only when the prior, more equitable methodologies fail to identify what the Class Member deems to be an accurate fee amount. The Administrator will review this submission and inform the Class Member of the results of its review.

24. If the Class Member still disagrees with its interchange fee amounts as determined by the Administrator after engaging in these three steps, it may appeal the Administrator's decision, initially to the Special Master and ultimately to the Court.

25. At the conclusion of each stage of the process, upon receipt of the Administrator's or Special Master's determination with regard to that step, the Class Member has 30 days to engage in the next step in the process.

**MISCHARACTERIZATION OF CLAIM STATUSES**

26. In its motion, Spectrum mischaracterizes statistics in the Initial Distribution Declaration to create the impression of a "bottleneck" of 500,000 claims that will be forced to go through the multi-step dispute process in the future. This figure is cited throughout Spectrum's motion as a significant backlog that is a primary factor impacting the timeline within which the remaining claims will be paid. This is an incorrect conclusion drawn from the statistics cited, both because the number does not represent the backlog Spectrum claims it does, and because the remaining claims still within the various processing steps are not the primary factor impacting payment timing – the pending appeals are.

27.     Spectrum references the 193,230 research requests pending at the time of the Initial Distribution Declaration, referenced in ¶10.b. of that Declaration, and implies that this is indicative of significant future efforts that will be needed to resolve claims.  Historically, of the hundreds of thousands of research requests received to date, less than a quarter of Class Members have chosen to proceed to the next step in the fee dispute process, the sales data step, upon receipt of their research request results.  In addition, of the claims that for which research requests have been submitted to date, less than 4% remain unresolved. The majority of these were submitted within the last 18 days. The statistic cited by Spectrum is accordingly not representative of the level of future work needed to finalize processing of all claims.

28.     Spectrum likewise mischaracterizes the 339,696 claims identified in the Initial Distribution Declaration at ¶10.c., which it refers to as "alternative data submissions," and alleges these claims will likewise need to engage in future rounds of interchange fee dispute steps. However, claims in this category had either engaged in the sales data process or were still pending a deadline within which they could do so at the time of that Declaration.  The deadline to do so has now passed for all claims that were in this category at the time of that Declaration. 60,727 claims are currently within the sales data process.  Aside from claims currently in conflict, the only claims that could potentially move to the sales data stage in the future, based on relevant deadlines, are the claims currently in the research request process, discussed in ¶27, *supra.*

29.     Rather than representing a "bottleneck" of claims that still must go through a future multi-step process, only approximately 21% of claims have engaged in more than one step of the dispute process. As of March 17, 1,096,755 claims have not engaged in the formal dispute process at all, and the deadline to do so has passed.

30. Spectrum also incorrectly characterizes the status of its own claims not included in the initial distribution, in an effort to illustrate its allegations of a "logjam."

31. Spectrum indicates that Spectrum submitted "alternative interchange fees" for "roughly 9,000 claims," yet has not received a response on 8,750 of those claims. It appears that Spectrum has a misunderstanding of the process to challenge interchange fees; in fact, the vast majority of Spectrum's claims are awaiting action by Spectrum, not by the Administrator.

32. Spectrum has 10,207 claims that were not paid in the initial partial distribution and which are not currently in conflict. Of those, Spectrum submitted a total interchange fee amount along with the claim that differed from what was in the administrator's records for 7,532 claims. Epiq reviewed these figures, but because they differed significantly from the data in our records, to initiate the multi-step dispute process, where Spectrum had not already submitted a research request Epiq requested that Spectrum file research requests for each of its clients where it disagreed with the fees provided in the Merchant Portal. Spectrum did so for 6,418 claims. Spectrum also submitted research requests for 3,213 claims in other contexts, for a total of 9,631 claims with research requests submitted in total. All but 446 of these have been resolved by Epiq, and Spectrum has been informed of the results of those requests.

33. Because Spectrum in many instances did not provide a sufficient number of data points to permit substantive research, the majority of Spectrum's research requests (representing 8,380 claims) did not result in additional transactions. As indicated in Para. 22, *supra*, claimants who still disagree with their interchange fees after a research request can engage in the sales data process. The communications sent to claimants about the results of research requests indicate this. Spectrum has engaged in the sales data process for 262 of its 10,502 claims that have made it

through the research request process.  Of the remainder, the deadline to engage the sales data process has passed for all but 204.

34.     Rather than illustrating a backlog in Epiq's claims processing that can be extrapolated to the population as a whole, the procedural posture of claims submitted by Spectrum indicate that the majority are awaiting action by Spectrum, or are past due action by Spectrum, as is true generally for the rest of the pending claim population.

35.     Spectrum also refers to the conflicts process as an "apparent high volume of conflicts" creating a "logjam" awaiting referral to or decision by the Special Master. That characterization is inaccurate and ignores the substantial number of conflicts that have been resolved since the claim-filing period opened. Since the inception of the administration, Epiq, often with guidance from the Special Master, has resolved more than 98% of all conflicts generated, through registrant agreement, withdrawal, or administrative resolution described further below.

36.     Epiq administers conflicts pursuant to a structured, sequential process designed to promote early resolution and minimize the need for Special Master involvement as well as to minimize the cost to the class that would be incurred should significant effort be expended by the Administrator or Special Master related to the conflict. When a conflict is created, Epiq promptly notifies the affected registrants and provides a 30-day period for the registrants to confer and reach agreement as to which registrant will proceed and which registrant(s) will withdraw. A significant percentage of conflicts are resolved at this initial stage without further action. If a conflict remains unresolved after that period, Epiq, acting at the direction of the Special Master, issues a second notice affording the registrants an additional 30 days either to submit proof of an agreed resolution or to file a dispute outlining the basis for their claim.

37.     Where a dispute is submitted (or the registrants otherwise advise that they are at an impasse), Epiq provides a further opportunity for the affected registrants to submit any documentation they wish the Special Master to consider. The number of conflicts at this final submission stage is currently 593. To streamline review and maximize efficiency, and in consultation with the Special Master, Epiq compiles and organizes dispute materials and reply papers for transmission to the Special Master. Consistent with the Revised Order Appointing Special Master, the 30-day review period runs from the date the reply papers are received by the Special Master.

## $1.5 BILLION IS NOT "AVAILABLE FOR DISTRIBUTION"

38.     Spectrum refers to the approximately $1.5 billion in net settlement funds not allocated to the PayFac and Branded Operator Trusts as "available for distribution." Spectrum Brief at p. 6. These funds are not available for distribution. As explained throughout the Initial Distribution Declaration, the initial distribution was a partial and conservative distribution, calculated to permit an initial payment while preserving sufficient funds to address unresolved appeals and other future claim submissions and processing. More than 50% of the approximately $1.5 billion is attributable to claims expected to receive payments of less than $5, claims involving active TIN conflicts, and the remaining pro rata amount for claims included in the initial partial distribution. Another 40% of the $1.5 billion relates solely to claims where the claimant initiated the process for disputing the fees in the Administrator's records; these claims will likely be included in future audit populations and thus cannot be paid at this time.

39.     These amounts remain undistributed to ensure sufficient reserves pending the resolution of the outstanding appeals, completion of required reconciliation and audit processes,

13

and finalization of all claims.  Funds will be released as appropriate as each of these activities concludes.

<h3 style="text-align:center">SPECTRUM REPORTING REQUESTS</h3>

40.     Epiq is an industry leader in class action administration, having handled more than 700 cases, including some of the most complex antitrust matters in history, which are described in the Epiq *curriculum vitae* included as **Attachment 1.**  The leadership team on this administration collectively has nearly 200 years of administering class action settlements.  By contrast, Spectrum has filed claims in "dozens of large class action settlements."  Spectrum Brief at p.2.  Despite its vastly inferior experience in complex antitrust settlements, and its nonexistent experience in actually administering a settlement, Spectrum is effectively requesting that its judgment regarding the appropriate mechanisms to effectively manage a settlement of this magnitude be substituted for that of Epiq.

41.     In my over twenty years of class action administration experience, I am not aware of a single instance where an outside entity that is neither a party to the action nor appointed by the court was given the authority to direct or decide what should be reported to class members.

42.     No amount of additional reporting will expedite resolution of the PayFac and Branded Operator appeals, which are the single biggest factor impacting timing of future payments. Although Spectrum represents its reporting requests are "best practices," it offers no actual examples of other cases where similar reporting was provided during an administration.  In fact, based on Epiq's extensive experience in this area, the type of reporting currently conducted in this administration, as well as the recipients of that reporting, is typical and customary for cases of this type and complexity. The requested granularity does nothing to expedite claim review and would cause confusion amongst Class Members if published publicly.

43. Spectrum proposes 16+ status categories with month-over-month transition tracking, cross-tabbed counts of claims and fee volumes (administrator and "alternative," a term they have created), and public fund accounting. Without any actual experience in administering a case of this complexity, which involves over one trillion rows of interchange data and millions of claim-related data points, Spectrum states that it's request "imposes no material burden." While Epiq maintains operational flags in our proprietary database to process and track claims, and provides snapshots of various statistics derived from these flags to Class Counsel during various meetings and communications, transforming those internal flags into filer-agnostic, publication-grade outputs with month-over-month transition matrices would require new, bespoke data pipelines, expanded and time-consuming quality assurance efforts before the release of each report, and dedicated review mechanisms, diverting specialized personnel and slowing core claims administration.

44. Spectrum's argument that reporting on fee disputes should occur is based on inaccurate backlog numbers derived from its misunderstanding of statistics reported in the Initial Distribution Declaration. The actual numbers demonstrate that the multi-step fee dispute process is proceeding at a reasonable and appropriate pace for the volume of work required. Further, Spectrum's argument that the Court can only assess the appropriateness of the sequential, iterative nature of the process via reporting is inaccurate. Large datasets and sequential processes (fee challenges, conflicts, appeals to the Special Master with attendant reply windows) require a measured cadence to ensure accuracy, parity across claimants, and auditability. Those are features of complex and careful administration, not evidence of noncompliance.

45. Epiq and Class Counsel are in daily communication. In addition to regular email correspondence and ad hoc communications, Class Counsel and Epiq hold weekly calls during

15

which Epiq provides regular reporting on claim-filing activity. Since the Settlement was approved, Epiq and Class Counsel have also met in person at least quarterly, with more frequent meetings during periods of high activity, to discuss the status of administration and review progress.

46. Significant effort was expended in ensuring the Merchant Portal provides Class Members and Third-Party Filers with an easy way to view the status of all of their claims, review and action correspondence from the Administrator, and otherwise manage the progress of their claims. Filers with numerous claims can even download a report from the Merchant Portal, which can be ingested into their own systems of record, to further streamline management of claims. The level of detail, transparency, and engagement afforded via the portal is far more extensive than other settlements of this nature.

47. Where the Special Master's workflow is involved, Epiq follows the Court's orders and the Special Master's instructions, including any rolling or batched transmissions he requests to manage his assignments.

48. The metrics Spectrum seeks would not meaningfully support claims administration and, instead, would create concrete risks. Publishing statistics that relate to the total interchange fees claimed which are inclusive of unvetted, unsubstantiated "alternative" fee numbers submitted by claimants, including numbers from some claimants that are so large as to be preposterous, add no value for Class Members or the Court. Those numbers do, however, invite claim purchasers and other third parties to speculate on the ultimate total value of all claims, and thus on the value of individual claims, putting those parties at an advantage over less-knowledgeable individual claimants. Such information invites market inferences about the value of individual claims or the posture of reserves, encouraging unnecessary disputes, potential spread of misinformation, and the expansion of a secondary market for claims.

49.     Moreover, these statistics would invite an increase in questions from class members as they seek to identify the category into which their claim falls or to argue the adjudication of their claim vis-à-vis other unrelated claims, based on their interpretation of the public reporting. Such questions would serve only to increase incoming communication volume and administrative costs, and would not aid a Class Member in complying with the various steps in the claims process.

**CONCLUSION**

50.     Spectrum's delay narrative is speculative, based on inaccurate factual representations, and ignores key constraints posed by the PayFac and Branded Operator appeals. Those appeals are relevant to the final Audit Plan and directly determine the distribution timeline and distribution population. Any narrative that disregards or minimizes those factors in favor of misidentified "logjam" misrepresents the actual risk management obligations analyzed and considered by Epiq and Class Counsel both in identifying the initial distribution population and in conducting ongoing administrative activities.

51.     Spectrum's motion seeks extraordinary, public-facing reporting that would materially disrupt the administration to the detriment of all Class Members. Imposing Spectrum's publication scheme would increase administrative costs, confuse claimants, and jeopardize the integrity of ongoing processing activities without delivering commensurate value.

52.     Epiq has administered, and continues to administer, the Settlement in conformity with the Court-approved Plan of Administration and Distribution and all Court orders, in close coordination with Class Counsel and the Special Master. Epiq stands ready to provide targeted updates directly to the Court, when requested, to address any specific informational needs identified by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on March 20, 2026 at Seattle, Washington.

_____

Loree Kovach