**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL No. 1720 (BMC)(JAM) |

This Document Relates To:

ALL ACTIONS.

 

**CASCADE SETTLEMENT SERVICES LLC'S**
**REPLY IN SUPPORT OF MOTION FOR AN ORDER**
**DIRECTING THE SETTLEMENT ADMINISTRATOR**
**TO PROVIDE REGULAR PUBLIC REPORTING**

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................... 1

II.     ARGUMENT ........................................................................................................... 2

    A.   Requesting Transparency Does Not "Substitute Judgment." ............................. 2

    B.   The Administrator Already Tracks the Requested Data. .................................... 3

    C.   The Court and Class Require Visibility into the Special Master Queue ............. 4

    D.   The Dispute Over Spectrum's Own Claim Challenges Illustrates the Danger of an

         Opaque Administration. .................................................................................... 6

III.    CONCLUSION ........................................................................................................ 7

i

## I.    INTRODUCTION

When asked by Class Members for a modicum of transparency regarding the administration of this multi-billion-dollar settlement, Class Counsel's response boils down to a single demand: "trust us." Class Counsel opposes basic oversight, insisting that reporting is burdensome and secrecy protects sophisticated Class Members from exploitation. The opposite is true. Secrecy invites the exploitation of Class Members while disclosure protects their interests and is irrefutably the best practice in complex litigation.

Opacity is contrary to established judicial guidance. The *Manual for Complex Litigation* (Fourth) § 21.661 (2004) encourages regular reporting on "distributions made, interest earned, allowance and disallowance of claims, the progress of the distribution process... and other matters involving the status of administration." Regular reporting facilitates judicial oversight and promotes Class confidence.

The Administrator's *own declaration* (ECF No. 9807-2 or "Kovach Decl.") validates Spectrum's position by providing some of the summary data Spectrum requested. But Class Members should not have to file motions to stay informed. And without reporting, the Court is left guessing about the settlement administration's progress, an unknown that is especially troubling since the resolutions of the *Lanning* and *Old Jericho* appeals may soon flood the process with tens or hundreds of thousands of new claims.

Contrary to Class Counsel's assertions, Spectrum does not seek to rewrite the rules or supplant Class Counsel's judgment. Spectrum proposes a reporting framework using information the Administrator likely already tracks and provides privately to Class Counsel. If the Administrator truly faces a material burden compiling its own data, the Court possesses broad discretion to streamline the metrics. The details and format are flexible; the need for reasonable

1

transparency is not.

## II.    ARGUMENT

### A.    Requesting Transparency Does Not "Substitute Judgment."

Class Counsel accuses Spectrum of attempting to "substitute its judgment" for the Administrator's. This substantially mischaracterizes the motion. Spectrum does not ask the Court to rewrite the audit plan, alter the Special Master protocols, or force a distribution. Spectrum asks only for the publication of uncontroversial information. Yet Class Counsel refuses to share even the most basic information, such as the interest being earned on the escrowed funds. Requesting progress reports is a reasonable demand from an absent Class whose damages date back more than two decades. As of today, less than 10% of the settlement funds have been distributed, and the Class has no guidance on when the payments will resume, much less conclude.

The Administrator demands absolute deference to its process and accuses Spectrum of misinterpreting the data. If Spectrum has misunderstood this information, it is only because the Administrator presents its data using undefined categories and buried footnotes.[1] Indeed, the Administrator's own sworn declaration demonstrates exactly why standardized oversight is necessary. The Administrator's Senior Vice President avers that approximately "98% of all conflicts" have been resolved. (Kovach Decl. ¶ 35.) Basic arithmetic proves this false. The Administrator testifies that 162,547 total conflicts were generated, and 16,005 remain active. (*Id.* ¶ 14(c) & n.2.) Subtracting active conflicts from the total leaves 146,542 resolved conflicts. That

---

[1] The Administrator cites numerous statistics throughout its opposition, frequently contrasting incomparable data points. Spectrum addresses several of these below, but based on the current record, even Spectrum cannot fully untangle the remaining figures without further information. This confusing presentation demonstrates exactly why the Class and the Court require clear, regular reporting.

is a 90% resolution rate, not 98%.[2]

While Spectrum does not allege intentional misrepresentation, an 8% error—overstating the clearance rate by 13,000 claims—illustrates why "trust us" is an inadequate standard. Mistakes happen; reporting exposes them.

Class Counsel cites private oversight, emphasizing daily emails and quarterly meetings with the Administrator. (ECF No. 9807-1 or "Bernay Decl." ¶¶ 3-5.) This internal coordination underscores the problem. Class Counsel hired the Administrator and oversees its work, but private monitoring by the party that selected the vendor is no substitute for objective, public reporting. Managing this process behind closed doors leaves the Court and the Class in the dark. Fiduciaries managing a $5 billion trust must operate with accountability, not secrecy.

**B.      The Administrator Already Tracks the Requested Data.**

The Administrator complains that the reports Spectrum requests require "bespoke data pipelines" and will divert specialized personnel. (Kovach Decl. ¶ 43.) This exaggerates the burden. Spectrum's proposed framework requires only data the Administrator likely tracks already.

To draft her opposition declaration, the Administrator's Senior Vice President extracted some of the exact information Spectrum requested. (ECF No. 9799-1 at 10-13.) She reported the total number of active conflicts (Type 1).[3] She provided the number of merchants paid and agreed-upon claims, which allows for a simple calculation of unpaid accepted claims (Type 3).[4] She disclosed the number of claims in the sales data process and research requests (Type 4).[5]

---

[2] Even then, as the Administrator concedes, these conflicts are overwhelmingly resolved by the claimants themselves through agreement or withdrawal, not by itself or the Special Master.

[3] Kovach Decl. ¶ 14(c) ("16,005 TINs are in conflict").

[4] Kovach Decl. ¶ 14(d) (949,111 total agreed-upon claims) and ¶ 9 (562,361 total merchants paid).

[5] Kovach Decl. ¶ 28 (60,727 claims in the "sales data process") and ¶ 14(e) (266,836 "research

3

Finally, she isolated the number of fully briefed conflicts ostensibly awaiting Special Master review (Type 6).[6]

The Administrator's own briefing proves it can generate these summaries and fails to explain how providing a high-level snapshot is burdensome. The Administrator readily extracted this data to defend itself in court, and Class Counsel concedes it already generates "monthly reporting on every aspect of the settlement administration process" for private review. (ECF No. 9807 or "Opposition" at 3.) The Opposition does not explain why keeping the Class informed by filing a sanitized version of these existing reports on the public docket would require a "bespoke data pipeline." Extracting data the Administrator already uses for claims processing—or simply redacting confidential information from a report that is already generated monthly—does not require new infrastructure; it requires the willingness to do so.

If the Court finds the proposed framework too granular, it retains discretion to modify the requirements. Spectrum's proposal is a flexible framework designed to provide visibility into the administration's progress. If the Court prefers a streamlined monthly summary — such as total funds distributed, total funds remaining, the macro-level status of fee disputes, and the total number of pending conflicts — Spectrum welcomes that relief.[7]

### C.    The Court and Class Require Visibility into the Special Master Queue.

The Revised Order Appointing Special Master mandates a decision within 30 days of the Special Master receiving reply papers. (ECF No. 9403 ¶ 4.) The Administrator is circumventing

---

requests").

[6] Kovach Decl. ¶ 37.

[7] Class Counsel attempts to justify its demand for secrecy by accusing Spectrum of seeking data to exploit the secondary market and purchase claims. This is a baseless ad hominem attack. Spectrum has not purchased a claim in many years, nor does it have any plans to do so. Ironically, it is the multi-year delay and total lack of information about the settlement administration that drives frustrated Class Members to the secondary market.

4

this deadline by holding fully briefed appeals in an internal queue and transmitting them on a "rolling basis." Class Counsel defends this as a necessary case management tool. (Opposition at 4.) Metering a docket may be practical, but it does not justify unilaterally tolling a Court-ordered deadline indefinitely or hiding the size of the resulting backlog from the Class.

Tellingly, the total number of active conflicts—16,005—is absent from the main Opposition brief, buried instead in a supporting declaration. (Kovach Decl. ¶ 14(c).)

Instead, Class Counsel highlights only a small fraction of conflicts—593—that are currently at the "final submission stage." (Opposition at 5.) But as far as can be discerned, it appears that even these 593 conflicts remain with Epiq, not the Special Master. (Kovach Decl. ¶ 37.) (Even if the Administrator intends its ambiguous phrasing to mean these claims have already been transmitted to the Special Master, the concern remains: there is no evidence the Special Master has resolved any conflicts, and in the absence of reporting, it is not clear why.[8]) Highlighting a small fraction while ignoring the 15,000 cases stuck in the earlier pipeline presents a misleading picture of the backlog.

The Opposition never discloses how many, if any, conflicts are active with or have been resolved by the Special Master. The public record indicates a stalled process. The Court requires the Special Master to file reports on a master miscellaneous docket. (ECF No. 9403 ¶ 4.) That docket contains just one such entry— a single Report and Recommendation regarding an entity's appeal of its classification, not a resolution of any competing claimant conflicts.[9] The Special Master's own billing records reflect this inactivity. Across multiple invoices spanning more than

---

[8] For example, Spectrum's conflicts have been fully briefed and sitting at this exact stage since September 2025.

[9] As the Special Master noted, the entry concerned "a single registrant's status rather than a conflict between two or more registrants . . ." (ECF No. 2 n. 16, *In re MDL 1720 Damages Class Settlement Disputes*, No. 1:24-mc-03415-BMC-JAM (E.D.N.Y.).)

a year, the Special Master has billed a total of roughly 24 hours of work, demonstrating that the conflict resolution process is effectively at a standstill.[10] If in fact conflicts are presently before the Special Master, we can find no record of this in the docket or in any communication from Class Counsel or the Administrator.

The Class should not have to parse declarations, inactive dockets, and third-party invoices to discover the true status of the administration. Public reporting ensures the Court and the Class receive an objective picture.

### D. The Dispute Over Spectrum's Own Claim Challenges Illustrates the Danger of an Opaque Administration.

The Opposition alleges Spectrum failed to advance thousands of its claims past the research request stage. (Opposition at 7.) This is patently false.

In fact, Spectrum followed the Administrator's specific instructions regarding these claims. Yet, despite extensive ongoing communication between Spectrum and the Administrator, the Opposition brief marks the first time Spectrum learned the Administrator deemed these challenges expired.[11]

Spectrum will file a separate motion if the Administrator denies these Class Members a merits review of their claims. Ultimately, this dispute illustrates the inherent flaws of an opaque administration that relies on uncommunicated deadlines and hidden bottlenecks.

---

[10] ECF No. 9247-1, ECF No. 9377-1, ECF No. 9557-1, ECF No. 9640-1, ECF No. 9644-1, ECF No. 9662-1, ECF No. 9674-1, ECF No. 9675-1, and ECF No. 9803-1.

[11] This dispute stems from a procedural issue Spectrum first raised almost two years ago regarding TIN aggregation, a process expressly contemplated by the Plan of Administration and Distribution which Spectrum requires for many of its enterprise-scale clients. (ECF No. 7257-2 Appendix I at I-9 ("The Class Administrator may require Claimants to provide supporting documentation and/or additional information as appropriate in connection with . . . a request to aggregate claims").)

## III.    CONCLUSION

Currently, contrary to established judicial guidance, there is no regular reporting to the Court or the Class on the settlement administration's progress. To ascertain whether the administration and claims processing is proceeding appropriately, the Court and the Class should not be forced to parse one-off declarations filed by the Administrator for the express purpose of opposing transparency. It is simply unreasonable that the only progress reports provided to the Class and the Court occur as a byproduct of motion practice, and in a manner that is ad hoc and difficult to decipher. A clear, standardized reporting framework should be implemented now, before pending class-wide appeals are resolved. Once those appeals conclude, many thousands of additional claims may enter the process. It is in everyone's best interests to ensure the claims infrastructure is prepared for that influx.

For the foregoing reasons, Spectrum respectfully requests that the Court grant the motion and direct the Administrator to file regular public reporting on the progress of the claims administration, utilizing either in the format proposed by Spectrum or in a modified format determined by the Court.

Dated:  March 30, 2026                         /s/ Kassra P. Nassiri
                                               Kassra P. Nassiri
                                               NASSIRI & JUNG LLP
                                               1700 Montgomery Street, Suite 207
                                               San Francisco, California 94111
                                               kass@njfirm.com
                                               (415) 762-3100
                                               *Attorney for Cascade Settlement Services LLC*

7

**Certificate of Compliance**

Pursuant to Local Civil Rule 7.1(c) and the Individual Practices of Judge Brian M. Cogan, the undersigned hereby certifies that this memorandum of law complies with the word-count limitation and does not exceed 3,500 words.


Dated:  March 30, 2026                    /s/ Kassra P. Nassiri

Kassra P. Nassiri
NASSIRI & JUNG LLP
1700 Montgomery Street, Suite 207
San Francisco, California 94111
kass@njfirm.com
(415) 762-3100
*Attorney for Cascade Settlement Services LLC*

8