UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

No. 05-MD-1720 (BMC) (JAM)

**MEMORANDUM OF LAW IN SUPPORT OF SDNY PLAINTIFFS'
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 3

LEGAL STANDARD .............................................................................................................. 7

ARGUMENT .......................................................................................................................... 7

    I.    Declaratory Relief is Proper and Will Serve a Useful Purpose. .................................... 7

    II.   The Future Release Violates Federal Law Because It Resulted in Inadequate Representation and Inequitable Relief for Absent Class Members. ............................... 8

        A.   New Merchants Were Inadequately Represented by Class Representatives. ....... 10

        B.   Class Members Were Treated Inequitably Relative to Each Other. ..................... 12

        C.   Opt-Out Rights Cannot Cure Inadequate Representation or Inequitable Treatment. ........................................................................................ 14

    III.  The Future Release Violates the Identical Factual Predicate Doctrine......................... 18

    IV.  The Future Release Violates Public Policy.................................................................. 20

CONCLUSION...................................................................................................................... 23

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Safety Equip. Corp. v. J.P. Maguire & Co.*,
  391 F.2d 821 (2d Cir. 1968)...................................................................................................23

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)............................................................................................................16

*Bradburn Parent/Tchr. Store, Inc. v. 3M (Minnesota Mining & Mfg. Co.)*,
  2004 WL 414047 (E.D. Pa. Mar. 1, 2004)............................................................................16

*Cellar Door Prods., Inc. of Michigan v. Kay*,
  897 F.2d 1375 (6th Cir. 1990) ...........................................................................................21

*Cox v. WSP USA Inc. Grp. Ins. Plan*,
  2026 WL 121206 (N.D. Cal. Jan. 16, 2026)............................................................................8

*Crawford v. Honig*,
  37 F.3d 485 (9th Cir. 1994) ...............................................................................................16

*DDMB, Inc. v. Visa, Inc.*,
  2021 WL 6221326 (E.D.N.Y. Sept. 27, 2021) .....................................................................15

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
  62 F.4th 704 (2d Cir. 2023)........................................................................................2, 5, 6, 12

*Fox Midwest Theatres v. Means*,
  221 F.2d 173 (8th Cir. 1955) .............................................................................................22

*Gaines v. Carrollton Tobacco Board of Trade, Inc.*,
  386 F.2d 757 (6th Cir. 1967) .............................................................................................22

*Gotthelf v. Toyota Motor Sales, U.S.A., Inc.*,
  525 F. App'x 94 (3d Cir. 2013) ..........................................................................................15

*Gov't Emps. Ins. Co. v. Zaitsev*,
  2026 WL 275945 (E.D.N.Y. Feb. 3, 2026)..............................................................................7

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995)............................................................................................16, 17

*In re Literary Works in Elec. Databases Copyright Litig.*,
  654 F.3d 242 (2d Cir. 2011) .....................................................................................11, 12, 16

*In re MI Windows & Doors, Inc., Prods. Liab. Litig.*,
  860 F.3d 218 (4th Cir. 2017) ...............................................................................15

*In re Payment Card*,
  986 F. Supp. 2d 207 (E.D.N.Y. 2013) ...................................................................3

*In re Payment Card*,
  827 F.3d 223 (2d Cir. 2016) ...................................................................3, 4, 8, 11

*In re Payment Card*,
  2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019)...........................................4, 5, 14, 22

*In re Payment Card*,
  714 F. Supp. 3d 65 (E.D.N.Y. 2024) ...............................................................3, 18

*In re Payment Card*,
  735 F. Supp. 3d 249 (E.D.N.Y. 2024) ....................................................................6

*In re Payment Card*,
  2024 WL 3236614 (E.D.N.Y. June 28, 2024) .............................................9, 12, 13

*In re Payment Card*,
  2025 WL 2412033 (E.D.N.Y. Aug. 20, 2025)..........................................................8

*Kakani v. Oracle Corp.*,
  2007 WL 1793774 (N.D. Cal. June 19, 2007) ......................................................17

*Lawlor v. National Screen Service Corp.*,
  349 U.S. 322 (1955)........................................................................................21, 22

*Maryland Cas. Co. v. Rosen*,
  445 F.2d 1012 (2d Cir. 1971)..................................................................................7

*Melito v. Experian Mktg. Sols., Inc.*,
  923 F.3d 85 (2d Cir. 2019)....................................................................................20

*Minnesota Mining & Mfg. Co. v. N.J. Wood Finishing Co.*,
  381 U.S. 311 (1965)...............................................................................................20

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985)..........................................................................................22, 23

*Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*,
  660 F.2d 9 (2d Cir. 1981) .............................................................................. *passim*

*Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*,
  94 F.3d 747 (2d Cir. 1996)......................................................................................8

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985)...............................................................................................9, 15, 17

*Prezant v. De Angelis*,
    636 A.2d 915 (Del. 1994) ................................................................................................17

*Redel's Inc. v. General Electric Co.*,
    498 F.2d 95 (5th Cir. 1974) .............................................................................................22

*Richard v. Hoechst Celanese Chem. Grp.*,
    355 F.3d 345 (5th Cir. 2003) ...........................................................................................16

*Ross v. Convergent Outsourcing, Inc.*,
    323 F.R.D. 656 (D. Colo. 2018) ......................................................................................16

*Saba Cap. CEF Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund*,
    2022 WL 493554 (S.D.N.Y. Feb. 17, 2022)......................................................................7

*Schanker & Hochberg, P.C. v. Berkley Assurance Co.*,
    589 F. Supp. 3d 281 (E.D.N.Y. 2022) ...............................................................................7

*TBK Partners, Ltd. v. W. Union Corp.*,
    675 F.2d 456 (2d Cir. 1982).......................................................................................19, 20

*True v. Am. Honda Motor Co.*,
    749 F. Supp. 2d 1052 (C.D. Cal. 2010) ...........................................................................16

*United States v. Gen. Elec. Co.*,
    358 F. Supp. 731 (S.D.N.Y. 1973)...................................................................................21

*Wolfert ex rel. Est. of Wolfert v. Transamerica Home First, Inc.*,
    439 F.3d 165 (2d Cir. 2006).............................................................................................16

*Zimmerman v. Zwicker & Assocs., P.C.*,
    2011 WL 65912 (D.N.J. Jan. 10, 2011) ...........................................................................17

**Rules**

Fed. R. Civ. P. 23(a)(4) .............................................................................................5, 9, 18

Fed. R. Civ. P. 23(c)(2)......................................................................................................17

Fed. R. Civ. P. 23(e) ..........................................................................................................17

Fed. R. Civ. P. 23(e)(2)(A) ..................................................................................................9

Fed. R. Civ. P. 23(e)(2)(D)..................................................................................5, 9, 12, 18

Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment............................................13

Fed. R. Civ. P. 56(a) ............................................................................................................7

Fed. R. Civ. P. 56(b) ........................................................................................................7

Fed. R. Civ. P. 56 advisory committee's note to 2009 amendment ...................................7

**Other Authorities**

Brief for Objector-Appellant Kara Bowes, *Melito v. Experian Mktg. Sols., Inc.*,
    No. 17-3277, Dkt. No. 78 (2d Cir. Jan. 29, 2018) ......................................................20

Plaintiffs in *Potayto-Potahto, LLC v. Visa Inc.*, No. 26-cv-3245 (S.D.N.Y.) (the "SDNY Action") bring this motion for partial summary judgment, seeking a declaration that their claims are not barred by the Rule 23(b)(3) Class Settlement Agreement and Final Judgment in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 05-MD-1720 (E.D.N.Y.) (hereinafter, "MDL 1720").

**PRELIMINARY STATEMENT**

This motion presents a straightforward legal question: can a class settlement release future antitrust claims when doing so leaves absent class members worse off than their representatives? This question matters to millions of merchants who have spent years paying artificially high fees on Visa and Mastercard transactions and who are bound by a settlement that purports to extinguish their right to relief.  Federal law supplies a clear answer: such a release of future claims is invalid on three grounds.  First, the release violates Federal Rule of Civil Procedure 23 because it resulted in absent class members being inadequately represented and inequitably treated.  Second, the release violates the identical factual predicate doctrine because unasserted future claims held only by some class members were sacrificed to benefit the class as a whole.  And third, the release violates public policy because it granted Visa and Mastercard prospective immunity from federal antitrust laws spanning nearly a decade.

The settlement at issue arose from a long-running antitrust class action in which millions of merchants challenged the interchange fees and network rules that Visa and Mastercard imposed on them.  That litigation produced a damages-class settlement compensating merchants *pro rata* for harm suffered during the class period (January 1, 2004 through January 24, 2019), without any compensation for harm incurred thereafter.  In exchange, Visa and Mastercard secured far more than a release for past claims: they obtained a release extending years into the future, purporting

to bar claims arising from the same ongoing conduct through August 8, 2028.  The settlement did not resolve claims for injunctive relief: those claims proceeded in a separate injunction class action, which remains ongoing, and the challenged conduct has continued in the meantime.

The Second Circuit upheld the settlement, though it declined to decide whether the future release was lawful.  It emphasized that "the release of claims provision contains a de-facto severability clause, providing that the release 'extend[s] to, but only to, the fullest extent permitted by federal law.'" *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 720 (2d Cir. 2023) (alteration in original).  As the court explained, "[t]his language ensures that the Settlement Agreement will stand even if certain aspects of the release were to fall." *Id.*  The court concluded that "[a] holding as to the proper scope of the release—i.e., whether the future release violates federal law—can await a case in which the issue would directly affect the proceedings." *Id.*

This is that case.  Plaintiffs bring post-January 2019 antitrust claims against Visa and Mastercard based on the same course of conduct at issue in the earlier action—conduct that generates more than $100 billion annually in interchange fees.  These claims fall within the temporal and substantive scope of the future release, which the defendants will invoke as a purported bar to the suit.  Accordingly, Plaintiffs seek a declaration that the future release is unlawful and unenforceable—a pure question of law appropriate for immediate resolution.

Striking the future release will not disturb the remainder of the settlement.  By its terms, the agreement preserves all valid provisions even if the release is narrowed; the distribution of settlement funds, the resolution of past claims, and all other aspects of the bargain remain intact. Only the attempt at immunity is extinguished, such that Visa and Mastercard will have to defend their conduct on the merits.  If defendants wanted to stop being sued for violations of the antitrust laws, they should have stopped violating the antitrust laws.

**BACKGROUND**

This Court has discussed in detail the credit industry and the antitrust violations alleged against Visa and Mastercard in many prior opinions. *See, e.g.*, *In re Payment Card*, 986 F. Supp. 2d 207, 213–16 (E.D.N.Y. 2013), *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016); *In re Payment Card*, 714 F. Supp. 3d 65, 75–80 (E.D.N.Y. 2024). Plaintiffs assume familiarity with those opinions and set out only the history needed to contextualize the settlement that is the subject of this motion.

The initial class action that gave rise to MDL 1720 was filed in 2005. *See In re Payment Card*, 714 F. Supp. 3d at 76. There, the plaintiffs—all merchants who accepted Visa and/or Mastercard credit cards—challenged as anticompetitive the rules and interchange fees that Visa and Mastercard imposed on them. *See In re Payment Card*, 827 F.3d 223, 228 (2d Cir. 2016). After more than seven years of litigation, the parties executed a settlement agreement, which the district court approved in 2012 (the "2012 Settlement Agreement"). *Id.* at 229.

The 2012 Settlement Agreement divided the plaintiffs into two classes: an opt-out damages class, which covered merchants that accepted Visa and/or Mastercard from January 1, 2004 to November 28, 2012; and a non-opt-out injunction class, which covered merchants that accepted (or would accept) Visa and/or Mastercard any time after November 28, 2012. *Id.* The former would receive billions of dollars in compensation, while the latter would receive modest changes to the network rules. *Id.* In exchange, the plaintiffs agreed to a perpetual release of all future claims related to the anticompetitive interchange fees and network rules. *Id.*

In 2016, the Second Circuit invalidated the 2012 Settlement Agreement after concluding that a "fundamental conflict" existed between the damages class and the injunction class. *Id.* at 236. The court explained that the damages class "would want to maximize cash compensation for

3

past harm," while the injunction class "would want to maximize restraints on network rules to prevent harm in the future." *Id.* at 233. The class representatives were all members of the damages class and, thus, were "in the position to trade diminution of [future injunctive] relief for increase of [past monetary] relief." *Id.* at 234.

After the case was remanded, the damages class—proceeding separately from the injunction class—reached a new settlement in 2019. *See* Dkt. 7257-2 (the "2019 Settlement Agreement"). The 2019 Settlement Agreement, which is the subject of this motion, defined the class as "all persons, businesses, and other entities that have accepted any Visa-Branded Cards and/or Mastercard-Branded Cards in the United States at any time from January 1, 2004 to the Settlement Preliminary Approval Date [January 24, 2019]." 2019 Settlement Agreement ¶ 4. The agreement provided that each claimant would be entitled to "a *pro rata* share of the monetary fund based on the interchange fees attributable to their transactions during the class period." *In re Payment Card*, 2019 WL 6875472, at *3 (E.D.N.Y. Dec. 16, 2019).

In exchange, each class member released claims "arising out of or relating to" any conduct or acts that were or could have been alleged in the litigation. 2019 Settlement Agreement ¶ 31(a). The release covered two categories of claims: (1) all existing claims that had accrued during the class period, and (2) all *future* claims that would "accrue no later than five years after the Settlement Final Date [August 8, 2023]" (the "Future Release"). *Id.*[1] The release of claims, by its own terms, "extend[s] to, but only to, the fullest extent permitted by federal law." *Id.*

---

[1] The Second Circuit denied petitions for rehearing on April 25, 2023. The time to seek certiorari expired 90 days later, on July 24, 2023. Under the Settlement Agreement, the "Settlement Final Date" occurs ten business days after appellate proceedings are no longer subject to further review, which was August 8, 2023.

The district court approved the 2019 Settlement Agreement over various objections to the Future Release.  Some objectors argued that the Future Release contravened public policy and the identical factual predicate doctrine.  *See In re Payment Card*, 2019 WL 6875472, at \*24–26.  The district court disagreed, ruling that "releases are acceptable where the future claims release[d] are those based on a continuation of conduct at issue and underlying the original claims."  *Id.* at \*25.  Some objectors challenged the Future Release on the grounds that newer merchants—who started accepting Visa and/or Mastercard toward the close of the class period—received inadequate representation and inequitable treatment.  *Id.* at \*7–8, \*26.  On that point, the court acknowledged the objectors' "frustration that a class member that became a merchant for only the last several months would receive very small remuneration but have to release claims for a number of years."  *Id.* at \*27.  The court reasoned that "[f]or those merchants, they may have assessed that it is not worthwhile to join the class."  *Id.*

The Second Circuit affirmed approval of the settlement, though it expressly left open the legality of the Future Release.  The Second Circuit acknowledged that newer merchants claimed to be inadequately represented in violation of Rule 23(a)(4) because "the class representatives, all of which had accepted Visa and/or MasterCard for the full fifteen-year class period, . . . had incentive to forgo five years (or more) of future claims in exchange for the cash that would afford newer merchants no more than a marginal recovery."  *Fikes Wholesale*, 62 F.4th at 720.  It also acknowledged the related challenge of inequitable treatment in violation of Rule 23(e)(2)(D).  *Id.* But the Second Circuit concluded that it had "no occasion to decide these questions," since "the release of claims provision contains a de-facto severability clause," such that the Future Release extends only to "the fullest extent permitted by federal law."  *Id.*  The court explained that "[t]his language ensures that the Settlement Agreement will stand even if certain aspects of the release

5

were to fall." *Id.* A decision as to "whether the future release violates federal law," the court continued, "can await a case in which the issue would directly affect the proceedings." *Id.*

On April 21, 2026, merchant plaintiffs filed the SDNY Action, a putative damages class action, alleging that Visa and Mastercard violated federal antitrust laws from January 25, 2019 onward (i.e., from the close of the last class period), by charging artificially high interchange fees and imposing a series of anticompetitive network rules on merchants. *See Potayto-Potahto, LLC v. Visa Inc.*, No. 26-cv-3245 (S.D.N.Y. Apr. 21, 2026), Dkt. 1 ("SDNY Complaint"). The plaintiffs in the SDNY Action (the "SDNY Plaintiffs") accepted Visa and Mastercard prior to January 25, 2019, and are therefore bound by the 2019 Settlement Agreement. *See* SDNY Complaint ¶¶ 10–12. Accordingly, they also brought a claim for declaratory judgment that the Future Release violates federal law, is invalid, and should be stricken from the 2019 Settlement Agreement. *See id.* ¶¶ 124–134.

Shortly after filing the SDNY Action, the SDNY Plaintiffs filed the instant motion before this Court seeking a determination as to the legality of the Future Release. They did so because this Court has retained exclusive jurisdiction to enforce the release in the 2019 Settlement Agreement. Dkt. No. 7832 ("Final Judgment") ¶¶ 18, 19. The Final Judgment provides that all applications "with respect to any aspect of the [2019] Settlement Agreement" must be "presented to and determined by" this Court "for resolution as a matter within the scope of MDL 1720." *Id*. ¶ 19; *In re Payment Card*, 735 F. Supp. 3d 249, 261 n.19 (E.D.N.Y. 2024) ("The Court has jurisdiction to decide Defendants' motion to enforce the Settlement Agreement because it retained jurisdiction pursuant to the Clerk's entry of judgment on December 20, 2019."). [2]

---

[2] The Final Judgment provides that any challenge to the release shall be resolved by Chief Judge Brodie or, "if she is not available, any other District Court Judge designated by the Court." Final

## LEGAL STANDARD

A party is entitled to summary judgment if it can "show[] that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party may move for summary judgment 'at any time until 30 days after the close of all discovery,' including before a defendant answers the complaint." *Schanker & Hochberg, P.C. v. Berkley Assurance Co.*, 589 F. Supp. 3d 281, 289 (E.D.N.Y. 2022) (quoting Fed. R. Civ. P. 56(b)). Indeed, Rule 56 "allows a party to move for summary judgment . . . even as early as the commencement of the action." Fed. R. Civ. P. 56 advisory committee's note to 2009 amendment. Early resolution is appropriate where, as here, the motion is "limited to a pure question of law." *Saba Cap. CEF Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund*, 2022 WL 493554, at *6 (S.D.N.Y. Feb. 17, 2022).

## ARGUMENT

### I.     Declaratory Relief is Proper and Will Serve a Useful Purpose.

"'Declaratory relief is proper' whenever 'the judgment will serve a useful purpose in clarifying and settling the legal relations in issue' or 'when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceedings.'" *Gov't Emps. Ins. Co. v. Zaitsev*, 2026 WL 275945, at *7 (E.D.N.Y. Feb. 3, 2026) (quoting *Maryland Cas. Co. v. Rosen*, 445 F.2d 1012, 1014 (2d Cir. 1971)). "Furthermore, a party seeking a declaratory judgment must allege that there is a 'substantial controversy, between parties with adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* (quoting

---

Judgment ¶ 19. On September 5, 2025, the MDL Panel reassigned the case from Chief Judge Brodie to Judge Cogan. *See* Dkt. 9666.

*Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 752 (2d Cir. 1996)).

There is an actual controversy here.  The SDNY Plaintiffs accepted Visa and Mastercard credit cards prior to January 25, 2019, were members of the MDL 1720 damages class, and are bound by the 2019 Settlement Agreement.  *See* 2019 Settlement Agreement ¶ 4; SDNY Complaint ¶¶ 10–12.  Their claims, moreover, are purportedly barred by the Future Release because they stem from the same course of conduct at issue in MDL 1720.  *See* 2019 Settlement Agreement ¶ 31(a); *see generally* SDNY Complaint.

Visa has invoked the Future Release as a defense in at least one other action.  *See* MDL 1720, Dkt. 9624 (motion to enforce the Settlement Agreement and dismiss plaintiffs from case pending in the Southern District of New York based in part on application of the Future Release).[3] It has therefore taken the position that the Future Release is valid, which would require dismissal of the SDNY Action.  Because the SDNY Plaintiffs disagree with that position, an actual controversy exists as to the validity of the Future Release and the vitality of the SDNY Action. The issue is ripe for declaratory relief.  *Cf. Cox v. WSP USA Inc. Grp. Ins. Plan*, 2026 WL 121206, at *2 (N.D. Cal. Jan. 16, 2026) (denying motion to dismiss claim seeking "a declaration that the [plaintiffs' prior] settlement does not bar the current claims").

## II.   The Future Release Violates Federal Law Because It Resulted in Inadequate Representation and Inequitable Relief for Absent Class Members.

"Class actions are an exception to the rule that only the named parties conduct and are bound by litigation."  *In re Payment Card*, 827 F.3d at 231.  To justify departure from that rule,

---

[3] The court declined to decide the validity of the Future Release in ruling on Visa's motion to enforce the Settlement Agreement, after concluding that the release (even if valid) did not cover the substance of the claims asserted in that action.  *See In re Payment Card*, 2025 WL 2412033, at *7 n.10 (E.D.N.Y. Aug. 20, 2025).

federal law incorporates safeguards designed to protect absent class members who have no control over the litigation. Rule 23(a)(4) requires that "the representative parties . . . fairly and adequately protect the interests of the class."[4]  Pursuant to the Due Process Clause, such adequate representation must exist "at all times" throughout a case. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).  Relatedly, Rule 23(e)(2)(D) instructs courts evaluating proposed settlements to consider whether "the proposal treats class members equitably relative to each other."  These rules share a single touchstone: fairness.

The Future Release resulted in certain class members receiving inadequate representation and inequitable treatment.  This feature of the release marked a sharp departure from the typical damages-class framework, where the class period and release period are roughly proportional and relief is distributed *pro rata* based on class period harm.  All class members in that situation share the same incentive—to maximize overall recovery—and each receives relief roughly proportionate to the value of the claims released.  The Future Release here disrupted that alignment of incentives.

For the reasons discussed below, the Future Release operates to benefit some at the expense of others—resulting in many absent class members getting a materially worse deal than their representatives.  It is true, of course, that the disadvantaged class members could have opted out of the class to avoid this unfair deal, theoretically with the option of pursuing claims individually.  But courts have been aligned for decades in holding that the right to opt out of a settlement—often

---

[4] Similarly, Rule 23(e)(2)(A) requires courts to consider, in determining whether to approve a proposed settlement, whether "the class representatives and class counsel have adequately represented the class."  Because Rule 23(e)(2)(A) "is nearly identical to the Rule 23(a)(4) prerequisite of adequate representation in the class certification context," courts draw on caselaw from both rules interchangeably. *In re Payment Card*, 2024 WL 3236614, at *15 n.34 (E.D.N.Y. June 28, 2024).

costly and impractical—cannot cure otherwise fatal defects. *See infra* Section II.C. Adequate representation and equitable treatment are essential protections, not optional conveniences.

### A.    New Merchants Were Inadequately Represented by Class Representatives.

The Future Release violates federal law because it resulted in absent class members receiving inadequate representation. Absent class members, who get no say in negotiations, rely entirely on the lead plaintiffs to represent their interests. So, when interests are aligned, a deal that benefits the representatives should be equally satisfactory for all the rest; absence from the negotiating table does not consign class members to a lesser bargain. But when interests diverge, absent class members are left vulnerable. That is what happened here—to the detriment of the "new merchants" who began accepting Visa and/or Mastercard only later in the prior damages class period.

These new merchants got a rotten deal. Consider, for example, the merchant who first accepted Visa and/or Mastercard on the last day of the class period. (Given the nationwide class of more than fifteen million merchants, this is hardly hypothetical.) That merchant was compensated for a single day of harm and, in exchange, released many years of future claims. The relief for this merchant was so marginal as to be almost non-existent; yet the sacrifice was immense. Defendants were granted a license to violate the antitrust laws for nearly a decade— continuing to receive an outsized cut of every hard-earned transaction. The new merchant, in return, got pennies.

The lead plaintiffs negotiated a far better bargain for themselves. Each had been in business for the full fifteen-year class period and, thus, would be compensated based on over five thousand days of harm. So, unlike the new merchants, these plaintiffs received something of real value in exchange for the release of their past and future claims. And to the extent the release of future claims enticed the defendants to increase the total settlement fund, the lead plaintiffs stood to

benefit disproportionately from that trade.  Every additional dollar secured in the settlement, after all, would be distributed based solely on harm incurred during the class period, and nothing after. This allocation method ensured that "old merchants" would receive the lion's share of any extra cash, even though all merchants (new and old alike) released future claims in equal measure. Evidently the lead plaintiffs were satisfied with the exchange, as they accepted a deal that the new merchants would have spurned without hesitation.

Courts routinely strike down settlements that involve conflicting interests of this sort.  The Second Circuit rejected the 2012 Settlement Agreement, for instance, after concluding that "[c]lass representatives had interests antagonistic to those of some of the class members they were representing."  *In re Payment Card*, 827 F.3d at 233.  There, the lead plaintiffs negotiated a settlement that provided billions of dollars for the damages class and modest changes to the network rules for the injunction class, while the defendants received a perpetual release from all related antitrust claims.  *Id.* at 229.  The Second Circuit concluded that a conflict existed between members of the damages class, who "would want to maximize cash compensation for past harm," and members of the injunction class, who "would want to maximize restraints on network rules to prevent harm in the future."  *Id.* at 233.  The class representatives, all members of the damages class, were "in the position to trade diminution of [future injunctive] relief for increase of [past monetary] relief."  *Id.* at 234.  A settlement with conflicts of this sort could not be sustained.

In another case, the Second Circuit rejected a settlement that divided copyright claims into three categories—A, B, and C—with the third category containing the weakest claims and receiving the least generous recovery.  *See In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 251–54 (2d Cir. 2011).  The court concluded that class members with the Category C claims—i.e., the weakest claims—held interests that diverged from the lead plaintiffs,

who held all three categories of claims. *Id.* at 254. The court reasoned that, to the lead plaintiffs, "how their compensation is allotted among their claims is irrelevant; what matters is the bottom line." *Id.* at 251. Class members who hold only Category C claims, by contrast, "are interested exclusively in maximizing the compensation for that one category of claim." *Id.* at 251–52. So while the former "could choose to sacrifice their Category C claims in exchange for more favorable compensation on their Category A and B claims, no such option is available to the latter." *Id.* at 252. The partial overlap of claims between representatives and class members was not enough to ensure adequate representation. *Id.* at 254.

The throughline here is simple: class representatives cannot have incentive to fashion relief that benefits their own interests at the expense of absent class members. Yet that is precisely what happened here through the Future Release. "For the class representatives, the release of claims accruing after the class period may well [have been] a sacrifice worth making," but "*the same cannot be said for the newer merchants*," who "stood to gain only marginally from the settlement and are now releasing claims for a period that may far exceed their period of recovery." *Fikes Wholesale*, 62 F.4th at 730 (Jacobs, J., concurring) (emphasis added). The divergent interests with respect to the Future Release are readily apparent and confirmed by the lopsided bargain ultimately struck; the newer merchants, who were bound by a deal that no one could deem fair, clearly lacked adequate representation.

## B.     Class Members Were Treated Inequitably Relative to Each Other.

The Future Release also violates federal law insofar as it caused class members with future claims to receive proportionately less relief relative to those without such claims. Under Rule 23(e)(2)(D), courts must assess whether a settlement treats class members equitably, which includes an assessment of "whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." *In re Payment Card*, 2024 WL 3236614, at *36

12

(E.D.N.Y. June 28, 2024) (quoting Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment).  In conducting this inquiry, courts must bear in mind that "[i]nequitable treatment can arise where differently situated class members are treated equally by a settlement." *Id.*

The Second Circuit cemented this principle in *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9 (2d Cir. 1981).  There, the court rejected a settlement that required class members to "release claims based on both liquidated and unliquidated [futures] contracts in return for a portion of the settlement proceeds that [was] determined solely on the basis of the [liquidated] contracts." *Super Spuds*, 660 F.2d at 18.  The court recognized that this broad release may have benefited the class as a whole, but explained that "[a]n advantage to the class, no matter how great, simply cannot be bought by the uncompensated sacrifice of claims of members, whether few or many, which were not within the description of claims assertable by the class." *Id.* at 19.  The court reasoned that the settlement clearly "departs from principles of equity," observing that "a class member holding one liquidated and one unliquidated contract receives no more than another class member holding only one liquidated contract." *Id.*[5]

Similar reasoning applies here.  Consider two merchants: the first operated for six years and went out of business on the last day of the class period; the second operated for six years before the class period closed and continued in business for six years after.  If both merchants processed the same volume of credit-card transactions each day they operated, the second merchant would have released claims twice as valuable as the first merchant; yet the settlement would compensate

---

[5] The district court relied on *Super Spuds* in rejecting a proposed settlement in the injunction class action against Visa and Mastercard, finding that the settlement did not "treat Class Members equitably relative to one another" because it "provides the least benefit to the merchants with the most valuable claims." *In re Payment Card*, 2024 WL 3236614, at *37.

both equally. A class member with claims both pre- and post-dating the close of the class period receives no more than another class member holding only the pre-closing claims.

Worse still is the comparison between merchants with identical claims but disparate relief. Consider, for example, one merchant who operated for six years and went out of business on the last day of the class period, and another who began operations on the last day of the class period and continued for six years thereafter. Assuming equal credit card transactions per day, the second merchant would have released claims just as valuable as the first merchant; yet the first merchant would be compensated for nearly two thousand days of harm while the second merchant would be compensated for only a single day. Same harm; drastically different relief.

Simply put, "[t]here is no justification for requiring [certain class members] to release claims based on [future harm] as part of a settlement in which payments to class members are to be determined solely on the basis of [past harm]." *Super Spuds*, 660 F.2d at 18. Federal law does not permit such an inequitable result, regardless of the benefits the class as a whole may have gained from the trade.

### C. Opt-Out Rights Cannot Cure Inadequate Representation or Inequitable Treatment.

The protections provided by Rule 23 and the Due Process Clause are critical and unyielding. Since the Future Release ran afoul of those protections, it is invalid. The fact that absent class members had the right to opt out of the damages class does not change that result. As decades of precedent make clear, the right to opt out of a class is separate and independent from all other class rights; it does not excuse defects in a settlement that resulted in certain class members getting a worse bargain than others.[6]

---

[6] It is true that the district court, in approving the 2019 Settlement Agreement, suggested that opt-out rights could cure such defects, stating that disadvantaged merchants "may have assessed that it is not worthwhile to join the class." *In re Payment Card*, 2019 WL 6875472, at *27. But the

14

In *Phillips Petroleum Co. v. Shutts*, the Supreme Court considered the contours of personal jurisdiction over absent, non-resident class members in a state court class action involving damages claims. 472 U.S. 797, 811–12 (1985). As a general matter, the Court concluded that "a forum State may exercise jurisdiction over the claim of an absent class-action plaintiff, even though that plaintiff may not possess the minimum contacts with the forum which would support personal jurisdiction over a defendant." *Id.* at 811. But three procedural safeguards were necessary. First, the absent class member "must receive notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel." *Id.* at 811–12. Second, "due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court." *Id.* at 812. "Finally, the Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members." *Id.*

Based on *Shutts*, circuit courts have consistently acknowledged that all three of these procedural safeguards must exist before a settlement can receive court approval—i.e., there must be adequate notice, the right to opt out, *and* adequate representation. *See, e.g.*, *In re MI Windows & Doors, Inc., Prods. Liab. Litig.*, 860 F.3d 218, 224 (4th Cir. 2017) ("[U]nder established class action principles, [the absent class member] was bound by the judgment entered in the class action as a party, so long as it was adequately represented, had fair notice of its class membership, *and* declined to opt out of the class." (emphasis added)).[7]

---

court later clarified, in certifying the separate injunction class, that it "is not aware of a case . . . that suggest[s] that a court can cure inadequate representation by providing opt-out rights." *DDMB, Inc. v. Visa, Inc.*, 2021 WL 6221326, at *47 (E.D.N.Y. Sept. 27, 2021). That later statement correctly reflects both binding precedent and the practical reality of opt-out rights.

[7] *See also Gotthelf v. Toyota Motor Sales, U.S.A., Inc.*, 525 F. App'x 94, 99 (3d Cir. 2013) ("In a class action settlement where opt-out rights are given, due process requires: (1) adequate representation by the class representatives, (2) notice of the class proceedings, and (3) the

15

The Second Circuit, for its part, has long treated adequate representation and opt-out rights as independent requirements. In *Literary Works*, for example, the Second Circuit struck down a settlement after concluding that the class representatives inadequately represented certain absent class members, despite all class members having the right to "opt[] out of the Settlement altogether." 654 F.3d at 247. The Supreme Court had previously struck down a settlement under similar circumstances in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997),[8] which led the Second Circuit to observe that "*Amchem* appears to have abrogated" any suggestion that inadequate representation "could be remedied by an opt-out opportunity." *Wolfert ex rel. Est. of Wolfert v. Transamerica Home First, Inc.*, 439 F.3d 165, 172 n.10 (2d Cir. 2006).

The Second Circuit is no outlier. Courts across the nation have held that "the right of parties to opt out does not relieve the court of its duty to safeguard the interests of the class and to withhold approval from any settlement that creates conflicts among the class." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 809 (3d Cir. 1995); *see also Ross v. Convergent Outsourcing, Inc.*, 323 F.R.D. 656, 660 n.5 (D. Colo. 2018) (same); *True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1080 (C.D. Cal. 2010) (same); *Bradburn Parent/Tchr. Store, Inc. v. 3M (Minnesota Mining & Mfg. Co.)*, 2004 WL 414047, at *9 (E.D. Pa. Mar. 1, 2004)

---

opportunity to be heard and to participate in the class proceedings."); *Richard v. Hoechst Celanese Chem. Grp.*, 355 F.3d 345, 351 (5th Cir. 2003) ("A court must ensure that class members have received adequate notice, representation, *and* an opportunity to opt-out." (emphasis added)); *Crawford v. Honig*, 37 F.3d 485, 487 n.2 (9th Cir. 1994) ("[T]he due process required in order to bind known absent class members in a class action suit for money damages includes adequate notice to the absent members, adequate representation, *and* an opportunity for the members to opt out of the suit." (emphasis added)).

[8] In *Amchem*, the Supreme Court invalidated a settlement for current and future asbestos-related claims after concluding that "[i]n significant respects, the interests of those within the single class are not aligned." 521 U.S. at 595. In particular, the Court concluded that "the currently injured" had an interest in "generous immediate payments," while "the interest of exposure-only plaintiffs [was] in ensuring an ample, inflation-protected fund for the future." *Id.*

16

("[T]he Court rejects Plaintiff's assertion that the opt out procedure found in Federal Rule of Civil Procedure 23(c)(2) would either cure or render moot the problems inherent in Plaintiff's representation of the proposed class.").

This principle applies with full force to the 23(e)(2)(D) requirement for equitable treatment. *See Zimmerman v. Zwicker & Assocs., P.C.*, 2011 WL 65912, at *8 (D.N.J. Jan. 10, 2011) (rejecting settlement as inequitable and explaining that "[t]he fact that disgruntled class members may opt out of the settlement does not cure the deficiencies in the settlement"); *Kakani v. Oracle Corp.*, 2007 WL 1793774, at *11 (N.D. Cal. June 19, 2007) ("While it is true that workers who dislike the proposal could opt out, this does not absolve the Court from its independent duty to vet the proposal. . . . There is no substitute for the requirement of district courts vetting the proposed settlement under Rule 23(e).").

This line of precedent makes sense. If opt-out rights could substitute for adequate representation and equitable treatment, the adequacy and equity requirements would be a dead letter. Class representatives could freely trade away claims of absent class members to enhance their own relief. Absent class members with small claims would have no realistic recourse, as "[i]t would cost considerably more [for them] to litigate individual claims than [they] could recover." *In re Gen. Motors*, 55 F.3d at 809. As courts have long recognized, that is why opt-out rights "are infrequently utilized and usually economically impracticable." *Prezant v. De Angelis*, 636 A.2d 915, 924 (Del. 1994); *see also Shutts*, 472 U.S. at 809 ("[T]his lawsuit involves claims averaging about $100 per plaintiff; most of the plaintiffs would have no realistic day in court if a class action were not available.").

To be sure, opting out may sometimes be viable. 7-Eleven, Home Depot, and Target, for instance, were able to opt out of the MDL 1720 damages class—proceeding to file their own cases,

17

with their own counsel, in pursuit of a better bargain.  *See In re Payment Card*, 714 F. Supp. 3d 65, 76 (E.D.N.Y. 2024).  But those larger merchants enjoyed a luxury not available to most, as the average award of $325 per class member could hardly justify the costs of pursuing individual claims.  Absent class members who could not afford to pursue their claims individually, but who did not want to be bound by the Future Release, had a choice: accept an unfair settlement, or opt out and forfeit any relief for past harm.  Federal law forbids putting class members in such an untenable position.

**III.    The Future Release Violates the Identical Factual Predicate Doctrine.**

Beyond the violations of Rules 23(a)(4) and 23(e)(2)(D), the Future Release must be invalidated for the additional—though related—reason that it violates the identical factual predicate doctrine.  That doctrine forbids class representatives from improving overall class recovery by bargaining away unasserted claims that are based on facts not common to all class members.  In other words, representatives may not enhance compensation for common injuries by sacrificing relief for distinct injuries borne only by some.  That is precisely what occurred here.

The identical factual predicate doctrine traces back to the Second Circuit's 1981 decision in *Super Spuds*.  *See supra* Section II.B.  As described above, the Second Circuit rejected a settlement that released claims for liquidated and unliquidated futures contracts, even though the lawsuit brought claims based only on liquidated contracts and payment would be based on those contracts alone.  *See Super Spuds*, 660 F.2d at 18.  The problem was not merely overbreadth; it was misalignment.  The court's concern was that the class representatives would buy a better deal for the class as a whole, to the detriment of some, "by the uncompensated sacrifice of claims of members . . . which were not within the description of claims assertable by the class."  *Id.* at 19.  To avoid this problem, a release of unasserted claims would ordinarily be limited to those claims that relied "on a legal theory different from that relied upon in the class action complaint but

18

depending on the very same set of facts." *Id.* at 18 n.7. That was not the case in *Super Spuds*, where the unasserted claims "depend[ed] not only upon a different legal theory but upon proof of further facts." *Id.*

The following year, in *TBK Partners, Ltd. v. Western Union Corp.*, the Second Circuit further clarified that the identical factual predicate doctrine is intended to ensure that a settlement does not alter the relative positions of class members. 675 F.2d 456 (2d Cir. 1982). There, plaintiffs brought a class action in federal court on behalf of all minority shareholders who challenged the price offered in a short-form merger as too low. *Id.* at 457–59. The parties eventually agreed to a settlement that not only released the federal claims, but which had the effect of enjoining class members from bringing separate state law appraisal claims as well. *Id.* at 459. Objectors to the settlement argued that the district court lacked authority to extinguish the state law claims that were not and could not (for jurisdictional reasons) have been brought in the federal action. *Id.* at 459–60.

The Second Circuit upheld the settlement, concluding that "a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action." *Id.* at 460. The result stemmed from the court's finding that "all class members had the same interest in maximizing the value placed on [their shares], and the settlement treats all members identically." *Id.* at 462. The appraisal claims, though procedurally distinct, turned on precisely the same valuation question that united every class member—no subset of shareholders held claims dependent on facts unique to them. On that basis, the court "conclude[d] that the District Court exercised the extra vigilance required to ensure that a settlement's release of a claim not asserted in the class action does not unfairly disadvantage individual class members." *Id.*

19

With such vigilance applied here, the Future Release cannot stand. By agreeing to the Future Release, the class representatives obtained enhanced compensation for past antitrust injuries common to all by trading away claims for future antitrust injury held by only some—the latter falling outside "the description of claims assertable." *Super Spuds*, 660 F.2d at 19. The winners and losers from such a trade were obvious at the time of settlement—with newer merchants, who planned to continue in business, bearing the brunt of the burden. *See supra* Section II.B. This is the precise sort of uncompensated sacrifice of non-common claims that *Super Spuds* expressly forbids and that *TBK Partners* distinguished.

"In approving the settlement of a class action a court has a responsibility to protect members of the class who have had no opportunity to protect themselves." *Super Spuds*, 660 F.2d at 20. That is what the identical factual predicate doctrine is about. The simple fact here is that unasserted claims held only by some were sacrificed for the benefit of asserted claims shared by all. The Second Circuit has long forbidden such trades.[9]

## IV.    The Future Release Violates Public Policy.

The Future Release should be invalidated for the additional reason that it violates public policy and the long-held "belief that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws." *Minnesota Mining & Mfg. Co. v. N.J. Wood Finishing Co.*, 381 U.S. 311, 318 (1965). This outcome follows naturally from well-established Supreme

---

[9] In *Melito v. Experian Marketing Solutions, Inc.*, the Second Circuit upheld a settlement that included a release for activities that post-dated the close of the class period. 923 F.3d 85, 95 (2d Cir. 2019). But, unlike here, the settlement did not present the issue of some class members benefiting at the expense of others. There, the objector argued only that claims predicated on post-settlement conduct cannot, as a categorical rule, satisfy the identical factual predicate doctrine, because such claims necessarily depend on facts that had not yet occurred when the class action was settled. *See* Brief for Objector-Appellant Kara Bowes, *Melito v. Experian Mktg. Sols., Inc.*, No. 17-3277, Dkt. No. 78, at 47–52 (2d Cir. Jan. 29, 2018). Plaintiffs do not rely on application of such a categorical rule here, though they preserve the argument for appeal.

20

Court precedent and subsequent circuit court caselaw, in which courts have held that a private party cannot contract away future antitrust claims, whether through settlement or other agreement, whether implicit or explicit.

The foundational case is *Lawlor v. National Screen Service Corp.*, 349 U.S. 322 (1955). There, the defendants argued that the plaintiffs' prior settlement barred their new antitrust action since the new allegations concerned "essentially the same course of wrongful conduct." *Id.* at 326–27. Rejecting that argument, the Court explained that "a prior judgment is res judicata only as to suits involving the same cause of action," and the new case concerned distinct causes of action since the conduct "complained of was all subsequent to the [prior] judgment." *Id.* at 328–29. The prior judgment simply could not "extinguish[] claims which did not even then exist and which could not possibly have been sued upon in the previous case." *Id*. at 328.[10] Critically, the Court observed that this result served "the public interest in vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action," while a contrary holding would wrongly "confer on [defendants] a partial immunity from civil liability for future violations." *Id.* at 329.

These same public policy concerns have permeated decades of Supreme Court and circuit court decisions, which have held or otherwise stated that antitrust rights cannot be contracted away.

---

[10] While the Court observed that the complaint alleged certain antitrust violations not contained in the prior suit, that fact merely supplied an "addition[al]" reason for the outcome. *Lawlor*, 349 U.S. at 328. It did not undermine *Lawlor*'s core holding, which hinged on the fact that post-settlement conduct necessarily constitutes a new cause of action. *See Cellar Door Prods., Inc. of Michigan v. Kay*, 897 F.2d 1375, 1377 (6th Cir. 1990) (rejecting argument that *Lawlor* turned on additional antitrust allegations, while explaining that the decision was "predicated on the finding that both suits were not based upon the same cause of action"); *United States v. Gen. Elec. Co.*, 358 F. Supp. 731, 740 (S.D.N.Y. 1973) ("G.E. seeks to distinguish *Lawlor* upon the ground that in the second suit there were also additional allegations as to some new acts which it was claimed the defendants had committed since the earlier judgment. But, in my view, this was merely an additional reason why res judicata did not apply.").

*See, e.g.*, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985) ("[I]n the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy."); *Redel's Inc. v. General Electric Co.*, 498 F.2d 95, 99 (5th Cir. 1974) ("Releases may not be executed which absolve a party from liability for future violations of our antitrust laws."); *Gaines v. Carrollton Tobacco Board of Trade, Inc.*, 386 F.2d 757, 759 (6th Cir. 1967) (explaining that any settlement agreement "executed in a fashion calculated to waive damages arising from future violations of the antitrust laws, would be invalid on public policy grounds"); *Fox Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955) ("Any contractual provision which could be argued to absolve one party from liability for future violations of the anti-trust statutes against another would to that extent be void as against public policy.").

It is true that many of those cases concerned "impermissibly broad releases that released all types of claims." *In re Payment Card*, 2019 WL 6875472, at *26. Yet those courts condemned contractual antitrust immunity in absolute terms, as the above parentheticals demonstrate. If more were needed, the Eighth Circuit in *Fox Midwest Theatres* stated the following: "[T]here was no way that appellees could at all, either intentionally or by legal import of any language used, have made the absolute and continuing obligation [of antitrust compliance] the subject of any possible release or discharge as to the future." 221 F.2d at 179–80. These categorical statements all align with *Lawlor*, where the Supreme Court held that a settlement releasing future antitrust claims, *even those based on a continuing course of conduct*, would confer on defendants an impermissible "partial immunity from civil liability." 349 U.S. at 328. Future immunity is improper, whatever its scope.

22

As the Supreme Court explained, "the private cause of action plays a central role in enforcing [the antitrust] regime," which is of "fundamental importance to American democratic capitalism." *Mitsubishi Motors*, 473 U.S. at 634–35. The Second Circuit has likewise emphasized that antitrust claims vindicate not merely private rights but "the national interest in a competitive economy," with plaintiffs acting as "private attorney[s] general." *Am. Safety Equip. Corp. v. J.P. Maguire & Co.*, 391 F.2d 821, 826 (2d Cir. 1968). Visa and Mastercard sought to purchase immunity from private antitrust enforcement through the 2019 Settlement Agreement. Public policy forbids this—for it is the *public*, not just the plaintiffs, who bear the cost of anticompetitive conduct. The national interest is not for sale.

*     *     *

While the defendants entered into a settlement that offered the possibility of future immunity, they did so knowing full well that they were placing a bet that might not pay. The release, by the express terms of the settlement, would be confined by the bounds of federal law. Because the Future Release falls outside those bounds, it must be set aside, and the defendants must answer for their conduct on the merits. That was the risk they assumed from the start.

## CONCLUSION

For the foregoing reasons, SDNY Plaintiffs' motion for partial summary judgment should be granted.

23

Dated: April 21, 2026                        Respectfully submitted,
      New York, New York

                                  **BRESSLER LLP**

                                  By:   /s/ *Jason Bressler*
                                            Jason Bressler
                                            Kenneth L Bressler
                                            175 Varick Street, Suite 410
                                            New York, NY 10014
                                            Tel.: (212) 444-2388
                                            jason.bressler@bresslerllp.com
                                            ken.bressler@bresslerllp.com

                                  *Attorneys for SDNY Plaintiffs*

24

## **Certificate of Compliance**

Pursuant to Local Civil Rule 7.1(c), I certify that the foregoing memorandum is 7,770 words, exclusive of the caption page, table of contents, table of authorities, and signature block. The basis of my knowledge is the word count feature of the word-processing system used to prepare this memorandum.

Dated:  April 21, 2026                              By:   /s/ *Jason Bressler*
                                                                           Jason Bressler