UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

This document refers to: <u>Barry's Cut Rate Stores Inc. v. Visa Inc.</u>, No. 05-md-1720 (E.D.N.Y.)

-------------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

05-md-1720 (BMC)

**COGAN**, District Judge.

In June 2024, this Court (Brodie, C.J.) denied preliminary approval of a previous settlement reached between the equitable relief class plaintiffs ("Plaintiffs") and defendants Visa and Mastercard (the "Networks" and, with the issuing bank-defendants, "Defendants"). Less than a year later, Plaintiffs moved for preliminary approval of a new settlement (the "Amended Settlement") before the undersigned.

In a case as protracted and expansive as this one, it is unsurprising that the Court received nearly 40 objection-letters to the Amended Settlement. However, it is too soon to tell whether the various complaints raised are pervasive among the 12-million-merchant class or confined to a vocal minority. Besides, on a motion for preliminary approval, and even on a motion for final approval, the Court's responsibility is not to determine whether the settlement is ideal by class members' varying standards, but whether it is fair, reasonable, and adequate under the Rule 23(e)(2) standards. As set forth below, the Court has concluded that the Amended Settlement meets these criteria. Therefore, the Court grants preliminary approval.

## BACKGROUND

### I.    Relevant Procedural History

In October 2005, several complaints asserting similar antitrust claims against the Networks and various issuing banks ("issuers" – *i.e.*, banks that issue credit and debit cards) were consolidated for pretrial purposes and transferred to this District.  In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., No. 05-md-1720, 2008 WL 115104, at *1 (E.D.N.Y. Jan. 8, 2008).  The cases ceaselessly poured in over the next couple years (and ultimately, over the next couple decades) – some styled as class actions, others styled as individual actions.  Id. at *1.  In April 2006, plaintiffs in the putative class actions filed a consolidated amended class complaint that defined two subclasses: one seeking damages and the other seeking equitable relief.  Id. at *1-2.

In November 2012, the Court provisionally certified a class and preliminarily approved a class settlement agreement between class plaintiffs and Defendants.  In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., No. 05-md-1720, 2012 WL 12929536, at *1-2 (E.D.N.Y. Nov. 27, 2012).  The Court granted class certification and final approval of the settlement agreement in 2013; however, on appeal, the Second Circuit vacated class certification and reversed final approval.  In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 986 F. Supp. 2d 207 (E.D.N.Y. 2013) ("Interchange Fees I"), rev'd and vacated, 827 F.3d 223 (2d Cir. 2016) ("Interchange Fees II").  The Second Circuit concluded that "members of the (b)(2) class were inadequately represented," because of a fundamental conflict between the interests of the (b)(3) class and the (b)(2) class.  See Interchange Fees II, 827 F.3d at 231, 233-34.  Whereas "[t]he former would want to maximize cash compensation for past harm, [] the latter would want to maximize restraints on network rules to prevent harm in the future."  Id. at 233.  The class counsel and representatives were thus "in the position to trade diminution of

2

(b)(2) relief for increase of (b)(3) relief," and the resulting settlement appeared to have done so. See id. at 234.

The Second Circuit advised that a "structural protection" against trading of relief "is division of the class into homogenous subclasses ... with separate representation." Id. at 234 (quoting Ortiz v. Fibreboard Corp., 527 U.S. 815, 856 (1999)). Thus, on remand, this Court appointed counsel to two putative classes: an equitable relief class and a damages class.[1] In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., No. 05-md-1720, 2016 WL 8138988, at *1 (E.D.N.Y. Nov. 30, 2016). The equitable relief class – i.e., Plaintiffs – filed their complaint on March 31, 2017.

Plaintiffs represent a class of over 12 million merchants who accept the Networks' credit and debit cards and who are thus bound by the Networks' rules. Plaintiffs challenge a number of the Networks' rules as anticompetitive, including:

- The "Honor All Cards" rule, which requires merchants to accept all Visa- or Mastercard-branded credit or debit cards if they accept any of them, no matter the type of card;

- The "Honor All Issuers" rule, which requires merchants to accept all Visa- or Mastercard-branded credit or debit cards if they accept any of them, no matter which bank issued the card;[2]

- The "All Outlets" rule, which requires merchants who accept the Networks' cards to accept those cards at all of their locations;

- The "No Discounting" and "No Surcharging" rules which, respectively, prohibit merchants from offering discounts to cardholders based on the issuer of those cards and limit merchants' ability to impose surcharges on the Networks' cards;

---

[1] The Court granted final approval of a settlement between the damages class and Defendants in 2019, which the Second Circuit affirmed in 2023. In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., No. 05-md-1720, 2019 WL 6875472, at *36 (E.D.N.Y. Dec. 16, 2019), aff'd sub nom. Fikes Wholesale, Inc. v. HSBC Bank USA, N.A., 62 F.4th 704 (2d Cir. 2023).

[2] The complaint groups this rule and the previously-listed rule under the "Honor All Cards" heading, but the Court addresses them separately, consistent with the general approach of the parties and the objecting class members.

3

- The "Anti-Discrimination" rules, which prohibit merchants from taking actions that might favor the use of one type of card or issuer's card over another (*e.g.*, advertising a preference for one issuer's cards); and

- The "No-Bypass" rules, which prevent or discourage issuers from settling transactions directly with merchants (or through a third-party network), and instead force issuers to go through the Networks' own transaction-processing systems.

Additionally, Plaintiffs challenge the Networks' "default interchange fees," which are fees that are assessed to the merchants or their banks ("acquiring banks" or "acquirers") in connection with all Visa and Mastercard transactions in the absence of a negotiated fee. Plaintiffs claim that the challenged rules (the "Anti-Steering Restraints"), in combination with the default interchange fees, prevent issuers from having to compete for merchant acceptance and result in supracompetitive total prices for transactions on the Networks.

In September 2021, the Court certified the equitable relief class as a mandatory, non-opt-out class pursuant to Rule 23(b)(2). DDMB, Inc. v. Visa, Inc., No. 05-md-1720, 2021 WL 6221326, at *46-50 (E.D.N.Y. Sept. 27, 2021). The Court reasoned that "[d]ue to the nature of the relief being sought, all merchants – regardless of whether they would choose to opt out of the class or not – would benefit from the equitable relief provided," and, accordingly, "neither notice nor an opportunity to opt out [was] required." Id. at *47-48.

Following class certification, Defendants filed Daubert and summary judgment motions, and Plaintiffs filed a motion for partial summary judgment. The Court denied Defendants' Daubert motions and admitted, in substantial part, the expert reports of Professors Dennis Carlton and Joseph Stiglitz. The Court also granted Defendants' summary judgment motions with respect to Plaintiffs' one-sided claims in light of Ohio v. American Express, 585 U.S. 529 (2018) ("Amex"),[3] and with respect to Plaintiffs' monopolization claims; the Court denied

---

[3] In Amex, the Supreme Court explained that credit- and debit-card networks are two-sided transaction platforms, meaning "that they cannot make a sale to one side of the platform" – cardholders – "without simultaneously making

Defendants' motions with respect to (1) Plaintiffs' claims based on Defendants' Europay, Mastercard, and Visa ("EMV") liability shift;[4] (2) Plaintiffs' two-sided claims under Amex; and (3) Plaintiffs' standing as direct purchasers under Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977).[5]  Finally, the Court denied Plaintiffs' motion for a ruling that one of Defendants' proffered procompetitive justifications was not cognizable as a matter of law.

In the background, the parties engaged in mediation in hopes of resolving the case short of trial.  Plaintiffs moved for preliminary settlement approval of a settlement agreement with the Networks (the "First Settlement"[6]) on March 26, 2024.  However, after receiving written objections from the class and hearing oral argument on the motion, the Court denied preliminary settlement approval.  In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., No. 05-md-1720 (E.D.N.Y.), 2024 WL 3236614, at *11 (E.D.N.Y. June 28, 2024) ("Interchange Fees III").  There were three factors that weighed against preliminary approval: (1) the adequacy of the relief (particularly considering the costs, risks, and delay of trial and appeal); (2) the treatment of class members relative to one another; and (3) the ability of the defendants to withstand a greater judgment.  See id. at *21-28, *35-41.  The Court was particularly concerned that the First Settlement did not provide any relief from the Honor All Cards rule, and that the

---

[4] EMV technology is "a global standard for credit cards that uses computer chips and chip readers to authenticate (and secure) chip-card transactions."  B & R Supermarket, Inc. v. Mastercard Int'l Inc., No. 17-cv-2738, 2021 WL 234550, at *1 n.1 (E.D.N.Y. Jan. 19, 2021).  When Visa and Mastercard implemented EMV liability shift, liability for fraudulent transactions with merchants that had not adopted EMV-compliant terminals shifted from issuers (cardholders' banks) to acquirers (merchants' banks) or the merchants themselves.

[5] Illinois Brick, as courts have subsequently interpreted it, limits standing for federal antitrust claims to those who are the "direct purchasers" from antitrust violators.  See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., No. 05-md-1720, 2024 WL 1014159, at *7 n.14 (E.D.N.Y. Mar. 8, 2024) (collecting cases).

[6] Of course, this was not the first settlement reached in this action.  See Interchange Fees I, 986 F. Supp. 2d 207 (E.D.N.Y. 2013).  However, it was the first settlement reached between the 23(b)(2) Plaintiffs and the Networks.

core relief that it did provide – surcharging reforms and a modest reduction in default interchange rates – was insufficient. See id.

## II.    The Amended Settlement

Following the Court's denial of preliminary approval of the First Settlement, the parties restarted their settlement discussions and engaged a new mediator to aid in the process. They also sought to schedule trial dates for the following year in the event that their settlement efforts proved unsuccessful, but a trial date was never scheduled. On September 5, 2025, this case was reassigned from Chief Judge Brodie to the undersigned.

On November 10, 2025, the parties moved for preliminary approval of the Amended Settlement. The Court again solicited written objections from class members, both represented and *pro se*, and directed the parties to file reply memoranda. The Court held a hearing on April 27, 2026, during which it heard arguments from the parties and objections from the following class members: Circle K and National Association of Convenience Stores (together, "NACS"); National Retail Federation and Retail Industry Leaders Association (together, the "Merchant Trade Groups"); Walmart, Inc.; and Yabla, Inc and the other merchant plaintiffs in In re Visa Debit Card Antitrust Litigation, No. 24-cv-7435 (S.D.N.Y.) (together, the "Debit Card Plaintiffs").

### A.    Comparison of the Settlements' Key Terms

The Amended Settlement provides more extensive relief than the First Settlement, notwithstanding the objections to its adequacy. The Court compares the Settlements' key terms below.

#### 1.    "Honor All" Relief

The First Settlement offered no relief from the Honor All Cards rule, meaning that a merchant was forced to accept all of Visa or Mastercard's cards if it accepted any of them. Thus,

6

if a merchant accepted Visa's standard cards, it would also have to accept Visa's premium cards, which come with higher interchange fees.  By contrast, the Amended Settlement would effectively repeal the Honor All Cards rule: merchants would be able to accept standard cards while rejecting higher-cost premium cards, and/or accept consumer cards while rejecting higher-cost commercial cards.  To facilitate this, the Amended Settlement would require the Networks to ensure that their premium and commercial cards are readily identifiable at the point-of-sale.[7]

Both Settlements would modify the Networks' "Honor All Wallets" rules, which currently require that a merchant which accepts payment from digital wallets must accept all payments from all digital wallets that include a Visa or Mastercard payment card.  The Settlements would require the Networks to modify the Honor All Wallets rules to allow merchants to accept some digital wallets (*e.g.*, Apple Wallet) and decline others (*e.g.*, Google Wallet), subject to several restrictions.  The key difference is that, under the First Settlement, the Networks carved out an exception for digital wallets of their own creation (*e.g.*, a "Visa Wallet" or "Mastercard Wallet," neither of which currently exists).  The Amended Settlement gets rid of that exception, further empowering merchants to choose which digital wallets to accept.

Importantly, neither Settlement would offer any relief from the Honor All Issuers rule, under which a merchant is forced to accept Visa or Mastercard's cards from all issuers if it accepts that network's cards from any issuer.

### 2.   "All Outlets" Relief

Both Settlements would provide for changes to the Networks' All Outlets rules to allow merchants to selectively decline acceptance of certain categories of cards "at all outlets that

---

[7] For example, the Networks will conspicuously place the words "Business," "Corporate," or "Commercial" on newly-issued commercial credit cards, and the words "Infinite" or "Signature" (for Visa) or "World," "World Elite," or "World Legend" (for Mastercard) on newly-issue premium credit cards.

operate under the same trade name or banner in the United States," even if that merchant accepts those cards at outlets operating under a different trade name or banner. For example, a merchant would be able to decline Mastercard's premium cards at all of its outlets operating under the same trade name or banner, even if the merchant were to accept Mastercard's premium cards at its outlets operating under a different trade name or banner.

Both Settlements would also allow merchants to run pilot programs where they could test how rejecting, surcharging, and/or discounting certain cards would affect their business. The First Settlement would have allowed merchants to run these pilot programs for up to 120 days in up to 20% of a merchant's outlets each year, whereas the Amended Settlement would increase that term to 180 days and provide additional testing ability for merchants operating in at least five states.

### 3.    "No Discounting" Relief

Both Settlements would provide for changes to the Networks' No Discounting rules to clarify that discounting by issuer, brand, and product is permitted. With respect to Mastercard, this change would be partly substantive, as Mastercard has never before allowed discounting at the issuer level.

### 4.    "No Surcharging" Relief

Both Settlements would provide for changes to the Networks' restrictions on merchants' ability to surcharge for the use of cards that are more expensive for them to accept. Specifically, the Settlements would allow all merchants to surcharge at the brand or product level – albeit not at the issuer level – up to the lesser of the full cost of acceptance or 3% of the transaction. However, under the First Settlement, merchants that accepted American Express or Discover, or any other "comparator" brand that limited surcharging, would not have been able to surcharge

more than 1%. By contrast, under the Amended Settlement, merchants would be able to surcharge the Networks' cards up to 3% regardless of whether the merchants were to accept or surcharge comparator cards.

### 5. Merchant Buying Groups

Both Settlements would provide for revisions to the Networks' rules to ensure that there are no restrictions on merchants' rights to organize merchant buying groups to collectively negotiate rates (including interchange rates) for the Networks' services and to buy those services as a group.

### 6. Rate Caps and Rollbacks

Both Settlements would impose systemwide limits on credit card interchange rates for five years in the form of (1) posted interchange rate caps and (2) a reduction to the combined average effective interchange rate. Under the First Settlement, the rate reduction would have been seven basis points; under the Amended Settlement, that reduction would be ten basis points.[8] Additionally, under the Amended Settlement, large merchants that pay negotiated interchange rates would get a *pro rata* reduction in those rates, whereas the First Settlement provisioned no such relief.

The Amended Settlement offers further relief: it would cap posted interchange rates on standard consumer credit cards at 125 basis points for at least eight years, marking a 62-basis-point reduction from the current average posted rate on standard cards. As a result, the gap between average posted interchange rates on premium and standard cards, which is currently 45 basis points, would become 100 basis points. Plaintiffs contend that with this greater gap,

---

[8] A basis point is equivalent to 0.01%.

9

merchants will have a greater economic incentive to decline acceptance of premium consumer credit cards or offer discounts to customers who use standard cards.

### 7. Merchant Education Program

Both Settlements would provide for the commencement of a merchant education program to advise merchants how to use the provisioned relief to their benefit. The Amended Settlement would set up a $21 million fund for the establishment of the program, which is $6 million more than the First Settlement would have provided. The Amended Settlement would also provide additional support for merchants in states that restrict surcharging.

### 8. Release

Both Settlements contain a release that would require all class members to "irrevocably waive, and fully, finally, and forever settle, discharge, and release" all Defendants "from any and all manner of claims, demands, actions, suits, and causes of action, ... to the extent that they seek any form of declaratory, injunctive, or equitable relief" that relates to any conduct that was or could have been alleged or raised in this case. Under the First Settlement, the release would have covered any potential cause of action that may have accrued as of the date of final settlement approval and for the five years after the commencement of the average effective rate limit. Under the Amended Settlement, the release would cover any potential cause of action that may accrue as of 90 days after final settlement approval and until the later of eight years after that date or five years after the conclusion of all appeals of final settlement approval.

### B. Objections to the Amended Settlement

The objections to the Amended Settlement run the gamut. Objectors have criticized the process by which settlement was reached; questioned the sufficiency and practicality of the relief provided; belabored the importance of the relief omitted; and challenged the adequacy of their

10

representation.  Below, the Court summarizes the objections to the Amended Settlement's more significant terms.[9]

### 1.    "Honor All" Relief

A frustration expressed amongst many of the objectors is that they will not be receiving any relief from the Honor All Issuers rule.  Objectors contend that without the ability to decline cards from certain issuers, they are unable to spur competition between issuers to get better rates.  They further contend that if they cannot reject cards from certain issuers, they are forced to absorb the risks and liabilities associated with those issuers.  They explain that authorization practices, fraud-control protocols, and chargeback procedures vary dramatically between issuers, and can result in costs – monetary and operational, among others – to merchants.

Although class members previously clamored for the ability to reject certain card products, most of the objectors now argue that repeal of the Honor All Cards rule is virtually useless to them.  For example, Walmart argues that "no large national merchant can afford to drop [premium] cards" because those cards make up "[t]he vast majority of credit card transactions."  Walmart also maintains that *because* no large national merchant can afford to drop premium cards, no large national merchant can credibly threaten that it will drop premium cards (whereas a credible threat could at least give them negotiating power with the Networks to lower their interchange rates).  Other objectors raise the additional concern that issuers can make the Honor All Cards relief ineffectual by simply moving cards from one category to another.  They also challenge the relief as unworkable because merchants need to know which cards are

---

[9] The Court set a December 12, 2025 deadline for submitting objections to preliminary settlement approval.  The Court declines to consider, as untimely, any objection-letters submitted after that date.

standard to selectively accept them and to communicate this selective acceptance to cardholders, but there is no set list of standard cards.

### 2.    Surcharging Ability

There are, principally, two strains of objections concerning surcharging: that merchants can't do it, and that they won't do it.  On the latter, objectors say that introducing differentiated pricing (by brand or product) conflicts with their business models or would otherwise frustrate customers.  On the former, objectors flag that some states cap surcharging to 2 to 3% or ban surcharging altogether.  This means that merchants operating entirely in those states cannot benefit from the surcharging relief.  This also means that large national merchants operating simultaneously in states that do and states that don't limit or ban surcharging will have to impose inconsistent, state-specific surcharging policies if they want to benefit from the relief at all.

### 3.    Discounting Ability

As with surcharging, some objectors say that discounting (by brand, product, or issuer) is something they simply won't do for fear of defying customers' expectations of standard pricing.  Separately, objectors argue that the Networks can limit the utility of issuer-level discounts by preserving existing agreements with merchants under which merchants do not discount and by simultaneously enforcing rules that prohibit merchants from disparaging their brands or encouraging customers to use cards from one issuer over another.

### 4.    Interchange Rates

Objectors argue that the ten-basis-point reduction to the average effective interchange rate for five years is insufficient.  Whereas the Networks' current rates are between 200 and 300 basis points, some experts have opined that interchange rates would be significantly less than *100* basis points in a truly competitive market.  The objectors add that the savings they would

12

experience from the interchange rate reduction would not adequately offset the costs that they've incurred to date in interchange fees. Some objectors, like NACS, go a step further, arguing (albeit without much explanation as to feasibility) that default interchange rates are not necessary for the credit card industry to operate.

Finally, objectors assert that the Networks will subvert the interchange rate relief. To achieve the ten-basis-point reduction to the average effective interchange rate, objectors posit that the Networks could reduce interchange rates for commercial cards while leaving interchange rates for consumer cards unchanged, or negotiate reductions with a few large merchants while leaving the vast majority of merchants with no rate relief. They claim that the Networks could also increase network fees to recoup money lost through the reduction in interchange fees. Finally, objectors worry that in the three years when the rate relief has expired but the release remains in place, the Networks will be able to resume rate increases without challenge.

### 5.    No-Bypass Rules

Walmart, purportedly speaking on behalf of large national merchants, voices the concern that the No-Bypass rules remain, meaning that issuers must go through the Networks to process transactions and cannot settle those transactions directly with the merchants. Walmart argues that removing these rules would allow large national merchants to negotiate directly with issuers to ultimately lower interchange fees. Walmart, which appears to be the only objector raising this objection, contends that failure to secure this relief is one of many examples of Plaintiffs (small local merchants) trading in the interests of large national merchants.

### DISCUSSION

## I.    Legal Standard

During the preliminary approval stage, the Court must consider whether it "*will likely be able to*: (i) approve the proposal under Rule 23(e)(2) and (ii) certify the class for purposes of

13

judgment on the proposal." In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 330 F.R.D. 11, 28 (E.D.N.Y. 2019) (emphasis in original). "Even at the preliminary approval stage, the Court's role in reviewing the proposed settlement 'is demanding because the adversariness of litigation is often lost after the agreement to settle.'" In re GSE Bonds Antitrust Litig., 414 F. Supp. 3d 686, 692 (S.D.N.Y. 2019) (quoting Zink v. First Niagara Bank, N.A., 155 F. Supp. 3d 297, 308 (W.D.N.Y. 2016)). Thus, in deciding whether to grant preliminary approval, the Court determines whether it will likely be able to make the findings set forth under Rule 23(e)(2), which are that:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Paragraphs (A) and (B) are the procedural analysis factors, which require the Court to examine "the conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. Paragraphs (C) and (D) are the substantive analysis factors, which require the Court to examine "[t]he relief that the settlement is expected to provide to class members." Id.

14

In addition to the Rule 23(e)(2) factors, the Court considers whether the factors articulated in City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974), are met.  Those factors are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement [] in light of the best possible recovery; and (9) the range of reasonableness of the settlement [] to a possible recovery in light of all the attendant risks of litigation.

Id. at 463 (citations omitted).  "There is significant overlap between the Rule 23(e)(2) and Grinnell factors, which complement, rather than displace each other." Interchange Fees III, 2024 WL 3236614, at *12.  Specifically, Grinnell factors (1), (3), (4), (5), and (6) overlap with Rule 23(e)(2)(C)(i), "the costs, risks, and delay of trial and appeal," and so the Court will analyze those factors together.  See id. at *21.

## II.  Analysis

### A.    Adequacy of Representation

Rule 23(e)(2)(A) requires the Court to consider whether "the class representatives and class counsel have adequately represented the class."  "Determination of adequacy typically 'entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'"  Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 99 (2d Cir. 2007) (quoting Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000)).

On Plaintiffs' previous motion for preliminary settlement approval, the Court determined that it was likely to find that the class representatives and class counsel adequately represented

15

the class.  See Interchange Fees III, 2024 WL 3236614, at *14-19.  Nothing has changed since that time that would warrant a different result: the class representatives and class counsel are the same, as are the objections to their adequacy in those roles.  Further, it remains the case that "[a]ll class members have the same interests to eliminate the rules that permit [the Networks] to maintain supracompetitive interchange fees."  Id. at *17.

Some of the objectors believe that the class representatives, which are small local merchants, traded in the interests of large national merchants to benefit themselves, and that class counsel traded in a victory at trial for a paycheck now.  But the objectors have no evidence of any procedural unfairness by which the Amended Settlement was reached.[10]  Fundamentally, their challenge is "more appropriately directed at the adequacy of relief" than the adequacy of their representatives or counsel.  Id.  Different class members have experienced different harms, and so the relief obtained will likely impact each of them differently; that this ends up being the result might affect the adequacy of the *relief*, but it does not automatically undermine the adequacy of the representation.  It certainly does "not negate the fact that [the Networks] have acted on grounds generally applicable to the class and that each merchant in the class stands to benefit from equitable relief from the [r]estraints."  See DDMB, 2021 WL 6221326, at *45.

Again, nothing has changed since the Court's prior determination of adequacy.  "That ruling is the law of the case: absent 'cogent and compelling reasons,' the Court is not going to revisit it."  Silver v. Top Line Reporting Inc., No. 25-cv-4375, 2026 WL 221308, at *3

---

[10] A few class members note that they reached out to class counsel to provide input, but that class counsel refused to share information about settlement negotiations without those class members signing nondisclosure agreements, which the class members declined to do.  There is no fundamental problem with class counsel rejecting, limiting, or conditioning the input of class members.  In fact, there's some sense to not having "too many cooks in the kitchen."  There would be no point in having class counsel and class representatives if every individual class member was nonetheless entitled to participate in litigation and settlement decisions.

16

(E.D.N.Y. Jan. 28, 2026) (quoting In re Peters, 642 F.3d 381, 386 (2d Cir. 2011)).  Accordingly, the Court finds that this factor weighs in favor of granting preliminary approval.

### III.    Arm's Length Negotiations

Plaintiffs maintain that the Amended Settlement was negotiated at arm's length with the assistance of Judge James Orenstein (Ret.), whom they retained in July 2024 after the Court denied preliminary approval of the First Settlement.  Judge Orenstein is a mediator at JAMS and was formerly a United States Magistrate Judge in this District.  Of Judge Orenstein's 16 years on the bench, 15 of them were on this case.  Thus, Judge Orenstein brings a deep understanding of the legal and factual issues involved, as well as of the strengths and weaknesses of the parties' positions.

Plaintiffs and Judge Orenstein describe continuous, productive negotiations since the parties resumed settlement discussions in July 2024.  Judge Orenstein facilitated multiple exchanges of detailed financial data and documents, plus expert economic analyses of that data; held five all-day in-person mediation sessions and seven virtual discussions; and conducted over thirty *ex parte* calls and Zoom sessions.  According to Judge Orenstein, "[t]he negotiations were occasionally contentious, and at all times the parties remained ready to revert to their litigation positions if agreement could not be reached."  Judge Orenstein adds that there was no discussion of attorneys' fees and expenses or service awards for the class representatives until the parties reached complete agreement as to all issues concerning class-wide relief.

On balance, the Court sees "no reason to doubt [c]lass [c]ounsel's familiarity with the ins-and-outs of the case," nor any "indication that the [Amended Settlement] is anything other than the product of hard-fought, arm's-length negotiations between adversaries."  Interchange Fees III, 2024 WL 3236614, at *20.  Accordingly, the Court finds that this factor under Rule 23(e)(2)(B) weighs in favor of granting preliminary approval.

**IV.**     <u>**Adequate Relief for the Class**</u>

In assessing whether a settlement provides adequate relief for the class under Rule

23(e)(2)(C), the Court must consider:

> (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3).

The first subfactor – costs, risks, and delay of trial and appeal – overlaps significantly with

several <u>Grinnell</u> factors, so the Court will consider those factors together.  The Court will also

consider the proposed release from liability as an additional factor under this section, as it affects

the determination of the fairness, reasonableness, and adequacy of class relief.

**A.**     **The Costs, Risks, and Delay of Trial and Appeal**

To assess the costs, risks, and delay of trial and appeal, the Court will consider the

following <u>Grinnell</u> factors: (i) the complexity, expense, and likely duration of the litigation;

(ii) the risks of establishing liability;[11] (iii) the risks of maintaining the class through the trial;

and (iv) the range of reasonableness of the settlement in light of the best possible recovery and in

light of all the attendant risks of litigation.

**1.**     **The Complexity, Expense, and Likely Duration of the Litigation**

Settlement is favored when litigation is likely to be "complex, expensive, or drawn out."

<u>In re GSE Bonds</u>, 414 F. Supp. 3d at 693.  "Class action suits in general have a well-deserved

reputation as being most complex."  <u>Interchange Fees III</u>, 2024 WL 3236614, at *21 (internal

---

[11] The inquiry under Rule 23(e)(2)(C)(i) also implicates the risks of establishing damages, but because the class seeks only equitable relief, the Court need not address this factor.  To the extent that this factor can be analogized to the context of an injunctive relief class, the Court acknowledges that, even if a (b)(2) class prevails on liability at trial, the injunctive relief provided by the Court may be less substantial or extensive than the relief sought by Plaintiffs.  The Court discusses this possibility *infra*.

quotation marks and citations omitted).  "In particular, numerous federal courts have recognized that federal antitrust cases are complicated, lengthy, and bitterly fought, as well as costly." Id. (internal quotation marks and citations omitted).

The Court previously held that this factor weighed in favor of granting preliminary approval, see id. at *22, and nothing has changed since then which would warrant a contrary conclusion.  This has proven to be a complex, costly, time-consuming case.  And although it may be *trial-ready* in the sense that there are no outstanding pretrial motions, it is certainly not *trial-ready* in the sense that it could be tried tomorrow.  The parties last estimated a trial of four to eight weeks, meaning that it will take significant time not just to prepare to try this case, but to actually try it.  Therefore, this factor weighs in favor of granting preliminary approval.

### 2.      The Risks of Establishing Liability

"This factor does not require the Court to adjudicate the disputed issues or decide unsettled questions; rather, the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement." In re Glob. Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 459 (S.D.N.Y. Nov. 24, 2004).  "Courts approve settlements where plaintiffs would have faced significant legal and factual obstacles to proving their case." Id.

The Court previously held that this factor weighed against granting preliminary settlement approval.  Among other things, it reasoned that Plaintiffs' claims "survived numerous Daubert and summary judgment motions, and ... what remain[ed] to be determined [was] only the sufficiency of the evidence, rather than the legal sufficiency of Plaintiffs' theories of liability." Interchange Fees III, 2024 WL 3236614, at *23.  Plaintiffs have cleared substantial hurdles to liability, which certainly has given them leverage in settlement negotiations.  But the fact of the matter is, Plaintiffs could still lose at trial.

19

Principally, the Court sees obstacles to Plaintiffs satisfying their burden at trial that the Networks' rules unreasonably restrain trade under the rule of reason.[12]  Plaintiffs will bear the initial burden to show that the challenged rules have "had an actual adverse effect on competition as a whole in the relevant market," and the ultimate burden to show "that any legitimate competitive benefits offered by [the Networks] could have been achieved through less restrictive means."  See 1-800 Contacts, Inc. v. Fed. Trade Comm'n, 1 F.4th 102, 114 (2d Cir. 2021) (citing North Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc., 883 F.3d 32, 42 (2d Cir. 2018), then quoting Geneva Pharm. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 507 (2d Cir. 2004)).  In so doing, Plaintiffs will have to account for both the merchant-side and the cardholder-side of the market.  See Amex, 585 U.S. at 544-45.

The Networks maintain that the credit and debit markets have seen "skyrocketing output, falling prices, and flourishing quality and innovation."  They also maintain that each of their challenged rules have procompetitive benefits.  For example, default interchange rates eliminate the need for millions of bilateral negotiations on rates; the Honor All rules provide cardholders and issuers with assurance that their cards will be widely accepted; and the No Surcharging rules protect cardholders from penalties for using their preferred forms of payment.  Finally, the Networks maintain that they could not achieve these and other procompetitive benefits without their challenged rules.

The Court expressed at the preliminary settlement approval hearing that the Networks may want to consider taking this to trial.  This was the Court's admonition to Plaintiffs, and to

---

[12] Under the rule of reason analysis, an antitrust plaintiff "must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful."  Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006).

20

the objectors, that establishing liability was not a foregone conclusion.  Thus, the Court finds that this factor weighs in favor of granting preliminary approval.

### 3.     The Risks of Maintaining the Class Through Trial

"Although the risk of maintaining a class through trial is present in [every] class action, this factor [nevertheless] weighs in favor of settlement where it is likely that defendants would oppose class certification if the case were to be litigated."  Interchange Fees III, 2024 WL 3236614, at *23 (internal quotation marks and citations omitted).  On this issue, nothing has changed since the last motion for preliminary settlement approval: the Networks still have not indicated an intention to move for decertification of the class.  Although some objectors have raised the specter of decertification, they would likely seek that relief only if this case does *not* proceed to trial – that is, if the Court approves (or is poised to approve) the Amended Settlement.  Thus, as before, the Court finds that this factor is neutral.

### 4.     The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and All the Attendant Risks of Litigation

"[E]ssential to analyzing a settlement's fairness is 'the need to compare the terms of the compromise with the likely rewards of litigation.'"  In re Citigroup Inc. Sec. Litig., 965 F. Supp. 2d 369, 384 (S.D.N.Y. 2013) (quoting Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982)). "[T]he question for the Court is not whether the settlement represents the highest recovery possible ... but whether it represents a reasonable one in light of the many uncertainties the class faces[.]"  Id.

Plaintiffs surely understand, even if they do not concede, that the Amended Settlement is not a slam dunk.  The objectors identify several things that they want to do but can't (*e.g.*, rejecting cards at the issuer-level, surcharging at the issuer-level) and that they theoretically can do but won't (*e.g.*, rejecting premium cards), and point to a plethora of other ways that the

21

Amended Settlement is lacking.  The Court has considered all of the objections and certainly, many of them have merit.  But the question is not whether the Amended Settlement constitutes the best possible recovery, *end stop* – it's whether the Amended Settlement constitutes the best possible recovery in light of what can be gained and lost through trial.  None of the objectors have persuaded the Court that they will, or even can, get more through trial.

As discussed above, there is a legitimate risk that Plaintiffs will not be able to establish liability at trial.  Plus, it's a safe bet that if they do succeed, the Networks will appeal.  There is also a risk, a bigger one in comparison, that Plaintiffs will not secure the relief that the Amended Settlement offers, much less the additional relief on which the objectors insist.

For example, most of the objectors argue that the ten-basis-point-reduction to the combined average effective interchange rate is *de minimis*.  Fair enough.  But this is a type of relief that Plaintiffs cannot secure through trial, as courts lack the power to set rates or regulate prices.  Prentis v. Atlantis Coast Line Co., 211 U.S. 210, 226 (1908) ("The establishment of a rate is the making of a rule for the future, and therefore is an act legislative, not judicial, in kind.").  Plus, the rate reduction is greater than the one proposed under the First Settlement, and will – unlike under the First Settlement – apply *pro rata* to the interchange rates negotiated by large national merchants.  Finally, for what it's worth, the rate reduction is not supposed to compensate merchants for past overcharges; that's what the (b)(3) settlement is for.  Rather, the rate reduction will allow for cost savings and certainty while the rules take hold in the market.

In rejecting preliminary approval of the First Settlement, the Court underscored the significance of the omitted "Honor All" relief.  This was the relief that Plaintiffs had "continuously argued for, and [which] would offer significantly more choice to all [c]lass [m]embers," such that its absence "suggest[ed] that the relief offered in the Settlement [fell]

22

short of the 'best possible' recovery." Interchange Fees III, 2024 WL 3236614, at *27. The Amended Settlement repeals the Honor All Cards rule and resolves the Court's concern about the First Settlement's limits on Honor All Wallets relief.

Many objectors see the Amended Settlement's preservation of the Honor All Issuers rule as a fatal flaw. Taking a holistic view of the Amended Settlement (and of the risks of continued litigation), the Court disagrees. The Court must also note that some of the objectors' arguments for repeal of the Honor All Issuers rule give the Court pause. Objectors say that they aren't going to reject cards at the product-level because doing so would anger their customers – wouldn't rejecting cards at the issuer-level have the same result? Objectors also say that without Honor All Issuers relief, they have no way of spurring competition among issuers for better rates – but isn't that what issuer-level discounting would enable them to do? Setting its skepticism aside, the Court can certainly agree that elimination of the Honor All Issuers rule would benefit merchants. But the presence of that relief cannot be the standard for settlement approval, especially considering the other substantial relief that the Amended Settlement provides.

The Court has considered Plaintiffs' best possible recovery at trial and the attendant risks of litigation – that is, the risk of winning less or losing everything – and finds that these factors weigh in favor of granting preliminary approval.

### B.    Effectiveness of Distributing Relief to the Class

"The Court does not consider this factor where the only relief sought is equitable, and no method of distribution is required." Interchange Fees III, 2024 WL 3236614, at *29. Thus, this factor is, for all intents and purposes, neutral.

23

**C.**      **The Terms of Any Proposed Award of Attorneys' Fees**

Where attorneys' fees and costs are not paid from a common fund, and money paid to attorneys is "entirely independent" of any award to class members, "the Court's fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest between attorneys and class members." Sow v. City of New York, No. 21-cv-533, 2024 WL 964595, at *6 (S.D.N.Y. Mar. 5, 2024) (quoting McBean v. City of New York, 233 F.R.D. 377, 392 (S.D.N.Y. 2006)).

The Settlement provides that within twenty days of the Court's approval of any attorneys' fees application, Defendants will pay the approved amounts "up to $206,000,000," with Visa paying up to two-thirds of the approved amount and Mastercard paying up to one-third. Plaintiffs note that the agreed-upon amount was upwardly adjusted from the amount proposed with the First Settlement to account for another seventeen months of advocacy and expenses. Although not separately provided for, the Amended Settlement defines "Attorneys' Fees and Expenses" to include "any incentive or service awards to be paid to a Rule 23(b)(2) Class Plaintiff." The terms of the Networks' payment of attorneys' fees and any approved service awards were discussed "only after reaching final agreement on all substantive terms of the Amended Settlement."

The Court concludes that the terms of any proposed award attorneys' fees raises no issues with respect to whether the interests of the class members are adequately protected. Therefore, this factor weighs in favor of granting preliminary approval.

**D.**      **Release from Liability**

The Amended Settlement would release all Defendants "from any and all manner of claims, demands, actions, suits, and causes of action, ... to the extent that they seek any form of

24

declaratory, injunctive, or equitable relief" that relates to any conduct that was or could have been alleged or raised in this case. The release also contains the "de-facto severability clause" described by the Second Circuit, which provides that the release "shall extend to, but only to, the fullest extent permitted by federal law." See Fikes Wholesale, Inc. v. HSBC Bank USA, N.A., 62 F.4th 704, 720 (2d Cir. 2023). Finally, the release covers any potential causes of action that may have accrued as of the date of final settlement approval or that accrue no later than the longer of eight years after that date or five years after the conclusion of all appeals of final settlement approval. This release, which is identical in all material respects to the one from the First Settlement, is acceptable for the reasons that the Court previously found. See Interchange Fees III, 2024 WL 3236614, at *34.

The Debit Card Plaintiffs have urged the Court to find that their lawsuit is not covered by the release. At the preliminary settlement approval hearing, the Court indicated that the effect of the release on their lawsuit was an issue for the presiding court to decide after imposition of the release. The Debit Card Plaintiffs disagreed, arguing that if the release does, in fact, cover their lawsuit, then (1) the release is inadequate, (2) the *relief* is inadequate (because none of it covers the restraints that they challenge in their litigation), and (3) the Amended Settlement should not be approved.

The Debit Card Plaintiffs first ask that the Court hold that their claims are not based on the same factual predicate as this action. But "[a] holding as to the proper scope of the release ... can await a case in which the issue would directly affect the proceedings." Fikes, 62 F.4th at 720. This approach is consistent with the fundamental principle that a court does not predetermine the preclusive effect of its own judgment; those questions are left to subsequent proceedings where the judgment is enforced. The Debit Card Plaintiffs have made strong

25

arguments as to why their case arises under a different factual predicate – the only problem is, they're making them to the wrong audience.

In the alternative, the Debit Card Plaintiffs ask the Court to find that the relief provided by the Amended Settlement is inadequate and deny preliminary settlement approval.  The Court declines to find that the relief is inadequate solely on the basis that it does not satisfy the claims raised in a separate lawsuit, though brought by class members.  If the Court finds that the relief is adequate as to the class (which it does), then the relief is necessarily adequate as to the Debit Card Plaintiffs, who are members of the class.

Overall, this factor weighs in favor of granting preliminary approval.

### E.       Equitable Treatment of Class Members Relative to Each Other

"Equitable treatment" pursuant to Rule 23(e)(2)(D) "include[s] whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief."  Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.  According to the Second Circuit, "[i]t bears emphasis that Rule 23(e)(2)(D) requires that class members be treated *equitably*, not identically."  Moses v. N.Y. Times Co., 79 F.4th 235, 245 (2d Cir. 2023) (emphasis in original).  In addition, "the relief to each class member in a Rule 23(b)(2) action need not 'be identical, only ... beneficial.'"  Berni v. Barilla S.p.A., 964 F.3d 141, 147 n.28 (2d Cir. 2020) (quoting Sykes v. Mel S. Harris & Assocs. LLC, 780 F.3d 70, 97 (2d Cir. 2015)).  "That means that different class members can benefit differently from an injunction – but no matter what, they *must* stand to benefit (it cannot be the case that some members receive no benefit while others receive some)."  Id. (emphasis in original).

Oft quoted by the objectors is the Court's prior statement that the First Settlement "provide[d] the least benefit to the merchants with the most valuable claims" – that is, the large national merchants who paid the most in interchange fees.  See Interchange Fees III, 2024 WL 3236614, at *37.  The large national merchant-objectors ask the Court to make the same determination with respect to the Amended Settlement.

But the large national merchants ignore the context in which that determination arose. Under the First Settlement, the merchants who did not pay default interchange rates were unlikely to receive any benefit from the rate relief, as they were more likely to have negotiated individual rates.  The Amended Settlement addresses this issue: merchants with negotiated rates will get a *pro rata* reduction.  In addition, under the First Settlement, merchants that accepted American Express and operated in states that prohibited surcharging (large national merchants, for example) were unlikely to receive any tangible benefit from the surcharging relief, which was arguably the core relief provided by that settlement.  The Amended Settlement addresses half of that particular problem: merchants will be able to surcharge up to 3% regardless of whether the merchants accept or surcharge American Express or other comparator cards.  Although not much can be done about the small handful of states that prohibit surcharging, surcharging is at least not the central relief offered by the Amended Settlement.

Arguably, the central relief offered by the Amended Settlement is repeal of the Honor All Cards rule.  Whether all merchants will avail themselves of that relief is to be seen.  As for whether all merchants *can* avail themselves of that relief, the answer is clearly yes.  Besides, the choice not to – that is, to opt for a frictionless checkout experience for customers and forgo saving money on interchange fees – is a sign of competition.  Importantly, in rejecting the 2013 settlement (between Defendants and the combined (b)(2)-(b)(3) class), the Second Circuit

remarked that the settlement omitted forms of relief that "might have conferred a real and palpable benefit, such as remedies that affect[ed] the default interchange fee or honor-all-cards rule." Interchange Fees II, 827 F.3d at 238. The class is now getting both of the forms of relief that the Second Circuit deemed important.

On balance, the Court does not think that there remains a problem of inequitable treatment among class members. For what it's worth, nearly every objection raised by Walmart appeared in the objection-letter of a small merchant. There is certainly some dissatisfaction with the Amended Settlement, but it does not appear to be size-relative. Thus, this factor weighs in favor of granting preliminary approval.

**F.        Ability of Defendants to Withstand a Greater Judgment**

The Court previously considered this factor even though Plaintiffs do not seek monetary relief, see Interchange Fees III, 2024 WL 3236614, at *40, so it will consider it again. The question is not exactly whether a greater judgment would bankrupt the Networks, but whether it would result in their dissolution.

The Court infers that the Networks could withstand a substantially greater judgment with respect to the rate reduction, which is arguably the only quantifiable relief that the Amended Settlement provides. With respect to other relief, the Court is uncertain. Could the Networks get rid of their default interchange rates entirely? The answer appears to be no, though some objectors argue otherwise without much explanation as to how that would actually work. Could the Networks get rid of the No-Bypass rules? The Networks say that they can't – that their existence would serve no utility if merchants could settle transactions directly with issuers. Could the Networks get rid of the Honor All Issuers rule? The Networks say that they can't – that repealing that rule would constitute a breakup of the Networks. There are numerous

28

uncertainties with respect to how much the Networks can really take.  Although the Court is persuaded by many of the Networks' arguments as to why they can't do more, the Court can't provide a conclusive determination absent a trial.

Ultimately, this factor weighs against granting preliminary approval (because *of course* the Networks are holding out on Plaintiffs to some extent), but not decisively so.

***

On balance, the factors weigh in favor of granting preliminary settlement approval, which suggests that the Court is likely to grant final approval.

**CONCLUSION**

The motion for preliminary settlement approval is granted.

**SO ORDERED.**

*Brian M. Cogan*
_____
                    U.S.D.J.

Dated:  Brooklyn, New York
        June 9, 2026

29