**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION

MDL No. 1720

Docket No. 05-md-01720 (BMC-JAM)

This Document Relates To:

BARRY'S CUT RATE STORES INC.; DDMB, INC. d/b/a EMPORIUM ARCADE BAR; DDMB 2, LLC d/b/a EMPORIUM LOGAN SQUARE; BOSS DENTAL CARE; RUNCENTRAL, LLC; CMP CONSULTING SERV., INC.; TOWN KITCHEN, LLC d/b/a TOWN KITCHEN & BAR; GENERIC DEPOT 3, INC. d/b/a PRESCRIPTION DEPOT; and PUREONE, LLC d/b/a SALON PURE,

Plaintiffs,

v.

VISA, INC.; MASTERCARD INCORPORATED; MASTERCARD INTERNATIONAL INCORPORATED; BANK OF AMERICA, N.A.; BA MERCHANT SERVICES LLC (f/k/a DEFENDANT NATIONAL PROCESSING, INC.); BANK OF AMERICA CORPORATION; BARCLAYS BANK PLC; BARCLAYS BANK DELAWARE; BARCLAYS FINANCIAL CORP.; CAPITAL ONE BANK, (USA), N.A.; CAPITAL ONE F.S.B.; CAPITAL ONE FINANCIAL CORPORATION; CHASE BANK USA, N.A.; CHASE MANHATTAN BANK USA, N.A.; CHASE PAYMENTECH SOLUTIONS, LLC; JPMORGAN CHASE BANK, N.A.; JPMORGAN CHASE & CO.; CITIBANK (SOUTH DAKOTA), N.A.; CITIBANK N.A.; CITIGROUP, INC.; CITICORP; and WELLS FARGO & COMPANY,

Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF EQUITABLE RELIEF CLASS PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS**

# TABLE OF CONTENTS


Page

I. INTRODUCTION ........ 1

II. SUMMARY OF EQUITABLE RELIEF CLASS COUNSEL'S LITIGATION EFFORTS ........ 3

A. Equitable Relief Class Plaintiffs' Class Action Complaint and Successful Opposition to Bank Defendants' Motion to Dismiss ........ 6

B. Case Management ........ 7

C. Discovery and Development of the Evidentiary Record ........ 7

1. Discovery From Defendants and Third Parties ........ 7

2. Discovery From ERCPs ........ 9

3. Expert Discovery ........ 10

4. Supplemental Discovery from Defendants ........ 11

D. Class Certification ........ 12

E. Defendants' Daubert Motions ........ 13

F. The Parties' Summary Judgment Motions ........ 14

G. ERCC's Efforts to Monitor Industry Developments, Government Investigations, And Legislative Reforms Relating to Payment Cards ........ 15

H. Settlement Negotiations And Motions For Preliminary Approval ........ 16

1. 2023-2024 Mediation and Settlement Negotiations ........ 16

2. Motion For Preliminary Approval Of 2024 Proposed Settlement ........ 17

I. Trial Preparation ........ 17

J. Renewed Settlement Discussions ........ 18

K. Motion For Preliminary Approval Of The Amended Settlement ........ 20

III. ARGUMENT ........ 20

A. Courts Routinely Approve and Encourage Fee Agreements Negotiated After Resolution of the Merits and Paid For Separately By Defendants Pursuant to Rule 23(h) ........ 21

B. The Requested Fee Is Reasonable Under Goldberger ........ 22

1. The Time and Labor Expended and the Magnitude and Complexity of the Litigation Support the Requested Fee (Goldberger Factors One and Two) ........ 23

2. The Requested Lodestar Multiplier Is Reasonable and Fully Supported by the Extraordinary Risks, Continuing Obligations, and Strong Public Policy Considerations Presented by This Litigation (Goldberger Factors Three and Six) ........ 26

3. Goldberger Factors Four and Five Strongly Support the Requested Fee Because It Represents a Small Fraction of the Extraordinary Benefits Conferred on the Class ........ 30

C. Reimbursement of Expenses ........ 32

D. The Requested Service Awards for the Settlement Class Representatives Are Reasonable ........ 34

IV. CONCLUSION ........ 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany & Albany Cnty. Bd. of Elections*,
522 F.3d 182 (2d Cir. 2008)....................25

*In re Auto. Parts Antitrust Litig.*,
2018 WL 7108072 (E.D. Mich. Nov. 5, 2018)....................26

*Azogue v. 16 for 8 Hospitality LLC*,
2016 WL 4411422 (S.D.N.Y. Aug. 19, 2016)....................27

*Barry's Cut Rate Stores Inc. v. Visa, Inc.*,
2019 WL 7584728 (E.D.N.Y. Nov. 20, 2019)....................6

*Beckman v. KeyBank, N.A.*,
293 F.R.D. 467 (S.D.N.Y. 2013)....................27

*Bekker v. Neuberger Berman Group 401(K) Plan Investment Committee*,
504 F. Supp. 3d 265 (S.D.N.Y. 2020)....................27

*Berry v. Schulman*,
807 F.3d 600 (4th Cir. 2015)....................32

*Blanchard v. Bergeron*,
489 U.S. 87 (1989)....................29

*Blessing v. Sirius XM Radio Inc.*,
507 Fed. Appx. 1 (2d Cir. 2012)....................21, 22

*Clem v. KeyBank, N.A.*,
2014 WL 2895918 (S.D.N.Y. June 20, 2014)....................28

*In re Colgate-Palmolive Co ERISA Litig.*,
36 F. Supp. 3d 344 (S.D.N.Y. 2014)....................27

*In re Credit Default Swaps Antitrust Litig.*,
2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016)....................27

*In re Currency Conversion Fee Antitrust Litig.*,
263 F.R.D. 110 (S.D.N.Y. 2009), *aff'd sub nom. Priceline.com, Inc. v. Silberman*, 405 F. App'x 532 (2d Cir. 2010)....................23

*DDMB, Inc. v. Visa, Inc.*,
2021 WL 6221326 (E.D.N.Y. Sep. 27, 2021)....................12, 13

*Dupler v. Costco Wholesale Corp.*,
705 F. Supp. 2d 231 (E.D.N.Y. 2010) ....................22, 32

*In re EVCI Career Colleges Holding Corp. Sec. Litig.*,
2007 WL 2230177 (S.D.N.Y. July 27, 2007) ....................27

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
62 F.4th 704 (2d Cir. 2023) ....................22

*Fleisher v. Phoenix Life Ins. Co.*,
2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015)....................26, 27, 32

*Geiringer v. Gleason*,
160 F.3d 858 (2d Cir. 1998)....................26

*Goldberger v. Integrated Resources, Inc.*,
209 F.3d 43 (2d Cir. 2000).................... *passim*

*Hall v. ProSource Techs., LLC*,
2016 WL 1555128 (E.D.N.Y. Apr. 11, 2016) ....................31

*Hensley v. Eckerhart*,
461 U.S. 424 (1983)....................21, 23, 30

*Int'l Salt Co. v. U.S.*,
332 U.S. 392 (1947)....................30

*Jermyn v. Best Buy Stores, L.P.*,
2012 WL 2505644 (S.D.N.Y. June 27, 2012) ....................22

*Jones v. Amalgamated Warbasse Houses, Inc.*,
721 F.2d 881 (2d Cir. 1983)....................21

*LeBlanc-Sternberg v. Fletcher*,
143 F.3d 748 (2d Cir. 1998)....................26

*Malchman v. Davis*,
761 F.2d 893 (2d Cir. 1985)....................22

*Massiah v. Metroplus Health Plan, Inc.*,
2012 WL 5874655 (E.D.N.Y. Nov. 20, 2012)....................28, 29, 34

*McBean v. City of N.Y.*,
233 F.R.D. 377 (S.D.N.Y. 2006) ....................32

*McDaniel v. County of Schenectady*,
595 F.3d 411 (2d Cir. 2010)....................22

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
246 F.R.D. 156 (S.D.N.Y. 2007) ....................31

*In re MetLife Demutualization Litig.*,
689 F. Supp. 2d 297 (E.D.N.Y. 2010) ....................33

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985)....................29

*Monserrate v. Tequipment, Inc.*,
2012 WL 5830557 (E.D.N.Y. Nov. 16, 2012)....................27

*Moore v. Rubin*,
766 F. Supp. 3d 423 (E.D.N.Y. 2025) ....................25

*Moses v. New York Times Co.*,
79 F.4th 235 (2d Cir. 2023) ....................23

*In re NASDAQ Market-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998). ....................27, 31

*Ohio v. American Express Co.*,
585 U.S. 519 (2018)....................3, 14, 15, 24

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2016 WL 8138988 (E.D.N.Y. Nov. 30, 2016)....................5, 6

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2019 WL 6888488 (E.D.N.Y. Dec. 16, 2019) ....................23, 30, 31

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
827 F.3d 223 (2d Cir. 2016)....................5

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
986 F. Supp. 2d 207 (E.D.N.Y. 2013) ....................4

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2022 WL 15044626 (E.D.N.Y. Oct. 8, 2022)....................14

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2022 WL 15053250 (E.D.N.Y. Oct. 7, 2022)....................14

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2024 WL 3236614 (E.D.N.Y. June 28, 2024) ....................13, 17

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2012 WL 12929536 (E.D.N.Y. Nov. 27, 2012)....................4

*Pearlman v. Cablevision Systems Corp.*,
2019 WL 3974358 (E.D.N.Y. 2019)....................32

*Pearlstein v. BlackBerry Ltd.*,
2022 WL 4554858 (S.D.N.Y. Sept. 29, 2022)....................23

*Ret. Ass'n v. Isaacson/Weaver Family Tr.*,
925 F.3d 63 (2d Cir. 2019)....................22, 26

*Ret. Sys. v. Bank of Am. Corp.*,
318 F.R.D. 19 (S.D.N.Y. 2016)....................33

*Roberts v. Texaco, Inc.*,
979 F. Supp. 185 (S.D.N.Y. 1997)....................34

*Sheppard v. Consol. Edison Co. of New York*,
2002 WL 2003206 (E.D.N.Y. Aug. 1, 2002)....................34

*In re Southeastern Milk Antitrust Litig.*,
2013 WL 2155387 (E.D. Tenn. May 17, 2013)....................29

*Sow v. City of New York*,
2024 WL 964595 (S.D.N.Y. March 5, 2024)....................32

*Taylor v. Sturgell*,
553 U.S. 880 (2008)....................12

*United States v. E.I. Du Pont de Nemours & Co.*,
366 U.S. 316 (1961)....................30

*Velez v. Novartis Pharms. Corp.*,
2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010)....................32

*In re Visa Check/MasterMoney Antitrust Litig.*,
297 F. Supp. 2d 503 (E.D.N.Y. 2003)....................27

*In re Vitamin C Antitrust Litig.*,
2013 WL 6858853 (E.D.N.Y. Dec. 30, 2013)....................25

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005)....................22

**Other Authorities**

Rule 23(b)(2).................... *passim*

# I. INTRODUCTION

The Rule 23(b)(2) Class Counsel ("Equitable Relief Class Counsel" or "ERCC")[1] respectfully submit this Memorandum of Law in Support of Equitable Relief Class Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards in the total amount of $206 million. As discussed below, the requested amount includes aggregate service awards of $375,000, comprising $75,000 for each of the five class representatives and $7,824,940.10 to reimburse litigation expenses already incurred. The remaining $197,800,059.90 will compensate ERCC for not only the work completed to date, but also the additional work that remains, including any appellate proceedings and ongoing responsibilities under the Amended and Superseding Settlement (the "Amended Settlement").[2]

The amount requested was discussed after the parties had reached agreement on all material terms of the Amended Settlement and will be paid separately by the Network Defendants. It therefore will neither diminish nor otherwise affect the relief obtained for the Class. The requested attorneys' fee award is fair, reasonable, and fully warranted under Rule 23(h), the lodestar method, and the applicable *Goldberger* factors, including the reasonableness of the requested multiplier. As a further cross-check confirming the reasonableness of the requested fee under the fourth and fifth *Goldberger* factors—the quality of representation and the relationship between the requested fee and the relief obtained—the requested attorneys' fee represents only a small fraction of the benefits[3] that the Amended Settlement confers on the Class under any credible, objective valuation

---

[1] ERCC are Grant & Eisenhofer P.A.; Nussbaum Law Group, P.C.; Hilliard Shadowen LLP; and Justice Jagher London & Millen LLC f/k/a Freed Kanner London & Millen LLC.

[2] A copy of the Amended Settlement is at ECF No. 9692-2.

[3] The Amended Settlement does not provide any cash payments, monetary fund, or other pecuniary recovery to any class member. All of its elements are exclusively equitable in nature, providing only prospective

methodology.

The Amended Settlement substantially reforms nearly every restraint challenged by the Equitable Relief Class and provides merchants with powerful competitive tools never before available in the payment-card industry. Among other things, the Amended Settlement substantially reforms the Honor-All-Cards rules, allowing merchants, for the first time, to decline acceptance of the networks' highest-cost Premium consumer credit cards and Commercial credit cards while continuing to accept lower-cost cards. The Amended Settlement also eliminates the Honor-All-Wallets rules; permits merchants to surcharge Visa and Mastercard credit cards up to 3% or the cost of acceptance, regardless of whether the merchant accepts or surcharges American Express or other competing cards; expands merchants' ability to discount specific issuer cards and lower-cost forms of payment; creates a new "value card" framework designed to encourage use of low-cost cards; facilitates merchant buying groups; eliminates significant barriers to steering and discounting; permits dual pricing to help merchants comply with state surcharge restrictions; provides significant debit card relief; and creates meaningful pilot-program and merchant education initiatives designed to increase use of the Amended Settlement's competitive tools. To ease the transition to a competitive marketplace, the Amended Settlement mandates interchange rate caps and substantial rollbacks that will benefit all merchants, including those with negotiated rates.

Collectively, these reforms fundamentally alter the competitive landscape governing Visa and Mastercard card acceptance and give merchants practical and enforceable tools to exert competitive pressure on interchange pricing and network fees. The result will be a substantially

---

relief. The "small fraction" estimate is based on the Amended Settlement's prospective economic benefit under any plausible valuation.

more competitive payment-card marketplace in which market forces—not network restraints—play a materially greater role in determining the prices paid by merchants and consumers.

The result achieved here did not come easily and was far from certain. For nearly a decade following remand from the Second Circuit, ERCC prosecuted this Rule 23(b)(2) action against the nation's largest payment-card networks and issuing banks, which are represented by some of the most sophisticated defense firms in the world. ERCC also litigated under the weight of extraordinary risks and evolving antitrust jurisprudence, including the Supreme Court's decision in *Ohio v. American Express*, that substantially altered the legal framework governing two-sided transaction platforms. ERCC defeated the banks' motion to dismiss, obtained certification of a mandatory nationwide Rule 23(b)(2) class, largely prevailed in extensive *Daubert* proceedings, defeated the principal summary judgment motions, coordinated voluminous fact and expert discovery, engaged in two rounds of mediation, and prepared for trial. This sustained and highly complex litigation effort culminated in the Amended Settlement now before the Court.

Based on the extraordinary results achieved by the ERCC over more than a decade of contingent, high-risk litigation, including more than 77,203.35 attorney and professional hours, the requested award of attorneys' fees is fair and reasonable under Rule 23(h) and the *Goldberger* factors. Further, the requested fee reflects a multiplier of approximately 2.6 on ERCC's lodestar and appropriately compensates ERCC for contingent litigation that produced industry-wide reforms of unprecedented scope and benefit to the Class.

## II. SUMMARY OF EQUITABLE RELIEF CLASS COUNSEL'S LITIGATION EFFORTS

This litigation began more than 20 years ago, in June 2005, when various merchants filed

cases against Visa[4] and Mastercard[5] (collectively, the "Network Defendants"), as well as certain issuing and acquiring banks (the "Bank Defendants"[6] and, together with the Network Defendants, the "Defendants"), which were consolidated into MDL 1720. The merchant plaintiffs alleged that Defendants violated the antitrust laws by imposing supracompetitive interchange fees for acceptance of Visa and Mastercard branded payment cards. The cases were consolidated before Judge John Gleeson, and he appointed interim co-lead counsel to represent the class plaintiffs. *See* ECF No. 279.

In April 2006, a single consolidated amended class complaint was filed on behalf of two classes of merchants: one seeking monetary damages under Rule 23(b)(3) and the other seeking equitable relief under Rule 23(b)(2). *See* ECF No. 317. The same counsel represented both classes.

The first phase of this litigation (the "Phase I Litigation") settled in 2012 (the "2012 Settlement Agreement"). Judge Gleeson approved the 2012 Settlement Agreement, which divided merchants into two classes: a Rule 23(b)(3) class comprising merchants that accepted Visa and Mastercard from January 1, 2004 to November 27, 2012; and a Rule 23(b)(2) class comprising merchants that accepted Visa and Mastercard as of November 27, 2012 and into the future. *See* ECF No. 1745 ¶¶ 5-6; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2012 WL 12929536, at *1–2 (E.D.N.Y. Nov. 27, 2012); *In re Payment Card Interchange Fee & Merch.*

---

[4] Defendants Visa Inc., Visa U.S.A. Inc., and Visa International Service Association are collectively referred to as "Visa."

[5] Defendants Mastercard Incorporated and Mastercard International Incorporated are collectively referred to as "Mastercard."

[6] The Bank Defendants are Bank of America, N.A., BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), Bank of America Corporation, Barclays Bank plc, Barclays Bank Delaware, Barclays Financial Corp., Capital One Bank, (USA), N.A., Capital One F.S.B., Capital One Financial Corporation, Chase Bank USA, N.A., Chase Manhattan Bank USA, N.A., Chase Paymentech Solutions, LLC, JPMorgan Chase Bank, N.A., JPMorgan Chase & Co., Citibank (South Dakota), N.A., Citibank N.A., Citigroup, Inc., Citicorp, and Wells Fargo & Company.

*Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 213 n.3 (E.D.N.Y. 2013). Both classes were represented by a single set of counsel.

In 2016, the Second Circuit reversed the district court's approval of the 2012 Settlement Agreement and remanded, holding, inter alia, that the damages and equitable relief classes required separate counsel. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223 (2d Cir. 2016). Following remand, Judge Brodie invited interested counsel to submit proposals for representing the proposed classes going forward. ECF No. 6654 (Aug. 11, 2016 Minute Entry). Multiple attorney groups moved for appointment as lead counsel for either the Rule 23(b)(2) or Rule 23(b)(3) proposed classes. The undersigned moved for appointment as lead counsel for the Rule 23(b)(2) proposed class. ECF No. 6669-1, 6673.

On November 30, 2016, former Magistrate Judge Orenstein appointed two sets of Interim Class Counsel—one for each proposed class under Rules 23(b)(2) and 23(b)(3). *See* ECF No. 6754 at 7. In appointing ERCC to represent the Rule 23(b)(2) class on an interim basis, Judge Orenstein concluded that the ERCC firms were "in the best position to represent the interest of the Putative Injunctive Relief Class," in part because certain of the firms had been "steeped in this litigation since its inception." *See* ECF No. 6754 at 6; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2016 WL 8138988, at *3 (E.D.N.Y. Nov. 30, 2016). For instance, Ms. Nussbaum and her co-counsel had filed a complaint challenging the network rules and interchange fees under the antitrust laws on August 29, 2005 (*Meijer, Inc. v. Visa U.S.A. Inc.*, No. 1:05-cv-04131 (E.D.N.Y.)), and Mr. Shadowen and his co-counsel had filed a similar complaint on November 14, 2005 (*Rite Aid Corp. v. Visa U.S.A.*, No. 1:05-cv-05352 (E.D.N.Y.)). Ms. Nussbaum and Mr. Shadowen successfully litigated those cases, and, in doing so, gained valuable knowledge of the background and facts of this complex litigation, which Judge Orenstein credited in his

appointment.

Judge Orenstein further found that the four ERCC firms had "demonstrated their ability to work cooperatively with each other, with the court, and with numerous non-lead counsel representing plaintiffs with very significant interests in this litigation." *See* ECF No. 6754 at 6; *Payment Card*, 2016 WL 8138988, at *3. Moreover, Judge Orenstein concluded that "the participation in the leadership team of a firm that has extensive experience in the litigation but has no client relationship with any current member of the putative class heightens the likelihood that holders of future claims will have an effective voice in debates about how best to represent the putative class." *Id*.

### A. Equitable Relief Class Plaintiffs' Class Action Complaint and Successful Opposition to Bank Defendants' Motion to Dismiss

On February 8, 2017, ERCC served a Proposed Equitable Relief Class Action Complaint (the "Complaint"), which was later filed under seal. ECF Nos. 6858 and 6892. The Complaint challenged Defendants' anticompetitive practices that harm competition and impose upon merchants supracompetitive, exorbitant, and collectively fixed prices in violation of Sections 1 and 2 of the Sherman Act and the California Cartwright Act. *See* ECF No. 6858. The Equitable Relief Class Plaintiffs ("ERCPs") brought their claims under Section 16 of the Clayton Act, seeking equitable relief to prevent and restrain violations of the Sherman Act and the California Cartwright Act. *See id.* The Network Defendants answered the Complaint on November 15, 2018; the Bank Defendants served a motion to dismiss on January 16, 2019. ECF Nos. 7293, 7296, and 7356.

On April 18, 2019, Bank Defendants filed their motion to dismiss the Complaint for failure to state a claim and lack of jurisdiction, which ERCPs opposed. *See* ECF No. 7399 and 7400; ECF No. 7402 (opposition); ECF No. 7403; ECF No. 7408 (opposition); ECF No. 7414 (opposition

with redactions). On November 20, 2019, the Court denied the motion. *See* ECF No. 7790; *Barry's Cut Rate Stores Inc. v. Visa, Inc.*, 2019 WL 7584728, at *34 (E.D.N.Y. Nov. 20, 2019).

### B. Case Management

In their application to be appointed lead counsel, ERCC told the Court they would efficiently litigate this case and would implement protocols to avoid duplication of effort and unnecessary time and expenses. ERCC supervised all facets of the litigation, including the assignment of work between firms, with these objectives in mind.

### C. Discovery and Development of the Evidentiary Record

ERCC were appointed 12 years into the MDL, after significant discovery had already occurred. Upon their appointment, ERCC reviewed and analyzed the existing, massive discovery record; worked cooperatively with counsel for the Rule 23(b)(3) Class and Direct-Action Plaintiffs ("DAPs")—groups of diverse merchants that had opted out of the damages class—in connection with ongoing discovery; and engaged in separate discovery specific to the equitable relief claims, including depositions, interrogatories/responses, document requests/production, extensive document and data review, and complex expert discovery focused on possible rules modifications.

#### 1. Discovery From Defendants and Third Parties

Immediately after being appointed as interim counsel for the proposed Rule 23(b)(2) class, ERCC began working to supplement the factual record amassed in the Phase I Litigation, which had a fact-discovery-cutoff date in 2010. Between the Second Circuit's decision in July 2016 and the appointment of ERCC in November 2016, Defendants and DAPs had negotiated various agreements and schedules to govern the next phase of discovery, and they were preparing to begin deposition discovery. In fact, deposition discovery of what is now referred to as Phase II of the litigation began the day after the Court's November 30, 2016 order appointing ERCC for the Rule

23(b)(2) Class. ERCC Decl. ¶¶ 15, 21-25.[7]

Once appointed, ERCC began coordinating scheduling and coverage of relevant depositions and gaining access to document depositories. Within weeks of their appointment, ERCC began to review and analyze documents and prepare for and attend depositions. *Id.* ¶¶ 15-30.

ERCC also worked with the other plaintiff groups to draft and serve document requests; negotiated the parameters of discovery, including search terms; and served subpoenas on third parties. *Id.* ¶ 25. Defendants produced privilege logs that contained millions of entries. ERCC reviewed the logs, which was a priority because of the upcoming depositions. *Id*. Coordinating with the other plaintiff groups, ERCC sent dozens of letters challenging privilege designations and participated in meet-and-confers with defense counsel regarding the documents. *Id.* ERCC further coordinated with the other plaintiff groups on motion practice relating to such matters as the scope of Defendants' supplementation of prior discovery responses (ECF No. 6987), the allotted time and scope of defendant depositions (ECF Nos. 7048, 7060, 7070, 7083, 7170), and motions to de-designate certain Defendant documents as privileged. ECF No. 7049. *Id.*

ERCC approached discovery strategically and with an eye toward efficiency. ERCC focused on mining the prior discovery record from the Phase I Litigation, which included 60 million pages of documents produced by Defendants and third parties and over 400 deposition transcripts, for evidence relevant to ERCPs' equitable relief claims. ERCC Decl. ¶ 26.

ERCC organized their document discovery efforts to update and supplement the discovery record with respect to specific issues or network rules, and to prepare for several rule-focused

[7] *See* Declaration of Equitable Relief Class Counsel in Support of Class Plaintiffs' Motion For Award of Attorneys' Fees, Expenses, and Service Awards, filed contemporaneously herewith ("ERCC Decl.").

depositions. *Id.* ¶ 27. Moreover, ERCC worked with their world renowned economic experts, including Professor Dennis W. Carlton ("Prof. Carlton"), of the David McDaniel Keller Professor of Economics at the University of Chicago Booth School of Business and Senior Managing Director of Compass Lexecon; and Nobel Prize winning economist Dr. Joseph E. Stiglitz ("Dr. Stiglitz"), Professor at Columbia University in the Departments of Economics, Finance and School of International and Public Affairs, to understand the information they needed for their economic analyses. Involving the experts in the process helped to ensure that ERCC targeted documents and information needed for their reports. *Id.*

ERCC actively participated in the depositions of those witnesses who were likely to possess important information to prove the equitable relief class claims and monitored or reviewed transcripts of other depositions. ERCC examined witnesses in dozens of depositions, taking key roles in the depositions concerning the relevant merchant restraints. *Id.* ¶ 28

ERCC also participated in numerous third-party depositions, which required preparation on par with that devoted to defendant depositions. This work included reviewing third-party document productions, coordinating with DAPs and Rule 23(b)(3) Class Counsel regarding the allocation of time and subject matter, and reviewing and preparing summaries of prior testimony. *Id.* ¶ 29. ERCC took defendant and third-party fact depositions between December 1, 2016 and June 15, 2018, and consulted with experts when appropriate. ERCC further prepared for and defended the depositions of the ERCPs' economic experts. *Id.* ¶¶ 29-31.

**2. Discovery From ERCPs**

In addition to offensive discovery, ERCC also had to respond to discovery directed at ERCPs. Defendants served 87 document requests on ERCPs, and ERCC in turn served formal responses and objections, negotiated production parameters with Defendants, and worked with the named ERCPs to collect, review, and produce responsive documents. Those productions were of

significant volume and the process was arduous, requiring extensive searches for documents dating back many years. For example, Plaintiff CMP Consulting Service, Inc. ("CMP") collected and produced over 1.3 million pages of documents. ERCC Decl. ¶ 33. Other ERCPs similarly collected and produced large numbers of documents, including supplemental productions.

Defendants also served 59 interrogatories and subparts along with contention interrogatories. ERCC served objections to the interrogatories, negotiated the scope of the responses with Defendants, worked with the named ERCPs to gather information, and drafted and served responses. *Id.* ¶ 34.

ERCC also prepared the named ERCPs for and defended their depositions. Defendants served Rule 30(b)(6) deposition notices on each of the ERCPs. ERCC objected to and negotiated the scope of the topics for those depositions. DAPs also served notices for individual third-party depositions of one witness from each ERCP. The conflicting notices led to motion practice, which resulted in ERCPs agreeing to be deposed for a total of eight hours on a single day. *Id.* ¶ 35-36. ERCC prepared the designated ERCP Rule 30(b)(6) witnesses and defended the following depositions: (i) Hal Goldman for Generic Depot 3, Inc. d/b/a Prescription Depot ("Generic Depot") on April 4, 2018; (ii) Carlos Perez for RunCentral, LLC ("RunCentral") on April 10, 2018 and CMP on April 12, 2018; (iii) Heather Boyd Smith for PureOne, LLC d/b/a Salon Pure ("PureOne") on April 30, 2018; (iv) and Arthur Boss, Jr. for Boss Dental Care ("Boss Dental") on April 20, 2018. *Id.*

### 3. Expert Discovery

ERCPs also retained and worked extensively with their experts to analyze the payment card industry, assess the extent to which Visa and Mastercard exert market power in the relevant economic market, and determine the role and impact of network anti-steering rules, or merchant restraints, in protecting prices from competition. ERCC Decl. ¶¶ 37-38.

Prof. Carlton submitted a 97-page initial report and a 56-page rebuttal report, while Dr. Stiglitz submitted a 91-page initial report and a 76-page rebuttal report. *Id.* ¶ 39. The preparation of both experts' initial reports entailed ERCC working with the experts and analyzing the massive discovery record. The rebuttal reports involved responding to the arguments of Defendants' and DAPs' experts. Defendants deposed both experts—Prof. Carlton in December 2019 and Dr. Stiglitz in February 2020—requiring ERCC to prepare them and defend their depositions. *Id.* ¶¶ 37-39.

ERCPs also retained Dr. Keith B. Leffler ("Dr. Leffler"), Emeritus Associate Professor of Economics at the University of Washington, to opine on issues related to certification of a mandatory Rule 23(b)(2) class. ERCC worked extensively with Dr. Leffler in producing his report. ERCC prepared Dr. Leffler for and defended him at his deposition in February 2021. *Id.* ¶ 40.

Drs. Stiglitz and Leffler also submitted additional declarations in support of the 2024 Proposed Settlement and a combined declaration in support of the Amended Settlement.[8] ERCC also spent considerable time and effort preparing for and deposing the experts retained by Defendants and the DAPs. *Id.* ¶ 41.

**4. Supplemental Discovery from Defendants**

On November 12, 2021, ERCPs served requests for supplemental discovery on Defendants because ERCPs' experts required updated data and documents on the network restraints and associated rules, including their impact, to continue analyzing the payment card industry and preparing for trial. ERCC Decl. ¶ 42. Defendants also requested supplemental discovery from ERCPs. Over the next two years, ERCPs, Defendants, and DAPs negotiated the scope of

[8] *See* ECF Nos. 9179-5, 9179-6, 9289 Exhibit U, 9295 Exhibit U (under seal), 9297 Exhibit U (redacted version); ECF No. 9692-5.

supplemental productions and produced responsive documents. *Id*. ERCC reviewed and analyzed more than 575,000 documents produced by Defendants in response to ERCPs' supplemental discovery requests. *Id.* ¶ 43.

### D. CLASS CERTIFICATION

On December 18, 2020, ERCPs moved for certification of a Rule 23(b)(2) class. ECF Nos. 8444, 8447. ERCPs supported their motion with the liability expert reports of Prof. Carlton and Dr. Stiglitz, along with the class-certification report of Dr. Leffler. ERCC Decl. ¶ 44.

Defendants did not oppose certification of a mandatory Rule 23(b)(2) class. *Id.* ¶ 45. It is not unusual for defendants to decline to fight certification of a Rule 23(b)(2) class rather than face the prospect of multiple trials and potential collateral estoppel risks. *See Taylor v. Sturgell*, 553 U.S. 880, 894 (2008) (judgment in class action is exception to the rule against nonparty preclusion).

Various DAPs and trade groups opposed certification and argued, among other things, that the proposed class should permit opt-outs or that purported conflicts precluded certification. *See, e.g.*, ECF Nos. 8411-8413. Other merchant groups sought leave to intervene to make similar arguments against class certification. ECF Nos. 8454 (Merchant Trade Groups), 8464-65 (Walmart).

ERCC vigorously litigated class certification over many months, filing multiple rounds of briefing addressing the objectors' arguments, purported constitutional concerns, and adequacy challenges, as well as the propriety of a mandatory non-opt-out Rule 23(b)(2) Class. ECF Nos. 8457, 8470, 8631. *See* ERCC Decl. ¶¶ 47-48.

Chief Judge Brodie agreed with ERCC and on September 27, 2021, certified the nationwide

Rule 23(b)(2) Class comprising more than 12 million merchants and declined to permit opt-outs.[9]

The Court overwhelmingly accepted the positions advanced by ERCC and rejected nearly all arguments advanced by the opponents. The Court held, among other things, that:

1. No fundamental conflict existed between absent class members and the objectors;
2. A mandatory Rule 23(b)(2) class did not violate due process;
3. Issue preclusion concerns did not render the class inadequate;
4. The class representatives' interests were aligned with those of the absent class members; and
5. Disallowing opt-outs increased the value of injunctive relief for the entire class by preventing free-riding.

*DDMB, Inc. v. Visa, Inc.*, 2021 WL 6221326, at *24-33, *46-49 (E.D.N.Y. Sep. 27, 2021).

The Court further found that certification of a mandatory class would allow merchants to leverage their collective claims to obtain the most comprehensive equitable relief possible. *Id.* at *33. The Court also formally appointed ERCC as Class Counsel and appointed Boss Dental, RunCentral, CMC, Generic Depot, and PureOne as Class Representatives. *Id.*

### E. DEFENDANTS' *DAUBERT* MOTIONS

Defendants filed multiple *Daubert* motions seeking to exclude certain expert opinions and testimony submitted by Prof. Carlton and Dr. Stiglitz. *See* ECF No. 8074; ECF No. 8076 (Stiglitz);

[9] ECF No. 8647. On September 27, 2021, the Court certified an equitable relief class, comprising "all persons, businesses, and other entities that accept Visa and/or Mastercard credit and/or debit cards in the United States at any time during the period between December 18, 2020 and the date of entry of Final Judgment in this case." *DDMB, Inc. v. Visa, Inc.*, 2021 WL 6221326, at *40 (E.D.N.Y. Sep. 27, 2021). By Order dated June 28, 2024, the Court modified the class definition (the "Class") as follows: "all persons, businesses, and other entities that accept Visa and/or Mastercard credit and/or debit cards in the United States at any time during the period between December 18, 2020 and the date of preliminary settlement approval." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *35 (E.D.N.Y. June 28, 2024).

ECF No. 8086; ECF No. 8087 (Carlton). ERCC filed papers opposing the motions. *See* ECF No. 8727; ECF No. 8730. The preparation and defense of the multiple *Daubert* motions required counsel to present exceptionally complex material in a concise and coherent manner. Notably, with the exception of one of the many opinions offered by Prof. Carlton and one of the many opinions offered by Dr. Stiglitz, Judge Brodie denied Defendants' *Daubert* motions. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2022 WL 15053250 (E.D.N.Y. Oct. 7, 2022); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2022 WL 15044626 (E.D.N.Y. Oct. 8, 2022).

### F. THE PARTIES' SUMMARY JUDGMENT MOTIONS

In December 2020, ERCPs filed a motion for partial summary judgment against Defendants, and Defendants filed four motions for summary judgment and/or partial summary judgment against ERCPs. Defendants' motions included: (i) Mastercard and Bank Defendants' Motion for Summary Judgment Based on Mastercard's Lack of Market Power; (ii) Defendants' Motion for Summary Judgment under *Ohio v. American Express*, 585 U.S. 519 (2018) ("*Amex*"); (iii) Defendants' Motion for Summary Judgment on Plaintiffs' Post-IPO Conspiracy Claims; and (iv) Visa and Bank Defendants' Motion for Summary Judgment on Plaintiffs' Monopolization Claims.

The summary judgment motions were the subject of extensive briefing.[10] The work on all of those motions required the investment of substantial attorney time, spent in large part scouring the massive discovery record and expert reports compiled over the course of the case for the best evidence supporting ERCPs' claims, and turning that evidence into briefs and appendices that

[10] *See, e.g.*, ECF Nos. 8067 through 8069; 8071; 8073; 8088; 8089; 8091; 8103; 8106; 8111; 8150; 8152 through 8157; 8167 through 8172; 8174; 8175; 8206; 8208.

collectively told a complex story in as streamlined a way as possible. ERCC Decl. ¶¶ 52-58.

On January 8, 2024, Judge Brodie denied Mastercard and Bank Defendants' motion for summary judgment as to Mastercard's lack of market power, holding that "Plaintiffs have adduced sufficient direct evidence of anticompetitive effect to defeat Defendants' summary judgment motion," ECF No. 9042 at 37, and noting that "Plaintiffs' evidence suffices to raise a triable issue of fact as to whether they have met their prima facie burden through direct evidence of anticompetitive effect," *id.* at 38. She also largely[11] denied Defendants' motion for summary judgment under *Amex*, holding that "Plaintiffs have adduced sufficient direct evidence of anticompetitive effect to defeat Defendants' summary judgment motion." ECF No. 9042 at 37.

On February 22, 2024, Judge Brodie rejected Defendants' arguments with respect to the post-IPO conspiracy claims, finding that there were triable questions of fact as to whether Defendants effectively withdrew from the pre-IPO conspiracies. *See* ECF No. 9140 at 42–43. On March 11, 2024, Judge Brodie denied ERCPs' motion for partial summary judgment on the ground that it was more appropriately brought as a motion in limine. *See* ECF No. 9152. On April 10, 2024, Judge Brodie granted in part and denied in part Visa and Bank Defendants' motion for summary judgment on the monopolization claims brought by the ERCPs, 7-Eleven Plaintiffs, and Home Depot Plaintiffs. ECF No. 9200.

### G. ERCC's Efforts to Monitor Industry Developments, Government Investigations, and Legislative Reforms Relating to Payment Cards

While this case was pending, ERCC researched, analyzed, and monitored industry developments, government investigations, and various legislative reforms relating to the payment card industry that might have impacted the equitable relief sought by ERCPs. Such developments

[11] Judge Brodie granted summary judgment in favor of Defendants only to the extent that ERCPs' claims were based on a one-sided market theory. *See* ECF No. 9042 at 78.

included, for example, the Credit Card Competition Act of 2023 and Congressional Hearings before the U.S. Senate Committee on the Judiciary held in May 2022. ERCC Decl. ¶ 59.

ERCC also researched, analyzed, and monitored developments in the payment card industry and new alternative payments forms, eCommerce payment solutions, mobile payments, peer-to-peer digital payment applications, and digital wallets. *Id.* ¶ 60.

ERCC's work further included research, analysis, and monitoring of developments in the payment processing and fintech industries that can enable and facilitate merchant surcharging in states that purport to prohibit or restrict surcharging. *Id.* ¶ 61.

### H. SETTLEMENT NEGOTIATIONS AND MOTIONS FOR PRELIMINARY APPROVAL

#### 1. 2023-2024 Mediation and Settlement Negotiations

While continuing to litigate the case, ERCC explored the possibility of resolving the ERCPs' claims, originally with the assistance of Professor Eric D. Green, a nationally renowned mediator who had been involved in efforts to mediate aspects of MDL 1720 for many years.

ERCC and Defendants first met with Professor Green in February 2017. After that initial meeting, the parties participated in more than two dozen mediation and settlement negotiation sessions—in person and remote—most of which included the participation of Professor Green. *See* ECF No. 9179-7.

Additionally, Professor Green had "hundreds of telephone calls and *ex-parte* zoom, telephone, or in-person conversations." *Id.* at 4. During the numerous phone and Zoom calls, the parties discussed outstanding terms, issues, and potential solutions to efficiently make use of time during subsequent mediation sessions.

ERCC's economic and industry experts assisted in evaluating Defendants' offers and crafting the relief contained in the 2024 Proposed Settlement. ERCC Decl. ¶ 65. ERCC also consulted with payments experts employed by numerous merchants, including national grocery

chains, national restaurant chains, gaming, hospitality, airlines, and small businesses. *Id.*

The parties' extensive and vigorous arm's-length negotiations facilitated by Professor Green culminated in the 2024 Proposed Settlement on March 25, 2024.

**2. Motion For Preliminary Approval Of 2024 Proposed Settlement**

On March 26, 2024, ERCPs moved for preliminary approval of the 2024 Proposed Settlement.[12] Following briefing and oral argument, however, Judge Brodie declined to grant preliminary approval. The Court expressed concerns regarding several aspects of the proposed relief, including components of the Honor-All-Cards reforms, limitations associated with the surcharging provisions, and the treatment of merchants paying negotiated interchange rates.[13]

ERCC immediately sought a trial date and resumed intensive trial preparation while simultaneously reengaging in negotiations to secure materially enhanced relief. ERCC Decl. ¶¶ 72-78. Those renewed efforts resulted in the Amended Settlement now before the Court, which directly addresses the concerns identified by Judge Brodie and achieves substantially stronger relief for merchants nationwide.

**I. TRIAL PREPARATION**

Following the denial of preliminary approval of the 2024 Settlement, ERCC immediately intensified trial preparations and urged the Court to schedule the matter for trial at the earliest practicable date. ERCC marshaled and synthesized the massive factual, expert, and economic record developed over nearly two decades of litigation; refined trial themes and strategies; prepared witness examinations and expert presentations; and continued readying the case for trial.

---

[12] *See* ECF Nos. 9178, 9179, 9179-1 through 8, 9180.

[13] *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614 (E.D.N.Y. June 25, 2024).

*Id.* ¶ 72.

### J. Renewed Settlement Discussions

In July 2024, while ERCC were preparing for trial, the parties discussed the possibility of exploring a new settlement. The parties approached now-retired Judge Orenstein at JAMS to see if he would mediate the parties' renewed settlement efforts. Judge Orenstein informed the parties on July 24, 2024 that he would act as the mediator. ECF No. 9692-6 at 1.

Between July 2024 and October 2025, the parties engaged in continuous, productive negotiations that included numerous all-day or hours-long, in-person and virtual meetings, multiple exchanges of detailed financial data and documents, expert economic analysis of that data, and negotiations of multiple proposed term sheets. *Id.* at 4.

Judge Orenstein held "five all-day, in-person mediation sessions, and seven virtual discussions with counsel for all parties." *Id.* He also conducted more than 30 *ex parte* calls and Zoom sessions in support of the parties' good-faith efforts to consider each other's positions and achieve a fair, reasonable, and adequate settlement. *Id.*

Throughout the time spent mediating, ERCC continuously conferred with their economists and industry consultant to analyze the potential impact of various settlement proposals and consider possible modifications. Also as part of the negotiation process, ERCC consulted class members and industry experts to ascertain their positions and suggestions as to the new and expanded relief contemplated by the Amended Settlement. ERCC Decl. ¶ 77.

Ultimately, on November 9, 2025, the parties executed the Amended Settlement. The Amended Settlement directly addresses the concerns identified by Chief Judge Brodie while securing materially expanded and strengthened relief well beyond that contemplated by the 2024 proposal. *Id.* ¶ 77. Among other things, the Amended Settlement:

* substantially reforms the Honor-All-Cards rules;

* permits merchants to decline acceptance of high-cost Premium and Commercial credit cards while continuing to accept lower-cost cards on the same network;
* permits merchants to surcharge Visa and Mastercard credit cards up to 3%, regardless of whether the merchant accepts or surcharges American Express or competing cards;
* eliminates the Honor-All-Wallets rules;
* expands issuer-specific discounting authority;
* permits other issuer-level differentiation;
* creates mechanisms designed to encourage competition through lower-cost "value cards";
* provides substantial debit card relief;
* authorizes dual-pricing structures;
* enhances merchant buying-group leverage and collective negotiating power; and
* provides merchants with additional steering tools and competitive flexibility previously prohibited by Network Rules; and
* eases the transition to a more competitive marketplace by providing interchange rate caps and substantial rollbacks, benefiting merchants paying both posted and negotiated rates.

As explained by ERCPs' experts, Dr. Stiglitz and Dr. Leffler, these reforms are designed to move interchange pricing and payment-card competition materially closer to competitive market conditions by reducing restraints that have historically limited merchant bargaining power and inhibited price competition. *See* Declaration of Joseph E. Stiglitz, Ph.D. and Keith B. Leffler, Ph.D. ("Stiglitz Decl."), ECF No. 9692-5 ¶¶ 8-16, 102-104, 109-112.

The Amended Settlement is thus the product of years of exceptionally complex and hard-fought litigation, enormous financial and professional commitment by ERCC, substantial and continuing litigation risk, extensive mediation efforts, and persistent advocacy even after the significant procedural setback resulting from the denial of preliminary approval of the earlier proposed settlement.

### K. MOTION FOR PRELIMINARY APPROVAL OF THE AMENDED SETTLEMENT

On November 10, 2025, ERCPs moved for preliminary approval of the Amended Settlement. ECF Nos. 9690, 9692 (redacted), 9694 (sealed). Beginning on December 9, 2025, a number of businesses and individuals filed objections, ECF Nos. 9714, 9719-20, 9722, 9725-26, 9727-9729, 9733-9736, 9740-45, 9749-9764, 9771, 9778, to which ERCPs replied on January 14, 2026. ECF No. 9775 (redacted). Thereafter, ERCC worked diligently to prepare for the preliminary approval hearing, which was held on April 27, 2026. On June 9, 2026, the Court issued a Memorandum Decision and Order granting preliminary approval of the Amended Settlement. ECF No. 9884. On June 15, 2026, the Court entered an order "preliminarily approv[ing] the Superseding and Amended Rule 23(b)(2) Class Settlement Agreement for class action settlement purposes as within the range of a fair, reasonable, and adequate settlement within the meaning of Federal Rule of Civil Procedure 23 and applicable law, and consistent with due process." ECF No. 9887.

## III. ARGUMENT

The requested award of $206 million, inclusive of attorneys' fees, litigation expenses, and service awards, was negotiated only after the parties reached agreement on all material terms of the Amended Settlement and will be paid separately by the Network Defendants, and thus will not diminish or otherwise affect the benefits afforded to the Class. As demonstrated below, the attorneys' fee amount is fair and reasonable under Rule 23(h), the lodestar method, and the *Goldberger* factors, including the reasonableness of the requested multiplier. As additional

confirmation of the fourth and fifth *Goldberger* considerations—the quality of representation and the relationship between the requested fee and the relief obtained—the requested fee award represents a small fraction of the value of the benefits conferred on the Class under any credible, objective valuation methodology.

### A. COURTS ROUTINELY APPROVE AND ENCOURAGE FEE AGREEMENTS NEGOTIATED AFTER RESOLUTION OF THE MERITS AND PAID FOR SEPARATELY BY DEFENDANTS PURSUANT TO RULE 23(H)

Rule 23(h) expressly authorizes courts to award reasonable attorneys' fees "that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). Courts have long recognized that fee agreements are not only permissible but desirable. *See, e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorneys' fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee."); *Jones v. Amalgamated Warbasse Houses, Inc.*, 721 F.2d 881, 884-85 (2d Cir. 1983) ("The settlement process is undermined if the court attaches little weight to the fact that the parties have reached an agreed figure reflecting, as in this case, compromise on both sides."). Courts favor fee negotiations that occur only after agreement has been reached on the settlement's substantive terms, as that sequencing is more conducive to ensuring that counsel's compensation does not materially diminish the relief obtained for the class. *See Blessing v. Sirius XM Radio Inc.*, 507 Fed. Appx. 1, 4 (2d Cir. 2012) (noting that "the fee was negotiated only after settlement terms had been decided and did not, as the district court found, reduce what the class ultimately received"); Manual for Complex Litigation (Fourth) § 21.7, at p. 335 (2004) ("Separate negotiation of the class settlement before an agreement on fees is generally preferable.").

Here, the parties did not discuss attorneys' fees or expenses until after they reached agreement on all material substantive terms of the Amended Settlement. ERCC Decl. ¶ 77. Defendants then agreed to pay any Court-approved fee and expense award up to $206 million

separately from, and in addition to, the relief provided to the Class. Courts in this Circuit routinely approve such separately negotiated fee agreements in injunctive-only settlements. *See, e.g.*, *Blessing*, 507 F. App'x at 4 (affirming approval of injunctive only settlement and separately negotiated attorneys' fee award); *Malchman v. Davis*, 761 F.2d 893, 905 & n. 5 (2d Cir. 1985) *abrogated on other grounds*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). As explained below, this Court should do the same here.[14]

### B. THE REQUESTED FEE IS REASONABLE UNDER *GOLDBERGER*

Courts can check the reasonableness of fees using one or both of the lodestar method and the percentage-of-benefit method. Courts use each method within the framework of the six-factor standard set forth in *Goldberger v. Integrated Resources, Inc*., 209 F.3d 43 (2d Cir. 2000). Indeed, "[r]egardless of which method is chosen, the analysis is effectively the same." *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 723 (2d Cir. 2023); *see also Fresno Cnty. Emps.' Ret. Ass'n v. Isaacson/Weaver Family Tr.*, 925 F.3d 63, 68 (2d Cir. 2019); *McDaniel v. County of Schenectady*, 595 F.3d 411, 423 (2d Cir. 2010); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005).

Under *Goldberger*, courts consider: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of

---

[14] Some district courts in this Circuit have held that '"the Court's fiduciary role in overseeing the award is greatly reduced'" when, as here, attorneys' fees are paid separately by defendants and do not diminish the relief afforded to the class, '"because'" in such a case '"there is no conflict of interest between attorneys and class members.'" *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 243 (E.D.N.Y. 2010) (quoting *McBean v. City of N.Y.*, 233 F.R.D. 377, 392 (S.D.N.Y. 2006)); *see also Jermyn v. Best Buy Stores, L.P.*, 2012 WL 2505644, *9 (S.D.N.Y. June 27, 2012) (noting the "danger of conflicts of interest between attorneys and class members is diminished" in settlements only containing injunctive relief). ERCC agree with those cases. But given the clear reasonableness of the negotiated fee here under any valid standard, *see infra*, there is no reason for this Court to apply a less-rigorous review. Under any standard of review, the negotiated fee here is more than reasonable, as explained below.

representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." 209 F.3d at 50. Moreover, "the relief actually delivered to the class can be a significant factor in determining the appropriate fee award." *Moses v. New York Times Co.*, 79 F.4th 235, 244 (2d Cir. 2023).

The requested fee yields a lodestar multiplier that falls within the range routinely approved in complex, contingent litigation and appropriately reflects the extraordinary risks undertaken by ERCC. Moreover, when considered in relation to the value of the relief obtained and the exceptional quality of representation under *Goldberger*'s fourth and fifth factors, the requested fee represents only a small fraction of the benefit conferred on the Class under any credible valuation methodology. The requested fee is therefore fair, reasonable, and fully warranted.

**1. The Time and Labor Expended and the Magnitude and Complexity of the Litigation Support the Requested Fee (*Goldberger* Factors One and Two).**

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 433. In cases of this magnitude and complexity, courts routinely conclude that the substantial time and labor devoted by counsel strongly support a significant fee award. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6888488, at *10 (E.D.N.Y. Dec. 16, 2019) (collecting similar cases).[15]

That principle applies with full force here. As detailed in the ERCC Declaration and summarized above, through June 30, 2026, ERCC devoted approximately 77,203.35 hours to

---

[15] For example, *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 129 (S.D.N.Y. 2009), *aff'd sub nom. Priceline.com, Inc. v. Silberman*, 405 F. App'x 532 (2d Cir. 2010); *Pearlstein v. BlackBerry Ltd.*, 2022 WL 4554858, at *9-10 (S.D.N.Y. Sept. 29, 2022).

prosecuting this litigation and securing the Amended Settlement. At current rates, ERCC's lodestar is $75,868,509.25, and the requested fee reflects a multiplier of approximately 2.6. As shown in Section III(B)(2) below, the multiplier is reasonable and compares very favorably to the multipliers that courts in this Circuit routinely approve in complex contingent litigation.

The time and effort expended by ERCC were necessitated by the exceptional magnitude and complexity of the case. For nearly a decade following remand from the Second Circuit, ERCC prosecuted this Rule 23(b)(2) action against the nation's largest payment-card networks and issuing banks, represented by some of the most sophisticated defense firms in the world. ERCC navigated evolving antitrust jurisprudence and extraordinary litigation risks, including the Supreme Court's decision in *Ohio v. American Express*, which fundamentally altered the legal framework governing two-sided transaction platforms.

Despite these challenges, ERCC defeated the Bank Defendants' motion to dismiss, obtained certification of a mandatory nationwide Rule 23(b)(2) class, largely prevailed in extensive *Daubert* proceedings and the principal summary judgment motions, coordinated voluminous fact and expert discovery, engaged in two rounds of mediation, and prepared for trial. This sustained and highly complex litigation effort culminated in the Amended Settlement now before the Court.

The complexity of this litigation likewise supports the reasonableness of ERCC's hourly rates. Although the Second Circuit's forum rule generally looks to prevailing rates in the district in which the reviewing court sits, the rule is not rigid. This Court has recognized that "there are different rates applicable to different kinds of cases because the demand for lawyers is different, the volume of lawyers bringing those cases is different, the size of overhead costs of the firms bringing those cases is different, and the expertise needed for different kinds of cases is different." *Moore v. Rubin*, 766 F. Supp. 3d 423, 427 (E.D.N.Y. 2025) (Cogan, J.). Accordingly, rates above

ordinary district rates may be appropriate in "a more complex case." *Id*. at 428.

This case readily satisfies that standard. The litigation involved exceptionally complex and high-stakes antitrust claims challenging longstanding restraints in the payment card industry. It required mastery of evolving antitrust doctrine, sophisticated economic and industry analyses, extensive expert coordination, and the resources necessary to litigate against large and well-heeled defendants and defense firms. ERCC's rates are those that a client would expect to pay to litigate this case. *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany & Albany Cnty. Bd. of Elections*, 522 F.3d 182, 191 (2d Cir. 2008) (courts should determine what a reasonable, paying client would be willing to pay to litigate the case effectively).

Indeed, the relevant market here is not the market for general commercial litigators in the Eastern District of New York. Rather, it is the national market for plaintiff-side antitrust counsel capable of prosecuting a contingent case of this magnitude and complexity. Every firm that sought appointment as counsel for the Rule 23(b)(2) Class in 2016 was located outside this district. ERCC Decl. ¶ 13. The market for legal services in this case has always been national in scope. Under these circumstances, as this Court has recognized, the rates charged by the firms with the capability of undertaking contingent, plaintiff-side antitrust litigation of this magnitude for a decade are "much higher than those customarily charged in the Eastern District of New York." *In re Vitamin C Antitrust Litig.*, 2013 WL 6858853, at *1-2 (E.D.N.Y. Dec. 30, 2013) (Cogan, J.).

ERCCs' hourly rates range from $700 to $1,850 for partners, $400 to $1,050 for associates, and $125 to $625 for professional and support staff. These rates are comparable to those charged by other plaintiff-side antitrust counsel, who even seven years ago "routinely charge[d] between $1,200 and $1,300 an hour," with the top specialized lawyers charging "$1,800 or even $1,950." *In re Auto. Parts Antitrust Litig.*, 2018 WL 7108072, at *3 (E.D. Mich. Nov. 5, 2018) (citation

omitted).

Moreover, these are the customary rates regularly charged by ERCC and reflect the experience, skill, and sophistication required to perform the work, the prevailing rates in the markets in which these services are ordinarily rendered, and the exceptional expertise of the attorneys and professional staff involved. ERCC's lodestar was calculated using current hourly rates, an approach routinely approved in long-running complex litigation to account for inflation and the lost time value of money. *See Gieringer v. Gleason*, 160 F.3d 858, 882 (2d Cir. 1998); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998); *Fleisher v. Phoenix Life Ins. Co.*, 2015 WL 10847814, at *18 (S.D.N.Y. Sept. 9, 2015).

In short, *Goldberger*'s first and second factors strongly support the requested fee. ERCC devoted extraordinary time and resources to one of the most complex and hard-fought antitrust litigations in recent memory, exercised substantial billing judgment in calculating their lodestar, and secured transformative relief only after nearly a decade of extraordinarily difficult litigation. These considerations strongly support the reasonableness of the requested fee and the resulting multiplier.

### 2. The Requested Lodestar Multiplier Is Reasonable and Fully Supported by the Extraordinary Risks, Continuing Obligations, and Strong Public Policy Considerations Presented by This Litigation (*Goldberger* Factors Three and Six)

The Second Circuit has long recognized that district courts may enhance the lodestar through a multiplier to account for factors not fully captured by hourly rates and hours worked because "an unenhanced lodestar fee does not account for the contingent risk that a lawyer may assume in taking on a case." *Fresno Cnty. Emps.' Ret. Ass'n*, 925 F.3d at 68. Courts in this Circuit regularly approve multipliers in complex contingent litigation, including multipliers ranging from approximately two to six times counsel's lodestar. *In re Visa Check/MasterMoney Antitrust Litig.*,

297 F. Supp. 2d 503, 524 (E.D.N.Y. 2003), *aff'd*, *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005) (3.5 multiplier); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (3.97 multiplier); *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *18 (S.D.N.Y. Apr. 26, 2016) (6 multiplier); *Monserrate v. Tequipment, Inc.*, 2012 WL 5830557, at *3 (E.D.N.Y. Nov. 16, 2012) (5 multiplier).[16] These multipliers encourage capable lawyers to take on substantial, meaningful litigation and account for "the risk of the litigation and the performance of the attorneys." *Goldberger*, 209 F.3d at 47. The Court of Appeals has "historically labeled the risk of success as 'perhaps the foremost' factor to be considered in determining whether to award an enhancement." *Id.* at 54 (citations omitted).

The requested multiplier of 2.6 readily satisfies these standards and falls well within the range of multipliers approved in comparable litigation. From its inception, this litigation presented extraordinary risk and remained uncertain at every stage. Nor was this a case that settled early or yielded an easy recovery. Quite the opposite. Persistence in the face of these risks strongly supports the requested multiplier.

The requested multiplier is also independently reasonable because the requested fee encompasses substantial future work and risk that ERCC must continue to bear without any opportunity to seek additional compensation. ERCC expect to incur significant additional

---

[16] *See also Bekker v. Neuberger Berman Group 401(K) Plan Investment Committee*, 504 F. Supp. 3d 265, 271 (S.D.N.Y. 2020) (5.85 multiplier); *Azogue v. 16 for 8 Hospitality LLC*, 2016 WL 4411422, at *7 (S.D.N.Y. Aug. 19, 2016) ("Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers") (quoting *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013)); *Fleisher v. Phoenix Life Ins. Co.*, 2015 WL 10847814, at *18 (S.D.N.Y. Sep. 9, 2015) (4.87 multiplier); *In re Colgate-Palmolive Co ERISA Litig.*, 36 F. Supp. 3d 344, 347 (S.D.N.Y. 2014) (5.2 multiplier); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481-82 (S.D.N.Y. 2013) (6.3 multiplier); *In re GSE Bonds Antitrust Litig.*, 2020 WL 3250593, at *5 (S.D.N.Y. Jun. 16, 2020) (recognizing that a 4.09 multiplier is within the range of what has been considered reasonable by courts); *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *17 n.7 (S.D.N.Y. July 27, 2007) ("Lodestar multipliers of nearly 5 have been deemed common by courts in this District.").

attorneys' fees and litigation expenses in implementing and defending the Amended Settlement, including through any appellate proceedings. In addition, ERCC will oversee the Merchant Education Program and monitor compliance with numerous settlement provisions. ERCC may be required to participate in proceedings concerning the Network Defendants' compliance with the 10-bps average-effective-rate reduction (Amended Settlement ¶¶ 48(e)-(f), 52, 97(e)-(f), 101); any Visa-requested changes to product identifiers (*id*. ¶ 27); any improper network rate structures (*id*. ¶¶ 30(b), 43(f)(ii), 79(b), 92(f)(ii)); and any network or issuer conduct designed to circumvent the Amended Settlement's provisions (*id*. ¶¶ 54, 103). In many respects, the Amended Settlement imposes on ERCC an ongoing compliance monitoring role that extends years beyond entry of final judgment.

As this Court has recognized, "[t]he fact that Class Counsel's fee award will not only compensate them for time and effort already expended, but for time that they will be required to spend administering the settlement going forward also supports their fee request." *Massiah v. Metroplus Health Plan, Inc.*, 2012 WL 5874655, at *8 (E.D.N.Y. Nov. 20, 2012) (Cogan, J.); *see also Clem v. KeyBank, N.A.*, 2014 WL 2895918, at *10 (S.D.N.Y. June 20, 2014) (same).

Public policy considerations also support the requested multiplier. ERCC undertook this representation expecting that there would be no common fund from which any fee would be paid and no guarantee that years of effort and millions of dollars in advanced expenses would ever be compensated. The requested fee is therefore reasonable not only because of the extraordinary risks and exceptional result discussed above, but also because it ensures that capable counsel will remain willing to undertake similarly difficult, risky, and socially valuable injunctive relief litigation in the future.

As this Court has recognized, "[a]ttorneys who fill the private attorney general role must

be adequately compensated for their efforts," because otherwise violations of important public policies "would go without remedy because attorneys would be unwilling to take on the risk." *Massiah*, 2012 WL 5874655, at *7.[17] The Second Circuit has likewise emphasized the importance of "providing lawyers with sufficient incentive to bring … cases that serve the public interest." *Goldberger*, 209 F.3d at 51. Absent the prospect of an enhanced fee reflecting both contingency risk and the difficulty of valuing structural relief, few, if any, firms would have the economic incentive to devote nearly a decade of uncompensated effort to securing industry-wide reforms of this magnitude.

Those concerns are particularly acute in cases seeking structural and injunctive relief rather than damages. Because the benefits of injunctive relief are often broad, prospective, and not readily reducible to a single monetary figure, there is a substantial risk that counsel who secure transformative market reforms will be undercompensated relative to the value of the benefits they create. The Supreme Court has cautioned against an "undesirable emphasis" on monetary recovery that might "shortchange efforts to seek effective injunctive or declaratory relief." *Blanchard v. Bergeron*, 489 U.S. 87, 95 (1989). Courts should be especially mindful of that concern in major antitrust cases, where injunctive relief frequently provides the only mechanism for eliminating unlawful restraints and restoring competitive conditions in important markets. This litigation "has the potential to impact the way nearly all business is conducted in this country," and it requires fee awards sufficient to "incentivize[] and attract[] capable counsel to bring such protracted and

[17] *See also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 634-35 (1985) (noting "the fundamental importance to American democratic capitalism of the regime of the antitrust laws," and the "central role" that private litigation plays in enforcement); *In re Southeastern Milk Antitrust Litig.*, 2013 WL 2155387, at *5 (E.D. Tenn. May 17, 2013) ("Society's interests are clearly furthered by the private prosecution of civil cases which further important public policy goals, such as vigorous competition by marketplace competitors").

difficult lawsuits." *Payment Card*, 2019 WL 6888488, at *21.[18]

Accordingly, *Goldberger*'s third and sixth factors strongly support the requested multiplier. The multiplier sought here is within the range routinely approved in complex contingent litigation and, given the extraordinary risks undertaken, the transformative relief obtained, and the substantial future obligations that ERCC must discharge, the requested fee is not only reasonable, but particularly appropriate under the unique circumstances of this case.

#### 3. *Goldberger* Factors Four and Five Strongly Support the Requested Fee Because It Represents a Small Fraction of the Extraordinary Benefits Conferred on the Class

"Compensating counsel for the actual benefits conferred on the class members" is the foundation for assessing the reasonableness of a fee award, including where class members receive nonmonetary benefits. Manual for Complex Litigation (Fourth) § 21.71, at p. 336 (2004); *see also Hensley*, 461 U.S. 426 (the degree of success obtained is the "most critical factor" in determining a reasonable fee). Here, both qualitatively and quantitatively, the benefits secured by ERCC strongly support the requested fee.

Qualitatively, the Amended Settlement represents an exceptional result achieved after years of extraordinarily complex and hard-fought litigation. *See, e.g.*, Stiglitz & Leffler Decl. ¶ 5, ECF No. 9694-3 (Nov. 9, 2025) ("For decades, Visa and Mastercard have imposed rules on merchants that restrain them from steering …"); *id.* ¶ 9 ("The Amended Settlement … eliminates nearly all restraints on merchant efforts to steer customers to low-cost payment methods via

---

[18] *See also United States v. E.I. Du Pont de Nemours & Co.*, 366 U.S. 316, 323 (1961) ("The proper disposition of antitrust cases is obviously of great public importance, and their remedial phase, more often than not, is crucial."); *Int'l Salt Co., Inc. v. U.S.*, 332 U.S. 392, 401 (1947) ("A public interest served by such civil suits is that they effectively pry open to competition a market that has been closed by defendants' illegal restraints.").

pricing.”).

When first appointed Class counsel in 2017, ERCC kept the pressure on the Defendants by not seeking any adjustments to the schedule and by then retaining world-renowned economic experts, including Professors Joseph Stiglitz and Dennis Carlton. Otherwise unable to elicit an acceptable settlement, ERCC litigated and won the ensuing summary judgment and *Daubert* motions. This Court recognized that ERCC’s prevailing on these motions “certainly has given [the Class] leverage in settlement negotiations.” 2026 WL 1662251, at *11. ERCC achieved these results against Defendants that were represented by some of the world’s premiere lawyers and law firms. *See Payment Card*, 2019 WL 6888488, at *15 (“the size and skill of the defense they litigated against cannot be overstated”); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 246 F.R.D. 156, 174 (S.D.N.Y. 2007) (“The quality of opposing counsel is also important in evaluating the quality of Class Counsels’ work.”) (citations omitted); *Hall v. ProSource Techs., LLC*, 2016 WL 1555128, at *15 (E.D.N.Y. Apr. 11, 2016) (same); *In re Nasdaq Market– Makers Antitrust Litig.*, 187 F.R.D. at 489 (awarding counsel 14% of $1 billion settlement where defendants’ counsel included “the nation’s biggest and best defense firms operating on a seemingly unlimited budget over a period of four years”).

Moreover, the Court of Appeals has held that “the quality of representation is best measured by results.” *Goldberger*, 209 F.3d at 55. The Amended Settlement compares favorably to the relief that could reasonably have been expected through continued litigation and, in several respects approaches or exceeds the benefits that might have been achieved through a complete victory at trial and on appeal. Although the Amended Settlement may not constitute a “slam dunk,” this Court has preliminarily concluded that none of the objections to preliminary approval “persuaded the Court that [the Class] will, or even can, get more through trial.” Prelim. Appr.

Order at 22, WL 1662251, at *12. The Court likewise recognized the substantial risk that continued litigation would "not secure the relief that the Amended Settlement offers." *Id.*

Quantitatively, under any reasonable range of outcomes under the Amended Settlement, the requested fee will amount to a tiny fraction of the benefit to the Class. *See* Stiglitz & Leffler Decl., ECF No. 9694-5 ¶¶ 110, 111. "[W]hile this is not a common fund case, the fact that the award here is lower than many awards actually taken from a common fund, at the expense of absent class members, is further evidence of its reasonableness." *McBean v. City of New York*, 233 F.R.D. 377, 393 (S.D.N.Y. 2006); *see also Sow v. City of New York*, 2024 WL 964595, at *7 (S.D.N.Y. March 5, 2024). This outstanding result, and the benefit in relation to the fees, fully support the fees' reasonableness, whether considered independently or as a basis for an increased lodestar multiplier. *See, e.g.*, *Berry v. Schulman*, 807 F.3d 600, 615, 617, 618 (4th Cir. 2015); *Pearlman v. Cablevision Systems Corp.*, 2019 WL 3974358, at *3-4 (E.D.N.Y. 2019); *Fleisher v. Phoenix Life Ins. Co.*, 2015 WL 10847814, at *17 (S.D.N.Y. Sept. 9, 2015); *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 243 (E.D.N.Y. 2010); *Velez v. Novartis Pharms. Corp.*, 2010 WL 4877852, at *21-22 (S.D.N.Y. Nov. 30, 2010).

*Goldberger*'s fourth and fifth factors therefore strongly support approval of the requested fee.

### C. REIMBURSEMENT OF EXPENSES

The requested award includes reimbursement of $7,824,940.10 million in litigation expenses reasonably incurred in prosecuting this action over the course of a decade. ERCC Decl. ¶¶ 3, 92-94. Those expenses include substantial expert and consultant fees, mediation costs, electronic discovery and document-management expenses, deposition and transcript costs, legal research charges, travel expenses, court-reporting fees, filing fees, and other customary litigation expenditures necessarily incurred in complex antitrust litigation. *Id*.

It is well accepted that counsel are entitled to the reimbursement of reasonable litigation expenses incurred to achieve a class action settlement. *See In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 363 (E.D.N.Y. 2010) ("[i]n connection with settlement of a class action, counsel's reasonable out-of-pocket expenses are properly awarded"); *see also Penn. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 318 F.R.D. 19, 27 (S.D.N.Y. 2016) ("When the lion's share of expenses reflects the typical costs of complex litigation such as experts and consultants, trial consultants, litigation and trial support services, document imaging and copying, deposition costs, online legal research, and travel expenses, courts should not depart from the common practice in this Circuit of granting expense requests.") (internal quotation marks omitted).

The expenses incurred here were necessary and reasonable given the magnitude, duration, and complexity of this litigation. Successfully litigating and resolving a case of this scale required substantial investments in experts, economic analysis, electronic discovery infrastructure, and other litigation-support services. These are precisely the types of expenditures routinely reimbursed in complex antitrust and class action litigation. Moreover, ERCC ensured that only reasonable, litigation-related expenses were included in the request. ERCC Decl. ¶¶ 3, 92-94.

Finally, ERCC advanced these expenses, and may well advance likely future appellate expenses, entirely on a contingent basis, with no guarantee of reimbursement. Had the litigation not succeeded, ERCC would have borne these costs themselves. Reimbursement of those expenses is therefore appropriate and consistent with longstanding practice in complex contingent litigation. *Id*.

Accordingly, because the requested expenses were reasonably incurred, are adequately documented, and are of the type customarily charged to paying clients in complex litigation, they should be fully reimbursed.

### D. The Requested Service Awards for the Settlement Class Representatives Are Reasonable

ERCC respectfully request a Service Award for the Settlement Class Representatives in the amount of $75,000 each, for a total of $375,000. These awards will not diminish any recovery by the Class, but will be paid solely as part of the separately negotiated $206 million requested award.

"[S]ervice awards are common in class action cases and are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by plaintiffs." *Massiah*, 2012 WL 5874655, at *8; *see also Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 200-01 (S.D.N.Y. 1997); *Sheppard v. Consol. Edison Co. of New York*, 2002 WL 2003206, at *5 (E.D.N.Y. Aug. 1, 2002).

The requested Service Awards are appropriate and justified here. Over the course of approximately a decade, the Class Representatives actively participated in the prosecution of this action by regularly communicating with ERCC, reviewing pleadings and significant filings, responding to discovery requests, gathering and producing documents and information, participating in litigation and settlement strategy discussions, and remaining actively engaged throughout the settlement negotiations and approval process. *See* Declaration of Arthur Boss, Jr., Boss Dental Care ¶¶ 4–14; Declaration of Carlos Perez, CMP Consulting Services, Inc. ¶¶ 4–13; Declaration of Hal Goldman, Generic Depot 3, Inc. d/b/a Prescription Depot ¶¶ 4–12; Declaration of Brittany Owens, PureOne, LLC d/b/a Salon Pure ¶¶ 4–13; Declaration of Carlos Perez, RunCentral, LLC ¶¶ 4–13, attached as Exhibits H through L to the Declaration. Their involvement required the expenditure of substantial time, attention, and business resources over many years in support of the Class and the litigation. *Id.* In undertaking these responsibilities, the Class

Representatives fulfilled important fiduciary obligations on behalf of millions of absent class members.

The requested Service Awards are modest considering the duration of the litigation, the significant commitments undertaken by the Class Representatives, and the substantial benefits achieved for the Class. Moreover, the requested Service Awards will not diminish the relief available to the Class because they will be paid as part of the requested award. The requested Service Awards, therefore, are fair and warranted.

## IV. CONCLUSION

For all the reasons detailed above, ERCC respectfully request that the Court grant Equitable Relief Class Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards.

Dated: July 15, 2026

Respectfully submitted,

/s/ *Robert G. Eisler*

Robert G. Eisler
Chad B. Holtzman
GRANT & EISENHOFER P.A.
485 Lexington Ave., 29th Floor
New York, NY 10017
(646) 722-8500
reisler@gelaw.com
choltzman@gelaw.com

Steve D. Shadowen
Tina J. Miranda
HILLIARD SHADOWEN LLP
1717 W. 6th Street, Suite 290
Austin, TX 78703
(855) 344-3298
steve@hilliardshadowenlaw.com
tmiranda@hilliardshadowenlaw.com

Michael J. Freed
William H. London
Robert J. Wozniak
JUSTICE JAGHER LONDON & MILLEN LLC
100 Tri-State International, Suite 128

Lincolnshire, IL 60069
(224) 632-4500
mfreed@fklmlaw.com
wlondon@fklmlaw.com
rwozniak@fklmlaw.com

Linda P. Nussbaum
Susan R. Schwaiger
Lauren M. Kostman
NUSSBAUM LAW GROUP, P.C.
1225 Franklin Ave.
Garden City, NY 11530
(917) 438-9189
lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com
lkostman@nussbaumpc.com

*Equitable Relief Class Counsel*