THE FOOD INDUSTRY ASSOCIATION

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ SEP 02 2026 ★
BROOKLYN OFFICE

August 28, 2026

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation : No. 05-MD-1720 (BMC)(JAM)

Statement of Objections

Food Marketplace Inc. dba FMI – The Food Industry Association (FMI) is a member of the Rule 23(b)(2) Class in the case called *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*. Having accepted Visa and Mastercard credit cards between December 18, 2020, and today, we respectfully object to the proposed settlement.

As the food industry association, FMI works with and on behalf of the entire industry to advance a safer, healthier, and more efficient consumer food supply chain. FMI brings together a wide range of members across the value chain – from retailers that sell to consumers, to producers that supply food and other products, as well as a variety of companies providing critical services – to amplify the work of the industry.

FMI's membership manufactures, distributes, and sells food and consumer goods that are found in pantries, refrigerators, medicine cabinets, and laundry rooms across the country. Our retail members, which range in size from independent operators to regional and large national and international businesses and brands, operate 45,000 grocery stores and 12,000 supermarket pharmacies. The food industry produces and supplies over 30,000 different food and consumer good products found on store shelves, employs over 6.3 million individuals, and ultimately touches the lives of more than 100 million U.S. households per week.

Food retailing is a diverse industry that presents a unique set of challenges, considering the numerous daily functions a single store provides to its customers and communities. Grocery stores are the hub for everyday food and consumer goods, operating pharmacies that dispense life-depending medications, vaccines, and flu shots, and serving the community of Americans who rely on critical food assistance programs like the Supplemental Nutrition Assistance Program (SNAP) and the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC). These functions involve millions of financial transactions every day.

The grocery industry is among the most competitive in our economy. Grocers negotiate prices on every product they sell and every service they use with vendors and operate on razor-thin profit margins – about 2.1% on average[1]. Intense competition for consumer business and market share helps keep prices

[1] FMI: Grocery Store Chains Net Profits

down for shoppers. Conversely, the credit card market today is among the least competitive sectors in our economy. Just two companies, Visa and Mastercard, centrally set the interchange fee rates and transaction terms for all the financial institutions that issue cards bearing a Visa or Mastercard network logo, and consumers and merchants, including grocers in every community in the country, are on the losing end of this unregulated fee fixing.

The duopoly of Visa and Mastercard controls over 80% of the card market in the U.S.[2] and enjoy profit margins of around 50%[3]. These dominant card network companies have established a system of fees and rules that limit market competition between the thousands of financial institutions that issue their branded cards. In grocery terms, it would be anticompetitive and illegal for a wholesaler (whose function is to supply goods to a store) to tell the peanut butter manufacturer (whose function is to produce the product) what the manufacturer price is for a jar of peanut butter. In the grocery supply chain, the manufacturer sets its own price, the wholesaler sets its own price, and the store sets its own price.

Card-issuing banks and credit unions within the Visa and Mastercard network systems do not compete with each other on the fee rates they receive from merchants on card transactions, nor do they compete with respect to the terms and conditions governing acceptance of their cards by merchants. Instead, Visa and Mastercard centrally set the fee rates for the interchange fees that card issuers deduct from card transaction amounts and centrally set transaction terms and conditions via so-called network rules. Because of this centralized fee-fixing, all issuers in each network enjoy the same guaranteed interchange fee rates as every other issuer in the network no matter how efficiently or inefficiently a particular issuer runs its card operations and no matter how much or how little fraud is associated with the issuer's cards. Because of Visa and Mastercard's respective network rules, merchants are also required to accept all branded cards from all issuers in the network, no matter how high the fees get or how much fraud occurs.

This system of centralized fees and rules that Visa and Mastercard have set up with their card issuers shields interchange fee rates from normal market competition and results in excessively high fees that far exceed the reasonable costs of conducting transactions. Every time a credit card is used for a purchase, a merchant is charged swipe fees that are collected by the credit card networks and the card-issuing bank or credit union. These fees (which include fees imposed on any sales tax or gratuity portion of the transaction) can total up to 4% of the transaction amount, which means that merchants often only receive 96 cents of each dollar paid by card. Because the fees are largely percentage-based, the fees grow with inflation and in turn accelerate that inflation. This also means that Visa, Mastercard, and card issuers often make more of a profit from grocery purchases than the store does.

It is not necessary for the fees to be this high. In the European Union, credit card interchange fee rates are capped at 0.3% per transaction – a small fraction of the average Visa and Mastercard U.S. credit card

---

[2] *See* Board of Governors of the Federal Reserve System, "Profitability of Credit Card Operations of Depository Institutions," June 2024, at p. 5 ("The general-purpose bank credit card market in the U.S. is dominated by cards issued on the Visa and Mastercard networks, which, combined, accounted for 726.6 million cards, or about 85 percent of general-purpose credit cards, in 2023."); *see also* Complaint, United States of America v. Visa, Inc., 1:24-cv-07214, (S.D.N.Y.) Sept. 24, 2024, at 7 ("Today, over 60% of all U.S. debit transactions run via Visa's payments network. Mastercard is a distant second, processing less than 25% of all U.S. debit transactions.")

[3] Emma Withrow, "Fact Check Team: Credit card giants' profit margins exceed 50% amidst American debt crisis," The National News Desk, Dec. 20, 2024.

rates – and the credit card systems in Europe operate efficiently and profitably[4]. However, Visa and Mastercard's fee-fixing in the United States allows them to get away with imposing fees that are much higher than those in the European Union and much higher than what a competitive market would bear (and because Visa and Mastercard charge their own network fee on each card transaction, they profit by setting interchange fee rates at high levels that incentivize issuers to issue more cards). Visa and Mastercard's high fees place pressure on grocery merchants, who operate on narrow single-digit margins, to incorporate these fees into retail prices to cover the costs.

As our economy has increasingly moved away from cash transactions and toward electronic retail payments – particularly during the pandemic – grocery stores have seen increased customer use of credit and debit cards. According to FMI's most recent Food Retailing Industry Speaks survey, 81% of grocery store purchases in 2025 were made with a credit or debit card – a 12% increase in use of these payment cards over the last decade[5]. Of this amount, 42% of all grocery purchases were made with a credit card, and 76% of all online grocery purchases were made with a credit card. Online purchases, including those made for curbside or in-store pickup and third-party or on-demand delivery, are categorized as "card not present" which yields an even higher interchange fee for grocery merchants.

While we recognize that there are benefits to electronic payment transactions, the anticompetitive fee structures in the Visa and Mastercard systems mean U.S. merchants pay fees that far exceed what is reasonably necessary to operate card transactions and that also exceed the rates charged in other countries around the world. Credit and debit card swipe fees charged to U.S. merchants and consumers in 2025 totaled $198.25 billion according to the *Nilson Report*[6]– an increase of 80% since the pandemic and 5.9% from the previous year. Of this amount, Visa and Mastercard-branded credit card swipe fees on merchants and consumers in 2025 totaled $118.83 billion, which is an increase of 365% since 2009 ($25.6 billion). These fees amount to an average cost of over $1,200 per American household, according to the Merchants Payments Coalition[7]. It is not just the total amount of fees that has increased over the years; the average Visa and Mastercard credit card interchange fee rates have increased too, rising from 2.02% in 2010 to 2.26% in 2023 and 2.36% last year[8]. U.S. merchants and ultimately their customers now pay the highest swipe fees in the industrialized world[9].

Grocers are committed to serving all customers, regardless of how they pay. However, as noted above, swipe fees negatively impact U.S. consumers. The billions of dollars in excessive credit card swipe fees artificially drive up the price consumers pay for goods and services. Retailers are forced to incorporate these fees into their pricing decisions and sell items at the "credit card" price to cover costs. The impact disproportionately hurts lower income Americans, those who rely on cash, and those who do not have access to high rewards credit cards. As a recent Harvard Business School working paper reported, "interchange fees generate approximately $30 billion in annual transfers from cash and debit card users

---

[4] *See* Fumiko Hayashi et al., "Public Authority Involvement in Payment Card Markets: Various Countries – August 2025 Update," Federal Reserve Bank of Kansas City (discussing interchange fee reforms in various countries, including how the European Union has capped interchange rates since 2015 at 0.3% for credit cards).

[5] The Food Retailing Industry Speaks 2026

[6] *Nilson Report* 1303, March 2026

[7] Merchants Payments Coalition: "Credit and Debit Card 'Swipe' Fees Reach Record $198.25 Billion as President and Congress Call for Action," March 18, 2026

[8] Mass Market Retailers, "Merchants sound alarm as swipe fees hit $198B," March 18, 2026.

[9] CMSPI: How Do U.S. Card Fees Compare Internationally?

to credit card users," and "this represents a $9.2 billion annual transfer from low- and middle-income households earning less than $150,000 in annual income to higher-income households"[10].

Grocers have tried numerous approaches but have no ability to negotiate with Visa and Mastercard on contract terms or the cost of accepting cards as a form of payment from our customers. Swipe fees that grocers must pay to accept credit and debit cards are typically grocers' highest operating cost after labor and rent. The situation is not sustainable, and there is an urgent need for swipe fee relief, but the proposed settlement is not relief.

The proposed settlement does not provide the meaningful relief from or permanent reform of the anticompetitive Visa-Mastercard duopoly that grocers have sought for over two decades. The timeframe and scope of the proposed settlement are temporary and limited and do not help grocers and our customers. This was also the case for the two previously proposed, and rejected, settlements. In fact, this proposed settlement is substantially like the March 26, 2024, proposed settlement that was rejected by Federal District Court Judge Margo Brodie of the Eastern District of New York in June 2024. For the following reasons and the above notations about the broken credit card market, FMI respectfully opposes the proposed settlement.

- The 10-basis point reduction in interchange fees for a period of five years will not provide significant relief for merchants and consumers. Visa and Mastercard's current rate average is 236 basis points. This means that with an average swipe fee of 2.36% on a purchase total, the proposed settlement would yield only a 1/10 of 1% reduction in the swipe fee levied on a grocer.
- It only pertains to the interchange fee portion of a swipe fee and not Visa and Mastercard's network fee portion of a swipe fee. Nothing in the proposed settlement would bar Visa and Mastercard from increasing their network fees to offset the temporary and limited reduction in the interchange fee.
- The proposed ability for merchants to refuse to accept rewards credit cards is a hollow offering that is unrealistic in practice. According to the Consumer Financial Protection Bureau,"[a]s of 2019, more than 90% of general purpose credit card spending occurred on rewards cards, and by the end of 2022, 75% of general purpose credit cards were rewards cards."[11] It is not realistic to expect merchants to opt out of accepting rewards credit cards given this statistic. The proposed settlement also does nothing to stop card issuers from shifting the remainder of their "standard" or no rewards cards over to rewards cards.
- The proposed interchange rate cap of 1.25% for "standard" or no rewards consumer credit cards for eight years offers little relief because of the dominance, as noted above, of cards classified as rewards cards.
- It restricts the legal rights of merchants and industry groups to challenge the anticompetitive credit card cartel pricing model for eight years. Because the proposed settlement is mandatory for any entity accepting cards, all merchants' hands would be tied to the terms and conditions of the proposed settlement.

---

[10] Mark Egan, *et al.*, "Who Pays for Payments?" Harvard Business School Working Paper 26-069, at p. 2.

[11] Consumer Financial Protection Circular 2024-07: Design, marketing and administration of credit card rewards programs, December 18, 2024

- Grocers of all sizes, even the largest retailers in the country, have no ability to negotiate with Visa and Mastercard on terms, conditions, and fees associated with accepting credit cards and the proposed settlement does nothing to change this.

In conclusion, FMI respectfully opposes the proposed settlement but remains committed to advancing meaningful, market-based competition in the broken U.S. credit and debit card systems for the greater good of our economy and consumer purchasing power. Grocers serve local communities around the country every day in a highly competitive manner. The anticompetitive Visa-Mastercard duopoly must be addressed in a more comprehensive and consequential manner than what this proposed settlement offers. As such, we urge the Court to reject the settlement proposal.

Sincerely,

Stephanie Harris

Stephanie Harris
Chief Public Policy Officer & General Counsel
FMI – The Food Industry Association
251 18th Street South, Suite 1200
Arlington, VA 22202
(202) 220-0614

cc: Robert G. Eisler, Grant & Eisenhofer P.A.
Matthew A. Eisenstein, Arnold & Porter Kaye Scholer LLP

FMI THE FOOD INDUSTRY ASSOCIATION

FMI
251 18th Street, S.
Suite 1200
Arlington, VA 22202

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF RETURN ADDRESS, FOLD AT DOTTED LINE

CERTIFIED MAIL

NOVA 220
28 AUG 2026 PM

9589 0710 5270 1835 4657 71

Retail

UNITED STATES POSTAL SERVICE

11201

U.S. POSTAGE PAID
FCM LETTER
ARLINGTON, VA
AUG 28, 2026

$6.37

S2324H500877-

RDC 99

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ SEP 02 2026 ★

BROOKLYN OFFICE

U.S. District Court for the Eastern District of New York
Clerk of Court
225 Cadman Plaza East
Brooklyn, NY 11201

USMS