**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION** | ) | |
| **This Document Applies To:** | ) | **No. 05-md-1720(BMC)(JAM)** |
| **Barry's Cut Rate Stores, Inc., et al. v. Visa, Inc., et al., No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM), also now known as DDMB, Inc., et al. v. Visa, Inc., et al., No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM)** | ) | |

**PEDERNALES ELECTRIC COOPERATIVE, INC.'S WRITTEN OBJECTION**

**TO PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT AGREEMENT**

**OF THE RULE 23(b)(2) PLAINTIFFS AND THE DEFENDANTS**

## TABLE OF CONTENTS


Table of Authorities ..... ii

I. Introduction ..... 1

II. Summary of Argument ..... 3

III. Argument ..... 4

A. Business realities justify low, flat interchange fees on Utilities transactions. ..... 4

B. Defendants inflate their fees by denying Utilities rates to certain selected products. ..... 5

C. Defendants reap windfalls by imposing HAC and NS rules on Utilities. ..... 7

D. The Proposal enshrines this broken system. ..... 10

1. The Proposal's HAC rule modifications do not address the harm to Utilities. ..... 10

2. The Proposal's rate reforms do not benefit Utility class members. ..... 11

3. The Proposal explicitly singles out Utilities class members and approves Defendants' continuing inequitable application of HAC and NS Rules against them, in particular. ..... 12

E. The Proposal could easily be modified to address these issues. ..... 14

IV. Conclusion and Prayer ..... 15

CERTIFICATE OF LENGTH ..... 16

CERTIFICATE OF SERVICE ..... 16

# TABLE OF AUTHORITIES

**Statutes, Rules, & Regulatory Materials**

TEX. BUS. & COM. CODE § 604A.0021 ........................................ 14

**Rules**

FED. R. CIV. P. 23(e)(3) ........................................ 14

Pedernales Electric Cooperative, Inc. (the "Cooperative" or "PEC"), based in Johnson City, Texas, is a member of the Rule 23(b)(2) Equitable Relief Plaintiff class in the above-captioned action. The Cooperative respectfully objects to preliminary approval of the settlement agreement jointly proposed on November 10, 2025 by the Rule 23(b)(2) Class Plaintiffs and Defendants Visa[1] and Mastercard[2] (collectively, "Defendants") [Dkt. 9692-2] (hereinafter, the "Proposal"), because the Proposal fails to address the ongoing costs Defendants are continuing to exact, through their application of Honor All Cards ("HAC") and No Surcharging ("NS") rules, on the Cooperative and thousands of other "Utilities" merchant class members who provide electricity, gas, water, and sanitary services to nearly every household and business in America.[3]

## I. Introduction

Founded in 1938 with the assistance of then-Congressman Lyndon B. Johnson, the Cooperative is a member-owned, not-for-profit, tax-exempt electric cooperative serving one million Central Texans in 45 cities and 24 counties, with distribution and transmission encompassing an area nearly the size of New Jersey (8,100 square miles). The Cooperative is

---

[1] "Visa" is defined as in the Proposal, namely, to mean Visa Inc., including Visa U.S.A. Inc. and Visa International (also known as Visa International Service Association), and each of their respective subsidiaries, successors, purchasers, and assigns (including an acquirer of all or substantially all of their respective assets, stock, or other ownership interests). Proposal at ¶ 1(rr).

[2] "Mastercard" is defined as in the Proposal, namely, to mean Mastercard International Incorporated and Mastercard Incorporated, and each of their respective subsidiaries, successors, purchasers, and assigns (including an acquirer of all or substantially all of their respective assets, stock, or other ownership interests). Proposal at ¶ 1(s).

[3] This Opposition addresses issues specific to merchant class members designated as Utilities pursuant to Merchant Category Code (MCC) 4900. MCC 4900 is reserved for businesses that, like the Cooperative, "provide the generation, transmission, and/or distribution of electric, gas, water, or sanitary utility services on an ongoing basis." *See, e.g.,* Ex. 1, *Visa Utility Interchange Reimbursement Fee (VUIRF) Program Guide* (hereinafter "Visa Utility Program Rules") at 1.

Though the Cooperative shares many of the concerns that have been expressed by other Objectors, those issues have already been briefed before this Court. Accordingly, this Objection focuses exclusively on the novel issue of the Proposal's unique impact specifically on the Cooperative and other Utilities members of the merchant class.

owned and governed by the members it serves, and is committed to delivering low-cost, reliable and safe energy. Today, the Cooperative delivers electricity to more than 430,000 meters, making it the largest of the almost 900 U.S. electrical cooperatives that serve more than 42 million individuals and 22 million businesses nationwide.[4]

Nearly half of the Cooperative's $920 million in annual revenue is collected through card transactions; in the year ending in July 2025, PEC's total card sales amounted to $440 million, for which the Cooperative paid approximately $4 million in card transaction fees.

Importantly, the issues underlying the Cooperative's Objection to the Proposal are not unique to PEC, or even to electrical cooperatives, but instead are **a common concern for Utilities merchants collecting over $1.3 *trillion* in customer payments each year**, including the entirety of the electricity ($514 billion in total revenue in 2024[5]), natural gas ($266 billion in 2024 revenues[6]), water ($564 billion in 2024 revenues[7]), and sanitary utilities services sectors.

As it stands, the Proposal fails to meet the Federal Rules' requirements for preliminary approval, because (in addition to issues raised by other Objectors) the Proposal fails to provide adequate relief to Utilities merchants like the Cooperative, and furthermore, treats these class members inequitably relative to other members of the Equitable Relief Class. *See* FED. R. CIV. P.

---

[4] *See* NRECA Fact Sheet February 2025: America's Cooperative Electric Utilities, *available at* https://www.cooperative.com/programs-services/bts/Documents/Data/Electric-Co-op-Fact-Sheet.pdf (presenting 2023 data).

[5] *See* U.S. Energy Information Administration, Table 2.3. Revenue from Sales of Electricity to Ultimate Customers, *available at* https://www.eia.gov/electricity/annual/table.php?t= epa_02_03.html (last visited April 18, 2026).

[6] *See* https://www.marketresearch.com/MarketLine-v3883/Gas-Utilities-United-States-42552806/ (last visited April 18, 2026).

[7] *See* https://www.marketresearch.com/MarketLine-v3883/Water-Utilities-United-States-42552842/ (last visited April 18, 2026).

23(e)(3). Accordingly, the Cooperative respectfully submits that preliminary approval should be denied unless the Proposal is materially revised to address the deficiencies described herein.

## II. SUMMARY OF ARGUMENT

Because Utilities transactions are uniquely low-risk and low-cost, Mastercard, Visa, and other card brands have all established special discounted interchange rate classes that apply to both consumer and business Utility bill payments.[8] But in the Utilities sector in particular, Defendants Visa and Mastercard are using Honor All Cards and No Surcharging rules to extract inflated interchange fees, with the ultimate burden falling on the millions of consumers who rely on credit cards to pay for necessary utilities such as electricity, gas, and water. Rather than reforming this system, the Proposal expressly *endorses* Defendants' continued use of the HAC and NS rules to extract inflated fees.

The Proposal does not offer meaningful relief to the Cooperative and other Utilities merchant class members. Instead, it authorizes the leveraging of HAC and NS rules specifically against Utilities merchants, to continue extracting higher profits for a minimum of eight more years. In so doing, the Proposal: (a) fails to provide the Cooperative and other Utilities class members adequate relief, and (b) treats them inequitably compared to other class members. The Cooperative submits that, if it is to be granted preliminary approval, the Proposal should first be modified to close loopholes that leave the Cooperative and other Utilities class members subject to inequitable application of the HAC and NS rules. The fix is simple: the Proposal should empower Utilities to refuse and/or surcharge Defendants' card products that incur

---

[8] *Available at* https://usa.visa.com/content/dam/VCOM/download/merchants/visa-usa-interchange-reimbursement-fees.pdf.

disproportionately high interchange fees, while retaining access to the established flat-rate Utilities interchange rates for the rest of their member/customer transactions.

## III. Argument

### A. Business realities justify low, flat interchange fees on Utilities transactions.

For many years, Defendants Visa and Mastercard, like all the major card brands, have purported to offer discounted rates for the interchange fees incurred by Utilities' customer payment transactions. In particular, Visa and Mastercard each have a "Utility Program" that establishes flat-rate interchange fees of $0.75 per transaction for "consumer" credit-card products, $1.50 per transaction for "business" credit-card products, and even lower fees for debit and pre-paid transactions.[9]

Although these preferential rates are a boon to consumers who may be literally struggling to keep their lights on, Defendants' Utility Programs are not simply largesse. Instead, their low, flat rates reflect the uniquely low risks and costs that card issuers and processors incur when Utilities customers pay their bills by card. For example, it is rare for a fraudster to use a stolen card to pay a utilities bill (which must be associated with an identified account); consumers paying for necessary utilities rarely charge-back their transactions; and Utilities merchants tend to be large, stable, and closely monitored by regulators.

In a competitive market, market pressures would induce Visa and Mastercard to pass the reduced risk and expense of Utilities transactions through to Utilities merchants in the form of lower interchange fees, who in turn would pass the savings through to their customers, ultimately

[9] *See* Ex. 2, *excerpted from* Visa USA Interchange Reimbursement Fees, *available at* https://usa.visa.com/content/dam/VCOM/download/merchants/visa-usa-interchange-reimbursement-fees.pdf; Ex. 3, *excerpted from* Mastercard 2025–2026 U.S. Region Interchange Programs and Rates, *available at* https://www.mastercard.com/content/dam/mccom/us/business/ documents/merchant-rates-2025-2026.pdf; *see also* Ex. 1, Visa Utility Program Rules.

allowing consumers to conveniently pay for necessary services with minimal transaction costs. Indeed, this is precisely what Defendants' existing Utility Programs purport to do: the Visa and Mastercard rate tables suggest that electricity, gas, water, and sanitary Utilities consumers should be able to pay for these essential services with Defendants' card products at minimal or no added expense, because merchants can easily absorb flat-rate $0.75 or $1.50 per transaction interchange fees.

But a closer look reveals a different reality. Through targeted use of HAC rules, Defendants are forcing Utilities to pay interchange fees orders of magnitude higher than their published Utility Program rates, and Defendants appear to be simply pocketing the proceeds. Further, Defendants use NS rules—and now a new Visa Service Fee initiative just introduced in October 2025—to put overwhelming pressure on Utilities to abandon Utility Program rates altogether. By driving these Utilities transactions (which remain low-risk and low-expense to process) into dramatically higher fee classes, Defendants extract interchange fees for Utilities payments up to ten times higher than is actually justified for these unique transaction types. Though this abuse of the HAC and NS rules is precisely the type of injury at the heart of this litigation, the Proposal expressly empowers Defendants to continue these practices against Utilities merchants for at least the next eight years.

**B. <u>Defendants inflate their fees by denying Utilities rates to certain selected products.</u>**

Though Defendants' published Utility Program rates reflect the underlying low-cost nature of Utilities transactions, they do *not* represent the fees Defendants are in fact collecting from Utilities merchants. Instead, as representative PEC transaction data illuminates, Defendants are unfairly inflating their profits by charging dramatically higher fees for a tiny fraction of Utilities transactions – then using the HAC rule to force Utilities like the Cooperative to simply absorb those costs.

As the charts below illustrate,[10] the vast majority (~93%) of the Cooperative's Visa and Mastercard transactions incur interchange fees at Utility Program credit-card rates or similarly low debit/prepaid rates. But a tiny fraction of PEC's Visa and Mastercard transactions (~7%) involve one of the handful of business/commercial credit card products that Defendants exclude from the Utility Programs.[11] For these products, Defendants apply interchange-fee rates so much higher that this 7% of card transactions incur *more* interchange fees than the remaining 93% of the Cooperative's transactions, *combined*.




[10] These figures reflect data from the Cooperative's actual customer payment transactions that used Visa and Mastercard card products in two representative months: May and September 2025. The first chart illustrates the percentage of PEC's total Visa and Mastercard transactions that fell into each of four interchange-fee rate categories: (1) credit cards charged the flat $0.75 Consumer Utility Program interchange fee; (2) credit cards charged the flat $1.50 Business Utility Program interchange fee; (3) debit or prepaid cards, which are consistently charged even lower rates; and (4) the card products for which Defendants charge much higher, non-Utility Program interchange rates, including various types of Commercial, Corporate, and Purchasing credit cards described more fully in n.11, *infra*.

The second chart illustrates the percentage of PEC's total interchange fees incurred by the transactions in each of those same four interchange rate categories.

[11] Examples of these credit-card products include Mastercard's various "US STP B2B VIP" (straight-through processing, business-to-business, variable interchange program) products, as well as certain—but not all—Mastercard credit-card products classified as "Commercial" or "Corporate," and Visa credit-card products classified as "Commercial" or "Purchasing." Notably, Mastercard still applies the $1.50 flat Business Utility rate to certain credit-card products it labels Commercial, and both Visa and Mastercard give the Business Utility rate to a variety of their "Business" credit-card products.

This system of back-door rate inflation is extremely lucrative for Defendants: the Cooperative routinely pays $1,000 or more in interchange fees for individual transactions that would have cost just $1.50 if the card used had received Utility rates.[12] In the end, Defendants' scheme of charging disproportionately high non-Utilities rates for a handful of card products effectively *doubles* Defendants' revenue – and correspondingly, also doubles the Cooperative's interchange fee expenses.

**C. Defendants reap windfalls by imposing HAC and NS rules on Utilities.**

Faced with this fee structure, a rational Utility would simply restrict its card acceptance to products included in the Utility Program and refuse to accept the handful of products charged disproportionate rates. If the Cooperative could take this approach, its interchange fee burden would be cut in half, with zero impact on the vast majority of its members. But Defendants expressly foreclose this possibility with a strategic use of the HAC rules: if the Cooperative is to accept *any* Visa or Mastercard credit card, it must accept *every* Visa or Mastercard credit card – even the ones that incur fees at ten, a hundred, or a *thousand* times the Utility Program rates.[13] This tactical utilization of the HAC rule allows Defendants to *double* the total interchange fees they collect from the Cooperative – with that excess in fees going to Defendants' profits.

A free market would offer the Cooperative a simple solution: pass its card transaction fees through to the members who incur them, who could then choose to pay these costs themselves or

[12] This outcome is particularly ironic because for non-Utilities merchants, Commercial/Purchasing interchange-fee rates typically afford a cost *savings* compared to regular business or consumer cards, reflecting the business reality that these transactions are typically less expensive and less risky to the card issuer. But here, Defendants are using the Commercial/Purchasing card rates to inflate Utilities merchants' interchange fees to many multiples of the low, flat Utility Program fees that otherwise would apply.

[13] *See* Ex. 4, *excerpts from* 18 Oct., 2025, Visa Core Rules and Visa Product and Service Rules ("Visa Rules"), at § 1.5.4.2 & 1.5.4.4 (Honor All Cards); Ex. 5, *excerpts from* 3 June, 2025, Mastercard Rules at § 5.11.1-5.11.2 (Honor All Cards and Merchant Acceptance of Mastercard Cards). As explained below, though the Proposal reforms HAC rules for some members of the Equitable Relief Class, its terms expressly authorize Defendants to continue imposing current HAC limitations on Utilities.

eliminate them entirely by switching to a card that receives Utility Program rates. But NS rules empower the Brands to foreclose this alternative too: Visa's Utility Program Rules require that, as a condition for Utility rates to apply to *any* of their transactions, the Cooperative and other Utilities must categorically, for *all* transactions, "[n]ot charge cardholders fees of any type for Visa transactions." Ex. 1 (Visa Utility Program Rules) at 1.

By combining HAC and NS rules, Defendants present Utilities like the Cooperative with a Hobbesian choice: (a) just absorb a doubling of their interchange fees caused by a tiny fraction of their transactions; or (b) forego the Utility Programs altogether, in order to be free to pass the inflated fees through to the customers/members who are incurring them. Given that the Utility Programs' purported rates are in fact illusory, it should not be surprising that an increasing number of Utilities are abandoning the Utility Program rates and electing to implement surcharging as the only alternative to absorbing a tiny number of customers' grossly disproportionate fees. Of critical importance, this choice means *none* of those merchants' transactions can access the low, flat Utility Program rates.

Defendants thus use HAC and NS together to establish a Catch-22 for Utilities merchants like the Cooperative, and a win-win for themselves:

- If a Utilities merchant like the Cooperative refrains from surcharging, it can secure the business-justified low, flat Utility rates on most of its transactions – but is powerless to avoid the handful of high-rate transactions that ultimately double its interchange fees. Accordingly, Defendants double their revenues from Utilities like the Cooperative: HAC forces the Utility to accept disproportionately high-fee cards, while NS ensures that the members/customers who could easily eliminate the inflated fees—by switching to a

product that receives Utility Program rates—have little or no motivation to do so, as they remain divorced from the exorbitant fees their transactions incur.

- If, instead, the Utilities merchant makes the rational choice to address the disproportionately high fees by passing them through to the customers/members incurring them, Defendants can use NS rules to eject the merchant from the Utility Program, and freely charge dramatically higher, non-Utility interchange rates across the board on all the Utility's transactions. This is the real win for Defendants, who can then collect fees of up to *tenfold* the Utility Program rates, even as the underlying bill-payment transactions remain uniquely low-cost and low-risk for them to process.[14]

Either way, Defendants' anticompetitive application of the HAC and NS rules continue to injure Utilities merchants, and their customers.[15] And either way, Defendants are continuing to

---

[14] Notably, recent changes to Visa's merchant rules suggest that this Defendant is actively encouraging Utilities merchants to abandon the Utilities program, and instead incur—and pay—interchange fees at the much higher general consumer/business rates and then recoup those inflated fees from Utilities customers. In October 2025, Visa changed its global merchant rules to add Utilities to the extremely short list of merchant types that can impose so-called "service fees," which are a special method of passing interchange fees through to cardholders that previously was available only to merchants in the government and education sectors. *See* Ex. 3, Visa Rules, at 57, 399-400. However, in making this change, **Visa notably did *not* modify its Utility Program NS rules** that prohibit charging Visa cardholders *any type of fee at all*. *See* Ex. 1, Visa Utility Program Rules. This means that any Utility that implements the special new Service Fee immediately forfeits access to Utility Program rates for *all* its transactions. Thus, instead of facilitating access to the best available interchange rates for Utilities transactions, Visa's October 2025 rule change simply increases the pressure on Utilities to abandon the low, flat Utility Program rates altogether – which, as explained above, frees Visa to collect as much as ten times more interchange fees for the same Utilities transactions.

[15] This dilemma is particularly challenging for cooperatives like PEC whose mission includes providing their members electricity at the lowest possible cost, because Defendants are forcing them to choose between two costly alternatives: increase all their members' bills to cover the cost of a few overpriced transactions, or extract additional surcharges from all their members to cover interchange fees up to ten times the Utilities Program rates that would otherwise apply to the vast majority of those members' transactions. Either way, the Cooperative will likely be required to collect inflated interchange fee payments from the members it serves, increasing Defendants' profits.

reap windfalls by imposing interchange fees on Utility bill payments that are many multiples of their published Utility Program rates.

### D. **The Proposal enshrines this broken system.**

Regardless of whether it helps other types of merchants, the Proposal fails to address Utilities companies' injuries in this case, and in fact actively discriminates against them, in at least three ways.

#### *1. The Proposal's HAC rule modifications do not address the harm to Utilities.*

The Proposal purports to curb Defendants' abuse of the HAC rules. But rather than freeing merchants to choose independently which Visa and Mastercard products to accept or refuse, the Proposal requires Defendants only to create slightly more granular categories that they still can require merchants to take or leave as a unit.[16] The Proposal's HAC reform does not solve Utilities class member's problem with the HAC rules, because the Proposal lumps together into a singular "Commercial Credit Card" category *all* the disproportionately high-fee products that are doubling the Cooperative's interchange rates, alongside *all* credit-card products that receive the low, flat $1.50 per transaction Business Utility Rate.[17] Thus the Proposal fails to alleviate Utilities'

---

[16] The Proposal requires Defendants to each "modify their 'Honor All Cards' Rules to permit a merchant in the United States to accept or decline acceptance" of each of four pre-defined product categories, for each Defendant: (i) all Debit Cards, (ii) all Commercial Credit Cards, (iii) all Standard Consumer Credit Cards, and/or (iv) all Premium Consumer Credit Cards. *See* ¶ 22 (Visa), ¶ 71 (Mastercard). The Proposal expressly confirms that Defendants can still require any merchant who accepts *any* card within one of these categories to honor *all* cards within that category – regardless of the cards' associated interchange fees. *See* Proposal ¶ 23 (Visa) & ¶ 72 (Mastercard), entitling each Defendant to "maintain[] and enforce[e] an 'Honor All Cards' Rule that requires merchants who choose to accept ***any*** [] Card product category (i.e., POS Debit Device, Debit Card, Standard Consumer Credit Card, Premium Consumer Credit Card, Commercial Credit Card) to accept ***all*** such cards within that product category . . . regardless of issuing financial institution ***or product type***" (emphasis added).

[17] As the Proposal's definitions confirm, the single "Commercial Credit Card" category includes all Business *as well as* all Commercial, Corporate, and Purchasing card products. *See* Proposal at ¶ 1 (k), defining "Commercial Credit Card" as:

> . . . one of the following product types: Corporate, Business, Small Business, Platinum Business, Signature Business, Infinite Business, Purchasing, or Fleet (for Visa-Branded Credit Cards) or Corporate, Business, Executive Business, Business Plus, Professional, World Mastercard for Business, World Elite Mastercard for

dilemma: they still must either (a) give up the benefits of the Utility Program—because the only way to avoid the handful of inflated-fee products is to eschew *all* products eligible for Business Utility rates—or (b) change nothing, and continue to absorb the same doubled fee burden from the exact same inflated-fee products Defendants have been forcing Utilities to accept all along. The Proposal's HAC reform fails to provide meaningful relief to Utilities class members.

2. *The Proposal's rate reforms do not benefit Utility class members.*

The Proposal's other flagship reform—the introduction of what has been called a "no-frills" consumer credit-card rate class with interchange fees capped at 1.25%[18]—also does nothing for the Cooperative and other Utilities class members. As explained above, the disproportionately high fees Defendants impose on Utilities come from Commercial Credit Cards, not Consumer card products. *See* n.11, *supra*. Furthermore, the no-frills consumer interchange rate is still higher than the flat $0.75 Consumer Utility Program interchange rate that reflects the unique low-cost, low-risk nature of Utility bill payment transactions.

Nor does the Proposal's five-year freeze on Defendants' posted interchange rates[19] offer Utilities class members any real benefit, because the core injury the Cooperative and other Utilities are suffering results not from the rates themselves, but instead from Defendants' tactical application of the HAC and NS rules and rerouting Utilities transactions out of the low, fixed-rate Utility Program and into higher interchange-rate classes – which may be appropriate for other

Business, Business World Legend, Corporate World Elite, Corporate Executive, Government Public Sector Commercial, Purchasing, or Fleet (for Mastercard-Branded Credit Cards), or any similar Visa Credit Card or Mastercard Credit Card issued during the term of this Superseding and Amended Rule 23(b)(2) Class Settlement Agreement.

*Compare to* n.11*, supra*, which describes the Visa and Mastercard products for which the Cooperative incurs disproportionately high, non-Utility rate interchange fees, all of which fall in this category.

[18] *See* Proposal ¶¶ 50 (Visa) & 99 (Mastercard).

[19] *See, e.g.,* Proposal ¶¶ 51 (Visa) & 100 (Mastercard).

types of transactions, but do not reflect the low-risk, low-cost nature of Utilities' customer payments. The Proposal does nothing to prevent Defendants from continuing to force Utilities out of the Utility Programs, so Defendants can continue applying dramatically higher non-Utility interchange rates to Utility transactions.

3. *The Proposal explicitly singles out Utilities class members and approves Defendants' continuing inequitable application of HAC and NS Rules against them, in particular.*

Finally, and most egregiously, the Proposal specifically singles out Utilities merchant class members, and expressly authorizes Defendants to continue their existing inequitable application of the HAC and NS rules against them in particular, for at least the next eight years.

Notably, the Proposal confirms that Defendants are *expressly authorized* to continue imposing the HAC and NS regime exactly as now implemented in the Visa Utility Program, on Utilities *in particular* – confirming that the Proposal (a) fails to provide the Cooperative and other Utilities class members adequate relief, and (b) treats them inequitably compared to other class members. The Proposal explains at length the system by which Visa will be entitled to continue penalizing the Cooperative and other Utilities for charging any cardholder any fee, by substituting arbitrarily inflated fees for Utility Program rates. In this explanation, the Proposal specifically calls out the existing Visa Utility Program as an example of an *allowed* use of NS restrictions, approving the use of:

> differential rate structures, that is, default interchange rate structures . . . generally available to similarly situated merchants where such merchants are eligible for a lower default interchange rate *when no cardholder fee is assessed* (*e.g.*, no surcharge or convenience fee). **Examples of such existing programs are the Utility Program** and the Small Merchant Program. . . . By way of example, . . . [Defendants may] create a default interchange rate structure available to all merchants for the segment in which Merchant X and Merchant Y operate, with a higher default rate available (merchant choice to surcharge) and a lower default rate available with eligibility based on merchants not surcharging. In this case Merchant

> X and Merchant Y could either *choose to surcharge and be assessed the higher interchange rate . . . or not surcharge and be subject to the lower interchange rate.*

Proposal ¶ 43(f) (emphasis added). Using materially identical language, three other paragraphs of the Proposal authorize Visa to make compliance with a global HAC rule a requirement to access Utility Program rates (¶ 30), and Mastercard similarly to condition access to Utility Program rates on merchants' compliance with global HAC (¶ 79) and NS (¶ 92(f)) restrictions.

These provisions override and wipe out any benefit the Proposal might have offered Utilities class members. As explained above, Defendants' current implementation of (a) Honor All Cards requirements, (b) No Surcharging limitations, and (c) existing interchange fee structures that make certain card products ineligible for Utility Program rates, work together to allow Visa and Mastercard to extract many multiples of the published Utility Program fees from Utilities merchants like the Cooperative – even though the underlying transactions remain uniquely low-risk and low-cost for Defendants. Rather than redressing this wrong, the Proposal gives Defendants carte blanche to continue their practices – while stripping all merchant class members of any right to challenge this regime for almost a decade to come.

* * *

In sum, the Proposal does not ameliorate the ongoing harm Utilities merchants are suffering from the Brand Defendants' HAC and NS rules. To the contrary, the Proposal expressly singles out Utilities merchants and approves Defendants' continued use of these rules against them. In other words, the Proposal guarantees Defendants the right to continue business as usual in the Utilities sector. Because Utilities cannot opt out of the Proposal, approval of the Proposal would guarantee Defendants eight more years of continuing to extract many multiples of their posted fees out of the Utilities merchant class members, with the resulting revenues going directly to Defendants' profits.

As it stands, the Proposal cannot be approved consistent with the Federal Rules. *See* FED. R. CIV. P. 23(e)(3).

**E. <u>The Proposal could easily be modified to address these issues.</u>**

Though the Proposal currently singles out Utilities merchants for exclusion from its benefits, most of these issues could be addressed with one or more simple changes:

1. Requiring Defendants to apply the established business and consumer Utility Program rates universally, to all their card products (including all Commercial, Corporate, and Purchasing cards), would close the loophole that is empowering Visa and Mastercard to use the HAC and NS rules to gain inflated profits from Utilities.
2. Alternatively or in conjunction, adjusting the proposed product categories for the new HAC rules, to make them consistent with Defendants' Utility Program fee structure such that a single category contains all—and only—the card products that are ineligible for Utility Program rates, would put Utilities on an equal footing with other types of merchants, who ostensibly will be able to choose to accept low-fee product categories while rejecting high-fee ones. However, this reform would only be effective if Defendants are also barred from imposing global HAC rules as a condition of accessing Utility Program rates.
3. Eliminating the Proposal's special exceptions allowing Defendants to continue imposing NS and HAC requirements as a condition to access Utility Program rates would help free Utilities to operate in a rational market, at least to the extent surcharging is allowed under applicable state laws.[20] If Utilities could pass the cost of disproportionate, non-Utility Program interchange fees through to the customers who are incurring them—*without*

---

[20] In Texas, where the Cooperative is headquartered and operates, state law purports to bar merchants from surcharging credit card customers. *See* TEX. BUS. & COM. CODE § 604A.0021.

having to altogether forego Utility Program rates as a result—market pressures may curb Defendants' ability to extract higher fees in lieu of the posted Utility Program rates.

4. Finally, if the Proposal is not revised to provide meaningful relief to Utilities merchants, Utilities members of the Equitable Relief Merchant Class should be allowed to opt out, so they can bring their own challenge to Defendants' discriminatory use of the HAC and NS rules against them in particular.

## IV. CONCLUSION AND PRAYER

Absent the above-stated or other effective reforms, the Proposal (a) fails to provide the Cooperative and other Utilities members of the Rule 23(b)(2) Equitable Relief Plaintiff class adequate relief, and (b) treats them inequitably compared to other class members. Accordingly, unless and until the Proposal is revised to adequately address the ongoing injury Defendants' application of the HAC and NS rules continues to cause Utilities merchant class members, the Cooperative respectfully submits that preliminary approval of the Proposal should be denied.

Dated: April 28, 2026

Respectfully submitted,

*/s/ Ryan A. Botkin*

Ryan A. Botkin
Texas State Bar No. 00793366
ryan@bccaustin.com
BOTKIN CHIARELLO CALAF PLLC
1209 Nueces Street
Austin, TX 78701
Telephone: (512) 615-2341

**COUNSEL FOR PEDERNALES ELECTRIC COOPERATIVE, INC.**

**CERTIFICATE OF LENGTH**

I hereby certify that this document complies with the word-count limitations imposed by Local Civil Rule 7.1(c). According to the word-processing program used to prepare this document, it contains 4,843 words, not including the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates.

*/s/ Ryan A. Botkin*
Ryan A. Botkin

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of April 2026, a true and correct copy of the foregoing document was served on all counsel of record who have appeared in this case using the Court's CM/ECF system as a Filing User.

*/s/ Ryan A. Botkin*
Ryan A. Botkin