**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION<br><br>This Document Applies To:<br><br>*Barry's Cut Rate Stores, Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM), also now known as *DDMB, Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM). | No. 05-md-01720 (BMC) (JAM) |

**WALMART'S OBJECTION TO FINAL APPROVAL OF PROPOSED AMENDED SETTLEMENT AGREEMENT**

## INTRODUCTION

It cannot seriously be disputed that, in the credit and debit payments industry, the Networks and issuers impose supracompetitive prices on merchants. Every merchant in the country suffers this antitrust injury, but not in uniform ways because not all merchants are alike. A competitive market would efficiently handle those differences by removing the restraints that stop merchants from negotiating directly and effectively with issuers. That is the only kind of relief that would justify treating all merchants in the country as a mandatory, indivisible class under Rule 23(b)(2).

The proposed settlement does the opposite. It cements in place the Honor-All-Issuers rule that prevents effective bilateral negotiation between merchants and issuers, and it strips from merchants for many years to come the right to challenge Defendants' anticompetitive practices. In place of creating true market competition by removing the core anticompetitive restraint, Class Plaintiffs (a handful of small merchants that share nothing in common with a retailer like Walmart) propose a complicated "process" of fiat price-setting, consumer-unfriendly surcharging, and the creation of merchant rewards programs to compete with well-entrenched issuer rewards programs. Because the efficacy of this process is all based on rank speculation, and has no real-world support, Class Plaintiffs (again, small merchants) propose that large merchants can try it all out through (and front the costs for) pilot programs. And if Class Plaintiffs' speculation is wrong and the pilots fail? Too bad: the class—every merchant in the country—is stuck with the raw deal negotiated without their input, which they were forced to accept.

This is not how Rule 23(b)(2) is supposed to work. There has never been a mandatory (b)(2) settlement like this—one which would rework the payments system at the heart of the U.S. economy, based on speculative economic theory that has not even had the benefit of adversarial testing. It would be one thing if the settlement relief were simply to remove the core anticompetitive restraint (Honor All Issuers), allowing each class member to engage in

negotiations that would bring competitive pricing for that class member. But it is quite another thing to force every merchant in the country to (1) accept a fiat system of speculative and dubious efficacy, and (2) forfeit all potential claims even if that speculative relief proves hollow. Due process cannot possibly permit that result. Accordingly, the Court should either deny final approval of the settlement or permit Walmart (and any other unwilling class members) to opt out.[1]

## STATEMENT OF FACTS

In this decades-old multidistrict litigation, a class of merchants sued Visa U.S.A. Inc. and Mastercard Incorporated (the "Networks"), along with various banks, for violating the Sherman Act by conspiring to fix interchange fees. In 2016, the Second Circuit rejected an initial class settlement providing for monetary and injunctive relief because it unfairly "trad[ed] the claims of many merchants for relief they cannot use." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 238 (2d Cir. 2016) ("*Interchange*"). On remand, this Court certified—over objections from hundreds of merchants, including Walmart—a mandatory Rule 23(b)(2) equitable-relief class of all merchants that accepted Visa or Mastercard credit or debit cards in the U.S. since December 18, 2020. Doc. 8647. The class is represented by Class Plaintiffs—small, local merchants, including a dental practice, an IT support provider, a pharmacy, and a beauty salon. These small merchants purport to represent Walmart—one of the world's largest retailers with over 5,200 U.S. locations and ecommerce websites accepting Defendants' payment cards. *See* Cook ¶ 9.

In June 2024, Judge Brodie rejected a second settlement proposal. Doc. 9342. The Court held the relief was "too limited to justify approval" because it "provide[d] the least benefit to [large] merchants with the most valuable claims" and did "not provide most other forms of relief

[1] Concurrent with this objection, Walmart is filing a motion to decertify the class or permit it to opt out.

sought by other Class Members," including relief that would let merchants "urge competition among issuing banks." *Id.* at 57, 80.

Subsequently, Walmart tried to engage Class Counsel about large merchants' interests in any future settlement. Doc. 9729-2. Class Counsel refused to engage in such discussions unless Walmart executed a non-disclosure agreement that would have barred Walmart from later disclosing to the Court the substance of its proposals. Walmart declined those terms, making clear it needed the ability to inform the Court of its proposals if Class Counsel presented another settlement lacking meaningful pro-competitive relief. Walmart then sent its concerns in writing to Class Counsel, stressing that the Honor-All-Issuers rule was the single most important issue to address in any settlement. Those concerns were disregarded.

In the meantime, Class Plaintiffs successfully litigated several *Daubert* and summary-judgment motions. "The Court denied Defendants' *Daubert* motions" and largely "admitted the expert reports of Profs. Carlton and Stiglitz." Doc. 9342 at 10. It also denied Defendants' summary-judgment motions on Plaintiffs' (1) "claims based on Defendants' EMV liability shift," (2) "two-sided claims under *Amex*," and (3) "standing as direct purchasers." *Id.* Thus, by "April 2, 2024, all of the pending pre-trial motions were resolved, and Plaintiffs' case [wa]s essentially ready for trial." *Id.* at 10 n.15.

On November 10, 2025, Class Plaintiffs moved for preliminary approval of another settlement agreement (the "Settlement"). Doc. 9690; *see* Doc. 9692-2 (copy of the Settlement). Walmart and other absent class members objected to preliminary approval. Doc. 9729. The Court granted preliminary approval. Docs. 9884, 9887.

**LEGAL STANDARD**

When assessing a class settlement, this Court serves as "protector of the rights of the class." *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 216, 222 (2d Cir. 1987). It must act as the

class's "fiduciary" and "exercise the highest degree of vigilance in scrutinizing proposed settlements." *In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*, 869 F.3d 551, 555 (7th Cir. 2017). "This duty is particularly acute" for Rule 23(b)(2) classes, where "class members have been denied an opportunity to opt out." *Grimes v. Vitalink Commc'ns Corp.*, 17 F.3d 1553, 1557-58 (3d Cir. 1994).

Under Rule 23(e), the Court must deny approval unless (A) "the class representatives and counsel have adequately represented the class"; (B) "the proposal was negotiated at arm's length"; (C) "the relief provided is adequate"; and (D) "the proposal treats class members equitably relative to each other." Doc. 9884 at 14. Factors A and B assess the Settlement's "procedural fairness"; factors C and D assess its "substantive fairness." *Moses v. N.Y. Times Co.*, 79 F.4th 235, 243-44 (2d Cir. 2023).

To assess substantive fairness, the Court considers, as relevant here, "the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C).[2] The Court also considers the factors articulated in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), including:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement [ ] in light of the best possible recovery; and (9) the range of reasonableness of the settlement [ ] to a possible recovery in light of all the attendant risks of litigation.

Doc. 9884 at 15. Because these factors and Rule 23(e) "complement, rather than displace each other," they are often analyzed "together." *Id.*

[2] The other Rule 23(e)(2)(C) factors are either undisputed or not meaningfully relevant. *See* Doc. 9884 at 23-24.

## ARGUMENT

### I. THE SETTLEMENT IS SUBSTANTIVELY UNFAIR[3]

#### A. The Settlement Fails to Remedy the Key Restraint on Competition: Honor-All-Issuers

The Settlement would not provide adequate relief because it fails to address the Networks' core anticompetitive rule: if a merchant accepts a network's card, then the merchant must accept that card from all issuing banks ("Honor-All-Issuers" or "HAI"). As Class Plaintiffs' experts explain, the "Honor-All-Cards rules" (of which HAI is a component) are the "[m]ost significant" of the "Merchant Restraints," which "restrain [merchants] from steering their customers towards the merchants' preferred means of payment," "severely impede competition," and result in "a loss of consumer and social welfare." Doc. 9692-5 ¶¶ 5-6, 20, 30. *See also Interchange*, 827 F.3d at 239 ("the honor-all-cards and default interchange rules" are "perhaps most important[]" in this case); *see also* Cook ¶¶ 6, 8(c), 13-14, 21, 26, 66-76. Class Plaintiffs' experts further state that the "chicken-egg problem" the HAC rules were meant to address "was solved decades ago." Doc. 9692-5 ¶¶ 30-31. Accordingly, whatever could once have been said for them, the HAC rules currently serve no pro-competitive purpose. Instead, they create supracompetitive prices because they eliminate the ability of merchants to effectively negotiate with issuer banks. *See* Cook ¶¶ 13-14, 66-76; Farrell ¶¶ 13, 15-31.

Compelling merchants to accept all cards from every issuing bank removes any competitive incentive for issuing banks to compete on price, resulting in supracompetitive interchange fees that issuers pocket at the expense of merchants. *See* Cook ¶¶ 6, 12-14, 66-76;

---

[3] With this objection, Walmart submits and relies upon the declarations of Michael A. Cook (cited as "Cook"), Joseph Farrell (cited as "Farrell"), and Mark Keegan (cited as "Keegan"). Walmart also relies upon the declaration of Adam Levitin, filed by the National Association of Convenience Stores, et al. (cited as "Levitin"). Walmart also incorporates all arguments in its objection to preliminary approval.

Farrell ¶¶ 13, 17-25. HAI also ignores the reality that there are significant issuer-specific variations in authorization practices, fraud-control protocols, and chargeback procedures. Cook ¶¶ 13-14. These differences translate into substantial differences in approval rates, fraud exposure, and operational burdens—and collectively subject merchants to billions of dollars in losses due to unnecessarily declined transactions, chargebacks, and excessive rates of fraud. *Id.* HAI deprives merchants of any ability to negotiate with high-cost and/or underperforming issuers or otherwise protect themselves through ordinary competitive means. Cook ¶¶ 13-14, 66-76; Farrell ¶ 23. So long as issuers are guaranteed that their cards must be accepted at Walmart stores, they have little incentive to negotiate directly with Walmart, as they can hide behind the aggregated power of all other issuers in the Networks. Cook ¶¶ 13-14, 21, 66-76; Farrell ¶¶ 17-21. So too, as long as individual issuers are guaranteed that their cards will be accepted at Walmart, they have little incentive to address practices that impose fraud losses and other operational burdens on Walmart. Cook ¶¶ 13-14, 21, 66-76; Farrell ¶¶ 17-21. If merchants could reject issuers, they would have the leverage to spur competition on interchange rates and other important terms. Cook ¶¶ 14, 69, 72; Farrell ¶¶ 26-28. Such negotiations would likely result in the continued widespread acceptance of issuers' cards, Farrell ¶ 31, but at a lower cost to merchants who could pass savings on to their customers, *see id.* ¶ 12; Cook ¶ 72.

The Settling Parties tout that the Settlement would permit merchants to reject a Network's entire line of premium, commercial, or standard cards. Doc. 9932-1 at 3-4. But that "relief" merely turns one HAC rule into three, while entrenching the core problem that a merchant cannot make *issuers* compete. As this Court previously found, issuer-level competition is key to an adequate settlement (and a competitive market). *See* Doc. 9342 at 57 (finding that surcharging gave "merchants … no way … to urge competition among issuing banks"). The "fact that such relief

has been continuously argued for, and would offer significantly more choice to all Class Members, suggests that the relief offered in the Settlement falls short of the 'best possible' recovery." *Id.* at 59. *See also* Doc. 9932-1 at 20 ("The Class would be prepared to aggressively seek additional issuer-level HAC relief at trial.").

In the preliminary-approval order, the Court cited three reasons for rejecting this concern. Respectfully, the Court should reconsider those reasons.

First, the Court asked: if merchants "aren't going to reject cards at the product-level because doing so would anger their customers—wouldn't rejecting cards at the issuer-level have the same result?" Doc. 9884 at 23. It would not. Product-level rejection (or the threat of it) would not cause issuers to compete, whereas issuer-level rejection (or the threat of it) would, leading to agreements before customers ever reach the point of sale. *See* Cook ¶¶ 8(a), 68. Product-level denial power is a paper tiger given the dominance of high-cost premium cards (which account for approximately 85 to 92 percent of card volume[4]): merchants cannot afford to decline them, and the issuers know this, which is presumably why the Networks agreed to this meaningless "relief." Moreover, product-level denial alone creates bargaining asymmetry: if one issuer has unreasonable terms, the merchant must deny *all* premium cards, bearing the cost of losing the business of an entire product line comprising nearly 90 percent of the market, while the issuer still benefits from being able to offer its other product lines at the merchant. By contrast, an issuer-level denial imposes symmetrical pain on the merchant and issuer, creating the circumstances for a standard bilateral business negotiation.

---

[4] *See* Evan Andersen, *What Merchants Need to Know About the New Visa & Mastercard Interchange Settlement*, Optimized Payments, https://perma.cc/S6CD-KSHM (last visited Sept. 13, 2026); CFPB, *The Consumer Credit Market Report to Congress* 138 (December 2025), https://perma.cc/NKK3-2VBS ("Overall, 92 percent of general purpose card spending was accounted for by rewards cards in 2023 and 2024.").

Second, the Court reasoned that "issuer-level discounting" will create competition among issuers. Doc. 9884 at 23. But discounting must be funded and it is quite expensive, and thus less likely to be used, because of the inframarginal cost (it must be provided to consumers who would use the preferred form of payment anyway). Moreover, under the Settlement, issuers would have no incentive to fund discounting: they would know merchants cannot deny the issuers' cards and that the merchants would have forfeited all potential legal claims with the Settlement's release. Farrell ¶ 68. That would leave the merchants to fund discounts, eliminating any economic gain. Cook ¶¶ 8(b), 58-59. Moreover, discounting would destroy price uniformity critical to merchants like Walmart, create significant customer friction, and cause delay and complexity at the point of sale. The ability to engage in front-end negotiations with issuers would eliminate or significantly lessen these problems.[5] Cook ¶¶ 51-62, 74-75.

Third, the Court reasoned that while "elimination of the Honor All Issuers rule would benefit merchants," its absence cannot undermine approval of the Settlement given "the other substantial relief" provided. Doc. 9884 at 23. But, as explained below, the Settlement's other relief is illusory or meager, not substantial—especially for merchants like Walmart.

**B. The Settlement's Proposed Relief Would Be Ineffective**

Class Plaintiffs concede that issuer competition is necessary for adequate relief. Doc. 9932-1 at 19-20. But none of the Settlement's major forms of relief would deliver such competition.

---

[5] Walmart's Every Day Low Price business model—like many price-competitive, large retailers—is built on consistent pricing across all forms of payment. If Walmart could negotiate with issuers on fees in advance, Walmart could maintain consistent pricing for customers by negotiating the best deal possible with each issuer (even if Walmart itself pays differential prices to different issuers). But discounting at the register places a burden on the customer.

***Product-Level Rejection Power ("HAC" Reform).*** Because most card transactions—now around 90 percent—are on premium cards, no large national merchant can afford to drop the category. Cook ¶¶ 8(a), 40, 68. And, as explained above, product-level rejection by a single merchant would create a cost asymmetry that could never give the merchant real bargaining power. Issuers and the Networks know all this, and thus the threat of product-level rejection creates little to no merchant leverage in negotiations. Levitin ¶¶ 112-19, 150. The Settlement's HAC reform, in short, would be ineffective for many merchants.

***Rate Relief.*** In 2024, the Court rejected as inadequate proposed settlement relief that would have reduced average interchange rates by seven basis points. Such a reduction would merely "maintain interchange rates" at the level "in place" when the litigation was commenced—rates "many plaintiffs had … challenged as the result of anticompetitive restraints." Doc. 9342 at 59. This Settlement would up that relief by three basis points but, once again, would not meaningfully reduce interchange fees from the anticompetitive levels that existed when this litigation began, nor account for increases since then. Levitin ¶ 75. And the reduction is paltry in absolute terms, compared against "Visa and Mastercard's typical credit interchange rates which are generally set between 200 and 300 basis points." Doc. 9342 at 60. The proposed rate reduction would also keep U.S. interchange rates well above the rates in other jurisdictions, which the Court previously concluded cuts against the Settlement. *Id.* at 87.

Moreover, the Networks could circumvent even that paltry rate reduction by raising network fees. That is precisely what they have done in countries where interchange rates are capped.[6] And though the Settlement purports to preclude such "circumvent[ion]," it preserves the

[6] *See* CMSPI, *State of the Industry Report: The Playbook for Smarter Payments* 80 (Sept. 2025), https://perma.cc/D4XC-AFY3.

Networks' "necessary flexibility in operating the … network to respond to market conditions in the ordinary course of business." *See* Settlement ¶ 54. Given their history of circumventing rate caps,[7] there is every reason to expect the Networks would exploit that "flexibility" to raise network fees and pass on the benefits to their issuers.

***Surcharging.*** Surcharging would conflict with Walmart's business model, including its Every Day Low Price pricing strategy, under which Walmart's price for a given item is the same across all forms of payment. Cook ¶¶ 29, 37, 39-50; Doc. 9342 at 81 n.51 ("the Court also recognizes that surcharging could be contrary to [Walmart's] brand image"). It would also be prohibited by state law in many jurisdictions where Walmart operates.[8] Furthermore, given its high-volume business, Walmart requires uniform processes across its 5,200 stores to streamline the checkout process, and surcharging would require process changes that would undermine uniformity, cause cardholder confusion, and increase customer wait times. *See* Cook ¶¶ 41-43 & n.3; Farrell ¶¶ 56-62; Levitin ¶¶ 173-77. Class Plaintiffs dismiss this objection by noting that some merchants are already adding "service fees, tips, and other extra charges." Doc. 9775 at 24-25. But Class Plaintiffs provide no evidence that such "extras" are common at retailers like Walmart and, in any event, consumers have "cried foul," "complained," and gotten "frustrated," by these

[7] Alex Rolfe, *EC Opens New Scheme Fee Investigation Into Visa and Mastercard*, Payments Indus. Intel. (Nov. 8, 2024), https://perma.cc/V668-GQXG.

[8] Connecticut, Massachusetts, Maine, and Puerto Rico prohibit credit card surcharges outright. *See* Conn. Gen. Stat. § 42-133ff(b); Mass. Gen. Laws ch. 140D, § 28A; Me. Rev. Stat. tit. 9-A, § 8-509; P.R. Laws tit. 10, § 11. California's statutory ban was held unconstitutional by the Ninth Circuit, *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1179 (9th Cir. 2018), but the Attorney General applies that ruling only to "similarly situated merchants," *Credit Card Surcharges*, State of Cal. Dep't of Just., Off. of the Att'y Gen., https://perma.cc/LXY9-DWAP (last visited Sept. 13, 2026). Texas's ban on credit card surcharging was likewise enjoined, *Rowell v. Paxton*, 336 F. Supp. 3d 724, 732 (W.D. Tex. 2018), but the Texas Attorney General maintains that it remains enforceable in "some contexts," *see* Tex. Att'y Gen. Op. No. KP-0257, at 3 (June 14, 2019), https://perma.cc/H33W-7GG4.

"extras." *See* Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2066, 2067 (Jan. 10, 2025) (codified at 16 C.F.R. pt. 464). A fair settlement would not require class members to "gamble" (Class Plaintiffs' term, Doc. 9775 at 25) with surcharging when a much more straightforward and feasible remedy (direct issuer negotiations) is available.

Even if surcharging were feasible, it would not solve the core anticompetitive problem. Surcharging has a limited, indirect effect on the absolute level of interchange fees themselves. Farrell ¶ 43. That is because surcharging at the brand or product level, which is all the Settlement would allow, does not offer any individual issuer an incentive to lower prices. *Id.* ¶ 64. Said otherwise, "the prospect of … surcharging does not provide competitive discipline on the factors, such as pricing, that ought to drive" a negotiation. *Id.*

***Discounting.*** As with surcharging, discounting offers little effective relief to merchants, like Walmart, whose business model conflicts with differentiated pricing. Cook ¶¶ 51-62. Moreover, discounting would fail to create competitive prices. A discount must be funded, either by the merchant or the issuer. If the merchant funds the discount, then discounting does nothing to resolve supracompetitive interchange fees: the merchant is still paying more than it would in a competitive market. Knowing this, issuers can simply ignore the discount until the merchant can no longer afford it.[9] The other possibility is that an issuer could fund the discount, believing it would attract more customers. But that would be expensive: many customers who would already use the discounted card would receive a benefit without any corresponding change in behavior and so there is no reason to believe issuers would do so when they could more profitably spend such customer-acquisition funds on increasing their own rewards (many of which go unclaimed).

[9] Issuers would know a merchant in a price competitive consumer market could not (i) raise base prices to account for discounts, or (ii) endlessly fund the discount itself.

Farrell ¶ 68; Levitin ¶ 198; Cook ¶¶ 60-61. Finally, discounting could never reform the market. Merchants cannot offer meaningful discounts to many issuers at once (if every issuer receives the discount, then the discount does not meaningfully increase cardholder volume), and so (at most) discounting could lower interchange rates between a small number of merchants and issuers; it could not reform the market. Farrell ¶ 69.

Real-world evidence (as opposed to the Settling Parties' theorizing) bears this out. Visa has long allowed issuer-level discounting. But few merchants use the tool. *See* Doc. 9692 at 21.

***Buying Groups/Merchant Education.*** In rejecting the previous proposed settlement, the Court stressed that large national merchants were unlikely to benefit from remedies focused on buying groups and merchant education. Doc. 9342 at 81. That remains true. Large retailers have no need for buying groups or education. Cook ¶¶ 82-84. Moreover, if the largest retailers in the world, like Walmart, do not have the bargaining power to create competitive pricing, there is no reason to believe buying groups of smaller merchants would possess meaningful bargaining power.

* * *

Class Plaintiffs' answer to the problems with each of the Settlement's supposed reforms is to say that they cannot be viewed in a "static analysis" but rather as a complicated, multistep "process," Doc. 9775 at 16:

(1) "spread" is created between the price of premium and standard cards by establishing interchange rates through Court-endorsed fiat (rather than market competition), Doc. 9692-5 ¶ 61 & n.54;

(2) this fiat "gap" would motivate merchants to want to steer customers away from premium cards (through surcharging and discounting), but merchants would be worried about "adverse customer response," *id.* ¶¶ 86-87;

(3) "[c]reative merchants" would alleviate customer friction by establishing their own rewards programs to replace "the culture" of existing and long-established premium-card rewards programs, *id.* ¶¶ 87, 89;

(4) because all this would be very expensive and uncertain, merchants should first run these complicated surcharging and rewards programs through "pilot[s]" in individual stores or regions (regardless of cost, lack of uniformity, or disruption), *id.* ¶¶ 67-70;

(5) through the pilot programs, merchants would discover the optimal mix of surcharging, discounting, and rewards to effectively steer consumers from premium to standard cards, *id.*; and

(6) premium-card usage would drop to a point at which merchants can afford to threaten to stop accepting them, thereby creating pressure on the Networks to lower premium card interchange rates or abandon premium cards, *id.* ¶¶ 88-89, 91; Doc. 9775 at 16.

The Class Plaintiffs—which are small businesses far different from Walmart—and their experts stack speculation upon speculation to theorize that this Rube Goldberg process would result in meaningful competition.[10] In the real world, it would never even get off the ground. Cook ¶¶ 27-35; Farrell ¶ 76; Levitin ¶¶ 47-68. And even if it did, the issuers could easily counteract the "process" by creating counterincentives to steer consumers back to premium cards. And, beyond that, the timeline the Settlement imposes before its "reforms" expire mean the "process" would never achieve market reform, especially because dynamic forces work in both directions (such that a single pilot over a few months might not be representative of conditions just a few years later) and the Networks and issuers have incentives to undermine the rate reduction the Settlement promises. Cook ¶¶ 32-33; Farrell ¶ 75. Finally, even if this fiat "process" did work well—and in time—at the end of eight years, the Networks could simply revert to their anticompetitive practices because the relief is all artificial: the key structural practice (HAI) that leads to supracompetitive pricing is not permanently removed.

---

[10] The proposed settlement further fails to spur competition by leaving the no-bypass rules unaddressed. Those rules require Visa- and Mastercard-branded credit card transactions to be processed over the respective network's rails, preventing merchants from routing transactions over lower-cost competing networks or through alternative arrangements. Eliminating those restrictions would create an avenue for large merchants and issuers to negotiate alternative processing arrangements directly, increasing competitive pressure on interchange fees and other network-related costs. Cook ¶ 13.

### C. The Release Is Overbroad and Unreasonable

Courts closely scrutinize a class release's scope when class members "have no ability to elect not to be bound by it." *See Interchange*, 827 F.3d at 241 (Leval, J., concurring); *Grimes*, 17 F.3d at 1557-58. Here, the lopsided "bargain that was struck between" the Settlement's meager "relief" and its "exceptionally broad release" underscores its unfairness. *Interchange*, 827 F.3d at 236, 239.

#### 1. The Release Unlawfully Insulates Future Antitrust Violations

"[P]rospective waiver[s] of a party's right to pursue statutory remedies for antitrust violations" are unenforceable. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985); *see also Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955). They are themselves unlawful contracts "in restraint of trade" because they "absolve one party from liability for future violations of the anti-trust statutes." *Fox Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955). Thus, a "waiver of future liability under the federal antitrust statutes is void." *In re Am. Express Merchs. Litig.*, 634 F.3d 187, 197 (2d Cir. 2011), *rev'd on other grounds sub nom. Amex v. Italian Colors Rest.*, 570 U.S. 228 (2013); *see also Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 896 n.27 (3d Cir. 1975).

The Settlement would release "any and all manner" of declaratory and equitable claims—including antitrust claims—"arising out of or relating to" this case that class members "can, shall, or may have" in the future, so long as the claim accrues no later than five years after the Settlement Final Date or eight years after the Settlement Approval Date. *See* Settlement ¶¶ 116(a), 119(c). And it would release challenges to any "substantially similar" interchange rules the Networks may enact later. *Id.* ¶ 116(c).

The Supreme Court has "condemn[ed]" such prospective antitrust waivers. *Mitsubishi*, 473 U.S. at 637 n.19. And because courts may not approve settlements that "contain[] provisions

that are … unlawful, or against public policy," the invalid release means the Settlement cannot be approved. *Kirkland v. N.Y. State Dep't of Corr. Servs.*, 711 F.2d 1117, 1129 (2d Cir. 1983) (simplified); *see also Perkins v. City of Chicago Heights*, 47 F.3d 212, 216-17 (7th Cir. 1995) (vacating consent decree that invalidly overrode state law); *In re Heritage Bond Litig.*, 546 F.3d 667, 678-80 (9th Cir. 2008) (vacating settlement bar orders that exceeded scope permitted by federal law).

Class Plaintiffs prior attempts to avoid that conclusion fail. Doc. 9775 at 49 n.131. It is irrelevant that *Mitsubishi* did not involve a release—it merely reiterated the principle applied in *Lawlor*: "[I]mmunity from civil liability for future violations" contradicts "the antitrust laws." 349 U.S. at 329. Next, though Class Plaintiffs try to distinguish waivers of "future antitrust violations" from the release's waiver of "future claims relating to conduct that occurred **during** the class period," Doc. 9775 at 49 n.131, there is no difference. The "class period" extends at least eight years into the future, so the Settlement releases claims for "future antitrust violations." Finally, though Judge Brodie suggested that waivers of future antitrust violations are permissible if they satisfy the identical-factual-predicate rule, *see* Doc. 9342 at 72, that ruling was mistaken. The identical-factual-predicate doctrine governs the *scope* of the release, not its legality. Nor have Class Plaintiffs identified any Second Circuit case supporting their view. Rather, the Second Circuit has said prospective waivers are "void." *In re Am. Express Merchs. Litig.*, 634 F.3d at 197.

**2. The Release Is Disproportionate to the Relief Granted**

The Settlement also makes an "unreasonable tradeoff between relief and release." *Interchange*, 827 F.3d at 240 (invalidating settlement on this basis).

<u>First</u>, the release is asymmetrical, long outlasting the relief the Settlement purports to grant. While the Settlement's rate caps and pro-rata reductions last about five years, the release runs for the later of eight years from final approval or five years after appellate resolution. Settlement

¶ 116(a). There is thus a three-year gap (likely longer depending on appeals) during which the Networks could raise interchange rates with antitrust immunity. That inequity has condemned many settlements, including the 2013 version of this Settlement. *See Interchange*, 827 F.3d at 239 (invalidating settlement when its release period eclipsed its relief period, ensuring that merchants "remain[ed] bound to the release" during a span in which they were "guaranteed nothing" in return); *cf. Stephenson v. Dow Chem. Co.*, 273 F.3d 249, 256-58 (2d Cir. 2001), *aff'd in part, vacated in part*, 539 U.S. 111 (2003) (invalidating settlement as to plaintiffs when it provided short-term relief to other litigants in exchange for a lengthy release of plaintiffs' claims).

Second, the release would permit gamesmanship. It immunizes the Networks from challenges not only to their current rules but also to "substantially similar" rules enacted in the future. Settlement ¶ 116(c). Yet the Networks regularly introduce costly new mandates under the guise of minor "enhancements." *See* Doc. 2644 ¶¶ 60(A)-(I) (listing examples, such as "Zero Floor Limit Fee[s]" penalizing merchants when the Networks' own systems failed, data requirements forcing operating changes, and an "Excessive Chargeback Program" that penalized merchants for fraud they could not control). Each of these was introduced as a minor rule change and could be deemed "substantially similar," which would immunize such practices for nearly a decade, even if they impose billions in new costs.

Third, the release would be overbroad—it sweeps far beyond the "factual predicate" driving this case. *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982). This case is about interchange fees. Yet the release extinguishes claims concerning network reorganizations and IPOs; service by bank employees on Visa or Mastercard boards or committees; cross-border acquiring rules; tokenization standards; mobile and e-commerce routing; "Merchant Fee[s]" of any kind; agreements between the Networks and their member banks; and even

Networks' counsel's conduct in this litigation. *See* Settlement ¶ 116(b)(i)-(vi). The release thus commits a sin the Second Circuit has long denounced: It "sacrifice[s] [unrelated] claims of members" that "were not within the description of claims assertable by the class." *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18-19 (2d Cir. 1981) (reversing approval where representatives released claims outside the lawsuit's factual predicates and asserted claims).

**3. The "Severability Clause" Confirms the Release's Inadequacy**

This Court, citing *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 720 (2d Cir. 2023), previously stated the release's propriety "can await a case in which the issue would directly affect the proceedings" because it contains a "de-facto severability clause" limiting the release to "the fullest extent permitted by federal law." Doc. 9342 at 72-75; *see* Doc. 9884 at 25 (adopting this reasoning). But *Fikes* involved a class certified under Rule 23(b)(3), where class members had the right to opt out of the settlement and preserve their claims. *See* 62 F.4th at 713. Because (b)(2) class members "have no ability to elect not to be bound by" the release, *Interchange*, 827 F.3d at 241 (Leval, J., concurring), courts must closely scrutinize its terms to protect due-process rights *before* the release is approved.[11]

Here, the purported "severability clause" only underscores the release's unfairness. Class Counsel has agreed to a release that improperly waives prospective antitrust claims, extends well beyond the relief period, invites gamesmanship that could undermine the Settlement's already meager remedies, and sweeps far beyond the case's factual predicate. *Supra* § I.C.1-2. But rather than mitigate these problems by narrowing the release at the outset, Class Counsel shifted the burden to absent class members to litigate, after the fact, which of their rights have been

[11] In all events, *Fikes* permits deferring inquiry; it does not forbid it. Given all that is at stake for merchants in this case, the Court should not leave this fundamental fairness issue for another day.

extinguished. That litigation burden would inevitably chill class-member efforts to enforce the Settlement, as merchants will hesitate to invest the resources needed to test the release's limits. In short, the Settlement would rob Peter to pay Paul: "One class of Plaintiffs receives" immediate relief "and in return gives up" all "the future rights" of absent class members—unless they expend great cost to wrestle some back. *Interchange*, 827 F.3d at 241 (Leval, J., concurring). That "is not a settlement; it is a confiscation." *Id.*

### D. The Settlement Is Unreasonable When Measured Against the Best Possible Recovery and the Risks of Litigation

*Grinnell* factors eight and nine corroborate the Settlement's unfairness. They ask whether the Settlement falls within the "range of reasonableness … in light of the best possible recovery and … all the attendant risks of litigation." Doc. 9342 at 44. That balancing test incorporates other *Grinnell* factors, like the complexity, expense, and likely duration of the litigation; the stage of the proceedings and the amount of discovery completed; the risks of establishing liability; and the defendants' ability to withstand a greater judgment. *See* Doc. 9884 at 18-23 (combining many of these considerations); *In re Real Est. Title & Settlement Servs. Antitrust Litig.*, 1986 WL 6531, at *12 (E.D. Pa. June 10, 1986) (*Grinnell*'s reasonableness factor "subsumes many of the others, [and] is the most important in judging the Settlement").

To conduct the range-of-reasonableness analysis, the Court must "compar[e] the relief offered by the Settlement's terms to the best possible recovery" to determine whether the Settlement falls within the "range of reasonableness" given the "risks and costs" of "taking [the] litigation to completion." Doc. 9342 at 55-56. Settlements that fall "below the lowest point in the zone of reasonableness" are strongly disfavored. *Cf. Newman v. Stein*, 464 F.2d 689, 698 (2d Cir. 1972); *see also Axinn & Sons Lumber Co. v. Long Island R.R. Co.*, 90 F.R.D. 2, 5 (E.D.N.Y. 1979)

(disapproving settlement amounting to roughly 3% of maximum recovery where case "difficult[ies]" did not justify the discount).

This Settlement falls well below the reasonable range.

### 1. Best Possible Recovery

A "complete victory" for Plaintiffs at trial would transform the payment-card industry. Doc. 9342 at 55. If Plaintiffs win "on every claim asserted," *id.*, they will have shown that the Networks' system of interlocking restrictions unreasonably restrains trade to inflate interchange fees. That finding would unlock this Court's broad equitable power "to fashion appropriate restraints on the [Networks'] future activities both to avoid a recurrence of the violation and to eliminate its consequences." *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 697 (1978). And the "best possible" injunction would enjoin the Networks as necessary to drive interchange rates down to competitive levels. Doc. 9342 at 55.

Absent class members objecting to the proposed settlement in this case have offered a host of proposed *permanent*, structural changes to accomplish that objective. These include eliminating the HAC and HAI rules that limit which cards and banks merchants can refuse; blocking the no-bypass rules that confine merchants to the Networks' rails; lifting the surcharging and discounting bans that prevent merchants from steering consumers to lower-cost cards; removing the form-factor and funding-source mandates that force merchants to accept certain devices, wallets, and currencies; and uprooting the Honor-All-Outlets rules that bar merchants from varying acceptance across stores, channels, and locations. Together, these reforms would dismantle the operational barriers insulating the Networks *and issuing banks* from competition, driving interchange rates down to competitive levels.

### 2. The Settlement Falls Well Below the Best Possible Recovery

Compared to those structural reforms, the Settlement is woefully inadequate:

| **Relief Dimension** | **Best Possible Recovery** | **Proposed Settlement** |
|---|---|---|
| **Honor All Cards** | **Eliminated.** Merchants choose which products to accept. | **Ineffective reform.** Splits HAC across three categories, and merchants must accept all cards within each category. |
| **Honor All Issuers** | **Eliminated.** Merchants choose which issuers to accept and can have arms-length negotiations with each. | **Fails to address.** Merchants must still accept all issuers within each card category and cannot negotiate with issuers. |
| **No-Bypass** | **Eliminated.** Issuers free to process transactions directly with merchants or through competing networks. | **Fails to address.** All transactions still must flow through the Networks' rails. |
| **Surcharging and discounting limits** | **Eliminated.** Unrestricted at the brand, product, and issuer level. | **Ineffective reform.** Surcharging allowed at brand/product level up to 3% or cost of acceptance, but not at issuer level; discounting permitted at issuer level. Neither is useful to Walmart and many other merchants. |
| **Form factors, funding sources, and all-outlets** | **Eliminated.** Full merchant choice over products, form factors, funding sources, and channels. | **Minor reform.** Some choice in accepting digital wallets, but not tap-to-pay cards or other non-traditional products; limited non-acceptance pilot at some outlets. |
| **Duration** | **Durable.** Relief lasts until modified. | **Temporary.** Relief lasts 5-8 years, even though release binds for 8+ years. |

As this table shows, the Settlement falls well short of the class's best possible recovery. It largely preserves the Networks' HAC and HAI rules—"perhaps [the] most important[]" anticompetitive restraints in the case. *Interchange*, 827 F.3d at 239. It offers no relief from the Networks' no-bypass rules. And it swaps a durable, permanent injunction for uneven temporary relief that expires years before the Settlement's release. *Supra* § I.C.2. The Networks, put simply, "are holding out on Plaintiffs," which "weighs against" the Settlement's "approval." Doc. 9884 at 29.

Nor would the Settlement's paltry reforms meaningfully lessen interchange fees. Interchange fees are overinflated by *hundreds* of points. *See* Doc. 9342 at 53, 60. The 125-point cap on standard card transactions is meaningless—those cards generally lack rewards, so barely anyone (less than 20% of the market) uses them. *See* Doc. 9692-5 ¶¶ 22-23, 85, 88 n.84; Cook ¶¶ 8(a), 16, 19, 40. The main tools the Settlement offers to steer customers toward standard cards—surcharging and discounting remedies—are commercially unusable for retailers like Walmart anyway, whose business models depend on consistent, low-cost pricing. *Supra* § I.B. The Settlement's half-measures cannot meaningfully remedy the competitive harms, and their temporary nature compounds the problem: the Networks could abandon them once the relief term expires, revive their anticompetitive regime, and recoup billions while merchants remain bound by a longer-term release that leaves them powerless to respond.

The Settlement, in sum, is engineered to ensure that many merchants "actually receive[] nothing." *Interchange*, 827 F.3d at 238. *See Berni v. Barilla S.p.A.*, 964 F.3d 141, 147 n.28 (2d Cir. 2020) ("[D]ifferent class members can benefit differently from an injunction—but no matter what, they *must* stand to benefit (it cannot be the case that some members receive no benefit while others receive some).").

#### 3. The Litigation's Risks and Posture Do Not Justify the Settlement's Discounted Remedies

The risk- and posture-based *Grinnell* factors affirm the Settlement's unreasonableness. After all, this decades-old case has progressed to "a relatively late stage." Doc. 9342 at 48. "Plaintiffs' claims have survived numerous *Daubert* and summary judgment motions" and prompted hundreds of depositions and millions of pages of document production. *Id.*; *see Interchange*, 827 F.3d at 229. "[W]hat remains to be determined is only the sufficiency of the evidence, rather than the legal sufficiency of Plaintiffs' theories of liability." Doc. 9342 at 48.

Thus, "Plaintiffs have cleared substantial hurdles to liability, which certainly has given them leverage in settlement negotiations." Doc. 9884 at 19.

This case is "complex" and "Plaintiffs could still lose at trial" or on "appeal." *Id.* But that is true of virtually every antitrust case. Doc. 9342 at 56. The Supreme Court has repeatedly explained that "Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972). *This* antitrust case is well-positioned for litigation success, to vindicate the objectives of federal antitrust law. "[S]ubstantial evidence has already been found to create at least a triable issue of fact" on the elements Plaintiffs must prove at trial. *Id.* at 61. With respect to the Honor-All-Issuers rule, the core facts are glaring: major banks in the country have agreed not to compete for acceptance via HAI and to fix interchange rates. The complete lack of issuer competition on the merchant side is indisputable, and it shows that the two-sided market is not functioning competitively. As Judge Brodie held in denying Defendants summary judgment, "Plaintiffs have provided empirical and direct evidence of supracompetitive profits and prices, as well as some evidence of stifled competition and reduced quality" due to the Networks' practices, Doc. 9052 at 79—the "most important[]" of which are the HAI rules, *Interchange*, 827 F.3d at 239, which "severely impede competition" among issuers and discourage card acceptance. Doc. 9692-5 ¶ 20. Nor can Defendants show that HAI has pro-competitive benefits in today's market. Their main concern—that HAI encourages acceptance by assuring cardholders their card will work wherever the network's brand is displayed—"was solved decades ago" when "Visa and Mastercard [became] mature networks with millions of card users and millions of accepting merchants." *Id.* ¶ 31. Today, the rules serve no assurance function—

they simply force merchants into "an all-or-none decision: accept hundreds of millions of credit cards issued by thousands of card issuing banks or accept none," thereby "shut[ting] down th[e] typical competitive process." Doc. 9774-9 ¶¶ 707-08; *see* Farrell ¶ 13.

Nor would anything less than enjoining "the whole [HAI] rule" remediate the antitrust violation. Doc. 9876 at 69:7-10. Supracompetitive interchange prices persist because HAI eliminates the market dynamics that would eliminate them—issuer-level competition for merchant acceptance. *See* Doc. 9774-9 ¶ 708. So long as HAI stands, no "individual issuing bank" has any "incentive … to agree to an interchange fee lower than the default rates set by Visa and Mastercard," because the rule guarantees each bank's cards will be accepted regardless of price. *Id.* As a result, only dismantling HAI will fully "eliminate" the operational roadblock to market-competitive rates and "avoid [its] recurrence." *Nat'l Soc. of Pro. Eng'rs*, 435 U.S. at 697; *see United States v. Glaxo Group Ltd.*, 410 U.S. 52, 64 (1973) ("The purpose of relief in an antitrust case is 'so far as practicable [to] cure the ill effects of the illegal conduct, and assure the public freedom from its continuance.'").

Plaintiffs have a legal path to victory. And even if Plaintiffs were to lose, at least they could assert *other* claims against the Networks moving forward, rather than forfeit those claims for nearly a decade in exchange for meaningless relief. Accordingly, the Settlement falls well below the range of reasonableness, which strongly undercuts its substantive fairness. *See Newman*, 464 F.2d at 698; *Axinn*, 90 F.R.D. at 5.

### E. The Class's Negative Reaction to the Settlement Underscores Its Unfairness

The reaction of the class to the Settlement also cuts against approval. A substantial survey of class members shows that very few (about 11%) even know about this litigation, and only 7.8% of class members know about the Settlement. Keegan ¶ 98. And even in that group, many misunderstand the Settlement's terms. *Id.* ¶ 99. Thus, the only direct study of class member

knowledge and understanding of the proposed Settlement shows "pitifully low" awareness, which negates any inference that can be drawn from the number of objections. *Kaufman v. Am. Exp. Travel Related Servs., Inc.*, 283 F.R.D. 404, 407 (N.D. Ill. 2012). But of the class members who do understand the settlement, many have objected "quite vociferously." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 813 (3d Cir. 1995) (finding "the class reaction" was "quite negative" when many class members strongly objected).[12] Their strong negative reaction provides a basis to reject the settlement.[13]

## II. THE SETTLEMENT IS PROCEDURALLY UNFAIR

A Settlement is procedurally fair only if "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). The Court also has a "continuing duty to monitor the adequacy of representation." *Jin v. Shanghai Original, Inc.*, 2019 WL 11816612, at *3 (E.D.N.Y. July 10, 2019). Here, Class Plaintiffs' (and their counsel's) treatment of Walmart and other merchants betrays a lack of adequacy.

An adequate class representative "must have no interests antagonistic to the interests of other class members." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011). But here, conflicts pervade the class. They pervade the class procedurally, as evidenced by Class Plaintiffs refusal to work with Walmart. And they pervade the class

[12] The Court should not assume that non-objecting class members support the Settlement. There are many reasons a class member disapproving of the Settlement might not file an objection, such as: lack of ability or willingness to retain counsel to assist with the objection process; belief or assumption that the class member's reasons for disapproval will be advanced by an objecting class member, and/or a sense of futility (given that class members were told they remain bound by Settlement even if they object).

[13] Class Plaintiffs' notice expert has no direct evidence about the number of class members who actually saw (or heard), and of those the number that understood the notice. Doc. 9956. Instead, he appears to infer that class members must have seen and understood notices in various media. The evidence from Mr. Keegan's survey shows that most of the class did not see or hear the notice, much less understand the Settlement, far outweighs Class Plaintiffs' surmise.

substantively because the Settlement offers no effective relief at all to many large retailers, like Walmart, while purporting to offer benefits—like buying groups and education programs—to small businesses. Indeed, rather than engage with Walmart, Class Plaintiffs offered them minor proportional rate reduction to check a settlement box, not to get meaningful reform. That is the same type of conflict that drove the Second Circuit to reject a prior settlement proposal in this case. *See Interchange*, 827 F.3d at 234 (finding inadequate representation when there were "unacceptable incentives for counsel to trade benefits to one class for benefits to the other in order [to] somehow reach a settlement"); *id*. at 240 (merchants that cannot surcharge "suffer an unreasonable tradeoff between relief and release that demonstrates their representation did not comply with due process"). And it is still true now. Indeed, the decision to offer merchants like Walmart relief they cannot use "is itself an allocation decision with results almost certainly different from the results that those with immediate injuries … would have chosen." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 857 (1999). If this settlement were truly beneficial for large merchants, the proponents would be fine with an opt out right because they would have confidence in support from large merchants.

## III. THE SETTLEMENT PROVES RULE 23'S TYPICALITY REQUIREMENT IS UNSATISFIED

The Settlement also shows the named Plaintiffs' claims are not typical of Walmart's. *See* Fed. R. Civ. P. 23(a)(3). Typicality is not met where legal goals of "the named plaintiffs potentially conflict with those of the absentees." *See Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 631 (3d Cir. 1996). Such a conflict exists when class representatives prove "willing to throw" the interests of absent class members "to the winds in order to settle their own claims." *Nat'l Super Spuds*, 660 F.2d at 17 n.6.

So it is here. Though Walmart labored to convey to Class Counsel what relief many large merchants need to bolster competition for interchange fees, those concerns fell on deaf ears. Cook

¶ 26. Instead, a group of small-business owners yet again "trad[ed] the claims of [large] merchants" for surcharging, buying group, and merchant education remedies that large merchants "cannot use." *Interchange*, 827 F.3d at 238; *supra* § I.B. Simply put, a representative whose claim is satisfied by relief Walmart cannot use is not typical of Walmart. That, too, justifies rejecting the Settlement. *See Nat'l Super Spuds*, 660 F.2d at 17 & n.6 (reversing approval of settlement releasing claims class representatives did not possess because representatives may bind the class only as to "the interests they possess in common with members of the class"); *Glover v. Conn. Gen. Life Ins. Co.*, 2026 WL 2300544, at *1-2 (2d Cir. Aug. 11, 2026) (reversing class certification for lack of typicality even after settlement approval).

## IV. THE SETTLEMENT PROVES THE CLASS IS NOT COHESIVE

The Settlement also illustrates that Rule 23(b)(2) cohesion is lacking. Rule 23(b)(2) is available only when a single injunction is "appropriate respecting the class as a whole." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). When "the necessary remedy differentiates materially among the class members," "class cohesion [is] destroyed." *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 n.8 (7th Cir. 2011) (citation omitted). Here, rather than an indivisible injunction that uniformly redresses injury class-wide, the Settlement offers a "toolbox" of merchant-specific options that some small merchants can use but many large merchants cannot. *Supra* § I.B. Plus, the Settlement's rate relief is divisible, applying differently to different class members. That is not the "single injunction" *Dukes* requires, 564 U.S. at 360—it is a menu of divisible remedies that benefits some at the expense of others.

## V. PREVENTING WALMART FROM OPTING OUT OF THE SETTLEMENT VIOLATES THE U.S. CONSTITUTION

### A. Due Process

In *Wal-Mart Stores, Inc. v. Dukes*, the Supreme Court reaffirmed that due process requires "opt out rights" "in the context of a class action predominantly for money damages." 564 U.S. at 363 (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985)). *Wal-Mart* further noted that, "[w]hile [the Court has] never held that to be so where the monetary claims do not predominate," there is a "***serious possibility that it may be so***." *Id.* (emphasis added); *see also id.* (noting that Rule 23(b)(2) might "wrongly" presume "that depriving people of their right to sue in this manner complies with the Due Process Clause"). This case realizes the "serious possibility" that a (b)(2) class like this, without opt-out rights, would violate due process.

The proposed settlement is like no other ever approved under Rule 23(b)(2). A small number of named Plaintiffs seek to entrench, through the judicial process, critical commercial terms governing the future economic relationship between each of millions of class members and the Defendants, encompassing trillions of dollars in financial transactions. A centerpiece of that entrenchment is an unprecedented prospective release of claims based on future conduct by Defendants, extending at least five, and up to eight, years. And all of this would occur without most absent class members even knowing about it. *See* Keegan ¶¶ 97-100. This is not what Rule 23(b)(2) was designed to do.

Adopted as part of the 1966 amendments to the Rules of Civil Procedure, Rule 23(b)(2) was conceived as predominantly for civil rights cases. *See* Myriam Gilles & Gary Friedman, *The Radical Majoritarianism of Rule 23(b)(2)*, 65 U. Kan. L. Rev. 989, 995 (2017) ("[T]he abundant record of contemporaneous correspondence surrounding the draft of Rule 23 apparently contains no evidence at all that any consideration was given to how Rule 23(b)(2) would function outside

of the desegregation context."); *Wal-Mart*, 564 U.S. at 361 ("'[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of what (b)(2) is meant to capture") (alteration in original) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)).[14] While Rule 23(b)(2) has extended beyond its civil rights origins, the proposed settlement would have no analogue in the history of 23(b)(2) settlements, and the Rule was not intended to impose on class members anything like the deprivations of rights—engineered by Class Plaintiffs and Defendants together—that would be created here. *Cf.* Brian Wolfman & Alan B. Morrison, *What the* Shutts *Opt-Out Right Is and What It Ought to Be*, 74 U. Kan. L. Rev. 729, 740 (2006) ("[T]he settlement class action setting is a breeding ground for manipulating mandatory certification.").

No reading of Rule 23 may ignore that "rules of procedure 'shall not abridge, enlarge or modify any substantive right,'" *Amchem,* 521 U.S. at 613 (quoting 28 U.S.C. § 2072(b)); *see also Ortiz*, 527 U.S. at 842 (adopting construction of Rule 23 that minimizes potential conflict with the Rules Enabling Act). Here, the Settlement would deprive Walmart of its substantive rights in multiple ways—and thus Rule 23(b)(2) cannot be read to permit this settlement without giving Walmart an opt-out right.

**1. The Settlement's Release of Future Antitrust Claims Would Be Unlawful**

As explained above, the Settlement would impose a prospective release of antitrust and other claims based on future conduct. But "prospective waiver[s] of a party's right to pursue statutory remedies for antitrust violations" are unenforceable. *Mitsubishi Motors*, 473 U.S. at 637

[14] *See also* Suzette M. Malveaux, *The Modern Class Action Rule: Its Civil Rights Roots and Relevance Today*, 66 U. Kan. L. Rev. 325, 333, 348 (2017) ("rulemakers coalesced around permitting aggregation for (b)(2) civil rights cases"); David Marcus, *The History of the Modern Class Action, Part I:* Strum and Drang*, 1953–1980*, 90 Wash U. L. Rev. 587, 608 (2013) (Rule 23(b)(2) was "designed" to aid desegregation lawsuits).

n.19 (1985) (collecting cases); *see also Lawlor*, 349 U.S. at 329 (similar); *In re Am. Express Merchs.' Litig.*, 634 F.3d at 197 (a "waiver of future liability under the federal antitrust statutes is void"). Due process requires that each class member be afforded the opportunity to exclude itself from the Settlement's mandatory, illegal release.

**2. The Court Lacks Personal Jurisdiction Over Many Class Members**

The Settlement's Release presents an additional threshold problem: because it would strip class members of rights they otherwise possess, this Court must have personal jurisdiction *over class members* to impose the Release (and force them to submit to the Court's continuing jurisdiction). While the named Plaintiffs have voluntarily submitted themselves to this Court's jurisdiction, they concede that personal jurisdiction over *each* class member is required, having included in their Proposed Class Settlement Order and Final Judgment the following: "This Court has jurisdiction over ... all members of the Rule 23(b)(2) Class ...." Doc. 9932-2 at 2; *see also* Settlement at E-2 ("The Court has … personal jurisdiction over ... all members of the Rule 23(b)(2) Class …."). The Court appears to have assumed, based on statements by the parties, that it has personal jurisdiction over all class members. *See*, *e.g.*, Doc. 9887 ¶ 3. But there is no reason to assume the Court has personal jurisdiction over all class members, and Class Plaintiffs have failed to make any such showing. In fact, the term "personal jurisdiction" never appears in their motion for final approval or memorandum in support. *See* Docs. 9932, 9932-1. The only cure for the failure to establish personal jurisdiction is to permit each class member to exclude itself from the Settlement. Any class member that declines to exclude itself from the Settlement will have consented to this Court's exercise of personal jurisdiction over it.[15]

[15] Theodore Eisenberg, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 Vand. L. Rev. 1529, 1531 (2004) ("the right to opt-out" of a (b)(3) action is a "key premise" for "jurisdiction over absent parties").

### 3. The Release Would Deprive Class Members of a Property Interest

"[A] cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428-29 (1982); *see also In re City of New York*, 5 N.Y.2d 300, 308 (N.Y. 1959) ("[A] cause of action, as we know, is property.");[16] *Ortiz*, 527 U.S. at 846 (It is our "deep-rooted historic tradition that everyone should have his own day in court."). Because the release would extinguish class member causes of action, due process requires permitting each class member to exclude itself from the Settlement.

### 4. Settlement Approval Would Improperly Impose on Class Members the Costs of Challenging the Legality of the Release

As discussed above, at preliminary approval the Court held that the release's propriety "can await a case in which the issue would directly affect the proceedings" because it contains a "de-facto severability clause" limiting the release to "the fullest extent permitted by federal law." *Supra* § I.C.3. But that approach would impose on class members the significant legal costs of litigating questions that should be resolved in this Court, and this juncture: whether the Settlement's Release is lawful and appropriately forced upon class members (the answer to both questions is "no").

### 5. The Settlement is Fundamentally About Money

This Settlement is not about "damages," but it is about money. According to Class Plaintiffs, the Settlement would effectuate "seismic shifts in the [payments] industry," Doc. 9932-1 at 2, and "will have substantial economic impact," reaching "hundreds of billions of dollars in interchange fees," Doc. 9692-5 ¶¶ 16, 111. Some absent class members supporting the Settlement

---

[16] This Settlement "shall be governed, construed, enforced, and administered in accordance with the laws of the State of New York without reference to its conflict of laws principles." Settlement ¶ 154.

agree, urging approval of the Settlement because it will "deliver more than $200 billion in relief." Doc. 9978; *accord* Doc. 9979 ("$200 billion in relief to mostly small businesses"). While Rule 23(b)(2) does not itself mandate a right to exclusion, in *this case* the Constitution does. "What constitutes due process under any given set of circumstances must depend upon the nature of the proceeding involved and the rights that may possibly be affected by that proceeding." *Madera v. Bd. of Educ.*, 386 F.2d 778, 780 (2d Cir. 1967); *see also Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (due process "calls for such procedural protections as the particular situation demands"). The Supreme Court has held that where "actions … seek to bind known plaintiffs concerning claims wholly or predominately for money judgments," due process requires opt-out rights, *Phillips Petroleum*, 472 U.S. at 811-12 & n.3, and further that (b)(2) cases must be carefully policed to ensure they do not vitiate the right to "*individualized* relief," *Wal-Mart*, 564 U.S. at 360. The point of those cases is that a party cannot be deprived of valuable causes of action; pure "monetary claims" are an obvious example, but there is a "serious possibility" that due process reaches other claims, too, *id.* at 363. This case presents just such a circumstance. Before an absent class member is compelled to participate in a vast reordering of significant economic relationships to which it is a party, due process requires that it be afforded the right to opt-out.[17]

**B. Takings**

Beyond these due process problems, ensnaring Walmart in a mandatory (b)(2) class would raise serious Takings Clause concerns. The Fifth Amendment's Takings Clause prohibits the government from "tak[ing]" private property "without just compensation." U.S. Const. amend. V. A "legal cause of action" is a "compensable property interest." *All. of Descendants of Tex. Land*

[17] The due process right to opt-out from *this* settlement arises from the atypical nature of this Rule 23(b)(2) settlement. A finding of a due process right to opt-out from this settlement does not require holding that such a right exists except in exceptional circumstances, like this.

*Grants v. United States*, 37 F.3d 1478, 1481 (Fed. Cir. 1994). And when the government extinguishes a private legal claim, it "transfer[s] ownership of [that] cause of action to itself" and commits "a Fifth Amendment taking." *Alimanestianu v. United States*, 124 Fed. Cl. 126, 132 (2015).

The Settlement would "confiscat[e]" Walmart's property, *Interchange*, 827 F.3d at 241 (Leval, J., concurring), by extinguishing its legal claims without consent. And this Court's judgment would animate the confiscation. *See* Fed. R. Civ. P. 23(e). Thus, if the Settlement is approved, a government actor will have "transferred ownership of [Walmart's] cause of action" and extinguished it—an unlawful taking without compensation. *Alimanestianu*, 124 Fed. Cl. at 132. To "avoid" this "serious constitutional issue[,]" the Court should allow Walmart to opt out. *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 182 (2d Cir. 2006).

### C. The Court Should Exercise Its Discretion to Permit Class Member Exclusion

It has long been settled in the Second Circuit that a district court has discretion to permit exclusion from a Rule 23(b)(2) class. *See McReynolds v. Richards-Cantave*, 588 F.3d 790, 800 (2d Cir. 2009); *see also Cnty. of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1303-05 (2d Cir. 1990) (finding Rule 23 permits exclusions from (b)(1) classes). Here, the Court should exercise its discretion to permit class members to opt-out if the Court intends to approve the Settlement. This would be consistent with doctrines favoring the avoidance of difficult and novel constitutional questions, and the Supreme Court's approach to interpreting Rule 23. *See Ortiz*, 527 U.S. at 842 (adopting construction of Rule 23 to "avoid[] serious constitutional concerns").[18]

## CONCLUSION

The Court should deny the motion for final approval of the Settlement.

[18] If the Court is inclined to allow only *some* class members to opt-out, Walmart should be permitted to do so, having consistently objected to inclusion. Docs. 8464, 8465, 9225, 9729.

Dated: September 14, 2026

Respectfully submitted,

/s/ *Jesse Panuccio*
Jesse Panuccio (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Tel: (954) 356-0011
jpanuccio@bsfllp.com

Scott E. Gant (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
Tel: (202) 237-2727
sgant@bsfllp.com

*Counsel for Walmart*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on September 14, 2026, a true and correct copy of the foregoing was filed electronically using the Court's electronic filing system. By operation of that system a notice of electronic filing will be served upon all counsel of record in the case.

/s/ Jesse Panuccio