IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION<br><br>This Document Applies To:<br><br>*Barry's Cut Rate Stores, Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM), also now known as *DDMB, Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM). | No. 05-md-01720 (BMC) (JAM) |

## DECLARATION OF MICHAEL A. COOK

I, Michael A. Cook, declare as follows:

1. I am the Senior Vice President and Assistant Treasurer of Walmart Inc. ("Walmart"). I have been with Walmart for more than 33 years.

2. I am responsible for the long-term strategic direction for Walmart's global treasury operations function. I lead a highly specialized team that develops strategies and initiatives involving global payment acceptance. I am knowledgeable about Walmart's acceptance of debit and credit card transactions on all payment networks, including Visa and Mastercard, and payment of interchange fees for transactions completed over those networks. I am knowledgeable about the negotiating practices (or lack thereof) of the Networks and issuing banks.

3. I have had significant experience outside of Walmart in multiple aspects of the payments industry. I began my career with the Office of the Comptroller of the Currency, where I participated in safety and soundness examinations and compliance reviews of nationally chartered banks. From 2005–2008, I served on the Consumer Advisory Council of the Federal Reserve Board. I served on the Board of Advisors for the Payment Card Industry Data Security

Standards Council from 2007 through 2023. I served on the board of directors for the Little Rock Branch of the Federal Reserve Bank of St. Louis until December 2016.

4. I submit this declaration in support of Walmart's objection to final approval of the Superseding and Amended Class Settlement Agreement. The bottom line is simple: this proposed settlement would give Walmart nothing we can use, while forcing us to give up our right to challenge anticompetitive conditions in the credit and debit industries for nearly a decade. That is not a trade Walmart should be forced to accept.

5. I have been involved in this case for years. In 2013, I submitted a declaration in support of Walmart's objection to the settlement proposed at that time (Doc. 2644), and I was later deposed. Walmart, which has been made a class member against its will and over its objections, has stayed engaged because the Networks' practices have, and continue to, cost us and our customers enormous sums of money, far beyond what we would pay in a competitive market.

6. This proposed settlement, like its predecessors, would leave untouched the single biggest problem Walmart and other retailers face in establishing true competition in the credit industry: the Honor All Issuers rule that prevents us from negotiating effectively with individual banks.

7. My understanding is that, at the preliminary-approval stage, the Court found the failure to address Honor All Issuers did not undermine the adequacy of relief for three reasons: (a) if merchants would not decline cards at the product level due to customer friction, then merchants also would not decline cards at the issuer level; (b) "issuer-level discounting" will "spur[] competition among issuers for better rates"; and (c) eliminating Honor All Issuers, even if it would "benefit merchants," is unnecessary "considering the other substantial relief that the Amended Settlement provides." Doc. 9884 at 23.

8. Respectfully, these rationales are not consistent with my understanding of the payments ecosystem over my three decades of experience.

a. There is a world of difference between (i) the ability to reject an entire category of cards for all issuers, and (ii) the ability to reject a single issuer. The key question is whether a given type of relief will provide merchants true negotiating power with the issuer who gets the interchange payments.

As explained more fully below, product-level denial power would not create leverage, while issuer-level denial power would. Because premium cards make up such a substantial part of the market, roughly 92%,[1] no merchant can credibly threaten to decline them—and the issuers and the Networks know this. Presumably, that is why the Networks have readily agreed to this "relief" in the proposed settlement; it is a paper tiger.

Moreover, product-level denial power creates a bargaining asymmetry: if one issuer has unreasonable terms, the merchant must deny *all* premium cards, bearing the cost of losing the business of the entire product line, while the issuer still benefits from being able to offer its other product lines at the merchant. Issuers would know that if merchants ever tried product-level denial, they could easily wait them out. Knowing that product-level denials are doomed to fail, merchants will not even try them, as they provide no upside and risk substantial customer friction and cost.

[1] Consumer Fin. Prot. Bureau, *The Consumer Credit Card Market: Report to Congress* 138 (2025), https://perma.cc/JH62-VU94 ("Overall, 92 percent of general purpose card spending was accounted for by rewards cards in 2023 and 2024.").

By contrast, an issuer-level denial imposes symmetrical pain on the merchant and issuer, creating the circumstances for a standard bilateral business negotiation (the two parties either come to competitive terms and symmetrically enjoy benefits, or they do not and share the loss of not doing business together).

Finally, it is easier to communicate to customers the denial of an individual issuer's cards, because most consumers know their issuer but not the type of card. Moreover, it is far more effective to communicate the reasons for an issuer-level denial than a product-level denial. For example, if Walmart could say, "we do not take Issuer A's cards because their price per transaction is unreasonably high and would increase your costs as a consumer," that would be a direct message with little chance for confusion—and customer sentiment might turn against the issuer and create downward pressure on prices and terms. But if Walmart were to say, "we do not take any premium cards," that would be a muddled, industry-wide message with little chance of directing cardholders to make choices that steer issuers.

b. As explained below, issuer-level discounting is not a substitute for issuer-level denials. Discounts are not just a theory: they must be funded either by the merchant or the issuer. This creates several issues.

First, discounts are expensive. Because the discount goes to all cardholders who use a specified card, the discount must be paid to many

cardholders who would use the preferred card regardless of the discount. That is, discounting has significant inframarginal costs.

Second, if the merchant funds the discount, then discounting does nothing to resolve supracompetitive prices: the merchant is still paying more than it would in a competitive market.

Third, rational issuers would not fund the discount: the proposed settlement does not require it, and the issuers would know merchants have no recourse both because (i) merchants cannot deny the issuers' cards, and (ii) merchants would have been forced to relinquish any potential legal claims under the proposed settlement. Experience bears this out: Visa has long permitted issuer-level discounting, but no issuer has approached Walmart offering rate relief in exchange for a discount.

Fourth, assuming issuers would fund the discount, it would still be a very difficult tool to implement for a large retailer like Walmart. Discounting would require differential pricing across all products in a store, which would create consumer confusion and demand substantial front-end merchant investment.

Fifth, even assuming all these problems away, discounting is still a negotiating tool with limited utility. It only works when the discount can drive enough cardholder behavior to affect issuer bottom lines. That is much less direct than the threat of rejecting an issuer's cards.

c. The "relief" in the proposed settlement would not substitute for eliminating the Honor All Issuers rule because, as I explain throughout this declaration, the proposed relief would be ineffective.

# I. Background on Walmart and the Payment-Card Industry

## A. Walmart

9. Walmart, one of the world's largest retailers, operates more than 10,900 stores and clubs in 19 countries and multiple e-commerce websites. Walmart employs 2.1 million associates worldwide—1.6 million in the United States alone—and operates approximately 4,600 stores and 600 Sam's Club locations in the United States. Walmart also sells goods online through Walmart.com and Samsclub.com, and operates Walmart+, a paid-membership service. Each year, Walmart processes billions of transactions and more than $700 billion in customer payments for merchandise.

10. Walmart accepts both Visa credit and debit (signature and PIN via both Visa's PIN debit network, Interlink, and PIN Authenticated Visa Debit) and Mastercard credit and debit (signature and PIN, through Mastercard's PIN debit network, Maestro) at Walmart and Sam's Club locations in the United States. Walmart has accepted Visa credit and debit transactions and Mastercard credit transactions in the United States between January 1, 2004, and the present. Walmart declined to accept Mastercard signature debit transactions from February 1 to June 21, 2004, and, after that, Walmart has accepted Mastercard debit transactions (signature and PIN) at all times to the present. While Walmart has long believed that the cost of accepting Visa and Mastercard transactions (credit and debit) is supracompetitive, Walmart cannot cease accepting all Visa or Mastercard transactions without losing unacceptable sales volume.

11. Each year, in Walmart's U.S. stores alone, Walmart processes over 2 billion credit card transactions, paying more than $1 billion in interchange fees and other card acceptance costs.

These fees represent one of Walmart's largest operating expenses. But unlike Walmart's other major expenses, Walmart is constrained in its ability to use its scale to negotiate these costs through ordinary competitive means.

### B. The Payment-Card Industry

12. Walmart has long understood, and been harmed by, the fact that the payment-card industry lacks real competition for merchant acceptance of Visa and Mastercard payment-card transactions. Visa and Mastercard, with their issuing banks, set (i) the interchange rates that merchants pay on every transaction, and (ii) the rules and processes that govern card transactions. These market constructs inherently impede merchants' ability to negotiate effectively with individual banks that issue cards on the Visa and Mastercard payment networks. This was true when the Networks were member-owned associations, and it remains true now that they are publicly traded companies.

13. The Networks have engineered a system of interlocking rules that eliminate competitive pressure on the prices Walmart pays to accept payment cards. The Networks' Honor All Cards rules, for example, mean that if Walmart were to accept any Visa credit card, it must accept every Visa credit card, no matter the issuer, product, or cost. The Honor All Issuers component of that rule goes further: Walmart must accept credit or debit cards from every issuing bank on the network, regardless of the interchange rate charged, authorization practices, chargeback procedures, or the quality of the bank's fraud controls. The No-Bypass rules, in turn, prevent Walmart from routing credit card transactions over lower-cost competing networks or directly to a bank, forcing every transaction through Visa's or Mastercard's own payment network rails. Together, these restraints ensure that issuing banks need not compete for acceptance at Walmart, the country's largest retailer. Banks instead know their cards will be accepted by

Walmart regardless of the terms they impose, the volume of transactions they charge back, or how they adjudicate fraud and payment disputes; networks similarly know their infrastructure will be used regardless of the fees they assess. Indeed, Walmart has tried to negotiate with banks about these terms and has been repeatedly rejected.

14. Absent these and other restraints, Walmart could and would negotiate effectively over interchange rates and other issuer practices that affect Walmart's costs and operations. For instance, issuers vary widely in their authorization practices, fraud-prevention protocols, and chargeback procedures. Such variations translate into substantial differences in approval rates, fraud exposure, and operational burdens for merchants. Some issuers decline legitimate transactions at disproportionately high rates, costing Walmart lost sales and frustrated customers. Some issuers maintain weaker fraud controls, exposing Walmart to chargebacks for fraudulent transactions that Walmart had no ability to prevent. Collectively, these practices cost merchants billions of dollars. In a competitive market, Walmart could refuse to accept cards from issuers who impose excessive costs, or Walmart could condition acceptance on improvements to security and fraud controls. Honor All Issuers, however, requires Walmart to accept every issuer's Visa or Mastercard credit or debit cards. As a result, Walmart must absorb these supracompetitive, issuer-created costs.

### C. Changes in the Consumer Side of the Payment-Card Industry

15. While the Networks' rules have frozen merchant competition for years, the consumer side of the general-purpose credit and debit card industry has changed significantly since this case was filed in 2005, and even since I filed my last declaration in 2013. One significant

change has been the growth of premium-rewards cards. Another has been the increasing use of commercial- or corporate-card products by small businesses.

16. Premium-rewards cards (e.g., Visa Signature, Visa Infinite, Mastercard World, and Mastercard World Elite) have grown from a relatively small share of credit card transactions to roughly 92% of credit card transactions.

17. Generally, premium cards carry substantially higher interchange rates than standard consumer credit cards. As shown in the proposed settlement's own interchange rate tables, Visa Infinite cards carry published interchange rates as high as 2.30% + $0.10 per transaction at the Retail Credit tier, compared to 1.43% + $0.10 for "All Other Products" (i.e., standard cards). *See* Settlement Agreement, Appendix J. Mastercard World Elite cards similarly carry published rates as high as 2.30% + $0.10, compared to 1.65% + $0.10 for Core cards. *See* Settlement Agreement, Appendix K.

18. Small-business card spending has also increasingly shifted from consumer cards to commercial- or corporate-card products, which generally carry higher interchange rates.

19. The growth and dominance of premium cards are significant because, as explained further below, they make rejection of the entire product line impossible.

**D. The Interests of Large Merchants**

20. As I explain in this declaration, based on my experience, merchants as a class would not benefit from a settlement that locks in anticompetitive rules for years while offering only tools that are impractical to deploy and ineffective even if deployed. But large national retailers, like Walmart, face additional and distinct harms that the proposed settlement fails to address or even perpetuates.

21. Large merchants like Walmart have the scale, sophistication, and economic incentive to negotiate directly with issuing banks but are limited in their ability to do so effectively by the very rules the proposed settlement would preserve. Because the Networks set interchange rates on behalf of issuers and the Honor All Issuers rules require Walmart to accept cards from every issuer, individual issuers have little incentive to negotiate directly with Walmart. Small local merchants, like the class representatives in this case, have little occasion or ability to negotiate issuer-level terms. These fundamentally different circumstances are not accounted for in the proposed settlement.

22. Large national merchants also face unique operational barriers to implementing the proposed settlement's supposed remedies. Some small merchants may not face significant customer friction or infrastructure challenges if they implement surcharging but, as I explain below, that is not the case for Walmart.

## II. The Proposed Settlement Provides Walmart and Other Merchants No Meaningful Benefits

23. The proposed settlement does not fix the lack of competition faced by merchants. In fact, the proposed settlement would make things worse by locking in anticompetitive practices for years to come, while forcing injured parties to relinquish their claims and leaving them with no legal recourse.

24. Walmart gets nothing of value from the proposed settlement. The so-called "relief" is a set of minor tweaks to Visa's and Mastercard's rules about surcharging, discounting, and selective acceptance. *See id.* ¶¶ 18-55 (Visa); ¶¶ 67-104 (Mastercard). As I explain below, none of these changes would create competition for merchant acceptance of Visa or Mastercard credit card transactions in any way.

25. Worse still, the proposed settlement would require Walmart to release all claims for "declaratory, injunctive, or equitable relief" related to interchange rates, Honor All Cards rules, surcharging, discounting, and many other practices. *See* Settlement Agreement ¶¶ 114-21. This means Walmart would lose the ability to challenge these practices for five to eight years. *See id.* ¶¶ 62, 111. While it remains unclear exactly how Visa and Mastercard would exploit this protection, history suggests the result would be the same: less competition and greater entrenchment of their market power. Among other things, Visa, Mastercard, and the banks would be free to increase existing network fees or introduce new ones, expand no-bypass rules, create new premium products with higher interchange rates, impose onerous new security burdens on merchants, or concoct novel steering rules—and Walmart would be powerless to challenge those practices.

26. Equitable Relief Class Counsel never asked Walmart what we needed to ensure competition in the credit card industry. From December 2024 through February 2025, Walmart reached out to Class Counsel to discuss relief that would address the interests of large national merchants. Class Counsel refused to engage in such discussions unless Walmart executed a non-disclosure agreement that would have barred Walmart from later disclosing to the Court the substance of its proposals. Walmart declined those terms, making clear that it needed the ability to inform the Court of its proposals if Class Counsel presented another settlement lacking meaningful, pro-competitive relief. Walmart then sent its concerns in writing to Class Counsel, stressing that the Honor All Issuers rule was the single most important issue to address in any settlement. Those concerns went unaddressed. As a result, the proposed settlement does not reflect the market reality faced by Walmart and many other retailers.

### A. The Proposed Settlement Would Require Merchants to Engage in a Complicated Process that Has Little Practical Chance of Working

27. The Class Plaintiffs and their experts assert that the proposed settlement's reforms would be effective not in isolation but because of the "process" they establish. Doc. 9775 at 16. That "process" is as follows:

a. "spread" is created between the price of premium and standard cards by establishing interchange rates through Court-endorsed fiat (rather than market competition), *see* Doc. 9692-5 at ¶ 61 & n.54;

b. this fiat "gap" would motivate merchants to steer customers away from premium cards (through surcharging and discounting), but merchants would be worried about "adverse customer response", *id.* at ¶¶ 86-87;

c. "[c]reative merchants" would alleviate customer friction by establishing their own rewards programs to replace "the culture" of existing and long-established premium-card rewards programs, *id.* at ¶¶ 87, 89;

d. because all this would be very expensive and uncertain, merchants should set up these complicated surcharging and rewards programs through "pilots" in individual stores or regions (regardless of cost, lack of uniformity, or disruption), *id.* at ¶¶ 67-70;

e. through the pilot programs, merchants would discover the optimal mix of surcharging, discounting, and rewards to effectively steer consumers from premium to standard cards, *id.*; and

f. premium card usage would drop to a point at which merchants can afford to threaten to stop accepting them, thereby creating pressure on the Networks to lower premium card interchange rates or abandon premium cards, Doc. 9775 at 16.

28. Based on my experience in payments for more than three decades, I can say with confidence that there is very little chance merchants can or would follow this "process" for credit card payments.

29. First, as I have explained earlier in this litigation, and detail again below, surcharging and discounting conflict with the business models of large national retailers like Walmart. These steering mechanisms damage customer goodwill and brand image at precisely the moment a merchant is accepting payment from a customer.

30. Second, Class Counsel assumes merchants would design, fund, and deploy entirely new rewards programs competitive enough to lure consumers away from premium-card programs, which represent roughly 92% of credit card transactions today. Based on my experience, it would be difficult to convince consumers to switch from existing credit card rewards programs to a smattering of unconnected and untested merchant programs. Indeed, many rewards cards offer rewards of more than 100 bps (and sometimes over 200 bps). It would be nearly impossible for merchants to fund that size of a reward program with the spread the proposed settlement creates between premium and standard interchange rates.

31. Third, the idea that merchants across the country would establish thousands of pilots for a surcharging and rewards program is not realistic. Retailers are unlikely to engage in the pilots contemplated by the proposed settlement. The proposed settlement generally limits pilots to 180 days at no more than 20% of outlets under the same banner, meaning a company like

Walmart could test in roughly 1,000 of its 5,200 stores for six months out of the year. It would be tremendously costly and cumbersome to establish a surcharging/discounting regime—and a customer rewards program—limited only to certain regions or stores and available for only six months. For a retailer of Walmart's scale, such a pilot would require changes to payment systems, point-of-sale processes, store operations, customer communications, and associate training across potentially 1,000 stores, all to test a temporary program that differs from the experience offered in the rest of the chain. Given those constraints, and given the limited sample size and time period, the results would hardly generate sufficient data to inform a seismic change to Walmart's business model.

32. But even if all those steps could work in theory, based on my experience with the industry migration to rewards cards, the most likely scenario is that the Networks and the issuers would counteract the premium-standard spread by creating additional incentives to move consumers to premium cards or by creating new low-reward, low-cost "premium" cards. That would eliminate any incentive merchants might have to engage in the "process" Class Counsel speculates might, one day, result in a migration to standard cards.

33. Moreover, even if the theorized "process" could work in practice, the time it would take to implement would render it ineffective. According to Class Counsel and their experts, for the proposed settlement's reform "process" to work, merchants would first need to design, implement, run, and study pilot programs to find the optimal balance among in-store rewards, surcharges, and discounts. After that lengthy process, merchants apparently must implement the optimal formula nationwide and hope the results are replicable (and not disastrous to their business). That (according to Class Counsel's theory) would eventually lead to competitive prices when the Networks and the issuing banks internalize the new market conditions. But all of this—

from pilot program to nationwide, durable market changes—must occur in five to eight years, at which point the proposed settlement's requirements on the Networks will expire. Based on my experience with the real world of payments, there is no way all of this can occur in a five-to-eight-year timeframe.

34. In short, the "process" reform contemplated by the proposed settlement is unworkable in both theory and practice.

35. Even if the overall "process" itself were not unworkable, each component step is also unworkable or ineffective, as I explain below.

**B. Surcharging Would Not Work**

36. The proposed settlement would allow merchants to add a surcharge to credit card transactions at either the "Brand Level" or "Product Level," up to the lesser of 3% or the merchant's cost of acceptance. *See* Settlement Agreement ¶¶ 39-43 (Visa); ¶¶ 88-92 (Mastercard). Class Counsel argues this is a key benefit, in part because the proposed settlement would effectively eliminate the "level playing field" rule, which required merchants that accepted a competing card brand that restricted surcharging—like American Express—to apply that brand's anti-surcharging restrictions to Visa and Mastercard transactions as well. Doc. 9932-1 at 5.

37. As I explained in my 2013 declaration, while "Walmart does believe that merchants should have the right to surcharge without limitations, if they so desire," "surcharging, standing alone, [is] an insufficient remedy to the interchange problem." Doc. 2644 at ¶¶ 12, 39. That remains true today, and several developments since 2013 have made surcharging even less feasible as a real-world solution.

38. Moreover, the cost of implementing this "solution" to the Networks' supracompetitive pricing would be borne by Walmart, not the parties imposing the antitrust injury.

### 1. *Surcharging Is Antithetical to a Pro-Consumer Business Model Like Walmart's*

39. Walmart has spent decades building trust with our customers through our "Everyday Low Price" strategy, under which Walmart works to offer the lowest possible prices and to keep those prices consistent across all forms of payment. Millions of Americans count on Walmart for affordable goods, and many use credit cards to pay. Adding fees when customers pay with credit cards would undermine Walmart's commitment to providing customers with consistent, transparent pricing. In short, surcharging would undermine Walmart's hard-earned "brand image," as this Court has already found. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (E.D.N.Y.), 2024 WL 3236614, at *37 n.51 (E.D.N.Y. June 28, 2024). This is especially problematic because Walmart competes with a wide range of retailers, and customers often attribute surcharges to the merchant rather than to the issuing banks and card networks. Class Counsel speculates this may not be the case in the future, because some merchants are already adding "service fees, tips, and other extra charges." Doc. 9775 at 24-25. But such "extras" are not common at large retailers like Walmart, and litigation speculation about customer expectations and behavior cannot replace Walmart's real-world experience and knowledge.

40. Compounding the problem, many customers today carry only premium cards. According to the Consumer Financial Protection Bureau: "Rewards cards make up the vast majority of credit card spending and accounts. Overall, 92 percent of general purpose card spending was accounted for by rewards cards in 2023 and 2024."[2] Simply put, it is one thing to

---

[2] CFPB, *The Consumer Credit Card Market: Report to Congress* 138 (2025), https://perma.cc/JH62-VU94.

surcharge a niche product; it is quite another to surcharge a category of cards that accounts for the overwhelming majority of credit card spending.

### 2. *Surcharging Is Operationally Impractical for Walmart*

41. Even if surcharging were not inconsistent with Walmart's business model, implementing it would be enormously complicated and expensive, and likely impossible. Walmart operates more than 5,200 retail locations across all 50 states, processes over 2 billion credit card transactions annually, and operates more than 100,000 point-of-sale terminals spanning in-store registers, self-checkout lanes, pharmacy counters, self-service fuel stations, and e-commerce platforms. These systems are designed for speed, uniformity, and simplicity. Surcharging would undermine all of that.

42. First, surcharging would require fundamental changes to that infrastructure at every level. Walmart would need to:

a. make significant changes to our more than 100,000 point-of-sale systems, payment processing, and accounting systems—an enormous undertaking in terms of both time and cost;

b. retrain more than one million associates across all U.S. locations;

c. redesign signs, receipts, and disclosures at every location to meet the proposed settlement's disclosure requirements, which require that surcharge practices be disclosed "at the point of interaction or sale" and that receipts must show the "dollar amount of the surcharge," *see* Settlement Agreement ¶¶ 42(b) (Visa), 91(b) (Mastercard);

d. establish systems to monitor compliance and send bi-annual reports to acquirers and networks about our surcharging practices, *see* Settlement Agreement ¶¶ 42(c) (Visa), 91(c) (Mastercard); and

e. absorb the cost and loss of goodwill resulting from lack of uniformity and speed at the checkout counter.

All of this would be made more complicated and expensive because states have differing restrictions on surcharging,[3] such that Walmart could not implement a uniform system across its 5,200 stores and club locations.

43. Second, even if all of the above complexity were resolved, merchants and customers would still need a way to visually and electronically identify card types subject to surcharging. Currently, no such identifiers exist. The proposed settlement recognizes as much,

[3] State surcharging laws vary widely, making a uniform nationwide program impractical. Connecticut, Massachusetts, Maine, and Puerto Rico prohibit credit card surcharges outright. *See* Conn. Gen. Stat. § 42-133ff; Mass. Gen. Laws ch. 140D, § 28A; Me. Rev. Stat. tit. 9-A, § 8-509; P.R. Laws tit. 10, § 11. Among states that permit surcharges, the rules differ substantially. Colorado caps surcharges at 2%, Colo. Rev. Stat. § 5-2-212; Oklahoma at the lesser of 2% or actual processing cost, Okla. Stat. tit. 14A, § 2-211; Illinois has a passed but not-yet-implemented law that would prohibit surcharges on taxes and gratuities, 815 ILCS 151/150-1 *et seq.*; and Minnesota allows surcharges up to 5% but imposes different disclosure requirements for in-person, online, and telephone transactions, Minn. Stat. § 325G.051. Other states, including Georgia, Nebraska, Nevada, New Jersey, and South Dakota, limit surcharges to actual processing costs. *See, e.g.*, Ga. Code § 13-1-15; N.J. Stat. Ann. § 56:8-156.2. New York requires surcharges to be disclosed in total dollar-and-cent pricing rather than as a percentage. N.Y. Gen. Bus. Law § 518. California's statutory ban was held unconstitutional by the Ninth Circuit, *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1179 (9th Cir. 2018), although the Attorney General applies that ruling only to "similarly situated merchants." *Credit Card Surcharges*, State of Cal. Dep't of Just., Off. of the Att'y Gen., https://perma.cc/LXY9-DWAP (last visited Sept. 13, 2026). Texas's ban on credit card surcharging was likewise enjoined, *Rowell v. Paxton*, 336 F. Supp. 3d 724, 732 (W.D. Tex. 2018), but the Texas Attorney General maintains that it remains enforceable in "some contexts." *See* Tex. Att'y Gen. Op. No. KP-0257, at 3 (June 14, 2019), https://perma.cc/H33W-7GG4. Most remaining states permit surcharges of up to 4% subject to disclosure requirements. This patchwork of outright bans, varying caps, differing disclosure rules, and unresolved constitutional questions makes a single nationwide surcharging program infeasible for a retailer operating in all 50 states.

and so it would require issuers to include visual and electronic identifiers on their cards. Doc. 9692-2 ¶¶ 26, 28, 75, 77. But the visual-identifier requirement would apply only to "newly issued" cards, meaning that, for many years, consumers with preexisting cards would have no easy way of identifying, before the point-of-sale, that a surcharge will be added to the sale. That would create significant and unacceptable customer friction and delay at the POS, and it would also greatly increase costs for merchants if customers cancel transactions upon learning of the surcharge (because the Networks charge for voided transactions and multiple authorization attempts).

### 3. *Even If Surcharging Could Be Effectively Implemented, the Proposed Settlement's Restrictions and Allowances Would Undermine any Utility*

44. Even if the above problems could be overcome, the proposed settlement includes several provisions that undermine any theoretical efficacy from surcharging.

45. First, the proposed settlement only allows surcharging at the brand or product level, not by issuing bank. So the proposed settlement stops merchants from surcharging in the very way it theoretically could partially combat anticompetitive behavior: directing price signals (and thus competitive forces) to the actual source of supracompetitive costs.

46. Second, the proposed settlement allows Visa and Mastercard to offer lower interchange rates to merchants who do not surcharge. *See* Settlement Agreement ¶¶ 43(f) (Visa), 92(f) (Mastercard). A merchant that tries to surcharge may end up paying higher costs, exactly the opposite of what surcharging is supposed to accomplish.

47. Third, the proposed settlement caps surcharges at 3% or the merchant's cost of acceptance, whichever is less. *See* Settlement Agreement ¶¶ 40, 41 (Visa); ¶¶ 89, 90 (Mastercard). But interchange fees are just one part of what Walmart pays to accept cards; there are also network fees and acquirer fees. Thus, even if Walmart could use the proposed settlement's surcharging option, it may not permit Walmart to recover the actual cost of accepting some credit cards.

48. The proposed settlement itself shows how this could occur in the general market: the interchange rates in the proposed settlement's appendix go as high as 3.15% plus $0.10 per transaction for some Visa cards. *See* Settlement Agreement, Appendix J. A 3% surcharge cap would not even cover the interchange fee on those transactions, let alone the total cost of acceptance.

### 4. *Surcharging Merely Moves the Cost of the Networks' Anticompetitive Behavior from One Victim to Another*

49. Even setting aside all these practical obstacles, surcharging would not solve the fundamental problem this litigation is meant to address. The reason interchange rates are supracompetitive is that the Networks' rules eliminate competition among issuing banks for merchant acceptance. Surcharging does nothing to create that competition. It does not (i) change the incentives that limit Walmart's ability to negotiate effectively with individual issuers or (ii) otherwise cause issuers to compete for Walmart's acceptance. And it does not constrain the Networks' ability to raise interchange rates or impose new fees in the future. What surcharging does, at best, is allow a merchant to pass along the cost of the Networks' anticompetitive conduct to the consumer standing at the register, who, like the merchant, played no role in creating the problem and has no ability to fix it. Surcharging would not create true competition; it is a cost-shifting mechanism that leaves the underlying restraint of trade fully intact and preserves profits for the Networks. And for a company like Walmart, whose mission is to save its customers money, being told that the "solution" to anticompetitive pricing is to charge those customers more is no solution at all.

* * * *

50. In sum, surcharging may be a workable option for a small local merchant that processes a limited number of credit card transactions and can explain a surcharge to customers

on an individual basis. But it is not a workable option for a retailer like Walmart that processes more than 2 billion credit card transactions per year across 5,200 stores and has built part of its brand promise on everyday low pricing.

**C. Discounting Would Not Work**

51. The proposed settlement would also change Mastercard's rules to let merchants offer discounts based on which bank issued a customer's card. *See* Settlement Agreement ¶¶ 67-68; Appendix H. Class Counsel calls this another major benefit. But like surcharging, discounting would not create true competition in the market.

52. We already know that the ability to discount in this way would not create a competitive market. Visa already permits it, yet its supracompetitive pricing persists.

53. Discounting is impractical. Discounting, like surcharging, would require a complete overhaul of Walmart's payment-processing systems. Walmart uses complex SKU pricing systems to individually price each of the thousands of items on its shelves. Discounting would require Walmart to develop systems to offer differential prices for thousands of products based on card type or issuer. That would introduce significant customer confusion and technical problems.

54. Discounting is also difficult to implement. To implement issuer-level discounting, Walmart would have to identify the issuing bank for every transaction, build bank-specific pricing logic into our checkout systems, and explain to customers why they are paying different prices than the person next to them—all based on which bank issued their card. Such differences would confuse and frustrate our customers in a way that a co-branded card does not.[4] And issuer-level

[4] Conversely, Walmart's direct negotiations with issuing banks (if made effective through elimination of the HAI restriction) would occur behind the scenes and affect no customer, while issuer-level discounting forces price differences into the open at the register.

discounting would go against our "Everyday Low Prices" approach. Our customers expect clear, consistent, low prices—not a complicated pricing scheme that changes based on who issued their card.

55. Indeed, Walmart expects that discounting would create significant cardholder confusion. Cardholders would have to identify their card type or issuer at the register; calculate the true price themselves; and then check that price at checkout. This would be even more complicated when price calculations depend on new systems to identify card types in the first place.

56. From a bargaining perspective, the ability to discount at the issuer level would also be less effective than the ability to deny card acceptance at the issuer level. If Walmart were permitted to decline an issuer's cards, it could effectively use that possibility at the negotiating table. After all, an issuer would suffer immediate harm if Walmart declined its cards. Discounting, on the other hand, would work (if at all) only over a long period as customers migrate to different cards. That is, from the non-discounted issuers' perspective, discounting only has an effect if the discount is large enough to materially change consumer behavior. That is unlikely: consumers who have spent years building rewards on one card are unlikely to switch to another for a store-specific discount. And even if consumers did switch, issuers could still avoid granting interchange relief by increasing their own rewards to recapture spend. Discounting thus offers much less leverage at the negotiating table.

57. More fundamentally, issuer-level discounting does not solve the real problem. Class Counsel says that discounting would give Walmart a tool to negotiate with issuers. As the theory goes, the carrot of a discount would bring issuers to the bargaining table. But the tool does

not work in the real world. As a result, discounting would not lead to any real-world issuer competition for merchant acceptance.

58. There are three possible scenarios for discounting. In one, Walmart could raise its base prices globally so that it can discount cards issued by preferred issuers without suffering a loss. But (even assuming Walmart would raise prices, which it would not) that would never work. If Walmart raised its base prices globally, it would lose customers (who depend on Walmart's low prices) before it could effect change at the issuer level. That is, non-discounted issuers would not bargain, they would just wait out the economic forces. They would know that basic consumer price sensitivity would end the discounting before they needed to change their business practices.

59. Alternatively, Walmart could keep its base prices the same and pay for the discount itself. But that too would not bring issuers to the bargaining table. It would just force Walmart to bear not only the supracompetitive prices it already pays, but also the cost of the discount.

60. Finally, an issuer could partially finance a discount by agreeing to lower Walmart's interchange fee. But Walmart's experience with Visa's rules, which have permitted issuer-level discounting, shows that issuers will not exchange lower interchange rates for discounts in the real world. Even if they did, discounting would never fully eliminate supracompetitive prices. Rational issuers will not take a loss on the rate relief they offer. So, even when an issuer finances a discount, it will still make more on increased fees than it loses on rate relief. That is, fees would remain high, even when discounting is possible.

61. Nor would issuers reduce rates to finance discounts. Discounting is inefficient because cardholders who would use the preferred card anyway will still receive the discount. So discounting, because of its high inframarginal costs, is more expensive than other cardholder-acquisition strategies. Issuers, in other words, will not pay for a discount because discounting is

expensive. Moreover, by discounting, an issuer hands over its customer-retention program to a merchant. Most issuers will prefer to keep that power in house by using the money they would have spent to finance discounts on their own cardholder incentives.

62. On top of all that, the proposed settlement would still let Visa and Mastercard control interchange rates, and banks would still be free to charge whatever those Networks set. Issuer-level discounting thus would not lower interchange rates, create competition over rates, or limit the Networks' pricing power. It would merely shift costs around while leaving the real problems untouched.

### D. Merchant Rewards Programs Are Not a Workable Solution

63. Professors Stiglitz and Leffler, Class Counsel's experts, suggest merchants could steer customers away from premium cards by creating their own rewards programs to replace existing card rewards programs. *See* Doc. 9692-5 at 33. This untested academic theory has no basis in the real-world retail space in which Walmart operates.

64. First, building a new rewards program would be very expensive.

a. A merchant would need to design and bankroll rewards from the ground up.

b. The inframarginal cost of launching a program designed to steer customers to lower-cost payment methods is significant. For example, if 20% of customers already use the preferred payment method, to drive even 1% more usage, the retailer would have to pay the rewards to the 20% already using the preferred method.

c. Because a single merchant's rewards program would need to compete with an entire network's program, the merchant's rewards

would need to be extremely lucrative. And nothing in the proposed settlement would stop the issuing banks from increasing their rewards to render merchant programs ineffective or cost prohibitive.

65. Second, even assuming a merchant could build a competitive rewards program, consumers would be unlikely to use it, especially within the limited timeframe that would be left in the settlement period after creation, testing, and widescale deployment of a program. At this point, consumers have spent years building up rewards through the networks, such that they are now accustomed to those programs. Many consumers now have only premium cards. A merchant rewards program would ask customers at checkout to use a card they do not want (and may not have) to avoid a surcharge (that Walmart could never implement anyway because of its business model).

## III. The Proposed Settlement Preserves the Core Anticompetitive Practice: Honor All Issuers

66. The core anticompetitive practice perpetrated by the Networks is the "Honor All Cards" rule, which requires a merchant to accept all branded cards ("HAC") from all issuers ("HAI"), regardless of price and terms.

67. Class Counsel and their experts argue that the proposed settlement provides relief on this front because it would permit merchants to decline acceptance of "all Visa-Branded Premium Consumer Credit Cards" and/or "all Mastercard-Branded Premium Consumer Credit Cards." Settlement Agreement ¶¶ 22 (Visa); 71 (Mastercard). But this "relief" is illusory.

68. Given that premium cards now represent roughly 92% of credit card transactions, declining to accept all premium cards would mean turning away an unacceptable percentage of customers. No rational merchant would decline acceptance of a category of cards that accounts

for the overwhelming majority of transactions.[5] The Networks know this. The threat of declining such cards would not be credible, and the Networks know this, too. That, based on my experience, is why they are willing to accept this "reform" to the HAC rules: it is toothless.

69. The rule that would be established by the proposed settlement would require a merchant to accept all cards within a category if it accepts any, regardless of issuing financial institution or product features. *See* Settlement Agreement ¶¶ 23 (Visa); 72 (Mastercard). This Honor All Issuers requirement is the most significant anticompetitive restraint Walmart faces. It means Walmart cannot effectively cause issuers to compete for its business by lowering prices and increasing benefits. Eliminating this restriction would allow merchants like Walmart to create genuine competitive pressure among issuing banks—forcing them to compete for merchant acceptance by offering lower interchange rates. This is the kind of relief that would provide real, tangible benefits to merchants and, ultimately, to consumers.

70. The payment card industry is a mature, highly developed market. Visa and Mastercard together process approximately 87% of all credit card transactions by purchase volume in the United States.[6] Credit card acceptance is no longer a novelty or a competitive differentiator for merchants, but rather a basic requirement of doing business. Virtually every merchant in the United States accepts Visa and Mastercard.

71. In a market this mature, the Honor All Cards rules (including HAI) serve no pro-competitive purpose. They do not encourage innovation or expand the market. Instead, they protect the market power of Visa, Mastercard, and their issuing banks by eliminating the most

---

[5] Even Class Counsel has acknowledged "[t]here will be some friction." *See* Preliminary Approval Hearing Tr. at 9:20-21. And the Court has expressed uncertainty whether merchants "will avail themselves" of the selectiveacceptance relief. *See* Doc. 9884 at 27.

[6] *Credit Card Market Share Statistics*, Capital One Shopping (June 3, 2026), https://perma.cc/UR5B-WWWZ.

powerful competitive tool available to merchants: the ability to selectively accept or decline individual issuers' cards based on the terms those issuers offer. The proposed settlement would protect this anticompetitive framework to the detriment of merchants like Walmart, all while purporting to be in our interest.

72. If the Honor All Issuers rule were eliminated, merchants like Walmart could negotiate more effectively with individual issuing banks for competitive terms just as Walmart negotiates with suppliers for competitive prices on the goods they sell. Banks that offered better terms would be rewarded with greater merchant acceptance; banks that maintained supracompetitive terms would risk losing merchant acceptance altogether. This is how other competitive markets function for Walmart.

73. The payment card market is mature enough to support this kind of competition. Consumers are sophisticated in their use of payment cards, and the technology exists for merchants to identify card issuers at the point of sale and make real-time acceptance decisions. The proposed settlement acknowledges as much by requiring Visa and Mastercard to make available "technology sufficient for merchants to work with their acquirers to be able to identify the product category and type for a payment card at the point of sale and prior to authorization of the transaction." *See* Settlement Agreement ¶¶ 28 (Visa), 77 (Mastercard). But the proposed settlement stops short of allowing merchants to use this technology to drive real competition among issuers.

74. Permitting competition for acceptance at the issuer level is far more efficient at promoting competition than at-the-register solutions like surcharging and discounting. To negotiate issuer-level acceptance, a merchant like Walmart could engage in a normal bilateral negotiation over prices and services. That is the typical negotiation that happens for all kinds of goods and services. By contrast, the proposed settlement attempts to spur competition indirectly

by holding Walmart's customers captive so that their buying decisions eventually influence issuers. That indirect approach is unlikely to work, much less work as well as a direct approach.

75. That is especially true because declining an issuer's cards is easier to implement—and thus a more credible threat—than surcharging or discounting. Cardholders know, or at least can easily figure out, their issuing bank: they typically applied for the card through the bank and the card itself clearly identifies the issuer. By contrast, consumers may not know whether their card is classified as "premium" or "standard." Thus, declining to accept an issuer's card is as simple as a sign in the store saying "we do not accept cards from Bank X." As explained above, surcharging and discounting are much harder to implement.

76. The proposed settlement does not address the Honor All Issuers restrictions that Walmart has consistently viewed as the most significant barrier to competition among issuing banks. The result is a proposed settlement that provides merchants with tools they cannot practically use (surcharging and discounting) while leaving in place the rule (Honor All Issuers) that most effectively prevents competition in this market.

## IV. THE INTERCHANGE RATE "RELIEF" IS INADEQUATE

77. The proposed settlement provides for a reduction of 10 basis points in the combined system-wide volume-weighted average effective interchange rate. *See* Settlement Agreement ¶¶ 48 (Visa); 97 (Mastercard). It also caps standard consumer credit card rates at 125 basis points. *See* Settlement Agreement ¶¶ 50-51 (Visa); 99-100 (Mastercard). These reductions do not approach the reduction in costs Walmart could achieve in a truly competitive market.

78. The proposed rate reductions do not even roll back the interchange rate increases that Visa and Mastercard have implemented since this litigation began. As Class Counsel has acknowledged, each network's average interchange rate has increased significantly since the MDL was filed. The proposed settlement's 10-basis-point reduction does not come close to undoing

these accumulated increases. That does not even include non-interchange fees (like digital commerce fees) that have been introduced since the MDL was filed. In short, rather than providing genuine relief, the proposed settlement merely "halts the interchange fee price spiral" while preserving supracompetitive rates.

79. The rate reductions also expire. The Average Effective Rate Limit is limited to five years. *See* Settlement Agreement ¶¶ 48 (Visa); 97 (Mastercard). The posted rate caps similarly have limited durations. After these periods expire, Visa and Mastercard are free to raise interchange rates again.

80. At that point, unwinding the rate increases will be very difficult. As this case itself shows, litigation is slow: it has already taken twenty years to litigate this case. Offering limited, litigation-driven rate relief, without solving the underlying structural problems in the market, cannot keep pace with rising rates.

81. The proposed settlement thus provides only temporary, inadequate rate relief.

## V. The Proposed Settlement's Other Purported Benefits Are of Little or No Value to Walmart

82. The proposed settlement's provisions regarding "Merchant Buying Groups" (Settlement Agreement ¶¶ 44-47 (Visa); 93-96 (Mastercard)) are of no value to Walmart. Walmart does not need, and would not benefit from, a buying group mechanism. To the contrary, Walmart's interest lies in preserving and strengthening its ability to negotiate individually with the Networks and issuing banks, an ability that the proposed settlement threatens to undermine by, among other things, standardizing terms across the class.

83. Merchant Buying Groups are unlikely to be effective anyway. Walmart's experience proves as much. On its own, Walmart is one of the largest retailers in the world and is usually able to negotiate effectively with suppliers to drive low and competitive prices for

consumers. Here, however, Walmart has been unable to prevent supracompetitive interchange fees because the HAI rule deprives Walmart of the key tool that would drive competition: the credible ability to tell individual issuing banks that their cards may not be accepted if they do not offer competitive terms. The proposed settlement would do nothing to change that anticompetitive dynamic. As a result, buying groups will remain ineffective: no matter how big they get, they lack the tools to negotiate effectively with the issuers.

84. The proposed settlement's "Merchant Education Program" (Settlement Agreement ¶¶ 56 (Visa); 105 (Mastercard)), funded with $21 million, is of no value to Walmart. Walmart has an experienced payments team that is fully familiar with Visa's and Mastercard's rules and has no need for a third-party education program.

## VI. The Release Walmart Is Being Forced To Make Is Too Broad and Unfair

### A. The Release Is Far Too Broad

85. The proposed settlement would require Walmart to provide a release far beyond a fair exchange for any benefit obtained. It would bar Walmart from bringing claims for declaratory, injunctive, or equitable relief against the Networks, their issuing banks, and scores of related entities for at least eight years, and potentially longer if there are appeals. *See* Settlement Agreement ¶¶ 114-16. It would require Walmart to waive all protections for unknown claims under California Civil Code Section 1542 and equivalent laws in every other jurisdiction, even though Walmart had no role in negotiating that waiver. *See id.* ¶¶ 117-18.

86. The release sweeps far beyond the practices the proposed settlement would actually modify. The proposed settlement purports to reform surcharging rules, product-level selective acceptance, discounting, and rate caps. But the release expressly encompasses claims concerning network reorganizations and IPOs; service by bank employees on Visa or Mastercard boards or committees; cross-border acquiring rules; tokenization standards; mobile and e-commerce routing;

"Merchant Fees" of any kind; and agreements between the Networks and their member banks. *See* Settlement Agreement ¶ 116(b)(i)-(vi). These subjects are far afield from the reforms the proposed settlement would provide.

87. The release covers future conduct that does not yet exist. Any rule that is "substantially similar" to a rule in place as of the Settlement Approval Date is released. *See id.* ¶ 116(c). Yet the Networks routinely introduce costly new mandates under the guise of minor "enhancements" that in reality impose substantial new costs and burdens on merchants. For example, Visa recently introduced a bundled "Digital Commerce Service Fee," which charges merchants for a host of tokenization and digital services regardless of whether the merchants use those tools. Likewise, the Networks have continued to change dispute procedures, evidence requirements, thresholds, and associated fees. Each of those practices was introduced as a routine rule change. Under the proposed settlement's release, merchants would be unable to challenge similar changes for at least eight years, even if those changes impose billions of dollars in new costs.

88. The release would outlast the relief. Again, the Average Effective Rate Limit is limited to five years. *See* Settlement Agreement ¶¶ 48 (Visa); 97 (Mastercard). The posted rate caps similarly have limited durations. The release, by contrast, runs for at least eight years from the Settlement Approval Date. This creates a gap of at least three years during which the Networks can raise interchange rates on premium and commercial cards, while Walmart would be legally barred from challenging those increases. If appeals extend the release beyond eight years, the gap would grow wider. Walmart would be locked into a release that has already outlived the protections it was supposed to justify.

**B. The Release Is Unfair**

89. Even if prior courts approved similar release language, those courts were not evaluating whether the current package of relief (surcharging, issuer-level discounting, merchant buying groups, premium-card rejection rights, and merchant education programs) provides any value to Walmart. Walmart should not be forced to be a party to a release that it does not support and for which it receives no consideration of value.

* * * *

90. The proposed settlement asks Walmart to release all its claims against Visa, Mastercard, and the bank defendants in exchange for "relief" that Walmart cannot use, does not want, and that fails to address the fundamental anticompetitive practices that have caused Walmart and its customers billions of dollars in harm.

91. Walmart objects to the proposed settlement and seeks a resolution to this litigation consistent with what Class Counsel's expert, Professor Stiglitz, called for at the conclusion of his book, The Price of Inequality: "**Make the banks and credit card companies more competitive and ensure that they *act* competitively**. We have the technology to create an efficient electronic[] payment mechanism for the twenty-first century, but we have a banking system that is determined to maintain a credit and debit card system that not only exploits consumers but imposes large fees on merchants for every transaction."[7]

92. A settlement that forces Walmart to release all of its claims but leaves in place the core anticompetitive practices is not fair, reasonable, or adequate as applied to Walmart. Moreover, the lawyers who negotiated the proposed settlement did not adequately represent Walmart's interests.

---

[7] Joseph E. Stiglitz, *The Price of Inequality: How Today's Divided Society Endangers Our Future* 337 (2012) (emphasis added).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct as of this 14th day of September, 2026.

Michael A. Cook
Sr. Vice President and Asst. Treasurer
Walmart Inc.