KEEGAN & DONATO
CONSULTING, LLC

31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re: Payment Card Interchange Fee and Merchant Discount Antitrust Litigation**<br><br>**This Document Applies to:** | |
| ***Barry's Cut Rate Stores, Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM), also now known as *DDMB, Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM)** | **No. 05-md-01720 (BMC) (JAM)** |

# Declaration of Mark Keegan

**Keegan & Donato Consulting, LLC**
**September 14, 2026**

KEEGAN & DONATO
CONSULTING, LLC

31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

## TABLE OF CONTENTS

Summary of Assignment .......... 1
Firm Overview .......... 3
Methodology .......... 5
Study Integrity .......... 5
Study Objective .......... 6
Study Population .......... 6
Study Design .......... 7
Data Collection .......... 8
Bias Management .......... 11
Accuracy of Estimate .......... 14
Questionnaire .......... 15
Screener .......... 15
Main Questionnaire .......... 21
Sample Characteristics .......... 25
Results & Analysis .......... 26
Conclusions .......... 32

**Exhibits**

Exhibit 1—About Keegan & Donato Consulting, LLC
Exhibit 2—Questionnaire (Screen Shots)
Exhibit 3—Questionnaire (Editor Export)
Exhibit 4—Tabulated Data
Exhibit 5—Disposition of Contacts

KEEGAN & DONATO
CONSULTING, LLC

31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

## Summary of Assignment

1. Keegan & Donato Consulting LLC was retained by counsel ("Counsel") for Walmart in the above-captioned matter to design and execute a survey to gauge certain aspects of Class Members' awareness of a prospective settlement agreement[1] (the "Prospective Settlement Agreement") in the current matter.

2. Based on my review of relevant case materials[2] and directions from Counsel, I assume the following information outlined in the Class Definition for the purpose of my analysis:

    a. The class period begins in December 2020 and continues to the date of preliminary settlement approval (the "Class Period");[3]

    b. The class consists of all persons, businesses, and other entities that have accepted Visa-branded cards and/or Mastercard-branded cards in the United States at any time during the Class Period (the "Class," with members of the Class being "Class Members"[4]).

3. It is my understanding that as part of the Prospective Settlement Agreement, a Settlement Notice Plan was drafted (the "Notice Plan"),[5] a notice period was adopted (the "Notice Period"),[6] and said Notice Period has now concluded.[7] I understand that the third-party notice vendor engaged to implement the Notice Plan outlined and presumably executed notice of the

---

[1] Superseding and Amended Class Settlement Agreement of the Rule 23(B)(2) Class Plaintiffs and the Defendants.

[2] See for example, Complaint, Prospective Settlement Agreement, Notice Plan.

[3] Prospective Settlement Agreement, Appendix C - Notice Plan, ¶ 14.

[4] Includes relevant employees of business/entity Class Members.

[5] Settlement Notice Plan.

[6] Memorandum Decision and Order (Document 9884), 6/9/2026.

[7] Declaration of Cameron R. Azari, Esq., Regarding Implementation and Adequacy of Class Notice Plan, 8/18/2026.

prospective settlement to Class Members through a media campaign that included print, digital, television, radio, and other forms of communication directed at Class Members.[8]

4. I was asked to review the Prospective Settlement Agreement and the Notice Plan and to consider whether conducting a research study to determine the efficacy of the Notice Plan in communicating the existence and terms of the Prospective Settlement Agreement to Class Members would yield useful information.

5. Upon completing this review, I determined that a research study of the relevant population (i.e., Class Members) would be informative. Specifically, I determined that a methodologically sound research study could demonstrate with a high degree of reliability the extent to which, if at all, Class Members have an awareness of the existence of a proposed settlement to the current matter (i.e., the Prospective Settlement Agreement), and, to the extent that such awareness exists, determine the extent to which Class Members demonstrate an accurate understanding of certain provisions outlined in the Prospective Settlement Agreement and Notice Plan.

6. Accordingly, I designed and executed a research study to determine the extent to which, if at all, Class Members are aware of the Prospective Settlement Agreement and its terms. A standard survey research methodology incorporating various industry standards and best practices of survey research was employed in the execution of the study (discussed in detail below).

7. My study of 1,042 Class Members demonstrates that Class Member awareness of both the litigation and the proposed settlement is exceptionally low. Specifically, the study findings show, among other things, that:

- 76.0 percent of Class Members have no awareness of any class action lawsuits against Visa and/or Mastercard;
- 88.2 percent of Class Members have no awareness of this case;
- 7.8 percent of Class Members indicated that they have seen or heard a notice describing a proposed resolution to the current case; and

[8] Settlement Notice Plan.

- Very few Class Members (approximately 5 percent or less depending on the settlement provision tested) have awareness of any specific terms of the Prospective Settlement Agreement, with some respondents erroneously believing that the Prospective Settlement Agreement entitles merchants to a monetary payment.

8. Additionally, respondents' answers to open-ended questions regarding the subject of the current litigation support the finding that even Class Members indicating an awareness of the current matter have an inconsistent or incomplete understanding of the subject matter of this litigation and the terms of the Prospective Settlement Agreement.

9. Accordingly, the study demonstrates a pervasive lack of awareness of the Prospective Settlement Agreement among Class Members. The overwhelming majority of Class Members are unaware of the Prospective Settlement Agreement, and even among the small minority claiming awareness, understanding of the terms of the Prospective Settlement Agreement is limited and frequently inaccurate.

10. The methodology and results of my study, and my conclusions, are presented in detail in the sections that follow.

## Firm Overview

11. I am a principal at Keegan & Donato Consulting, a consulting firm serving litigators and their clients. Our areas of expertise include marketing analysis, consumer survey research, intellectual property, forensic economic analysis, and related disciplines. Our firm designs and executes methodologically sound consumer survey research studies, conducts objective evaluation of existing survey research, and collaborates on a wide range of marketing and complex commercial litigation issues. We are also regularly engaged by clients for non-litigation consulting assignments related to marketing research and strategy.

12. I have 25 years of experience conducting consumer research. Over the course of my career, I have personally conducted over 1,000 consumer surveys, reaching more than 250,000 consumers. Many of these surveys have been admitted into evidence in federal courts, state courts, at arbitrations, and presented to the Trademark Trial and Appeal Board, the National Advertising Division of the Council of Better Business Bureaus, and the United States International Trade Commission. My survey evidence and testimony have been relied upon by tribunals in reaching their decisions.

13. I am a graduate of the University of Georgia's Principles of Market Research Program. This comprehensive course of study, developed in concert with the Market Research Institute International (MRII), is a post-graduate program for marketing industry professionals covering all aspects of the market research process. Coursework is based on the MRII's Market Research Core Body of Knowledge (MRCBOK), a compilation of the underlying principles and essential skills that comprise the market research process. Certification is conferred only upon participants who demonstrate mastery of concepts presented in 284 detailed module studies across 13 core areas of market research, as determined by rigorous proctored examinations. The University of Georgia's Principles of Market Research Program is endorsed by all major market research and insights industry associations, including ESOMAR and the Insights Association.

14. I am a member of the American Marketing Association (AMA), the preeminent professional association for marketing practitioners and scholars. From the AMA, I have earned the designation of Professional Certified Marketer (PCM). The AMA confers the PCM certification upon individuals who have demonstrated a mastery of comprehensive and core marketing knowledge and principles. PCM certification requires rigorous testing, ongoing professional development, and a commitment to upholding the highest standards in the marketing field. The AMA only accepts into the PCM certification program applicants with demonstrated professional experience in the field of marketing.

15. My educational background includes a Juris Doctorate degree from Brooklyn Law School and a Bachelor of Arts degree in History from Pace University. I have completed coursework in the Master of Business Administration program at the Lubin School of Business at Pace University and in Harvard University's Corporate Finance Certificate program. I have also served as a Registered Representative, National Association of Securities Dealers (Series 7, expired).

16. Keegan & Donato Consulting is a member of ESOMAR, the leading global association for market, social, and opinion research, the American Association for Public Opinion Research (AAPOR), a professional organization of more than 2,000 public opinion and survey research professionals in the United States and from around the world, the International Trademark Association (INTA), and the Association for Consumer Research (ACR). I have published in an ESOMAR compendium on the benefits of methodologically sound marketing research. I was a featured speaker on survey methodology and practice at the 2026 Arizona State Bar's

*CLE in the Garden* conference. I have taught CLE-accredited courses on survey research for litigation at the Florida Bar's Annual IP Symposium and have addressed the Pennsylvania Bar Association's Intellectual Property Law group with a presentation on the building blocks of survey research for litigation, consumer research best practices, and current trends in the industry. I have guest lectured on survey design and intellectual property issues at Cardozo School of Law in New York and UC Irvine School of Law in California.

17. Additional information about my credentials is provided at Exhibit 1 to this report.

18. Keegan & Donato Consulting's compensation for this matter is not dependent on the outcome of the matter.

## Methodology

### Study Integrity

19. This study of 1,042 Class Members was designed and executed in accordance with accepted standards and best practices of survey research. For example, this survey follows the guiding principles for survey research for the purpose of litigation as outlined by Shari Diamond,[9] including but not limited to:

- Appropriate universe selection and sampling frame;
- Rigorous and valid survey design that is probative of the relevant issues in the case;
- Inclusion of representative, qualified respondents;
- Use of procedures to minimize potential biases in data collection;
- Use of objective, non-leading questions;
- Use of procedures to reduce guessing among respondents; and
- Full analysis and reporting of survey data.

[9] Diamond, S.S. (2011). "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence, Third Ed.*, Federal Judicial Center/National Academy of Sciences, pp. 359-423.

20. The research was also guided by recognized treatises in the areas of survey and social science research.[10]

**Study Objective**

21. The objective of the study that I designed and executed in this matter was to determine the extent to which, if at all, Class Members—i.e., all persons, businesses, and other entities that have accepted Visa-branded cards and/or Mastercard-branded cards in the United States at any time during the Class Period—are aware of the Prospective Settlement Agreement and some of its key provisions.

22. To this end, I designed and executed a research study to evaluate these issues. The remaining sections of this report describe the methodology, findings, and conclusions of my study.

**Study Population**

23. Surveys are conducted by collecting data from a sample, or subset, of the population of interest, i.e., the larger group to which the study results may be projected. The appropriate population for this study is all persons or businesses who have accepted Visa-branded cards and/or Mastercard-branded cards in the United States at any time during the Class Period.

24. Specifically, the survey was designed to identify and accept for participation in the study three specific types of individuals who comprise the Class:

- ***Enterprise Class Members***: this category includes respondents who (a) work for a company or organization; *and* (b) have job responsibilities that include credit and/or debit card processing; *and* (c) confirm that their company has accepted Visa and/or Mastercard during the Class Period; *and* (d) indicate that they would make or influence the credit and/or debit card issuing vendor vetting process and selection/negotiation decision for their company or organization.

- ***Business Owner Class Members***: this category includes respondents who (a) own a business or are self-employed; (b) confirm that their business accepted credit cards, debit cards, digital wallet, and/or online payment services during the Class Period;

---

[10] See, for example, Reid, H.T. & Judd, C.M. (2014). *Handbook of Research Methods in Social and Personality Psychology*, *2nd Ed.*, Cambridge University Press*;* Jacoby, J. (2013). *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*, American Bar Association; Groves, R.M. et al. (2009). *Survey Methodology, Second Edition*, John Wiley & Sons, Inc.

*and* (c) confirm that their business has accepted Visa and/or Mastercard during the Class Period; *and* (d) indicate that they would make or influence the credit and/or debit card issuing vendor vetting process and selection/negotiation decision for their business.

- ***Individual Class Members***: this category includes respondents who (a) indicate that they have, as an individual, accepted payment for goods and/or services during the Class Period; *and* (b) confirm that they accepted credit cards, debit cards, digital wallet, and/or online payment services during the Class Period; *and* (c) confirm that they have accepted Visa and/or Mastercard during the Class Period.

25. Targeting individuals across all three classifications listed above ensures that the survey sample contains and is representative of all of the various types of individuals and entities included as Class Members in the Class Definition. The specific procedure for targeting and qualifying respondents based on these classifications is described in the Questionnaire section below (the full questionnaire is available at Exhibit 2). The study was designed and conducted to achieve a representative sample.[11]

26. In accordance with standard marketing research practice, only respondents aged 18 and older were permitted to participate in the study. Consistent with the Class Definition, the study was restricted to U.S. residents only.

27. Respondents who did not meet the study criteria outlined above were excluded from study participation.

**Study Design**

28. This research employed a standard consumer perception study design wherein respondents were probed on their awareness and understanding of the current litigation, specifically regarding the existence and terms of the Prospective Settlement Agreement.

29. This survey, like many consumer perception surveys, follows a *descriptive* study design, not a *causal* study design. Descriptive research is observational in nature: it seeks to observe the level, or magnitude, of a certain phenomenon among a defined population. In this way,

---

[11] *Representative Samples: What You Need to Know*, QualtricsXM (March 30, 2022), https://www.qualtrics.com/articles/strategy-research/representative-samples.

descriptive research seeks to measure and summarize characteristics of a population without manipulating any variables or drawing causal conclusions.[12] A descriptive study design might seek to determine, for example, the proportion of high-school graduates who voted in the last election. In this way, a descriptive study provides a snapshot of the phenomenon being evaluated at a particular point.

30. Upon being qualified to participate in the study, respondents were first asked a broad threshold question to determine whether they had any awareness of any class action lawsuit(s) involving Visa/Mastercard. Respondents who indicated awareness were next asked a question to determine whether they have awareness of this specific matter. Respondents who indicated awareness of the current matter were administered an open-ended question[13] wherein they were asked to describe what they can recall about the litigation. These respondents were next asked if they have seen or heard a notice describing a proposed resolution to this case. Respondents who answered affirmatively were asked to indicate where they had seen notice and, to the extent they knew, select from a list the terms that are included in the Prospective Settlement Agreement. This question sequence is discussed in more detail in the Questionnaire section below and can be viewed in full at Exhibit 2.

31. The study designed and executed herein provides an empirical gauge of the extent to which, if at all, Class Members are aware of the existence and terms of the Prospective Settlement Agreement. As such, it provides a measure of the efficacy of the Notice Plan in informing Class Members of the proposed settlement terms being considered in this case.

**Data Collection**

32. This survey was completed through online interviewing via the Internet. Online interviewing is the dominant data collection method used in survey research today.[14] Data collection for

[12] Aggarwal, R. & Ranganathan, P., (2019). "Study Designs: Part 2 – Descriptive Studies." *Perspectives in Clinical Research*, Vol. 10, No. 1, pp. 34-36; Salkind, N. (ed.) (2007). "Descriptive Research." *Encyclopedia of Measurement and Statistics,* Sage Publications, Inc., pp. 251-253.

[13] An "open-ended" question requires respondents to answer in their own words, commonly through typing their response in a text box. Conversely, a "closed-ended" question provides respondents with a set of defined answer options from which to choose, commonly in the multiple-choice format.

[14] *Global Market Research 2025: An ESOMAR Industry Report*, pp. 38, 105-109, 176-177.

this study took place in August and September 2026, following the completion of public notice of this matter as outlined in the Notice Plan.[15]

33. The sample (i.e., set of respondents) for this project was provided by three online panel vendors: Prodege,[16] Veridata Insights,[17] and Dynata.[18] All three of these online panel vendors are leading providers of online sample for research projects in the U.S. and across the globe, with large and diverse sample frames and minimal risk of coverage and sample bias. Prodege, Veridata Insights, and Dynata all conduct comprehensive intake interviewing of their members, thereby facilitating accurate pre-targeting on a broad range of demographic and psychographic variables in accordance with the particular sampling criteria for any given study.[19]

34. Online panel vendors, including those used in this study, employ and enforce a range of policies and procedures to ensure "panel health"—i.e., that the panel is representative (i.e., balanced to the U.S. Census) and that respondents provide honest and accurate answers to questions. Additional panel health protocols include double-opt in registration, digital fingerprinting, respondent verification, device verification, CAPTCHA completion, mobile verification, and third-party validation, among others.

35. I have personally used Prodege, Veridata Insights, and Dynata as sample providers for hundreds of consumer research studies. I am familiar with the panel health procedures employed by these panels and am satisfied that they provide high quality, representative respondents. The Prodege, Veridata Insights, and Dynata online panels constituted the sample frame (i.e., source from which respondents were sampled) of my study. Additional information about Prodege, Veridata, and Dynata is available through each respective vendor's website.

---

[15] The notice period was completed no later than August 18, 2026. See Declaration of Cameron R. Azari, Esq., Regarding Implementation and Adequacy of Class Notice Plan, 8/18/2026.

[16] https://www.prodege.com.

[17] https://veridatainsights.com.

[18] https://dynata.com.

[19] See for example, Prodege Panel Book and ESOMAR 37 Questions Book, available at https://www.prodege.com/corporate-resource-library; Veridata Insights Panel Book and ESOMAR 37 Questions Book, available at https://veridatainsights.com/faqs; Dynata Panel Book and ESOMAR 37 Questions Book, available at https://www.dynata.com/why-dynata/resources/panel-book and https://www.dynata.com/why-dynata/resources/ebooks/download-the-esomar-37.

36. Per my instructions, the online panel vendors implemented a national deployment using a balanced start (i.e., geographically representative survey distribution), click balancing,[20] and natural demographic fallout.[21] This resulted in a nationally representative sample of Class Members that is projectable to the broader population of purchasers within the relevant market (see Sample Characteristics section below).

37. Respondents accessed the survey via an electronic invitation sent by the online panel vendors. The survey URL was embedded with a unique respondent ID ensuring that each respondent could only complete the survey one time. As is customary in marketing research, including consumer surveys for litigation, respondents who qualified and completed the survey received a monetary reward or rewards points—i.e., incentive—from their respective panel (not from Keegan & Donato). Receipt of the incentive was not dependent on any specific answers or opinions provided by the respondent because the study sponsor was not disclosed to the survey participants.

38. The survey was programmed and managed using an industry-leading online survey software platform utilizing custom code integration. All survey programming and management was performed by Keegan & Donato. The survey software platform facilitates the programming and execution of advanced survey designs, custom coding, complex skip logic, and advanced rotation and randomization of questions, answer options, and stimuli. All such options were implemented wherever appropriate.

39. In accordance with standard marketing research practice, I collected a small number of responses and then paused fielding of the survey to review the data and ensure proper survey administration through the online software platform. This step fulfills the function of a soft

---

[20] Click balancing is the process of ensuring that individuals who click on the survey link (not to be confused with those who qualify for and complete the survey) are representative of the target population. More specifically, click balancing is "a form of sample matching that partially corrects for selection and nonresponse bias by insisting that those beginning the screening process match some predefined demographic characteristics (generally census representation) while not making firm assumptions about the demographics of the post-screened sample. This method, implemented by panel providers, involves real-time monitoring of the attributes of respondents who are actually clicking on the invitation to begin the study." See Kugler, M.B. and Henn, Jr., R.C., (2022). "Internet Surveys in Trademark Cases." in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design, Second Edition.* Diamond, S.S. & Swann, J.B. (eds.), American Bar Association, p. 310.

[21] The screener portion of the survey's questionnaire confirmed that the study sample consisted of Class Members. Potential respondents who did not meet this requirement were terminated, resulting in natural fallout. As such, the demographic characteristics of the survey sample are reflective of the natural composition of Class Members.

launch (also known as a pilot or pre-test).[22] The soft launch confirmed that the survey instrument was functioning properly and that respondents showed no signs of having difficulty understanding or completing the questionnaire. Accordingly, I proceeded to re-launch data fielding and complete data collection.[23]

**Bias Management**

40. The survey employed various measures to ensure data integrity and minimize biases in data collection.[24] All efforts were made to present the survey questions in an objective, unbiased, and non-leading format. Respondents were instructed not to guess and were presented with a "don't know" or equivalent answer option wherever appropriate throughout the survey to minimize guessing.

41. The respondents' web browser's "back" button was disabled during the survey. This ensures that the survey collected respondents' present, unbiased opinions regarding the mark at issue because respondents were unable to change previous answers based on information gained later in the survey.

42. It is common in consumer survey research, both for litigation and more broadly, for the researcher to employ various types of randomization of questions and answer options across respondents. Randomization is an important tool that researchers use to minimize the potential for order bias (i.e., order effects) to impact the study's results. Order bias refers to a respondent's tendency to select the first answer in a given list of answer options regardless of the question content[25] or answer the first question in a series of questions differently than later questions.[26] In this study, randomization was employed wherever possible to minimize

[22] Diamond, S. (2011). "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*. Federal Judicial Center/National Academy of Sciences, pp. 388-389.

[23] The pre-test data is incorporated into the final data. All study data is provided at Exhibit 4.

[24] "Attention, honesty, and quality checks should appear throughout the survey to ensure respondent integrity and data quality." See Hair, Jr., J.F., et al. (2024). *Essentials of Marketing Research, 6th Ed.*, McGraw Hill, pp. 225-226.

[25] Visser, P. S., Krosnick, J. A., & Lavrakas, P. J. (2000). Survey research. In H. T. Reis & C. M. Judd (Eds.), *Handbook of Research Methods in Social and Personality Psychology*. Cambridge University Press, p. 240.

[26] See Diamond, S. (2011). "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*. Federal Judicial Center/National Academy of Sciences, p. 396: "To control for order effects, the order of the questions and the order of the response choices in a survey should be rotated, so that, for example, one-third of the respondents have Product A listed first, one-third of the respondents have Product

the potential for order bias. For example, in the question measuring potential awareness of any class action lawsuit(s) involving major corporations, the multiple-choice answer options (i.e., the list of corporations, including Visa and Mastercard) was randomized across respondents.

43. Masking items were used throughout the survey. Masking items are used in surveys to obscure the intended purpose of a question from the respondent, thereby reducing biases in the data.[27] A variety of answer option masking items were included throughout the questionnaire wherever appropriate to prevent the sample from being tainted.[28] For example, respondents were not simply asked a "yes/no" question to indicate whether they had accepted payment for goods and/or services, but rather were asked to select from a randomized multiple-choice list which included a range of other activities (e.g., took an international vacation, attended a professional sporting event, etc.) which masked the item of interest (accepted payment for goods and/or services) from standing out to respondents.

44. The final data were examined to ensure data integrity. First, I examined the data to identify "speeders," who are respondents who complete the survey too quickly. Speeders may introduce respondent-related error into the survey data. Respondents were flagged if they completed the survey in less than one-third of the median completion time across all respondents in the sample.[29] Four respondents were removed from the sample based on this criterion.

---

B listed first, and one-third of the respondents have Product C listed first. If the three different orders are distributed randomly among respondents, no response alternative will have an inflated chance of being selected because of its position, and the average of the three will provide a reasonable estimate of response level."

[27] Jacoby, J. (2013). *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*, American Bar Association, pp. 708-709; Kugler, M.B. and Henn, Jr., R.C., (2022). "Internet Surveys in Trademark Cases." in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design, Second Edition*. Diamond, S.S. & Swann, J.B. (eds.), American Bar Association, p. 304.

[28] For example, in this case, masking takes the form of filler answer options that conceal the item of interest. Masking was employed for all questions in the screener and main questionnaire where applicable.

[29] Less than one-third of the median completion time is the industry standard for identifying speeders for removal. See, for example, Kugler, M.B. and Henn, Jr., R.C., (2022). "Internet Surveys in Trademark Cases." in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design, Second Edition*. Diamond, S.S. & Swann, J.B. (eds.), American Bar Association, pp. 305-306.

45. I also reviewed the open-ended survey data for low-quality responses, which are not reflective of actual consumer opinions and therefore introduce biases into the data.[30] Based on this criterion, a total of 32 respondents were removed from the sample.

46. An attention filter question asked respondents to type the word "green" into a text box to ensure that participants were devoting sufficient attention to the survey task at hand. Respondents who failed to complete this exercise successfully were flagged for removal from the data set. Six respondents were removed from the sample based on the attention filter.

47. The survey also included a security measure designed to identify and remove respondents who failed to engage properly with the study questionnaire. The security measure was designed to eliminate "straight liners"—i.e., respondents who select every possible answer option in an attempt to qualify—and other respondents attempting to qualify without providing quality responses. The survey asked respondents to indicate whether they were aware of any class action lawsuits involving a range of companies (including Visa and/or Mastercard). The list of answer options for this question included a fabricated, non-existent company ("Torivex Group"); respondents who selected the fabricated answer option were terminated. A total of 32 respondents were screened out based on this criterion.

48. Finally, the online survey software platform employs various fraud detection measures to reduce the potential for bots and other automated respondents from participating in the study.[31] These measures include a CAPTCHA question, which all respondents were required to complete at the outset of the survey, as well as tracking to detect potential duplicate and/or fraudulent responses. In total, seven respondents were removed from the sample based on the fraud detection measures.

49. The study was conducted under "double blind" conditions—neither the panel provider nor the survey participants knew the purpose of the study or the sponsoring party. Double blind

[30] "Survey experts should review [open-ended] responses and generally exclude from the sample any respondents who repeatedly provide purely gibberish responses, such as 'asdf,' 'qwerty,' or actual words that have nothing to do with the question asked ('good' and 'good survey'). This particular check is non-negotiable; it measures attention regarding the most important questions in the survey. If the participant's attention has drifted here, then their answers on the critical questions are likely to be meaningless." See Kugler, M.B. and Henn, Jr., R.C., (2022). "Internet Surveys in Trademark Cases." in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design, Second Edition*. Diamond, S.S. & Swann, J.B. (eds.), American Bar Association, pp. 302-303.

[31] https://www.qualtrics.com/support/survey-platform/survey-module/survey-checker/fraud-detection.

research is designed to prevent external or circumstantial bias from impacting the survey process and results and is the gold standard for consumer surveys.[32]

**Accuracy of Estimate**

50. Surveys typically, and in this case, are designed such that the results are reliable at the 95 percent confidence level.[33] After applying the screening and data integrity measures, a total of 1,042 respondents qualified for and completed the questionnaire (see Disposition of Contacts at Exhibit 5). Samples of this size are associated with a maximum margin of error of ±3.0 percentage points at 95 percent confidence.[34] Accordingly, all survey findings and conclusions are presented with a reasonable degree of scientific certainty.

51. This survey was conducted using a non-probability sample,[35] as is standard for surveys used in litigation.[36] Confidence intervals, while technically not applicable to non-probability samples,[37] commonly are calculated by survey experts for non-probability samples[38] because

---

[32] Diamond, S. (2011). "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*. Federal Judicial Center/National Academy of Sciences, pp. 410-411. See also Jacoby, J. (2013). *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*, American Bar Association, pp. 819-820.

[33] "Traditionally, scientists adopt the 95% level of confidence, which means that if 100 samples of the same size were drawn, the confidence interval expected for at least 95 of the samples would be expected to include the true population value." See Diamond, S.S. (2011). "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence, Third Ed*., Federal Judicial Center/National Academy of Sciences, p. 381.

[34] This means that the margin of error for any given study finding will never exceed ±3.0 percent. The margin of error for a specific study finding will become smaller (i.e., the ± percentage range will tighten) the farther the finding falls from the 50 percent mark. For example, the margin of error for the Q22 finding that 11.8 percent of Class Members are aware of the current litigation is ±1.9 percent. Statistical calculations performed at https://www.surveysystem.com/sscalc.htm.

[35] Diamond, S.S. (2011). "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence, Third Ed.*, Federal Judicial Center/National Academy of Sciences, p. 382.

[36] "In the vast majority of instances, and regardless of whether conducted by practitioners or scholarly academicians, social science research relies on nonprobability sampling, not probability sampling." See Jacoby, J. (2013). *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*, American Bar Association, p. 370, citing Jacoby, J. & Handlin, A.H. (1991). "Non-Probability Designs for Litigation Surveys," *The Trademark Reporter*, Vol. 81, pp. 169-179.

[37] Jacoby, J. (2013). *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*, American Bar Association, p. 391.

[38] "Technically speaking, the use of confidence intervals applies only to probability samples. That said, practitioners frequently rely on confidence intervals when evaluating findings from well-conducted non-probability [samples] as well." See Jacoby, J. (2013). *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*, American Bar Association, p. 892 at footnote 45.

the confidence interval provides context for interpreting the study's results. I was asked to provide such context for this study.

**Questionnaire**

52. In consumer surveys, data are collected by means of a questionnaire. In this case, the questionnaire was divided into two parts: a screener portion and the main questionnaire. A total of 4,037 respondents started the survey and 1,042 qualified as Class Members and completed the questionnaire,[39] for an overall qualification rate of 25.8 percent. The full questionnaire is available at Exhibit 2. As discussed above, throughout the survey the answer options were randomized wherever possible[40] to minimize the potential for order bias.

***Screener***

53. The screener opened with a CAPTCHA security question followed by a standard survey research statement that conveyed relevant information about survey mechanics, privacy issues, etc., This question instructed respondents not to guess if they did not know the answer to a question but, instead, to use the "Don't know" option that was provided when appropriate. Only respondents who indicated that they understood the instructions were allowed to participate in the survey.

54. Respondents were next asked to provide their age. Consistent with typical marketing research practice, only respondents aged 18 and older were permitted to participate in the study.

55. Next, respondents were asked to provide the U.S. state or territory in which they reside. Only U.S. residents were permitted to participate in the study.

56. The next questions were designed to identify Class Members—i.e., all persons (individuals, as well as employees and owners of businesses and other entities) who have accepted Visa-branded cards and/or Mastercard-branded cards in the United States at any time during the Class Period. The screener identified Class Members by administering a sequence of

---

[39] Although the full sample is comprised of 1,042 respondents, not all respondents were administered all questions. This is intentional, as some questions were only designed to be answered by respondents based on their prior answers or characteristics. For example, respondents who indicated they are not aware of the current litigation were not asked further questions about that topic. As a result, the number of respondents who answered each question varies throughout the report and the exhibits.

[40] Randomization typically is not employed for answer option sets wherein a logical order exists and would be expected by respondents (e.g., age categories).

questions designed to identify respondents who, during the Class Period, had accepted Visa- and/or Mastercard-branded cards in any of three ways: as an employee of a company or organization; as a business owner or self-employed individual; or as an individual accepting payment for goods or services.

57. To begin this sequence, all respondents were administered a question to determine their employment status:

> Which of the following best describes your current employment status?
>
> m Stay-at-home home-maker
> m Retired
> m Full-time student
> m Self-employed
> m Business owner / Principal
> m Work for a company or organization
> m Unemployed seeking employment
> m Unemployed not seeking employment
> m Other
> m Prefer not to answer

58. ***Enterprise Class Members:*** Respondents who indicated that they are an employee of a company or organization were asked a series of additional questions to determine whether they qualify as a Class Member based on their employment. First, respondents were asked to select the business functions in which they participate as part of their job responsibilities:

> In which of the following core business functions, if any, do you participate **<u>in any way</u>** in your primary employment at your current organization? ***Please select all that apply***.
>
> o Human resources (HR)
> o Information technology (IT)
> o Accounting / finance
> o Operations
> o Marketing / sales
> o Legal / compliance
> o Research & development (R&D)
> o Customer service
> o Governance / executive management
> o Communications
> o Production / supply chain
> o Quality management
> o Government relations / regulatory
> o Credit and/or debit card processing
> o Other
> o None of these

59. Respondents who selected “Credit and/or debit card processing” skipped to a question to ensure their company or organization accepted Visa and/or Mastercard during the Class Period (see paragraph 60 below). Respondents who did not select “Credit and/or debit card processing” but did select “Accounting / finance,” “Operations,” “Legal / compliance,”

and/or "Governance / executive management" were asked a follow-up question to determine whether they have any job responsibilities related to credit and/or debit card processing:

> In which of the following activities, if any, do you participate **in any way** as part of your job responsibilities? ***Please select all that apply***.
>
> o Interviewing / hiring / human resources
>
> o Credit and/or debit card processing
>
> o Accounting / finance
>
> o Marketing communications / advertising
>
> o Strategy / operations
>
> o None of the above

60. Respondents who indicated that their job responsibilities include credit and/or debit card processing were asked an additional follow-up question to determine whether their company or organization has accepted Visa and/or Mastercard during the Class Period:[41]

> If you know, since the beginning of 2021, which types of credit and/or debit cards, if any, has your company/organization accepted for the sale of products or services? ***Please select all that apply***.
>
> o Visa
>
> o Mastercard
>
> o American Express (AmEx)
>
> o Discover
>
> o Other
>
> o None of these
>
> o Don't know / Don't recall

61. Respondents who indicated that their company or organization has accepted Visa and/or Mastercard during the Class Period were asked an additional follow-up question to determine whether they have decision-making responsibilities with regard to selecting a credit and/or debit card issuing vendor as part of their job responsibilities. Respondents were asked:

---

[41] The Class Period starts on December 18, 2020. Given that it is unrealistic to expect respondents to recall to the day activities that took place approximately six years ago, a period of "since the beginning of 2021" was used. I would not expect the omission of 13 days at the end of December 2020 to impact the survey findings in any way.

Imagine that your company/organization is in need of either (a) selecting a new credit and/or debit card issuing vendor or vendors or (b) negotiating the terms of its account(s) with its current credit and/or debit card issuing vendor or vendors. How would you describe your involvement in the process of identifying, vetting, and selecting such a vendor or vendors?

m I would engage in the vetting process and make the selection/negotiation decision on my own

m In combination with others, I would engage in the vetting process and make the selection/negotiation decision

m I would influence the vetting process and selection/negotiation decision

m I would not be involved in the vetting process or making the selection/ negotiation decision

m Other

m I am not sure

62. Respondents who indicated that their job responsibilities include credit and/or debit card processing *and* that their company has accepted Visa and/or Mastercard during the Class Period *and* that they would make or influence the credit and/or debit card issuing vendor vetting process and selection/negotiation decision qualified as Class Members and advanced to the main questionnaire. Respondents who did not meet these criteria skipped to the *Individual Class Members* screening module (discussed at paragraph 67 below).

63. ***Business Owner Class Members***: Respondents who indicated that they are a business owner or self-employed were asked a series of additional questions to determine whether they qualify as a Class Member based on their potential engagement in credit and/or debit card processing activity. First, respondents were asked about the forms of payment that their business accepted for the sale of products or services during the Class Period:

If you know, since the beginning of 2021, which of the following forms of payment has your business accepted for the sale of products or services? ***Please select all that apply***.

o Credit cards
o Debit cards
o Cash
o Personal check
o Digital wallet (e.g., Apple Pay, Google Pay)
o Online payment service (e.g., Venmo, PayPal, Square)
o Other
o Don’t know / Don’t recall

64. Respondents who indicated that their business accepted credit cards, debit cards, digital wallet, or online payment services during the Class Period were asked a follow-up question to determine whether their business has accepted Visa and/or Mastercard during the Class Period (see paragraph 60 above). Respondents who indicated that their business has accepted

Visa and/or Mastercard during the Class Period were asked a follow-up question to determine whether they would make or influence the credit and/or debit card issuing vendor vetting process and selection/negotiation decision at their business (see paragraph 61 above).

65. Respondents who indicated that their business accepted credit cards, debit cards, digital wallet, and/or online payment services during the Class Period *and* that their business has accepted Visa and/or Mastercard during the Class Period *and* that they would make or influence the credit and/or debit card issuing vendor vetting process and selection/negotiation decision for their business qualified as Class Members and advanced to the main questionnaire. Respondents who did not meet these criteria skipped to the *Individual Class Members* screening module (discussed at paragraph 67 below).

66. Respondents who qualified as Class Members based on their status as an employee of a company or organization or as a business owner or self-employed individual were asked additional questions to collect their job title (in their own words)[42] and the number of employees at their company or organization. These questions were designed to provide information about the respondent pool and were not used to terminate any respondents.

67. ***Individual Class Members***: Respondents who did not qualify as a Class Member based on their status as an employee of a company or organization or as a business owner or self-employed individual were evaluated to determine whether they qualified as a Class Member based on personally accepting Visa and/or Mastercard for goods or services during the Class Period.[43] Respondents were asked:

> In which, if any, of the following activities have you personally engaged since the beginning of 2021? ***Please select all that apply***.
>
> o Accepted payment for goods and/or services
> o Took an international vacation
> o Attended a professional sporting event
> o Enrolled in a course or class
> o Hired a landscaping service
> o Purchased life insurance
> o Used a ride share service
> o None of these

---

[42] Job titles are provided at Exhibit 4 (Tabulated Data) both as verbatim responses provided by participants and as a "word cloud" generated by the survey software. A word cloud is visual representation of the words that appear in a range of text (in this case, the set of job titles provided by respondents), where words that appear more often are displayed in bigger and bolder letters.

[43] Any respondent who did not select "Work for a company or organization," "Business owner / Principal," or "Self-employed" in the employment question described at paragraph 57 skipped to the "Individuals accepting payment for goods or services" section of the screener.

68. Respondents who indicated that they had accepted payment for goods and/or services were asked a follow-up question to determine the type(s) of transaction for which they had accepted payment. This question was designed to provide information about the respondent pool and was not used to terminate any respondents:

> If you recall, since the beginning of 2021, what type(s) of transactions have you accepted payment for? ***Please select all that apply***.
>
> o Services provided
>
> o Items / goods sold
>
> o Charity payment
>
> o Membership fees / dues
>
> o Other
>
> o Don't know / Don't recall

69. Next, respondents were asked the question to determine whether they accepted credit cards, debit cards, digital wallet, or online payment services during the Class Period (see paragraph 63 above). Respondents who indicated that they had accepted credit cards, debit cards, digital wallet, and/or online payment services during the Class Period were asked the follow-up question to determine whether they had accepted Visa and/or Mastercard during the Class Period (see paragraph 60 above).

70. These respondents were also asked a question to determine how many personal transactions they had accepted payment for during the Class Period. This question was designed to provide information about the respondent pool and was not used to terminate any respondents:

> You indicated that since the beginning of 2021, you have accepted payment for goods and/or services. If you know, approximately how many transactions have you accepted payment for during this time?
>
> m 1 - 10
>
> m 11 - 50
>
> m 51 - 100
>
> m 101 - 250
>
> m More than 250
>
> m Don't know / Don't recall

71. Respondents who indicated that they had, as an individual, accepted payment for goods and/or services *and* accepted credit cards, debit cards, digital wallet, and/or online payment

services during the Class Period *and* that they have accepted Visa and/or Mastercard during the Class Period qualified as Class Members and advanced to the main questionnaire. Respondents who indicated that they had not, as an individual, accepted payment for goods and/or services during the Class Period, *or* have not accepted credit cards, debit cards, digital wallet, and/or online payment services during the Class Period *or* have not accepted Visa and/or Mastercard during the Class Period did not qualify as Class Members and were terminated. A complete accounting of the survey termination points, including the specific points at which respondents screened out and the number of respondents terminated at each point, is provided in Exhibit 5—Disposition of Contacts.

***Main Questionnaire***

72. Respondents who qualified as Class Members upon completion of the screener proceeded to the main portion of the questionnaire.

73. Because the remainder of the survey addresses issues relevant to the current litigation, the main questionnaire began with a question to confirm that respondents understood the concept of a "class action lawsuit":

> In the remainder of this survey, we would like to ask you some questions regarding class action lawsuits. For the purpose of this survey, a ***class action lawsuit*** is defined as follows:
>
> *A **class action lawsuit** is a legal case in which one or more people sue on behalf of a larger group of people who have the same or similar claim against the same defendant(s).*
>
> Which of the following best describes your personal understanding?
>
> m I **DO understand** the concept of "class action lawsuit" as it has been defined for the purpose of this survey
>
> m I **DO NOT understand** the concept of "class action lawsuit" as it has been defined for the purpose of this survey
>
> m Don't know

74. Respondents who indicated that they do understand the concept of a class action lawsuit advanced to the next question. Respondents who indicated that they do not understand the concept of a class action lawsuit or didn't know were terminated.

75. Respondents were next presented with a general instruction not to guess or to use the Internet or any other source to inform their answers.

76. The next question was the first substantive question relevant to the issues in this matter. Respondents were asked a broad threshold question to determine whether they have awareness of any class action lawsuit involving Visa and/or Mastercard:

> If you know, are you aware of any class action lawsuit(s) involving any of the following companies? ***Please select all that apply***.
>
> o Visa and/or Mastercard
> o GEICO and/or Allstate
> o Microsoft
> o Meta and/or Facebook
> o Home Depot and/or Lowe's
> o Torivex Group
> o None of these
> o Don't know

77. Respondents who indicated a lack of awareness of any class action lawsuits against Visa and/or Mastercard advanced to the demographics section at the end of the main questionnaire. Any respondent who selected the fabricated company ("Torivex Group") was terminated regardless of any other selections they may have made.

78. Remaining respondents (i.e., those with claimed awareness of class action lawsuit(s) involving Visa and/or Mastercard) were asked a follow-up question to determine whether they are aware of the current matter. The description of this matter was based on the description that was provided to respondents as outlined in the Notice Plan. Respondents were asked:

If you can recall, which of the following class action lawsuits ***involving Visa and/or Mastercard*** are you aware of? ***Please select all that apply***.

o Case alleging Visa and Mastercard caused merchants to pay excessive fees for accepting Visa / Mastercard credit and debit cards, including by adopting interchange rules and rates

o Case alleging credit card companies and banks conspired to keep ATM fees artificially high

o Case alleging credit card companies conspired to shift responsibility for fraudulent payment card transactions to merchants

o Cases regarding data breaches at major retailers including Target and Home Depot

o Case alleging that rules requiring merchants who accepted Visa/Mastercard credit cards to also accept their debit cards improperly raised fees

o None of these

79. Respondents who did not select the answer option referencing *interchange rules and rates* advanced to the demographics section at the end of the main questionnaire.

80. Next, remaining respondents—i.e., those with claimed awareness of the current matter—were asked an open-ended follow-up question to gauge their understanding of the issues relevant to the current litigation. Respondents were asked:

You indicated that you have awareness of the class action lawsuit against Visa / Mastercard **alleging Visa and Mastercard caused merchants to pay excessive fees for accepting Visa / Mastercard credit and debit cards, including by adopting interchange rules and rates**. In the space below, please tell us what you can recall about this litigation. ***Please be as detailed as possible***.

| |
|---|
| |

o Don't know / Don't recall

81. Next, respondents with claimed awareness of the current matter were asked a question to determine whether they recalled seeing a notice about the Prospective Settlement Agreement in the current matter. Respondents were asked:

Again, please think of the class action lawsuit against Visa / Mastercard **alleging Visa and Mastercard caused merchants to pay excessive fees for accepting Visa / Mastercard credit and debit cards, including by adopting interchange rules and rates**.

If you can recall, which of the following applies to you?

m I **HAVE** seen or heard a notice describing a proposed resolution to this case

m I **HAVE NOT** seen or heard a notice describing a proposed resolution to this case

m Don't know / Don't recall

82. Respondents who indicated that they have seen a notice about the Prospective Settlement Agreement in the current matter were asked a follow-up question to determine where they had seen the notice. Respondents were asked:

If you can recall, where have you seen or heard a notice describing a proposed resolution to this case? ***Please select all that apply***.

o Social media (e.g., Facebook, Instagram, X, YouTube)

o TV (broadcast or streaming)

o Website

o Internet advertising

o Outdoor signage (e.g., billboard, bus shelter)

o Mass transit (e.g., subway ads, bus ads)

o Postcard or other mailing

o Radio (broadcast, streaming, or satellite)

o Business magazine or journal (print)

o Business magazine or journal (digital)

o Newspaper (print)

o Newspaper (digital)

o Other (please specify): _____________

o Don't know / None of these

83. Finally, respondents who indicated that they have seen a notice about the Prospective Settlement Agreement in the current matter were asked a question to determine their understanding of certain terms of the proposed settlement. Respondents were asked:

If you know, in which of the following ways do the terms upon which the parties have agreed to resolve the case impact merchants? ***Please select all that apply***.

**Under the terms upon which the parties have agreed to resolve the case, <u>merchants</u> will be:**

o Able to decline acceptance of Visa- or Mastercard-Branded Commercial Credit Cards and/or Premium Consumer Credit Cards, while still accepting other Visa- or Mastercard-Branded cards

o Able to decline acceptance of Visa- or Mastercard-Branded cards issued by certain issuing banks

o Entitled to a monetary payment

o Permitted to surcharge customers a fee for the use of any Visa or Mastercard-Branded Credit Cards

o Permitted to accept some digital wallets at brick-and-mortar locations but decline others

o None of the above

o Don't know / Don't recall

84. The main questionnaire concluded with an attention filter question and several standard demographic questions regarding education level, gender, and household income. The full questionnaire as viewed by respondents is provided at Exhibit 2.

## Sample Characteristics

85. The sample for this study provides a representative, projectable overview of the awareness of Class Members. Demographic characteristics for the study participants are shown in Table 1 below.

*Table 1. Sample Characteristics – Respondent Demographics*

| | % (n=1,042) |
|---|---|
| ***Age*** | |
| 18 - 30 | 24.6 |
| 31 - 40 | 27.3 |
| 41 - 50 | 22.6 |
| 51 - 60 | 14.0 |
| 61 - 70 | 8.4 |
| 71 or older | 3.1 |
| ***Education*** | |
| Less than high school | 2.8 |
| High school graduate | 21.6 |
| Technical school or training | 3.4 |
| Some college | 15.3 |
| 2-year college degree | 11.6 |
| 4-year college degree | 29.3 |
| Master’s / professional degree | 13.6 |
| Doctorate or equivalent | 2.3 |
| Prefer not to answer | 0.2 |

| | % (n=1,042) |
|---|---|
| ***Household income*** | |
| Under $35,000 | 15.6 |
| $35,000 - $49,999 | 13.9 |
| $50,000 - $74,999 | 20.5 |
| $75,000 - $99,999 | 18.3 |
| $100,000 - $124,999 | 12.1 |
| $125,000 - $149,999 | 8.3 |
| $150,000 or more | 10.7 |
| Prefer not to answer | 0.4 |
| ***Gender*** | |
| Male | 55.3 |
| Female | 44.4 |
| Non-binary or other | 0.2 |
| Prefer not to answer | 0.1 |
| ***Region*** | |
| Northeast | 19.7 |
| South | 38.6 |
| Midwest | 21.1 |
| West | 20.6 |

## Results & Analysis

86. The findings of this study of 1,042 Class Members provide reliable empirical evidence that awareness of the current litigation, and particularly the proposed settlement, is exceptionally low among Class Members.

87. As shown in Table 2 below, 24 percent of Class Members indicated awareness of *any* class action lawsuit(s) involving Visa and/or Mastercard, with the majority of Class Members—76.0 percent—indicating no awareness of any class action lawsuits against Visa and/or Mastercard.

*Table 2. Awareness of Any Visa and/or Mastercard Class Action Lawsuit(s) (Q21)*

| *Base: All respondents (n=1,042)*<br>*Q21 - If you know, are you aware of any class action lawsuit(s) involving any of the following companies?* | % | n |
|---|---|---|
| Meta and/or Facebook | 48.3 | 503 |
| **Visa and/or Mastercard** | **24.0** | **250** |
| Microsoft | 17.3 | 180 |
| GEICO and/or Allstate | 13.1 | 136 |
| Home Depot and/or Lowes | 11.8 | 123 |
| Torivex Group | 0.0 | 0 |
| None of these | 17.7 | 184 |
| Don't know | 18.7 | 195 |

88. Respondents who indicated that they have awareness of any class action lawsuit(s) involving Visa and/or Mastercard (n=250 of 1,042) were asked a follow-up question to determine whether they have awareness of the current matter. As shown in Table 3 below, 123 respondents—11.8 percent of the total sample—indicated awareness of the current litigation. Thus, one can conclude that nearly nine-in-ten Class Members—88.2 percent—have no awareness of this case.

*Table 3. Awareness of Specific Visa/Mastercard Class Action Lawsuits (Q22)*

| *Base: All respondents (n=1,042)*<br>*Q22 - If you can recall, which of the following class action lawsuits involving Visa and/or Mastercard are you aware of?* | % | n |
|---|---|---|
| **Case alleging Visa and Mastercard caused merchants to pay excessive fees for accepting Visa / Mastercard credit and debit cards, including by adopting interchange rules and rates** | **11.8** | **123** |
| Case alleging that rules requiring merchants who accepted Visa/Mastercard credit cards to also accept their debit cards improperly raised fees | 10.5 | 109 |
| Case alleging credit card companies conspired to shift responsibility for fraudulent payment card transactions to merchants | 6.7 | 70 |
| Cases regarding data breaches at major retailers including Target and Home Depot | 6.5 | 68 |
| Case alleging credit card companies and banks conspired to keep ATM fees artificially high | 5.8 | 60 |
| None of these | 1.2 | 13 |

89. Respondents who indicated an awareness of the current litigation (n=123 of 1,042) were administered an open-ended question, wherein respondents reported in their own words what

they could recall about the litigation. The open-ended responses to this question show a range of responses, some of which correctly describe certain aspects of the current litigation and others of which convey uncertainty and/or misunderstanding of the current litigation. A selection of exemplar verbatim responses to the open-ended question is provided in Table 4 below.[44]

*Table 4. Exemplar Open-Ended Responses (Q23)*

| **Respondent ID** | ***Q23 - You indicated that you have awareness of the class action lawsuit against Visa / Mastercard alleging Visa and Mastercard caused merchants to pay excessive fees for accepting Visa / Mastercard credit and debit cards, including by adopting interchange rules and rates. In the space below, please tell us what you can recall about this litigation. Please be as detailed as possible.*** **(Verbatim)** |
|---|---|
| R_1hU2LWaER5zIoQV | I heard the details of the case on the TV news and also read about it in my local newspaper. |
| R_1NySTBp8dbeNAR3 | it seems they are scamming people |
| R_1WL4GKEmryZ50ad | I am aware as I have been advised my store owners of this and I agree that the credit cards should pay |
| R_34zWNkJiqmBv4Aq | I am aware of a refund. |
| R_3D0KxGs3n8UWygS | I heard something about it about how it’s a huge lawsuit and they are in trouble for how they’ve been taxing people |
| R_3oM8EBAik0mEQey | There was news that merchants were forced to pay inflated rates and fees by accepting these cards. |
| R_3oYFSYiXIAdIqlB | How customers mentioned how theirs a lot of fees that was over charged on people's card balances, or their card being stolen and used without being notified. |
| R_3QnZKHlfNP4M5bk | The merchants claimed that the credit card companies were allegedly fixing enormous fees on their credit card processing |
| R_3RpAMRS3rMRbqCC | What I can recall from memory is that it had something to do with fraudulent payments. As vis and master cards were purposely doing fraud against their own customers |
| R_51nNVNJrC6OTjbG | They were charging people extra fees and not being transparent about it so they are getting sued. |
| R_5afbPoGkGVeSH8V | From what I am familiar with regarding the class action suit, Visa is being sued for overcharging customers high processing fees. |
| R_5i2u3MyJcWTA0fX | The main thing was that they are charging extra |
| R_5p3BOnM8nWA1C8S | It focused on claims that the cards artificially fixed interchange fees that merchants pay |
| R_7zaDvwAuPUA5Sox | Many excessive fees and interest rates |

[44] See Exhibit 4 for a full listing of open-ended responses.

90. The next part of the survey gauged the extent to which Class Members had seen notice of the Prospective Settlement Agreement. Respondents who reported having awareness of the current matter (n=123 of 1,042) were asked a question to determine whether they had seen or heard a notice describing a proposed resolution to the current case. As shown in Table 5 below, 7.8 percent of all respondents indicated that they have seen or heard such notice. Stated differently, more than 92 percent of Class Members did not report having seen or heard the notice describing the proposed resolution.

*Table 5. Awareness of Prospective Settlement Agreement Notice (Q25)*

| *Base: All respondents (n=1,042)*<br>*Q25 - If you can recall, which of the following applies to you?* | % | n |
|---|---|---|
| I **HAVE** seen or heard a notice describing a proposed resolution to this case | 7.8 | 81 |
| I **HAVE NOT** seen or heard a notice describing a proposed resolution to this case | 3.7 | 39 |
| Don't know / Don't recall | 0.3 | 3 |

91. Respondents who indicated that they have seen or heard a notice describing a proposed resolution to the current litigation (n=81 of 1,042) were asked to indicate where they had seen or heard such notice. As shown in Table 6 below, the most commonly cited means of seeing or hearing about the Prospective Settlement Agreement notice was social media, cited by just 5.5 percent of the overall sample. Additionally, some respondents erroneously reported seeing notice through forms of media that were not covered by the Notice Plan (i.e., mass transit, outdoor signage, postcard or other mailing).

*Table 6. Where Class Members Have Seen Prospective Settlement Agreement Notice (Q26)*

| *Base: All respondents (n=1,042)*<br>*Q26 - If you can recall, where have you seen or heard a notice describing a proposed resolution to this case?* | % | n |
|---|---|---|
| Social media (e.g., Facebook, Instagram, X, YouTube) | 5.5 | 57 |
| Website | 3.6 | 37 |
| TV (broadcast or streaming) | 2.4 | 25 |
| Internet advertising | 2.4 | 25 |
| Business magazine or journal (digital) | 2.0 | 21 |
| Postcard or other mailing | 1.3 | 14 |
| Newspaper (digital) | 1.2 | 13 |
| Radio (broadcast, streaming, or satellite) | 1.2 | 13 |
| Business magazine or journal (print) | 1.2 | 12 |
| Newspaper (print) | 0.8 | 8 |
| Mass transit (e.g., subway ads, bus ads) | 0.8 | 8 |
| Outdoor signage (e.g., billboard, bus shelter) | 0.7 | 7 |
| Other | 0.1 | 1 |
| Don't know / None of these | 0.0 | 0 |

92. Finally, Respondents who indicated that they have seen or heard a notice describing a proposed resolution to the current litigation (n=81 of 1,042) were asked to select (from a provided list) the ways in which merchants would be impacted by the terms of the Prospective Settlement Agreement.

93. The list presented to respondents included three provisions that are part of the Prospective Settlement Agreement, i.e., that merchants will be:

a. "able to decline acceptance of Visa- or Mastercard-Branded Commercial Credit Cards and/or Premium Consumer Credit Cards, while still accepting other Visa- or Mastercard-Branded cards,"

b. "permitted to surcharge customers a fee for the use of any Visa or Mastercard-Branded Credit Cards," and

c. "permitted to accept some digital wallets at brick-and-mortar locations but decline others."

94. Also included were two provisions that are not part of the Prospective Settlement Agreement: i.e., that merchants will be "entitled to a monetary payment" or be "able to decline acceptance of Visa- or Mastercard-Branded cards issued by certain issuing banks."

95. As shown in Table 7 below, very few respondents across the entire sample have awareness of the specific terms of the Prospective Settlement Agreement, with some respondents erroneously believing that the Prospective Settlement Agreement entitles merchants to a monetary payment or to decline cards issued by certain issuing banks.

*Table 7. Awareness of Prospective Settlement Agreement Terms (Q27)*

| *Base: All respondents (n=1,042)*<br>*Q27 - If you know, in which of the following ways do the terms upon which the parties have agreed to resolve the case impact merchants?*<br>*Under the terms upon which the parties have agreed to resolve the case, merchants will be:* | % | n |
|---|---|---|
| Able to decline acceptance of Visa- or Mastercard-Branded Commercial Credit Cards and/or Premium Consumer Credit Cards, while still accepting other Visa- or Mastercard-Branded cards | 3.8 | 40 |
| Permitted to surcharge customers a fee for the use of any Visa or Mastercard-Branded Credit Cards | 3.1 | 32 |
| Able to decline acceptance of Visa- or Mastercard-Branded cards issued by certain issuing banks | 2.6 | 27 |
| Permitted to accept some digital wallets at brick-and-mortar locations but decline others | 2.2 | 23 |
| Entitled to a monetary payment | 2.0 | 21 |
| None of the above | 0.1 | 1 |
| Don't know / Don't recall | 0.6 | 6 |

96. Virtually no respondents in the sample demonstrated accurate awareness of the Prospective Settlement Agreement. Only three respondents[45] (out of 1,042) selected all three listed accurate terms of the Prospective Settlement Agreement and not any inaccurate term.

## Discussion

97. This study of 1,042 Class Members shows that the vast majority of Class Members are unaware of the current litigation. The study was designed to probe Class Members on multiple dimensions of their potential awareness of the existence and terms of the current

[45] Respondent IDs: R_3fdWotH3sqme1sD, R_3DMnxhsmVSsj17f, and R_1mgErUBZgOTsrV9.

litigation, and the administered measures consistently show low awareness of any class action litigation involving Visa and/or Mastercard, generally, or of the current action involving Visa and Mastercard, specifically. In particular, the study findings show that 76.0 percent of Class Members have no awareness of any class action lawsuit(s) against Visa and/or Mastercard, and 88.2 percent of Class Members have no awareness of this case.

98. Because a substantial majority of Class Members exhibited no awareness of the current case, it follows that these respondents have little or no awareness of the Prospective Settlement Agreement or the terms thereof. This is supported by the study's findings, which show that just 7.8 percent of Class Members indicated that they have seen or heard a notice describing a proposed resolution of this case.

99. Furthermore, among those with claimed awareness of the current case, there is uncertainty regarding the specific terms of the Prospective Settlement Agreement: very few Class Members have awareness of any specific terms of the Prospective Settlement Agreement, with some respondents erroneously believing that the Prospective Settlement Agreement entitles merchants to a monetary payment or to decline certain issuers' cards. Additionally, respondents' verbatim answers to an open-ended question regarding the subject of the current litigation support the finding that Class Members who indicated an awareness of the current litigation demonstrated an inconsistent or incomplete understanding of the subject matter of the current litigation and the terms of the Prospective Settlement Agreement.

100. Accordingly, the study demonstrates that awareness of the Prospective Settlement Agreement among Class Members is exceptionally low. More than nine in ten Class Members did not report having seen or heard notice of the proposed resolution; very few demonstrated awareness of any specific settlement term; and only three respondents demonstrated awareness of all three tested settlement terms without also selecting an inaccurate term. Even among the small minority claiming awareness, the results demonstrate substantial confusion and misunderstanding regarding what the proposed settlement actually provides.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of September, 2026, at Rye, New York.

Mark Keegan

## Exhibit 1—About Keegan & Donato Consulting, LLC

KEEGAN & DONATO
CONSULTING, LLC

31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

## Mark T. Keegan, Esq.

**Partner, Keegan & Donato Consulting, LLC**

**Education**

§ Principles of Market Research Program, University of Georgia (graduated 2021)

- Post-graduate program for industry professionals covering all aspects of the market research process
- Coursework based on the Market Research Core Body of Knowledge (MRCBOK), a compilation of the underlying principles and essential skills that comprise the market research process developed by Market Research Institute International (MRII)
- Certification conferred upon participants who demonstrate mastery of concepts presented in 284 detailed module studies across 13 core areas of market research
- Endorsed by all major market research and insights industry associations, including ESOMAR and the Insights Association

§ Professional Certified Marketer (PCM), American Marketing Association (2015 – present)

- AMA certification for individuals who have demonstrated a mastery of comprehensive and core marketing knowledge and principles
- Designation conferred only upon successful completion of rigorous testing spanning full range of marketing principles and concepts
- Ongoing professional development and education credits required on annual basis
- PCM recipients must have demonstrated professional experience in the field of marketing

§ Juris Doctor, Brooklyn Law School (graduated 1995)

§ Bachelor of Arts, History, Pace University (graduated 1990)

§ MBA Coursework, Pace University, Lubin School of Business (1990 – 1991)

§ Corporate Finance Program, Harvard University (coursework)

**Professional Memberships**

- § Admitted to the Bar in the states of New York and Connecticut
- § Member, ESOMAR (World Association of Opinion and Marketing Research Professionals)
- § Member, International Trademark Association (INTA)
- § Member, American Marketing Association (AMA)
- § Member, American Association for Public Opinion Research (AAPOR)
- § Member, Association for Consumer Research (ACR)
- § Registered Representative, National Association of Securities Dealers (Series 7, expired)

**Current Employment**

- § Keegan & Donato Consulting, LLC, Litigation Consultant, Founding Partner (7/2011 – present)

**Consumer Research Experience**

- § Designed and executed over 1,000 consumer research studies reaching more than 250,000 respondents for corporate and litigation clients over the course of two-decade career
- § Focus on trademark and marketing research with principal areas of study including consumer confusion, trade dress, dilution, secondary meaning, genericness, false advertising, consumer perception, consumer understanding, and other consumer research issues
- § Represent a mix of both plaintiffs and defendants in litigation matters spanning a broad range of products, services, and industries
- § Submitted survey research expert reports in relevant venues including federal courts, state courts, at arbitration, to the National Advertising Division of the Council of Better Business Bureaus, and to the Trademark Trial and Appeal Board
- § Founder and owner of two successful marketing and consumer research consulting firms
- § Regularly testify to consumer behavior research, findings, and related issues at trials, depositions, hearings, and other proceedings

§ Qualified to testify as an expert in the field of marketing and consumer survey research at federal court trials:

- *ImprimisRx, LLC. v. OSRX, Inc. and Ocular Science, Inc.*, United States District Court, Southern District of California, the Honorable Cynthia Bashant presiding
- *Van Leeuwen Ice Cream, LLC v. Rebel Creamery, LLC,* United States District Court (Eastern District of New York), the Honorable Eric R. Komitee presiding
- *Top Brand LLC, et al. v. Cozy Comfort Company LLC, et al.*, United States District Court (District of Arizona), the Honorable Steven P. Logan presiding
- *S10 Entertainment & Media, LLC v. Samsung Electronics Co., LTD,* U.S. District Court (Central District of California), the Honorable Christina A. Snyder presiding
- *Stitch, LTD v. TikTok, Inc., et al.* U.S. District Court (Southern District of California), the Honorable Stanley Blumenfeld, Jr. presiding
- *BillFloat Inc., d/b/a SmartBiz Loans v. Collins Cash Inc., d/b/a Smart Business Funding, et al*., U.S. District Court (Northern District of California), the Honorable Edward M. Chen presiding
- *Bodum U.S.A., Inc. v. A Top New Casting, Inc.*, U.S. District Court, Northern District of Illinois, the Honorable Matthew F. Kennelly presiding
- *Coty Inc., et al. v. Excell Brands LLC*, U.S. District Court (Southern District of New York), the Honorable Jesse M. Furman presiding
- *Christopher Lewert v. Boiron, Inc.*, U.S. District Court (Central District of California), the Honorable André Birotte, Jr. presiding
- *BuzzBallz, LLC v. Jem Beverage Co.*, U.S. District Court (Central District of California), the Honorable William D. Keller presiding

§ Qualified as a survey expert by numerous federal court judges (pre-trial)

§ Develop and execute consumer research studies using industry-accepted methodologies, cutting-edge technologies, and industry-leading consumer panel partners

**Marketing and Other Relevant Experience**

- § Serve as a marketing consultant to private clients and have advised on a wide range of issues including product development and rollout, advertising, consumer feedback and intelligence, the product life-cycle, and other issues concerning marketing and marketing research
- § Formulated winning brand positioning strategies as a branding expert for some of the best-known consumer brands and services including General Electric (GE), Nike, Pepsi, Subaru, AOL, Excite, NBC, and others
- § Analyzed and evaluated comprehensive marketing campaigns for a broad range of corporate clients to determine their impact on consumers
- § Evaluated all components of integrated marketing communications including advertising, public relations, packaging, sales promotions, and point of sale materials, among others
- § Developed testimony on marketing messages and their intended influence on consumer understanding and behavior

**Previous Employment**

- § Keegan & Company LLC, Founding Partner (9/2001 – 12/2015)

  Designed and executed consumer research studies, conducted complex litigation consulting, and developed marketing and economic analyses for clients across a range of industries

- § Information Markets Corp, Program Manager (2000 – 2001)

  Managed enterprise-wide marketing and product development. Developed use cases and conducted consumer market research. Coordinated with multiple partners including AOL, Excite, and NBC.

- § Affiliation Networks, Inc., Project Manager (1999 – 2000)

  Produced online advertising solutions for Fortune 500 clients. Coordinated creative team of account managers, designers, programmers and copywriters.

- § UpTick Technologies, Marketing Consultant (1999)

  Managed the creation of innovative marketing products for large brokerage software provider

§ Cosmos Internet Solutions, Marketing Consultant (1998 – 1999)

Developed marketing strategy for business ISP and hosting provider as well as Web site marketing and development for clients

§ FactSet Research Systems, Product Development (1996 – 1998)

Formulated product and communications strategies for leading integrated financial and economic database provider

§ Warren Keegan Associates, Inc., Marketing Consultant (1992 – 1996)

Marketing consultant to clients across a range of industries. Edited and contributed content to marketing textbooks and other academic marketing publications.

§ BMW of North America, Inc., Graduate Appointment (1991)

Reviewed, analyzed, and cataloged broad-based market research on consumer preferences and attitudes in the automobile industry

**Lectures, Presentations & Publications**

§ *Principles and Practical Considerations in Consumer Survey Design*, Conference Presenter, State Bar of Arizona - CLE in the Garden, March 2026.

§ *A Practitioner's Guide to False Advertising Surveys,* Guest Lecturer, Cardozo Law School (Course: Advertising Law; Instructor: Olivera Medenica, Esq.), April 2025.

§ *False Advertising: Field Observations*, Guest Lecturer, University of California, Irvine School of Law (Course: False Advertising Law; Instructor: Adam Sechooler, Esq.), January 2025.

§ *Legal Ethics for Counsel in the Fashion Industry*, Panelist, hosted by Federal Bar Association, Intellectual Property Law Section, February 2024. CLE-accredited presentation.

§ *Advertising Law & Survey Evidence: Tales from the Road*, Guest Lecturer, Cardozo Law School (Course: Advertising Law; Instructor: Olivera Medenica, Esq.), Spring 2023.

§ *Squirt vs. Eveready: Battle of the Titans*, 9th Annual Intellectual Property Law Symposium, hosted by The Florida Bar Continuing Legal Education Committee and Business Law Section, April 2018. CLE-accredited presentation.

§ *Panel Power: Online Panel Sampling for Litigation Surveys*, 8th Annual Intellectual Property Law Symposium, hosted by The Florida Bar Continuing Legal Education Committee and Business Law Section, March 2017. CLE-accredited presentation.

- *Evaluating a Brand's Equity in a Nascent Market*, ESOMAR World Research, The EUREKA's Project: Success Stories of Market Research, 2016.
- *Consumer Survey Research for Litigation: With Great Data Comes Great Power*, Presentation before the Pennsylvania Bar Association, Intellectual Property Law Group, December 2014.

**Continuing Education**

- *Targeted Designs to Address Survey Nonresponse* (International Statistical Institute Webinar 56). Presenter: Peter Lynn, Professor of Survey Methodology, University of Essex, UK, 9/24/2025.
- *Avoiding Consumer Survey Pitfalls at the TTAB*. Presenter: J. Michael Keyes, Consumer Survey Expert, IP Litigation Partner, Dorsey & Whitney LLP, 10/16/2024.
- *Integrity in Action: Exploring Marketing Ethics*. Moderator: Bennie F. Johnson, CEO, American Marketing Association, 9/28/2023.
- *Questionnaire Design Best Practices 2: The Art of Question Composition*. Presenter: Jordan A. Levitin, Founding Board Member/Vice Chair, Certified Analytics and Insights Professionals of Canada, 3/22/2023.
- *Survey-Based Techniques for Optimizing Prices and Products: Overview and Best Practices*. Presenter: Bryan Orme, President, Sawtooth Software, 1/18/2023.
- *Eureka! The Science and Art of Insight*. Presenter: Andrew Grenville, Chief Research Officer, Maru, 12/8/2022.
- *Online Sample Fraud: Causes, Costs & Cures*. Moderator: Melanie Courtright, Chief Executive Officer, Insights Association, 2/11/2022.
- *Quantifying Unjust Enrichment*. Presenter: Shawn Fox, Founding Partner, Fox Forensic Accounting, 10/6/2021.
- *Questionnaire Design Best Practices*. Presenter: Jeffrey Henning, Chief Research Officer, Researchscape, 5/19/2021.
- *Making Online Samples More Representative*. Presenter: Andrew Mercer, Senior Research Methodologist, Pew Research Center, 3/17/2021.
- *Intelligence 360: Solicited + Unsolicited Customer Opinion*, Presenter: Michalis A. Michael, Chief Executive Officer, Digital MR, 2/17/2021.
- *The Future of Online Polling After 2020*. Moderator: Kathy Frankovic, ESOMAR Professional Standards Committee, 12/16/2020.

§ *The Opportunity for UX Research*. Presenter: Michaela Mora, President, Relevant Insights, 12/8/2020.

§ *BigSurv20: Big Data Meets Survey Science*, Online Conference, November/December 2020.

§ *International Trademark Association (INTA), 141st Annual Meeting (2019)*, Attendee, May 2019.

KEEGAN & DONATO
CONSULTING, LLC

31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

# Mark Keegan Testimony List

## Depositions (Last Four Years)

| Case Caption | Court/Venue | Client |
|---|---|---|
| Dana Sohovich, et al. v. Monat Global Corp., Alcora Corporation, and B & R Products, Inc. | United States District, Southern District of Florida, Miami Division | Plaintiffs |
| Acella Pharmaceuticals, LLC v. ANI Pharmaceuticals, Inc. | United States District Court, District of Minnesota | Defendant/ Counterclaim Plaintiff |
| Therabody, Inc. v. Hyper Ice, Inc. | United States District Court, Central District of California, Southern Division | Defendant |
| General Conference Corporation of Seventh-day Adventists v. The Davidian Seventh-Day Adventist Association | United States Patent and Trademark Office, Trademark Trial and Appeal Board | Plaintiff (Petitioner) |
| Credo Technology Group, Ltd. v. Credo.AI Corp. | United States District Court, Northern District of California | Defendant |
| Kelly Toy Holdings, LLC; Jazwares, LLC, et al., v. Zuru, LLC | United States District Court, Central District of California | Plaintiffs |
| Urban Intelligence, Inc. v. Spring Scaffolding, LLC | United States District Court, Eastern District of New York | Plaintiff |
| NECA LLC and Kidrobot, LLC v. Jazwares, LLC and Kelly Toys Holdings, LLC | United States District Court, District of New Jersey | Defendants |
| International Star Registry of Illinois, Ltd. v. RGifts Limited and Matei Supply Corp. | United States District Court, Northern District of Illinois | Defendants |
| PSI Marine, Inc. v. Seahorse Docking, LLC | United States District Court, District of Connecticut | Plaintiff |
| Inkit, Inc. v. airSlate, Inc. | United States District Court, District of Delaware | Defendant |
| Hyundai Motor Company and Hyundai Motor America, Inc. v. Hyundai Technology Group, Inc., et al. | United States District Court, Northern District of California | Defendants |
| Arik Cohen, et al. v. Copart, Inc. | United States District Court, Central District of California | Defendant |

KEEGAN & DONATO
CONSULTING, LLC

31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

| Case Caption | Court/Venue | Client |
|---|---|---|
| Linda Sunderland, et al. v. Pharmacare U.S., Inc., et al. | United States District Court, Southern District of California | Defendants |
| Dialect, LLC v. Amazon.com and Amazon Web Services, Inc. | United States District Court, Eastern District of Virginia, Alexandria Division | Plaintiff |
| Diamond Resorts U.S. Collection Development, LLC, et al., v. Wesley Financial Group, LLC, et al. | United States District Court, Eastern District of Tennessee, Knoxville Division | Defendants |
| CAP Barbell, Inc. v. Hulkfit Products, Inc., BalanceFrom, LLC, et al. | United States District Court, Southern District of Texas, Houston Division | Plaintiff |
| Smoot Construction Company of Washington, D.C., Inc. v. The Smoot Corporation, et al. | United States District Court, Southern District of Ohio, Eastern Division | Defendants/ Counterclaimants |
| Doctor's Financial Network, Inc. v. DrDisabilityQuotes.com LLC | United States District Court, District of New Jersey | Defendant |
| Nike, Inc. v. By Kiy, LLC, et al. | United States District Court, Southern District of New York | Defendants |
| General Cigar Company, Inc. v. Empresa Cubana Del Tabaco, D.B.A. Cubatabaco | United States District Court, Eastern District of Virginia, Alexandria Division | Defendant |
| Montiqueno Corbett, et al. v. Pharmacare U.S., Inc. | United States District Court, Southern District of California | Defendant |
| Sazerac Brands, LLC v. Buffalo City Distillery, LLC | United States Patent and Trademark Office, Trademark Trial and Appeal Board | Defendant (Registrant) |
| ImprimisRx, LLC v. OSRX, Inc. and Ocular Science, Inc. | United States District Court, Southern District of California | Plaintiff |
| Tequila Los Abuelos S.A De C.V. (Fortaleza) v. Podlaska Wytwórnia Wódek "Polmos" S.A. | United States Patent and Trademark Office, Trademark Trial and Appeal Board | Plaintiff (Opposer) |
| Aman Group, S.à.r.l. v. Aman Spirits LLC, et al. | United States District Court, Central District of California, Western Division | Plaintiff |
| Steven Robert Prescott, et al. v. Reckitt Benckiser LLC | United States District Court, Northern District of California | Defendant |
| S10 Entertainment & Media, LLC v. Samsung Electronics Co., LTD, et al. | United States District Court, Central District of California | Plaintiff |

KEEGAN & DONATO
CONSULTING, LLC

31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

| Case Caption | Court/Venue | Client |
|---|---|---|
| Nestlé USA, Inc., et al. v. Ultra Distribuciones Mundiales S.A. de C.V., et al. | United States District Court, Western District of Texas, San Antonio Division | Defendants |
| Stitch, LTD v. TikTok, Inc., et al. | United States District Court, Central District of California | Plaintiff |
| Van Leeuwen Ice Cream, LLC v. Rebel Creamery LLC | United States District Court, Eastern District of New York | Plaintiff |
| DarkOwl, LLC v. ArkOwl LLC and ArkOwl Corporation | United States District Court, District of Colorado | Defendant |
| Chasom Brown, et al. v. Google LLC | United States District Court, Northern District of California | Plaintiffs |
| BillFloat Inc., d/b/a SmartBiz Loans v. Collins Cash Inc., d/b/a Smart Business Funding, et at. | United States District Court, Northern District of California | Defendants |
| Kenco Bucket Trucks LLC v. Versabucket LLC, et al. | District Court, Harris County, Texas, 113th Judicial District | Defendants |
| EBIN New York, Inc. v. SIC Enterprise, Inc., et al. | United States District Court, Eastern District of New York | Plaintiff |
| Kudos, Inc. v. Kudoboard, LLC, et al. | United States District Court, Northern District of California | Plaintiff |
| Master Inspector Certification Board, Inc. v. Examination Board of Professional Home Inspectors, Inc. | United States Patent and Trademark Office, Trademark Trial and Appeal Board | Plaintiff (Petitioner) |
| Solid 21 Inc. v. Richemont North America, Inc. et al. | United States District Court, Southern District of New York | Defendants |
| Watching Time, LLC v. International Watchman, Inc. | United States Patent and Trademark Office, Trademark Trial and Appeal Board | Plaintiff (Petitioner) |
| Diamond Resorts U.S. Collection Development, LLC, et al. v. Newton Group Transfers, LLC, et al. | United States District Court, Southern District of Florida, West Palm Beach Division | Defendants |
| Fair Isaac Corporation v. Fido Alliance, Inc. | United States Patent and Trademark Office, Trademark Trial and Appeal Board | Defendant (Applicant) |

KEEGAN & DONATO
CONSULTING, LLC

31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

| Case Caption | Court/Venue | Client |
|---|---|---|
| Solid 21, Inc. v. Breitling U.S.A. Inc., et al. | United States District Court, District of Connecticut | Defendants |
| Juul Labs, Inc. v. Eonsmoke, LLC d/b/a 4X PODS, et al. | United States District Court, District of New Jersey | Defendants |
| Restoration Hardware, Inc., et al., v. Bungalow Home, LLC | United States District Court, Southern District of Ohio, Western Division | Plaintiffs |
| United States of America ex. rel., Yoash Gohil v. Sanofi U.S. Services Inc., et al. | United States District Court, Eastern District of Pennsylvania | Defendants |
| Alo, LLC v. Acadia Malibu, Inc., d/b/a Alo House Recovery Centers, et al. | United States District Court, Central District of California | Plaintiff |
| Farjad Fani, et al. v. Shartsis Friese LLP, et al. | JAMS Arbitration, JAMS Reference No. 1100104777 | Claimants |
| Solid 21, Inc. v. Ulysse Nardin USA Inc., et al. | United States District Court, Southern District of Florida | Defendants |
| The Shoppes at River Station, LLC v. College Park Retail Investors, LLC | Superior Court of Fulton County, State of Georgia | Plaintiff |
| Spartan Chemical Company, Inc. v. Ecolab, Inc. | United States District Court, Northern District of Ohio, Western Division | Plaintiff |

Trials & Hearings (Lifetime)

| Case Caption | Court/Venue | Client | Type |
|---|---|---|---|
| ImprimisRx, LLC v. OSRX Inc. and Ocular Science, Inc. | United States District Court, Southern District of California | Plaintiff | Trial |
| Van Leeuwen Ice Cream, LLC v. Rebel Creamery, LLC | United States District Court, Eastern District of New York | Plaintiff | Trial |
| Top Brand LLC, et al. v. Cozy Comfort Company LLC, et al. | United States District Court, District of Arizona | Defendant/ Counterclaimant | Trial |
| DarkOwl, LLC v. ArkOwl LLC and ArkOwl Corporation | United States District Court, District of Colorado | Defendant | Hearing |
| S10 Entertainment & Media, LLC v. Samsung Electronics Co., LTD | United States District Court, Central District of California | Plaintiff | Trial |
| Stitch, LTD v. TikTok, Inc., et al. | United States District Court, Central District of California | Plaintiff | Trial |

KEEGAN & DONATO
CONSULTING, LLC

31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

| Case Caption | Court/Venue | Client | Type |
|---|---|---|---|
| BillFloat Inc., d/b/a SmartBiz Loans v. Collins Cash Inc., d/b/a Smart Business Funding, et al. | United States District Court, Northern District of California | Defendants | Trial |
| Identity Intelligence Group, LLC v. Rocket Mortgage, LLC | United States District Court, District of Arizona | Plaintiff | Hearing |
| Amarussein Investments Luxembourg S.a.r.L. v. Signet Jewelers Brands Limited and Sterling Jewelers, Inc. | American Arbitration Association, New York, New York | Respondents | Hearing |
| Bodum U.S.A., Inc. v. A Top New Casting, Inc. | United States District Court, Northern District of Illinois, Eastern Division | Defendant | Trial |
| Coty Inc., et al. v. Excell Brands, LLC | United States District Court, Southern District of New York | Defendant | Trial |
| Christopher Lewert, et al., v. Boiron, Inc., et al. | United States District Court, Central District of California | Plaintiffs | Trial |
| BuzzBallz, LLC v. BuzzBox Beverages, Inc., et al. | United States District Court, Central District of California | Plaintiff | Trial |

Trial Consulting (No Testimony)

| Case Caption | Court/Venue | Client |
|---|---|---|
| Anibal Rodriguez, et al. v. Google, LLC | United States District Court, Northern District of California | Plaintiffs |
| Inkit, Inc. v. airSlate, Inc. | United States District Court, District of Delaware | Defendant |
| Allergan USA, Inc. v. Imprimis Pharmaceuticals, Inc. | United States District Court, Central District of California, Southern Division | Defendant |

KEEGAN & DONATO CONSULTING, LLC

31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

## Mark Keegan – Professional Experience



Mark Keegan brings a wide breadth of experience to Keegan & Donato Consulting, having spent decades formulating case strategies in complex litigation. As a founding partner of Keegan & Donato Consulting, Mr. Keegan has actively consulted on a variety of litigation issues ranging from consumer research for Lanham Act claims to complex marketing strategy and analysis, to intellectual property research and analysis.

Mr. Keegan has over 25 years of experience conducting consumer survey research. Over the course of his career, he has personally conducted over 1,000 consumer surveys reaching more than 250,000 consumers. Many of these surveys have been admitted into evidence in federal courts, state courts, at arbitration, to the Trademark Trial and Appeal Board (TTAB), the National Advertising Division of the Council of Better Business Bureaus, and the United States International Trade Commission. He also has extensive experience as a rebuttal witness.

Mr. Keegan maintains a number of professional certifications and memberships that are directly related to his work as an expert in marketing and consumer research. He is a graduate of the University of Georgia's Principles of Market Research Program, a professional certification program for marketing industry professionals covering all aspects of the survey research process. He is also a Professional Certified Marketer (PCM), an American Marketing Association certification conferred upon individuals who have demonstrated a mastery of comprehensive and core marketing knowledge and principles. Mr. Keegan is an active member of numerous professional organizations including ESOMAR (World Association of Opinion and Marketing Research Professionals), the International Trademark Association (INTA), the American Marketing Association (AMA), and others.

Mr. Keegan has published within his field, has taught CLE-accredited courses on survey research for litigation, and has appeared as a guest lecturer and panelist in both classroom and conference settings. Prior to his work with Keegan & Donato Consulting, Mr. Keegan assisted a diverse range of both large and small companies as a marketing strategist and operations manager.

Education:

J.D., Brooklyn Law School (1995)

B.A., Pace University (1990)

Professional Certifications:

Professional Certificate, Principles of Market Research Program, University of Georgia (2021)

Professional Certified Marketer (PCM), American Marketing Association (2015–present)

## Exhibit 2—Questionnaire (Screen Shots)

**Screener - Enterprise**

Thank you for agreeing to participate in this anonymous survey. The survey will take just a few minutes of your time.

Please begin by completing the CAPTCHA below.

I'm not a robot

reCAPTCHA

Next >>

This survey is for research purposes only. Your responses will be held confidential and we are not trying to sell you anything.

Before we begin, please read the following instructions:

• If you don't know the answer, don't recall, or don't have an opinion on any of the questions that follow, please indicate that by checking "don't know." Please do not guess at any of your answers.

• Please do not look up answers to any of the survey questions on the Internet or consult with any other persons regarding the survey answers. We are interested in your opinions only.

• This survey makes use of images. If you are currently using a device that does not have image capabilities, please stop now and resume this survey when you have access to a compatible device.

• If you typically wear eyeglasses when reading information or looking at pictures or videos on your electronic device, please put them on now and wear them through the remainder of this survey.

• Your browser's back button will be disabled during the survey. Please use the "Next" button within the survey to advance through the questionnaire.

Do you understand and agree to follow the instructions provided above?

I understand and agree

I do not understand and/or do not agree

Don't know

Next >>

Which of the following age brackets contains your age on your last birthday?

Under 18

18 - 30

31 - 40

41 - 50

51 - 60

61 - 70

71 or older

Next >>

In which U.S. state or territory do you currently reside?

Please select a state...

Other

Prefer not to answer

Next >>

Which of the following best describes your current employment status?

| | |
|---|---|
| Stay-at-home home-maker | Self-employed |
| Retired | Unemployed not seeking employment |
| Business owner / Principal | Unemployed seeking employment |
| Full-time student | Other |
| Work for a company or organization | Prefer not to answer |

Next >>

In which of the following core business functions, if any, do you participate **in any way** in your primary employment at your current organization? ***Please select all that apply***.

| | |
|---|---|
| Information technology (IT) | Marketing / sales |
| Research & development (R&D) | Governance / executive management |
| Legal / compliance | Communications |
| Accounting / finance | Operations |
| Human resources (HR) | Quality management |
| Customer service | Credit and/or debit card processing |
| Production / supply chain | Other |
| Government relations / regulatory | None of these |

Next >>

In which of the following activities, if any, do you participate **in any way** as part of your job responsibilities? ***Please select all that apply***.

- Credit and/or debit card processing
- Strategy / operations
- Accounting / finance
- Marketing communications / advertising
- Interviewing / hiring / human resources
- None of the above

Next >>

If you know, since the beginning of 2021, which types of credit and/or debit cards, if any, has your company/organization accepted for the sale of products or services? ***Please select all that apply***.

Visa

Discover

Mastercard

American Express (AmEx)

Other

None of these

Don't know / Don't recall

Next >>

Imagine that your company/organization is in need of either (a) selecting a new credit and/or debit card issuing vendor or vendors or (b) negotiating the terms of its account(s) with its current credit and/or debit card issuing vendor or vendors. How would you describe your involvement in the process of identifying, vetting, and selecting such a vendor or vendors?

I would engage in the vetting process and make the selection/negotiation decision on my own

In combination with others, I would engage in the vetting process and make the selection/negotiation decision

I would influence the vetting process and selection/negotiation decision

I would not be involved in the vetting process or making the selection/negotiation decision

Other

I am not sure

Next >>

What is your current job title in your primary occupation?

Prefer not to answer / Not applicable

Next >>

Thinking of your primary occupation, if you know, how many employees work at your company/organization?

- More than 500 employees
- 251 - 500 employees
- 51 - 250 employees
- 11 - 50 employees
- 1 - 10 employees
- Don't know

Next >>

**Screener - Business Owners**

Thank you for agreeing to participate in this anonymous survey. The survey will take just a few minutes of your time.

Please begin by completing the CAPTCHA below.

I'm not a robot

reCAPTCHA

Next >>

This survey is for research purposes only. Your responses will be held confidential and we are not trying to sell you anything.

Before we begin, please read the following instructions:

• If you don't know the answer, don't recall, or don't have an opinion on any of the questions that follow, please indicate that by checking "don't know." Please do not guess at any of your answers.

• Please do not look up answers to any of the survey questions on the Internet or consult with any other persons regarding the survey answers. We are interested in your opinions only.

• This survey makes use of images. If you are currently using a device that does not have image capabilities, please stop now and resume this survey when you have access to a compatible device.

• If you typically wear eyeglasses when reading information or looking at pictures or videos on your electronic device, please put them on now and wear them through the remainder of this survey.

• Your browser's back button will be disabled during the survey. Please use the "Next" button within the survey to advance through the questionnaire.

Do you understand and agree to follow the instructions provided above?

I understand and agree

I do not understand and/or do not agree

Don't know

Next >>

In which U.S. state or territory do you currently reside?

Please select a state...

Other

Prefer not to answer

Next >>

Which of the following best describes your current employment status?

| | |
|---|---|
| Full-time student | Self-employed |
| Retired | Unemployed not seeking employment |
| Business owner / Principal | Unemployed seeking employment |
| Work for a company or organization | Other |
| Stay-at-home home-maker | Prefer not to answer |

Next >>

If you know, since the beginning of 2021, which of the following forms of payment has your business accepted for the sale of products or services? ***Please select all that apply***.

| | |
|---|---|
| Digital wallet (e.g., Apple Pay, Google Pay) | Online payment service (e.g., Venmo, PayPal, Square) |
| Personal check | Cash |
| Debit cards | Other |
| Credit cards | Don't know / Don't recall |

Next >>

If you know, since the beginning of 2021, which types of credit and/or debit cards, if any, has your company/organization accepted for the sale of products or services? ***Please select all that apply***.

- American Express (AmEx)
- Mastercard
- Visa
- Discover
- Other
- None of these
- Don't know / Don't recall

Next >>

Imagine that your company/organization is in need of either (a) selecting a new credit and/or debit card issuing vendor or vendors or (b) negotiating the terms of its account(s) with its current credit and/or debit card issuing vendor or vendors. How would you describe your involvement in the process of identifying, vetting, and selecting such a vendor or vendors?

I would not be involved in the vetting process or making the selection/negotiation decision

I would influence the vetting process and selection/negotiation decision

In combination with others, I would engage in the vetting process and make the selection/negotiation decision

I would engage in the vetting process and make the selection/negotiation decision on my own

Other

I am not sure

Next >>

What is your current job title in your primary occupation?

Prefer not to answer / Not applicable

Next >>

Thinking of your primary occupation, if you know, how many employees work at your company/organization?

- More than 500 employees
- 251 - 500 employees
- 51 - 250 employees
- 11 - 50 employees
- 1 - 10 employees
- Don't know

Next >>

**Screener - Individuals**

Thank you for agreeing to participate in this anonymous survey. The survey will take just a few minutes of your time.

Please begin by completing the CAPTCHA below.

☐ I'm not a robot

reCAPTCHA

Next >>

This survey is for research purposes only. Your responses will be held confidential and we are not trying to sell you anything.

Before we begin, please read the following instructions:

• If you don't know the answer, don't recall, or don't have an opinion on any of the questions that follow, please indicate that by checking "don't know." Please do not guess at any of your answers.

• Please do not look up answers to any of the survey questions on the Internet or consult with any other persons regarding the survey answers. We are interested in your opinions only.

• This survey makes use of images. If you are currently using a device that does not have image capabilities, please stop now and resume this survey when you have access to a compatible device.

• If you typically wear eyeglasses when reading information or looking at pictures or videos on your electronic device, please put them on now and wear them through the remainder of this survey.

• Your browser's back button will be disabled during the survey. Please use the "Next" button within the survey to advance through the questionnaire.

Do you understand and agree to follow the instructions provided above?

I do not understand and/or do not agree

I understand and agree

Don't know

Next >>

Which of the following age brackets contains your age on your last birthday?

- Under 18
- 18 - 30
- 31 - 40
- 41 - 50
- 51 - 60
- 61 - 70
- 71 or older

Next >>

In which U.S. state or territory do you currently reside?

Please select a state...

Other

Prefer not to answer

Next >>

Which of the following best describes your current employment status?

| | |
|---|---|
| Business owner / Principal | Self-employed |
| Full-time student | Unemployed not seeking employment |
| Work for a company or organization | Unemployed seeking employment |
| Retired | Other |
| Stay-at-home home-maker | Prefer not to answer |

Next >>

In which, if any, of the following activities have you personally engaged since the beginning of 2021?
***Please select all that apply***.

| | |
|---|---|
| Accepted payment for goods and/or services | Used a ride share service |
| Purchased life insurance | Attended a professional sporting event |
| Enrolled in a course or class | Took an international vacation |
| Hired a landscaping service | None of these |

Next >>

If you recall, since the beginning of 2021, what type(s) of transactions have you accepted payment for? ***Please select all that apply***.

- Services provided
- Membership fees / dues
- Items / goods sold
- Charity payment
- Other
- Don't know / Don't recall

Next >>

If you recall, since the beginning of 2021, which of the following forms of payment have you accepted for goods and/or services? ***Please select all that apply***.

| | |
|---|---|
| Online payment service (e.g., Venmo, PayPal, Square) | Cash |
| Digital wallet (e.g., Apple Pay, Google Pay) | Credit cards |
| Personal check | Other |
| Debit cards | Don't know / Don't recall |

Next >>

You indicated that since the beginning of 2021, you have accepted payment for goods and/or services. If you know, approximately how many transactions have you accepted payment for during this time?

- More than 250
- 101 - 250
- 51 - 100
- 11 - 50
- 1 - 10
- Don't know / Don't recall

Next >>

**Main Questionnaire**

In the remainder of this survey, we would like to ask you some questions regarding class action lawsuits. For the purpose of this survey, a ***class action lawsuit*** is defined as follows:

> *A **class action lawsuit** is a legal case in which one or more people sue on behalf of a larger group of people who have the same or similar claim against the same defendant(s).*

Which of the following best describes your personal understanding?

I **DO NOT understand** the concept of "class action lawsuit" as it has been defined for the purpose of this survey

I **DO understand** the concept of "class action lawsuit" as it has been defined for the purpose of this survey

Don't know

Next >>

For the remainder of this survey, if you do not know or do not have an opinion about any of the questions, please select the "don't know / no opinion" answer option. ***We are only interested in your own personal knowledge. Please do not guess at any of your answers and please do not use the Internet or any other sources to inform your answers.***

Click the "Next" button below to continue.

Next >>

If you know, are you aware of any class action lawsuit(s) involving any of the following companies?
***Please select all that apply***.

Microsoft

Visa and/or Mastercard

GEICO and/or Allstate

Meta and/or Facebook

Home Depot and/or Lowe's

Torivex Group

None of these

Don't know

Next >>

If you can recall, which of the following class action lawsuits ***involving Visa and/or Mastercard*** are you aware of? ***Please select all that apply***.

***Remember**: We are only interested in your own personal knowledge. Please do not guess at any of your answers and please do not use the Internet or any other sources to inform your answers.*

- Case alleging Visa and Mastercard caused merchants to pay excessive fees for accepting Visa / Mastercard credit and debit cards, including by adopting interchange rules and rates
- Case alleging that rules requiring merchants who accepted Visa/Mastercard credit cards to also accept their debit cards improperly raised fees
- Cases regarding data breaches at major retailers including Target and Home Depot
- Case alleging credit card companies conspired to shift responsibility for fraudulent payment card transactions to merchants
- Case alleging credit card companies and banks conspired to keep ATM fees artificially high
- None of these

Next >>

You indicated that you have awareness of the class action lawsuit against Visa / Mastercard **alleging Visa and Mastercard caused merchants to pay excessive fees for accepting Visa / Mastercard credit and debit cards, including by adopting interchange rules and rates**. In the space below, please tell us what you can recall about this litigation. ***Please be as detailed as possible***.

***Remember*: *We are only interested in your own personal knowledge. Please do not guess at any of your answers and please do not use the Internet or any other sources to inform your answers.***

Don't know / Don't recall

Next >>

Again, please think of the class action lawsuit against Visa / Mastercard **alleging Visa and Mastercard caused merchants to pay excessive fees for accepting Visa / Mastercard credit and debit cards, including by adopting interchange rules and rates**.

If you can recall, which of the following applies to you?

***Remember: We are only interested in your own personal knowledge. Please do not guess at any of your answers and please do not use the Internet or any other sources to inform your answers.***

I **HAVE** seen or heard a notice describing a proposed resolution to this case

I **HAVE NOT** seen or heard a notice describing a proposed resolution to this case

Don't know / Don't recall

Next >>

Again, please think of the class action lawsuit against Visa / Mastercard **alleging Visa and Mastercard caused merchants to pay excessive fees for accepting Visa / Mastercard credit and debit cards, including by adopting interchange rules and rates**.

If you can recall, where have you seen or heard a notice describing a proposed resolution to this case? ***Please select all that apply***.

***Remember: We are only interested in your own personal knowledge. Please do not guess at any of your answers and please do not use the Internet or any other sources to inform your answers.***

| | |
|---|---|
| Outdoor signage (e.g., billboard, bus shelter) | Postcard or other mailing |
| Radio (broadcast, streaming, or satellite) | Newspaper (digital) |
| Website | Newspaper (print) |
| Internet advertising | Business magazine or journal (digital) |
| Social media (e.g., Facebook, Instagram, X, YouTube) | Business magazine or journal (print) |
| TV (broadcast or streaming) | Other (please specify): |
| Mass transit (e.g., subway ads, bus ads) | Don't know / None of these |

Next >>

Again, please think of the class action lawsuit against Visa / Mastercard **alleging Visa and Mastercard caused merchants to pay excessive fees for accepting Visa / Mastercard credit and debit cards, including by adopting interchange rules and rates**.

If you know, in which of the following ways do the terms upon which the parties have agreed to resolve the case impact merchants? ***Please select all that apply***.

***Remember*: We are only interested in your own personal knowledge. Please do not guess at any of your answers and please do not use the Internet or any other sources to inform your answers.**

**Under the terms upon which the parties have agreed to resolve the case, merchants will be:**

Permitted to accept some digital wallets at brick-and-mortar locations but decline others

Permitted to surcharge customers a fee for the use of any Visa or Mastercard-Branded Credit Cards

Entitled to a monetary payment

Able to decline acceptance of Visa- or Mastercard-Branded Commercial Credit Cards and/or Premium Consumer Credit Cards, while still accepting other Visa- or Mastercard-Branded cards

Able to decline acceptance of Visa- or Mastercard-Branded cards issued by certain issuing banks

None of the above

Don't know / Don't recall

Next >>

Please type the word "green" in the box below.

Next >>

If you can recall, which of the following applies to you?

Other than this survey, I **HAVE NOT** taken one or more other surveys related to Visa and/or Mastercard within the last month

Other than this survey, I **HAVE** taken one or more other surveys related to Visa and/or Mastercard within the last month

Don't know / Don't recall

Next >>

Now, a few more questions for classification purposes only. Which of the following best describes your educational background?

- Doctorate or equivalent
- Master's / professional degree
- 4-year college degree
- 2-year college degree
- Some college
- Technical school or training
- High school graduate
- Less than high school
- Prefer not to answer

Next >>

What is your gender?

Female

Male

Non-binary or other

Prefer not to answer

Next >>

Which of the following includes your household's approximate annual income in 2025?

- $150,000 or more
- $125,000 - $149,999
- $100,000 - $124,999
- $75,000 - $99,999
- $50,000 - $74,999
- $35,000 - $49,999
- Under $35,000
- Prefer not to answer

Next >>

We thank you for your time spent taking this survey.
Your response has been recorded.

## Exhibit 3—Questionnaire (Editor Export)

Start of Block: CAPTCHA

Q1 Thank you for agreeing to participate in this anonymous survey. The survey will take just a few minutes of your time. Please begin by completing the CAPTCHA below.

End of Block: CAPTCHA

Start of Block: Screener - Basics

Q2 This survey is for research purposes only. Your responses will be held confidential and we are not trying to sell you anything. Before we begin, please read the following instructions:
• If you don't know the answer, don't recall, or don't have an opinion on any of the questions that follow, please indicate that by checking "don't know." Please do not guess at any of your answers.

• Please do not look up answers to any of the survey questions on the Internet or consult with any other persons regarding the survey answers. We are interested in your opinions only.

• This survey makes use of images. If you are currently using a device that does not have image capabilities, please stop now and resume this survey when you have access to a compatible device.

• If you typically wear eyeglasses when reading information or looking at pictures or videos on your electronic device, please put them on now and wear them through the remainder of this survey.

• Your browser's back button will be disabled during the survey. Please use the "Next" button within the survey to advance through the questionnaire.
Do you understand and agree to follow the instructions provided above?

- O I understand and agree (1)
- O I do not understand and/or do not agree (2)
- O Don't know (3)

*Skip To: End of Block If Q2 != I understand and agree*

Page Break

X→

Q3 Which of the following age brackets contains your age on your last birthday?

O Under 18 (1)

O 18 - 30 (2)

O 31 - 40 (3)

O 41 - 50 (4)

O 51 - 60 (5)

O 61 - 70 (6)

O 71 or older (7)

**End of Block: Screener - Basics**

---

**Start of Block: Residency**

JS X→

Q4 In which U.S. state or territory do you currently reside?

- O Alabama (1)
- O Alaska (2)
- O Arizona (3)
- O Arkansas (4)
- O California (5)
- O Colorado (6)
- O Connecticut (7)
- O Delaware (8)
- O Florida (9)
- O Georgia (10)
- O Hawaii (11)
- O Idaho (12)
- O Illinois (13)
- O Indiana (14)
- O Iowa (15)
- O Kansas (16)
- O Kentucky (17)
- O Louisiana (18)
- O Maine (19)
- O Maryland (20)
- O Massachusetts (21)

- O Michigan (22)
- O Minnesota (23)
- O Mississippi (24)
- O Missouri (25)
- O Montana (26)
- O Nebraska (27)
- O Nevada (28)
- O New Hampshire (29)
- O New Jersey (30)
- O New Mexico (31)
- O New York (32)
- O North Carolina (33)
- O North Dakota (34)
- O Ohio (35)
- O Oklahoma (36)
- O Oregon (37)
- O Pennsylvania (38)
- O Puerto Rico (39)
- O Rhode Island (40)
- O South Carolina (41)
- O South Dakota (42)

- O Tennessee (43)
- O Texas (44)
- O Utah (45)
- O Vermont (46)
- O Virginia (47)
- O Washington (48)
- O West Virginia (49)
- O Wisconsin (50)
- O Wyoming (51)
- O Other (52)
- O Prefer not to answer (53)

**End of Block: Residency**

---

**Start of Block: Employment**

Q5 Which of the following best describes your current employment status?

- O Stay-at-home home-maker (1)
- O Retired (2)
- O Full-time student (3)
- O Self-employed (4)
- O Business owner / Principal (5)
- O Work for a company or organization (6)
- O Unemployed seeking employment (7)
- O Unemployed not seeking employment (8)
- O Other (9)
- O Prefer not to answer (10)

**End of Block: Employment**

---

**Start of Block: Work for a company**

*Display this question:*

*If Q5 = Work for a company or organization*

Q6 In which of the following core business functions, if any, do you participate **in any way** in your primary employment at your current organization? ***Please select all that apply***.

- ☐ Human resources (HR) (1)
- ☐ Information technology (IT) (2)
- ☐ Accounting / finance (3)
- ☐ Operations (4)
- ☐ Marketing / sales (5)
- ☐ Legal / compliance (6)
- ☐ Research & development (R&D) (7)
- ☐ Customer service (8)
- ☐ Governance / executive management (9)
- ☐ Communications (10)
- ☐ Production / supply chain (11)
- ☐ Quality management (12)
- ☐ Government relations / regulatory (13)
- ☐ Credit and/or debit card processing (14)
- ☐ Other (15)
- ☐ ⊗None of these (16)

End of Block: Work for a company

Start of Block: Legal / Governance

*Display this question:*

*If Q6 , Credit and/or debit card processing Is Displayed*

*And Q6 != Credit and/or debit card processing*

*And Q6 = Legal / compliance*

*Or If*

*Q6 , Credit and/or debit card processing Is Displayed*

*And Q6 != Credit and/or debit card processing*

*And Q6 = Governance / executive management*

*Or If*

*Q6 , Credit and/or debit card processing Is Displayed*

*And Q6 != Credit and/or debit card processing*

*And Q6 = Operations*

*Or If*

*Q6 , Credit and/or debit card processing Is Displayed*

*And Q6 != Credit and/or debit card processing*

*And Q6 = Accounting / finance*

Q7 In which of the following activities, if any, do you participate **in any way** as part of your job responsibilities? ***Please select all that apply***.

☐ Interviewing / hiring / human resources (1)

☐ Credit and/or debit card processing (2)

☐ Accounting / finance (3)

☐ Marketing communications / advertising (4)

☐ Strategy / operations (5)

☐ None of the above (6)

End of Block: Legal / Governance

Start of Block: Business owner

*Display this question:*

*If Q5 = Business owner / Principal*

*Or Q5 = Self-employed*

Q8 If you know, since the beginning of 2021, which of the following forms of payment has your business accepted for the sale of products or services? ***Please select all that apply***.

- ▢ Credit cards (1)
- ▢ Debit cards (2)
- ▢ Cash (3)
- ▢ Personal check (4)
- ▢ Digital wallet (e.g., Apple Pay, Google Pay) (5)
- ▢ Online payment service (e.g., Venmo, PayPal, Square) (6)
- ▢ Other (7)
- ▢ ⊗Don't know / Don't recall (8)

**End of Block: Business owner**

---

**Start of Block: Which cards**

*Display this question:*

*If Q6 , Credit and/or debit card processing Is Displayed*

*And Q6 = Credit and/or debit card processing*

*Or If*

*Q8 , Credit cards Is Displayed*

*And Q8 = Credit cards*

*Or If*

*Q8 , Credit cards Is Displayed*

*And Q8 = Digital wallet (e.g., Apple Pay, Google Pay)*

*Or If*

*Q8 , Credit cards Is Displayed*

*And Q8 = Online payment service (e.g., Venmo, PayPal, Square)*

*Or If*

*Q7 , Credit and/or debit card processing Is Displayed*

*And Q7 = Credit and/or debit card processing*

*Or If*

*Q8 , Credit cards Is Displayed*

*And Q8 = Debit cards*

Q9 If you know, since the beginning of 2021, which types of credit and/or debit cards, if any, has your company/organization accepted for the sale of products or services? ***Please select all that apply***.

- ▢ Visa (1)
- ▢ Mastercard (2)
- ▢ American Express (AmEx) (3)
- ▢ Discover (4)
- ▢ Other (5)
- ▢ ⊗None of these (6)
- ▢ ⊗Don't know / Don't recall (7)

End of Block: Which cards

---

Start of Block: Decision-makers

*Display this question:*

*If Q9 , Visa Is Displayed*

*And Q9 = Visa*

*Or If*

*Q9 , Visa Is Displayed*

*And Q9 = Mastercard*

Q10 Imagine that your company/organization is in need of either (a) selecting a new credit and/or debit card issuing vendor or vendors or (b) negotiating the terms of its account(s) with its current credit and/or debit card issuing vendor or vendors. How would you describe your involvement in the process of identifying, vetting, and selecting such a vendor or vendors?

O I would engage in the vetting process and make the selection/negotiation decision on my own (1)

O In combination with others, I would engage in the vetting process and make the selection/negotiation decision (2)

O I would influence the vetting process and selection/negotiation decision (3)

O I would not be involved in the vetting process or making the selection/negotiation decision (4)

O Other (5)

O I am not sure (6)

**End of Block: Decision-makers**

---

**Start of Block: Job Title**

*Display this question:*

*If Q10 , I would engage in the vetting process and make the selection/negotiation decision on my own Is Displayed*

*And Q10 != I would not be involved in the vetting process or making the selection/negotiation decision*

*And Q10 != Other*

*And Q10 != I am not sure*

Q11 What is your current job title in your primary occupation?

________________________________________________________________

*Display this question:*

*If If Job title Text Response Is Displayed*

JS ✻ X→

Q12 .

☐ Prefer not to answer / Not applicable (1)

End of Block: Job Title

Start of Block: Org Size

*Display this question:*

*If If Job title OE Text Response Is Displayed*

*And If*

*Q5 = Work for a company or organization*

*Or Q5 = Business owner / Principal*

Q13 Thinking of your primary occupation, if you know, how many employees work at your company/organization?

- 1 - 10 employees (1)
- 11 - 50 employees (2)
- 51 - 250 employees (3)
- 251 - 500 employees (4)
- More than 500 employees (5)
- Don't know (6)

End of Block: Org Size

Start of Block: Activities

*Display this question:*

*If Q10 , I would engage in the vetting process and make the selection/negotiation decision on my own Is Not Displayed*

*Or If*

*Q10 , I would engage in the vetting process and make the selection/negotiation decision on my own Is Displayed*

*And Q10 != I would engage in the vetting process and make the selection/negotiation decision on my own*

*And Q10 != In combination with others, I would engage in the vetting process and make the selection/negotiation decision*

*And Q10 != I would influence the vetting process and selection/negotiation decision*

Q14 In which, if any, of the following activities have you personally engaged since the beginning of 2021? ***Please select all that apply***.

- ▢ Accepted payment for goods and/or services (1)
- ▢ Took an international vacation (2)
- ▢ Attended a professional sporting event (3)
- ▢ Enrolled in a course or class (4)
- ▢ Hired a landscaping service (5)
- ▢ Purchased life insurance (6)
- ▢ Used a ride share service (7)
- ▢ ⊗None of these (8)

Page Break

*Display this question:*

*If Q14 = Accepted payment for goods and/or services*

Q15 If you recall, since the beginning of 2021, what type(s) of transactions have you accepted payment for? ***Please select all that apply***.

- ☐ Services provided (1)
- ☐ Items / goods sold (2)
- ☐ Charity payment (3)
- ☐ Membership fees / dues (4)
- ☐ Other (5)
- ☐ ⊗Don't know / Don't recall (6)

Page Break

*Display this question:*

*If Q14 = Accepted payment for goods and/or services*

*Carry Forward All Choices - Displayed & Hidden from "Q8"*

Q16 If you recall, since the beginning of 2021, which of the following forms of payment have you accepted for goods and/or services? ***Please select all that apply***.

- ☐ Credit cards (1)
- ☐ Debit cards (2)
- ☐ Cash (3)
- ☐ Personal check (4)
- ☐ Digital wallet (e.g., Apple Pay, Google Pay) (5)
- ☐ Online payment service (e.g., Venmo, PayPal, Square) (6)
- ☐ Other (7)
- ☐ ⊗Don't know / Don't recall (8)

Page Break

*Display this question:*

*If If Payment accepted gen pop Credit cards Is Displayed*

*And If*

*If Payment accepted gen pop Credit cards Is Selected*

*Or Or Payment accepted gen pop Digital wallet (e.g., Apple Pay, Google Pay) Is Selected*

*Or Or Payment accepted gen pop Online payment service (e.g., Venmo, PayPal, Square) Is Selected*

*Or Or Payment accepted gen pop Debit cards Is Selected*

*Carry Forward All Choices - Displayed & Hidden from "Q9"*

Q17 If you know, since the beginning of 2021, which types of credit and/or debit cards, if any, have you accepted for goods and/or services? ***Please select all that apply***.

- ☐ Visa (1)
- ☐ Mastercard (2)
- ☐ American Express (AmEx) (3)
- ☐ Discover (4)
- ☐ Other (5)
- ☐ ⊗ None of these (6)
- ☐ ⊗ Don't know / Don't recall (7)

Page Break

*Display this question:*

*If Q14 = Accepted payment for goods and/or services*

Q18 You indicated that since the beginning of 2021, you have accepted payment for goods and/or services. If you know, approximately how many transactions have you accepted payment for during this time?

- O 1 - 10 (1)
- O 11 - 50 (2)
- O 51 - 100 (3)
- O 101 - 250 (4)
- O More than 250 (5)
- O Don't know / Don't recall (6)

**End of Block: Activities**

---

**Start of Block: Awareness of Class Action Lawsuit**

Q19 In the remainder of this survey, we would like to ask you some questions regarding class action lawsuits. For the purpose of this survey, a ***class action lawsuit*** is defined as follows: *A **class action lawsuit** is a legal case in which one or more people sue on behalf of a larger group of people who have the same or similar claim against the same defendant(s).* Which of the following best describes your personal understanding?

- O I **DO understand** the concept of "class action lawsuit" as it has been defined for the purpose of this survey (1)
- O I **DO NOT understand** the concept of "class action lawsuit" as it has been defined for the purpose of this survey (2)
- O Don't know (3)

**End of Block: Awareness of Class Action Lawsuit**

---

**Start of Block: General instruction**

Q20 For the remainder of this survey, if you do not know or do not have an opinion about any of the questions, please select the "don't know / no opinion" answer option. ***We are only interested in your own personal knowledge. Please do not guess at any of your answers and please do not use the Internet or any other sources to inform your answers.*** Click the "Next" button below to continue.

End of Block: General instruction

Start of Block: Awareness

Q21 If you know, are you aware of any class action lawsuit(s) involving any of the following companies? ***Please select all that apply***.

- ☐ Visa and/or Mastercard (1)
- ☐ GEICO and/or Allstate (2)
- ☐ Microsoft (3)
- ☐ Meta and/or Facebook (4)
- ☐ Home Depot and/or Lowe's (5)
- ☐ Torivex Group (6)
- ☐ ⊗None of these (7)
- ☐ ⊗Don't know (8)

*Skip To: End of Block If Q21 != Visa and/or Mastercard*

*Skip To: End of Block If Q21 = Torivex Group*

Page Break

Q22 If you can recall, which of the following class action lawsuits ***involving Visa and/or Mastercard*** are you aware of? ***Please select all that apply***. ***Remember: We are only interested in your own personal knowledge. Please do not guess at any of your answers and please do not use the Internet or any other sources to inform your answers.***

- ☐ Case alleging Visa and Mastercard caused merchants to pay excessive fees for accepting Visa / Mastercard credit and debit cards, including by adopting interchange rules and rates (1)
- ☐ Case alleging credit card companies and banks conspired to keep ATM fees artificially high (2)
- ☐ Case alleging credit card companies conspired to shift responsibility for fraudulent payment card transactions to merchants (3)
- ☐ Cases regarding data breaches at major retailers including Target and Home Depot (4)
- ☐ Case alleging that rules requiring merchants who accepted Visa/Mastercard credit cards to also accept their debit cards improperly raised fees (5)
- ☐ ⊗ None of these (6)

Page Break

*Display this question:*

*If Q22 = Case alleging Visa and Mastercard caused merchants to pay excessive fees for accepting Visa / Mastercard credit and debit cards, including by adopting interchange rules and rates*

Q23 You indicated that you have awareness of the class action lawsuit against Visa / Mastercard **alleging Visa and Mastercard caused merchants to pay excessive fees for accepting Visa / Mastercard credit and debit cards, including by adopting interchange rules and rates**. In the space below, please tell us what you can recall about this litigation. ***Please be as detailed as possible***. ***Remember: We are only interested in your own personal knowledge. Please do not guess at any of your answers and please do not use the Internet or any other sources to inform your answers.***

________________________________________________________________

________________________________________________________________

________________________________________________________________

________________________________________________________________

________________________________________________________________

*Display this question:*

*If If About litigation OE Text Response Is Displayed*

JS

Q24 .

☐ Don't know / Don't recall (1)

End of Block: Awareness

Start of Block: Settlement

*Display this question:*

*If If About litigation OE Text Response Is Displayed*

Q25 Again, please think of the class action lawsuit against Visa / Mastercard **alleging Visa and Mastercard caused merchants to pay excessive fees for accepting Visa / Mastercard credit and debit cards, including by adopting interchange rules and rates**. If you can recall, which of the following applies to you? ***Remember: We are only interested in your***

***own personal knowledge. Please do not guess at any of your answers and please do not use the Internet or any other sources to inform your answers.***

- O I **HAVE** seen or heard a notice describing a proposed resolution to this case (1)
- O I **HAVE NOT** seen or heard a notice describing a proposed resolution to this case (2)
- O Don't know / Don't recall (3)

Page Break

*Display this question:*

*If Q25 = I <b><u>HAVE</u></b> seen or heard a notice describing a proposed resolution to this case*

Q26 Again, please think of the class action lawsuit against Visa / Mastercard **alleging Visa and Mastercard caused merchants to pay excessive fees for accepting Visa / Mastercard credit and debit cards, including by adopting interchange rules and rates**. If you can recall, where have you seen or heard a notice describing a proposed resolution to this case? ***Please select all that apply***. ***Remember: We are only interested in your own personal knowledge. Please do not guess at any of your answers and please do not use the Internet or any other sources to inform your answers.***

- ▢ Business magazine or journal (print) (1)
- ▢ Business magazine or journal (digital) (2)
- ▢ Newspaper (print) (3)
- ▢ Newspaper (digital) (4)
- ▢ Social media (e.g., Facebook, Instagram, X, YouTube) (5)
- ▢ TV (broadcast or streaming) (6)
- ▢ Website (7)
- ▢ Internet advertising (8)
- ▢ Radio (broadcast, streaming, or satellite) (9)
- ▢ Outdoor signage (e.g., billboard, bus shelter) (10)
- ▢ Mass transit (e.g., subway ads, bus ads) (11)
- ▢ Postcard or other mailing (12)
- ▢ Other (please specify): (13) ________________________________________________

☐ ⊗ Don't know / None of these (14)

Page Break

*Display this question:*

*If Q25 = I <b><u>HAVE</u></b> seen or heard a notice describing a proposed resolution to this case*

Q27 Again, please think of the class action lawsuit against Visa / Mastercard **alleging Visa and Mastercard caused merchants to pay excessive fees for accepting Visa / Mastercard credit and debit cards, including by adopting interchange rules and rates**. If you know, in which of the following ways do the terms upon which the parties have agreed to resolve the case impact merchants? ***Please select all that apply***. ***Remember: We are only interested in your own personal knowledge. Please do not guess at any of your answers and please do not use the Internet or any other sources to inform your answers.*** **Under the terms upon which the parties have agreed to resolve the case, merchants will be:**

☐ Able to decline acceptance of Visa- or Mastercard-Branded Commercial Credit Cards and/or Premium Consumer Credit Cards, while still accepting other Visa- or Mastercard-Branded cards (1)

☐ Able to decline acceptance of Visa- or Mastercard-Branded cards issued by certain issuing banks (2)

☐ Entitled to a monetary payment (3)

☐ Permitted to surcharge customers a fee for the use of any Visa or Mastercard-Branded Credit Cards (4)

☐ Permitted to accept some digital wallets at brick-and-mortar locations but decline others (5)

☐ ⊗None of the above (6)

☐ ⊗Don't know / Don't recall (7)

End of Block: Settlement

---

Start of Block: Data integrity

Q28 Please type the word “green” in the box below.

________________________________________________________________

End of Block: Data integrity

Start of Block: Recent Survey Taker

Q29 If you can recall, which of the following applies to you?

- Other than this survey, I **HAVE** taken one or more other surveys related to Visa and/or Mastercard within the last month (1)
- Other than this survey, I **HAVE NOT** taken one or more other surveys related to Visa and/or Mastercard within the last month (2)
- Don't know / Don't recall (3)

End of Block: Recent Survey Taker

Start of Block: Demographics

Q30 Now, a few more questions for classification purposes only. Which of the following best describes your educational background?

- Less than high school (1)
- High school graduate (2)
- Technical school or training (3)
- Some college (4)
- 2-year college degree (5)
- 4-year college degree (6)
- Master's / professional degree (7)
- Doctorate or equivalent (8)
- Prefer not to answer (9)

Page Break

Q31 What is your gender?

- O Male (1)
- O Female (2)
- O Non-binary or other (3)
- O Prefer not to answer (4)

Page Break

Q32 Which of the following includes your household's approximate annual income in 2025?

- Under $35,000 (1)
- $35,000 - $49,999 (2)
- $50,000 - $74,999 (3)
- $75,000 - $99,999 (4)
- $100,000 - $124,999 (5)
- $125,000 - $149,999 (6)
- $150,000 or more (7)
- Prefer not to answer (8)

---

**End of Block: Demographics**

## Exhibit 4—Tabulated Data

# Tabulated Data

## Q1, Q2 - CAPTCHA and Beginning instructions




| # | Answer | % | Count |
|---|---|---|---|
| 1 | I understand and agree | 100.0% | 1042 |
| 2 | I do not understand and/or do not agree | 0.0% | 0 |
| 3 | Don't know | 0.0% | 0 |
| | Total | 100% | 1042 |

Q3 - Age




| # | Answer | % | Count |
|---|---|---|---|
| 1 | Under 18 | 0.0% | 0 |
| 2 | 18 - 30 | 24.6% | 256 |
| 3 | 31 - 40 | 27.3% | 284 |
| 4 | 41 - 50 | 22.6% | 236 |
| 5 | 51 - 60 | 14.0% | 146 |
| 6 | 61 - 70 | 8.4% | 88 |
| 7 | 71 or older | 3.1% | 32 |
| | Total | 100% | 1042 |

Q4 - State




| # | Answer | % | Count |
|---|---|---|---|
| 1 | Alabama | 1.2% | 12 |
| 2 | Alaska | 0.0% | 0 |
| 3 | Arizona | 2.6% | 27 |
| 4 | Arkansas | 0.8% | 8 |
| 5 | California | 9.5% | 99 |

KEEGAN_EXHIBITS_96

| | | | |
|---|---|---|---|
| 6 | Colorado | 2.0% | 21 |
| 7 | Connecticut | 1.3% | 14 |
| 8 | Delaware | 0.4% | 4 |
| 9 | Florida | 8.3% | 86 |
| 10 | Georgia | 4.6% | 48 |
| 11 | Hawaii | 0.0% | 0 |
| 12 | Idaho | 0.3% | 3 |
| 13 | Illinois | 4.2% | 44 |
| 14 | Indiana | 2.3% | 24 |
| 15 | Iowa | 1.1% | 11 |
| 16 | Kansas | 0.8% | 8 |
| 17 | Kentucky | 1.0% | 10 |
| 18 | Louisiana | 2.1% | 22 |
| 19 | Maine | 0.6% | 6 |
| 20 | Maryland | 1.5% | 16 |
| 21 | Massachusetts | 1.8% | 19 |
| 22 | Michigan | 3.1% | 32 |
| 23 | Minnesota | 0.9% | 9 |
| 24 | Mississippi | 0.8% | 8 |
| 25 | Missouri | 2.2% | 23 |
| 26 | Montana | 0.2% | 2 |
| 27 | Nebraska | 0.8% | 8 |
| 28 | Nevada | 1.7% | 18 |
| 29 | New Hampshire | 0.6% | 6 |
| 30 | New Jersey | 2.7% | 28 |
| 31 | New Mexico | 0.3% | 3 |
| 32 | New York | 7.1% | 74 |
| 33 | North Carolina | 3.7% | 39 |
| 34 | North Dakota | 0.1% | 1 |
| 35 | Ohio | 4.4% | 46 |

| | | | |
|---|---|---|---|
| 36 | Oklahoma | 1.2% | 12 |
| 37 | Oregon | 1.2% | 13 |
| 38 | Pennsylvania | 3.4% | 35 |
| 39 | Puerto Rico | 0.0% | 0 |
| 40 | Rhode Island | 0.3% | 3 |
| 41 | South Carolina | 1.3% | 14 |
| 42 | South Dakota | 0.1% | 1 |
| 43 | Tennessee | 1.6% | 17 |
| 44 | Texas | 8.7% | 91 |
| 45 | Utah | 1.1% | 11 |
| 46 | Vermont | 0.0% | 0 |
| 47 | Virginia | 2.8% | 29 |
| 48 | Washington | 1.6% | 17 |
| 49 | West Virginia | 0.6% | 6 |
| 50 | Wisconsin | 1.2% | 13 |
| 51 | Wyoming | 0.1% | 1 |
| 52 | Other | 0.0% | 0 |
| 53 | Prefer not to answer | 0.0% | 0 |
| | Total | 100% | 1042 |

Q5 - Current employment status




| # | Answer | % | Count |
|---|---|---|---|
| 1 | Stay-at-home home-maker | 4.4% | 46 |
| 2 | Retired | 4.9% | 51 |
| 3 | Full-time student | 2.5% | 26 |
| 4 | Self-employed | 16.8% | 175 |
| 5 | Business owner / Principal | 12.8% | 133 |

| | | | |
|---|---|---|---|
| 6 | Work for a company or organization | 52.1% | 543 |
| 7 | Unemployed seeking employment | 3.8% | 40 |
| 8 | Unemployed not seeking employment | 0.8% | 8 |
| 9 | Other | 1.6% | 17 |
| 10 | Prefer not to answer | 0.3% | 3 |
| | Total | 100% | 1042 |

Q6 - Job functions of those that responded they "Work for a company or organization" (Displayed only to those who selected "Work for a company or organization" in Q5)




| # | Answer | % | Count |
|---|---|---|---|
| 1 | Human resources (HR) | 14.5% | 79 |
| 2 | Information technology (IT) | 24.3% | 132 |
| 3 | Accounting / finance | 14.5% | 79 |
| 4 | Operations | 24.9% | 135 |

| | | | |
|---|---|---|---|
| 5 | Marketing / sales | 13.1% | 71 |
| 6 | Legal / compliance | 3.1% | 17 |
| 7 | Research & development (R&D) | 6.4% | 35 |
| 8 | Customer service | 25.4% | 138 |
| 9 | Governance / executive management | 5.9% | 32 |
| 10 | Communications | 9.0% | 49 |
| 11 | Production / supply chain | 14.4% | 78 |
| 12 | Quality management | 11.8% | 64 |
| 13 | Government relations / regulatory | 2.8% | 15 |
| 14 | Credit and/or debit card processing | 11.6% | 63 |
| 15 | Other | 8.3% | 45 |
| 16 | None of these | 13.4% | 73 |
| | Total | 100% | 543 |

Q7 - Follow-up question to determine whether "Credit and/or debit card processing" is part of job responsibilities (Displayed only to Q6 respondents who selected "Accounting / finance," "Operations," "Legal / compliance" and/or "Governance / executive management")




| # | Answer | % | Count |
|---|---|---|---|
| 1 | Interviewing / hiring / human resources | 50.3% | 77 |
| 2 | Credit and/or debit card processing | 36.6% | 56 |
| 3 | Accounting / finance | 48.4% | 74 |
| 4 | Marketing communications / advertising | 32.7% | 50 |
| 5 | Strategy / operations | 66.0% | 101 |
| 6 | None of the above | 7.2% | 11 |
| | Total | 100% | 153 |

Q8 - Payment methods accepted by those indicating they are business owners or self-employed (Displayed only to “Business Owner / Principal” and “Self-employed”)




| # | Answer | % | Count |
|---|---|---|---|
| 1 | Credit cards | 74.0% | 228 |
| 2 | Debit cards | 77.9% | 240 |
| 3 | Cash | 66.9% | 206 |
| 4 | Personal check | 45.5% | 140 |
| 5 | Digital wallet (e.g., Apple Pay, Google Pay) | 55.5% | 171 |
| 6 | Online payment service (e.g., Venmo, PayPal, Square) | 73.7% | 227 |

| | | | |
|---|---|---|---|
| 7 | Other | 4.9% | 15 |
| 8 | Don't know / Don't recall | 0.3% | 1 |
| | Total | 100% | 308 |

Q9 - Types of credit and debit cards accepted (Displayed only to “Work for company or organization” and “Business Owner / Principal” and “Self-employed” respondents)




| # | Answer | % | Count |
|---|---|---|---|
| 1 | Visa | 93.6% | 394 |
| 2 | Mastercard | 82.2% | 346 |
| 3 | American Express (AmEx) | 57.7% | 243 |
| 4 | Discover | 53.7% | 226 |
| 5 | Other | 4.5% | 19 |
| 6 | None of these | 0.0% | 0 |
| 7 | Don't know / Don't recall | 0.7% | 3 |
|  | Total | 100% | 421 |

Q10 - "Imagine that your company/organization is in need of either (a) selecting a new credit and/or debit card issuing vendor or vendors or (b) negotiating the terms of its account(s) with its current credit and/or debit card issuing vendor or vendors. How would you describe your involvement in the process of identifying, vetting, and selecting such a vendor or vendors?" (Displayed only to "Work for company or organization" and "Business Owner / Principal" and "Self-employed" respondents)




| # | Answer | % | Count |
|---|---|---|---|
| 1 | I would engage in the vetting process and make the selection/negotiation decision on my own | 55.2% | 229 |
| 2 | In combination with others, I would engage in the vetting process and make the selection/negotiation decision | 22.4% | 93 |
| 3 | I would influence the vetting process and selection/negotiation decision | 15.9% | 66 |

| | | | |
|---|---|---|---|
| 4 | I would not be involved in the vetting process or making the selection/negotiation decision | 5.1% | 21 |
| 5 | Other | 0.2% | 1 |
| 6 | I am not sure | 1.2% | 5 |
| | Total | 100% | 415 |

Q11 - Job titles (Collected only from "Work for company or organization" and "Business Owner / Principal" and "Self-employed" respondents)




| | | |
|---|---|---|
| Construction | owner | Affiliate |
| Manager | Warehouse and distribution manager | Boss |
| senior manager | owner | Dasher |
| Office manager | Owner and Bookkeeper | CEO |
| Business owner | CEO | dispatch owner |
| Owner | customer services | VP Finance |
| Owner | Sole Proprietor | Owner |
| Manager | Owner | Project manager |
| operator | Owner | Director of Procurement |
| Ceo | Business owner | Delivery driver |
| admin | Owner/Operator | Project manager |
| General | delivery | Co owner |
| owner | Project Manager | Ceo |
| manager | | Consultant to the JanSan |

| Industry |
|---|
| Manager |
| Food |
| Whole trade |
| Operation manager |
| Loborer |
| Food delivery |
| Cna |
| Senior Vice President |
| Vp of intenrtts |
| Technology Business Director |
| CEO |
| Vice presidwnt |
| Owner |
| Finance director |
| MANAGING PARTNER & FOUNDER |
| Owner |
| chief technology officer |
| Assistant |
| Manager |
| Tender |
| Executive Vice President of Operations |
| Owner/ Principal |
| Owner |
| Director |
| Director of operations. |
| Owner |
| President |
| Manager |
| Sales representative |
| Amazon delivery mail services |
| VP Sales |
| Waitress |
| Owner |
| assistant manager |
| Owner |
| Amber |
| Real estate appraiser |
| Cos |
| Owner |
| Finance |
| Healthcare |
| Nail Tech |
| Housewife |
| Government |
| CEO |
| Owner |
| Account Manager |
| Owner operator |
| owner of a constuction company |
| vice precident |
| Owner/Operator |
| Self employed |
| Manager |
| Food Service |
| Finance |
| Accounting Manager |
| Caregiver |
| Owner |
| Chief Executive Officer |
| co assistant manager |
| Owner |
| Store Owner / Appraiser |
| Property manager |
| Ceo |
| Racklink |
| Director |
| Auto shop owner |
| Business Owner |
| Tire manager |
| Administrative Assistant |
| Construction |
| Retail Manager |
| Real estate |
| General manager |
| Owner |
| Director of State Affairs |
| Childcare |
| Chief executive officer |
| Salesclerk |
| General manager |
| Videography |
| PRESIDENT |
| Manager |
| CEO |
| Inside Sales and IT support |
| nurse independent proprieter |
| Chief financial officer |
| Escorr |
| Owner |

| | | |
|---|---|---|
| Operations manager | creative director | Owner operator |
| Attorney | Owner | contractor manager |
| Designer | Personal banker | Longevity Lifestyle Coach |
| Senior account resolution manager | Porn star | Owner |
| CEO | Senior Research Specialist | Tesla |
| Retail Stocker | Manager | IT Manager |
| Human resource | Owner builder and remodel | SURVEYOR |
| Hotel Manager | partner | Healthcare |
| Owner | Manager | Cashier |
| principal coordinator | Finance | VP of Operations |
| Owner operator | Principal | CTO |
| Business Owner | owner | Owner of a small business owner |
| Content creation | CEO | Director of Finance |
| Owner | CEO | Partner |
| owner | Director | Owner |
| Payroll Specialist | Cook | COO |
| Director of sales and operations | Retail | CEO |
| CEO of a Retail clothing company | ceo | Senior manager |
| Owner | Owner of a beauty bar | President |
| licensed independent social worker | Owner | Manager |
| Child care | executive buwessiness owner | Owner |
| General manager | Sales executive | Business owner |
| operations manager | Cashier | Driver |
| Project Manager | Head sales manager | Aborist |
| Creative management | Accountant | manager |
| Owner | President | Director |
| Produce assistant manager | Retail Sales | IT Manager |
| transcriptionist | Owner | Department manager |
| Product design | Artist | Manufacturing |
| Cashier | Driver owner | Director of Merchandise |

small business owner
owner
Owner
Software Developer
Manager
Owner
owner
Director
Owner
Ceo
Housekeeping
Business Owner
Transportation
Fashion designer
Ecommerse
Assistant manager
Sales manager
Test analyst
IT Specialist
Computer technology
Owner/ service manager
Director
Sales advisor
Car Wash
Customer service manager and tax preparer and payroll
Mover
Content creator
VP
hr director
Landscaper

Managing Director
Owner/Operator
CEO
Senior VP
Director of marketing
Office Manager
Chief operations officer
Teacher aid
manager
Owner
COO
Manager
Real Estate Small Business Owner
Real estate
Owner
C Level Executive
Procurement Manager
Graphic Designer
Chef
Owner
Self employed
Owner
Marketing
CEO
CFO
Operations Manager
CEO
Founder
Software Executive
Owner

Regional manager
VP of Finance
Owner
Senior Manager of Finance
CEO
general dentist
Owner, CEO
CEO
CEO
Vice President
Owner
Owner of business
CEO
vice president
I am the CEO in financial service.
Owner
Owner/operator
Coo
Owner
Attorney
CEO
Office administrator
Chief operations officer
Chief Operation manager
Small bussiness owner
SMALL BUSINESS OWNER
Owner
Owner
Owner / Graphic Designer
Small business owner

| | | |
|---|---|---|
| Owner/operator | Owner | Real estate |
| CEO | publisher | Retail |
| Florist | Creative Director | Owner |
| District manager | 32811 | Boss |
| Owner | Property Manager | Caregiver |
| owner | Owner | I would place things on bet |
| Owner | Owner | Owner of a design build company |
| Driver | owner | IT Senior Manager |
| Buisness Owner | Project manager | Partner |
| Owner / Operator | Owner/operator | Owner |
| Owner | Executive Manager | Owner |
| Child care provider | Owner/CEO | owner |
| Consultant | President | Owner operator of construction contracting firm |
| Creative Marketing | OWNER | Owner |
| IT Manager | Ceo | Front desk manager |
| President | CEO/Founder | Freelance |
| Small business owner | Construction | Owner |
| owner | Owner | Field supervisor |
| Senior VP | fashion designer | Farm owner |
| Co-owner | CEO | COO |
| Self employed | Owner Hair Styllist | Director |
| Administrative assistant | Owner | Project Manager |
| Online Technical Support | Director of operations | |

Q12 - Respondents who selected "Prefer not to answer / Not applicable" in Q11




| # | Answer | % | Count |
|---|---|---|---|
| 1 | Prefer not to answer / Not applicable | 100.0% | 10 |
| | Total | 100% | 10 |

Q13 - Company size (Displayed only to “Work for company or organization” and “Business Owner / Principal” and “Self-employed” respondents)




| # | Answer | % | Count |
|---|---|---|---|
| 1 | 1 - 10 employees | 20.5% | 48 |
| 2 | 11 - 50 employees | 21.8% | 51 |
| 3 | 51 - 250 employees | 31.6% | 74 |
| 4 | 251 - 500 employees | 12.4% | 29 |
| 5 | More than 500 employees | 13.7% | 32 |
| 6 | Don't know | 0.0% | 0 |
| | Total | 100% | 234 |

Q14 - "In which, if any, of the following activities have you personally engaged since the beginning of 2021?" (Displayed to respondents who did not qualify as "Work for company or organization" or "Business Owner / Principal" or "Self-employed" respondents, i.e., "General Population" respondents)




| # | Answer | % | Count |
|---|---|---|---|
| 1 | Accepted payment for goods and/or services | 100.0% | 654 |
| 2 | Took an international vacation | 32.6% | 213 |
| 3 | Attended a professional sporting event | 54.3% | 355 |
| 4 | Enrolled in a course or class | 29.8% | 195 |
| 5 | Hired a landscaping service | 23.5% | 154 |
| 6 | Purchased life insurance | 26.9% | 176 |
| 7 | Used a ride share service | 71.4% | 467 |

| | | | |
|---|---|---|---|
| 8 | None of these | 0.0% | 0 |
| | Total | 100% | 654 |

Q15 - “If you recall, since the beginning of 2021, what type(s) of transactions have you accepted payment for?” (Displayed only to “General Population” respondents)




| # | Answer | % | Count |
|---|---|---|---|
| 1 | Services provided | 68.8% | 450 |
| 2 | Items / goods sold | 79.4% | 519 |
| 3 | Charity payment | 21.6% | 141 |
| 4 | Membership fees / dues | 40.2% | 263 |
| 5 | Other | 5.0% | 33 |
| 6 | Don't know / Don't recall | 1.8% | 12 |
| | Total | 100% | 654 |

Q16 - "If you recall, since the beginning of 2021, which of the following forms of payment have you accepted for goods and/or services?" (Displayed only to "General Population" respondents)




| # | Answer | % | Count |
|---|---|---|---|
| 1 | Credit cards | 54.0% | 353 |
| 2 | Debit cards | 63.1% | 413 |
| 3 | Cash | 74.8% | 489 |
| 4 | Personal check | 30.9% | 202 |
| 5 | Digital wallet (e.g., Apple Pay, Google Pay) | 59.0% | 386 |

| | | | |
|---|---|---|---|
| 6 | Online payment service (e.g., Venmo, PayPal, Square) | 80.4% | 526 |
| 7 | Other | 1.7% | 11 |
| 8 | Don't know / Don't recall | 0.0% | 0 |
| | Total | 100% | 654 |

Q17 - Types of credit and debit cards accepted (Displayed only to “General Population” respondents)




| # | Answer | % | Count |
|---|---|---|---|
| 1 | Visa | 91.0% | 595 |
| 2 | Mastercard | 71.6% | 468 |
| 3 | American Express (AmEx) | 29.2% | 191 |
| 4 | Discover | 31.2% | 204 |
| 5 | Other | 4.6% | 30 |
| 6 | None of these | 0.0% | 0 |
| 7 | Don't know / Don't recall | 0.0% | 0 |
| | Total | 100% | 654 |

Q18 - Number of transactions accepted payment for since the beginning of 2021
(Displayed only to “General Population” respondents)




| # | Answer | % | Count |
|---|---|---|---|
| 1 | 1 - 10 | 12.5% | 82 |
| 2 | 11 - 50 | 23.7% | 155 |
| 3 | 51 - 100 | 18.7% | 122 |
| 4 | 101 - 250 | 14.5% | 95 |
| 5 | More than 250 | 20.6% | 135 |
| 6 | Don't know / Don't recall | 9.9% | 65 |
| | Total | 100% | 654 |

Q19 - Understanding of the concept of “class action lawsuit”




| # | Answer | % | Count |
|---|---|---|---|
| 1 | I DO understand the concept of "class action lawsuit" as it has been defined for the purpose of this survey | 100.0% | 1042 |
| 2 | I DO NOT understand the concept of "class action lawsuit" as it has been defined for the purpose of this survey | 0.0% | 0 |
| 3 | Don't know | 0.0% | 0 |
| | Total | 100% | 1042 |

Q20 - Instruction displayed

Q21 - Awareness of any class action lawsuit(s) against the following companies:




| # | Answer | % | Count |
|---|---|---|---|
| 1 | Visa and/or Mastercard | 24.0% | 250 |
| 2 | GEICO and/or Allstate | 13.1% | 136 |
| 3 | Microsoft | 17.3% | 180 |
| 4 | Meta and/or Facebook | 48.3% | 503 |
| 5 | Home Depot and/or Lowe's | 11.8% | 123 |
| 6 | Torivex Group | 0.0% | 0 |
| 7 | None of these | 17.7% | 184 |
| 8 | Don't know | 18.7% | 195 |
| | Total | 100% | 1042 |

Q22 - Awareness of class action lawsuits against Visa and Mastercard




| # | Answer | % | Count |
|---|---|---|---|
| 1 | Case alleging Visa and Mastercard caused merchants to pay excessive fees for accepting Visa / Mastercard credit and debit cards, including by adopting interchange rules and rates | 49.2% | 123 |
| 5 | Case alleging that rules requiring merchants who accepted Visa/Mastercard credit cards to also accept their debit cards improperly raised fees | 43.6% | 109 |
| 3 | Case alleging credit card companies conspired to shift responsibility for fraudulent payment card transactions to merchants | 28.0% | 70 |
| 4 | Cases regarding data breaches at major retailers including Target and Home Depot | 27.2% | 68 |

| | | | |
|---|---|---|---|
| 2 | Case alleging credit card companies and banks conspired to keep ATM fees artificially high | 24.0% | 60 |
| 6 | None of these | 5.2% | 13 |
| | Total | 100% | 250 |

Q23 - Open-ended question asking respondents what they can recall about the current litigation involving Visa and Mastercard (Displayed only to respondents who indicated awareness of the current litigation in Q22)

| |
|---|
| N/A |
| i know that merchants sued visa and mastercard over high swipe fees |
| visa has charging people without informing the customers. |
| I know they were doing unfair trade. |
| it seems they are scamming people |
| Just the fact they where over charging people without knowledge |
| Merchants alleged that Visa and Mastercard conspired to fix interchange fees (swipe fees) that merchants must pay to accept credit and debit cards |
| Yes i am aware of it |
| They overcharged us |
| I am aware that a multi-billion dollar class action settlement was reached regarding merchant swipe fees. The litigation centered around Visa and Mastercard artificially fixing interchange rules, leading to rules that forced merchants to absorb high transaction fees or pass surcharges to customers. |
| How customers mentioned how theirs a lot of fees that was over charged on people's card balances, or their card being stolen and used without being notified. |
| It focused on  claims that the cards artificially fixed interchange fees that merchants pay |
| The lawsuit alleges that visa and Mastercard along with certain banks violated antitrust laws by setting payment methods resulting in merchants allegedly paying excessive fees. |
| I just know a lot of data and information was shared inappropriately. |
| They taking money off the card without permission |
| I remember seeing it on a commercial |
| Nnot sure |
| They were charging extra fees and keeping the amount. |
| There’s a class action lawsuit against visa and Mastercard for allegedly violating rate agreements for usage between merchants |
| The only thing I'm aware of is that there is a lot of corruption involved. |
| I am aware of a refund. |
| It stems from allegation that Visa and Mastercard fixed interchange fees and imposed restrictive rules on merchants, forcing businesses to pay excessive processing costs for credit and debit card transaction over a multi-year period. |
| There were instances of fees and charges that weren't allowed |
| Don’t know |

Im not sure all I know is they have a lawsuit against them

Because own would possibly take money from another

Basically, millions of merchants sued Visa and Mastercard for colluding to jack up swipe fees and forcing them to accept expensive rewards cards under rigid rules. It ended up triggering a massive $5.54 billion payout for businesses and forced the networks to give merchants a bit more breathing room on surcharges and card rules I believe

Many excessive fees and interest rates

The litigation that I do remember it isn't as deep as the one that you're trying to portray over there, but I do know that there is a litigation that is kind of complicated for certain people, but I'm not sure

They were ripping people off and now owe billions

I remember a small retailer being forced to pay exorbitant fees to visa in order to be able to accept credit card purchases as payment.

I don't know much, but its a severe situation and one that has to be dealt with soon.

The merchants claimed that the credit card companies were allegedly fixing enormous fees on their credit card processing

They were charging people extra fees and not being transparent about it so they are getting sued.

to keep people safe and secured

From what I am familiar with regarding the class action suit, Visa is being sued for overcharging customers high processing fees.

Companies were charging fees for credit cards when it is against the law to do so and not informing the credit card company

Bad payment

I only have basic general knowledge of the lawsuit allegations, not much else beyond that

That is about the extent of my knowledge.

Merchants want a lower fee

Basically it was collusion and I know about this because of the news also because I'm going to be part of the class action

They were charging merchants more money to accept their cards during the transaction.

Mastercard lawsuit

I recall reading about this online

Just that they were being sued for high fees

That I was being charges higher fees. I just recieve a ck for $15.13 from Visa.

I am aware as I have been advised my store owners of this and I agree that the credit cards should pay

That these companies were charged on too many fees at a unreasonable rate

It will be solved

Merchants have accused Visa and Mastercard of charging excessive fees and violating antitrust laws. Visa and Mastercard reached an amended settlement, and the litigation is still being contested in 2026

| |
|---|
| The lawsuit alleged that Visa and MasterCard charged merchant excessive fees through their interchange rules and rates |
| i recall that this long running antitrust litigatipon centre on merchants accusing visa and mastercarrd |
| They are raising fees and charges for processing and purchase |
| Store had to pay fees to visa and MasterCard in order to accept them at the store |
| I recall especially mastercard requiring my small business to pay a large amount to accept this card |
| About 5 billion dollar. They apply high rate of swipe fees |
| There was news that merchants were forced to pay inflated rates and fees by accepting these cards. |
| I am someone who is against this type of behavior considering what is the reason for doing something so bad to people and customers |
| I recall seeing news about how visa and Mastercard were both in the wrong and overcharging |
| It was through the news that I learned about this continuing legal dispute over the excessive fees charged by Visa and Mastercard on small businesses or retailers whenever customers use their credit cards. The rationale behind this complaint is that the excessive interchange fees result in higher costs for merchants and thus the need to increase prices for the consumers. According to my recollection, this dispute led to a large antitrust settlement between the credit card companies, in which they agreed to reduce and cap these fees for a few years. |
| I have only heard about it, but not the full knowledge of the litigation. Would you love to tell me about it ? |
| Cases to complain about the arbitrary high rate charged to merchants |
| I know they are getting sued i don't know the reason for it though |
| They had some companies and businesses who were unauthorized to charge customers fees for using their credit cards |
| Collaborating to set fees |
| in payment card Interchange fee litigation |
| I heard something about it about how it’s a huge lawsuit and they are in trouble for how they’ve been taxing people |
| It wasn’t right to pay excessive fees |
| I read about it on the news |
| It was basically saying how it was excessive rates |
| I understand that the lawsuit alleges Visa and Mastercard caused merchants to pay excessive fees for accepting their cards. |
| I know they charged the merchants more than they should have. |
| It's been a standard operation to overcharge my business for excepting credit card for purchases |
| That they charge to many late fees. |
| It was all about swipe fees. It was said issuing banks conspired to violate monopoly laws by fixing artificial high swipe fees and imposing anti competitive network rules. |
| I remember that I was reading an article on Facebook about this specific lawsuit what people made against Visa/Mastercard but I can’t recall what exactly was about |
| Yes, there has been a lawsuit against Mastercard because they think that there is something going wrong |

| |
|---|
| For me I recalled it involves merchant arguing that visa and Mastercard charged excessive interchange fees and used rules that kept those fees. High |
| I remember it was about merchants paying high fees when customers used Visa or Mastercard cards. |
| I just know they caused high fees |
| That they are suing each other |
| Sometimes, due to banka hidden fees, we need pay more to the banks for every transaction. |
| The main thing was that they are charging extra |
| Limited competition and increased the cost of accepting credit costs that merchants said were often passed on to consumers through higher prices though I don't think the companies |
| Venmo |
| What I can recall from memory is that it had something to do with fraudulent payments. As vis and master cards were purposely doing fraud against their own customers |
| I recall that the rates of clients were overpriced. |
| I remember that Visa and Mastercard were accused of charging merchants and small businesses excessive swipe fees to process credit and debit cards |
| Of them charging  crazy fees for purchasing items |
| How they mismanaging funds |
| I read on my Google feed that they intentionally mislead vendors. |
| This multi-billion dollar antitrust lawsuit alleged that Visa, Mastercard companies and major issueing banks conspired to set high interchange fees artificially for transactions and enforced anti-steering methods that prevented merchants to show customers toward lower cost payment method. |
| Rule changes and flexibility, beyond monetary payouts, proposed settlements focused on capping swipe rates for a periodof time and relaxing restrictive network rules. |
| The long-running class action lawsuit against Visa, Mastercard, and certain banks alleged that the networks and their member banks violated U.S. antitrust laws by setting and enforcing interchange fees and rules that kept merchants paying higher-than-competitive rates for accepting Visa and Mastercard credit |
| I saw it on the news a while ago but don't remember much |
| I heard the details of the case on the TV news and also read about it in my local newspaper. |

Q24 - Respondents who selected “Don’t know / Don’t recall” in Q23




| # | Answer | % | Count |
|---|---|---|---|
| 1 | Don't know / Don't recall | 100.0% | 26 |
| | Total | 100% | 26 |

Q25 - Have/have not seen or heard notice about a proposed resolution to the current litigation (Displayed only to respondents who indicated awareness of the current litigation in Q22)




| # | Answer | % | Count |
|---|---|---|---|
| 1 | I HAVE seen or heard a notice describing a proposed resolution to this case | 65.9% | 81 |
| 2 | I HAVE NOT seen or heard a notice describing a proposed resolution to this case | 31.7% | 39 |
| 3 | Don't know / Don't recall | 2.4% | 3 |
| | Total | 100% | 123 |

Q26 - Where respondents have seen or heard notice of the current litigation (Displayed only to respondents who indicated they had seen or heard a notice describing a proposed resolution to the current litigation in in Q25)




| # | Answer | % | Count |
|---|---|---|---|
| 5 | Social media (e.g., Facebook, Instagram, X, YouTube) | 70.4% | 57 |
| 7 | Website | 45.7% | 37 |
| 8 | Internet advertising | 30.9% | 25 |
| 6 | TV (broadcast or streaming) | 30.9% | 25 |

| | | | |
|---|---|---|---|
| 2 | Business magazine or journal (digital) | 25.9% | 21 |
| 12 | Postcard or other mailing | 17.3% | 14 |
| 9 | Radio (broadcast, streaming, or satellite) | 16.0% | 13 |
| 4 | Newspaper (digital) | 16.0% | 13 |
| 1 | Business magazine or journal (print) | 14.8% | 12 |
| 11 | Mass transit (e.g., subway ads, bus ads) | 9.9% | 8 |
| 3 | Newspaper (print) | 9.9% | 8 |
| 10 | Outdoor signage (e.g., billboard, bus shelter) | 8.6% | 7 |
| 13 | Other (please specify): | 1.2% | 1 |
| 14 | Don't know / None of these | 0.0% | 0 |
| | Total | 100% | 81 |

## Other (please specify) open end. One response given:

Recieve in the mail

Q27 - "If you know, in which of the following ways do the terms upon which the parties have agreed to resolve the case impact merchants?" (Displayed only to respondents who indicated they had seen or heard a notice describing a proposed resolution to the current litigation in in Q25)




| # | Answer | % | Count |
|---|---|---|---|
| 1 | Able to decline acceptance of Visa- or Mastercard-Branded Commercial Credit Cards and/or Premium Consumer Credit Cards, while still accepting other Visa- or Mastercard-Branded cards | 49.4% | 40 |
| 4 | Permitted to surcharge customers a fee for the use of any Visa or Mastercard-Branded Credit Cards | 39.5% | 32 |
| 2 | Able to decline acceptance of Visa- or Mastercard-Branded cards issued by certain issuing banks | 33.3% | 27 |
| 5 | Permitted to accept some digital wallets at brick-and-mortar locations but decline others | 28.4% | 23 |
| 3 | Entitled to a monetary payment | 25.9% | 21 |
| 7 | Don't know / Don't recall | 7.4% | 6 |
| 6 | None of the above | 1.2% | 1 |
| | Total | 100% | 81 |

Q28 - Survey taker quality test (“Please type the word “green” in the box below.” Displayed to all respondents)

Q29 - Surveys taken related to Visa and/or Mastercard




| # | Answer | % | Count |
|---|---|---|---|
| 1 | Other than this survey, I HAVE taken one or more other surveys related to Visa and/or Mastercard within the last month | 15.0% | 156 |
| 2 | Other than this survey, I HAVE NOT taken one or more other surveys related to Visa and/or Mastercard within the last month | 82.1% | 856 |
| 3 | Don't know / Don't recall | 2.9% | 30 |
| | Total | 100% | 1042 |

Q30 - Education




| # | Answer | % | Count |
|---|---|---|---|
| 1 | Less than high school | 2.8% | 29 |
| 2 | High school graduate | 21.6% | 225 |
| 3 | Technical school or training | 3.4% | 35 |
| 4 | Some college | 15.3% | 159 |
| 5 | 2-year college degree | 11.6% | 121 |
| 6 | 4-year college degree | 29.3% | 305 |
| 7 | Master's / professional degree | 13.6% | 142 |

| | | | |
|---|---|---|---|
| 8 | Doctorate or equivalent | 2.3% | 24 |
| 9 | Prefer not to answer | 0.2% | 2 |
| | Total | 100% | 1042 |

## Q31 - Gender




| # | Answer | % | Count |
|---|---|---|---|
| 1 | Male | 55.3% | 576 |
| 2 | Female | 44.4% | 463 |
| 3 | Non-binary or other | 0.2% | 2 |
| 4 | Prefer not to answer | 0.1% | 1 |
| | Total | 100% | 1042 |

Q32 - Income




| # | Answer | % | Count |
|---|---|---|---|
| 1 | Under $35,000 | 15.6% | 163 |
| 2 | $35,000 - $49,999 | 13.9% | 145 |
| 3 | $50,000 - $74,999 | 20.5% | 214 |
| 4 | $75,000 - $99,999 | 18.3% | 191 |
| 5 | $100,000 - $124,999 | 12.1% | 126 |
| 6 | $125,000 - $149,999 | 8.3% | 87 |
| 7 | $150,000 or more | 10.7% | 112 |
| 8 | Prefer not to answer | 0.4% | 4 |
| | Total | 100% | 1042 |

**Exhibit 5—Disposition of Contacts**

KEEGAN & DONATO
CONSULTING, LLC

| Disposition of Contacts | n | % |
|---|---|---|
| Responded to invitation | 4,037 | 100.0% |
| Rejected - failed - instruction acknowledgement question | 91 | 2.3% |
| Rejected - failed - age (under 18) | 8 | 0.2% |
| Rejected - failed - state | 18 | 0.4% |
| Rejected - failed - did not accept payment for goods or services | 1,923 | 47.6% |
| Rejected - failed - did not accept credit cards | 180 | 4.5% |
| Rejected - failed - did not accept Visa or Mastercard | 292 | 7.2% |
| Rejected - failed - did not understand concept of "class action" | 37 | 0.9% |
| Rejected - failed - red herring ("Torivex Group") | 32 | 0.8% |
| Rejected - failed - low quality response | 32 | 0.8% |
| Rejected - failed - speeders | 4 | 0.1% |
| Rejected - failed - data quality/attention filter question ("Green") | 6 | 0.1% |
| Rejected - failed - fraud detection measures | 7 | 0.2% |
| Rejected - over quota | 29 | 0.7% |
| Did not finish | 336 | 8.3% |
| Total qualified respondents | 1,042 | 25.8% |

| Panel Composition | n | % |
|---|---|---|
| Prodege | 523 | 50.2% |
| Veridata Insights | 434 | 41.7% |
| Dynata | 85 | 8.2% |
| Total | 1,042 | 100.0% |