EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP

JONATHAN S. ABADY
MATTHEW D. BRINCKERHOFF
ANDREW G. CELLI, JR.
RICHARD D. EMERY
DEBRA L. GREENBERGER
DIANE L. HOUK
DANIEL J. KORNSTEIN
JULIA P. KUAN
HAL R. LIEBERMAN
ILANN M. MAAZEL
KATHERINE ROSENFELD
ZOE SALZMAN
SAM SHAPIRO
VASUDHA TALLA
EARL S. WARD
O. ANDREW F. WILSON

ATTORNEYS AT LAW
ONE ROCKEFELLER PLAZA
8TH FLOOR
NEW YORK, NEW YORK 10020

TEL: (212) 763-5000
FAX: (212) 763-5001
www.ecbawm.com

DANIEL M. EISENBERG

CLAIRE Z. ABBADI
ERIC ABRAMS
NICK BOURLAND
HANNAH BRUDNEY
SARA LUZ ESTELA
ALBERT HUBER[1]
LAURA S. KOKOTAILO
HAFSA S. MANSOOR
SANA MAYAT
ADAM NASSER
VIVAKE PRASAD
MAX SELVER
MAGGIE TURNER
EMILY K. WANGER
RACHAEL WYANT
SYDNEY ZAZZARO

September 14, 2026

***Via ECF***

The Honorable Brian M. Cogan
United States District Judge
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

*Re:* *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation* (MKB) (JAM), No. 05-MD-1720

Dear Judge Cogan:

We represent the National Retail Federation ("NRF") and the Retail Industry Leaders Association ("RILA"), together, the "Merchant Trade Groups," which are trade associations for thousands of large and small merchants across the retail industry. The Merchant Trade Groups are both permissive intervenors in the above-captioned action and themselves members of the certified Rule 23(b)(2) class.[2] *See* ECF No. 8605 (June 28, 2021 Mem. & Order). They write to object to the superseding proposed settlement, ECF No. 9692-2, and to respectfully request that the Court decline to approve it. The Court should also decertify the mandatory Rule 23(b)(2) Class.

The Class Plaintiffs, five tiny businesses, have not achieved a settlement that protects the diverse interests of perhaps the largest class in the history of Rule 23(b)(2), comprised of almost every single one of more than 20 million businesses in the United States. But, if approved, each Class Member will be forced to accept what the Merchant Trade Group's members, other leading trade associations, and more than one thousand objectors have determined to be a bad deal. *See,*

---

[1] Albert Huber: admitted only in Florida.
[2] The Merchant Trade Groups themselves accept Visa and Mastercard credit cards for transacting business, and pay interchange fees on credit card swipes, in addition to representing thousands of their members who do the same.

*e.g.*, ECF No. 9981, 9988.

The proposed settlement has both constitutional and Rule 23 infirmities. It has traded true antitrust reforms that would apply competitive pressure to interchange fees for a series of half-measures that will yield varying, *de minimis*, or no benefit to millions. In return, it demands an incredibly broad release from a mandatory class with no right to opt out. That bargain cannot support continued certification of this Rule 23(b)(2) class and is neither fair, reasonable, nor adequate under Rule 23(e).

The settlement exceeds the proper bounds of mandatory Rule 23(b)(2) relief because its economic effects are neither unitary nor indivisible. Merchants differ materially in their payment mix, negotiated-rate arrangements, geographic footprint, ability to surcharge, and capacity to use the settlement's steering mechanisms. Some may receive limited temporary savings; others may receive little or no practical benefit. Yet all would surrender claims under the same mandatory release. Denying Class Members an opportunity to opt out of that heterogeneous bargain violates Rule 23 and Class Members' Due Process rights.

Independently, the settlement fails Rule 23(e). Its reforms do not create issuer-level competition, are vulnerable to circumvention, and are too temporary and uncertain to justify the release. The settlement provides insufficient value to satisfy Rule 23, especially when compared to the unlawful and overbroad release of statutory antitrust claims that extends years into the future, regardless of what happens to market conditions. It is no coincidence that the proposed settlement lacks durable protection for Class Members: the proposed agreement was negotiated without the interests of the full class in mind, without the merchant community's involvement, and by a handful of entities that seem fixated on resolution before trial.

The Merchant Trade Groups first explain why the merchant community has broadly rejected the settlement. They then explain why denying merchants an opt-out from this mandatory class violates due process. Finally, they address the settlement's substantive defects, including an overbroad future release exchanged for inadequate reforms that preserve an anticompetitive market.

The Merchant Trade Groups' positions are supported by two experts. Joseph Farrell, D.Phil., Emeritus Professor of Economics at the University of California, Berkeley and a Partner at Bates White LLC, evaluated the extent to which the proposed settlement would inject competition in the interchange fee market. Adam J. Levitin, the Carmack Waterhouse Professor of Law and Finance at Georgetown University Law Center, evaluates the settlement's operation in the payments market and merchants' practical ability to use its provisions. Their expert declarations are attached as Exhibits A and B, respectively.[3]

---

[3] Professor Levitin's expert declaration contains information that has been designated by the parties as Attorney's Eyes Only. That confidential information has been redacted in Exhibit B. The full, unredacted version of the report will be filed under seal by the National Association of Convenience Stores ("NACS") and Circle K, which have jointly retained Professor Levitin, in conjunction with their objections to final approval of the proposed settlement. The Merchant Trade Groups incorporate that sealed filing into their objection.

For the reasons the Merchant Trade Groups set forth below and for the reasons set forth in the declarations of Professors Farrell and Levitin, the Court should deny approval of the proposed settlement. The Court should also decertify the mandatory Rule 23(b)(2) Class.

## I. The Merchant Community Is Clear: This Settlement is Not in Merchants' Interest

### a. NRF and RILA Speak for their Merchant Members on Interchange Fees, a Top Priority for Thousands of Members

NRF is the world's largest trade association of retailers both large and small, representing stores in every retail sector across the United States. NRF's members include many of the world's largest and most influential retailers, such as Walmart Inc., Amazon.com, Inc., Target Corporation, BJ's Wholesale Club, Lowe's Companies, Inc., Albertsons Company, and Goodwill Industries International, among others. But they also include smaller businesses, such as independent hardware stores, boutiques, gift shops, specialty food stores, and beauty and personal care retailers. RILA is the trade association for retailers that have earned leadership status by virtue of their sales volume, innovation, or aspiration; its members include the largest and fastest growing companies in the industry. These include merchants like Best Buy Co., Inc., The Home Depot, Inc., Target Corporation, Walgreens Co., 7-Eleven, Inc., and Costco Wholesale Corporation, and so many more.

NRF and RILA are longstanding membership organizations whose dues-paying members expect them to advocate on issues affecting retail operations and costs. Together, the Merchant Trade Groups' members account for over $2.7 trillion in annual retail sales, over 30 million American jobs, and hundreds of thousands of stores, manufacturing facilities, and distribution centers domestically and abroad. Their members include some of the largest companies in the United States to some of the smallest, giving the Merchant Trade Groups a broad and practical perspective on whether the settlement's purported relief will work.

The decision to object at both preliminary and final approval phases reflects the Merchant Trade Groups' established member-driven positions. Interchange is a major and growing operating cost in a low-margin industry like retail. Unlike many other significant inputs, interchange is generally imposed through network-set default rates rather than ordinary bilateral negotiation. As Professor Levitin explains, interchange rates have risen even as transaction volume has increased, while merchants receive no corresponding new value from card acceptance. Expert Decl. of Adam. J. Levitin ("Levitin Decl.") (Exhibit B) ¶ 46.

This issue has been a top priority for the Merchant Trade Groups for the past 20 years. They have committed significant resources to interchange reform. The Merchant Trade Groups have formal working groups and committees to obtain and report members' positions concerning legal and policy matters for interchange rates and regulation; they have developed policy papers and expertise; they have lobbied to reform interchange; and they have participated in litigation on interchange, including objecting to each of Defendants' attempts to buy litigation peace

without meaningfully reforming their practices. In short, their position on this issue is informed by a deep knowledge of interchange fees and commitment to protecting the interchange market from Defendants' anti-competitive practices. Members are united that they should not be bound by a broad, ongoing release for the limited reforms offered in this settlement.

**b. Widespread Objections from the Merchant Community Reflect Merchants' Business Judgment that this is Not a Good Deal**

Given the import of this issue, merchants have been desperate for meaningful interchange relief; if they believed this settlement would finally inject competition into the market, they would support it. Yet more than one thousand merchants have objected to this settlement, imploring the Court not to approve it. *See, e.g.*, ECF Nos. 9981, 9988. Leading merchant associations—tasked with advocating for the merchant community—have objected on behalf of their thousands of members. Despite significant consultation with their member base on this settlement, the Merchant Trade Groups received no member support for the settlement. No member asked either association to support final approval or opposed their objections. That evidence is highly probative of whether the settlement delivers relief that merchants themselves regard as usable and valuable. Consumers, too, have objected. That breadth matters under Rule 23(e): it shows that merchants facing the settlement in actual operations do not regard its temporary and conditional tools as an adequate exchange for the release. This widespread, negative "reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 362, 364 (S.D.N.Y. Jan. 29, 2002); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).

Class Plaintiffs do not explain why merchants so widely oppose a settlement that purportedly will "fundamentally alter the competitive landscape governing Visa and Mastercard card acceptance." ECF No. 9932-1 at 1-2. The answer is not that merchants misunderstand their own businesses. It is that the settlement substitutes the judgment of five named Plaintiffs for the business judgment of 20 million businesses.

In the face of widespread disapproval at the preliminary approval stage—objections that have only grown at this, final, stage—Class Counsel highlighted that some larger merchants did not object. Specifically, Class Counsel pointed to merchants that had opted out of the Rule 23(b)(3) money damages settlement, objected to the earlier Rule 23(b)(2) settlement, and filed their own individual opt-out lawsuits, but did not raise independent objections to this latest version of proposed settlement. *Id.* at 71:10-72:3 ("All the major merchants that opted out of the last settlement, maybe they'll come charging in at final approval and object, but I don't think so."). Left unsaid was that these powerful merchants have resolved those standalone lawsuits through side deals that pre-date any settlement. While the terms of Defendants' individual side deals are not public, it is a matter of public record that they have happened: as of April 16, 2026, at least 65 retailers suing the networks over card swipe fees—some of the largest in the United States—had settled their claims.[4]

---

[4] Justin Bachman, *Visa, Mastercard settle merchant claims: About 65 retailers suing the networks over*

In an apparent attempt to take these potential objectors off the board, Defendants have made sure that these side deals are preserved in the proposed settlement. Paragraphs 49 and 98 of the proposed settlement make clear that, for both Visa and Mastercard, "For each merchant that has a **custom Credit Card interchange rate agreement** with [Visa or Mastercard] in effect . . . [Visa and Mastercard] will reduce the interchange rates on its Applicable Domestic Credit Transactions subject to that agreement []." ECF No. 9692-2 (proposed settlement) (emphasis added) ¶¶ 49, 98. The proposed settlement represents the floor of the deal that these few powerful Class Members get.

**c. The Settlement Was Negotiated Without the Insight and Experience of the Merchant Community**

The settlement's deficiencies are unsurprising given the merchant community was excluded from the negotiating table: Class Counsel chose to rely on the risk appetite and judgment of five tiny, non-representative merchants when deciding terms for resolving perhaps the largest class action in history. This settlement could govern a $2.7 trillion industry for almost one decade. These five businesses and their attorneys did not hold out for terms that would address the fundamental antitrust problem: the lack of competitive pressure on interchange fees. *See* Levitin Decl. ¶¶ 47-48. This can only happen if the card networks are true two-sided networks, with price competition on both sides of the networks. *See id.* The fundamental question for any proposed settlement is whether it will actually expose interchange fees by Defendants Visa and Mastercard (collectively, "the Networks") to competitive pressures on both sides of the two-sided network. This proposed settlement has not done that. *See id.* Instead, the parties have picked winners and losers on myriad issues spanning surcharges, buying groups, and other half-measures that disregard practical implementation challenges.

Since mid-2017, the Merchant Trade Groups have been actively involved in this litigation, both informally through attempts to support and work with appointed Class Counsel and then later as permissive intervenors to advocate for a resolution to this litigation that corrects the current market failures. In the beginning, the Merchant Trade Groups sought to share privileged information with their putative appointed counsel about the appropriate certification of any Rule 23(b)(2) class and what equitable relief would be meaningful to the broad merchant community beyond the Class Plaintiffs. The Merchant Trade Groups sought to bridge the vast disparity in collective resources and knowledge between the merchants represented by the Merchant Trade Groups on the one hand and the five merchants that are the named Rule 23(b)(2) class representatives on the other. These discussions included in-person meetings where the Merchant Trade Groups brought member retail representatives with deep experience in the payment industry to share their views with Class Counsel.

---

*swipe fees in a New York case have now settled claims* (PAYMENTSDIVE Apr. 16, 2026), https://www.paymentsdive.com/news/visa-mastercard-settle-merchant-claims/817693/. *See also* Eric Casey, *BJ's Wholesale receives $240M in credit card fee settlement* (WORCESTER BUSINESS JOURNAL Sept. 9, 2026), https://wbjournal.com/article/bjs-wholesale-receives-240m-in-credit-card-fee-settlement/.

While Class Counsel initially expressed a willingness to engage, they ultimately refused to continue that engagement with the very Class Members they purport to represent. They would not even enter into a confidentiality/non-disclosure agreement that the Merchant Trade Groups had proposed to facilitate sharing information with Class Counsel. Repeatedly, the Merchant Trade Groups proposed settlement terms and structure—flagging that reforming Honor-All-Cards ("HAC") and default interchange was necessary to restore competitive market pressure and relief that could benefit the full range of members in the largest mandatory class in history. Repeatedly, the Merchant Trade Groups asked to be kept apprised of negotiations so that they or their members would at least have the opportunity to provide Class Counsel with their perspective and share resources. Class Counsel once again refused to engage with the absent Class Members despite their fiduciary duty to them. And after the Merchant Trade Groups objected to the last proposed settlement, Class Counsel never spoke with them again. The Merchant Trade Groups only learned of this proposed settlement when it was filed on the docket.

The Merchant Trade Groups and their thousands of members have an existential interest in how this case is resolved, and deep substantive expertise in interchange rate matters. In this mandatory class, the Merchant Trade Groups' members have been deprived of the ability to make decisions that benefit their interests—or even influence the decision-making process—and instead would be bound by the judgment of a handful of tiny businesses and their attorneys. The exclusion of the Merchant Trade Groups, their peers, and their members helps explain the substantive deficiencies of the proposed settlement.

## II. <u>The Lack of an Opt-Out Right Renders the Settlement Unconstitutional, or, at a Minimum, Weighs against Approval</u>

The parties seek to bind approximately 20 million businesses to economic terms that directly impact their bottom lines. More than one thousand have directly objected. *See, e.g.*, ECF Nos. 9981, 9988. As have some of the leading merchant trade associations, representing additional thousands of Class Members, that are responsible for a significant percentage and volume of credit card transactions in the United States. The Class's negative reaction evidences the underlying Due Process problem with this mandatory settlement.

The individual's right to pursue a claim is "a constitutionally recognized property interest." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 807 (1985). The Fifth Amendment prohibits the federal government from depriving persons of their property "without due process of law." U.S. Const. Amend. V. That prohibition governs the entry of a judgment resolving a claim in litigation because the claim is a "species of property protected by the . . . Due Process Clause." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).

Consistent with these foundational constitutional guideposts, the Supreme Court has established two principles limiting the permissibility of Rule 23(b)(2)'s mandatory classes. First, Rule 23(b)(2) applies only "when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). Second, Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Id.* at 360-61. The proposed

settlement exceeds the boundaries of both limiting principles, violating Class Members' Due Process rights.

**a. The Proposed Settlement Treats Different Class Members Differently**

A Rule 23 (b)(2) settlement—binding the entire class *without* notice and opt-out rights, and *without* regard to whether common questions predominate—can apply only when the case consists *exclusively* of common claims in which the class has a single, indivisible interest, and where the claims are non-monetary. In the Supreme Court's words, "[t]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360.

Here, the remedies are not "indivisible" because of the incredible diversity of Class Members, the individual interchange agreements between merchants and Class Members, and the terms of the proposed settlement. The certified mandatory Rule 23(b)(2) Class and proposed settlement is fundamentally unlike the mandatory class cases that the Supreme Court has held up as representative examples of permissible mandatory classes. *See Dukes*, 564 U.S. at 361-62 (citing three cases where desegregation remedies would benefit all members of racial minority class) (citations omitted).

Class Members are merchants of all sizes, from individual sole proprietorships to multi-billion-dollar corporations. They use cards differently and vary by size and location. Some operate nationwide; some within single states; some within multiple states, each with unique surcharge regulatory regimes. Merchants vary in terms of the percentage of sales in cash or by card; the percentage of card sales by premium and regular cards; and the percentage of sales by digital wallet. A small handful have had the economic power to negotiate limited deals with Visa and Mastercard as to the fees they pay to accept cards; most have not. Many merchants are legally sophisticated entities with their own general counsel and professionals with payments expertise that make decisions about how to engage with—or to bring suit against—Visa and Mastercard. Some merchants want to accept new payment mechanisms existing now or emerging soon, while others only accept traditional cards. Given these differences, no single package of relief benefits all merchants alike.

This is also not a case where all merchants operate under the same playbook, such that the Defendants' conduct "can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360. Different Class Members have different deals under the existing (pre-settlement) regime. For example, Class Plaintiffs themselves acknowledge that some merchants pay negotiated rather than posted rates. ECF No. 9932-1 (Class Plaintiffs' Mem. in Supp. of Final Approval) at 10. As discussed above, there are existing side deals between Defendants and some of the more powerful and/or litigious Class Members. Similarly, Class Plaintiffs admit that Visa permits issuer-level discounting for some merchants but not others. *Id.* at 10.

The settlement's relief also does not apply equally to all Class Members. By design, the

proposed settlement expressly carves out and does not alter these merchant-level distinctions as to relief, further belying any claim that the relief must apply "only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360. The settlement enshrines different deals, both expressly and in its impact. It preserves rates that some merchants have negotiated. ECF No. 9932-1 at 6, 23. It preserves the terms of merchant-specific side deals. Other examples abound: some Class Members benefit from surcharging reforms in exchange for a release, but these changes confer no benefit to other Class Members, such as those that operate in states that prohibit surcharging. Buying groups serve no purpose for larger merchants. Merchant education is similarly useless for larger merchants.[5]

Accordingly, "the relief sought" in this proposed settlement will not in fact "perforce affect the entire class at once," as is required for mandatory classes. *Dukes*, 564 U.S. at 360-61 ("Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class."). Because this is not a case where "a single injunction . . . would provide relief to each member of the class" (which is no surprise given the breadth and variety of the proposed class, the complexity of the payment industry, and the vast Visa and Mastercard rules that limit competition), merchants cannot be bound to the judgments of five, tiny Class Plaintiffs.

The settlement should be disapproved. This Court should decertify the mandatory class and, at a minimum, provide opt out rights to permit merchants to decide their preferred approach for themselves. These economic actors should be permitted to make their own business decisions about what is best for them, their employees, and their customers without being bound by the judgments of other, wholly dissimilar businesses.

**b. The Proposed Settlement Confers "Similar Relief at Law" to Money Damages**

The settlement (and mandatory class) is constitutionally defective for another, related reason: if a court "wishes to bind an absent plaintiff concerning a claim for **money damages or similar relief at law**, it must provide minimal procedural due process protection," including "an opportunity to remove himself from the class," along with the "best-practicable" notice. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985) (emphasis added). Although this action is styled as seeking injunctive relief, both the challenged conduct and the proposed relief concern how much merchants pay. One of the clearest examples is that the settlement mandates specific reductions in interchange rates, which have different cash values to different Class Members. This is money damages by another name. The problem is not that this (b)(2) relief has an economic impact on Class Members, but rather that monetary relief is the central relief offered. This proposed settlement, with its broad release, cannot be imposed without meaningful exit rights.

While Class Plaintiffs—with Defendants' support—framed this case as seeking only

---

[5] Buying groups and merchant education have minimal value for small merchants as well, *see* Levitin Decl. ¶¶ 189, 193-195.

injunctive relief to be within the Rule 23(b)(2) ambit, this case is ultimately about the merchant community's bottom line: how much they spend to accept credit cards. Class Members' potential claims are essentially about the amount of money Defendants can extract from merchants over the course of their business relationships. Had Plaintiffs succeeded at trial, Defendants would have been required to reform the anti-competitive policies—particularly HAC and default interchange—that they use to extract inflated fees from merchants and which result in merchants paying more in interchange fees. Indeed, Defendants seek to avoid a trial because they recognize that if these anticompetitive rules are eliminated, competition will increase and interchange rates will fall, at the expense of Defendants' (substantial) profits. Moreover, the relief in the proposed settlement includes a small reduction in interchange fees, which is monetary relief. Absent Class Members must have the right, under the Due Process Clause, to opt-out and choose their own course on whether to accept a settlement for an issue that directly impacts their bottom line.

In the thirty years since *Shutts*, the Supreme Court has not once approved a class action judgment that purported to resolve individualized legal claims without affording class members the right to opt out and pursue their own claims. Rather, the Supreme Court has reaffirmed that "mandatory class actions aggregating damages claims implicate the due process principle . . . deep-rooted [in our] historic tradition that everyone should have his own day in court." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999).

This Court should reject the proposed settlement because it impermissibly deprives Class Members of an opt-out. The Court should also decertify the mandatory Rule 23(b)(2) Class, or, at a minimum, permit opt-outs for the reasons detailed here and in the Merchant Trade Groups' opposition to certification. That opposition brief is incorporated by reference. ECF No. 8468-1. "The language of Rule 23 is sufficiently flexible to afford district courts discretion to grant opt-out rights in . . . (b)(2) class actions.'" *See Onosamba-Ohindo v. Ball*, 184 F.4th 74, 82 (2d Cir. 2026) (the "district court is required to monitor class proceedings and 'reassess [its] class rulings as the case develops'") (quoting *Boucher v. Syracuse Univ.*, 164 F.3d 113, 118 (2d Cir. 1999)). If, at "any time before final judgment is entered," the district court finds "that a previously satisfied requirement of Rule 23 is now lacking," it should decertify the class. *See Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 261–62 (2d Cir. 2021); *see also In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 157 (S.D.N.Y. 2008) (decertifying a previously certified class after preliminarily approving a settlement).

## III. <u>The Proposed Settlement Does Not Provide Fair, Reasonable, or Adequate Relief to Class Members</u>

Neither the structure nor the terms of the settlement provide adequate and meaningful relief to the Class Members. As the Second Circuit has made clear, a proposed settlement's purported relief must be judged through the lens of both the procedural posture of the case and the scope of potential recovery. *See Moses v. N.Y. Times Co.*, 79 F.4th 235, 242 (2d Cir. 2023) ("To evaluate the fairness, reasonableness, and adequacy of a class settlement, we have historically applied the nine factors set out in *Grinnell Corp.*, 495 F.2d at 463."). The Court has denied all of Defendants' summary judgment motions on Class Plaintiffs' anti-competition

claims and this case is ready for trial. *See* June 28, 2024 Order, 2024 WL 3236614, at *23. The Class Plaintiffs have strong claims and Defendants' potential exposure is significant. *See id.* ("Plaintiffs' claims have survived numerous *Daubert* and summary judgment motions, and while the issues addressed at summary judgment would likely be raised again at trial, what remains to be determined is only the sufficiency of the evidence, rather than the legal sufficiency of Plaintiffs' theories of liability. Stated differently, Plaintiffs' case is ready for trial—and this Settlement comes at a relatively late stage in this litigation."). The proposed settlement is completely untethered to this reality.

The Court must also subject this proposed settlement to a searching review under Rule 23(e) due to the risks posed by misaligned incentives. Here, by convincing Class Plaintiffs to agree to illusory reforms, Defendants get (if approved) litigation peace through a broad release without having to materially change their anti-competitive behavior that animated the filing of this lawsuit in the first place. Class Counsel, in turn, can receive approximately *$200 million in fees* and need not incur the time and expense of trial if the Court approves the settlement. ECF No. 9933-2 ¶ 1. Class Counsel's financial incentives to cram this settlement down the throats of their unwilling clients are self-evident.

The settlement also fails to cure the flaws Chief Judge Brodie identified in the 2024 proposal. Even a cursory review of the proposed settlement demonstrates that the terms do not protect Class Members and will have little, if any, practical effect on Defendants' anti-competitive behavior. Rather, the proposed settlement would enshrine the very anti-competitive behavior that gave rise to this lawsuit. Class Counsel's decision to recoil from the prospect of a successful trial and instead accept underwhelming terms that are substantially similar to those that were previously rejected by the Court deprives the Merchant Trade Groups' members of an opportunity to leverage the strength of their claims as to Defendants' anti-competitive conduct into achieving meaningful reforms. It is yet another way that the Merchant Trade Groups are receiving illusory relief.

**a. The Proposed Settlement Unlawfully Imposes an Overbroad, Future-Looking Release in Exchange for Inadequate Relief**

The proposed settlement forces all Class Members to accept a release of future claims against Defendants for years into the future. The release states in pertinent part:

> (a) The Rule 23(b)(2) Class Releasing Parties hereby expressly and irrevocably . . . release the Rule 23(b)(2) Class Released Parties from any and all manner of claims, demands, actions, suits, and causes of action, . . . whether known or unknown, suspected or unsuspected, in law or in equity that any Rule 23(b)(2) Class Releasing Party ever had, now has, or hereafter can, shall, or may have and that have accrued as of the Settlement Approval Date or accrue no later than **the longer of five years after the Settlement Final Date or eight years after the Settlement Approval Date**, arising out of or relating to any conduct, acts, transactions, events,

> occurrences, statements, omissions, or failures to act of any Rule 23(b)(2) Class Released Party **that are or have been alleged or otherwise raised in the Action, or that could have been alleged or raised in the Action relating to the subject matter thereof, or arising out of or relating to a continuation or continuing effect of any such conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act.**

ECF No. 9692-2 ¶ 116(a) (emphasis added).

The release precludes Class Members from bringing claims for injunctive relief under the federal antitrust laws for at least eight years, regardless of what is happening in the market. *Id.* at D2-7. The forward-looking release is wholly inappropriate in the context of these antitrust claims.

As a threshold matter, "prospective waiver[s] of a party's right to pursue statutory remedies for antitrust violations" are unenforceable. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985) (collecting cases); *see also Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955) (similar); *In re Am. Express Merchs. Litig.*, 634 F.3d 187, 197 (2d Cir. 2011) (a "waiver of future liability under the federal antitrust statutes is void"), *rev'd on other grounds sub nom. Amex v. Italian Colors Rest.*, 570 U.S. 228 (2013). The Supreme Court has had "little hesitation . . . condemning" such prospective antitrust waivers. *Mitsubishi*, 473 U.S. at 637 n.19. And because courts may not approve settlements that "contain provisions that are . . . unlawful[] or against public policy," the invalid release means the Settlement cannot be approved. *Kirkland v. N.Y. State Dep't of Corr. Servs.*, 711 F.2d 1117, 1129 (2d Cir. 1983) (simplified); *see also Perkins v. City of Chicago Heights*, 47 F.3d 212, 216-17 (7th Cir. 1995) (vacating consent decree that invalidly overrode state law); *In re Heritage Bond Litig.*, 546 F.3d 667, 681 (9th Cir. 2008) (vacating settlement bar orders that exceeded scope permitted by federal law). Prospective waivers in this context are "void." *In re Am. Express Merchs. Litig.*, 634 F.3d at 197.

Additionally, the scope is of extraordinary breadth. It "sacrifices [unrelated] claims of members" that "were not within the description of claims assertable by the class." *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18-19 (2d Cir. 1981) (reversing approval where representatives released claims outside the lawsuit's factual predicate). Three issues are of particular concern to merchants. First, the release purports to insulate Defendants from any future litigation that "could have been alleged or raised" in this one, no matter how distant from the allegations in the complaint. ECF No. 9692-2 (proposed settlement) ¶ 116.

Second, it expressly releases the "continuation or continuing effect of any such [released] conduct," regardless of the (unknown) scope of those effects on the market. "The rule of reason requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984)). What happens if, during the eight-year (or longer) release, the impacts of Defendants'

interchange policies are even more harmful to the market based on their "actual effect on competition," which could be different than they are now? *See id.* Or if Defendants' new anticompetitive practices "relat[e] to" those ostensibly encompassed by the release? Should the Court accept this proposed settlement, Class Members may have no remedy.

Third, paragraph 116(b) lists many issues deemed "claims that were or could have been alleged" in this litigation, including claims involving interchange fees, a host of network rules, any anticompetitive agreements made between the networks and banks, and "any Merchant Fee" relating to Visa or Mastercard card transactions. "Merchant Fee," in turn, is defined to include any type of fee that issuing banks, card networks, acquirers, or processors might deduct from a card transaction amount or otherwise charge merchants. ECF No. 9692-2 ¶ 1(u). This purports to release claims based on fees unrelated to this suit and transaction fees that *might be* assessed to merchants or in the future, including fees charged by acquirers and processors that are not even defendants.

The release likely exceeds the boundaries of what is lawful. The parties bat away merchants' concerns about the overbroad release by pointing to language stating the release: "shall extend to, but only to, the fullest extent permitted by federal law." ECF No. 9692-2 ¶ 116(a) (emphasis added). But this is cold comfort. Defendants relish that ambiguity, as it mires new claims in litigation and shifts the burden to absent class members to litigate, after the fact, which of their rights have been extinguished. This is already playing out in post-settlement litigation over the scope of a release in a 2019 Rule 23(b)(3) damages settlement. *See generally* Order, *Potayto-Potahto, LLC v. Visa Inc.*, No. 1:26-cv-03245 (S.D.N.Y. May 13, 2026), ECF No. 28 (Cronan, J.). Here, any new plaintiff would have to spend years litigating its ability to bring an antitrust claim before reaching the merits, as the clock ticks by on Defendants' eight-year release. That burden will inevitably chill class-member efforts to enforce the Settlement, as merchants will hesitate to invest the resources needed to test the release's limits. This release language is at best ambiguous in scope, and at worst gives Defendants protection from further challenges for years to come.

The release can therefore leave class members worse off than an adverse judgment after trial. A trial loss would resolve the claims actually litigated; it would not ordinarily extinguish later claims based on post-judgment conduct merely because that conduct continued an earlier course. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 499 (2d Cir. 2014); *Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 327-28 (1955). The settlement should not purchase broader immunity than litigation could provide, particularly without substantial and durable relief.

Defendants have obtained much more than what is fair and reasonable. They would be insulated from future claims over their misconduct for the next eight years (or more) irrespective of how the market changes in years to come. It is unconscionable—and certainly not fair and reasonable—for this settlement to impose these terms on mandatory Class Members.

**b. The Proposed Settlement Effectively Preserves the Honor-All-Cards Rule, Which Remains at the Heart of the Anticompetitive Action**

The Merchant Trade Groups have repeatedly made clear—including in their objections to the 2013 Rule (b)(2) settlement and during the Court's preliminary review of the 2024 proposed settlement—that Defendants' antitrust violations cannot be remediated unless the HAC and default interchange rules are eliminated or substantially modified. Chief Judge Brodie agreed. In denying preliminary approval to the 2024 iteration of the proposed settlement, Chief Judge Brodie reasoned that the proposed relief—which would have maintained HAC rules despite making some changes to the Honor-All-Wallets rules—was inadequate and fell far short of the "best possible recovery." At the end of the day, "merchants are still being saddled with another all-or-nothing choice among card products." June 28, 2024 Order, 2024 WL 3236614, at *27 (citation omitted). This Court has also affirmed the centrality of HAC reform, explaining in its preliminary approval decision for the current proposed settlement that the Second Circuit had specifically cited HAC reform as something that could confer "real and palpable benefit." ECF No. 9884 (internal citations and quotation marks omitted). *In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig*, 827 F.3d 223, 239 (2d Cir. 2016) ("the honor-all-cards and default interchange rules" were "perhaps most important[]" of the claims in this Litigation).

But contrary to the Court's preliminary approval analysis, the proposed settlement does little to change the HAC all-or-nothing choice. As Professor Farrell concludes: "the proposed Amended Settlement fails to address the anticompetitive HAI rule and thereby unleash[es] the prospect of normal competitive negotiations and incentives regarding interchange[,]" especially as concerns large merchants. "The Amended Settlement relaxes rules on surcharging and discounting[,]" which might help in theory but which the "experience and economic theory indicate are unlikely to be widely used, or very potent, in practice." Expert Decl. of Joseph Farrell ("Farrell Decl.") (Exhibit A) ¶¶ 95-96.

Class Counsel and Defendants have argued that the proposed settlement *does* modify the HAC rule by allowing merchants to selectively accept cards by brand and product. In practice, however, this change does not benefit merchants nor redress the anti-competitive problem that is at the heart of this lawsuit. For example, a merchant could choose to not accept Visa branded "premium" consumer credit cards, which usually carry a higher interchange fee. But if a merchant wanted to accept *any* premium card issued by any bank within a card network, the merchant must accept *all* premium cards issued by *all* banks within that network. This term has the practical effect of enshrining the HAC rules. It also does nothing to put downward competitive pressure on interchange, especially because Visa and Mastercard classify nearly all cards as "premium" cards. If a merchant were to refuse a particular premium card, the customer's backup card is also likely to be a premium card, as very few current cards are classified as "standard" cards. As a result, should a merchant opt out of premium cards, it would also be opting out of credit cards altogether, which is not viable in today's marketplace. *See, e.g.*, Levitin Decl. ¶ 95. This causes what Professor Levitin describes as a "chicken-and-egg problem," where merchants will not decline Premium Cards because they constitute most of the card market; because merchants will continue to accept Premium Cards, issuers will face no

pressure to increase the share of Standard Cards. *See* Levitin Decl. ¶ 99.

In contrast, meaningful reform would permit merchants to pick-and-choose among premium cards, or at the very least, decline to accept cards by issuer (such as Chase or Bank of America). If a merchant could refuse, say, Visa's Chase Sapphire cards because it has particularly exorbitant interchange fees, the customer almost certainly has another credit card he or she can use to complete the transaction. As Professor Farrell explains: "[A] merchant 'selectively' rejecting Visa or Mastercard premium cards is uncomfortably close to rejecting an entire network[,]" as is, of course, an option ("but a very unsatisfactory one") prior to the proposed Amended Settlement. Farrell Decl. ¶ 37. "In contrast, the largest credit card issuer (Chase) accounts for only 19% of outstanding credit cards." *Id.*; *see also* Levitin Decl. ¶ 255 (explaining why rejecting cards at the issuer-level would not result in the same consumer anger as rejecting premium cards). That merchant choice to refuse cards with the highest rates would naturally create real competitive pressure on interchange rates, because all credit cards want to be "front of wallet," i.e., the card a customer reaches for first. "[H]aving the ability to selectively exclude cards at the level of issuers would allow merchants to obtain competitive interchange rates from all issuers, since (consistent with buyer-seller negotiations in a workably competitive industry generally) any issuer individually would risk losing all its volume if it insisted on too high an interchange rate." Farrell Decl. ¶ 90. Professor Levitin explains that the benefit to cardholders "of universal acceptance by brand . . . will not disappear" because "the credible threat of [issuer-level discrimination] should result in issuers reaching deals." Levitin Decl. ¶ 275.

What's more, merchants cannot avail themselves of these new HAC rules because they are unworkable. For example, the settlement proposes that Visa and Mastercard will ensure that their "Commercial" and "Premium" cards—with higher interchange fees—are readily identifiable visually and electronically at the point-of-sale, so that merchants can, if they choose, selectively decline them from their customers. ECF No. 9932-1 at 17. The settlement does not address the practical challenges merchants would face in differentiating between Premium/Commercial and Standard cards. If issuers stuck to their "normal reissuance cycles, it would still take around five years of the eight year settlement period before all current cards were reissued with visual identifiers." Levitin Decl. ¶ 133. Merchants would "not be able to visually identify all cards for at least half of the settlement period," and it would be resource-intensive to develop a new system for identifying these cards electronically. *Id.* (discussing how merchants will have to wait for the networks to make the technological capacity available to them, acquire the equipment necessary to make use of that technology—which the Networks are under no obligation to provide, and incorporate these new systems into their practices). Of course, "these technological challenges will fall harder on smaller merchants, making them less able to steer consumers to Standard cards and putting them at a competitive disadvantage to larger merchants." *Id.* ¶ 125.

Moreover, as Class Plaintiffs and Defendants must surely know, point-of-sale is far too late in the process for the customer to learn that his or her card will be declined. Any time a merchant rejects a card it needs to consider the customer experience, balancing the "customer friction" of rejection with the benefit of pressuring exorbitant credit cards to reduce their rates.

The only way to feasibly manage those tensions is to have clear and consistent signage—e.g., "We accept only these standard credit cards [LISTING CARDS] because they charge merchants' lower swipe fees and will pass those savings onto you!"

But no such signage is possible. Not only (as detailed above) would the list of standard cards be too small to be meaningful, but there is also no set list of standard cards. Under the settlement, Defendants retain the discretion to move cards from the standard to premium category as they wish. The upshot is that even if point-of-sale software could keep up with the shifting categories of cards, it is unclear how merchants would be able to comply with the notice requirement under the proposed settlement.

While the proposed settlement's elimination of the Networks' Honor-All-Wallets rules would theoretically allow merchants to negotiate with digital wallet providers about the terms of acceptance or not, "most smaller merchants are unlikely to have the technological wherewithal to refuse to accept particular digital wallets." Levitin Decl. ¶ 204 ("It is hard to imagine the local bodega or pizzeria negotiating with Apple over the terms of acceptance of Apple Wallet transactions."). "Nor do smaller merchants have the technological wherewithal to refuse to accept particular digital wallets. At most, they can refuse to accept contactless ('tap') payments as a way of refusing all digital wallets, as well as contactless payments with physical cards." *Id.* Even that "requires reconfiguring existing point-of-sale terminals." *Id.* The Honor-All-Wallets "reform" will, at best, only benefit a subset of the largest merchants. *Id.*

Likewise, because "[t]he All-Outlets rule has no effect on small merchants or those with only one banner, [] eliminating [it] has no benefit for small merchants, like a medical office or dry cleaner or bakery, or for merchants with only one banner." *Id.* ¶ 208. And, to further enshrine their anticompetitive behavior, the proposed settlement allows Visa and Mastercard to lower interchange rates for merchants who agree to accept all cards. ECF No. 9692-2 ¶¶ 30(a), 79(a). It is all but guaranteed that the HAC rule will, in practical effect, operate the same way under the proposed settlement as it does today.

The real-world deficiencies of this proposed settlement appear to be by design, crafted to enable Defendants to preserve their anti-competitive business practices. Professor Levitin details how the complicate system for credit card payments "does not lend itself to a cobbled-together jury-rigged Rube Goldberg intervention like the Proposed Settlement." Levitin Decl. ¶ 158. For example: (a) Merchants must identify cards by product type—but it is unclear when in the class period cards will all have visual identifiers; (b) Merchants would need to have point of sale technology necessary to distinguish premium from standard cards—but that will impose substantial costs to implement; (c) Merchants must be able to discriminate against premium and commercial cards to push down interchange fees—but premium cards represent a significant percent of the purchase volume and commercial card purchases cannot be easily substituted. Plus, the Networks have multiple workarounds to buyer groups; there is no incentive for the Networks to act in good faith by refraining from creating new product categories or increasing fees to create frictions to steering; there is no incentive for the issuers to issue standard cards, and so on. *See* Levitin Decl. ¶ 234).

Professor Levitin summarizes (*id.* at 296):

> [The] lack of consideration of practical and operational challenges in the Proposed Settlement is unfortunately not surprising. Payment systems operations are quite complicated. The named class plaintiffs are a group of very small merchants without any clear payments expertise to provide to Class Counsel. Small merchants such as the named plaintiffs tend to purchase off-the-rack payment solutions and lack dedicated personnel who deal solely with payments issues. In contrast, larger merchants tend to use customized technology and have employees with particular operational expertise in payments. The ERCPs have not shown that any large merchants with such expertise actually support the Proposed Settlement. Indeed, at least one large merchant's efforts to provide input on the Proposed Settlement to Class Counsel were rebuffed.

The CEO of Mastercard admitted as much at an investor conference on November 12, 2025—just two days after the Class Plaintiffs and Defendants moved for preliminary approval of their proposed settlement. In response to a question from a panel moderator on whether Mastercard's "competitive positioning" will hold given the proposed settlement's changes to the HAC rules, Mastercard CEO Michael Mieback stated:[6]

> Yeah. You know, it holds for a number of reasons. First of all, the way that the agreement was reached is to say, honor all cards on a level of issuer basis, that will not be a choice. But you can say you're going to take premium cards or not. You think about, if you're a merchant, what are you trying to do? You're trying to sell. When you think about the proportional level of sales that are related to premium cards, we've seen this in Europe. This really did not play out because the merchant wants that customer in their shop and have a predictable experience. You do not go on and off or left and right.
>
> I think the balance struck about standard cards, premium cards, and commercial cards is just very sensible so that the overall user experience will hold. I think overall, that makes a lot of sense. The overall acceptance level is there. That beats any other alternative payments. The protections are there. The cybersecurity, all these other things that are built into the cards ecosystem, in particular, zero liability. When you take the category of cards

---

[6] Investing.com, *Mastercard at KBW Fintech Payments Conference: Strategic Insights and Future Plans* (Nov. 12, 2025), https://www.investing.com/news/transcripts/mastercard-at-kbw-fintech-payments-conference-strategic-insights-and-future-plans-93CH-4352728.

overall versus other alternatives, that anyway holds.

Mastercard's own CEO admitted that this settlement will not inject new competition—as one should expect from a settlement of antitrust claims—or fundamentally change the "overall user experience." In his own telling: "because Premium Cards are such a high "proportion[] of all cards, it is not feasible for merchants to refuse all premium cards."[7]. He also admitted there was another, more meaningful reform that, apparently, Defendants refused: permitting merchants to decide, on an issuer-by-issuer basis (what he calls the "level of issuer basis"), which credit cards to accept. As a result, the settlement does not change the fundamental anti-competitive HAC rules, as detailed above: if a merchant decides to accept any premium Visa cards, it still must accept *all* premium Visa cards. While offering the appearance of modifying the HAC cards rule, the proposed settlement will have no real-world impact on the HAC rules at all. Mastercard's CEO admitted just that.

**c. The Settlement Does Not Alter Default Interchange and the Temporary Interchange Fee Caps Are Negligible and Time-Limited**

The settlement's treatment of default interchange and temporary rate caps likewise do not satisfy Rule 23(e). *Grinnell Corp.*, 495 F.2d at 463. Class Plaintiffs admit that the proposed settlement "leaves in place" the setting of default interchange rates, which is the practice where Visa and Mastercard each set "default" interchange rates, which the merchant must pay in the absence of an agreement between the merchant and the network or the issuing bank for a different rate. ECF No. 9932-1 at 6, 23. Class Plaintiffs raised a "significant" challenge that default interchange is anti-competitive because the "nominally 'default' rates [turn] into de facto fixed rates, extracting supra-competitive interchange rates from each merchant segment." *Id.* at 12-13. But faced with the prospect of settlement (and their own significant financial incentives to settle), Plaintiffs' Counsel have lost their commitment to changing this core anti-competitive practice. In short, the Plaintiffs' Counsel have folded the Class Members' winning hand while still cashing out themselves.

Additionally, while Visa and Mastercard agreed to (marginally) lower their average system-wide interchange fees, these rollbacks would still maintain interchange fees at inflated rates, and many merchants would see *no* reduction in their interchange rates because the proposed reduction takes into account side-deals between Defendants and individual merchants. *See* Levin Decl. ¶ 158 ("Thus, many merchants with negotiated rates might already have rates for Standard Cards that are lower than 125bps, and even if they do not, their blended negotiated rate might still be better than they would do with off-the-rack rates given the current transaction share of different product types.").

At the end of the day, these rates would be well *above* those in place when the litigation

---

[7] Investing.com, *Mastercard at KBW Fintech Payments Conference: Strategic Insights and Future Plans* (Nov. 12, 2025), https://www.investing.com/news/transcripts/mastercard-at-kbw-fintech-payments-conference-strategic-insights-and-future-plans-93CH-4352728.

started, and even above those assessed by Visa and Mastercard as recently as 2023.[8] *See* ECF No. 9692-2 ¶¶ 48(a), (c)(ii), 97(a). Further, reducing average Visa and Mastercard credit card interchange rates by 10 basis points for a period of eight years is not meaningful. Most of Visa's and Mastercard's current rates average 235 basis points.[9] In fact, the reduction would barely exceed Visa's and Mastercard's recent rate increases.[10] *See* Levitin Decl. ¶ 75 ("The 10-basis-point reduction in the Average Effective Interchange Rates still leaves U.S. average interchange rates as inflated on average by something in the nature of 300% or more over competitive pricing.").

There are other aspects of the rollbacks that offer essentially meaningless relief. For example, while the proposed settlement sets a temporary interchange rate cap of 1.25% for eight years for so-called "standard" consumer credit cards, those cards are an exceedingly small fraction of the marketplace, as detailed above. *See* ECF No. 9692-2 ¶¶ 50, 99. *See also* Farrell Decl. ¶ 78 ("Professors Stiglitz and Leffler do not explain why a significantly smaller interchange differential between standard and premium cards would induce merchants to engage in the kind of steering required to achieve reductions in card acceptance costs."). And credit card companies would be able to freely recategorize cards out of this category to avoid the rate cap. In exchange for this small temporary rate reduction, the agreement broadly bars all merchants—even those who strongly object to this proposed settlement—from challenging any of Visa's and Mastercard's merchant fees and rules in court. Similarly, the proposed settlement only reduces (albeit temporarily) the fees that Visa and Mastercard set on behalf of banks—not the network fees that go directly to Visa and Mastercard.

Further, as soon as the settlement goes into effect, Visa and Mastercard could raise their own network fees, passing those costs to the merchants and customers, and then discounting what the banks pay to handle transactions. *See, e.g.*, Levitin Decl. ¶¶ 226-236 (citing examples of potential circumventions ostensibly permitted by the proposed settlement). As Professor Levitin describes, "The Networks have already shown that they are willing and adept at evading interchange fee regulations. In countries where interchange fees have been capped by regulation, the Networks' own fees have increased considerably, raising the concern that the Network fees are being used to circumvent the regulations." *Id.* ¶ 224. And issuers are not subject to the anti-circumvention provision. *See id.* ¶ 136 (describing different ways an issuer could circumvent the terms of the proposed settlement, including by doing the following: an issuer could issue a card 89 days after the Settlement Approval Date "with an 8-year expiration date [and that card would] never need to have a physical identifier of product type during the settlement period, so it would be impossible for a merchant to discriminate against it on the basis of product type. If so, merchants might not have the ability to discriminate among cards by product type based on

---

[8] CMSPI, *State of the Industry Report*, The Playbook for Smarter Payments (Sept. 2025), https://insights.cmspi.com/soir-2025.

[9] Press Release, *Credit and Debit Card 'Swipe' Fees Hit New Record of $187.2 Billion, Driving Up Prices for American Families*, Merchants Payments Coalition (March 18, 2025), https://www.merchantspaymentscoalition.com/credit-and-debit-card-swipe-fees-hit-new-record-1872-billion-driving-prices-american-families.

[10] CMSPI, *State of the Industry Report*, The Playbook for Smarter Payments (Sept. 2025), https://insights.cmspi.com/soir-2025.

physical identification for *any* of the class period.").

**d. Permitting Merchants to Surcharge Offers Negligible and Inconsistent Relief**

The proposed settlement would marginally increase merchants' ability to impose surcharges." *See* ECF No. 9692-2 ¶¶ 43(f), 92(f). But this confers little benefit to merchants in practice. As a threshold matter, surcharges are altogether illegal in a handful of states and, for most states, they are capped at 2 to 3% and must be accompanied by varying and complicated surcharge disclosures at the point of sale or before.[11] Allowing merchants to surcharge is illusory when such practices are barred by state law.

Moreover, surcharging certain brands, or only Premium cards, is not beneficial to merchants because it is not workable and risks customer goodwill, as detailed by Professor Levitin. Levitin Decl. ¶¶ *See also id.* ¶¶ 238-251 (discussing how the proposed settlement's surcharging terms offer little value even in states where surcharging is permitted). It remains to be seen whether consumers will continue to patronize businesses that impose bespoke surcharges for different cards at the point of sale, which would be both a sharp departure from consumer shopping expectations and risk merchants incurring consumer ire as merchants attempt to mitigate the harm caused by Visa and Mastercard. But the proposed settlement ignores these business realities.

The proposed settlement's surcharge changes are problematic for another reason, as discussed above: they are not designed to benefit the full range of Class Members. Some Class Members may operate in single states that allow merchants to surcharge. Other Class Members may operate in single states that bar surcharging. And yet others may operate in multiple states, and as such, must craft surcharge policies that are compatible with multiple regulatory regimes.

This is representative of a fundamental conflict within the Class. Those Class Members based in states permitting surcharging without restraint may view surcharging as potentially valuable, while this relief has less (or no) value for Class Members in states with statutory surcharging restrictions. "[D]ifferent class members can benefit differently from an injunction—but no matter what, they *must* stand to benefit (it cannot be the case that some members receive

---

[11] Gabriela Jhean, *Credit card surcharge laws by state explained for 2025*, 8AMLAWPAY (Oct. 24, 2025), https://www.lawpay.com/about/blog/credit-card-surcharge-rules/. This form of relief would not even be possible in certain states that require posting of surcharges on each item prior to sale, which is unknowable until the merchant learns of the interchange fee for a specific credit card from Defendants. *See, e.g.*, N.Y. Gen. Bus. Law § 518 (McKinney) ("Any seller in any sales transaction imposing a surcharge on a customer who elects to use a credit card in lieu of payment by cash, check, or similar means shall clearly and conspicuously post the total price for using a credit card in such transaction, inclusive of surcharge . . .").

no benefit while others receive some." *Berni v. Barilla S.p.A.*, 964 F.3d 141, 147 n.28 (2d Cir. 2020)) (alteration in original).

**e. The Proposed Settlement Enshrines the Anticompetitive Pricing at the Heart of the Class Plaintiffs' Claims**

Taken together, the proposed settlement preserves the anti-competitive pricing model at the heart of this case. Visa and Mastercard may continue establishing default interchange rates; merchants remain unable to reject cards issuer by issuer; and the remaining tools depend on merchants imposing category-wide rejection, complex differential pricing, or negotiations without a credible issuer-specific acceptance decision. That is mitigation around the existing system, not a competitive reform of it.

Preserving their market dominance has harmful, downstream effects that make other purported relief in the proposed settlement illusory—such as allowing merchant buying groups to negotiate fees with Defendants. The buying groups confer no additional leverage in an anti-competitive market. *See* Levitin Decl. ¶¶ 210-219. The 2024 version of the settlement had these same flaws. As Chief Judge Brodie explained, that agreement claimed to "remove any restrictions" from the Merchant Buying Group provisions, but these changes did not "offer merchants any more bargaining leverage than they previously had." *See* June 28, 2024 Order, 2024 WL 3236614, at *28.

Rather than changing the fundamentals of this monopolistic market, the proposed settlement enshrines them. It locks in Visa's and Mastercard's dominant position and, via its release and waiver provisions, cuts off the legal rights of any other merchant or group to challenge the credit card cartel pricing model. *See* ECF No. 9692-2 ¶¶ 116(a), (b).

Ultimately, this settlement benefits Defendants at the expense of the merchant community. Thus, it is unsurprising that this is the rare case where the Defendants *supported* class certification. *See* ECF No. 8449 (Defendants' response to motion for class certification) ("For the purpose of this motion only, defendants do not oppose certification of the non-opt out Rule 23(b)(2) class that plaintiffs have proposed."). The reason is clear: by providing what amounts to token relief, Defendants will secure releases for future equitable claims, and with that, essentially carte blanche to continue to mandate acceptance and to fix interchange rates.

For the reasons above, this Court should deny approval of the proposed settlement. The Court should also decertify the mandatory Rule 23(b)(2) class, or at a minimum, permit opt-outs from the Rule 23(b)(2) class to allow those Class Members that will not benefit from the proposed settlement to avoid paying for it by releasing the valuable claims that Class Counsel are trading away for nothing.

Respectfully submitted,

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

By: *___/s/ Debra L. Greenberger*
Debra L. Greenberger
Daniel M. Eisenberg
One Rockefeller Center, 8th Floor
New York, New York 10020
(212) 763-5000
dgreenberger@ecbawm.com
deisenberg@ecbawm.com

*Attorneys for the Merchant Trade Groups*[12]

[12] NRF's address is 1101 New York Avenue NW, Suite 1200, Washington, D.C. 20005, and its phone number is (202) 626-8100. RILA's address is 99 M Street SE, Suite 700, Washington, D.C. 20003 and its phone number is (202) 869-0200. NRF and RILA should be contacted through the undersigned counsel for all matters related to this litigation.