# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION<br><br>This Document Applies To:<br><br>*Barry's Cut Rate Stores, Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM), also now known as *DDMB, Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM). | No. 05-md-01720 (BMC) (JAM) |

**DECLARATION OF JOSEPH FARRELL, D.PHIL.**

**September 14, 2026**

# Table of contents

I. Introduction ... 3
I.A. Qualifications ... 3
I.B. Assignment ... 4
I.C. Background ... 4

II. Intra-network competition among issuers for merchants would be beneficial ... 6

III. "Honor All Issuers" rule makes competition among issuers for merchant acceptance unlikely ... 9

IV. Removing the HAI rule would bring the market toward normal competitive incentives for card issuers and merchants ... 13

V. The Amended Settlement fails to foster normal competitive mechanisms and generate competitive incentives for issuers ... 15
V.A. Permitting rejection only at a broad aggregate level is not a good substitute for the ability to engage in issuer-level rejection ... 16
V.B. Proposed changes to the surcharging and discounting rules are unlikely to effectively ensure competition among issuers or to significantly benefit merchants ... 19
V.B.1. Surcharging and discounting are already allowed to a degree, but are rarely used by merchants ... 20
V.B.2. Merchant benefits from differential pricing based on the payment method are likely to be small ... 22
V.B.3. Surcharging and discounting would make merchant pricing more complex, increasing consumer search costs and reducing competition among merchants ... 24
V.B.4. The proposed changes in surcharging rules are insufficient to effectively ensure issuer-level competition for merchants ... 26
V.B.5. The proposed changes in discounting rules are insufficient to effectively ensure issuer-level competition for merchants ... 27

VI. Interchange fee caps and rollbacks under the Amended Settlement are unlikely to effectively ensure intra-network competition among issuers ............. 29

VII. Examples provided by Professors Stiglitz and Leffler fail to show that the proposed changes in combination would ensure intra-network competition among issuers ........................................................................................... 35

VIII. Conclusion ......................................................................................................... 38

Appendix A. Curriculum vitae of Joseph Farrell .................................................... A-1

# I. Introduction

## I.A. Qualifications

(1) I am Emeritus Professor of Economics at the University of California, Berkeley. I am also a Partner with Bates White, LLC. I received my D.Phil., M.Sc., and B.A. degrees from Oxford University.

(2) From 2009 to 2012, I served as Director of the Bureau of Economics at the Federal Trade Commission (FTC), where I supervised approximately 70 PhD-level economists and reported directly to the Chairman and Commissioners. I was responsible for economic analysis relating to the Commission's broad antitrust and consumer protection portfolios. As part of these responsibilities, I was a member of the six-person FTC-DOJ team that drafted the 2010 revision of the Horizontal Merger Guidelines.

(3) Earlier, in 2000 to 2001, I served as Deputy Assistant Attorney General for Economic Analysis for the Antitrust Division of the DOJ. In this position, which is the chief economist position at the Division, I supervised approximately 50 PhD-level economists and reported directly to the Assistant Attorney General for Antitrust. Earlier, in 1996–1997, I served as Chief Economist for the Federal Communications Commission (FCC), where I reported directly to the Chairman and Commissioners.

(4) I have taught undergraduate and PhD-level courses on microeconomic theory, industrial organization, and game theory at the University of California at Berkeley, the Massachusetts Institute of Technology, and the University of Michigan.

(5) I have published extensively in peer-reviewed academic journals and elsewhere on topics centering on the economics of competition, market definition, industrial organization, and innovation. Industrial organization is the field in economics that includes the analysis of regulation and competition.

(6) I have served on the editorial boards of professional journals, including serving as Editor of the *Journal of Industrial Economics* from 1995–2000 and on the Board of Editors of *Information Economics and Policy* from 2004–2007. I am a Fellow of the Econometric Society, past President of the Industrial Organization Society, and former Board Member for the National Academies' Computer Science and Telecommunications Board. In 2016, I received the Distinguished Service Award from the Industrial Organization Society.

(7) I have been retained as a consultant or expert witness in a variety of matters involving mergers, antitrust, telecommunications, and intellectual property analysis. I have served as a consultant to DOJ, FTC, Canadian Bureau of Competition, Reserve Bank of Australia, the Organization for Economic Cooperation and Development (OECD), and many private parties. I have testified on matters related to economic policy in hearings before the Senate Judiciary Committee, FCC, FTC, DOJ, OECD, and International Trade Commission.

(8) A copy of my curriculum vitae is attached as Appendix A.

## I.B. Assignment

(9) I have been asked by Counsel for Walmart, the National Retail Federation, and the Retail Industry Leaders Association to evaluate the extent to which the proposed Amended Settlement Agreement ("Amended Settlement")[1] is likely to bring the benefits of intra-network (that is, within Visa or MasterCard) issuer competition, notably more competitive interchange fees and merchant discounts, to the merchant side of the market.

## I.C. Background

(10) The current system can be characterized as follows:

- The networks set default interchange fees, which issuers follow unless they reach another agreement with merchants. As I explain, because of the card network rules, most issuers adhere to the default interchange.
- Issuers are also able in practice to affect other aspects of the cost of transactions to merchants (e.g., chargebacks, fraud protection) through their authorization practices, fraud-control protocols, and chargeback procedures, among other measures, although within parameters set by the networks.
- On the cardholder side, every cardholder selectively declines to adopt or use most of the cards offered by issuers, choosing one or a small number of cards that the cardholder perceives offer an attractive bundle of attributes, including cardholder-side pricing. This ability to pick and choose among many different cards offered by many different issuers powers a substantial amount of intra-network competition among issuers on the cardholder side of each network.
- On the merchant side, in contrast, each merchant must honor all cards ("HAC") by all issuers on a given network if it accepts any card on that network. This rule implies not

[1] Doc. 9692-2.

only that a merchant cannot accept only some types of cards, such as "standard" cards, and decline other types of cards, such as "premium" cards, but also, importantly, that a merchant cannot accept cards only from some issuers, while declining cards from other issuers. The latter part of the HAC rule, which I will argue below is most problematic, is sometimes called the "honor all issuers" ("HAI") rule.

(11) Interchange fees are the main component of the merchant discount, which is the price that the merchant pays to transact with a cardholder.[2] Interchange fees are paid to the card issuer and differ, among other factors, by card type (e.g., standard, premium, commercial), merchant's line of business, merchant sales volume on the card network, and transaction security (e.g., card present or online). For Visa credit cards, the posted interchange fees in the United States range from 1.18% + $0.05 to 3.15% + $0.10; for Mastercard credit cards, they range from 0.00% + $0.10 to 3.30% + $0.10.[3]

---

2 Congressional Research Service, *Merchant Discount, Interchange, and Other Transaction Fees in the Retail Electronic Payment System*, by Andrew P. Scott, IF11893, Washington, D.C., 2021: 1 ("Interchange fees are paid to the consumer's bank and represent the largest share of the MDR [merchant discount rate].").

3 Mastercard, "Mastercard 2026–2027 U.S. Region Interchange Programs and Rates," April 17, 2026. The highest value corresponds to Commercial Rates – Small Business Credit, Standard program, Level 5. The lowest value corresponds to Consumer Credit Rates, Payment Transaction (Gaming Payments MCCs), for Core, Enhanced Value, World, World High Value, and World Elite levels.

Visa, "Visa USA Interchange Reimbursement Fees: Visa Supplemental Requirements," April 18, 2026. The highest value corresponds to Consumer Credit, Non-Qualified Consumer Credit, for Visa Infinite Spend Qualified, Visa Infinite Spend Not Qualified, Visa Signature Preferred, Visa Signature, Traditional Rewards, and All Other Products. The lowest value corresponds to Consumer Credit, Supermarket Credit—Tier 0, Traditional Rewards and All Other Products.

## II. Intra-network competition among issuers for merchants would be beneficial

(12) It is well recognized in economics that consumers tend to benefit when firms face competition, and I will not belabor that point here.[4] Competition generally leads to lower prices and higher-quality products and incentivizes both existing and entrant firms to innovate and adapt in ways that create customer value. Economists broadly agree that the competitive mechanism is normally the most powerful and reliable way to improve economic efficiency and in particular to benefit customers, here including merchants.

(13) Within each of Visa and Mastercard credit card networks, there is already competition among issuers to attract cardholders, creating a stark asymmetry relative to the merchant side, where issuer competition is predominantly blocked, as I describe below.[5] A more balanced competitive process for determining interchange can be expected to lower the overall *level* of interchange fees and merchant discounts, rebalance the unbalanced card fee *structure,* and reduce the corresponding competitive bias and the subsidy of generally richer premium cardholders by less well-off consumers.[6]

---

4 Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (2026): ¶ 401 ("Competition is thought to yield the highest output and lowest prices consistent with competitors' ability to earn minimally profitable returns to their investments."); Joseph E. Stiglitz and Carl E. Walsh, *Principles of Microeconomics* (New York and London: W.W. Norton & Company, 2006): 217 ("[…] equilibrium in the competitive market leads to the greatest possible total gain for consumers and firms."); Daron Acemoglu, David Laibson, and John A. List, *Microeconomics* (London: Pearson Education, 2015): 148. ("[…] the competitive market equilibrium maximizes social surplus: this is the best that society as a whole can do if it is simply interested in maximizing the total size of the economic pie.").

5 *See* Consumer Financial Protection Bureau, "The Consumer Credit Card Market," October 2023: 23, 98 ("Interchange and rewards expense has grown over time […] as purchase volume has increased and competition in rewards has escalated." "The fight for both new customers and 'top-of wallet' status for existing cardholders has intensified competition on rewards offerings"); Capital One, *Annual Report,* 2025, 42, https://investor.capitalone.com/static-files/0f92d64a-245b-4497-bc95-5433235d84cc ("[…] in our credit card business, competition for rewards customers may result in higher rewards expenses, or we may fail to attract new customers or retain existing rewards customers due to increasing competition for these consumers.").

6 Lulu Wang, "Regulating Competing Payment Networks" (April 2026): 37–38 ("The increased use of credit cards over time and the corresponding increase in merchants' costs of payments are a consequence of intense network competition channeled toward the wrong side of the market. Because consumers are far more sensitive to rewards than

(14) The economics literature has shown that merchants internalize—that is, value—features of a payment card or method that in the first instance benefit the cardholder.[7] This result should not be surprising. After all, merchant revenues and profits are higher when demand for the products they sell increases. Cardholders, however, do not similarly internalize the effects that their choices of payment method have on merchants. Consequently, one would expect that a system in which the merchant has relatively more influence over the payment method used would tend to do a better job of choosing the payment method that would maximize the joint benefit to itself and its customers than a system that has been described as putting the cardholder "in the driver's seat" and largely disempowering the merchant.[8]

---

merchants are to fees, networks compete for cardholders with generous rewards funded by merchant fees. Price coherence ensures that these fees pass through to higher retail prices borne by all consumers, including those who pay with cash and debit. The rewards draw more consumers to credit cards, increasing merchants' costs."); Mark L. Egan, Gregor Matvos, Amit Seru, Lulu Wang, and Vincent Yao, "Who Pays for Payments" (NBER Working Paper 35067, Cambridge, MA, April 2026): 29 ("We find that interchange fees generate a large regressive transfer from households with incomes below $150, 000 to those with incomes above that level."); Marie-Hélène Felt, Fumiko Hayashi, Joanna Stavins, and Angelika Welte, "Distributional Effects of Payment Card Pricing and Merchant Cost Pass-through in the United States and Canada" (Federal Reserve Bank of Boston Working Papers 20, no. 13, 2020): 17 ("Higher-income consumers use more payment methods that are more costly for merchants […] Relative to how much it costs the merchants to process their payments, each consumer in the highest-income cohort pays $13 less on average per month through retail prices. In contrast, every consumer in the lowest income cohort pays $0.6 more.").

7 *See* Benjamin Edelman and Julian Wright, "Price Coherence and Excessive Intermediation," *The Quarterly Journal of Economics* 130, no. 3 (August 2015): 1285, 1296 ("[E]ach seller is willing to pay the intermediary a fee that equals the expected per-buyer benefit that buyers receive from using the intermediary to buy from a seller since this allows the seller to increase its retail price by an equivalent amount without losing any demand." "Merchant internalization [is] established in the payments literature").

8 Joseph Farrell, "Efficiency and Competition between Payment Instruments," *Review of Network Economics* 5, no. 1 (2006): 27 ("[…] the merchant *internalizes* cardholder-side fees and non-price benefits through their effect on demand. […] Without internalization, one might naturally expect merchants to push for a payment instrument with low merchant fees, while cardholders push for one with low cardholder fees. But with strong internalization, the merchant will (approximately) favor instruments that are best for merchant and cardholder *jointly* – not for the merchant narrowly."); Jean-Charles Rochet and Jean Tirole, "Externalities and Regulation in Card Payment Systems," *Review of Network Economics* 5, no. 1 (2006): 3–4, 8 (to the extent that cardholders hold a single card (i.e., single-home), each system can "'charge' a monopoly merchant discount. Cardholders are in the driver's seat, as systems try to woo them[.]" Importantly,

cardholders "may not internalize the merchant's welfare […] That is, the cardholder's lack of internalization of the merchant's loss […] may lead to inefficient card transactions." By contrast, "merchants realize that card acceptance is part of their quality of service (QoS) package and accordingly internalize, at least in part, the cardholders' net benefit from being able to use their card.").

## III. "Honor All Issuers" rule makes competition among issuers for merchant acceptance unlikely

(15) In most of this Declaration, I comment on incentives that would arise if network-level default interchange were less widely used and, instead, each individual issuer set, or negotiated, its interchange fees with merchants. As noted in Section I.C, in theory this can be part of the process now; but I understand that in practice, issuers very seldom, if ever, agree to arms-length interchange rates below the network-set default levels. Downward departures from the posted fees are sometimes negotiated between a merchant and the card network, not in general issuers.[9]

(16) I focus below on the question of what changes in the merchant restraints would effectively bring normal competitive incentives to the determination of interchange rates—and on whether the most relevant provisions of the Amended Settlement proposal would do so. The starting point is the long-understood fact that the HAI rule—or versions of the HAC rule that include the HAI rule—eliminates normal commercial incentives for an issuer (not acting jointly with other issuers) to set, or negotiate, reasonable interchange rates. To put it differently, decentralized setting of interchange and the HAI rule do not work well together. This happens for two reasons.

(17) First, the HAI rule greatly dilutes the effect of a given issuer's offering on merchant acceptance. As a result, an issuer setting its own interchange rates does not face normal consequences of that choice for the volume of business that it will attract.

(18) Under HAI, each merchant evaluating whether to accept a network's cards faces a price for accepting cards that is driven by a weighted average of interchange fees charged by many issuers (e.g., the average fee across all Visa cards or all Mastercard cards). Thus, unless the issuer market were extremely concentrated, no issuer would expect its own pricing choice to move that weighted average price very much, and thus no issuer would perceive that its own pricing would make much difference to merchant acceptance of the entire bundle of cards (and therefore the issuer's volume of transactions from which it derives revenues). Each issuer would perceive that an increase or decrease in its own interchange fee would be highly diluted before being evaluated by the merchant who would be paying it. As a result, HAI blocks the commercially normal demand response and eliminates incentives for an individual issuer to reduce its interchange below the posted rates.

[9] The fact that merchants can negotiate with the network does not imply that doing so is a good substitute for a fair negotiation with an issuer. See Section V.A.

(19) An analogous problem applies to quality: an issuer that degrades the quality of its payment cards by, potentially, adopting weaker authorization practices and fraud-control protocols or more cumbersome chargeback procedures for merchants (within the parameters set by the card network) would not expect its own actions to have a large impact on the overall quality of the network. Since any one issuer individually has little control over the overall performance of the card network, each individual issuer has little incentive or ability to improve group performance. Each issuer rationally—but dysfunctionally—views the success of the network as something largely outside its control, as in the well-known "tragedy of the commons."[10]

(20) Second, with decentralized setting of interchange and HAI, a merchant who identifies a particular issuer as egregiously raising the average level of interchange would be unable to address that problem in the commercially normal way, by refraining from trade with that issuer—unless the problem were so severe that the merchant would reject the entire network. The HAI rule essentially eliminates a large merchant's ability to negotiate interchange with an issuer.

(21) If an issuer and a merchant negotiate toward an agreement, there are in general substantial "gains from trade," or joint benefits from reaching an agreement that allows the issuer's

---

[10] The tragedy of the commons is a well-recognized problem in the social sciences, and the original article by Garrett Hardin has received over sixty thousand citations. Garrett Hardin, "The Tragedy of the Commons," *Science* 162, no. 3859 (December 13, 1968): 1243–148.

*See, e.g.,* Matthew Elliot and Benjamin Golub, "A Network Approach to Public Goods," *Journal of Political Economy* 127, no. 2 (2019): 763–764 ("Many practical problems, such as preventing harmful climate change, entail a tragedy of the commons. It is in each agent's interest to free-ride on the efforts of others. A question at the heart of economics, and of intense public interest, is the extent to which negotiations can overcome such problems and lead to outcomes different from, and better than, the outcomes under noncooperative, voluntary provision."); Gregory Ponthiere, "Stoicism and the Tragedy of the Commons," *Environmental and Resource Economics* 88 (2025): 1213–1214 ("Following Hardin's (1968) pioneer work, economists and social scientists have paid substantial attention to the Tragedy of the Commons, which refers to a generic problem of coordination of agents using a common resource […] When using a common resource, agents do not perfectly internalize the negative impact of their decisions on other agents"); Amy Sinden, "The Tragedy of the Commons and the Myth of a Private Property Solution," *University of Colorado Law Review* 78, no. 4 (spring 2007): 545 ("Where, however, there are externalities—where some of the costs (or benefits) of an activity are not borne by the decision maker engaging in that activity—the market will fail to produce an optimal result. […] In a now famous 1968 essay, biologist Garrett Hardin dubbed this phenomenon 'the tragedy of the commons.'").

cardholders and the merchant to trade. Negotiation is then a process of maximizing those gains and agreeing on how the gains will be divided. The economics of bargaining studies how that process, and the ensuing agreement, depends on—among other factors—the relative payoffs to the parties of reaching an agreement and of failing to do so; the payoffs from failure to reach an agreement, or delays in doing so, are central to that analysis.[11]

(22) Economists have identified two key ways in which disagreement outcomes matter in bargaining. The first is the relative ongoing pain or loss of benefit for the parties while no agreement has yet been reached, but the parties are still open to negotiation, and this normally is what drives active negotiation. The second is sometimes called the "walk-away" payoff: a payoff that a party would get if it abandoned the negotiation entirely. Of course, it cannot be the case that the negotiation process leads to either party getting a payoff that is worse (for it) than its walk-away payoff. However, it is routine for the ongoing disagreement payoffs to be clearly inefficient for the two parties and very possibly to be worse for at least one of them than the walk-away payoffs. A mutually painful outcome that would not be credible as a walk-away payoff can be—and routinely is—entirely credible as a no-agreement-yet flow-payoff.[12]

(23) From this point of view, the HAI rule biases the normal commercial negotiation process, in which interim failures to reach an agreement may have a temporary effect along the lines of "no trade between this merchant and this Visa issuer," and replaces it with "no trade between this merchant and any Visa issuer." In other words, through HAI, all other issuers put their

---

11 Economists generally model bargaining outcomes as a function of the total "surplus" to be divided – the benefits of reaching agreement – relative to each side's "threat point," or best alternative if the bargaining process breaks down. *See, e.g.,* Amit Gandhi and Aviv Nevo, "Empirical models of demand and supply in differentiated products industries," Chapter 2 in Handbook of Industrial Organization, vol. 4, Kate Ho, Ali Hortacsu, and Alessandro Lizzeri eds. (North-Holland: Elsevier, 2021): 115 ("The Nash bargaining solution is the set of input prices that maximize the weighted product of the values to both parties from agreement (as a function of that price) relative to the values without agreement."); Steven C. Salop, "The AT&T/Time Warner Merger: How Judge Leon Garbled Professor Nash." *Journal of Antitrust Enforcement*, 6:3 (2018): 463 ("In negotiation markets, the outcome depends on the parties' relative losses from a failure to reach a negotiated agreement. The greater one party's relative losses, ceteris paribus, the greater will be the other party's bargaining leverage, and the higher price the other party can achieve in the negotiation.") *See also* Howard Raiffa, The Art and Science of Negotiation (Cambridge, MA: Harvard University Press, 1982), 46; Martin J. Osborne and Ariel Rubinstein, Bargaining and Markets (Cambridge, MA: Academic Press, Inc., 1990), 3.

12 *See, e.g.,* Abhinay Muthoo, Bargaining Theory with Applications (Cambridge and New York: Cambridge University Press, 1999).

cardholder penetration at the service of the one hypothetically negotiating issuer, making disagreement payoffs disproportionately painful for a merchant.

(24) Thus, the HAI rule adversely affects both an issuer's incentives to offer favorable terms and a merchant's ability and incentives to discipline or negotiate with an issuer. This effectively eliminates the possibility that competitive levels of interchange would emerge from a decentralized system in which each individual issuer chooses (or negotiates with merchants or acquirers) its own level of interchange. This has been recognized for many years, and has historically been the rationale for centralized setting of default interchange by the networks.[13]

(25) Even though issuers and merchants are technically free to negotiate deviations from default interchange, we seldom see such bilateral negotiations.[14] The infrequency of such negotiations is consistent with the implication above that under HAI, which merchants and issuers cannot bilaterally suspend, the price elasticity of demand on the merchant side (effects on merchant acceptance) faced by an individual issuer is very low or even zero: given the HAI rules, if an issuer lowers its interchange fees, it will not capture much (if any) additional business.

[13] Benjamin Klein, Andres V. Lerner, Kevin M. Murphy, and Lacey L. Plache, "Competition in Two-Sided Markets: The Antitrust Economics of Payment Card Interchange Fees," *Antitrust Law Journal* 73, no. 3 (2006): 574 ("Given an honor-all-cards rule, bilaterally negotiated interchange fees in the absence of a default interchange fee would create an incentive for individual card issuers in an open-loop payment card system to "hold up" acquirers by demanding arbitrarily high interchange fees on transactions made with their cards. […] A default interchange fee prevents such holdups by placing a cap on interchange fees that can be bilaterally negotiated between individual issuers and individual acquirers in the Visa and MasterCard payment systems."); Marc Rysman and Julian Wright, "The Economics of Payment Cards," *Review of Network Economics* 13, no. 3 (2015): 323 ("[… ] it is difficult to combine the "honor all cards" rule with bilateral interchange negotiation because it leads to a hold-up problem, in which a single issuer might refuse to deal with acquirers unless they accept its demands for a particularly high interchange fee.").

[14] Co-branded cards may be an exception. Co-branded cards are cards created through a partnership between a merchant and an issuer or card network. They typically have the merchant's name and logo, offer discounts or other benefits when purchasing from the merchant, and can be used at any other merchants where the card network is accepted. Issuers usually lower the interchange fee or partially reimburse it to the merchant in exchange for promoting the co-branded card. US Government Accountability Office, *Credit Cards: Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges*, GAO-10-45 (November 2009). One could view the lower interchange rates on co-branded cards as evidence that the default rates are inefficiently high.

# IV. Removing the HAI rule would bring the market toward normal competitive incentives for card issuers and merchants

(26) Removing HAI and allowing a merchant to selectively reject a given issuer's cards would provide merchants with a needed mechanism to incentivize competition among issuers. Removing this significant constraint on merchants would presumably benefit them and bring the market closer to normal competitive incentives. As explained in Section V.A, relaxing HAC to allow selective rejection of card types (as the Amended Settlement would do) would not address the core problems created by HAC as a whole, because (as explained in Section III) those problems are created more specifically by HAI.

(27) Removing HAI, accordingly, would resolve the dilution problem. Merchants (perhaps especially large merchants) could evaluate the specific terms offered by each issuer alone, and respond in a properly targeted way to those terms and that issuer. Because the issuer would be responsible for its own offers to merchants, who could accept or reject or negotiate, the issuer would have a normal commercial incentive to make its offers attractive.

(28) If selective rejection at the issuer level is allowed, and a merchant is threatening to reject Chase cards because hypothetically they involve high fees, Chase can unilaterally sharpen its pencil and work to convince the merchant not to reject. As I will describe below, the same is not true of the issuers whose premium cards might be categorically declined if one or more merchants consider taking advantage of the limited right to reject that is proposed by the Amended Settlement. In effect, under HAI, merchant responses are constrained to depend only on a weighted average of terms across multiple issuers.

(29) Removing HAI would also eliminate distortions in the credibility and the balance of pain when a large merchant negotiating with an issuer considers selectively declining (probably temporarily) the issuer's cards. The ability to refrain from trading with a particular supplier whose offerings are unsatisfactory is a fundamental part of ordinary competition. And the ability to impose a (temporary) pause on such trading, even if doing so would cause pain to both sides, is a fundamental negotiating tool, at least to have in one's back pocket. Under current HAC/HAI, the only way a merchant can refrain from trading with a particular issuer is to exit the network completely, at what is likely a multiple of the cost to the merchant.

(30) Removal of HAI would enable merchants to flexibly reward an issuer who is willing to offer a better overall deal, and to penalize an issuer who tries to insist on particularly high rates. This significant demand elasticity—more merchants will want to do more business with an

issuer if the issuer offers better terms—is key to the competitive mechanism. It is closely linked to, and often used to diagnose, the presence of effective or "workable" competition.[15]

(31) I understand that at the preliminary approval stage, the Court expressed a concern that permitting issuer-level denials would lead to widespread card rejection. This is unlikely. Large gains from trade militate toward a right of issuer-level selective rejection serving predominantly as a threat or at most a temporary pause in trade that properly colors the negotiations between parties in a commercially normal way, and both sides will want to avoid actually carrying out the threat, let alone permanently.[16]

---

[15] In perfectly competitive markets, the demand elasticity faced by each firm is extreme: if a firm increases its price above the market level, it will lose all its business. That is, the firm faces an extremely or infinitely elastic demand curve: a small increase in price leads to a very large drop in sales. As a result, firms have no incentives to raise prices above the competitive levels. David M. Kreps, *A Course in Microeconomic Theory* (Princeton, NJ: Princeton University Press, 1990), 264–265 ("In the theory of perfect competition […] [t]he producers/vendors […] believe they can sell as much of the item as they wish at the going price, and they can sell none at all at a higher price.").

Note that this argument refers to the elasticity of demand faced by each firm, not to the overall market demand elasticity. Even if the overall demand is relatively inelastic (i.e., consumers tend to reduce their consumption by a relatively small amount when prices increase), in perfectly competitive markets, each firm faces an infinitely elastic demand curve, as if it increases its price by a small amount, consumers will switch all their purchases to a different firm. *See* Figure 8–1, Paul A. Samuelson and William D. Nordhaus (Columbus, Ohio: McGraw Hill, 1998): 138 ("The industry demand is on the left, showing inelastic demand at competitive equilibrium at *A*. However, the perfect competitor on the right has such a tiny part of the market that demand looks completely horizontal (i.e., perfectly elastic).")

Most markets in reality are not perfectly competitive, but the same logic applies: if each firm faces a more elastic demand curve, it will have little incentive to increase its prices, as this would result in a large drop in sales. Thus, firms will have incentives to compete with other firms based on prices, as reducing their price by a relatively small amount would let them capture a significant volume of business.

[16] *See*, *e.g.*, Steven C. Salop, "The AT&T/Time Warner Merger: How Judge Leon Garbled Professor Nash." *Journal of Antitrust Enforcement,* 6:3 (2018): 463 ("These dynamics do not mean that blackouts would be common. To the contrary, economic analysis assumes that the parties normally would succeed in reaching an agreement. Failing to reach agreement would inflict losses on both parties and thus would be inefficient. In fact, even if failure to agree would benefit the seller in a vertical merger, so that total foreclosure would be strictly profitable, it generally would be even more profitable to negotiate a higher price to compensate for those higher profits rather than forgo an efficient agreement.")

# V. The Amended Settlement fails to foster normal competitive mechanisms and generate competitive incentives for issuers

(32) I understand that the Amended Settlement proposes, among others, the following changes to the networks' merchant restraints relative to the rules currently in effect:

1. HAC is modified to allow a merchant to reject cards by type (commercial, standard consumer, and premium consumer), but HAI still applies.[17]
2. Surcharging by brand is replaced (within limits) with surcharging by brand and card type (but not by issuer) and "level playing field" rules are relaxed.[18]
3. Discounting by card type for MasterCard is replaced with discounting by card type and issuer for MasterCard. Visa already allowed discounting by card type and issuer.[19]

[17] *See* Amended Settlement, ¶¶ 22–23, 71–72.

[18] Regarding the partial relaxation of networks' surcharging rules, *see* Amended Settlement, ¶¶ 39–41, 88–90.

The "level playing field" rules imposed by Visa and Mastercard establish that if a merchant accepts any other credit-card brand that limits surcharging, the merchant must also apply that other brand's surcharging rules to Visa or Mastercard credit cards. *See* Visa, "Visa Core Rules and Visa Product and Service Rules," April 18, 2026, ¶ 5.5.1.6; Mastercard, "Mastercard Rules," June 2, 2026, ¶ 5.12.2.1. American Express prohibits surcharging unless the merchant also surcharges all other credit and debit transactions. *See* American Express, "Merchant Regulations: U.S.," April 2026, § 3.2. Moreover, Visa and Mastercard prohibit surcharging on debit card transactions. *See* Visa, "Merchant Surcharging Considerations and Requirements"; Mastercard US, "Mastercard Credit Card Surcharge Rules and Fees for Merchants." The interaction between these rules implies that merchants who accept American Express in addition to Visa and Mastercard cannot surcharge.

The Amended Settlement relaxes Visa and Mastercard's level playing field rules, allowing merchants to surcharge Visa and Mastercard cards pursuant to the Amended Settlement regardless of merchants' acceptance of other brands (such as American Express or Discover). Amended Settlement, ¶¶ 43 (c), 92 (c).

[19] Amended Settlement, ¶ 68 ("[T]he Mastercard Defendants shall modify their 'no discounting' and 'non-discrimination' Rules to allow discounting at the issuer level"). As for Visa's implicit tolerance of issuer discounting, *see* Amended Settlement, ¶ 19 ("[T]he Visa Defendants shall modify their "no discounting" and "non-discrimination" Rules to clarify that discounting at the issuer level […] is permitted.")

## V.A. Permitting rejection only at a broad aggregate level is not a good substitute for the ability to engage in issuer-level rejection

(33) Allowing selective acceptance only at the card type level (with each "type" of card being a relatively broad category) still suffers from the dilution problem described in Section III: a merchant's evaluation of accepting/rejecting a type of card depends on the average terms that would apply when the card type is used at that merchant, and those average terms are not under the control of any one issuer. Consequently, no issuer will have an incentive to improve those terms: any unilateral improvement will be heavily diluted before being evaluated by the merchant.

(34) Allowing selective acceptance only at the card type level still handicaps a merchant's ability to discipline an individual issuer or a small group of issuers, because, under that rule, the merchant would have to also reject cards of the same type from all other issuers. That would present the merchant with the unreasonable choice between doing nothing and rejecting what might very well be a large percentage of all cards on that network, with concomitantly excessive losses of transaction volume, for example. And as before, the dilution problem would ensnare those issuers in a collective action problem if they even tried to ensure good performance that would avert such a group rejection.

(35) To flesh out the issue of credibility of merchant rejection that is raised by those points, Professors Stiglitz and Leffler argue that "the threat of rejecting Mastercard's premium cards (or all Mastercard cards) would be as credible as the threat of rejecting a large issuer's cards."[20] They appear to suggest that whether a merchant can credibly threaten to reject one versus the other category of cards is merely a matter of whether the respective shares of merchant commerce accounted for by those categories of cards are similar. Their example appears numerically questionable and its logic is incorrect on two levels.

(36) First, if one interprets the rejection of Mastercard's premium cards and a large issuer's cards as walk-away payoffs, the relative economic pain from these two options is more complex than Professors Stiglitz and Leffler suggest. Card share of actual volume of commerce, in particular, is only one factor in the merchant's calculus, and focusing on this factor alone greatly oversimplifies the analysis.[21] From a merchant's perspective, the tradeoff in each case

---

[20] Doc. 9775-2, Rebuttal Declaration of Joseph E. Stiglitz, Ph.D., and Keith B. Leffler, Ph.D., January 14, 2026, ¶ 17 (hereinafter "Stiglitz and Leffler Rebuttal Declaration").

[21] Elsewhere in their Rebuttal Declaration, Professors Stiglitz and Leffler criticize Objectors for focusing on the low share that standard cards currently account for in actual transactions. They argue that this measure is a "static observation," that ignores the possibility of consumer substitution toward standard cards in the future in response to incentives provided by merchants, and suggest that the share of standard cards among all

is between (a) savings on merchant discount for those transactions that still take place but with a lower-priced payment means, and (b) loss of profit on those transactions that are lost (potentially including future transactions).[22] But each of those quantities differs as between "all Mastercard's premium cards" and "all Chase cards."

(37) In terms of numbers, Visa and Mastercard account for 52% and 34% of outstanding credit cards, respectively.[23] Rewards cards account for about 80% of issued credit cards,[24] so for a merchant, selectively rejecting Visa or Mastercard premium cards is uncomfortably close to rejecting an entire network.[25] The latter, of course, is an option prior to the Amended Settlement, but a very unsatisfactory one. In contrast, the largest credit card issuer (Chase) accounts for only 19% of outstanding credit cards, and other large issuers account for significantly less.[26]

(38) Moreover, roughly 40% of consumers carry credit cards from only one network.[27] This behavior, known as "single-homing," is especially common among Visa users: about half of them carry only Visa-network cards.[28] Single-homing makes it less appealing for a merchant to steer consumers toward cards from lower-cost networks by declining cards from higher-cost networks. If a merchant were to decline a costly network's cards, the merchant might lose that network's single-homing users, who may not be able to easily substitute to cards from a different network.

(39) Second, if one interprets the rejection of Mastercard's premium cards and a large issuer's cards as mutually painful outcomes that a merchant could employ while negotiating with an

issued cards is more informative about the extent of the potential substitution. *See* Stiglitz and Leffler Rebuttal Declaration, ¶ 24.

22 I present a simple model of this tradeoff in Section VI.

23 These figures refer to general-purpose credit cards. HSN Consultants, Inc., Nilson Report, no. 1301 (February 2026): 7.

24 Rewards cards account for 92% of purchases and about 80% of issued cards, according to the Consumer Financial Protection Bureau (CFPB). Consumer Financial Protection Bureau, "The Consumer Credit Card Market: Report to Congress," December 2025, 138-141.

25 Note that some cards classified as "Standard Consumer credit cards" in the Amended Settlement, such as Visa Traditional Rewards cards and Mastercard Enhanced Value cards, also give cardholder rewards.

26 Capital One accounts for 11% of outstanding credit cards, Citi for 9%, and Bank of America for 6%. HSN Consultants, Inc, Nilson Report, no. 1301 (February 2026): 6; HSN Consultants, Inc, Nilson Report, no. 1302 (February 2026): 10-11.

27 Lulu Wang, "Regulating Competing Payment Networks" (April 2026).

28 Lulu Wang, "Regulating Competing Payment Networks" (April 2026).

issuer, the credibility of threatening these outcomes may depend on entirely different considerations than an evaluation of the saving-loss tradeoff. As explained above, a mutually painful outcome that would not be credible as a walk-away payoff based on economic profitability calculation can be—and routinely is—entirely credible as a no-agreement-yet flow-payoff. It is routine in commercial negotiations that, if negotiations seem to be going badly, trade between the negotiating parties may come to a pause. Strikes, in the context of labor negotiations, or blackouts in the context of video programming and distribution, are two salient examples.[29]

(40) Finally, even if threats of rejecting Mastercard premium cards and rejecting Chase cards by a major retailer such as Walmart were equally credible (whether viewed as walk-away payoffs or no-agreement-yet flow-payoffs), their effect on issuer incentives and on bargaining is very different, because of the dilution problem. No individual Mastercard issuer could avert the merchant's threat to reject the broad category of premium cards, and a coordinated response would be in tension with the idea of unleashing competition. By contrast, as described above, Chase can unilaterally sharpen its pencil in response to a merchant's threat to reject Chase cards.

(41) In summary, instead of ending the anticompetitive HAI rule, the proposed partial relaxation of the HAC rule gives a merchant the right to accept some, but not all, of the products of every issuer who issues both standard and premium cards. Given that rejecting all Visa premium cards may seem to a merchant much like rejecting all Visa cards, this is unlikely to have much of an effect. But if it had an effect, this would be an intervention in each issuer's product line design—not an initiative that facilitates issuer-versus-issuer competition or rivalry. In this regard it would be much less standard and less well targeted at the core

[29] *See*, *e.g.*, Steven C. Salop, "The AT&T/Time Warner Merger: How Judge Leon Garbled Professor Nash," *Journal of Antitrust Enforcement* 6, no. 3 (2018): 463–464 ("The fact that permanent blackouts rarely if ever occur is not inconsistent with leverage theory. The leverage theory is premised on blackout threats, not actual blackouts." "Even though failure to agree is inefficient when an agreement is collectively profitable for the two sides, negotiators commonly make threats not to agree unless their demands are met. For example, both unions and management make strike threats, and strikes sometimes occur. These may occur as a result of imperfect information, which leads to miscalculation of BATNAs [Best Alternative to a Negotiated Agreement] or from one or both sides trying to create a reputation for hard negotiating. Strikes do not result from a one-time breakdown in negotiation and are not permanent. They instead take place one period at a time until one side capitulates. Stated differently, while the threat of a permanent or long-term blackout may lack credibility, threats to delay the agreement for one more period are credible.").

competitive issue than directly addressing the HAI rule, with its implications for issuer-versus-issuer competition.

## V.B. Proposed changes to the surcharging and discounting rules are unlikely to effectively ensure competition among issuers or to significantly benefit merchants

(42) Discounting and surcharging are two methods to achieve differential pricing, i.e., charging different prices based on the payment instrument used. I discuss the general economics of differential pricing below. In practice, discounting and surcharging can raise different issues, as I also discuss below.

(43) Professors Stiglitz and Leffler stress an economic welfare benefit if merchants do surcharge and/or discount in such a way that prices to the cardholder closely reflect costs to society or perhaps to the cardholder and merchant together. This has been called the "merchant indifference criterion" or the "tourist test."[30] While theoretically appealing, it seems quite distant from the data and analysis on surcharging and discounting described in the rest of this section. In particular, the merchant indifference criterion requires that the difference in payment costs to the merchant and the cardholder together be reflected in the difference in payment costs to the cardholder. This is a statement only about *differences* in costs and says nothing about the overall *level*.

[30] Joseph Farrell, 'Efficiency and Competition between Payment Instruments," *Review of Network Economics* 5, no. 1 (March 2006): 26–44 ("Aligning cardholder incentives for choice of payment instrument with the (joint) interests of the two-sided customer means making the merchant indifferent. […] **Merchant Indifference Criterion:** The customer choice criterion holds when the *merchant is indifferent among the consumer's choices of payment instrument*" [emphasis in original].); Jean-Charles Rochet and Jean Tirole, "Must-Take Cards: Merchant Discounts and Avoided Costs, *Journal of the European Economic Association* 9, no. 3 (June 2011): 463–495 ("[W]ould the merchant want to refuse a card payment when a non-repeat customer with enough cash in her pocket is about to pay at the cash register? Put differently, the merchant discount passes the *tourist test* if and only if accepting the card does not increase the merchant's operating costs. […] We show that, when issuers' margins are constant, the tourist test is an exact test of excessive interchange fees from the point of view of short-term consumer surplus, and yields false positives if the criterion is social welfare" [emphasis added].).

### V.B.1. Surcharging and discounting are already allowed to a degree, but are rarely used by merchants

(44) Perhaps the most striking fact about surcharging and discounting is that, even though both are allowed (with restrictions) under the current rules, they are sparsely used by merchants.

(45) Merchants have been allowed by the Cash Discount Act to offer a discount to customers who pay with cash or check instead of credit cards since 1981.[31] Discounts for paying with a debit card rather than a credit card have been legally permitted nationwide since the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act was enacted in 2010.[32] The 2010 consent decree between Visa, Mastercard, and the Department of Justice (DOJ) required Visa and Mastercard to relax their rules constraining merchants from offering consumers discounts based on the payment method, brand, and product.[33] In 2013, Visa and Mastercard modified their rules to allow surcharging by brand and product although the effectiveness of these changes may have been limited due to restrictions imposed by other card networks, through Visa's and Mastercard's "level playing field" rules.[34] [35] In addition, Visa's rules allow discounting by issuer, while Mastercard's rules explicitly prohibit it.[36]

---

[31] Cash Discount Act, Pub. L. No. 97-25, 95 Stat. 144 (1981).

[32] Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, 124 Stat. 2072 (2010).

[33] Department of Justice, "Justice Department Sues American Express, Mastercard and Visa to Eliminate Rules Restricting Price Competition; Reaches Settlement with Visa and Mastercard," news release no. 10-1115, October 4, 2010, https://www.justice.gov/archives/opa/pr/justice-department-sues-american-express-mastercard-and-visa-eliminate-rules-restricting.

[34] Visa, "Surcharging Credit Cards—Q&A for Merchants," https://usa.visa.com/dam/VCOM/download/merchants/surcharging-faq-by-merchants.pdf ("U.S. merchants have the option to add a surcharge at the "brand level […] or to particular types of Visa credit card transactions at the "product level"); Mastercard, "Mastercard Rules 5.11.2—Effective: 27 January 2013 6 June 2019," https://www.mastercard.com/content/dam/mccom/us/business/documents/Merchant-Surcharge-Rules.pdf ("[...] a Merchant located in the U.S. Region or a U.S. Territory may only require a Mastercard Credit Card Cardholder to pay a Surcharge by choosing to apply either of the following Surcharge methods: Brand-level Surcharge [… and] Product-level Surcharge.")

[35] See footnote 18.

[36] Visa, "Visa Core Rules and Visa Product and Service Rules," April 18, 2026; Mastercard, "Mastercard Rules," June 2, 2026.

(46) Despite having the ability to offer discounts by payment method and, to a lesser degree, charge surcharges, merchants mostly stick to pricing that doesn't reflect the differences in merchants' payment processing costs ("price coherence").

- Discounts for cash or debit card payments are infrequent. According to the 2025 Survey and Diary of Consumer Payment Choice, a nationally representative survey administered by the Federal Reserve, only 5% of cash payments and 2% of debit transactions receive payment-method discounts.[37] Earlier editions of the survey point to comparable, or even lower, rates of payment-method discounting.[38] Of the discounting that does occur, a disproportionate share concentrates in specific sectors, such as auto and vehicle-related transactions.[39]
- Surcharging of credit card transactions is also infrequent. The 2025 Survey and Diary of Consumer Payment Choice indicates that 3% of credit card payments are surcharged.[40] Earlier editions of the survey point to comparable, or even lower, incidences of surcharging.[41]

(47) Accordingly, whatever effects discounting and surcharging might have where implemented, their marketwide significance is likely to be limited. If merchants do not use the surcharging and discounting options they currently have, that calls into question whether they will use the Amended Settlement's surcharging and discounting options. As discussed below, there are

---

[37] Kevin Foster, Claire Greene, and Joanna Stavins, "2025 Survey and Diary of Consumer Payment Choice: Summary Results," *Federal Reserve Bank of Atlanta Research Data Report* 26, no. 1 (2026).

[38] *See* Joanna Stavins, "Consumer Preferences for Payment Methods: Role of Discounts and Surcharges," *Journal of Banking & Finance* 94 (2018): 45 ("In 2015, consumers reported receiving cash discounts on 1.6 percent of in-person cash transactions, debit card discounts on 2.0 percent of in-person debit card transactions, and credit card surcharges on only 1.0 percent of in-person credit card transactions (all purchases). In 2012, the comparable numbers were 1.7 percent, 1.8 percent, and 1.2 percent, respectively.").

[39] *See* Joanna Stavins, "Consumer Preferences for Payment Methods: Role of Discounts and Surcharges," *Journal of Banking & Finance* 94 (2018): 35-53.

[40] Kevin Foster, Claire Greene, and Joanna Stavins, "2025 Survey and Diary of Consumer Payment Choice: Summary Results," *Federal Reserve Bank of Atlanta Research Data Report* 26, no. 1 (2026).

[41] *See* Joanna Stavins and Huijia Wu, "Payment Discounts and Surcharges: The Role of Consumer Preferences" (Federal Reserve Bank of Boston Working Papers 17, no. 4, 2017): 15–16 ("As was the case in 2012 […] surcharges based on the payment instrument continued to be very rare in 2015." "In 2015, consumers reported receiving […] credit card surcharges on only 0.9 percent of in-person credit card transactions (all non-bills). In 2012, the comparable numbers were […] 1.2 percent").

valid economic reasons for many merchants to prefer price coherence to surcharging and discounting.

### V.B.2. Merchant benefits from differential pricing based on the payment method are likely to be small

(48) A simple economic analysis can help understand why a merchant might leave on the table the opportunity to set separate prices for, say, a coat bought with a payment instrument that charges the merchant a high cost versus for the same coat bought with a lower cost payment method. This is particularly true when the underlying cost differences are small fractions of the price, as with card payment fees.

(49) To illustrate, suppose that a merchant is selling coats that cost it $60 each, that payment method A costs the merchant $2 and payment method B costs it $6, that half the target market consists of consumers who will use method A if they buy a coat, and the other half would use B, and that in each of those groups of consumers there is a linear demand curve $Q = 200 - p$, where $p$ is the price of a coat and $Q$ is the number of coats sold to that group of consumers. (In other words, everything is symmetrical between these groups except the merchant cost for the payment instruments.)

(50) If the merchant sets a single price $p$ to consumers, it will sell $2 \times (200 - p)$ coats in total (half to each group). Its profit-maximizing price thus maximizes $2 \times (200 - p) \times (p - \$60 - \$4)$, using the fact that by symmetry it is paying $2 in payment fees per coat for half of its sales, and $6 for the other half. Thus it will set a profit maximizing price of $132, sell 136 coats (68 to each group of consumers), and incur an average cost of $64 per coat ($60 for the coat and on average $4 for the transaction fee). This yields a net profit of 136 × ($132 – $64) = 136 × $68 = $9,248.

(51) If, instead, the merchant sets separate prices to the two groups, then for sales to group A, the merchant's unit cost per coat, including the fee, is $62, while for sales to group B it is $66. This induces profit-maximizing prices of $131 for group A and $133 for group B. Profits from group A are thus (200 – 131) × ($131 – $62) = 69 × $69 = $4,761, and profits from group B are (200 – 133) × ($133 – $66) = 67 × $67 = $4,489. Total profits are thus $9,250.

(52) The merchant has gained only $2 (i.e., $9,250 minus $9,248) from the ability to surcharge/discount, i.e., to engage in differential pricing: this is less than $1/40^{th}$ of 1 percent ($2 ÷ $9,248 = 0.0002) of its single-price profits.

(53) This is an example of what economists call first- and second-order effects. The separate-prices solution and the single-price solution all cluster on prices that differ from one another

by less than 1 percent, a small first-order effect. Still, 1 percent of profits would be over $90, so one might expect the merchant to gain somewhere in that non-trivial first-order range by optimally pricing to the two different groups separately; but the calculation shows that the profit impact is far smaller. This is because profits as a function of price have slope zero at the profit maximizing price, so (for proportionally small cost and price differences, as here, both in my example and in payment cards) the first-order approximation is that the difference in profits is approximately zero times the difference in prices—or zero; the second-order approximation, which governs when the difference in prices is small and the first-order approximation is zero, is proportional to the square of the difference in profit-maximizing prices. Proportionally, then, setting separate prices gains the merchant only a small quantity squared.[42]

(54) This phenomenon may help explain why merchants often refrain from surcharging or discounting even where it would be allowed. Because, *given the levels of merchant discount on the two cards*, the merchant's gain from separate pricing is so small that it does not take much to reverse it. In my example again, the $2 profit reward from separate pricing is about 1.5 cents for each of the 136 coats sold, or, to put it another way, it is a few percent of the merchant's profit ($67-plus) from the sale of just one coat. It wouldn't take much by way of adverse, skeptical, or even merely puzzled, consumer reaction to be enough of a detriment to overcome the $2 motivation: there is something to the idea that simplicity can be good business in this context.

(55) While squaring a proportionally small cost difference yields a very small profit difference between differential and uniform pricing, squaring a bigger cost or demand difference yields a much more substantial profit difference. An implication is that it is merchants who for one reason or another would set particularly large surcharges or discounts if they engaged in differential pricing, who are most likely to find it worthwhile to do so. Another implication is that different merchants will be impacted to very different degrees—and the impacts on their customers, typically larger, will also differ—from a relaxation of the merchant rules about surcharging and discounting. Most strikingly, some merchants who are not tempted to surcharge or discount will gain no direct benefit from those relaxations.

[42] Using a quantitative model of payment network competition, Wang (2026) also concludes that uniform pricing generates only second-order losses for merchants and estimates that losses from uniform pricing are 17 bps of merchant profits. Lulu Wang, "Regulating Competing Payment Networks" (April 2026): A-45.

### V.B.3. Surcharging and discounting would make merchant pricing more complex, increasing consumer search costs and reducing competition among merchants

(56) If surcharging and/or discounting became widespread, it would also make pricing more complex and less transparent (e.g., the same card could be surcharged differently by different merchants), raising consumer search costs and making comparison shopping more difficult. Economic theory predicts that increases in consumer search costs are likely to reduce the intensity of competition among merchants, thereby encouraging them to charge higher prices.[43] Even small search costs might allow merchants to charge prices well above competitive levels.[44]

(57) As a general matter, consumer charges applied and/or disclosed late in the shopping/purchase process tend to be unpopular and treated with suspicion by consumers: they may understandably suspect even a legitimate surcharge of being, or including, an opportunistic junk fee.[45] At a minimum consumers may want an explanation, adding to wait times at the cash register or guessing (correctly or not, but not obviously irrationally) that the presence of such a fee suggests that they should shop elsewhere.

---

[43] Joseph Farrell, "Consumer and Competitive Effects of Obscure Pricing" (presentation, FTC, Washington, DC, May 21, 2012), 8, https://www.ftc.gov/sites/default/files/documents/public_events/economics-drip-pricing/jfarrell.pdf ("If consumer can't see full cost up- front, can't comparison shop as well; Hence weaker competitive pressure."); Michael Choi, Anovia Yifan Dai, and Kyungmin Kim, "Consumer Search and Price Competition," *Econometrica* 86, no. 4 (July 2018): 1257–1281 ("It is well-known that if prices are unobservable before search, then market prices tend to rise with search costs. Intuitively, an increase in search costs reduces the value of additional search, which strengthens each seller's market power over visiting consumers and, therefore, leads to higher prices."); Rafael Rob, "Equilibrium Price Distributions," *Review of Economic Studies* 52, no. 3 (July 1985): 487–504 ("[I]nformational imperfection gives sellers a limited monopoly power to the extent that buyers shift to other sellers only in response to significant price rises. [… B]uyers with high search costs conduct a less extensive search and buy, on the average, at higher prices.").

[44] *See*, *e.g.*, Peter Diamond, "A Model of Price Adjustment," *Journal of Economic Theory* 3 (1971): 157, 156–68.

[45] *See*, *e.g.*, Reserve Bank of Australia, "Review of Merchant Card Payment Costs and Surcharging: Conclusions Paper," March 31, 2026, 23 ("Consumers have a strong preference for removing card surcharging. Around three-quarters of [survey] respondents thought surcharging was unnecessary and should stop[.]").

(58) Consistent with the fact that the merchant's incentive to surcharge or discount is much greater if the optimal prices differ more substantially, there is evidence that when merchants do surcharge, the surcharge often exceeds card acceptance fees.[46] This might be because the merchant is seeking to take advantage of the opportunity to assess a junk fee, or it might be that as a group, customers who have high-fee cards have a higher willingness to pay or lower demand elasticity.

(59) A general tendency for surcharging to be excessive when it is nonzero is not the only way in which it fails to provide an accurate signal to consumers about cards' differential costs to merchants. Whereas surcharging and discounting might sound relatively simple if one thinks of only two relevant costs to a merchant ("high cost" and "low cost"), it is much more complex if each of several networks sponsors several card "types," let alone if the merchant's cost is issuer-specific. Faced with that complexity, merchants often impose the same percentage surcharges across all card types.[47]

(60) Indeed, with multiple (not merely two) payment methods, at different costs to the merchant, it is unclear where a surcharge belongs, versus a discount, and hard to imagine explaining the profile of prices to a consumer at the cash register.

(61) All this may make it unsurprising that merchants often pass up opportunities to use discounts and surcharges as a response to differences in interchange that they cannot affect.

(62) Walmart says it wouldn't engage in surcharging or discounting. Professors Stiglitz and Leffler argue that this is a strange or inconsistent position to take, given that Walmart charges different prices for goods that vary in other dimensions (e.g., steak quality or egg size). This may be a natural way for economists to think about how they themselves feel about

---

[46] International experience shows that some merchants may surcharge above their card acceptance costs. According to estimates from the Reserve Bank of Australia, roughly one in ten merchants imposed surcharges of 3% or more, compared to an average merchant service fee of 0.8%. Reserve Bank of Australia, "A Variation to the Surcharging Standards: Final Reforms and Regulation Impact Statement," June 2012, 4–5. Similarly, before the United Kingdom banned surcharging, airlines' surcharges were perceived to greatly exceed their payment processing costs. For example, while the UK's Office of Fair Trade estimated credit card acceptance costs at 1.34% of the transaction value, EasyJet imposed a one-off transaction fee of £9 per booking plus 2.5% of the transaction amount. Ali Hussain, "Money Made Easy: Your five minute guide to… airline surcharges," *The Sunday Times*, July 8, 2012.

[47] According to a study of merchants in Australia, less than a third of merchants that impose surcharges differentially surcharge debit and credit cards, despite the difference in costs between these two payment methods. Reserve Bank of Australia, "Review of Merchant Card Payment Costs and Surcharging: Conclusions Paper," March 31, 2026, 25.

surcharging/discounting, but the overall consumer response seems a different matter, as I discuss in Section V.B.5.

### V.B.4. The proposed changes in surcharging rules are insufficient to effectively ensure issuer-level competition for merchants

(63) The Amended Settlement proposes to allow limited surcharging:[48]

1. Capped at the merchant discount or 3%, whichever is less;
2. Only at "brand" or "product" level—not issuer-specific.

(64) Because proposed changes to the surcharging rules do not allow surcharging by issuer, they do not address the dilution problem. Whether issuers and merchants negotiate interchange bilaterally, or whether issuers independently set their own interchange fees, any given issuer has little or no control over whether (or how much) one or more merchants will decide to surcharge a network-defined category of cards that includes (some of) that issuer's cards. Thus, the prospect of such surcharging does not provide competitive discipline on the factors, such as pricing, that ought to drive that choice. This is, of course, the dilution problem described above. Moreover, there will be no assurance that all of the issuers in that category of cards will choose, or negotiate, the same (presumably high) level of interchange; a surcharge that is appropriate for one may not be equally appropriate for another.

(65) It is also worth noting that the Amended Settlement limits surcharging to 3% or the merchant's cost of card acceptance, whichever is less.[49] This 3% limit makes it impossible for a merchant to fully pass on a particularly steep fee; it is unclear why limiting surcharges to the merchant cost of acceptance would not suffice to protect against excessive surcharging.

[48] The Amended Settlement also removes Visa's and Mastercard's "level playing field" rules, which limited the ability of merchants that accept cards from other networks to surcharge. See footnote 18. Note, however, that this does not remove restrictions on surcharging imposed by American Express, which could affect merchants' incentives to impose surcharges on Visa and Mastercard credit cards.

[49] Amended Settlement, ¶¶ 40(a), 41(a), 89(a), 90(a).

### V.B.5. The proposed changes in discounting rules are insufficient to effectively ensure issuer-level competition for merchants

(66) The Amended Settlement allows discounting by card type and issuer for cards issued by both networks. Previously, such discounting was allowed only for Visa cards, whereas Mastercard rules allowed discounting only by card type, but not by issuer.

(67) As I noted above, surcharging and discounting are both forms of differential pricing but in practice, they may not be equivalent. One reason for the lack of equivalence is that consumers may have limited attention and may gather information quickly when making everyday decisions.[50] Posted prices are relatively easily observable, whereas consumers may learn about the exact discount offered by a merchant on each type of card and issuer only at the register. As a result, consumers may focus on posted prices when comparing prices across retailers, and ignore discounts or add-on costs that may be less visible. [51] If consumers choose which merchant to patronize based on posted prices, a merchant that raises its posted product prices (and offers discounts) would be at a competitive disadvantage compared to rivals that do not discount. In this situation, a merchant will be reluctant to increase the

---

[50] The behavioral economics literature shows that consumers have limited attention and do not gather all available information before making decisions. *See, e.g.,* Stefano DellaVigna, "Psychology and Economics: Evidence from the Field," *Journal of Economic Literature* 47, no. 2 (June 2009): 315–372 ("In the starkest form of the standard model, individuals make decisions using all the available information. Since Simon (1955), economists have attempted to relax this strong assumption and have proposed models in which individuals simplify complex decisions, for example by processing only a subset of information… Limited attention helps explain the (partial) neglect of: (i) shipping costs in eBay auctions; (ii) non-transparent taxes; (iii) complex information in rankings; (iv) earnings news, specially before weekends and on days with more competing news; (v) news about linked companies; (vi) demand shifts in the distant future.").

[51] Studies show that consumers tend to focus on posted prices when shopping and ignore sales taxes to a large degree when posted prices do not include them, even when they are well-informed and know the magnitude of the taxes. *See* Raj Chetty, Adam Looney, and Kory Kroft, "Salience and taxation: Theory and evidence," *American Economic Review* 99, no. 4 (2009): 1145–77; and Taubinsky, Dmitry, and Alex Rees-Jones, "Attention variation and welfare: theory and evidence from a tax salience experiment," *The Review of Economic Studies* 85, no. 4 (2018): 2462–2496. *See also* Shelle Santana, Steven K. Dallas, and Vicki G. Morwitz, "Consumer Reactions to Drip Pricing," *Marketing Science* 39, no. 1 (2020): 188–210 ("Across six studies, we find that when optional surcharges are dripped (versus revealed up front) consumers are more likely to initially select a lower base priced option which, after surcharges are included, is often more expensive than the alternative.").

posted prices of *all* products just to be able to provide discounts at the cash register for most cardholders, except those carrying cards from high-cost issuers.

(68) Given that the Amended Settlement extends issuer-level discounting from Visa to both networks, one theoretical possibility is that a merchant could negotiate with an issuer to offer that issuer's cardholders a discount in exchange for a lower interchange fee.[52] For the issuer to accept the deal, the merchant discount would have to increase the transaction volume on its cards sufficiently to offset the lost revenues on inframarginal consumers or transactions, i.e., those that would have used the issuer's card at the merchant without the discount.[53] Because interchange fees are small relative to merchants' overall costs, the discounts that a merchant can offer to the issuer's cardholders are unlikely to be large enough to generate significant volume gains for the issuer. For instance, receiving a relatively small price discount from a particular merchant is unlikely to induce many customers to adopt a new card. Consequently, it is unlikely that any issuer would be willing to agree to a reduction in interchange as long as there is no corresponding "stick" or prospect of losing volume.

(69) That said, suppose, arguendo, that it was profitable for some issuer to offer a lower interchange fee in exchange for a merchant discount for its cardholders. This would only lower interchange fees for that issuer alone, with little prospect of other issuers having incentives to reduce their interchange fees. While a merchant might in theory succeed in offering a deal that results in significant volume gain for one issuer, it is unlikely that it can credibly promise significant volume gains to all or very many issuers. As a result, the impact of issuer-level discounting on overall interchange fees is likely to be limited at best.

(70) Allowing issuer-level discounting is therefore unlikely to bring the market toward normal competitive incentives for card issuers and merchants, and is not a good substitute for eliminating the HAI rule.

---

[52] *See* Stiglitz and Leffler Rebuttal Declaration, ¶ 21, where Professors Stiglitz and Leffler argue that merchant discounts could be funded from reduced interchange fees.

[53] This is the same problem faced by any firm with a downward-sloping demand curve setting a single price.

# VI. Interchange fee caps and rollbacks under the Amended Settlement are unlikely to effectively ensure intra-network competition among issuers

(71) In addition to the permanent rule changes discussed above, the Amended Settlement also proposes three types of temporary interchange fee reductions. First, it prohibits Visa and Mastercard from raising their posted interchange rates from their March 2025 levels.[54] Second, it requires each network to reduce its average effective interchange rate to be at least 10 bps below the current combined average effective interchange rate of the two networks.[55] Third, it requires Visa and Mastercard to reduce the interchange fee on standard cards to no more than 125 bps.[56] The first two measures will remain in effect for five years, while the third one will remain in effect for at least eight years.[57]

(72) All three types of fee reduction amount to price regulation. As an initial matter, price regulation is generally not a good long-term substitute for ensuring that appropriate rules govern the competitive process. Price regulation treats the symptoms, not the underlying causes—in this case, as I have explained, meaning primarily the HAI rule. These fee reductions will be short-lived, and may not help at all after these measures expire if the causes of the lack of intra-network competition among issuers are not addressed.

(73) That said, Professors Stiglitz and Leffler argue that the 125-bps fee cap on standard cards also has an indirect effect that goes beyond mere price relief. In their Initial Declaration, they argue that "a current disincentive to steering results from the interchange-rate compression" and "[t]he Amended Settlement responds to that problem by mandating a reduction in interchange rates to a maximum of 125 bps on all standard cards. This will increase the likelihood of steering or using the threat of steering to achieve a more favorable negotiated Visa and Mastercard pricing."[58] They repeat their argument in their Rebuttal Declaration, writing "[t]he Objectors fail to understand the potential competitive impact of the 125 bps

---

[54] Amended Settlement, ¶¶ 51, 100.

[55] Amended Settlement, ¶¶ 48, 97.

The 10-bps rate relief will be applied proportionally to merchants that pay negotiated interchange rates for the duration of their custom interchange rate agreements with the networks. Amended Settlement, ¶¶ 49, 98.

[56] The impact of the 125-bps cap on posted interchange fees on standard cards is included in meeting the 10-bps overall rate reduction. Amended Settlement, ¶¶ 50, 99.

[57] Amended Settlement, ¶¶ 49–51, 98–100, 120.

[58] Doc. 9692-5, Initial Declaration of Joseph E. Stiglitz, Ph.D., and Keith B. Leffler, Ph.D., November 10, 2025, ¶ 28 (hereinafter "Stiglitz and Leffler Initial Declaration").

rate cap on standard cards. The purpose of this change is not so much a rate reduction, as the posted rate cap and the overall rate rollback of the Amended Settlement directly addresses this. Rather the purpose is to provide merchant and issuer incentives to encourage customers to shift to lower cost cards."[59]

(74) Professors Stiglitz and Leffler seem to be arguing that the way to achieve a lower average interchange fee is to artificially *increase* the gap in interchange fees between standard and premium cards, with the idea that this generates additional incentives for merchants to steer consumers away from premium cards in various ways (surcharge premium cards, discount standard cards, or other means). The ability of merchants to steer volume towards standard cards would then provide a competitive incentive for issuers to offer rates even lower than 125 bps in order to become a merchant's favored standard card provider.[60]

(75) However, a more direct economic argument would observe that (a) capping (or lowering the cap on) interchange fees on standard cards would reduce the profitability of issuing standard cards relative to the current situation, as Professors Stiglitz and Leffler acknowledge, and accordingly (b) issuers would have stronger incentives than now to steer consumers towards premium cards. These incentives would counteract merchants' attempts to move volume from premium cards to standard cards.

(76) Even if the proposed mechanism were to work, this is a remarkably indirect way of trying to achieve a reduction in credit card acceptance costs. It requires a long chain of causation, involving multiple separate economic actors (issuers, card networks, merchants, consumers, and possibly acquirers). Professors Stiglitz and Leffler provide no evidence that all the economic actors involved in their chain of causation would respond in the manner they assume.

(77) Professors Stiglitz and Leffler state that "[t]he 125 bps cap on standard cards creates a standard-premium interchange differential of nearly 100 bps."[61] They claim that this differential is high enough to prompt merchants to try to steer consumers away from premium cards and towards standard cards. However, they provide no evidence to support their claim, and the on-point evidence I am aware of makes the hypothesized merchant steering unlikely.

---

[59] Stiglitz and Leffler Rebuttal Declaration, ¶ 20.

[60] Stiglitz and Leffler Initial Declaration, ¶ 88; Stiglitz and Leffler Rebuttal Declaration, ¶ 23.

[61] Stiglitz and Leffler Rebuttal Declaration, ¶ 21.

(78) According to data from Nilson reports, a leading industry trade publication, the difference between the aggregate merchant discount rate for Visa and Mastercard *credit* card transactions and the corresponding figure for Visa and Mastercard *debit* card transactions exceeded 160 bps in 2025.[62] Merchants can currently steer consumers away from credit cards and toward debit cards or cash,[63] but seldom do.[64] Professors Stiglitz and Leffler do not explain why a significantly smaller interchange differential between standard and premium cards would induce merchants to engage in the kind of steering required to achieve reductions in card acceptance costs.

(79) Steering consumers from a higher cost payment method (e.g., premium credit cards) to a different one (e.g., standard credit cards) creates a risk for the merchant that some customers—e.g., those who strongly prefer a particular payment method or cannot easily substitute to other payment methods—may not complete the transaction or may stop patronizing the merchant in the future. This "walk-away" risk has been highlighted as a potential risk of surcharging:

- According to the Reserve Bank of Australia's 2010 Consumer Payments Use Study, **14%** of consumers in Australia would patronize another store if faced with a 1% surcharge on a MasterCard or Visa credit card.[65]
- Survey evidence from the Netherlands suggests that **5%** of consumers would take their business elsewhere if faced with a 10–15 cents surcharge on debit-card purchases below EUR 10.[66]

---

62 HSN Consultants, Inc., Nilson Report, no. 1303 (March 2026): 10.

63 Discounts for paying with a debit card rather than a credit card have been legally permitted nationwide since the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act was enacted in 2010. Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, 124 Stat. 2072 (2010).

64 Some credit card holders may have preferences for credit cards not driven by rewards, such as valuing the ability to use the free float and the guaranteed line of credit to smooth fluctuations in their cash flow, and thus steering these cardholders towards debit may result in larger sales losses. However, this is unlikely to account for the lack of discounts on debit transactions.

65 *See* Graph 30 in John Bagnall, Sophia Chong, and Kylie Smith, "Strategic Review of Innovation in the Payments System: Results of the Reserve Bank of Australia's 2010 Consumer Payments Use Study," June 2011, 31.

66 Wilko Bolt, Nicole Jonker, and Corry Van Renselaar, "Incentives at the Counter: An Empirical Analysis of Surcharging Card Payments and Payment Behaviour in the Netherlands," *Journal of Banking & Finance* 34, no. 8 (2010): 1738-1744.

- An Ipsos survey found that **17%** of U.S. customers stop shopping at merchants that implement surcharges.[67]
- In a JD Power survey, 32% of merchants said their retail customers occasionally or frequently cancel a purchase when a surcharge is added to their transaction.[68]
- According to a 2024 study conducted by Morning Consult, two-thirds of customers are less likely to shop at a retailer if it adds a surcharge for using a credit or debit card.[69]

(80) To help understand the profitability of surcharging for a merchant, a simple model is useful. For simplicity, I consider a surcharge that makes the merchant indifferent between a customer paying the surcharge and sticking to the high-cost payment mechanism, versus shifting to the lower-cost payment means. This indifference simplifies the exposition because it implies that we only need to keep track of two consumer responses to the surcharge: shift to the lower-cost payment means (or pay the surcharge, which by assumption is equivalent for the merchant), versus walk away from the merchant.

(81) The downside of such a surcharge is that some customers will walk away from the transaction.[70] The forgone profits that the merchant would have made on those transactions can be measured by its gross margin (net of the payment acceptance cost).[71] The overall cost per potential client can be expressed as:

$$\text{Cost} = \text{walk-away rate} \times \text{merchant gross margin} \times \text{average transaction size}$$

(82) The benefits of surcharging for the merchant will depend on the difference in merchant discount rate between the high-cost payment method and the lower-cost payment method that

---

[67] Carlos Aragon and Kaili Hunsaker, "Why Payment Card Surcharges Don't Add Up for Merchants: An Ipsos Point of View," Ipsos, 2023, 4.

[68] JD Power, "Non-Traditional Payment Method Acceptance and Customer Surcharges Grow Significantly at U.S. Small Businesses, JD Power Finds," news release, January 13, 2026.

[69] American Bankers Association, "ABA Unveils New National Consumer Polling Data on Major Bank Policy Issues," news release, October 29, 2024.

[70] I focus on the case of surcharging for this discussion, but a similar framework applies to other forms of steering. Note that this analysis differs from the one I present in Section V.B.2. Among other differences, the calculation in Section V.B.2. is based on features of an optimal pricing strategy for the merchant, whereas the one in this section compares costs and benefits associated with a given level of surcharging starting from not necessarily optimal pricing.

[71] The gross margin (net of the payment acceptance cost) is the appropriate measure of profit for these calculations, as it does not include fixed costs, which would not be expected to change in response to small changes in demand.

customers are steered towards,[72] applied to the transactions that the merchant retains. The overall benefit per potential client can be expressed as:

> Benefit = (1 – walk-away rate) × (merchant discount on high-cost payment method – merchant discount on low-cost payment method) × average transaction size

(83) For the merchant to find it beneficial to surcharge, the benefits of surcharging must exceed the costs, so the following condition should hold:[73]

> (1 – walk-away rate) × (merchant discount on high-cost payment method – merchant discount on low-cost payment method) ≥ walk-away rate × merchant gross margin

(84) Intuitively, merchants with higher margins would face higher opportunity costs of customers walking away and would find it less beneficial to surcharge. Merchants facing smaller differences between merchant discount rates on high- and low-cost payment methods would find it less beneficial to surcharge. And merchants facing a higher walk-away rate, e.g., because they operate in more competitive sectors or because their customers cannot easily substitute to other payment methods, would be less likely to surcharge.[74]

---

[72] For this analysis, I assume that the merchant surcharges by the difference between the cost of cards with high merchant discounts and cards with lower merchant discounts that they want consumers to use. In this case, the merchants would be indifferent between consumers paying with the high-merchant-discount card and paying the surcharge and consumers shifting their payment method. This simplifies the analysis since the share of cardholders who choose to pay the surcharge does not matter. One can interpret the formula for the benefits of surcharging as referring to either (a) the case where all cardholders pay the surcharge, so the merchant gets additional revenues equivalent to the amount of the surcharge (merchant discount on high-cost payment method – merchant discount on low-cost payment method) on the remaining sales, but experiences no reduction in its merchant discount or (b) the case where all cardholders do not pay the surcharge and switch to the lower cost card, so the merchant gets no additional revenues but experiences a reduction in its merchant acceptance costs equal to the difference between the cost of cards with high merchant discounts and cards with lower merchant discounts costs on the remaining sales.

[73] These calculations assume, for simplicity, that the transaction size is the same for customers who walk away and those who don't. If this wasn't the case, we could use still this condition, but the walk-away rate would have to represent the share of spending accounted for by customers who walk away, instead of the share of customers that walk away.

[74] All three comparisons assume all else equal.

(85) Applying the cost-benefit framework described above suggests that the 100-bps differential between premium and standard cards claimed by Professors Stiglitz and Leffler may not create strong enough incentives for many merchants to attempt to steer consumers away from premium cards. The inequality above can be used to determine the walk-away rate that leaves the merchant indifferent between surcharging and not surcharging, which I refer to as the critical walk-away rate. An actual walk-away rate that exceeds the critical walk-away rate means that the merchant is worse off from surcharging. Figure 1 shows the critical walk-away rate for different industries, based on their gross margins, calculated using a 100-bps gap between premium and standard cards. Overall, the critical walk-away rates Figure 1 are small, ranging from 2.5% to 4.4%. The potential actual walk-away rates based on the survey evidence I summarized above exceed all of the critical rates. To the extent that merchants with negotiated interchange rates would experience a smaller initial increase in the differential between premium and standard cards than those paying posted interchange fees, they would likely have lower critical walk-away rates, everything else equal.

**Figure 1. Critical walk-away rates for selected industries, based on a 100-bps gap between premium and standard credit cards**

| Industry | Gross margin | Critical walk-away rate |
|---|---|---|
| Recreation | 39.8% | 2.5% |
| Restaurant and dining | 32.2% | 3.0% |
| Retail (automotive) | 22.0% | 4.4% |
| Retail (building supply) | 34.2% | 2.8% |
| Retail (general) | 33.2% | 2.9% |
| Retail (grocery and food) | 26.3% | 3.7% |
| Retail (special lines) | 35.3% | 2.8% |

Source: Aswath Damodaran, “Cash Flow Estimation: Operating and Net Margins by Industry Sector,” January 5, 2026, https://pages.stern.nyu.edu/~adamodar/pc/datasets/margin.xls, accessed September 9, 2026. Note: This figure reports for selected industries the critical walk-away rate, defined as the walk-away rate that leaves the merchant indifferent between surcharging and not surcharging, assuming a 100-bps differential between premium and standard credit cards.

## VII. Examples provided by Professors Stiglitz and Leffler fail to show that the proposed changes in combination would ensure intra-network competition among issuers

(86) In their Rebuttal Declaration, Professors Stiglitz and Leffler argue that "in evaluating the likely impact of the Amended Settlement reforms to the anti-steering merchant restraints, it is important to consider the reforms as a whole," and provide a series of examples of how, in their view, merchants could leverage different aspects of the changes introduced by the Amended Settlement to increase competition.[75]

(87) In one such example, Professors Stiglitz and Leffler argue that "If a merchant wishes to favor the premium cards of a particular issuer, it could, for example, impose a surcharge of 3% on all premium cards while also offering customer advantages such as faster check out or other amenities for the use of the premium cards of the favored issuer or a discount. Offering the right to be the favored premium card creates a substantial incentive for issuers to compete to be that card by offering reduced interchange. Indeed, we would expect this alternative to have interchange reduction incentives comparable to the threat of not accepting the premium cards of an issuer, while providing greater flexibility."[76]

(88) Imposing a surcharge of 3% on all premium cards does not address the dilution problem and does not increase competition among issuers. Professors Stiglitz and Leffler do not explain how this part of the proposed strategy interacts with the other part(s). They also do not explain why they "would expect this alternative to have interchange reduction incentives comparable to the threat of not accepting the premium cards of an issuer."

(89) Professors Stiglitz and Leffler claim that "[o]ffering the right to be the favored premium card creates a substantial incentive for issuers to compete to be that card by offering reduced interchange." But any such reduction in interchange (if it occurred) would only apply to the card issuer that the merchant chose as its preferred. Other card issuers not selected as

---

[75] Stiglitz and Leffler Rebuttal Declaration, footnote 31. *See also* Stiglitz and Leffler Rebuttal Declaration, ¶¶ 3, 5 ("[T]he reforms of the Amended Settlement provide multiple avenues for merchants to generate competition well beyond what might be available from the ability to reject the cards of particular issues." "We find the objections [to the Amended Settlement] to be based on an incomplete understanding of how the reforms of the Amended Settlement considered together will increase the ability of merchants to steer consumers to lower cost payment means. It is this increased ability to impact card usage depending on the price charged to the merchant that underlies the increase in competition that is expected to result from the Amended Settlement.").

[76] Stiglitz and Leffler Rebuttal Declaration, ¶ 16.

preferred would have no incentive to lower their interchange fees. The extent to which preferring a particular issuer would lead to reductions in the overall interchange fees paid by a merchant would depend on the amount of volume that merchants can shift to their preferred cards, which Professors Stiglitz and Leffler do not quantify.[77]

(90) In contrast, having the ability to selectively exclude cards at the level of issuers would allow merchants to obtain competitive interchange rates from all issuers, since (consistent with normal buyer-seller negotiations in a workably competitive industry generally) any issuer individually would risk losing all its volume if it insisted on too high an interchange rate.

(91) In another example, Professors Stiglitz and Leffler argue that "[a] merchant would then be expected to steer its customers to the now lower-cost Mastercard credit cards. There are a variety of ways that it could do this, all allowed within the proposed settlement. **For example, a merchant could now impose a surcharge on Visa premium cards with the expectation of a minimal loss in business, as customers could avoid the surcharge by switching to a Mastercard premium card, retaining their high rewards. A merchant could negotiate an even lower rate with a particular Mastercard issuer in return for discounting or offering merchant rewards on that issuer's Mastercards and promoting that issuer's cards.** [emphasis added] Visa would be expected to react to this threat to its credit card market share by offering more favorable Visa fees. Over time, the opening of such competition would likely permeate the market. This is an example of how the proposed settlement induces competition, which will lower both the costs to merchants and the total price of the card."[78]

(92) If customers could easily substitute from a Visa premium card to a Mastercard premium card, as the example assumes, then a merchant's rejection of *all* Visa cards would also entail "minimal loss," since rewards cards account for the majority of outstanding cards and purchase volume. Merchants could use this threat to negotiate for lower interchange fees with Visa under the current system. In effect, Professors Stiglitz and Leffler are assuming a very high cross-elasticity between Visa premium and Mastercard premium. In reality, as I discuss in Section V.A, about half of Visa cardholders carry only Visa-network cards, so "minimal loss" is very optimistic.

(93) As in the previous example, Professors Stiglitz and Leffler do not explicitly explain how the different elements of their proposed strategy synergistically interact to increase competition.

---

[77] Of course, it is not possible to promise all issuers significantly increased volume.

[78] Stiglitz and Leffler Rebuttal Declaration, ¶ 18.

(94) The ability to "negotiate an even lower rate with a particular Mastercard issuer in return for discounting or offering merchant rewards on that issuer's Mastercards and promoting that issuer's cards" is in part merely delegating the provision of rewards from the issuer to the merchant. Also, for the same reason I discuss above, the strategy of promoting cards from one issuer or from a few issuers would be inherently limited because a merchant cannot simultaneously promote the cards of all issuers.

# VIII. Conclusion

(95) The Amended Settlement fails to address the anticompetitive HAI rule and thereby unleash the prospect of normal competitive negotiations and incentives regarding interchange. Instead, the Amended Settlement relaxes an aspect of the HAC rule but retains HAI. To the extent that premium/rewards cards are the great majority of the market, that relaxation would change little; to the extent that it does, it would entitle a merchant to accept only some types of cards from each issuer, but it would still not entitle the merchant to reward an issuer that offers an appealing set of products and prices, nor to discipline one that does not.

(96) The Amended Settlement relaxes rules on surcharging and discounting. But experience and economic theory indicate those reforms are unlikely to be widely used, or very potent, in practice. Finally, it also puts its faith in several versions of price cap regulation, which is less likely to work than competition. The Amended Settlement thus misses the opportunity to benefit merchants through promoting competition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | |
|---|---|
| [signature] | September 14, 2026 |
| Joseph Farrell, D.Phil. | Date |

# Appendix A. Curriculum vitae of Joseph Farrell

## A.1. Summary

Joseph Farrell is a Professor of the Graduate School in the Department of Economics at the University of California, Berkeley. From 2009 to 2012, Dr. Farrell served as Director of the Bureau of Economics at the Federal Trade Commission (FTC), where he was responsible for economic analysis relating to the Bureau's antitrust and consumer protection portfolios. He oversaw important antitrust matters such as *FTC v. Intel*, *In re Omnicare*, *In re OSF Healthcare System*, *FTC v. Promedica Health System*, and *FTC v. Watson Pharmaceuticals*, and he was a key member of the team that revised the FTC/Department of Justice *Horizontal Merger Guidelines*. His prior government experience includes serving as Deputy Assistant Attorney General for Economic Analysis for the Antitrust Division of the US Department of Justice and as Chief Economist for the Federal Communications Commission.

Dr. Farrell is an experienced expert witness who has been retained by US and international government and private clients for internal advice and expert testimony. His widely cited academic research has focused on the economics of competition, mergers, innovation, and network effects. He is an internationally recognized leader for his contributions in industrial organization, regulation and antitrust enforcement, intellectual property, and game theory.

Previously, Dr. Farrell was Chair of the Competition Policy Center at UC Berkeley. Dr. Farrell is a Fellow of the Econometric Society, past President of the Industrial Organization Society, former Editor of the *Journal of Industrial Economics*, and former Board Member for the National Academies' Computer Science and Telecommunications Board. In 2016, the Industrial Organization Society awarded him the Distinguished Service Award, which is given annually in recognition of professional leadership in the scholarship and practice of industrial organization. Dr. Farrell has been named to the Lexology Index (formerly *Who's Who Legal*) list of leading competition economists since 2015 and is also on its Global Elite Thought Leaders–Competition list. In 2022, he was named on Global Competition Review's inaugural list of Antitrust Academics.

## A.2. Education

- DPhil, Economics, Oxford University, United Kingdom

- MSc, Mathematics, Oxford University, United Kingdom
- BA, Mathematics, First Class Honours, Oxford University, United Kingdom

## A.3. Representative Testimony

- *Klein et al. v. Meta Platforms*
- *Optis Cellular Technology, LLC, et al. v. Apple Retail UK Limited et al.*
- *In re Anthem/Cigna Merger Litigation*
- AdvoCare's multilevel marketing
- *Complete Entertainment Resources LLC v. Live Nation Entertainment, Inc., et al.*
- US International Trade Commission cases No. 337-TA-862, No. 337-TA-866, and No. 337-TA-868
- *Gulfstream Aerospace Corp. v. Camp Systems Int'l.*
- Proceedings concerning interchange fee for debit and credit cards in Australian Federal Court

## A.4. Publications

- "What's New in the 2023 Merger Guidelines?" In *The 2023 U.S. Merger Guidelines: A Review*, ed. Sean Sullivan. New York: Concurrences, 2024.
- "The oligopoly problem, trigger strategies, and 'Coordinated Effects'," *CPI Antitrust Chronicle*, July 2023.
- "Looking at More Evidence in Antitrust," *Network Law Review*, Spring 2023.
- "The 2010 Horizontal Merger Guidelines After 10 Years" (with Carl Shapiro). *Review of Industrial Organization* 58 (2021): 1–11.
- "Natural Oligopoly Responses, Repeated Games, and Coordinated Effects in Merger Analysis: A Perspective and Research Agenda" (with Jonathan B. Baker). *Review of Industrial Organization* 58 (2021): 103–41.
- "Oligopoly Coordination, Economic Analysis, and the Prophylactic Role of Horizontal Merger Enforcement" (with Jonathan Baker). *University of Pennsylvania Law Review* 168 (2020) 1985–2018.

- Jerry S. Cohen Antitrust Writing Award: Best Antitrust Article of 2020 on Tacit Collusion.

- "Comments on Merger Guidelines." In *Competition Law and Economics: Developments, Policies, and Enforcement Trends in the US and Korea*, eds. Jay Pil Choi, S. Lee, and W. Lim. Northampton, MA: Edward Elgar Publishing, 2020.
- "Pharmaceutical Patents and Pay-for-Delay: Actavis" (with Mark Chicu). In *The Antitrust Revolution*, 7th ed., eds. John E. Kwoka, Jr., and Lawrence J. White. New York: Oxford University Press, 2018.
- "Some Simple Analytics of Vertically Linked Markets." *Review of Industrial Organization* 50, no. 4 (2017): 431–40.
- "Some Failures of the Popular Coase Theorem." In *The Elgar Companion to Ronald H. Coase*, ed. Claude Menard, chap. 24. Northampton, MA: Edward Elgar, 2016.
- "Resetting Merger Policy in the New Administration" (with John Kwoka). *Concurrences* 4 (2016).
- "The US Federal Trade Commission at 100: A Symposium on FTC Economics." *Review of Industrial Organization* 46, no. 1 (2015): 1–3.
- "Freedom to Trade and the Competitive Process" (with Aaron Edlin). In *Oxford Handbook of International Antitrust Economics*. Vol. I, eds. Roger D. Blair and D. Daniel Sokol, chap. 13. New York: Oxford University Press, 2014.
- "Can Privacy Be Just Another Good?" *Journal on Telecommunications and High Technology Law* 10, no. 2 (2012): 251–65.
- "Economics at the FTC: Drug and PBM Mergers and Drip Pricing" (with Howard A. Shelanski, Daniel Hanner, Christopher J. Metcalf, Mary W. Sullivan, and Brett W. Wendling). *Review of Industrial Organization* 41, no. 4 (2012): 303–19.
- "Four Paths to Compatibility" (with Tim Simcoe). In *Oxford Handbook of the Digital Economy*, eds. Martin Peitz and Joel Waldfogel. New York: Oxford University Press, 2012.
- "Keynote Address: Mosquitoes, Micropayments, and Privacy." In *Consumer Payment Innovation in the Connected Age: Proceedings of 2012 Federal Reserve Payment Systems Conference*, Kansas City Fed., 89– 97.
- "Market Data and Participants' Views in Horizontal Merger Analysis." *Concurrences* (2012).

- Republished in *William E. Kovacic: An Antitrust Tribute*, eds. Nicolas Charbit, Elisa Ramundo, Anna Chehtova, and Abigail Slater, 137–46. New York: Institute of Competition Law, 2012.

- "Choosing the Rules for Consensus Standardization" (with Tim Simcoe*). RAND Journal of Economics* 43, no. 2 (2012): 235–52.
- "Economics at the FTC: Hospital Mergers, Authorized Generic Drugs, and Consumer Credit Markets" (with David Balan, Keith Brand, and Brett Wendling). *Review of Industrial Organization* 39, no. 4 (2011): 271–96.
- "Fox, or Dangerous Hedgehog? Keyte and Schwartz on the 2010 Horizontal Merger Guidelines." *Antitrust Law Journal* 77, no. 2 (2011): 661–68.
- "Economics at the FTC: Mergers, Dominant-Firm Conduct, and Consumer Behavior" (with Janis Pappalardo and Howard Shelanski). *Review of Industrial Organization* 37, no. 4 (2010): 263–77.
- "Upward Pricing Pressure in Horizontal Merger Analysis: Reply to Epstein and Rubinfeld" (with Carl Shapiro). *Berkeley Electronic Press Journal of Theoretical Economics* 10, no. 1 (2010).
- "Recapture, Pass-Through, and Market Definition" (with Carl Shapiro). *Antitrust Law Journal* 76 (2010): 585– 604.
- "Upward Pricing Pressure and Critical Loss Analysis: Response" (with Carl Shapiro*). Competition Policy International* (February 2010).
- "Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition" (with Carl Shapiro). *Berkeley Electronic Press Journal of Theoretical Economics* 10, no. 1 (2010).
- "Economics at the FTC: Retrospective Merger Analysis with a Focus on Hospitals" (with Paul Pautler and Michael Vita). *Review of Industrial Organization* 35 (2009): 369–85.
- "Intellectual Property as a Bargaining Environment." In *Innovation Policy and the Economy*, eds. Josh Lerner and Scott Stern. National Bureau of Economic Research/University of Chicago Press, 2008.
- "How Strong Are Weak Patents?" (with Carl Shapiro). *American Economic Review* 98, no. 4 (2008): 1347–69.
- "Merger to Monopoly to Serve a Single Buyer: Comment" (with Jonathan Baker and Carl Shapiro). *Antitrust Law Journal* 75, no. 2 (2008): 637–46.
- "Improving Critical Loss Analysis" (with Carl Shapiro). *Antitrust Source* (February 2008).

- "Standard Setting, Patents, and Hold-Up" (with John Hayes, Carl Shapiro, and Theresa Sullivan). *Antitrust Law Journal* 74, no. 3 (2007): 603–70.
- "Coordination and Lock-In: Competition with Switching Costs and Network Effects" (with Paul Klemperer). *Handbook of Industrial Organization*, vol. 3, eds. Mark Armstrong and Robert Porter, 1967–2072. Amsterdam: Elsevier Science Publishing, 2007.
- "Do Investors Forecast Fat Firms? Diagnosing Profit Dissipation from Stock Market Values of Gold Mining Firms" (with Severin Borenstein). *RAND Journal of Economics* 38, no. 3 (2007): 626–47.
- "Compatibility and Competition Policy." In *Standards and Public Policy*, eds. Shane Greenstein and Victor Stango, 372–88. New York: Cambridge University Press, 2007.
- "The Economics of Welfare Standards in Antitrust" (with Michael L. Katz). *Competition Policy International* 2, no. 2 (2006): 3–28.
- "Efficiency and Competition among Payment Instruments." *Review of Network Economics* 5, no. 1 (2006): 26–44.
- "Open Access Arguments." In *Net Neutrality or Net Neutering: Should Broadband Services Be Regulated?* eds. Thomas Lenard and Randolph May, 195–214. New York: Springer, 2006.
- "Complexity, Diversity, and Antitrust." *Antitrust Bulletin* 51, no. 1 (2006): 165–73.
- "Assessing Australian Interchange Regulation: Comments on Chang, Evans and Garcia Swartz." *Review of Network Economics* 4, no. 4 (2005): 359–63.
- "Amicus Brief of 37 Business, Economics and Law Professors." In *Tamoxifen Citrate antitrust litigation*, December 2005, written with Mark Lemley and Carl Shapiro, also signed by 34 other professors of business, economics and law.
- "Deconstructing Chicago on Exclusive Dealing." *Antitrust Bulletin* 50*,* no. 3 (2005): 465–80.
- "Innovation and Regulation" (invited review of part of Economic Report of the President). *Journal of Economic Literature* 43 (2005): 801–05.
- "Competition or Predation? Consumer Coordination, Strategic Pricing, and Price Floors in Network Markets" (with Michael L. Katz). *Journal of Industrial Economics* 53, no. 2 (2005): 203–31.
- "Incentives to Challenge and Defend Patents: Why Litigation Won't Reliably Fix Patent Office Errors, and Why Administrative Patent Review Might Help" (with Robert P. Merges). *Berkeley Technology Law Journal* 19, no. 3 (2004).

- *The Economics of Information Technology: An Introduction* (with Hal R. Varian and Carl Shapiro). New York: Cambridge University Press, December 2004.
  - Translations into Chinese and Italian.
- "Listening to Interested Parties in Antitrust: Competitors, Customers, Complementors, and Relativity." *Antitrust* 18, no. 2 (2004): 64–68.
- "Modularity, Vertical Integration, and Open Access Policies: Towards a Convergence of Antitrust and Regulation in the Internet Age" (with Philip Weiser). *Harvard Journal of Law and Technology* 17, no. 1 (2003): 85–135.
- "Negotiation and Merger Remedies: Some Problems." In *Merger Remedies in American and European Union Competition Law*, eds. Francois Leveque and Howard Shelanski. Cheltenham, UK: Edward Elgar, 2003.
- "Integration and Independent Innovation on a Network." *American Economic Review* 93, no. 2 (2003): 420–24.
- "The American Airlines Case: A Chance to Clarify Predation Policy" (with Aaron Edlin). In *The Antitrust Revolution*, 4th edition., eds. John Kwoka and Lawrence White, 502–27. New York: Oxford University Press, 2003.
- "Market Structure, Organizational Structure, and R&D Diversity" (with Richard Gilbert and Michael L. Katz). In *Economics for an Imperfect World: Essays in Honor of Joseph E. Stiglitz*, eds. Richard Arnott and others, 195–220. Cambridge, MA: MIT Press, 2003.
- "Renegotiation in the Repeated Amnesty Dilemma, with Economic Applications" (with Georg Weizsäcker). In *Business Applications of Game Theory*, eds. Kalyan Chatterjee and William Samuelson. Boston: Kluwer Academic Publishers, 2001.
- "Monopoly Slack and Competitive Rigor." In *Readings in Games and Information*, ed. Eric Rasmusen. Oxford: Blackwell Publishing, 2001.
- "Scale Economies and Synergies in Horizontal Merger Analysis" (with Carl Shapiro). *Antitrust Law Journal* 68 (2001): 685–710.
- "Innovation, Rent Extraction, and Integration in Systems Markets" (with Michael L. Katz). *Journal of Industrial Economics* 48, no. 4 (2000): 413–32.
- "The Professor and the Madmen: Review of New Palgrave Dictionary of Economics and the Law." *Economic Journal* 110 (2000): 842–45.
- "Renegotiation in Repeated Oligopoly Interaction." In *Incentives, Organisation, and Public Economics: Papers in Honour of Sir James Mirrlees*, eds. Gareth Myles and Peter Hammond. Oxford, UK: Oxford University Press, 2000.

- "Using Cost-Cutting Announcements to Diagnose X-Inefficiency" (with Severin Borenstein). *American Economic Review* 90, no. 2 (2000).
  - Reprinted in *National Bureau of Economic Research, Industrial Technology and Productivity: Incorporating Learning from Plant Visits and Interviews into Economic Research*, 2000.
- "Inside the Pin Factory: Empirical Studies Augmented by Manager Interviews" (with Severin Borenstein and Adam Jaffe). *Journal of Industrial Economics* 46, no. 2 (1998): 123–24, editorial introduction.
- "The Effects of Antitrust and Intellectual Property Law on Compatibility and Innovation" (with Michael L. Katz). *Antitrust Bulletin* (Fall/Winter 1998): 609–50.
- "Cheap Talk and Coordination." In *The New Palgrave Dictionary of Economics and the Law*, ed. Peter Newman, 224–27. London: McMillan, 1998.
- Discussion of article by Church and Ware. In *Competition Policy and Intellectual Property Rights in the Knowledge-Based Economy,* eds. R. Anderson and N.T. Gallini. University of Calgary Press, 1998.
- "The Vertical Structure of Industry: Systems Competition versus Component Competition" (with Hunter Monroe and Garth Saloner). *Journal of Economics and Management Strategy* 7, no. 2 (1998): 143–82.
- "Public Policy and Private Investment in Advanced Telecommunications Infrastructure" (with Michael L. Katz). *IEEE Communications Magazine* 36, no. 7 (1998): 87–92.
- "Prospects for Deregulation in Telecommunications." *Industrial and Corporate* Change 6, no. 4 (1997): 719– 40.
- "Creating Local Competition." *Federal Communications Law Journal* 49, no. 1 (1996): 201–15.
- "Cheap Talk" (with Matthew Rabin). *Journal of Economic Perspectives* 10, no. 3 (1996): 103–18.
- "Harnesses and Muzzles: Greed as Engine and Threat in the Standards Process," *StandardView* 4, no. 1 (1996): 29–31.
  - Reprinted in *The Standards Edge*, ed. Carl Cargill, 2002.
- "Brief Amicus Curiae" to Supreme Court, *Lotus v. Borland*, December 1995. Written with Glenn Woroch; signed by 13 other economists.
- "Talk Is Cheap." *American Economic Review* 85, no. 2 (1995): 186–90.

- "The Economic Role of Standards." In *The Changing Nature of Telecommunications/Information Infrastructure*. Washington, DC: National Academy Press, 1995.
- "Some Arguments for Weaker Intellectual Property Protection in Network Industries." *StandardView* 3, no. 2 (1995): 46–49.
  - Reprinted *in Standards Policy and Information Infrastructure*, eds. Brian Kahin and Janet Abbate, 368–77. Cambridge, MA: MIT Press, 1995.
- "Cheap Talk about Specific Investments" (with Robert Gibbons*). Journal of Law, Economics, and Organization* 11, no. 2 (1995).
- "Irrational Behavior in the AT&T Investment Game" (with Suzanne Scotchmer). *Economics Letters* 45, no. 4 (1994): 471–74.
- "Choosing How to Compete: Strategy and Tactics in Standardization" (with Stanley M. Besen). *Journal of Economic Perspectives* 8 (1994): 117–31.
- "Meaning and Credibility in Cheap-Talk Games." *Games and Economic Behavior* 5 (1993): 514–31.
  - Reprinted in *Mathematical Models in Economics*, eds. Michael Bacharach and Michael Dempster. Oxford, UK: Oxford University Press, 1997.
- "The Dynamics of Bandwagons" (with Carl Shapiro). In *Problems of Coordination in Economic Activity*, ed. James W. Friedman, chap. 8. Boston: Kluwer Academic Publishers, 1994.
- "Standard Setting in High-Definition Television" (with Carl Shapiro). *Brookings Papers on Economic Activity: Microeconomics* (1992): 1–93.
- "Converters, Compatibility and the Control of Interfaces" (with Garth Saloner). *Journal of Industrial Economics* 40, no. 1 (1992): 9–36.
- Discussion of article by Franklin M. Fisher. *Brookings Papers on Economic Activity: Microeconomics* (1991): 231–40.
- "Review of Changing the Rules: Technological Change, International Competition, and Regulation in Telecommunications, eds. Robert W. Crandall and Kenneth Flamm." *Journal of Economic Literature* 29 (1991): 1204–05.
- "The Role of the ITU in Standardization: Pre-Eminence, Impotence, or Rubber Stamp?" (with Stanley M. Besen). *Telecommunications Policy* (1991): 311–21.
- "Horizontal Mergers and Antitrust Policy: Reply" (with Carl Shapiro). *American Economic Review* 81 (1991): 1007–11.

- "One-Sided Patience with One-Sided Communication Does Not Justify Stackelberg Equilibrium" (with Eddie Dekel). *Games and Economic Behavior* 2 (1990): 299–303.
- "Decentralization, Duplication, and Delay" (with Patrick Bolton). *Journal of Political Economy* 98 (1990): 803–26.
- "The Economics of Standardization: A Guide for Non-Economists." In *An Analysis of the Information Technology Standardization Process: Proceedings of the International Symposium on Information Technology Standardization*, eds. John L. Berg and Harald Schumny, 189–98. Amsterdam: North-Holland, 1990.
- "Asset Ownership and Market Structure in Oligopoly" (with Carl Shapiro). *RAND Journal of Economics* 21 (1990): 275–92.
- "Renegotiation in Repeated Games" (with Eric Maskin). *Games and Economic Behavior* 1 (1989): 327–60.
    - Reprinted in *Recent Developments in Game Theory*, ed. Eric Maskin, 388–421. Cheltenham, UK: Edward Elgar, 1999.
- "Horizontal Mergers: An Equilibrium Analysis" (with Carl Shapiro). *American Economic Review* 80, no. 1 (1990): 107–26.
    - Reprinted in *Takeovers*, Vol. I, eds. A.D. Cosh and Allan Hughes, International Library of Management.
    - Reprinted in *Applied Industrial Economics*, ed. Louis Phlips. Cambridge: Cambridge University Press, 1998.
    - Reprinted in *Recent Developments in Monopoly and Competition Policy*, ed. George Norman. Cheltenham, UK: Edward Elgar, 2008.
- "Cheap Talk with Two Audiences" (with Robert Gibbons). *American Economic Review* 79 (1989): 1214–23.
- "Renegotiation-Proof Equilibrium: Reply" (with Eric Maskin). *Journal of Economic Theory* 49 (1989): 376–78.
- "Evolutionary Stability in the Repeated Prisoner's Dilemma" (with Roger Ware). *Theoretical Population Biology* 36 (1989): 161–66.
- "Standardization and Intellectual Property." *Jurimetrics Journal* 30, no. 1 (1989): 35–50.
    - Reprinted in *Intellectual Property*, ed. Peter Drahos, chap. 5. Aldershot, UK: Dartmouth, 1999.
    - Reprinted in *The Economics of Intellectual Property*, eds. Ruth Towse and Rudi Holzhauer, chap. 22. Cheltenham, UK: Edward Elgar, 2002.

- "Competition Between and Within Teams: The Lifeboat Principle" (with Eric Lander). *Economics Letters* 29 (1989): 205–08.
- "Optimal Contracts with Lock-In" (with Carl Shapiro). *American Economic Review* 79, no. 1 (1989): 51–68.
- "Second-Sourcing as a Commitment: Monopoly Incentives to Attract Competition" (with Nancy T. Gallini). *Quarterly Journal of Economics* 103 (1988): 673–94.
- "Cheap Talk Can Matter in Bargaining" (with Robert Gibbons). *Journal of Economic Theory* 47 (1989): 221–37.
  - Reprinted in *Bargaining with Incomplete Information*, eds. Peter B. Linhart, Roy Radner, and Mark A. Satterthwaite. Waltham, MA: Academic Press, 1992.
- "Communication, Coordination, and Nash Equilibrium." *Economics Letters 27*, no. 3 (1988): 209–14; misprint corrected in Economics Letters 33, no. 3 (1990): 299.
- "Coordination through Committees and Markets" (with Garth Saloner). *RAND Journal of Economics* 19 (1988): 235–52.
- "Puzzles: Sylvia, Ice Cream, and More." *Journal of Economic Perspectives* 2 (1988): 175–82.
- "Dynamic Competition with Switching Costs" (with Carl Shapiro). *RAND Journal of Economics* 19 (1988): 123–37.
- "Information and the Coase Theorem." *Journal of Economic Perspectives* 1 (1987): 113–29.
  - Reprinted (in part) in *Economics of the Public Sector*: *Readings and Commentary*, eds. S. Baker and C. Elliott. Lexington, MA: Heath, 1989.
- "Partnerships" (with Suzanne Scotchmer). *Quarterly Journal of Economics* 103 (1988): 279–97.
- "Competition with Lock-In." In *Telecommunications Demand Modeling: An Integrated View*, eds. de Fontenay, Shugard, and Sibley, 353–62. Amsterdam: North-Holland, 1990.
- "Competition, Compatibility and Standards" (with Garth Saloner). In *Product Standardization and Competitive Strategy*, ed. H. Landis Gabel, 1–18. Amsterdam: North-Holland, 1987.
- "Rigidity versus License." *American Economic Review* 77 (1987): 195–97.
- "Cheap Talk, Coordination and Entry." *RAND Journal of Economics* 18 (1987): 34–39.
  - Reprinted in *Readings in Games and Information*, ed. Eric Rasmusen. Oxford, UK: Blackwell, 2001.

   - Reprinted in *Game Theory: Critical Concepts in the Social Sciences*, eds. Yanis Varoufakis and Anthony Housego. New York: Routledge, 2001.
- "Experience Rating and Premium Risk." *Economics Letters* 21 (1986): 311–14.
- "Installed Base and Compatibility: Innovation, Product Preannouncements, and Predation" (with Garth Saloner). *American Economic Review* 76 (1986): 940–55.
   - Reprinted in *The Economics of Innovation Policy*, ed. Albert N. Link, chap. 10. Cheltenham, UK: Edward Elgar, 2008.
- "Economic Issues in Standardization" (with Garth Saloner). *Telecommunications and Equity: Policy Research Issues*, ed. James Miller, 165–78. Amsterdam: North-Holland, 1986.
- "Moral Hazard as an Entry Barrier." *RAND Journal of Economics* 17 (1986): 440–49.
- "A Note on Inertia in Market Share." *Economics Letters* 21 (1986): 73–75.
- "Voluntary Disclosure: Robustness of the Unraveling Result." In *Antitrust and Regulation*, ed. R. Grieson, 91– 103. Lexington, MA: Lexington Books, 1986.
- "Standardization and Variety" (with Garth Saloner). *Economics Letters* 20 (1986): 71–74.
- "How Effective is Potential Competition?" *Economics Letters* 20 (1986): 67–70.
- "Owner-Consumers and Efficiency." *Economics Letters* 19 (1985): 303–306.
- "Standardization, Compatibility and Innovation" (with Garth Saloner). *RAND Journal of Economics* 16, no. 1 (1985): 70–83.
   - Reprinted in *The Economics of Information*, eds. Steven A. Lippman and David K. Levine, chap. 18. Cheltenham, UK: Edward Elgar, 1995.

## A.5. Professional activities and honors

- GCR Antitrust Academic (inaugural member), 2022
- Who's Who Legal Global Elite Thought Leader: Competition, 2019–present
- Distinguished Service Award, Industrial Organization Society, 2016
- Academic Advisor, OECD Competition Section, 2015
- Fellow, Econometric Society, 2002–present
- Finalist, International Who's Who of Competition Economists, 2013–present
- Senior Consultant, Charles River Associates, 2003–2009

- Board of Editors, Information Economics and Policy, 2004–2007
- Chair, Competition Policy Center, 1999–2006
- Co-Chair, American Bar Association conference on antitrust in high technology, June 2005
- Faculty, New York University graduate workshop on economics of technology, June 2005
- Computer Science/Telecommunications Board, National Academy of Sciences, 2001–2004
- Scientific Committee, Toulouse, 2004
- Vice-Chair, Economics Committee, Antitrust Section, American Bar Association, 2001
- Editor, Journal of Industrial Economics, 1995–2000 (previously Associate Editor)
- Program Committee, Econometric Society, June 1992; American Economic Association, January 2000
- President, Industrial Organization Society, 1996
- Reviewer, United States Office of Technology Assessment: "Computer Software and Intellectual Property," Finding a Balance, 1992
- Global Standards: Building Blocks for the Future, March 1992
- Organizing Committee, Telecommunications Policy Research Conference, April 1986
- Organized the GTE Laboratories Economics Symposium, August 1985
- Reviewer, National Academy of Sciences/National Research Council
- Referee for multiple economics journals, research agencies, publishers, etc.
- Witness, United States Senate Judiciary Committee, FCC, FTC, and DOJ hearings
- Consultant for Department of Justice, Federal Trade Commission, Canadian Bureau of Competition, Reserve Bank of Australia, and private parties
- University and departmental administrative service including past service as Chair of the Competition Policy Center, Chair of the Graduate Committee, membership of the Personnel Committee and Undergraduate Committee, promotion and tenure committees, and ad hoc committee.

## A.6. Academic advisory boards

- Centre for Competition Policy (UK) (2004–2008)

- Power and Telecom (1997–1999)
- Consortium on Telecommunications Policy (1997)
- Economics of Innovation and New Technology (1990–1995)

## A.7. Seminar presentations and speeches

- American Bar Association, American Enterprise Institute, American National Standards Institute, Australian Competition and Consumer Commission, Barcelona, Brookings Institution, Cal Tech, California Public Utilities Commission, Calgary, Cambridge University, Canadian Bureau of Competition, Columbia University, Concurrences Global Antitrust Economics Conference, Consumer Financial Protection Bureau, [US President's] Council of Economic Advisors, University of Chicago, E.CA Expert Forum, European Commission DG Competition, University of East Anglia, Federal Communications Bar Association, Federal Communications Commission, Federal Reserve Board, Federal Trade Commission, George Washington University Competition Law Center, Harvard, International Chamber of Commerce Diploma in Competition Policy (México chapter), LSE, MIT, Melbourne, Michigan, National Association of Attorneys General, National Economists' Club, NBER, New University of Lisbon, Nokia, Northwestern, Norwegian School of Management, Oslo University, Oxford, Princeton, Progress and Freedom Foundation, Santa Fe Institute, Stanford, Tel Aviv, Toronto, Toulouse, University of British Columbia, University of California (multiple campuses), USC, USC Gould School, National Economists' Club, New University of Law's Center for Transnational Law & Business, Lisbon, United States Department of Justice, United States Treasury, National Association of Attorneys General, National Research Council, OECD, World Bank, UK Competition Commission, Office of Fair Trading (UK), and numerous conferences.
- Speeches as Deputy Assistant Attorney General: http://www.usdoj.gov/atr/public/speeches/speech_farrell.htm.

## A.8. Professional experience

- Partner, Bates White, 2013–present
- University of California, Berkeley
  - Professor of the Graduate School, Department of Economics, since 2020
  - Professor of Economics, 1991–2020

    - Affiliated Professor, Haas School of Business, 1994–2013
    - Associate Professor, 1989–1991
    - Visiting Assistant Professor, 1986–1988
- Director, Bureau of Economics, United States Federal Trade Commission, June 2009–May 2012
- Deputy Assistant Attorney General and Chief Economist, Antitrust Division, United States Department of Justice, July 2000–June 2001
- Chief Economist, Federal Communications Commission, January 1996–June 1997
- Chair, Competition Policy Center, 1999–2006
- National Fellow, Hoover Institution, Stanford University, 1988–1989
- Technical Staff, GTE Laboratories
    - Principal Member, 1985–1986
    - Senior Member, 1984–1985
- Massachusetts Institute of Technology
    - Assistant Professor of Economics, 1980–1984
    - Instructor, 1979–1980
- Visiting Assistant Professor, University of California, San Diego, Spring 1983
- Visitor, Bell Laboratories, Summer 1978

## A.9. Teaching experience

- Teaching experience at Massachusetts Institute of Technology, University of Michigan, University of California, Berkeley and University of California, San Diego
    - Graduate and undergraduate industrial organization
    - Regulation and antitrust
    - Competitive strategy
    - Microeconomics
    - Statistical decision theory
    - Game theory

## A.10. Scholarships and grants

- Gordon Cain Senior Fellow, SIEPR, 2001–2002
- Sloan Foundation/NBER grant (with Severin Borenstein), "Why Do Firms Cut Costs?" 1998–2000
- Co-Principal Investigator (with Carl Shapiro), NSF, "Technology Transitions with Network Externalities," 1992–1994
- Hewlett Fund grant, Institute of International Studies, Berkeley, 1990–1991
- Co-Principal Investigator (with Carl Shapiro), NSF grant, "The Evolution of Network Industries," 1989–1991
- National Fellow, Hoover Institution, Stanford University, 1988–1989
- Principal Investigator, National Science Foundation (NSF), "Economics of Compatibility Standards and Lock-In," 1987–1989
- University Prize for best economics master's thesis, 1979
- Hulme Senior Scholarship (one of three in all subjects), 1978–1979
- Amphlett Senior Scholarship (one of six in all subjects), 1976–1978
- Science Research Council Studentship, 1975–1978
- Taberdar Senior Scholarship (awarded to one to two graduate students in all subjects), 1975–1976
- University Prize for final examinations in mathematics, 1975
- Open Scholarship in Mathematics (undergraduate) 1972–1975
- College Book Prize for academic performance, 1974