# Exhibit B

**Confidential**

# DECLARATION OF PROFESSOR ADAM J. LEVITIN

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*

05-MDL-1720 (E.D.N.Y.)

**Confidential**

**INTRODUCTION** .......... **4**

**I. PROFESSIONAL BACKGROUND AND QUALIFICATIONS** .......... **4**

**II. ASSIGNMENT AND SUMMARY OF OPINIONS** .......... **8**

**III. BACKGROUND** .......... **11**

**IV. OVERVIEW: THE SETTLEMENT'S RUBE GOLDBERG COMPETITION MACHINE** .......... **15**

**V. ANALYSIS OF INDIVIDUAL SETTLEMENT PROVISIONS** .......... **20**

***A. 10-Basis Point Reduction in Average Effective Interchange Rates*** .......... ***20***

***B. Capping of Posted Interchange Rates as of March 31, 2025*** .......... ***23***

***C. Capping Interchange for Standard Consumer Credit Cards at 125 Basis Points*** .......... ***25***

***D. Merchant Steering Reforms*** .......... ***29***

**i. Reform of the Networks' Honor-All-Cards Rules** .......... **29**

*a. Merchants Cannot Realistically Refuse to Accept a Particular Brand's Cards* .......... *30*

*b. Merchants Cannot Realistically Refuse to Accept Premium and Commercial Cards, Which Account for Nearly* [redacted] *% of the Networks' Purchase Volume* .......... *31*

*c. Merchants Will Incur Substantial Costs to Be Able to Identify Card Product Types and Will Not Be Able to Do so for Most or All of the Settlement Period* .......... *33*

*d. Even with Visual Identifiers, Merchants Lack the Ability to Identify Card Product Types at Point-of-Sale Prior to an Authorization Attempt* .......... *37*

*e. For Online Transactions, Merchants Would Need a Technological Solution That Would Allow Them to Decline Cards Based on Product Type* .......... *38*

*f. Declining Cards at the Product Level at Point-of-Sale Risks Customer Goodwill* .......... *38*

*g. Summary* .......... *39*

**ii. Brand- or Product-Level Surcharging and Dual Pricing** .......... **40**

*a. State No-Surcharge Statutes Prevent Many Merchants From Surcharging* .......... *41*

*b. The Right to Surcharge by Brand* .......... *43*

*c. The Right to Surcharge Premium and Commercial Cards Is of Little Value Because Most Cardholders Lack a Standard Card* .......... *43*

*d. Surcharging Cards at Point-of-Sale Risks Customer Goodwill and Sales* .......... *45*

*e. Surcharging Is Incompatible with Some Merchants' Business Models* .......... *46*

*f. Interchange Rates Will Exceed the Maximum Surcharge Allowed in Certain Cases* .......... *47*

g. *Merchants Cannot Always Know the Applicable Interchange Rate in Advance of a Transaction* ........ 47

h. *Merchants Will Not Be Able to Surcharge Until Much or All of the Settlement Period Has Expired* ........ 48

i. *The Proposed Settlement Provides No New Right to Engage in Dual Pricing* ........ 49

j. *Dual Pricing Is Already Legal, But Rarely Used Because It Is Cumbersome to Merchants* ........ 49

**iii. Issuer-Level Discounting ........ 50**

**iv. Elimination of the Networks' Honor-All-Wallets Rules ........ 51**

**v. Reform of the Network's All-Outlets Rules ........ 53**

***E. Facilitation of Merchant Buying Groups ........ 54***

***F. Merchant Education Funding ........ 56***

***G. Anti-Circumvention ........ 57***

**VI. ISSUES LEFT UNADDRESSED BY THE PROPOSED SETTLEMENT ........ 61**

***A. Issuer-Level Discrimination and Surcharging and Default Interchange ........ 61***

***B. Network Fees ........ 73***

***C. No-Bypass Rules ........ 74***

***D. Lack of a Multi-Homing Requirement ........ 75***

***E. Treatment of Debit Card Conduct ........ 75***

**VII. DEFICIENCIES OF THE STIGLITZ-LEFFLER DECLARATION ........ 76**

***A. Failure to Address the Limited Time Duration of the Settlement ........ 76***

***B. Failure to Engage with the Practical and Operational Realities of Merchant Steering ........ 77***

***C. Lack of Discounting to Present Value ........ 79***

***D. Mislabeled and Unexplained Calculations ........ 80***

***E. Unduly Optimistic Predictions ........ 80***

***F. The Stiglitz-Leffler Declaration's Bottom-Line Numbers Underscore How Little the Proposed Settlement Achieves for Merchants ........ 81***

**CONCLUSION ........ 82**

**APPENDIX A. DOCUMENTS RELIED UPON IN FORMULATING THE DECLARATION ........ 85**

**APPENDIX B. CURRICULUM VITAE OF ADAM J. LEVITIN ........ 91**

**APPENDIX C. LIST OF EXPERT TESTIMONY GIVEN AT DEPOSITION OR TRIAL DURING THE PREVIOUS FOUR YEARS ........ 119**

## <u>INTRODUCTION</u>

1. My name is Adam Jeremiah Levitin. I was retained by Lehotsky Cohn ("**<u>Counsel</u>**") on behalf of the National Association of Convenience Stores, Circle K, the National Retail Federation, and the Retail Industry Leaders Association to provide an expert declaration evaluating the proposed settlement (the "**<u>Proposed Settlement</u>**") in the litigation captioned *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 05-MDL-1720 (E.D.N.Y.) (the "**<u>Litigation</u>**").

2. I have long acquaintance with the Litigation going back to its inception and am familiar with the previous proposed settlements in the Litigation. I have read the Proposed Settlement and the declarations and memoranda of law filed in support of it, as well as the materials listed in Appendix A, and am so familiar with the Proposed Settlement.

3. Although I have background and experience in law, I express no opinion here on any ultimate interpretation of law in the Litigation. Instead, the opinions I state here would merely be evidence that the Court could use in reaching a conclusion about whether the Proposed Settlement is fair, reasonable, and adequate.

## <u>I. PROFESSIONAL BACKGROUND AND QUALIFICATIONS</u>

4. I am the Carmack Waterhouse Professor of Law and Finance at the Georgetown University Law Center in Washington, D.C., where I have taught as a full-time faculty member since 2007. I have held tenure at Georgetown Law since 2011 and held a named chair, signifying preeminence in my field, since 2018.

5. At Georgetown Law, I teach courses in payment systems and consumer finance, among other topics, and in these courses I regularly teach about the economics and regulation of the payment card industry, including about interchange fees and the payment card networks' rules that shield interchange fees from market pressure and competition.

6. I have previously served as the Bruce W. Nichols Visiting Professor of Law at Harvard Law School; as the Robert Zinman Scholar in Residence at the American Bankruptcy Institute; as a faculty member for the Practicing Law Institute's Consumer Financial Services program; and as the faculty instructor for the training program for the Federal Trade Commission's Division of Financial Practices attorneys.

7. From 2008-2010, I served as Special Counsel to the Congressional Oversight Panel that supervised the Troubled Asset Relief Program ("**TARP**").

8. From 2012-2015, I served as a member of the statutory Consumer Advisory Board for the Consumer Financial Protection Bureau ("**CFPB**").

9. I have testified thirty-two times before Congress on financial regulatory issues, including regarding interchange fee regulation.

10. I have presented on consumer finance topics, including interchange fee and payment card network rules, at the CFPB, Federal Reserve banks, Federal Deposit Insurance Corporation ("**FDIC**"), and FTC. I have also presented on consumer finance issues on a compensated basis to institutional clients of Citigroup, FBR Capital Markets, Raymond James, and Wells Fargo, and I serve as a for-fee consultant for various investment funds.

11. I have previously been engaged by the Credit Union National Association, the main trade association for the credit union industry, to advise regarding the Durbin Interchange Amendment rulemaking and by the Merchants Payments Coalition to undertake a study about the interaction of payment card network rules with digital wallets.

12. The consumer finance industry is a major focus of my academic research. I have authored over ninety academic articles, book chapters, and encyclopedia entries, the majority of which deal with aspects of consumer finance.

13. I have been writing on interchange fees and payment card network rules since before the commencement of this now twenty-one-year-old Litigation. Among my publications are several articles and white papers relating to payment card network rules and interchange fees:

    a. *Pandora's Digital Box: The Promise and Perils of Digital Wallets*, 166 U. PA. L. REV. 305 (2018);

    b. *An Analysis of the Proposed Interchange Fee Litigation Settlement*, Geo. L. & Econ. Research Paper, No. 12-033, (2012);

    c. *Cross-Routing: PIN and Signature Debit Interchangeability Under the Durbin Amendment*, 2 LYDIAN J.16 (Dec. 2010);

    d. *Interchange Regulation: Implications for Credit Unions*, The Filene Research Institute, Research Brief #224, Nov. 2010;

e. *Priceless? The Economic Costs of Credit Card Merchant Restraints*, 55 UCLA L. REV. 1321 (2008);

f. *Priceless? The Social Costs of Credit Card Merchant Restraints*, 45 HARV. J. ON LEGIS. 1 (2008);

g. *Payment Wars: The Merchant-Bank Struggle for Control of Consumer Payment Systems*, 12 STAN. J. L., BUS. & FIN. 425 (2007);

h. *Antitrust Issues in Credit Card Merchant Restraints Rules*, Tobin Project Working Paper, Risk Policy Working Paper, May 6, 2007 (with Elizabeth Warren);

i. *The Merchant-Bank Struggle for Control of Payment Systems*, 17 J. FIN. TRANSFORMATION 73 (2006);

j. *The Antitrust Super Bowl: America's Payment Systems, No-Surcharge Rules, and the Hidden Costs of Credit*, 3 BERKELEY BUS. L.J. 265 (2005). This article was the first scholarly publication in any field to address the Networks' no-surcharge rules in detail.

14. My publications also include a law school textbook on consumer finance and its regulation, *CONSUMER FINANCE: MARKETS AND REGULATION* (2d ed. Aspen, 2023). The book includes coverage of payment card network fees and rules. I am also a co-author of the 5th edition of the National Consumer Law Center's treatise on *CONSUMER BANKING AND PAYMENTS LAW*. A complete list of my academic publications from the last ten years may be found along with my curriculum vitae in Appendix B to this report.

15. My work has been published in leading law, economics, and finance journals and has been awarded prizes from the American College of Commercial Financial Lawyers, the American College of Consumer Financial Services Lawyers (thrice), the *American Bankruptcy Law Journal*, the George Washington University Center for Law, Economics and Finance, and the *Yale Journal on Regulation*. My scholarship has also been cited in numerous judicial opinions, including by the United States Supreme Court, several state supreme courts, and several federal circuit courts of appeals.

16. I am an elected Fellow of the American College of Consumer Financial Services Lawyers, an elected Fellow of the American College of Bankruptcy, and an elected member of the American Law Institute. In 2013, I received the American Law Institute's Young Scholar's Medal, which is awarded every two years to "one or two outstanding early-career law professors

whose work is relevant to the real world and has the potential to influence improvements in the law."

17. I hold a J.D. *cum laude* from Harvard Law School. I also hold a Bachelor of Arts (A.B.) degree *magna cum laude* with highest honors in field from Harvard College, and a Master of Arts (A.M.) degree and a Master of Philosophy (M.Phil.) degree from Columbia University.

18. I have served as law clerk to the Honorable Jane R. Roth on the United States Court of Appeals for the Third Circuit and am admitted to practice before the bars of the State of New York, the Supreme Court of the United States, the United States Court of Appeals for the Third Circuit, the United States District Court for the Southern District of New York, and the United States District Court for the Eastern District of New York.

19. I have submitted *amicus curiae* briefs as the main or sole author in several consumer finance-related litigations before the United States Supreme Court and state supreme courts.

20. I have previously submitted two declarations in this Litigation. The first, dated September 15, 2016, was submitted in connection with the application of the law firm of Cuneo, Gilbert & LaDuca LLP to serve as proposed class counsel for a Rule 23(b)(2) class in the Litigation. The other, dated August 14, 2019, was provided in connection with a fee application by the Thrash Law Firm, P.A., the Duncan Firm, P.A., and Parker Waichman, LLP, counsel to the Retail and Merchant Objectors to the original 2013 settlement in this Litigation that was reversed by the Second Circuit. I have also previously served as an expert witness in other matters related to payment card interchange fees: *CAPP, Inc. et al. v. Discover Financial Services et al.*, Case No. 1:23-cv-4676 (N.D. Ill.); *Lemmo's Pizzeria, LLC v. Discover Financial Services et al.*, Case No. 1:23-cv-14250 (N.D. Ill.); *Support Animal Holdings, LLC et al. v. Discover Financial Services et al.*, Case No. 1:23-cv-15297 (N.D. Ill.); *MCX, LLC v. Gemalto, Inc*. (Am. Arb. Ass'n).

21. A list of my testimony at trial or deposition in the past four years may be found in Appendix C to this report.

22. Based on the foregoing experiences, as well as my research following my engagement in this case, I am familiar with defendants Visa and Mastercard (the "**Networks**") and their rules, interchange fees, and the Proposed Settlement. I believe this specialized knowledge would be helpful to the Court in evaluating the Proposed Settlement.

23. My compensation for preparing this report, for preparing for giving testimony, and for any testimony given in this litigation is at the rate of $1,250/hour plus reimbursement of approved expenses, with travel time at half rate.

24. My compensation does not depend on either the opinions I express or the outcome of this litigation.

25. This report is the product solely of my own work. I received no assistance from any person in the writing of the report and used no generative artificial intelligence in its writing.

26. The sources I considered upon in preparing this report are listed in Appendix A to this report.

## II. Assignment and Summary of Opinions

27. In order to help inform the trier of fact, Counsel has requested that I provide an evaluation of the Proposed Settlement, with particular attention to the ability of merchants to practically and meaningfully benefit from its provisions. Counsel has also requested that I address how the Networks could operate without an Honor-All-Cards Rule that prohibits issuer-level discrimination and that I address certain claims in the Declaration of Joseph E. Stiglitz, Ph.D, and Keith B. Leffler, PhD, filed by the Equitable Relief Class Plaintiffs ("**ERCPs**") in support of the Proposed Settlement (the "**Stiglitz-Leffler Declaration**").

28. The ERCPs have presented the Proposed Settlement as having several distinct benefits for merchants:

    a. A 10-basis-point reduction in the system-wide, volume-weighted average Effective Interchange Rate on Applicable Domestic Credit Card Transactions (the "**Average Effective Interchange Rate**") for five years (commencing no earlier than four months after settlement approval),[1] and proportional interchange rate reduction for merchants with custom credit card interchange rate agreements.[2]

---

[1] Proposed Settlement, ¶¶ 48, 97.

[2] Proposed Settlement, ¶¶ 49, 98.

**Confidential**

b. A freeze for five years of posted interchange rates for all existing categories as of March 31, 2025;[3]

c. A reduction for eight years in the interchange rate for the Networks' Standard consumer credit cards to 125 basis points for the duration of the settlement;[4]

d. A package of provisions lasting eight years regarding the Networks' rules:

    i. Reform of the Networks' Honor-All-Cards rules to permit merchants to decline acceptance of the Networks' higher-cost Premium consumer credit cards and Commercial cards, while continuing to accept other categories of lower cost cards;[5]

    ii. Reform of the Networks' No-Surcharge rules to permit merchants to surcharge the Networks' credit cards either by brand or by product category (but not by issuer)[6] up to 3% or the cost of acceptance, regardless of the merchant's treatment of American Express or other card brands;[7]

    iii. Clarification that merchants may use dual pricing to comply with state surcharge restrictions;[8]

    iv. Reform of the Networks' No-Discounting rules to permit issuer-level discounting or clarify that issuer-level discounting is permitted;[9]

    v. Elimination of the Networks' interpretation of their Honor-All-Cards rules as Honor-All-Wallets rules;[10]

    vi. Modification of the Networks' All-Outlets rules to allow different steering methods (as otherwise permitted by the Proposed Settlement) in different store locations;[11]

---

[3] Proposed Settlement, ¶¶ 51, 100.
[4] Proposed Settlement, ¶¶ 50, 99.
[5] Proposed Settlement, ¶¶ 22-30, 70-79.
[6] Proposed Settlement, ¶¶ 43(a), 92(a).
[7] Proposed Settlement, ¶¶ 39-43, 88-92.
[8] Proposed Settlement, ¶¶ 42(d), 91(d).
[9] Proposed Settlement, ¶¶ 19, 68.
[10] Proposed Settlement, ¶¶ 34-38, 83-87.
[11] Proposed Settlement, ¶¶ 31-33, 80-82.

vii. Continuation of the provisions in a prior antitrust settlement to allow merchants to accept the Networks' credit cards without accepting their debit cards;[12]

viii. Modification of Network rules to permit merchants to have selective, outlet-based non-acceptance pilot programs;[13]

e. Agreement for eight years by the Networks to bargain in good faith with qualified Merchant Buying Groups;[14] and

f. $21 million in funding from the Networks for a merchant education program to be run by Class Counsel.[15]

29. All of the provisions in the Proposed Settlement run for eight years aside from the rate freeze and the 10-basis-point reduction in the Networks' Average Effective Interchange Rates, which run for only five years.

30. In exchange for this consideration, every merchant in the no-opt-out Rule 23(b)(2) class will release the Networks from any claims it:

> ever had, now has, or hereafter can, shall, or may have and that have accrued as of the Settlement Approval Date or accrue no later than the longer of five years after the Settlement Final Date or eight years after the Settlement Approval Date, arising out of or relating to any conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act of any Rule 23(b)(2) Class Released Party that are or have been alleged or otherwise raised in the Action, or that could have been alleged or raised in the Action relating to the subject matter thereof, or arising out of or relating to a continuation or continuing effect of any such conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act.[16]

[12] Proposed Settlement, ¶¶ 21, 31-32, 70, 80-81 (continuation of exemption of Visa and MasterCard POS Debit from Honor-All-Cards rule).

[13] Proposed Settlement, ¶¶ 31-32, 80-81.

[14] Proposed Settlement, ¶¶ 44-47, 93-96.

[15] Proposed Settlement, ¶¶ 56-61, 105-109.

[16] Proposed Settlement, ¶ 116(a).

31. It is my opinion that the value of these settlement provisions is either scant or illusory. The alleged benefits of the Proposed Settlement are of little to no use to many or all merchants.

32. I explain the bases for my opinion below, beginning with some general observations about the design of the Proposed Settlement and then addressing each of these purported benefits in turn, as well as the serious weakness of the Proposed Settlement's anti-circumvention provision, which all but blesses some of the most obvious types of circumvention, and astonishingly does not apply to the bank defendants in the Litigation, only the Networks. After addressing the provisions that are in the Proposed Settlement, I address some of its glaring omissions, as well as the deficiencies of the Stiglitz-Leffler Declaration that attempts to value the Proposed Settlement.

## III. BACKGROUND

33. This Litigation has been pending for over 20 years, has survived summary judgment, and is "trial ready." Rather than proceed to trial, however, the ERCPs seek to enter into the Proposed Settlement. The Proposed Settlement is a litigation settlement—this means it is necessarily a compromise, and not necessarily the ideal outcome for any party. I make no attempt in this Declaration to evaluate the tradeoff with litigation risk in this Litigation, beyond noting that the case is already at an advanced state.

34. Yet it is also apparent that the Proposed Settlement offers scant real value for merchants, who are surrendering not only their antitrust claims for the Networks' past behavior in both the credit card and debit card markets, but also their right to bring claims based on future Network behavior for the duration of the Proposed Settlement, which is eight years after the end of appeals and challenges. Merchants may also be relinquishing their right to bring claims even beyond those eight years, as there is ambiguity about whether the release covers future claims regarding conduct that is a continuation of conduct from before or during the settlement period.

35. The goal that merchants, including the ERCPs, have pursued for over twenty years in this long-running Litigation is the exposure of the Networks' interchange fees to market discipline *from merchants* by forcing issuers to compete on interchange rates for merchants' business. Currently, there is no competition among issuers for merchants' business, and this has enabled issuers to charge supracompetitive interchange rates.

36. The Networks operate payment systems that are "two-sided" networks, in that they have two types of ultimate users: merchants and cardholders.[17]

37. Issuers have always issued credit cards that operate on only a single network; Network rules prohibit issuers from issuing credit cards that operate on multiple networks.[18] Thus, the Networks have to compete to attract issuance volume from issuers, and they do this by offering higher interchange fees on transactions and lower issuer-side network fees on their Networks.

38. Interchange fees for all payment card networks are generally structured as a percentage of the transaction (an *ad valorum* component) plus a flat amount (*e.g.*, [redacted]). The interchange fee applicable to a transaction varies by:

- the card product used (*e.g.*, credit or debit, consumer card or commercial card);
- the card's rewards and service tier (*e.g.,* basic, rewards, premium, premium plus, etc.);
- whether the transaction was card-present or card-not-present (*e.g.*, a physical card is presented in person or the transaction is done online or telephonically);
- whether a tokenized version of the card was used (*e.g.*, with a card stored in ApplePay, which replaces the card's funding primary account number with a tokenized device primary account number, such that the

---

[17] *See In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig*., 2024 U.S. Dist. LEXIS 41269, *199 (E.D.N.Y. Feb. 22, 2024); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig*., 2024 WL 1014159 at *19 (E.D.N.Y. Mar. 8, 2024).

[18] Visa Rule 1.3.4.1 (April 18, 2026) (prohibiting the use of Visa-owned marks in connection with the "promotion, offer, or solicitation of a Visa Card not defined as a US Covered Visa Debit Card, or the maintenance of a US Cardholder relationship for a Visa Card"); Visa Rule 1.3.4.6 (April 18, 2026) (prohibiting competitors' names and trademarks from appearing on Visa cards); MasterCard Rule 4.1.1 (June 2, 2026) ("no use of a Mark may be made on or in connection with any card, device or other application associated with a payment service that the Corporation deems to be competitive with any Activity."); MasterCard Rule 4.9 (June 2, 2026) (prohibiting use of competitors' marks on MasterCards).

real card number is never transmitted to merchants, providing data breach security);

- the type of end merchant of record involved (*e.g.*, restaurant or gas station or supermarket or hotel or taxi); and
- the way the transaction was entered (*e.g.*, manual key-entry, magnetic stripe, limited security data).[19]

39. The Networks set interchange fee schedules as a default pricing system that applies in the absence of an individually negotiated price between an issuer and acquirer.

40. Although there are thousands of issuers and acquirers in each Network, most are quite small, such that the market share for issuance in particular is highly concentrated among a small number of banks. In the United States, the top 5 issuers alone accounted for [redacted]% of total U.S. credit card purchase volume in 2025, with the top 10 accounting for [redacted]% and the top 20 accounting for [redacted]%.[20] Table 1, below, summarizes.

**Table 1. 2025 U.S. Visa/Mastercard Credit Card Purchase Volume & Market Share by Issuer[21]**

| | **Share of Total US Credit Card Purchase Volume** |
|---|---|
| **Top 5 issuers** | [redacted]% |
| **Top 10 issuers** | [redacted]% |
| **Top 20 issuers** | [redacted]% |
| **Top 30 issuers** | [redacted]% |

41. The high concentration of issuance volume among a small number of issuers means that it is actually quite feasible for large merchants or merchant buying groups to negotiate bilateral contracts with them, rather than relying on the Networks' default interchange system. For example, the

[19] Visa, *Visa USA Interchange Reimbursement Fees*, Apr. 18, 2026, *at* https://usa.visa.com/dam/VCOM/download/merchants/visa-usa-interchange-reimbursement-fees.pdf; MasterCard, *MasterCard 2026-2027 U.S. Region Interchange Programs and Rates, Effective Apr. 17, 2026, at* https://www.mastercard.com/content/dam/mccom/us/business/documents/merchant-rates-2026-2027-april2026.pdf.

[20] Nilson Report, #1302 (Feb. 2026) at 5-6.

[21] *Id.*

number of bilateral contracts needed for the total number (*n*) of both issuers and merchants/buying groups would be $(n^2-n)/2$. Thus, if the top 10 issuers and 10 large merchants or buying groups were to negotiate bilateral interchange pricing deals, *n* would be 20, so there would need to be some [redacted] contracts, a completely feasible set of negotiations that would cover issuers that comprise [redacted]% of the Networks' purchase volume. With so many issuers covered by such a substantial portion of merchants, the negotiations would go a long way to establishing a competitive market price.

42. Because of the concentration of the issuance business, the Networks are incentivized to focus their inter-network competitive efforts on signing up the handful of large issuers to issue cards in their Networks. They do this by paying those issuers "rebates" based on their issuance volumes or sign-on or renewal bonuses in addition to the default interchange fees.

43. In contrast, acquiring is not Network-specific. An acquirer can accept transactions from multiple competing networks. Merchants generally accept cards from both Networks because they do not know what sort of cards their customers will have and do not want to risk losing sales by refusing one Network or the other. Indeed, because payment cards are now the predominant consumer payment method in the United States, accounting for [redacted]% of dollar volume of consumer payments in 2024,[22] it is impossible for most merchants to refuse card payments altogether, because doing so will cost them sales from consumers who lack an alternative payment method, or otherwise harm them competitively.

44. Separate and apart from interchange fees, however, the Networks charge their own network fees on every transaction. Network fees are one of the Networks' major sources of revenue and are used for financing the rebates, sign-on bonuses, and renewal bonuses used to attract large issuers to the Networks.

45. Neither the Networks nor the issuer banks need to compete for merchants' business because:

- merchants have no practical ability to refuse to accept Visa or Mastercard cards or to discriminate by card brand (because the overall prices as between Visa, MC, and Amex are so similar);

[22] Nilson Report, #1297 (Dec. 2025) at 8.

- merchants' acquirers do not have to deal exclusively with any particular Network; and
- the Networks aggregate the volume of all the issuers into a take-it-or-leave-it package for merchants through their Honor-All-Cards rules.

Thus, neither the Networks nor the issuer banks need to offer lower interchange and network fees to get merchants to accept their cards.

46. Instead, what price competition exists in payment card networks is for attracting issuers' business. The presence of price competition solely on one side of the two-sided payment card market has put upward pressure on interchange fee rates, which despite being primarily *ad valorum* fees and despite decreasing processing costs, have seen a steady increase in rates for decades, meaning that the percentage fee charged on transactions has gone up, even as transaction volume has itself increased. Merchants have gotten no new value from accepting cards, but are paying higher fee rates on a larger volume of transactions. Even in the course of this Litigation, the Networks' fees [redacted], with the ERCPs' experts reporting [redacted] basis points just between 2020 and 2024,[23] and [redacted] going back to the start of the Litigation in 2005.[24]

## IV. Overview: The Settlement's Rube Goldberg Competition Machine

47. Merchants' overriding goal in this Litigation has been to force the Networks to permit them to engage in practices that will create competition among issuers to lower interchange fees. In other words, merchants are seeking to make the Networks *true* two-sided networks, with price competition on *both* sides of the networks. As it stands now, there is no reason for an issuing bank to negotiate lower fees with a merchant, because merchants must accept all issuers' cards regardless of price.

48. From the perspective of merchant class members—and this case involves a Rule 23(b)(2) class from which no opt-out has been permitted—the merit of any proposed settlement must, therefore, be evaluated against the yardstick of whether it will actually expose the Networks' interchange fees to competitive pressures on *both* sides of the two-sided network. A

[23] Stiglitz-Leffler Declaration, Chart 1.

[24] Report of Roy J. Epstein, Ph.D., Figure 3 (indicating [redacted] between 2004 and 2016).

settlement that fails to do so, but grants the Networks a release is no better than a loss at trial, as the release in the Proposed Settlement continues in the future, whereas the effect of a loss at trial would not necessarily have such a future impact. Accordingly, it would be better to face a trial with its attendant risks than accept a settlement that fails to meaningfully expose interchange fees to competitive market pressure.

49. The Proposed Settlement imagines itself as creating market pressures on interchange fees by:

(1) facilitating collective bargaining for negotiated (non-standard) interchange rates by groups of merchants;

(2) enabling a set of steering mechanisms that will permit merchants to engage in selective acceptance or surcharging of product categories or brands of cards (including with outlet-level variation), as well as issuer-level discounting of cards; and

(3) reducing the default interchange rate for the Networks' Standard Consumer Credit Cards ("**Standard Cards**") to 125 basis points for eight years to provide a low-cost card option to which merchants can steer transactions.

50. Collective bargaining is valuable only to the extent that merchants individually have negotiating leverage that can be amplified through coordinated bargaining.[25] That means that collective bargaining is valuable only if there is issuer competition and merchants can credibly threaten meaningful steering of card transactions to lower cost options. They cannot under the Proposed Settlement.

51. The Proposed Settlement's steering mechanisms are a grossly impractical Rube Goldberg machine that disregards the operational and market details that are critical in making steering work.[26] Moreover, the Rube Goldberg machine's functioning relies heavily on the good faith cooperation not just of the Networks, but also of the card issuers, who are not even party to the Proposed Settlement.[27] The card issuers have every incentive to undermine the Proposed Settlement, and because they are not parties to the Proposed Settlement, just beneficiaries, they are not bound by the Proposed

[25] *See infra* ¶ 218.
[26] *See infra* ¶¶106-209.
[27] *See infra* ¶ 234.

Settlement's anti-circumvention provisions, which apply only to the Networks.

52. None of the pieces of the Rube Goldberg mechanism are likely to work individually to create meaningful price pressure on interchange fees, and there is certainly no reason to think that they would somehow have collective synergies.

53. Merchants are unlikely to utilize the steering mechanisms allowed because few cardholders have lower-cost Standard Cards, so there is no good alternative to which transactions can be steered; such Standard Cards account for only around [redacted]% of the Networks' credit card transactions. Moreover, Standard Cards are not an alternative at all for Commercial cards.[28] A cardholder whose Commercial card is declined will likely take his business to a competing merchant.

54. Even if Standard Cards were more common, the steering mechanisms allowed by the Proposed Settlement would be difficult and costly or even impossible to implement (such as surcharging in states that have no-surcharge laws); would risk customer good will; or are already known to be ineffective (and implicitly acknowledged as such by the Proposed Settlement).[29]

55. Additionally, because of technological challenges to identifying cards by product type (which issuers could readily compound through strategic behavior), merchants may not even be able to utilize the steering mechanisms until most or all of the settlement period has elapsed.[30]

56. Absent the credible threat of steering—which the Proposed Settlement does not create—the Proposed Settlement provides no mechanism to create downward market price pressure on interchange fees.

57. But even if the steering mechanisms were to somehow succeed in putting downward market pressure on interchange fees, the Proposed Settlement does nothing to prevent the Networks and issuers from neutralizing this market pressure by shifting card issuance among product categories, creating new product categories, creating new interchange fee categories, reclassifying merchants among interchange fee categories, and raising

[28] *See infra*, ¶¶ 93, 118.
[29] *See infra, passim* ¶¶ 106-209.
[30] *See infra, passim* ¶¶ 106-209.

network fees to rebate or pay bonuses to the largest card issuers for their business in lieu of interchange fees.

58. The Networks and issuer have no incentive to facilitate the implementation of the Proposed Settlement, and given the Networks' track record of behavior under prior settlements, foreign interchange fee regulations, and in response to the Durbin Interchange Fee Amendment,[31] there is every reason to expect that the Networks will attempt to frustrate competitive price pressure from merchants on interchange fees. The Proposed Settlement leaves open substantial and obvious mechanisms for the Networks to frustrate its purposes while complying with its express terms, and they should be expected to do so, and the Proposed Settlement does not even bind issuers in any way.

59. In other words, either:

(1) the merchant steering mechanisms won't succeed at pushing down interchange fees; or

(2) the merchant steering Rube Goldberg machine will somehow work, but the Networks and issuers will just circumvent it.

60. Either way, the Networks will have bought a release of decades of past antitrust liability for interchange fees, other transaction fees, and associated network rules, as well as (at least) another eight years of near blanket antitrust immunity for future violations, without having to meaningfully lower interchange rates.

61. The only way that merchants may reap non-illusory benefits is if the Rube Goldberg machine magically threads the needle and results in a lowering of interchange fees, but not so much that the Networks and issuers are motivated to circumvent it.

62. Such a Goldilocks outcome would likely mean an exceptionally small reduction in interchange fees; if savings start to push into the hundreds of millions or billions of dollars annually, there would be substantial incentive for the Networks and issuers to circumvent the Proposed Settlement. Thus, the only benefit possible for merchants under the Proposed Settlement would be in the low millions of dollars annually.

63. The Proposed Settlement itself evinces a lack of confidence in this Rube Goldberg structure. In addition to the steering provisions, the Proposed

[31] *See infra*, ¶ 224.

Settlement imposes a freeze on existing interchange fee rates and requires a 10-basis-point reduction in the Average Effective Interchange Rates, with a corresponding pro rata decrease in negotiated interchange fee rates.

64. The Proposed Settlement's rate freeze and 10-basis-point reduction in Average Effective Interchange Rates would be unnecessary if the Proposed Settlement's steering and collective bargaining provisions worked. The 10-basis-point rate reduction has value if, and only if, the Proposed Settlement fails to push down interchange fees more than 10 basis points by fostering competition. Thus, if the Proposed Settlement were to actually engender greater competition that resulted in a 25-basis-point reduction in the average interchange fee, the 10-basis-point reduction under the Proposed Settlement would be duplicative and thus have no value.

65. Alternatively, if the 10-basis-point rate reduction and rate freeze were meant to be a transitional provision until the effects of merchant steering kick in, it should be set to the level of rate reduction expected because of the steering. If the ERCPs believe the Proposed Settlement will reduce interchange rates by [redacted] basis points or more, any transitional rate reduction should be at that level.[32] The fact that it is set at 10 basis points suggests that this is what the ERCPs expect the ultimate result to be.

66. Similarly, the Proposed Settlement's reduction of the interchange rate for the Networks' Standard Consumer Credit Cards to 125 basis points has value only if that rate is below the competitive equilibrium that the Proposed Settlement's steering mechanisms would achieve. If the competitive equilibrium under the Proposed Settlement would be lower, then the 125-basis-point rate cap does not itself have any value once the equilibrium is achieved.

67. Putting aside both the Rube Goldberg nature of the Proposed Settlement and its naïve reliance on Network and issuer good faith facilitation, the Proposed Settlement's provisions are also of limited value even on their own terms. The Proposed Settlement is of limited duration. Its provisions (other than the merchant education fund that Class Counsel will control) last for either five years (the 10-basis-point reduction in the Average Effective Interchange Rate and rate freeze) or eight years (all other settlement provisions).

---

[32] Stiglitz-Leffler Declaration, ¶ 50.

**Confidential**

68. These durations are critical to keep in mind when evaluating all of the Proposed Settlement's provisions because merchants will not be able to realize most of the relief on day one. Instead, as discussed below, merchants will not be able to realize the benefits of many of the injunctive relief provisions for several years, if at all. Thus, even if the Proposed Settlement offered merchants real relief, they would not be getting it for the full eight years of the Proposed Settlement's term, but for a substantially shorter period of time. Accordingly, any value ascribed to these provisions must be discounted to reflect that merchants cannot realize eight years of value from them.

69. The following section presents an analysis of each of the major alleged benefits of the Proposed Settlement.

## V. Analysis of Individual Settlement Provisions

### A. 10-Basis Point Reduction in Average Effective Interchange Rates

70. The Proposed Settlement provides for a one-time, 10-basis-point reduction in the weighted, blended average of both Networks' Average Effective Interchange Rate.[33] It also provides for a proportional interchange rate reduction for merchants with negotiated custom credit card interchange rate agreements.[34]

71. The rate reductions are to commence no earlier than four months after the "Settlement Approval Date," and last for five years.[35] The Settlement Approval Date is the date of approval of the Proposed Settlement by this Court.[36] It is a distinct date from the "Settlement Final Date," which is the date after which the Court's approval order is no longer subject to further judicial review.[37]

72. Although the ERCPs' experts calculate these reductions to be worth approximately [redacted] over five years,[38] their calculation [redacted]

[33] Proposed Settlement, ¶¶ 48, 97.

[34] Proposed Settlement, ¶¶ 49, 98.

[35] Proposed Settlement, ¶¶ 48(a)-(b), 97(a)-(b).

[36] Proposed Settlement, ¶ 1(ll).

[37] Proposed Settlement, ¶ 1(mm).

[38] Stiglitz-Leffler Declaration, ¶ 103, table 2 (the $40.7 billion figure includes both the $37.9 billion in predicted savings from the rollback for posted rates and $2.7

[redacted]. I do not offer an opinion on the precise monetary value of the Proposed Settlement. To illustrate, however, the general magnitude on the ERCPs' experts' valuation from applying a reasonable discounting to present value, such as with a [redacted]% discount rate that approximates U.S. merchants' weighted average cost of capital,[39] the present value of the settlement, even under the ERCPs' experts' calculations, would be [redacted].[40] In other words, the nominal valuation produced by the ERCPs' experts appears to be inflated by about [redacted]% over actual present values.

73. Additionally, it is important to recognize how limited the Proposed Settlement's reduction in average interchange fees is. The ERCPs' experts themselves note that [redacted][41] This observation, however, understates the real effect of rate increases, as the ERCPs' experts observe, [redacted]

---

billion in predicted savings from the equivalent percentage reduction in negotiated rates).

[39] Aswath Damodaran, Cost of Equity and Capital, (US) (Jan. 2026), *at* https://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/wacc.html. It is standard practice in commercial litigation to use the plaintiff's weighted average cost of capital, rather than a risk-free Treasury yield, as a discount rate because business operations have inherent risks.

[40] The precise discounted value will depend on the frequency of discounting period and whether settlement savings are credited as happening at the beginning or ending of a period. My calculation assumes that the annual figures from the ERCP experts' declaration are divided equally by month and discounted at the end of the month. Thus, present value (*PV*) for the stream of monthly payments (*PMT*) for 60 monthly periods with a [redacted]% annual discount rate is calculated as:

[redacted]

My point here is not to provide a precise discounted value, but merely to observe that the figure provided by the ERCP experts appears to be inflated by around [redacted]% over a discounted value. If one discounts just the [redacted] in predicted savings from a 10-basis-point reduction in posted rates, then using the same methodology, the present value is around [redacted].

[41] Stiglitz-Leffler Declaration, ¶ 15. *See also id.*, ¶ 47.

[redacted][42]

74. The ERCPs' experts fail to discuss—although it is evident from the chart in their declaration in support of the Proposed Settlement—that from 2020 to 2024 alone, the Networks' average interchange rate [redacted]—more than the reduction offered in the Proposed Settlement.[43]

75. In other words, the 10-basis-point reduction in the Average Effective Interchange Rates in the Proposed Settlement would merely set back the clock to around 2021, such that merchants would still be substantially worse off than when the Litigation began in 2005. The 10-basis-point reduction in the Average Effective Interchange Rates still leaves U.S. interchange rates inflated on average by something in the nature of 300% or more over competitive pricing.[44]

76. Whatever the value of the five-year rate reduction, however, it is critical to recognize that the period of rate reduction does not track the period of the release under the Proposed Settlement. The Proposed Settlement would release the Networks from their antitrust liability not just prior to the Settlement Approval Date, but also until the later of five years from the Settlement Final Date or eight years from the Settlement Approval Date.[45] This means that there is a potential period of three years between the lapse of five years from the Settlement Approval Date and the termination of the Proposed Settlement eight years from the Settlement Approval Date during which the Networks are not subject to a cap on their Average Effective Interchange Rates.

77. Accordingly, nothing prevents the Networks from increasing their Average Effective Interchange Rates after the fifth year of the settlement, such that savings from the reduction in their Average Effective Interchange Rates in

---

[42] Stiglitz-Leffler Declaration, ¶ 47.

[43] Stiglitz-Leffler Declaration, Chart 1.

[44] *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *41 (E.D.N.Y. June 25, 2024) (networks operate viable in countries where rates are capped at 50 bps or less, while U.S. rates are over 200 bps, indicating that U.S. prices are 400% their competitive level). *See also* Stiglitz-Leffler Declaration, ¶ 50 (card networks' pricing net of rewards is [redacted] basis points when competitive price would be [redacted] basis points, indicating that prices are [redacted]% their competitive level).

[45] Proposed Settlement, ¶ 116(a).

**Confidential**

years 1-5 could be more than offset by increases in their Average Effective Interchange Rate in years 6-8.

78. As discussed further in Part B, below, the Proposed Settlement's freeze on interchange rates at their March 31, 2025, level does not prevent this because the freeze applies only to existing rates and not to newly created rates, which are not prohibited by the Settlement. The Networks could simply create new rate categories not subject to the freeze and use those categories to raise their Average Effective Interchange Rates after the fifth year of the Proposed Settlement. This is hardly a farfetched scenario: a 2009 Government Accountability Office study reported that from 1991 to 2009, Visa went from having four interchange categories to having 60, while MasterCard went from having four interchange categories to 243.[46] The Networks have not previously refrained from creating new interchange rate categories when it suits them.

79. The apparent conceit of the Proposed Settlement is that by years 6-8 the merchant steering mechanisms will have kicked in, such that the guaranteed reduction in the Average Effective Interchange Rate would be superfluous, and average interchange rates will be lower in years 6-8 even without the guaranteed reduction.

80. As discussed below, this is wishful thinking. If the steering mechanisms are ineffective, as will likely be the case, then merchants might have effectively agreed to pay more in years 6-8 of the Proposed Settlement than they save in years 1-5. In other words, the Proposed Settlement could even be of *negative value* to merchants if increased interchange rates in years 6-8 offset the savings in years 1-5.

### B. Capping of Posted Interchange Rates as of March 31, 2025

81. The Proposed Settlement provides that the Networks will not increase any of their posted interchange rates above those effective for any category as of March 31, 2025.[47] This rate freeze lasts only as long as the 10-basis-point

[46] Government Accountability Office, *Credit Cards: Rising Interchange Fees Have Increase Costs for Merchants, but Options for Reducing Fees Pose Challenges*, GAO-10-45 (Nov. 2009) at 15, *at* https://www.gao.gov/assets/gao-10-45.pdf.

[47] Proposed Settlement, ¶¶ 51, 100.

reduction in Average Effective Interchange Rates, so it will last for only around five years.[48]

82. In the calculation of the ERCPs' experts, this provision adds substantial value to the Proposed Settlement. In their analysis, the "Average Effective Rate Rollback Amount" is not simply the 10-basis-point reduction, but also savings from the rate increases the experts predict would occur but for the Proposed Settlement. Thus, [redacted]0.[49] Accordingly, over [redacted] of the projected merchant savings that the ERCPs' experts identify comes from the rate cap, rather than from the mandated Average Effective Interchange Rate reduction.

83. There are two glaring problems with the rate freeze. First, it is only in place for around *five* years, but the release merchants provide in the Proposed Settlement covers interchange fees and associated practices for *eight* years. This means that the Networks have carte blanche to increase interchange fees during the last three years of the settlement period without facing any liability to class members for doing so. Accordingly, one would expect the Networks to substantially increase interchange fees for everything except Standard Cards during years 6-8 of the settlement period. Thus, whatever "gains" merchants may inure from the rate freeze in years 1-5 could be offset by rate increases in years 6-8.[50]

84. Second, even for the five years when the rate freeze is in effect, it only covers existing rate categories. The Proposed Settlement does not, however, prohibit the Networks from creating new interchange fee categories or new card types.[51] Thus, the Networks could create new rate categories (for merchant type or card type) with higher rates.

85. The only constraint on the Networks doing so is the Average Effective Interchange Rates reduction, but that applies solely to card types covered by the Networks' amended Honor-All-Cards rules. The Networks could introduce new high-interchange rate card types not covered by their Honor-All-Cards rules that would therefore not be subject to the rate freeze or included in the calculation of their Average Effective Interchange Rates.

---

[48] Proposed Settlement, ¶¶ 51, 100.

[49] Stiglitz-Leffler Declaration, table 2.

[50] *See supra*, ¶ 77.

[51] *See supra*, ¶ 7778.

Issuers would be highly incentivized to issue these cards because of the high interchange rates, and merchants would find it difficult to refuse to accept these cards if issuance volume were too large.

86. The creation of new rates and products, as well as recategorizing of merchants, are foreseeable loopholes, given the past conduct of the Networks.[52]

87. The Proposed Settlement also does not prohibit the Networks from redefining their existing interchange fee categories or reclassifying merchants to different categories. Thus, the rate schedule might stay the same, but different rates might apply to any particular merchant.

88. This means that instead of actually freezing interchange rates at their March 31, 2025, level, the Proposed Settlement leaves open the possibility that certain *existing* rates will remain at that level, but that they will be supplemented by other, new rates at higher levels. This in turn could undermine the savings that would accrue in years 1-5 of the Proposed Settlement from the 10-basis-point reduction in Average Effective Interchange Rates by being a mechanism for higher *overall* average rates (measured not just for the subset of cards included in the Average Effective Interchange Rate calculation) in years 6-8.

### C. Capping Interchange for Standard Consumer Credit Cards at 125 Basis Points

89. The Proposed Settlement would mandate a cap of the interchange rate for Visa and MasterCard-branded Standard Cards at 125 basis points until the later of five years from the Settlement Final Date (court approval of the Proposed Settlement) or eight years from the Settlement Approval Date (the end of all appeals).[53]

90. Standard Cards is the term for those Network products that have either no rewards or minimal rewards, namely Visa Traditional and Visa Traditional Rewards cards and MasterCard Core and MasterCard Enhanced cards.

91. Currently, Standard Cards constitute just [redacted]% of Visa transactions and [redacted]% of MasterCard transactions.[54] Instead, most of the Networks'

---

[52] *See supra* ¶ 7778 (discussing GAO report documenting enormous expansion of interchange categories between 1991 and 2009); *infra*, ¶ 224.

[53] Proposed Settlement, ¶¶ 50, 99.

[54] Supplemental Declaration of Keith B. Leffler, Ph.D., table 1.

transactions occur on either Commercial cards[55] or Premium cards,[56] or at merchants who have individually negotiated rates.[57] In other words, the Proposed Settlement caps the interchange rate on cards that currently constitute an extraordinarily small minority of the Networks' transactions. Accordingly, this rate cap would have little value to merchants unless a much greater share of transactions were to take place on Standard Cards.

92. The Proposed Settlement appears to hold out hope that card issuance will shift from Commercial and Premium cards to Standard Cards based on the merchant steering mechanisms it facilitates. This is wishful thinking.

93. First, no amount of merchant steering can shift significant volume from Commercial credit cards to consumer cards of any sort because the products are not substitutes. Commercial cards are issued to businesses.[58] To the extent that the spending is done on cards issued to businesses, it cannot readily shift to consumer cards. Commercial cards are generally used by businesses' employees for business expenses. Employers often restrict their employees to using the business's Commercial card. Even if not required to use the card for business expenses, the employee might still prefer to use it at another merchant rather than face a hassle in obtaining reimbursement if he used a personal card instead. Commercial cards cannot generally be steered to Standard consumer cards.

94. Second, the primary steering mechanisms authorized by the Proposed Settlement are for merchants to decline or surcharge cards by product type. Thus, a merchant could decline or surcharge Premium cards or Commercial cards or both.

95. As discussed at greater length below, given the current mix of card issuance, no merchant will decline Premium and Commercial cards because doing so is essentially opting out of accepting credit cards altogether, which is not a realistic choice for most merchants given that [redacted]%

[55] [redacted]% of Visa transactions and [redacted]% of MasterCard transactions. Supplemental Declaration of Keith B. Leffler, Ph.D., table 1.

[56] [redacted]% of Visa transactions and [redacted]% of MasterCard transactions. Supplemental Declaration of Keith B. Leffler, Ph.D., table 1.

[57] [redacted]% of Visa transactions and [redacted]% of MasterCard transactions. Supplemental Declaration of Keith B. Leffler, Ph.D., table 1.

[58] *See, e.g.*, Visa Rules, Glossary (Apr. 18, 2026) (defining "Visa Commercial Cards" as "A physical or virtual Card intended for business expense use").

of sales are, on average, paid using credit cards.[59] (And those merchants who can opt out of credit cards are likely to have already done so.) Refusing to take Premium and Commercial cards leaves the average merchant accepting perhaps just [redacted]% of all card transactions, meaning risking a possible loss of nearly [redacted]% of sales.

96. Attempting to decline Premium and Commercial cards would impose serious practical difficulties for the merchant in terms of identifying at point-of-sale which cards it would accept.[60] Additionally, rejection of Premium and Commercial cards risks considerable consumer good will when consumers' cards are declined, and also the prospect of lost sales for consumers who (like the undersigned) do not carry any payment mechanism with them except Premium cards.[61] After all, Premium cards are generally issued to more affluent consumers—some of merchants' most valuable customers—making it even more difficult for merchants to consider non-acceptance.

97. Likewise, merchants are unlikely to surcharge Premium and Commercial cards because doing so is unlikely to shift consumption to lower-cost Standard Cards. Standard Cards are not a substitute for Commercial cards. Regardless, many holders of Premium and Commercial cards do not have Standard Cards, and the reduced interchange fees available under the Proposed Settlement for Standard Cards create no incentive for issuers to issue them.[62]

98. Similarly, surcharging of Premium and Commercial cards poses challenges for merchants in terms of identifying cards and risks customer goodwill, much as with declining cards.[63] And for other merchants, surcharging is incompatible with their business model.[64]

99. The result is a chicken-and-egg problem. Merchants will not decline to accept or surcharge Premium and Commercial cards because those cards constitute most of the card market. Because merchants will not decline to accept those cards: issuers will face no pressure to shift issuance to

---

[59] Nilson Report #1297 (Dec. 2025) at 9 (reporting $6.16038 trillion in credit card transactions and $15.39004 trillion in total transactions).

[60] *See infra*, ¶¶ 120-124, 131-136.

[61] *See infra*, ¶¶ 144-149.

[62] *See infra*, ¶¶ 165-172.

[63] *See infra*, ¶¶ 173-177.

[64] *See infra*, ¶¶ 178-179.

Standard Cards; consumers will have no reason to shift usage to Standard Cards or to newly acquire Standard Cards to use; and neither issuers nor the Networks will face any pressure to reduce rates on non-Standard Cards.

100. The threat of refusing to accept Premium cards is unlikely to motivate issuers to shift issuance or to accept lower Premium rates. Not only do issuers understand the dynamic discussed above that makes selective acceptance by product type unlikely, but issuers face a strong incentive to issue Premium Cards, such that they are unlikely to shift issuance volume on consumer cards to Standard Cards. The Proposed Settlement provides no incentive for issuers to issue Standard Cards.

101. To the contrary, the Proposed Settlement's mandated rate cap on Standard Cards creates a disincentive for issuers to issue Standard Cards. Instead, by capping the interchange rate on Standard Cards, the Proposed Settlement incentivizes issuers to shift their consumer card issuance to Premium cards.

102. Likewise, the Proposed Settlement also incentivizes issuers to shift their issuance to Premium cards so as to increase the market share of Premium cards, such that merchants will find it even more difficult to discriminate against Premium cards.

103. Even if issuers were to shift some issuance volume to Standard Cards, however, that shift would not happen immediately. Cards tend to be issued with a four-year expiry date. Issuers are unlikely to incur the expense of reissuing cards before the expiry date, particularly if they know that attempting to do so with a change in rewards programs will likely cost them the account or pressure them to lower rates.

104. Finally, there is no reason to think that merchants with individually negotiated interchange rates will go back to off-the-rack rates simply because the rate on Standard Cards has been capped. Some of those merchants might be in long-term contracts that extend for some or all of the duration of the 125-basis-point rate cap, such that they cannot benefit from the rate cap. The Average Effective Interchange Rate for merchants with negotiated rates is already [redacted] basis points for Visa and [redacted] basis points for MasterCard.[65] Thus, many merchants with negotiated rates might [redacted]. Even if they do not, their blended, negotiated rate might still be better than

[65] Supplemental Declaration of Keith B. Leffler, Ph.D., table 1.

they would do with off-the-rack rates given the current transaction share of different product types.

105. What all this means is that there is little reason to expect the transaction share of Standard Cards to rise as a result of the Proposed Settlement. Therefore, capping the interchange fee on Standard Cards at 125 basis points is of very limited value because Standard Cards account for only around [redacted]% of all credit card transactions.[66] Such a rate cap might have been meaningful decades ago when Premiums cards were first introduced and constituted only a small number of cards, but today it is an empty gesture.

### D. Merchant Steering Reforms

106. The Proposed Settlement contains several provisions that purport to facilitate merchant steering of transactions toward lower-cost cards. According to the ERCPs, the Proposed Settlement will enable merchants to:

> decline Commercial credit cards and/or Premium consumer credit cards (or threaten to do so); use dual-price posting to effectively surcharge in compliance with state laws; discount to steer customers to the new Standard consumer credit cards; discount by issuer; selectively decline digital wallets; steer to a particular credit card (by brand, product, or issuer) in the gray area between surcharging and discounting; and get the benefit of the immediate rate caps and rollbacks.[67]

Each of these are addressed below.

#### *i. Reform of the Networks' Honor-All-Cards Rules*

107. Honor-All-Cards rules are Network rules that require merchants to accept all of the Network's credit or debit cards, regardless of cost or issuing bank.[68] Thus, the Honor-All-Cards rules force merchants to accept all of the Network's credit cards if they accept any of them and to accept all of the Network's debit cards if they accept any of them.

---

[66] *See* Supplemental Declaration of Keith B. Leffler, Ph.D., table 1.

[67] Equitable Relief Class Plaintiffs' Memorandum of Law in Support of Final Approval of Amended Settlement Agreement, MDL 1720 (ECF No. 9932-1) at 18.

[68] *See, e.g.*, Declaration of Michael A. Cook ("Cook Decl.") [Doc. 2644].

108. The Proposed Settlement requires the Networks to amend their Honor-All-Cards rules to permit merchants to decline acceptance of the Networks' higher-cost Premium consumer credit cards or Commercial cards, while continuing to accept other categories of lower-cost cards.[69] The Proposed Settlement also continues the provisions of a prior antitrust settlement that amended the Honor-All-Cards rules to allow merchants to accept the Networks' credit cards without accepting their debit cards or vice-versa.[70]

109. Therefore, under the Proposed Settlement, a merchant would still be required to accept all of a Network's Premium consumer credit cards on the same terms if it accepted any, and merchants would likewise be required to accept all of a Network's Commercial cards on the same terms if it accepted any. All the Proposed Settlement would allow merchants to do would be to refuse to take entire product categories. Merchants are still left with all-or-nothing choice among card products

110. The relief the Proposed Settlement gives to merchants from the Networks' Honor-All-Cards rules is virtually worthless for several reasons.

*a. Merchants Cannot Realistically Refuse to Accept a Particular Brand's Cards*

111. In 2024, there were [redacted] in payments made on all payment cards (credit, debit, and prepaid) in the United States.[71] This included [redacted]% of the purchase volume of consumer payments.[72] Most merchants cannot realistically opt out of accepting payment cards, which are consumers' preferred payment method and often the only practicable one for a transaction.

112. Nor is it realistic to expect merchants to engage in brand-level discrimination between the Networks. Even if a customer has multiple cards, they might all be issued on the same network.

113. This is particularly true if a merchant were to decline to accept Visa-branded cards given Visa's dominant market position. Visa accounted for [redacted]% of consumer card payments and [redacted]% of commercial card payments, while MasterCard had [redacted]% of consumer card payments and [redacted]% of commercial

---

[69] Proposed Settlement, ¶¶ 22-30, 70-79.

[70] Proposed Settlement, ¶¶ 21, 31-32, 70, 80-81 (continuation of exemption of Visa and MasterCard POS Debit from Honor-All-Cards rules).

[71] Nilson Report, #1298 (Dec. 2025) at 10.

[72] Nilson Report, #1297 (Dec. 2025) at 8.

card payments.[73] If we treat Visa as having a [redacted]% market share of card issuance, then if a cardholder has two cards and one is a Visa, there is a [redacted]% chance that the second will also be a Visa. If the cardholder has a third card, there is a [redacted]% chance that it too will be a Visa,[74] while if the cardholder has a fourth card, there is a [redacted]% chance that it will also be a Visa.[75] There are, on average, 3.7 active credit cards per consumer,[76] but with some demographics having far fewer on average.[77] In these circumstances, a merchant cannot assume that a cardholder with a Visa will have a card issued by another network, so by declining to take Visa cards the merchant incurs a substantial risk of losing the transaction altogether.

114. In the past, many merchants declined to accept American Express cards because of their higher costs, but American Express has only ever had a small market share—[redacted]% of U.S. consumer purchase volume and [redacted]% of U.S. commercial purchase volume in 2024[78]—and most American Express cardholders are likely to have a Visa or MasterCard branded card that they can use as an alternative. For example, if a consumer cardholder has two cards, the chance that they are both American Express cards would be just [redacted]%.[79] Even at that low likelihood of not having an alternative, many merchants still did not decline American Express cards.

*b. Merchants Cannot Realistically Refuse to Accept Premium and Commercial Cards, Which Account for Nearly [redacted]% of the Networks' Purchase Volume*

115. Given the current makeup of card issuance by product type, it is not feasible for merchants to engage in product-level discrimination against

---

[73] Nilson Report, #1298 (Dec. 2025) at 10. For credit cards alone, Visa had a [redacted]% share of consumer card purchase volume and a [redacted]% share of commercial card purchase volume, while MasterCard had a [redacted]% share of consumer card purchase volume and a [redacted]% share of commercial card purchase volume. *Id.* at 11.

[74] This figure is [redacted]% squared.

[75] This figure is [redacted]% cubed.

[76] Chris Horymski, *What Is the Average Number of Cards*, Experian, Aug. 15, 2025, https://www.experian.com/blogs/ask-experian/average-number-of-credit-cards-a-person-has/.

[77] *Id.*

[78] Nilson Report, #1298 (Dec. 2025) at 10.

[79] Using the percentage of cards issued instead of purchase volume produces a similar figure. [redacted]% of credit cards in issue are American Express cards, so the chance of having two is just [redacted]%. *See* Nilson Report, #1301 (Feb. 2026) at 7.

higher-cost Premium consumer cards and Commercial cards. Premium consumer cards account for [redacted]% of Visa's transactions and [redacted]% of MasterCard's, while Commercial cards are [redacted]% of Visa's transactions and [redacted]% of MasterCard's.[80] Overall, the Networks' Commercial cards account for [redacted]% of all purchase volume at U.S. merchants.[81]

116. In other words, if a merchant declines to accept the higher-cost Premium consumer cards and Commercial cards, the merchant is declining to accept the cards that account for roughly [redacted]% of all the Networks' credit card transactions, without any guarantee that the cardholder will have another payment method available. There is no realistic situation in which most merchants would engage in such discrimination; they would effectively be opting out of accepting credit cards altogether, and likely losing sales.

117. Nor can it be assumed that by declining to accept Premium or Commercial cards that merchants will shift purchases to lower-cost Standard Cards. In order for such a shift to happen, the cardholder has to have a Standard Card. Few do; most cards card transactions are on Premium or Commercial cards. So, although cardholders frequently have multiple cards, all of the cards in a consumer cardholder's wallet might be Premium cards.

118. Likewise, a cardholder using a Commercial card might not have any other payment mechanism available, because the cardholder might be making the purchase for a business and not want to use (or may not be permitted by their employer to use) a personal card for the transaction.[82] In other words, the ability to decline Commercial cards is of virtually no value; the merchant would just be declining business without creating any competitive pressure for interchange fees on Commercial cards.

119. Realistically, merchants are extremely unlikely to decline to accept the cards that account for [redacted]% of the Networks' credit card transactions. Bragging that merchants can now decline these cards is basically a statement that merchants can decline to accept credit cards altogether. Legally this has always been possible, but it is not economically feasible for most merchants. The relief provided by the Proposed Settlement in relation to the Honor-All-Cards rules is of no value to most merchants. For all purposes, the Proposed Settlement functionally preserves the Networks' Honor-All-Cards rules, especially the core Honor-All-Issuers aspect of the

---

[80] Supplemental Declaration of Keith B. Leffler, Ph.D., table 1.

[81] *See infra* Table 2, rows 4-5, column (C).

[82] *See supra* ¶ 93.

rule, despite that having been a problem with the 2013 and 2024 settlements that failed to achieve final court approval.

*c. Merchants Will Incur Substantial Costs to Be Able to Identify Card Product Types and Will Not Be Able to Do so for Most or All of the Settlement Period*

120. The Proposed Settlement requires the Networks to:

> (1) "require issuers to comply with the category identification requirements" for cards issued 90 days or more after the Settlement Approval Date,[83] and
>
> (2) "make available, free of any network charge to merchants or acquirers, technology sufficient for merchants to work with their acquirers to be able to identify the product category and type for a payment card at the point of sale and prior to authorization of the transaction so that a merchant may use the payment card product category to inform that merchant's acceptance decision."[84]

121. Notably, neither of these changes will make it possible for merchants to immediately engage in discrimination based on product category, and much or even all of the settlement period might lapse before merchants are broadly able to identify all cards by product type.

122. First, issuers would be required to include visual identifiers only for Commercial and Premium cards. No visual identifier is required for Standard cards, so Standard cards' appearance need not be standardized, making it harder to identify cards visually.

123. Even for Commercial and Premium cards, the identifiers are not standardized. Instead, Commercial cards can be labeled with the words ""Business," "Corporate," or "Commercial," for Commercial Credit Cards. Premium cards can also have various labels for each Network, with Visa using the words "Infinite" or "Signature" and MasterCard using the words "World," "World Elite," and "World Legend." The sheer variety of nomenclature—and use of common terms that do not obviously signify anything—will make card identification challenging for merchants' register employees.

[83] Proposed Settlement, ¶¶ 26(b), 75(b)

[84] Proposed Settlement, ¶¶ 28, 77.

**Confidential**

124. Similar challenges exist for digital identification of cards. A card's product category is already included in the full BIN Data for the card.[85] The BIN data is the bank identification number data and other associated information encoded on the card. In theory, all that needs to be done is to make it possible for the merchant to access and decode that data. But simply making it technologically possible for merchants to identify card product types does not mean that merchants will actually be able to do so.

125. These technological challenges will fall harder on smaller merchants, making them less able to steer consumers to Standard cards and putting them at a competitive disadvantage to larger merchants.

126. The Proposed Settlement requires the Networks to make available "technology" to identify their cards by product type and category free of charge, but that just means that the Networks will make available the technological capability; it does not mean that they will make available the actual equipment necessary to implement that technology. Actually implementing that technology will necessitate merchants having point-of-sale equipment and software capable of accessing the information the networks make available. That may necessitate investment in new point-of-sale equipment and software by merchants or for-fee updates to their systems from their technology vendors or processors.

127. What's more, to the extent that merchants have to update their point-of-sale equipment, the equipment may need to be recertified for compliance with the Payment Card Industry Data Security Standards ("**PCI-DSS**"). The recertification process can be expensive and time-consuming (and must be done for each individual point-of-sale equipment unit affected). Failure to be certified as in compliance exposes merchants to fines and consequential damage liability in the event of a data breach.

128. PCI-DSS recertification is likely to take substantial time, as there is not the capacity in terms of Qualified Security Assessors authorized to recertify all of the point-of-sale equipment in the United States immediately. For example, the transition to EMV chip cards was a multi-year process in every jurisdiction in the world (including the U.S.), and even then it caused backlogs in demand for the programming and certification specialists that delayed the transition. There is no reason to think that a mass recertification

---

[85] Visa, *How to Use Visa BIN Attribute Sharing Service*, *at* https://developer.visa.com/capabilities/visa-bin-attribute-sharing-service/docs-how-to.

of U.S. merchants' point-of-sale equipment will be any faster. In the meantime, uncertified merchants would bear the risk of counterfeit card fraud.

129. In other words, merchants will incur significant costs to even be able to identify card product types electronically. Additionally, merchants will not be able to realize this capability immediately. Instead, they must first wait for the Networks to make the technological capacity available and then they must wait for their equipment and software vendors or processors to incorporate those technological changes in their equipment and software offerings. Merchants must then order and install such updated equipment and software.

130. This is a process that could easily take up multiple years of the Proposed Settlement's eight-year time frame. During this time period, merchants would be unable to realize *any* benefit from product-level discrimination.

131. Likewise, the Proposed Settlement's requirement that issuers make Premium and Commercial cards physically identifiable by product category applies solely to cards issued 90 days or more after the Settlement Approval Date, so merchants might not be able to visually identify cards for some time.

132. The Networks' rules do not impose an expiration date requirement on cards in the U.S. region. The standard card issuance cycle is between every two to five years.[86]

133. If issuers stuck to their normal reissuance cycles, it would still take around five years of the eight-year settlement period before all current cards were reissued with visual identifiers. In other words, merchants would not be able to visually identify all cards for at least half of the settlement period.

134. In the interim, it seems unlikely that merchants would discriminate only against the subset of cards that have been reissued with visual identifiers;

---

[86] *See, e.g.*, Citi, *What to Know About Credit Card Expiration Dates*, Dec. 3, 2025, *at* https://www.citi.com/credit-cards/understanding-credit-cards/credit-card-expiration-date (2-5 year expiration cycle); CapitalOne, *What is a credit card expiration date?*, July 28, 2026, *at* *https://www.capitalone.com/learn-grow/money-management/credit-card-expiration-and-replacement/* (2-5 year expiration cycle); American Express, *What to Know About Credit Card Expiration Dates*, Oct. 14, 2024, *at* https://www.americanexpress.com/en-us/credit-cards/credit-intel/credit-card-expiration-date/ (3-5 year expiration cycle).

indeed, it is not clear that they would be permitted to do that under the Proposed Settlement, as they would be treating cards within a product category differently by rejecting, say, Premium cards with a physical identifier and accepting those Premium cards without one. The Proposed Settlement does not exempt such discrimination from the modified Honor-All-Cards rules. Even if issuers are acting in good faith, merchants will not have the ability to discriminate among cards by product type based on physical identification for the majority of the settlement period because of the Honor-All-Cards rules.

135. Issuers are not parties to the Proposed Settlement and are not subject to its anti-circumvention provisions. The anti-circumvention provisions apply solely to the defendant Networks.

136. Accordingly, issuers may attempt to frustrate the Proposed Settlement by reissuing cards before 90 days after Settlement Approval Date and including longer expiry dates on those cards. An issuer could, therefore, 89 days after the Settlement Approval Date, issue a card with an 8-year expiration date. Under the Proposed Settlement, such a card would never need to have a physical identifier of product type during the settlement period, so it would be impossible for a merchant to discriminate against it on the basis of product type. If so, merchants might not have the ability to discriminate among cards by product type based on physical identification for *any* of the class period.

137. What's worse, even if a merchant can *electronically* identify a card by product type, if the merchant cannot *physically* identify the card by product type, the merchant might end up discriminating against, say, Premium cards in card-not-present transactions (such as online), but not against Premium cards in card-present transactions. The same would be true if the merchant could identify the cards physically, but not electronically.

138. In either case, such differential treatment of Premium cards is not allowed under the Proposed Settlement. The Honor-All-Cards rule is preserved by the Proposed Settlement, so that it is all-or-nothing for each product category. There is no carve-out based on a merchant's inability to identify the cards in person or electronically.[87]

---

[87] At most, the relief from the All-Outlets rules might enable some merchants to handle online transactions differently than in-person transactions, but this requires advanced notice to the Networks. Proposed Settlement, ¶¶ 32(c), 81(c).

139. In other words, for a merchant to engage in product-level discrimination, it would need to be able to identify products in both card-present and card-not-present environments. This means that merchants could not engage in *any* discrimination until they could engage in *all* of it. Realistically, that means that merchants are unlikely to be able to engage in product-level discrimination for most or all of the settlement period.

*d. Even with Visual Identifiers, Merchants Lack the Ability to Identify Card Product Types at Point-of-Sale Prior to an Authorization Attempt*

140. Even if issuers were to place clear visual identifiers on cards, merchants would still have trouble identifying cards at point-of-sale before a consumer attempted to authorize a transaction.[88]

141. For card-present transactions, merchants' employees often do not see and handle the credit card. Instead, the consumer taps, inserts, or swipes the card or the smart phone containing the card data in a mobile wallet. In some situations, such as gas station pumps in most states, there is no employee who will ever be involved in the card-present transaction. In other situations, such as at a grocery store, there will be a low-level employee, not trained in identifying cards, involved in the transaction, but unlikely to be able to inspect the card prior to it being used to authorize the payment. And if the card is in a digital wallet, such as ApplePay, the merchant has no ability to see the card.

142. All this means that no matter what sort of visual identifiers are placed on cards, merchants will have little-to-no ability to identify the product type at point-of-sale, so the merchant will not be able to decline acceptance of the card based on card product type.

---

[88] I note that the Proposed Settlement requires that newly issued cards have "either as a product identification or as part of a product name" the words "Business" "Corporate" or "Commercial" for Commercial cards and "World," World Elite," "World Legend," Infinite" or "Signature" for Premium cards. Proposed Settlement, ¶¶ 26, 75. These terms do not have to appear in isolation, as they can be "part of a product name". As a result, there could be myriad combinations of nomenclature appearing on cards, making visual identification difficult.

*e. For Online Transactions, Merchants Would Need a Technological Solution That Would Allow Them to Decline Cards Based on Product Type*

143. Merchants face a similar problem for online transactions. Card issuers, not merchants, determine whether a transaction is authorized. This means that merchants cannot readily decline a transaction in advance online. For example, if a merchant were to decline to accept Premium cards, the merchant would have no ability to block cardholders with Premium cards from submitting their payment data online, unless a PAN digit were used to indicate product type, which is not currently the case. Once the data is submitted, the choice is the issuer's, not the merchant's, to authorize the transaction, so merchants would have no ability to decline a card before a card was submitted for authorization.[89]

*f. Declining Cards at the Product Level at Point-of-Sale Risks Customer Goodwill*

144. Even if merchants had access to sufficient technology, the Point-of-Sale is far too late of a point for a merchant to decline to accept

145. Merchants are also unlikely to engage in selective card acceptance by product level because it risks losing customer good will. While cardholders are generally familiar with the issuing bank (that, after all, is who they applied to for the card and who they pay their bills to), cardholders are not generally aware of the different categories of cards and are likely to react badly to their choice of payment instrument being refused, particularly if they lack a different means of payment the merchant will accept.

146. In order for merchants to avoid alienating their customers, they would need to be able to indicate in advance whether they accept a particular card or not. But it is not clear that merchants could successfully communicate their product-level acceptance policies to consumers in advance in a way that consumers would understand.

147. Merely having signage indicating that "We accept only Standard Cards," would not work because consumers do not know if their card is a "Standard Card"—the terminology is so anodyne as to be meaningless outside the payment card industry. Nothing in the Proposed Settlement requires that

[89] Even if the issuer were to decline authorization, nothing in the Proposed Settlement prevents the Networks from creating a declined authorization fee for themselves or the issuers.

the term "Standard Card" be printed on the front of the card, unlike the 2003 debit interchange settlement, that require the word "Debit" be printed on the front of debit cards.[90] In contrast, the Proposed Settlement requires issuers to choose from a variety of terms to be printed on the front of cards to indicate that the cards are Commercial or Premium cards. The variety of terms that the Proposed Settlement allows makes it much harder for merchants to indicate the types of cards they do not accept short of a hard-to-read laundry list. As discussed below,[91] this would not be a problem with issuer-level surcharging, as the issuer's name is clearly indicated on the card.

148. Further, most Point-of-Sale terminals are configured such that the customer never even shows the merchant their card (interacting only with the payment terminal), making communicating a non-acceptance decision extremely difficult.

149. Few merchants want to risk irking their customers in this way, particularly if their competitors are not doing so. This creates a first-mover problem that will, at best, further delay any meaningful adoption of selective acceptance during the settlement period. More likely, the risk to customer goodwill will simply prevent selective acceptance by product altogether for most merchants.

*g. Summary*

150. Merchants are unlikely to decline to accept all Premium and Commercial cards because doing so would render them uncompetitive. Declining to accept cards by brand risks losing sales for customers who only have one brand of card, and declining to accept Premium and Commercial cards is virtually tantamount to declining to accept cards altogether. But even if merchants wanted to refuse to accept Premium and Commercial cards, they would have to incur substantial technology expenses to do so and would likely not be able discriminate among product categories until most or all of the settlement period had run. All of this means that relying on selective acceptance by product category as fostering downward price pressure on interchange fees is wishful thinking. The Proposed Settlement's relief from the Honor-All-Cards rule is illusory.

---

[90] Settlement Agreement, *In re Visa Check/MasterMoney Antitrust Litigation*, No. 96-cv-5238 (E.D.N.Y. June 4, 2003), ¶ 5(a).

[91] *See infra*, ¶ 271.

### *ii. Brand- or Product-Level Surcharging and Dual Pricing*

151. A more nuanced form of steering than simply declining to accept certain cards is to surcharge for more-expensive cards.

152. The Networks maintain No-Surcharge rules that currently permit merchants to surcharge on the brand or product level, but only under limited circumstances (most notably only if the merchant is not prohibited from surcharging by other payment card networks, such as American Express), and even then only to charge up to the lower of 3% or the cost of acceptance, with substantial disclosure requirements to boot.[92]

153. The Proposed Settlement requires reform of the Networks' No-Surcharge rules to permit merchants to surcharge Visa and Mastercard credit cards on either the brand level or the product-category level (but not on the issuer level)[93] up to 3% or the cost of acceptance, regardless of the merchant's treatment of American Express or other card brands.[94] The Proposed Settlement also provides that:

> For the avoidance of doubt, nothing in this [Proposed Settlement agreement] shall prevent a merchant from employing a dual pricing program in which the merchant discloses to customers a total price for a transaction using a [MasterCard Credit Card or Visa Credit Card] and a separate total price for a transaction using cash or another means of payment.[95]

The Proposed Settlement does not affect the Networks' disclosure requirements for surcharges, which are quite extensive. Visa, for example, currently requires a merchant to clearly and prominently disclose that a surcharge will be assessed both at "the point of entry to the Merchant Outlet and the Point-of-Transaction." The point-of-transaction disclosure must also state the exact amount or percentage of the surcharge, a statement that the surcharge is being assessed by the merchant as is only applicable to credit transactions, and a statement that the surcharge is not greater than the applicable Merchant Discount Rate for Visa credit card

[92] Visa Rule 5.5.1.5-5.5.1.9 (Apr. 18, 2026).
[93] Proposed Settlement, ¶¶ 43(a), 92(a).
[94] Proposed Settlement, ¶¶ 39-43, 88-92.
[95] Proposed Settlement, ¶¶ 42(d), 91(d).

transactions at the merchant.[96] The Proposed Settlement includes similar disclosure requirements.[97]

154. The relief the Proposed Settlement gives to merchants from the Networks' No-Surcharge rules is virtually worthless for several reasons.

*a. State No-Surcharge Statutes Prevent Many Merchants From Surcharging*

155. First, not all merchants are legally permitted to engage in surcharging of any sort because of the operation of state no-surcharge laws. Merchants whose businesses are covered by these laws gain no benefit whatsoever from an expanded right to surcharge under the Networks' rules because they still cannot legally surcharge at all or are practically unable to do so.

156. Several states have no-surcharge laws that either prohibit surcharging altogether[98] or cap surcharges at 2% of the transaction amount[99] or at the cost of acceptance.[100] Additionally, some state laws require disclosure of surcharges upfront in advertising or on sticker prices, not just at the register.[101] They also sometimes require various disclosures at point-of-sale or elsewhere.[102]

157. New York, for example, requires that a merchant:

> clearly and conspicuously post the total price for using a credit card in such transaction, inclusive of surcharge, provided however, any such surcharge may not exceed the amount of the surcharge charged to the business by the credit card company for such credit card use. The final sales price of any such sales transaction, inclusive of such surcharge, shall

---

[96] Visa Rule 5.5.1.9 (Apr. 18, 2026).

[97] Proposed Settlement, ¶ 42(b).

[98] Conn. Gen. Stat. §42-133ff; Mass. Gen. L. ch. 140D, §28A; 9-A Me. Rev. Stat. § 8-509; P.R. Code Ann. tit. 10, §11.

[99] Colo. Rev Stat § 5-2-212.

[100] Ga. Code § 13-1-15; NJ Rev. Stat. § 56:8-156.2.

[101] *E.g.*, Cal. Civ. Code § 1770(a)(29)(A); Ga. Code § 13-1-15; N.Y. Gen. Bus. L. § 518.

[102] Gabriela Jhean, *Credit card surcharge laws by state explained for 2025*, 8AMLAWPAY (Oct. 24, 2025), https://www.lawpay.com/about/blog/credit-card-surcharge-rules/.

not amount to a price greater than the posted price for such sales transaction.[103]

158. In other words, the statute cannot be satisfied with signage that says "3% surcharge for credit cards." Instead, the merchant would need to write "$10.30 for credit card, $10.00 otherwise." The New York law thus requires the dollar amount of the surcharged price to be indicated on every item in advance.

159. The effect of the New York law is to make surcharging impossible for some types of merchants, such as medical or dental offices that do not post prices or restaurants that cannot know total transaction amount in advance because of tipping.

160. But even for other merchants, the merchant would need to know the interchange fee for a card in advance of the transaction because the New York statute limits surcharging to the amount "charged to the business by the credit card company for such credit card use."[104] Thus, New York is effectively requiring not just dual pricing, but dual pricing that is limited to the interchange rate on the particular transaction. The merchant cannot know its own cost of acceptance for a particular transaction without knowing the brand and product type of card being used; Visa has six interchange categories for consumer cards (there are subcategories among Premium and Standard cards) and a seventh for Commercial cards. In these circumstances, it is exceedingly difficult for a merchant to surcharge and comply with New York law.

161. State no-surcharge laws obviously apply to in-person transactions in a state, but because they are consumer protection statutes, states are likely to apply them to online transactions involving state residents, regardless of the merchant's location. This means that any business that does online commerce will have to determine if it must comply with various state no-surcharge laws and how it will do so while surcharging cardholders from other states.

162. The Court expressed concern that a prior proposed settlement in this Litigation was "virtually worthless" to merchants in states with prohibitions

---

[103] N.Y. Gen. Bus. L. § 518.

[104] N.Y. Gen. Bus. L. § 518.

on surcharging.[105] The Proposed Settlement does nothing to change this defect.

*b. The Right to Surcharge by Brand*

163. The right to surcharge by brand is of little value to merchants for the same reason that selective acceptance by brand has little value: many cardholders have only one Network's brand cards in their wallet.

164. Surcharging for a Visa card when the cardholder has only Visa cards does not incentivize the consumer to shift the transaction to a MasterCard because the consumer cannot switch to a card he does not have. Instead, surcharging in such a situation is likely only to cost the merchant goodwill with the consumer. Rather than the consumer then going home and applying for a MasterCard, the consumer is likely to just take future (and maybe current) business to another merchant. Surcharging by brand is only likely to cost merchants business, particularly in the case of Visa.

*c. The Right to Surcharge Premium and Commercial Cards Is of Little Value Because Most Cardholders Lack a Standard Card*

165. Surcharging by product category is similarly of little benefit to merchants for the same reasons that the right to refuse cards by category is of no value: the card categories that merchants would want to surcharge, namely the Premium and Commercial cards, constitute the overwhelming share of the market. Many cardholders lack a Standard Card, so it has little steering effect for a merchant to penalize Premium and Commercial cards if cardholders cannot respond by opting to use a lower-cost Standard Card.

166. According to the ERCPs' experts, only [redacted]% of cards issued historically have been Standard cards.[106] Such data is not publicly available, however, so the only basis merchants have for estimating the existing mix of cards in circulation—and hence the expected basis for their behavior—is transaction share. In other words, what matters in terms of merchant behavior is not the actual percentage of cards that are Standard, but what merchants' best estimate of the percentage is. The percentage of transactions is the best

[105] *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *38 (E.D.N.Y. June 25, 2024) (quoting *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 238 (2d Cir. 2016)).

[106] Rebuttal Declaration of Joseph E. Stiglitz, Ph.D. & Keith B. Leffler, Ph.D, ¶ 24. The underlying documents upon which they rely are under seal and were not available to me for analysis.

available proxy for merchants, and one that is available to many merchants from their own data.

167. Using this proxy, we see that Premium cards account for at least [redacted]% of the Networks' consumer card transactions.[107] If merchants assume that [redacted]% of cards are Premium cards, then if a consumer with two cards has a Premium card, the chance that the second card is a Standard card is just [redacted]%, while if a consumer with three cards has a Premium card, the chance that at least one of the other two will be a Standard card is just [redacted]%.[108]

168. Regardless of the actual breakdown of current, active cards, the real question is what cards consumers carry with them. A consumer with both a Premium and Standard card is more likely to carry the Premium card, as the overwhelming [redacted]% transaction share indicates.[109] That means that a merchant who surcharges for Premium cards risks surcharging consumers in many cases when the consumer has no ability to avoid the surcharge by using a Standard card.

169. This, however, assumes a random distribution of cards. Cardholders with Premium cards, however, are likely to have only Premium cards because they have opted for those cards because of the more generous rewards offerings. Even assuming a random distribution, however, the possibility that a consumer will not have a card that is not a Premium card means that merchants risk losing sales by surcharging for Premium cards.

170. Nor is surcharging likely to change cardholders' choice of cards, contrary to the claims of the ERCPs' experts.[110] Cardholders would only be likely to switch their consumption to Standard cards if (1) a sufficient number of

---

[107] Stiglitz-Leffler Declaration, table 2, line 19 ([redacted]. *See also* Leffler Supplemental Declaration (Visa Premium card transactions are [redacted]% of all Visa posted rate transactions and Visa Consumer transactions are [redacted]% of all Visa posted rate transactions, so Visa Premium card transactions are [redacted]% of Visa Consumer posted rate transactions. MasterCard Premium card transactions are [redacted]% of all MasterCard posted rate transactions and MasterCard Consumer transactions are [redacted]% of all MasterCard posted rate transactions, so MasterCard Premium card transactions are [redacted]% of MasterCard Consumer posted rate transactions.). I have used the [redacted] in the Stiglitz-Leffler Declaration.

[108] This is calculated as the remainder of 1 – ([redacted])$^2$.

[109] *See supra*, note 107.

[110] Rebuttal Declaration of Joseph E. Stiglitz, Ph.D. & Keith B. Leffler, Ph.D, ¶ 24.

merchants surcharge, and (2) the cardholders understand the differences between Standard and Premium cards.

171. Both are unlikely. For the reasons explained in this section, many merchants cannot or will not surcharge, and even if they did, cardholders are unlikely to understand the differences between Standard and Premium cards. Indeed, absent card reissuance, cardholders have no ready way to identify whether their cards are Standard or Premium, and the visual identifiers required by the Proposed Settlement do little to clarify that, as they permit issuers to use a variety of inconsistent terms to indicate card type.

172. Similarly, surcharging for Commercial cards is unlikely to result in cardholders switching to other, less expensive cards because Commercial card users are likely using the cards for business, rather than personal use, and may not have a low-cost Standard card that they can use (such as a standard consumer card) for business use.

*d. Surcharging Cards at Point-of-Sale Risks Customer Goodwill and Sales*

173. Merchants are also unlikely to engage in surcharging by product level or brand because it risks losing customer good will. Cardholders are not generally aware of the different categories of cards and are likely to react badly to being confronted with a surcharge based on a distinction they are unaware of, particularly if they lack a different means of payment the merchant will accept. In particular, cardholders are likely to blame the merchant for the surcharge, rather than the issuer or the Network because the merchant is the party applying the surcharge and cardholders generally do not understand the interchange fee system.

174. Survey evidence supports the idea that merchants risk customer goodwill and sales from surcharging. One survey of 2,507 U.S. credit card users found that "56% of credit card users who have been asked to pay a surcharge say it made them "'very' or 'extremely'" likely to take their business to another merchant."[111] Another survey of a random sample of 380 small business customers found that 71% of business customers

[111] PYMNTS.com & Payroc, *Credit Card Surcharges, How Cardholders React to Extra Costs*, Feb. 2022, at 5, *at* https://www.pymnts.com/wp-content/uploads/2022/02/PYMNTS-Credit-Card-Surcharges-February-2022.pdf.

express a preference for avoiding companies that charge a fee to use a credit card.[112]

175. The loss of customer goodwill can mean loss of sales, which can outweigh the benefits of surcharging. Thus, another study found that "Surcharging debit and credit transactions costs the average merchant more in lost sales than they offset in customer surcharge fees," with same-store sales down 10% with surcharging.[113]

176. In order for merchants to avoid alienating their customers, they would need to be able to indicate in advance whether they accept a particular card or not. But it is not clear that merchants could successfully communicate their acceptance policies to consumers in advance in a way that consumers would understand. Merely having signage indicating that "3% Surcharge for Premium Cards," would not work because consumers do not know if their card is a "Premium Card"—the terminology is so anodyne as to be meaningless outside the payment card industry. Even with such a notice, there is good chance that a consumer would be surprised at Point-of-Sale that the merchant will surcharge his card—which might be his only payment method available.

177. Few merchants want to risk irking their customers in this way, particularly if their competitors are not doing so, creating a first-mover problem that will, at best, delay large-scale product-level surcharging until a good part of the settlement period has run, but which is more likely to simply prevent it altogether for most merchants.

*e. Surcharging Is Incompatible with Some Merchants' Business Models*

178. Surcharging is also simply incompatible with some merchants' business models, rendering the right to surcharge useless to those merchants.

---

[112] Weave, *Small Business Payments: New Study Reveals the Best Forms of Payment for Small Business Success*, Mar. 30, 2020, *at https://www.getweave.com/new-small-business-payment-statistics/*. The study has a margin of error is +/-5.03% at the 95% confidence level. Weave, *Study: Small Businesses Offering Multiple Payment Options Increase Revenue by Nearly 30 Percent*, https://www.prnewswire.com/news-releases/study-small-businesses-offering-multiple-payment-options-increase-revenue-by-nearly-30-percent-301031597.html.

[113] Ipsos, *Why payment card surcharges don't add up for merchants*, June 16, 2023, *at* https://www.ipsos.com/sites/default/files/ct/publication/documents/2023-06/Ipsos_Payment.pdf.

179. Some merchants seek to attract customers by offering low, transparent prices. Merchants who have such a business model are not capable of taking advantage of surcharging. The surcharged customers will be deprived of the low price that brought them to the merchant in the first place, and even if clearly disclosed, surcharges necessarily feel like "gotchas" to consumers.

*f. Interchange Rates Will Exceed the Maximum Surcharge Allowed in Certain Cases*

180. The Proposed Settlement caps surcharges at the lesser of 3% or the merchant's cost of acceptance. This means that a merchant would find its ability to surcharge capped at 3%, even if the card had a higher interchange rate. For example, Visa's interchange rate for all consumer credit cards for "Non-Qualified Consumer Credit" transactions (those transactions done by magnetic stripe or manual key entry or missing security data or with other flags), is [redacted]." For a $25 transaction, the merchant's effective interchange rate would be [redacted]%, but the merchant would be limited to surcharging only 3%.

181. Similarly, the fixed amount component of interchange rates means that the rate on small transactions is often over 3%, even if the *ad valorum* component of the interchange fee is less than 3%. For example, Visa Infinite Spend Qualified interchange tier has a rate of [redacted] for Consumer Bill Payment Services. Because of the fixed component of the fee, any transaction for less than $25 in this category will have an interchange rate that exceeds 3%.

182. Merchants will not be able to surcharge the full cost of these transactions, which will be particularly problematic for merchants that tend to have lots of small transactions.

*g. Merchants Cannot Always Know the Applicable Interchange Rate in Advance of a Transaction*

183. A merchant may in fact not know the applicable interchange rate on a transaction in advance. Even if a merchant knows what category *generally* applies to its transactions, it can still end up with transactions that are deemed "non-qualified" and subject to higher, punitive interchange fee rate. This can be triggered by something as simple as the EMV chip reader at a Point-of-Sale terminal not working and defaulting to magnetic stripe authorization (perhaps because the reader was deliberately sabotaged by a fraudster seeking to force fallback magnetic stripe authorization). If the

merchant surcharges at its regular rate, it will fail to surcharge as much as it would be allowed on the non-qualified transaction.

184. The point here, not appreciated by the ERCPs, is how complicated this system is, which is why it does not lend itself to a cobbled-together Rube Goldberg intervention like the Proposed Settlement.

*h. Merchants Will Not Be Able to Surcharge Until Much or All of the Settlement Period Has Expired*

185. Merchants will only be able to surcharge when they can identify cards by product type. As noted above, however, in the discussion of the Honor-All-Cards rules,[114] merchants will lack the ability to identify cards by product type for some time.

186. For card-present transactions, merchants rarely have the ability to physically inspect cards, and even if they did, it will take perhaps five years (if issuers act in good faith) in the ordinary course of business for all existing cards to be reissued with physical identifiers indicating their product type. If issuers do mass reissuance in the period before 90 days have run from settlement approval and use extended expiry dates, the entire settlement period might expire before merchants can surcharge most cards.

187. For card-not-present transactions, merchants might have to invest considerable sums in their software systems to be able to take advantage of the ability to identify cards by product type.

188. Similarly, as noted in the discussion of the Honor-All-Cards rules, it is questionable whether merchants are even allowed, under the Proposed Settlement to surcharge only the cards in a product category that they can identify as such if they do not surcharge all cards in the product category.

189. By the time surcharging or selective acceptance would actually start to be effective, the end of the settlement period will be looming. Issuers will just wait out merchants, instead of shifting to issuing lower-cost Standard Cards. A right to surcharge for perhaps around three years, and maybe not at all, is not valuable relief for merchants. The surcharging rights created by the Proposed Settlement are not a real solution to the problem merchants face.

---

[114] *See supra*, ¶¶ 120-139.

*i. The Proposed Settlement Provides No New Right to Engage in Dual Pricing*

190. The ERCPs present the Proposed Settlement as "permit[ting] dual pricing to help merchants comply with state surcharge restrictions".[115] This characterization of the Proposed Settlement is misleading, at best.

191. Nothing in the Proposed Settlement creates any new rights for merchants regarding dual pricing. Instead, all it does is affirm that the Proposed Settlement agreement itself does not prohibit the use of dual pricing as a means of complying with state surcharge restrictions. This is not a concession from the Networks; they have long permitted dual pricing. The Networks' rules only limit surcharging for credit cards; because of the federal Cash Discount Act,[116] they cannot restrict merchants' ability to offer cash discounts.

192. Dual pricing does not present either price—credit or cash—as the baseline, so there is neither a surcharge nor a discount, just two separate prices. Accordingly, dual pricing does not fall within the scope of the Networks' prohibitions. Moreover, if the Networks were to claim that it did, they would face a challenge for violation of the Cash Discount Act.

193. Contrary to the characterization of the ERCPs, the Proposed Settlement's dual pricing provision provides no consideration whatsoever to merchants.

*j. Dual Pricing Is Already Legal, But Rarely Used Because It Is Cumbersome to Merchants*

194. Even if the Proposed Settlement's dual pricing provision were to be interpreted as providing a new right to merchants, however, that right would be of little value. Dual pricing is already legal is every state. For example, Connecticut has the one of the strictest no-surcharge statutes in the country, but its Department of Consumer Protection explains that businesses can comply by having "dual pricing by listing a cash price and a credit card price."[117] Likewise, New York's no-surcharge state provides that it shall not "be deemed to prohibit merchants from offering a two-tier pricing system. For the purposes of

[115] Equitable Relief Class Plaintiffs' Memorandum of Law in Support of Final Approval of Amended Settlement Agreement, MDL 1720 (ECF No. 9932-1) at 1, 18, 20.

[116] 15 U.S.C. § 1666f.

[117] Ct. Dept. of Consumer Protection, Surcharges, *at* https://portal.ct.gov/dcp/legal/credit-card-surcharge?language=en_US.

**Confidential**

this section, 'two-tier pricing system' shall mean the tagging or posting of two different prices in which the credit card price, inclusive of any surcharge, is posted alongside the cash price."[118]

195. Despite the legality of dual pricing, few merchants utilize it because it is cumbersome. Dual-price posting is a feasible solution only for merchants that offer a limited array of items, such as gasoline stations that might have only three or four fuel products for sale. But having to dual price every item in a convenience store or grocery store imposes a much greater administrative burden on the merchant and is also likely to cause consumer confusion, which could erode goodwill for the merchant. The impracticability of dual pricing is the reason merchants have eschewed it, not legal concerns about its treatment. The proposed Settlement does nothing to change that.

### ***iii. Issuer-Level Discounting***

196. The Proposed Settlement requires the Networks to modify their No-Discount rules to clarify that issuer-level discounting is permitted.[119] The value of allowing issuer-level discounting is quite limited to merchants, however.

197. Although surcharges and discounts are mathematically interchangeable—just addition and subtraction—they are behaviorally distinct.[120] Consumers exhibit a strong negative reaction to surcharges, but only a mild positive

---

[118] N.Y. Gen. Bus. L. § 518.

[119] Proposed Settlement, ¶¶ 19, 68. Issuer-level discounting is already arguably permitted by Visa. *See* Visa Rule 1.5.4.10 (providing that the requirement that a merchant process all transactions with cardholders in exactly the same manner "does not apply to discounts, promotional offers, or in-kind incentives offered by the Merchant to a subset of Visa Cards.").

[120] Adam J. Levitin, *Priceless? The Economic Costs of Credit Card Merchant Restraints*, 55 UCLA L. REV. 1321, 1350-52 (2008). The ERCPs' Experts [redacted] Rebuttal Declaration of Joseph E. Stiglitz, Ph.D. & Keith B. Leffler, Ph.D, ¶ 13, n.21. The idea that a fundamental consumer behavioral bias can be unwound by $21 million in education funds is risible and completely unsupported by anything in the behavioral economics literature. If such debiasing were so feasible, merchants would have undertaken it long ago.

reaction to a discount.[121] Accordingly, a much larger discount is needed to have the same effect on consumer behavior as a smaller surcharge.

198. Given this reality, discounting is often impractical for merchants. If the merchant sets the non-discounted price—that is the price for disfavored issuers' cards—as the baseline, the merchant's maximum ability to offer a discount for use of a favored issuer's cards (without subsidizing the favored issuer's cards by accepting a small profit margin) is limited to the difference in the merchant's costs of acceptance of the disfavored issuers' cards and favored issuers' cards. This cost difference is likely to be relatively limited and unlikely to be more than 100 basis points. It will certainly be smaller than the total cost of accepting cards or 300 basis points, which is the most the Proposed Settlement would allow merchants to surcharge on a brand or product-level basis. Accordingly, it is hard to see how issuer-level discounting would be particularly effective at shifting cardholder behavior and thus at creating demand for lower-interchange fee cards.

199. The fact that the Proposed Settlement permits only issuer-level discounting, but not issuer-level surcharging, confirms that they are not equivalent and that the Networks are much more comfortable with issuer-level discounting than surcharging because they recognize that it is unlikely to be used on any scale or to be effective.[122]

### ***iv. Elimination of the Networks' Honor-All-Wallets Rules***

200. Digital wallets are software applications that can hold payment information for multiple payment instruments. Digital wallets can pose a variety of risks to merchants, including loss of control over customer data, frictions in customer relationship management, greater exposure to data security

---

[121] ITM RESEARCH, THE ABOLITION OF THE NO-DISCRIMINATION RULE, REPORT FOR THE EUROPEAN COMMISSION DIRECTORATE GENERAL COMPETITION 12 (2000) (finding strong negative consumer reaction to credit card surcharges); Fumiko Hayashi, *Discounts and Surcharges: Implications for Consumer Payment Choice*, Fed. Res. Bank of K.C. Payment System Research Briefing, June 2012.

[122] If the Networks do believe that issuer-level discounting is meaningful, it undercuts their claim that they cannot remain competitive in the face of issuer-level surcharging.

breaches and fraud, intellectual property liability, and limitations on ability to influence payment routing on debit cards.[123]

201. The Networks "interpret their Honor All Cards rules to be 'Honor All Wallets' rules, meaning that merchants are required to accept all devices set up to transact through the Card Network if the merchant accepts payments using the communications technology employed by the device."[124] In other words, merchants who accept cards with a Network's brand must accept all network-branded payments from any digital wallet, such as ApplePay and GooglePay, that is compatible with the merchant's point-of-sale technology.

202. As I have previously written:

> The Honor All Wallets rules not only require acceptance of all wallets using a certain technology, but also nondiscrimination among devices and among technologies. Therefore a merchant who takes magnetic stripe payments must accept emulated magnetic stripe payments, such as those used by SamsungPay, *without discrimination*. Similarly a merchant that takes NFC cards must accept all NFC devices, including devices running ApplePay and Google Pay wallets, *without discrimination*.
>
> The inability to discriminate on terms of acceptance not only means that merchants cannot price for the risks imposed by particular wallets, but also impedes merchants' ability to partner with wallet providers. A merchant might want to partner with a particular digital wallet provider to gain access to the wallet as a platform for advertising and loyalty programs. The Honor All Wallets rules would permit such a partnership, but the merchant could not discriminate in favor of its partner to encourage use of its wallet.[125]

203. The Proposed Settlement entirely eliminates the Networks' interpretation of their Honor-All-Cards rules as Honor-All-Wallets rules.[126]

---

[123] Adam J. Levitin, *Pandora's Digital Box: The Promise and Perils of Digital Wallets*, 166 U. PA. L. REV. 305, 348-58 (2018).

[124] *Id.* at 360-61.

[125] *Id.* at 362 (emphasis original).

[126] Proposed Settlement, ¶¶ 34-38, 83-87.

204. Elimination of the networks' Honor-All-Wallets rules enables merchants to negotiate with digital wallet providers about terms of acceptance or simply to avoid the risks of digital wallets altogether. Realistically, however, only the largest merchants are likely to negotiate bespoke terms of digital wallet acceptance. It is hard to imagine the local bodega or pizzeria negotiating with Apple over the terms of acceptance of Apple Wallet transactions. Nor do smaller merchants have the technological wherewithal to refuse to accept particular digital wallets. At most, they can refuse to accept contactless ("tap") payments as a way of refusing all digital wallets, as well as contactless payments with physical cards, but even doing that requires reconfiguring existing point-of-sale terminals by turning off their Near Field Communication capabilities, which might itself necessitate recertification of the point-of-sale terminals for PCI-DSS compliance. Thus, elimination of the Honor-All-Wallets rules is a benefit, but only for a subset of larger merchants.

#### *v. Reform of the Network's All-Outlets Rules*

205. The Networks' Honor-All-Cards rules are interpreted by the Networks to require merchants that accept a Network's cards at one location to accept them at all locations on the same terms. These interpretations are known as the All-Outlets rules.

206. The effect of the All-Outlets rules is two-fold. First, they prohibit merchants that operate multiple stores with distinct business models (*e.g.*, regular retail locations and discount outlets or limited service locations or brick-and-mortar stores vs. online) from having different card acceptance policies by business model. And second, they prevent merchants from testing acceptance patterns and discounting (or surcharging) on a low-risk, limited basis.

207. The Proposed Settlement reforms the Networks' All-Outlets rules to make it clear that merchants may adopt different steering methods—as otherwise permitted by the Proposed Settlement—in different store locations.[127] The Proposed Settlement also permits merchants to have selective, outlet-based non-acceptance pilot programs.[128]

[127] Proposed Settlement, ¶¶ 31-33, 80-82.

[128] Proposed Settlement, ¶¶ 31-32, 80-81.

208. While this is a positive step for merchants, its impact is quite limited. The All-Outlets rules affect only merchants that operate multiple trade banners (e.g., The Gap, Inc., operates the Gap, Banana Republic, Old Navy, and Athleta). The All-Outlets rule has no effect on small merchants or those with only one banner. Thus, eliminating the All-Outlets rules has no benefit for small merchants, like a medical office or dry cleaner or bakery, or for merchants with only one banner.

209. Even for merchants who are constrained by the All-Outlets rules, the Proposed Settlement, only permits the limited types of steering by merchants authorized elsewhere in the Proposed Settlement. As explained above, such types of steering are of limited to no use for most merchants.[129]

### E. Facilitation of Merchant Buying Groups

210. The Proposed Settlement provides that the Networks "shall modify their Rules to the extent necessary to remove any restrictions contained therein on merchants' rights to organize Merchant Buying Groups" provided that the Merchant Groups are non-profit corporations that comply with FTC and DOJ antitrust guidelines.[130]

211. This relief too is of no value. Historically, nothing other than the antitrust laws has formally prevented merchants from banding together as a buying group to negotiate interchange rates for the group with the Networks, and nothing in the Networks' current rules prohibits the formation of merchant buying groups. Moreover, nothing in current law would require merchant buying groups to be non-profits; that would be a new restriction on merchants created by the Proposed Settlement.

212. Instead, the only obstacles to merchant buying groups currently are the Networks' willingness to negotiate with such groups, and the inability for such groups to move volume. The Proposed Settlement, however, only requires the Networks to:

> exercise their discretion and business judgment in good faith: (i) to consider each Merchant Buying Group proposal; (ii) to determine whether the proposal sets forth commercially reasonable benefits to merchants, consumers, the network,

[129] *See supra*, ¶¶ 107-204.

[130] Proposed Settlement, ¶¶ 44-47, 93-96.

> and all other stakeholders; and, if so, (iii) to conduct reasonable, *bona fide* negotiations with the Merchant Buying Group concerning the proposal.[131]

In other words, the Proposed Settlement just requires the Networks to do what they already do, namely decide if they think a Merchant Buying Group's proposal is worth discussing further.

213. It is critical to recognize that the Proposed Settlement does *not*, contrary to the claim of the ERCP's experts, [redacted].[132] It only requires such good faith negotiation *if* the Networks have previously determined that the merchant buying group proposal "sets forth commercially reasonable benefits to merchants, consumers, the network, and all other stakeholders". That determination is to be made in the good faith exercise of the Network's "discretion and business judgment," which basically leaves the entire matter in the Network's discretion.

214. The inclusion of consideration of benefits to "other stakeholders" permits the networks to consider the interests of issuers, such that the Networks could simply decline any proposal for lower interchange rates because it would harm their issuer clients. Nor does the Proposed Settlement require any documentation of Networks' evaluative process or explanation from them that could be reviewed.

215. Likewise, the ERCP's experts note that the Proposed Settlement [redacted][133] In fact, the Proposed Settlement *limits* such challenges by restricting jurisdiction to this Court and permitting only declaratory relief, thereby preventing merchant buying groups from obtaining monetary or injunctive relief if the Networks fail to honor their contractual obligations under the Proposed Settlement with regard to collective bargaining.

216. Additionally, the Proposed Settlement appears to leave to the Networks' discretion in the first instance whether a Merchant Buying Group conforms to FTC and DOJ antitrust guidelines. This is no small matter, as merchants in the same industry are generally competitors, so banding together as a buying group could raise the prospect of antitrust actions against them.

---

[131] Proposed Settlement, ¶¶ 45, 94.
[132] Stiglitz-Leffler Declaration, ¶ 94.
[133] *Id.*

Determination of whether a Merchant Buying Group conforms to the FTC and DOJ antitrust guidelines is potentially the equivalent of an entire antitrust case in itself. If the issue were disputed, it could take years to resolve, by which point the settlement would have expired, leaving the declaratory relief entirely worthless. And it is unclear if merchants could ever successfully challenge a refusal to negotiate given that they would be unlikely to allege any facts in a pleadings beyond the Network's refusal to negotiate. Such a pleading might not survive a motion to dismiss under plausibility pleading standards.

217. Even if the Proposed Settlement were to require the Networks to change their rules or to negotiate with Merchant Buying Groups, it is hard to see how this alone would place downward pressure on interchange rates.

218. The ability to band together as buying groups is meaningful only if merchants have negotiating leverage with the Networks in the first place. If merchants had such leverage, then it would be magnified through group buying because the group would have more leverage due to its larger market share. In other words, collective action magnifies merchants' negotiating leverage, but if merchants have no leverage to begin with, there is nothing to magnify.

219. Because merchants' threat of steering is not credible under the Proposed Settlement, it will matter little how many coordinate to make such a threat. As Chief Judge Brodie explained, removing Network restrictions from Merchant Buying Groups does not "offer merchants any more bargaining leverage than they previously had."[134]

### F. Merchant Education Funding

220. The Proposed Settlement requires the Networks to pay $21 million to fund a merchant education program, designed to ensure that merchants can realize the value in the Proposed Settlement.[135] The Proposed Settlement does not specify how the funds will be used to that end, but the ERCPs' experts [redacted]

[134] *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *28 (E.D.N.Y. June 28, 2024).

[135] Proposed Settlement, ¶¶ 56-61, 105-109.

[redacted],[136] despite consumer's unequal perception of the phenomena being well established in the behavioral economics literature.[137]

221. As noted above, the Proposed Settlement provides only limited value to merchants. The obstacles to merchants realizing what value it provides frequently relate to merchants' need to maintain customer goodwill, and to avoid liability under state no-surcharge laws, and the costs of engaging in dual pricing or discounting or surcharging. These obstacles will not disappear because of an education program.

222. Instead, the primary beneficiary of the education program might well end up being Class Counsel for the ERCPs, which will administer the program and presumably be compensated for doing so. Thus, in addition to the $206 million in fees that Class Counsel would be paid under the Proposed Settlement, Class Counsel would control a $21 million education fund.

### G. Anti-Circumvention

223. The Proposed Settlement contains a pair of expressly labeled "anti-circumvention" provisions.[138]

224. The Networks have already shown that they are adept at evading interchange fee regulations. In countries where interchange fees have been capped by regulation, the Networks' own fees have increased considerably,[139] raising the concern that the Network fees are being used to circumvent the regulations.[140]

225. Accordingly, the anti-circumvention provision prohibits the Networks from "implementing programs whereby" they "systematically transfer [their]

---

[136] Rebuttal Declaration of Joseph E. Stiglitz, Ph.D. & Keith B. Leffler, Ph.D, ¶ 13, n.21.

[137] *See, e.g.*, Richard Thaler, *Toward a Positive Theory of Consumer Choice*, 1 J. ECON. BEHAVIOR & ORG. 39, 45 (1980); Daniel Kahneman & Amos Tversky, *Choices, Values, and Frames*, 39 AM. PSYCHOLOGIST 341, 346 (1980).

[138] Proposed Settlement, ¶¶ 54, 103.

[139] *See* CMSPI, *State of the Industry Report: The Playbook for Smarter Payments* (Sept. 2025), at 80, *available at* https://insights.cmspi.com/soir-2025.

[140] *See* Alex Rolfe, Payments Card & Mobile, *EC opens new Scheme Fee investigation into Visa and Mastercard* (Nov. 8, 2024), *available at* https://www.paymentscardsandmobile.com/ec-opens-new-scheme-fee-investigation-into-visa-and-mastercard/.

network fees assessed to acquirers and pass the economics to issuers."[141] Likewise, the Networks agree that "they will not defeat the benefits that merchants receive [from the Proposed Settlement] by increasing other network fees or Merchant fees to restore the revenues that issuers lost from the interchange commitments herein."[142]

226. These prohibitions do not, however, appear to prevent the Networks from implementing programs whereby they transfer their network fees to a select group of large issuers as a way to retain those large issuers' business on the network. Given that 20 issuers make up nearly [redacted]% of purchase volume, the Networks would not need to have a general program of fee shifting, but could instead just use their Network fees to fund bespoke rebate deals or lucrative sign-on or renewal bonuses with larger issuers and achieve much the same result. As long as the increased network fees are diverted to a subset of issuers, rather than to issuers at large, the practice would appear to conform to the anti-circumvention provision.

227. Similarly, the Networks are the parties that will decide on the precise changes to their rules, and that gives them the ability to make it harder for merchants to engage in steering, such as through particularly onerous disclosure requirements. The idea that the Networks would do such a thing is hardly speculative: the Department of Justice has sued Visa for using network fees and technical rules (including tokenization and PIN-less routing restrictions) to suppress competition from rival debit networks.[143]

228. Likewise, nothing in the anti-circumvention provision clearly prohibits the Networks from creating new product categories or new interchange categories or redefining existing interchange categories or reclassifying existing merchants and transactions to different categories. Instead, the Proposed Settlement expressly preserves the Networks' right to "necessary flexibility in operating the[ir Networks] to respond to market conditions in the ordinary course of business."[144]

229. Similarly, the anti-circumvention provision states that the Networks "will refrain from actions that have the effect of artificially reducing the calculated average Effective Interchange Rate for Applicable Domestic

[141] Proposed Settlement, ¶¶ 54, 103.

[142] Proposed Settlement, ¶¶ 54, 103.

[143] *See* Complaint, United States v. Visa, Inc., No. 1:24-cv-7214 (S.D.N.Y. Sept. 24, 2024), ¶¶ 43, 58–59, 87–88, 92.

[144] Proposed Settlement, ¶¶ 54, 103.

Credit Transactions, for example, manipulating which credit products are or are not subject to the 'Honor All Cards' Rule for the specific purposes of affecting the calculation of the average Effective Interchange Rate."[145]

230. This provision all but spells out the roadmap for the Networks to evade both the 10-basis-point reduction in the Average Effective Interchange Rate and the freeze on current interchange rates. Those provisions are both keyed to the term "Applicable Domestic Credit Transactions."[146] The Proposed Settlement defines "Applicable Domestic Credit Transactions" as excluding transactions on any of the Networks' credit cards that are not subject to their Honor-All-Cards rules, meaning that merchant acceptance of the card is optional.[147]

231. Thus, the Networks could create new product categories with higher interchange rates, exclude them from their Honor-All-Cards rules, and therefore exempt them from the calculation of the Average Effective Interchange rate and from the rate freeze.

232. Exempting the new higher-rate product from the calculation of the Average Effective Interchange rate will push down the average interchange rate on those cards that remain under the Network's Honor-All-Cards rule. Issuers will be incentivized to move their issuance volume to the new product category, and if enough issuance volume moves to the new product category, merchants will have little choice but to accept it because cardholders might not have an alternative payment mechanism.

233. As long as the Networks can concoct a business justification for creating the new category (e.g., the need to attract high net worth cardholders who engage in a disproportionate share of spending), they can claim it was not done "for the specific purposes of affecting the calculation of the average Effective Interchange Rate," so they would not be in violation of the anti-circumvention provision. Well-counseled firms like the Networks will have no trouble concocting a plausible business justification and ensuring that any internal discussions that show otherwise are hidden by attorney-client privilege.

234. Additionally, the Proposed Settlement binds only the Networks. It does not bind card issuers, and issuers have every incentive to attempt to frustrate

---

[145] Proposed Settlement, ¶¶ 54, 103.

[146] Proposed Settlement, ¶¶ 48-49, 51, 97-98, 100.

[147] Proposed Settlement, ¶ 1(b).

the Proposed Settlement. For example, as noted above, they can reissue cards en masse just prior to the date by which they would need to add identifiers to the cards to facilitate steering and thereby defeat merchants' steering efforts.[148] Likewise, issuers can discourage the use of Standard Cards by limiting the credit lines on those cards and making more credit line available on Premium cards.

235. Thus, even if the Proposed Settlement's Rube Goldberg machine worked as promised and enabled merchants to steer transactions to low-cost Standard Cards with the result of pushing down interchange rates across the board, all it would do is create an incentive for Networks and issuers to circumvent the Proposed Settlement, and the weak anti-circumvention provision gives them plenty of leeway to do so.

236. In other words, either the Rube Goldberg machine won't work, so there will be no incentive for circumvention, or it will work, and the Networks and issuers will circumvent the settlement. Either way, merchants lose because they will have surrendered their claims for both past anticompetitive activity and for future activity for the next eight years (or more) in exchange for a basket of illusory relief.

237. To summarize, for the Rube Goldberg machine to work:

a. Merchants need to be able to identify cards by product type, but it is unclear that they will be able to do so for some or even all of the settlement period;

b. Merchants need to have the POS technology to discriminate by product type, and for it all to be PCI-DSS compliant, which will impose substantial costs on them;

c. Merchants need to be able to push down interchange fees on Premium cards by discriminating against them, but Premium cards are [redacted]% or more of consumer card purchase volume, so substitution will be unlikely, and surcharging is not possible in some states;

d. Merchants need to be able to push down interchange fees on Commercial cards by discriminating against them, but Commercial card purchases cannot generally be substituted to consumer cards;

e. Merchants need to be able to push down interchange fees Network-wide by discriminating against the Networks, but if they do, they just

[148] *See supra*, ¶ 135.

drive more traffic to the other Networks, making future Network-level discrimination even harder;

f. Merchants need to be able to band together as buyer groups that the Networks will actually negotiate with, but the Networks have several ways of avoiding this without running afoul of the anti-circumvention provision;

g. The Networks need to cooperate in good faith and not create new product categories or increase Network fees or create frictions to steer, but they have no incentive to do so, and are not clearly prohibited from doing so;

h. The Networks need to not increase the Average Effective Interchange Rate in years 6-8 of the settlement so as to offset the reduction in years 1-5, but they have no incentive to do so;

i. The issuers need to issue Standard cards, but they have no incentive to do so because without rewards they lose their primary method of attracting cardholders; and

j. The issuers need to cooperate in good faith and not reissue cards before identifiers are required or throttle credit limits on Standard cards, but they have no incentive to do so and are not even covered by the anti-circumvention provisions of the Proposed Settlement.

If all of this were to somehow happen, despite the myriad obstacles detailed above, it is still not clear that the Proposed Settlement would result in credit card interchange rates equilibrating at anything close to the competitive level, and if they did, it would only be for a limited part of the eight-year settlement period, not permanently; once the Proposed Settlement expires, the Networks could return to their prior practices and the entire twenty-year long litigation process would have to start up again.

## VI. Issues Left Unaddressed by the Proposed Settlement

### A. Issuer-Level Discrimination and Surcharging and Default Interchange

238. The Proposed Settlement does not permit merchants to discriminate in acceptance or to surcharge based on the issuer of a card. Absent the ability to engage in issuer-level discrimination, the Networks' take-it-or-leave-it default interchange scheme will remain fundamentally unaltered, such that

there will not be competition among issuers for merchants' business, which is what has enabled issuers to charge supracompetitive interchange rates.

239. Beyond addressing the competition problem at the heart of this Litigation, the right to issuer-level discrimination is particularly important for merchants for several additional reasons.

240. First, the right to issuer-level non-acceptance would be far more effective at forcing down interchange rates than any other steering method. Consumers respond negatively to surcharges and will switch payment instruments when confronted with them.[149] Thus, one survey of 2,050 U.S. consumers found that "73% of cardholders say they wouldn't continue using their credit cards as much if they had to pay a surcharge to merchants each time."[150]

241. Issuers understand this dynamic and the need to ensure that their card is the "front of the wallet" card, because if their card does not get "the spend," they do not make money. Accordingly, faced with issuer-level surcharging, issuers would be incentivized to compete for acceptance by offering lower interchange fees.

242. As long as issuers do not have to compete with each other for acceptance by merchants, they have no incentive to offer lower prices in the form of reduced interchange fees. Enabling *meaningful* issuer-level discrimination (particularly non-acceptance, as surcharging faces state-law obstacles and customer frictions, and discounting is ineffective) would produce competition for merchant acceptance that would be the single most effective way to place downward pressure on interchange fees through a market mechanism.

243. Indeed, issuer-level discrimination would force issuer banks to negotiate with merchants; in contrast, for brand- and product-level discrimination,

---

[149] Wilko Bolt, Nicole Jonker & Corry Van Renselaar, *Incentives at the Counter: An Empirical Analysis of Surcharging Card Payments and Payment Behavior in the Netherlands,* 34 J. BANKING & FIN. 1738 (2010) (debit card surcharges result in Dutch consumers using different payment methods); Ron Borzekowski, Elizabeth K. Kiser & Shaista Ahmed, *Consumers' Use of Debt Cards: Patterns, Preferences, and Price Response,* J. MONEY, CREDIT & BANKING 149 (2008) (PIN debit card surcharges result in a reduction in PIN debit card use).

[150] Matt Schulz, *69% of Cardholders Have Paid a Credit Card Processing Fee, but 57% Think It Should Be Illegal*, LendingTree, Sept. 11, 2023, *at* https://www.lendingtree.com/credit-cards/study/processing-fees/.

the Networks act as intermediaries, protecting the banks from the need to compete for merchants' business.

244. Second, even with the default interchange system, there are still material differences among issuers from merchants' perspective. Issuers have different authorization practices, different fraud-control protocols, and differences in their chargeback procedures. The current system prohibiting discrimination on an issuer-level encourages issuers to engage in lax authorization and fraud control and to be unduly aggressive with chargebacks.

245. Third, merchants would only have to focus their discrimination efforts on a handful of issuers to be effective. As Table 1, above, shows, most credit card transactions take place on cards issued by a handful of issuers, with the top 10 issuers accounting for [redacted]% of U.S. purchase volume in 2025, and the top 20 issuers accounting for [redacted]% of U.S. purchase volume in 2025.[151] The high level of concentration among a small number of issuers means that merchants only need to concentrate their discrimination efforts on a handful of issuers in order to create market pressure on the transactions that account for the overwhelming majority of interchange fees.[152]

246. Fourth, unlike with brand- or product-level discrimination, merchants would not be disincentivized from discrimination on the issuer-level out of fear of losing a large volume of sales. Although there is a high level of concentration among a small number of issuers, no single issuer is dominant. This makes it possible for merchants to surcharge or refuse to accept cards at the issuer level without having to incur a significant risk of lost sales. Because of the limited market share of any individual issuer, issuer-level discrimination also does not have the first-mover problem that inhibits product-level discrimination. Unlike with product-level discrimination, a merchant that discriminates against an individual issuer is not incurring the risk of a serious competitive disadvantage relative to merchants who do not.

247. To illustrate, JPMorgan Chase has the [redacted], accounting for around [redacted]% of U.S. credit card purchase volume in

---

[151] Nilson Report, #1302 (Feb. 2026) at 5-6.

[152] Smaller merchants might not be able to negotiate with issuers individually, but could join Merchant Buying Groups that could do issuer-level negotiations.

**Confidential**

2025.[153] If a merchant were to decline Chase's cards or surcharge for them, there is a very high likelihood that a cardholder with a Chase card would have another card from a different issuer that could be used for the transaction. Thus, the chance that a cardholder with two cards would have only Chase cards is only [redacted]%.[154]

248. Chase cards, however, account for only [redacted]% of all transactions (card and non-card) by dollar volume at merchants,[155] so a merchant who discriminates against Chase cards would be incurring a risk that in [redacted]% of [redacted]% transactions that the cardholder would not have another card for payment. In other words, by discriminating against Chase cards, the merchant might lose [redacted]% of sales (and probably less because some of those sales might still happen on non-card payments).

249. CapitalOne was the [redacted] in terms of U.S. purchase volume in 2025. It had a [redacted]% market share.[156] If a merchant were to decline CapitalOne's cards or surcharge for them, it is likely that a cardholder with a CapitalOne card would have another card from a different issuer that could be used for the transaction. Thus, the chance that a cardholder with two cards would have only CapitalOne cards is only [redacted]%.[157]

---

[153] Nilson Report, #1302 (Feb. 2026) at 5-6 (reporting U.S. credit card purchase volume of [redacted] for JPMorgan Chase in 2025, and total U.S. credit card purchase volume of [redacted]).

[154] [redacted]% is the square of [redacted]%.

[155] I calculate this figure by multiplying Chase's purchase volume share by [redacted]%, which is the percentage of all transactions (excluding wires and direct deposits) that are done on credit cards. *See* Nilson Report #1297 (Dec. 2025) at 9 [redacted] in credit card transactions and [redacted] in total transactions). As explained below in ¶ 254, the ERCPs' experts incorrectly calculate this figure as [redacted]% rather than [redacted]% because they [redacted] ([redacted]%), not the percentage of transactions by dollar amount ([redacted]%). Supplemental Declaration of Keith B. Leffler, Ph.D., table 2; Rebuttal Declaration of Joseph E. Stiglitz, Ph.D. & Keith B. Leffler, Ph.D, ¶ 17, n.28 (explaining methodology).

[156] Nilson Report, #1302 (Feb. 2026) at 5-6 (reporting U.S. credit card purchase volume of [redacted] billion for Capital One in 2025, including Discover card volume after May 18, 2025, and total U.S. credit card purchase volume of [redacted]).

[157] [redacted]% is the square of [redacted]%.

250. CapitalOne cards, however, account for [redacted]% of all transactions (card and non-card) by dollar volume at merchants,[158] so a merchant who discriminates against CapitalOne cards would be incurring a risk that in [redacted]% of [redacted]% transactions that the cardholder would not have another card for payment. In other words, by discriminating against CapitalOne cards, the merchant might lose [redacted]% of sales (and probably less because some of those sales might still happen on non-card payments).[159]

251. Citi was the [redacted] in terms of U.S. purchase volume in 2025. It had a [redacted]% market share.[160] If a merchant were to decline Citi's cards or surcharge for them, it is likely that a cardholder with a Citi card would have another card from a different issuer that could be used for the transaction. Thus, the chance that a cardholder with two cards would have only Citi cards is only [redacted]%.[161]

252. Citi cards, however, account for only [redacted]% of all transactions (card and non-card) by dollar volume at merchants,[162] so a merchant who discriminates against Citi cards would be incurring a risk that in [redacted]% of [redacted]% transactions that the cardholder would not have another card for payment. In other words, by discriminating against Citi cards, the merchant might lose [redacted]% of sales (and probably less because some of those sales might still happen on non-card payments).[163]

253. Issuer-level discrimination enables merchants to avoid the lost sales risk that exists with brand-level discrimination against Premium cards. Premium cards are generally issued to more affluent consumers, who are often merchants' most valuable customers, making product-level discrimination difficult, but the issuer-level discrimination does not risk losing sales to

---

[158] *See supra* note 155 for the methodology (substituting CapitalOne's share of U.S. credit card purchase volume for Chase's).

[159] *See supra* note 155 for the methodology (substituting Citi's share of U.S. credit card purchase volume for Chase's).

[160] Nilson Report, #1302 (Feb. 2026) at 5-6 (reporting U.S. credit card purchase volume of [redacted] for Citi in 2025, and total U.S. credit card purchase volume of [redacted]).

[161] [redacted]% is the square of [redacted]%.

[162] *See supra* note 155 for the methodology (substituting CapitalOne's share of U.S. credit card purchase volume for Chase's).

[163] *See supra* note 155 for the methodology (substituting Citi's share of U.S. credit card purchase volume for Chase's).

many of those cardholders, and they are also likely to have additional cards from other issuers, so the likelihood of a lost sale is lower.

254. The ERCPs' experts fail to grasp the point that issuer-level discrimination is much more feasible because no individual issuer has such a large market share so as to make it indispensable. Instead, they contend in their Rebuttal Declaration that [redacted][164] Their argument contains a quartet of mistakes.

255. First, the ERCPs' experts do not seem to understand that consumer cards are not a substitute for Commercial cards, such that threatening non-acceptance of Commercial cards, which account for over [redacted]% of all purchase transactions (card and non-card) by dollar amount,[165] is not equivalent to threatening rejection of all of an issuer's Premium cards, or a subset thereof (e.g., rejection of Chase Sapphire Reserve cards, [redacted], the Visa Infinite Spend tier).[166] Rejection of a Commercial card likely means a lost sale, whereas rejection of an issuer's Premium card, likely means a sale on another issuer's card. No merchant wants to risk losing over [redacted]% of its sales.

256. Second, the ERCPs' experts fail to recognize the greater practical difficulties in product-level discrimination, such as the difficulties in product recognition, that make the threat less credible than issuer-level discrimination.

257. Third, the ERCPs' experts fail to recognize that a cardholder with a MasterCard Premium card is much less likely to have an alternative non-Premium card than the holder of a Chase card is to have a second card from another issuer.[167]

258. And fourth, the ERCPs' experts' argument stands entirely on [redacted]. Specifically, the ERCP's experts' argument is [redacted]

[164] Rebuttal Declaration of Joseph E. Stiglitz, Ph.D. & Keith B. Leffler, Ph.D, ¶ 17.
[165] *See infra*, Table 2, rows 4-5, column (C).
[166] Rebuttal Declaration of Joseph E. Stiglitz, Ph.D. & Keith B. Leffler, Ph.D, ¶ 19.
[167] *See supra* ¶¶ 247-252.

[redacted]. From this they argue that [redacted]

259. The ERCPs' experts arrive at their figures by [redacted] There are three errors in their data, however, that, when corrected, undercut their argument entirely:

a. First, the ERCPs' experts [redacted] In fact, the correct figure for the Networks' share of all card transactions is [redacted]%.[168]

b. Second, the ERCPs' experts [redacted][69] That source is just a statistics agglomeration website, which in turn cites to the Federal Reserve Board's *2025 Diary of Consumer Payment Choice*.[170]

c. The *2025 Diary of Consumer Payment Choice* is a study about the *number* of payments consumers make in a month, not their transaction dollar volume; it does not report dollar figures *anywhere*, so it cannot be used for calculating credit cards' share of purchase volume at merchants.[171] The correct figure is that credit cards account for over [redacted]% of U.S. consumer payment systems volume.[172]

d. Third, the ERCPs' experts' [redacted]

---

[168] *See* Nilson Report, #1279 (Feb. 2025) and #1301 (Feb. 2026).

[169] https://www.sellerscommerce.com/blog/credit-card-statistics/.

[170] Berhan Bayeh, Isaiah Nardone, Shaun O'Brien & Hailey Phelps, *2025 Findings from the Diary of Consumer Payment Choice*, Federal Reserve System, https://www.frbservices.org/binaries/content/assets/crsocms/news/research/2025-diary-of-consumer-payment-choice.pdf.

[171] *Id.*

[172] Nilson Report #1297 (Dec. 2025) at 9 (reporting [redacted] trillion in credit card transactions and [redacted] trillion in total transactions). The Nilson Report is generally treated as the authoritative source of payment card industry statistics.

[redacted][173] discussed above. That source in turn cites to another website, Motley Fool,[174] which in turn cites to the various 2024 issues of the *Nilson Report*, which produce statistics about 2023 market shares, which the ERCP experts then use to compare with MasterCard's 2024 market share, despite same-year statistics being readily available.

260. Table 2, below, recomputes the proper figures for not only MasterCard and Chase, but for all credit cards (row 1), both Networks overall (rows 2-3), both Networks' Commercial cards (rows 4-5), and the ten largest card issuers (rows 6-15) and updates them for 2025. Column (A) shows the 2025 credit card purchase volume. Column (B) shows the share of 2025 credit card purchase volume. Column (C) shows the share of total 2025 U.S. purchase volume (cards and non-cards). Column (D) then multiplies Column (C) share by the percentage of Premium cards issued on the Networks to approximate the share of Premium cards for total U.S. purchase volume.

[173] https://www.sellerscommerce.com/blog/credit-card-statistics/

[174] https://www.fool.com/money/research/credit-debit-card-market-share-network-issuer/

**Table 2. Networks and 10-Largest Issuer Share of Credit Card Purchase Volume, Total Purchase Volume, and Premium Card Purchase Volume**

| | | [redacted] | [redacted] | [redacted] | [redacted] |
|---|---|---|---|---|---|
| | | [redacted] | [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] | [redacted] | [redacted] | [redacted] |

[175] Nilson Report, #1298 (Dec. 2025); Nilson Report, #1301 (Feb. 2026); Nilson Report, #1302 (Feb. 2026).

[176] Nilson Report #1297 (Dec. 2025).

[177] Nilson Report, #1297 (Dec. 2025).

[178] Supplemental Declaration of Keith B. Leffler, Ph.D., table 1.

**Confidential**

262. Using correct figures, what we see is that in 2025, Visa had a [redacted]% market share of U.S. credit card purchase volume,[179] and MasterCard had a [redacted]% share.[180] In contrast, the credit card issuer with the largest market share–[redacted]–had only a [redacted]% share of all U.S. credit card transactions by purchase volume in 2025.[181] [redacted]

263. Based on credit cards constituting [redacted]% of total U.S. purchases by dollar amount, MasterCard's share of total U.S. purchases in 2025 was [redacted]%, and Chase's was [redacted]%.[182]

264. According to the ERCP's experts, [redacted]% of MasterCard consumer card transactions were on Premium cards.[183] Based on these figures, MasterCard Premium cards [redacted]% of the average merchant's purchase volume (from all payment types) by dollar amount.[184]

265. Thus, the correct calculation of the figures the ERCPs' experts compared is an [redacted]% market share for MasterCard Premium cards against an [redacted]% market share for all Chase cards–Premium, Commercial, and Standard.[185] Rather than all Chase cards having a much larger market share, they actually have the same share as MasterCard's Premium cards. Other large issuers, such as CapitalOne and Citi, have market shares of only [redacted]% and [redacted]%, respectively.[186]

266. Using the correct figures alone undercuts the ERCPs' experts' claim that [redacted]

---

[179] Table 2, row 2, column (B); Nilson Report, #1301 (Feb. 2026) at 5 [redacted] in U.S. Visa transactions in a total U.S. marketplace of [redacted] in credit card transactions).

[180] Table 2, row 3, column (B); Nilson Report, #1301 (Feb. 2026) at 5 [redacted] in total U.S. credit card transactions and [redacted] in MasterCard credit card transaction in U.S. in 2025).

[181] Table 2, row 6, column (B).

[182] Table 2, rows 3 and 6, column (C).

[183] Supplemental Declaration of Keith B. Leffler, Ph.D., table 1 (reporting [redacted]% of all MasterCard U.S. credit transactions were on Premium cards and [redacted]% of MasterCard U.S. credit transactions were consumer cards).

[184] Table 2, row 3, Column (D) in Table 2.

[185] Table 2, row 6, Column (C) in Table 2.

[186] Table 2, rows 6-8, column (C).

[redacted][187] Their conclusion, however, is also based on an apples to oranges that [redacted]

267. If so, then the real apples-to-apples comparison would be between the threat of merchants discriminating against MasterCard Premium cards, which constitutes [redacted]% of average U.S. merchant purchase volume,[188] and the threat of merchants discriminating against Premium cards issued by [redacted], which constitute [redacted]% of average U.S. merchant purchase volume.[189] Contrary to the ERCP's experts' claim, it would be more credible for merchants to threaten to discriminate against Chase's Premium cards than against MasterCard Premium cards.

268. As noted above, [redacted], so the strength of this observation is even greater with regard to all other card issuers, as indicated by the market shares of the nine other largest issuers in Table 2. It would be far more credible for merchants to threaten discrimination by issuer than by brand or product.

269. The Court previously expressed skepticism about whether issuer-level discrimination was more feasible than product-level discrimination, asking rhetorically in the Preliminary Approval order: "Objectors say that they aren't going to reject cards at the product-level because doing so would anger their customers – wouldn't rejecting cards at the issuer-level have the same result?"[190]

270. Responding directly to the Court's rhetorical question: No, it will not because the scale of issuer-level rejection would be massively smaller than the scale of product-level rejection. Individual issuers have much smaller market shares than products or brands, so the consumer frictions of non-acceptance will be lower: consumers are more likely to have cards from multiple issuers than they are to have cards in multiple product categories, so merchants are less likely to lose transactions from non-acceptance by issuer than by product. That makes the threat of rejection plausible, which

[187] Rebuttal Declaration of Joseph E. Stiglitz, Ph.D. & Keith B. Leffler, Ph.D, ¶ 17.
[188] Table 2, row 3 , Column (D) in Table 2.
[189] Table 2, row 6, Column (D) in Table 2. This assumes that [redacted]% of [redacted] cards' purchase volume are on Premium cards.
[190] *Memorandum Decision and Order*, ECF No. 9884 at 23 (June 9, 2026).

would give merchants the leverage to negotiate with issuers, such that they would never have to actually reject any cards.

271. Finally, although all surcharging faces obstacles of state-law compliance and customer friction, issuer-level discrimination (whether non-acceptance or surcharging) is more practical and easier to implement than brand-level or product-level discrimination. Issuers can already be readily identified by either a physical review of a card or from the bank identification number included in the 16-digit personal account number (PAN) on the card. The problems that exist with product-level steering do not apply to issuer-level steering.

272. Moreover, claims that the card networks could not function without an issuer-level Honor-All-Cards rule are disproven by the Proposed Settlement itself, which permits issuer-level discounting. If issuer-level discounting (already possible for Visa cards) is workable, issuer-level surcharging should also be. By consenting to issuer-level discounting, the Networks have conceded that issuer-level discrimination is not fatal to their business model. Or, they have conceded that issuer-level discounting is not as effective as issuer-level surcharging, and therefore relatively valueless to merchants.

273. Again, responding directly to the Court's second rhetorical question in the Preliminary Approval order: "Objectors also say that without Honor All Issuers relief, they have no way of spurring competition among issuers for better rates – but isn't that what issuer-level discounting would enable them to do?"[191] Again, no, because although discounting and surcharging and mathematically equivalent, they are very different behaviorally and operationally, such that discounting is wholly ineffective, which is why one cannot observe merchant discounting currently, even though it is already allowed on the brand- and product-level, and in the case of Visa, on the issue-level. The ability to discount is not the equivalent of the ability to surcharge, and issuer-level rejection is even more powerful than issuer-level surcharging.

274. Similarly, the existence of negotiated interchange rates and co-brand arrangements indicates that issuer-level surcharging is workable. Negotiated interchange rates demonstrate that it is possible to have individualized pricing for merchants, while co-brand arrangements, such as

[191] *Id.*

a Citi/AAdvantage card that Citi issues on the MasterCard network, involves a bespoke, negotiated economic relationship between the card issuer and cobrand partner that might involve a sharing of interchange fee revenue to fund rewards. The point is not the specifics of the deals, but that they indicate that card issuers are readily able to negotiate individualized deals with merchants in which the issuers provide certain economic benefits to merchants, because these issuers recognize the value of merchants and their brands in increasing customer engagement and originating loans for these banks. If issuers can reach such deals for co-brand arrangements, they can surely reach them to avoid surcharging or non-acceptance from merchants. Co-brand arrangements currently only make sense for a small number of large merchants with strong brands, but non-acceptance and issuer-surcharging may be deployed by a larger number of merchants who do not have co-branded credit cards.

275. Critically, allowing effective issuer-level discrimination does not mean that cardholders will in fact face non-acceptance or surcharging. Instead, the credible threat of doing so should result in issuers reaching deals such that merchants are not incentivized to surcharge or decline cards. In other words, the benefit of universal acceptance by brand, which does benefit cardholders, will not disappear, but will instead remain in the equilibrium in which interchange fees fall. Meaningful issuer-level discrimination would provide the one thing the Proposed Settlement does not: competition among issuers.

### B. Network Fees

276. Nothing in the Proposed Settlement limits the fees the Networks may themselves charge, and they remain free to increase these fees for own bottom-lines without any restriction.

277. As noted above, regarding the anti-circumvention provision, the Networks' own fees have increased considerably in countries that have capped interchange fees by regulation,[192] and there is a concern that the Networks are using those fees to circumvent the regulations by paying rebates or bonuses to large issuers out of the Network fees.

[192] *See* CMSPI, *State of the Industry Report: The Playbook for Smarter Payments* 80 (Sept. 2025), *available at* https://insights.cmspi.com/soir-2025.

278. The ability to discriminate by brand among cards does nothing to prevent the increase in Network fees because, as discussed above,[193] a merchant has little ability to decline a Network's cards or surcharge them given competitive realities, as many cardholders have only cards from a single network.

279. If merchants had the ability to discriminate by issuer, however, it might actually help discipline the Networks' own fees. For example, Visa might agree to reduce its network fees for a particular merchant in order to keep the merchant from declining Chase Visa cards. From the merchant's perspective, it does not matter if the fee is from the Network or the issuer, so to the extent that a Network wants to retain issuers, it might accept lower Network fees in order to help the issuers avoid greater reductions in their own take—the interchange fees.

### C. No-Bypass Rules

280. The Networks perform two basic services. First, they play a standard-setting, coordinating function for their myriad financial institution members. Thus, Visa sets the rules and information standards for Visa transactions, and MasterCard sets the rules and information standards for MasterCard transactions.

281. Second, the Networks provide the settlement layer for transactions undertaken on their branded cards. Thus, if payments are made on Visa cards issued by Bank of America to Wells Fargo, or vice-versa, the payment obligations would be netted and settled via accounts Bank of America and Wells Fargo maintain with Visa.

282. The Networks' rules currently require issuers to process card transactions through the Network, instead of using alternative settlement channels. These "No-Bypass" rules thus bundle the Networks' settlement services with their standard-setting services. The "No-Bypass" rules mean that there is no competition for authorization and settlement of card transactions. If there were competition for settlement it would place market pressure on the Networks' own fees in addition to interchange fees.

[193] *See supra*, ¶ 224.

### D. Lack of a Multi-Homing Requirement

283. The Proposed Settlement does not affect the exclusive routing requirements for credit card transactions. The Durbin Amendment of 2010 required all debit cards to be capable of processing transactions over at least two unaffiliated networks.[194] The result of this is that debit cards must "multi-home," so that each physical card is operable on multiple networks, with the merchant deciding on the routing choice. This has allowed merchants to route the transaction to whatever network offers the lowest cost, and in certain cases has resulted in lower debit card costs, below the statutory rate cap of 5 basis points of the transaction amount plus 21¢ plus a 1¢ fraud prevention adjustment.[195]

284. Requiring multi-homing for credit cards would foster brand-level competition in a way that brand-level non-acceptance does not. Currently, a merchant who refuses to take Visa cards risks that the cardholder will not have any cards that are not Visas. If cards had to operate on multiple networks, however, the merchant could simply opt to route the transaction through a different card network. From the consumer's perspective none of this should matter, as it would not affect the consumer's relationship with the issuer, only how the transaction is processed between the acquirer and the issuer.

### E. Treatment of Debit Card Conduct

285. The Litigation is about both credit card and debit card interchange fees and Network rules, yet the Proposed Settlement offers no meaningful relief for the debit card market. Even if the Rube Goldberg machine works as planned, it does nothing to address the claims that merchants have brought about the Networks' debit card practices.

286. The centerpieces of the Proposed Settlement: the rate cap on Standard Cards, the rate freeze on existing rates, and the 10-basis-point reduction in

[194] 15 U.S.C. § 1693o-2(b)(1).

[195] *See* Bd. of Govs. of the Fed. Res. Sys., Average Debit Card Interchange Fee by Payment Card Network, https://www.federalreserve.gov/paymentsystems/regii-average-interchange-fee.htm (showing certain networks having average interchange fees of below 21¢ plus 0.05% of the transaction amount, indicating that competition has pushed prices down below the statutory rate cap).

the Average Effective Interchange Rate all apply solely to credit cards. Likewise, the Proposed Settlement permits brand-level and product-level surcharging only for credit cards, not for debit cards. Similarly, the Proposed Settlement permits product-level non-acceptance only for credit cards, not debit cards.

287. The Proposed Settlement permits brand-level non-acceptance for debit cards, but only because the Networks are already committed to that under the terms of the settlement agreement in *In re Visa Check/MasterMoney Antitrust Litigation*, No. 96-CV-05238 (E.D.N.Y.), so this is not new consideration.

288. The only debit-specific relief is a requirement that the Networks "clarify that discounting at the issuer level" for both credit and debit cards is permitted.[196] It is hard to call this a concession, however, as the Networks' existing rules do not expressly prohibit issuer-level discounting for debit.

*289.* The Litigation appears to release the claims relating to the Networks' debit card practices, but it provides virtually no consideration in return.[197]

## VII. Deficiencies of the Stiglitz-Leffler Declaration

290. Counsel has also requested that I address the Declaration filed by Joseph E. Stiglitz, Ph.D, and Keith B. Leffler, Ph.D, in support of the Proposed Settlement. The Stiglitz-Leffler Declaration is, to my knowledge, the only evidence that the proponents of the Proposed Settlement have adduced regarding the value of the Proposed Settlement. It is a deeply flawed and unreliable analysis, for the reasons already stated above, and for the additional reasons given below.

### A. Failure to Address the Limited Time Duration of the Settlement

291. The Stiglitz-Leffler Declaration [redacted]

[196] Proposed Settlement, ¶¶ 19, 68.

[197] The ERCPs' experts have nothing to say about this other than to [redacted]t. Rebuttal Declaration of Joseph E. Stiglitz, Ph.D. & Keith B. Leffler, Ph.D, ¶ 3, n.7.

[redacted].[198] Professors Stiglitz and Leffler [redacted] Accordingly, their analysis is necessarily incomplete and insufficient for evaluating whether merchants would actually see cost savings over the full term of the settlement.

292. As discussed above,[199] because the rate freeze and the 10-basis-point reduction in the Average Effective Interchange Rate expire after five years, the Networks will be able and incentivized to increase the Average Effective Interchange Rate in years 6-8 of the settlement and immunized from any private antitrust liability for such increases. Thus, merchants could well lose more in years 6-8 of the settlement period than they gain in years 1-5, such that the Proposed Settlement could end up having negative value for merchants.

293. Because the Stiglitz-Leffler Declaration [redacted] it is not probative of the value of the Proposed Settlement overall, but in fact misleadingly incomplete.

**B. Failure to Engage with the Practical and Operational Realities of Merchant Steering**

294. Professors Stiglitz and Leffler write that, [redacted][200] They admit that, [redacted]

295. Professors Stiglitz and Leffler do not, however, ever consider the practical and operational challenges to steering that render the Proposed Settlement's steering mechanisms of little value. Instead, Professors Stiglitz and Leffler [redacted] The real world often operates in more complex ways than economic theory predicts.

[198] Stiglitz-Leffler Declaration, table 2.
[199] *See supra*, ¶¶ 76-80, 83-88.
[200] Stiglitz-Leffler Declaration, ¶ 104.

296. The Proposed Settlement's lack of consideration of practical and operational challenges is unfortunately not surprising. Payment systems operations are quite complicated. The named class plaintiffs are a group of very small merchants without any clear payments expertise to provide to Class Counsel. Small merchants such as the named plaintiffs tend to purchase off-the-rack payment solutions and lack dedicated personnel who deal solely with payments issues. In contrast, larger merchants tend to use customized technology and have employees with particular operational expertise in payments. The ERCPs have not shown that any large merchants with such expertise actually support the Proposed Settlement. Indeed, at least one large merchant's efforts to provide input on the Proposed Settlement to Class Counsel were rebuffed.[201]

297. Rather than basing their opinions about the potential for merchant steering under the Proposed Settlement on an real world understanding of the practical and operational obstacles involved, all of Professor Stiglitz and Leffler's [redacted] If this were true, however, merchants would already have be engaged in wide-scale discounting on the brand- or product- or even issuer-level, as they are already permitted to do.[202] I am unaware of any instances of merchants having ever engaged in brand-, product-, or issuer-level discounting among credit products. Instead, as detailed above, however, the Proposed Settlement is unlikely to produce much, if any steering by merchants.

298. Professors Stiglitz and Leffler similarly [redacted][203]—in other words, they seem unconcerned that the Proposed Settlement might just roll into another twenty-year round of antitrust litigation. They also [redacted]

[201] Walmart's Opposition to Plaintiffs' Motion for Preliminary Approval of Proposed Amended Settlement Agreement, *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL 1720 (E.D.N.Y. Dec. 12, 2025) (Doc. 9729) at 1-2.

[202] Visa arguably currently permits issuer-level discounting. *See supra* note 119.

[203] Rebuttal Declaration of Declaration of Joseph E. Stiglitz, Ph.D. & Keith B. Leffler, Ph.D, ¶ 32.

[redacted] But as noted above, that does not prevent the Networks from doing so in a way that is not "systematic," such as using network fees to compensate only the largest issuers.

299. The failure of the Stiglitz-Leffler Declaration to [redacted] renders its conclusions about the value of the Proposed Settlement unreliable.

### C. Lack of Discounting to Present Value

300. The Stiglitz-Leffler Declaration's valuation of the Proposed Settlement is found in table 2 to the Declaration. Table 2's figures [redacted] That is, the numbers [redacted]

301. The use of discounting to present value for asset valuations involving future cash flows, including valuations of litigation settlements, is standard practice for valuation professionals.[204] Professors Stiglitz and Leffler [redacted]

302. Discounting future nominal values to present value materially changes the value of the Proposed Settlement. As noted above,[205] if one uses a discount rate of [redacted]% (an estimate of merchants' weighted average cost of capital) and discounts monthly (assuming equal monthly allocation of annual values, with discounting at the end of the month), then the value of the

[204] *See, e.g.*, Christopher S. Sontchi, *Valuation Methodologies: A Judge's View*, 20 AM. BANKR. INST. L. REV. 1, 4 (2012) (noting that "discounted cash flow or DCF valuation has its foundation in the present value rule under which the value of any asset is the present value of expected future cash flows from it.").

[205] *See supra*, ¶ 72.

Proposed Settlement, using Professors Stiglitz and Leffler's own figures, is not [redacted], but [redacted], or around [redacted]. The point here is not the precise valuation of the Proposed Settlement, but that without discounting to present value, the Stiglitz-Leffler Declaration's valuation is unreliable.

### D. Mislabeled and Unexplained Calculations

303. Some of Professors Stiglitz and Leffler's calculations appear to be mislabeled and also unduly optimistic. This is apart and aside from the data errors in their Rebuttal Declaration, discussed above.[206] [redacted]

304. Likewise, [redacted]

305. Other parts of their calculations are similarly unclear. [redacted]

### E. Unduly Optimistic Predictions

306. Alternatively, if line 18 of Table 2 to the Stiglitz-Leffler Declaration is taken according to its actual labeling, then Professors Stiglitz and Leffler would be [redacted] This would align with paragraph 50 of their declaration, where they write:

307. [redacted]

---

[206] *See supra* ¶ 254.

[redacted][207]

308. If Professors Stiglitz and Leffler are in fact [redacted], it is an astoundingly optimistic prediction: it presumes that the Proposed Settlement will result in the market immediately equilibrating at the perfectly competitive price—something that not even the ERCPs would claim—and that such equilibrium will be achieved in the first year of the settlement. Indeed, Professor Stiglitz has previously written in an expert report in this Litigation that [redacted][08] Either the calculations in the Stiglitz-Leffler Declaration are mislabeled or they are wildly optimistic.

### F. The Stiglitz-Leffler Declaration's Bottom-Line Numbers Underscore How Little the Proposed Settlement Achieves for Merchants

309. The bottom line number in the Stiglitz-Leffler Declaration underscores just how little the Proposed Settlement achieves for merchants.

310. Putting aside the Stiglitz-Leffler Declaration's use of inflated present value figures and overly optimistic assumptions, it estimates the total interchange fees without the Proposed Settlement to be [redacted], with savings from the proposed settlement at [redacted].

311. In other words, the Proposed Settlement would result in a [redacted]% reduction in total interchange fees for five years, despite estimates that U.S. interchange fees are inflated by some 300% or more over competitive pricing.[209] And for anything beyond five years, merchants cannot count on any overall reduction in interchange fees.[210]

---

[207] Stiglitz-Leffler Declaration, ¶ 50.

[208] Expert Report of Joseph E. Stiglitz (Oct. 5, 2018) ¶ 170.

[209] *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *41 (E.D.N.Y. June 28, 2024) (networks operate viable in countries where rates are capped at 50 bps or less, while U.S. rates are over 200 bps, indicating that U.S. prices are 400% their competitive level); *see also* Stiglitz-Leffler Declaration, ¶ 50 (card networks' pricing net of rewards is around [redacted] basis points when competitive price would be [redacted] basis points, indicating that prices are [redacted]% their competitive level).

[210] *See supra*, ¶¶ 76-80, 83-88.

312. By this measure, the Proposed Settlement gives merchants scant relief in exchange for the broad release of the Networks.

## CONCLUSION

313. The Proposed Settlement provides little real relief for merchants. It fails to address several key issues, and what relief it grants is often illusory. It does not create the conditions necessary for real competition in the payment card market because it does not make material changes to the Networks' Honor-All-Cards rules and leaves the Networks' default interchange system untouched.

314. The Proposed Settlement's operation depends on the success of the limited and cabined steering it offers, but as explained above,[211] merchants are unlikely to discriminate against cards by brand or product category given the current market shares of the Networks and the predominance of high-cost Premium and Commercial cards. Even if merchants want to engage in steering, they will face serious practical obstacles to doing so for some, if not all, of the settlement period, and in some cases be legally prohibited by state law from exercising the rights created by the Proposed Settlement.

315. The Proposed Settlement's three other major provisions—the 125-basis-point cap on interchange rates on Standard Cards, the five-year freeze on interchange rates at March 31, 2025, levels, and the five-year reduction in the Networks' Average Effective Interchange Rates by 10 basis points —are likely to be similarly ineffective.

- A rate cap on Standard Cards is of little value given that only around [redacted]% of the Networks' credit card transactions are performed on Standard Cards. The rate cap itself will result in scant savings and will incentivize issuers *not* to issue Standard cards.
- The five-year freeze on rates and 10-basis-point reduction in the Average Effective Interchange Rates have some value, but their magnitude is minimal compared to current rates and historical rate increases. The ERCPs' experts calculate the average savings from these provisions as [redacted] basis points, but that is against an average posted rate of [redacted] basis points. In other words, the rate freeze and Average Effective Interchange Rate reduction together account for only a [redacted]%

[211] *See supra*, ¶¶ 107-195.

reduction in average posted interchange rates, and still fail to return posted rates to where they were even in 2021, much less at the start of the Litigation in 2005. Even that modest improvement assumes that the rate freeze and reduction are not circumvented, and the Proposed Settlement leaves open numerous routes for circumvention.

316. In 2024, the Court rejected a previous proposed settlement, noting that:

> Thus, the estimated $6 billion in annual savings to merchants is paltry compared to the $100 billion that merchants paid in interchange fees on Visa and Mastercard transactions in 2023. Further, the four- and seven-basis-point rollbacks and rate caps, respectively, are also relatively modest compared to the fact that "most of Visa's and Mastercard's current rates are *200 basis points* or more."[212]

317. Little has changed. Under the Proposed Settlement, the estimated [redacted] in average annual savings to merchants is still paltry compared to the average [redacted] that merchants are anticipated to pay in interchange fees on Visa and MasterCard transactions from 2026-2030.[213] Further, the ten-basis-point rollback and rate caps, respectively, remain relatively modest compared to the fact that most of Visa's and MasterCard's rates remain 200 basis points or more.[214]

318. In short, merchants will receive scant value in exchange for a broad release of the Networks from antitrust liability not just from before the effective date of the Proposed Settlement, but for eight years in the future, and possibly beyond. The Proposed Settlement is a terrible deal for merchants, as it does nothing to fix the fundamental competition problem that merchants

---

[212] *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614 at *41 (E.D.N.Y. June 25, 2024).

[213] Stiglitz-Leffler Declaration, Table 2. These average annual figures are calculated by taking rows 9 and 2, respectively, for the column labeled 2026-2030 and dividing by five to reflect that they are sums for five years.

[214] MasterCard, *MasterCard 2026-2027 U.S. Region Interchange Programs and Rates, Effective Apr. 17, 2026, at* https://www.mastercard.com/content/dam/mccom/us/business/documents/merchant-rates-2026-2027-april2026.pdf; Visa, *Visa USA Interchange Reimbursement Fees*, Apr. 18, 2026, *at* https://usa.visa.com/dam/VCOM/download/merchants/visa-usa-interchange-reimbursement-fees.pdf.

have sought to address for the past 21-years of this Litigation because it fails to create competition among issuers for merchants' business.

319. I reserve the right to amend and supplement this declaration.

320. I declare the foregoing to all be true and correct to the best of my knowledge.

EXECUTED on the 14th day of September, 2026, in the Town of Somerset, Montgomery County, Maryland.

## APPENDIX A. DOCUMENTS RELIED UPON IN FORMULATING THE DECLARATION

### Litigation Documents

- Superseding and Amended Class Settlement Agreement of the Rule 23(b)(2) Class Plaintiffs and the Defendants ("Proposed Settlement")
- *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223 (2d Cir. 2016)
- *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614 (E.D.N.Y. June 25, 2024)
- *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig*., 2024 U.S. Dist. LEXIS 41269 (E.D.N.Y. Feb. 22, 2024)
- Memorandum Decision and Order, June 9, 2026 (ECF No. 9884) (preliminary settlement approval)
- Declaration of Michael A. Cook ("Cook Decl.") (ECF No. 2644)
- Report of Roy J. Epstein, Ph.D. (in Exhibits A-U to Declaration of Steve D. Shadowen, May 14, 2024)
- Expert Report of Keith B. Leffler, Dec. 18, 2020
- Declaration of Keith Leffler, Mar. 25, 2024
- Rebuttal Declaration of Keith Leffler, May 13, 2024
- Supplemental Declaration of Keith B. Leffler, Ph.D., July 15, 2026
- Supplemental Expert Report of Parag Pathak, Oct. 1, 2024
- Declaration of Ketan R. Patel, Ph.D., Apr. 26, 2024
- Expert Report of Joseph E. Stiglitz. Oct. 5, 2018
- Reply report of Joseph E. Stiglitz, Oct. 11, 2019
- Declaration of Joseph E. Stiglitz, Ph.D. & Keith B. Leffler, Ph.D., No. 9, 2025
- Rebuttal Declaration of Joseph E. Stiglitz, Ph.D. & Keith B. Leffler, Ph.D, Jan. 14, 2026
- Equitable Relief Class Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Approval of Amended Settlement Agreement (ECF No. 9692)
- Equitable Relief Class Plaintiffs' Reply Memorandum of Law in Support of Motion for Preliminary Approval of Amended Settlement Agreement

- Equitable Relief Class Plaintiffs' Memorandum of Law in Support of Final Approval of Amended Settlement Agreement, MDL 1720 (ECF No. 9932-1)
- Network Defendants' Memorandum in Support of Preliminary Approval of the Rule 23(b)(2) Class Settlement Agreement (ECF No. 9693)
- Network Defendants' Reply Memorandum in Support of Preliminary Approval of the Rule 23(b)(2) Class Settlement Agreement (ECF No. 9773)
- Network Defendants' Memorandum in Support of Final Approval of the Rule 23(b)(2) Class Settlement Agreement (ECF No. 9934)
- National Association of Convenience Stores' and Circle K's Objection to Equitable Class Plaintiff's Motion for Preliminary Approval of Settlement (ECF No. 9722)
- Letter from Debra L. Greenberg on behalf of National Retail Federation and Retail Industry Leaders Association to Hon. Brian M. Cogan, Dec. 12, 2025 (ECF No. 9727)
- Merchant Plaintiffs' Statement of Objections to Equitable Relief Class Plaintiffs' Motion for Preliminary Approval of Amended Settlement (ECF No. 9728)
- Walmart's Opposition to Plaintiffs' Motion for Preliminary Approval of Proposed Amended Settlement Agreement (ECF. No. 9729)

**Litigation Documents from Other Cases**

- Settlement Agreement, *In re Visa Check/MasterMoney Antitrust Litigation*, No. 96-cv-5238 (E.D.N.Y. June 4, 2003)
- Complaint, *US v. Visa, Inc.*, No. 1:24-cv-7214 (S.D.N.Y. Sept. 24, 2024)

**Federal Statutes and Regulatory Reports**

- Bd. of Govs. of the Fed. Res. Sys., Average Debit Card Interchange Fee by Payment Card Network, https://www.federalreserve.gov/paymentsystems/regii-average-interchange-fee.htm
- 15 U.S.C. § 1666f
- 15 U.S.C. § 1693o-2

Confidential

**State Statutes and Regulatory Materials**

- Conn. Gen. Stat. §42-133ff
- Mass. Gen. L. ch. 140D, §28A
- 9-A Me. Rev. Stat. § 8-509
- P.R. Code Ann. tit. 10, §11
- Colo. Rev Stat § 5-2-212
- Ga. Code § 13-1-15
- NJ Rev. Stat. § 56:8-156.2
- Cal. Civ. Code § 1770(a)(29)(A)
- N.Y. Gen. Bus. L. § 518
- Ct. Dept. of Consumer Protection, Surcharges, *at* https://portal.ct.gov/dcp/legal/credit-card-surcharge?language=en_US

**Other Documents**

- American Express, *What to Know About Credit Card Expiration Dates*, Oct. 14, 2024, *at* https://www.americanexpress.com/en-us/credit-cards/credit-intel/credit-card-expiration-date/
- Wilko Bolt, Nicole Jonker & Corry Van Renselaar, *Incentives at the Counter: An Empirical Analysis of Surcharging Card Payments and Payment Behavior in the Netherlands,* 34 J. BANKING & FIN. 1738 (2010)
- Ron Borzekowski, Elizabeth K. Kiser & Shaista Ahmed, *Consumers' Use of Debt Cards: Patterns, Preferences, and Price Response,* J. MONEY, CREDIT & BANKING 149 (2008)
- CapitalOne, *What is a credit card expiration date?*, July 28, 2026, *at* *https://www.capitalone.com/learn-grow/money-management/credit-card-expiration-and-replacement/*
- Citi, *What to Know About Credit Card Expiration Dates*, Dec. 3, 2025, *at* https://www.citi.com/credit-cards/understanding-credit-cards/credit-card-expiration-date
- CMSPI, *State of the Industry Report: The Playbook for Smarter Payments* (Sept. 2025), *available at* https://insights.cmspi.com/soir-2025

- Aswath Damodaran, Cost of Equity and Capital, (US) (Jan. 2026), *at* https://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/wacc.html
- Chris Horymski, *What Is the Average Number of Cards*, Experian, Aug. 15, 2025, https://www.experian.com/blogs/ask-experian/average-number-of-credit-cards-a-person-has/
- Berhan Bayeh, Isaiah Nardone, Shaun O'Brien & Hailey Phelps, *2025 Findings from the Diary of Consumer Payment Choice*, Federal Reserve System, https://www.frbservices.org/binaries/content/assets/crsocms/news/research/2025-diary-of-consumer-payment-choice.pdf
- Government Accountability Office, *Credit Cards: Rising Interchange Fees Have Increase Costs for Merchants, but Options for Reducing Fees Pose Challenges*, GAO-10-45 (Nov. 2009) at 15, *at* https://www.gao.gov/assets/gao-10-45.pdf
- Ipsos, *Why payment card surcharges don't add up for merchants*, June 16, 2023, *at* https://www.ipsos.com/sites/default/files/ct/publication/documents/2023-06/Ipsos_Payment.pdf
- ITM RESEARCH, THE ABOLITION OF THE NO-DISCRIMINATION RULE, REPORT FOR THE EUROPEAN COMMISSION DIRECTORATE GENERAL COMPETITION (2000)
- Gabriela Jhean, *Credit card surcharge laws by state explained for 2025*, 8AMLAWPAY (Oct. 24, 2025), https://www.lawpay.com/about/blog/credit-card-surcharge-rules/
- Daniel Kahneman & Amos Tversky, *Choices, Values, and Frames*, 39 AM. PSYCHOLOGIST 341 (1980)
- Adam J. Levitin, *Priceless? The Economic Costs of Credit Card Merchant Restraints*, 55 UCLA L. REV. 1321 (2008)
- Adam J. Levitin, *Pandora's Digital Box: The Promise and Perils of Digital Wallets*, 166 U. PA. L. REV. 305 (2018)
- MasterCard Rules (June 2, 2026)
- MasterCard, *MasterCard 2026-2027 U.S. Region Interchange Programs and Rates, Effective Apr. 17, 2026, at* https://www.mastercard.com/content/dam/mccom/us/business/documents/merchant-rates-2026-2027-april2026.pdf

- Motley Fool, https://www.fool.com/money/research/credit-debit-card-market-share-network-issuer/
- Nilson Report, #1275 (Dec. 2025)
- Nilson Report, #1279 (Feb. 2025)
- Nilson Report, #1280 (Feb. 2025)
- Nilson Report, #1297 (Dec. 2025)
- Nilson Report, #1298 (Dec. 2025)
- Nilson Report, #1301 (Feb. 2026)
- Nilson Report, #1302 (Feb. 2026)
- PYMNTS.com & Payroc, *Credit Card Surcharges, How Cardholders React to Extra Costs*, Feb. 2022,, *at* https://www.pymnts.com/wp-content/uploads/2022/02/PYMNTS-Credit-Card-Surcharges-February-2022.pdf
- Alex Rolfe, Payments Card & Mobile, *EC opens new Scheme Fee investigation into Visa and Mastercard* (Nov. 8, 2024), *available at* https://www.paymentscardsandmobile.com/ec-opens-new-scheme-fee-investigation-into-visa-and-mastercard/
- Matt Schulz, *69% of Cardholders Have Paid a Credit Card Processing Fee, but 57% Think It Should Be Illegal*, LendingTree, Sept. 11, 2023, *at* https://www.lendingtree.com/credit-cards/study/processing-fees/
- SellersCommerce; Credit Card Market Share by Network (2026)," https://www.sellerscommerce.com/blog/credit-card-statistics/
- Hon. Christopher S. Sontchi, *Valuation Methodologies: A Judge's View*, 20 AM. BANKR. INST. L. REV. 1 (2012)
- Richard Thaler, *Toward a Positive Theory of Consumer Choice*, 1 J. ECON. BEHAVIOR & ORG. 39 (1980)
- Visa, *How to Use Visa BIN Attribute Sharing Service*, *at* https://developer.visa.com/capabilities/visa-bin-attribute-sharing-service/docs-how-to
- Visa Rules (April 18, 2026)
- Visa, *Visa USA Interchange Reimbursement Fees*, Apr. 18, 2026, *at* https://usa.visa.com/dam/VCOM/download/merchants/visa-usa-interchange-reimbursement-fees.pdf

- Weave, *Small Business Payments: New Study Reveals the Best Forms of Payment for Small Business Success*, Mar. 30, 2020, at *https://www.getweave.com/new-small-business-payment-statistics/*
- Weave, *Study: Small Businesses Offering Multiple Payment Options Increase Revenue by Nearly 30 Percent*, https://www.prnewswire.com/news-releases/study-small-businesses-offering-multiple-payment-options-increase-revenue-by-nearly-30-percent-301031597.html

## APPENDIX B. CURRICULUM VITAE OF ADAM J. LEVITIN

# ADAM J. LEVITIN

Carmack Waterhouse Professor of Law and Finance
Georgetown University Law Center
600 New Jersey Ave., NW
Washington, DC 20001
adam.levitin@law.georgetown.edu
(202) 662-9234 (o)

## ACADEMIC APPOINTMENTS

**GEORGETOWN UNIVERSITY LAW CENTER** 2007-present
*Carmack Waterhouse Professor of Law and Finance (2023-present)*
*Anne Fleming Research Professor (2020-2023)*
*Agnes N. Williams Research Professor (2018-2020)*
*Professor of Law (2011-present) (tenured)*
*Associate Professor of Law (2007-2011)*

**HARVARD LAW SCHOOL** 2012-2013
*Bruce W. Nichols Visiting Professor of Law*

**AMERICAN BANKRUPTCY INSTITUTE** Fall 2009
*Robert Zinman Scholar in Residence*

**FEDERAL TRADE COMMISSION** Summer 2008
*Faculty, Division of Financial Practices Academy*

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *cum laude* 2005

**COLUMBIA UNIVERSITY**, M.PHIL. IN HISTORY 2001

**COLUMBIA UNIVERSITY**, A.M. IN HISTORY 2000

**HARVARD COLLEGE**, A.B. IN NEAR EASTERN LANGUAGES & CIVILIZATIONS AND HISTORY,
*magna cum laude with highest honors in field* 1998

## OTHER PROFESSIONAL LEGAL EXPERIENCE

**GORDIAN CRYPTO ADVISORS LLC** 2022-2026
*Principal*

**DELAWARE ATTORNEY GENERAL'S OFFICE** 2011-2012
*Volunteer Consulting Attorney*

**CONGRESSIONAL OVERSIGHT PANEL FOR TROUBLED ASSET RELIEF PROGRAM** 2008-2010
*Special Counsel*

**WEIL, GOTSHAL & MANGES LLP**, New York, New York 2006-2007
*Associate, Business Finance & Restructuring Department*

**HON. JANE R. ROTH, THIRD CIRCUIT COURT OF APPEALS,** Wilmington, Delaware 2005-2006
*Judicial Clerk*

## HONORARY PROFESSIONAL AFFILIATIONS

- American College of Bankruptcy, Elected Fellow (2021)
- American College of Consumer Financial Services Lawyers, Elected Fellow (2021)
- American Law Institute, Elected Member (2014)

## SCHOLARSHIP AWARDS AND GRANTS

- Section Award, American Association of Law Schools Section on Commercial and Consumer Law (2026)
- Best Professional Article, American College of Consumer Financial Services Lawyers Annual Writing Competition (2025)
- Grant Gilmore Award, American College of Commercial Finance Lawyers (2022)
- Axiom Business Book Awards, Gold Medal for Real Estate (2021)
- LawDragon 500 Leading Global Insolvency and Restructuring Lawyers (2020)
- LawDragon 500 Leading U.S. Bankruptcy and Insolvency Lawyers (2020)
- Student Loan Law Initiative Research Grant for Understanding and Encouraging Enrollment in Income Driven Repayment Programs (with John Brooks and Brian Galle) (2020)
- Best Professional Article, American College of Consumer Financial Services Lawyers Annual Writing Competition (2014)
- American Law Institute, Young Scholar's Medal (2013)
- Pew Charitable Trusts, Grant for Strategies for Reviving the Housing Market (2012)
- George Washington University, Center for Law, Economics & Finance, Junior Faculty Scholarship Prize (2011)
- Walton H. Hamilton Prize for Outstanding Scholarship, *Yale Journal on Regulation* (2009)
- Best Professional Article, American College of Consumer Financial Services Lawyers Annual Writing Competition (2009)
- Editors' Prize, *American Bankruptcy Law Journal* (2007)

## LEGAL PUBLICATIONS

**Books**

- CONSUMER FINANCE: SELECT FEDERAL LAW MATERIALS (CreateSpace, 4th ed. 2022)
- CONSUMER FINANCE: SELECT STATE LAW AND PRIVATE LAW MATERIALS (CreateSpace, 4th ed. 2022)
- THE GREAT AMERICAN HOUSING BUBBLE: WHAT WENT WRONG AND HOW WE CAN PROTECT OURSELVES IN THE FUTURE (Harvard University Press 2020) (with Susan Wachter)
  –"an impressive new book," Robert J. Schiller, *N.Y. Times* (July 31, 2020)
  –"an indispensable analysis of the crisis and the far-reaching measures needed to prevent a recurrence." *Kirkus Starred Review*
  – Axiom Business Book Awards, Gold Medal for Real Estate (2021)

Confidential

- CONSUMER FINANCE: MARKETS AND REGULATION (Wolters Kluwer, 2018; 2nd edition, Aspen, 2023; 3rd edition, Aspen 2027)
- BUSINESS BANKRUPTCY: FINANCIAL RESTRUCTURING AND MODERN COMMERCIAL MARKETS (Wolters Kluwer, 2015; 2nd edition, Wolters Kluwer, 2018; 3rd edition, Aspen, 2023, 4th edition, Aspen 2027)
- CONSUMER BANKING AND PAYMENTS LAW (Nat'l Consumer Law Center, 5th ed., 2013; 2014 supplement) (with Lauren Saunders *et al.*)

**Articles (published or accepted for publication)**

- *The Federal Corporate Law of Bankruptcy*, 115 GEO. L.J. (forthcoming 2026) (with Stephen Lubben)
- *Death of Consumer Contract*, 68 ARIZ. L. REV. 55 (2026)
- *Predatory Small Business Lending: Market and Regulatory Failures*, 42 YALE J. ON REG. 732 (2025)
  –Review article by Samantha Heavner, *How to Fix Small-Business Lending*, REG. REV., Nov. 12, 2025
- *Samson's Toupée: The Source-of-Strength Doctrine in Bankruptcy*, 41 YALE J. ON REG. 1078 (2024) (invited contribution)
- *The New Usury: The Ability-to-Repay Revolution in Consumer Finance*, 92 GEO. WASH. L. REV. 425 (2024)
  –Winner, American College of Consumer Financial Services Lawyers Annual Writing Competition
- *The Financial Inclusion Trilemma*, 41 YALE J. ON REG. 109 (2024)
- *Not Your Keys, Not Your Coins: Custodial Credit Risk in Cryptocurrency*, 101 TEX. L. REV. 877 (2023)
  –Reviewed in JOTWELL, Oct. 2022
  –Winner, Grant Gilmore Award, American College of Commercial Finance Lawyers
  –Reprinted in 65 CORP. PRACTICE COMMENTATOR 873 (2024)
- *Judge Shopping in Chapter 11 Bankruptcy*, 2023 ILL. L. REV. 351 (2023)
- *The Constitutional Problems with Nondebtor Releases in Chapter 11 Bankruptcy*, 90 FORDHAM L. REV. 429 (2022)
- *Purdue's Poison Pill: The Breakdown of Chapter 11's Checks and Balances*, 100 TEX. L. REV. 1079 (2022)
  –Response piece by Jonathan C. Lipson, *First in Time; First is Right: Comments on Levitin's* Poison Pill, 101 TEX. L. REV. ONLINE (2022)
- *The Spurious Pedigree of the "Valid-When-Made" Doctrine*, 71 DUKE L.J. ONLINE 87 (2022)
- *Rent-a-Bank: Bank Partnerships and the Evasion of Usury Laws*, 71 DUKE L.J. 329 (2021)
- *The Proceduralist Inversion—A Response to Skeel*, 130 YALE L.J. FORUM 335 (2020) (with Edward Janger)
- *Redesigning Education Finance: How Student Loans Outgrew the "Debt" Paradigm*, 109 GEO. L.J. 5 (2020) (with John R. Brooks)
- *A Tale of Two Markets: Post-Crisis Regulation and Innovation in the Mortgage and Structured Finance Markets*, 2020 ILL. L. REV. 47 (2020) (with William Bratton)
- *The Fast and the Usurious: Putting the Brakes on Auto Lending Abuses*, 108 GEO. L.J. 1257 (2020)
- *Considering Law and Macroeconomics*, 83 LAW & CONTEMP. PROB. i (2020) (with Anna Gelpern)
- *Mortgage Risk Premiums During the Housing Bubble*, 58 J. R.E. FIN. & ECON. (2019) (with Desen Lin and Susan Wachter) (peer-reviewed journal)
- *Law of the Middle Class: Consumer Finance in the Law School Curriculum*, 31 LOYOLA CONSUMER L. REV. 393 (2019)

- *One Dollar, One Vote: Mark-to-Market Governance in Bankruptcy*, 104 IOWA L. REV. 1857 (2019) (with Edward Janger)
- *Junk Cities: Insolvency Crises in Overlapping Municipalities*, 106 CAL. L. REV. 459 (2019) (with David Schleicher & Aurelia Chaudhury)
- *Badges of Opportunism: Policing Restructuring Support Agreements*, 13 BROOK. J. OF CORP., FIN. & COMM. LAW 169 (2019) (symposium issue) (with Edward Janger)
- *The Faulty Foundation Draft Restatement of Consumer Contracts*, 36 YALE J. ON REG. 447 (2019) (with Nancy Kim *et al.*) (lead author)
  –Reviewed in JOTWELL, May 15, 2019
- *Bankruptcy's Lorelei: The Dangerous Allure of Financial Institutions Bankruptcy*, 97 N.C. L. REV. 101 (2019)
  –Reprinted in BANKRUPTCY'S UNIVERSAL PRAGMATIST (Christoph G. Paulus & John A.E. Pottow, ed.)
- *The New Bond Workouts*, 167 U. PA. L. REV. 1597 (2018) (with William Bratton)
- *Pandora's Digital Box: The Promise and Perils of Digital Wallets*, 166 U. PA. L. REV. 305 (2018)
- *Safe Banking: Finance and Democracy*, 83 U. CHIC. L. REV. 357 (2016)
- *Prioritization and Mutualization: Clearinghouses and the Redundancy of Financial Contract Safe Harbors in Bankruptcy*, 10 BROOK. J. OF CORP., FIN. & COMM. LAW 129 (2015)
- *Second Liens and the Leverage Option*, 68 VAND. L. REV. 1243 (2015) (with Susan Wachter)
- *Bankruptcy Law and the Cost of Credit: The Impact of Cramdown on Mortgage Interest Rates,* 57:1 J.L. & ECON. 139 (2014) (with Joshua Goodman) (peer-reviewed journal)
- *The Politics of Financial Regulation and the Regulation of Financial Politics,* 127 HARV. L. REV. 1991 (2014)
- *The Paper Chase: Securitization, Foreclosure, and the Uncertainty of Mortgage Title,* 63 DUKE L.J. 637 (2013)
  –Winner, American College of Consumer Financial Services Lawyers Annual Writing Competition
- *A Transactional Genealogy of Scandal from Michael Milken to Enron to Goldman Sachs*, 86 S. CAL. L. REV. 783 (2013) (with William Bratton)
  –Discussed in TIME ("The Accounting Trick Behind Thirty Years of Scandal," Aug. 15, 2012)
  –Reprinted in 56 CORP. PRACTICE COMMENTATOR (2014)
- *The Consumer Financial Protection Bureau: An Introduction*, 32 REV. BANKING & FIN. L. 321 (2013)
- *The Commercial Real Estate Bubble*, 2 HARV. BUS. L. REV. 801 (2013) (with Susan Wachter)
- *The Public Option in Housing Finance*, 46 U.C. DAVIS L. REV. 1111 (2013) (with Susan Wachter)
- *Skin-in-the-Game: Risk Retention Lessons from Credit Card Securitization*, 81 GEO. WASH. L. REV. 813 (2013)
- *The Tenuous Case for Derivatives Clearinghouses*, 101 GEO. L.J. 445 (2013)
- *Why Housing?* 23 HOUSING POL'Y DEBATE 5 (2013) (with Susan Wachter) (peer reviewed)
- *Bankrupt Politics and the Politics of Bankruptcy*, 97 CORNELL L. REV. 100 (2012)
- *Explaining the Housing Bubble*, 100 GEO. L.J. 1177 (2012) (with Susan Wachter)
  –Discussed in THE ECONOMIST ("Bricks and Slaughter," Mar. 3, 2011)
- *The Dodd-Frank Act and Housing Finance: Can It Restore Private Risk-Capital to the Securitization Market?* 29 YALE J. ON REG. 101 (2012) (symposium volume) (with Andrey D. Pavlov & Susan M. Wachter)
- *Rate Jacking: Risk-Based and Opportunistic Pricing in Credit Cards*, 2011 UTAH L. REV. 339 (2011) (invited theme issue on the Credit C.A.R.D. Act)

**Confidential**

- *Private Disordering? Payment Card Fraud Liability Rules*, 5 BROOK. J. OF CORP., FIN. & COMM. LAW 1 (2011) (symposium issue)
- *Mortgage Servicing*, 28 YALE J. ON REG. 1 (2011) (with Tara Twomey)
- *In Defense of Bailouts*, 99 GEO. L.J. 435 (2011)
  –Winner, 2011 C-LEAF Junior Faculty Scholarship Prize
  –Reviewed in JOTWELL, May 14, 2010
- *Rewriting Frankenstein Contracts: The Workout Prohibition in Residential Mortgage Backed Securities*, 82 S. CAL. L. REV. 1075 (2010) (with Anna Gelpern)
  –Accepted for the 2009 Stanford-Yale Junior Faculty Forum
- *Back to the Future with Chapter 13: A Reply to Professor Scarberry*, 37 PEPPERDINE L. REV. 1261 (2010)
- *Bankruptcy Markets: Making Sense of Claims Trading*, 4 BROOK. J. OF CORP., FIN. & COMM. LAW 64 (2010) (symposium issue)
- *The Crisis Without a Face: Emerging Narratives of the Financial Crisis*, 63 U. MIAMI L. REV. 999 (2009) (invited foreword to themed volume)
- *Resolving the Foreclosure Crisis: Modification of Mortgages in Bankruptcy*, 2009 WISC. L. REV. 565 (2009)
  –Accepted for the American Law and Economics Association Annual Convention
  –Accepted for Third Annual Conference on Empirical Legal Studies
  –Accepted for Harvard-Texas Conference on Commercial Realities
- *Hydraulic Regulation: Regulating Credit Markets Upstream*, 26 YALE J. ON REG. 143 (2009)
  –Winner, Walton H. Hamilton Prize for Outstanding Scholarship, Yale Journal on Regulation
  –Accepted for Univ. of Connecticut Workshop on Banking & Consumer Financial Services Law
- *Priceless? The Economic Costs of Credit Card Merchant Restraints*, 55 UCLA L. REV. 1321 (2008)
  –Winner, American College of Consumer Financial Services Lawyers Annual Writing Competition
- *Priceless? The Social Costs of Credit Card Merchant Restraints*, 45 HARV. J. ON LEGIS. 1 (2008)
- *Payment Wars: The Merchant-Bank Struggle for Control of Consumer Payment Systems*, 12 STAN. J. L., BUS. & FIN. 425 (2007)
- *Finding <u>Nemo</u>: Rediscovering the Virtues of Negotiability in the Wake of <u>Enron</u>*, 2007 COLUM. BUS. L. REV. 83 (2007)
- *Toward a Federal Common Law of Bankruptcy: Judicial Lawmaking in a Statutory Regime*, 80 AM. BANKR. L.J. 1 (2006) (double-blind peer-reviewed journal, published by National Conference of Bankruptcy Judges)
  –Winner of American Bankruptcy Law Journal's 2007 Editors' Prize
- *The Limits of <u>Enron</u>: Counterparty Risk in Bankruptcy Claims Trading*, 15 J. BANKR. L. & PRAC. 389 (2006) (peer-reviewed journal)
- *The Merchant-Bank Struggle for Control of Payment Systems*, 17 J. FIN. TRANSFORMATION 73 (2006) (peer-reviewed applied finance journal)
- *The Antitrust Super Bowl: America's Payment Systems, No-Surcharge Rules, and the Hidden Costs of Credit*, 3 BERKELEY BUS. L.J. 265 (2005)

**Book Chapters**

- *Rethinking Duties to Serve in Housing Finance*, in HOMEOWNERSHIP BUILT TO LAST, Eric Belsky *et al.*, eds. (Brookings Institution Press 2014) (with Janneke Ratcliffe)
- *Deregulation and the Financial Crisis of 2008,* in REGULATORY BREAKDOWN? THE CRISIS OF CONFIDENCE IN U.S. REGULATION, Cary Coglianese, ed. (University of Pennsylvania Press 2012) (with Susan M.

Wachter)

- *Fiscal Federalism and the Limits of Bankruptcy*, in WHEN STATES GO BROKE: ORIGINS, CONTEXT, AND SOLUTIONS FOR THE AMERICAN STATES IN FISCAL CRISIS, Peter Conti-Brown, ed. (Cambridge University Press 2011)
- *Information Asymmetries in the U.S. Mortgage Crisis*, in THE AMERICAN MORTGAGE SYSTEM: RETHINK, RECOVER, REBUILD, Susan M. Wachter & Martin M. Smith, eds. (University of Pennsylvania Press 2011) (with Susan M. Wachter)
- *Modification of Mortgages in Bankruptcy*, LESSONS FROM THE FINANCIAL CRISIS: INSIGHTS AND ANALYSIS FROM TODAY'S LEADING MINDS, Richard W. Kolb, ed. (Wiley 2009)

**Edited Volumes**

- 82 LAW & CONTEMP. PROB., *Law and Macroeconomics* (2019) (with Anna Gelpern)

**Shorter Articles, Research Papers, and Commissioned Studies**

- *Legal Accountability for Health Crises: "Unshielding" the Sackler Family*, J. AM. MED. ASS'N (2024) (with Daniel Aaron and Michael Sinha)
- *Massachusetts Auto Finance Regulation: The Usury Ceiling, Issues, and Potential Reforms*, commissioned by the Office of the Attorney General of the Commonwealth of Massachusetts, April 2024 (with Kathleen Engel)
- *Report on Legal and Institutional Differences in the European and American Securitization Markets*, commissioned by the German Council of Economic Experts (Sachverständigenrat zur Begutachtung der gesamtwirtschaftlichen Entwicklung), Sept. 2023
- "*No More Bailouts: A Blueprint for a Standing Emergency Economic Resilience and Stabilization Program*," Great Democracy Initiative whitepaper (July 2020) (with Lindsay Owens and Ganesh Sitaraman)
- *"Abusive Acts and Practices"—Towards a Definition?* Invited Written Presentation for Consumer Financial Protection Bureau Symposium on "Abusive" (June 25, 2019)
- *Independent Review of the Empirical Studies Supporting the Draft Restatement of Consumer Contracts* (Dec. 21, 2017) (lead author)
- *The Economics of Retail Payments Security: Commentary,* in THE PUZZLE OF PAYMENTS SECURITY: FITTING THE PIECES TOGETHER TO PROTECT THE RETAIL PAYMENTS SYSTEM 69 (Fed. Res. Bank of K.C. 2016)
- *Pandora's Digital Box: Competitive and Business Risks of Mobile Wallets*, Merchants Advisory Group White Paper (2016) (commissioned study)
- *A Lawyer and Partner, and Also Bankrupt*, 4 J. OF LAW (4 THE POST) 93 (2014) (reprinted from blog post at www.creditslips.org)
- *An Analysis of the Proposed Interchange Fee Litigation Settlement*, Geo. L. & Econ. Research Paper, No. 12-033, *at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2133361
- *Clearing the Mortgage Market Through Principal Reduction: A Bad Bank for Housing (RTC 2.0)*, Pew Charitable Trusts Strategies to Improve the Housing Market Research Paper (2012), *available at* http://www.pewstates.org/uploadedFiles/PCS_Assets/2012/Clearing_the_Mortgage_Market.pdf (commissioned study).
- *What Next for Housing Finance?* 15 WHARTON REAL ESTATE REV. (2012) (with Susan Wachter)
- *Cross-Routing: PIN and Signature Debit Interchangeability Under the Durbin Amendment,* 2 LYDIAN J. 16 (Dec. 2010)

- *Interchange Regulation: Implications for Credit Unions*, Research Brief #224, The Filene Research Institute, November 2010
- *Overdraft Regulation: A Silver Lining to the Regulatory Clouds?*, Research Brief #211, The Filene Research Institute, April 2010 (commissioned study)
- *The Credit C.A.R.D. Act: Opportunities and Challenges for Credit Unions*, Research Brief #202, The Filene Research Institute, Dec. 2009 (commissioned study)
- *Critique of Evans and Wright's Study of the Consumer Financial Protection Agency Act*, white paper, Oct. 22, 2009, *available at* http://ssrn.com/abstract=1492471
- *Bad and Good Securitization*, 13 WHARTON REAL ESTATE REV. 23 (2010) (with Andrey Pavlov and Susan Wachter), *available at* http://papers.ssrn.com/abstract=1462895
- *The Consumer Financial Protection Agency*, Policy Analysis, Pew Charitable Trusts Financial Reform Project, Research Brief #2, July 2009
  –The "best one-stop paper for understanding why CFPA needs to pass." Baseline Scenario, *at* http://baselinescenario.com/2009/08/17/a-cfpa-research-brief/
- *Evaluation of Alternatives for Secondary Mortgage Markets*, Study for the National Association of Realtors' Presidential Advisory Group (2009) (commissioned study)
- *Remote Deposit Capture: A Legal and Transactional Overview*, 126 BANKING L.J. 115 (2009) (peer-edited journal)
- *Helping Homeowners: Modification of Mortgages in Bankruptcy*, 3 HARV. L. & POL'Y REV. (online) (Jan. 19, 2009) (invited contribution), *at* http://www.hlpronline.com/Levitin_HLPR_011909.pdf
- *Reforming Mortgage* Servicing, Research Brief, American Association of Retired Persons, Dec. 2008 (commissioned study)
- *All But Accurate: A Critique of the American Bankers Association Study on Credit Card Regulation*, white paper, December 6, 2007, *at* http://papers.ssrn.com/abstract=900444
- *Gifting Plans and Absolute Priority*, 124 BANKING L.J. 722 (2007) (peer-edited journal)
- *The Problematic Case for Incentive Compensation in Bankruptcy*, 155 UNIV. PA. L. REV. PENNUMBRA 88 (2007)
- *Antitrust Issues in Credit Card Merchant Restraints Rules*, Tobin Project Working Paper, Risk Policy Working Paper, May 6, 2007 (with Elizabeth Warren)
- *Health Care Privacy Issues in Corporate Reorganizations*, Materials Presented Before the American Bankruptcy Institute 2007 New York City Bankruptcy Conference, May 7, 2007 (with Arthur R. Cormier & Andrew M. Troop)

**Encyclopedia Entries**

- *Mortgage Market Character and Trends: USA*, in THE HOUSING ENCYCLOPEDIA, Susan Smith, ed., (Cambridge University Press 2012) (with Susan Wachter)
- *American Mortgages*, in THE HOUSING ENCYCLOPEDIA, Susan Smith, ed., (Cambridge University Press 2012) (with Susan Wachter)

## LEGISLATIVE AND REGULATORY TESTIMONY AND BRIEFINGS

- "Cryptocurrency Custody Issues," SEC Roundtable, Apr. 25, 2025
- "Stablecoin Issuer Bankruptcy," Senate Banking Committee Staff Briefing, Apr. 7, 2025
- "FTX Bankruptcy," Bipartisan House Financial Services Committee Staff Briefing, Dec. 8, 2022

- Testimony Before the House Judiciary Committee Subcommittee on Regulatory Reform, Commercial and Antitrust Law, July 28, 2021 (hearing on "Oversight of the Bankruptcy Code, Part 1: Confronting Abuses of the Chapter 11 System").
- Testimony Before the House Committee on Small Business, Sept. 9, 2020 (hearing on "Transparency in Small Business Lending").
- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, March 26, 2019 (hearing on Chairman's Housing Reform Outline: Part I).
- Testimony Submitted to the Senate Judiciary Committee, Nov. 13, 2018 (hearing on the Taxpayer Protection and Responsible Resolution Act of 2018).
- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit, Jan. 25, 2018 (hearing on "Examining Opportunities and Challenges in the Financial Technology ("Fintech") Marketplace").
- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, June 8, 2017 ("Fostering Economic Growth: The Role of Financial Institutions in Local Communities").
- Testimony Submitted to the House Financial Services Committee's Subcommittee on Financial Institutions and Consumer Credit, Mar. 21, 2017 (hearing on "Ending the *De Novo* Drought: Examining the Application Process for *De Novo* Financial Institutions").
- Testimony Before the House Financial Services Committee, July 9, 2016 ("Making a Financial Choice: More Capital or More Government Control?") (hearing on the CHOICE Act).
- Testimony Before the Senate Judiciary Committee, Subcommittee on The Constitution, July 23, 2015 ("The Administrative State v. The Constitution: Dodd-Frank at Five").
- Testimony Before the House Financial Services Committee, Mar. 15, 2015 ("Preserving Consumer Choice and Financial Independence").
- Testimony Before the House Judiciary Committee, Subcommittee on Regulatory Reform, Commercial and Antitrust Law, July 17, 2014 ("Guilty Until Proven Innocent? A Study of the Propriety & Legal Authority for the Justice Department's *Operation Choke Point*").
- Testimony Before the House Financial Services Committee, Subcommittee on Capital Markets and Government Sponsored Enterprises, Feb. 26, 2014 ("The Dodd-Frank Act's Impact on Asset-Backed Securities").
- Testimony Before the House Committee on Small Business, Subcommittee on Oversight, Investigations, and Regulation, Dec. 3, 2013 ("Regulatory Landscape: Burdens on Small Financial Institutions").
- Testimony Before the Senate Banking Committee, Oct. 1, 2013 ("Housing Finance Reform: Fundamentals of a Functioning Private Label Mortgage Backed Securities Market").
- Testimony Before the House Financial Services Committee, July 18, 2013 ("A Legislative Proposal to Protect American Taxpayers and Homeowners by Creating a Sustainable Housing Finance System") (hearing on the PATH Act).
- Testimony Before the House Judiciary Committee, Subcommittee on Intellectual Property, Competition, and the Internet, July 10, 2012 ("The Dodd-Frank Act's Effects on Financial Services Competition").
- Testimony Before the House Financial Services Committee, Subcommittee on Capital Markets and Government Sponsored Institutions, June 7, 2012 ("Investor Protection: The Need to Protect Investors from Government").
- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit, May 9, 2012 ("Rising Regulatory Compliance Costs and Their Impact on the Health of Small Financial Institutions").

- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit & Subcommittee on Capital Markets and Government Sponsored Enterprises, Nov. 16, 2011 (Joint Hearing on "H.R. 1697: The Communities First Act").
- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, Sept. 13, 2011 ("Housing Finance Reform: Should There Be a Government Guarantee?").
- Testimony Submitted to the House Committee on the Judiciary, Sept. 8, 2011 (H.R. 2533, the "Chapter 11 Bankruptcy Venue Reform Act of 2011").
- Testimony Before the House Committee on Small Business, Subcommittee on Oversight, Investigations & Regulation, July 28, 2011 ("Open for Business: The Impact of the CFPB on Small Business").
- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, July 19, 2011 ("Enhanced Consumer Financial Protection After the Financial Crisis").
- Testimony Before the House Government Oversight and Reform Committee, Subcommittee on TARP, Financial Institutions, and Bailouts of Public and Private Institutions, May 24, 2011 ("Who's Watching the Watchmen? Oversight of the Consumer Financial Protection Bureau").
- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit, Apr. 6, 2011 ("Legislative Proposals to Improve the Structure of the Consumer Financial Protection Bureau").
- Testimony Before the House Financial Services Committee, Subcommittee on Housing and Community Opportunity, Nov. 18, 2010 ("Robo-Signing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing").
- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, Nov. 16, 2010 ("Problems in Mortgage Servicing from Modifications to Foreclosures").
- Testimony Before the Financial Crisis Inquiry Commission, Oct. 28, 2010, *at* http://fcic.law.stanford.edu/interviews/view/421.
- "Future of Housing Finance," Center for American Progress Mortgage Finance Working Group Presentation to the U.S. Department of Treasury, August 2, 2010.
- Testimony Before the House Judiciary Committee, Subcommittee on Commercial and Administrative Law, December 11, 2009 ("Home Foreclosures: Will Voluntary Mortgage Modification Help Families Save Their Homes? Part II?").
- Testimony Before the Senate Judiciary Committee, Subcommittee on Administrative Oversight and the Courts, July 23, 2009 ("The Worsening Foreclosure Crisis: Is It Time to Reconsider Bankruptcy Reform?).
- Testimony Before the House Judiciary Committee, Subcommittee on Commercial and Administrative Law, April 2, 2009 (re: Consumer Debt — Are Credit Cards Bankrupting Americans?).
- Testimony Before the Senate Judiciary Committee, Subcommittee on Administrative Oversight and the Courts, Mar. 24, 2009 ("Abusive Credit Card Practices and Bankruptcy," re: Consumer Credit Fairness Act, S.257).
- Testimony Before the Senate Committee on Banking, Housing and Urban Affairs, Feb. 12, 2009 (re: Modernizing Consumer Protection in the Financial Regulatory System: Strengthening Credit Card Protections).
- Testimony Before the House Judiciary Committee, Jan. 22, 2009 (re: Helping Families Save Their Homes in Bankruptcy Act, H.R. 220, and the Emergency Homeownership and Equity Protection Act, H.R. 225).
- Testimony Before the Senate Judiciary Committee, Nov. 19, 2008 (re: Helping Families Save Their Homes in Bankruptcy Act, now S.61).

- "Bankruptcy Modification of Mortgages," Democratic Staff Briefing, United States House of Representatives, November 14, 2008.
- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit on March 13, 2008 (re: Credit Cardholders' Bill of Rights).
- Testimony Submitted to the Economic Matters Committee, Maryland State House of Delegates, March 6, 2008.
- "Credit Card Regulation," Democratic Staff Briefing, United States House of Representatives, March 5, 2008.

## REGULATORY AND LEGISLATIVE COMMENTS FILED

- Comments to the Office of the Comptroller of the Currency regarding Order Preempting the Illinois Interchange Fee Preemption Act, Docket No. OCC-2026-0431, Apr. 29, 2026
- Comments to the Office of the Comptroller of the Currency regarding National Bank Non-Interest Charges and Fees, Docket No. OCC-2026-0430, Apr. 29, 2026
- Comments to the Consumer Financial Protection Bureau regarding Notice of Proposed Rulemaking regarding "Legal Standard Applicable to Supervisory Designation Proceedings," Docket No. CFPB-2025-0018, Sept. 12, 2025
- Letter to the Reporters on the fourth draft of the American Law Institute Restatement of the Law of Consumer Contracts, Nov. 10, 2021
- Letter to the Permanent Editorial Board of the Uniform Commercial Code regrading proposed Commentary on Perfection of a Security Interest in Intangible Money and Related Choice-of-Law Rules, Aug. 9, 2021
- Comments to the Office of the Comptroller of the Currency regarding Notice of Proposed Rulemaking regarding "Fair Access to Financial Services," Docket No. OCC-2020-004, Dec. 18, 2020
- Legal Scholars Letter to Senator Elizabeth Warren Regarding the Consumer Bankruptcy Reform Act of 2020, December 14, 2020 (co-lead drafter)
- Comments to the Office of the Comptroller of the Currency regarding the Charter Application of Figure Bank, N.A., 2020-WE-Charter-317953, Dec. 7, 2020
- Letter to Chief Judge Cecilia Morris, U.S. Bankruptcy Court for the Southern District of New York, regarding Local Rule 1073-1, Nov. 24 (2020)
- Comments to the Consumer Financial Protection Bureau regarding "Qualified Mortgage Definition Under the Truth in Lending Act (Regulation Z): General QM Loan Definition", Docket No. CFPB-2020-0020, Sept. 23, 2020
- Comments to the Office of Comptroller of the Currency regarding Notice of Proposed Rulemaking regarding "National Banks and Federal Savings Associations as Lenders," Docket No. OCC-2020-0026, September 3, 2020
- Comments to the Consumer Financial Protection Bureau regarding Request for Information from Taskforce on Federal Consumer Financial Law, Docket No. CFPB-2020-0013, June 1, 2020
- Comments to the Federal Deposit Insurance Corporation regarding Notice of Proposed Rulemaking regarding "Federal Interest Rate Authority," RIN 3064-AF21, Jan. 5, 2020
- Comments to the Office of Comptroller of the Currency regarding Notice of Proposed Rulemaking regarding "Permissible interest on loans that are sold, assigned, or otherwise transferred," Docket No. OCC-2019-0027, Jan. 5, 2020
- Comments to the Securities and Exchange Commission on Request for Comments on Asset-Level Disclosure Requirements for Residential Mortgage-Backed Securities, Nov. 23, 2019

- Letter to William K. Harrington, Esq. United States Trustee, Region 2, Regarding Appointment of Examiner in the Chapter 11 Case of Purdue Pharma, Inc., No. 19-23649 (Bankr. S.D.N.Y.), Nov. 5, 2019 (co-author with Jonathan Lipson and Stephen Lubben)
- Comments to the Consumer Financial Protection Bureau on proposed rescission of Final Rule regarding Payday, Vehicle Title, and Certain High-Cost Loans, Docket No. CFPB-2019-0006, May 15, 2019
- Letter on behalf of bankruptcy and financial regulation scholars to Senators Warren and Sanders in support of the U.S. Territorial Relief Act of 2019, May 2, 2019 (drafter)
- Joint Letter of Concerned Members of the Members Consultative Group to the American Law Institute Council on Council Draft No. 5 of the Restatement of the Law of Consumer Contracts, Oct. 3, 2018 (lead drafter)
- Letter on behalf of bankruptcy and financial regulation scholars to Senators Warren and Sanders in support of the U.S. Territorial Relief Act of 2018, July 25, 2018 (drafter)
- Comments of Financial Regulation and Consumer Protection Scholars Regarding the Consumer Financial Protection Bureau's Request for Information on Regulatory Guidance, Docket No. CFPB-2018-0013, July 2, 2018 (lead drafter)
- Letter Regarding Independent Review of the Empirical Studies Supporting Council Draft No. 3 of the Restatement of the Law, Consumer Contracts, to the American Law Institute Council, Jan. 12, 2018
- Joint Letter of Empirical Legal Scholars to the American Law Institute Council, concerning the third draft of the Restatement of the Law of Consumer Contracts, Oct. 9, 2017
- Letter to the American Law Institute Council, concerning the third draft of the Restatement of the Law of Consumer Contracts, Oct. 2, 2017
- Legal Scholars Letter to Congressional Banking and Financial Services Committee Leadership Regarding H.R. 10 and the Consumer Financial Protection Bureau, May 12, 2017 (co-lead drafter)
- Joint Letter of Concerned Members of the Members Consultative Group to the Reporters on the second draft of the American Law Institute Restatement of the Law of Consumer Contracts, Oct. 19, 2016 (lead drafter)
- Consumer Finance Scholars Comment Letter to the Consumer Financial Protection Bureau regarding Proposed Rulemaking on Payday, Vehicle Title, and Certain High-Cost Loans, Sept. 13, 2016 (lead drafter)
- Joint Letter of Concerned Members of the Members Consultative Group to the Reporters on the second draft of the American Law Institute Restatement of the Law of Consumer Contracts, Dec. 31, 2015 (lead drafter)
- Corporate Finance Scholars' Letter to Congressional Leadership on Proposed Omnibus Appropriations Bill Rider to Amend the Trust Indenture Act, Dec. 8, 2015 (lead drafter)
- Letter to the Reporters on the second draft of the American Law Institute Restatement of the Law of Consumer Contracts. Nov. 15, 2015
- Letter to the Reporters on the first draft of the American Law Institute Restatement of the Law of Consumer Contracts. Mar. 27, 2015
- Comments to the Consumer Financial Protection Bureau on Amendments Relating to Small Creditors and Rural or Underserved Areas Under the Truth in Lending Act (Regulation Z), Feb. 27, 2015
- Letter to the Reporters on the first draft of the American Law Institute Restatement of the Law of Consumer Contracts, Nov. 12, 2014
- Comments to the Consumer Financial Protection Bureau on Advanced Notice of Proposed Rulemaking regarding Debt Collection, Feb. 28, 2014
- Comments to the Federal Housing Finance Agency on Proposed State-Level Guarantee Fee Increases, Nov. 29, 2012

- Comments to the Permanent Editorial Board of the Uniform Commercial Code on the Draft Report on Mortgage Notes, May 27, 2011
- Comments to the Permanent Editorial Board of the UCC on Draft Report on Enforceability of Mortgage Notes, April 2011
- Comments to the Federal Reserve Board on the Durbin Amendment Rulemaking (Reg E), Feb. 21, 2011 –Cited in NACS v. Bd. of Governors of Fed. Reserve Sys., 2013 WL 3943489 (D.D.C. July 31, 2013)
- Comments to the Bankruptcy Rules Committee on Proposed Amendments to Federal Rule of Bankruptcy Procedure 2019, Feb. 15, 2010.
- Comments to the Permanent Editorial Board of the UCC on Proposed (Pre-Release) Draft Report on Enforceability of Mortgage Notes, Jan. 5, 2011

## AMICUS BRIEFS AUTHORED (LEAD AUTHOR OR CO-AUTHOR)

- Amicus Brief (in support of petitioners), *In re Cross-Holder ad hoc Group and Excluded First Lien Lenders*, No. 26-1595 (3d Cir. 2026) (sole author and counsel)
- Amicus Brief (in support of appellants), *Harrington v. Purdue Pharma L.P.*, No. 23-a-87, Supreme Court of the United States, 2023 (sole author, represented by Daniel Walfish)
- Amicus Brief (in support of respondent), *Community Financial Services Ass'n v. Consumer Financial Protection Bureau*, Supreme Court of the United States, No. 22-448 (lead co-author; represented by Greg Lipper)
- Amicus Brief (in support of appellees and affirmance), *In re Purdue Pharma, LP*, No. 22-110-bk(L) (2d Cir. 2022) (sole author, represented by Daniel Walfish)
- Amicus Brief (in support of plaintiffs), *California ex rel. Becerra v. FDIC*, No. 20-cv-5860 (N. D. Cal. 2020) (sole author, represented by Eliza Duggan and Ted Mermin)
- Amicus Brief (in support of plaintiffs), *California ex rel. Becerra v. v. Brooks*, No. 20-cv-5200 (N. D. Cal. 2020) (sole author, represented by Eliza Duggan and Ted Mermin)
- Amicus Brief (in opposition to proposed settlements between the United States Department of Justice and the Debtors and between the United States Department of Justice and the Sackler Family), *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y.) (lead co-author; co-counsel with Jonathan Lipson and Daniel Walfish)
- Amicus Brief (in support of respondent), *City of Chicago v. Fulton*, Supreme Court of the United States, No. 19-357 (co-author; represented by David Kuney)
- Amicus Brief (in support of the judgment below), *Seila Law LLC v. Consumer Financial Protection Bureau*, Supreme Court of the United States, No. 19-7 (lead co-author; co-counsel with Deepak Gupta and Patricia McCoy)
- Amicus Brief (in support of neither party), *McShannock v. JP Morgan Chase Bank N.A.*, No. 1:19-15899 (9th Cir. 2019) (sole author)
- Amicus Brief (in support of appellant), *Rent-Rite Super Kegs West, Ltd. v. World Business Lenders, LLC*, No. 1:19-cv-01552 (D. Colo. 2019) (sole author) (discussed favorably in decision reversing and remanding)
- Amicus Brief (in support of plaintiff), *Meade v. Marlette Funding, LLC*, No. 17-cv-30376 (Denver District Court, Colo. 2018) (sole author)
- Amicus Brief (in support of plaintiff), *Meade v. Avant of Colorado, LLC*, No. 17-cv-30377 (Denver District Court, Colo. 2018) (sole author)
- Amicus Brief of Scholars Consumer Finance Regulation in support of Plaintiff, *English v. Trump,* United

States Court of Appeals for the District of Columbia, (2018) (co-lead author; represented by Law Offices of Courtney Weiner)

- Amicus Brief of Scholars Consumer Finance Regulation in support of Plaintiff, *Lower East Side People's Federal Credit Union v. Trump,* United States District Court for Southern District of New York, No. 1:17-cv-09536 (S.D.N.Y. 2017) (co-lead author; represented by Law Offices of Courtney Weiner)
- Amicus Brief of Scholars Consumer Finance Regulation in support of Plaintiff, *English v. Trump,* United States District Court for District of Columbia, No. 1:17-cv-02534 (D.D.C. 2017) (co-lead author; represented by Law Offices of Courtney Weiner)
- Amicus Brief of Scholars of Behavioral Science and Economics in support of Respondents, *Masterpiece Cakeshop, Ltd., et al., v. Colorado Civil Rights Commission et al,* Supreme Court of the United States, No. 16-111 (co-author; represented by Allison Ehlert and Adam Hoffman)
- Amicus Brief (in support of appellant), *Expressions Hair Designs v. Schneiderman*, Supreme Court of the United States, No. 15-1391, Nov. 21, 2016 (lead author; co-counsel with Carl Cecere)
- Amicus Brief of Financial Regulation Scholars in support of petitioners at en banc rehearing, *CFPB v. PHH Corp.,* D. C. Circuit en banc, No. 15-1177, Mar. 31, 2016 (co-lead author; co-counsel with Michael Barr and Deepak Gupta)
- Amicus Brief of Scholars of Behavioral Economics (in support of certiorari petition), *Expressions Hair Designs v. Schneiderman*, Supreme Court of the United States, No. 15-1391, June 15, 2016 (lead author; represented by Allison Ehlert and Adam Hoffman)
- Amicus Brief (in support of respondents), *Bank of America v. Caulkett*, United States Supreme Court, 2015 (lead author; co-counsel with Michael Fitzgerald)
- Amicus Brief (supplemental), *Eaton v. Federal National Mortgage Association & Another*, Supreme Judicial Court of Massachusetts, No. 11041, Jan. 27, 2012 (sole author)
- Amicus Brief, *Eaton v. Federal National Mortgage Association & Another*, Supreme Judicial Court of Massachusetts, No. 11041, Sept. 22, 2011 (sole author)
- Amicus Brief, *Residential Funding Co. v. Saurman,* No. 143178, Supreme Court of Michigan, Oct. 21, 2011 (co-author with John Pottow & Rebecca Tushnet)
- Amicus Brief, *Bevilacqua v. Rodriguez,* Supreme Judicial Court of Massachusetts, No. 10880, April 21, 2011 (lead author)
- Amicus Brief on Behalf of the Texas Hotel and Lodging Ass'n, *La Villita Motor Inns, J.V., v. Orix Capital Markets, LLC, et al.*, Supreme Court of Texas, No. 10-1001, Mar. 20, 2011 (lead author)

## Editorials and Blogging

- "Consumers, Financial Services Win With CFPB Making Rules of Road," BLOOMBERGLAW, May 17, 2024
- "Purdue Pharma Oral Argument Summary + Thoughts," Harvard Bankruptcy Roundtable Blog, Dec. 13, 2023
- "Supreme threat," FTAlphaville, August 30, 2023
- "The Justice Department was right to object to Purdue's rotten deal," Letter to the Editor, WASH. POST, Aug. 28, 2023
- "The Solution to Biden's Student Loan Problems Is Right Before His Eyes," WASH. POST, July 18, 2023 (with John Brooks and Brian Galle)

- "The Debt Ceiling Is Unconstitutional—but Not for the Reason You Think," THE AMERICAN PROSPECT, May 22, 2023 (with Anna Gelpern and Stephen Lubben)
- "Dissecting the U.S. Public Debt Clause," FTAlphaville, May 10, 2023 (with Anna Gelpern and Stephen Lubben)
- "The Implications of LTL's Per-Debtor Analysis," Harvard Bankruptcy Roundtable Blog, Feb. 14, 2023
- "Johnson & Johnson Was Abusing the Bankruptcy System," Letter to the Editor, WALL ST. J., Feb. 9, 2023
- "The Texas Two-Step: A Different Look at Bankruptcy Code Section 548," Harvard Bankruptcy Roundtable Blog, Nov. 1, 2022 (with Judith Fitzgerald)
- "CFPB Opponents Are Playing with Fire," AMERICAN BANKER, Oct. 28, 2022
- "Looming Legal Issues in Cryptocurrency Bankruptcies," THE DEAL, July 19, 2022
- "Crypto Winter Arrives," THE DEAL, July 18, 2022
- "How Apple Locks Out the Competition with Its Digital Key," PROMARKETS, Jan. 12, 2022
- "A Better Way to Fix the Student Loan Problem," POLITICO, Jan. 12, 2022 (with John Brooks)
- "It's Time for Biden to Fire the FDIC Chief," POLITICO, Dec. 16, 2021
- "The Boy Scouts Are Abusing Bankruptcy," BLOOMBERGLAW, Nov. 16, 2021
- "Now is the time for bankruptcy venue reform," THE HILL, August 6, 2021 (with Joan Feeney, Steven Rhodes, and Jay Westbrook)
- "Consumers—not banks—should control access to personal financial data," THE HILL, July 6, 2021
- "Reform Our Bankruptcy Laws Before a Tsunami of Covid Debt Comes Due," CNBC, Jan. 11, 2021
- "Supersize the Supreme Court to Save It," The AMERICAN PROSPECT, October 12, 2020
- "In Case of Economic Emergency: Break Glass," BOSTON GLOBE, July 5, 2020 (with Lindsay Owens and Ganesh Sitaraman)
- "Mortgage Market Déjà vu," THE AMERICAN PROSPECT, July 1, 2020 (with Susan Wachter)
- "How to Start Closing the Racial Wealth Gap," THE AMERICAN PROSPECT, June 17, 2020
- "How to Get Money to Small Businesses, Fast," N.Y. TIMES, Mar. 24, 2020 (with Satyam Khanna)
- "The Americans Joe Biden Left Behind on the Bankruptcy Bill," THE AMERICAN PROSPECT, Jan. 9, 2019
- "Who Needs More Supreme Court Justices? Democrats and Republicans Do," BLOOMBERGLAW, Apr. 2, 2019
- "Depoliticize the Supreme Court by Adding Two Dozen New Justices," THE HILL, Dec. 7, 2018
- "Treasury's Bankruptcy Plan Would Mean More, Not Fewer, Bailouts," AMERICAN BANKER, Feb. 23, 2018
- "Toys 'R' Us and the Rigged Economy," HUFFINGTON POST, Sept. 26, 2017
- "Fixing the Equifax Problem: Public Utility Regulation of Credit Reporting," HUFFINGTON POST, Sept. 24, 2017
- "'Madden fix' bills are a recipe for predatory lending," AMERICAN BANKER, Aug. 25, 2017
- "Draining the Financial Swamp," WALL ST. JOURNAL, Mar. 21, 2017
- "What the CFPB 'Commission' Debate Is Really About," AMERICAN BANKER, Dec. 29, 2016
- "Glass-Steagall's Political Firewall," HUFFINGTON POST, Oct. 27, 2015
- "Where's the Proof that Durbin Failed Consumers?" AMERICAN BANKER, Oct. 22, 2015
- "Who's Afraid of a Republican CFPB?" AMERICAN BANKER, Oct. 16, 2015
- "Recalibrate the TIA for Today's Debt Markets," WALL ST. J. BANKRUPTCY BEAT, Sept. 30, 2015
- "The CFPB's Data Collection Should Be Applauded," AMERICAN BANKER, Aug. 17, 2015

- "Discharge Private Student Loans, But Federal Loans Have Safety Net," WALL ST. J. BANKRUPTCY BEAT, May 11, 2015
- "Eliminate Vendor Priority Claims," WALL ST. J. BANKRUPTCY BEAT, Dec. 3, 2014
- "Argentina and Distressed Investors," WALL ST. J. BANKRUPTCY BEAT, July 29, 2014
- "Mandatory Arbitration Offers Bargain-Basement Justice," AMERICAN BANKER, May 13, 2014
- "Outlook for Corporate Restructuring," WALL ST. J. BANKRUPTCY BEAT, Mar. 26, 2014
- "Postal Banking: Maybe Not So Crazy After All," AMERICAN BANKER, Jan. 31, 2014
- Letter to the Editor, N.Y. TIMES, Nov. 1, 2013
- "Hands Off Detroit's Final Treasures!" SALON, Aug. 20, 2013.
- "Don't Take My Pension: The Looming Public Worker Nightmare," SALON, Aug. 12, 2013.
- "Make the Banks Pay," SALON, Oct. 27, 2011.
- "Fed's Feeble Swipe Fee Rule Is an Unauthorized Sop to Big Banks," AMERICAN BANKER, July 8, 2011.
- "More Openness on Mortgages," N.Y. TIMES, Mar. 8, 2010.
- Letter to the Editor, WASHINGTON POST, July 6, 2010.
- Letter to the Editor, WASHINGTON TIMES, June 22, 2010.
- "Swipe Fee Reform Benefits Consumers and Businesses Large and Small," HUFFINGTON POST, June 18, 2010.
- "Rein in the Credit Card Games," DETROIT FREE-PRESS, Nov. 28, 2008 (reprinted as "Consumer Pay High Price for Credit Cards," SAN DIEGO UNION-TRIBUNE, Nov. 30, 2008) (reprinted as "Credit cards on Santa's naughty list," ATLANTA JOURNAL CONSTITUTION, Dec. 7, 2008).
- "Bailout Bill Must Include Help for Homeowners," WASHINGTON INDEPENDENT, Sept. 26, 2008.
- "The Card Industry Still Has a Chance to Reform," AMERICAN BANKER, Aug. 8, 2008.
- "The Flaws in the FHA Housing Bill", op-ed, WALL ST. JOURNAL, July 11, 2008.
- Letter to the Editor, WALL ST. JOURNAL, April 3, 2008.
- "Complex Pricing of Credit Cards Should be Simplified," op-ed, CHICAGO TRIBUNE, Dec. 27, 2007
- "Conglomerate Master" guest blogger on The Conglomerate, 2010-2011
- Guest blogger, PrawfsBlawg, May 2008
- Guest blogger, Warren Reports at TPM Café, Jan. 2007
- Blogger, Credit Slips, www.creditslips.org, Dec. 31, 2007-present

## PRESENTATIONS AND PANELS

**2026**

- "Liability Management Transactions," Gerson Lehrman Group webinar, Aug. 27, 2026
- "Debanked? Viewpoint Discrimination in Banking," Georgetown Law Faculty Workshop, Aug. 25, 2026
- "Chapter 11's North Star," Troutman Sanders Bankruptcy Practice Group Retreat, May 6, 2026
- "Usury, Old and New," Yale Law School Seminar on Private Law, March 3, 2026
- "Liability Management Transactions," Gerson Lehrman Group webcast, Feb. 5, 2026

**2025**

- "DIP Lending," Gerson Lehrman Group webcast, Nov. 19, 2025
- "The Market for Ideas: Viewpoint Discrimination in Banking" University of Virginia Faculty Workshop, Nov. 14, 2025
- "The Federal Corporate Law of Bankruptcy," Corporate Restructuring & Insolvency Seminar, Oct. 1, 2025
- "What Could Go Wrong," Symposium on Agentic AI & Consumer Payments, Consumer Bankers Association, Sept. 8, 2025
- "Economic Risk and the Social Safety Net," Symposium on Debt in the Real World, Brooklyn Law School, Feb. 28, 2025
- "Predatory Small Business Lending," American University Washington College of Law, Feb. 17, 2025
- "The Death of Consumer Contracts," Symposium on the Restatement of Consumer Contracts, Harvard Law School, Jan. 25, 2025

**2024**

- "Liability Management Transactions," Gerson Lehrman Group webinar, Dec. 17, 2024
- "Creditors Rights in Bankruptcy," Gerson Lehrman Group webcast, Dec. 13, 2024
- "DIP Lending," Gerson Lehrman Group webcast, April 17, 2024
- "Samson's Toupée: The Source-of-Strength Doctrine in Bankruptcy," Yale Journal on Regulation Symposium, Yale Law School, April 4, 2024

**2023**

- Comments on David Schleicher's *In a Bad State: Responding to State and Local Budget Crises*, Wharton School, University of Pennsylvania, May 24, 2023 (commentator)
- The Panic of 2023," University of Illinois Law School, Apr. 24, 2023 (guest lecturer)
- "Bankruptcy 202: Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, Apr. 24, 2023 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, Apr. 21, 2023 (presenter)
- "Bankruptcy 101: Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Apr. 19, 2023 (presenter)
- "Russia Sanctions and Payment Card Networks," Georgetown University Law Center, Mar. 21, 2023 (guest lecturer)
- "Cryptocurrency Regulation: Market Structure" Berkeley Law Center for Law and Business Conference, Feb. 8, 2023
- "Cryptocurrency and Bankruptcy," Corporate Restructuring and Insolvency Seminar, January 20, 2023 (presenter)

**2022**

- "Cryptocurrency and Bankruptcy," Fordham Law School, Nov. 14, 2022
- "The Good, the Bad, and the Ugly of Blockchain, Crypto, and Web3," Berkeley Center for Law and Business webinar, Sept. 23, 2022

- Bankruptcy 202: Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, July 21, 2022 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, July 19, 2022 (presenter)
- "US Consumer Finance Regulation," JPMorgan Chase Institute, July 18, 2022
- "Bankruptcy 101: Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, July 14, 2022 (presenter)
- "The Stop Wall Street Looting Act," Harvard Law School, Apr. 18, 2022 (guest lecturer)
- Bankruptcy 202: Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, Mar. 23, 2022 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, Mar. 16, 2022 (presenter)
- "Bankruptcy 101: Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Mar. 14, 2022 (presenter)
- "Credit Derivatives 101," Gerson Lehrman Group webcast, Mar. 9, 2022 (presenter)
- "Russia Sanctions and Payment Card Networks," Georgetown University Law Center, Mar. 6, 2022 (guest lecturer)
- "The Fintech Trilemma," Federal Reserve Board conference on The Future of Financial Services | Data and Connectivity Symposium, Mar. 1, 2022 (presenter)
- "How Academia Influences Lawmaking," American Association of Law Schools Annual Meeting, Section on Creditors' and Debtors' Rights, Jan. 6, 2022 (presenter)

**2021**

- "If It Walks Like a Loan and Talks Like a Loan, Is It a Loan?" Consumer Federation of America Virtual Financial Services Conference, Dec. 8, 2021 (panelist)
- "The Legislative Landscape for Consumer Bankruptcy: Chapter 10, Student Loans and Beyond," American Bankruptcy Institute Consumer Practice Extravaganza, Nov. 3, 2021 (presenter)
- "State of the Settlements, Bellwethers, and Settlement Design Innovations," Georgetown University O'Neill Institute for National and Global Health Law and the Pew Charitable Trusts Opioid Summit, Sept. 25, 2021 (panelist)
- "Cryptocurrency Regulation," Capstone investor webinar, Sept. 29, 2021 (presenter)
- "Cryptocurrency Regulation," Raymond James investor webinar, Sept. 13, 2021 (presenter)
- "The Financial Inclusion Trilemma," Georgetown Law Faculty Workshop, July 13, 2021 (presenter)
- "Purdue's Poison Pill: The Breakdown of Chapter 11's Checks and Balances," Corporate Restructuring and Insolvency Seminar, June 15, 2021 (presenter)
- "Rethinking Bankruptcy Exceptionalism," Emerging Scholars Conference, University of Chicago, May 25, 2021 (commentator on paper by Jonathan Seymour)
- "Conglomerates, Conflicts of Interest, and Consumer Protection," Arthur Wilmarth Celebration Conference, May 24, 2021 (panelist)
- "Addressing Poverty and Financial Distress in the Jewish Community," Jewish Federation of Greater Washington Board Meeting, Apr. 28, 2021 (panelist)
- "Contractual Inequality," Consumer Law Scholars Conference, UC Berkeley, Mar. 5, 2021 (commentator on paper by Manisha Padi)
- "Cryptocurrency, Blockchain, and Decentralized Finance," National Community Reinvestment Coalition Just Economy 2021 Conference, May 12, 2021 (panelist)

- Bankruptcy 202: Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, Mar. 16, 2021 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, Mar. 10, 2021 (presenter)
- "Contractual Inequality," Consumer Law Scholars Conference, UC Berkeley, Mar. 5, 2021 (commentator on paper by Manisha Padi)
- "Bankruptcy 101: Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Mar. 3, 2021 (presenter)
- "The Consumer Bankruptcy Reform Act of 2020," Brooklyn Law School, Feb. 4, 2021 (co-presenter)
- "The Great American Housing Bubble," Wharton Club of Boston, Jan. 28, 2021 (presenter)
- "The Coming Consumer Financial Cliff," Hebrew Free Loan Association Board Meeting, Jan. 11, 2021

**2020**

- "Attacking State Usury Law Evasions," National Consumer Law Center Consumer Rights Litigation Conference, Nov. 14, 2020 (panelist)
- Bankruptcy 202: Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, Oct. 30, 2020 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, Oct. 28, 2020 (presenter)
- "Bankruptcy 101: Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Oct. 26, 2020 (presenter)
- "Loan Sharks or Angel Fish? The Pros and Cons of Bank Partnerships and Interest Rate Exportation Rights," Columbia Law and Political Economy Society, Oct. 26, 2020 (panelist)
- "The Great American Housing Bubble," Harvard Club of New York, August 12, 2020 (presenter)
- "The New Usury: The Ability-to-Repay Revolution in Consumer Finance," Georgetown Law Faculty Workshop, June 17, 2020 (presenter)
- Bipartisan briefing on nonbank mortgage lending and servicing, House Financial Services Committee Staff, Apr. 16, 2020 (presenter)
- "The New Usury: The Ability-to-Repay Revolution in Consumer Finance," Consumer Law Scholars Conference, UC Berkeley, Mar. 6, 2020 (presenter)
- "Bankruptcy: Voidable Actions and Equitable Remedies," Gerson Lehrman Group webcast, Feb. 26, 2020 (presenter)
- Bankruptcy: Chapter 11 Operations and Governance," Gerson Lehrman Group webcast, Feb. 25, 2020 (presenter)
- Bankruptcy: Chapter 11 Plans," Gerson Lehrman Group webcast, Feb. 19, 2020 (presenter)
- Bankruptcy: Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Feb. 18, 2020 (presenter)
- "Fintech Innovations?" American Association of Law Schools Annual Meeting, Jan. 5, 2020 (roundtable participant)
- "Reflections On and Lessons From 'Foreclosed,' a New Book by Professor Chris Odinet," American Association of Law Schools Annual Meeting, Jan. 4, 2020 (commentator)

**2019**

- "Debt Restructurings: Exchange Offers and Consent Solicitations," Gerson Lehrman Group webcast, Oct. 31, 2019 (presenter)

- Bankruptcy 202: Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, Oct. 24, 2019 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, Oct. 17, 2019 (presenter)
- "Bankruptcy 101: Creditors' Rights and Chapter 7," Gerson Lehrman Group webcast, Oct. 3, 2019 (presenter)
- "Law and Macroeconomics," Georgetown Law and Macroeconomics Conference, Sept. 27, 2019 (presenter)
- "Opioid Bankruptcies: Further Developments," Capstone LLC, September 17, 2019 (presenter)
- "Credit Derivatives 101," Gerson Lehrman Group webcast, Sept. 11, 2019 (presenter)
- "Securitization 101," Gerson Lehrman Group webcast, Sept. 4, 2019 (presenter)
- "Opioid Bankruptcies," Capstone LLC, August 13, 2019 (presenter)
- "Abusive Acts and Practices," Consumer Financial Protection Bureau Symposium, June 25, 2019 (presenter)
- "Credit Derivatives 101," Gerson Lehrman Group webcast, April 2, 2019 (presenter)
- "Securitization 101," Gerson Lehrman Group webcast, March 26, 2019 (presenter)
- "Bankruptcy 202: Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, March 12, 2019 (presenter)
- "The Fast and the Usurious: Putting the Brakes on Auto Lending Abuses," University of Minnesota School of Law Faculty Workshop, Mar. 7, 2019 (presenter)
- "Public-Private Risk-Sharing in Financial Regulation," Boston College, Regulation and Markets Workshop, Feb. 19, 2019 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, March 5, 2019 (presenter)
- "Bankruptcy 102: Bankruptcy Basics," Gerson Lehrman Group webcast, February 26, 2019 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, February 13, 2019 (presenter)

**2018**

- "Get Rid of Multi-Member Commissions," American Constitution Society Convening on Reimagining the Regulatory State, Dec. 13, 2018 (presenter)
- "Bankruptcy 202: Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, November 14, 2019 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, November 9, 2018 (presenter)
- "Bankruptcy 102: Bankruptcy Basics," Gerson Lehrman Group webcast, October 31, 2018 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, October 24, 2018 (presenter)
- "Bankruptcy 202: Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, July 18, 2019 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, July 16, 2018 (presenter)
- "Bankruptcy 102: Bankruptcy Basics," Gerson Lehrman Group webcast, July 12, 2018 (presenter)
- "Law, Macroeconomics, and Norms," Georgetown University Law Center Summer Workshop, July 10, 2018 (presenter with Anna Gelpern)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, July 9, 2018 (presenter)

- "A Public Option for Bank Accounts (or Central Banking for All)", Vanderbilt Law Roundtable on Financial Transformation, June 1, 2018 (commentator)
- "Mortgage Risk Premia During the Housing Bubble," American Finance Association 2018 Annual Meeting, Washington D.C., June 1, 2018
- "Bankruptcy 202: Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, March 26, 2019 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, March 19, 2018 (presenter)
- "Bankruptcy 102: Bankruptcy Basics," Gerson Lehrman Group webcast, March 12, 2018 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, March 5, 2018 (presenter)
- "The Fast and the Usurious: Putting the Brakes on Auto Lending Abuses," Agnes N. Williams Research Chair Inaugural Lecture, Georgetown University Law Center, Feb. 21, 2018
- "Bankruptcy's Lorelei: The Dangerous Allure of Financial Institutions Bankruptcy," Jay Westbrook Celebration Symposium, University of Texas School of Law, Feb. 3, 2017 (presenter)

**2017**

- "The New Restructuring? Coercion and Opportunism in Debt Workouts," University of Pennsylvania Law Review Symposium, Oct. 20, 2017 (presenter)
- "Bankruptcy 202: Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, November 1, 2017 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, October 25, 2017 (presenter)
- "Bankruptcy 102: Bankruptcy Basics," Gerson Lehrman Group webcast, October 18, 2017 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, October 11, 2017 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, June 15, 2017 (presenter)
- "Bankruptcy 102: Bankruptcy Basics," Gerson Lehrman Group webcast, June 8, 2017 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, June 1, 2017 (presenter)
- "Bankruptcy 202: Avoidance Actions and Equitable Remedies," Gerson Lehrman Group webcast, February 7, 2017 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, January 31, 2017 (presenter)
- "Bankruptcy 102: Bankruptcy Basics," Gerson Lehrman Group webcast, January 24, 2017 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, January 17, 2017 (presenter)

**2016**

- "The New Restructuring? Coercion and Opportunism in Debt Workouts," University of Pennsylvania Institute of Law and Economics Fall Corporate Roundtable, December 9, 2016 (co-presenter)
- "FinTech Charters," U.S. PIRG/National Council of LaRaza FinTech/Big Data Conference, December 6, 2016
- Roundtable on Housing Finance Reform, Bipartisan Policy Center, December 5, 2016 (participant)
- "The New Restructuring? Coercion and Opportunism in Debt Workouts," Georgetown University Law Center Faculty Workshop, Nov. 8, 2016 (presenter)

- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, October 20, 2016 (presenter)
- "Bankruptcy 102: Bankruptcy Basics," Gerson Lehrman Group webcast, October 13, 2016 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, October 6, 2016 (presenter)
- "Pandora's Digital Box," Merchant Advisory Group Webinar, July 27, 2016 (presenter)
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, June 16, 2016 (presenter)
- "Bankruptcy 102: Bankruptcy Basics," Gerson Lehrman Group webcast, Jun 9, 2016 (presenter)
- "Bankruptcy 101: Creditors' Rights," Gerson Lehrman Group webcast, June 2, 2016 (presenter)
- "One Dollar, One Vote," Wharton School, University of Pennsylvania, April 21, 2016
- "Minority Creditors' Rights under the Trust Indenture Act and Syndicated Loan Agreements", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016
- "Gifting Revisited", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016
- "Multi-Debtor Issues in Chapter 11", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016
- "Empty and Indirect Creditor Issues in Restructuring", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016
- "Developments in Fraudulent Transfer Law", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016
- "State and Federal Law of Corporate Governance", Financial Lawyers Conference, Ojai, California (lead conference moderator), April 1-3, 2016
- "Bankruptcy 201: Chapter 11 Restructuring," Gerson Lehrman Group webcast, Feb. 18, 2016 (presenter)
- "Bankruptcy 101: Introduction to Creditors' Rights and Bankruptcy," Gerson Lehrman Group webcast, Feb. 11, 2016 (presenter)

**2015**

- "Introduction to Creditors' Rights and Bankruptcy," Gerson Lehrman Group webcast, Aug. 17, 2015 (presenter)
- "The Puzzle of Payments Security: Fitting the Pieces Together to Protect the Retail Payments System," Federal Reserve Bank of Kansas City, June 25-26, 2015 (presenter)
- "Foreclosure Activity: Legal Framework and the Impact on Borrowers and Lenders," Urban Institute, June 9, 2015 (respondent)
- "Introduction to Creditors' Rights and Bankruptcy," Gerson Lehrman Group webcast, June 2, 2015 (presenter)
- "Mortgage Servicing: Contracts, Technology and Incentives," Consumer Financial Protection Bureau, Enforcement Division, Washington DC, April 21, 2015 (presenter)
- "Politics of the Bailouts," Financial Crisis Seminar, University of California, Irvine, Mar. 11, 2015 (presenter)
- "Clearinghouses and the Bankruptcy Treatment of Financial Contracts," Brooklyn Law School, Symposium on the Treatment of Financial Contracts in Bankruptcy and Bank Resolution, Feb. 27, 2015 (presenter)
- "Second-Liens and the Leverage Option," Georgetown University Law Center Faculty Workshop, Jan. 29, 2015 (presenter)

**2014**

- "Safe Banking," Duke University School of Law Faculty Workshop, Dec. 11, 2014 (presenter)
- ABI-Brooklyn Law School Junior Scholars Bankruptcy Workshop, Nov. 21-22, 2014 (commentator)
- "Safe Banking," University of Virginia Law School Law & Economics Workshop, Nov. 13, 2014 (presenter)
- "Safe Banking," University of Maryland School of Law Faculty Workshop, Oct. 23, 2014 (presenter)
- "Introduction to Creditors' Rights and Bankruptcy," Gerson Lehrman Group webcast, Oct. 16, 2014 (presenter)
- "Safe Banking," Georgetown University Law Center Faculty Workshop, Sept. 23, 2014 (presenter)
- "Introduction to Creditors' Rights and Bankruptcy," Anchorage Capital, New York, Sept. 18, 2014 (presenter)
- "Introduction to Creditors' Rights and Bankruptcy," Gerson Lehrman Group webcast, July 29, 2014 (presenter)
- "Financial Services and the Post Office," Pew Charitable Trusts, Washington, D.C., July 16, 2014 (panelist)
- "The $10 Trillion Dollar Question: Reforming Housing Finance Markets," American Law Institute Young Scholar's Medalist Conference, Washington, DC, June 10, 2014 (convener)
- "Why Teach Consumer Finance", American Association of Law Schools Mid-Year Meeting, Washington DC, June 9, 2014, panel on "Modern Financial Regulatory Approaches"
- "Perspectives on the CFPB," Financial Services Roundtable's 4th Annual Consumer Program, May 14, 2014, Washington, DC (panelist)
- "Short-Term Debt Markets," Institute for Law and Economics Corporate Roundtable, University of Pennsylvania Law School, May 2, 2014 (panelist)
- "What Should/Shouldn't Be in the Fine Print?", Making The Fine Print Fair, April 4, 2014, Washington, DC (moderator)
- "Behavioral Economics: The End of the First Wave," Georgetown University Faculty Retreat, Feb. 19, 2014 (presenter)

**2013**

- "Mortgage Servicing", Consumer Financial Protection Bureau Legal Division Speaker Series, Dec. 11, 2013
- "The Politics of Financial Regulation and the Regulation of Financial Politics," Georgetown University Law Center Faculty Workshop, Nov. 12, 2013
- "The Politics of Financial Regulation and the Regulation of Financial Politics," Fordham University Law School Faculty Workshop, Nov. 7, 2013
- "The Disclosure Paradox," Americans for Financial Reform Conference on Transparency in Financial Regulation, Washington DC, Oct. 11, 2013.
- "Financing Housing: GSE Reform and Sensible Mortgage Lending, CQ Roll Call Forum in partnership with the National Association of Home Builders, Washington, DC, Sept. 17, 2013 (panelist)
- CFPB Conference on Mobile Payments and Financial Inclusion, Sept. 12, 2013 (panelist)
- "Legal Leverage," Law and Society Association Annual Meeting, June 1, 2013
- "Legal Leverage," American Law Institute Annual Meeting, May 21, 2013
- "Bankruptcy Law and the Cost of Credit: The Impact of Cramdown on Mortgage Interest Rates," Harvard Law School Law and Economics Workshop, April 9, 2013

- "Duties to Serve after the Fall," Harvard Joint Center for Housing Studies, April 2, 2013

**2012**

- "The Paper Chase: Securitization, Foreclosures, and the Uncertainty of Mortgage Title," Harvard Law Faculty Workshop, Nov. 12, 2012
- "Community Responses to the Foreclosure Crisis," Harvard Law School, Nov. 9, 2012 (panelist)
- Cornell Junior Scholars Financial Regulation Workshop, Sept. 29, 2012 (commentator)
- "American Financial Regulation," Cornell Law School Faculty Workshop, Sept. 28, 2012
- "A Transactional Genealogy of Scandal," Georgetown University Law Center Faculty Workshop, July 19, 2012
- "RTC 2.0," Pew Housing Conference, Washington, DC, June 20, 2012
- "Opportunities and Challenges for Businesses and Consumers." FTC Mobile Payments Workshop, Washington, DC, April 26, 2012
- "A Theory of American Financial Regulation," University of Minnesota School of Law, Minneapolis, MN, April 23, 2012
- "A Theory of American Financial Regulation," Georgetown University Law Center Faculty Workshop, April 19, 2012
- Consumer and Investor Protection, George Washington University Law School C-LEAF Conference, Mar. 2, 2012 (panelist)
- "Mortgage Notes and the Uniform Commercial Code," American Ass'n of Law Schools Annual Convention, Washington, DC, Jan. 5, 2012 (panelist)

**2011**

- "The Consumer Financial Protection Bureau," World Bank, Washington, DC, Nov. 17, 2011 (panelist)
- "Mortgage Servicing Litigation," AmeriCatalyst Conference, Austin Texas, Nov. 2011
- "Modification of Mortgages in Bankruptcy," John Marshall School of Law, Chicago, IL, Oct. 20, 2011
- "Financial institutions in the new regulatory environment: Opportunities, constraints and global challenges," Georgetown McDonough School of Business, Washington, DC, Sept. 22, 2011 (panelist)
- "The Public Option in Housing Finance," Univ. Pennsylvania Law School Conference on Regulatory Breakdown, Sept. 2011
- "Mortgage Servicing," National Association of Business Economists webinar, July 7, 2011
- "Servicing Litigation," AmeriCatalyst webinar, June 23, 2011
- "State Bankruptcy," Stanford Law School, Palo Alto, CA, May 13, 2011
- "In Defense of Bailouts," C-LEAF Junior Scholars Workshop, April 1, 2011
- Durbin Amendment, PYMNTS Conference, Washington, DC, Mar. 29, 2011 (panel)
- "State Bankruptcy," American College of Bankruptcy, Washington, DC, March 19, 2011
- "Behavioral Economics and the Consumer Financial Protection Bureau," GMU National Attorneys General Education Program, Arlington, VA, March 11, 2011
- "The Dodd-Frank Act and the Financial Crisis Inquiry Commission Report," GMU National Attorneys General Education Program, Arlington, VA, March 10, 2011
- The Big-Bankruptcy Empirical Research Agenda, Conference, UCLA Law School, Los Angeles, California, February, 11 2011 (presenter)
- Treatment of Derivatives and Other Financial Contracts in Insolvency, World Bank Insolvency and Debtor/Creditor Regime Task Force Meeting, January 11, 2011 (presenter)

- Asset Sales in Bankruptcy, American Association of Law Schools Annual Convention, San Francisco, California, January 7, 2011 (moderator)
- Credit Cards and College Students, American Association of Law Schools Annual Convention, San Francisco, California, January 7, 2011 (panelist)
- "Explaining the Housing Bubble," American Association of Law Schools Annual Convention, San Francisco, California, January 6, 2011

**2010**

- "Explaining the Housing Bubble," Tel Aviv University Law School, Law and Economics Workshop, Tel Aviv, Israel, Nov. 29, 2010
- "Modification of Mortgages in Bankruptcy," American University Washington College of Law, Washington, D.C., Nov. 11, 2010
- "The Uncertain Value Proposition in Mobile Commerce," Mobile Commerce Conference, University of Washington Law School, Seattle, October 29, 2010
- "Robosigning, Putbacks, and Failed Loan Modification Programs," Federal Reserve System & Federal Deposit Insurance Corporation Conference on Mortgages and the Future of Housing Finance, Arlington, VA, Oct. 25, 2010
- "Why We Need Bankruptcy More Than Ever," American College of Bankruptcy, Washington, D.C., Oct. 22, 2010 (moderator)
- "Explaining the Housing Bubble," Georgetown University Law School Legal Scholarship Workshop, Washington, D.C., Oct. 20, 2010
- "In Defense of Bailouts," University of Pennsylvania School of Law, Philadelphia, Pennsylvania, Oct. 18, 2010
- "What Have They Done?" American Enterprise Institute, Washington, D.C. Oct. 14, 2010 (panelist)
- AmeriCatalyst, Inside Out: Rebuilding the U.S. Housing Finance System, Austin, Texas, Sept. 14, 2010 (moderator)
- AmeriCatalyst, Inside Out: Rebuilding the U.S. Housing Finance System, Austin, Texas, Sept. 13, 2010 (panelist)
- "Financial Data Privacy in the United States," U.S. State Department Foreign Press Center, Washington, D.C., June 21, 2010
- "Information Failures in the U.S. Mortgage Crisis," Tobin Project Workshop, Washington, D.C., June 8, 2010
- "Information Failures in the U.S. Mortgage Crisis," Federal Reserve Bank of Philadelphia, May 14, 2010
- "Too Big to Fail," American Bankruptcy Institute Great Debates, ABI Annual Convention, Washington, D.C., April 30, 2010
- "In Defense of Bailouts," Georgetown University Law Center Faculty Workshop, Washington, D.C., April 14, 2010
- Practicing Law Institute, Consumer Financial Services Institute, Chicago, Apr. 8, 2010 (panelist)
- "Private Disordering? Payment Card Fraud Liability Rules," Symposium on Data Security and Data Privacy in the Payment System, Brooklyn Law School, Mar. 19, 2010
- The New Regulatory Landscape, Filene Research Institute, National Credit Union Executive Conference, Feb. 23, 2010 (keynote)
- "Private Label Securitization," University of Pennsylvania Wharton School, Philadelphia, Pennsylvania, Feb. 22, 2010

- Practicing Law Institute, Consumer Financial Services Institute, New York, Feb. 18, 2010 (panelist)

**2009**

- The Consumer Financial Protection Agency, Consumer Federation of America Financial Services Conference, Washington, D.C., Dec. 3, 2009 (panelist)
- "Conceptual Challenges in Access to Credit versus Regulation" Conference on Consumer Finance Post-Apartheid: The South African Experience, University of Connecticut School of Law, Nov. 21 (moderator)
- "The Disclosure Paradox," University of Connecticut School of Law, Nov. 21, 2009
- The Consumer Financial Protection Agency, American Enterprise Institute, Washington, D.C., Nov. 18, 2009 (panelist)
- "Mortgage Workouts," University of Pennsylvania Law School, Philadelphia, Pennsylvania, Nov. 17, 2009
- "Too Big to Fail," American Bankruptcy Institution Legislative Symposium, Washington, D.C., Nov. 17, 2009 (panelist)
- "Role of Central Banks in Payment System Regulation," Federal Reserve Bank of Kansas City, November, 2009
- Workshop on Behavioral and Institutional Research and Financial Services Regulatory Reform, Penn Law School, Philadelphia, Pennsylvania, Nov. 6, 2009 (moderator)
- "The Consumer Financial Protection Agency," Women in Housing Finance, Washington, D.C., Oct. 29, 2009 (panelist)
- The Consumer Financial Protection Agency, Symposium: Regulatory Reform at the Crossroads: What Is the Right Response to the Financial Crisis?, George Washington University Law School, Washington, D.C., October 23, 2009 (panelist)
- "Consumer Credit Reform Legislation," American Bankruptcy Institute Midwest Consumer Bankruptcy Conference, Chicago, Illinois (October 2009) (keynote address)
- "DIP Financing," American Bankruptcy Institute-University of Missouri Kansas City Bankruptcy Conference, Kansas City, Missouri (October 2009) (panelist)
- "Making Home Affordable?," American Bankruptcy Institute-University of Missouri Kansas City Bankruptcy Conference, Kansas City, Missouri (October 2009) (keynote address)
- "Current Issues in Chapter 11," American Bankruptcy Institute Northeast Bankruptcy Conference, Bretton Woods, New Hampshire (July 2009) (panelist)
- "Consumer Protection in Financial Transactions," ABA Section on Antitrust, Consumer Protection Conference, Georgetown University Law Center (June 2009) (panelist)
- "Frankenstein Contracts," Stanford-Yale Junior Faculty Forum, Palo Alto, California (May 30, 2009)
- "Who Pays for Payments," Federal Reserve Bank of Chicago, May 15, 2009
- "The Financial Crisis and Administrative Law," Georgetown University Law Center White Tablecloth Faculty Luncheon, May 2009
- "The Financial Crisis," Georgetown University Law Center Board of Visitors Annual Meeting, Santa Fe, NM, April 4, 2009
- "Bankruptcy Claims Trading," Symposium, Brooklyn Law School & Brooklyn Journal of Corporate, Financial and Commercial Law (February 27, 2009)
- "Modification of Mortgages in Bankruptcy," International Monetary Fund, (January 23, 2009)

- "Real Estate Transactions in Troubled Times," Joint Extended Program of the AALS Section on Real Estate Transactions and the AALS Section on Creditors' and Debtors' Rights, American Association of Law Schools Annual Convention (January 10, 2009)
- "Hydraulic Regulation," AALS Section on Financial Institutions and Consumer Financial Services. American Association of Law Schools Annual Convention (January 9, 2009)

**2008**

- "Mortgage Loss Mitigation," Pennsylvania Bar Institution Real Estate Institute, Philadelphia, PA, (Dec. 5, 2008) (panelist)
- "The Impact of the Subprime Meltdown," Commercial Law League of America and National Conference of Bankruptcy Judges (Nov. 11, 2008) (panelist)
- "Foreclosure Externalities," Conference on "The Public Aspects of Private Property," Georgetown University Law Center (Nov. 7-8, 2008)
- "United States Banking Regulation," Presentation to Great Wall Asset Management Corporation (Chinese government agency responsible for non-performing bank assets), Georgetown University, Oct. 30, 2008)
- "Equal Rights Under Law," Response to Professor Li Xia Feng, Georgetown University-Chinese Central Party School Conference, Washington, D.C., (Oct. 21, 2008)
- "Wall Street to Main Street: Bail Out and Restructuring," ABA 2008 Administrative Law Conference, Washington, D.C. (Oct. 17, 2008) (panelist)
- "The Subprime Mortgage Crisis: A Systemic View," National Conference of Bankruptcy Judges Annual Convention (September 25, 2008) (panelist)
- "Lehman Brothers' Bankruptcy," Student Bar Association, Georgetown University Law Center (Sept. 17, 2008)
- "Hydraulic Regulation: Regulating Credit Markets Upstream," Georgetown University Law Center Faculty Workshop (Sept. 16, 2008)
- Panel on "Mounting Household Debt, Lending Practices, and Legislative and Regulatory Responses," Federal Reserve Bank of Cleveland 2008 Community Development Policy Summit (June 11, 2008)
- "Hydraulic Regulation: Regulating Markets Upstream" University of Connecticut School of Law Junior Workshop on Banking and Consumer Financial Services Law (May 28, 2008)
- Panel on "Credit Card Regulation" Conference on Consumer Credit Protection Sponsored by the Federalist Society, the Financial Services Roundtable, and the Consumer Bankers Association, National Press Club, Washington, D.C., (May 20, 2008)
- "Mortgage Market Sensitivity to Bankruptcy Modification," American Law and Economics Association Annual Convention, (May 16, 2008)
- Panel on "Emerging Privacy Issues between the US and the EU - Bridging the Transatlantic Gap," Conference at Georgetown University Law Center (April 28, 2008)
- Panel on "Bankruptcy Law in Indonesia" at *Indonesia: Current Legal Reform*, Conference sponsored by the United States-Indonesia Society, International Law Institute, and the Millennium Challenge Corporation (a United States government corporation) (April 22, 2008)
- Panel on "Subprime Mortgage Lending," Paul Robeson Conference, Columbia Law School (April 18, 2008)
- "Mortgage Market Sensitivity to Bankruptcy Modification," University of Virginia School of Law Faculty Workshop (April 11, 2008)
- "Mortgage Market Sensitivity to Bankruptcy Modification," Board of Governors of the Federal Reserve, Research and Statistics Workshop (March 25, 2008)

- "Mortgage Market Sensitivity to Bankruptcy Modification," Georgetown University Faculty Workshop (March 18, 2008)
- "Mortgage Market Sensitivity to Bankruptcy Modification," Harvard-University of Texas Conference on Commercial Realities (Feb. 29, 2008)

**2007 and prior**

- Commentator, Conglomerate Third Annual Junior Scholars' Workshop (June 24, 2007)
- "Priceless? The Costs of Credit Card Merchant Restraints," Cornell Law School (Dec. 18, 2006)
- "Priceless? The Costs of Credit Card Merchant Restraints," Georgetown University Law Center (Dec. 4, 2006)
- "Priceless? The Costs of Credit Card Merchant Restraints," The Ohio State University Moritz College of Law (Nov. 28, 2006)
- "Priceless? The Costs of Credit Card Merchant Restraints," Cardozo Law School (Nov. 21, 2006)
- "Priceless? The Costs of Credit Card Merchant Restraints," Washington University in St. Louis Law School (Nov. 20, 2006)
- "Priceless? The Costs of Credit Card Merchant Restraints," Northwestern University Law School (Nov. 14, 2006)
- "Priceless? The Costs of Credit Card Merchant Restraints," American University Washington College of Law (Nov. 9, 2006)
- "Priceless? The Costs of Credit Card Merchant Restraints," Brooklyn Law School (Nov. 1, 2006)
- "Priceless? The Costs of Credit Card Merchant Restraints," Emory Law School (Oct. 18, 2006)
- "Finding Nemo: Rediscovering the Virtues of Negotiability in the Wake of Enron," New York Law School (Sept. 8, 2006)
- "Finding Nemo: Rediscovering the Virtues of Negotiability in the Wake of Enron," Conglomerate Second Annual Junior Scholars' Workshop (July 10, 2006), *at* http://www.theconglomerate.org/junior_scholars_workshop/index.html

## COURSES TAUGHT

**Bankruptcy:** 2008(s); 2008(sum); 2008(f); 2009 (sum); 2010(s)

**Contracts:** 2009(f); 2011(f); 2012(f-Harvard Law School), 2024(f)

**Commercial Finance Transactions/Secured Credit:** 2009(s); 2013(f); 2026(s), 2026(f)

**Consumer Finance:** 2011(s); 2012(s); 2013(s-Harvard Law School); 2014(s), 2017(s); 2018(s); 2019(s), 2021(s), 2023(f)

**Corporate Debt Markets:** 2026(s)

**Financial Restructuring:** 2011(s); 2012(s); 2013(s-Harvard Law School); 2014(s); 2016(s), 2016(f); 2017(f); 2019(s), 2020(s), 2020(f), 2021(f); 2023(s), 2024(s), 2025(s), 2027(s)

**Law of Money Seminar:** 2016(s), 2021(s)

**Payment Systems and Financial Transactions**: 2008(sum—FTC); 2008(f); 2023(s)

**Payment Systems: Law, Technology, and Policy**: 2023(f), 2025(s), 2026(f)

**Regulation of Financial Institutions:** 2018(f)

**Sales and Leases:** 2017(s); 2018(s)

**Structured Finance (Securitization & Derivatives):** 2010(s)

## SCHOOL SERVICE

- Academic Standards Committee (2021(f))
- Admissions Committee (2022-23)
- Appointments Committee (2018-19; 2013-14; 2011-12, chair; 2009-10)
- Appointments: Legal Practice (2025-26)
- Faculty Workshop Committee (2016(s), chair; 2017(f), chair)
- Fellows and Teaching Careers Committee (2019-20)
- Finance Committee (2010-11)
- Financial Aid Committee (2013-2014)
- Legal Profession Committee (2008-2009; 2007-2008)
- Professors from Practice Committee (2023-24, 2024-25)
- Rank and Tenure Committee (2020-21)
- Tax Appointments Committee (2013-14; chair, 2010-11)
- Technology Committee (2016-17)
- University Faculty Senate (2025-26)

## PROFESSIONAL SERVICE AND ACTIVITIES

- DC Bar Pro Bono Center, Bankruptcy Clinic trainer (2021)
- Jewish Federation of Greater Washington Anti-Poverty Initiative (2021)
- Biden for President, Policy Volunteer Coordinator—Consumer Protection and Consumer Credit (2020)
- Warren for President, Policy Volunteer Coordinator—Financial Regulation, Consumer Protection, and Bankruptcy (2019-2020)
- Federal Reserve Bank of Philadelphia, Supervisory Research Forum (2019-2020)
- Supreme Court Fellows Program, Academic Advisory Board (2018-19)
- Member, Mortgage Servicing Collaborative (convened by the Urban Institute) (2018)
- Federal Reserve Secure Payments Task Force (2015)
- Federal Reserve Faster Payments Task Force (2015)
- Consumer Financial Protection Bureau, statutory Consumer Advisory Board (2012-2015)
- Member, American Law Institute Advisory Group on UCC and Holder-in-Due-Course Policy.
- Member, American Law Institute Member's Consultative Group, Restatement on Law of Consumer Contracts
- Urban Institute, Housing Finance Policy Center, Academic Research Council
- Center for American Progress, Mortgage Finance Working Group
- Reporter, Advisory Committee on Multiple Debtor Cases, American Bankruptcy Institute Commission to Study the Reform of Chapter 11
- World Bank Insolvency and Debtor/Creditor Regime Task Force
- Fellow, Center for Law, Economics and Finance (C-LEAF) at George Washington University Law School
- Editorial Board, AMERICAN BANKRUPTCY INSTITUTE LAW REVIEW

- Manuscript reviewer for AMERICAN BANKRUPTCY LAW JOURNAL; Cambridge University Press; CITYSCAPE; Conference on Empirical Legal Studies; COLUMBIA LAW REVIEW; Cornell University Press; GEORGETOWN LAW JOURNAL; HOUSING POLICY DEBATE; JOURNAL OF EMPIRICAL LEGAL STUDIES; LAW & SOCIETY REVIEW; Netherlands Organization for Scientific Research; Oxford University Press; STANFORD LAW REVIEW, University of Chicago Press; YALE LAW JOURNAL; Yale University Press
- Area Organizer for Bankruptcy, American Law and Economics Association (2009)
- Executive Committee Member, AALS Section on Fin. Institutions & Consumer Fin. Services (2009)

## COURT ADMISSIONS

- Supreme Court of the United States (2015) (Bar # 294231)
- United States Court of Appeals for the Third Circuit (2006)
- United States District Court for the Southern District of New York (2006)
- United States District Court for the Eastern District of New York (2006)
- New York State Courts (2006)

## APPENDIX C. LIST OF EXPERT TESTIMONY GIVEN AT DEPOSITION OR TRIAL DURING THE PREVIOUS FOUR YEARS

- *Fernandez v. Corelogic CredCo*, No. 3:20-cv-01262 (S.D. Cal.) (deposition, July 10, 2023)
- *Cox v. Century Financial Group, Inc.*, No. 7-cv-100-4294 (Mo. Cir. Ct. of Clay County) (deposition, August 22, 2023)
- *Small Business Finance Association v. Hewlet,* No 22-cv-08775-RGK-SK (C.D. Cal.) (deposition, October 10, 2023)
- *Christian v. Trans Union LLC*, No. 22-cv-02253 (E.D. Pa.) (deposition, April 24, 2025)
- *In re Del Monte Food Corporation II Inc.*, No. 26-16984 (Bankr. D.N.J.) (deposition, Jan. 26, 2026; trial testimony, Jan. 28, 2026)
- *Belyea v. GreenSky, Inc.*, No. 3:20-cv-01693-JSC (N.D. Cal.) (deposition, July 22, 2026)