**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION<br><br>This document applies to:<br><br>*Barry's Cut Rate Stores, Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM), *also now known as DDMB, Inc., et al. v. Visa, Inc., et al.*, No. 05-md01720 (E.D.N.Y.) (BMC) (JAM) | Civil Action No.: 05-md-01720 (BMC) (JAM) |

# NATIONAL ASSOCIATION OF CONVENIENCE STORES' AND CIRCLE K'S OBJECTION TO APPROVAL OF SETTLEMENT

**Circle K Stores Inc.**
**1130 West Warner Road,**
**Tempe, Arizona 85284**
**T: (704) 440-7159**

**NACS (National Association of Convenience Stores)**
**1600 Duke Street, 7th Floor,**
**Alexandria, VA 22314**
**T: (703) 684-3600**

## TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ..... iv

Introduction ..... 1

Background ..... 5

A. This litigation has long challenged an antitrust conspiracy that has caused soaring interchange fees by insulating them from issuer competition. ..... 5

B. All settlement attempts have failed because Class Counsel have been unable or unwilling to gain ground on the core of Defendants' anti-competitive scheme. ..... 7

C. The current proposed settlement again offers inadequate relief. ..... 8

Argument ..... 10

I. The Proposed Settlement is not Fair, Reasonable, or Adequate ..... 11

A. The settlement is wholly unreasonable in light of the best possible recovery, which is a market in which issuers compete on fees. ..... 12

1. The proposed settlement provides no meaningful relief from the rules Plaintiffs have long sought to eliminate that prevent issuer competition. ..... 12

a. The settlement fails to provide the core relief sought since the beginning: the ability for merchants to reject some issuers' cards and not others. ..... 13

b. The settlement also fails to provide the secondary tool to create issuer competition: surcharging by issuer. ..... 17

c. The settlement's discounting provisions will not spur meaningful competition among issuers. ..... 17

2. The proposed settlement's rate relief confirms the settlement falls far short of the best possible relief at trial. ..... 20

3. The proposed settlement's rule reforms will be ineffectual at reducing interchange rates, falling far short of the best possible recovery. ..... 27

a. Merchants will not benefit from the proposed settlement's changes allowing them to reject cards by broadly-defined product category. ..... 27

b. Merchants will not benefit from being able to surcharge product categories because of the numerous hurdles to this type of surcharging. ..... 32

c. The settlement's Honor All Cards and surcharging changes will take so long to implement, little to no time will be left for any market changes to occur before the settlement expires. ..... 34

B. Defendants would be able to withstand far greater reforms than the proposed settlement provides. ..... 37

C. Because this decades-old case is at a very advanced stage of litigation and Plaintiffs have a strong chance to succeed on the merits, they are better off going to trial than accepting an inadequate deal. ....38

D. Class members' overwhelming rejection of the proposed settlement militates against this Court approving it. ....43

II. NACS and Circle K have a due process right to opt out of the proposed settlement. ....46

III. The proposed settlement is unlawful and contrary to public policy because it immunizes future antitrust violations. ....47

Conclusion ....50

Certificate of Service ....51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Express Co. v. Italian Colors Res.*,
570 U.S. 228 (2013)....................48

*In re Am. Express Merchs. Litig.*,
634 F.3d 187 (2d Cir. 2011)....................48

*Authors Guild v. Google, Inc.*,
770 F. Supp. 2d 666 (S.D.N.Y. 2011)....................44, 46

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974)....................11, 43, 46

*DDMB, Inc. v. Visa, Inc.*,
2021 WL 6221326 (E.D.N.Y. Sept. 27, 2021) ....................7, 46, 47

*Fox Midwest Theatres v. Means*,
221 F.2d 173 (8th Cir. 1955) ....................48

*In re GSE Bonds*,
414 F. Supp. 3d 686 (S.D.N.Y. 2019)....................37

*Hecht v. United Collection Bureau, Inc.*,
691 F.3d 218 (2d Cir. 2012)....................46

*Int'l Salt Co. v. United States*,
332 U.S. 392 (1947)....................50

*Lawlor v. Nat'l Screen Serv. Corp.*,
349 U.S. 322 (1955)....................48

*Logan v. Zimmerman Brush Co.*,
455 U.S. 422 (1982)....................46

*McLaughlin v. IDT Energy*,
2018 WL 3642627 (E.D.N.Y. July 30, 2018)....................45

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985)....................48

*Moses v. New York Times Co.*,
79 F.4th 235 (2d Cir. 2023) ....................38

*Nat'l Collegiate Athletic Ass'n v. Alston*,
594 U.S. 69 (2021)....................19

*Odom* v. *Hazen Transp., Inc.*,
275 F.R.D. 400 (W.D.N.Y. 2011)....................38

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)....................39, 42

*In re Payment Card*,
986 F. Supp. 2d 207 (E.D.N.Y. 2013)....................7

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2018 WL 4158290 (E.D.N.Y. Aug. 30, 2018)....................13

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2024 WL 3236614 (E.D.N.Y. June 28, 2024)....................*passim*

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
714 F. Supp. 3d 65 (E.D.N.Y. 2024)....................13, 21, 39, 40

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
729 F. Supp. 3d 298 (E.D.N.Y. 2024)....................14

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
827 F.3d 223 (2d Cir. 2016)....................*passim*

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985)....................46, 47

*Schutter v. Tarena Int'l, Inc.*,
2024 WL 4118465 (E.D.N.Y. Sept. 9, 2024)....................38

*Three Rivers Motors Co. v. Ford Motor Co.*,
522 F.2d 885 (3d Cir. 1975)....................48

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)....................46

**Other Authorities**

Complaint, ECF 1, *NACS v. Visa U.S.A., Inc.*,
No. 1:05-cv-04521-BMC-JAM (E.D.N.Y. Sept. 23, 2005)....................5

Fed. R. Civ. P. 23....................11

Federal Reserve Bank of Kansas City, Interchange Fees in the U.S.,
https://tinyurl.com/3zf6pnh3 (last visited Aug. 14, 2026)....................6

J. Craig Shearman, *Credit and Debit Card 'Swipe' Fees Reach Record $198.25 Billion as President and Congress Call for Action*, Merchants Payments Coalition (Mar. 18, 2026), https://perma.cc/99LL-C65N ....................................................6, 23

*NACS, Credit Card Competition Act* (July 29, 2025), https://perma.cc/3YV2-AGWH ....................................................................................................................6

NACS, *State of the Industry Annual Report of 2024 Data*, available at https://perma.cc/PW23-XQJU ..........................................................................................6

Nicholas Economides, *Competition Policy Issues in the Consumer Payments*, N.Y.U. Stern Sch. of Bus. (2009), https://perma.cc/V2ZN-EUT3 ..........................................16

*The Now and Future of Convenience Stores*, NIQ (July 25, 2025), 2XJHhttps://perma.cc/P2Y9-23AC ............................................................................31

Transcript, *Mastercard at KBW Fintech Payments Conference: Strategic Insights and Future Plans*, *supra* ...................................................................................20

*U.S. Merchant Surcharge Q and A*, Visa, https://perma.cc/ERU6-QPVH...................................34

*Visa USA Interchange Reimbursement Fees* (October 18, 2025), https://perma.cc/TM9G-VDJW ...........................................................................31

## INTRODUCTION

Banks charge merchants exorbitant interchange fees that are not subject to any competition between banks because of anticompetitive agreements embodied in credit card network rules. The proposed settlement does nothing that would, as a practical matter, disturb the fundamental features of that scheme. Meanwhile, decades of litigation—and repeated litigation victories against the card networks—goes to waste under the proposed settlement. That is neither fair nor reasonable nor adequate.

Having survived Defendants' numerous summary judgment and *Daubert* motions, the next step in this case is a trial. This Court need look no further than its summary judgment orders to acknowledge the merits of Plaintiffs' case and its likely strength at trial. After all, if Plaintiffs had no chance of success at trial, this Court would have granted Defendants summary judgment. Yet since all major pre-trial issues were resolved in 2024, Class Counsel and Defendants have proposed repeated meager settlement offers to avoid a trial, our justice system's foundational process for resolving disputes.

None of the previous settlement proposals has ever conceded meaningful ground on the core conspiracy that allows Defendants to set prices without market competition between the entities that receive those fees—the banks. Courts have rejected them all. The current settlement proposal is simply a repackaged version of the inadequate and properly-rejected 2024 settlement agreement with cosmetic, rather than structural, changes. Under the proposed settlement, Defendants' scheme remains insulated from interbank competition that would push prices downward, merchants lack any meaningful negotiating power while receiving largely illusory relief, and Defendants' exorbitant and noncompetitive interchange rates would artificially remain the highest in the world. This Court should reject the proposed settlement under Rule 23(e)(2)(D).

This Court rejected the fundamentally similar proposal in 2024 because, among other problems, it did not adequately address the anticompetitive conditions in the card market. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *21 (E.D.N.Y. June 28, 2024). The relief offered by that settlement, like this one, was "too limited to justify approval of a settlement," especially given that the case is "ready for trial." *Id.* at *23, *27. It similarly tweaked but did not "eliminat[e] the Honor All Cards rules" that would allow class members a genuine choice to reject particular issuers' cards and introduce competition among issuers, which class members have "continuously argued for." *Id.* at *27. Like the present settlement, the 2024 proposal purported to provide "surcharging relief," but that failed to induce "competition among issuing banks" because the settlement "still prohibit[ed] surcharging at the issuer level." *Id*. And the 2024 settlement's promise to lower "average effective interchange rate[s]" by "seven basis points," *id.* at *28, like the current proposal's meager promise to lower those rates by ten basis points, was paltry in the face of the over-200 basis point average that Visa and Mastercard charge. This Court properly rejected that settlement and should reject this one for similar reasons.

This Court's order preliminarily approving the most recent settlement agreement was, respectfully, mistaken on several points that change the analysis and require a different final result. First, this Court mistakenly believed that the proposed settlement will "effectively repeal the Honor All Cards rule," Prelim. App. Order at 7, but the settlement would do no such thing. It instead offers the illusion of repeal—granting merchants' right to reject cards only by category—but in reality forces merchants to choose all cards or none by placing the overwhelming majority of cards and transactions within one category. The proposed settlement carefully avoids disrupting the core Honor All Cards rule by prohibiting merchants from rejecting cards based on issuer—the

only tool that would allow meaningful market competition among the issuing banks. Second, this Court incorrectly equated issuer-level discounting with issuer-based card rejection or even issuer-level surcharging. Prelim. App. Order at 23. Discounting is fundamentally different: Visa has permitted issuer-level discounting for over a decade with no market effect because the tool is too weak to matter, and expert testimony explains the basis of that failure relative to issuer-level rejection or issuer-level surcharging. Its inability to spur competition is exactly *why* Defendants agreed to issuer-level discounting and not surcharging or rejection. Third, this Court accepted the argument that a ten-basis-point reduction is adequate, relative to the hundreds of basis points rate, because "courts lack the power to set rates." Prelim. App. Order at 22. But the question is not whether courts can set rates; it is whether courts can prohibit Defendants' collusive actions that currently prevent market competition, and thereby allow the *market* to reduce the rate dramatically more than the settlement offers. Expert testimony reveals Defendants' rates to be several *times* higher than the competitive benchmark and the point of profitability, so a genuine market correction would lower the rates far more than the mere ten basis points Defendants offer here. The rate relief is thus an extremely poor proxy for, and far worse than, what Plaintiffs could obtain at trial.

Moreover, as Objectors' expert Prof. Adam Levitin explains in his Declaration, Ex. 1, the proposed settlement suffers several further shortfalls that would render even its meager relief illusory. It relies on a fragile and grossly-impractical "Rube Goldberg" machine that would require all pieces to work simultaneously to impose any downward pressure on rates, yet every given piece is more likely to fail than to succeed, much less for each to succeed at once. *Id.* ¶¶ 51-66, 235. And if the unlikely design works, it still allows the issuers, who are not bound by the settlement, as well as the Networks themselves, to circumvent it rather than act contrary to their own economic

interest. *Id.* ¶¶ 223-36. Time itself is a problem throughout the proposed settlement: it will take years for issuers to produce a meaningful number of new cards that would readily allow identification sufficient to implement market-wide the provisions allowing merchants to reject or surcharge premium cards, and years for merchants to implement technology enabling them to do so electronically. That leaves little time, if any, in which these reforms might be implemented—which is insufficient to affect the market before the reforms expire. *Id.* ¶¶ 120-43, 183-87. Similarly, the trivial rate relief lasts only five years, but the required release lasts eight years, which means Networks may increase the interchange fees for the final three years—free from lawsuit—to more than recoup any reduced fees and potentially give the settlement net *negative* value for merchants. *See*, *e.g.*, *id.* ¶¶ 78-80, 83. In short, Prof. Levitin explains that the proposed settlement agreement trades scant (and possibly negative) relief for a broad release without ever allowing market forces to affect their core conspiracy. *Id.* ¶ 318.

The proposed settlement agreement fails to touch Defendants' central conspiracy, instead nibbling at the margins. It offers Plaintiffs meager and illusory relief while protecting Defendants' scheme from market forces and making Plaintiffs wait at least eight years before even having the opportunity to press the reset button on hard-fought, decades-old litigation. Trial may be a slog and carries a risk of loss, but no deal is better than a bad deal and, as Prof. Levitin concludes, even a complete loss at trial would leave Plaintiffs no worse off than this settlement leaves them. Ex. 1, Levitin Decl., at ¶ 48. This Court should reject the agreement as failing to be fair, reasonable, and adequate under Rule 23(e)(2)(D).

## BACKGROUND

### A. This litigation has long challenged an antitrust conspiracy that has caused soaring interchange fees by insulating them from issuer competition.

Plaintiffs, including the undersigned objectors, sued Visa, Mastercard, and issuing banks to challenge their collusive violations of U.S. antitrust law under the Sherman Act. *See* Complaint, ECF 1, *NACS v. Visa U.S.A., Inc.*, No. 1:05-cv-04521-BMC-JAM (E.D.N.Y. Sept. 23, 2005). NACS's original Complaint sought damages for the billions of dollars of supra-competitive interchange fees its members have paid. *Id.* at 57. Merchants also sought declaratory and injunctive relief designed to dismantle the anti-competitive network rules that have led to exorbitant interchange fees. *See id.*

Merchants have long argued that Visa and Mastercard, along with their member banks, establish non-competitive interchange fees. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 228 (2d Cir. 2016). Several network rules "work[] in tandem" to "allow the issuing banks to impose an artificially inflated interchange fee that merchants have little choice but to accept." *Id.* The central rule requires merchants to honor all cards <u>from every issuer</u> regardless of differences in interchange fees or quality of service between issuers that prevents any market competition among issuers for merchant customers, especially given the existence of a default interchange fee that presumptively applies to every transaction by every issuer. The upshot of these rules is that the credit card industry is "free to set interchange fees at a supra-competitive rate," leaving the default interchange fee "effectively locked in" and giving "the issuing banks[] little incentive to deviate from it." *Id.* at 228-29. These central rules are also bolstered by satellite rules that help enforce the underlying anticompetitive scheme, including no-surcharge and no-discount rules. *Id*. at 228.

These rules have allowed Defendants to run massive profits insulated against market forces, and those wrongful profits have only increased throughout the duration of the litigation. In 2024 alone, U.S. merchants paid more than [redacted] in fees to accept Visa and Mastercard credit cards. Nilson Rep. at 8, Issue 1281 (Mar. 2025). That is a steep increase from 2010, when the fees totaled $26 billion. NACS, *Credit Card Competition Act* (July 29, 2025), https://perma.cc/3YV2-AGWH. NACS' members alone paid over $21 billion in interchange fees in 2024. NACS, *State of the Industry Annual Report of 2024 Data*, available at https://perma.cc/PW23-XQJU. Unsurprisingly the Networks' profits have been exorbitant: every single year from 2020 to 2023, including during the pandemic, Mastercard reported operating margins of over [redacted]%, while Visa reported [redacted]%, leading to [redacted] of profit annually. Pathak Supp. Rep., ECF 9951-5 ¶ 27. In contrast, most corporations average profits of [redacted]% before even paying taxes. *Id.*

These Network profits are driven not solely by the increased volume of credit card transactions, but significantly by the ever-increasing interchange rates charged to merchants. In 2005, when this litigation began, the average retail transaction interchange fees for Mastercard and Visa were 173 and 164 basis points, respectively. Federal Reserve Bank of Kansas City, Interchange Fees in the U.S., https://tinyurl.com/3zf6pnh3 (last visited Aug. 14, 2026). During this litigation those already-massive rates have risen over [redacted] points, having surpassed [redacted] and [redacted] basis points on average, and surpassing a blended [redacted] basis point average in some cases. J. Craig Shearman, *Credit and Debit Card 'Swipe' Fees Reach Record $198.25 Billion as President and Congress Call for Action*, Merchants Payments Coalition (Mar. 18, 2026), https://perma.cc/99LL-C65N; Stiglitz & Leffler Jan 2026 at 19, Table 1.

### B. All settlement attempts have failed because Class Counsel have been unable or unwilling to gain ground on the core of Defendants' anti-competitive scheme.

Counsel representing the class and Defendants have tried repeatedly to settle the case, but in over 20 years of litigation, those settlements have to failed propose any meaningful change to the core anti-competitive rules that would create rate competition between issuing banks.

A proposed settlement agreement in July 2012 purported to resolve both Rule 23(b)(2) class claims for damages and Rule 23(b)(3) class claims for injunctive relief, to which NACS objected. Objection of NACS, ECF 2561. Judge Gleeson initially approved that settlement. *See In re Payment Card*, 986 F. Supp. 2d 207, 213 (E.D.N.Y. 2013).

The Second Circuit rejected the proposed 2012 settlement. *In re Payment Card*, 827 F.3d at 240. The fundamental problem was that "same counsel represented both the (b)(3) and the (b)(2) classes," creating "unacceptable incentives for counsel to trade" relief that would have benefited the (b)(2) injunctive relief class for increased compensation to the (b)(3) damages class. *Id.* at 234. Unsurprisingly, the resulting agreement had unacceptably foregone any sufficient "remedies that affected the default interchange fee or honor-all-cards rule." *Id.* at 238. And the prospective relief that the 2012 settlement *did* include—a limited "ability to surcharge at the point of sale"—was "virtually worthless to vast numbers of class members," many of which could not impose surcharges. *Id.*[1] Concurring in the decision of the court, Judge Leval concluded at the time, "This is not a settlement; it is a confiscation." *Id.* at 241 (Leval, J., concurring).

---

[1] On remand this Court appointed separate class counsel for the (b)(2) equitable relief classes and the (b)(3) damages classes. NACS and Circle K sought to opt out of the (b)(2) relief class, but this Court rejected that argument. *DDMB, Inc. v. Visa, Inc.*, 2021 WL 6221326, at *48 (E.D.N.Y. Sept. 27, 2021). NACS and Circle K argued that class counsel seemed mistakenly focused on "surcharging relief as opposed to relief from rules like the honor-all-cards rules," but this Court rejected those concerns as "speculative." *Id.* at *20, *22. They are speculation no more.

In 2024, Class Counsel accepted a second unfair and unreasonable settlement that did not include relief that would spur competition among issuers. They instead agreed to Defendants' offer of ineffectual relief that centered on a purported increase in the ability of merchants to surcharge, reform to honor-all-cards rules relating to digital wallets, a modest, time-limited average rate reduction, and provisions on card network policies on discounting and collective negotiation. NACS and Circle K again opposed that insufficient proposed settlement. *See* Objections of 7-Eleven Plaintiffs, ECF 9230. This Court agreed that the relief was insufficient, explaining that despite class certification being "premised" in large part on challenging the "honor-all-cards" rule and the default interchange fees, the settlement had failed to dismantle those rules and instead had "focus[ed] primarily" on expanding merchants' ability to surcharge. *In re Payment Card Interchange Fee*, 2024 WL 3236614, at *24, *27. But this "surcharging relief is too limited to justify approval of a settlement," especially when the settlement "would still prohibit surcharging at the issuer level, meaning that merchants still have no way to use surcharging (or credible threats thereof) to urge competition among issuing banks." *Id*. at *27.

This Court thus held that Defendants' purported concessions fell far "short of the 'best possible' recovery" the class could expect. *Id.* at *27 (citation omitted). It also observed that the case was "ready for trial," and the 2024 proposed settlement came "at a relatively late stage." *In re Payment Card*, 2024 WL 3236614, at *23. Because "Plaintiffs' claims have survived numerous *Daubert* and summary judgment motions," the class reasonably expected significant relief. *Id.* Accordingly, this Court rejected the proposed 2024 settlement agreement.

**C. The current proposed settlement again offers inadequate relief.**

After this Court rejected the proposed 2024 settlement as inadequate, Class Counsel did not pursue a trial that could have provided full and final relief (or at the very least strengthened the

class's bargaining position). Class Counsel instead devoted its efforts to obtaining another settlement. The current proposed settlement largely provides the same type of relief as the judicially-rejected 2012 and 2024 settlements, with no changes that would create competition.

*First*, like the inadequate 2024 settlement, the current proposal again offers limited rate reduction. Proposed 2025 Settlement, ECF 9692-2 ¶ 48. Defendants only offer three additional basis points this time, promising to cap current posted rates and reduce their "average Effective Interchange Rate" by ten basis points, *id.* ¶ 48, rather than the seven point reduction that this Court held "too limited" in light of the several-hundred point rate that Defendants impose. *In re Payment Card*, 2024 WL 3236614, at *27–28. Moreover, none of even these minimal rate reductions will exist after the first five years of the eight-year settlement period. Proposed 2025 Settlement, ECF 9692-2 ¶ 48. Defendants also commit to limit the interchange rates for "Standard Consumer Credit Cards" at 125 basis points, but "Standard Consumer Credit Cards" comprise only around [redacted]% of consumer card transaction volume for Visa and Mastercard, Stiglitz Decl., ECF 9692-5 at 33 ¶ 88 n.84.

*Second*, like the inadequate 2024 proposal, the current proposed settlement requires Visa to "continue to maintain" rules that permit "discounting at the issuer level" and to require Mastercard to do the same. Proposed 2025 Settlement, ECF 9692-2 ¶¶ 18-19, 67-68.

*Third*, like the inadequate 2024 settlement, the current settlement proposal increases the ability of merchants to surcharge but prohibits surcharging at the issuer level. *Id.* ¶ 40.

*Fourth*, the proposed settlement would allow merchants to accept or reject certain defined *categories* of cards—for example, accepting "Standard Consumer Credit Cards" but refusing to accept "Commercial Credit Cards" or "Premium Consumer Credit Cards"—but like the prior settlement still prohibits merchants from accepting or rejecting cards based on issuer. *Id.* ¶¶ 22,

80. Thus, this reform would still create no increased competition among issuing banks for merchants' business. Moreover, in practice, "Premium" credit cards across both Visa and Mastercard account for the vast majority of existing consumer transactions. *See* Ex. 1, Levitin Decl., ¶¶ 165-67 (showing that [redacted]% of the Networks' consumer credit transactions came from "Premium" consumer cards).

In exchange for this purported relief, the 2025 settlement would require class members to "expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release . . . any and all manner of claims, demands, actions, suits, and causes of action" that any class member "ever had, now has, or hereafter can, shall, or may have" for equitable relief. Proposed 2025 Settlement, ECF 9692-2 ¶ 116(a). The release will bar any equitable claims that accrue until the later of eight years after the settlement is approved or five years after the last appeal of the settlement ends. *Id.* This includes claims "arising out of or relating to a continuation or continuing effect of any such conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act" at issue in this case. *Id.*

The release in the proposed 2025 settlement is thus broader than the release in the proposed 2024 settlement, which lasted only for five years. And the release lasts longer than certain provisions, such as the rate caps and average rate reduction, allowing Defendants to increase rates substantially after five years without the possibility of litigation.

## ARGUMENT

The proposed settlement once again fails to meaningfully disrupt the anti-competitive scheme against which merchants have litigated for over two decades. It would solidify Networks' ability to set fees centrally and would protect the issuer banks from competing with each other,

thereby insulating interchange fees from the market forces that the merchants have tried to bring to bear since 2005. It undermines Plaintiffs' core concerns while making tweaks only at the margin.

While this Court's preliminary approval order intimated that merchants will not receive better relief at trial, that both overestimates the efficacy of the settlement's relief and underestimates the ground-breaking relief available at trial. This Court should rule the proposed settlement's relief is "too limited to justify approval of a settlement." *In re Payment Card*, 2024 WL 3236614, at *27.

## I. The Proposed Settlement is not Fair, Reasonable, or Adequate

The parties may settle a class action only if the settlement is approved by the district court. *See* Fed. R. Civ. P. 23(e). The court must be satisfied that the settlement is "fair, reasonable, and adequate" for all class members. *Id.* R. 23(e)(2). "[C]ourts in the Second Circuit have traditionally considered the[se] nine factors" to assist in determining whether a settlement is substantively "fair, reasonable, and adequate":

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*In re Payment Card Interchange Fee*, 2024 WL 3236614, at *12 (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)).

Because under these standards the proposed settlement is not fair, reasonable, or adequate, NACS and Circle K object to the proposal. For the reasons set forth below, the settlement is (A) a bad deal in light of the best possible recovery at trial (*Grinnell* Factors 8 and 9), (B) paltry in comparison to the ability of the defendants to withstand a greater judgment (*Grinnell* Factor 7);

(C) scant given the highly advanced stage of the proceedings after over two decades of litigation and substantial likelihood of the success of plaintiffs' claims after trial (*Grinnell* Factors 1 and 3-6), and (D) unacceptable to the vast majority of class members aware of and responding to the settlement proposal (*Grinnell* Factor 2).

### A. The settlement is wholly unreasonable in light of the best possible recovery, which is a market in which issuers compete on fees.

The eighth and ninth *Grinnell* factors focus on "[t]he range of reasonableness of the settlement in light of the best possible recovery," comparing what the settlement offers with "complete victory on both liability and [relief] as to all class members on every claim asserted against each defendant in the action." *In re Payment Card Interchange Fee*, 2024 WL 3236614, at *26 (citation and internal marks omitted).

#### 1. The proposed settlement provides no meaningful relief from the rules Plaintiffs have long sought to eliminate that prevent issuer competition.

Merchants for years have pushed for the meaningful ability to reject cards based on issuer and thereby introduce competition among issuers to lower their fees or better their products in order to obtain merchants' business. That and similar market tools are prohibited by the Networks' rules. Issuers can thus "set interchange fees at a supra-competitive rate" and "that rate is effectively locked in via the default interchange fee because the issuing banks have little incentive to deviate from it unless a given merchant is huge enough to have substantial bargaining power." *In re Payment Card*, 827 F.3d at 228-29. Yet the proposed settlement does nothing to meaningfully create competition among issuers on interchange fees. It does not permit rejection or even surcharging based on issuer, and its discounting provisions have already failed to introduce meaningful competition. Thus, as a structural matter, the proposed settlement falls far short of the best possible recovery.

**a. The settlement fails to provide the core relief sought since the beginning: the ability for merchants to reject some issuers' cards and not others.**

As courts have recognized from the beginning, the protection of issuers from competition on interchange rates created by Honor All Cards (coupled with the default interchange rate) has always been the core collusive practice this litigation sought to eliminate. *See Id.*; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 79 (E.D.N.Y. 2024); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2018 WL 4158290, at *12 (E.D.N.Y. Aug. 30, 2018). The aspect of the Networks' Honor All Cards rule that requires merchants to accept cards from all issuers if they accept a card from any issuer (*i.e.,* the Honor All Issuers aspect of the Honor All Cards rule) has been the key target of this litigation.

A large part of why Plaintiffs successfully fended off Defendants' summary judgment motion based on the Supreme Court's *Amex* decision is that, "unlike American Express' rules, Visa's and Mastercard's rules apply to nearly every bank in America and ***prevent those banks from competing with each other***, allowing them to enjoy profits without competing for merchants." *In re Payment Card Interchange Fee.*, 714 F. Supp. 3d at 115 (emphasis added). The court favorably quoted Prof. Hausman's argument regarding the Honor All Cards rule specifically as it pertained to issuer competition:

> Prof. Hausman compares the Honor All Cards rule to an agreement among all beer companies to force their products on unwilling barkeeps: "If all beer companies in the U.S. (*comparable to all card issuers*) got together and agreed that no bar could sell any of their beers unless they sold all their beers, including the more expensive varieties, at whatever price they set, no serious economist would challenge the conclusion that the outcome was anticompetitive."

*Id.* at 118.

Similarly, the Court rejected Defendants' argument that the court should throw out Plaintiffs' Section 2 claim of monopoly power *because of* Honor All Issuers. The Court observed, among other things, that Plaintiffs "contend that undergirding all of Visa's anticompetitive conduct

was its debit HAC Rule, ***which prevented issuer competition for merchant acceptance***, caused higher prices and lower output, and enabled Visa to block competition from other networks." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 729 F. Supp. 3d 298, 325 (E.D.N.Y. 2024) (cleaned up) (emphasis added). The court ultimately held that "Plaintiffs have offered sufficient evidence of anticompetitive effect such that material issues of fact preclude granting Defendants' motion for summary judgment." *Id.* at 327.

Thus, Plaintiffs' experts have explained, [redacted] Harris Rep., Dkt. 9774-9, ¶¶ 707-708 & n.807 (emphasis added). [redacted] *Id.* And because of [redacted] Hausman Rep., Dkt. 9774-10, ¶ 176. That "asymmetry has resulted in price increases that cost U.S. merchants (and U.S. consumers) billions of dollars each year." *Id.*; *see also* Hausman Report, Dkt. 2670-5, ¶ 107; Cook Decl., Dkt. 2644, ¶¶ 8, 50. In short, elimination of the Honor All Issuers portion of the Honor All Cards rule has always been the heart of the reforms Plaintiffs seek and can prevail on at trial.

This Court rejected an earlier settlement proposal as falling "short of the 'best possible' recovery" the class could obtain because it offered "***a significantly limited form*** of the relief that . . . the objecting Class Members" have "continuously argued for": "***elimination of the Honor All Cards rules***." *In re Payment Card Interchange Fee*, 2024 WL 3236614, at *27 (emphasis added).

Here, the current settlement proposal does *not* eliminate Honor All Cards, but instead again offers only a "significantly limited form" of that relief: changes to that rule to allow rejection of cards based on product, but *not* based on issuer. Proposed 2025 Settlement, ECF 9692-2 ¶¶ 22-23, 71-72; Stiglitz Decl., ECF 9692-5 ¶ 115. Class Counsel's experts themselves do not claim that the settlement repeals Honor All Cards, but contend only that "the Honor-All-Cards rules is substantially relaxed," Stiglitz Decl. ¶ 8, though even that is exaggeration. On consideration of preliminary approval of the most recent settlement proposal, this Court was thus mistaken when it indicated that the current proposed settlement "effectively repeal[s] the Honor All Cards rule." Prelim. App. Order at 6. Rather, like the prior proposal this Court rejected, the current proposed settlement wholly maintains the Honor All Cards protection issuers have from competition on interchange fees—because it prevents merchants from distinguishing between issuers—and thus falls far short of the "best possible recovery" that Class Members have "continuously argued for."

With the ability to distinguish among issuers, merchants would be able to negotiate interchange rates in a manner that would set a competitive market price. Contrary to the settling parties' claims, bilateral negotiation would be feasible and realistic. As Prof. Levitin explains, the concentration of card issuance would make those bilateral negotiations a manageable, finite task. The top five issuers alone account for [redacted]% of all credit card purchase volume, and the top ten issuers account for [redacted]%. Ex. 1 at ¶ 40, Table 1. That number makes it "quite feasible for large merchants and merchant buying groups to negotiate bilateral contracts with them, rather than relying on the Networks' default interchange system." *Id.* ¶ 41. It means that "if the top 10 issuers and 10 large merchants or buying groups were to negotiate bilateral interchange pricing deals, there would need to be some [redacted] contracts," which for those large merchants or groups "would cover issuers that comprise [redacted]% of the Networks' purchase volume." *Id.* "With so many issuers

covered by such a substantial portion of merchants, the negotiations would go a long way to establishing a competitive market price." *Id.*; *see also* Nicholas Economides, *Competition Policy Issues in the Consumer Payments*, N.Y.U. Stern Sch. of Bus. (2009) at 122, https://perma.cc/V2ZN-EUT3.[2]

Indeed, the settlement itself is based on the premise that issuer-level competition and bilateral negotiation with merchants is practically feasible: it purports to "unleash[] . . . intense competition among many issuing banks," allowing "[l]arge merchants and buying groups" to "be able to negotiate with the major issuers" in recognition of the fact that "[t]he top eight issuers account for about [redacted]% of the Visa and Mastercard credit-card volume." Prelim. Approval Br., Dkt. 9694 at 21. Without that premise, the settlement is a self-admitted failure. So while the settlement, as explained herein, will in fact fail to create such competition, in order for the settlement to be approved as providing adequate relief, the Court must agree with the premise that issuer competition and bilateral negotiations are feasible.

If issuer competition were permitted, merchants would have negotiating power because, although the issuers are concentrated, no single issuer dominates the market. If any particular issuer tries to hold out for higher fees, it would only that "attract competition by other issuers for the same customers and will, in the long run, have these customers signed by a different issuer, resulting in lower fees because of competition among issuers." Economides, *Competition Policy Issues in the Consumer Payments*, at 122.

---

[2] The number of contracts necessary for market prices to prevail is not out of line with what already exists in this industry. Visa maintains bilateral agreements with more than [redacted] issuers for Apple Pay, which cards from non-participating banks simply decline, an outcome that is [redacted] Pathak Supp. Rep. ¶¶ 92–93. Visa likewise has been willing to waive these rules in other circumstances, including for B2B transactions. *Id.* ¶¶ 56, 64–68.

The settlement and (sadly) Class Counsel abandon this fundamental market-oriented tool. In doing so, the settlement provides nowhere near the best possible relief that could be secured at trial.

**b. The settlement also fails to provide the secondary tool to create issuer competition: surcharging by issuer.**

Similarly, the proposed settlement maintains the prohibition on surcharging at the issuer-level—the key "anti-steering" rule that supports Honor All Cards in shielding issuers from interchange fee-lowering competition. Proposed 2025 Settlement, ECF 9692-2 ¶¶ 43(a), 92(a). The prior proposed settlement, too, did not permit surcharging at the issuer level, and this Court held that "the surcharging relief is too limited to justify approval of a settlement that does not provide most other forms of relief sought by other Class Members." *In re Payment Card Interchange Fee*, 2024 WL 3236614, at *27. The *first* reason this Court gave for the surcharging relief being "too limited" is that "the surcharging provisions would still prohibit surcharging at the issuer level, meaning that merchants still have no way to use surcharging (or credible threats thereof) to urge competition among issuing banks." *Id.* The current proposed settlement does not fix that flaw.[3] This is yet another reason the settlement fails to provide the best possible relief that trial could secure.

**c. The settlement's discounting provisions will not spur meaningful competition among issuers.**

The only mechanism for issuer competition the proposed settlement purports to provide is to specify that discounting by issuer is permitted. Proposed 2025 Settlement, ECF 9692-2 ¶¶ 19, 68. That is telling: the only reason the settlement permits issuer-level discounting is because

[3] Instead, the proposed settlement only purports to address the secondary reason this Court rejected the prior proposal—the practical limitations on surcharging created by the interaction of Visa's and Mastercard's rules with those of American Express, *id.*—but as explained below, even those purported fixes are flawed, *see infra* pp. 27-36.

Defendants know it will be ineffective at creating any meaningful issuer competition on fees. If discounting were as effective as surcharging or rejection, Class Counsel could have insisted on (and Defendants may have agreed to) issuer-level surcharging, or even issuer-level rejection, in addition to issuer-level discounting. They did not. Both logic and experience demonstrate that issuer-level discounting does not meaningfully create fee-lowering competition among issuers. *See* Ex. 1, Levitin Decl., ¶¶ 196-199.

To start, Visa's rules already do not prohibit issuer-level discounting, yet that has not resulted in meaningful issuer competition and lowered rates, even though the world's largest and most sophisticated merchants are aware of this option. Visa has permitted discounting by card issuer since February 2013, but "there has been no evidence that change impacted interchange or resulted in meaningful competition between issuers for merchant preference." Hausman Rep., ECF 8526-17 ¶ 481; *see also* Farrell Decl., ¶¶ 49-50 (attached to Walmart objections to final approval).

That is in part because discounting forces the merchants, rather than the consumer, to bear the cost of the interchange fee but puts no pressure on banks. The bank receives the interchange fees regardless, so it has no incentive to reduce them. If issuers do not "reduce their costs of acceptance," discounts merely increase merchant costs, and so merchants do not offer them. *Id.* It also may force a merchant to raise posted prices, decreasing the merchant's competitiveness. Farrell Decl., ¶ 72. Moreover, while "[c]onsumers exhibit a strong negative reaction to surcharges," they have "only a mild positive reaction to a discount," so "a much larger discount is needed to have the same effect on consumer behavior as a smaller surcharge." Ex. 1, Levitin Decl. ¶ 197. That minimal effect on consumers also means issuers have little reason to reach discounting deals with merchants. Farrell Decl. ¶ 73. Discounting is simply too weak and too costly a mechanism to induce competition among banks. Ex. 1, Levitin Decl., ¶ 198. It is no coincidence

that this is the *only* settlement provision in which Defendants ostensibly allow merchants to differentiate by issuer; Defendants realize that this provision has been tested to be effectively meaningless, so they can allow its nominal imposition.

The proposed settlement offers merchants no greater ability to discount than the 2024 proposed settlement this Court rejected. *Compare* Proposed 2025 Settlement, ECF 9692-2 ¶¶ 18-20, 67-69 *with* Proposed 2024 Settlement, ECF 9179-2 ¶¶ 18-20, 50-52. For Visa, which has the largest share of the market, both settlements sought to "*clarify* that discounting at the issuer level—i.e., providing discounts that vary by the issuing financial institution . . . —is permitted." Proposed 2025 Settlement, ECF 9692-2 ¶¶ 19, 68 (emphasis added); Proposed 2024 Settlement, ECF 9179-2 ¶¶ 19, 51. Yet that relief did "not weigh in favor of" approval in 2024, and it should not now, *In re Payment Card*, 2024 WL 3236614, at *28, because this tool is inadequate to overcome Defendants' structural barriers to competition.

Thus, contrary to Class Counsel's claim that discounting will result in "unleashing what should be intense competition among the many issuing banks," Plaintiffs' App. Mem., ECF 9692 at 21, the experience with Visa has demonstrated the opposite. Nor do Defendants endorse Class Counsel's claim, tacitly recognizing that issuer-level discounting will *not* create issuer-level competition on fees.

* * *

The focus of antitrust law "is one of competition" and "precludes inquiry into the question whether competition is good or bad." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 95 (2021) (citation and internal marks omitted). Yet Class Counsel "concede[s]" that "issuer-level competition" is "not the focus of the settlement." Preliminary Approval Hearing Tr. at 69 (Apr. 27, 2026). Defendants also agree the settlement does nothing to reform Honor All Cards in a way

that creates competition between issuers. As Mastercard's CEO explained, the proposed settlement "preserves the honor all cards rule," and under it merchants will have no greater options to push issuing banks to compete on fees—"that will not be a choice" merchants can make. *See* Transcript, *Mastercard at KBW Fintech Payments Conference: Strategic Insights and Future Plans*, (November 12, 2025), https://perma.cc/8LVH-3YZH.

This puts to lie the claim by Class Counsel that the settlement will somehow create a "transition to a competitive marketplace." ECF 9932-1 at 1-2. The proposed settlement provides no meaningful tools to create competition among issuers on interchange fees. Unlike Class Counsel, the Networks never claim the settlement will create any meaningful competition among issuers—they know it won't. The proposed settlement only purports to give merchants tools to attempt to exert downward pressure of fees in the *absence* of that competition, though as explained below, those tools will be ineffectual. *See infra* pp. 27-36. But the goal of antitrust law is to create competition to lower prices. Such robust issuer-level competition for merchant business by lowering fees and increasing product quality is the best possible relief the Class could obtain. By providing no meaningful tools for issuer-level competition, the proposed settlement as a structural matter falls far short of this relief. That the proposed settlement of *antitrust* claims provides for no meaningful increase in *competition* among issuers on rates should be reason alone to reject it—or at least give this Court extreme pause when considering the *Grinnell* factors.

**2. The proposed settlement's rate relief confirms the settlement falls far short of the best possible relief at trial.**

The proposed settlement's rate relief—rate caps on current posted rates and reducing average rates by 10 basis points for the first five years of the eight-year settlement period—illustrates the wide gap between the relief that could be obtained at trial and the purported benefits of this settlement. If Plaintiffs' expert's testimony at trial is accepted, the result of competition

would be much, much lower rates. That is, the relief that merchants could obtain at trial would be many times greater than the relief contemplated by the proposed settlement. And the minimal rate relief that extends for only part of the settlement period shows that the settling parties do not truly believe that the settlement's changes to Network rules will provide substantially lower rates.

According to Class Counsel, Visa and Mastercard charge merchants an average posted interchange rate of [redacted], respectively. Dkt. 9935-1, Leffler Report July 15, 2026. Visa and Mastercard typically set their United States interchange rates "between 200 and 300 basis points." *In re Payment Card*, 2024 WL 3236614, at *28 (citation omitted); *id*. at *41 (same). Thus, the rate relief offered by the settlement maintains average rates well-above 200 basis points. By contrast, Professor Hausman has "calculate[d] a competitive benchmark rate of 72 basis points." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 105 (E.D.N.Y. 2024). Dr. Kohler opined that "[e]ven at an interchange rate that is 20% of the actual weighted average interchange rate . . . credit card issuing would still be profitable." *Id.* at 110 (citation omitted). And the rates in the United States are "higher than virtually all other countries." Pathak Supp. Rep. ¶ 39. As of 2018, the United States was the only country in the world with interchange rates over 200 basis points. See *id.* (citing a statement from Visa CEO Al Kelly). "In the United Kingdom and the European Union, interchange fees are capped at 30 basis points," while "in Australia, interchange fees are capped at 50 basis points"—yet card issuers operate profitably in both regions. *In re Payment Card*, 2024 WL 3236614, at *41. Even Class Counsel's expert, Prof. Stiglitz, "cites evidence from Australia as yet another competitive benchmark indicating supracompetitive prices in the United States," where despite the 50-basis point cap, "Visa and Mastercard 'remain viable and profitable' in Australia 'with a total price lower than those of Visa and Mastercard in the United States.'" *In re Payment Card Interchange Fee &*

*Merch. Disc. Antitrust Litig.*, 714 F. 3d Supp. at 109-10. Thus, the gap between the proposed settlement's rate relief and a competitive rate if Plaintiffs prevail at trial is enormous. Regarding the prior settlement proposal, this Court similarly recognized that proposed rate relief "would still keep interchange significantly above rates that experts in this litigation have previously described as an 'upper limit' on what interchange fees might have been in the absence of the challenged competitive restraints," so "[t]he rollbacks and rate caps offered in the Settlement, therefore, do not adequately compare to the 'best possible' recovery such that these *Grinnell* factors weigh in favor of approving the Settlement to avoid the costs and risks of continued litigation." *In re Payment Card Interchange Fee*, 2024 WL 3236614 at *28.

To be sure, Class Counsel advertises this rate relief as merely "easing the transition to the new competitive marketplace," which is why the 10-bps average rate reduction lasts only five of the eight years of the settlement. Plaintiffs' Mot. for Final Settlement App., ECF 9932-1 at 1, 6. But Class Counsel claims the settlement tools may "substantially reduce (or possibly altogether eliminate) the gap between the actual and competitive total price," which they claim is [redacted] Class Counsel Mot. for Prelim. Approval ECF 9792 at 43-44 (sealed) (quoting Stiglitz Decl., ECF 9692-5 ¶ 119); *see also* Stiglitz Decl. ¶ 50. If the settling parties really believed that around a [redacted]-basis point reduction was likely after eight years, then the mandated average rate reduction during the five-year "transition period" would match that ultimate reduction. The fact that Defendants and Class Counsel only agreed to a mandatory 10-bps reduction in average rate shows that neither believes a larger rate reduction is likely to occur with the other purported reforms the settlement offers. That is, the paltry rate relief is a virtual concession that the settlement's rule reforms will not meaningfully result in decreased rates—or that Class Counsel failed to negotiate (even though Defendants could easily bear) a much higher transitional rate relief.

This Court considered a similar rate reduction "paltry" relief, *In re Payment Card*, 2024 WL 3236614, at *28, and it should do so again, particularly because the current proposal is arguably even *worse* than the prior one. The Court rejected a seven-point reduction as plainly insufficient. *In re Payment Card*, 2024 WL 3236614, at *28. Yet since that time the Defendants have only *increased* their interchange fees, making the current settlement's change to a ten-point reduction even less significant than it already appears on its face. J. Craig Shearman, *Credit and Debit Card 'Swipe' Fees Reach Record $198.25 Billion as President and Congress Call for Action,* Merchants Payments Coalition (Mar. 18, 2026), https://perma.cc/99LL-C65N. But it gets worse: in the prior settlement, the rate relief was coextensive with the settlement period and release (both lasted 5 years). *In re Payment Card Interchange Fee*, 2024 WL 3236614, at *6, 8. Here, however, the rate caps and reduction last five years but the overall settlement and release period is *eight* years. Proposed 2025 Settlement, ECF 9692-2 ¶¶ 62. So, as explained further below, this means that the Networks and issuers could raise rates in years six through eight of the settlement period and wipe out all the benefits the supposed rate relief gave to merchants in the first five years. Ex. 1, Levitin Decl. ¶¶ 77, 80, 83, 88. That puts the class in a *worse* position than it was in the rejected 2024 settlement.

The rate relief's inadequacy is also evident when contrasted with the interchange rate that Defendants have previously imposed during this very case. When merchants first filed this lawsuit, Visa and Mastercard used average interchange rates of 173 and 164, respectively, *supra* p. 6— already exorbitant rates that necessitated a lawsuit. This Court held that militated against approval of the prior settlement proposal: "the proposed rollbacks, if strictly met, would maintain interchange rates above those in place while this litigation was ongoing, and above rates that many plaintiffs had already challenged as the result of anticompetitive restraints." *In re Payment Card*

*Interchange Fee*, 2024 WL 3236614, at *28. After two decades of litigation against a collusive scheme, the acceptance of a rate over [redacted] points above the initial collusive mark would represent an overwhelming victory for Defendants and an overwhelming defeat for the Class. It would mean the proposed settlement is a step backward from where merchants were when they initiated this litigation, giving negative value to their litigation successes on dismissal motions, *Daubert* motions, summary judgment motions, and related appeals.

Nor does it matter that the proposed settlement would cap the interchange rate for "Standard" consumer credit cards at 125 basis points. *See* Proposed 2025 Settlement, ECF 9692-2 ¶ 50. "Standard" consumer credit cards account for a small (and dropping) portion of total transactions. Class Counsel admits that "the current volume of transactions on the standard cards today is fairly low." Prelim. Approval Hearing Tr. at 12 (Apr. 27, 2026). In 2024, "Standard" cards subject to posted rates accounted for only [redacted]% of Visa's total transactions and only [redacted]% of Mastercard's total transactions. Stiglitz Decl., ECF 9692-5 at 19 (Table 1). Those numbers reflect a successful, decades-long effort by banks to shift consumers from Standard cards to Premium cards—which will only likely accelerate because of the Settlement. *See supra* p. 9, *infra* pp. 24-29; Pathak Supp. Rep. ¶ 40. The 125 basis-point cap for "Standard" cards thus also provides paltry, if any, rate relief.

On top of its facial inadequacy, the rate relief can also be easily circumvented by the Networks and issuers, including in ways that would harm some but not all Class members, treating them unequally. The settlement permits Visa and Mastercard to achieve the ten basis-point reduction in the "average Effective Interchange Rate" in whatever manner they wish. *See* Proposed Settlement, ECF 9692-2 ¶ 48. The networks could, for instance, reduce interchange rates for *commercial* cards while leaving interchange rates for *consumer* cards essentially unchanged. *See*

Patel Decl., ECF 9154-12 ¶ 15. That would benefit merchants "with a high share of commercial card transactions," but offer no meaningful relief for "merchants with mostly consumer transactions," like NACS's members and Circle K. *Id.* The card networks could also reduce the "average Effective Interchange Rate" by negotiating "interchange reductions" with a few large merchants, while leaving the vast majority of retailers, most of which are small, single-store operators, with no rate relief. *See* Proposed Settlement, ECF 9692-2 ¶ 1(o). And if consumers continue moving from Standard cards to Premium cards, merchants that "do not currently have a high proportion of premium cards" might end up paying *more* for interchange fees, even if the overall "Average Effective Interchange Rate" drops by ten basis points; the Networks can meet their nationwide requirements under the proposed settlement without protecting rates for any individual merchant, leaving some merchants worse off if their consumers shift to a higher proportion of Premium cards. Patel Decl., ECF 9154-12 ¶ 16.

Worse still, the 10-bps rate reduction requirement lasts only five years but Plaintiffs' release lasts for eight so, as Prof. Levitin explains, the Networks can recoup any lost revenue and more in the final three years of the release without fear of suit. Ex. 1, ¶¶ 77-83 (explaining that the provision thus "could even be of *negative value* to merchants"). And the rate reduction applies only to "Available Domestic Credit Transactions," which allows Networks to create new high-rate cards to escape its limitations, "all but spell[ing] out the roadmap for the Networks to evade both the 10-basis-point reduction in the Average Effective Interchange Rate and the freeze on current interchange rates." *Id.* ¶¶ 228-233. They also are permitted to create new categories of cards not subject to the rate freeze, and could use these new categories to raise their effective average interchange rate after the fifth year, further frustrating any rate relief. *Id.* ¶¶ 77-78. Moreover, issuers are not bound by the proposed settlement agreement and have "every incentive to attempt

to frustrate the Proposed Settlement." *Id.* ¶ 234. For example, issuers can render the Standard Card rate cap at 125-bps illusory by shifting the issuance of cards towards the higher-paying Premium category, which issuers would be incentivized to do. *Id.* ¶¶ 101-03.

At preliminary approval, this Court observed that it "lack[s] the power to set rates," Prelim. App. Order at 22; *see* ECF 9932-1 at 20, so any agreed rate reduction (no matter how minuscule) is a boon over trial relief. But that formulation misses the crux of the question. The issue is not whether this Court unilaterally might set rates, the way that Defendants illegally do; the question is whether this Court can eliminate the anticompetitive restraints that would allow the *market* to lower the rate to a greater extent than the rate reductions proposed in the settlement. Here, expert testimony establishes that the rate reductions from an injunction removing market restraints would be far greater than the rate reduction mandated by the settlement, *see supra* pp. 20-24, and Class Counsel does not meaningfully dispute that point.

In short, the proposed settlement's rate relief provisions would (at most) serve as a very small band-aid over a very large wound. The tiny size of the "transitional" rate relief also shows that the settling parties do not believe the settlement's rule reforms will work to meaningfully reduce rates. Objectors maintain that the "evidence indicates that, absent the allegedly anticompetitive conduct, credit-card interchange rates could be more than 100 basis points lower than they currently are," and this Court has explained that the earlier similar settlement proposal "would still keep interchange significantly above rates that experts in this litigation have previously described as an 'upper limit' on what interchange fees might have been in the absence of the challenged competitive restraints." *In re Payment Card*, 2024 WL 3236614, at *25, *28. Defendants' miniscule rate relief remains inadequate.

**3. The proposed settlement's rule reforms will be ineffectual at reducing interchange rates, falling far short of the best possible recovery.**

In lieu of competition among issuers, the settlement proposes to tweak certain Network rules in an attempt to provide merchants additional tools to try to force the Networks to lower rates in a *noncompetitive* market. But those tools are a poor proxy for competition among issuers, will fail to meaningfully lower rates, and as a practical matter provide only illusory relief. Moreover, in order for the proposed settlement's tools to work to lower rates even in theory, numerous unlikely events would have to occur, and the Networks and issuers have both the incentive and ability to make sure they don't.

**a. Merchants will not benefit from the proposed settlement's changes allowing them to reject cards by broadly-defined product category.**

Start with the reform the settling parties tout the most: the slight relaxation of the Honor All Cards rule. The proposal allows merchants to reject categories of cards common to all Issuers, permitting merchants to reject "Debit Cards," "Standard Consumer Credit Cards," "Commercial Credit Cards," or "Premium Consumer Credit Cards," as long as the merchants do not distinguish between issuing banks within those categories. Proposed Settlement, ECF 9692-2 ¶¶ 22, 80. This change is meaningless in practice.

The vast majority of consumer credit card purchases occur on one type of card—Premium Cards—effectively forcing merchants to choose between all consumer credit card purchases and almost none of them. The proposed settlement agreement groups various Visa and Mastercard types into one Premium Consumer Credit Cards category,[4] which has the highest consumer

[4] A "Premium Consumer Credit Card" is a credit card from "one of the following product types: Signature, Signature Preferred, or Infinite (for Visa-Branded Credit Cards), or World, World High Value, World Legend, or World Elite (for Mastercard-Branded Credit Cards), or any similar Visa Credit Card or Mastercard Credit Card" issued during the settlement term. Proposed 2025 Settlement, ECF 9692-2 ¶ 1(z).

interchange fees, forcing merchants to accept or reject all cards within that category. Proposed 2025 Settlement, ECF 9692-2 ¶¶ 22, 80; *see* Stiglitz Decl., ECF 9692-5 at 19 (Table 1). In 2024, [redacted]% of Visa's and [redacted]% of Mastercard's consumer credit transactions came from "Premium" consumer cards. *See* Stiglitz Decl., ECF 9692-5 at 19 (Table 1). Thus this rule leaves merchants stuck either accepting all consumer credit cards with the highest fees or accepting virtually no consumer credit card transactions at all.

There also are several important differences in bargaining power between merchants' ability to negotiate with issuers (were they meaningfully allowed to do so) and negotiating with Networks. One such difference is that a merchant who threatens to decline a single issuer's cards will negotiate over 100% of the volume from that issuer to the merchant, whereas a threat aimed at any given Network's card category necessarily negotiates over a portion of the volume from that Network to the merchant. Thus the proposed settlement's relief operates on the level less likely to implement change by reducing negotiations to portions of the counterparty's business with the merchant, rather than its entirety.

Class Counsel responds by arguing that there is a comparable transaction volume between Premium Mastercard cards (but not Visa) and cards from the largest issuers, such that Objectors cannot argue that rejecting Premium cards is untenable but rejecting any given issuer would be feasible. Dkt. 9775 at 17. But there are important differences. Merchants can afford to risk declining cards from any given issuer because "no single issuer is dominant," with the largest market share accounting for "around [redacted]% of U.S. card purchase volume" last year [redacted], and the second largest being only [redacted]%. Ex. 1, Levitin Decl., ¶¶ 247-50. Under the proposed settlement agreement, merchants must decide whether to reject all Premium cards, which account for [redacted]% and [redacted]% of Visa's and Mastercard's transactions

respectively. *Compare id. with* ¶¶ 115-16. The numbers are even more dramatic for consumers, for whom upward of [redacted]% of their purchases occur on Premium cards. *See id.* ¶ 264. And looking at all purchases generally, combining Premium cards with the category with the highest interchange rates—Commercial cards—these two categories account for over [redacted]% of all credit card volume, leaving "no realistic situation in which most merchants would engage in such discrimination" because to do so would effectively require "opting out of accepting credit cards altogether, and likely losing sales." *Id.* ¶ 116. The negotiating power of any individual issuer will be substantially smaller than the power of Networks to leverage their high-rate cards.

Moreover, rejections or surcharging by issuer will be less likely to result in a lost sale, since consumers with multiple cards are much more likely to have cards from different issuers than cards from different brands or product categories. *Id.* ¶¶ 246-252; *see also* Farrell Decl., ¶ 42. Also, the relief that Plaintiffs seek is a fundamental reform of all Honor All Cards rules, meaning that merchants would be able to reject based on *both* issuer and product (*e.g.*, rejecting only Citi Premium cards), which have a much lower market share than either issuer or product-level categories alone. Ex. 1, Levitin Decl. ¶ 253. All this "makes the threat of rejection plausible, which would give merchants the leverage to negotiate with issuers, such that they would never have to actually reject any cards." *Id.* ¶ 270.

Not only is issuer-level rejection less risky to merchants than product-level, it also comes with greater benefits. Issuers will have positive incentives to *compete*, rather than merchants trying to force one or two dominant market players (the Networks) to lower rates through attempts at leverage alone. *See id.* ¶¶ 240-245. As Prof. Joseph Farrell explains, Honor-All-Issuers means that individual issuers have little power to affect merchants' overall cost of acceptance, so they have little incentive to work with merchants to lower prices or increase quality. Farrell Decl. ¶¶ 18-23

(attached to the objections of Walmart to final settlement approval). In other words, issuer actions are too diluted: lowering prices would not increase their share of the market since merchants are forced to treat all issuers the same. *Id.* But removing Honor-All-Issuers would mean issuers would finally be incentivized to reach deals with merchants to avoid rejection, and thus would be a "needed mechanism to incentivize competition among issuers." *Id.* ¶¶ 26. By contrast, allowing for product-level discrimination does *not* solve the dilution problem, meaning there are little Network- or issuer-side benefits for lowering prices, even if (for example) Mastercard and Chase have similar market shares. *Id.* ¶¶ 37-45. Being able to reject by issuer, unlike being able to reject by product type, creates a downward price spiral. *Id.* So far from creating chaos, this would create true market conditions that would reward flexibility and compromise. *Id.* ¶ 33. Nor is it likely that merchants would even need to actually refuse issuers' cards on a large scale in practice: the credible threat, which only would be credible after the rule's elimination, likely would be sufficient to bring issuers to the table and negotiate lower rates. *Id.* ¶ 35. Consumers will still be able to use almost all their cards at almost all merchants. Thus, the incentives for merchants to reject by issuer are much higher than the incentive to reject by product, even assuming comparable market shares.

And unlike with competition between issuers, the proposed settlement allows the issuers and Networks to push remaining consumers to Premium cards to truly remove merchant choice to accept only Standard cards. This shift is fact: "[b]etween 2004 and 2016, the share of Visa's consumer credit card purchase volume on rewards cards increased from [redacted]% in 2004 to [redacted]% in 2016, and the share of Mastercard's consumer credit card purchase volume on rewards cards increased from [redacted]% in 2004 to [redacted]% in 2016." Defs.' 56.1 Stmt., ECF 8262 ¶ 177 (citing Hausman Report, ECF 8526-17, ¶ 200). For instance, in 2010, only [redacted]% of consumer credit transactions came from Visa Signature Preferred cards, one of the Premium card categories. Pathak Supp. Rep. ¶ 40,

*7-Eleven et al. v. Visa Inc. et al.*, 13-cv-4442 (S.D.N.Y. Oct. 1, 2024). By 2023, "[redacted]% of consumer credit volume was on either a Signature or Signature Preferred card." *Id.* The 2025 settlement would merely incentivize Defendants to accelerate that process and further recategorize cards into the Premium category to deprive merchants of the realistic choice to reject that category entirely. Ex. 1 ¶¶ 101-02; *see also id.* ¶¶ 85-86. And issuer-level rejection is easier to inform and educate consumers about than product-level, as consumers are not familiar with the difference between Standard and Premium cards, but are informed as to which bank issued the card.

The ability to decline Commercial cards is even less useful because the lower-priced Standard consumer cards often do not function as a substitute for Commercial cards. *See* Ex. 1, Levitin Decl., ¶¶ 53, 93. "Commercial cards are issued to businesses" and "are generally used by businesses' employees for business expenses," where "[e]mployers often restrict their employees to using the Commercial card." *Id.* ¶ 93. Even if allowed to, an employee is less likely to use a personal Standard card if the Commercial card is declined to avoid the "hassle in obtaining reimbursement." *Id.* Thus, the result of declining Commercial cards is not downward pressure on rates, but simply a lost sale for the merchant. *Id.* ¶¶ 54, 118, 254.

Finally, the ability to reject "categories" of cards offers especially illusory relief to NACS and Circle K specifically. These businesses have two lines of revenue: fuel sales and convenience store sales. Convenience stores sell disproportionately to consumers, not businesses, so the ability to reject "Commercial" credit cards is not impactful. *See The Now and Future of Convenience Stores*, NIQ (July 25, 2025), 2XJHhttps://perma.cc/P2Y9-23AC. They also engage in small-dollar sales, making the ad valorem portion of an interchange fee less salient and the Standard Card 125 bps reduction meaningless. For fuel sales, Visa charges the same interchange rates for all fuel transactions, no matter the category of card used. *See Visa USA Interchange Reimbursement Fees*

at 7 (October 18, 2025), https://perma.cc/TM9G-VDJW. So the ability for gas stations to reject "Premium" cards would eliminate only the cards used for most fuel transactions, without actually lowering the fees the merchant pays. Fuel retailers will have no incentive to push consumers to Standard cards and thus there would not be any even theoretical pressure to lower Premium card rates. Where a settlement fails to offer some class members any "appreciable benefit," the settlement is inadequate. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 238.

**b. Merchants will not benefit from being able to surcharge product categories because of the numerous hurdles to this type of surcharging.**

Nor does the proposed settlement's allowance of surcharging by product type move the needle. Proposed Settlement, ECF 9692-2 ¶¶ 39, 88. Surcharging relief would be illusory in practice.

To start, some state surcharge laws either prohibit surcharging, impose lower caps on surcharging than the settlement, or make surcharging extremely difficult on merchants in states like California, New York, Georgia, Massachusetts, Colorado, Connecticut, Maine, and Puerto Rico. Ex. 1, Levitin Decl., ¶¶ 156-162. The settlement itself imposes onerous surcharge disclosure requirements and more generally requires *merchants*, rather than issuers or networks, to bear the public-facing brunt of this proposed correction to a distorted market, creating a disincentive to use it. *Id.* ¶ 153.

As with the ability to reject, surcharging by brand or product will do little to steer consumers to lower cost cards because they often have only Premium cards or only Visa cards. *Id.* ¶¶ 163-172. Most cards are not Standard cards, most consumers are unlikely to have Standard cards, and because merchants see such incredibly low transaction volume on Standard cards, they are unlikely to start surcharging the vast majority of card transactions in the hopes that the tiny

percentage of Standard card transactions inches upward. *Id.* If merchants are unlikely to surcharge, consumers are even less likely to start reversing historical course and switching to Standard cards—assuming they even know the difference between the two categories when existing cards do not bear these labels. *Id.*

That, too, makes the cost of consumer goodwill especially onerous on merchants who consider surcharging by product. Unlike with their cards' issuing bank, consumers are wholly unaware of these newly created categories of cards, so they will be especially surprised and irked when they get a category-level surcharge. *Id.* ¶¶ 173-177. Mere signage announcing surcharging on Premium Cards would not give customers sufficient notice before the point of sale, because many customers do not know whether their card is one that Networks have technically categorized into the "Premium" category. *Id.* ¶ 176. That is on top of surcharging being inconsistent with the business practices of NACS's members, which pride themselves on providing low prices. *See* Decl. of Kwik Trip, Inc., ECF 2436 at 2, 4; Decl. of Speedway LLC, ECF 2532 at 3; *see also* Ex. 1, Levitin Decl., ¶¶ 178-179. Nor does surcharging consistently provide full recoupment. Some interchange fees are higher than the settlement's 3% surcharging cap and merchants sometimes do not know the interchange rate in advance of a transaction to surcharge. Ex. 1, Levitin Decl., ¶¶ 180-184. Economic analysis also demonstrates why surcharging is often more costly for merchants than it is worth. Farrell Decl., ¶¶ 52-59.

Worse still, the proposed settlement also keeps open the possibility that Defendants could *increase* rates against categories of merchants that surcharge, Ex. 1. Levitin Decl., ¶¶ 84, 227-28. The proposed settlement states that although the Networks cannot "target or penalize a specific merchant" with higher interchange fees "solely on the basis of such specific merchant compliantly surcharging," that prohibition does not prevent them "from establishing differential rate structures"

that are "generally available to similarly situated merchants" by making merchants "eligible for a lower default interchange rate when no cardholder fee is assessed." Dkt. 9692-2, ¶¶ 43(f) and 92(f). The settlement even gives a specific example under which the network "could create a default interchange rate structure available to all merchants for the segment in which" similarly situated merchants "operate, with a higher default rate available (merchant choice to surcharge) and a lower default rate available with eligibility based on merchants not surcharging," allowing the merchants to either "choose to surcharge and be assessed the higher interchange rate," or "not surcharge and be subject to the lower interchange rate." ¶¶ 43(f)(i) and 92(f)(i). Thus the settlement itself keeps open the possibility that Defendants can retaliate against, or at least disincentivize, merchants from surcharging at all.[5]

**c. The settlement's Honor All Cards and surcharging changes will take so long to implement, little to no time will be left for any market changes to occur before the settlement expires.**

Last, but certainly not least, is yet another practical problem left unaddressed by Class Counsel with the settlement's proposed product-level rejection and surcharging relief: time itself. The settlement's provisions are so convoluted, and will take so long to implement, that the possibility that they will have enough time to work to reduce interchange rates meaningfully by the end of the settlement period is vanishingly small.

Merchants will only be able to reject or surcharge based on the new product categories only after they can identify cards by product type, and that process will likely take years. That means

[5] There are also practical reasons why the surcharging relief will be ineffectual. Visa, for instance, requires merchants to report surcharges "within a dedicated data field (labelled Field 28) in the transaction message." *U.S. Merchant Surcharge Q and A*, Visa, https://perma.cc/ERU6-QPVH. Merchants rely on third-party processors to process these transactions, and many processors have informed merchants that reporting information in Field 28 is technically infeasible. Those technical limitations will prevent many merchants from surcharging Visa transactions.

the right to reject or surcharge would only be viable for a few years of the settlement period. *Id.* ¶¶ 185-89.

Issuers will first take time to put visual identifiers on *new* Commercial or Premium cards to ensure consumers and merchants have clear information about these novel different categories of cards, and merchants will not be able to reject or surcharge by product category for the bulk of the settlement period. *Id.* ¶¶ 122-123, 131-134, 137-138. Issuers can also further delay that process by mass re-issuing cards without the required identifying label, and with even longer expiry dates, prior to the time the settlement requires them to include the label on new cards. *Id.* ¶¶ 135-136. The Networks in the past have allowed issuers to engage in such mass reissuance to recategorize cards and obtain a higher interchange rate. Hausman Report, ECF 2670-5 ¶¶ 197-198.

Digital card identification is even more problematic. Class Counsel admits that "[c]urrently, the networks do not make sufficient data available to merchants in real time as to the specific credit card product that the customer is using and its applicable interchange rate," which is why the settlement "incentivizes Visa and Mastercard to develop the technology necessary to make that information available." Prelim. Approval Br., ECF 9884 at 19. But even assuming those incentives work and that information is made available, merchants will have to program point-of-sale equipment that can read and accept the Networks' new technology to digitally identify cards by product category, and that programming may require recertification in a time-consuming process that could take years. Ex. 1, Levitin Decl., ¶¶ 124-128.

In short, under the settlement, merchants will not be able to "immediately engage in discrimination based on product category, and much or even all of the settlement period might lapse before merchants are broadly able to identify all cards by product type." *Id.* ¶ 121. That would not be enough time for any of the settlement's even theoretical reforms to take hold. "By

the time surcharging or selective acceptance would actually start to be effective, the end of the settlement period will be looming. Issuers will just wait out merchants, instead of shifting to issuing lower-cost Standard Cards." *Id.* ¶ 189.[6]

As Professor Levitin explains, the Proposed Settlement relies on a complex Rube Goldberg machine, no individual part of which is likely to work, and yet *all* of which must work to be successful. Ex. 1, Levitin Decl., ¶ 237. Prof. Farrell agrees with this conclusion, noting that the settlement's mechanisms are "remarkably indirect" and require a "long chain of causation" that is unlikely to work. Farrell Decl., ¶ 81. It is fanciful to think that all of these unlikely events will occur at once and allow the settlement to succeed.

* * *

The proposed settlement offers illusory relief. It does nothing to change the rule that requires honoring cards from every issuer if accepted from one, which allows banks to levy exorbitant interchange fees without competition. It ratifies interchange fees of over 200 basis points—among the highest in the world, far higher than a free market would dictate, and far higher than they were even at the outset of this lawsuit. It otherwise provides merchants with no meaningful tools to push banks to compete for business by reducing interchange fees. This Court rejected as inadequate the 2024 settlement because it "left unchanged" the "anticompetitive" restraints and harms being challenged. *In re Payment Card*, 2024 WL 3236614, at *28. This Court

[6] The settlement's other reforms also do little to address the core problems. Merchant buying groups are already permitted under law and the settlement only adds new restrictions (such as requiring them to be nonprofits) while inserting meaningless good-faith negotiation provisions. Ex. 1, Levitin Decl., ¶¶ 210-219. The All-Outlets reforms apply to only a small number of merchants with multiple trade banners. *Id.* ¶¶ 205-209. The All-Wallets reform has similarly limited importance. *Id.* ¶ 204.

should do so again with this similarly inadequate proposal. Accordingly, the eighth and ninth *Grinnell* factors weigh heavily against approval of the proposed settlement.

**B. Defendants would be able to withstand far greater reforms than the proposed settlement provides.**

The seventh *Grinnell* factor concerns the ability of Defendants to withstand a greater judgment. *In re Payment Card Interchange Fee*, 2024 WL 3236614, at *12, *40. When a Court finds that a defendant can withstand a greater judgment at trial than a proposed settlement, this factor weighs against approval of the settlement. *In re GSE Bonds*, 414 F. Supp. 3d 686, 696 (S.D.N.Y. 2019). This Court earlier concluded "this factor weighs against granting preliminary approval" of the current proposed settlement "because *of course* the Networks are holding out on Plaintiffs to some extent." Dkt. 9884 at 28-29. But it goes beyond that.

As this Court noted in rejecting the prior settlement, "evidence in the record" shows "Visa's and Mastercard's fees in the United Kingdom, the European Union, and Australia" are capped between 30 to 50 basis points, and "[t]he continuing viability of Visa and Mastercard in those regulated jurisdictions thus strongly suggests that Defendants could agree to more substantial rate caps and rollbacks." *In re Payment Card Interchange Fee*, 2024 WL 3236614, at *41. Moreover, Class Counsel claims that the rule changes in this settlement will get rates nearly down to their estimation of a competitive market, which they estimate as [redacted] lower than current rates, Dkt. 9694 at 43, yet the settlement's "transitional" average reduction is *many times* short of that, at 10 bps. *See supra* 22. Thus, if the premise of the settlement's rule changes is correct—that it will give merchants tools to lower rates by [redacted]—Defendants could have easily agreed to the same amount as a mandatory rate reduction during the transition. That they did not shows Defendants can withstand relief many times greater than the settlement provides. Or that the settlement's rule reforms are illusory, and the settling parties know it.

Similarly, Defendants will implement issuer-level discounting but not issuer-level surcharging. This either shows that discounting will be essentially ineffectual (as experience demonstrates) and less potent than surcharging, or that Defendants could with little trouble withstand greater judgment by permitting issuer-level surcharging. *See supra* 17-19. Thus, as it did with this prior settlement, this Court should "find[] that Defendants could withstand a substantially greater judgment." *In re Payment Card Interchange Fee*, 2024 WL 3236614, at *41.

### C. Because this decades-old case is at a very advanced stage of litigation and Plaintiffs have a strong chance to succeed on the merits, they are better off going to trial than accepting an inadequate deal.

*Grinnell* factors one, three, four, five, and six all concern the state of the litigation, including the stage of the proceedings and the amount of discovery completed, the risks of establishing liability and damages, the risks of maintaining the class through the trial, and the complexity, expense and likely duration of the litigation. *See Moses v. New York Times Co.*, 79 F.4th 235, 242 & n.3 (2d Cir. 2023); *Odom* v. *Hazen Transp., Inc.*, 275 F.R.D. 400, 411 (W.D.N.Y. 2011); *Schutter v. Tarena Int'l, Inc.*, 2024 WL 4118465, at *11 (E.D.N.Y. Sept. 9, 2024).

All of these factors weigh heavily in favor of disapproving the minimal relief offered by the proposed settlement in lieu of the next and final phase of this litigation: a trial. The settling parties do not claim the class is at risk of being decertified at trial. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *23 ("none of the Defendants in this case have indicated an intention to move for decertification of the class"). Discovery is largely complete and *Daubert* and summary judgment motions have been adjudicated. After over 20 years, the litigation is at a very advanced stage. As further explained below, Plaintiffs are ready for trial, have a substantial chance to prevail at trial and obtain the relief they seek, and are better off trying the case than accepting this inadequate deal.

As this Court has explained, "Plaintiffs' claims have survived numerous Daubert and summary judgment motions," and the "only" substantive point that "remains to be determined" is "the sufficiency of the evidence, rather than the legal sufficiency of Plaintiffs' theories of liability." *In re Payment Card*, 2024 WL 3236614, at *23. The record already contains direct and "substantial evidence" of supracompetitive pricing, *id.* at *28, litigation has revealed Defendants' own inculpatory documents, and any benefits that Defendants can show could be achieved through less restrictive means—all of which leaves Plaintiffs well positioned to prevail. Defendants' inadequate settlement provisions "come[] at a relatively late stage in this litigation" when "Plaintiffs' case is ready for trial," *id.* at *23, and Plaintiffs would do better to try the case rather than accept a settlement that does not approach the "best possible recovery" a trial could deliver, *id.* at *28. The Networks state that with respect to several of these factors, including "the risks of establishing liability," this "Court previously found [them] to weigh against preliminary approval" but they argue that somehow these factors "now heavily support" approval. Networks' Prelim. Approval. Br., Dkt. 9693 at 8. They offer nothing to support this nonsensical claim and nothing about how the strength of Plaintiffs' claims has changed from the 2024 settlement proposal to today. *See In re Payment Card Interchange Fee*, 2024 WL 3236614, at *22-23 (holding that the "risks of establishing liability" factor "is likely to weigh against final approval of the Settlement").

This case will be tried under the rule of reason as applied to a two-sided-market analysis. That analysis requires courts to "conduct a fact-specific assessment of 'market power and market structure'" to assess the challenged restraint's "actual effect on competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). It proceeds under a three-step burden-shifting framework. First, "Plaintiffs must show either direct evidence of anticompetitive effect . . . or indirect evidence of anticompetitive effect." *In re Payment Card*, 714 F. Supp. 3d at 88-89. Second, the burden then

"shifts to the defendant[s] to offer a procompetitive justification for the challenged conduct." *Id.* at 83. Third, if Defendants can offer that justification, "the burden shifts back to the plaintiff[s] to demonstrate that the procompetitive ends can be achieved through substantially less anticompetitive means." *Id.* Plaintiffs have survived summary judgment and have a substantial likelihood of success to prevail at trial under that framework.

*First*, Plaintiffs can establish actual adverse effect through direct evidence of supracompetitive pricing. There is no dispute that the Networks' interchange rates for U.S. merchants run "between 200 and 300 basis points." *In re Payment Card*, 2024 WL 3236614, at *28. Plaintiffs will present evidence that these rates are extraordinary and that the "Defendants are charging a net, two-sided price several times higher than would be necessary to earn a reasonable profit." *In re Payment Card*, 714 F. Supp. 3d at 110. Expert witnesses will show that a competitive benchmark could exist at least as low as 72 basis points and that card issuing "would still be profitable" even "at an interchange rate that is 20% of the actual weighted average interchange rate." *Id.* at 105, 110. Yet the Networks' current rates make the United States an "interchange island," as rates in Australia, the E.U., and the U.K. all are substantially lower at 50 and 30 basis points respectively. Pathak Supp. Rep. ¶ 39; *In re Payment Card*, 2024 WL 3236614, at *41. Plaintiffs' two-sided price analysis will show a pass-through of around [redacted]%—for every dollar of interchange collected from merchants, only about [redacted] cents reaches cardholders—far below the near-100% a competitive market would produce. Pathak Supp. Rep. ¶¶ 29-30.

Plaintiffs will show that Defendants' market power is immense and the market structure prevents competition. Visa and Mastercard control nearly [redacted]% of the credit card market, no firm has launched a successful general-purpose credit-card network in the United States since 1985, and neither American Express nor Discovery have constrained Visa and Mastercard's near-parity

acceptance. ECF No. 9722, at 1; Pathak Supp. Rep. ¶¶ 21-23. The rules Visa and Mastercard have created "force[] merchants to accept all Visa and Mastercard credit cards" because "few merchants can afford to accept none," and the rate is "effectively locked in via the default interchange fee." *In re Payment Card.*, 827 F.3d at 228-29. The rules that Visa and Mastercard employ plainly control and affect the market.

*Second*, Defendants will have difficulty presenting a procompetitive justification for their collusive conduct. Internal Visa documents have revealed that the interchange rate is set by [redacted] typically [redacted] Pathak Supp. Rep. ¶ 34. Nor does it help the Networks that their internal discussions include an admission that [redacted] *Id.* ¶ 33. And when the Networks raise rates, they do so [redacted] further showing their lack of competitive justification, and their ability to [redacted] with which they can noncompetitively set prices. *Id.* ¶¶ 32, 38.

*Third*, if Defendants can indeed show a procompetitive justification for their conduct, then Plaintiffs still will prevail by showing that procompetitive ends can be reached by substantially less burdensome means. Plaintiffs ask merely to repeal Defendants' collusive and anticompetitive rules through which they distort the market and avoid market competition. The Networks' response to this proposal—that removing honor-all-issuers rules to allow competition "would constitute a breakup of the Networks," Prelim. App. Order, Dkt. 9884, at 28—is not supported in the record, and indeed is refuted by the Networks' own practice of granting exceptions without harm. These solutions, though less exorbitantly profitable for Defendants, are workable less-restrictive alternatives.

The settling parties' counterarguments fail. Demonstrating their inadequacy to be zealous advocates for the class in this case, Class Counsel frets that liability remains uncertain. ECF 9932-1 at 13-21. But this case has cleared every dispositive threshold and leaves only the role of the fact-finder to weigh competing evidence. *In re Payment Card*, 2024 WL 3236614, at *23. Defendants will again argue that the Networks "can't do more," but this Court acknowledged that it cannot resolve that question "absent a trial." Prelim. App. Order at 28-29.

Nor does *Ohio v. Am. Express Co.* present a hurdle to Plaintiffs' chances at trial because that case involved meaningfully different facts. 585 U.S. 529 (2018) ("*Amex*"). *Amex* involved a firm with roughly a one-quarter market share, *id.* at 537, unlike Defendants here who control approximately [redacted]% of the market. Pathak Supp. Rep. ¶¶ 21-23. The plaintiff in that case had relied on merchant-side prices alone, in contrast to Plaintiffs here quantifying the net two-sided price to still show supracompetititon. *See*, *e.g.*, Pathak Supp. Rep. ¶¶ 29-30. And the Supreme Court emphasized that output surged and that the *Amex* plaintiffs lacked an explanation that fit their theory, 585 U.S. at 549, whereas in contrast Plaintiffs here have evidence of output-suppression, Pathak Supp. Rep. ¶¶ 57-60. So while the Networks incant "skyrocketing output, falling prices, and flourishing innovation" as a mantra, Network Prelim. Approval Br., Dkt. 9693 at 1, 12, 22 n.16, repetition does not establish truth and Plaintiffs' substantial evidence described above and on summary judgment demonstrates the contrary. Most importantly, this Court already has applied *Amex* and allowed Plaintiffs' two-sided claims to proceed based on Plaintiffs' evidence. *In re Payment Card*, 2024 WL 3236614, at *23. *Amex* is not an obstacle for Plaintiffs to prevail.

Class Counsel argues that the settlement proposal is sufficient and a preferable alternative to potential loss at trial, ECF 9932-1, but the balance of risks lopsidedly counsels in favor of settlement disapproval. The settlement itself provides relief that is mostly illusory. *Supra* 27-36.

In exchange for that, class members are forced to execute the broadest possible release that snuffs out their hard-fought antitrust claims. It resets the decades-long litigation to time zero and, when the settlement relief expires after eight years, Defendants are free to go back to their old ways leaving class members back at square one. Worse still, the release's effect on *future* claims threatens to forever insulate Defendants from competition and subject class members to oppressive rates. *See infra* Part III. As Prof. Levitin states, even a complete loss at trial would leave Plaintiffs no worse off than this settlement leaves them. Ex. 1 at ¶ 48.

To be sure, as far as trials go, the trial here will be long and complex. But in the context of the duration of this litigation as a whole, which has progressed for over 20 years, we are near the finish line, and Plaintiffs have already endured the vast majority of the litigation's expense, duration, and complexity. The risk of losing at trial is always there, but in the larger context of litigation, most of the risks have already been overcome, with Plaintiffs largely defeating dispositive motions and *Daubert* challenges while obtaining class certification. At this advanced stage of proceedings, an approvable settlement should provide very meaningful relief, at least comparable to what Plaintiffs could receive by prevailing on the merits. Indeed, if this Court rejects the proposed settlement and pushes this case towards trial, the likelihood of Defendants agreeing to a *substantial* settlement would increase, as is often the case with any trial. This proposed settlement comes nowhere close. Accordingly, the first, third, fourth, fifth, and sixth *Grinnell* factors weigh in favor of disapproving the proposed settlement.

### D. Class members' overwhelming rejection of the proposed settlement militates against this Court approving it.

The second *Grinnell* factor asks this Court to look at "the reaction of the class to the settlement." *Grinnell*, 495 F.2d at 463. When this Court initially approved the settlement agreement, it stated that it was "too soon to tell" whether the class accepted or rejected the proposed

settlement agreement. Prelim. App. Order, Dkt. 9884 at 1. Class Counsel also told the Court, "we'll know what the response of the class is when we send out notice and final hearing." Prelim. Approval Hearing Tr. at 71 (Apr. 27, 2026). Since then, the number of additional objectors has grown dramatically to nearly a thousand or more, and class survey data has revealed that the reason even more have not yet joined is that remaining class members are unaware of the settlement's provisions or very existence. By contrast, very few class members have voiced support for the settlement. The reaction of class members who are familiar with the proposed settlement cuts decidedly against approval.

At the preliminary stage the objectors already included the country's largest retailer, the country's largest merchant trade associations that encompassed both large and small merchants, and other substantial companies and associations. *See*, *e.g.*, Dkts. 9722, 9727, 9728, 9729. Since that time the number of objections has grown even further: just last week, 978 additional merchants and merchant trade associations filed their own detailed objections, observing that the proposed settlement's "provisions still do not provide meaningful relief for merchants" and will do "more harm than good." Dkt. 9981 at 1-3. When this level of class rejection exists such that the objectors are "great in number," meaning "hundreds," and "some of the[ir] concerns are significant," courts have held that this alone is sufficient to reject the settlement agreement based on the second *Grinnell* factor. *See Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 671, 676 (S.D.N.Y. 2011) (rejecting a proposed settlement under those circumstances, including when "an extremely high number of class members—some 6800—opted out" when permitted to do so). Here, the number, market share, and diversity of objectors is evidence of the "pervasive" class rejection of the settlement. Prelim. App. Order Dkt. 9884 at 1.

The settling parties may point to the fact the class includes millions of merchants, most of whom have stayed silent during this approval process, but the Court should not lightly assume that silence is consent. Survey data reveals that the vast majority of the class is still unaware of this lawsuit at all, much less the details of the proposed settlement agreement. The Keegan Survey of class members found that 88% of class members do not even know that this lawsuit exists in the first place. Keegan Dec. Table 3, ¶ 98. Less than 8% said they had seen any notice of this proposed settlement, *id.* Table 5, and only a few survey respondents could accurately identify three provisions from the proposed settlement from a multiple-choice listing without picking provisions that do not exist in the settlement. *Id.* Table 4. For example, of the respondents who did indicate knowledge of the settlement agreement, some of them incorrectly believed that the proposal guarantees them a refund or would allow them to reject cards from particular issuers. *Id.*

Since vanishingly few class members know enough about the settlement's terms to object or voice support in the first place, great weight must be given to the enormous number of objectors who arose from the relatively few class members who even know what the proposed settlement says. The one thousand or more companies and trade associations that already have objected reveals the class's "pervasive" rejection of the agreement and pushes the question outside a mere "vocal minority." Prelim. App. Order Dkt. 9884 at 1. And at the very least, if this Court were to question the current size of the objecting class, it should find that when the "non-response rate [is] unusually high," that fact would negate any countervailing "presumption of approval stemming from the lack of objectors." *McLaughlin v. IDT Energy*, 2018 WL 3642627, at *11 (E.D.N.Y. July 30, 2018) (treating the second *Grinnell* factor as neutral given a non-response rate of over 96%, though recommending approval on other grounds). The reaction of the class to the proposed

settlement cuts decidedly against approval under *Grinnell*. 495 F.2d at 463; *Authors Guild*, 770 F. Supp. 2d at 676.

* * *

Each *Grinnell* factor weighs against settlement approval, decisively so. This Court should reject the inadequate settlement agreement and set the case for trial.

## II. NACS and Circle K have a due process right to opt out of the proposed settlement.

Given the severe infirmities in the proposed settlement, this Court should reject it. If, instead, the Court grants approval, then it should allow NACS members to opt-out if the settlement is approved, despite being denied that choice earlier in this litigation. *See DDMB, Inc.*, 2021 WL 6221326, at *49. Due process requires it.

The Supreme Court has long held that "due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). *Shutts* limited that holding to "class actions which seek to bind known plaintiffs concerning claims wholly or predominately for money judgments." *Id.* at 811 n.3. The question "whether the right to notice and an opportunity to opt out applies even when monetary claims do not predominate" remains open today. *Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 222 (2d Cir. 2012).

The Supreme Court has noted "the serious possibility" that due process requires a right to opt out of *all* class actions. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 363 (2011). This Court should hold that due process so requires. "[A] cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). But mandatory class actions "extinguish . . . forever" a property right—the individual cause of action—without recourse. *Shutts*, 472 U.S. at 807. The mandatory class

settlement thus violates due process by destroying NACS's individual claims and the claims of its members. To the extent that Rule 23(b)(2) allows for denial or requires denial of opt-out, it violates the Due Process Clause.

There is special need for opt-out here, where the proposed settlement fails to provide the core relief that NACS and its members have sought from the beginning and affects them differently than other class members. "[T]he Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members." *Id.* at 812. Judge Brodie previously denied opt-out rights because "Plaintiffs seek equitable relief from the bundle of Restraints that together result in the supracompetitive interchange fees." *DDMB, Inc.*, 2021 WL 6221326, at *48. Because "equitable relief . . . that tackles these Restraints is proper as to all merchants," Judge Brodie found opt-outs were unnecessary. *Id.* But Class Counsel did not negotiate a settlement providing that equitable relief. Class Counsel instead proposed a settlement that vast numbers of merchants and merchant trade groups oppose. *See supra* Section I.D. The proposed settlement simply perpetuates the underlying anticompetitive restraints. *See supra* 12-19. The proposed settlement thus not only extinguishes NACS's and its members' future claims, but it also denies them meaningful equitable relief from the anticompetitive conditions that they have been litigating for over a decade. That cannot be squared with due process. NACS and its members who oppose the settlement have a right to their day in court, and a settlement approval they cannot opt out of violates the Fifth Amendment's Due Process Clause.

## III. The proposed settlement is unlawful and contrary to public policy because it immunizes future antitrust violations.

The proposed settlement will not only leave in place anticompetitive restraints of trade but also immunize those restraints from future challenge. That is the sort of "prospective waiver of a party's right to pursue statutory remedies for antitrust violations" that the Supreme Court has

expressed "little hesitation in condemning . . . as against public policy." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985).

Courts have long recognized that agreements that eliminate private claims for future antitrust violations violate the antitrust laws. Even "a partial immunity from civil liability for future violations" of the antitrust laws is against public policy. *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955). "Any contractual provision" that "absolve[s] one party from liability for future violations of the anti-trust statutes" is itself a contract "in restraint of trade," and thus illegal. *Fox Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955). Prospective waivers of private antitrust claims are thus prohibited by the letter of the antitrust laws. *See Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 896 n.27 (3d Cir. 1975). Any "agreement which in practice acts as a waiver of future liability under the federal antitrust statutes is void." *In re Am. Express Merchs. Litig.*, 634 F.3d 187, 197 (2d Cir. 2011).[7]

The proposed settlement immunizes the networks from ongoing and future antitrust violations. To start, it releases "any and all manner of claims" that any class member "ever had, now has, or hereafter can, shall, or may have" for five years after the last appeal of the settlement is exhausted. Proposed 2025 Settlement, ECF 9692-2 ¶ 116(a). But under black letter antitrust law, each act in furtherance of a continuing anticompetitive conspiracy that injures a plaintiff creates a new factual predicate for a new claim, even if the basic nature of the conspiracy remains unaltered. *See Lawlor*, 349 U.S. at 327-28. Thus, the day after the settlement is approved, if the Networks

[7] *In re Am. Express Merchants' Litig.* involved whether a mandatory arbitration provision that precluded class action litigation of an antitrust claim in effect deprived "plaintiffs of the statutory protections of the antitrust laws." *Id.* at 198. The Supreme Court explained that an arbitration provision that made it more expensive to seek a remedy "does not constitute the elimination of the *right to pursue* that remedy." 570 U.S. 228, 236 (2013). Here, the release directly eliminates NACS's and Circle K's right to pursue future antitrust remedies.

maintain their anticompetitive rules like Honor All Issuers, a new antitrust claim arises for NACS and Circle K that the Networks will argue these plaintiffs will be unable to bring. In that circumstance, the settlement immunizes future antitrust conduct.

Worse still, even after the settlement period expires, the release purports to immunize Defendants from claims "arising out of or relating to a continuation or continuing effect of any such conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act" that "could have been alleged." Proposed 2025 Settlement, ECF 9692-2 ¶ 116(a). So if restraints like Honor All Issuers continue after the settlement period expires, Defendants will argue the release immunizes them from a new and future antitrust claim based on that new predicate conduct. That makes the settlement agreement *itself* an agreement in restraint of trade by agreeing to keep in place anticompetitive restraints. Indeed, the settlement quite literally fixes prices (through the rate cap, rate reduction, and Standard card rate), albeit at a slightly lower price than currently persists.

Moreover, that release will extend for *years* beyond when the proposed settlement's (inadequate) reductions on interchange fees will end. The proposed settlement agrees to reduce "average Effective Interchange Rate" fees by ten basis points for five years, and cap existing posted rates, "[c]ommencing no earlier than four months following the Settlement Approval Date." *Id.* ¶ 48(a). But the release will extend for *eight* years after approval, or five years after the last appeal of the settlement is exhausted. So the release not only violates the antitrust laws, it also means the settlement is not fair, reasonable, or adequate for the same reasons that the proposed 2012 settlement was defective. *See In re Payment Card*, 827 F.3d at 239 (rejecting settlement in part because the parties "remain[ed] bound to the release" even after the relief had expired).

The settlement agreement forces nearly every merchant in the country to surrender its right to critical remedies eliminating future antitrust violations—whether it wants to or not. For over ten

years, NACS, Circle K, and other class members, have insisted that only fundamental reform of the honor-all-card rule and excessive interchange rate will provide meaningful relief. The settlement eliminates their right to seek and obtain that relief. At best, NACS's members and Circle K will have no ability to obtain relief until the eight-year release expires and the *next* interchange fee class action is litigated to final judgment. But, if this case is any guide, that will take decades: this case has already spanned over twenty years.

In that sense, the settlement agreement puts class members in a *worse* position than they are today. Today, decades of litigation has class members "ready for trial." *In re Payment Card*, 2024 WL 3236614, at *23. But if the settlement is approved, eight years from now class members will no longer benefit from any provision in the settlement *and* will have to start decades-long litigation on their equitable claims all over again: motions to dismiss, class certifications, summary judgment proceedings, *Daubert* motions, and challenges to flawed settlements will all need to recur. Even then, class members will face the prospect of Defendants claiming those claims are barred in perpetuity. That is highly prejudicial, violates federal antitrust laws, and confirms the settlement is not fair, reasonable, or adequate. *See In re Payment Card*, 2024 WL 3236614, at *23 (weighing against settlement approval the fact that the 2024 settlement came "at a relatively late stage in this litigation"). NACS's members and Circle K should not need to wait another twenty years, and pay hundreds of billions more in interchange fees, before they can "pry open to competition a market that has been closed by defendants' illegal restraints." *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947).

## CONCLUSION

The proposed mandatory settlement should be rejected.

Dated: September 14, 2026

Respectfully submitted,

*/s/ Mithun Mansinghani*

**Mithun Mansinghani**
LEHOTSKY COHN LLP
629 W. Main Street
Oklahoma City, OK 73102
(512) 693-8350
mithun@lehotskycohn.com

**Rick W. Eberstadt**
LEHOTSKY COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
rick@lehotskycohn.com

**CERTIFICATE OF SERVICE**

I certify that on September 14, 2026, I served a true and correct copy of the foregoing document, with information covered by the protective order redacted, on counsel of record via e-filing. I also served a true, correct, and unredacted copy of the foregoing on counsel of record via email.

*/s/ Mithun Mansinghani*
Mithun Mansinghani