**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**BROOKLYN DIVISION**

| | |
|---|---|
| *In re:* PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION<br><br>This document relates to: *Barry's Cut Rate Stores Inc., et al., v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.). | MDL No. 1720<br>Docket No. 05-md-01720 (BMC-JAM)<br>Hon. Brian M. Cogan |

# STATEMENT OF OBJECTIONS TO PROPOSED AMENDED CLASS SETTLEMENT BY AMERICAN ECONOMIC LIBERTIES PROJECT, CONSUMER REPORTS, DEMAND PROGRESS EDUCATION FUND, AND SMALL BUSINESS MAJORITY

**admitted pro hac vice*

Basel J. Musharbash
Texas Bar No. 24111402*

Anureet K. Sandhu
Illinois Bar No. 6336697

**ANTIMONOPOLY COUNSEL**
500 Clarksville Steet
P.O. Box 795
Paris, Texas 75461
Phone: 903.212.3096
Email: basel@antimonopoly.us
anu@antimonopoly.us
hilary@antimonopoly.us
counsel@antimonopoly.us

*Attorneys for Objectors*

# TABLE OF CONTENTS


**I. INTRODUCTION .......... 5**

**II. OBJECTORS .......... 5**

**III. LEGAL STANDARD .......... 9**

**IV. ARGUMENT .......... 12**

**A. The Court lacks the authority to approve the Proposed Settlement Agreement because it violates the Sherman Antitrust Act. .......... 12**

**i. The Sherman Act Framework .......... 12**

**ii. The Proposed Settlement Agreement is illegal because it is a horizontal price-fixing contract between Visa and Mastercard in *per se* violation of Section 1 of the Sherman Act. .......... 14**

a. The Proposed Settlement Agreement is unreasonable *per se*. .......... 16

b. None of the limited exceptions to the *per se* rule apply. .......... 24

**iii. Alternatively, the Proposed Settlement Agreement is illegal because it is a horizontal restrain on competition that will tend to create a shared Visa-MasterCard monopoly in the credit card transactions market. .......... 26**

a. The Proposed Settlement Agreement's price-fixing restraints would entrench Visa and Mastercard against competition from other networks. .......... 27

b. There are no procompetitive justifications for the Proposed Settlement Agreement's price-fixing restraints. .......... 34

**B. The Court lacks the authority to approve the Proposed Settlement Agreement because it violates the policy of the antitrust laws and undermines their objectives. .......... 36**

**i. The Framework of Federal Antitrust Policy .......... 37**

**ii. The Proposed Settlement Agreement would immunize Visa and Mastercard from antitrust liability for entering an illegal horizontal price-fixing contract. .......... 38**

**iii. The Proposed Settlement Agreement would empower Visa and Mastercard to engage in new and novel unfair methods of competition against merchants with legal immunity. .......... 40**

**C. Even if it had the discretion to do so, the Court should not approve the Proposed Settlement Agreement under Rule 23(e) because it fails to provide adequate relief. .......... 42**

**i. The Court's preliminary-approval analysis underestimated the strength of Plaintiffs' case with respect to both (a) proving liability and (b) securing complete relief from the Anti-Steering Restraints. .......... 42**

a. The Court overrated Defendant's rebuttal arguments because it erroneously treated the exclusion of competition by the No-Bypass and Honor-All-Cards rules as a "procompetitive" justification for them. .......... 42

b. The Court underrated Plaintiffs' ability to secure complete relief from the Anti-Steering Restraints because it erroneously assumed that, even after liability is proven, it would have the discretion to deny such relief. .......... 45

**ii. Evaluated against a fair assessment of Plaintiffs' case, the Proposed Settlement Agreement is inadequate. .......... 47**

a. The Proposed Settlement Agreement is ineffectual because it contains explicit loopholes which Network Defendants can exploit to evade, nullify, or defeat the "relief" it purports to provide to merchants. .......... 47

b. The Proposed Settlement Agreement is likely to worsen competitive conditions in the general-purpose credit card transactions market. .......... 53

**D. The Proposed Settlement Agreement would disserve the public interest by impairing the ability of third parties—including public agencies—to enforce the antitrust laws in the financial sector writ large. .......... 53**

**V. CONCLUSION .......... 54**

# TABLE OF AUTHORITIES

> The Supreme Law of the Land—which is binding alike upon all—upon Presidents, Congresses, the Courts and the People—gives to Congress, and to Congress alone, the authority to regulate interstate commerce, and when Congress forbids *any* restraint of such commerce—in any form—all must obey its mandate. To overreach the action of Congress merely by judicial construction, that is, by indirection, is a blow at the integrity of our governmental system, and in the end will prove most dangerous to all.
>
> — Justice Harlan, concurring in the judgment and otherwise dissenting, in *Standard Oil Co. of New Jersey v. United States*[1]

## I. INTRODUCTION

Congress enacted the Sherman Act to "mak[e] competition rather than monopoly the rule of trade" throughout the Nation's economy.[2] Competition is premised on a system of "separate economic actors pursuing separate economic interests."[3] The Sherman Act therefore seeks to nurture and preserve in every market a process of rivalry by which independent firms compete vigorously with each other on their offerings—whether by making their prices more favorable, by improving the quality of their products, or by other means.[4] Thus, when powerful incumbents in concentrated markets enter agreements with one another "restraining" or "eliminating" their "autonomy" to compete, they mount a "frontal assault on the basic policy of the Sherman Act."[5]

The Proposed Settlement Agreement—which is supposed to resolve one of the most important antitrust litigations in the Nation—makes a mockery of that policy. Rather than restore

[1] 221 U.S. 1, 105 (1911) (emphasis in original).

[2] Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 505 (1959); see also N. Pac. R. Co. v. United States, 356 U.S. 1, 4 ("The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. … [T]he policy unequivocally laid down by the Act is competition.").

[3] Am. Needle, Inc. v. NFL, 560 U.S. 183, 190, 195 (2010).

[4] The Supreme Court has long defined "competition" within the contemplation of the antitrust laws as the activity of competing—of "striving for something which another is actively seeking and wishes to gain"—in which rival firms engage as "honorable opponents" to obtain the business of third parties. See, e.g., United States v. Union Pac. R.R. Co., 226 U.S. 61, 87 (1912) ("To compete is to strive for something which another is actively seeking and wishes to gain."); FTC v. Raladam Co., 283 U.S. 643, 649 (1931) ("It is obvious that the word 'competition' imports the existence of present or potential competitors[.]"); FTC v. Gratz, 253 U.S. 421, 427–28 (1920) ("The [FTC] Act was … not intended to fetter free and fair competition as commonly understood and practiced by honorable opponents in trade.").

[5] Polygram Holding, Inc. v. FTC, 416 F.3d 29 (D.C. Cir. 2005);

competition to the credit card transactions market, it would have this Court approve and enforce a new horizontal agreement between Visa and Mastercard fixing core price and price-determining terms for years to come. The Agreement would enable Visa and Mastercard to coordinate interchange rates, prescribe common surcharge and honor-all-cards policies, and then use sweeping releases to shield those restraints and related future conduct from meaningful challenge. This is not a settlement that will deliver antitrust relief to merchants; it is a joint monopolization scheme masquerading as a settlement—seeking to evade the law by dint of "judicial construction."[6]

In light of the foregoing, American Economic Liberties Project, Consumer Reports, Demand Progress Education Fund, and Small Business Majority respectfully submit that the Court should deny approval of the Proposed Settlement Agreement for at least four reasons. First, the Court lacks authority to approve an agreement that itself violates the Sherman Act by restraining price competition between horizontal rivals. Second, the Agreement violates federal antitrust policy by immunizing unlawful restraints and future unfair methods of competition. Third, even apart from those legal defects, the settlement is inadequate under Rule 23(e) because its purported relief is loophole-ridden, ineffectual, and likely to worsen—not improve—competitive conditions. Finally, entry of the requested consent judgment would disserve the public interest by impairing the ability of merchants, public agencies, and other third parties to enforce the antitrust laws in the financial sector.

The Court's approval of class action settlements is not a ministerial function. As an "organ of government constituted to make judicial decisions" and as the "guardian of the rights of absent class members," the Court must independently ensure that the Proposed Settlement complies with the antitrust laws, serves the policies those laws embody, provides adequate relief to the class, and

[6] Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 105 (1911) (emphasis in original).

does not impair the public's interest in open and effective enforcement of the competition laws. Because the Proposed Settlement fails each of those requirements, it should not be approved.

## II. OBJECTORS

**American Economic Liberties Project (AELP)** is an independent nonprofit organization that works to promote competition, combat monopolistic corporations, and advance economic liberty for all. It advocates for policies that address today's crisis of concentration through legislative efforts and public policy debates. AELP is non-profit and non-partisan and does not accept funding from corporations. It has been accepting donations via credit cards since its founding in 2020.

Founded in 1936, **Consumer Reports (CR)** is an independent, non-profit and nonpartisan organization that works with consumers to create a fair and just marketplace. CR is included in the two merchant classes in this litigation as it has in the past accepted, and continues to accept, MasterCard and Visa credit card payments from its subscribers and donors. Known for its rigorous testing and ratings of products, CR advocates for laws and company practices that put consumers first. CR is dedicated to amplifying the voices of consumers to promote safety, digital rights, financial fairness, and sustainability. The organization surveys millions of Americans every year, reports extensively on the challenges and opportunities for today's consumers, and provides ad-free content and tools to over 5 million members across the U.S.

**Demand Progress Education Fund (DPEF)** is a 501(c)(3) charitable organization that educates and mobilizes its members and the general public about matters pertaining to the democratic nature of our nation's communications infrastructure and governance structures, and the impacts of corporate power over our economy and democracy. DPEF is non-profit, non-partisan, and accepts donations through credit cards.

**Small Business Majority** is a national small business organization that empowers America's diverse entrepreneurs to build a thriving and equitable economy. It engages its network of more than 85,000 small businesses and 1,500 business and community organizations to deliver resources to entrepreneurs and advocate for public policy solutions that promote inclusive small business growth. Its work is bolstered by extensive research and deep connections with the small business community that enable it to educate stakeholders about key issues impacting America's entrepreneurs, with a special focus on the smallest businesses and those facing systemic inequities and barriers to entry. Small Business Majority has a general interest in seeing pro-competitive swipe fee reform happen.

Each of the organizations submitting this Objection is also a member of the Rule 23(b)(2) Class, which Paragraph 1(ff) of the proposed settlement defines as:

> all persons, businesses, and other entities that accept Visa-Branded Cards and/or Mastercard-Branded Cards in the United States at any time during the period between December 18, 2020 and the date of preliminary settlement approval, and from which no exclusions are permitted.

Each organization submitting this Objection has accepted, and continues to accept, Visa and Mastercard card payments from donors or contributors whose support sustains the organization's work. As a result, each of our organizations has had interchange fees deducted from transaction amounts paid to the organization via Visa and Mastercard cards. Because the Rule 23(b)(2) Class permits no exclusions, each of our organizations would continue to bear the cost of excessive Visa and Mastercard interchange fees going forward, and we would also be bound by the settlement's sweeping liability release provisions that would immunize Visa, Mastercard, and 15 of their largest card-issuing banks from fee-related claims. This would be the case even though our organizations have never been consulted by class counsel about the proposed settlement, nor are

we aware of any other consumer or worker advocacy organizations that have been consulted by class counsel about the Proposed Settlement Agreement's impact on consumer or worker interests.

Because our organizations are dedicated to advocating for competition and the rights of consumers, workers, and independent businesses, and because we are payors of interchange fees and members of the Rule 23(b)(2) Class, we have a strong interest in the Proposed Settlement and therefore seek to assist the Court in evaluating its legality, fairness, and conformity with public policy and the public interest. Accordingly, our organizations intend to appear through counsel at the Fairness Hearing on November 16, 2026. We reserve the right to request discovery in advance of the Hearing, to present our own witnesses, experts, exhibits, and affidavits at the Hearing, and to make use of all documents entered on the docket by any party or objector. We also reserve the right to cross-examine witnesses who testify in support of the Settlement Agreement's final approval. Our organizations join any other objections not inconsistent with the objections herein.

## III. LEGAL STANDARD

"[A] federal court is more than a recorder of contracts from whom parties can purchase injunctions; it is an organ of government constituted to make judicial decisions[.]"[7] When a court enters a consent judgement to effectuate a settlement agreement, the court exercises "federal power" to give the agreement "the force of res judicata" and make it enforceable by "judicial sanctions."[8] Accordingly, before giving its "judicial imprimatur" to a proposed class-action settlement that contemplates the entry of a consent judgment and injunctive relief, a court must make three prerequisite determinations: (1) that the agreement does not violate applicable law or public

---

[7] Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland, 478 U.S. 501, 525-26 (1986).

[8] Pearson Educ., Inc. v. Bobadilla, No. 08 CIV. 7413 GBDKNF, 2009 WL 4405810, at *2 (S.D.N.Y. Nov. 24, 2009), report and recommendation adopted, No. 08 CIV. 7413 GBD KNF, 2011 WL 1045078 (S.D.N.Y. Mar. 17, 2011); see also Wilder v. Bernstein, 645 F. Supp. 1292, 1308 (S.D.N.Y. 1986), aff'd, 848 F.2d 1338 (2d Cir. 1988); Cruz v. JKS Ventures, Inc., No. 23-CV-8311 (LJL), 2024 WL 814563, at *3 (S.D.N.Y. Feb. 26, 2024).

policy;[9] (3) that the agreement is fair, reasonable, and adequate;[10] and (3) that entry of the requested injunctive relief would not disserve the public interest.[11]

First, the court must "scrutinize" the proposed settlement agreement to "ensure" that it would not "put the court's sanction on, and power behind, a decree that violates the Constitution, statutes, or jurisprudence."[12] In this vein, the court must, at a minimum, determine that the proposed settlement does not violate the statute upon which the underlying litigation is based or undermine the policies embodied in that statute.[13] Second, the court must determine that the proposed settlement agreement is "fair, reasonable, and adequate" to the parties and not a product of "collusion or corruption."[14] In the class-action settlement context, this determination must be guided by Rule 23(e)(2), which requires the court to focus its inquiry on four "core" elements, including whether "(A) the class representatives and class counsel have adequately represented the class; (B)

[9] See Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland, 478 U.S. 501, 525-26 (1986) (collecting cases); U.S.S.E.C. v. Citigroup Global Markets, Inc., 752 F.3d 285, 294-96 (2d Cir. 2014); United States v. Int'l Bhd.of Teamsters, 970 F.2d 1132, 1137 (2d Cir. 1992); Kozlowski v. Coughlin, 871 F.2d 241, 244 (2d Cir. 1989); Hernandez v. 26 Bruckner LLC, No. 1:25-CV-3872-GHW, 2026 WL 1863246, at *1 (S.D.N.Y. June 29, 2026); Cruz v. JKS Ventures, Inc., No. 23-CV-8311 (LJL), 2024 WL 814563, at *3 (S.D.N.Y. Feb. 26, 2024); Pearson Educ., Inc. v. Bobadilla, No. 08 CIV. 7413 GBDKNF, 2009 WL 4405810, at *2 (S.D.N.Y. Nov. 24, 2009), report and recommendation adopted, No. 08 CIV. 7413 GBD KNF, 2011 WL 1045078 (S.D.N.Y. Mar. 17, 2011); Wilder v. Bernstein, 645 F. Supp. 1292, 1308 (S.D.N.Y. 1986), aff'd, 848 F.2d 1338 (2d Cir. 1988). See also Sierra Club, Inc. v. Elec. Controls Design, Inc., 909 F.2d 1350, 1355 (9th Cir. 1990); Grunin v. Int'l House of Pancakes, 513 F.2d 114, 123 (8th Cir. 1975); Eli Lilly & Co. v. Genesis Lifestyle Med. of Nevada, LLC, No. 1:24-CV-01862-JRO-TAB, 2026 WL 1763300, at *2 (S.D. Ind. June 18, 2026).

[10] Fed. R. Civ. P. 23(e)(2). See also Moses v. N.Y. Times Co., 79 F.4th 235, 243 (2d Cir. 2023).

[11] See U.S.S.E.C. v. Citigroup Global Markets, Inc., 752 F.3d 285, 294-96 (2d Cir. 2014); see also Cruz v.JKS Ventures, Inc., 2024 WL 814563 at *3, 5 (S.D.N.Y. Feb. 26, 2024).

[12] United States v. Int'l Bhd.of Teamsters, 970 F.2d 1132, 1137 (2d Cir. 1992) (cleaned up); Hernandez v. 26 Bruckner LLC, No. 1:25-CV-3872-GHW, 2026 WL 1863246, at *1 (S.D.N.Y. June 29, 2026) (quoting Teamsters, 970 F.2d at 1137); Wilder v. Bernstein, 645 F. Supp. 1292, 1308 (S.D.N.Y. 1986), aff'd, 848 F.2d 1338 (2d Cir. 1988).

[13] See Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland, 478 U.S. 501, 525-26 (1986) (collecting cases); U.S.S.E.C. v. Citigroup Global Markets, Inc., 752 F.3d 285, 294-96 (2d Cir. 2014); United States v. Int'l Bhd.of Teamsters, 970 F.2d 1132, 1137 (2d Cir. 1992). See also Sierra Club, Inc. v. Elec. Controls Design, Inc., 909 F.2d 1350, 1355 (9th Cir. 1990); Eli Lilly & Co. v. Genesis Lifestyle Med. of Nevada, LLC, No. 1:24-CV-01862-JRO-TAB, 2026 WL 1763300, at *2 (S.D. Ind. June 18, 2026).

[14] See Detroit v. Grinnell Corp., 495 F.2d 448, 462 (2d Cir. 1974); U.S.S.E.C. v. Citigroup Global Markets, Inc., 752 F.3d 285 (2d Cir. 2014); Cruz v. JKS Ventures, Inc., No. 23-CV-8311 (LJL), 2024 WL 814563, at *5 (S.D.N.Y. Feb. 26, 2024); Wilder v. Bernstein, 645 F. Supp. 1292, 1308 (S.D.N.Y. 1986), aff'd, 848 F.2d 1338 (2d Cir. 1988).

the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate … and (D) the proposal treats class members equitably relative to each other."[15] Third, if the proposed settlement agreement contemplates equitable relief, the court must "assure itself that the public interest would not be disserved" by the issuance of the relief requested, including the interests of third parties who may be affected by the consent decree.[16]

While a court need not conduct "a trial or a rehearsal of a trial" in order to make these determinations, the court must "explore the facts sufficiently to make intelligent determinations" on these threshold issues,[17] and its determinations must be informed by correct applications of the substantive law governing the case.[18] The proponents of a class settlement bear the burden of demonstrating that it meets all requirements for approval.[19] Moreover, where class members lodge timely objections to the proposed settlement under Rule 23(3)(5)(a), the proponents of the settlement must respond to and defeat each such objection by showing that it does not demonstrate the settlement's failure to satisfy the requirements for approval.[20]

---

[15] Fed. R. Civ. P. 23(e)(2). While the four elements listed in Rule 23(e)(2) identify "the core concerns of procedure and substance that should guide the decision whether to approve" a proposed settlement or not, Fed. R. Civ. P. 23(e)(2) (advisory committee note of 2018), the Court's evaluation of the Proposed Settlement's fairness, reasonableness, and adequacy must also consider the nine factors identified in the Second Circuit's jurisprudence. Moses v. N.Y. Times Co., 79 F.4th 235, 243 (2d Cir. 2023).

[16] See U.S.S.E.C. v. Citigroup Global Markets, Inc., 752 F.3d 285 (2d Cir. 2014); Cruz v. JKS Ventures, Inc., No. 23-CV-8311 (LJL), 2024 WL 814563, at *5 (S.D.N.Y. Feb. 26, 2024); Wilder v. Bernstein, 645 F. Supp. 1292, 1308 (S.D.N.Y. 1986), aff'd, 848 F.2d 1338 (2d Cir. 1988).

[17] See Detroit v. Grinnell Corp., 495 F.2d 448, 462 (2d Cir. 1974) (citing Newman v. Stein, 464 F.2d 689 (2d Cir. 1972)) ("The rule in this Circuit provides that an approval of a class action settlement offer by a lower court must be overturned if that court acted 'without [knowledge of] sufficient facts concerning the claim' or if it 'failed to allow objectors to develop on the record facts going to the propriety of the settlement.'"); Id. at 463 ("The question becomes whether or not the District Court had before it sufficient facts intelligently to approve the settlement offer.").

[18] See Newman v. Stein, 464 F.2d 689, 692-93 (2d Cir. 1972) (explaining that "clear error with respect to the law governing a defendant's liability may warrant reversal of the trial court's approval of a settlement").

[19] See WRIGHT & MILLER, 7B Fed. Prac. & Proc. Civ. § 1797.1 (3d. ed. 2026) (collecting cases) ("In all cases, the burden is on the proponents of a settlement to show that it meets the standards of fairness, reasonableness, and adequacy.").

[20] 1988 Tr. For Allen Child. Dated 8/8/88 v. Banner Life Inc. Co., 28 F.4th 513, 521 (4th Cir. 2022).

## IV. ARGUMENT

### A. The Court lacks the authority to approve the Proposed Settlement Agreement because it violates the Sherman Antitrust Act.

It is well-established that a court may not lend its approval to any contract or agreement that violates the antitrust laws.[21] Nor may a court agree to enter a consent judgment that "would make the court a party to carrying out one of the very restraints forbidden" by the antitrust laws.[22] While these restrictions on a court's authority apply most forcefully to settlement agreements that constitute or authorize a *per se* violation of the antitrust laws,[23] courts in the Second Circuit have also rejected proposed settlements that threaten to violate the antitrust laws even when the terms or conduct they contemplated have not been susceptible to *per se* treatment.[24]

Here, the Court must not lend its judicial imprimatur to the Proposed Settlement Agreement because the Agreement is, in itself, a violation of the Sherman Act. Specifically, the Proposed Settlement Agreement is a horizontal price-fixing contract between Visa and Mastercard that nakedly restrains price and non-price competition between these two powerful incumbents in the general-purpose credit-card transactions market—and will tend to create a joint Visa-Mastercard monopoly with the power to fix prices and exclude competing networks from this critical market.

#### i. The Sherman Act Framework

The relevant provision of antitrust law for our analysis is Section 1 of the Sherman Act. There are two central elements of a Section 1 violation: (1) concerted action—*i.e.*, a "contract,

---

[21] See Kelly v. Kosuga, 458 U.S. 516, 520 (1959); Continental Wall Paper Co. v. Louis Voigt & Sons Co., 212, U.S. 227, 261-67 (1909); see also Robertson v. Nat'l Basketball Ass'n, 556 F.2d 682, 686 (2d Cir. 1977); Grunnin v. Int'l House of Pancakes, 513 F.2d 114, 123 (8th Cir. 1975) (citing Kosuga, 358 U.S. at 520) ("[A] court cannot lend its approval to any contract or agreement that violates the antitrust laws.").

[22] Kelly v. Kosuga, 458 U.S. 516, 520-21 (1959) (cleaned up).

[23] See Robertson v. Nat'l Basketball Ass'n, 556 F.2d 682, 686 (2d Cir. 1977); Grunnin v. Int'l House of Pancakes, 513 F.2d 114, 123 (8th Cir. 1975) (citing Kosuga, 358 U.S. at 520);

[24] See, e.g., Authors Guild v. Google, Inc., 770 F. Supp. 2d 666, 682-83, 686 (S.D.N.Y. 2011).

combination, or conspiracy," 15 U.S.C. § 1; and (2) unreasonableness—*i.e.*, that the concerted action "unreasonably restrains trade."[25]

Because "[c]oncerted activity inherently is fraught with anticompetitive risk," Congress has defined concerted action broadly to encompass diverse arrangements, including contracts, combinations, and conspiracies.[26] Accordingly, the Supreme Court has long held that a settlement agreement—like any contract—satisfies the concerted-action element of a Section 1 violation.[27]

A restraint "can be unreasonable in one of two ways."[28] First, some restraints are unreasonable *per se*.[29] Such restrains violate Section 1 by virtue of their inherently anticompetitive "nature and character,"[30] and are deemed unlawful "without further inquiry."[31] Such *per se* unlawful restraints include "agreements among competitors to fix prices."[32] Second, a restraint is unreasonable if it violates a fact-specific standard known as the rule of reason.[33] A court applying the rule

[25] Am. Needle, Inc. v. NFL, 560 U.S. 183, 186, 195 (2010). Plaintiffs must also show that the alleged restraint of trade substantially affected, or occurred in the flow of, interstate or foreign commerce. McLain v. Real Est. Bd. Of New Orleans, Inc., 444 U.S. 232, 241 (1980). There can be no question this element is satisfied here.

[26] Am. Needle, Inc. v. NFL, 560 U.S. 183, 190, 195 (2010).

[27] See, e.g., FTC v. Actavis, Inc., 570 U.S. 136, 141 (2013); Kelly v. Kosuga, 458 U.S. 516, 520-21 (1959); Continental Wall Paper Co. v. Louis Voigt & Sons Co., 212, U.S. 227, 261-67 (1909).

[28] Ohio v. Am. Express Co., 585 U.S. 529, 540 (2018).

[29] Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007).

[30] Standard Oil v. United States, 221 U.S. 1, 64 (1911); see, e.g., NCAA v. Alston, 141 S.Ct. 2141, 2156 (2021); Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 646–48 (1980); United States v. Apple, Inc., 791 F.3d 290, 328-29 (2d Cir. 2015); see also Verizon Commc'ns Inc. v RM. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 408 (2004) (referring to collusion as one of the "supreme evil[s]" of antitrust law).

[31] Gelboim v. Bank of Am. Corp., 823 F.3d 759, 771 (2d Cir. 2016); see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007) (explaining that the per se rule "treat[s] categories of restraints as necessarily illegal" and thereby "eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work").

[32] Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007); see, e.g., United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218 (1940) ("[P]rice-fixing agreements are unlawful per se under the Sherman Act.").

[33] See Ohio v. Am. Express Co., 585 U.S. 529, 540 (2018).

of reason evaluates "the surrounding circumstances" of the market to determine whether the restraint tends to harm competition.[34] If this evaluation indicates that it does, "liability follow[s]."[35]

**ii. The Proposed Settlement Agreement is illegal because it is a horizontal price-fixing contract between Visa and Mastercard in *per se* violation of Section 1 of the Sherman Act.**

The Supreme Court has long interpreted Section 1's prohibition against "contracts, combinations …, and conspiracies in restraint of trade," to mean that certain types of restraints are categorically—or *per se*—illegal.[36] A contract between horizontal competitors to fix prices is the paradigmatic *per se* violation of Section 1.[37] By their "nature and character," all horizontal price-fixing agreements "eliminate competition that would otherwise exist"—"the central evil addressed by" Section 1 of the Sherman Act.[38] As a result, such price-fixing agreements are categorically

[34] Standard Oil v. United States, 221 U.S. 1, 68 (1911); Ohio v. Am. Express Co., 585 U.S. 529, 540 (2018).

[35] U.S. v. Gypsum Co., 438 U.S. 422, 446-47 n.222 (1978) (confirming that "proof of purpose to restrain trade or competition" is not required for Section 1 liability if there is proof of competitive harm).

[36] Standard Oil v. United States, 221 U.S. 1, 64-65; Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 238 (1899) (quoting United States v. Addyston Pipe & Steel Co., 85 F. 271, 293 (6th Cir. 1898) (Taft, J.), aff'd 175 U.S. 211 (1899)).

[37] Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 646–48 (1980); [Standard Oil]

[38] Standard Oil v. United States, 221 U.S. 1, 64-65 (explaining that the "nature and character" of price-fixing agreements brings them categorically "within the purview of" of Section 1 because they necessarily "operate[] to produce the injuries which the statute forbade"); Am. Needle Co. v. ;

unlawful by "statutory command,"[39] with no "question of reasonableness [left] open to the courts."[40] "[O]nce a price-fixing agreement [i]s proved," the "inquiry … ends."[41]

The *per se* condemnation of price-fixing covers not only agreements that "literally set or restrict prices," but extends to all agreements "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity," regardless of the "machinery employed" to seek that "unlawful objective."[42] This includes agreements between rivals to fix output or supply;[43] to fix "the range [of prices] within which purchases or sales will be made," including maximum price caps;[44] to fix non-price terms that function as "elements" or "components" of price;[45] and to fix the ways in which prices are negotiated, calculated, or otherwise determined.[46] In all their varieties, the Sherman Act places price-fixing schemes "beyond the pale,"

[39] FTC v. Superior Ct. Trial Lawyers' Ass'n, 493 U.S. 411, 432-433 (1990) (explaining that the per se prohibition on price-fixing is a "statutory command" of Section 1 that is "analogous to per se restrictions upon, for example, stunt flying in congested areas").

[40] Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 238 (1899) (quoting United States v. Addyston Pipe & Steel Co., 85 F. 271, 293 (6th Cir. 1898) (Taft, J.), aff'd 175 U.S. 211 (1899)); accord United States v. McKesson & Robbins, Inc., 351 U.S. 305, 309-10 (1956) (explaining that "price fixing is contrary to the policy of competition underlying the Sherman Act" and therefore "its illegality does not depend on a showing of its unreasonableness," i.e., a showing of actual anticompetitive effect); NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 133 (1998) ("[The] antitrust laws do not require proof that [a price-fixing, bid-rigging, or market-division agreement] is, in fact, anticompetitive in the particular circumstances"); Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 211 (1959) ("As to [price-fixing and other per se violations], … Congress … determined its own criteria of public harm and it [i]s not for the courts to decide whether in an individual case injury ha[s] actually occurred."). Just six years ago, Congress expressly confirmed courts' longstanding per se treatment of price-fixing, agreeing that "[c]onspiracies among competitors to fix prices, rig bids, and allocate markets are categorically and irredeemably anticompetitive and contravene the competition policy of the United States." 15 U.S.C. § 7a note (Findings; Purpose of 2020 Amendment).

[41] Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332, 344 (1982); accord United States v. Koppers Co., 652 F.2d 290, 294 (2d Cir. 1981) (quoting Robert H. Bork, The Antitrust Paradox 18 (1978) (explaining that, for both bid rigging and price-fixing restraints, a plaintiff "need prove only that [the challenged behavior] occurred in order to win [its] case, there being no other elements to the offense and no allowable defense.").

[42] United States v. Apple, Inc., 791 F.3d 290, 321 (2d Cir. 2015) (quoting Socony Vacuum …)

[43] F.T.C. v. Superior Ct. Trial Laws. Ass'n, 493 U.S. 411, 423 (1990).

[44] Socony Vaccum 222-223; Maricopa County; Kiefer-Stewart; Albrecht

[45] See Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 646–48 (1980); see also Gelboim v. Bank of Am. Corp., 823 F.3d 759, 771 (2d Cir. 2016).

[46] See Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 646–48 (1980); Sugar Institute v. United States, 297 US. 553, 601-602 (1936); see also Gelboim v. Bank of Am. Corp., 823 F.3d 759, 771 (2d Cir. 2016) (citing Plymouth Dealers'

regardless of the market involved,[47] the two-sided nature of the market,[48] or any "procompetitive justifications" that may be offered.[49]

**a. The Proposed Settlement Agreement is unreasonable *per se*.**

Here, the Proposed Settlement Agreement is unreasonable *per se* because it is a price-fixing contract between two direct competitors—Visa and Mastercard—in the relevant market for general-purpose credit-card transactions. Specifically, the Proposed Settlement Agreement nakedly restrains Visa and Mastercard's autonomy to compete with each other on price and price-determining terms in six critical ways:[50]

---

Ass'n of No. Cal. V. United States, 279 F.2d 128, 132 (9th Cir. 1960)) (noting that "use of a common fixed list price constituted price-fixing despite independently negotiated departures from said list price").

[47] Arizona v. Maricopa County Medical Soc., 457 U.S. 332, 349 (1982) (quoting Socony-Vacuum, 310 U.S. at 222) (explaining that, with respect to its per se proscription of price-fixing,the Sherman Act "establishes one uniform rule applicable to all industries alike" that need not be "rejustified" in each application") (collecting cases); see also [socony vacuum]; Gelboim v. Bank of Am. Corp., 823 F.3d 759, 771 (2d Cir. 2016) (citing Maricopa County, 457 U.S. at 349).

[48] See, e.g., In re Delta Dental Antitrust Litig., 484 F. Supp. 3d 627, 637 (N.D. Ill. 2020) (explaining that Amex does not foreclose a claim that horizontal price-fixing in a two-sided market is anticompetitive per se).

[49] Arizona v. Maricopa County Medical Soc., 457 U.S. 332, 351 (1982) ("The anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some."); accord, e.g., Leegin v. Creative Leather-Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007); United States v. Apple, Inc., 791 F.3d 290, 321 (2d Cir. 2015); cf. United States v. Sealy, Inc., 388 U.S. 350, 357-58 (1967) (explaining per se rule similarly in case dealing with

[50] The Proposed Settlement Agreement authorizes Visa and Mastercard to enforce these provisions against each other. See Doc. 9692-2 at ¶ 154 (providing that the Settlement Agreement "shall be binding upon, and shall inure to the benefit of, the Rule 23(b)(2) Class Plaintiffs, the members of the Rule 23(b)(2) Class, the Visa Defendants, and the Mastercard Defendants") (emphasis added).

1. The Agreement fixes the maximum Effective Interchange Rate[51] that Visa and Mastercard may assess on credit-card transactions over the next 5 years at a level equal to the current cross-network Effective Interchange Rate minus 10 basis points. [52]

2. The Agreement fixes the maximum interchange rates that Visa and Mastercard may assess on credit-card transactions in certain categories over the next 5 years by prohibiting Visa and Mastercard from increasing such rates above the posted rates for transactions in the identified categories as of March 31, 2025.[53]

3. The Agreement fixes the maximum interchange rate that Visa and Mastercard may assess on transactions involving Standard credit cards over the next 8 years at 125 basis points. Since the current average default interchange rate for Standard credit cards is higher than 125 basis points, the Agreement also operates to fix the actual default interchange rates that Visa and Mastercard will impose on Standard-card transactions immediately after the Agreement goes into effect.[54]

4. The Agreement fixes the interchange rates that Visa and Mastercard will assess on credit card transactions involving merchants with which they have entered a "custom credit card interchange-rate agreements" over the next 5 years. Specifically, it requires each network to discount those rates by a percentage equal to the ratio of 10 basis points divided by the current cross-network Effective Interchange Rate.[55]

5. The Agreement fixes the merchant-surcharge policy to which Visa and Mastercard will adhere over the next 8 years. This policy includes a maximum-surcharge restriction (the lesser of 3% or the merchant's average cost of accepting the network's

---

[51] The Proposed Settlement Agreement defines the "Effective Interchange Rate" as follows: "'Effective Interchange Rate" means all network-set default interchange fees (without regard to any network assessments or fees) assessed to acquirers in connection with Visa-Branded Credit Card or Mastercard-Branded Credit Card transactions authorized, cleared, and settled by the Visa Defendants or the Mastercard Defendants, respectively, including any individually-negotiated interchange reductions implemented as a result of an agreement between the network and a merchant, divided by the sales volume of the corresponding transactions. The 'Effective Interchange Rate' is calculated net of returns and chargebacks. Credit Card or Mastercard-Branded Credit Card transactions involving individually-negotiated interchange reductions or rebates implemented as a result of an agreement between an issuer and a merchant or its acquirer, the 'Effective Interchange Rate' is calculated using the network-set default interchange fees corresponding to those transactions." ECF No. 6962-2 at 10-11.

[52] Paragraphs from agreement.

[53] Paragraphs from agreement

[54] Pargraphs from agreement

[55] Paragraphs from agreement

credit cards), a prohibition on issuer-based surcharges, various merchant-reporting duties, and various customer-disclosure requirements.[56]

6. The Agreement fixes the "Honor All Cards" policy to which Visa and Mastercard will adhere over the next 8 years. This policy would permit merchants to decline credit cards by "product category" (*e.g.*, all Premium Consumer cards, all Commercial cards, etc.) but not by the "issuing financial institutions" (*e.g.*, Chase cards) or by the "product type" (*e.g.*, Visa Signature Preferred cards). The Agreement also requires Visa and Mastercard to set up identical infrastructures for merchants to be able to decline credit cards by product category at point of sale.[57]

By its very terms, the Agreement expressly authorizes Visa and Mastercard to enforce these provisions against one other.[58] Thus, the Agreement fixes critical price and price-determining procedures on which Visa and Mastercard are supposed to compete in offering their transaction platform services to the market—"joining together separate decisionmakers" and thus "depriv[ing] the marketplace of [the] independent centers of decisionmaking" on which competition depends.[59]

### *1. Fixing Cross-Network Default Interchange Rates*

To begin with, the first four of the above-listed provisions are "naked restraints" on independent price-setting by each network,[60] committing Visa and Mastercard to a joint policy of: (1) reducing and then capping their default interchange rates to fixed levels slightly lower than current ones; and (2) offering a mandatory default-interchange-rate discount to certain merchants with custom-rate contracts (*i.e.*, large merchants). These terms are facially illegal.[61] It makes no difference that these terms purport to fix maximum prices rather than minimum prices. As the Supreme

---

[56] Paragraphs from agreement

[57] [paragraphs from agreement]

[58] See Settlement Agreement, Doc. 9692-2, at ¶ 154 (providing that the Settlement Agreement "shall be binding upon, and shall inure to the benefit of, the Rule 23(b)(2) Class Plaintiffs, the members of the Rule 23(b)(2) Class, the Visa Defendants, and the Mastercard Defendants") (emphasis added).

[59] Am. Needle, 560 U.S. at 195.

[60]

[61] Gelboim v. Bank of Am. Corp., 823 F.3d 759, 771 (2d Cir. 2016);

Court has repeatedly affirmed, "schemes to fix maximum prices … cripple the freedom of [rivals]" to compete "in accordance with their own judgment" no less than schemes "to fix minimum prices," and they are unlawful *per se* all the same.[62] It also makes no difference that these terms purport to fix "default" interchange rates that apply "only" to transactions between merchants and issuers who have not executed a bilateral interchange agreement. As the Second Circuit recently affirmed, the Section 1's *per se* condemnation applies to competitors who fix "starting point[s] for prices" — such as "list prices" that apply by default absent a negotiation — "even if *most* or for that matter *all* transactions occur at [different] prices."[63] Indeed, the fact that merchants would (theoretically) "remain free to negotiate" interchange rates with issuer banks that deviate from the default "starting points" fixed by Visa and Mastercard through the Agreement is entirely beside the point: The Act's categorical condemnation of "combination[s] which tampe[r] with price structures" turns on their inherent tendency to "corrupt market conditions," not whether the parties affected by them have the "bargaining power" to resist their malign "influence."[64]

### ***2. Restraining Cross-Network Honor-All-Cards and Surcharge Policy to Force Merchants to Pay Fixed Default Interchange Rates***

Even if that were not the case, however, the remaining at-issue Agreement provisions—which establish a joint Visa-Mastercard policy with respect to "Honor All Cards" and "No Surcharge" rules—are designed to preclude any bilateral rate negotiations between merchants and issuers, and thereby convert the fixed "default" rates in Visa and Mastercard's schedules into the prices that merchants actually pay to transact on both networks. As various plaintiffs have ably argued throughout this litigation, by barring merchants from surcharging or declining to accept a

[62] Maricopa county medical

[63] Gelboim v. Bank of Am. Corp., 823 F.3d 759, 771 (2d Cir. 2016)

[64] Gelboim v. Bank of Am. Corp., 823 F.3d 759, 771 (2d Cir. 2016)

credit cards based on their issuer, Visa and MasterCard's parallel Honor-All-Cards and No-Surcharge rules have "force[d] merchants into an 'all or nothing' acceptance decision" that "prevents merchants from being able to negotiate" bilateral interchange rates with issuer banks.[65] As a result of these rules, "issuing banks [have had] no incentive to negotiate with merchants, and merchants [have had] no ability to negotiate [with issuers] for lower [rates]," forcing merchants to pay the "default" interchange fees set by Visa and Mastercard.[66] Nothing about these negotiation-precluding, price-fixing features of the Honor-All-Cards and No-Surcharge rule will change because of the Proposed Settlement Agreement—except that Visa and MasterCard will now have a *jointly fixed policy* with respect to these critical terms of trade.

Under the Proposed Settlement Agreement, both Visa and MasterCard agree to allow merchants to selectively decline credit cards based on their "product category" (*e.g.*, all "premium" cards, or all "standard" cards, etc.) and to differentially surcharge credit cards based on their "brand" (*e.g.*, all Visa cards) or their "product type" (*e.g.*, Visa Traditional, Visa Signature, etc.), on the one hand, but to continue to prohibit merchants from declining or differentially surcharging credit cards based on the "issuing financial institution," on the other hand.[67] Plainly, by implementing this joint policy, Visa and MasterCard will ensure that their "Honor All Cards" and "No Surcharge" rules continue to preclude any price negotiation between merchants and issuers, and thereby continue to force merchants to pay their (now horizontally-fixed) "default" interchange rates.[68] This is not just Objectors' opinion: Class Counsel's own briefing in support of the Proposed

[65] See Direct Action Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment Under Ohio v. American Express, ECF No. 8325, at 6-7.

[66] See Direct Action Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment Under Ohio v. American Express, ECF No. 8325, at 6-7

[67] Settlement Agreement paragraphs

[68] See infra n. [__]

Settlement Agreement all but admits that the Agreement's Honor-All-Cards and Surcharge "reforms" would not create any incentive for issuers to enter—or leverage for merchants to compel—bilateral negotiations over interchange fees. Indeed, Class Counsel's whole theory of how the Agreement's "reforms" might—depending on a host of contingent market developments—ultimately deliver material economic benefits to merchants *depends* on preserving the Honor-All-Cards and No-Surcharge rules' negotiation-precluding, price-fixing function.[69]

Instead of arguing that the Proposed Settlement Agreement will benefit merchants by increasing competition among card networks or issuers, Class Counsel has argued that the Agreement will do so by creating a "process" through which merchants can "incentivize *cardholders* to use lower cost cards."[70] Their argument proceeds in three parts. First, Class Counsel argues that the Agreement will expand the delta in interchange rates between the Network's "standard" and "premium" cards from ~45 basis points to ~100 basis points by (1) lowering and capping the "default" interchange rate on the Networks' "standard" credit cards to 125 basis points (2) while allowing the Networks to set higher "default" interchange rates in the 200-300 basis point range on their "premium" cards.[71] Second, Class Counsel claims that, by allowing merchants to apply (higher) surcharges or decline to accept "premium" cards in favor of "standard" cards, the Agreement gives merchants tools with which to incentivize their customers to use "standard" as opposed to "premium" cards.[72] Finally, as merchants use these tools to nudge their customers toward

[69] See infra n. [__]

[70] Transcript, preliminary approval hearing, page 29, line 13-15, argument of MasterCard Counsel

[71] Equitable Relief Class Plaintiffs' Reply Memorandum of Law in Support of Motion for Preliminary Approval of Amended Settlement Agreement, ECF No. 9775, at 15-16, 25-32.

[72] Id.

"standard" cards, Class Counsel surmises, their customers will shift more of their transactions to "standard" cards with lower rates, reducing the average interchange rates that merchants pay.[73]

Setting aside the significant doubt that empirical research has cast on the efficacy of such "nudges"—*i.e.*, small changes in the choice architecture, like those that might flow from a 55 basis point increase in the delta between "standard" and "premium" cards—in producing meaningful changes in individual behavior,[74] it is plain that Class Counsel's grand theory of how this Agreement might deliver economic benefits to merchants is predicated on fixing prices to manipulate cardholders' choices at point of sale—not restoring competition to the credit card transactions market.[75] Indeed, the entirety of Class Counsel's discussion of how this Agreement is supposed to benefit merchants assumes that the "default" Visa-MasterCard interchange rates fixed in the Agreement will be the actual rates paid by merchants.[76] Class Counsel make that assumption because they knows what Objectors know—that the joint Visa-MasterCard policy on Honor-All-Cards and No-Surcharge rules established by the Agreement maintains the bilateral-negotiation-precluding, price-fixing features of those rules.[77] When a horizontal restraint "operates to preclude … price negotiation[s]" in this way, it "constitutes horizontal price fixing" and "is unreasonable as a matter of law."[78]

---

[73] Id.

[74] https://www.bbc.com/future/article/20220804-does-nudge-theory-work-after-all ; https://www.wsj.com/economy/consumers/decision-making-research-behavior-2e5060c1?eafs_enabled=false ; https://www.newscientist.com/article/2511930-we-were-wrong-about-being-able-to-nudge-people-to-improve-the-world/ ;

[75]

[76] Equitable Relief Class Plaintiffs' Reply Memorandum of Law in Support of Motion for Preliminary Approval of Amended Settlement Agreement, ECF No. 9775, at 15-16, 25-32.

[77] Class Counsel cites only one example of a merchant—Amazon—being able to use a combination of the tools provided by the Agreement — differential surcharging, differential discounting, and threatening non-acceptance of all Network cards — to negotiate lower interchange rates from Visa solely in the Singapore and Australia markets.

[78] Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma, 468 U.S. 85, 99-100 (1984). See also United States v. Gen. Motors Corp., 384 U.S. 127, 147, 86 S. Ct. 1321, 1331, 16 L. Ed. 2d 415 (1966) (holding that, when "a

### *3. Fixing Cross-Network Merchant Surcharge Rates*

In addition to being a horizontal restraint that "cause[s] [interchange rates] to be fixed or contribute[s] to that result" by precluding bilateral negotiations between merchants and issuers,[79] the joint Visa-Mastercard policy on merchant surcharges established by the Agreement also fixes surcharge rates across the competing networks. Specifically, the relevant provisions of the Agreement provide that, for the next eight years, Visa and MasterCard will permit merchants to impose surcharges on credit cards based on "brand" (*e.g.*, all Mastercard cards) or "product type" (*e.g.*, Mastercard Standard World, World Elite, etc.) at a rate not to exceed either 3% or the merchant's cost of accepting the Network's card, whichever is less.[80] This is another facially illegal horizontal restraint on price competition between the two networks.[81]

For the merchant deciding whether to accept Visa or Mastercard credit cards, this restraint fixes the price they can charge a cardholder for using a card from either Network, as well as how much of the cost of acceptance (*i.e.*, interchange fee plus network fees) they can pass through to the cardholder. For the cardholder deciding whether to obtain Visa or Mastercard credit card or use one for any given transaction, the restraint fixes the price they can expect to pay for using a card from either Network at the point of sale. For the issuer deciding whether to issue credit cards on Visa or Mastercard, it fixes not only the price which cardholders might pay to use those cards at point of sale, but also how much of the interchange fee (which mostly goes to the issuer) a merchant is able to pass through to the cardholder—a factor which, depending on the vigor of competition among issuers, might constrain the interchange fees that issuers can charge.

---

substantial restraint upon price competition" is "inherent [to] the success of [a] combination," it renders the combination "unlawful per se … even when the effect upon prices is indirect") (collecting cases).

[79] Socony vacuum

[80] Agreement paragraphs

[81] [cite]

In short, by establishing a joint Visa-Mastercard policy on merchant surcharging, the Proposed Settlement Agreement fixes the prices charged or paid by merchants and cardholders across both networks and thereby fixes the allocation of the total transaction price among merchants and cardholders on both networks—a core feature of price competition between Visa, Mastercard, and other credit card transaction platforms. Such "interfer[ence] with the setting of price" by the "free play of competitive forces" is a *per se* violation of the "policy unequivocally laid down by the [Sherman] Act."[82]

**b. None of the limited exceptions to the *per se* rule apply.**

When an agreement among competitors restricts how they will compete with each other on price, the agreement is subject to the *per se* rule—with two exceptions that the factfinder may consider if requested by defendants and sufficiently supported by evidence. Neither applies here.

The first exception arises when a legitimate joint venture or similar business collaboration restricts activities outside of the collaboration.[83] Such a restriction will be evaluated under the rule of reason if it satisfies the two requirements of "the ancillary restraints doctrine."[84] The restraint must be (i) "subordinate and collateral"[85] to a "legitimate business collaboration, such as a business

---

[82] Arizona v. Maricopa county Medical ("interference"); Underwriters Ass'n ("competitive forces") N. Pac. Ry. Co. v. U.S. ("policy")

[83] Texaco Inc. v. Dagher, 547 U.S. 1, 7 (2006). The hallmarks of a typical legitimate joint venture or similar business association are "fusions or integrations of economic activity," Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210, 224 (D.C. Cir. 1986) (Bork, J.), wherein "multiple sources of economic power [are] cooperating to produce a product," Am. Needle, Inc. v. NFL, 560 U.S. 183, 199, 203 (2010).

[84] Ibid.; Rothery, 792 F.2d at 224.

[85] Rothery, 792 F.2d at 224,

association or joint venture,"[86] and (ii) "reasonably necessary" to achieving that collaboration's procompetitive purpose.[87]

The second exception arises in other contexts in which "the restraint at issue was imposed in connection with some kind of potentially efficient joint venture."[88] This type of joint-venture defense exists, for instance, when a joint venture creates a new product, and "the 'restraints on competition are essential if the product is to be available at all.'"[89] The Supreme Court addressed such a circumstance in *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, when it recognized that, in order to offer a venture product for sale, the venture must, for practical reasons, "set the price of" *that* product.[90] This setting of prices, in lay terms, might be "literally 'price fixing,'"[91] but it is not "price fixing" in the antitrust sense because the joint venture is "regarded as a single firm competing with other sellers in the market."[92] Therefore, it is "subjected to a more discriminating examination under the rule of reason."[93]

Obviously, neither of these exceptions apply to the Proposed Settlement Agreement or its price-fixing terms because there is neither a "legitimate business collaboration" nor a "potentially efficient joint venture" between Visa and MasterCard in the first place. The Proposed Settlement

---

[86] Dagher, 547 U.S. at 7,

[87] United States v. Addyston Pipe & Steel Co., 85 F. 271, 281 (6th Cir. 1898) (Taft, J.), aff'd as modified in other part, 175 U.S. 211 (1899); accord Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 338 (2d Cir. 2008) (Sotomayor, J., concurring in the judgment).

[88] Apple, 791 F.3d at 326.

[89] Id. (quoting Am. Needle, 560 U.S. at 203).

[90] Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 9 (1979). See also Polygram Holdings

[91] Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 9 (1979).

[92] Texaco Inc. v. Dagher, 547 U.S. 1, 6 (2006) (quoting Arizona v. Maricopa County Medical Soc., 457 U.S. 332, 256 (1982) (citing Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1. (1979))).

[93] Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 24 (1979).

Agreement is a naked restraint on price-competition between Visa and Mastercard in *per se* violation of Section 1 of the Sherman Act.

**iii. Alternatively, the Proposed Settlement Agreement is illegal because it is a horizontal restrain on competition that will tend to create a shared Visa-MasterCard monopoly in the credit card transactions market.**

Even if the Proposed Settlement Agreement were evaluated under the rule of reason, however, "no elaborate industry analysis [would be] required to demonstrate [its] anticompetitive character[.]"[94] The rule of reason is intended to be flexible—entailing an "enquiry meet for the case."[95] The "quality of proof required [in applying the rule of reason] should vary with the circumstances."[96] Accordingly, the analysis can be highly abbreviated—sometimes referred as quick-look review—where the challenged restraint bears a "close family resemblance" to restraints that have been condemned *per se* in prior cases,[97] or where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect."[98]

To provide structure to the rule-of-reason inquiry, courts often use a burden-shifting framework.[99] First, the plaintiff must show that the challenged conduct has an "anticompetitive effect"—*i.e.*, that it "harm[s] the competitive process and thereby harm[s] consumers."[100] If the plaintiff does so, the burden shifts to the defendant to provide a sufficient "procompetitive justification"

---

[94] F.T.C. v. Indiana Fed'n of Dentists, 476 U.S. 447, 459 (1986) (quoting Nat'l Society of Prof'l Eng'rs v. United States, 435 U.S. 679, 692 (1978)).

[95] Cal. Dental Ass'n v. FTC, 526 U.S. 756, 781 (1999).

[96] Cal. Dental Ass'n v. FTC, 526 U.S. 756, 780 (1999) (internal quotations omitted).

[97] FTC v. Indiana Federation of Dentists, 476 U.S. 447, 458-59 (1986); United States v. Apple, Inc., 791 F.3d 290, 321 (2d Cir. 2015); In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 714 F. Supp. 3d 65, 82 (E.D.N.Y. 2024) (citing Apple, 791 F.3d at 329-30).

[98] Cal. Dental Ass'n v. FTC, 526 U.S. 756, 770 (1999).

[99] See Ohio v. Am. Express Co., 585 U.S. 529, 541-2 (2018).

[100] See Ohio v. Am. Express Co., 585 U.S. 529, 540 (2018).

for its conduct.[101] If that is provided, the burden shifts back to the plaintiff to show that the pro-competitive benefits of the conduct could be reasonably achieved through less restrictive means.[102]

**a. The Proposed Settlement Agreement's price-fixing restraints would entrench Visa and Mastercard against competition from other networks.**

To make a *prima facie* showing of the "anticompetitive character" of the challenged restraint under the first step, plaintiffs can rely on either direct evidence or indirect evidence.[103] Direct evidence is proof of "actual detrimental effects" on competition,[104] which may include not only adverse price or output effects,[105] but also decreased quality,[106] reduced choice,[107] and—importantly—the elimination of significant head-to-head competition from the relevant market.[108] Indirect evidence is "proof of market power plus some evidence" that the challenged restraint is likely to lead to anticompetitive effects.[109]

Here, by restraining competition between Visa and Mastercard on price and price-determining factors, the Proposed Settlement Agreement will likely entrench their dominance in the credit card transactions market against both existing and potential competitors in at least two ways. First, the Agreement will neutralize the primary threat that Visa and Mastercard face in competition for credit card transaction volume—each other—by aligning their interchange-rate and

---

[101] 1-800 Contacts, Inc. v. FTC, 1 F.4th 102, 114 (2d Cir. 2021).

[102] 1-800 Contacts, Inc. v. FTC, 1 F.4th 102, 114 (2d Cir. 2021).

[103] Ohio v. Am. Express Co., 585 U.S. 529, 542 (2018).

[104] Ohio v. Am. Express Co., 585 U.S. 529, 542 (2018).

[105] Ohio v. Am. Express Co., 585 U.S. 529, 542, 549-52 (2018).

[106] Ohio v. Am. Express Co., 585 U.S. 529, 542 (2018).

[107] FTC v. Indian Fed'n of Dentists, 476 U.S. 447, 459 (1986); Lifewatch Servs. Inc. v. Highmark Inc., 902 F.3d 323 340 (3d Cir. 2018).

[108] United States v. First Nat'l Bank & Trust Co. of Lexington, 376 U.S. 665, 671-72 (1964); Ohio v. Am. Express Co., 585 U.S. 529, 550 (2018).

[109] Ohio v. Am. Express Co., 585 U.S. 529, 542 (2018); Tops Mkts, Inc. v. Quality Mkts., Inc, 142 F.3d 90, 97 (2d Cir. 1998).

transaction-price-allocation policies for the next 5-8 years. Second, the Agreement will handicap the ability of smaller credit-card networks to capture market share, and new credit-card networks to enter the market at all, by setting an inflated interchange-rate floor in the market and forcing upstart networks to exceed it in order to secure partnerships with card issuers. Since offering such a high interchange fee to issuers would likely raise the cost of accepting the small networks to a merchant above the cost of accepting Visa or Mastercard, doing so would risk triggering "a feed-back loop of declining demand" for a smaller network—or undermine the ability of a new network to secure sufficient merchant participation to succeed in the first place.[110]

### *1. Market Power and Market Structure*

The general-purpose credit-card transactions market is highly concentrated and characterized by high barriers to entry.[111] The market is divided among only four competing networks: Visa, Mastercard, American Express, and Discover.[112] These networks "operate what economists call a two-sided platform," which "offers different products or services to two different groups who both depend on the platform to intermediate between them."[113] Specifically, they offer transaction services to merchants, who accept credit cards as payment, and cardholders, who use credit cards to make payments.[114] Since "no credit-card transaction can occur unless both the merchant and the cardholder simultaneously agree to use the same credit-card network,"[115] new entrants into this market face a "chicken-and-egg" problem: "merchants value a payment system only if a sufficient number of cardholders use it[,] and cardholders value a payment card only if a sufficient number

[110] Ohio v. Am. Express Co., 585 U.S. 529, 538, 544 (2018).

[111]

[112] In re Am. Express Anti-Steering Rules Antitrust Litig., 19 F.4th 127, 135–36 (2d Cir. 2021)

[113]

[114]

[115]

of merchants accept it."[116] In this context, No new networks have entered the market in nearly four decades—since Discover launched in 1985.[117]

Visa and Mastercard are the dominant incumbents in the general-purpose credit card transactions market.[118] Visa—with its market share of approximately 50% of credit card transactions by dollar volume and its demonstrated ability to exclude competitors—obviously has market power.[119] Although Mastercard has contested its possession of market power in this litigation, the Court has held that Plaintiffs' evidence is sufficient for a jury to find that Mastercard—with its consistent ~25% market share, admitted ability to set the price of its products without regard to cost, and long track record of price discrimination and supracompetitive profits, among other things—does, indeed, possess market power.[120] Under similar market conditions to those which prevail today, the Second Circuit has found that Visa and Mastercard, both individually and collectively, possess market power in the relevant market.[121]

Indeed, "Visa and Mastercard have significant structural advantages over Amex and Discover."[122] Since Visa and MasterCard began as "structural conspiracies" of approximately 20,000

[116] In re Am. Express Anti-Steering Rules Antitrust Litig., 19 F.4th 127, 135–36 (2d Cir. 2021)

[117] In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 714 F. Supp. 3d 65, 99 (E.D.N.Y. 2024)

[118]

[119] United States v. Visa U.S.A., Inc., 344 F.3d 229, 240 (2d Cir. 2003); Amex at 537-38

[120] In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 714 F. Supp. 3d 65, 98-99 (E.D.N.Y. 2024).

[121] In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 714 F. Supp. 3d 65, 96, 96 n. 26 (E.D.N.Y. 2024) (citing United States v. Visa U.S.A., Inc., 344 F.3d 229, 242 (2d Cir. 2003)).

[122] In re Am. Express Anti-Steering Rules Antitrust Litig., 19 F.4th 127, 135–36 (2d Cir. 2021); United States v. Visa U.S.A., Inc., 344 F.3d 229, 242 (2d Cir. 2003); Amex at 537-38. As of 2023, the market shares of the four networks by transaction volume has been reported as follows: Visa (52%), Mastercard (24%), American Express (19%), and Discover (5%). https://www.fool.com/money/research/credit-debit-card-market-share-network-issuer/; see also https://shopappy.com/payments/card-networks/card-networks-compared (providing similar market shares as of 2026).

banks to fix interchange fees,[123] "almost every bank that offers credit cards is in the Visa or MasterCard network."[124] "This makes it very likely that the average consumer carries, and the average merchant accepts, Visa or MasterCard. As a result, the vast majority of Amex [and Discover] cardholders have a Visa or MasterCard, but only a small number of Visa and MasterCard cardholders have an Amex [or Discover]."[125] The card circulation figures for each network put Visa and Mastercard's disproportionate scale into sharp relief: As of 2018, Visa accounted for 338 million and Mastercard accounted 231 million credit cards in circulation in the United States, yielding a combined total of 569 million, while Amex and Discover accounted for 54 million and 57 million, respectively.[126] These lopsided circulation figures reflect, in part, that Visa (+40.8%) and Mastercard (+35.1%) experienced enormous circulation growth between 2010 and 2018, while Amex (+10.2%) and Discover (+3.6%) struggled to expand the number of cards issued on their networks.[127]

Historically, Amex and Discover have competed by employing a different business model than Visa and Mastercard. While Visa and Mastercard are "pure networks" that intermediate between cardholders and issuing banks, on the one hand, and merchants and acquiring banks, on the other,[128] Amex and Discover operate a mostly "closed loop" system in which they issue their own credit cards which run on their own payment networks.[129] In the mid-1990s, Amex tried to change

---

[123] Barry's Cut Rate Stores Inc. v. Visa, Inc., Case No. 05MD1720MKBJO, 2019 WL 7584728, at *6 (E.D.N.Y. Nov. 20, 2019); see also United States v. Visa U.S.A., Inc., 344 F.3d 229, 240 (2d Cir. 2003); Osborn v. Visa Inc., 797 F.3d 1057, 1063–64 (D.C. Cir. 2015)

[124] Amex at 537-38.

[125] See Amex at 537-38.

[126] https://wallethub.com/edu/cc/number-of-credit-cards/25532

[127] https://wallethub.com/edu/cc/number-of-credit-cards/25532

[128] Visa 2003

[129] Visa 2003

its structure by soliciting banks to issue Amex cards.[130] Its solicitations were successful abroad, but Visa and Mastercard were able to thwart Amex's efforts to secure bank partners in the United States by prohibiting their member banks from issuing Amex or Discover cards.[131] Although Visa and Mastercards' exclusionary prohibition was ultimately enjoined, Amex never developed a significant number of bank partnerships in the United States.[132] Today, only a *de minimis* percentage (~1%) of Amex's transaction volume involves credit cards issues by banks other than Amex.[133]

Although Amex historically trailed Visa and Mastercard in the number of merchants who accept its cards by millions of locations,[134] in 2017 it launched a campaign to close the gap through merchant-fee-reducing partnerships with major payment processors, and has reportedly enjoyed merchant-acceptance parity with Visa and Mastercard since 2020.[135] The same goes for Discover.[136] Moreover, although Amex historically charged a significantly higher transaction price and merchant fee than Visa or Mastercard in order to provide a premium credit card for wealthy individuals, the substantial increase in Visa and Mastercard interchange rates and networks fees since the mid-2010s has substantially reduced the price gap between Amex and Visa-Mastercard.[137] Nevertheless, Amex has seen its market share decline significantly over the past decade—going from a high-water mark of 26.4% of credit card transactions by volume in 2013 down to

---

[130] Visa 2003

[131] Visa 2003

[132]

[133]

[134] See Amex at 537-38; see also https://www.nerdwallet.com/credit-cards/learn/discover-american-express-acceptance ; https://www.americanexpress.com/en-us/newsroom/articles/products-and-services/american-express-is-accepted-at-160-million-merchants-around-the.html ;

[135]

[136]

[137]

approximately 18% of transactions in 2026.[138] Discover's market share, meanwhile, has treaded water, inching up from 5.3% in 2013 to ~6% in 2026.[139]

### *2. Anticompetitive Effect*

In this context, the anticompetitive effect of the Proposed Settlement Agreement's restraints on price competition between Visa and Mastercard is straightforward.

On the one hand, by fixing individual interchange rates as well as the average interchange level across both Visa and Mastercard through the above-discussed provisions, the Agreement would restrict the parameters of Visa and Mastercard's competition for issuers (who tend to demand higher interchange fees from competing networks). Since the Agreement simultaneously gives Visa and Mastercard complete freedom to replace reduced interchange fees (which are paid to banks) with their own network fees (which they keep), the Agreement would allow Visa and Mastercard to directly monetize the Agreement's price restraints, in whole or in part, by pocketing a larger percentage of the merchant fee for themselves. Indeed, if Visa and Mastercard refrain from replacing reductions in interchange fees arising from the Agreement with network fees, they would be "leaving money on the table."[140]

On the other hand, by setting the so-called "caps" on Visa and Mastercard's individual interchange rates at current levels or below, the Agreement would effectively fix a roughly uniform interchange rate level—and a concomitant total transaction price allocation scheme—for approximately 75% of all credit card transaction volume and substantially all such transactions on bank-

---

138

139 the market shares of the four networks by transaction volume has been reported as follows: Visa (52%), Mastercard (24%), American Express (19%), and Discover (5%). https://www.fool.com/money/research/credit-debit-card-market-share-network-issuer/; see also https://shopappy.com/payments/card-networks/card-networks-compared (providing similar market shares as of 2026).

140

issued credit cards.[141] Once fixed for the bank-issued card submarket, this interchange rate level would almost certainly become the benchmark against which banks decide whether to issue credit cards on non-incumbent networks or not—creating a *de facto* floor beneath interchange rates that Visa and Mastercard's competitors must exceed in order to partner with issuing banks.

If small networks fail to exceed this interchange floor, then banks will likely have no incentive to issue cards with them, and they will have to issue their own cards (like Amex and Discover) to stay in business—a path that has failed to yield meaningful circulation or market-share growth for Amex or Discover in more than a decade. On the flipside, if small networks *do* exceed the Visa-Mastercard benchmark interchange rate level fixed by the Agreement, they will be significantly handicapped in their ability to secure wide acceptance from the merchants who would be forced to pay that high interchange fee *as well as* the small network's own fees. Indeed, if Amex were to attempt this strategy in a reprise of its mid-1990s campaign to partner with issuing banks, it would likely disrupt Amex's merchant-fee-reducing arrangements with payment processors and undermine the progress it has made in closing the merchant-acceptance gap.[142]

The Agreement's joint Visa-Mastercard "No-Surcharge" policy would only exacerbate the handicap which the Agreement's interchange-fixing places on small and new networks. To continue with the Amex example above, Amex currently enforces a so-called "equal treatment" rule on surcharges, requiring merchants to apply the same surcharge terms to all of the credit card brands they accept (or none at all).[143] By capping merchant surcharges on Visa and Mastercard transactions at the lesser *of* the 3% or the merchant's average cost of Visa or Mastercard acceptance over time, however, the Agreement would turn Amex's "equal treatment" rule against it. On the

141

142 [explain]

143 https://ebizcharge.com/blog/credit-card-surcharge-rules-by-network-visa-mastercard-and-more/

one hand, if a merchant surcharges only specific Visa or Mastercard product types, it is unclear whether they would be able to surcharge Amex cards at all, since Amex card products do not follow the same pattern as Visa or Mastercard products. On the other hand, if a merchant surcharges all Visa or Mastercard transactions, the merchant would only be allowed to surcharge bank-issued Amex cards in accordance with the Agreement's formula. However, in light of the benchmark-exceeding interchange rate on (hypothetical) bank-issued Amex cards, that formula is likely to yield a surcharge that exceeds the one imposed on Visa-Mastercard transactions—or a maximum surcharge of 3% that is insufficient to cover the average cost of Amex transactions. In all of these cases, Amex will be disadvantaged—either in its effort to secure merchant acceptance, or in its effort to win the loyalty of cardholders, or both.

**b. There are no procompetitive justifications for the Proposed Settlement Agreement's price-fixing restraints.**

In responding to plaintiffs' *prima facie* case, the range of cognizable "procompetitive justifications" that a defendant may offer is restricted by the core policy of the Sherman Act to preserve and nurture competition. "Contrary to its name, the [rule of reason] does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason."[144] The "statutory policy" embodied in the Sherman Act "is one of competition," and Congress's adoption of that policy "precludes inquiry into the question of whether competition if good or bad."[145] Accordingly, a horizontal restraint on competition between rivals cannot be justified by the "good motives" of the participants or by the reasonableness of the prices fixed, nor

[144] Professional Engineers

[145] NCAA v. Alston, 141 S. Ct. 2131, 2159 (2021) (citation omitted).

by the "judgment of the courts" that "monopolistic arrangements" might "better promote trade and commerce than competition" in any given case.[146]

The latter principle applies *a fortiori* to horizontal price-fixing agreements like the Proposed Settlement Agreement. As the Supreme Court has repeatedly affirmed: "Congress has not left with [courts] the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive."[147] There is, at a minimum, an "anticompetitive potential" in every price-fixing agreement.[148] As the Second Circuit has recently explained, where horizontal price-fixing arrangements are successful, they "concentrate power to set prices" among their participants—giving them powerful "leverage" over non-participating rivals which they can use to "destroy or drastically impair" competition, "control the market," and "fix arbitrary and unreasonable prices."[149] "[E]ven where these arrangements are unsuccessful or not aimed at complete elimination of price competition," they "creat[e] a dangerously attractive opportunity for competitors to enhance their power at the expense of others" by hijacking "the central nervous system" of the market.[150] Meanwhile, "[t]he conceivable social benefits" of price-fixing arrangements "are few in principle, small in magnitude, speculative in occurrence, and always premised on the existence of price-fixing power which is likely to be exercised adversely to the public."[151]

---

[146] Professional Engineers; McKesson

[147] United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 221–22, 60 S. Ct. 811, 843, 84 L. Ed. 1129 (1940); Klor's — collect more cases

[148] Arizona v. Maricopa Cnty. Med. Soc., 457 U.S. 332, 351, 102 S. Ct. 2466, 2476, 73 L. Ed. 2d 48 (1982)

[149] United States v. Apple, Inc., 791 F.3d 290, 327 (2d Cir. 2015) (quoting United States v. Trenton Potteries Co., 273 U.S. 392, 297 (1927)).

[150] United States v. Apple, Inc., 791 F.3d 290, 327 (2d Cir. 2015) (quoting United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223 (1941)).

[151] United States v. Apple, Inc., 791 F.3d 290, 327 (2d Cir. 2015) (quoting FTC v. Sup. Ct. Trial Lawyers Ass'n, 493 U.S. 411, 433 (1990)).

Here, even if the Court were to "indulge" in the kind of "general reasoning as to the expediency or nonexpediency" of the restraints on price-competition in the Agreement which caselaw prohibits, the result would only demonstrate the wisdom of the *per se* prohibition on such restraints. As detailed above, Class Counsel's entire theory of how the Proposed Settlement Agreement will deliver meaningful economic benefits to merchants is premised on fixing prices and restraining competition at every juncture of the Visa and Mastercard networks so that a merchant might—possibly—be able to nickel-and-dime their customers into using lower-cost credit cards.[152] However, as demonstrated above, this elaborate scheme comes, not only at the cost of entrenching Visa and Mastercard against competitive threats, but of creating an interchange-rate floor that will ultimately drive merchants' costs *up* not down.[153].

**B. The Court lacks the authority to approve the Proposed Settlement Agreement because it violates the policy of the antitrust laws and undermines their objectives.**

As the Supreme Court and the Second Circuit have affirmed, a court may not enter a consent judgment that contravenes public policy, especially the objectives of the statute on which the underlying complaint is based.[154] Here, the Proposed Settlement Agreement contravenes the policy of the antitrust laws in three critical ways. First, the Proposed Settlement Agreement's provisions would immunize the horizontal restraints within the Agreement discussed above entirely from challenge by merchants. Second, the Agreement's provisions indicate that Defendants intend to use the release of antitrust liability in this settlement as a shield in litigation against third parties not bound the Agreement, undermining the private enforcement of the antitrust laws—"an integral

152

153

154

part of the congressional plan for protecting competition."[155] Finally, several of the Proposed Settlement Agreement's release provisions would operate to waive merchants' claims and defense arising from Defendants' conduct with respect to *future* contracts, policies, and actions—giving them *carte blanche* to engage in unfair, deceptive, and anticompetitive practices with immunity.

**i. The Framework of Federal Antitrust Policy**

The antitrust laws reflect a "congressional plan" to secure an economy where competition—not combination or monopoly—is "the rule of trade."[156] Toward that end, the Sherman and Clayton Acts were designed to nurture and protect "fair opportunity for the play of contending forces ordinarily engendered by an honest desire for gain" in the Nation's markets.[157] That fundamental policy is implemented not only through the express prohibitions of those laws, but also by the Federal Trade Commission's (FTC) enforcement of the FTC Act's prohibition on "unfair methods of competition."[158] Indeed, the scope of the FTC Act properly identifies the framework of federal antitrust policy because its prohibition on "unfair methods of competition" encompasses: (1) conduct that violates the antitrust laws, (2) conduct that constitutes an "incipient" violation of the antitrust laws; and (3) conduct that violates the "spirit" of the antitrust laws.[159]

---

[155] California v. Am. Stores Co., 495 U.S. 271, 284 (1990).

[156] Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 505 (1959); Fashion Originators' Guild;

[157] FTC v. Raladam Co., 283 U.S. 643 (1931).

[158]

[159] See Grand Union Co. v. F.T.C., 300 F.2d 92, 95 (2d Cir. 1962) ("The [FTC] Act was intended to give the Commission the power to hit at every trade practice, then existing or thereafter contrived, which restrained competition or might lead to such restraint if not stopped in its incipient stages.") (collecting cases) (internal citations omitted); F.T.C. v. Brown Shoe Co., 384 U.S. 316, 321 (1966) (explaining that Section 5 of the FTC Act was designed to prohibit "practices which conflict with the basic policies of the Sherman and Clayton Acts even though such practices may not actually violate [the letter of] these laws," "stop in their incipiency acts and practices which, when full blown, would violate [the antitrust laws]," as well as prohibit "existing violations" of the antitrust laws); see also Federal Trade Commission, Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act (Nov. 10, 2022), available at: https://www.ftc.gov/legal-library/browse/policy-statement-regarding-scope-unfair-methods-competition-under-section-5-federal-trade-commission

To comply with its duties under Second Circuit precedent, the Court must ensure that the Proposed Settlement Agreement does not contravene the FTC Act or the federal antitrust policy it embodies before lending judicial approval to it.[160] In this vein, courts have rejected proposed settlements on public-policy grounds for depriving private parties of the ability to assert their legal rights against future violations of the antitrust laws.[161] Courts have rejected class settlements on public-policy grounds for undermining competitive conditions or sanctioning the use of unfair methods of competition.[162] While this statement of objections focuses on these issues, we note that they are not necessarily the only issues the Court should examine with respect to the Proposed Settlement's compliance with the FTC Act and federal antitrust policy.

**ii. The Proposed Settlement Agreement would immunize Visa and Mastercard from antitrust liability for entering an illegal horizontal price-fixing contract.**

The Proposed Settlement Agreement requires merchants to release Visa and Mastercard from essentially any future liability related to the Settlement Agreement for the longer of five years after the Settlement Final Date or eight years after the Settlement Approval date.[163] While this would be an unobjectionable provision in most settlement, here it would serve to immunize a naked restraint of trade in violation of the Sherman Act from private antitrust actions by merchants.[164] Indeed, the Proposed Settlement Agreement goes even further and bars merchants from raising the Agreement's illegality as an affirmative defense, not only to its own enforcement,[165] but to the

---

[160]

[161] California v. Am. Stores Co., 495 U.S. 271, 284 (1990); see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, 473 U.S. 614, 635 (1985); Redel's, Inc. v. General Elec. Co., 498 F.2d 95, 99 (5th Cir. 1974); Fox Midwest Theatres, Inc. v. Means, 221 F.2d 173, 180 (8th Cir. 1955).

[162] Authors Guild v. Google, Inc., 770 F. Supp. 2d 666,

[163] Agreement, ¶ 116(a).

[164]

[165] Paragraph 117, 116(b) and 116(c)

enforcement of the whole gamut of commercial contracts.[166] Notably, the Agreement also appears to require merchants to release claims against counsel on both sides related to the conduct of the litigation and the negotiation and terms of the Proposed Settlement Agreement.[167]

Perhaps the most glaring attempt to immunize the Proposed Settlement Agreement's unlawful restraints of trade are in Paragraph 143, which plainly indicates that Defendants intend to use the Proposed Settlement Agreement, if approved, "as a ground for a defense, in whole or in part" to claims brought by third parties not bound by the Settlement Agreement at all.[168] The Court should not enter a settlement approval that Defendants could use to defend the Agreement's restraints—or their conduct underlying this action—against antitrust claims by potential parties to this action that are not bound by the Agreement's terms.[169] Indeed, the Supreme Court has made clear that neither entering, nor complying with, nor implementing a settlement affords the parties to the settlement immunity to such enforcement actions.[170] The risk that defendants may attempt to use this private, negotiated settlement as a shield in future litigation underscores how important it is for the Court to closely evaluate its terms. At a minimum, if the Court approves the Proposed Settlement, it should make clear that doing so is not a ruling on the legality of the Salary Cap Rule such that the approval could be used as a defense in future litigation.[171]

---

[166] Paragraph 119

[167] Paragraph 121 (CONFIRM]

[168]

[169]

[170] Actavis

[171] See, e.g., White v. Nat'l Football League, 822 F. Supp. 1389, 1426 n.59 (D. Minn. 1993). (noting that in approving the settlement the court was making "no ruling on the issue" of whether the rules enshrined in the settlement were legal under the antitrust laws and recognizing that a court might find they were not in a "in future litigation concerning the legality of [those rules].")

### iii. The Proposed Settlement Agreement would empower Visa and Mastercard to engage in new and novel unfair methods of competition against merchants with legal immunity.

In addition to immunizing itself, the Proposed Settlement Agreement immunizes Visa and Mastercard against liability to merchants that could potentially arise from a wide range of wholly discretionary future actions that Visa and Mastercard may take in connection with the Settlement Agreement, including entering into no-exclusion contracts with merchants, providing required technology to merchants, imposing various pricing structure on merchants, and more. Contrary to what Class Counsel has represented to the Court, the release provisions in the Settlement Agreement extend beyond the legitimate confines of the "identical factual predicate" rule.[172] Although the principal release provision of the Agreement —Paragraph 116(a) — is, in fact, is limited to claims arising from the identical factual predicates to this action, the subsequent release provisions in the Agreement have been artfully drafted to require merchants to release much more.

To begin with, Paragraphs 116(b), 116(b)(iii), and 116(c), read together, would waive all merchant claims for equitable relief arising from any of the myriad discretionary "practice[s], activit[ies]," and "course[s] of conduct" related to implementing Paragraphs 18-55 and 67-104 of the Agreement. The problem starts with Paragraph 116(b), which deems all claims seeking equitable relief in connection with a wide variety of matters to be "claims that were or could have been alleged in this Action and relate to the subject matter thereof" by *ipse dixit*.[173] Paragraph 116(b)(iii) then indicates that those matters include "any actual or alleged 'no surcharge' rules, 'honor all cards' rules, 'honor all issuers' rules, … 'anti-steering' rules, … 'no bypass' rules, 'no multi-issuer' rules, …" and so on. Finally, Paragraph 116(c) delivers the kicker: "For purposes of clarity,"

172

173

it says, "references to the Rules identified in this paragraph 116 means" not only those Rules as they are or were through the Settlement Approval date, but also "as they may be modified in any manner provided in Paragraphs 18-55 and 67-104 above, and Rules in place thereafter that are substantially similar to those Rules."[174] At a minimum, this would immunize Visa and Mastercard's future adoption or modification of rules in *all the ways* permitted by Paragraphs 18-55 and 67-104 from merchant liability, which is bad enough. But the truth is actually worse, because the definition of the term "Rules" in the Proposed Settlement Agreement goes far beyond actual rules and standards to include "*any … practice, activity, or course of conduct* relating to any Visa-Branded Card or any Mastercard-Branded Card."[175] Paragraph 122 then reiterates and confirms that the scope of the release extends beyond claims arising from the "identical factual predicate" underlying this action to future discretionary conduct, including any practice, activity, or course of conduct implementing Paragraphs 18-55 and 67-104 of the Agreement.

The referenced paragraph ranges in these release provisions (18-55, 67-104) contemplate Visa and Mastercard engaging in a wide range of discretionary future conduct that cannot be considered part of the "identical factual predicate" of this case. This conduct includes negotiating and entering into no-exclusion contracts with merchants, imposing no-exclusion-favoring price structures on merchants, imposing reporting, registration, and disclosure requirements on merchants, providing certain technologies to merchant, and more. Given Visa and Mastercard's market power over merchants—including their repeatedly demonstrated power to "make merchants do things they do not want to do"[176]—Visa and Mastercard's implementation of the bilateral contracts, price structures, compliance systems and various other discretionary Visa-Mastercard actions

---

174

175

176 Fed. R. Civ. P. 23(e).

contemplated in the Agreement is bound to be rife with risks of unfairness, deception, and restraint of trade. The Court should not—and, indeed, may not—approved a settlement that gives dominant firms *carte blanche* to engage in unfair methods of competition with impunity—and thereby entrenches them against honest competitors.[177]

**C. Even if it had the discretion to do so, the Court should not approve the Proposed Settlement Agreement under Rule 23(e) because it fails to provide adequate relief.**

Before approving a proposed class-action settlement under Rule 23(e), the Court must determine that "the relief [it] provide[s] to the class is adequate" in consideration of "the costs, risks, and delay of trial and appeal."[178] In conducting this evaluation, the Second Circuit has instructed that a district court "is to act as a fiduciary who must serve as a guardian of the rights of absent class members."[179]

**i. The Court's preliminary-approval analysis underestimated the strength of Plaintiffs' case with respect to both (a) proving liability and (b) securing complete relief from the Anti-Steering Restraints.**

The Court's preliminary-approval analysis evaluated the strength of Plaintiffs' case, the risks of continued litigation, and the remedies Plaintiffs were likely to obtain under incorrect standards of law. As a result, the court overestimated Defendant's ability to avoid liability and underestimated Plaintiffs' ability to achieve complete relief from the Anti-Steering Restraints.

**a. The Court overrated Defendant's rebuttal arguments because it erroneously treated the exclusion of competition by the No-Bypass and Honor-All-Cards rules as a "procompetitive" justification for them.**

First, the Court's evaluation of Defendants' justifications for the Anti-Steering Restraints treated the very exclusion of competition which they imposed as a "procompetitive" justification

177

178

179 Goldberger v. Integrated Res., Inc., 209 F.3d 43, 52 (2d Cir. 2000)

for them—seemingly substituting its own judgment that "monopolistic arrangements" would "better promote trade and commerce" in the relevant market "than competition" for the "statutory policy" laid down by Congress.[180] At the preliminary approval hearing, the Court adopted the language of Defendants to describe the competition among issuers for merchant acceptance that would exist but-for the Honor-All-Cards rule and other Anti-Steering Restraints as "complete chaos."[181] In its preliminary approval order and opinion, the Court went further and characterized the elimination of "millions of bilateral negotiations" by the Network and Bank Defendants' horizontal fixing of interchange rates as a "procompetitive benefit."[182]

Respectfully, this analysis is erroneous—not only because it has long been demonstrated that the highly consolidated marketplace for card issuance does not require centralized fee-fixing in order to operate efficiently[183]—but, more importantly, because the Sherman Act does not permit the courts to sanction horizontal restraints on price competition based on their own choices "between competing business and economic theories,"[184] or their own assessment that doing so would "better promote" the "public interest" or the "interest of the members of an industry" in any case.[185] As the Supreme Court has repeatedly emphasized, Congress has "not left at large for determination [by a court] in each [antitrust] case the ultimate demands of the public interest."[186] Nor has

---

[180] Professional Engineers

[181]

[182] In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., No. 05-MD-1720 (BMC), 2026 WL 1662251, at *11 (E.D.N.Y. June 9, 2026)

[183] Nicholas Economides, "Competition Policy Issues in the Consumer Payments Industry," at 122 in R. Litan & M. Baily, Moving Money: The Future of Consumer Payment, Brookings Institution (2009) available at https:/ /www.neconomides.com/uploads/Economides _ Competition_Policy _ Payments_Industry.pdf.

[184] United States v. Crescent Amusement Co., 323 U.S. 173, 187 (1944).

[185] Professional Engineers

[186] United States (**Standard Stations**), 337 U.S. 293, 304, 311 (1949

congress authorized the courts to decide that price competition ought to be sacrificed for "greater efficiency,"[187] or even lower prices.[188] "For it is the [policy] of the antitrust laws that the long-run advantage of the community depends upon the removal of restraints upon competition"[189]—and that policy "precludes" the courts from "inquiry into the question of whether competition is good or bad" in any given case.[190]

Here, the "chaos" eliminated by the centralized interchange fixing carried out by Visa and Mastercard is "nothing more than … competition" itself.[191] The purported "efficiency" it generates by eliminating "millions of bilateral negotiations" is "the ordinary give and take of the market place" which it is the purpose of the antitrust laws to nurture and preserve.[192] As Justice Ginsburg held under analogous facts in *Polygram Holdings*: To credit such arguments as cognizable "pro-competitive justifications" for horizontal restraints would be "nothing less" than to mount "a frontal assault on on the basic policy of the Sherman Act."[193]

---

[187] Standard Oil Co. of California v. United States, 337 U.S. 293, 309, 69 S. Ct. 1051, 1060, 93 L. Ed. 1371 (1949)

[188] Arizona v. Maricopa Cnty. Med. Soc., 457 U.S. 332, 348, 102 S. Ct. 2466, 2475, 73 L. Ed. 2d 48 (1982) ("The per se rule is grounded on faith in price competition as a market force [and not] on a policy of low selling prices at the price of eliminating competition.") (internal citations omitted).

[189] Standard Oil Co. of California v. United States, 337 U.S. 293, 309, 69 S. Ct. 1051, 1060, 93 L. Ed. 1371 (1949). As the Supreme Court stated in N. Pac. Ry. Co. v. United States, 356 U.S. 1, 4, 78 S. Ct. 514, 517, 2 L. Ed. 2d 545 (1958): "The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conductive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition."

[190] NCAA v. Alston, 141 S. Ct. 2131, 2159 (2021) (citation omitted).

[191]

[192] F.T.C. v. Indiana Fed'n of Dentists, 476 U.S. 447, 459, 106 S. Ct. 2009, 2018, 90 L. Ed. 2d 445 (1986)

[193] Polygram Holding, Inc. v. F.T.C., 416 F.3d 29, 38 (D.C. Cir. 2005)

**b. The Court underrated Plaintiffs' ability to secure complete relief from the Anti-Steering Restraints because it erroneously assumed that, even after liability is proven, it would have the discretion to deny such relief.**

Second, the Court's analysis of whether Plaintiffs were likely to achieve better relief by going to trial wrongly assumed that, even after liability is proven, the Court would still have the discretion to "make as little change as possible" in the "Honor-All-Cards" and other Anti-Steering Restraints "rather than go [a]t it with a meat cleaver."[194] Later, in its preliminary-approval opinion and order, the Court suggested that it would be hesitant to enjoin the "No-Bypass" rule because Visa and Mastercard contended that "their existence would serve no utility" if they were prohibited from imposing a "No-Bypass" rule that prevents merchants and issuers from forming direct payment connections (which compete with the Networks' own rails). With all due respect to the Court, that is a mistaken Based on these considerations and its apparent predilection to issuing only the most limited remedies, the Court found there was a significant risk—bigger than the risk of not proving liability even—"that Plaintiffs will not secure the relief that the Amended Settlement offers, much less the additional relief on which the objectors insist."[195]

Respectfully, this analysis is mistaken. Rather than giving the Court discretion to leave combinations in restraint of trade and their violative practices mostly intact, once antitrust liability is established the governing precedent would impose a "duty"—indeed, an "inescapable responsibility"—on the Court to order "effective relief" that will (1) "cure the ill effects of the illegal conduct," (2) "assure the public freedom from its continuance," and (3) deny to violators "future benefit of their forbidden conduct."[196] Further, "where the creation of [a] combination is itself the

[194] Transcript of Civil Hearing Before the Honorable Brian M. Cogan, In re Payment card Interchange Fee and Merchant Discount Antitrust Litigation, 05-MDL-1720 (BMC) (April 27, 2026) (page 60, lines 3-16)

[195] In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., No. 05-MD-1720 (BMC), 2026 WL 1662251, at *11 (E.D.N.Y. June 9, 2026)

[196] Gypsum; See also

violation," the Court must order "the dissolution of the combination" and deprive the violators of the "fruits of their statutory violation."[197]The Court must "decree relief effective" to achieve these objectives regardless of "the adverse effect of such a decree on private interests," let alone any plea of "hardship or inconvenience" by defendants.[198] In short, once liability is established, the Court has no discretion to carry out an "open-ended balancing act" with respect to remedies—it is "duty-bound" to "undo what the conspiracy achieved."[199]

Here, if Plaintiffs were to establish that the conspiracy of the Bank and Network Defendants to implement the Anti-Steering Restraints, including the No-Bypass rule, is a violation of Section 1 of the Sherman Act, the Court would plainly be obligated to enjoin the challenged rules in full and, indeed, go much further to "dissol[ve] the combination" and deny to the violators "future benefit of their forbidden conduct."[200] Indeed, the fact that Visa and Mastercard *admit* that "their existence would serve no utility" in the absence of the restraints they impose on alternative (competitive) methods of payment intermediation would make such an obligation that much more justified.[201] To quote Justice Ginsburg in *Polygram Holdings* again: "If the only way a [venture] can profitably [exist] is to restrain the legitimate competition of [other] products, then one must seriously wonder whether consumers are genuinely benefitted by [that venture]."[202]

---

[197] Crescent Amusement, Dan Hanley

[198] Crescent Amusement, dan Hanley

[199] United States v. Paramount Pictures, Inc. (1948),

[200]

[201]

[202] Polygram

#### ii. Evaluated against a fair assessment of Plaintiffs' case, the Proposed Settlement Agreement is inadequate.

The Proposed Settlement Agreement provides inadequate relief for two primary reasons. First, a close examination of its "reforms" demonstrates they are riddled with loopholes that the Network Defendants can easily use to evade their "obligations" thereunder, making the Agreement ineffectual. Second, by restraining operating to entrench Visa and Mastercard against competition from other networks, the Proposed Settlement Agreement will undermine competitive conditions in the credit card transactions market—ultimately harming the merchants it is supposed to benefit.

##### a. The Proposed Settlement Agreement is ineffectual because it contains explicit loopholes which Network Defendants can exploit to evade, nullify, or defeat the "relief" it purports to provide to merchants.

The following sections examines the "relief" that the Proposed Settlement Agreement purports to provide across interchange rate, honor-all-cards, "value" card, surcharging, and discounting issues. Each proposed reform contains loopholes that make it ineffectual.

###### *1. Interchange Rate Caps and Rollbacks*

According to industry analyst The Nilson Report, a staggering total of over $187 billion in fees was charged to U.S. merchants on credit and debit card transactions in 2024, and according to the Merchants Payments Coalition, these fees increased retail prices by an average of nearly $1,200 per American family. The Nilson Report also found that the fees charged to merchants on Visa and Mastercard credit card transactions increased from an average of 2.26% in 2023 to 2.35% in 2024—an increase of 0.09% in one year. The credit card fee rates paid by U.S. merchants are now the highest in the world, as many other countries have taken regulatory action to rein in these excessive fees, often after years-long antitrust investigations; for example, in the European Union, credit card interchange fees are capped at 0.3%. But in the United States, credit card interchange fees remain both unregulated and unconstrained by marketplace competition.

Unfortunately, the proposed settlement will fail to meaningful reduce the rates Visa and Mastercard have fixed—if at all. The proposed settlement would direct Visa and Mastercard to reduce their credit card interchange rates by 0.10% for a period of five years-a reduction representing a tiny fraction of Visa's and Mastercard's current rate levels that average between 2% and 3%, and barely more than the 0.09% that Visa's and Mastercard's fees increased just between 2023 and 2024. And because the proposed settlement does not change Visa's and Mastercard's role of centrally fixing fee rates on behalf of banks, Visa and Mastercard would be able to resume raising interchange fee rates to even higher levels without meaningful restraint after the five-year settlement period ends.

The proposed settlement also fails to constrain Visa and Mastercard from increasing network fees or establishing new types of merchant fees, meaning that any interchange fee savings that might be achieved during the five-year settlement period could be cancelled out by Visa and Mastercard's increases in other fees. This is because the proposed settlement's provisions in Paragraphs 54 and 103 preserve Visa and Mastercard's ability to raise network fees and other merchant fees "to respond to market conditions." Even slight increases in those fees or the introduction of new merchant fees could erase any benefits merchants might achieve from the temporary 0.10% interchange fee reduction. Further, a large loophole in Paragraphs 54 and 103 appears to undermine the goal of preventing Visa and Mastercard from using network fee or other merchant fee increases to functionally reimburse issuers for the five-year 0.10% reduction in interchange fees. Those paragraphs preserve Visa and Mastercard's ability to set issuer "fee programs" and to negotiate "custom fee incentives" with sets of issuers, which means that under the proposed settlement, Visa and Mastercard can claim that they need to increase network fees or impose new merchant fees "to respond to market conditions" and then give issuers incentives or discounts within any other "fee

programs" that Visa and Mastercard charge to issuers within their contractual relationships. The loopholes in the proposed settlement's provisions actually provide a roadmap for how Visa and Mastercard can successfully circumvent the settlement's fee reductions.

***2. Honor-All-Cards***

While the proposed settlement touts reforms to Visa and Mastercard's honor-all-cards rules that would allow merchants to refuse to accept "Premium Consumer Credit Cards," the settlement defeats the potential benefit of this reform by leaving Visa, Mastercard, and bank issuers firmly in control of determining whether a card will remain within the settlement's definition of "standard" or "premium" cards. Allowing merchants to choose whether to decline to accept all "Premium Consumer Credit Cards" (a category defined to include Visa and Mastercard's most widely-used rewards card programs) in reality is not much of a choice at all. This is because the overwhelming majority of credit card transactions today involve rewards cards; according to the Consumer Financial Protection Bureau, "[a]s of 2019, more than 90 percent of general purpose credit card spending occurred on rewards cards." A merchant that declines to accept "premium" consumer credit cards would functionally be declining to accept Visa or Mastercard consumer credit cards altogether—a choice that merchants cannot realistically make given the Visa-Mastercard duopoly's 80% card network market share.

Also, the proposed settlement does not change the fact that card-issuing banks can easily upgrade consumers' credit cards into higher rewards categories at the consumers' request or at the issuer's own volition. Indeed, it is not uncommon for consumers to be surprised to learn that their issuer has shifted the consumer's credit card into a higher-rewards category or has reissued the consumer's card as a higher-rewards card. Since the proposed settlement allows card issuers to continue recategorizing "standard" cards as "premium" cards (or as some other third category of

cards) whenever they want, a merchant that chooses to only accept "standard" consumer cards may quickly find that issuers have the ability and incentive to make such cards unavailable in the marketplace, thereby forcing the merchant to accept higher-fee "premium" cards if they want to accept consumer cards at all.

Allowing merchants to decline "premium" cards can only be effective if networks and issuers are not able to control and freely manipulate whether and when consumers' cards fall into the "standard" or "premium" categories. The proposed settlement does not solve that issue, nor does it even acknowledge it. If the proposed settlement were approved, it would be feasible and logical for networks and issuers to make sure that the "standard" card category—which already represents a small and declining subset of credit cards—further shrinks to become functionally insignificant in the marketplace, thus undermining the benefit of any relief.

### *3. "Value" Standard Card*

The card network and bank defendants also tout the proposed settlement's provision imposing a temporary 1.25% interchange rate cap on so-called "standard" consumer credit cards," but this provision is unlikely to be effective as it is unlikely to apply to many, if any, transactions. While we find it noteworthy that, with this 1.25% rate cap provision, the credit card industry has finally recognized and conceded that interchange rate caps can be a reasonable solution to excessive swipe fees, such caps will only be effective if the universe of cards subjected to them represents a meaningful portion of the marketplace and if those cards cannot be converted into other categories. However, the proposed settlement does nothing to stop issuers from converting a "standard" consumer card into a "premium" card (or into a new third category of card that fits neither definition) whenever the issuer feels like it—and card issuers will have significant incentive to do so because they will receive higher interchange fee rates when transactions are not

subject to the "standard" card rate cap. Thus, the benefit of the proposed settlement's rate cap for "standard" cards is illusory.

#### *4. Surcharging*

The proposed settlement also purports to increase merchants' options for surcharging on credit card transactions, but these surcharge provisions represent a consumer-unfriendly and flawed approach to addressing the problems with the Visa and Mastercard systems. Surcharges do not fix the core anticompetitive problems of centralized fee-fixing or "honor-all-cards" tying arrangements or reduce fee rates; they simply pass along the excessive fees generated by those problems in a more visible way to consumers. Surcharges thus make merchants bear the ire of consumers for the high fees that Visa and Mastercard impose and make the merchants risk a consumer backlash for serving as the card industry's toll collector. We believe consumers would be better served by pro-competitive reforms that reduce rates and obviate the need for any surcharges to cover excessive fees.

Even if we did agree that surcharges should be made available as a cost-effective option for merchants to pass along credit card transaction fees to credit card purchasers without raising overall prices, the proposed settlement makes it possible for Visa and Mastercard to ensure that surcharging will be cost-prohibitive for merchants to use. For example, the proposed settlement says that surcharge amounts must be limited to the lesser of 3% or the merchant's credit card cost of acceptance, but the settlement does not take any steps to prevent Visa or Mastercard from increasing network fees or imposing new fees on merchants that surcharge. Visa and Mastercard could easily increase such fees so that merchants who wish to surcharge would face a level of fees that exceeds the permissible 3% surcharge amount, thus making surcharging cost-prohibitive. Also, after the five-year settlement period ends, Paragraphs 43(f) and 92(f) of the proposed

settlement protect Visa and Mastercard's ability to establish "differential rate structures" in which lower interchange rates are made available to merchants that do not surcharge but higher interchange rates are assessed upon merchants that do surcharge. Visa and Mastercard could use this "differential rate structures" loophole to raise interchange rates on merchants that surcharge to a level that exceeds the permissible surcharge amount, again making surcharging cost-prohibitive. Thus, the surcharging provisions of the proposed settlement are not likely to be available in a cost-effective way for merchants.

#### *5. Discounting*

With respect to discounting, we appreciate that discounting can be a consumer-friendly way for merchants to differentiate prices between payment options and encourage consumers to use more cost-efficient payment methods, but we are concerned that the proposed settlement leaves too much power in Visa and Mastercard's hands over merchants' options for discounting. For example, we note that the settlement fails to define either "discount" or "surcharge," apparently leaving it to Visa and Mastercard network rules to determine whether a merchant's posting of a list price and a deviation from that list price constitutes a discount or a surcharge. This has practical impacts under the proposed settlement; for example, the settlement allows discounting on the basis of an issuer but does not allow surcharging on the basis of an issuer, and by letting Visa and Mastercard network rules ultimately determine whether a merchant's differential price scheme treats the higher or lower price as the list price and thus constitutes a permissible "discount" or an impermissible "surcharge," the proposed settlement gives Visa and Mastercard the ability to stymie merchant efforts to incentivize consumers to pay with cards issued by certain issuers and, accordingly, stymies merchant efforts to create market incentives for the centralized fee-setting bodies to reduce fees.

* * * * *

In short, the provisions of the Proposed Settlement Agreement that purport to reform Visa and Mastercard's fees and rules are flawed in ways that significantly undermine any benefit the provisions might provide to competition or to the interests of consumers, workers, or independent businesses. These flaws alone form a sufficient basis for us to object to the proposed settlement, but they are particularly troubling when considered alongside the proposed settlement's liability release provisions

**b. The Proposed Settlement Agreement is likely to worsen competitive conditions in the general-purpose credit card transactions market.**

As the detailed analysis in Parts A and B above makes clear, the Proposed Settlement Agreement would not only fail to improve competitive conditions in the credit card transactions market—it would worsen them. Over a century ago, the American people put their faith in competition, rather than monopoly or combination, to protect their livelihoods, their communities, and their fundamental liberties from concentrated economic power. The deep flaws in the Proposed Settlement Agreement demonstrate why—and prove they were right.

### D. The Proposed Settlement Agreement would disserve the public interest by impairing the ability of third parties—including public agencies—to enforce the antitrust laws in the financial sector writ large.

Finally, when deciding whether to approve any settlement that includes injunctive relief, the Court must ensure that the issuance of the requested injunction "would not disserve the public interest."[203] In addition to all of preceding arguments about the deterioration in competitive conditions that would result from the entry of the consent judgment and injunction contemplated by

---

[203] See U.S.S.E.C. v. Citigroup Global Markets, Inc., 752 F.3d 285 (2d Cir. 2014); Cruz v. JKS Ventures, Inc., No. 23-CV-8311 (LJL), 2024 WL 814563, at *5 (S.D.N.Y. Feb. 26, 2024); Wilder v. Bernstein, 645 F. Supp. 1292, 1308 (S.D.N.Y. 1986), aff'd, 848 F.2d 1338 (2d Cir. 1988).

the Proposed Settlement Agreement, issuing the Agreement's requested equitable relief would also disserve the public interest by imposing a veritable gag order on millions of merchants and acceptors of cards barring from supporting the enforcement of antitrust and consumer protection laws. Specifically, Paragraph 120(b) prohibits any acceptor of cards from assisting any third party (such as a consumer or a new consumer organization who hasn't yet accepted donations made aby credit card and is not bound by the mandatory settlement) from bring a civil lawsuit against the networks or banks "related in any way to any claim released herein," thus limiting the ability of organizations like ours to weigh in support of potential future claims.[204] Since this provision applies not only to the Network Defendants and Bank Defendants but to all of their co-conspirators (*i.e.*, Visa and Mastercard's member/customer financial institutions) as well, it would effectively hamstring tens of millions of merchants and acceptors like the objector organizations from assisting third parties in enforcing the law against nearly every financial institution in the country.[205]

## V. CONCLUSION

For the foregoing reasons, the Court should deny approval of the Proposed Settlement.

Dated: September 14, 2026

Respectfully Submitted,

/s/ Basel J. Musharbash
Basel J. Musharbash*
Texas Bar No. 24111402
Anureet K. Sandhu
Illinois Bar No. 6336697
**ANTIMONOPOLY COUNSEL**
500 Clarksville Street
P.O. Box 795
Paris, Texas 75461
Phone: (903) 205-8422
Email: basel@antimonopoly.us
info@antimonopoly.us

*Admitted *pro hac vice*

204

205

*Attorney for Objectors*