UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | **MEMORANDUM DECISION AND ORDER**<br><br>05-md-1720 (BMC) |

**COGAN**, District Judge.

Currently pending before this Court is a Rule 60(b) motion filed by merchants Potayto-Potahto, Dougicaban, and CAM-OMO ("plaintiffs"); a motion to reconsider the Court's August 31, 2026 order, which converted plaintiffs' motion for summary judgment into the aforementioned Rule 60(b) motion; and a motion for an injunction filed by defendants Visa and Mastercard ("defendants," or the "Networks"). At the heart of all three motions is whether this Court should revisit its prior ruling that approved a class-wide release of certain future claims. Because the Court finds that the ruling should not be disturbed, and because the Court finds that the release of future claims is lawful in any event, all three motions are denied.

## BACKGROUND

### I. MDL 1720

In October 2005, several complaints asserting similar antitrust claims against the Networks and various issuing banks were consolidated for pretrial purposes and transferred to this District. In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., No. 05-md-1720, 2008 WL 115104, at *1 (E.D.N.Y. Jan. 8, 2008).

In November 2012, the Court provisionally certified a class and preliminarily approved a class settlement agreement. In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., No. 05-md-1720, 2012 WL 12929536, at *1-2 (E.D.N.Y. Nov. 27, 2012). The Court granted

class certification and final approval of the settlement agreement in 2013. In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 986 F. Supp. 2d 207 (E.D.N.Y. 2013).

However, on appeal, the Second Circuit vacated class certification and reversed final approval. In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 827 F.3d 223 (2d Cir. 2016). The Second Circuit concluded that "members of the (b)(2) [equitable relief] class were inadequately represented," because of a fundamental conflict between their interests and those of the (b)(3) damages class. See id. at 231, 233-34. Whereas the (b)(3) class "would want to maximize cash compensation for past harm," the (b)(2) class "would want to maximize restraints on network rules to prevent harm in the future." Id. at 233. Class counsel and the class representatives were thus "in the position to trade diminution of (b)(2) relief for increase of (b)(3) relief." Id. at 234.

The Second Circuit advised that a "structural protection" against trading of relief was "division of the class into homogenous subclasses ... with separate representation." Id. at 231 (quoting Ortiz v. Fibreboard Corp., 527 U.S. 815, 856 (1999)). Thus, on remand, this Court appointed counsel to two putative classes: an equitable relief class and a damages class. In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., No. 05-md-1720, 2016 WL 8138988, at *1 (E.D.N.Y. Nov. 30, 2016).

The damages class reached a settlement with the Networks in 2019. The Court ultimately granted final approval, and the Second Circuit affirmed. In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., No. 05-md-1720, 2019 WL 6875472, at *36 (E.D.N.Y. Dec. 16, 2019) ("Interchange Fees I"), aff'd sub nom. Fikes Wholesale, Inc. v. HSBC Bank USA, N.A., 62 F.4th 704 (2d Cir. 2023) ("Interchange Fees II"). The damages class included merchants that accepted the Networks' cards at any time from January 1, 2004 through January 24, 2019, the

date of preliminary approval. Interchange Fees I, 2019 WL 6875472, at *3, 31. The settlement provided for a $5.6 billion cash fund to be distributed to class members on a *pro rata* basis, calculated based on the interchange fees attributable to their payment-card transactions during the class period. Id. at *3, 28.

In exchange for the right to share in the settlement fund, class members released damages claims "arising out of or relating to" any conduct or acts that were or could have been alleged in this case. The release covered two categories of claims: (1) all existing claims that had accrued through January 24, 2019, the end of the class period, and (2) all future claims that would accrue "no later than five years after the Settlement Final Date" (the "Future Release"). Id. at *3, 23. August 8, 2023 was later deemed the Settlement Final Date, so the Future Release applies to claims accrued through August 8, 2028.

In its final approval decision, the Court considered all the 23(e)(2) and Grinnell factors before concluding that the settlement was fair, reasonable, and adequate.[1] Interchange Fees I, 2019 WL 6875472, at *15-30. The Court found that the representation was adequate, the class members were treated equitably relative to one another, and the relief was adequate notwithstanding the Future Release.

Regarding adequacy of representation, the Court concluded, over objections, that the class representatives "[sought] to represent a finite class that desires and will receive the same type of relief – damages for past harm – and that therefore all [class representatives] and members of the Rule 23(b)(3) class [had] the same incentive to maximize cash compensation for past harm." Id. at *17 (internal quotation marks and citations omitted).

[1] The Court also conducted a fulsome analysis of these factors in its preliminary approval opinion. See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 330 F.R.D. 11, 29-50 (E.D.N.Y. 2019).

Regarding equitable treatment of class members, the Court concluded that the *pro rata* distribution scheme was "sufficiently equitable." Id. at *27. In making that determination, the Court rejected an objecting class member's argument that the distribution scheme provided a greater benefit to merchants who were class members for the entire class period than to merchants who became class members toward the end of the class period. Id. at *26-27. The Court acknowledged the risk that these latecomers would receive "very small remuneration but have to release claims for a number of years." Id. at *27. It noted that, as a result, these merchants "may have assessed that it [was] not worthwhile to join the class" and opted out, as was every class member's right. See id. But the merchants that declined to opt out would be bound. The Court reasoned that "for such large class action settlements that involve releases, it would be nearly administratively unfeasible to tailor a release to match the duration that a member had been in the class." Id.

Finally, the Court considered the adequacy of the relief and the impact of the Future Release. Id. at *25-26. Among other things, the Court found that the law supplied no restriction on "how far into the future claims can be released, as long as the released claims are based on the 'identical factual predicate' of the action at issue." Id. at *25 (quoting Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 107 (2d Cir. 2005)). Indeed, the Court explained that "[s]uch releases are acceptable where the future claims releases are those based on a continuation of conduct at issue and underlying the original claims," as was the case here. Id.

Additionally, the Court rejected the argument that the Future Release was "void due to public policy protection of antitrust cases," finding instead that releases were problematic only when they "released all types of claims, including 'future' entirely unrelated antitrust claims not circumscribed to an identical factual predicate or to claims that arose out of the alleged conduct

or related conduct that could have been alleged." Id. at *25-26. Here, the Future Release was properly cabined and thus did not pose such public policy concerns. Id.

After granting final approval, the Court entered Final Judgment incorporating the settlement and retained jurisdiction over matters relating to the settlement and its enforcement. Dkt. No. 7832. The Final Judgment stated in relevant part:

> The Rule 23(b)(3) Settlement Class Releasing Parties hereby expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the Rule 23(b)(3) Settlement Class Released Parties from, any and all manner of claims, demands, actions, suits, and causes of action … that have accrued as of the Settlement Preliminary Approval Date or accrue no later than five years after the Settlement Final Date arising out of or relating to any conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act of any Rule 23(b)(3) Settlement Class Released Party that are or have been alleged or otherwise raised in the Action, or that could have been alleged or raised in the Action relating to the subject matter thereof, or arising out of or relating to a continuation or continuing effect of any such conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act. For avoidance of doubt, this release shall extend to, but only to, the fullest extent permitted by federal law.

On appeal from the Final Judgment, the Second Circuit affirmed final approval of the settlement in nearly all respects, with one exception not relevant here (relating to the service awards). Interchange Fees II, 62 F.4th at 727. The Second Circuit's decision "ma[d]e no ruling as to ... the legality of releasing an as-of-yet hypothetical future claim," reasoning that such a decision would have to await "the assertion by the defendants in a future litigation of a claim of release which is challenged on the ground that interpreting the [Future Release] so broadly violates federal law." Id. This open question did not bar (or warrant reversing) final settlement approval because the release's "de-facto severability clause" ensured that the settlement would stand "even if certain aspects of the release were to fall." See id. at 720. Notwithstanding this language in the Second Circuit's opinion, its Mandate, Dkt. No. 8823 (the "Mandate"), stated in relevant part:

> IT IS HEREBY ORDERED, ADJUDGED and DECREED that the district court's orders are AFFIRMED in all respects to the extent they constituted a final judgment, with the exception that the district court is directed to reduce the service award to class representatives to the extent that its size was increased by time spent in lobbying efforts that would not increase the recovery of damages.

## II. The Pending Motions

On April 21, 2026, plaintiffs seized the Second Circuit's suggestion in its decision that the legality of the Future Release could be challenged in "a future litigation" and filed a lawsuit alleging that the Networks violated federal antitrust laws from January 25, 2019 to the present by charging artificially high interchange fees and imposing a series of anticompetitive network rules on merchants. See Potayto-Potahto, LLC v. Visa Inc., No. 26-cv-4885 (E.D.N.Y.).[2]

Plaintiffs admit that they are challenging the exact conduct at issue in MDL 1720. Plaintiffs also admit that they are members of the Rule 23(b)(3) damages class. As a result, plaintiffs are ostensibly bound by the terms of the 2019 damages settlement agreement, including the Future Release.

Immediately after filing their lawsuit, plaintiffs filed a motion for partial summary judgment in MDL 1720, seeking a declaration that the Future Release does not bar their claims in Potayto-Potahto and relying on the Second Circuit's opinion in Interchange Fees II. Defendants filed a cross-motion for an injunction compelling plaintiffs to dismiss their claims in Potayto-Potahto because such claims are barred by the Future Release.

On August 27, 2026, the Court held oral argument on the summary judgment motion and the cross-motion for an injunction, during which the Court and the parties discussed the potential impropriety of the summary judgment motion in the context of the MDL. Specifically, the Court

[2] Plaintiffs originally filed their case in the Southern District of New York. On August 8, 2026, the Panel on Multidistrict Litigation transferred the case to this District and assigned it to the undersigned.

expressed to the parties that it did not think summary judgment in MDL 1720 was the proper vehicle for litigating the Future Release.

On August 31, 2026, the Court entered an order deeming plaintiffs' motion for summary judgment to be a Rule 60(b) motion seeking to set aside the Court's Final Judgment approving the Future Release, and plaintiffs filed a motion for reconsideration of that order shortly thereafter.

## DISCUSSION

### I. Plaintiffs' Motion for Reconsideration

#### A. Legal Standard

Under Federal Rule of Civil Procedure 59(e), a party may ask for reconsideration of a judgment within 28 days of the judgment's entry. The Court may grant a reconsideration motion "to correct a clear error of law or prevent manifest injustice." Munafo v. Metro. Transp. Auth., 381 F.3d 99, 105 (2d Cir. 2004) (quoting Collision v. Int'l Chem. Workers Union, Local 217, 34 F.3d 233, 236 (4th Cir. 1994)). "[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Van Buskirk v. United Grp. of Cos., Inc., 935 F.3d 49, 54 (2d Cir. 2019) (citation omitted).

#### B. Analysis

Plaintiffs argue that reconsideration of the Court's order converting plaintiffs' summary judgment motion into a Rule 60(b) motion is justified because the Second Circuit's decision in Interchange Fees II essentially narrowed the Final Judgment in Interchange Fees I to exclude the Future Release. Plaintiffs insist that this Court's prior ruling on the Future Release "has no preclusive effect" because that finding "was challenged on appeal, and the Second Circuit expressly declined to decide that issue."

Plaintiffs confuse the Second Circuit's dicta in its decision, which certainly expressed doubt about the validity of some future releases, with the Second Circuit's Mandate, which affirmed this Court's approval of the settlement in all respects (except the one not relevant here relating to service awards). District courts must comply with a circuit mandate even when the circuit court's decision includes contrary dictum. See United States v. Ben Zvi, 242 F.3d 89, 95 (2d Cir. 2001) ("The mandate rule 'compels compliance on remand with the dictates of the superior court and forecloses relitigation of issues expressly or *impliedly* decided by the appellate court.'" (quoting United States v. Bell, 5 F.3d 64, 66 (4th Cir. 1993)); Simon v. Repub. of Hungary, 579 F. Supp. 3d 91, 128 n. 27 (D.C. 2021) ("The reach of the [circuit] mandate is generally limited to matters actually decided. A mere recital of matters assumed for purposes of decision and dicta are not part of the mandate." (quoting Wright & Miller, Fed. Prac. & Proc. § 4478.3 (2d ed. 2021))).

Although the Second Circuit discussed the Future Release at some length in Interchange Fees II, "it is not substantive discussion of a question or lack thereof that distinguishes holding from dictum, but rather whether resolution of the question is necessary for the decision of the case." Baraket v. Holder, 632 F.3d 56, 59 (2d Cir. 2011). Here, even though Interchange Fees II admittedly suggests that the Second Circuit had doubt about the Future Release, the Second Circuit did not "actually decide[]" that the Future Release was invalid. Simon, 579 F. Supp. 3d at 128 n. 27. To the contrary, the Mandate affirmed this Court's approval of the settlement and thus affirmed this Court's approval of the Future Release.

This Court's approval of the Future Release (as affirmed by the Second Circuit) is therefore part of the Final Judgment to which plaintiffs are bound as class members, and the Court declines to reconsider its August 31, 2026 order recognizing the same. If the Circuit wants

to modify its Mandate so as to vacate that portion of the Final Judgment that approved the Future Release, this Court will of course follow that Mandate. But that is not the Mandate which this Court is currently duty-bound to apply, and it cannot disregard the Mandate based on dicta in the Circuit's decision.

## II. Plaintiffs' Rule 60(b) Motion

### A. Legal Standard

Under Federal Rule of Civil Procedure 60(b), a court may relieve a party from a final judgment for:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud ..., misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

Such motion must be made "within a reasonable time – and for reasons (1), (2), and (3), no more than a year after the entry of the judgment or order[.]" Fed. R. Civ. P. 60(c)(1).

### B. Analysis

If plaintiffs had initially filed their motion as a Rule 60(b) motion, they would have presumably done so under reasons (4), (5), or (6); such motions must be made "within a reasonable time." Id. Plaintiffs filed their motion over six years after the Final Judgment. There are essentially no circumstances that could render plaintiffs' six-year delay reasonable. See PRC Harris, Inc. v. Boeing Co., 700 F.2d 894, 897 (2d Cir. 1983) ("In considering whether a Rule

60(b)(6) motion is timely, [courts] must scrutinize the particular circumstances of the case, and balance the interest in finality with the reasons for delay."). However, because plaintiffs have not briefed the issue, the Court will assume that plaintiffs' motion was timely. For the same reason, the Court will consider all of plaintiffs' challenges to the Future Release under the Rule 60(b)(6) catchall.

Plaintiffs challenge the Future Release on three grounds. First, they argue the Future Release violates Rule 23 because it resulted in absent class members being inadequately represented and inequitably treated. Second, they argue the Future Release violates the identical factual predicate doctrine because the class representatives sacrificed unasserted future claims held by only some class members to benefit the class as a whole. Third, they argue the Future Release violates public policy because it granted the Networks prospective immunity from federal antitrust laws. The Court is not moved by these challenges to the Future Release. As set forth below, the Court finds that the Future Release is lawful.

1. Inadequate Representation and Inequitable Treatment

Plaintiffs first argue that the Future Release violates federal law because it resulted in some merchants being treated "worse" than other merchants. The crux of plaintiffs' arguments with respect to adequacy of representation and equitability of treatment is that the class representatives, as merchants who were members of the class during the entire class period, had divergent interests from "new merchants," like plaintiffs, who joined the class later.[3] To plaintiffs, the Future Release signifies trading of relief: more money in the pockets of the "old merchants," who were compensated for many years of harm, and less money in the pockets of

[3] Plaintiffs argue in their reply that their equitable treatment argument does not rely on the old-versus-new merchant distinction, but rather "on the fact that certain class members were required to surrender non-common claims for no corresponding compensation." The Court does not see the difference, particularly when plaintiffs' hypotheticals in support of their argument turn on the old-versus-new merchant distinction.

the "new merchants," who were compensated for fewer years of harm but nonetheless foreclosed from suing for five years after the settlement final date.

Plaintiffs' argument fails for several reasons. First, plaintiffs seem to assume that because "old merchants" became class members earlier, they were class members for longer than "new merchants." But a merchant could have been a class member at the inception of the class period but gone out of business shortly after, such that a merchant who became a class member later in the class period may nonetheless have been a class member for longer. Which merchant is inequitably treated in this scenario: the one that joined the class earlier or the one that was a class member for longer?

Relatedly, plaintiffs are assuming that all merchants – old and new – are foregoing future claims of the same value. That, of course, is not necessarily true. An older, more established merchant may have more to lose from a five-year ban on lawsuits than a newer merchant. Plaintiffs say they're worried about the merchant who became a class member on the last day of the class period, who got a tiny share of the settlement fund yet released its claims for the next five years. But it is not at all certain that this last-day merchant will miss out on more compensation than the "older" merchants.

Plaintiffs' reliance on <u>In re Literary Works in Electronic Databases Copyright Litigation</u>, 654 F.3d 242 (2d Cir. 2011), in which the Second Circuit overturned a settlement for inadequate representation, is misplaced. There, the settlement covered three categories of claims – Categories A, B, and C – but provided the least recovery to Category C. Importantly, although the class representatives held all three categories of claims, some class members held only Category C claims. The Court concluded that "[o]wning Category C claims in addition to other claims [did] not make named plaintiffs adequate representatives for those who [held] only

Category C claims" because they could trade in Category C relief for greater Category A and Category B relief. Id. at 251-52.

There is a key difference between Literary Works and MDL 1720. In MDL 1720, there is not a single class member that holds *only* future claims. By definition, the class includes merchants that incurred harm *during* the class period. All class members were compensated for past harm, and all class members relinquished five years of future claims.

Plaintiffs' old-versus-new merchants quandary may just be a way to get their foot in the door. After all, they don't necessarily have to define these categories; they just have to raise some doubt in the Court's mind that the Future Release treats all class members equitably. Like plaintiffs, the Court could fashion plenty of hypotheticals showing how some hypothetical group of merchants might have gotten a worse deal than some other hypothetical group of merchants. But it is a function of any settlement, especially one of this size, that class members will benefit differently. Nothing about that is inherently nefarious or wrongful. Fundamentally, all class members – class representatives included – sought the same relief: compensation for past harms. All class members got that relief.[4]

Further, the Future Release did not "distort[] an otherwise equitable allocation." It is inherent to any damages settlement that compensation is for past harms, not future ones. Some class members may have opted out because they recognized that the harm they already incurred, for which they would be compensated, was outweighed by the harm that they would incur during the Future Release period, for which they would not be compensated. But it was always the case that no matter the monetary recovery obtained or the nature of the release imposed, class

[4] Plaintiffs emphasize repeatedly that they continue to be harmed by the Networks' conduct. That argument is more appropriately raised in the context of the equitable relief class action.

members would not be compensated for future harms. The *pro rata* allocation method was designed to ensure that class members would receive a share of the settlement fund that was proportionate to the harm they incurred during the class period. The Future Release does not impact any class member's compensation for past harm.

Lastly, contrary to plaintiffs' contention, this Court has never viewed opt-out rights as a substitute for adequate representation or equitable treatment. Rather, the relevance of opt-out rights here is that plaintiffs did not exercise or even attempt to exercise them. Plaintiffs act as though they've been unwillingly bound to a settlement agreement they never would have agreed to, but by staying silent throughout the settlement approval process, they effectively agreed to it. Although courts analyze adequate representation and equitable treatment in class actions in part to protect class members who may not have the luxury of litigating their individual interests, plaintiffs' failure to speak up during the settlement approval process and decision to pursue individual litigation now are obviously inconsistent.

2. Identical Factual Predicate Doctrine

Plaintiffs next argue that the Future Release violates the identical factual predicate doctrine, which "forbids class representatives from improving overall class recovery by bargaining away unasserted claims that are based on facts not common to all class members." That is not what happened here.

The law is "well established" that class settlements may release "claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct," including claims for future injury. In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 2024 WL 3236614, at *31

(E.D.N.Y. June 28, 2024) (quoting Melito v. Experian Mktg. Sols., 923 F.3d 85, 95 (2d Cir. 2019)); see also TBK Partners, Ltd. v. W. Union Corp., 675 F.2d 456, 460 (2d Cir. 1982).

Plaintiffs concede that this is the law. They also concede that Potayto-Potahto shares the same factual predicate as MDL 1720. However, they argue that the Future Release violates the identical factual predicate doctrine because the class representatives "obtained enhanced compensation for past antitrust injuries common to all" in exchange for releasing claims for "future antitrust injuries held by only some." This is largely inaccurate. With the exception of class members who went out of business or stopped accepting the Networks' cards for one reason or another, *all* class members surrendered compensation for the same period of future antitrust injuries (*i.e.*, injuries that would accrue within the Future Release period).[5]

Plaintiffs again overread the cases on which they rely, National Super Spuds, Inc. v. New York Mercantile Exchange, 660 F.2d 9 (2d Cir. 1981), and TBK Partners, Ltd. v. West Union Corp., 675 F.2d 456 (2d Cir. 1982). In Super Spuds, the Second Circuit rejected a settlement that provided for payment based only on liquidated futures contracts but released claims based on both liquidated *and* unliquidated futures contracts. That case is easily distinguishable. The class representatives here did not release two categories of claims for the price of one.

In TBK Partners, the Second Circuit *upheld* a settlement, finding that "all class members had the same interest in maximizing the value placed on [their shares], and the settlement treat[ed] all members identically." 674 F.2d at 462. And although the settlement released state law claims that could not have been part of the class action, the unasserted state law claims and the asserted federal claims "hinged on the identical operative factual predicate." Id. at 460-61.

[5] In fact, many class members probably considered that fact when deciding whether their *pro rata* settlement share was a sufficient trade for the right to pursue those future claims. But plaintiffs' arguments sound in adequate representation and equitable treatment, not the identical factual predicate doctrine. As set forth above, these arguments are unavailing.

Thus, TBK Partners directly undermines plaintiffs' position. Not only do plaintiffs hold the exact same claims as the rest of the class, but the Court did the searching review that was ratified in TBK Partners in granting final approval. The Court concluded that the Future Release only "bargained away" claims that would "arise[] out of the 'identical factual predicate' as the settled conduct." In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 2024 WL 3236614, at *31 (quoting Melito, 923 F.3d at 95).

3. Public Policy

Plaintiffs' final argument is that the Future Release violates the public policy against "contract[ing] away future antitrust claims." The releases that courts have invalidated on this ground were "impermissibly broad releases that released all types of claims, including 'future' entirely unrelated antitrust claims not circumscribed to an identical factual predicate or to claims that arose out of the alleged conduct or related conduct that could have been alleged." Interchange Fees I, 2019 WL 6875472, at *25-26. By contrast, the Future Release releases only claims based on the conduct at issue in the settled class action.

Plaintiffs rely on Lawlor v. National Screen Service Corp., 349 U.S. 322 (1955), to argue that a settlement cannot bar future antitrust claims through *res judicata* because doing so would wrongly confer on defendants a partial immunity from civil liability for future violations. But Lawlor is also distinguishable. Although the original suit and the post-settlement suit in Lawlor involved the same course of allegedly wrongful conduct, the post-settlement suit alleged new conduct and new antitrust violations "which could not possibly have been sued upon in the previous case." See id. at 327-28. This was important in Lawlor because the Court was deciding the *res judicata* effect of a judgment, not the legality of a release.[6] See id. at 328. Further, the

[6] Although the Networks invoked *res judicata*, the Court has decided the motion on different bases.

scope of the future release in Lawlor was ambiguous; the court order dismissing the original suit with prejudice contained no findings of fact or law. That is a different situation from the one here, where there is no ambiguity as to what the class representatives intended to give up when they agreed to the settlement.

## III. The Networks' Motion for an Injunction

### A. Legal Standard

"Federal courts have authority under the All-Writs Act, 28 U.S.C. § 1651 (1982), to 'issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.'" In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.), 770 F.2d 328, 335 (2d Cir. 1985). Specifically, a court that has retained jurisdiction over "a complex class settlement" "has the power to enforce an ongoing order against relitigation." In re Am. Express Fin. Advisors Secs. Litig., 672 F.3d 113, 134 (2d Cir. 2011) (quoting In re Prudential Ins. Co. of Am. Sales Prac. Litig., 261 F.3d 355, 367-68 (3d Cir. 2001)). The jurisdiction conferred by the All-Writs Act is "permissive in nature; it in no way mandates a particular result or the entry of a particular order." Application of U.S. in Matter of Order Authorizing Use of a Pen Reg., 438 F.2d 956, 961 (2d Cir. 1976), rev'd on other grounds, United States v. N.Y. Tel. Co., 434 U.S. 159 (1977).

### B. Analysis

The Networks ask the Court to issue an injunction compelling dismissal of plaintiffs' claims because they are barred by the Future Release. Although the Future Release surely applies to plaintiffs' claims, the Court declines to exercise its discretionary equitable power to issue an injunction. At oral argument, the Networks represented that Potayto-Potahto is one of the only suits, if not the only suit, of this nature. If there is an onslaught of lawsuits brought

without regard for the scope of the Future Release, the Court may consider granting injunctive relief. But the current state of play does not warrant the Court's exercise of equitable power.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for reconsideration [9966], plaintiffs' Rule 60(b) motion [9835], and defendants' motion for an injunction [9891] are denied.

**SO ORDERED.**

Brian M. Cogan
U.S.D.J.

Dated: Brooklyn, New York
September 29, 2026