**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION**

**This Document Applies to:**

***Barry's Cut Rate Stores, Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM), also now known as *DDMB, Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM)**

**No. 05-md-01720 (BMC) (JAM)**

**NETWORK DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF THE RULE 23(b)(2) CLASS SETTLEMENT AGREEMENT**

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT ............................................................................................ 1**

**ARGUMENT ............................................................................................................................ 3**

**I. The Settlement Remains Fair, Reasonable, and Adequate in Light of Plaintiffs' Litigation Risks and Best Possible Recovery. ................................................................. 3**

A. There Is No "Pervasive" Opposition to the Settlement Among Class Members, Many of Which Recognize the Settlement's Benefits. .............................................................. 4

B. Plaintiffs Continue to Face Significant Risks at Trial, in Any Remedies Phase, and on Appeal. ......................................................................................................................... 7

C. The Settlement Provides Significant Benefits to Merchants and Compares Favorably to Plaintiffs' Best Possible Recovery at Trial. ........................................................................ 15

D. The Other Applicable Factors Confirm That Final Approval Is Warranted. .................... 25

**II. The Court Should Not Revisit Its Prior Decision to Certify a Mandatory, Non-Opt-Out Class. .............................................................................................................................. 27**

A. Class Members Are Still Adequately Represented. ......................................................... 28

B. Typicality Is Still Satisfied. ................................................................................................ 30

C. Rule 23(b)(2) Cohesion Is Still Satisfied. .......................................................................... 30

D. The Court Should Not Revisit Its Decision to Certify a Mandatory Class. ...................... 32

**III. The Amended Settlement Agreement Is Lawful. ........................................................ 37**

A. The Release Is Limited by the Identical Factual Predicate Doctrine and Limited to the Time Period of the Relief; Further Questions About Its Scope Are Premature. ....................... 37

B. The Settlement Agreement Does Not Constitute Price-Fixing. ........................................ 42

**CONCLUSION ........................................................................................................................ 46**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alimanestianu v. United States*,
124 Fed. Cl. 126 (2015) .....36

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
256 F.3d 799 (D.C. Cir. 2001) .....45, 46

*Belk, Inc. v. Visa Inc., et al.*,
No. 19-cv-7273 (N.D. Ill. Oct. 9, 2026), ECF No. 370-1 .....10, 11, 22

*Berry v. Schulman*,
807 F.3d 600 (4th Cir. 2015) .....32, 33

*Calibuso v. Bank of Am. Corp.*,
299 F.R.D. 359 (E.D.N.Y. 2014) .....43

*Charron v. Pinnacle Grp. N.Y. LLC*,
874 F. Supp. 2d 179 (S.D.N.Y. 2012) .....5

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974) .....4, 12

*County of Suffolk v. Long Island Lighting Co.*,
907 F.2d 1295 (2d Cir. 1990) .....35

*DDMB, Inc. v. Visa, Inc.*,
2021 WL 6221326 (E.D.N.Y. Sept. 27, 2021) ..... *passim*

*Dudas v. Spinnaker Resorts, Inc.*,
2022 WL 23046282 (S.D. Ohio 2022) .....33

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
62 F.4th 704 (2d Cir. 2023) .....37, 38, 39

*FTC v. Actavis, Inc.*,
570 U.S. 136 (2013) .....42, 43

*Garcia v. Pancho Villa's of Huntington Vill., Inc.*,
2012 WL 5305694 (E.D.N.Y. Oct. 4, 2012) .....14

*Glover v. Conn. Gen. Life Ins. Co.*,
186 F.4th 110 (2d Cir. 2026) .....30

*Gold v. Midland Credit Mgmt., Inc.*,
306 F.R.D. 623 (N.D. Cal. 2014)....33

*Haar v. Allen*,
687 F. App'x 93 (2d Cir. 2017)....19

*Handschu v. Special Servs. Div.*,
605 F. Supp. 1384 (S.D.N.Y. 1985), *aff'd*, 787 F.2d 828 (2d Cir. 1986)....43

*Hansberry v. Lee*,
311 U.S. 32 (1940)....36

*Hines v. Equifax Info. Servs. LLC*,
2024 WL 4132333 (E.D.N.Y. Sept. 10, 2024)....36

*Houser v. Pritzker*,
28 F. Supp. 3d 222 (S.D.N.Y. 2014)....30

*In re Am. Express Merchs.' Litig.*,
634 F.3d 187 (2d Cir. 2011)....41

*In re Blue Cross Blue Shield Antitrust Litig.*,
85 F.4th 1070 (11th Cir. 2023)....38, 41

*In re Domestic Air Transp. Antitrust Litig.*,
148 F.R.D. 297 (N.D. Ga. 1993)....6

*In re Facebook, Inc.*,
343 F. Supp. 3d 394 (S.D.N.Y. 2018)....14

*In re Literary Works in Elec. Databases Copyright Litig.*,
654 F.3d 242 (2d Cir. 2011)....41

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019)....5, 38, 41

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2024 WL 3236614 (E.D.N.Y. June 28, 2024).... *passim*

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
714 F. Supp. 3d 65 (E.D.N.Y. 2024)....41

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
827 F.3d 223 (2d Cir. 2016)....34, 36, 39

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
986 F. Supp. 2d 207 (E.D.N.Y. 2013)....45

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2026 WL 1662251 (E.D.N.Y. June 9, 2026) .................................................................. *passim*

*In re Visa Check*,
No. 96-cv-05238 (E.D.N.Y.), ECF No. 804 (docketed June 17, 2003)..................................45

*In re Visa Check/MasterMoney Antitrust Litig.*,
297 F. Supp. 2d 503 (E.D.N.Y. 2003) ..........................................................................45

*Joel A. v. Giuliani*,
218 F.3d 132 (2d Cir. 2000)...........................................................................................4

*Lawlor v. National Screen Service Corp.*,
349 U.S. 322 (1955).....................................................................................................41

*Mandel v. Daskal*,
2025 WL 2822698 (E.D.N.Y. Oct. 4, 2025)...................................................................27

*Maywalt v. Parker & Parsley Petroleum Co.*,
864 F. Supp. 1422 (S.D.N.Y. 1994), *aff'd*, 67 F.3d 1072 (2d Cir. 1995) ................................6

*McAdams v. Robinson*,
26 F.4th 149 (4th Cir. 2022) ........................................................................................39

*McReynolds v. Richards-Contave*,
588 F.3d 790 (2d Cir. 2009)..........................................................................................35

*Nat'l Collegiate Athletic Ass'n v. Alston*,
594 U.S. 69 (2021).......................................................................................................12

*Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*,
660 F.2d 9 (2d Cir. 1981)..............................................................................................30

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018).............................................................................................. *passim*

*Onosamba-Ohindo v. Ball*,
184 F.4th 74 (2d Cir. 2026) ..........................................................................................35

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999).....................................................................................................34

*Robertson v. NBA*,
556 F.2d 682 (2d Cir. 1977)..........................................................................................43

*Three Rivers Motors Co. v. Ford Motor Co.*,
522 F.2d 885 (3d Cir. 1975)..........................................................................................41

*United States v. Am. Express Co.*,
838 F.3d 179 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 585 U.S. 529 (2018)....24

*United States v. Google*,
803 F. Supp. 3d 18 (D.D.C. 2025)....12, 13

*United States v. Google, LLC*,
2026 WL 2754741 (E.D. Va. Sept. 2, 2026)....13

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)....31, 32, 33, 35

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005)....38, 41, 45

**Other Authorities**

Adam J. Levitin, *Priceless? The Economic Costs of Credit Card Merchant Restraints*, 55 UCLA L. REV. 1321 (2008)....16, 17

Adam J. Levitin, *Priceless? The Social Costs of Credit Card Merchant Restraints*, 45 HARV. J. ON LEGIS. 1 (2008)....17

Rule 23.... *passim*

## PRELIMINARY STATEMENT

At preliminary approval, the Court evaluated the Amended Settlement,[1] compared it to the prior proposed settlements (and the prior decisions from this Court and the Second Circuit assessing those settlements), and considered extensive record evidence from the class and the networks, as well as arguments from objectors. On that basis, the Court concluded it was "likely to grant final approval." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2026 WL 1662251, at *15 (E.D.N.Y. June 9, 2026).[2] More specifically, the Court found that "[t]he Amended Settlement provides more extensive relief than" the class and the networks had proposed in 2024, including "both of the forms of relief"—on the networks' Honor-All-Cards rules and default interchange fees—"that the Second Circuit deemed important." *Id.* at *4, *15. Nothing in the objections submitted to final approval undermines the conclusions this Court reached in its preliminary approval order. Visa and Mastercard respectfully submit that those objections should be overruled, and the settlement should be approved.

Rather than offering any factual or legal basis why the Court should revisit and reverse its findings at preliminary approval, the objections merely reprise the same arguments this Court already considered and rejected. In particular, the objections maintain the radical position that no settlement should be approved unless the networks' Honor-All-Cards rules—which prohibit issuer-level discrimination, and by doing so attract banks to issue cards over the networks and make the cards valuable to cardholders (and, in turn, merchants)—are eliminated entirely. That position is tantamount to insisting that Visa and Mastercard no longer be permitted to exist as four-party networks. Such "meat cleaver" relief (as the Court aptly described it at the preliminary

[1] ECF No. 9692-2, Superseding and Amended Class Settlement Agreement of the Rule 23(b)(2) Class Plaintiffs and the Defendants ("Amended Settlement").

[2] The names of decisions from this MDL are abbreviated as "*In re Payment Card*."

approval hearing) would in all likelihood not be available to Plaintiffs even if they were to try this case to a final judgment and win. The notion that it should be a pre-condition of settlement is baseless.

Indeed, the latest round of objections only underscores that the Plaintiffs' path to obtaining *any* injunctive relief at trial is fraught with substantial risk. The network rules that the class challenges are cardholder friendly and have demonstrably resulted in procompetitive market outcomes: *decreasing* two-sided transaction prices, *increasing* output, and *promoting* continuous innovation. The objectors ignore that the class could (and, the networks submit, very likely would) lose at trial. And even if the class overcame all of the hurdles necessary to win on liability, it remains unlikely that the Court would order remedies anywhere near as extreme as those the objectors claim they want, particularly given their harmful effects on cardholders and on internetwork competition in the two-sided transaction markets.

The Court made clear that it would consider any additional evidence from the objectors at final approval, including any evidence showing "whether the various complaints raised" at preliminary approval "are pervasive among the 12-million-merchant class." *In re Payment Card*, 2026 WL 1662251, *1. The objectors have made no such showing. Rather, the objections to final approval, to which the networks respond in detail below, are indeed confined to "a vocal minority" of class members, *see id.*, many of whom were before the Court, making the same objections, at preliminary approval. As before, the objectors dismiss the value of the settlement's rules reforms, and they now go so far as to argue that the Court was "mistaken" that the settlement would fundamentally reform the Honor-All-Cards rules that have been at the heart of this MDL for more than 20 years. But the Court's preliminary approval decision reflects no confusion about the nature of the settlement's reforms. And the value of those reforms is apparent to merchants too. While

the notice distributed to class members specifically solicited objections to final approval, dozens of big and small merchants across diverse industries have voiced support for the settlement. For example, a group of major merchants that, for over a decade, pursued opt-out damages claims as part of the *7-Eleven* plaintiff group has taken the position that the Amended Settlement is "a vast improvement" over the prior settlements and provides "real, measurable value to the Class," for which the merchants in this MDL have long advocated.[3] Notably, this group includes merchants on whose behalf objecting trade groups (the National Retail Federation and the Retail Industry Leaders Association) purport to speak in opposition to the settlement. Those merchants' own statements—made in their own names—belie the notion that the trade groups' objections actually reflect the positions of their members, or any suggestion that there is widespread or uniform merchant opposition to the settlement's terms.

Finally, some objectors seek opt-out rights or decertification, or argue that the settlement release is too broad. Their arguments are contrary to numerous decisions by this Court and by the Second Circuit passing upon those very same arguments, deciding that this action—concerning network rules broadly applicable to all merchants—is a suitable one for mandatory class treatment, and that the release extends no further than federal law allows. The networks respectfully submit that all of the objectors' arguments should be rejected, and final approval should be granted.

## ARGUMENT

### I. **<u>The Settlement Remains Fair, Reasonable, and Adequate in Light of Plaintiffs' Litigation Risks and Best Possible Recovery.</u>**

At final approval (as at preliminary approval), the Court must determine whether the proposed class settlement "is fair, reasonable, and adequate under the Rule 23(e)(2) standards,"

---

3 ECF No. 9994, Obj. to Class Counsel's Mot. for Fees and Request of Certain 7-Eleven Plaintiffs For Successful Objector Fees, at 7, 12.

not whether it "is ideal by class members' varying standards." *In re Payment Card*, 2026 WL 1662251, at *1. The relevant factors include, among others, the "costs, risks, and delay of trial and appeal," including "the complexity, expense and likely duration of the litigation"; "the risks of establishing liability"; and "the range of reasonableness of the settlement [] in light of" both "the best possible recovery" and "all the attendant risks of litigation." *Id.* at *8 (citing Fed. R. Civ. P. 23(e)(2); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)). A proposed settlement "does not have to be perfect" to receive judicial approval, "just reasonable, adequate and fair." *Joel A. v. Giuliani*, 218 F.3d 132, 144 (2d Cir. 2000).

The Court's findings on preliminary approval that these factors weigh in favor of approval remain sound. The settlement provides "substantial relief" that is "more extensive" than the 2024 settlement and includes "both of the forms of relief that the Second Circuit deemed important"—namely, relief that affects default interchange fees and the Honor-All-Cards rules. *In re Payment Card*, 2026 WL 1662251, at *12, *15. None of the objectors has shown that the Rule 23(b)(2) Plaintiffs "will, or even can, get more through trial." *Id.* at *12.

### A. There Is No "Pervasive" Opposition to the Settlement Among Class Members, Many of Which Recognize the Settlement's Benefits.

With respect to the *Grinnell* factor assessing "the reaction of the class to the settlement," *In re Payment Card*, 2026 WL 1662251, at *8, the Court noted at preliminary approval that it was "too soon to tell whether the various complaints raised are pervasive among the 12-million-merchant class or confined to a vocal minority," *id.* at *1. It is now clear that the concerns raised at preliminary approval and reiterated by largely the same objectors at final approval are nowhere near "pervasive."

First, while class counsel notified class members that they could either (i) object to the settlement or (ii) "automatically benefit" from it by "do[ing] nothing,"[4] dozens of varied merchants (convenience stores, gas stations, auto repair shops, restaurants, grocers, etc.) nevertheless wrote letters urging the Court to *grant* final approval, arguing the settlement would give them more options for managing costs while maintaining the security and dependability of payment card transactions. ECF Nos. 9973–79, 9982–84, 10011, 10016, 10018, 10023, 10027. This affirmative expression of support is notable, given that the notice process "generally solicits *negative* feedback regarding a settlement, because it is designed to solicit . . . *objections* by advising class members of the procedures and deadlines for filing such responses with the court." *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 197 (S.D.N.Y. 2012) (emphases added); *In re Payment Card*, 2019 WL 6875472, at *16 (E.D.N.Y. Dec. 16, 2019) (noting that "a certain number of objections are to be expected in a class action with an extensive notice campaign and a potentially large number of class members" (alteration and citation omitted)).

The objections to final approval, which are addressed below, are from the following seven entities or groups: (1) Walmart, ECF Nos. 9991, 9993; (2) Circle K and the National Association of Convenience Stores (NACS), ECF Nos. 10003, 10005; (3) approximately 1,000 merchants that signed two identical objection letters, ECF Nos. 9981, 9988; (4) three other trade organizations (the Food Industry Association (FMI), ECF No. 9980, and the National Retail Federation (NRF) and Retail Industry Leaders Association (RILA), ECF No. 9999); (5) the Pedernales Electric Cooperative, ECF No. 9989; (6) a group of public interest organizations led by the American Economic Liberties Project (AELP), ECF No. 10007; and (7) a single consumer who concedes he

---

4 Interchange B2 Settlement Home Page, https://www.interchangeequitablereliefsettlement.com/en (last visited Oct. 12, 2026).

is not a class member, ECF No. 10019. In a class of more than 12 million members, these constitute no more than a "vocal minority" objecting to the settlement. *See Maywalt v. Parker & Parsley Petroleum Co.*, 864 F. Supp. 1422, 1433 (S.D.N.Y. 1994) (reasoning that "[t]he number of objectors in relation to the size of the entire class [nearly 2,700 objections from a class of approximately 89,000] is relatively small"), *aff'd*, 67 F.3d 1072 (2d Cir. 1995); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 326 nn.33–34 (N.D. Ga. 1993) (approving settlement where 773 objections amounted to "less than 1/100 of 1% of all class members").

Notably, while NRF and RILA purport to speak for their members and claim that they "received no member support for the settlement," ECF No. 9999, NRF & RILA Obj. at 4, that is demonstrably untrue. Major members of each of these organizations—including Cracker Barrel, Dick's Sporting Goods (which, in addition to being a member of RILA,[5] has a representative on NRF's board[6]), Dillard's, Foot Locker, and Gap Inc.—have made a separate filing in their own names, seeking to share in class counsel's fees, ECF No. 9994. In so doing, they have highlighted that they were members of the "7-Eleven" group of merchants "that vigorously litigated" against Visa and Mastercard as opt-outs from the Rule 23(b)(3) class for over a decade before ultimately resolving their claims in lieu of going to trial. *Id.* at 2. And despite having objected to prior settlements, including the 2024 settlement, each of these large merchants and trade group members argues that *this* settlement is "a vast improvement over" the 2024 settlement. *Id.* at 7.

Specifically, they assert that the proposed settlement, in their view, "addresse[s] some of the most problematic anticompetitive conduct at issue," including by reforming the Honor-All-

5 RILA, Our Members, https://www.rila.org/about-rila/our-membership (last visited Oct. 12, 2026).

6 NRF, About Us: NRF Board of Directors, https://nrf.com/about-us/board-directors (last visited Oct. 12, 2026).

Cards rules, *id.* at 20. These statements directly contradict the assertions by NRF and RILA that their members (and even their board members) uniformly oppose the settlement and believe it has no value.[7] Moreover, other major members of these trade organizations that opted out of the Rule 23(b)(3) class, pursued individual damages claims, and individually objected to prior proposed Rule 23(b)(2) settlements—like Target, Macy's, 7-Eleven, BJ's Wholesale Club, and others—have chosen to stay silent now.[8] Given this context, the trade association objections should be afforded little (if any) weight, and the Court should not accept the implication that those objections reflect the views of the associations' individual members.

### B. Plaintiffs Continue to Face Significant Risks at Trial, in Any Remedies Phase, and on Appeal.

As the Court found at preliminary approval, Plaintiffs face a "legitimate risk" of failing to establish liability at trial and an even "bigger" risk of failing to "secure the relief that the Amended Settlement offers, much less the additional relief" objectors demand. *In re Payment Card*, 2026 WL 1662251, at *12. The objectors do not confront these realities, breezing past them by claiming "[i]t cannot seriously be disputed that . . . the Networks and issuers impose supracompetitive prices on merchants." ECF No. 9991, Walmart Obj. at 1. Of course that is false—as more than two decades of litigation demonstrate, that proposition has been, and continues to be, subject to serious dispute. The objectors nonetheless continue to argue that, because the class largely survived summary judgment and *Daubert* motions, "most of the risks have already been overcome." ECF No. 10003, Circle K & NACS Obj. at 43; *see also* Walmart Obj. at 21–22. That overconfidence

---

7 Similarly, the objection filed by "978 Merchants and Merchant Trade Associations" listed Scholl Oil as a member of that group, *see* ECF No. 9981, at 37, but Scholl Oil separately filed a letter in support of the settlement, *see* ECF No. 9982.

8 *See* ECF No. 9220, Target Pls.' Obj. to 2024 Settlement; ECF No. 9224-1, 7-Eleven Pls.' Obj. to 2024 Settlement; ECF No. 9221, Grubhub Pls.' Obj. to 2024 Settlement; ECF No. 9281, Wawa Obj. to 2024 Settlement.

ignores repeated warnings from this Court and others. The risks at trial, in a remedies phase, and on appeal remain substantial.

### 1. *Risks of Establishing Liability at Trial.*

The objectors continue to grossly understate the hurdles to establishing liability at trial. Among other things, the Rule 23(b)(2) Plaintiffs would have to:

- prove that, before it became a public company, each network participated in an unlawful conspiracy, as opposed to a lawful joint venture that created a widely accepted payment card brand no individual bank could have created by itself;
- prove that, since becoming a public company that answers to its stockholders, each network has engaged in coordinated activity with the banks it is accused of conspiring with, as opposed to making decisions unilaterally as to that network's rules and interchange fees;
- demonstrate adverse effects on *inter-network* competition from each network's rules in a two-sided transaction market, in the face of clear evidence of exploding output, decreasing two-sided prices, and consistent innovation in the payments industry;
- overcome the procompetitive benefits of each network's rules as recognized by numerous courts, including this one;
- show there are substantially less restrictive alternatives to the challenged rules that could achieve the same procompetitive benefits in terms of price, output, and quality in the two-sided market; and
- show that the class was actually harmed by a competition-reducing aspect of the challenged rules.

*See In re Payment Card*, 2026 WL 1662251, at *11; ECF No. 9693, Defs.' Prelim. Approval Br. at 9–23 (previewing extensive evidence that would prevent Plaintiffs from meeting their burden at trial). If Plaintiffs were to fall at *any* of these hurdles, they would receive no relief at all—let alone the complete relief for which they claim the class should have held out (the dissolution of the networks as four-party systems with rules limiting issuer-level discrimination). And in proving their case, Plaintiffs would not be at liberty to ignore, as the objectors do, that the relevant markets include not just merchants but also cardholders, who benefit immensely from the networks' rules.

As the Supreme Court has recognized, rules that promote "the promise of a frictionless transaction" to cardholders ultimately "promote interbrand competition"—which is the kind of competition that the antitrust laws are meant to protect. *Ohio v. Am. Express Co.*, 585 U.S. 529, 551 (2018) ("*Amex*").

These hurdles would be particularly high as to the "honor all issuers" rule—which objectors insist is the "key target" of this litigation and must be eliminated, *see, e.g.*, Circle K & NACS Obj. at 13; Walmart Obj. at 5. Testimony from senior executives at each network and the networks' economics expert, Professor Kevin Murphy, shows that rules preventing issuer-level discrimination are fundamental to Visa's and to Mastercard's ability to compete as four-party networks that do not issue their own cards.[9] In addition to making it impossible to attract issuers to join a network, the absence of these protections would result in consumer uncertainty and frustration, making the cards less valuable to consumers—and in turn less valuable for merchants to accept. 2026 Knupp Decl. ¶¶ 8–11; 2026 Kirkpatrick Decl. ¶¶ 7–9; Murphy Decl. ¶¶ 8–17, 24–25, 34–44. The result would be fragmentation of the Visa and Mastercard networks and diminished use of Visa and Mastercard cards (*i.e.*, decreased output), less interbrand competition in the marketplace, and less value provided to network participants. Murphy Decl. ¶¶ 8–17, 34–44.

At this stage, this Court need not decide whether Professor Murphy and Visa's and Mastercard's executives are right, or that the objectors and their witnesses are wrong. That would

---

[9] *See* ECF No. 9934, Defs.' Mem. in Support of Final Approval, at 1 (incorporating into the final approval record all of the evidence that Defendants submitted at preliminary approval); ECF No. 9693-2, Knupp Decl. ¶¶ 29–33; ECF No. 9693-3, Aikat Decl. ¶¶ 12–16.

Together with this brief, the networks submit a declaration from Professor Murphy, as well as declarations from the Senior Vice President for Global Interchange and Pricing of Visa, William Knupp, and Mastercard's Chief Services Officer (and formerly President, Americas) Linda Kirkpatrick. The declarations submitted in support of final approval are abbreviated as "Murphy Decl.," "2026 Knupp Decl.," and "2026 Kirkpatrick Decl."

be for a trial, if it were to go forward. What matters for present purposes is that the networks' evidence confirms the Court's key conclusion at preliminary approval: establishing liability in a case that seeks to abolish the honor-all-issuers rule is anything but a "foregone conclusion." *In re Payment Card*, 2026 WL 1662251, at *11.

Recent experience in Rule 23(b)(3) opt-out cases remanded from MDL 1720 also highlights the risks of trial. Just a few weeks ago, the trial court presiding over the *Belk* damages opt-out case, which settled just days before jury selection, granted most of Defendants' 19 motions *in limine* and made clear that the merchant plaintiff would not be permitted to prove its case with prejudicial shortcuts, many of which the objectors seek to leverage here. Order, *Belk, Inc. v. Visa Inc., et al.*, No. 19-cv-7273 (N.D. Ill. Oct. 9, 2026), ECF No. 370-1 ("*Belk* MIL Ruling"). For example, the court rejected the plaintiff's attempt, which objectors also make here, to lump both networks' shares together to claim that Visa's and Mastercard's combined share "of the credit card market" "show[s] that [their] market power is immense." Circle K & NACS Obj. at 40, 42. The *Belk* court held that "the Plaintiff [could] not present evidence and argument that combines Visa and Mastercard's market shares or invokes the 'combined' market power of Visa and Mastercard," given that there (as here) there was no allegation (let alone proof) of an inter-network conspiracy. *Belk* MIL Ruling at 13. As to Mastercard, the Court highlighted its low market shares over time and predicted they "may have substantial force for [an] inevitable Rule 50 motion to be filed by Mastercard," seeking judgment as a matter of law for lack of market power. *Belk* MIL Ruling at 13.

The *Belk* court also excluded as irrelevant evidence of the banks' and networks' overall profitability, *Belk* MIL Ruling at 15–18, severely constraining plaintiff's "big is bad" strategy, which the objectors mistakenly presume they could employ at an injunctive relief trial as well, *see*

Circle K & NACS Obj. at 41; NRF & RILA Obj. at 9. And the *Belk* court excluded as irrelevant evidence regarding interchange rates in foreign markets, including because "[f]oreign markets are subject to their own regulatory frameworks, such as credit interchange rate caps, so evidence of Defendants' foreign conduct . . . is not probative as to potential interchange rates of the payment-card market in the United States." *Belk* MIL Ruling at 14–15. Again, this ruling highlights that the Rule 23(b)(2) Class may very well be precluded from relying on the kind of irrelevant, prejudicial evidence that the objectors seek to marshal. *See, e.g.*, Circle K & NACS Obj. at 21–22.

Finally, the *Belk* court made clear that the merchant plaintiff would not be able to sidestep the requirements of *Amex*. *Belk* MIL Ruling at 4 ("The Court will instruct the jury consistent with *Amex* . . . ."). The plaintiff sought to focus its case, as objectors do here, on *intra*brand competition between issuing banks on only the merchant side of the market. But the *Belk* court cautioned that the utility of the approach was limited, recognizing that competition among issuers within a network is *intra*brand competition, and stating "the alleged anticompetitive effects on the intrabrand market is not the ultimate market that the jury will be considering and to which the jury will apply the rule of reason. Under *Amex*, the jury still must consider both sides of the two-sided platform—merchants and cardholders—when defining the market for credit-card transactions." *Belk* MIL Ruling at 3. Consistent with this ruling, the court excluded certain evidence from plaintiff's chief economist as impermissibly one-sided. *Id.* at 4. Yet, here, the objectors' economic experts base their conclusions on the same impermissible one-sided analysis. Murphy Decl. ¶¶ 10–12, 34–44.

The *Belk* decision is a stark warning that the class will not be able to breeze through to verdict, and highlights that the objectors here give no consideration to the real risks of establishing

liability. As discussed above, Plaintiffs will face multiple, independent hurdles in obtaining a liability verdict, and should they falter at any of them, they will recover nothing—let alone the extreme relief the objectors urge them to hold out for.

*Grinnell* itself is instructive. In *Grinnell*, before the proposed private plaintiff class settlement was presented to the court, the government had obtained a judgment of liability for monopolization and an injunction against the same defendants, which was affirmed by the Supreme Court. 495 F.2d at 452–53. Nevertheless, the Second Circuit found that the risk to the class of continuing to litigate weighed in favor of settlement approval because defendants could relitigate some of the same questions and "[t]hey might well carry the day in any new airing of th[e] issue." *Id.* at 456–57. That possibility is even more stark here, where there has never been a judgment of liability against Defendants on the rules at issue and the class has no guarantee that it would prevail at trial (as *Amex* demonstrates). Indeed, the possibility—and in Visa's and Mastercard's view, the *likelihood*—that Defendants' arguments will "carry the day" at trial weigh heavily in favor of final approval.

2. *Risks in Obtaining Remedies.*

Objectors also wrongly assume that a liability finding would automatically produce sweeping "structural reforms," including eliminating all barriers to issuer-level discrimination. Walmart Obj. at 19–20; *see* ECF No. 10007, AELP Obj. at 45–46. These objectors ignore that the Court could instead find that the network rules prohibiting issuer-level discrimination specifically are reasonable and procompetitive, even if it saw fit to bar (or revise) other network rules. In this respect, the objectors fail to acknowledge that, "[w]hen it comes to fashioning an antitrust remedy. . . caution is key." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 106 (2021). For example, following a verdict for the government in the Google search monopolization trial, the court declined to grant several of the most severe remedies sought by the plaintiff, including where the

remedies were not sufficiently tailored to the conduct found unlawful and where they would cause "substantial—in some cases, crippling—downstream harms." *United States v. Google*, 803 F. Supp. 3d 18, 37–38, 99–100 (D.D.C. 2025); *see also United States v. Google, LLC*, 2026 WL 2754741, at *2 (E.D. Va. Sept. 2, 2026) (rejecting requested structural remedies as "neither realistic nor needed" following a verdict for the government in the Google ad monopolization trial).

Here, again, it is far from certain that "honor all issuers" would be found unlawful or that the Court would abolish this foundational rule, particularly given negative effects on cardholders. Rather, the Court's goal in a remedies phase would be "to make as little change as possible to restore competition rather than go [at the Honor-All-Cards rules] with a meat cleaver." ECF No. 9876, Prelim. Approval Tr. at 60:3–12. As this Court has explained, "the question is not whether the Amended Settlement constitutes the best possible recovery, *end stop* – it's whether the Amended Settlement constitutes the best possible recovery in light of what can be gained and lost through trial." *In re Payment Card*, 2026 WL 1662251, at *12. Objectors' assumption that a post-trial remedy (if any) would meet—or exceed—the relief secured in the Amended Settlement has no basis.

*3. Risks on Appeal.*

The obstacles to achieving objectors' preferred trial result are further compounded by the complexity of this case and the certainty that appellate litigation would follow from any judgment in favor of the class. *In re Payment Card*, 2024 WL 3236614, at *22 (E.D.N.Y. June 28, 2024); *see also In re Payment Card*, 2026 WL 1662251, at *12. Walmart's claim that these risks are no different here—in one of the longest-running, most complex MDLs ever—than in "virtually every antitrust case" is absurd on its face. Walmart Obj. at 22. *Amex* (affirming the reversal of the government's trial victory on Amex's similar cardholder-friendly rules) should be enough of a

lesson on this point. Courts have recognized that the possibility of a lengthy, uncertain appeal could delay or eliminate any recovery, and these risks weigh heavily in favor of settlement approval here. *See, e.g.*, *In re Facebook, Inc.*, 343 F. Supp. 3d 394, 412 (S.D.N.Y. 2018) (granting final approval of a $35 million securities class settlement that may have represented "one-tenth—or less—of Plaintiffs' potential recovery," because "[e]ven if Plaintiffs overcame [certain] defenses and others, lengthy appeals could tie up, delay, or ultimately preclude recovery for the class"); *Garcia v. Pancho Villa's of Huntington Vill., Inc.*, 2012 WL 5305694, at *5 (E.D.N.Y. Oct. 4, 2012) (granting final approval of a class settlement where establishing liability would require "favorable outcomes at trial and on appeal, both of which are inherently uncertain and lengthy" (citation omitted)).

*   *   *

The objectors' own conduct exposes the weakness of their trial predictions. At the start of this year, objector Circle K was set to go to trial in the Southern District of New York in April, in a damages case challenging the legality of the same network rules at issue here. The parties had made pre-trial exchanges (witness lists, exhibit lists, deposition designations, etc.) and served motions in limine. Yet Circle K chose to resolve its case, obtaining the certain benefits of a settlement rather than risk going to trial. Walmart did the same thing on the eve of trial more than 20 years ago. Objector NACS also chose to settle its damages case. At this point, all of the Rule 23(b)(3) class members and opt-outs have settled their damages claims, deciding that settlement was preferable to confronting the risks of trial and beyond. Objectors' insistence that the class gamble with certain relief that, per several of the *7-Eleven* Plaintiffs, has "real, measurable value," ECF No. 9994 at 12, should be accorded no weight. Plaintiffs' risks at trial and on appeal are substantial and weigh heavily in favor of final approval.

### C. The Settlement Provides Significant Benefits to Merchants and Compares Favorably to Plaintiffs' Best Possible Recovery at Trial.

The Court found at preliminary approval that the settlement provides "substantial relief" that is "more extensive" than the relief in the 2024 settlement and contains "both of the forms of relief that the Second Circuit deemed important" (referring to reform on the Honor-All-Cards rules and interchange fees). *In re Payment Card*, 2026 WL 1662251, at *4, *12, *15. Objectors nevertheless recycle their rejected claims that this relief is "illusory" or "meaningless" because, despite previously advocating for the very reforms the settlement provides, they now insist that the *only* acceptable relief is to grant merchants the ability to pit issuers within a network against each other by selectively accepting or surcharging their cards. *E.g.*, Circle K & NACS Obj. at 4; Walmart Obj. at 23. Their distorted account of the facts and law does not diminish the substantial relief the settlement delivers.

#### *1. The Honor-All-Cards Relief Is Substantial.*

The settlement breaks up, for the first time, each network's Honor-All-Cards rules applicable to credit cards on multiple levels, allowing merchants to reject Visa and/or Mastercard commercial cards, or premium consumer credit cards, or both. *In re Payment Card*, 2026 WL 1662251, at *4; *see also* ECF No. 9692-2, Amended Settlement ¶¶ 22, 71. This Court thus recognized at preliminary approval that "the Amended Settlement would effectively repeal the Honor All Cards rule," while preserving the networks' prohibitions on issuer-level discrimination. *In re Payment Card*, 2026 WL 1662251, at *4.

Circle K and NACS suggest that this finding was "mistaken"—that the Court somehow misunderstood the nature of the reform at preliminary approval. Circle K & NACS Obj. at 2, 15. But there is no reason to think the Court suffered from a lack of clarity as to what the settlement does and does not do. "Honor all issuers" does not need to be abolished for merchants to have

new options to pick among categories of credit cards, which they have not been able to do before. And class members—including some of the objectors here—"previously clamored for the ability to reject certain card products." *In re Payment Card*, 2026 WL 1662251, at *6.[10]

The same is true of their experts. Professor Adam Levitin, who submitted a declaration in support of the objections from NRF, RILA, Circle K, and NACS, takes the position that the settlement's Honor-All-Cards relief is "virtually worthless." ECF Nos. 9999-2, 10003-1, Levitin Decl. ⁋ 110. But in his earlier scholarship, before he was hired to advocate against this settlement, his views were consistent with those advanced by the Rule 23(b)(2) Plaintiffs and contrary to those he now espouses. Specifically, Professor Levitin argued in a published academic article that "merchants want to differentiate between high-priced cards (rewards and corporate) and regular-priced cards (nonrewards consumer cards) and between credit cards and debit cards to encourage the use of payment systems with the lowest net costs"—in other words, they want exactly the types of steering relief that the Amended Settlement provides.[11] And that is not all. Professor Levitin went further to note that merchants should be *indifferent* to which bank issued a particular card

---

[10] *See, e.g.*, *7-Eleven, Inc., et al. v. Visa Inc., et al.*, No. 13-cv-5746 (E.D.N.Y.), ECF No. 183, Sixth Am. Compl. ¶ 236 (alleging that "rewards cards have harmed merchants"); *Target Corp., et al. v. Visa Inc., et al.*, No. 13-cv-3477 (S.D.N.Y.), ECF No. 197, Third Am. & Suppl. Compl. ¶ 117 (alleging that the Honor-All-Cards rules "require merchants, as a condition of accepting any Visa-branded or Mastercard-branded credit cards, to accept higher-cost cards such as rewards cards or commercial cards"); ECF No. 9225, 2024 Walmart Obj. at 5–6 (Walmart "particularly has an interest in eliminating or rolling back Defendants' Honor All Cards rules, which require Walmart to accept for payment all manner of Defendants' cards, including those that have interchange fees that are substantially higher than other cards"); Testimony of Doug Kantor (General Counsel, NACS) before U.S. Senate Committee on the Judiciary Hearing on "Breaking the Visa-Mastercard Duopoly: Bringing Competition and Lower Fees to the Credit Card System," at 8 (Nov. 19, 2024) ("Because the fees are so much higher for some cards than for others, merchants very sensibly might want to accept some of them but not others . . . ."), available at https://www.judiciary.senate.gov/imo/media/doc/2024-11-19_-_testimony_-_kantor.pdf.

[11] Adam J. Levitin, *Priceless? The Economic Costs of Credit Card Merchant Restraints*, 55 UCLA L. REV. 1321, 1354 (2008).

because interchange does not differ by issuer, but by product.[12] According to Levitin, "[i]f merchants could discriminate among cards within a brand, they would likely refuse to accept cards that had high interchange fees—and hence high merchant discount fees. This would create substantial market pressure on card issuers to stop issuing high interchange fee cards."[13] Levitin made these arguments—entirely consistent with the class's position and contrary to the objections now before the Court—in 2008, when rewards cards were already widespread. He also wrote that two-thirds of cardholders had rewards cards, while "[e]ighty percent of credit card transactions in 2005 were made on rewards cards."[14] As he recognized, the behaviors of cardholders, issuers, and merchants can be influenced with rules reform similar—if not identical to—that provided in the Amended Settlement.

Nevertheless, objectors maintain that this relief is "meaningless in practice" because "the market is so strongly skewed towards [premium] cards" that rejecting them is "unrealistic." Circle K & NACS Obj. at 27; ECF No. 9981, 978 Merchants Obj. at 4–5; Walmart Obj. at 9. This argument ignores their own expert's reasoning and mistakenly assumes that merchants are powerless to influence cardholder behavior. The tools provided in the settlement ensure that is not the case.

As an initial matter, objectors highlight statistics indicating that nearly 90% of consumer credit card transaction volume currently comes from premium cards. *See, e.g.*, Circle K & NACS Obj. at 29; 978 Merchants Obj. at 4–5; Walmart Obj. at 9. But they ignore that, according to Plaintiffs' experts, more than 40% of consumer credit cards in circulation are standard cards, and

---

[12] *Id.* at 1354 (footnote omitted), 1391.

[13] Adam J. Levitin, *Priceless? The Social Costs of Credit Card Merchant Restraints*, 45 HARV. J. ON LEGIS. 1, 23 (2008).

[14] Levitin, *supra* note 11, at 1344 (footnote omitted).

the majority of cardholders carry two or more cards. ECF Nos. 9692-5, 9694-2, Stiglitz Decl. ¶ 88 n.84. Thus, many consumers already hold standard cards and can be incentivized to use them if merchants find it worthwhile to do so (including by, for example, surcharging premium cards, or discounting for the use of standard cards). This is particularly true given that the proposed settlement creates and maintains, for the full term of the release, a substantial difference between the interchange fees associated with standard cards and premium cards, while making surcharging simpler and easier to implement. *See* ECF No. 9693, Networks' Prelim. Approval Br. at 24–25; Amended Settlement ¶¶ 50, 99; Stiglitz Decl. ¶¶ 74–77, 85–89.[15]

Objectors insist that these steering mechanisms are useless because they are onerous, whereas issuer-level discrimination would be transformational, seamlessly and automatically giving merchants "the leverage to spur competition." Walmart Obj. at 6; *see also* Circle K & NACS Obj. at 15. Objectors' absolutist position hinges on a theory of merchant-issuer negotiations that is unsupported by record evidence or fundamental economics. As Professor Murphy explains, the objectors offer no basis for their view that merchants that have no desire to surcharge or discount because of friction would be able to credibly threaten an issuer with selective acceptance. Murphy Decl. ¶ 42. At the same time, far from creating ideal conditions of competition, abolishing "honor all issuers" risks destroying the value of payment cards to cardholders, in turn making them less valuable to merchants. Murphy Decl. ¶¶ 8–17, 34–44. And

[15] With respect to merchants' ability not to accept premium cards, NRF and RILA recycle their prior mischaracterization of Mastercard's CEO's statements on an investor call following the announcement of the Amended Settlement, to which Mastercard previously responded on preliminary approval. ECF No. 9773 at 11 n.9. NRF and RILA now further mischaracterize the CEO's statements by misattributing to the CEO a quote from their own objection on preliminary approval. *Compare* NRF & RILA Obj. at 17, *with* ECF No. 9727, NRF & RILA Obj. on Prelim. Approval, at 6, *and* Tr., *Mastercard at KBW Fintech Payments Conference: Strategic Insights and Future Plans* (Nov. 12, 2025), *available at* https://www.investing.com/news/transcripts/mastercard-at-kbw-fintech-payments-conference-strategic-insights-and-future-plans-93CH-4352728.

in any event, a theoretical disagreement between objectors' and the class's economists as to the most effective version of Honor-All-Cards relief is not a basis to find the settlement unfair or inadequate. *See Haar v. Allen*, 687 F. App'x 93, 95 (2d Cir. 2017) (holding a fair and adequate settlement need not "resolve all of [the class members'] grievances to their satisfaction").

Objectors also claim that it will "take [] years" before premium and commercial cards are sufficiently identifiable for merchants to apply product-based acceptance (or surcharging). NRF & RILA Obj. at 14; Circle K & NACS Obj. at 34–36. The premise is wrong. Each network maintains and enforces product brand standards allowing different card products to be identified visually. 2026 Knupp Decl. ¶¶ 20–21; 2026 Kirkpatrick Decl. ¶¶ 38–39. Likewise, the technology needed to identify different card products electronically for both in-person and online transactions is already available. 2026 Knupp Decl. ¶¶ 22–23; 2026 Kirkpatrick Decl. ¶¶ 31–35. These objections lack any basis in fact and thus do not show that the settlement is unfair or inadequate.

2. *The Surcharging Relief Is Substantial.*

The settlement allows merchants to surcharge each network's credit cards at the product level (*e.g.*, commercial or premium) up to the lower of 3% or the cost of acceptance, regardless of whether merchants surcharge other competitors' cards. *In re Payment Card*, 2026 WL 1662251, at *5; Networks' Prelim. Approval Br. at 24–25; Stiglitz Decl. ¶¶ 74–77, 88–89. The networks have explained, and objectors do not dispute, that this 3% cap would allow merchants to recoup the entire interchange fee amount on the vast majority of credit card transactions. *See* ECF No. 9773, Networks' Prelim. Approval Reply at 9 n.5.[16]

[16] Some objectors note that interchange rates for some limited subset of transactions are higher than the settlement's 3% surcharging cap. The overall cap on surcharges is designed to protect against merchants price-gouging cardholders and turning surcharging into a merchant profit-center. A small minority of all Visa credit card transactions have interchange rates that exceed 3% and, on many of those transactions, merchants could take steps to obtain lower interchange

*(footnote continued on next page)*

Objectors speculate that the "benefit of this provision" could be undermined if Visa and Mastercard "raise interchange rates on merchants that surcharge to a level exceeding 3%." 978 Merchants Obj. at 5; *see also* Circle K & NACS Obj. at 32–34. In particular, objectors note that the settlement permits the networks to "establish 'differential rate structures' with higher interchange rates for merchants that surcharge." 978 Merchants Obj. at 5 (quoting Amended Settlement ¶¶ 43(f), 92(f)); *see also* Circle K & NACS Obj. at 32–34. This speculation ignores that any "differential rate structures" would still be subject to the settlement's rate caps. Amended Settlement ¶¶ 43(f), 92(f); Networks' Prelim. Approval Br. at 25. Given those rate caps, the networks can only systematically offer *lower* rates to merchants who do not surcharge; they cannot systematically increase rates for merchants who do. And, as objectors acknowledge, *see* Circle K & NACS Obj. at 33, the settlement specifically prohibits the networks from penalizing merchants for surcharging. Amended Settlement ¶¶ 43(f), 92(f).

Objectors also attempt to raise surcharge-related implementation concerns, but they are baseless. *See* NRF & RILA Obj. at 14; Circle K & NACS Obj. at 33–34. As noted, premium and commercial cards will continue to have visual identifiers that merchants could use to apply product-level surcharging. 2026 Knupp Decl. ¶¶ 20–21; 2026 Kirkpatrick Decl. ¶¶ 38–39. Likewise, the technology already exists to identify different card products electronically for both point-of-sale and online transactions. 2026 Knupp Decl. ¶¶ 22-23; 2026 Kirkpatrick Decl. ¶¶ 31–

rates. 2026 Knupp Decl. ¶ 32. Similarly, the only Mastercard transactions with interchange rates approaching 3% are those that do not qualify for any other rate because no authorization was obtained from an issuer, and those for which acquirers could obtain lower rates by providing more data for security purposes. *See* Mastercard 2026-2027 U.S. Region Interchange Programs and Rates, Effective Apr. 17, 2026, pp. 2, 7, 8 ("Standard" rates not qualifying for any other rate), pp. 7, 8 ("Data Rate I"), *available* at https://www.mastercard.com/content/dam/mccom/us/business/documents/merchant-rates-2026-2027-april2026.pdf.

35. Other surcharging-related technological concerns likewise lack any basis. 2026 Knupp Decl. ¶ 24 (addressing arguments about Visa's Field 28).

*3. The Rate Relief Is Substantial.*

In addition to rule changes, the settlement imposes limitations on interchange rates, both to ensure the existence of lower-cost standard credit cards and to "allow for cost savings and certainty while the rules take hold in the market." *In re Payment Card*, 2026 WL 1662251, at *12; Networks' Prelim. Approval Br. at 25. For the entire duration of the agreement, the settlement imposes an interchange rate cap for the standard (non-premium) consumer credit card category, making those rates over 100 basis points lower than rates for premium credit products. *See* Amended Settlement ¶¶ 50, 99. For five years, the settlement also provides for posted interchange rate caps and an overall average effective rate limit that is 10 basis points lower than the current level. *Id.* ¶¶ 48, 51, 97, 100. Merchants with existing custom interchange rate agreements receive a reduction from their custom rate that is proportional to the 10-basis-point reduction in the systemwide average effective rate. *Id.* ¶¶ 49, 98. These substantial rate-based benefits for all merchants are "a type of relief that Plaintiffs cannot secure through trial," *In re Payment Card*, 2026 WL 1662251, at *12, and thus exceed the class's best possible recovery.

Objectors misguidedly attempt to dismiss this rate relief as too small both in absolute terms and in relation to the amount that the class claims interchange fees have exceeded competitive rates. *See* Circle K & NACS Obj. at 20–24; Walmart Obj. at 9–10; 978 Merchants Obj. at 4. It makes no sense to evaluate the rate relief in this way, both because rate relief would not be available *at all* following trial and because the relief is not intended to approximate a "competitive rate" that supposedly should exist. As this Court has explained, the purpose of the interchange rate caps and reduction is to "allow for cost savings and certainty while the rules take hold in the market." *In re Payment Card*, 2026 WL 1662251, at *12.

In addition, objectors claim the rate relief is too small because rates in the U.S. will still exceed rates in other countries. *See* Circle K & NACS Obj. at 21–22. This is not an appropriate yardstick, as regulated rates in other countries are irrelevant to this Court's evaluation of the U.S. market, which features its own distinct payment system with its own set of costs and benefits to network participants (like lower cardholder fees, higher cardholder rewards, and a higher output of card transactions overall). As discussed above, the trial court presiding over a case remanded from MDL 1720 recently granted Defendants' motion *in limine* to exclude as irrelevant all evidence "about foreign markets, including regulated interchange rates . . . in Australia [and] Europe." *Belk* MIL Ruling at 14–15. The court recognized that "[f]oreign markets are subject to their own regulatory framework," such that "evidence of the Defendants' foreign conduct . . . is not probative as to potential interchange rates of the payment-card market in the United States." *Id.* at 14. A regulated rate in a different country with a different payment system that offers different costs and benefits to cardholders provides no reason to reject the settlement.

Objectors also offer various unfounded theories of how the networks could circumvent the rate relief, such as by recategorizing cards or creating new card products with higher interchange rates. The networks explained at preliminary approval, and reaffirm here, why these concerns are wrong. *See* 2026 Knupp Decl. ¶¶ 25–28; 2026 Kirkpatrick Decl. ¶¶ 25–30; Networks' Prelim. Approval Reply at 14–15.

For example, the networks and issuers cannot simply "recategorize[e] or reissue[e] Standard cards . . . as Premium cards" to undermine the settlement relief. 978 Merchants Obj. at 5; *see also* AELP Obj. at 50–51. As defined in the settlement, both terms map onto specific card types. Amended Settlement ¶¶ 1(z), 1(nn). Each network maintains extensive requirements for premium card types, as they must to attract cardholders and compete with other networks offering

premium products. 2026 Knupp Decl. ¶ 26; 2026 Kirkpatrick Decl. ¶ 29. If issuers convert card portfolios from standard to premium, they will have to meet these requirements and fund the corresponding rewards—discouraging any opportunistic recategorization of standard cards. 2026 Knupp Decl. ¶ 26; 2026 Kirkpatrick Decl. ¶ 29. At the same time, if premium transaction volume grows, the networks will have to further reduce premium or other interchange rates to stay below the average effective interchange rate cap. *See* Amended Settlement ¶¶ 48, 51, 97, 100. These terms ensure that the merchants' benefits from the settlement will not be circumvented.

Additionally, in connection with the objectors' concerns over network fees, *see* Walmart Obj. at 10; AELP Obj. at 48–49, the settlement provides that the networks cannot "defeat the benefits that merchants receive . . . by increasing other network fees or Merchant Fees to restore the revenues that issuers lost from the interchange commitments herein." Amended Agreement ¶¶ 54, 103; *see* 2026 Knupp Decl. ¶ 27; 2026 Kirkpatrick Decl. ¶ 30. Critically, moreover, the settlement includes specific mechanisms for class counsel to monitor and enforce the interchange reductions, with oversight by the Court. *See* Amended Settlement ¶¶ 1(p), 48, 52–53, 97, 101–02, 140 (discussing Independent Auditor). Objectors do not address these monitoring and enforcement mechanisms, or attempt to explain why they would be inadequate to deter the kinds of attempts at circumvention that they speculate will occur.

#### 4. *If Merchants Do Not Want to Avail Themselves of the Rules Changes to Avoid Consumer Friction, That Would Be a Result of Competition in the Two-Sided Market.*

Throughout their attempts to minimize the settlement relief, objectors complain that rejecting categories of cards, surcharging, and discounting all can impose costs in the form of "customer friction" or "ang[er]" that will reduce any benefit to merchants of adopting the steering practices that the settlement allows. *See, e.g.*, NRF & RILA Obj. at 14; Walmart Obj. at 8; 978 Merchants Obj. at 5. Defendants do not dispute that the rules changes required by the settlement

could increase friction at the point-of-sale. Both networks' existing rules are designed to minimize friction and ensure a seamless, reliable experience. That is why output in the transactions markets has skyrocketed, and why Plaintiffs would be unable to prove any harm to competition at trial. *Amex*, 585 U.S. at 549, 551.

As this Court has noted, a merchant's decision not to pursue potentially cost-saving steering enabled by the settlement in favor of a frictionless experience for customers is itself "a sign of competition." *In re Payment Card*, 2026 WL 1662251, at *15. This conclusion is consistent with the Second Circuit's ruling in *Amex* that consumer preferences and cardholder demand for certain acceptance practices are a facet of competition in a two-sided transaction platform, which reflect the benefits to cardholders of payment cards—and the "concomitant competitive benefits to merchants who choose to accept" those cards. *See United States v. Am. Express Co.*, 838 F.3d 179, 202 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 585 U.S. 529 (2018). The impact of those cardholder preferences thus is not something a settlement should seek to "remedy"—especially when the purported remedy would, as here, likely result in even greater harm to cardholders' interests.

To the extent objectors are worried that use of the steering mechanisms in the settlement would create friction, abolishing "honor all issuers" would create far more uncertainty for cardholders. The networks have agreed to revise their Honor-All-Cards rules pertaining to credit into three categories (commercial credit, premium consumer credit, and standard consumer credit). But there are *thousands* of card-issuing banks. The unpredictability of a system without "honor all issuers" would diminish the value of payment cards and in turn diminish competition among payment networks and payment forms. Murphy Decl. ¶¶ 8–17, 34–44. That only underscores

why the objectors' requests to reject the settlement in hopes that the Court will "go [at the Honor-All-Cards rules] with a meat cleaver" is misguided. Prelim. Approval Tr. at 60:3–12.

### D. The Other Applicable Factors Confirm That Final Approval Is Warranted.

At preliminary approval, the Court also evaluated the settlement with respect to the equitable treatment of class members and the ability of the Defendants to withstand a greater judgment. *In re Payment Card*, 2026 WL 1662251, at *14–15. These factors continue to weigh on balance in favor of final approval.

The settlement treats class members equitably in that it provides broad and uniform nationwide reform to the networks' rules and interchange rates. *See* Networks' Prelim. Approval Br. at 29–30. The central relief is available to all class members. *See In re Payment Card*, 2026 WL 1662251, at *14–15. Some objectors attempt to draw distinctions among class members that are utilities, convenience stores, or fuel merchants, but there is no factual basis to believe that those merchants could not benefit from the proposed settlement. *See* 2026 Knupp Decl. ¶¶ 29–31; 2026 Kirkpatrick Decl. ¶¶ 40–42.[17] Moreover, consistent with the Court's findings at preliminary approval, nearly every objection to the settlement's relief raised at final approval by Walmart also "appeared in the objection-letter of a small merchant," indicating that any "dissatisfaction with the Amended Settlement . . . does not appear to be size-relative." *In re Payment Card*, 2026 WL

[17] Mastercard's capped rates for petroleum transactions differ for standard cards (1.9%, maximum of 95 cents) and Premium cards (2%, maximum of 95 cents), so it is not accurate that fuel merchants have no incentives to use steering tools to differentiate among those cards. *See* Circle K & NACS Obj. at 31–32. And convenience stores that have a large volume of small ticket transactions stand to benefit considerably from the Amended Settlement, including the 125-basis-point cap on standard transactions. *See* Mastercard 2026-2027 U.S. Region Interchange Programs and Rates, Effective Apr. 17, 2026, p. 2 (listing "Petroleum Base" rates and "Small Ticket" rates), *available* at https://www.mastercard.com/content/dam/mccom/us/business/documents/merchant-rates-2026-2027-april2026.pdf.

1662251, at *15. At the same time, both large and small merchants in different industries have recognized the benefits of this settlement. *Supra* Section I.A.

As to the ability to withstand a greater judgment, the Court previously found that it could not make a "conclusive determination" as to whether the networks could survive if a judgment significantly curtailed the challenged rules beyond the ways proposed in the settlement. *In re Payment Card*, 2026 WL 1662251, at *15. Yet again, objectors make clear that no settlement would satisfy them unless it unraveled the foundational, competitive value the networks offer as four-party systems, namely, establishing a basic price for network transactions in place of millions of individual negotiations and assuring widespread acceptance for issuers and their cardholders. But, as they did at preliminary approval, Defendants submit evidence to show that further rules changes, and in particular the allowance of issuer-level discrimination, would hurt their ability to compete with other networks and other forms of payment. 2026 Knupp Decl. ¶¶ 9–10; 2026 Kirkpatrick Decl. ¶¶ 7–9; Knupp Decl. ¶¶ 20–27, 33, 41, 45–47; Aikat Decl. ¶¶ 20–21, 37, 42; Murphy Decl. ¶¶ 8–17, 34–44; *see generally* Networks' Prelim. Approval Br. at 30–32. Undermining the basis on which issuers choose to issue cards under the Visa network or the Mastercard network, and the basis on which cardholders find value in their cards, cannot be required as a pre-condition to settling this matter. If it were, any settlement would be untenable from the networks' perspective.

After considering these points, the Court held that this factor weighed "against granting preliminary approval . . . but not decisively so." *In re Payment Card*, 2026 WL 1662251, at *15. While the networks respectfully disagree with that conclusion, objectors offer no basis for the Court to find this factor weighs against approval in any material way or that it outweighs the multiple other factors that strongly favor approval.

* * *

Walmart ultimately concedes, as it must, that the settlement will "rework the payments system at the heart of the U.S. economy." Walmart Obj. at 1. In reality, there can be no legitimate debate that the settlement provides "substantial relief" to the class that is "more extensive" than the relief in the 2024 settlement and contains "both of the forms of relief [as to default interchange and Honor All Cards] that the Second Circuit deemed important." *In re Payment Card*, 2026 WL 1662251, at *4, *12, *15. Nothing has changed to disturb this Court's conclusion at preliminary approval that the relevant Rule 23(e)(2) and *Grinnell* factors, as a whole, support final approval.

## II. <u>The Court Should Not Revisit Its Prior Decision to Certify a Mandatory, Non-Opt-Out Class.</u>

In 2021, this Court certified a mandatory, non-opt-out class pursuant to Rule 23(b)(2), after considering the same objections raised by many of the same objectors that are now again before the Court. *DDMB, Inc. v. Visa, Inc.*, 2021 WL 6221326, at *46–50 (E.D.N.Y. Sept. 27, 2021). Despite multiple unsuccessful attempts to alter the decision since then, the objectors yet again seek opt-out rights and decertification based on the same arguments the Court already considered and rejected—namely, that (i) the objectors' interests are not adequately represented as required by Rule 23(a)(2), (ii) the class fails the typicality requirement of Rule 23(a)(3), (iii) the class is not "cohesive" under Rule 23(b)(2), and (iv) a mandatory, non-opt-out class violates various constitutional rights. The Court's prior reasoning on these points applies with equal force now.[18]

---

[18] In addition to objections to final approval, Walmart, and NACS and Circle K, contemporaneously filed documents styled as notices of motions and motions to decertify the class. ECF Nos. 9993, 10005. Those motions repeat the same arguments those objectors made to final approval, ECF Nos. 9991, 10003, and Defendants oppose the motions for the reasons stated herein. Moreover, those motions were not preceded by requests for a pre-motion conference and thus are improper under this Court's individual practice rules. *See Mandel v. Daskal*, 2025 WL 2822698, at *1 n.1 (E.D.N.Y. Oct. 4, 2025).

### A. Class Members Are Still Adequately Represented.

"Determination of adequacy typically 'entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'" *In re Payment Card*, 2024 WL 3236614, at *15 (citations omitted); *see also DDMB*, 2021 WL 6221326, at *19–24, *37–38. This Court has now concluded *three* times that Plaintiffs and class counsel satisfy these elements. *See DDMB*, 2021 WL 6221326, at *19–24, *37–38; *In re Payment Card*, 2024 WL 3236614, at *15–16; *In re Payment Card*, 2026 WL 1662251, at *8–9. As this Court noted in granting preliminary approval, "[n]othing has changed since" these prior decisions "that would warrant a different result: the class representatives and class counsel are the same, as are the objections to their adequacy in those roles." *In re Payment Card*, 2026 WL 1662251, at *8. Moreover, the adequacy decision "is the law of the case," so "absent 'cogent and compelling reasons,' the Court is not going to revisit it." *Id.* at *9 (citations omitted).

As before, the objectors provide no basis—let alone any "cogent and compelling" one—to revisit adequacy of representation. First, the objectors do not provide any reason to question the adequacy of class counsel. *See* ECF No. 9692-6, Orenstein Decl. ¶¶ 15, 19 (attesting "without reservation" that the class was "represented throughout" the negotiations "by exceptionally experienced and qualified" counsel who advocated "strongly" for the class's interests). With respect to supposed intra-class conflict, objectors again claim that the small class representatives negotiated away the interests of large national merchants[19] and others who supposedly would

[19] Walmart purports to speak for "large merchants" in arguing that the settlement "offers no effective relief at all," Walmart Obj. at 3, 25. Levitin says the opposite: that relief as to digital wallets and All Outlets rules only benefits large merchants. Levitin Decl. ¶¶ 204, 209. And, as noted above, many large merchants (including The Gap, Dick's Sporting Goods, Foot Locker, and others) believe the new settlement is "a vast improvement" that has "real,

*(footnote continued on next page)*

prefer the ability to selectively accept or surcharge by issuer. *See, e.g.*, Walmart Obj. at 25; NRF & RILA Obj. at 2, 5, 15. These complaints are "'more appropriately directed at the adequacy of relief' than the adequacy of their representatives or counsel." *In re Payment Card*, 2026 WL 1662251, at *9 (quoting *In re Payment Card*, 2024 WL 3236614, at *17).

Critically, for purposes of adequacy of representation, despite "the many differences between small, local merchants and large, national merchants, *all* Plaintiffs seek the same type of redress for the same type of harms." *In re Payment Card*, 2024 WL 3236614, at *17. To the extent the objectors might prefer one form of relief over another, that reflects a disagreement with class counsel's strategic judgments and does not create an intra-class conflict. *Id.* at *19. As this Court recently concluded in the context of the Rule 23(b)(3) class action in rejecting claims of inadequate representation: "it is a function of any settlement, especially one of this size, that class members will benefit differently. Nothing about that is inherently nefarious or wrongful. Fundamentally, all class members—class representatives included—sought the same relief." ECF No. 10022, Mem. and Order (Sept. 29, 2026), at 12.

Nor were the objectors inadequately represented because they did not individually participate in the settlement negotiations. *See, e.g.*, NRF & RILA Obj. at 5-6; Walmart Obj. at 1, 3. "There is no fundamental problem with class counsel rejecting, limiting, or conditioning the input of class members." *In re Payment Card*, 2026 WL 1662251, at *9 n.10. If every merchant in a nationwide class must participate in every decision made by class counsel, the purpose of Rule 23(b)(2) classes would be destroyed. *Id.*

---

measurable value to the Class." ECF No. 9994 at 7, 12. No large retailers other than Walmart and Circle K submitted objections (while other large merchants objected to the 2024 settlement). *See supra* note 8.

### B. Typicality Is Still Satisfied.

Walmart objects that "the named plaintiffs' claims are not typical of Walmart's." Walmart Obj. at 25. As the sole basis for this argument, Walmart posits that class plaintiffs threw the interests of absent class members "to the winds in order to settle their own claims." *Id.* (quoting *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 17 n.6 (2d Cir. 1981)). In addition to being wrong for the reasons set forth in the adequacy section above, Walmart's argument misconstrues the typicality requirement.

Typicality "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *DDMB*, 2021 WL 6221326, at *16 (citations omitted). That standard is easily satisfied here, where the class representatives seek redress for the same type of alleged harms (allegedly supracompetitive fees) resulting from the same course of conduct (the networks' rules) applicable to the entire class. *Id.* The cases on which Walmart relies to argue to the contrary are inapposite.[20]

### C. Rule 23(b)(2) Cohesion Is Still Satisfied.

Objectors' arguments about Rule 23(b)(2) cohesion fail now for the same reasons they failed in 2021. Rule 23(b)(2) requires that class members' "injuries be similar enough that they all can be remedied with a single 'indivisible' injunction." *DDMB*, 2021 WL 6221326, at *44 (quoting *Houser v. Pritzker*, 28 F. Supp. 3d 222, 250 (S.D.N.Y. 2014)). According to objectors, Rule 23(b)(2) cohesion is lacking because "rather than an indivisible injunction that uniformly redresses injury class-wide," the proposed settlement presents "a menu of divisible remedies that

[20] In *Nat'l Super Spuds*, 660 F.2d at 18–19, the class representatives had different claims than absent class members because they did not hold certain contracts that absent class members held. In *Glover v. Conn. Gen. Life Ins. Co.*, 186 F.4th 110, 111–13 (2d Cir. 2026), an insurance contract case, the named class member faced no hurdle to proving privity of contract whereas absent class members did.

benefits some at the expense of others." Walmart Obj. at 26; NRF & RILA Obj. at 7–8. The Court previously considered these types of objections to class certification, *DDMB*, 2021 WL 6221326, at *41,[21] and rejected them multiple times.

In certifying the class, the Court focused on the "indivisible nature" of the relief provided in Rule 23(b)(2) actions: "[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Id.* at *43 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011)). The Court concluded that, where (as here) the relief sought is changes to Visa's and Mastercard's network rules—applicable to *all* merchants—a mandatory class is the proper procedural vehicle. *Id.* at *44–45, *48.

Again, when considering whether to preliminarily approve the 2024 settlement, the Court disagreed with these same arguments.[22] It reiterated that "[a]ll class members have the same interests to eliminate the rules that permit Defendants to maintain" what the objectors and Plaintiffs argue are "supracompetitive interchange fees." *In re Payment Card*, 2024 WL 3236614, at *17. Objectors provide no new reasons for this Court to reconsider. It remains the case that, where the relief sought is changes to Visa's and Mastercard's network rules applicable to *all* merchants, a mandatory class is the proper procedural vehicle. *DDMB*, 2021 WL 6221326, at *44–48.

---

[21] *See also, e.g.*, ECF No. 8465, Ex. A to Decl. of Paul H. Schoeman (Walmart Mem. in Opp'n to Equitable Relief Pls.' Mot. for Class Cert.) at 20; ECF No. 8450, Direct Action Pls.' Mem. in Opp'n to Equitable Relief Pls.' Mot. for Class Cert. at 23; ECF No. 8468-1, Ex. 1 to Decl. of Debra L. Greenberger (Merchant Trade Groups' Mem. in Opp'n to Equitable Relief Class Pls.' Mot. for Class Cert.) at 7.

[22] ECF No. 9225, Walmart Obj. to 2024 Settlement at 10–11; ECF No. 9222, NRF & RILA Obj. to 2024 Settlement at 4; *see also* ECF No. 9224-1, 7-Eleven Pls.' Obj. to 2024 Settlement at 27.

### D. The Court Should Not Revisit Its Decision to Certify a Mandatory Class.

The objectors provide no valid reason to allow opt-outs from the class, which would lead to termination of the settlement agreement. *See* Amended Settlement ¶¶ 136–38. Objectors recycle their earlier arguments that the Court should permit opt-outs because they prefer extreme forms of injunctive relief that likely would not be attainable even if Plaintiffs prevailed at trial (which is highly uncertain, as already discussed). None of their arguments has merit.

#### *1. Due Process Does Not Require Opt-Outs.*

As before, objectors again erroneously argue that "due process requires a right to opt out of *all* class actions" and that "[t]here is a special need for opt-out here, where the proposed settlement fails to provide the core relief that [the objectors] have sought." Circle K & NACS Obj. at 46–47; *see also* Walmart Obj. at 27–28; NRF & RILA Obj. at 8–9. The Court has already rejected this argument and should do so again.

This Court previously refused to "find that mere membership in a mandatory class violates due process." *DDMB*, 2021 WL 6221326, at *31. This is consistent with the Supreme Court's holdings that "[Rule 23](b)(2) does not require that class members be given . . . opt out rights." *Dukes*, 564 U.S. at 363; *see also id.* at 362 (Rule 23 "provides no opportunity" for "(b)(2) class members to opt out"). This Court further found that denial of opt-out rights is particularly warranted where, as here, merchants challenge uniformly applicable rules, and individual suits may result in inconsistent injunctions. *DDMB*, 2021 WL 6221326, at *46–49. Further, permitting opt-out rights in this context would discourage settlements, as defendants "will not agree to settlements like this one if they cannot buy something approaching global peace." *Id.* at *49 (quoting *Berry v. Schulman*, 807 F.3d 600, 613 (4th Cir. 2015)).

To suggest that there is an open constitutional question on the permissibility of opt-outs from Rule 23(b)(2) classes, Walmart quotes the statement from *Dukes* that, while the Supreme

Court has "never held" that lack of notice and opt-out rights "violates due process" "where the monetary claims do not predominate," there is a "serious possibility that it may be so." Walmart Obj. at 27 (quoting *Dukes*, 564 U.S. at 363). But the Supreme Court was referring there to class actions where class members have "individualized claim[s] for money." *Dukes*, 564 U.S. at 363.[23] That is obviously not the case here, where all claims to money damages for alleged past harm were addressed in a separate class action (and separate opt-out suits).[24]

Additionally, objectors again argue that due process requires opt-out rights when actions seek to bind "known plaintiffs concerning claims wholly or predominantly for money judgments," and that this "settlement is fundamentally about money." Walmart Obj. at 30–31; *accord* NRF & RILA Obj. at 8–9. This Court previously rejected that argument as to the 2024 settlement. While that settlement, like this one, included prospective interchange rate caps and reductions with an easily quantifiable value (alongside several other rules reforms), this was still prospective injunctive relief and not "individualized monetary relief" for past harm. *In re Payment Card*, 2024 WL 3236614, at *18. As the Court explained, "[w]hile it is possible to ascribe a dollar value to nearly any form of injunctive relief, the ability to do so does not transform it *ipso facto* into

---

[23] *See also, e.g.*, *Dudas v. Spinnaker Resorts, Inc.*, 2022 WL 23046282, at *4 (S.D. Ohio 2022) (reading *Dukes* to address "'the serious possibility' that it would violate due process to certify a Rule 23(b)(2) class *when damages are sought*, even if the damages do not predominate over claims for injunctive or declaratory relief" (emphasis added)); *Schulman*, 807 F.3d at 611–12 (noting "federal courts long have permitted certification of mandatory Rule 23(b)(2) classes involving monetary relief so long as that relief is 'incidental' to injunctive or declaratory relief," and that "[w]e do not believe that the Court's dictum in *Dukes* warrants or even authorizes overturning this established precedent"); *Gold v. Midland Credit Mgmt., Inc.*, 306 F.R.D. 623, 634 (N.D. Cal. 2014) (stating that *Dukes* "concluded that 'the serious possibility' that money damages *may* predominate cautioned against reading Rule 23(b)(2) *to include money damages*" (first emphasis in original, second added)).

[24] Walmart also contends that Rule 23(b)(2) "was conceived as predominantly for civil rights cases" even if "it has extended beyond its civil rights origins." Walmart Obj. at 27–28. Rule 23(b)(2) was never intended to be so limited. Rule 23(b)(2) Advisory Committee Notes to 1966 Amendment (stating that "[s]ubdivision (b)(2) is not limited to civil-rights cases" and providing examples analogous to the claims here: claims for improper differential pricing and tying).

monetary relief." *Id.*; *see also In re Payment Card*, 2026 WL 1662251, at *15 (noting that "Plaintiffs do not seek monetary relief").

As before, Walmart cites *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 857 (1999), and the Second Circuit's opinion rejecting the initial combined Rule 23(b)(2)/(b)(3) settlement, *In re Payment Card*, 827 F.3d 223, 234, 240 (2d Cir. 2016), to argue for opt-out rights because "the Settlement offers no effective relief at all to many large retailers, like Walmart, while purporting to offer benefits—like buying groups and education programs—to small businesses." Walmart Obj. at 25. However, this Court already concluded that "the issues that motivated the Supreme Court[] in *Ortiz* are not present in this case: this settlement does not involve (1) monetary damages in (2) a Rule 23(b)(1) action where (3) the class will make claims against a 'limited fund.'" *In re Payment Card*, 2024 WL 3236614, at *18. And this Court likewise rejected objectors' attempts to "analogize the varying interests of individual class members (*i.e.*, between small, local merchants and large, national merchants) to the fundamental conflict *between classes*" underlying the Second Circuit's decision in 2016. *In re Payment Card*, 2024 WL 3236614, at *17. The Court should reach the same conclusions now.

*2. The Court Should Not Permit Opt-Outs.*

Objectors assert that the Court has discretion to allow opt-outs from the Rule 23(b)(2) class. NRF & RILA Obj. at 9; Walmart Obj. at 32. However, they fail to address this Court's prior decision "declin[ing] to grant an opt-out right from the Rule 23(b)(2) class," and the reasoning underlying that decision. *DDMB*, 2021 WL 6221326, at *47–49. The concerns the Court previously found to weigh against an opt-out right—including (i) that plaintiffs do not seek monetary relief but rather "equitable relief from the bundle of Restraints that together result in the supracompetitive interchange fees," and (ii) the "[c]oncerns about opt-outs resulting in contradictory equitable relief and disincentivizing settlement"—apply with even more force now.

*Id.* at *48–49. As discussed above, the networks' rules apply equally to all U.S. merchants, and if the settlement is approved, those rules will be revised as to all U.S. merchants. It makes no sense to allow opt-outs to pursue disparate injunctions against uniformly applicable rules. And if merchants *could* individually pursue injunctive relief claims, settlement would not be feasible. It makes no sense for the networks to agree to rules changes for a class of merchants when individual merchants are permitted to seek different or additional changes to those same rules.

In support of their argument, NRF and RILA cite *Onosamba-Ohindo v. Ball*, 184 F.4th 74, 82 (2d Cir. 2026). *See* NRF & RILA Obj. at 9. But in that case, the Second Circuit did not address opt-outs and instead concluded that the lower court abused its discretion when it *decertified* a Rule 23(b)(2) class for declaratory relief. *See Onosamba-Ohindo*, 184 F.4th at 84. Walmart also cites *McReynolds v. Richards-Contave*, 588 F.3d 790, 800 (2d Cir. 2009), and *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1303-05 (2d Cir. 1990). Walmart Obj. at 32. Those cases pre-date the Supreme Court's admonition that Rule 23 "provides no opportunity for (b)(1) or (b)(2) class members to opt out, and does not even oblige the [d]istrict [c]ourt to afford them notice of the action." *Dukes*, 564 U.S. at 361–62.[25]

3. *Certification of a Mandatory Rule 23(b)(2) Class Is Not a Taking.*

Walmart asserts that "ensnaring Walmart in a mandatory (b)(2) class would raise serious Takings Clause concerns," on the theory that the government (*i.e.*, the Court) would be extinguishing Walmart's private legal claim and thus "transfer[ring] ownership of [that] cause of

[25] These cases are also factually distinguishable. In *McReynolds*, the Second Circuit stated that a district court may permit a class member to opt out of a Rule 23(b)(1) or (b)(2) class action, but ruled that the district court had erred in finding that a particular plaintiff who objected to the settlement had actually opted out. 588 F.3d at 800–02. In *County of Suffolk*, the Second Circuit found it was not an abuse of discretion for the district court to allow the County to opt out of a Rule 23(b)(1)(B) limited fund class where the County (unlike the rest of the class) had already litigated its claims to conclusion and won a jury verdict in its favor, and where permitting the opt-out would not harm the class. 907 F.2d at 1302–05.

action to itself." Walmart Obj. at 31. Walmart offers no authority for this novel proposition. And the argument is at odds with the Court's prior decision that "mere membership in a mandatory class" does not "improperly confiscate[] Opponents' claims." *DDMB*, 2021 WL 6221326, at *31.

Walmart points to *Alimanestianu v. United States*, 124 Fed. Cl. 126 (2015), where plaintiffs obtained a billion-dollar judgment against Libya for an act of state-sponsored terror, and, before plaintiffs could collect the judgment, the United States and Libya entered an agreement that terminated the suit. Walmart Obj. at 31–32; *Alimanestianu*, 124 Fed. Cl. at 129. Here, Walmart has no interest in a monetary judgment against the networks that the settlement is taking away—Walmart (like other members of the Rule 23(b)(3) class and opt-outs from that class) already settled and released its claims for money damages against the networks. Its unsupported theory should be rejected.

*4. The Court Does Not Lack Personal Jurisdiction over Class Members.*

Walmart also asserts without authority that opt-outs must be permitted because this Court lacks personal jurisdiction over the members of the Rule 23(b)(2) class. Walmart Obj. at 29. This argument is baseless. "'It is familiar doctrine of the federal courts that members of a class not present as parties to the litigation may be bound by the judgment where they are *in fact adequately represented* by parties who are present' consistent with 'the requirements of due process and full faith and credit.'" *In re Payment Card*, 827 F.3d at 236 (quoting *Hansberry v. Lee*, 311 U.S. 32, 42–43 (1940)). Courts thus routinely allow nationwide class actions to proceed without establishing personal jurisdiction over unnamed class members. *See, e.g.*, *Hines v. Equifax Info. Servs. LLC*, 2024 WL 4132333, at *2–3 (E.D.N.Y. Sept. 10, 2024) (recognizing the "longstanding practice that has permitted nationwide class actions to go forward when specific jurisdiction is proper based on the defendant's in-state contacts with the named plaintiff").

## III. The Amended Settlement Agreement Is Lawful.

### A. The Release Is Limited by the Identical Factual Predicate Doctrine and Limited to the Time Period of the Relief; Further Questions About Its Scope Are Premature.

As they did at preliminary approval and previously, some objectors argue that the proposed settlement release is improperly broad as to the substance it covers and how long it extends, and that it violates public policy. All of these arguments are wrong, and this Court and the Second Circuit have already rejected them. *See Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 714–15, 720 (2d Cir. 2023); *In re Payment Card*, 2024 WL 3236614, at *34; *In re Payment Card*, 2026 WL 1662251, at *13–14. The release is appropriately narrow both because it is limited by the identical factual predicate doctrine, and because it will extend approximately eight years after final approval, no longer than the settlement's substantial rules reforms will be in effect. And a time-limited future release of claims arising from the same course of conduct at issue in the underlying suit does not violate public policy. At preliminary approval, this Court concluded that "[t]his release, which is identical in all material respects to the one from the [2024 settlement], is acceptable for the reasons that the Court previously found." *In re Payment Card*, 2026 WL 1662251, at *13 (citing *In re Payment Card*, 2024 WL 3236614, at *34). Objectors provide no basis to revisit that decision.

#### 1. *The Substantive Scope of the Release Is Proper.*

As they did at preliminary approval (and for prior settlements containing substantively identical releases), objectors again argue that the release purports to "insulate Defendants from any future litigation . . . no matter how distant from the allegations in the complaint." NRF & RILA Obj. at 11; *see also* Circle K & NACS Obj. at 47–48; 978 Merchants Obj. at 3. But the release here is limited by the identical factual predicate doctrine, which will apply in any future disputes

about its scope. The release is thus lawful, and this Court need not and should not resolve its precise contours as part of settlement approval proceedings.

Under the identical factual predicate doctrine, "[c]lass actions may release claims, even if not pled, when such claims arise out of the same factual predicate as settled class claims." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 108 (2d Cir. 2005), *overruled in part on other grounds*, *Moses v. N.Y. Times Co.*, 79 F.4th 235, 243 (2d Cir. 2023). Here, the Amended Settlement provides that its "release shall extend to, but only to, the fullest extent permitted by federal law." Amended Settlement ¶ 116(a). This Court and the Second Circuit approved the identical language in the Rule 23(b)(3) release as comporting with the identical factual predicate doctrine. *Fikes*, 62 F.4th at 714–15, 720; *In re Payment Card*, 2019 WL 6875472, at *22–26.[26]

This Court did the same when finding that the 2024 settlement's release was not overly broad, "because it [was] constrained by the 'identical factual predicate' test" and thus did "not impermissibly cover future violations of the antitrust laws." *In re Payment Card*, 2024 WL 3236614, at *34 (citations omitted). The Court approved this analysis in concluding the release is acceptable at preliminary approval. *In re Payment Card*, 2026 WL 1662251, at *13. And just last month, the Court confirmed that the substantively identical Rule 23(b)(3) release was lawful because it was constrained by the identical factual predicate doctrine, recognizing that the law in this regard is "well established." ECF No. 10022, at 13.

Moreover, in evaluating objections to the release at preliminary approval, this Court noted that a "holding as to the proper scope of the release . . . can await a case in which the issue would directly affect the proceedings." *In re Payment Card*, 2026 WL 1662251, at *14 (quoting *Fikes*,

[26] The doctrine applies in the context of class actions under both Rule 23(b)(2) and Rule 23(b)(3). *See In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070, 1084, 1090–91 (11th Cir. 2023) (applying the identical factual predicate doctrine to a settlement agreement covering both a Rule 23(b)(2) and a Rule 23(b)(3) class).

62 F.4th at 720); *see also In re Payment Card*, 2024 WL 3236614, at *34 (reaching same conclusion about identical release). The Court explained that this approach is "consistent with the fundamental principle that a court does not predetermine the preclusive effect of its own judgment; those questions are left to subsequent proceedings where the judgment is enforced." 2026 WL 1662251, at *14; *see also McAdams v. Robinson*, 26 F.4th 149, 160–61 (4th Cir. 2022) (explaining that predetermining the "outer limit of the release's scope" in response to an objection to a class settlement "would be advisory"). That remains true.

*2. The Release's Time Limitation Is Proper.*

Some objectors again complain that the release extends too far into the future, even though its term is commensurate with the relief provided by the settlement (up to five years after resolution of all appeals from final approval, or eight years after final approval, whichever is longer, Amended Settlement ¶ 116(a)). Walmart Obj. at 16; Circle K & NACS Obj. at 48–49; NRF & RILA Obj. at 10–11. This Court rejected these arguments at preliminary approval and when considering the 2024 settlement, and it should do so again. As this Court explained, the law does not limit "how far into the future claims can be released, as long as the" release is limited by the identical factual predicate doctrine, as it is here. *In re Payment Card*, 2024 WL 3236614, at *33; *see also* ECF No. 10022, at 13 (determining that future releases are proper where limited by the identical factual predicate doctrine).

The limited future release here addresses the Second Circuit's previous concern when it rejected a proposed combined Rule 23(b)(2) and Rule 23(b)(3) class settlement that would have released claims from merchants that accept Visa or Mastercard cards without limitation into the future. *In re Payment Card*, 827 F.3d at 229, 239. It also heeds this Court's direction in 2024 that the class should not include merchants that begin accepting cards only after preliminary approval. *In re Payment Card*, 2024 WL 3236614, at *35; Amended Settlement ¶ 1(ff).

Finally, as they did at preliminary approval, objectors point out that some of the rate relief (the published rate cap and the 10-basis-point average effective rate reduction) lasts for five years, while the other rules changes and the release would be in effect for approximately eight years. *In re Payment Card*, 2026 WL 1662251, at *7; *see* Circle K & NACS Obj. at 49. But, as explained on preliminary approval, these measures are a "backstop" intended to provide immediate relief while the rules changes take effect. Stiglitz Decl. ¶ 123. Additionally, the 125-basis-point cap on standard credit cards (designed to incentivize the use and issuance of standard cards) will last for the entire agreement period and release. Amended Settlement ¶¶ 50, 62, 99, 111. This structure is sensible, and, regardless, not a reason to revisit the Court's prior conclusion that the release is acceptable. *In re Payment Card*, 2026 WL 1662251, at *13.

*3. The Release Does Not Violate Public Policy.*

As before, objectors again argue that the settlement agreement release violates public policy against a prospective waiver of antitrust claims. *See, e.g.*, Walmart Obj. at 14–15; Circle K & NACS Obj. at 47–48; NRF & RILA Obj. at 11; 978 Merchants Obj. at 3. This Court previously rejected these same arguments in 2024, recognizing that settlement releases constrained by the identical factual predicate doctrine are acceptable "where the future claims release[d] are those based on a continuation of conduct at issue and underlying the original claims." *In re Payment Card*, 2024 WL 3236614, at *34. This Court cited that analysis favorably in granting preliminary approval here. *In re Payment Card*, 2026 WL 1662251, at *13. And the Court recently reaffirmed these principles in the context of the Rule 23(b)(3) settlement, concluding that a release of antitrust claims—identical in substance to the one here—extending into the future does not violate public policy where it "releases only claims based on the conduct at issue in the settled class action."

ECF No. 10022, at 15;[27] *see also Wal-Mart Stores, Inc.*, 396 F.3d at 106 ("Broad class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country.").[28]

In reiterating their rejected arguments to the contrary, the objectors erroneously rely on authority addressing contracts prospectively waiving antitrust claims. *See, e.g.*, *In re Am. Express Merchs.' Litig.*, 634 F.3d 187, 189 (2d Cir. 2011) ("[T]he only issue before us is the narrow question of whether the class action waiver provision contained in the contract between the parties should be enforced."); *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 894, 896 & n.27 (3d Cir. 1975) (approving release of unknown antitrust claims that had accrued when contract was signed). These cases, which do not address time-limited releases in class settlement agreements that are subject to the identical factual predicate doctrine, have no applicability here.

---

[27] In contrast, cases suggesting that releases of future claims violate public policy have done so because the releases—unlike here—"released all types of claims, including 'future' entirely unrelated antitrust claims not circumscribed to an identical factual predicate or to claims that arose out of the alleged conduct or related conduct that could have been alleged." *In re Payment Card*, 2019 WL 6875472, at *26. For example, objectors emphasize that in *Lawlor v. National Screen Service Corp.*, 349 U.S. 322 (1955), the Supreme Court suggested that "a partial immunity from civil liability for future violations" would be "consistent with neither the antitrust laws nor the doctrine of res judicata." *Id.* at 329. But the Supreme Court declined to apply res judicata to bar claims based on the conduct there because it was new conduct "all subsequent to the . . . judgment," "which did not even then exist and which could not possibly have been sued upon in the previous case." *Id.* at 328. That is not the case here. *See also* ECF No. 10022, at 15–16 (distinguishing *Lawlor*, including because it concerned "the *res judicata* effect of a judgment, not the legality of a release," and because "the scope of the future release in *Lawlor* was ambiguous").

[28] *See also In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 248 (2d Cir. 2011) (finding objectors' argument that the release impermissibly released future conduct "unavailing," because the released future conduct fell "squarely within the factual predicate underlying [] claims"); *In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th at 1088 (finding that "releases of future claims are an important part of many [antitrust] settlement agreements" and such "releases are commonly approved and enforced in class actions"); *see also id.* at 1089–90 (explaining that while perpetual releases of per se violations might be overly broad, the same concern does not apply in rule of reason cases); *cf. In re Payment Card*, 714 F. Supp. 3d 65, 88–89 (E.D.N.Y. 2024) (finding that the conduct challenged in MDL 1720 is governed by the rule of reason).

### B. The Settlement Agreement Does Not Constitute Price-Fixing.

Some objectors argue that the interchange caps and roll-backs in the Amended Settlement—which will prospectively lower the rates that the Plaintiffs and objectors argue are supracompetitive—together with the required rules reforms constitute "price-fixing" by the networks that is "per se" illegal under the Sherman Act. AELP Obj. at 12–26. According to these objectors, the Amended Settlement "nakedly restrains Visa and Mastercard's autonomy to compete with each other on price and price determining-terms." *Id.* at 16. Similar objections were lodged against the prior settlement in 2024, and the Court did not accept them, instead faulting the settlement for not providing *greater* rate reductions (which this settlement now does). *In re Payment Card*, 2024 WL 3236614, at *24, *28, *41. These objections should again be rejected.

As with the similar objections in 2024, these objectors ignore what the settlement actually provides and its context. Neither the class Plaintiffs nor any other Plaintiffs in this MDL have pursued claims of horizontal collusion between Visa and Mastercard. Rather, they alleged that certain Visa rules and certain Mastercard rules are the respective products of two separate alleged conspiracies among Visa and its banks, and separately among Mastercard and its banks. ECF No. 6892, Compl. ¶¶ 365, 374, 378, 387. Visa and Mastercard each settled with the Plaintiffs because they named both networks as defendants in the same lawsuit. The Amended Settlement resolves the allegations against each of Visa and Mastercard and does not involve any agreement by Visa and Mastercard not to compete. Nor can any objector point to a shred of evidence in the MDL record or anywhere suggesting that Visa and Mastercard do anything other than compete for market share, customers (including issuers, merchants, governments, etc.), and cardholders.

The Supreme Court has held that even a settlement agreement that resolves a lawsuit between two competitors by stipulating that one company will not compete with the other is not subject to per se illegality, but rather the rule of reason. *FTC v. Actavis, Inc.*, 570 U.S. 136, 159

(2013). There can be no credible argument that the settlement here, which involves no similar agreement among competitors not to compete, is per se illegal. Indeed, even the objectors that challenge the rate reductions as supposed price-fixing also argue that the rate reductions do not go deep enough, AELP Obj. at 48–49—suggesting that they take issue not with the form of the relief, but the extent of it (even though rate relief is not even obtainable at trial).

Further, the Second Circuit has declined to find that class settlements constitute per se violations of Section 1 of the Sherman Act where the conduct permitted by the settlement was not clearly illegal under existing precedent. In *Robertson v. NBA*, 556 F.2d 682 (2d Cir. 1977), a putative antitrust class action challenging NBA rules, the Second Circuit affirmed approval of a settlement over objections that it "perpetuates for ten years two 'classic group boycotts,'" including through a future rule change. *Id.* at 686 & nn.3–4. The Second Circuit determined that because "[t]he challenged practices have not been held to be illegal per se in any previously decided case," and because the settlement required a variety of NBA rule changes, "the settlement authorizes no future conduct that is clearly illegal." *Id.* at 686.[29]

The same is true here: nothing about this settlement sanctions "clearly illegal" conduct. The proposed settlement would reduce currently applicable interchanges rates and require both networks to reform rules that merchants have long challenged; competition continues on from there. Each network must unilaterally comply with the proposed settlement injunction. The Average Effective Rate Limit provision requires an Independent Auditor to evaluate each

[29] *See also, e.g.*, *Calibuso v. Bank of Am. Corp.*, 299 F.R.D. 359, 372 (E.D.N.Y. 2014) (approving class settlement in gender discrimination action where objector at most raised "an issue that could have been litigated at trial" but did not show that any policy reinforced or adopted in the settlement was illegal to "a 'legal certainty'"); *Handschu v. Special Servs. Div.*, 605 F. Supp. 1384, 1405 (S.D.N.Y. 1985) (approving class settlement of claims that police department violated constitutional rights where guidelines to be adopted under the settlement did not authorize "clearly illegal" conduct), *aff'd*, 787 F.2d 828 (2d Cir. 1986).

network's data separately, determine the overall interchange rate that each network will need to meet by managing its interchange rates unilaterally, assess compliance, and present findings to the Court. Amended Settlement ¶¶ 48(d)–(f), 52–53, 97(d)–(f), 100–02. The posted interchange rate caps and roll-backs likewise require each network not to increase its existing unilaterally set posted rates for five years and to reduce its existing unilaterally set posted rates for standard cards for the duration of the release, with the Independent Auditor again assessing compliance and presenting findings to the Court. *See id.* ¶¶ 50–52, 99–101.

Beyond reducing the level of interchange rates compared to current levels, the settlement allows continuing inter-network competition over those rates—and in response to any actions taken by merchants in response to the rules changes. Each network is free to reduce interchange rates below the capped levels by implementing its average effective interchange rate and posted interchange rates at levels that are lower than the caps set forth in the settlement agreement. *See id.* ¶¶ 48(c), 50–51, 97(c), 99–100. The networks also will continue to compete against each other (and other payment methods) for particular merchant categories and particular payment products by reducing rates for those categories and products. In other words, the networks remain free to compete with each other and other networks to lower interchange rates to merchants even more than required by the settlement. On the issuer side, each network remains free to continue to compete against each other and other networks for particular issuers, but each network must comply with its overall reduced average effective interchange rate and posted interchange rate requirements. Competition on both sides of the market therefore remains firmly in place.

Courts have previously evaluated and taken no issue with the types of interchange rate reductions included in the Amended Settlement. In this litigation, Judge Gleeson approved funding the 2012 class settlement in part with prospective, 10-basis-point reductions in both Visa

and Mastercard credit interchange for eight months—an aspect of the settlement with which the Second Circuit did not find fault on appeal. *See In re Payment Card*, 986 F. Supp. 2d 207, 241 (E.D.N.Y. 2013); ECF No. 1656-1, ¶¶ 11–13. And, as noted, the Court took no issue with the prior interchange rate caps and roll-backs (other than their levels) in considering the 2024 settlement. *See In re Payment Card*, 2024 WL 3236614, at *28, *41. Additionally, in earlier class actions brought by merchants against both networks, Judge Gleeson approved merchant class settlements in which Visa and Mastercard both agreed to reduce debit interchange rates by roughly one-third for five months. *See In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 507–08 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005). When a bank moved to intervene to challenge Visa's interim debit rate reduction, the Court denied the motion and explained that "a reduction in the interchange fees on debit cards during this interim period" was appropriate to allow merchants to "prepare for the newly competitive environment." June 12, 2003 Order at 1, *In re Visa Check*, No. 96-cv-05238 (E.D.N.Y.), ECF No. 804 (docketed June 17, 2003).

This Court's role in reviewing the class settlement, resolving objections, and holding a hearing to determine that the overall package of relief is fair, reasonable, and adequate—and then, if approved, monitoring the relief thereafter—further confirms that the agreement is not "clearly illegal." While Defendants do not take the position that all court-reviewed settlements are immune from antitrust challenge, the level of involvement by the Court here constitutes the type of government action that should trigger *Noerr-Pennington* protection from the types of antitrust challenges that the objectors seek to raise. *See Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 818 (D.C. Cir. 2001) (assessing *Noerr-Pennington* argument and noting that "[i]f anticompetitive harm is caused by the decision of a court, even though granted at the request of a

private party, no private restraint of trade occurs because the intervening government action breaks the causal chain").

**CONCLUSION**

For all of the reasons Defendants provided in their preliminary approval papers and at the preliminary approval hearing, those set forth in the Court's June 9, 2026 decision, and those shown in the Defendants' opening filings on final approval, herein, and in Defendants' accompanying papers, Defendants respectfully request that the Court grant final approval to the Amended Settlement.

Dated: October 14, 2026

Respectfully submitted,

**ARNOLD & PORTER KAYE SCHOLER LLP**

By: *<u>/s/ Matthew A. Eisenstein</u>*
Anne P. Davis
Matthew A. Eisenstein
Rosemary Szanyi
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
(202) 942-5000
anne.davis@arnoldporter.com
matthew.eisenstein@arnoldporter.com
rosemary.szanyi@arnoldporter.com

**HOLWELL SHUSTER & GOLDBERG LLP**

Michael S. Shuster
Demian A. Ordway
Benjamin F. Heidlage
Jayme Jonat
425 Lexington Avenue
New York, NY 10017
(646) 837-5151
mshuster@hsgllp.com
dordway@hsgllp.com
bheidlage@hsgllp.com
jjonat@hsgllp.com

*Counsel for Defendants Visa Inc., Visa U.S.A. Inc., and Visa International Service Association*

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By: *<u>/s/ William B. Michael</u>*
William B. Michael
Brette Tannenbaum
Nina Kovalenko
Crystal Parker
1285 Avenue of the Americas
New York, NY 10019-6064
Tel.: (212) 373-3000
Fax: (212) 757-3990

wmichael@paulweiss.com
btannenbaum@paulweiss.com
nkovalenko@paulweiss.com
cparker@paulweiss.com

Paul D. Brachman
Donna M. Ioffredo
Lisa M. Danzig
2001 K Street, NW
Washington, DC 20006-1047
Tel.: (202) 223-7300
Fax: (202) 223-7420
pbrachman@paulweiss.com
dioffredo@paulweiss.com
ldanzig@paulweiss.com

*Counsel for Defendants Mastercard Incorporated and Mastercard International Incorporated*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), and the Court's October 13, 2026 Minute Order granting Defendants leave to file a single responsive brief not to exceed 17,000 words, I hereby certify that the foregoing memorandum is 15,724 words, exclusive of the caption page, table of contents, table of authorities, and signature block. The basis of my knowledge is the word count feature of the word-processing system used to prepare this memorandum.

Dated: October 14, 2026

*/s/ Matthew A. Eisenstein*

Matthew A. Eisenstein