**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION

MDL No. 1720

Docket No. 05-md-01720 (BMC-JAM)

This Document Relates To:

BARRY'S CUT RATE STORES INC.; DDMB, INC. d/b/a EMPORIUM ARCADE BAR; DDMB 2, LLC d/b/a EMPORIUM LOGAN SQUARE; BOSS DENTAL CARE; RUNCENTRAL, LLC; CMP CONSULTING SERV., INC.; TOWN KITCHEN, LLC d/b/a TOWN KITCHEN & BAR; GENERIC DEPOT 3, INC. d/b/a PRESCRIPTION DEPOT; and PUREONE, LLC d/b/a SALON PURE,

Plaintiffs,

v.

VISA, INC.; MASTERCARD INCORPORATED; MASTERCARD INTERNATIONAL INCORPORATED; BANK OF AMERICA, N.A.; BA MERCHANT SERVICES LLC (f/k/a DEFENDANT NATIONAL PROCESSING, INC.); BANK OF AMERICA CORPORATION; BARCLAYS BANK PLC; BARCLAYS BANK DELAWARE; BARCLAYS FINANCIAL CORP.; CAPITAL ONE BANK, (USA), N.A.; CAPITAL ONE F.S.B.; CAPITAL ONE FINANCIAL CORPORATION; CHASE BANK USA, N.A.; CHASE MANHATTAN BANK USA, N.A.; CHASE PAYMENTECH SOLUTIONS, LLC; JPMORGAN CHASE BANK, N.A.; JPMORGAN CHASE & CO.; CITIBANK (SOUTH DAKOTA), N.A.; CITIBANK N.A.; CITIGROUP, INC.; CITICORP; and WELLS FARGO & COMPANY,

Defendants.

**EQUITABLE RELIEF CLASS PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR FINAL APPROVAL OF AMENDED SETTLEMENT AGREEMENT**

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
FILED UNDER SEAL

## TABLE OF CONTENTS


**Page**

INTRODUCTION ... 1
ARGUMENT ... 3
I. THE HONOR-ALL-CARDS RELIEF IS ADEQUATE AND EFFECTIVE. ... 3
  A. Merchants Can Effectively Decline Commercial Cards. ... 3
  B. Merchants Can Effectively Decline Digital Wallets. ... 6
  C. Merchants Can Effectively Decline Premium Cards. ... 7
II. THE SURCHARGING RELIEF IS ADEQUATE AND EFFECTIVE. ... 12
  A. The Amended Settlement Makes Surcharging Viable and Effective. ... 12
  B. The Amended Settlement Prevents the Networks from Punishing Merchants that Surcharge. ... 17
III. DISCOUNTING AND OTHER ISSUER-LEVEL RELIEF IS ADEQUATE AND EFFECTIVE. ... 18
  A. Issuer-Level Discounting Is Adequate and Effective. ... 18
  B. The Amended Settlement Provides Other Powerful Tools to Generate Issuer Competition. ... 20
IV. THE RATE RELIEF IS ADEQUATE AND IS NOT DAMAGES. ... 21
  A. The Rate Relief Will Ease the Transition to a More Competitive Market. ... 21
  B. Defendants Cannot Undermine the New Standard Cards by Re-Classifying Them. ... 22
  C. The Rate Relief Is Not Impermissible Monetary Relief. ... 24
  D. The Rate Caps and Rollbacks Are Not Illegal Price Fixing. ... 25
  E. The Average Effective Rate Limits Are Not Illegal Price-Fixing. ... 31
V. AN APPROVABLE SETTLEMENT DOES NOT REQUIRE ADDITIONAL RELIEF. ... 32
  A. An Approvable Settlement Does Not Require Issuer-Level Non-Acceptance. ... 32
  B. An Approvable Settlement Does Not Require Additional Relief. ... 34
    1. Default Interchange ... 34
VI. THE NETWORKS CANNOT UNDERMINE THE SETTLEMENT BY RAISING NETWORK FEES. ... 36
VII. THE RULE 23 (e) AND *GRINNELL* FACTORS CONFIRM THAT THE COURT SHOULD GRANT FINAL APPROVAL. ... 38
  A. The Costs, Risks, and Delay of Trial and Appeal ... 38
    1. The Complexity, Expense, and Likely Duration of the Litigation ... 38

2. The Risks of Establishing Liability ........ 38
3. The Risks of Maintaining the Class Through Trial ........ 39
4. The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and All the Attendant Risks of Litigation ........ 39
B. Effectiveness of Distributing Relief to the Class ........ 41
C. Release from Liability ........ 41
1. The Release Is Appropriately Time-Limited. ........ 42
2. The Release Reaches Only to the Extent Permitted by the Identical-Factual-Predicate Standard. ........ 43
3. The Release Appropriately Extends to Claims Against Defendants' Coconspirators. . 47
D. Equitable Treatment of Class Members Relative to Each Other ........ 49
E. Ability of Defendants to Withstand a Greater Judgment ........ 52
F. The Terms of Any Proposed Award of Attorneys' Fees ........ 52
G. The Class's Reaction ........ 53
VIII. CLASS CERTIFICATION POSED NO CONSTITUTIONAL PROBLEMS ........ 61
A. The Court Properly Certified a Non-Opt-Out Class. ........ 61
B. Due Process Does Not Require Opt-Out Rights, Because the Settlement Provides No Damages. ........ 63
C. Neither the Absence of Objectors' Preferred Relief Nor the Purported Failure to Consult with the Objectors Raises a Due Process Problem. ........ 65
D. The Takings Clause Does Not Require an Opt-Out Right. ........ 67
E. The Class Need Not Establish Personal Jurisdiction Over Absent Class Members. ........ 68
CONCLUSION ........ 69

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ace Arts, LLC v. Sony/ATV Music Pub., LLC*,
56 F. Supp. 3d 436 (S.D.N.Y. 2014)....29

*In re Agent Orange Prod. Liab. Litig.*,
818 F.2d 145 (2d Cir. 1987)....69

*In re Agent Orange Prod. Liab. Litig.*,
996 F.2d 1425 (2d Cir. 1993)....69

*Alimanestianu v. United States*,
124 Fed. Cl. 126 (Fed. Cl. 2015)....68

*Allen v. McCurry*,
449 U.S. 90 (1980)....39

*In re Am. Express Merchs. Litig.*,
634 F.3d 187 (2d Circ. 2011)....46

*Amara v. CIGNA Corp.*,
775 F.3d 510 (2d Cir. 2014)....51

*Arizona v. Maricopa Cnty Med. Soc'y*,
457 U.S. 332 (1982)....30

*Armstrong v. Bd. of Sch. Directors of City of Milwaukee*,
616 F.2d 305 (7th Cir. 1980)....27

*Authors Guild v. Google, Inc.*,
770 F. Supp. 2d 666 (S.D.N.Y. 2011)....28, 54

*Avagliano v. Sumitomo Shoji Am., Inc.*,
107 F.R.D. 748 (S.D.N.Y. 1985)....69

*In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*,
909 F. Supp. 2d 259 (S.D.N.Y. 2012)....60

*Bennett v. Behring Corp.*,
737 F.2d 982 (11th Cir. 1984)....27

*Bennett v. Behring Corp.*,
96 F.R.D. 343 (S.D. Fla. 1982)....54

*Berni v. Barilla S.p.A.*,
964 F.3d 141 (2d Cir. 2020)....24, 50

*Bldg. & Realty Inst. of Westchester & Putnam Cntys., Inc. v. New York*,
2020 WL 5667181 (S.D.N.Y. Sept. 23, 2020)....65

*In re Blue Cross Blue Shield Antitrust Litig.*,
85 F.4th 1070 (11th Cir. 2023)....45

*Bowen v. Pub. Agencies Opposed to Social Sec. Entrapment*,
477 U.S. 41 (1986)....67

*Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*,
441 U.S. 1 (1979)....28

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)....29

*Bryan v. Pittsburgh Plate Glass Co.*,
494 F.2d 799 (3d Cir. 1974)....54

*Calibuso v. Bank of America Corp.*,
299 F.R.D. 359 (E.D.N.Y. 2014)....27

*Charron v. Pinnacle Group N.Y. LLC*,
874 F. Supp. 2d 179 (S.D.N.Y. 2012)....55, 60

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984)....30

*Cotton v. Hinton*,
559 F.2d 1326 (5th Cir. 1977)....54

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001)....56

*DDMB, Inc. v. Visa, Inc.*,
2021 WL 6221326 (E.D.N.Y. Sept. 27, 2021).... *passim*

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
62 F.4th 704 (2d Cir. 2023)....42, 44, 45, 48

*Fox Midwest Theatres v. Means*,
221 F.2d 173 (8th Cir. 1955)....46

*Franks v. Bowman Transp. Co.*,
424 U.S. 747 (1976)....25

*FTC v. Actavis, Inc.*,
570 U.S. 136 (2013)....28

*Gao v. Holder*,
595 F.3d 549 (4th Cir. 2010) ....26

*Geier v. Alexander*,
801 F.2d 799 (6th Cir. 1986) ....15

*Grant v. Bethlehem Steel Corp.*,
823 F.2d 20 (2d Cir. 1987)....55

*Grunin v. Int'l House of Pancakes*,
513 F.2d 114 (8th Cir. 1975) ....27

*Haar v. Allen*,
687 F. App'x 93 (2d Cir. 2017) ....62

*Handschu v. Special Servs. Div.*,
605 F. Supp. 1384 (S.D.N.Y. 1985)....27, 29

*Hecht v. United Collection Bureau, Inc.*,
691 F.3d 218 (2d Cir. 2012)....64

*Hukui Tech, Inc. v. Intelligent Sols., LLC*,
2025 WL 3500725 (N.D. Cal. Sept. 10, 2025) ....26

*Int'l Union v. Ford Motor Co.*,
2006 WL 1984363 (E.D. Mich. July 13, 2006) ....69

*In re Ivan F. Boesky Sec. Litig.*,
948 F.2d 1358 (2d Cir. 1991)....15

*Jermyn v. Best Buy Stores, L.P.*,
256 F.R.D. 418 (S.D.N.Y. 2009) ....25

*In re Joint E. & S. Dist. Asbestos Litig.*,
78 F.3d 764 (2d Cir. 1996)....64, 69

*Kaufman v. Am. Exp. Travel Related Servs., Inc.*,
283 F.R.D. 404 (N.D. Ill. 2012)....57

*Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*,
340 U.S. 211 (1951)....30

*Lawlor v. National Screen Service Corp.*,
349 U.S. 322 (1955)....45, 46

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007)....................30

*In re LinkedIn User Privacy Litig.*,
309 F.R.D. 573 (N.D. Cal. 2015)....................55

*In re Literary Works in Elec. Databases Copyright Litig.*,
654 F.3d 242 (2d Cir. 2011)....................44

*Marble v. Halo Innovations, Inc.*,
2025 WL 3273813 (S.D.N.Y. Oct. 14, 2025)....................44

*Marisol A. v. Giuliani*,
185 F.R.D. 152 (S.D.N.Y. 1999)....................56

*Matsushita Elec. Indus. Co., Ltd. v. Epstein*,
516 U.S. 367 (1996)....................63

*Maywalt v. Parker & Parsley Petroleum Co.*,
864 F. Supp. 1422 (S.D.N.Y. 1994)....................54

*McLaughlin v. IDT Energy*,
2018 WL 3642627 (E.D.N.Y. July 30, 2018)....................57

*Med. Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Conn., Inc.*,
675 F.2d 502 (2d Cir. 1982)....................28

*Melito v. Experian Mktg. Sols.*,
923 F.3d 85 (2d Cir. 2019)....................44

*Meredith Corp. v. SESAC LLC*,
1 F. Supp. 3d 180 (S.D.N.Y. 2014)....................29

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985)....................46

*Monahan v. New York City Dept. of Corrections*,
214 F.3d 275 (2d Cir. 2000)....................39

*Moses v. N.Y. Times Co.*,
79 F.4th 235 (2d Cir. 2023)....................49, 50

*In re NASDAQ Market-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998)....................55

*NCAA v. Alston*,
594 U.S. 69 (2021)....................30

*In re NFL Players Concussion Inj. Litig.*,
821 F.3d 410 (3d Cir. 2016)....62

*Ohio v. American Express Co.*,
585 U.S. 529 (2018)....6

*Orellana v. Cnty. of Suffolk*,
2026 WL 2031336 (E.D.N.Y. June 24, 2026)....61

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999)....63

*In re Patriot Nat'l, Inc. Sec. Litig.*,
828 F. App’x 760 (2d Cir. 2020)....56

*In re Payment Card*,
827 F.3d at 239....32, 43, 51, 68

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2019 WL 6888488 (E.D.N.Y. Dec. 16, 2019),....53

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2026 WL 1662251 (E.D.N.Y. June 9, 2026).... *passim*

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
986 F. Supp. 2d 207 (E.D.N.Y. 2013)....28, 63

*In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*,
2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019)....45, 54, 56

*In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*,
2024 WL 3236614 (E.D.N.Y. June 28, 2024).... *passim*

*Pella Corp. v. Saltzman*,
606 F.3d 391 (7th Cir. 2010)....25

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985)....63, 64

*In re Republic Airways Holdings Inc.*,
2016 WL 2616717 (Bankr. S.D.N.Y. May 4, 2016)....28

*Reyn’s Pasta Bella, LLC v. Visa USA, Inc.*,
442 F.3d 741 (9th Cir. 2006)....47

*Robertson v. Nat’l Basketball Ass’n*,
556 F.2d 682 (2d Cir. 1977)....27, 29

*State Oil Co. v. Khan*,
522 U.S. 3 (1997)....................30

*Swinton v. SquareTrade, Inc.*,
454 F. Supp. 3d 848 (S.D. Iowa 2020)....................54

*Sykes v. Mel S. Harris & Assocs. LLC*,
780 F.3d 70 (2d Cir. 2015)....................50, 51, 62

*TBK Partners, Ltd. v. Western Union Corp.*,
675 F.2d 456 (2d Cir. 1982)....................54, 55

*Thompson v. Metro. Life Ins. Co.*,
216 F.R.D. 55 (S.D.N.Y. 2003)....................62

*Three Rivers Motors Co. v. Ford Motor Co.*,
522 F.2d 885 (3d Cir. 1975)....................46

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
718 F. Supp. 1099 (S.D.N.Y. 1989)....................1, 8, 60

*United States v. Am. Exp. Co.*,
2011 WL 2974094 (E.D.N.Y. July 20, 2011)....................28

*United States v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015)....................30

*United States v. Brewbaker*,
87 F.4th 563 (4th Cir. 2023)....................29

*United States v. City of New York*,
308 F.R.D. 53 (E.D.N.Y. 2015)....................61

*United States v. Google, LLC*,
2026 WL 2754741 (E.D. Va. Sept. 2, 2026)....................2, 40

*United States v. Google LLC*,
803 F. Supp. 3d 18 (D.D.C. 2025)....................40

*United States v. Visa USA Inc.*,
163 F. Supp. 2d 322 (S.D.N.Y. 2001)....................6

*Van Gemert v. Boeing Co.*,
590 F.2d 433 (2d Cir. 1978)....................62

*In re Visa Check/MasterMoney Antitrust Litig.*,
2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003)....................6

*In re Visa Check/Mastermoney Antitrust Litig.*,
297 F. Supp. 2d 503 (E.D.N.Y. 2003) ....................28, 53

*Vogel v. Amer. Soc'y of Appraisers*,
744 F.2d 598 (7th Cir. 1984) ....................30, 31

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011).................... *passim*

*White v. National Football League*,
822 F. Supp. 1389 (D. Minn. 1993)....................27

*Yan Won Liao v. Holder*,
691 F. Supp. 2d 344 (E.D.N.Y. 2010) ....................63

**Other Authorities**

Adam J. Levitin, *Priceless? The Economic Costs of Credit Card Merchant Restraints*, 55 UCLA L. Rev. 1321, 1354, 1391 (2008)....................4

Adam J. Levitin, *Priceless? The Social Costs of Credit Card Merchant Restraints*....................4

## INTRODUCTION

In granting preliminary approval, the Court started with two observations. The Court would have the opportunity to see the Class's reaction to the settlement. And, regardless of the reaction, the Court would itself evaluate the settlement's merits. Both considerations now overwhelmingly confirm the Court's preliminary decision to approve this settlement.

Fewer than *8 hundredths of one percent* of Class members objected to the Amended Settlement. That overwhelmingly positive response comes despite a vigorous online effort by certain trade associations to solicit objections—to add their names to a boilerplate objection, all merchants had to do was click a button.

The reaction by the most knowledgeable and engaged Class members is particularly telling. Some 156 large, national chain stores filed individual damages cases in MDL 1720. Although the great majority of those 156 objected to one or both of the 2013 and 2024 proposed settlements, only *four* objected to the Amended Settlement.

The substance of the Objections only reinforces the Court's preliminary decision to approve the settlement. The few Objections regarding the ability to decline Commercial Cards assert that merchants cannot practically decline them because Consumer credit cards are not substitutable for Commercial Cards. But the same Objectors' own damages complaints alleged, and their expert economist correctly insisted—as did all other plaintiffs' economists in MDL 1720—that Commercial cards and Consumer cards *are* substitutable.

The Objections to a merchant's ability to decline Premium Cards are also meritless. Objectors assert that merchants cannot realistically decline Premium cards because they are allegedly 90% of credit card transactions. That observation fails to account for, among other things, the Commercial Card transaction volume. The Amended Settlement defines Premium Cards to include only certain types of *consumer* credit cards. When Objectors' calculations are corrected to

back out Commercial Cards, the reality is exactly what the Class previously advised the Court: Visa Premium volume is greater than [redacted] volume (but not dramatically so), and Mastercard's Premium volume is less than [redacted] and comparable to that of the other big issuers.

Other Objections offer little that is new. Objections about technological difficulties in *declining* Premium or Commercial cards are simply wrong—there are no technical challenges at all. The complaints as to *surcharging* those cards are vastly overstated. More generally, what the Objectors call "friction" is inherent in using the price system that antitrust law promotes. And the Objections consistently fail to show that the ability to decline cards by issuer—the Objectors' preferred remedy—would entail any less friction or fewer implementation challenges than declining Premium or Commercial cards, surcharging, or discounting.

As before, the Objectors fail to confront the reality of litigation risk, including the risk of failing to get the requested additional relief even assuming a win on liability. Just since preliminary approval, a court in yet another major antitrust litigation refused to grant certain requested relief on the ground that this Court previewed—it was not going to start with a meat cleaver.[1]

As to decertifying the class or permitting opt-outs, the Objectors for the fourth time try to alchemize disagreements about litigation or negotiation strategy into intra-class conflicts. The Court should reject those attempts again. Likewise, the Objections to the release.

This settlement delivers nearly every bit of major reform that the Class set out to get. A microscopic sliver of Class members nevertheless demands that the Class put at risk all this relief—the ability to decline Premium and/or Commercial cards; to decline high-cost digital wallets; to surcharge regardless of whether the merchant accepts or surcharges AmEx; to discount by issuer; to differentiate by issuer in important commercial contexts; to steer customers to the

---

[1] *United States v. Google, LLC*, 2026 WL 2754741 (E.D. Va. Sept. 2, 2026).

new low-cost Standard card; to get start-up relief in rate caps and rollbacks—for the chance to also get the ability to decline cards based on the issuing bank.

The Class's eminent economists conclude that the additional relief would be marginal at best. Neither the Department of Justice nor any regulator anywhere in the world has required the elimination of honor-all-issuers rules. At trial, the networks would produce evidence that the rules exist in every four-party network in the world, for credit cards and debit cards, and regardless of whether the network has market power. Putting the Amended Settlement's substantial reforms at risk in an attempt to get additional issuer-level relief would be foolhardy. The Court should not require the Class to incur that risk at the insistence of a tiny minority of Objectors.

The following Reply first addresses the objections' substance and then applies the Rule 23(e) and *Grinnell* factors. This Amended Settlement warrants final approval, and the Court should grant it.

## ARGUMENT

### I. THE HONOR-ALL-CARDS RELIEF IS ADEQUATE AND EFFECTIVE.

#### A. Merchants Can Effectively Decline Commercial Cards.

Merchants and their economists testified[2] that they want the ability to decline the highest-cost cards—Commercial cards and Premium cards.[3] Objector Circle K's own Lawyer/Declarant,

[2] The Class incorporates herein by reference all the materials it submitted in support of preliminary approval.

[3] *See* Equitable Relief Class Plaintiffs' Reply Memo of Law In Support of Motion for Preliminary Approval of Amended Settlement Agreement ("Class PA Reply"), ECF 9774, at 14 & nn. 11-13. Even Circle K's current Objection admits that the problem that merchants face is [redacted] *See* National Association of Convenience Stores' and Circle K's Objection to Approval of Settlement ("Circle K Obj."), ECF 10002, at 14 (quoting Expert Report of Professor Jerry Hausman (Oct. 5, 2018) ("Hausman Rep.")), ECF 9774-10, ¶ 176) (emphasis added). The National Retail Federation and the Retail Industry Leaders Association (collectively, "NRF")

Mr. Levitin, previously wrote that "merchants want to differentiate between high-priced cards (rewards and corporate) and regular-priced cards (non-rewards consumer cards)."[4]

With respect to the Honor-All-*Products* relief, almost all Objectors limit their concerns to the relief regarding Premium cards. They do not deny that the relief is practical and effective with respect to Commercial cards.

Objectors are right that declining Commercial cards is viable. Merchants' transaction volume on Commercial cards is less than or comparable to the volume on particular issuers' cards, so merchants can decline the former as readily as the latter:

| Type of Payment | % Transaction Volume* |
|---|---|
| | |
| Chase Credit Cards | [redacted]% |
| Visa Commercial | [redacted]% |
| Citibank Credit Cards | [redacted]% |
| CapitalOne Credit Cards | [redacted]% |
| Bank of Am. Credit Cards | [redacted]% |
| Mastercard Commercial | [redacted]% |
| | |

*Average percentage of merchants' total dollar transaction volume (including all payment mechanisms). Each bank's "credit card" volume is its combined volume of Visa and Mastercard credit cards. Source: Stiglitz Reply Dec., Table 1.

---

admit that "merchant choice to refuse *cards with the highest rates* would naturally create real competitive pressure on interchange rates, because all credit cards want to be 'front of wallet,' i.e., the card a customer reaches for first." NRF Obj., ECF 9999, at 14 (emphasis added). Food Marketplace Inc. dba the Food Industry Association ("FMI") demands reforms that enhance merchants' ability to "negotiate *with Visa and Mastercard* on terms, conditions, and fees associated with accepting credit cards." FMI Obj., ECF 9980, at 5 (emphasis added).

[4] Adam J. Levitin, *Priceless? The Economic Costs of Credit Card Merchant Restraints*, 55 UCLA L. Rev. 1321, 1354, 1391 (2008); *see also* Adam J. Levitin, *Priceless? The Social Costs of Credit Card Merchant Restraints*, 45 Harv. J. Legis. 1, 23 (2008) (merchants' discriminating among high-cost and low-cost cards within the same network would "create substantial market pressure on card issuers to stop issuing high interchange fee cards").

The Amended Settlement's Commercial-card relief is substantial. Commercial cards comprise [redacted] of merchants' Visa transaction volume, and [redacted] of the Mastercard volume.[5] They also have the highest interchange rates. On average, Visa's posted Commercial card rates ([redacted] bps) are [redacted] bps higher than even some of its Premium cards, and [redacted] bps higher than the mandated [redacted]-bps rate for the new Standard cards.[6] Mastercard's posted Commercial card rates ([redacted] bps) are [redacted] bps higher than even some of its Premium cards, and [redacted] bps higher than the mandated 125-bps rate for the new Standard cards.[7]

Circle K asserts that this reform is "illusory" for convenience stores because they have "disproportionate" consumer-card transactions compared to the systemwide average.[8] They cannot deny, however, that between in-store sales and fuel sales—the stores' "two lines of revenue"—they have a substantial volume of Commercial card transactions.[9]

Two Objections take the outlier position that, regardless of transaction volume, rejecting Commercial credit cards is not feasible because they are not substitutes for Consumer credit cards.[10] Yet Circle K's own complaint in MDL 1720 expressly alleges that the two types of cards *are* substitutable, *i.e.*, in the same relevant antitrust market,[11] and its expert economist so

---

[5] Declaration of Joseph E. Stiglitz, Ph.D. and Keith B. Leffler, Ph.D. ("Stiglitz Nov. 2025 Dec."), ECF 9692-5, at ¶ 48 & Table 1.

[6] *Id.*

[7] *Id.*

[8] Circle K Obj. at 31.

[9] *See* Rebuttal Declaration of Joseph E. Stiglitz, Ph.D. and Keith B. Leffler, Ph.D. (Jan. 14, 2026) ("Stiglitz Jan. 2026 Dec."), ECF 9774-3, at ¶ 19 n.34.

[10] Circle K Obj. at 31, citing Declaration of Professor Adam J. Levitin ("Levitin Dec."), ECF 10003, at ¶¶ 53, 59; NRF Obj. at 15.

[11] *See* 7-Eleven, Inc. et al v. Visa Inc. et al, 1:13-cv-05746-MKB-JO, ECF 1, at ¶¶ 13(e), 168; *see also id.* at ¶ 169 (the scope of this market "ha[s] been confirmed by economic analysis of cross-elasticity of demand"). Circle K and NACS refer to themselves as "Plaintiffs" and hypothesize how the "Plaintiffs" will conduct the trial, etc. So far as the Class is aware, neither entity is

testified.[12] So did every other economist in MDL 1720 who opined on market definition.[13] That means that just a 5% decrease in the price of Commercial cards would drive transactions to Consumer cards, and vice-versa.[14] Indeed, "[b]lending business and personal credit is common: 54% of [small and medium size businesses] say they use both personal and business cards to finance operational expenses, with that figure jumping to 61% in large cities."[15]

### B. Merchants Can Effectively Decline Digital Wallets.

The Amended Settlement also permits merchants to decline digital wallets, including any network-sponsored wallets, that contain a network credit card or debit card. No Objector asserts

currently a plaintiff in any case in MDL 1720. Circle K and NACS were plaintiffs in No. 1:13-cv-05746-MKB-JO, but they settled their case earlier this year. Both entities are absent Class members.

[12] Reply Declaration of Steve D. Shadowen In Support of Equitable Relief Class Plaintiffs' Reply Memorandum of Law In Support of Motion for Final Approval of Amended Settlement Agreement ("Shadowen Dec.") (submitted herewith), Ex. 10, Hausman Rep. ¶¶ 145-149.

[13] *See, e.g.*, Shadowen Dec., Ex. 6, Expert Report of Dennis W. Carlton (Oct. 4, 2018) ("Carlton Rep."), at ¶ 132; *id.*, Ex. 7, Expert Report of Joseph E. Stiglitz (Oct. 5, 2018) ("Stiglitz Rep."), at ¶¶ 64-72; *id.*, Ex. 8, Expert Report of Dr. Robert G. Harris (Oct. 5, 2018) ("Harris Rep."), at ¶¶ 108-111, 445; *id.*, Ex. 11, Expert Report of Roy J. Epstein, Ph.D. (Oct. 5, 2018) ("Epstein Rep."), at ¶¶ 83-84. The courts have routinely accepted the proposition that consumer credit cards and commercial credit cards are in the same relevant market. *See, e.g., Ohio v. American Express Co.*, 585 U.S. 529, 547 (2018); *United States v. Visa USA Inc.*, 163 F. Supp. 2d 322, 335 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003); *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003).

[14] *See, e.g.*, Stiglitz Rep. ¶ 65; Epstein Rep. ¶ 83; Harris Rep. ¶ 531.

[15] https://www.businesswire.com/news/home/20250731162461/en/New-Report-Reveals-SMBs-Rely-on-Both-Business-and-Personal-Credit-Cards-to-Bankroll-Operations; *see also* https://www.prnewswire.com/news-releases/navcom-data-reveals-small-business-owners-use-twice-as-many-credit-cards-as-consumers-300654228.html ("On average, small business owners use twice as many personal credit cards than consumers, according to new data from Nav."); *see* Shadowen Dec., Ex. 1, Declaration of Joseph E. Stiglitz, Ph.D. and Keith B. Leffler, Ph.D. (Oct. 13, 2026) ("Stiglitz Oct. 2026 Dec.") ¶ 35.

that this reform is impractical or without substantial value. Nor could they—in 2025, digital wallets accounted for 40% of U.S. online spending and 17% of in-store spending.[16]

Circle K's expert Mr. Levitin acknowledges that the Honor-All-Wallets reform is important and feasible for large merchants but asserts it is somehow not valuable to small merchants.[17] He is simply wrong. Today, a small merchant that accepts wallets with Visa or Mastercard cards must accept all similar wallets that contain Visa or Mastercard credit cards or debit cards, regardless of how high the fee the wallet vendor charges. The Amended Settlement allows all merchants to decline those wallets, on a wallet-by-wallet basis, and a merchant's size has no bearing on taking advantage of that right. Moreover, merchants that want to continue accepting the wallets if they can negotiate a lower fee can join a buying group to facilitate those negotiations.

### C. Merchants Can Effectively Decline Premium Cards.

Objections to the ability to decline Premium cards are grounded in a gross misunderstanding of the Amended Settlement and the facts. Objectors' premise is that declining Premium cards is not viable because "[a]s of 2019, more than 90 percent of general purpose credit card spending occurred on rewards cards."[18] That premise is wrong in multiple determinative ways.

---

[16] Stiglitz Oct. 2026 Dec. ¶ 9, n.7 citing https://investors.globalpayments.com/news-events/press-releases/detail/504/gen-z-driving-the-shift-from-cards-to-digital-wallets-new.

[17] Levitin Dec. ¶ 204.

[18] *See* Objection of 978 Merchants and Merchant Trade Associations to Motion for Final Approval of Settlement ("MPC Obj."), ECF 9981, at 4-5; *see also* Walmart's Objection to Final Approval of Proposed Settlement Agreement ("Walmart Obj."), ECF 9991, at 9 ("most card transactions—now around 90 percent—are on premium cards, [so] no large national merchant can afford to drop the category"); FMI Obj. at 4 (the "proposed ability for merchants to refuse to accept rewards credit cards" is "hollow" and "unrealistic" because "'[a]s of 2019, more than 90% of general

Objectors' 90% figure does not bear on whether merchants can realistically decline Premium cards. The figure reflects a reported percentage of "rewards" cards, but the Amended Settlement classifies some basic "rewards" cards as Standard cards, not Premium cards.[19] More importantly, Premium card transactions are just one subset of total credit-card transactions (and of merchants' transactions via all payment means).[20] Under the Amended Settlement, "Commercial Credit Cards"—most of which provide rewards—and "Premium *Consumer* Credit Cards" are mutually exclusive categories.[21] The former is not a sub-category of the latter. Thus, an argument that a merchant cannot realistically decline Premium card transactions because of their volume requires actually calculating the volume of those transactions, exclusive of Commercial card (and Standard card) transactions.[22]

And a merchant may decline both or only one of the two networks' Premium cards—perhaps playing them off against one another. Thus, references to "rewards" cards being 90% of transactions, or of consumer-card transactions, do not bear on whether merchants can reject Premium card transactions as provided in the Amended Settlement.[23]

purpose credit card spending occurred on rewards cards'"); NRF Obj. at 13 ("Visa and Mastercard classify nearly all cards as 'premium' cards").

[19] Specifically, Visa's Traditional Rewards cards, and Mastercard's Enhanced cards provide rewards (albeit less than the networks' respective Premium products), but the Amended Settlement includes them in the "Standard Card" bucket, not the "Premium Card" bucket. *See* Amended Settlement ¶ 1(nn).

[20] Stiglitz Oct. 2026 Dec. ¶¶ 15-20.

[21] ECF 9692, Ex. 2, Superseding and Amended Class Settlement Agreement of the Rule 23(b)(2) Class Plaintiffs and the Defendants ("Amended Settlement"), at ¶ 1(k) & (z) (defining the two categories of cards, the former of which are certain cards for "payment for business-related goods and services" and the latter of which are certain "consumer" cards).

[22] Stiglitz Oct. 2026 Dec. ¶¶ 15-20.

[23] Walmart cites the same irrelevant 90% statistic for transactions on rewards cards, but throughout its Objection substitutes the word "premium" (with a small "p") for the word "rewards." *E.g.*, Walmart Obj. at 7, 9. Despite its wordplay, Walmart, like the other Objectors, relies on a statistic

For example, in purporting to calculate the transaction volume on Visa and Mastercard Premium cards, Circle K's Mr. Levitin says that their percentage of consumer-card transactions is [redacted]% and then applies that percentage to each network's *total* credit-card transactions, *thus failing to back out the substantial transactions on Commercial cards.*[24] All the Objectors make the same conceptual mistake—they fail to isolate that portion of the network's transactions that are Premium-card transactions as defined in the Amended Settlement.[25]

Moreover, Objectors ask the Court to deny final approval on the basis that the only viable, effective relief is the ability to decline particular issuers' cards. But Objectors fail to compare the average merchant's volumes of Premium cards versus their volumes of particular issuers' cards. That comparison, including Mr. Levitin's (once his math is corrected), confirms what the Class previously advised the Court: Visa's Premium volume is greater than the [redacted] volume (though not dramatically so), while Mastercard's is less than [redacted] and comparable to the other big issuers:[26]

that does not correspond to the Amended Settlement's definition of Premium cards and does not bear on the viability of declining those cards.

[24] Stiglitz Oct. 2026 Dec. ¶ 17.

[25] Some Objectors say that rewards cards are 90% of all credit-card transactions. But most Commercial cards also have rewards and some Standard cards also have rewards, so these Objectors leave unanswered what portion of all credit-card transactions are on Premium cards instead of Commercial cards or Standard cards. Other Objectors say that rewards cards are 90% of all consumer-card transactions. But those Objectors leave unanswered what portion of all credit-card transactions are on consumer cards instead of Commercial cards. Arguing that Mastercard's CEO admitted that there are too many Premium cards for merchants to reject them, NRF makes up a quote and attributes it to him. NRF tells the Court that the CEO said that because Premium Cards are such a high "proportion[] of all cards, it is not feasible for merchants to refuse all premium cards." NRF Obj. at 17. That sentence appears nowhere in the purportedly quoted interview.

[26] Class PA Reply, at 17; Shadowen Dec., Ex. 4, Hearing Tr., Apr. 27, 2026 ("Hearing Tr."), at 13, 70.

| Type of Payment | % Transaction Volume* |
|---|---|
| | |
| Visa Premium | [redacted]% |
| Chase Credit Cards | [redacted]% |
| Mastercard Premium | [redacted]% |
| Citibank Credit Cards | [redacted]% |
| CapitalOne Credit Cards | [redacted]% |
| Bank of Am. Credit Cards | [redacted]% |
| | |

*Average percentage of merchants' total dollar transaction volume (including all payment mechanisms). Each bank's "credit card" volume is its combined volume of Visa and Mastercard credit cards. Source: Stiglitz Reply Dec., Table 1.

Mr. Levitin suggests that the issuer volumes might be materially lower if the merchant threatened to decline only a subset of the issuer's cards, *e.g.*, only Chase Sapphire cards.[27] But he fails to explain how such a strategy would make any practical sense or how it could be carried out in the real world without extreme cardholder confusion. Indeed, Circle K itself emphasizes that "an important difference" between declining an issuer's cards and declining a network's Premium cards is that "a merchant who threatens to decline a single issuer's cards will negotiate over 100% of the volume from that issuer to the merchant."[28] Walmart's expert Professor Farrell agrees: in negotiating with merchants, "any issuer individually would risk losing *all its volume* if it insisted on too high an interchange rate."[29]

The Class has previously shown that any merchants that are hesitant to decline Premium cards due to the transaction volume (presumably the same ones that would also hesitate to decline

[27] Levitin Dec. ¶ 253.

[28] Circle K Obj. at 28. *But see id.* at 29 (changing gears and asserting that merchants want to reject only subsets of issuers' cards).

[29] *See* Declaration of Joseph Farrell, D.Phil. (Sept. 14, 2026) ("Farrell Dec."), ECF 9993-3, at ¶ 90 (emphasis added); *see also* NRF Obj. at 14 (quoting Farrell).

particular issuers' cards) can first use surcharging or discounting to reduce that volume.[30] They can use the Amended Settlement's pilot programs to test whether and how best to decline the cards. And declining the cards will likely prove more viable today than ever before due to substantial growth in multi-homing—customers carrying multiple payment cards.[31]

Nor is it true that it is somehow easier to communicate to a customer that the merchant is rejecting her Chase-issued card rather than her Visa Premium card.[32] Circle K's own merits expert, Professor Hausman, repudiated that very argument because it:

> "[redacted]

[30] *See* Class PA Reply, at 16-17.

[31] Several Objectors contend that "the settlement" is worthless because the option to steer customers to a Standard card requires too many "steps." Circle K Obj. at 33; Walmart Obj. at 1, 12-13; Corrected Objection of American Economic Liberties Project ("AELP Obj."), ECF 10015-1, at 64. But the Standard card reform is not "the settlement," just one aspect of it. Merchants that find steering to the Standard card too taxing can instead use the Amended Settlement's new steering mechanisms—non-acceptance, surcharging, discounting—to steer customers to debit cards, cash, ACH, or a favored issuer's or network's competing card, or, in the case of surcharging, to simply recover the entire cost of acceptance. This is an antitrust case, and the Amended Settlement makes newly available all the pricing mechanisms that exist in most of their dimensions (excepting only nonacceptance and surcharging by issuer). In addition to those price mechanisms, the Amended Settlement also effectively creates a new product—a low-cost Standard credit card. Objectors cannot defeat approval by ignoring the whole suite of pricing reforms and complaining that the Amended Settlement *also* effectively adds an entirely new product.

[32] *See* Circle K Obj. at 31. Professor Farrell tries to assert that issuer-level rejection is superior to Premium-card rejection even if the transaction volumes are comparable. *See* Walmart Obj. at 7; Farrell Dec. ¶¶ 33-40. He applies his "dilution" analysis only to declining issuers' cards; the same analysis shows that declining Commercial or Premium cards is every bit as effective. Stiglitz Oct. 2026 Dec. ¶ 31.

[redacted][33]

Relying on Mr. Levitin rather than its merits expert, Professor Hausman, Circle K asserts that declining Premium cards will be too difficult and take too long to implement.[34] Not so. The technology to identify and decline certain cards already exists. Declining Premium cards is a matter of coordination between the merchant and its acquiring bank.[35]

Objectors dismiss all economic and practical considerations with declining an issuer's cards, asserting that merchants will not in fact decline them because they will reach deals with issuers for lower rates.[36] Objectors offer no explanation—there is no good one—why that panacea, if it had any validity, would apply only to declining issuers' cards and not also to declining Commercial and Premium cards and to surcharging and discounting.

Premium cards have high interchange rates, so this relief is correspondingly substantial. If merchants switch just 10% of the Visa and Mastercard Premium transaction volume to the new Standard cards, the total systemwide reduction will be more than [redacted] bps annually; if they switch cardholders to debit cards the reduction will be [redacted] bps annually.[37]

## II. THE SURCHARGING RELIEF IS ADEQUATE AND EFFECTIVE.

### A. The Amended Settlement Makes Surcharging Viable and Effective.

The Amended Settlement's surcharging relief is transformative. Merchants can surcharge up to 3% or their cost of acceptance, regardless of whether they accept or surcharge AmEx or other

---

[33] Shadowen Dec., Ex. 20, Reply Expert Report of Professor Jerry Hausman (Oct. 11, 2019), at ¶ 149.

[34] Circle K Obj. at 35.

[35] *See* Amended Settlement ¶¶ 28, 77.

[36] *E.g.*, Farrell Dec. ¶ 35; Levitin Dec. ¶ 275; Circle K Obj. at 30.

[37] Stiglitz Nov. 2025 Dec. ¶ 110.

competitive cards; surcharging is permitted in states accounting for more than [redacted]% of transaction volume;[38] and merchants can use surcharging to steer customers to lower-cost payment mechanisms or to simply recover their entire cost of acceptance.

The surcharging relief is substantial. For example, if merchants surcharge just 10% of their transaction volume, the annual systemwide rate reduction would be [redacted] bps.[39]

Objectors nevertheless complain that "surcharges often anger consumers."[40] But this is an antitrust case in which lower interchange rates must be brought about through competition, and competition means using the price mechanism to signal to cardholders the resource costs of their payment choices.[41] Merchants can use the price mechanism by declining cards, discounting, or surcharging.

Imposing a price on card usage can cause what the Objectors call "friction." Undoubtedly, customers prefer to get something for what, absent a price mechanism, they perceive to be "free." But using a credit card—especially a high-cost one—is not free to either the user or the other

[38] *Id.* ¶ 97 n.92. Walmart admits that the California ban on surcharging was held unconstitutional, but states without elaboration that the state Attorney General will apply that ruling only to "similarly situated" merchants. Walmart Obj. at 10 n.8. Walmart does not deny that all merchants applying surcharges in California are similarly situated. Walmart asserts that the Texas Attorney General asserts that the ban remains enforceable "in some contexts" (Walmart Obj. at 10 n.8), but reading the AG's opinion reveals that he noted only that the State remained free to "prevent the dissemination of commercial speech that is false, deceptive, or misleading," and thus the ban might still apply "if the merchants sought to impose higher surcharges than the swipe fees charged to the merchants by credit card companies." Tex. Att'y Gen. Op. No. KP-0257, at 2 (June 14, 2019), https://www.texasattorneygeneral.gov/sites/default/files/opinion-files/opinion/2019/kp0257.pdf.

[39] Stiglitz Nov. 2025 Dec. ¶ 110.

[40] Blue Shield of California Objection ("BSC Obj."), ECF 9988, at p. 5(f); *see also* AELP Obj. at 64.

[41] Stiglitz Nov. 2025 Dec. ¶¶ 6, 122.

customers to whom the merchant must spread the high costs.[42] Making card usage responsive to price will cause the networks to lower the cost or cause users of high-cost cards to internalize the effects of their decisions to use the cards.[43]

Objectors disregard these fundamental economics and exaggerate the degree of friction. Customers today are more familiar with and less resistant to surcharges as more merchants use them. Customers increasingly realize that using a high-priced card is not free, and the Amended Settlement will amplify that trend by permitting merchants to tell customers that the surcharge simply represents the cost of the card to the merchant.[44]

Objectors also ignore the friction inherent in their preferred relief. They cannot explain why charging the customer a price to use a particular Visa card is inferior to telling the customer that, because her Visa card is issued by a particular bank, she cannot use the card at any price.[45] No Objector has ever provided a convincing explanation, because none exists.

Walmart asserts that surcharging conflicts with its business model of uniform prices.[46] In fact, Walmart regularly offers discounts to a variety of customers on a variety of products.[47] Indeed, it is an industry leader in using Electronic Shelf Labels that allow quick and frequent multiple prices for the same item.[48] Walmart not only testified under oath that surcharging would be valuable to it, but it also included surcharging on the list of reforms that it asked the Class to

---

[42] *Id.* ¶ 10.

[43] *Id.*

[44] Class PA Reply, at 24-25; Amended Settlement ¶¶ 42(b), 74(b). Even now Circle K demands the right to surcharge by issuer. Circle K Obj. at 17.

[45] Stiglitz Jan. 2026 Dec. ¶ 9.

[46] Walmart Obj. at ¶ 10.

[47] Stiglitz Oct. 2026 Dec. ¶ 77.

[48] *Id.*

pursue.[49] Regardless, to merit approval a settlement need only make the relief available to the Class; each member can decide whether or how to use it.

Professor Farrell provides an economic model showing that surcharging a card may not be economically wise, depending on the incidence of customers not making the purchase or not returning to the store.[50] He fails to show, however, that the analysis is any different if the merchant declines a particular issuer's card altogether.[51] In fact, the "walk away" incidence is inherently greater for issuer-level non-acceptance than for surcharging.[52]

Circle K's expert Mr. Levitin conjures possible scenarios in which the banks issue cards that obscure the Standard/Premium markings and leave them in circulation for the duration of the Amended Settlement.[53] The networks have branding and issuance standards, the Amended Settlement has anti-circumvention provisions, and this Court will retain jurisdiction over the parties' conduct. Mr. Levitin's hypothetical "possibilities" cannot derail the Amended Settlement.[54]

---

[49] Class PA Reply, at 19 & n.35; ECF 9729-2, Ex. A, at p. 3.

[50] Farrell Rep. ¶¶ 80-85.

[51] *See* Stiglitz Oct. 2026 Dec. ¶¶ 23-32, 75. A consumer (but no Class member) has objected on the ground that the Amended Settlement should repeal the no-surcharge rules as they related to debit cards. Neuenschwander Objection, ECF No. 10019. The Durbin Amendment caps the rates for the vast majority of debit-card transactions, and the benchmarks have a net (total) price of about [redacted] bps. Stiglitz Nov. 2025 Dec. ¶ 50. Merchants want to drive transactions *to* debit cards, not use surcharging to drive transactions *away* from them.

[52] Stiglitz Oct. 2026 Dec. ¶ 75.

[53] Levitin Dec. ¶¶ 226-236; *see also* NRF Obj. at 18-19.

[54] *See, e.g.*, *In re Ivan F. Boesky Sec. Litig.*, 948 F.2d 1358, 1369 (2d Cir. 1991) (rejecting challenge to settlement based on a "hypothetical possibility"); *Geier v. Alexander*, 801 F.2d 799, 809 (6th Cir. 1986) ("To allow the objectors to disrupt the settlement on the basis of nothing more than their unsupported suppositions would completely thwart the settlement process.") (citation omitted).

Notably, these purported difficulties, if they existed at all, would relate only to surcharging based on the card category (Premium or Commercial). No one suggests any identification problems in surcharging all a network's credit cards, which is an option that many merchants undoubtedly will choose.

Objectors assert without analysis that "complicated surcharge disclosures make surcharging effectively unworkable."[55] The Amended Settlement's disclosure requirements are straightforward,[56] and the increasing trend toward surcharging belies the Objectors' implication that state-law disclosure requirements prevent surcharging. Again, Objectors offer no explanation as to how disclosure requirements with respect to their preferred relief—non-acceptance of certain issuers' cards—would somehow be less "complicated" than the surcharging disclosures.

Objectors contend that complying with New York's dual-pricing statute might be impossible for surcharging based on the card category or type if the statute were construed to require the merchant to post the cost of accepting the particular customer's card rather than the merchant's *average cost of accepting that type of card* (thus preventing the merchant from posting the price before the point-of-sale).[57] New York has not in fact interpreted the statute that way; doing so would make compliance impossible in those circumstances and render the statute unconstitutional.[58]

---

[55] BSC Obj. at p. 5(f).

[56] *See* Amended Settlement ¶¶ 42(b), 91(b).

[57] NRF Obj. at 19 n.11; Levitin Dec. ¶ 160.

[58] Declaration of Equitable Relief Class Counsel in Support of Motion for Preliminary Approval of Amended Settlement Agreement, ECF 9692-10 ("Class Counsel Dec.") ¶¶ 187-188 (responding to *In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 2024 WL 3236614, at *3 n.12 (E.D.N.Y. June 28, 2024)). Worst case, merchants could comply with the New York statute by surcharging all cardholders the merchant's lowest cost of acceptance for any of the networks' credit cards.

### B. The Amended Settlement Prevents the Networks from Punishing Merchants that Surcharge.

Objectors complain about a "loophole" that "allows the networks to establish 'differential rate structures' with *higher interchange rates for merchants that surcharge.*"[59] That is not correct.

For starters, the Amended Settlement expressly prohibits the networks from imposing higher rates on or otherwise punishing merchants that surcharge.[60] With respect to differential rate structures, for the first five years the Amended Settlement caps all posted interchange rates at their March 2025 levels, prohibiting the networks from raising posted rates for any merchant or group of merchants for any reason.[61] The Amended Settlement does permit—the agreement's reforms are *designed to bring about*—"differential rate structures, that is, default interchange rate structures, subject to the Posted Interchange Rate Caps in Paragraph 51 [and 100] below, generally available to similarly situated merchants where such merchants are eligible for *a lower default interchange rate* when no cardholder fee is assessed (*e.g.*, no surcharge or convenience fee)."[62]

Simply put, the rate caps prevent the networks from raising posted rates, but the networks can offer *lower posted rates* to merchants that agree not to surcharge. That way, whole categories of merchants that pay posted rates, not just those with individually negotiated rates (like some Objectors), can get lower rates for agreeing not to surcharge. Given the rate caps, the networks *cannot* create differential rates by *raising* the rates for those who surcharge.[63]

---

[59] Circle K Obj. at 33-34 (emphasis added); *see also* AELP Obj. at 65.

[60] Amended Settlement ¶¶ 43(f), 92(f).

[61] *Id.* ¶¶ 51, 100.

[62] *Id.* ¶¶ 43(f), 79(f) (emphasis added).

[63] The Class had explained this in connection with the objections to the 2024 agreement. Class 2024 Prelim. Approval Reply Br., ECF 9297, at 14.

The rate caps apply during only the first five years of the eight-plus years of the agreement. After the rate caps expire, the networks "shall not announce or implement a differential rate structure without providing 90 days' advance notice to Rule 23(b)(2) Class Counsel."[64] If the networks tried to somehow use differential rate structures to raise the rates on merchants that surcharge in ways that contradict the Amended Settlement, Class Counsel would invoke the Amended Settlement's anti-circumvention provision and promptly bring the matter to the Court's attention.[65]

## III. DISCOUNTING AND OTHER ISSUER-LEVEL RELIEF IS ADEQUATE AND EFFECTIVE.

The Amended Settlement provides several tools to generate issuer-level competition. Those tools, together with the other very substantial relief, confirm this Court's preliminary view—expressed twice already—that issuer-level non-acceptance is not the standard for approval. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2026 WL 1662251, at *12 (E.D.N.Y. June 9, 2026); *Payment Card*, 2024 WL 3236614, at *28 n.40.

### A. Issuer-Level Discounting Is Adequate and Effective.

Objectors' dismissiveness regarding the discounting relief is curious, because their own economist in the MDL litigation, Professor Hausman, testified that allowing merchants to discount at the issuer level would "[redacted][66] Under the Amended Settlement,

---

[64] Amended Settlement ¶¶ 43(f)(ii), 92(f)(ii).

[65] Objectors seem to also complain that the Amended Settlement would not prevent the networks from imposing higher rates on surchargers "after the settlement period ends." True, the Amended Settlement's reforms end when the agreement ends. So does the release. The practical reality is that it would be nearly impossible for a network to later revoke the Amended Settlement's reforms that deliver lower rates. Definitionally, those reforms will have left a factual record that would make successful antitrust litigation, among other consequences, a given. The time-limited reforms, with a time-limited release of claims, create a one-way ratchet in favor of merchants.

[66] Hausman Rep. ¶ 466.

merchants can now discount at every level—brand (Visa), product category (Visa Premium), product type (Visa Signature), and/or issuer (Chase-issued Visa). The power of issuer-level discounting is reflected in issuing banks' resistance to it.[67]

Walmart now contends that discounting is ineffectual because the merchant must give discounts to inframarginal customers, *i.e.*, those who would have used a low-cost card even absent the discount.[68] The large merchants' expert economists previously testified otherwise. Permitting issuer-level discounting will allow merchants and issuers to develop "[redacted]"[69] Merchants and issuers "[redacted][70] That data will enable merchants to give *targeted* discounts that avoid the inframarginal customers and "[redacted]"[71] Contrary to Objectors' portrait of merchants as hapless victims stuck in a static world, their merits experts emphasized:

[redacted]

---

[67] Class PA Reply, at 26-27. Even under the current rules, discounting is substantial. *See, e.g.*, Federal Reserve Bank of Atlanta, Research Data Report, 2023 Survey and Diary of Consumer Payment Choice: Summary Results, at 19, https://www.atlantafed.org/-/media/documents/banking/consumer-payments/survey-diary-consumer-payment-choice/2023/sdcpc_2023_report.pdf.

[68] Walmart Obj. at 8-11.

[69] Hausman Reply Rep. ¶ 77; *see also* Harris Rep. ¶¶ 60, 1067, 1103, 1207; Shadowen Dec., Ex. 9, Reply Expert Report of Dr. Robert G. Harris ("Harris Reply Rep."), at ¶¶ 636-637.

[70] Hausman Rep. ¶ 387.

[71] Harris Rep. ¶ 1090.

[redacted][72]

Circle K suggests that merchants have long had the ability to discount Visa cards by issuer.[73] But it fails to respond to the Class's showing that Visa's published rules did not permit issuer discounting and that even sophisticated merchants were unaware that Visa had an informal policy permitting it.[74] Mastercard has always prohibited issuer-level discounting.

### B. The Amended Settlement Provides Other Powerful Tools to Generate Issuer Competition.

Discounting is not the only issuer-level tool in the Amended Settlement.[75] It allows merchants to differentiate among particular issuers' cards in 19 recurring, commercially important circumstances.[76] No Objector contends that this reform lacks value or is impractical. These issuer-differentiation reforms were crafted in consultation with major retailers and industry consultants.[77] More generally, "preferencing" of particular products, services, and search results in online platforms is already a large commercial phenomenon: vendors pay to be listed first in online search results, on the first page, or on the checkout page.[78] The Amended Settlement ensures that merchants can harness these techniques to prefer particular issuers' cards in exchange for reduced interchange rates or other consideration.

---

[72] *Id.* ¶ 1073.

[73] Circle K Obj. at 18; *see also* Walmart Obj. at 12.

[74] *See* Stiglitz Jan. 2026 Dec. ¶ 12 n.18.

[75] *See* Class Prelim. Approval Brief ("Class PA Br."), ECF 9692, at 26-32.

[76] Amended Settlement ¶¶ 19, 68, and Appendix H.

[77] Class Counsel Dec. ¶¶ 113, 192.

[78] Class PA Reply, at 29.

Merchants can also generate issuer competition by negotiating to partner with a particular bank(s) to be the favored issuer of Standard cards used in the merchant's stores.[79] Merchants can do likewise with negotiations to accept digital wallets that contain the issuer's cards.[80]

## IV. THE RATE RELIEF IS ADEQUATE AND IS NOT DAMAGES.

### A. The Rate Relief Will Ease the Transition to a More Competitive Market.

Some Objectors persist in complaining about the "minuscule" rate relief,[81] but this is not a damages case. The rate relief's function is merely to ease the transition to the more competitive regime that the Amended Settlement will deliver. Accordingly, in granting preliminary approval the Court comprehensively rejected the objections about the magnitude of the rate relief:

> [T]his is a type of relief that Plaintiffs cannot secure through trial, as courts lack the power to set rates or regulate prices. *Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 226 (1908) ("The establishment of a rate is the making of a rule for the future, and therefore is an act legislative, not judicial, in kind."). Plus, the rate reduction is greater than the one proposed under the First Settlement, and will – unlike under the First Settlement – apply pro rata to the interchange rates negotiated by large national merchants. Finally, for what it's worth, the rate reduction is not supposed to compensate merchants for past overcharges; that's what the (b)(3) settlement is for. Rather, the rate reduction will allow for cost savings and certainty while the rules take hold in the market.

*Payment Card*, 2026 WL 1662251, at *12.

The Objectors have provided no new facts or analysis to compel any different conclusion now.

---

[79] *Id.* at 31-32.

[80] *Id.* at 31.

[81] *E.g.*, MPC Obj. at p. 4(b); Walmart Obj. at 9; FMI Obj. at 4; NRF Obj. at 18.

Circle K argues that, if the Class believed the rules reforms would deliver a [redacted]-bps reduction in interchange rates, the Amended Settlement would have mandated immediate reductions of that magnitude.[82] This is an antitrust case, not a regulatory proceeding. Relying on competition rather than a Court mandate is especially important because at a certain point the price reductions to merchants may result in price increases to cardholders.[83]

Circle K asserts that somehow the "vast majority" of merchants could be left with "no rate relief."[84] That is manifestly untrue. First, nearly all merchants have transactions on Standard cards, and for eight-plus years those rates are reduced by some [redacted] bps, at least [redacted] bps below the average rate on Premium cards.[85] The odds are essentially nil that any merchant will fail to benefit from just this relief. Second, all posted rates are capped at March 2025 levels, whereas historical effective increases averaged about [redacted] bps per year.[86] Third, merchants that pay negotiated rather than posted rates get a pro rata reduction. The caps and rollbacks will benefit *all* merchants.

### B. Defendants Cannot Undermine the New Standard Cards by Re-Classifying Them.

The Amended Settlement's new "Standard" credit card is a substantial and valuable innovation. Currently, merchants have little financial incentive to steer customers from Premium cards or Commercial cards to other credit cards because there is significant "compression" in

---

[82] Circle K Obj. at 22; *see also id.* at 37.

[83] *See* Class PA Reply, at 34-35.

[84] Circle K Obj. at 25; *see also* NRF Obj. at 18.

[85] Stiglitz Nov. 2025 Dec. ¶¶ 13, 24.

[86] *See* Stiglitz Jan. 2026 Dec. ¶ 6 n.13. Circle K cites a press release showing that since 2024 the amount of all "swipe fees" from all credit-card networks, acquirers, and processors has risen to $198.25 billion. Circle K Obj. at 23. Examining the press release, however, shows that the Visa and Mastercard increase in rates—including rates for voluntary services such as buy-now-pay-later—was 1 bps. Similarly, FMI refers to recent increases in the *amount* of fees, not the *rate*, and acknowledges that there have been significant increases in card usage. FMI Obj. at 3.

interchange rates, with merchants paying posted rates of, for example, [redacted] bps for a Visa Signature card transaction and only [redacted] bps less for a Visa Traditional card transaction.[87]

The Standard card will fundamentally alter the merchant's calculation by creating a 100+ bps gap between the average rates on Premium and Standard cards. The merchant thus can offer the customer a 1% discount to use the Standard card.[88]

The Objectors do not contest these foundational facts and economics. Instead, Objectors assert without analysis that the networks or the banks could "recategorize" the Standard cards as Premium cards, thereby undermining this reform.[89] Objectors cannot explain why or how that would happen.

Issuing banks make more net interchange fees on Standard card transactions, even at the new, lower interchange rates, than on Premium card transactions. The interchange rates net of rewards are [redacted] bps on the former and only [redacted] bps on the latter.[90] Banks issue Premium cards not because the net interchange rates are higher—they aren't—but because the banks compete among themselves to sign up cardholders.[91] Nothing about the Amended Settlement changes that competitive dynamic.

Even if the networks or banks had an incentive to move cardholders from Standard cards to Premium cards, the Amended Settlement itself addresses any concern about migration. The 10-bps Annual Effective Rate reduction would require that the Defendants wholly offset the rate

---

[87] Stiglitz Nov. 2025 Dec. ¶ 48 & Table 1. There is a larger gap between the rates on Premium cards and debit cards. But a substantial percentage of cardholders want to use the credit function of a credit card, so in those circumstances a debit card will not suffice.

[88] *Id.*

[89] *E.g.*, MPC Obj. at p. 5(c); Circle K Obj. at 31; NRF Obj. at 15, 18.

[90] Stiglitz Jan. 2026 Dec., ¶ 23.

[91] Stiglitz Oct. 2026 Dec. ¶ 58 n.74.

increases that the migration would otherwise cause. Moreover, issuers cannot loose-handedly reclassify cards. They must meet the networks' significant card-issuance and classification standards. The Amended Settlement's anti-circumvention provisions make these purported concerns even more unrealistic.

Circle K does not explain its argument that the ad valorem aspect of interchange rates on small-dollar sales makes the 125-bps reduction on Standard cards "meaningless."[92] For example, the Visa posted rates for small-ticket sales have only an ad valorem portion—no fixed-fee portion—and the current rate is [redacted] bps, so the reduction to 125 bps is quite meaningful.[93]

The savings from steering customers from Premium or Commercial cards to Standard cards are even more consequential.

### C. The Rate Relief Is Not Impermissible Monetary Relief.

Some Objectors contend that the rate caps and rollbacks are impermissible "monetary" relief because they "concern how much merchants pay."[94] Injunctions that alter future conduct—whether network rules or alterations to interchange rates—are not "monetary" or "damages" merely because they prevent or reduce future overcharges or because their value can be estimated. *Payment Card*, 2024 WL 3236614, at *18.

Preventing future harm is a principal purpose of injunctive relief and is appropriately sought under Rule 23(b)(2). *Berni v. Barilla S.p.A.*, 964 F.3d 141, 147 n.29 (2d Cir. 2020). For example, injunctive-relief classes can pursue claims challenging discriminatory prices,[95] seeking

[92] Circle K Obj. at 31.

[93] *See* Amended Settlement, Appendix J-1, "Small Ticket" row.

[94] *See* NRF Obj. at 8; *see also* Circle K Obj. at 46.

[95] Rule 23(b)(2), Advisory Committee Note to 1966 Amendment.

adjustments to seniority status,[96] demanding specific performance of warranties,[97] and combating anti-price-matching policies.[98] The Amended Settlement does not require payment to any merchant based on past conduct. It is solely forward-looking; provides no claims process; and requires no individualized inquiries into class members' transactions or rates. *See Payment Card*, 2024 WL 3236614, at *18 ("this settlement does not involve (1) monetary damages in (2) a Rule 23(b)(1) action where (3) the class will make claims against a 'limited fund'"). No court has held that such relief is impermissible monetary relief under Rule 23(b)(2).

### D. The Rate Caps and Rollbacks Are Not Illegal Price Fixing.

The American Economic Liberties Project asks the Court to deny approval on the ground that the Amended Settlement purportedly embodies per se unlawful horizontal restraints between the two networks with respect to: (1) the rate caps, average-effective-rate limits, and pro rata reductions for negotiated rates; and (2) a purported joint Visa/Mastercard "prohibition on issuer-based surcharges," and a purported joint "policy [to] permit merchants to decline credit cards by 'product category' … but not by 'issuing financial institutions.'"[99]

Taking the second accusation first, the Amended Settlement does not embody or refer to any such joint agreement. With respect to issuer surcharging and non-acceptance, the Amended Settlement says only that nothing in its terms shall preclude the networks from maintaining those policies, *i.e.*, it does not require either network to *eliminate* those policies.[100] But absolutely

[96] *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 750, 755, 779–80 (1976).

[97] *Pella Corp. v. Saltzman*, 606 F.3d 391, 395 (7th Cir. 2010).

[98] *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418, 434 (S.D.N.Y. 2009).

[99] AELP Obj. at 24-25.

[100] Amended Settlement ¶¶ 23, 43(a), 72 , 92(a). The Objectors studiously avoid citing this specific language.

nothing in the Amended Settlement requires that the networks *maintain* those policies or reflects an *agreement that they will maintain* them.[101] Each network is perfectly free, today as well as the day after the Amended Settlement takes effect, to eliminate (or not) its rules on those issues. The Objectors' accusation to the contrary is groundless and irresponsible.[102]

The Objectors' first set of accusations—that the rate caps, average-effective-rate limits, and pro rata reductions for negotiated rates are unlawful price-fixing—is equally baseless. Objectors' premise is that the default interchange rates will be cemented into de facto interchange rates because the Amended Settlement purportedly "preclude[s] any bilateral rate negotiations between merchants and issuers."[103] Again, the Amended Settlement does no such thing. Moreover, it prevents the default rates from becoming de facto rates by providing the ability to decline Premium cards, decline Commercial cards, and all the rest. Objectors' assertions that these reforms will not generate substantial competition are wrong for all the reasons stated above.[104]

---

[101] The distinction is fundamental, and courts recognize it in a variety of contexts. *See, e.g.*, *Gao v. Holder*, 595 F.3d 549, 555 (4th Cir. 2010) (statutory language stating that provision "shall not preclude" the Attorney General from certain conduct is "permissive" and reinforces the scope of her discretion); *Hukui Tech, Inc. v. Intelligent Sols., LLC*, 2025 WL 3500725, at *4 (N.D. Cal. Sept. 10, 2025) (permissive language in agreement "do[es] not obligate contractor to do or not do any certain thing," but rather implies that contractor "can if it chooses").

[102] The Objectors offer similarly tendentious readings of other provisions. Referring to Paragraph 143, the Objectors complain that the Release would bar "claims brought by third parties not bound by the Settlement Agreement at all." AELP Obj. at 50. The Amended Settlement contains no such provision. Paragraph 143 refers to only *the Class* being bound. Objectors assert that the Amended Settlement provides a right for each network to enforce its terms against the other. AELP Obj. at 26. But the agreement's standard "beneficiary clause" says no such thing, and as to third-party beneficiaries refers specifically only to enforcing the Release and other provisions "applicable to them." Amended Settlement ¶ 159. (The Objectors erroneously refer to Paragraph 154.)

[103] AELP Obj. at 27.

[104] Objectors ridicule the reforms that depend on "incentiviz[ing] *cardholders* to use lower cost cards." *Id.* at 29 (emphasis in original). Like other Objectors, they fail to acknowledge that their preferred remedy—issuer-level non-acceptance—also depends on incentivizing cardholders to switch cards.

Even if Objectors could get out of the starting gate, they have failed to identify any case suggesting that rate caps in an antitrust settlement are impermissible.[105] That is not surprising. Courts cannot reject a settlement on illegality grounds unless it authorizes "clearly illegal conduct," *i.e.*, unless the "alleged illegality of the settlement agreement is . . . a legal certainty." *Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 686 (2d Cir. 1977) (approving settlement where "the challenged practices have not been held to be per se illegal in any previously decided case"); *see also Calibuso v. Bank of America Corp.*, 299 F.R.D. 359, 372 (E.D.N.Y. 2014) (rejecting illegality challenge to settlement where "the purported illegality . . . hardly amounts to a 'legal certainty'") (quoting *Robertson*); *accord Bennett v. Behring Corp.*, 737 F.2d 982, 987 (11th Cir. 1984); *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 124 (8th Cir. 1975). Moreover, in evaluating illegality, "[t]he settlement agreement . . . must be looked at as a whole." *Robertson*, 556 F.2d at 686 (emphasis added); *see White v. National Football League*, 822 F. Supp. 1389, 1426 (D. Minn. 1993) ("it is unlikely that the proposed settlement, taken as a whole, would be deemed a per se violation of the antitrust laws"). And "[a]ny illegality or unconstitutionality must appear 'as a legal certainty on the face of the agreement.'" *Handschu v. Special Servs. Div.*, 605 F. Supp. 1384, 1395 (S.D.N.Y. 1985) (citation omitted), *aff'd*, 787 F.2d 828 (2d Cir. 1986); accord *Calibuso*, 299 F.R.D. at 372; *Armstrong v. Bd. of Sch. Directors of City of Milwaukee*, 616 F.2d 305, 320 (7th Cir. 1980).

Objectors come nowhere near clearing these hurdles. The very fact that the rate caps and rollbacks are embedded in a broader settlement agreement designed to improve competition precludes characterizing them as a "naked restraint of trade with no purpose except stifling of

---

[105] Many courts have held that they are permissible. *See* Class 2024 Prelim. Approval Br. ("Class 2024 PA Br."), ECF 9694, at 29-30 & n.24.

competition." *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 20 (1979) (cleaned up) (blanket license, while literally entailing horizontal price fixing, was not per se illegal because it accompanied efficiency-enhancing activity); *see also FTC v. Actavis, Inc.*, 570 U.S. 136, 159 (2013) (settlement in which one competitor paid another to delay entering the market is subject to only rule-of-reason analysis); *Med. Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Conn., Inc.*, 675 F.2d 502, 505-06 (2d Cir. 1982) (although a maximum drug-price insurance plan involved agreements that "fix prices," it was not subject to *per se* rule because agreements were "novel restraints with potential procompetitive effects").

Even-handed treatment of the networks (with respect to both rules and rates) addresses the practical problem of settling with defendants that are competitors and that will not agree to disadvantage themselves against each other. Courts frequently use equal treatment to induce settlement and have already done so three times with respect to these networks. *See In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 508-09 (E.D.N.Y. 2003) (mandating modification of the same rules splitting debit and credit acceptance, and imposing interim rate caps), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005); *United States v. Am. Exp. Co.*, 2011 WL 2974094, at *3 (E.D.N.Y. July 20, 2011) (imposing same rules on Visa and Mastercard regarding certain discounting practices); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 234 (E.D.N.Y. 2013) (mandating same surcharging rules), *rev'd on other grounds*, 827 F.3d 223, 238 (2d Cir. 2016); *see also In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at *9 (Bankr. S.D.N.Y. May 4, 2016) (imposing most favored nations clause to ensure equal treatment).[106]

[106] Objectors (AELP Obj. at 19) cite *Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 682-83 (S.D.N.Y. 2011), but there the Department of Justice, among others, showed that the proposed

Even if viewed in isolation from the rest of the settlement, the rate caps and rollbacks are not *per se* illegal price fixing. These "practices have not been held to be illegal per se in any previously decided case." *Robertson*, 556 F.2d at 686; *see also Handschu*, 605 F. Supp. at 1396. Naked horizontal price-fixing agreements do not involve, as here, an agreement by suppliers (1) with their customers (2) to reduce prices or refrain from raising them. To the extent the Amended Settlement has horizontal aspects, it is hardly a "pure horizontal agreement[] among competitors to fix prices of the sort condemned *per se*, but instead [has] a significant vertical dimension"—namely the involvement of the merchant class—which requires that it "be judged according to the rule of reason." *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 205-06 (S.D.N.Y. 2014) ("presence of even . . . significant horizontal dimension, alongside a vertical one, does not trigger per se review"); *accord Ace Arts, LLC v. Sony/ATV Music Pub., LLC*, 56 F. Supp. 3d 436, 448 (S.D.N.Y. 2014); *United States v. Brewbaker*, 87 F.4th 563, 576 n.9 (4th Cir. 2023) ("[t]he only restraints that the Supreme Court has held to be per se unreasonable are purely horizontal"); *see Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962) ("Economic arrangements between companies standing in a supplier-customer relationship are characterized as 'vertical.'").

Moreover, the caps are just that—the Amended Settlement carefully preserves each network's ability to reduce the rates below the caps (and the rollbacks) as much as the newly unleashed competition will require. That the rate caps and rollbacks are designed to limit what the networks charge distinguishes virtually all the per se price-fixing cases that Objectors cite, which involve naked horizontal agreements with the purpose or likely effect of *raising* prices. *See, e.g.*,

settlement agreement would likely *create* monopoly power over unclaimed works and over the search market. The Amended Settlement here will do the opposite: it will dismantle market power.

*United States v. Apple, Inc.*, 791 F.3d 290, 323 (2d Cir. 2015) ("horizontal agreements with the purpose and effect of raising prices are per se unreasonable").[107]

Certain older precedent holds that purely horizontal maximum price fixing may be per se illegal, see *Arizona v. Maricopa Cnty Med. Soc'y*, 457 U.S. 332 (1982), even though "[c]ommentators have wondered how an agreement by sellers to limit the amount they will charge their customers . . . can reduce competition," *Vogel v. Amer. Soc'y of Appraisers*, 744 F.2d 598, 601 (7th Cir. 1984) (Posner, J.); *id.* at 604 ("[J]udicial language about the per se illegality of competitors' tampering with price must, like all legal language, be read with sensitivity to its context."). Regardless of whether it is still good law,[108] *Maricopa County* is plainly inapt, even beyond considering the Amended Settlement as a whole or its vertical dimension. *Maricopa County* involved competitors adopting a uniform, maximum fee schedule, and has been explained by a concern that maximum price fixing "may be a masquerade for an agreement to fix uniform prices, or it may in the future take on that character." 457 U.S. at 348; *State Oil*, 522 U.S. at 17

---

[107] Objectors also cite *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211 (1951), which held that a horizontal agreement to adopt maximum resale prices was *per se* illegal. But *Kiefer-Stewart* rested on older case law outlawing vertical maximum resale price maintenance agreements, which was later overturned, *see State Oil Co. v. Khan*, 522 U.S. 3 (1997), as well as on the subsequently overturned inter-enterprise-conspiracy doctrine, *see Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984). The same analysis disposes of the objection to setting caps on the amount of surcharges. *See* AELP Obj. at 30-31. The cost of acceptance for very few transactions is more than 3%. *See* Network Prelim. Approval Reply ("Network PA Reply"), ECF 9773, at 9 n.5. The cap has obvious procompetitive (and pro-merchant-surcharging) benefits, *i.e.*, preventing merchants with market power from using surcharges as a profit center, which could bring surcharging into disrepute among customers systemwide.

[108] *See State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997) ("condemnation of practices resulting in lower prices to consumers is especially costly") (internal quotation marks omitted); *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) ("[r]esort to per se rules is confined to restraints . . . that would always or almost always tend to restrict competition and decrease output") (internal quotation omitted); *NCAA v. Alston*, 594 U.S. 69, 89 (2021) ("we take special care not to deploy these condemnatory tools [per se and quick-look rules] until we have amassed 'considerable experience with the type of restraint at issue' and 'can predict with confidence that it would be invalidated in all or almost all instances'") (quoting *Leegin*).

("maximum pricing might mask minimum pricing"); *Vogel*, 744 F.2d 598 at 604 ("price ceiling in Maricopa may have been intended as a target or even a floor").

Here, by contrast, the caps and rollbacks apply to Visa's and Mastercard's separate (and non-identical) fee schedules, and Objectors offer no basis to believe that the caps will effectively serve as a price floor—that, absent the caps and rollbacks the rates would be lower.

### E. The Average Effective Rate Limits Are Not Illegal Price-Fixing.

The AERLs are even further removed from per se illegality. They are not even prices. The AERLs are limits on the weighted average (network-wide) effective (considering posted rates and negotiated rates) rates that each network, acting unilaterally, may charge. Objectors seem to complain that the AERLs were constructed using a blended average of both networks' average effective rate and then deducting 10 bps.[109] Each network is free to reduce its average effective rate even lower, but it must meet at least the 10-bps reduction. Objectors do not deny the inarguable benefits to merchants of having such a limit, leaving aside how it is constructed. The alternative to a single blended average was to have a separate benchmark for each network. But that would have given an unfair commercial advantage to one of the networks—the one with the *higher* interchange fees—for no good reason.

Nor is there any danger that the AERLs could become a "focal point" for the networks to converge their interchange fees. Just to be clear: the AERLs—the mark that each network must meet—were constructed using the blended average effective rate of the two networks combined. But each network, separately and without consulting with each other and subject to all antitrust constraints, must ensure that its own average effective rate is at least 10 bps below that mark. Each network's average effective rate is determined by more than 100 factors with more than a million

[109] *See* AELP Obj. at 24-25.

permutations. For example, Visa's posted rates include 7 card types, 33 consumer merchant categories, 12 corporate purchasing categories, a number of different commercial fee programs, 35 business interchange fees, 13 other transactions fees, plus schedules for Puerto Rico transactions.[110] And its AERL will be determined by the volume as well as the mix of those factors. Simply put, there are too many variables affecting each network's average effective rate for the AERLs to function as a focal point for their interchange rates—for them to become, in effect, an average-effective-interchange-rate floor rather than a ceiling.[111]

## V. AN APPROVABLE SETTLEMENT DOES NOT REQUIRE ADDITIONAL RELIEF.

### A. An Approvable Settlement Does Not Require Issuer-Level Non-Acceptance.

This Court and Judge Brodie have held that eliminating the Honor-All-Issuers rule cannot be the *sine qua non* of approving this settlement. *Payment Card*, 2026 WL 1662251, at *12; *Payment Card*, 2024 WL3236614, at *28 n.40.

Walmart falsely asserts that the Court of Appeals concluded that Honor-All-*Issuers*—as opposed to Honor-All-*Cards*—rules are the "most important."[112] To the contrary, in discussing the Honor-All-Cards rule the Court of Appeals referred only to the Honor-All-*Products* aspect, not the Honor-All-*Issuer*s aspect. The Court characterized the rule as requiring that a merchant accept all a network's cards "regardless of the *differences in interchange fees*." 827 F.3d at 228 (emphasis added). Similarly, Circle K quotes Judge Brodie's references to the "Honor-All-*Cards*" rules as if they were references to "Honor-All-*Issuers*" rules.[113]

---

[110] Rebuttal Declaration of Keith Leffler (May 13, 2024), ECF 9297-23, at ¶¶ 19-21.

[111] *Id.*

[112] Walmart Obj. at 22.

[113] *See* Circle K Obj. at 14. Circle K asserts that this Court was "mistaken" in concluding that the Amended Settlement "effectively repeal[s] the Honor All Cards rule." Circle K Obj. at 15. It is

Walmart contends that the Honor-All-Issuers rule does not currently serve any procompetitive purpose because the "chicken-and-egg problem" (the networks' need to simultaneously sign up merchants and cardholders) was solved long ago.[114] Helping to solve that problem, however, was just one of the Honor-All-Issuers rule's procompetitive benefits. Another is "the benefit to cardholders 'of universal acceptance by brand.'"[115]

Walmart contends that "this Court previously found [that] issuer-level competition is key to an adequate settlement."[116] Not so. The Court merely noted that the settlement lacked issuer-level surcharging, not that it was required. *Payment Card*, 2024 WL 3236614, at *27.

Some Objectors complain, without details, that the Honor-All-Issuers rule dampens *non-price* competition, allowing issuers to "provide[] substandard service or fraud prevention."[117] There is no evidence, however, that substandard issuer service is a widespread problem. Visa and Mastercard each have performance standards for issuer services, and they compete against each other, and with AmEx and Discover, on these and other service issues.

Moreover, the same tools that the Amended Settlement provides to reduce interchange rates will also be effective against any significant service issues. Merchants can act against the offending network (decline, surcharge, or discount competitors). Or they can zero in on any offending issuer (assuming issuer-level problems truly exist, which the Objectors do not demonstrate), using discounting or issuer-differentiation to steer transactions away from any underperformer. Modern

---

hard to know what to make of that assertion. It is literally the case that there will no longer be a rule that requires a merchant to accept all the network's credit cards if it accepts any of them.

[114] Walmart Obj. at 5, 22.

[115] NRF Obj. at 14 (quoting Levitin Dec. ¶ 275).

[116] Walmart Obj. at 6.

[117] BSC Obj. at p. 4(a); *see* Walmart Obj. at 6.

customer-level data makes that steering especially powerful. And no underperforming issuer will find itself partnering with merchants or their buying groups to be the preferred issuer of the new Standard cards or the preferred partner for a digital wallet.

### B. An Approvable Settlement Does Not Require Additional Relief.

#### 1. Default Interchange

NRF asserts that the Class had previously challenged the setting of default interchange rates and no longer does so, ergo the Class has "lost their commitment to changing this core anti-competitive practice."[118] Like the other plaintiff groups in MDL 1720, the Class did not challenge the setting of default rates as such. All plaintiff groups challenged setting default rates *in the presence of the anti-steering restraints*.[119] Absent the restraints, default interchange rates are competitively benign, and possibly procompetitive.[120]

The Amended Settlement eliminates or substantially reforms nearly all the significant restraints the Class set out to reform. The Class did not "lose its commitment to solving" the anticompetitive problem; we solved it.

*The No-Bypass Rule*

Walmart's objection concerning the No-Bypass rule reflects a disagreement about remedies, not a defect in the Amended Settlement. *See DDMB, Inc. v. Visa, Inc.*, 2021 WL 6221326, at *23–24 (E.D.N.Y. Sept. 27, 2021) (citing *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 596 (N.D. Cal. 2015) (non-opt-out Rule 23(b)(2) class)). The rule is at best tangential to the core provisions that the Amended Settlement reforms. Nor is there any evidence or analysis that, given

---

[118] NRF Obj. at 17.

[119] *See, e.g.*, Stiglitz Rep. ¶¶ 87 n.134, 136-137; Carlton Rep. ¶ 61; Harris Rep. ¶¶ 204 n.189, 321, 708 n.807, 723-725, 729; Hausman Rep. ¶¶ 96, 615 & n.845.

[120] Stiglitz Jan. 2026 Dec. ¶ 29.

the sweeping set of reforms, eliminating the No-Bypass rule is necessary to deliver competitive merchant fees.

*Low Utility Rates*

Pedernales is a public utility that gets special, very low interchange rates on 93% of its *transactions*, but asserts that the high interchange rates on the remaining 7% of its transactions generate more than half of the *total fees* that it pays.[121] It objects to the Amended Settlement because, it says, it will not continue to qualify for the special low rates if it declines or surcharges the Commercial cards that are generating the high fees on the 7% of transactions.[122]

Pedernales is simply wrong in asserting that the Amended Settlement will "enshrine" its purported inability to avoid the fees on the higher-cost cards.[123] It cites Paragraph 43(f) of the Amended Settlement, but that merely provides that Visa can provide lower rates for merchants that do not surcharge particular cards.

Pedernales is apparently unaware that it *can already* do what it says it wants to do—keep the rates on the cards that are in the low-rate utility program and also surcharge the high-cost cards that are not in it. Specifically, Pedernales says that certain Visa "Commercial" and "Purchasing" cards are driving the high fees on the non-utility-program 7% of transactions.[124] Visa's Eligibility Requirements state that, to get the special low utility rates, the merchant must not "charge cardholders fees of any type for Visa transactions."[125] But it goes on: "*Exception applies to*

---

[121] Objection to Class Action Settlement Filed by Pedernales Electric Coop, Inc. ("Ped. Obj."), ECF 9989, at 6.

[122] *Id.* at 8.

[123] *Id.* at 12.

[124] *Id.* at 6 n.11.

[125] Shadowen Dec., Ex. 12, at 5.

*transactions that are not eligible for an incentive interchange rate within the Utility Program*, e.g., a fee may be charged under the rules for a U.S. Credit Card Surcharge for commercial transactions."[126] Pedernales can get low rates on the transactions that are in the utility program, and also surcharge those that are not.

Pedernales has not argued that Mastercard conditions the application of its utility rates on the merchant's agreement to forgo surcharging, and we understand that it does not.

Regardless, the Amended Settlement is valuable to utilities as to both Visa and Mastercard transactions. Pedernales itself acknowledges that some utilities are surcharging to get rates even lower than the published rates in the utilities program.[127] Given their described high-dollar transactions, utilities are particularly well situated to use the whole suite of reforms to negotiate even better rates or to recover, through surcharging, their entire cost of acceptance.

## VI. THE NETWORKS CANNOT UNDERMINE THE SETTLEMENT BY RAISING NETWORK FEES.

Objectors contend, without analysis, that the Amended Settlement will somehow incentivize the networks to increase their "network fees," *i.e.*, fees that the networks charge directly to merchants, or charge to acquiring banks that then pass them on to merchants.[128] Objectors do not explain why or how this would happen.

Interchange fees are paid to issuing banks; network fees are paid to the networks. Objectors provide no economic or other explanation why reducing the former would permit increases in the latter. Nothing about reducing interchange rates will increase the profit-maximizing price for the

---

[126] *Id.*

[127] Ped. Obj. at 8.

[128] *See e.g.*, Circle K Obj. at 24-25; Walmart Obj. at 9-10; NRF Obj. at 18; FMI Obj. at 4.

networks' services—if the networks could profitably raise the fees they receive, they would have already raised them.[129]

Moreover, the Amended Settlement provides the whole suite of new tools that merchants could use to push back against any attempted increases in network fees. Merchants could discount other cards, surcharge the offending network's cards (merchants can surcharge the lesser of 3% or the merchant's cost of acceptance, which specifically includes the cost of network fees[130]), use dual pricing,[131] selectively decline high-cost cards, etc. As a backstop, the Amended Settlement's anti-circumvention clause would prevent any Visa or Mastercard attempt to raise network fees and channel those funds, directly or indirectly, to issuers.[132]

---

[129] Stiglitz Jan. 2026 Dec. ¶¶ 32-33. The AELP Objectors assert, with no citation of any sort, that from 2023 to 2024 Visa and Mastercard fees increased by 9 bps. AELP Obj. at 60-61. Not true. Indeed, after the Class debunked that same allegation when made by other Objectors at preliminary approval (Class PA Reply at 35-36), they did not repeat it on final approval.

[130] *See* Amended Settlement ¶¶ 39-42, 88-91.

[131] Mr. Levitin asserts that the Amended Settlement's reform permitting dual pricing was unnecessary because the networks already permitted it. Levitin Dec. ¶¶ 190-193. He cites no existing rule permitting it, and his reference to a statute that permits posting both a cash price and a credit-card price overlooks that the Amended Settlement will permit posting of *multiple* prices (*e.g.*, a price for cash, debit, Standard card, Premium cards, etc.). *See* Amended Settlement ¶¶ 42(d), 91(d) (dual-pricing provision permits merchants to post "a total price for a transaction using [a network's credit card] and a separate total price for a transaction using cash or *another means of payment*") (emphasis added).

[132] Amended Settlement ¶¶ 54, 103. Walmart cites to an "inquiry" by the European Commission ("EC") into whether Visa and Mastercard raised their network fees after regulators capped interchange rates. Walmart Obj. at 10 n.7. The EC inquiry is just that—an inquiry. There has been no finding that the networks took unusual fee increases or that any such increases are related to caps on interchange fees. Regardless, merchants in the EU do not have the complement of reforms that the Amended Settlement provides for pushing back against any fee increases.

## VII. THE RULE 23 (E) AND *GRINNELL* FACTORS CONFIRM THAT THE COURT SHOULD GRANT FINAL APPROVAL.

### A. The Costs, Risks, and Delay of Trial and Appeal

#### 1. The Complexity, Expense, and Likely Duration of the Litigation

At preliminary approval, the Court concluded that the costs, risks, and delay of trial and appeal weigh in favor of approval because the litigation has already been long, complex, and expensive, and going forward "it will take significant time not just to prepare to try this case, but to actually try it." *Payment Card*, 2026 WL 1662251, at *10. No Objector credibly contends otherwise.

#### 2. The Risks of Establishing Liability

The Court concluded that "Plaintiffs have cleared substantial hurdles to liability," but "the fact of the matter is, Plaintiffs could still lose at trial." *Id*. at 11. In trying to meet the initial burden under the rule of reason the Class will face evidence of "skyrocketing output, falling prices, and flourishing quality and innovation," and, if it clears the first hurdle, will be met with additional substantial evidence of procompetitive benefits. *Id*. The Court therefore admonished the Class and the Objectors that "establishing liability [is] not a foregone conclusion." *Id*.; *see also id*. at 12 ("there is a legitimate risk that Plaintiffs will not be able to establish liability at trial," and "it's a safe bet that if they do succeed, the Networks will appeal").

The Court found that this sub-factor weighs in favor of approval. To the extent that Objectors address this issue, they simply equate having survived summary judgment with having little risk at trial and on appeal.[133] This is a rule-of-reason case where the Honor-All-Issuers rule—

[133] Typical is Circle K's assertion—either oblivious or disingenuous—that "most of the risks have already been overcome." Circle K Obj. at 43.

the focus of the Objectors' attention—has procompetitive benefits.[134] The Class believes that it can prevail on liability, but Objectors' denial of the existence of substantial risk is Panglossian. As the Court concluded at preliminary approval, this sub-factor weighs in favor of approval.

#### 3. The Risks of Maintaining the Class Through Trial

The Court previously found this a "neutral" sub-factor (*Payment Card*, 2026 WL 1662251, at *11), and no Objector has contended otherwise.

#### 4. The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and All the Attendant Risks of Litigation

The Court concluded that this sub-factor weighs in favor of approval because "the question is not whether the Amended Settlement constitutes the best possible recovery, *end stop*– it's whether the Amended Settlement constitutes the best possible recovery in light of what can be gained and lost through trial." *Id.* at *12 (emphasis in original).[135] And "[n]one of the objectors have persuaded the Court that they will, or even can, get more through trial." *Id.* In addition to "the legitimate risk" that the Class would not establish liability, there is "also a risk, a bigger one in comparison, that Plaintiffs will not secure the relief that the Amended Settlement offers, much less the additional relief on which the objectors insist." *Id.*[136]

[134] Stiglitz Rep. ¶¶ 87 n. 134, 136-137; Carlton Rep. ¶ 61; Harris Rep. ¶¶ 204 n.189, 321, 708 n.807, 723-725, 729; Hausman Rep. ¶¶ 96, 615 & n.845.

[135] Disregarding the Court's statement of the standard, Circle K insists that the benchmark is the relief that is "*available* at trial." Circle K Obj. at 11 (emphasis added); *see also id.* at 43 (asserting that a settlement must deliver relief "at least comparable to what Plaintiffs could receive by prevailing on the merits"). As the Court held, the standard is not what relief is theoretically available, but the available relief discounted by the probability of prevailing on both liability and remedies and then maintaining both on appeal. *Payment Card*, 2026 WL 1662251, at *12-13.

[136] Objectors' assertion that a trial loss would permit class members to pursue other claims against the networks (Walmart Obj. at 23; NRF Obj. at 12) is an overbroad simplification—a trial loss would itself carry substantial claim-preclusive effects. *See, e.g.*, *Allen v. McCurry*, 449 U.S. 90, 94 (1980) ("a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action"); *Monahan v. New York City Dept. of Corrections*, 214 F.3d 275, 284-85 (2d Cir. 2000) (quoting *Allen*). Nor does the potential

In particular, the Court cautioned the Class and the Objectors that among the relief they are least likely to get after trial and appeal is Honor-All-Issuers relief. The Court will "want to make as little change as possible to restore competition rather than go [at] it with a meat cleaver."[137]

Trials in two other recent major antitrust cases illustrate that principle. In *United States v. Google LLC*, 803 F. Supp. 3d 18 (D.D.C. 2025), the court found liability but denied the government's preferred remedy of divestiture. Courts "must be sensitive to remedies that risk," among other consequences, "impairing consumer welfare," so they order more intrusive remedies "only after determining that less severe remedies likely would prove inadequate." *Id.* at 70, 99. In September 2026 the same principle led to the same conclusion in another government case against Google. *United States v. Google, LLC*, 2026 WL 2754741 (E.D. Va. Sept. 2, 2026). The government sought a whole menu of structural remedies, including, for example, forced open-sourcing of Google's ad-server algorithm or the divestiture of its ad exchange. After an 11-day bench trial devoted solely to remedies, the court held that behavioral remedies—anti-discrimination and data-sharing policies and limits on Google's bidding practices—were sufficient to "foster much-needed competition," so that was all the government would get. *Id.* at *1-2, 31; *see also id.* at *17 ("Plaintiffs have not shown that behavioral remedies will be ineffective").

Here the Objectors radically downplay the value and effectiveness of the relief that the Amended Settlement provides—and therefore what a trial and appeal would risk.[138] Their

viability of other claims after a trial loss mean that the Amended Settlement's value is less than the discounted value of proceeding to trial and appeal.

[137] Hearing Tr., at 60. Some Objectors truncate the Court's comment by clipping out the reference to "restor[ing] competition." They then fault the Court for asserting that it would "have the discretion to 'make as little change as possible.'" AELP Obj. at 57. What the Court *actually* said is not wrong.

[138] NRF says the Court should infer the Amended Settlement's inadequacy because this is "the rare case" where the Defendants did not oppose class certification. NRF Obj. at 20. Class certification was litigated long before anyone knew whether there would be a settlement and, if so, what its

Objections fail to show that eliminating the Honor-All-Issuers rule is the only way to generate meaningful competition. It isn't. The Amended Settlement's suite of reforms is far too valuable to risk for the chance of getting the additional relief that the Objectors say they want.

In the end, Objectors offer nothing to change the conclusion that, even if eliminating the Honor-All-Issuers rule would bring *some* benefit, "the presence of that relief cannot be the standard for settlement approval, especially considering the other substantial relief that the Amended Settlement provides." *Payment Card*, 2026 WL 1662251, at *12. As before, "the risk of winning less or losing everything" weighs in favor of approval. *Id.* at *13.

### B. Effectiveness of Distributing Relief to the Class

"[N]o method of distribution is required,'" so this factor is neutral. *Id.* (quoting *Payment Card*, 2024 WL 3236614, at *29).

### C. Release from Liability

The Court found that the Release extends only as limited by the identical-factual-predicate standard and covers only "any potential causes of action that may have accrued as of the date of final settlement approval or that accrue no later than the longer of eight years after that date or five years after the conclusion of all appeals of final settlement approval." *Id.* The Release is "acceptable for the reasons that the Court previously found." *Id.* (citing *Payment Card*, 2024 WL 3236614, at *34).

---

terms would be. And this Court already explained to NRF that it is "not so unusual" for defendants to forgo opposing class certification. Hearing Tr., at 48. That is especially true where the plaintiffs seek an injunction against defendants' uniform policies that affect many similarly situated claimants, thus posing significant free-rider and one-way-collateral-estoppel problems for defendants.

Certain Objectors raise a series of purported concerns about the potential scope of the release in unspecified, hypothetical future litigation.[139] The Court of Appeals has determined, and this Court has already emphasized, that these sorts of concerns are appropriately raised if and when a defendant actually ever asserts the release against a real claim. This Court held:

> But "[a] holding as to the proper scope of the release ... can await a case in which the issue would directly affect the proceedings." *Fikes*, 62 F.4th at 720. This approach is consistent with the fundamental principle that a court does not predetermine the preclusive effect of its own judgment; those questions are left to subsequent proceedings where the judgment is enforced. *Payment Card*, 2026 WL 1662251, at *14.

*Fikes*'s suggestion that courts take a wait-and-see-it-in-context approach to determining the scope of a release is not limited to releases in cases that permit opt outs.[140] The Court's rationale is a prudential one that applies regardless of opt-out status, and it certainly does not depend on whether the class member is in the class voluntarily or because it is a mandatory class. Walmart's further proposal—that this Court should ignore *Fikes* because it purportedly places an undue burden on class members—is a non-starter.[141]

Objectors' concerns regarding the scope of the release are speculative and hypothetical. The Court should reject them on that ground, and on the ground that they are substantively meritless.

#### 1. The Release Is Appropriately Time-Limited.

[139] *E.g.*, Walmart Obj. at 14-18; MPC Obj. at 2-3; Circle K Obj. at 47-50; NRF Obj. at 10-12.

[140] *Contra* Walmart Obj. at 17.

[141] *Id*. at 17-18, 30; *see also* NRF Obj. at 12. Walmart asserts that the "burden" of hypothetical future litigation over the scope of the release is impermissible because the release "extends well beyond the relief period," and "gives up all 'the future rights' of absent class members." Walmart Obj. at 17, 18. We show below that this is simply untrue. The temporal scope of the Release is limited to the duration of the Amended Settlement's relief.

The fanciful nature of Objectors' arguments is illustrated by their assertion that the Amended Settlement's release could be read to be perpetual.[142] It cannot reasonably be read that way. Paragraph 116(a) provides that the Class "irrevocably waive[s] … and release[s] …. [relevant claims] that have accrued as of the Settlement Approval Date or accrue no later than the longer of five years after the Settlement Final Date or eight years after the Settlement Approval Date…." Fastening on the word "irrevocably," Objectors ignore that what is irrevocably waived are only the claims that accrue during the limited time period.[143]

The time limitation is plain and unambiguous on its face. The Court reads the release that way; so do the Defendants;[144] and so does the Class.[145]

**2. The Release Reaches Only to the Extent Permitted by the Identical-Factual-Predicate Standard.**

---

[142] *E.g.*, MPC Obj. at 2-3; Walmart Obj. at 14 (asserting that, after the agreement term, the release extinguishes claims for "any 'substantially similar' interchange rules the Networks may enact later"); Circle K Obj. at 49 (complaining that release extinguishes claims that arise "after the settlement period expires").

[143] *See also* Amended Settlement ¶ 120(c) (Class covenants not to "take any action or make any claim until the longer of five years after the Settlement Final Date or eight years after the Settlement Approval Date"); *id.* ¶ 122 (release and covenant not to sue are intended to preclude Class from seeking relief "until the longer of five years after the Settlement Final Date or eight years after the Settlement Approval Date").

[144] *See, e.g.*, Network Prelim. Approval Brief ("Network PA Br."), ECF 9693, at 3 (defendants "will receive an appropriate limited-duration release that provides litigation peace only for so long as the rules commitments remain in effect, but not beyond"); Network PA Reply Br., at 23 ("The release is appropriately narrow because it … will extend approximately eight years after final approval, no longer than the settlement's substantial rules reforms will be in effect."); Network PA Reply Br., at 4 ("The release is appropriately limited both in substance (by the identical factual predicate doctrine) and temporally (as it extends approximately eight years after final approval, coterminous with the rules relief)."); *id.* at 25 ("[T]he eight-year release addresses the Second Circuit's previous concern when it rejected a proposed combined Rule 23(b)(2) and Rule 23(b)(3) class settlement that would have released claims from all merchants that accept Visa or Mastercard cards in the future 'onwards' and 'forever.' *In re Payment Card*, 827 F.3d at 239.").

[145] Class PA Reply at 49-50 ("the release is the longer of eight years after the "Settlement Approval Date" or five years after the "Settlement Final Date," which is "coterminous with the expiration of the rules changes provided by the Amended Settlement").

Objectors assert that the release is overly broad to the extent that it releases claims: (a) that could have been alleged; (b) concerning "substantially similar" future rules or the continuing effects of current rules; and (c) related to the defined Merchant Fees. The Release incorporates the identical-factual-predicate standard, and it cabins the Release's reach in each of those dimensions. The Release provides that it extends only to "the fullest extent permitted by federal law."[146] This Court, the Court of Appeals, and Judge Brodie have all concluded that this language incorporates and comports with the identical-factual-predicate standard. *Payment Card*, 2026 WL 1662251, at *13; *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 714–15 (2d Cir. 2023); *Payment Card*, 2024 WL 3236614, at *34. That conclusion wholly undermines the Objections.

*Could Have Been Alleged*. Adopting Judge Brodie's analysis, the Court at preliminary approval rejected the contention that the Release cannot properly extinguish claims related to "any conduct that was or could have been alleged or raised in this case." *Payment Card*, 2026 WL 1662251, at *13; *Payment Card*, 2024 WL 3236614, at *34; *see also id.* at *31. Courts regularly approve releasing such claims that arise from the same factual predicate as the litigated claims. *See, e.g.*, *Melito v. Experian Mktg. Sols.*, 923 F.3d 85, 95-96 (2d Cir. 2019) (class plaintiffs may release claims that could have been pled); *Wal-Mart Stores*, 396 F.3d at 107 (same); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 247-248 (2d Cir. 2011) (same); *Marble v. Halo Innovations, Inc.*, 2025 WL 3273813, *2-3 (S.D.N.Y. Oct. 14, 2025) (same).

*Similar Rule or Continuing Effect*. Objectors contend that the Amended Settlement improperly releases claims challenging Defendants' existing rules, as well as claims regarding "substantially similar" rules Defendants may implement in the future.[147] The Release does not

[146] Amended Settlement ¶ 116(a).

[147] *See, e.g.*, Walmart Obj. at 14; AELP Obj. at 51-53; FMI Obj. at 11.

insulate Defendants from future violations of the antitrust laws; it releases them only from claims arising from the conduct that has the identical factual predicate as the litigation claims, or from that conduct's continuing effects. When thus appropriately limited, "releases of future claims are an important part of many settlement agreements." *In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070, 1088 (11th Cir. 2023).

Accordingly, the Court rejected this same objection at preliminary approval. *Payment Card*, 2026 WL 1662251, at *13. Judge Brodie had previously done so twice before—in connection with both the Rule 23(b)(3) settlement and the 2024 proposed settlement, *In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 2019 WL 6875472, at *22 (E.D.N.Y. Dec. 16, 2019); *Payment Card*, 2024 WL 3236614, at *33-34, the former having been affirmed by the Court of Appeals, *Fikes*, 62 F.4th at 714. This Court adopted the conclusion that "the release does not impermissibly cover future violations of the antitrust laws." *Payment Card*, 2024 WL 3236614, at *34.

The Court recently confirmed again that "[t]he law is 'well established' that class settlements may release 'claims not presented and even those which could not have been presented as long as the released conduct arises out of the "identical factual predicate" as the settled conduct,' including claims for future injury." Memorandum Decision and Order, ECF No. 10022 (Sept. 29, 2026), ECF 10022 (the *Potayto-Potahto* Decision), ECF 10022, at 13 (quoting *Payment Card*, 2024 WL 3236614, at *31).

Notably, this Court in *Potayto-Potahto* distinguished *Lawlor v. National Screen Service Corp.*, 349 U.S. 322 (1955), the principal case on which Walmart relies.[148] *Potayto-Potahto* at 15-16. *Lawlor* involved a prospective waiver of "alleged new conduct and new antitrust violations

[148] *See* Walmart Obj. at 14.

'which could not possibly have been sued upon in the previous case.'" *Id.* at 15 (quoting *Lawlor*, 349 U.S. at 327-28). Neither *Lawlor* nor any of Walmart's other cases[149] involved the release of claims sharing the same factual predicate as the settled claims.

Releasing future claims arising from the same factual predicate has elicited scrutiny only when the alleged effect is to treat class members unequally, as was alleged in *Potayto-Potahto*. No such objection has been asserted here. Objectors instead assert a far more radical position: releasing future claims, *including those that share the same factual predicate as the litigated claims*, is per se prohibited. Under that rule, there could be no settling of injunctive-relief claims, whether class or non-class. That cannot be, and is not, the law.[150]

*Merchant Fees*. Objectors assert that the Release is overbroad in releasing claims related to fees other than just interchange fees. Objectors had complained about the release of claims for non-interchange network fees, both in 2024 and at preliminary approval of this Amended

---

[149] *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985) (noting in dicta that if choice-of-forum and choice-of-law clauses in an arbitration agreement operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, the agreement would be "condemned" as against public policy); *In re Am. Express Merchs. Litig*., 634 F.3d 187, 197 (2d Circ. 2011) (citing *Mitsubishi* and *Lawlor* but involving mandatory class action waiver provision in arbitration clause and finding arbitration agreement unenforceable because the mandatory class action waiver would preclude plaintiffs from enforcing statutory rights), *rev'd on other grounds sub nom. Amex v. Italian Colors Rest.*, 570 U.S. 228 (2013); *Fox Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955) (contract need not be construed to avoid releasing future antitrust claims because future violations cannot be released); *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 896 n.27 (3d Cir. 1975) (upholding broad release that released accrued, but unknown, antitrust claims, not future violations of antitrust laws).

[150] Circle K tries to avoid this law by asserting that "a new claim" arises with each new credit-card transaction and class settlement cannot release new claims. Circle K Obj. at 48-49. If that were the law, then all the "well-established" authority on this issue would be wrong. Similarly without merit is Walmart's assertion that the Release "long outlast[s] the relief the Settlement purports to grant." Walmart Obj. at 15; *see also* Circle K Obj. at 23-25. That assertion falsely equates the rate relief with the totality of the Amended Settlement's reforms, ignoring the principal reforms, which are the rules relief. And even a major portion of the rate relief—the 125-bps cap on Standard-card rates—extends to the termination of the Release.

Settlement.[151] Judge Brodie summarily rejected those objections in 2024, and this Court did likewise at preliminary approval. *Payment Card*, 2026 WL 1662251, at *13; *Payment Card*, 2024 WL 3236614, at *33-34.

That is hardly surprising; the Class in fact challenged non-interchange network-imposed fees—those imposed by the networks directly on merchants or indirectly on merchants via acquiring banks.[152] And the Amended Settlement provides substantial relief against those network fees. See Section IV above.

Regardless, the Objectors' assertion that the Release extinguishes claims arising from any and all other card "transaction fees that might be assessed to merchants … in the future"[153] is simply wrong. The Release applies only to claims that satisfy the identical-factual-predicate standard.

### 3. The Release Appropriately Extends to Claims Against Defendants' Coconspirators.

Objectors complain that the Release extends to claims against Defendants' non-party coconspirators.[154] It is necessary and routine, however, for a class release to extend to the claims of non-party coconspirators, subject to meeting the identical-factual-predicate standard. *See, e.g.*, *Wal-Mart Stores,* 396 F.3d at 107; *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 748

---

[151] *See, e.g.*, ECF 9729 (Walmart Objection at Prelim. Approval), at 16; ECF 9728 (Visa Debit Plaintiffs' Objection at Prelim. Approval), at 1-2, n.1, 7-8; ECF 9220 (Target Objection at 2024 Prelim. Approval), at 29-30.

[152] *See* Equitable Relief Class Action Complaint (Feb. 2, 2017), ECF 6892 (under seal), ECF 6910 (redacted), at ¶¶ 269-299, 425, alleging additional anticompetitive conduct and seeking injunctive relief. Objectors appear to also complain about releasing the conduct identified in Paragraph 116(b) of the Amended Settlement. *See* Walmart Obj. at 16; MPC Obj. at 3; NRF Obj. at 12. But the Class Complaint challenges all of it. *See, e.g.*, Class Complaint ¶¶ 9(c), (d), (k), (p), (s), (t), (u), 106, 142-165, 269-299.

[153] NRF Obj. at 12.

[154] NRF Obj. at 12; BSC Obj. at p. 3.

(9th Cir. 2006). In exchange for the settlement's benefits to the class, defendants demand "peace," which they would not get if they could later be subjected to claims by their coconspirators for contribution or indemnification. *See, e.g.*, *Wal-Mart Stores*, 396 F.3d at 109 ("it is hard to imagine" that networks "would have settled without also releasing their [non-defendant] member banks from liability; to do so would have invited relitigation of the same factual allegations against the banks").

Objectors seem to assert that the Release extends to claims against "third-party processors" as well as against the coconspirator issuing and acquiring banks.[155] Not so. Third-party processors are intermediaries that manage card payment transactions on behalf of merchants (for example, the company Stripe). The Release protects *Defendants* from claims arising from or relating to any conduct, acts, transactions, events, etc. that are or could have been alleged or otherwise raised in this action (as spelled out in the Amended Settlement),[156] and the Amended Settlement mentions third-party processors in only that context.

Moreover, even if third-party processors were coconspirators within the meaning of the Release (and they are not),[157] the scope of the release as to them would be limited by the identical-factual-predicate standard, just as it is as to the Defendants. The Release decidedly would *not*

---

[155] *Id.*

[156] Amended Settlement ¶ 1(u).

[157] Paragraph 115(r) of the Amended Settlement defines the "Rule 23(b)(2) Class Released Parties" to include "every entity or person alleged to be a co-conspirator of any Defendant in any of the complaints in the Action." Para. 1(a) defines the "Action" to include any of the complaints in MDL 1720. The Class complaint alleges only that the issuing and acquiring banks, not any processors, are coconspirators. Our search (we found 43 complaints) did not unearth any complaints in MDL 1720 that allege that the processors are coconspirators (*see* Shadowen Dec. ¶ 20), and the Objectors have not identified any. Regardless, no merchant in this 21-year old MDL has ever in fact sued any processor related to the conduct at issue in this litigation. If any merchant ever does, the court handling that case can determine whether and how the Release might cover processors and, if necessary, apply the identical-factual-predicate standard. *Payment Card*, 2026 WL 1662251, at *14; *Fikes*, 62 F.4th at 720.

extend to "any and all other card transaction fees" imposed by third-party processors, as Objectors erroneously assert.[158]

**D. Equitable Treatment of Class Members Relative to Each Other**

The Court concluded that this factor weighs in favor of approval, noting that "[i]t bears emphasis that Rule 23(e)(2)(D) requires that class members be treated *equitably*, not identically." *Payment Card*, 2026 WL 1662251, at *14 (quoting *Moses v. N.Y. Times Co.*, 79 F.4th 235, 245 (2d Cir. 2023) (emphasis in *Moses*)). The relief to each class member "need not 'be identical, only ... beneficial,'" meaning only that "it cannot be the case that some members receive no benefit while others receive some." *Id.* (quoting *Berni*, 964 F.3d at 147 n.28).

The Amended Settlement eliminated the equal-treatment faults of the 2024 agreement, providing pro rata rate reductions to merchants with negotiated rates, permitting surcharging regardless of whether the merchant also accepts or surcharges AmEx, and avoiding the no-surcharge-state issue by not relying so heavily on surcharging relief. *Id.* at *14-15.

Walmart disparages the Amended Settlement's "toolbox" of "merchant-specific options" that some small merchants can use but many large merchants purportedly cannot.[159] The Amended Settlement provides a toolbox of reforms because the networks have a toolbox of restraints. An injunction is not impermissibly divisible just because it requires the dismantling of multiple restraints. The rules "can be enjoined or declared unlawful only as to all of the class members or

[158] Circle K seems to complain that the Amended Settlement's term is too short. Circle K Obj. at 50. The reforms will last for at least eight years, and "likely longer" (Walmart Obj. at 16) depending on how long the appeals take. That term is appropriate given the changes taking place in the industry and the fact that the Defendants' rival, American Express, is not subject to the reforms. To take account of changes in the marketplace, even in less dynamic industries, the standard term for a Department of Justice consent decree is 10 years. https://www.justice.gov/archives/opa/pr/department-justice-announces-initiative-terminate-legacy-antitrust-judgments.

[159] Walmart Obj. at 26.

as to none of them." *DDMB*, 2021 WL 6221326, at *43; *see also Payment Card*, 2024 WL 3236614, at *17 ("[a]ll class members have the same interests to eliminate the rules"). Nor does the Amended Settlement contain any *merchant-specific* reforms of any kind.

Contrary to NRF's contention, all merchants do in fact "operate under the same playbook."[160] That playbook injures all merchants, including those that pay negotiated rather than posted rates.[161]

As the Court held in granting class certification, "[t]he Court recognizes that merchants are likely impacted in a variety of ways by the Restraints…. Differences in how each individual merchant is affected do not negate the fact that Defendants have acted on grounds generally applicable to the class and that each merchant in the class stands to benefit from equitable relief from the Restraints." *DDM*B, 2021 WL 6221326, at *45. That conclusion applies to the rules relief as well as rate relief caps and rollbacks.[162]

Disagreement over the form or scope of proposed injunctive relief does not change the rationale for the Court's prior rulings. Individual Class members need not value the relief identically. *Moses*, 79 F.4th at 245; *Berni*, 964 F.3d at 147 n.28. Differences in size, business models, bargaining power, or preferred competitive strategies do not convert disagreement over remedies into equal-treatment problems. *See Wal-Mart Stores, Inc.*, 396 F.3d at 113; *DDMB*, 2021 WL 6221326, at *23. Some Class members' *choice* to forgo using every aspect of relief does not render the settlement inadequate. *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 360 (2011); *Sykes*

---

[160] NRF Obj. at 7.

[161] *See* Rebuttal Declaration of Keith Leffler (May 13, 2024), ECF 9289-24, at ¶¶ 4-5.

[162] NRF falsely asserts that "Visa permits issuer-level discounting for some merchants but not others." NRF Obj. at 7. As the Class has explained, Visa contends that it permits issuer discounting for all merchants, but it has not put that policy in its published rules.

*v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 98 (2d Cir. 2015); *Amara v. CIGNA Corp.*, 775 F.3d 510, 522 (2d Cir. 2014). If some merchants choose not to avail themselves of the relief because they think it would cause too much friction for their customers, this "is a sign of competition." *Payment Card*, 2026 WL 1662251, at *15.

Certain large retailers argue that the Court should deny approval because the buying group provisions do not benefit them.[163] That remains to be seen, as large retailers may choose to join buying groups. Nevertheless, not every class member need benefit from every element of an injunction. *DDMB*, 2021 WL 6221326, at *45; *see also Sykes*, 780 F.3d at 97; *Amara*, 775 F.3d at 522. Moreover, while buying groups and merchant education may be more attractive to smaller merchants, they impose no burden on large merchants and do not diminish the relief available to them. Instead, those provisions enhance the value of the Amended Settlement to *all* merchants: they increase the number of merchants likely to, *e.g.*, surcharge, thereby reducing customers' resistance to the practice and raising the value of surcharging to all merchants, large and small alike.[164]

Some Objectors complain of alleged unequal treatment of merchants whose transactions are among the 4.5% in no-surcharge states.[165] Notably, the Court of Appeals faulted the surcharging relief in 2016 primarily because it was the *only* relief provided to merchants in those states—the settlement provided "only relief they cannot use: they actually received nothing." *Payment Card*, 827 F.3d 223, 238 (2d Cir. 2016). That is far from the case here: "surcharging is

---

[163] *E.g.*, Walmart Obj. at 12, 25.

[164] Expert Report of Keith B. Leffler (Dec. 18, 2020), ECF 8474-3, at ¶¶ 38-41, 78.

[165] *E.g.*, NRF Obj. at 8; Walmart Obj. at 10 & n.8.

… not the central relief offered by the Amended Settlement." *Payment Card*, 2026 WL 1662251, at *14.

It is worth noting, moreover, that the Amended Settlement's reform to the no-surcharge rules in fact provides some value even to merchants in these few states; it eliminates one of two barriers to surcharging. Successful legal challenges to other states' no-surcharge statutes provide the blueprint for these merchants to eliminate the other barrier.[166]

### E. Ability of Defendants to Withstand a Greater Judgment

"[T]his factor weighs against granting preliminary approval (because *of course* the Networks are holding out on Plaintiffs to some extent), but not decisively so." *Payment Card*, 2026 WL 1662251, at *15 (emphasis in original). The networks may withstand a substantially greater rate reduction, but whether eliminating the Honor-All-Issuers rule would be tantamount to a breakup of the networks cannot be conclusively determined "absent a trial." *Id.* at 28-29.

### F. The Terms of Any Proposed Award of Attorneys' Fees

"The terms of the Networks' payment of attorneys' fees and any approved service awards were discussed 'only after reaching final agreement on all substantive terms of the Amended Settlement.'" *Payment Card*, 2026 WL 1662251, at *9. This factor supports approval because the "proposed award [of] attorneys' fees raises no issues with respect to whether the interests of the class members are adequately protected." *Id.* at *13.

Nevertheless, one Objector complains about the lodestar multiplier of 2.6.[167] Class Counsel's filings amply support the multiplier, which is modest in relation to those in other major

[166] *See* Class PA Br. at 25.

[167] Contractors Grind Objection ("CG Obj."), ECF 10017, at 3-4.

complex litigation,[168] and is comparable to that awarded (and affirmed on appeal) to counsel in the Rule 23(b)(3) case. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6888488, at *24 (E.D.N.Y. Dec. 16, 2019) (awarding 2.45 multiplier, resulting in $523 million fee), *aff'd Fikes*, 62 F.4th at 723; *see also Visa Check/Master Money*, 297 F. Supp. 2d at 524 (3.5 multiplier), *aff'd*, 396 F.3d 96 (2d Cir. 2005). Unlike the award to the Rule 23(b)(3) counsel, the requested fee here: (1) will not reduce the Class's recovery; (2) rewards counsel for successfully litigating through summary judgment and *Daubert* motions; and (3) must cover future work, including inevitable appeals, oversight of the Merchant Education Program, and monitoring and enforcing compliance with numerous settlement provisions.[169] Contrary to the Objector's contention, the moving papers also fully support the reimbursement of expenses and service awards for the class representatives, which, again, will not in any way diminish the Class's recovery.[170]

### G. The Class's Reaction

This factor also weighs heavily in favor of approval.

Conservatively, more than 9.8 million of the roughly 12 million class members received notice of the settlement and its terms.[171] Only 1,018 Class members objected to the Amended

---

[168] *See* ECF 9933-1 at 27 (including n. 16).

[169] *See id.* at 20-28.

[170] *See id.* at 32-35. The Objector complains that the moving papers were not posted on the settlement website. CG Obj. at 2. All the moving papers were filed, unredacted, on Pacer and were not required to also be posted on the website. The Objector in fact cites the publicly filed principal brief. *See* CG Obj. at 2-5, discussing details of ECF 9933-1 (Memorandum of Law in Support of ERCPs' Motion for Attorneys' Fees, Expenses, and Service Awards). All the supporting attachments were equally available on the public docket. *See* ECF 9933-2 through 9933-16. If the Objector somehow had trouble downloading those supporting materials, it could have contacted the Settlement Administrator as the website in fact advises.

[171] *See* Declaration of Cameron R. Azari, Esq., on Proposed Class Notice Plan for Superseding and Amended Class Settlement Agreement, ECF 9692-3, at ¶ 11 (the claims administrator

Settlement.[172] This is less than 8 one-hundredths of one percent of the Class. This is many orders of magnitude below the lowest levels that have resulted in courts denying final approval. *See, e.g.*, *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 462 (2d Cir. 1982) (affirming approval where more than 50% of the shares held by the minority-shareholder class opposed the settlement); *Maywalt v. Parker & Parsley Petroleum Co.*, 864 F. Supp. 1422, 1433 (S.D.N.Y. 1994) (approving settlement where 2,700 of 89,000 objected), *aff'd*, 67 F.3d 1072 (2d Cir. 1995); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) (affirming approval where counsel purported to represent nearly 50% of the class in objecting; the number of objectors "is a factor to be considered but is not controlling"); *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799 (3d Cir. 1974) (affirming approval where more than 22% objected); *Bennett v. Behring Corp.*, 96 F.R.D. 343 (S.D. Fla. 1982) (objections from under 10% of the class "insufficient to mandate" disapproval); *compare Swinton v. SquareTrade, Inc.*, 454 F. Supp. 3d 848, 879 (S.D. Iowa 2020) (approving settlement where roughly .0236% of the 15.7 million class members objected).[173]

Courts do not let the views of vocal minorities derail settlements. Notices of settlement solicit *only objections*, and in a class of this size, some outlier views are inevitable. *See, e.g.*, *Payment Card*, 2019 WL 6875472, at *6 ("a certain number of objections are to be expected in a class action with an extensive notice campaign and a potentially large number of class members";

---

conservatively estimates that the blanket coverage will reach 82% of U.S. Business Owners); *id.* ¶ 5(a) (this settlement follows two 19.8 million and 16.3 million direct mailings made for the Rule 23(b)(3) settlement and the mailing of more than 38 million claim forms to merchants in the (b)(3) settlement).

[172] We do not include the 18 large merchants that approve of the Amended Settlement so much that they think they are entitled to fees.

[173] Circle K (Obj. at 44) cites *Authors Guild*, 770 F. Supp. 2d at 676-77, but there the principal concern was that the proposed relief went "far beyond the dispute before the Court" and "exceed[ed] what the Court may permit under Rule 23." Moreover, in a class one-tenth the size of this one, the proposal elicited 6,800 opt-outs and some 500 objections.

granting final approval despite 675 opt-outs, representing 28% of the transaction volume, and 176 objections), *aff'd sub nom. Fikes*, 62 F.4th 704; *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 478 (S.D.N.Y. 1998) ("In litigation involving a large class, it would be extremely unusual not to encounter objections.").[174]

Despite contrary "vociferous" views, the Court has a "duty to protect the interests of the silent class majority." *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 22-24 (2d Cir. 1987); *see also TBK Partners*, 675 F.2d at 462-63. Indeed, the "low number of opt-outs and objections in comparison to class size is typically a factor that supports settlement approval." *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 589 (N.D. Cal. 2015).

The surrounding circumstances here highlight that the Class overwhelmingly supports this settlement. The objecting trade associations made significant efforts to drum up opposition. NACS and the Merchant Payments Coalition sponsored an online campaign to get their members and other merchants to object.[175] The months-long campaign garnered only 978 button clicks.[176]

Having previously assured the Court that "the vast majority of merchants are opposed to this [Amended Settlement],"[177] Objectors float several excuses to try to explain away the actual results. They point to a survey that purports to show that only 7.8% of the Class were aware of and understood the Amended Settlement's terms.[178] The survey is irrelevant. The Court approved the

---

[174] Circle K suggests comparing the number of merchants that objected to the number that sent in letters of support. Circle K Obj. at 44. But "the notice and approval process generally solicits negative feedback regarding a settlement." *Charron v. Pinnacle Group N.Y. LLC*, 874 F. Supp. 2d 179, 197 (S.D.N.Y. 2012), *aff'd sub nom. Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013). Letters of support are not required or expected.

[175] *See* Shadowen Dec. ¶ 16.

[176] *See* MPC Obj. at 1.

[177] Hearing Tr., at 46.

[178] Circle K Obj. at 45.

Notice program; it complied with the Federal Judicial Center's guides for plain-language communication; the Claims Administrator has testified that the Notice program was carried out and in fact reached more than 80% of the Class;[179] and no Objector has even tried to show that the Notice was inadequate under the applicable legal standards. There is no basis to depart from the uniform practice of using the total Class membership as the denominator for determining the Class's reaction to a settlement. *See, e.g.*, *In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x 760, 763 (2d Cir. 2020); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 86–87 (2d Cir. 2001); *Payment Card*, 2019 WL 6875472, at *6; *Marisol A. v. Giuliani*, 185 F.R.D. 152, 163 (S.D.N.Y. 1999).

Moreover, the Objectors' survey is junk science.[180] If courts were tempted to trade established standards of Notice adequacy for litigation over bespoke surveys, this would be a distinctly inauspicious inaugural case. Among other glaring defects, the survey made no attempt to match the attributes of the Class (*e.g.*, an array of small business, mid-size business, industry sectors), so it was incapable of producing a representative sample.[181] Instead, nearly two-thirds of the respondents were, in the survey's own description, "General Population," *i.e.*, individuals whose "acceptance" of credit cards, for all the survey can tell, consists of occasionally receiving money by PayPal or Venmo.[182]

On top of that, the survey's (flawed) 7.8% notice finding is largely a product of question routing—81 of the 123 respondents who were asked if they had seen or heard a notice said that

[179] Shadowen Dec., Ex. 3, Declaration of Cameron R. Azari, Esq. Regarding Objections ¶¶ 14, 19, 29.

[180] Shadowen Dec., Ex. 2, Expert Report of Scott R. Murray, at ¶¶ 11-14, 24-53.

[181] *Id.* at ¶¶ 11, 24-36.

[182] *Id.* at ¶¶ 24-36.

they had, while the remaining 919 respondents who were never asked the question were counted as not having seen the notice.[183]

Moreover, no respondent was shown any actual notice material, and therefore the survey cannot distinguish Class members who were never reached by the Notice Plan from those who were reached but simply could not later recall the litigation or the settlement terms.[184] And the reported ±3.0 percent margin of error overstates the precision of the results.[185] The survey provides absolutely no basis to conclude that the Notice failed to reach Class members or that they failed to understand what they were reading.[186]

Objectors contend that the "non-response rate" is unusually high, which purportedly "negate[s] any countervailing 'presumption of approval stemming from the lack of objectors.'"[187] The case on which they rely—*McLaughlin v. IDT Energy*, 2018 WL 3642627, at *11 (E.D.N.Y. July 30, 2018)—was a money-damages case that solicited class members to submit a claim for a portion of the recovery.[188] In that context, of course a low response rate could negate the "presumption of approval." Here, in stark contrast, the Court-ordered Notice solicited only objections, so the microscopic rate of objections surely does raise the usual presumption of approval.

The response among the group of large merchants that filed their own lawsuits in MDL 1720 and thus understand the merits of the substantive claims and the risks of continued litigation

---

[183] *Id.* at ¶¶ 37-42.

[184] *Id.* at ¶¶ 43-47.

[185] *Id.* at ¶¶ 48-50.

[186] *Id.* at ¶¶ 51-53.

[187] Circle K Obj. at 45 (quoting *McLaughlin*).

[188] The same is true of the case that Walmart cites (Walmart Obj. 24)—*Kaufman v. Am. Exp. Travel Related Servs., Inc.*, 283 F.R.D. 404, 407 (N.D. Ill. 2012).

is especially telling. Our count shows that 156 major, national chain merchants pursued their own damages claims in MDL 1720 (and most of them objected to one or more of the proposed settlements in 2013, 2019, or 2024).[189] Directly or through their economic and industry experts, these merchants pushed hard for the right to decline Premium cards, decline Commercial cards, decline digital wallets, surcharge, discount, and differentiate by issuer. These 156 merchants include some of the largest, most sophisticated retailers in the world. Of these 156, only four—Walmart, Circle K, Meijer, and Newegg Commerce[190]—objected to the Amended Settlement.

NRF offers two excuses as to why almost all the most knowledgeable merchants did not object. It suggests that they did not object because they settled their damage claims.[191] But nothing about settling a damages claim prevents a merchant from objecting to the injunctive relief. Walmart settled its damage claim, and it is objecting; Circle K and NACS settled theirs just a few months ago, and they are objecting.

NRF tells the Court that, "[i]n an apparent attempt to take these potential objectors off the board," the crafty networks agreed to reduce those merchants' otherwise-agreed interchange rates.[192] But this is just the pro rata rate reduction for negotiated rates, the absence of which Judge Brodie faulted (at the behest of objectors) in 2024.[193] The pro rata rate reductions could not induce acceptance of an otherwise objectionable settlement.

---

[189] Shadowen Dec. ¶ 17, & Ex. 17.

[190] Newegg Commerce filed an individual case in Phase I of the MDL, and it signed on to the boilerplate objection at ECF 9988.

[191] NRF Obj. at 4.

[192] *Id.* at 5.

[193] *Id.*, citing Amended Settlement ¶¶ 49, 98.

NRF and RILA's last gambit is to advise the Court that *they* "speak for their merchant members on interchange fees."[194] They may "speak for" merchants in the halls of Congress or elsewhere, but they cannot—and do not purport to—*object on behalf of* their members. *See* Fed. R. Civ. P. 23(e)(5)(A) ("any *class member* may object") (emphasis added).[195] NRF, RILA, and other trade associations can file objections here because they are themselves members of the class by virtue of accepting payments via Visa and Mastercard credit cards.[196] But NRF's and RILA's *members* have taken the opposite view of the Amended Settlement.

Of the 152 major merchants noted above who brought their own cases but have not objected to the Amended Settlement, some two-thirds of them are members of NRF.[197] A subset of the 152 have gone even further and publicly *praised* the agreement, noting that it "addresses the concerns identified [earlier] while securing materially expanded and strengthened relief well beyond that contemplated by the 2024 proposal," including by "afford[ing] greater relief to a broader set of merchants."[198] They avow that the Amended Settlement "create[s] significant value for the Class" by, among other things, enacting "'historic' changes to the Honor All Cards rule."[199] Of this subset of 18, 13 are members of NRF.[200]

---

[194] *Id.* at 3.

[195] Also see the Court-approved Notice, which provides that to Object "You must file a Statement of Objections with the Court" and it "**must be signed**." (Emphasis in original). https://www.interchangeequitablereliefsettlement.com/Content/Documents/Website%20Notice.pdf.

[196] *See* NRF Obj. 1 n.2.

[197] *See* Shadowen Dec. ¶ 18 and Ex. 18.

[198] Objection to Class Counsel's Motion for Fees, ECF 9994, at 1, 8 (quoting Class Counsel's fee brief).

[199] *Id.* at 8, 11, 12.

[200] Shadowen Dec. ¶ 19 & Ex. 18. Scholl Oil is listed as a signatory to the MPC Objection (ECF 9981, at 37), but it in fact filed a letter supporting the settlement. *See* ECF 9982.

Notably, even the small minority of objections ignore or dramatically understate the risks of continued litigation. At the preliminary approval hearing, and again in the written decision, the Court expressly warned the Class and the Objectors about the risks as to both liability and scope of relief. Yet almost all the Objections are devoid of any mention of, let alone reasoned consideration of, the litigation risks. The Court should evaluate them accordingly.

Moreover, the Objections seriously misread the Amended Settlement's terms. As noted in detail above, the Objections:

- Erroneously assert that the release of claims is perpetual rather than limited to the period of the relief;
- Erroneously assert that the release extinguishes claims against third-party processors;
- Erroneously assume that the Class could get greater fee reductions as relief at trial;
- Erroneously assert that the Amended Settlement provides no relief directed to network fees;
- Erroneously assert that Commercial credit cards and consumer credit cards are not substitutes;
- Erroneously assert that the Amended Settlement's Premium-card reforms would require merchants to decline 90% of all credit card transactions; and
- Erroneously deny that declining Visa's Premium cards would involve comparable transaction volume as declining [redacted]-issued cards and that declining Mastercard's Premium cards would involve less volume than declining [redacted]-issued cards and comparable volumes to declining the cards issued by each of [redacted]

Such factually inaccurate objections are entitled to little or no weight. *See, e.g.*, *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 718 F. Supp. 1099, 1108-09 (S.D.N.Y. 1989); *Charron*, 874 F. Supp. 2d at 207, 209; *In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*,

909 F. Supp. 2d 259, 270 n.3 (S.D.N.Y. 2012); *United States v. City of New York*, 308 F.R.D. 53, 72 (E.D.N.Y. 2015).

In short, a *tiny fraction of one percent* of the 12 million Class members have objected, despite trade associations' solicitation campaign. Among the most knowledgeable and engaged Class members, 152 of 156 have not objected. This Amended Settlement has earned the Class's overwhelming support and merits final approval.

## VIII. CLASS CERTIFICATION POSED NO CONSTITUTIONAL PROBLEMS.

### A. The Court Properly Certified a Non-Opt-Out Class.

The Court certified this Class as a mandatory, non-opt-out class under Rule 23(b)(2) over the objections of, among others, Walmart and Circle K. *See DDMB*, 2021 WL 6221326, at *46-50. Differences in how individual merchants are affected did not negate the facts that Defendants acted on grounds generally applicable to the class and that each merchant in the class stood to benefit from equitable relief. *Id.* at *45, 48. The non-opt-out class did not violate due process; there was no fundamental conflict within the Class. *Id.* at *47.[201]

Rule 23(b)(2) "does not require that class members be given . . . opt out rights." *Dukes*, 564 U.S. at 363. Objectors offer no good grounds to allow exclusions now or to decertify the Class.[202] A party seeking to decertify a class bears a "heavy burden of establishing some significant intervening event or a compelling reason to reexamine the question of class certification." *Orellana v. Cnty. of Suffolk*, 2026 WL 2031336, at *25 (E.D.N.Y. June 24, 2026).

---

[201] When denying the request for preliminary approval of the prior agreement, the Court again rejected those Objectors' arguments for opt-out rights, reaffirming that the Class was properly certified as a non-opt-out class. *Payment Card*, 2024 WL 3236614, at *16-19, 39.

[202] *See* ECF 9993, 10005.

Objectors come nowhere near carrying that burden, or even tipping the scales if the issue were within this Court's original discretion. What was true when Judge Brodie certified the Class remains true today. The relief sought is classwide and indivisible, so Rule 23(b)(2) does not require an opportunity to opt out. Instead, permitting opt-outs would risk inconsistent equitable relief, permit free-riding, and substantially diminish the Class's leverage to get a fair settlement for the entire Class. There is no due process issue with a remedy simply because class members may have differences in business models, bargaining power, or preferred competitive strategies. *See DDMB*, 2021 WL 6221326, at *23; *Wal-Mart Stores*, 396 F.3d at 113. While every class member must receive beneficial relief, they can experience that relief differently. *Id.*

Certain Class members' decisions to forgo using aspects of the relief would not render the settlement inadequate or create conflicts within the class. *Dukes*, 564 U.S. at 360; *Sykes*, 780 F.3d at 98. And "settlements are compromises that do not provide either side with all that they might have hoped to obtain in litigation." *Haar v. Allen*, 687 F. App'x 93, 95 (2d Cir. 2017); *see also In re NFL Players Concussion Inj. Litig.*, 821 F.3d 410, 447 (3d Cir. 2016) ("It is the nature of a settlement that some will be dissatisfied with the ultimate result."); *Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 65 (S.D.N.Y. 2003) (a settlement is not a "wish-list of class members that the Defendant must fulfill") (internal quotation omitted).

Conversely, allowing opt-outs would frustrate the Rule's core purposes. The injunctive relief here operates market wide, so opt-out merchants would receive the benefits of classwide reforms regardless—creating free-rider and hold-up problems and risking inconsistent obligations (and the possibility that Defendants would not be willing to settle at all). The Court denied opt-out rights for those very reasons. *DDMB*, 2021 WL 6221326, at *49; *see also Van Gemert v. Boeing Co.*, 590 F.2d 433, 439 n.14 (2d Cir. 1978) (en banc) (lack of opt-out privilege "reflects the

conclusion of those who drafted the Rules that individual choice should be subordinated to the interests of the class as a whole to avoid inconsistent judgments or prejudice to absent class members"), *aff'd*, 444 U.S. 472 (1980); *accord Yan Won Liao v. Holder*, 691 F. Supp. 2d 344, 354 (E.D.N.Y. 2010); *see also Payment Card*, 986 F. Supp. 2d at 236 ("To allow [merchants] to opt out and pursue their own rules-based injunctive relief would eliminate the incentive to settle that Rule 23(b)(2) was designed in part to create.").

As for Walmart's arguments about "typicality" and "cohesion,"[203] the Court has consistently rejected them,[204] and Walmart offers nothing new.

### B. Due Process Does Not Require Opt-Out Rights, Because the Settlement Provides No Damages.

Walmart concedes that "[t]his Settlement is not about 'damages,'" but asserts that due process nevertheless requires opt-out rights because "it is about money."[205] The Court has already concluded, however, that "[w]hile it is possible to ascribe a dollar value to nearly any form of injunctive relief, the ability to do so does not transform it *ipso facto* into monetary relief." *Payment Card*, 2024 WL 3236614, at *18. An injunction requiring prospective changes in conduct is not "monetary" even if it affects a lot of commerce or its value can be estimated.

Instead, the due process right to notice and opportunity to opt out is "limited to those class actions which seek to bind known plaintiffs concerning claims wholly or predominately for money judgments." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811 n.3 (1985); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848 n.24 (1999) (same, quoting *Shutts*); *Matsushita Elec. Indus.*

---

[203] Walmart Obj. at 25-26.

[204] *See DDMB*, 2021 WL 6221326, at *16-17; *id*. at *41-44; *Payment Card*, 2024 WL 3236614, at *17.

[205] Walmart Obj. at 7.

*Co., Ltd. v. Epstein*, 516 U.S. 367, 395 (1996) (Ginsburg, J., concurring and dissenting in part) (same); *In re Joint E. & S. Dist. Asbestos Litig.*, 78 F.3d 764, 777-78 (2d Cir. 1996) (no due-process right to opt out where case "is not an action for money damages").

Objectors note that the Court in *Dukes*, 564 U.S. at 363, identified a serious possibility that an opt-out right might be required when damage claims "predominate" over, or are more than "incidental" to, the injunction claims, and in *Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 222 (2d Cir. 2012), the Court said this was still an open question.[206]

Walmart asks the Court to fashion a new rule that due process requires an opportunity to opt out whenever injunctive relief results in "a vast reordering of significant economic relationships to which [a class member] is a party."[207] Walmart offers no standards or limiting principles for what would count as a "vast reordering" or a "significant economic relationship[]." Its invocation of cases debating whether damages claims "predominate" over or are more than "incidental" to the injunction claims is irrelevant. None of its cases hold that due process requires opt-out rights where, as here, there are no money damages at all.[208]

Contrary to Walmart's assertion that "the proposed settlement would have no analogue in the history of 23(b)(2) settlements,"[209] the Advisory Committee Notes to Rule 23(b)(2) confirm that the rule accommodates injunctive relief that has quantifiable economic value. For example,

---

[206] Circle K Obj at 46; Walmart Obj. at 27.

[207] Walmart Obj. at 31.

[208] To the extent that Walmart tries to draw a distinction based on some courts' references to "money *judgments*" rather than "money *damages*," that effort fails because *Dukes* itself equated the two. 564 U.S. at 363 (citing *Shutts* as holding that opt-out rights are required "[i]n the context of a class action predominantly for money damages"). *Shutts* also equates the two, 472 U.S. at 811-812, and so do *Hecht*, 691 F.3d at 222, and *Joint E & S*, 78 F.3d at 777-78. Beyond verbal distinctions, *Dukes* explains that the potential requirement for opt-out rights is driven by the need to protect class members' "individualized claim[s] for money." 564 U.S. at 363.

[209] Walmart Obj. at 28.

the Note to the 1966 amendment—when section (b)(2) was originally added—provides the example of an action to enjoin "prices higher than those set for other purchasers, say retailers of another description, when the applicable law forbids such a pricing differential." Such an injunction has economic value just as easily calculable as the rate caps and rollbacks here. This Court cited that same example in granting class certification. *DDMB*, 2021 WL 6221326, at *45.

### C. Neither the Absence of Objectors' Preferred Relief Nor the Purported Failure to Consult with the Objectors Raises a Due Process Problem.

NRF pays lip service to the settled law that a Rule 23(b)(2) class is permissible when "the [challenged] conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."[210] But it then contends that class treatment is precluded here because the relief's "*economic effects* are neither unitary nor indivisible."[211] Section VIII.A above demonstrates that the law is to the contrary.

Moreover, it is plainly insufficient to argue that the Class did not bargain for Objectors' preferred form of relief, did not press certain claims more forcefully, or did not seek certain changes to the network rule books more zealously. The decision to reach a settlement on the proposed terms reflects a difference in litigation strategy and judgment, not a fundamental conflict of interest that renders the Class Plaintiffs or Counsel inadequate. *Payment Card*, 2024 WL 3236614, at *19 (citing *DDMB*, 2021 WL 6221326, at *23); *see also Bldg. & Realty Inst. of Westchester & Putnam Cntys., Inc. v. New York*, 2020 WL 5667181, at *5 (S.D.N.Y. Sept. 23, 2020) ("[R]epresentation is not inadequate simply because they have different ideas about how

---

[210] NRF Obj. at 7.

[211] *Id*. at 2 (emphasis added); *see also id*. at 7.

best to achieve these goals") (citing *United States v. City of New York*, 198 F.3d 360, 367 (2d Cir. 1999)).[212]

NRF asserts that the Amended Settlement was negotiated "without the merchant community's involvement."[213] Not so. The Class consulted industry consultants and more than 70 national and regional merchants.[214] NRF's only complaint is that the Class *did not continue to consult with NRF*.

Walmart's argument about alleged conflicts within the Class is similarly meritless. Its fundamental complaint—that the Amended Settlement purportedly provides no effective relief to many large retailers—is addressed above. Walmart confuses relief it *cannot* use with relief that it can use but purportedly will *choose not* to use. Walmart asserts that Class Counsel refused to meet with Walmart again in 2024 (we had multiple meetings with Walmart's senior management and its prior legal counsel between 2017 and 2019) unless Walmart executed "a non-disclosure agreement that would have barred Walmart from later disclosing to the Court *the substance of its proposals*."[215] Not true. The meeting failed to happen because Class Counsel insisted on making the NDA clear that, even after the agreement terminated, the parties could not disclose to anyone (the Court, the defendants, the Wall Street Journal) *the parties' communications with one another*.[216]

---

[212] Circle K cryptically asserts that the Class "did not pursue a trial" that would have "strengthened the class's bargaining position." Circle K. Obj. at 8-9. In fact, the Class prepared for trial while also negotiating the Amended Settlement. Class Counsel Dec. ¶ 94. And despite Objectors' prior false statement to the Court (Hearing Tr., at 47), the Class sought a prompt trial date.

[213] NRF Obj. at 2, 6.

[214] *See* Class Counsel Dec. ¶ 113.

[215] Walmart Obj. at 3 (emphasis added).

[216] Shadowen Dec. ¶¶ 14-15 & Ex. 13.

Regardless, this Court has already noted that "[t]here is no fundamental problem with class counsel rejecting, limiting, or conditioning the input of class members," and "[t]here would be no point in having class counsel and class representatives if every individual class member was nonetheless entitled to participate in litigation and settlement decisions." *Payment Card*, 2026 WL 1662251, at *9 n.10.

In the end, Rule 23's procedural safeguards have worked as intended. Class members' damages claims were separately litigated, with different counsel and with opt-out rights; Class Counsel has been found to be adequate; the Class representatives have been found to have the same interests as absent Class members; Class members have had an opportunity to voice their concerns at preliminary approval and again now; and this Court will have twice independently evaluated the Amended Settlement's reasonableness, fairness, and adequacy, with a searching review.

**D. The Takings Clause Does Not Require an Opt-Out Right.**

The Court's approval of the Amended Settlement would not violate the Takings Clause. Walmart argues that if the Court approves the settlement, a government actor will have "transferred ownership of [their] cause of action" and extinguished it, amounting to an unlawful taking without compensation.[217] The idea is that the Court's approval of the Amended Settlement would "confiscate" Walmart's property.[218]

Walmart cannot repackage its losing due process arguments into a successful Takings argument. The Takings Clause protects a far narrower class of property interests than does the Due Process Clause. *See, e.g.*, *Bowen v. Pub. Agencies Opposed to Social Sec. Entrapment*, 477 U.S.

[217] Walmart Motion to De-Certify, ECF 9993-1, at 9; Walmart Obj. at 32.

[218] *Id.*

41, 55 (1986) (rights in a government benefits program were property for purposes of the Due Process Clause but were not vested property for purposes of the Takings Clause).

Walmart cherry-picks Judge Leval's reference to "confiscation" in his 2016 concurrence in *Payment Card*, 827 F.3d at 241 (Leval, J., concurring). That settlement provided *no relief* to much of the class yet bound them *in perpetuity*, and neither the Court nor Judge Leval concluded there was any unlawful taking. *Id.* Walmart also cites *Alimanestianu v. United States*, 124 Fed. Cl. 126 (Fed. Cl. 2015), but there, President Bush took over the plaintiff's terrorism-related claim against Libya and set up a claims process under which plaintiff got a much lower payout. We are unaware of any case—Walmart has cited none—holding that a Court's approval of a class settlement was an unlawful taking. This settlement certainly isn't one.

### E. The Class Need Not Establish Personal Jurisdiction Over Absent Class Members.

Walmart floats the novel idea that the Class must establish personal jurisdiction over absent class members.[219] The Complaint alleges personal jurisdiction;[220] the Defendants did not deny personal jurisdiction over the Class;[221] no other Class member has raised this objection; and Walmart does not deny personal jurisdiction over Walmart.

Regardless, Walmart cites no authority requiring a class to demonstrate personal jurisdiction over absent class members.[222] Instead, the Second Circuit rejected a personal

---

[219] Walmart Obj. at 29.

[220] Class Complaint at ¶ 8.

[221] ECF 7293 at ¶¶ 8, 74-78 (Mastercard); ECF 7296 at ¶¶ 8, 41-44 (Visa); ECF 7934 at ¶¶ 8, 54-57 (Wells Fargo); ECF 7935 at ¶¶ 8, 47-50 (Barclays); ECF 7936 at ¶¶ 8, 55-57 (Citigroup); ECF 7937 at ¶¶ 8, 63-66 (Chase); ECF 7938 at ¶¶ 8, 66-69 (BA Merchant Services and Bank of America); ECF 7958 at ¶¶ 8, 56-59 (Capital One).

[222] Walmart cites only a law review article that analyzes the issue as to Rule 23(b)(3) claims for damages. Walmart Obj. at 29 n.15.

jurisdiction challenge to the *Agent Orange* class-action settlement. *See In re Agent Orange Prod. Liab. Litig.*, 996 F.2d 1425, 1434-36 (2d Cir. 1993), *abrogated on other grounds* by *Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 31 (2002); *see also Joint E. & S. Dist. Asbestos*, 78 F.3d at 777-78; *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 163 (2d Cir. 1987); *Avagliano v. Sumitomo Shoji Am., Inc.*, 107 F.R.D. 748, 749 (S.D.N.Y. 1985); *Int'l Union v. Ford Motor Co.*, 2006 WL 1984363, at *33 (E.D. Mich. July 13, 2006), *aff'd sub nom. Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007).

## CONCLUSION

For these reasons and those stated at preliminary approval, the Court should grant the Class's motion for final approval of the Amended Settlement.

Dated: October 14, 2026

Respectfully submitted,

*/s/ Robert G. Eisler*

Robert G. Eisler
Chad B. Holtzman
GRANT & EISENHOFER P.A.
485 Lexington Ave., 29th Floor
New York, NY 10017
(646) 722-8500
reisler@gelaw.com
choltzman@gelaw.com

Steve D. Shadowen
Tina J. Miranda
HILLIARD & SHADOWEN LLP
1717 W. 6th Street, Suite 290
Austin, TX 78703
(855) 344-3298
steve@hilliardshadowenlaw.com
tmiranda@hilliardshadowenlaw.com

Michael J. Freed
William H. London
Robert J. Wozniak

JUSTICE JAGHER LONDON & MILLEN LLC
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
(224) 632-4500
mfreed@fklmlaw.com
wlondon@fklmlaw.com
rwozniak@fklmlaw.com

Linda P. Nussbaum
Susan R. Schwaiger
Lauren M. Kostman
NUSSBAUM LAW GROUP, P.C.
1225 Franklin Ave.
Garden City, NY 11530
(917) 438-9189
lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com
lkostman@nussbaumpc.com

*Equitable Relief Class Counsel*