# Exhibit 1

**UNITED STATES DISTRICT COURT FOR**
**THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL No. 1720<br><br>Docket No. 05-md-01720-BMC-JAM |
| BARRY'S CUT RATE STORES INC.; DDMB, INC. d/b/a EMPORIUM ARCADE BAR; DDMB 2, LLC d/b/a EMPORIUM LOGAN SQUARE; BOSS DENTAL CARE; RUNCENTRAL, LLC; CMP CONSULTING SERV., INC.; TOWN KITCHEN, LLC d/b/a TOWN KITCHEN & BAR; GENERIC DEPOT 3, INC. d/b/a PRESCRIPTION DEPOT; and PUREONE, LLC d/b/a SALON PURE,<br><br>Plaintiffs,<br>-v-<br><br>VISA, INC.; MASTERCARD INCORPORATED; MASTERCARD INTERNATIONAL INCORPORATED; BANK OF AMERICA, N.A.; BA MERCHANT SERVICES LLC (f/k/a DEFENDANT NATIONAL PROCESSING, INC.); BANK OF AMERICA CORPORATION; BARCLAYS BANK PLC; BARCLAYS BANK DELAWARE; BARCLAYS FINANCIAL CORP.; CAPITAL ONE BANK, (USA), N.A.; CAPITAL ONE F.S.B.; CAPITAL ONE FINANCIAL CORPORATION; CHASE BANK USA, N.A.; CHASE MANHATTAN BANK USA, N.A.; CHASE PAYMENTECH SOLUTIONS, LLC; JPMORGAN CHASE BANK, N.A.; JPMORGAN CHASE & CO.; CITIBANK (SOUTH DAKOTA), N.A.; CITIBANK N.A.; CITIGROUP, INC.; CITICORP; and WELLS FARGO & COMPANY,<br><br>Defendants. | **HIGHLY CONFIDENTIAL**<br>**FILED UNDER SEAL** |

**REBUTTAL DECLARATION OF JOSEPH E. STIGLITZ, PH.D. AND KEITH B. LEFFLER, PH.D.**

1) We previously filed Reports and Declarations in this case on behalf of the Equitable Relief Class Plaintiffs.[1] Our qualifications and backgrounds are detailed therein. We have been asked by counsel for the Equitable Relief Class to respond to the Declarations of Dr. Joseph Farrell, Mr. Adam Levitin, and Mr. Michael Cook (collectively "the Declarants") regarding the proposed Settlement of In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation.[2]

2) Summary of Opinions. The essence of Declarants' opposition to the proposed Settlement is that it does not include elimination of the Visa and Mastercard Honor-All-Issuers rules, which would allow merchants to decline the credit cards of an issuer.[3] Declarants argue that the threat of such non-acceptance of an issuer's credit cards would result in a merchant being able to negotiate lower interchange rates from the threatened issuer. We do not dispute that the elimination of the Honor-All-Issuers rule could increase competition among issuers. Nor do we contend that the Settlement is perfect; after all, it is a settlement. However, in our opinion, the Declarants overstate the competitive impact of merchants being able to reject a particular issuer's cards. They also make incorrect comparisons between the volume of commerce at risk with issuer rejection versus network card-type rejection. More importantly, they understate the extent to which the changes in the rules in the proposed Settlement considered collectively would put significant competitive pressures on supracompetitive interchange rates, including through both increased network competition and increased issuer competition.

---

[1] Expert Report of Joseph E. Stiglitz, October 5, 2018,; Reply Report of Joseph E. Stiglitz, October 11, 2019; Declaration of Joseph E. Stiglitz, Ph.D., March 25, 2024; Declaration of Keith B. Leffler, March 25, 2024; Rebuttal Declaration of Keith Leffler, May 13, 2014; Declaration of Joseph E. Stiglitz, Ph.D. and Keith B. Leffler, Ph.D., November 9, 2025; Rebuttal Declaration of Joseph E. Stiglitz, Ph.D. and Keith B. Leffler, Ph.D., January 14, 2026; Supplemental Declaration of Keith B. Leffler, PhD., July 15, 2026.

[2] Superseding and Amended Class Settlement Agreement of the Rule 23(b)(2) Class Plaintiffs and the Defendants.

[3] Cook Declaration ¶¶ 6, 66 ("The core anticompetitive practice perpetuated by the Networks is the 'Honor All Cards' rule, which requires a merchant to accept all branded cards . . . from all issuers . . ."). *See* also Farrell Declaration ¶¶ 16-20; Levitin Declaration ¶ 35, 47.

3) The Declarants assert that the proposed Settlement's reforms to the Honor-All-Cards rules allowing merchants to decline acceptance of a network's Premium or Commercial cards will be "virtually worthless," provide "nothing of value," or be "unlikely to have much of an effect."[4] However, none of the Declarants provides any analysis showing this is the case or comparing the likely impact of issuer card rejection to network card-type rejection. We here elaborate on our prior work on this issue and continue to conclude that the ability of merchants to reject a network's Premium cards or Commercial cards creates merchant negotiating leverage that is comparable to or superior to that which would result from the ability to reject an issuer's cards.

4) The Declarants also fail to consider the multiple ways in which the reforms in the proposed Settlement complement one another so that we expect the reforms collectively to have substantially greater impact on the interchange rates than would elimination of Honor-All-Issuers rules. As a consequence, the proposed Settlement will increase competition in the credit card services market while retaining the viability and efficiencies of the Visa and Mastercard networks.

5) In addition, the Declarants fail to note how the Settlement provides a package that both enhances competition and creates incentives for merchants to achieve lower interchange fees, particularly compared to levels that might otherwise result if current trends continue. In particular, the proposed Settlement's lowering of the merchant cost of Standard Visa and Mastercard cards. along with allowing issuer level discounting, complements the card-type non-acceptance reform. The proposed Settlement allows merchants to both reject a network's Commercial and/or Premium cards while simultaneously steering customers to a particular favored issuer's low-cost Standard credit card. This extends to the network level the negotiating power that merchants have already demonstrated on "co-brand" cards.[5]

---

[4] Levitin Declaration ¶ 110 ("The relief the Proposed Settlement gives to merchants from the Networks' Honor-All-Cards rules is virtually worthless . . .."); Cook Declaration ¶ 8.a. ("product-level denial power would not create leverage . . ..", ¶ 24 (Walmart "gets nothing of value from the proposed settlement."); Farrell Declaration ¶ 41 (the Honor-All-Cards reform "is unlikely to have much of an effect").

[5] As we discuss further below, retailers, including [redacted], [redacted], [redacted], and [redacted], have successfully negotiated low interchange fees for use of co-branded cards for in-store purchases.

6) The proposed Settlement expands the ability of merchants to surcharge for the use of high-cost Mastercard or Visa credit cards. Visa and Mastercard currently allow merchants to charge a fee for specific product-type credit cards. However, for most merchants this opportunity is moot. The Visa and Mastercard rules include a provision called the "Level-Playing-Field" rule. Under this rule, a merchant cannot surcharge Visa or Mastercard credit cards unless an equivalent surcharge is applied to all competing cards with the same or greater merchant acceptance fees. American Express, the major competing network, allows surcharging its credit cards only if the merchant also surcharges all competing cards, which it defines to include debit cards. Visa and Mastercard prohibit surcharging their debit cards (and merchants generally do not want to surcharge them).[6] As a consequence, all merchants accepting Visa, Mastercard, and American Express cannot impose card-type specific surcharges on Visa and Mastercard transactions. Therefore, those merchants who wish to charge customers for using of *high-cost* Visa and/or Mastercard cards are currently unable to do so. The proposed Settlement eliminates the Level-Playing-Field rule. This will dramatically expand the ability of most merchants to surcharge, including to selectively surcharge for the use of high-cost Visa or Mastercard cards.

7) Declarants emphasize the possible loss of customer goodwill if merchants attempt to charge customers the cost implied by their choice of a high-cost payment method. We understand that the decades-long competitive distortions in the credit card services market have led to perverse expectations. Many customers have come to expect "free" rewards from using their Premium cards. To minimize such losses of goodwill, a merchant needs a clear and convincing message explaining the fairness of such charges. Currently most merchants (those accepting American Express) that might surcharge high-cost cards are unable to so.

8) The proposed Settlement corrects this problem by allowing a surcharge to focus on the problem high-cost Premium cards and/or Commercial cards *regardless* of whether the merchant accepts American Express. Under the proposed Settlement, a merchant will be

[6] Nearly all merchants that accept Visa and Mastercard also accept American Express. *See,* e.g., Where is American Express Accepted? - NerdWallet (99% of U.S. merchants who accept credit cards also now accept AmEx").

able to surcharge high-cost cards and explain that "certain credit cards impose significant added costs on our store. To offer the lowest prices to our customers, we will begin charging for using (or will decline) high-cost premium cards." In contrast, surcharging (or rejecting) only the cards of a particular issuer results in a confusing and muddled message: "if you use a Visa card issued by Capital One (high or low cost), you will be charged (but if you use a high-cost Visa card issued by Citibank, there will be no charge)." What is clear is that communicating the reason for denying Premium cards is almost surely simpler than for denying an issuer's card.

9) The proposed Settlement includes an important reform that will allow for issuer-differentiation in digital wallets, which impacts a significant portion of transactions.[7] Digital wallets store credit card information in smart phones, alleviating the need to carry cards. Smart phone and digital wallet use is pervasive among younger customers, and it will become increasingly important to merchants as their customers age.[8] Currently, a merchant that accepts a digital wallet that includes a Visa or a Mastercard card must accept all similar wallets containing that network's cards. The proposed Settlement removes this restraint, leaving a merchant free to pick and choose which digital wallets are accepted, regardless of the cards contained in them. This opens the door for a merchant to accept digital wallets that contain only a specific issuer's cards. While we emphasize below that the threat of issuer card rejection is unlikely to be a more effective bargaining tool than the threat of network card-type rejection, even if Declarants were correct that issuer-level rejection will generate significant issuer level competition, then the changes to the digital wallet "honor-all-wallets" rule will open up this competitive tool for a significant and increasing percent of credit card transactions.[9]

---

[7] Overall, digital wallets today account for 40% of U.S. online spending and 17% of in-store spending, and the use of digital wallets is growing rapidly. https://investors.globalpayments.com/news-events/press-releases/detail/504/gen-z-driving-the-shift-from-cards-to-digital-wallets-new.

[8] *See* FedNow Instant Payments Find Learning and Resources With FedNow Explorer ("80% of Gen Z and 78% of millennials use digital wallets . . .")

[9] And if merchants can negotiate lower interchange for digital wallet transactions, merchants will be incentivized to encourage digital wallet use.

10) The proposed Settlement includes other reforms to the merchant restraints that the merchants have been requesting. The all-outlets rule will be relaxed to allow different discounting or charging strategies at different stores, and to have different card acceptance policies at stores operating under different names. In addition, merchants will be allowed to experiment with different card acceptance policies at different stores. Declarants recognize the value of these reforms, complaining only that they would "be tremendously costly and cumbersome" for a large retailer to implement or, contrarily, would only benefit larger merchants operating multiple stores.[10]

11) The proposed Settlement includes the requirement that Visa and Mastercard negotiate in good faith with buyer groups. Declarants dismiss the impact of buyer groups, suggesting that merchants will have no additional bargaining power acting collectively. This ignores the fact that certain larger merchants have been able to use their credit card transactions volume to negotiate substantially lower interchange fees. We believe that the ability to form merchant groups to bargain with issuers and networks, together with educational programs studying and explaining successful bargaining strategies, will allow smaller merchants to duplicate the success of the larger merchants that have negotiated much lower interchange fees.[11]

12) The Declarants dismiss the value of the rate rollbacks and caps included in the proposed Settlement because, they claim, Visa and Mastercard will simply evade these provisions, and, regardless, the rolled-back rates remain above the competitive level. But they do not understand the purpose of the rollbacks/caps. These rollbacks/caps are designed to arrest the interchange fee spiral while merchants begin to take advantage of the reforms to the merchant restraints, offering some relief in fees while that learning process occurs. Equally important, the cap on Standard card rates is intended to counter the compression of

---

[10] Cook Declaration ¶ 31; Levitin Declaration ¶ 208. Declarants also fail to note that the all-outlets restraint only impacted the larger merchants operating multiple outlets.

[11] *See* Leffler Supplemental Declaration, Table 1 showing Visa/Mastercard average negotiated interchange rates averaging [redacted] bps compared to non-negotiated rates of [redacted] bps applying to [redacted] of their transactions.

interchange fees which currently dulls merchants' incentives to steer customers away from the high-cost Premium cards. The proposed Settlement thus guarantees some relief from supracompetitive pricing while enhancing the incentives to move towards a more competitive landscape, in ways that just eliminating the honor-all-issuers rule would not.

13) In the remainder of this Rebuttal Declaration, we expand upon these themes and explain why the reforms of the proposed Settlement have the potential to bring substantial competition to what has been a dysfunctional, perverted market from at least the inception of rewards cards some thirty years ago.

14) <u>Honor-All-Issuers.</u> Declarants emphasize the potential competitive impact of eliminating the Honor-All-Issuers rule, allowing a merchant to create negotiating leverage through the threat of declining an issuer's cards. According to Declarants, this would create competition among the issuers to retain acceptance of their cards. However, they provide no comparison to the competitive potential of the threat opened up by the proposed Settlement – the threat to decline a network's Premium and/or Commercial cards. The Declarants simply assume that threatening to decline an issuer's cards will create negotiating leverage above and beyond that available from threating to decline a network's Premium or Commercial cards.[12] That assumption is incorrect.

[12] Mr. Levitin asserts that the Stiglitz-Leffler analysis in our Rebuttal Declaration "stands entirely on [redacted]

15) The Declarants make two fundamental errors in their discussion of the likely impact of merchants' ability to decline a network's Premium or Commercial cards. First, they fail to consider the actual possibilities opened by the proposed Settlement, asserting that "merchants cannot realistically refuse to accept a particular brand's cards. . ..'"[13] Second, they discuss the supposed problems with rejecting the networks' Commercial or Premium cards, but fail to compare those problems to those from rejecting an issuer's cards. We show that transaction volumes on Visa Commercial cards, Mastercard Commercial cards, and Mastercard Premium cards are less than or comparable to those of the major issuing banks. In addition, we show that rejecting the networks' Commercial or Premium cards provides a negotiating threat equal to or superior to that from rejecting issuer cards.

16) <u>Transactions volume.</u> Declarants all substantially overstate the transaction volumes that would be impacted by declining a network's Premium cards. Under the proposed Settlement, Commercial cards and Premium cards are separate, mutually exclusive categories. However, Declarants include Commercial transaction volume (purchase volume) as part of Premium card transaction volume, thereby substantially overstating the actual purchase volumes on Premium cards that would be impacted if a merchant took advantage of the proposed Settlement's reforms to the Honor-All-Cards rule.

17) Mr. Levitin's Table 2 purports to compare the Visa and Mastercard Premium card transactions volume to individual issuer's transactions volume. However, Mr. Levitin's Visa and Mastercard Premium card transaction shares ([redacted] percent for Visa and [redacted] percent for Mastercard) are incorrect and substantially overstated. This is because he fails to take

---

[redacted]

[13] Levitin Declaration at § V.D.i.a. p. 30. See also Cook Declaration ¶ 8.a. ("Because premium cards make up such a substantial part of the market, roughly 92%, no merchant can credibly threaten to decline them."); Farrell Declaration ¶ 37 ("In terms of numbers, Visa and Mastercard account for 52% and 34% of outstanding credit cards, respectively. Rewards cards account for about 80% of issued credit cards, so for a merchant, selectively rejecting Visa or Mastercard premium cards is uncomfortably close to rejecting an entire network.").

account of Commercial card transactions.[14] To illustrate his error, we focus on Mr. Levitin's purported Mastercard Premium share of merchant transactions of [redacted] percent. Mr. Levitin derived this from the percentage of consumer card transactions that are from Premium cards ([redacted] percent). He then multiplied this by Mastercard's share of *all* credit card transactions ([redacted] percent) and the credit card share of all transactions ([redacted] percent). However, this fails to account for the [redacted] percent of all Mastercard transactions volume that is on Commercial credit cards.[15] The correct Mastercard Premium share of all transactions volume begins by adjusting the percent of Mastercard consumer transactions volume that are from Premium cards of [redacted] percent to account for the fact that only [redacted] percent of Mastercard transactions volume is on consumer credit cards, and then adjusting for Mastercard's share of all credit card transactions volume and for the overall credit card share of all transactions volume. The correct estimate of Mastercard Premium card's share of merchant transactions volume is [redacted] percent.[16] For Visa, the correct figure is [redacted] percent.[17] Table 1 summarizes the percent of transactions volume accounted for by network card-types and by the larger issuers.[18]

---

[14] *See* Levitin Declaration Table 2, cells (D)2 for Visa and (D)3 for Mastercard.

[15] *See* Leffler Supplemental Declaration Table 1.

[16] This is [redacted]% (Mastercard Premium card share of Mastercard consumer transactions) X [redacted]% (Mastercard consumer transactions as a percent of all Mastercard transactions) X [redacted]% (Mastercard's share of credit card transactions) X [redacted]% (credit card's share of all transactions). This can be approximated in Mr. Levitin's Table 2 by subtracting the Mastercard Commercial share from the incorrect Mastercard Premium share of [redacted]%.

[17] Visa's Premium card transactions are [redacted]% of all Visa consumer card transactions. Consumer card transactions are [redacted]% of all Visa card transactions, Visa's share of credit transactions is [redacted]%, and credit card transactions are [redacted]% of all transactions. Multiplying these shares implies that Premium Visa card transactions are [redacted]% of all merchant transactions.

[18] *See* Leffler Supplemental Declaration Table 1, the backup data; Levitin Declaration Table 2.

**Table 1 Percent of Transaction Volumes**

| Payment Means | % Transactions $$ |
|---|---|
| Visa Premium | [redacted]% |
| Mastercard Premiuim | [redacted]% |
| VIsa Commercial | [redacted]% |
| Mastercard Commercial | [redacted]% |
| Chase Credit Cards | [redacted]% |
| Citibank Credit Cards | [redacted]% |
| Capital One Credit Cards | [redacted]% |
| Bank of America Credit Cards | [redacted]% |

18) Mr. Cook and Dr. Farrell also substantially overstate the volume of transactions impacted by network Premium card rejection. Relying on data limited to the consumer credit card segment of the market, Mr. Cook asserts that "92 percent of general purpose card spending was accounted for by rewards cards in 2023 and 2024. . .."[19] The economic issue at play with this percentage is the credibility of a merchant's threat to decline a network's Premium *or* Commercial cards. This must be evaluated by the significance of the market segment accounted for by the card-type being considered for non-acceptance. As we have shown above, spending on Premium cards as defined in the proposed Settlement as a share of total spending is [redacted] percent for Mastercard and [redacted] percent for Visa, while the largest issuer, Chase, has [redacted] percent of total spending. The 92 percent figure cited by Mr. Cook is of no relevance to the volume of sales at risk for a merchant considering the credibility of threatening card-type rejection under the terms of the proposed Settlement.

19) Dr. Farrell does not offer an estimate of the significance of the transactions covered by the card-types eligible for non-acceptance.[20] Rather he cites to data related to the number of cards issued, noting that "[r]ewards cards account for about 80% of issued credit cards."[21]

[19] Cook Declaration ¶ 8.a. The source for this figure is the Consumer Financial Protection Bureau's December 2025 Report to Congress, "Consumer Credit Card Market," p. 138. The Report notes that it "includes data on credit cards issued to consumers in the United States. It does not include data on credit cards issued to small businesses, corporate cards, or fleet cards." p. 14.

[20] Farrell Declaration ¶ 37.

[21] Consumer Financial Protection Bureau's December 2025 Report to Congress, "Consumer Credit Card Market," ("by 2024 the share of general purpose cards not offering rewards had shrunk to 20 percent"), p. 141.

However, Dr. Farrell misinterprets the data on which he relies; it includes only consumer cards, not also commercial or corporate cards.[22] The 80 percent figure is clearly not the percentage of total cards that are Premium cards. More relevant, the data of interest is the volume of transactions from Visa's or Mastercard's Premium cards, and not the number of cards. Dr. Farrell claims that "rejecting . . . Mastercard premium cards is uncomfortably close to rejecting [the] entire network." This is not correct. Dr. Farrell's favoring of issuer rejection assumes that the threat of declining, for example, Chase cards, has credibility. But, Mastercard Premium cards account for [redacted] percent of transactions volume, which is significantly less than what is accounted for by Chase ([redacted] percent).

20) None of the Declarants suggests that the networks' volumes of *Commercial* cards are too great for merchants to be able to decline them. We agree, and we show the network's Commercial transaction volume shares in Table 1 above.

21) <u>Failure to Compare Rejection by Issuer Versus Card Type</u>. A second problem with Declarants' claim that issuer-level card rejection will have competitive impacts well beyond those from network card-type rejection is their failure to provide any analysis of the relative costs and benefits of these different card rejection approaches. Alone among the Declarants, Dr. Farrell addresses how successful negotiations for lower interchange fees must be based on a credible threat that a merchant can profitably move transactions away from an issuer or network.[23] Dr. Farrell's model focuses on the costs and benefits of surcharging, illustrating the conditions underlying a credible surcharging threat.[24] His analysis is summarized in his Figure 1, which shows that relatively low critical "expected

---

[22] *See* footnote 18 above.

[23] Dr. Farrell emphasizes that the value of the opportunity to reject or surcharge certain credit cards is mainly its value as a threat. Farrell Declaration ¶ 31 ("Large gains from trade militate toward a right of issuer-level selective rejection serving predominantly as a threat or at most a temporary pause in trade that properly colors the negotiations between parties in a commercially normal way, and both sides will want to avoid actually carrying out the threat, let alone permanently rejection.").

[24] Farrell Declaration ¶¶ 80-85.

walk-away" rates – the incidence of customers not making purchases because of the surcharge – would make surcharging unprofitable.[25]

22) Dr. Farrell's model is equally applicable to his preferred remedy, card rejection based on issuer. But neither he, Mr. Levitin, nor Mr. Cook applies that model or its concepts to the question of rejecting an issuer's cards compared to rejecting a network's Commercial or Premium cards. Using the structure of Dr. Farrell's model, we have done this analysis and find that there are sound economic reasons to expect that the ability of merchants to decline acceptance of a network's high-cost card types will have competitive impacts comparable to or even superior to rejecting issuers' cards.

23) Consider a merchant evaluating whether to decline (or threatening to decline) all Chase cards (the most prevalent issuer's cards in the market) compared to declining all Mastercard Premium cards. Note that the transactions volume (purchase volume) at risk from rejecting Mastercard Premium cards (accounting for about [redacted] percent of all transactions volume) is lower than the transactions volume from Chase cards ([redacted] percent). This lower volume of commerce at risk favors the Mastercard Premium card rejection alternative.[26]

24) Next consider the likely responses of customers if their preferred card is not accepted. Some customers that are prevented from using their preferred Premium cards may switch to an alternative Premium card and thereby continue to receive rewards (though by assumption less preferred rewards).[27] In that instance, the customer response results in

[25] Farrell Declaration ¶ 85. Dr. Farrell's analysis presumes a 100 bps surcharge. However, merchants could surcharge up to the cost of acceptance, which average about [redacted] basis points in interchange plus the network fees. This higher level of a surcharge would increase the maximum calculated walk-away rate that makes surcharging unprofitable.

[26] As explained in footnote 94 below, the calculated walk-away rate in Dr. Farrell's model is not a function of the volume of transactions at issue. Therefore, the walk-away percentage analysis is applicable to Visa, Mastercard, or both networks' Premium card rejection. The savings figures in Table 1 would change somewhat for the Visa Premium card rejection case, but there will still be greater savings for the network Premium card rejection case for each switching alternative. Of course, the volume of transactions the merchant rejects is greater in the Visa rejection case, and this does impact the total amount of margin at risk from walk-aways.

[27] The Declarants all note that most customers using a Premium card also carry alternative Premium cards. Levitin ¶¶ 112, 164, 247, 249, 253; Cook Declaration ¶ 40; Farrell Declaration ¶ 38.

essentially no gain to the merchant from either issuer rejection or Premium Mastercard rejection.[28] Others may switch to a Standard card. Because of the current compression of rates between Premium and Standard cards, for these customers with issuer rejection the merchant's savings would be modest, about [redacted] bps.[29] However, under the proposed Settlement, with Premium card rejection, these customers would switch to a Standard card with significantly lower interchange. The savings to the merchant would be substantial, about [redacted] bps.[30] A third group of customers would switch to debit cards or cash. For issuer rejection, the savings from switching from an issuer's typical card would be [redacted] bps; for Premium card rejection the savings would be slightly lower at about [redacted] bps.[31]

25) Table 2 summarizes the approximate expected savings to the merchant for each switching alternative for issuer rejection and for Premium Mastercard rejection (all savings are per transaction dollar).

[28] For simplicity, we ignore customers who might switch to American Express with its higher merchant fees. We are interested in the relative magnitude of the savings for the two cases – issuer card rejection and network card type rejection. Any impact of American Express switches should be about equal in both cases and therefore does not affect the relative savings.

[29] For issuer rejection, the savings is the overall interchange of [redacted] bps minus the overall Standard card interchange of [redacted] bps.

[30] For Mastercard Premium card rejection, the savings is the Mastercard Premium interchange of [redacted] minus the overall Standard card interchange of [redacted] bps on posted rate transactions and [redacted] bps on negotiated transactions.

[31] We assume a cost of debit and cash of about [redacted] bps. The figures in Table 1 are the overall average interchange of [redacted] (Case 1 issuer rejection) and the Mastercard Premium interchange of [redacted] (Case 2) minus the debit-cash cost.

**Table 2 Savings From Card Rejection**

| | |
|---|---|
| Case 1 Decline an Issuer's Cards | |
| Switch to | Savings bps |
| Other Premium CCs | [redacted] |
| Standard CCs | [redacted] |
| Debit or Cash | [redacted] |
| | |
| Case 2 Decline Network Premium Cards | |
| Switch to | Savings bps |
| Other Premium CCs | [redacted] |
| Standard CCs | [redacted] |
| Debit or Cash | [redacted] |
| | |

26) The implied walk-away rates that make the threat of non-acceptance not credible will depend upon the percentages of retained customers in each of the switching groups. We do not have data on this, but we expect comparable rates for switching to Standard cards or cash/debit and a somewhat lower percent switching to other Premium cards for the Mastercard Premium card rejection case than for issuer rejection. This lower switching to alternative Premium cards is because some customers' alternative Premium card will be from a different issuer but from the same network. Switching to that alternative would not be available with rejection of a network's Premium cards but would be for issuer rejection. This analysis implies a pattern of switching that likely results in a higher threshold walk-away rate for declining a network's Premium cards than for declining an issuer's card, that is, merchants will prefer rejecting a network's Premium cards.

27) In Table 3, we present an illustrative example of implied breakeven walk-away rates. For issuer rejection, the example assumes a 60 percent switch to other Premium cards, 10 percent switch to Standard cards, and 30 percent switch to debit or cash. For network Premium rejection, we illustrate for 55 percent switch to other Premium cards with the difference (5 percent) allocated proportionately to Standard cards and debit-cash. With these assumptions, we follow Dr. Farrell's methodology and calculate the maximum expected walk-away rates that make the threat of card rejection credible, where a credible

threat increases the merchant's leverage in negotiating lower interchange rates. For the case illustrated, the walk-away threshold for network Premium Card rejection is

**Table 3 Walk Away % Making Card Rejection Not Credible**

| | | |
|---|---|---|
| Case 1 Decline an Issuer's Cards | | |
| Switch to | Savings bps | Switch % |
| Other Premium CCs | [redacted] | 60% |
| Standard CCs | [redacted] | 10% |
| Debit or Cash | [redacted] | 30% |
| Walk Away % (Grocery) | | [redacted]% |
| Case 2 Decline Network Premium Cards | | |
| Switch to | Savings | Switch to |
| Other Premium CCs | [redacted] | 55% |
| Standard CCs | [redacted] | 12% |
| Debit or Cash | [redacted] | 33% |
| Walk Away % (Grocery) | | [redacted]% |

greater than for issuer card rejection. This result does not depend on the specifics of the switching percentages but only that the switching choices are about the same for issuer rejection as for network card-type rejection.[32] The higher critical walk-away threshold for the network Premium card rejection case implies that the threat of this type of card rejection should be a more credible bargaining threat than is issuer card rejection.

28) Our analysis demonstrates that Declarants' preferred reform of eliminating the Honor-All-Issuers rule to allow merchants to decline acceptance at the issuer level will not provide competitive pressures greater than reforming the Honor-All-Cards rule as in the proposed Settlement. The Declarants have not provided any evidence for their assertion that abolishing the honor-all-issuers rule is more effective than reforming the Honor-All-Cards rule to allow merchants to decline acceptance of a network's Premium high-cost cards. To the contrary, we have shown that, even ignoring all the other provisions of the Settlement, reforming the Honor-All-Cards rule to allow merchants to decline acceptance of a network's

[32] Other than the lower switching to other premium cards if a network's Premium cards are declined, there is no basis to assume differential responses in switching for the two cases.

Premium high-cost cards is likely an even more valuable tool in promoting effective competition and lowering interchange rates.[33]

29) The goal of the proposed Settlement is to generate competitive forces leading to lower interchange rates. Whether that goal is achieved through network or issuer competition is unimportant. In addition to providing no analysis supporting their claims of the greater competitive impact of issuer-level card rejection than from network card-type rejection, Declarants fail to consider the rules relief taken together.[34] While the threat of Premium card rejection alone is expected to increase competition among the networks, and not *directly* among issuers, as we elaborate below, in conjunction with increased incentive and opportunity for a merchant to steer customers to a preferred issuer's Standard cards, important issuer level competition can also result from the proposed Settlement's Honor-All-Cards reforms.

30) As noted, in addition to the ability to decline acceptance of a network's Premium cards, the proposed Settlement also allows merchants to decline Visa and/or Mastercard Commercial cards. Rejection of either Visa Commercial or Mastercard Commercial cards puts at risk lower or comparable transactions volume (purchase volume) compared to rejecting the cards of major issuers. Visa's Commercial cards represent [redacted] percent of transactions volume, and Mastercard's Commercial is [redacted] percent.[35] The Visa and Mastercard combined Commercial transactions volume, as a share of all transactions volume (of all payment means) is [redacted] percent, which is lower than [redacted]. The Visa Commercial share is comparable to [redacted], and the Mastercard Commercial share is lower than that of

---

[33] Mr. Levitin asserts that "merchants would not be disincentivized from discrimination on the issuer-level out of fear of losing a large volume of business. Although there is a high level of concentration among a small number of issuers, no single issuer is dominant." Levitin Declaration ¶ 246. He does not define dominant. In fact, as shown in Table 1 above, Chase credit cards account for about [redacted]% of transactions volume and Capital One about [redacted]%. This compares to Mastercard Premium cards which account for [redacted]% of transactions volume.

[34] See, e.g., Farrell Declaration ¶ 40.

[35] *See* Stiglitz-Leffler November 2025 Declaration as updated in the Supplemental Declaration of Keith B. Leffler; Levitin Declaration, Table 2.

[redacted]. Therefore, the transactions risk for card rejection favors Commercial card rejection over issuer rejection.

31) Also, the benefit from Commercial card rejection is significantly greater than for issuer card rejection. Visa's Commercial interchange rate is [redacted] basis points higher than that of the overall average interchange (and therefore the issuer average), and [redacted] basis points higher for Mastercard Commercial cards.[36] Like the case for Premium card rejection, the ability to threaten to reject Commercial cards provides a very credible negotiating threat for merchants.

32) Dr. Farrell invokes a concept of "dilution" to contend that, even if the issuer transaction volumes are comparable to the Visa or Mastercard card-type volumes, the negotiation dynamics would favor eliminating the Honor-All-Issuers rule rather than reforming the rule to allow network card-type rejection.[37] We do not agree. The "dilution" issue referenced by Dr. Farrell is the fact that if a merchant negotiates a lower interchange rate with an issuer, with the Honor-All-Issuers rule in place, the impact on the network's overall interchange is "diluted" by other issuers' high rates. Hence, a merchant's threat to reject a network's card to attempt to extract a lower interchange from an *issuer* is not credible. The threat, however, becomes credible if *the rejection* is at the same level as *the negotiation,* either both at the issuer level or at the network level.

33) This is accomplished if merchants threaten an issuer with rejecting its cards. But this is also accomplished when merchants threaten a network with rejecting its Premium or Commercial cards. With network level card-type rejection, merchants will have network level negotiations. The only important differences are the possible different levels of lost transaction volumes from walk-aways, and the merchant savings from customers switching

---

[36] *Id.*

[37] Farrell Declaration ¶¶ 17-24 explaining the concept of dilution. *See also* ¶¶ 33-39. Dr. Farrell appears to assume that with network card-type rejection, the merchant's negotiation would be with individual issuers. ¶ 40. However, it is the networks that set the interchange rate for all posted rate transactions. The merchant's negotiations would be with the networks regarding this "maximum" rate. For transactions at negotiated rates below the lower negotiated maximum rates, those already low rates would remain the same.

to alternative lower-cost payments in response to the card rejections. But the volumes of transactions are comparable for the larger issuers and for certain network card types, and, as we demonstrated above, the savings from customers switching to other payments can favor network card-type rejection.

34) We also note that the required negotiations to achieve reduced interchange rates will be far simpler under the proposed Settlement than with elimination of Honor-All-Issuers. Under the proposed Settlement, a merchant would negotiate with Visa and/or Mastercard with the new threat of Visa or Mastercard Premium and/or Commercial card rejection. Success in those negotiations would impact the merchant fees of those card types for all issuers. In contrast, negotiations with an issuer would impact only that issuer's fees.

35) In addition, the competitive logic of Premium or Commercial card rejection is clear while issuer card rejection has a looser connection to the competitive problem. The competitive problem is the spiraling of interchange rates from high rewards cards that has resulted from having effective competition on the issuer side and not on the merchant side of the credit card services market.[38] Informing customers that a merchant will no longer accept the problem cards connects the action to the problem. The problem is not, for example, Chase Cards, but all Premium cards, and rejecting Chase cards is not directly related to the problem. A customer whose favored card is rejected while the merchant accepts the equally costly card of the next customer in line is certainly not a way to gain customer support.

36) With no analysis or explanation, Mr. Levitin dismisses any enhanced negotiating power from threatened Commercial card rejection by assuming consumer cards are not substitutes for Commercial cards. However, readily available data shows that "[b]lending business and

[38] See Stiglitz-Leffler November 2025 Declaration ¶ 22 and footnote 16 (citing to a more extended discussion in the Stiglitz Merits Report). The markets for Visa and Mastercard credit card services have aspects of two-sided markets in which card users benefit from greater merchant participation. The proposed Settlement instills competitive pressures on both sides of the market. Some reforms of the merchant restraints act directly on the merchant side; the rate caps and rollbacks act directly on the issuer side of the market; reducing the rate on Standard cards influences the incentives on both sides of the market.

personal credit is common: 54% of SMBs [small and medium size businesses] say they use both personal and business cards to finance operational expenses, with that figure jumping to 61% in large cities."[39] This is expected. Both commercial and consumer cards provide a means of payment with access to credit and fraud protection. While there currently are administrative differences in the cards, there is no reason consumer cards could not overcome these differences. The most notable feature of Commercial cards not available on the typical consumer card is enhanced spending controls, which can limit employees' purchase volumes or approved vendors. Commercial cards also offer detailed expense categorization. Consumer cards could be offered with these options. Commercial cards may also offer customized rewards for business-related categories such as office supplies or travel. But consumer cards already also offer such specialized rewards, and an issuer could easily offer new consumer cards within current card categories mimicking the rewards of commercial cards.

37) As far as we are aware, all merchants' plaintiff experts in MDL 1720 that opined on the market definition issue concluded the same thing – there is a single product market that includes both consumer and commercial cards.[40] This implies that consumer and commercial cards are close economic substitutes for one another and that at least a significant number of customers could and would switch from one to the other in response to a small change in relative prices (and card-rejection is effectively a large price change) to make these card-types close economic substitutes.

38) Thus, Mr. Levitin's assumption of a separate commercial card market is contrary to the facts and to other expert analyses. Moreover, the relevant question is not how substitutable the cards are today, but how substitutable they could be, were commercial cards not accepted

---

[39] https://www.businesswire.com/news/home/20250731162461/en/New-Report-Reveals-SMBs-Rely-on-Both-Business-and-Personal-Credit-Cards-to-Bankroll-Operations. *See also* https://www.prnewswire.com/news-releases/navcom-data-reveals-small-business-owners-use-twice-as-many-credit-cards-as-consumers-300654228.html ("On average, small business owners use twice as many personal credit cards than consumers, according to new data from Nav.").

[40] Expert Report of Joseph E. Stiglitz (Oct. 5, 2018) ¶¶ 64-72; Expert Report of Dennis W. Carlton (Oct. 4, 2018) ¶ 132; Expert Report of Professor Jerry Hausman (Oct. 5, 2018) ¶¶ 145-149; Expert Report of Dr. Robert G. Harris (Oct. 5, 2018) ¶¶ 108-111, 445.

by a significant set of merchants. We are aware of no impediments to issuers devising "consumer" cards with features comparable to those of commercial cards.

39) Mr. Cook suggests that issuer card rejection is favored because a merchant could minimize adverse customer responses to issuer-level card denial by posting a notice that "we do not take Issuer A's cards because their price per transaction is unreasonably high and would increase your costs as a consumer."[41] He claims this would be "a direct message with little chance for confusion." He does not mention that the message would not be entirely true because all issuers have cards with relatively low "price per transaction." He also claims, without evidence or reasoning, that the same message directed at "Premium cards" would be "muddled." We suggest that the opposite is true—a customer is more likely to understand "we reject all Visa Premium cards because they're too expensive," than "we reject some (though not all) of Visa's high-cost cards, and yours happens to be one of them."

40) Regarding the low walk-away implied from Dr. Farrell's credible threat analysis, we note that there is an important element of dynamic analysis missing from his analysis of the threat credibility. The credibility of a negotiating threat depends on the costs and benefits of executing the threat. There is, of course, uncertainty about how customers will respond to card rejection – how many will switch, what they will switch to, and how many will "walk-away."[42]

41) Dr. Farrell's analysis (and our discussion, taking off on his analysis) entails what economists call a "one play game," it is a static analysis. The merchant changes his card acceptance policies, customers respond, and that is the end of the analysis. But that is not the way the real world works. In the real world, after the "experiment" of not accepting say a network's Premium cards, the merchant observes the result and can reassess what he does. If his profits are up, and walkaways are few, he can continue the policy, perhaps extending it to exclude other high-cost cards. But if the incidence of walkaways is high and the savings from shifting to lower cost cards is low, the merchant can abandon the rejection policy, in

[41] Cook Declaration ¶ 8.a.

[42] As we discuss elsewhere, the pilot program provisions (allowing experiments) of the proposed Settlement are important ways of reducing this uncertainty.

which case the only cost of the "experiment" is the loss of profits during the experiment (and any walkaways that won't return).

42) The important point is that the benefits from a successful experiment extend over time, while the cost are quite limited. The failure of Dr. Farrell (and the other Declarants) to recognize the dynamic, fluid nature of the card rejection decisions leads them to overstate the possible costs from network card-type rejection. It doesn't take much per period expected benefit to make experimenting have positive expected long run profit.[43] This more dynamic analysis, of course, applies not just to the "experiment" of refusing a network's Premium cards, but also to other steering mechanisms, such as surcharging, increasing significantly the likelihood that the mechanisms included in the settlement will lead to more competitive pricing.

43) Issuer competition from the Standard card rate cap. The Declarants emphasize the need for issuer competition. While the Declarants undervalue the role that enhanced network competition can play in achieving more competitive merchant fees, they also fail to appreciate that the proposed Settlement opens the possibility of issuer competition by the changes in the rate structure combined with the changes in and clarification of the discounting restraints in the proposed Settlement. Card issuers have developed reward programs that they hope cardholders prefer to other issuers' programs. But the issuer reward programs are of a "one size fits all" variety – an airlines miles program, general travel program, or discounts on the monthly credit card bill. Whatever the programs, they are not generally tailored to the specific purchase patterns of individual customers and they are not immediate at the point of sale.

44) The competitive new environment from the proposed Settlement creates an opportunity for merchants to offer specialized merchant reward programs. Larger merchants like Walmart and/or smaller merchant industry groups (like convenience stores) have (or can have)

[43] In addition, as more and more merchants experiment, more and more will find it profitable because as more merchants don't accept a network's Premium cards, the expected walk-away rates will fall. Note that this impact will only occur for issuer rejection if merchants reject the same issuer's card.

knowledge of individual customers' preferences that are unavailable to card issuers.[44] Artificial Intelligence technology can design merchant-based rewards programs of a value unachievable by issuer programs.[45] For example, Walmart has the data available to know that a specific customer stocks up on infant diapers the first week of each month. At the time of that customer's diaper shopping trip, Walmart could offer the customer "free" diapers based on "Walmart points" earned from the use of a Walmart preferred Standard card. No issuer could match such a customer specialized rewards program.

45) Under the proposed Settlement, there can be substantial benefits to both the merchant and a preferred standard card issuer from shifting purchases away from Premium or Commercial cards to an issuer's Standard card. This can lead to joint efforts by one or two issuers and a merchant to promote those cards in conjunction with merchant-sponsored rewards programs. Many large retailers have in place "loyalty" programs which can serve as models for the essence of such merchant sponsored rewards programs. The Declarants summarily dismiss such merchant-centered programs. But the large merchants' experts in the merits litigation extolled the benefits of merchants' ability to launch exactly these types of programs, and they explained exactly how they would work.[46]

46) The lower Standard card interchange in the proposed Settlement offers a significant opportunity for merchants to stimulate issuer competition. Currently, issuers have a net revenue from Premium cards of about [redacted] basis points.[47] For Standard cards, with the Settlement in place, an issuer will have a net revenue from Standard cards of about [redacted]

[44] Smaller local merchants also are likely to have specialized knowledge of their customers through close interactions both in their stores and in their communities. This would favor these merchants' abilities to design rewards programs of particular value to their customer bases.

[45] Some merchants have been instituting "surveillance" or "algorithmic" pricing in which a customer's prices are specific to that customer. See, e.g., FTC Surveillance Pricing Study Indicates Wide Range of Personal Data Used to Set Individualized Consumer Prices | Federal Trade Commission January 2025 ("Initial staff findings show that retailers frequently use people's personal information to set targeted, tailored prices for goods and services . . ..).

[46] Harris Report ¶¶ 60, 1067, 1073, 1090, 1103, 1207; Reply Expert Report of Dr. Robert G. Harris, ¶¶ 636-637; Reply Expert Report of Professor Jerry Hausman (Oct. 11, 2019) ¶ 77, 387.

[47] *See* Stiglitz-Leffler November 2025 Declaration, as updated in Leffler Supplemental Report. By net revenue, we mean interchange less average rewards.

basis points. Therefore, an issuer has significant value from switching its card users from the typical Premium card to a Standard card.[48] In addition, by partnering with a merchant to implement merchant rewards, the issuer would presumably gain substantial transaction volumes from other issuers.[49] Therefore, it is reasonable that a merchant eliciting issuer competition to be the preferred merchant-rewards Standard card could achieve rates as low as [redacted] bps,[50] while providing a saving to the merchant of about [redacted] basis points, some of which could fund the merchant rewards, while leaving the merchant better off.[51]

47) Declarants' static analyses. A major deficiency in the Declarants' analyses is their static nature. The Declarants implicitly assume that the current distorted features of the credit card service market will persist, ignoring the Settlement provisions that provide clear and strong incentives for change. We noted this above in our discussion of Mr. Levitin's analysis of the likely impacts of merchant rejection of Visa or Mastercard Commercial cards. In that analysis, he improperly holds constant the current characteristics and prevalence of Commercial and consumer credit cards.

48) As another example, based on the current state of the credit card market, Declarants argue that merchants will have no incentive to take advantage of the favorable Standard card costs because such cards are not widely used, representing in 2025 only about [redacted]% of Visa and Mastercard transactions volume.[52] But, of course, these cards are not widely used.

---

[48] It is the one-sided issuer competition which has resulted in the distorted market, where issuers are pushing cards that generate for them less net revenue than Standard cards.

[49] This assumes effective competition on the card-holder/issuer side of the market.

[50] This is [redacted] above the net margin on Premium cards ensuring a marginal advantage to the issuer of Standard cards.

[51] This is the overall Premium rate of [redacted] bps minus the competitive issuer Standard card rate of [redacted] bps. Our analysis assumes (as the Declarants do) that there is competition among issuers. Effectively, merchants can conduct an auction among issuers with bidding to be the preferred Standard card issuer. With sufficient issuer competition, the interchange can be bid down to the level just profitable at the margin.

[52] Levitin Declaration § V.D.ii.c. ("The Right to Surcharge Premium and Commercial Cards Is of Little Value Because Most Cardholders Lack a Standard Card."); Cook Declaration ¶ 40 ("compounding the problem, many customers today carry only Premium cards."). In contrast, Dr. Farrell recognizes that the current use of Standard cards provides little information about the potential use "in response to incentives provided by merchants . . ." Farrell Declaration ¶ 31, fn. 21.

Premium cards appear to give users free money!! Presumably, the customers currently using Standard cards are those who either do not qualify for a rewards card, or who rarely use a credit card.

49) The proposed Settlement creates incentives for issuers to issue Standard cards to customers who currently do not have them, and it creates incentives for merchants to encourage their use. Neither the current Standard usage rate nor the percentage of issued cards that are Standard cards is indicative of how the market may look if merchants use the proposed Settlement's steering opportunities to motivate consumers to use Standard cards. Issuers have been effectively steering customers to the higher-cost but lower margin cards,[53] and existing network restrictions on steering have prevented merchants from acting as a counter-weight. The proposed Settlement gives merchants additional tools to steer customers to lower cost cards, and equally important, an increased incentive to steer.

50) As another example of misguided opinions resulting from the static nature of Declarants' analyses is Mr. Levitin's argument that "[s]urcharging for a Visa card when the cardholder has only Visa cards does not incentivize the consumer to shift the transaction to a Mastercard because the consumer cannot shift to a card he doesn't have."[54] This fails to take into account that a merchant that wants to surcharge will announce ahead of time the intent to surcharge and define the dimensions of the pending surcharge. This will allow customers to react prior to being surcharged, acquiring alternative cards if desired. Even if a merchant did not announce this ahead of time, it wouldn't take long for customers and issuers to determine effective and efficient responses. Indeed, if the surcharging is

[53] This is another illustration of the perverse nature of competition in the current credit card services market with competition on the issuer-cardholder side of the market and limited competition on the merchant side.

[54] Levitin Declaration ¶ 184. *See also* ¶ 164 ("Rather than the consumer going home and applying for a Mastercard, the consumer is likely to just take future (and maybe current) business to another merchant."). Dr. Farrell and Mr. Cook also analyze the proposed Settlement in a static context. Farrell Declaration ¶ 38 (". . . roughly 40% of consumers carry credit cards from only one network. . . . If a merchant were to decline a costly network's cards, the merchant might lose that network's single-homing users, who may not be able to easily substitute to cards from a different network."); Cook Declaration ¶ 40 ("compounding the problem, many customers today carry only premium cards.").

combined with favoring an issuer's Standard card, as described above, a merchant and the preferred issuer can cooperate in facilitating customers' acquisition of the preferred issuer's Standard card. In any case, if there are incentives for customers to take up a Standard card, the presumption is that both sides of the market will respond accordingly.

51) Rate caps and rollbacks. We have emphasized that competition in the credit card services market has been perverted for decades. We recognize the likelihood that whatever competitive tools are provided to the merchants, interchange rates will not immediately fall to competitive levels.[55] Many customers have come to believe in some intrinsic right to receive "rewards" from their use of an anticompetitive, inefficient payment methods. Correcting these expectations will take education and creative merchant actions.

52) In prior Reports and Declarations, we have emphasized these long-standing entrenched distortions in the credit card services market. But merchants and issuers are clever and innovative. The economic benefits to merchants from making use of the tools are clear and substantial. As more creative merchants begin to take advantage of the new opportunities, others will follow. As customers become accustomed to more competitive payments markets, charging for or rejecting Premium cards will become more acceptable, just as surcharging for card use has (and increasingly continues to) become more acceptable. The new competitive tools can foster significantly more competitive merchant fees, while retaining the efficiencies of the current networks. Notably, there is no reason to expect the time for the market to adjust to these new tools to be any different than the time that it would take for the market to adjust to non-acceptance or surcharging of certain issuers' cards.

53) Rate rollbacks and rate caps are included in the proposed Settlement as recognition that an adjustment period will be needed. The rate caps and rollbacks will limit further supracompetitive rate increases in the interim as competition develops, while rolling back

[55] Mr. Levitin makes the absurd claim that we assume [redacted] Levitin Declaration ¶ 297. As made clear in this Declaration and our prior ones, we have never made that assumption.

the interchange fees to the rates charged in 2014-2015.[56] In addition to providing some immediate benefit to all merchants, the rate rollbacks and caps have been designed to alter the merchant incentives. As emphasized in our earlier Declarations and noted above, the interchange fees charged for various card types are not only supracompetitive but also distorted. Most obvious is the distortion regarding Standard and Premium cards. Considering both transactions at posted and at negotiated rates, the interchange differential between Standard and Premium cards is only about [redacted] bps.[57] This provides very little incentive for merchants to move customers away from the Premium cards to lower cost Standard cards. The proposed Settlement directly attacks this incentive by capping the Standard card interchange at a maximum of 125 bps, about [redacted] the differential between Premium and Standard cards.

54) Mr. Levitin notes that the overall rate rollbacks and the posted rate caps last for only the first five years covered by the proposed Settlement.[58] He argues that in years 6-8 of the Settlement, the networks and issuers will be free to raise interchange.[59] Firstly, we expect the competitive pressures on interchange from the relaxation of the merchant restraints to alter the culture related to credit card charges. Merchants will have educated their customers that using high-cost cards causes higher prices for all customers. Standard card use and merchant rewards should become more prevalent. Discounting and surcharging should increase. These changes are expected to put significant downward pressure on any

[56] The overall effective interchange under the proposed settlement will be capped at 10 bps under the current rate for five years after the Settlement is implemented. See Stiglitz-Leffler November 2025 Declaration, Table 2. This will put the interchange at about the levels of 2014-2015. Mr. Levitin misleadingly asserts "that from 2020 to 2024 alone, the Networks' average interchange rate rose by [redacted] basis points–more that the reduction offered by the Proposed Settlement." Levitin Declaration ¶ 47, citing Stiglitz-Leffler Declaration Chart 1. As is clear in that Chart 1, the 2020 rate is a "covid anomaly" from disrupted shopping patterns, with a quickly reversed increase of [redacted] bps points in the average interchange in the next year.

[57] The overall interchange on Premium card transactions is [redacted] bps for Visa and [redacted] bps for Mastercard. For Standard card transactions, the interchange is [redacted] bps for Visa and [redacted] for Mastercard.

[58] Levitin Declaration ¶ 71.

[59] Levitin Declaration ¶ 83 (". . . the Networks have carte blanche to increase interchange fees during the last three years of the settlement period . . ..").

attempted significant interchange rate increase.[60] The 125 cap on Standard cards will remain in place throughout the settlement period. In this more competitive environment, we expect substantial merchant resistance to a large increase in merchant fees. We expect that a new market environment will have been created, where surcharging and not honoring certain cards is normalized, and this in turn means that there will be strong downward competitive pressures on merchant fees.

55) Mr. Levitin goes further to argue that ". . . whatever 'gains' the merchants may inure from the rate freeze in years 1-5 could be offset by rate increases in years 6-8."[61] This is economic nonsense. The profit maximizing interchange rate is not increased by the proposed Settlement. As we've explained, the profit maximizing interchange rate will have been decreased. Even if the networks were to raise Premium rates in years 6-8, the increase would be at most to the level that would have existed absent the Settlement. Mr. Levitin has not even attempted to provide an argument in support of his contention. Contrary to Mr. Levitin's conjectures about economically implausible network behavior, the package of reforms in the proposed Settlement should substantially lower the merchant fees such that the rate caps and rollbacks become irrelevant by years 6-8.

56) Mr. Levitin criticizes our estimate of the potential benefits to merchants from the proposed rate caps and rollbacks.[62] Our estimate was in nominal dollars; Mr. Levitin adjusts to present value dollars. We have no problem with such an adjustment, but it makes no difference. Our estimate was intended to be illustrative. Whether it is reported as [redacted] in nominal dollars or as [redacted] as present value dollars is of no substance. More importantly, Mr. Levitin misleadingly labels his present value estimate as the "value of the

[60] In 2030, under the proposed Settlement, the overall interchange cap is expected to about [redacted] bps below the but-for the Settlement rate. Stigitz-Leffler Declaration Table 2. Of course, if the steering mechanisms available under the proposed Settlement are effectively used, the actual rate should be much lower.

[61] Levitin Declaration ¶ 83. *See also* ¶ 292 ("merchants could well lose more in years 6-8 of the settlement period than they gain in years 1-5, such that the Proposed Settlement could end up having negative value for merchants.").

[62] Levitin Declaration ¶ 72.

settlement."[63] This is not the value of the settlement. It is rather only the value of rate rollbacks and rate caps, taking no account of the enhanced steering opportunities that the proposed Settlement will unleash and the consequent improvement in the competitive landscape that these steering opportunities and the many other provisions in the settlement will engender.

57) Mr. Levitin does not understand Table 2 in the Leffler Rebuttal Declaration. The title of this Table is "Estimated Merchant Savings from the Rate Rollbacks and Caps." However, Mr. Levitin apparently interprets the estimates in Table 2 as estimates of the value of the Settlement in its entirety.[64] Table 2 estimates the direct savings to the merchants of, and only of, the interchange caps and rollbacks. The estimates are not a summary of the expected benefits of the proposed Settlement, the goal of which is to increase competition in the credit card services market, and is expected to generate far larger benefits for merchants and consumers.[65]

58) <u>Will issuers evade the rate caps?</u> Mr. Levitin asserts that issuers can evade the rate caps by issuing new cards.[66] Although he seemingly recognizes the constraint of the Overall

---

[63] *Id.*

[64] Levitin Declaration ¶ 309 ("The bottom line number in the Stiglitz-Leffler Declaration underscores just how little the Proposed Settlement achieves for the merchants."); ¶ 311 ("the Proposed Settlement would result in a [redacted]% reduction in total interchange fees for five years").

[65] Mr. Levitin criticizes some labels in Table 2. Levitin Declaration ¶¶ 303-305. These labeling issues have no substantive impact. Mr. Levitin suggests that we are including a reduction in posted rates of [redacted] basis points. Levitin Declaration ¶ 306. That is obviously not the case. The reduction in posted rates for all Premium cards from a freeze on posted rates ranges from [redacted] basis points (row 15 of Table 2). The [redacted] to [redacted] rate reduction (row 18 Table 2) is mislabeled as Average rate Reduction Premium Cards, duplicating and contradicting the label of row 15. The constant interchange fee of [redacted] in row 17 makes it obvious that that the reduction is for Standard cards.

[66] Mr. Levitin dismisses the "anti-circumvention" provisions of the proposed Settlement. These provisions include prohibitions on the Networks using increased network fees to effectively maintain high interchange fees through transfer of fees labelled as network fees to issuers. Mr. Levitin asserts that the anti-circumvention provisions "do not, however, appear to prevent the Networks from implementing programs whereby they transfer their network fees to a select group of large issuers as a way to retain those large issuers' business on the network." Levitin Declaration ¶ 226. We apparently have more faith that a Court would not allow such evasions of the Settlement's provision that the Networks "will not defeat the benefits that merchants receive from the commitments in [the Settlement] by increasing

Effective Rate Cap,[67] he nevertheless proposes that the issuers can avoid that constraint by issuing new cards not subject to the Honor-All-Issuers rule.[68] Given Mr. Levitin's apparent belief that the competitive problems in the credit card services market result mainly from the Honor-All-Issuers rule, we would expect Mr. Levitin to welcome the issuer competition that would be fostered by new cards that are not subject to the Honor-All-Issuers rule. However, he instead simply asserts that merchants must accept such cards because they "would find it difficult to refuse to accept these cards if issuance volume were large."[69] But initially it is impossible that the volume could be large, when it begins from zero. Obviously, if merchants refused to honor some circumventing card, that card could not gain traction. And if merchants fail to reject a new card with, initially, trivial transactions volume and high merchant cost, then eliminating the Honor-All-Issuers rule cannot be the panacea Mr. Levitin envisions.

59) In addition, Mr. Levitin and Mr. Cook argue that the issuers will subvert any merchant efforts to steer customers to Standard cards by creating new categories of high-cost rewards cards.[70] However, because of the decades of the distortions of competition from the

---

other networks fees or Merchant Fees to restore the revenues issues lost from the interchange commitments herein." Proposed Settlement ¶¶ 54, 103.

[67] Levitin Declaration ¶ 85.

[68] Because of rapidly evolving technological developments in payment mechanisms, the proposed Settlement allows the issuers and networks to develop new payment means outside the Settlement as long as those new means are not subject to Honor-All-Cards rules.

[69] Levitin Declaration ¶ 85.

[70] Levitin Declaration ¶ 84 ("The Proposed Settlement does not, however, prohibit the Networks from creating new interchange fee categories or new card types. Thus, the Networks could create new rate categories (for merchant type or card type) with new rates."). Mr. Cook suggests that same issuer response to retailers' attempts to steer towards the lower cost Standard cards. Cook Declaration ¶ 32 ("the Networks and the issuers would counteract the Premium-Standard spread by creating additional incentives to move consumers to Premium cards or by creating new low-reward, low-cost 'Premium' cards"). However, the Overall Effective Rate cap will constrain moving ("moving" implies customers have already shifted to low cost cards) consumers to Premium cards. If the issuers response is to shift customers to low-cost Premium cards, as Mr. Cook suggests, this would be a benefit from the proposed Settlement. Moreover, Mr. Levitin and Mr. Cook ignore the obvious responses of merchants to these new categories of cards – they can decline to accept or surcharge these cards. Again, Mr. Levitan and Mr. Cook have ignored the dynamics of the marketplace, a curious lapse given that the whole point of the settlement is to change these dynamics.

merchant restraints, the competitive incentives on the issuer side have resulted in issuers making significantly more net revenue on Standard card transactions than on Premium card transactions.[71] This will continue to be the case even with the reductions of the Standard card interchange to a maximum of 125. The interchange-rewards spiral perpetuated this perverse relationship as issuers sought loyal card users wedded to their rewards programs.[72] If the proposed Settlement is successful in motivating more merchant-oriented rewards competition, the issuers' incentives will be redirected to the more efficient competition of lower fees and more tailored merchant rewards. As a consequence, the structure of the interchange rates and customer rewards will have the potential to create strong competition among issuers to become preferred Standard card providers, in contrast to offering a super-premium card, which might be subject to exclusion by many merchants (and whose potential profitability will be limited by the overall rate cap).[73] As noted above, such cards

[71] Mr. Levitin ignores the fact that the issuer margin on Standard cards exceeds that on Premium cards. The overall interchange on Visa Premium cards is [redacted] bps, with average rewards of [redacted] bps. Therefore, issuers net about [redacted] bps on Premium card transactions dollars. On Standard cards, the current overall interchange is [redacted] bps with rewards of about [redacted] bps, for a net of [redacted] bps. With a 125 bps cap on posted rate Standard card transactions, the average interchange will fall to [redacted] bps with an issuer net of [redacted] bps, some [redacted]% more than the issuer nets on Premium card transactions.

[72] This highlights the two conflicting margins of competition, an aspect of this distorted market that neither Dr. Farrell nor Mr. Levitin recognizes. Issuers would like to steer customers to the higher margin standard cards (in this the interests of the merchants and the issuers are aligned) but each issuer wants more cardholders, and here the instrument is competition over benefits on the Premium card. The latter aspect has dominated issuer competition. As we noted earlier, the profits of acquiring a new Premium cardholder will be reduced under the proposed Settlement, especially once one accounts for the fact that some Premium cardholders will have switched to a Standard card. Overall, the constraint on Standard card interchange fees should act as an anchor on the whole system, lowering interchange fees on Premium cards and, of course, on the rewards of Premium cards.

[73] Dr. Farrell and Mr. Levitin suggest that, with the reduction of interchange on Standard cards, the issuers will be incentivized to steer consumers towards Premium cards. Dr. Farrell Declaration ¶ 75; Levitin Declaration ¶ 75, 101. This argument ignores both the constraint of the overall effective rate and that the issuer margin (interchange minus rewards), even with the reduction in the interchange rate on Standard cards, is greater on Standard cards than on Premium cards.
Mr. Levitin goes a step further asserting that ". . . reduced interchange fees available under the Proposed Settlement for Standard Cards create no incentive for issuers to issue them." Levitin Declaration ¶ 97. This is incorrect for all issuers, and particularly so for issuers that make deals with merchants to favor that issuer's Standard cards. Mr. Levitin doesn't seem to understand market economics – if merchants make it more desirable for customers to use standard cards, issuers will respond, with more issuers

would start with no customer use, so the cost of exclusion would be negligible, and merchants' refusal to accept the card would be an impediment to their becoming established.

60) We understand that the National Association of Convenience Stores, Circle K, the National Retail Federation, and the Retail Industry Leaders Association (the sponsors of Mr. Levitin's Declaration) have objected to the proposed Settlement, including the claim that "The settlement permits Visa and Mastercard to achieve the ten basis-point reduction in the 'average Effective Interchange Rate' in whatever manner they wish. . . . The networks could, for instance, reduce interchange rates for *commercial* cards while leaving interchange rates for *consumer* cards essentially unchanged. . . . That would benefit merchants 'with a high share of commercial card transactions,' but offer no meaningful relief for 'merchants with mostly consumer transactions,' like NACS's members and Circle K."[74] We find no economic merit to this objection.

61) First, these Objectors provide no evidence or facts supporting the assumption that these retailers have substantially disproportionate "consumer transactions." Many of the NACS members dispense gasoline, and commercial card users should be common for these purchases.[75]

62) In addition, as economists we assume that Visa and Mastercard and their card issuers currently set merchant fees to maximize the networks' and banks' profits. There is no economic basis to assume that the relationship of the most profitable fees for commercial and consumer cards would vary because of a requirement to lower the average fee by 10 basis points. Currently the Visa Commercial rate is [redacted] basis points compared to the consumer rate of [redacted] basis points. For Mastercard, the Commercial rate is [redacted] basis points

competing to issue them. This is especially true given that the net interchange fees on Standard cards are actually higher than on Premium cards, a fact that Mr. Levitan doesn't seem to take account of.

[74] NACS/Circle K Objection at 24-25.

[75] For example, Circle K is a division of Tosco, a petroleum company with about 5,400 gas stations. Circle K Gas Stations in the USA: Locations & Insights, xmap.ai (Jan. 14, 2025). 7-Eleven operates about 8,200 gas stations. About Us – 7-Eleven Fleet, feet.7-eleven.com. Another NACS member, Pilot, is essentially a retail fuel dispensing company that also has convenience stores. Pilot Corporation | Encyclopedia.com.

and the consumer rate [redacted] basis points. The higher Commercial rate is the result of Visa, Mastercard and the issuers' assessments that these are the profit maximizing relationships between these fees.

63) Under the Settlement, Visa and Mastercard are prohibited from raising the posted rates applicable to consumer cards. Holding constant these posted rates of consumer cards, to effectuate a 10 basis points overall effective rate reduction via reductions in Commercial interchange rates would require Visa to lower its Commercial rate to [redacted] basis points and for Mastercard to lower its Commercial rate to [redacted] basis points. In both cases, this would result in a Commercial rate below the consumer rate. This is contrary to the observed profit-maximizing, higher commercial interchange fee. Thus, it makes no economic sense to hypothesize this perverse response by the networks to the Overall Effective Rate reduction requirement. Moreover, Mr. Levitan ignores that this part of the proposed Settlement should be viewed as a safeguard. It is the other provisions that are intended to benefit merchants, including the convenience store merchants, through lower interchange fees from increased competition.

64) Honor-all-wallets reform. As we discussed in our November 2025 Declaration, the elimination of the Visa and Mastercard honor-all-cards rule regarding digital wallets ("honor-all-wallets") has substantial potential to create issuer competition.[76] We noted that digital wallets are an increasingly and rapidly growing means of payment. With the elimination of the honor-all-wallets rule, a merchant can negotiate a lower interchange rate with an issuer by agreeing to accept a digital wallet that is (or is not) loaded with (and potentially only with) a particular issuer's card.

65) Mr. Levitin apparently agrees that the elimination of the honor-all-wallets rules can be a substantial benefit for larger merchants.[77] But he dismisses that value for smaller merchants, asserting that "[i]t is hard to imagine the local bodega or pizzeria negotiating

---

[76] Stiglitz-Leffler Declaration ¶¶ 64, 116.

[77] Levitin Declaration ¶ 204.

with Apple over the terms of acceptance of Apple Wallet transactions."[78] Under the proposed settlement, the small merchant, like all merchants, will have the ability to decline that high-priced wallet, and they can join buying groups to assist in negotiations with issuers for lower interchange.

66) Surcharging reforms. The proposed Settlement expands merchants' surcharging opportunities by allowing surcharging by card category. Dr. Farrell dismisses the benefits of this reform because (in addition to low walk-away rates discussed further below) surcharging may lead to longer checkout lines as "consumers may want an explanation . . . ."[79] But he does not consider the likelihood that the same customer would demand an explanation for why the merchant surcharged (or declined) his preferred Visa card while not charging others in front of him in line using other issuers' Visa rewards cards. Contrary to this confusion problem, a simple statement posted at the checkout line would suffice for the rejection of a network's Premium cards; something along the lines of – "We no longer accept Mastercard Premium cards because we are charged an excessive fee for their use. Passing along these costs to other customers is simply unfair. By charging those credit cards causing the high costs, we are able to keep our prices low to all customers."

67) Indeed, the very problem Dr. Farrell asserts will arise in the case of the refusal to accept Premium cards is likely to be even worse (for reasons already explained) in the case of the refusal to accept an issuer's card. Dr. Farrell doesn't even attempt to provide an analysis of the relative adverse effects, e.g. in waiting times at check-out, he simply asserts (incorrectly)

[78] Levitin Declaration ¶ 204. If it were true that "the local bodega or pizzeria" cannot negotiate with digital wallet providers, how will those same merchants use the threat of declining, for example, Chase cards to negotiate with Chase the terms of acceptance of Chase transactions?

[79] Farrell Declaration ¶ 57. Dr. Farrell also expresses concern that there could be "[a] general tendency for surcharging to be excessive . . . ." ¶ 59. This ignores the provisions of the proposed Settlement limiting surcharges to the merchant costs or 3%, whichever is less. A few paragraphs later, Dr. Farrell expresses concern that the "3% limit makes it impossible for a merchant to fully pass on a particularly steep fee . . . ." ¶ 65. Mr. Levitin and Mr. Cook offer the same concern. Levitin Declaration ¶¶ 180-182; Cook Declaration ¶ 47. Our understanding is that transactions with a cost of acceptance above 3% are a small percentage of all transactions.

that it will be large in one case and presumably assuming that it would be negligible in the other case, without evidence or analysis.

68) Dr. Farrell purports to explain why "merchants often refrain from surcharging . . . even when it is allowed."[80] He does this through an illustrative example of differential pricing (price discrimination) versus single pricing which purports to show only a trivial gain from "surcharging."[81] The illustration is not convincing.[82] Dr. Farrell assumes two groups of consumers wedded to their payment means. Group A uses a low-cost payment means with cost to the merchant of about 151 basis points, Group B uses an expensive payment means with a cost of about 454 basis points.[83] He then finds the profit maximizing single-price and two-price solutions. The result shows that the gain to the merchant from setting two prices is an increase in profits of only 1/40th of one percent, an increase that would likely not justify the cost of implementing the two-price system (surcharging).[84]

69) However, Dr. Farrell's illustration is flawed because it does not capture the potential benefits from surcharging. Surcharging is a way to influence customers' selection of their means of payment.[85] A customer will evaluate the benefits and costs of one means of payment versus

---

[80] Farrell Declaration ¶ 54.

[81] Farrell Declaration ¶¶ 48-55.

[82] We focus on the deficiencies in Dr. Farrell approach regarding the elasticities between the groups from differential costs of payment means. However, the very low additional profits from classic price discrimination in Dr. Farrell's example is a consequence of another flaw in his analysis, having the same price elasticities of demand for the two groups

[83] These are from the costs of payment method A of $6 and the price of $132 and the second with costs of B of $2 with a price of $132.

[84] Dr. Farrell's example finds that with two prices the merchant would lower the "base price" to those using the low-cost method from $132 to $131, and then impose a surcharge of 153 bps (raising the effective price to $133) for the use of the high-cost payment means. The result is a trivial increase in sales of one unit from those using the low-cost method A and a one-unit reduction in sales to those using high-cost method B.

[85] Mr. Cook asserts that "Surcharging merely moves the cost of the Networks' anticompetitive behavior from one victim to another. . . . surcharging allow[s] a merchant to pass along the cost . . . to the consumer standing at the register, who, like the merchant, played no role in creating the problem . . . " Cook Declaration II.B.4., ¶ 49. To the contrary, the economic problem is that the person selecting what payment means to use ("the consumer standing at the register") does not bear the costs of her decision. The "victim" is not the Premium card user, but those customers using low-cost payments and the merchant. Absent the frictions and entrenched culture created by decades of merchant restraints, the

the benefits and costs of alternatives. Dr. Farrell's illustration has no substitution possibilities within his two groups. There is nothing in the analysis allowing those in group B (initially using a high-cost payment means) to become members of group A, switching to the low-cost payment means because the benefits of using payment means A have now increased relative to those of using payment means B.

70) This increased ability to steer is, as we have repeatedly noted, one of the benefits of the proposed Settlement. Incorporating such steering into the Farrell analysis demonstrates the power of surcharging. If, for example, half of the users of method B switched to A because of the price differential (the surcharge), the merchant's profits would increase by about 1.5 percent.[86] To put this in perspective, the average "merchant fee" in the Farrell illustration absent surcharging is about 3 percent.[87] With the illustrative 50% switching to low cost payment means, the merchant's cost of the payment mechanism falls in half.

71) The Declarants also argue that the current low rate of surcharging "calls into question whether [the merchants] will use the Amended Settlement's surcharging and discounting options."[88] There are a number of problems with this argument. Even in the current environment in which product category surcharging is not allowed, surcharging is becoming much more prevalent. A 2024 survey found 35 percent of small businesses surcharge credit cards, up from only about 2% in 2019.[89] This has occurred in the environment in which a surcharge hits equally customers using a lower cost standard card and a high cost Premium card. The surcharge thus penalizes some customers who are choosing payments that the

---

simplest and efficient solution to the problem is for customers to pay the cost imposed by their selection of payment method. That is how a price system promotes economic efficiency.

[86] Using the Farrell differential prices of $131 and $133 respectively, but increasing the A units by half to 103.5 and lowering the B units by half to 33.5 implies profits of $9,386.

[87] The cost of the payments means is $544 ($2 X 68 + $6 X 68) and the revenue $17,952 (2 X $68 X 132).

[88] Farrell Declaration ¶ 47. *See also* Levitin Declaration ¶ 297; Cook Declaration ¶ 53.

[89] 2025 U.S. Merchant Services Satisfaction Study - JD Power; Third of U.S. small businesses add credit card surcharges | Payments Dive. Mr. Levitin cites this Study, quoting a finding that "73% of cardholders say they wouldn't continue using their credit cards as much if they had to pay a surcharge to merchants each time." Levitin Declaration ¶ 240. "As much" is not defined. The finding that 35 percent of small merchants impose surcharges suggests that "as much" is not much.

merchant wishes to encourage. Because virtually all consumers make at least some of their purchases from small businesses, by now almost all consumers have come to accept surcharging and understand the reason for it.

72) However, with the increased spread of the interchange rates that will result from the 125 bps Standard card rate cap, the incentive to surcharge only the high cost Premium cards as allowed by the proposed Settlement will increase. Finally, the possibility of merchant rewards engendered by the lower cost Standard cards could alleviate much of the merchant risk from "walk-aways." In addition, as more and more stores engage in surcharging, it becomes more and more accepted – even viewed as fair, as customers realize that those using low-cost cards, cash or debit are being asked to subsidize wealthier individuals who use Premium credit cards.

73) The current but rapidly growing rates of surcharging are also in part a function of the networks' level-playing-field Rules. Under the current rules, merchants that accept American Express generally cannot surcharge that card or Visa or Mastercard cards. And today, nearly all merchants that accept Visa and Mastercard accept American Express.[90] That is why the Settlement's elimination of the level-playing-field rules is a watershed.

74) Under the proposed Settlement, merchants will be allowed to surcharge by card type, including Premium or Commercial cards. Mr. Levitin argues that these expanded surcharging opportunities opened by the proposed Settlement will not help to alleviate the

[90] *See, e.g.*, Where is American Express Accepted? - NerdWallet (99% of U.S. merchants who accept credit cards also now accept AmEx.")

supracompetitive merchant fees.[91] Dr. Farrell and Mr. Cook make the same argument.[92] These Declarants assert that surcharging is not likely to be profitable due to the expected loss in business (the "walk-away" problem) as some customers may reduce or eliminate purchases at a merchant where they cannot obtain their rewards by using their preferred Premium cards.[93] However, neither Mr. Levitan nor Dr. Farrell provides any empirical evidence for this assumption. Declarants also seem to summarily dismiss the ability of education programs embraced within the Settlement to enhance public understanding of the distorted and inequitable nature of the current arrangement and do not take into

---

[91]Levitin Declaration ¶ 73 ("Merchants are also unlikely to engage in surcharging by product or brand because it risks losing customer good will."). Mr. Levitin continues his static analysis in this regard, noting that "cardholders are likely to blame the merchant for the surcharge, rather than the issuer or Network because the merchant is the party applying the surcharge and cardholders generally do not understand the interchange fee system." *Id.* Instead, merchants have an easy to tell story – "the use of Premium cards results in a significant increase in cost to us. This cost has continued to increase each year. Beginning [some days] in the future, we will begin imposing these costs on the customers who choose to use these costly Premium cards. This will allow us to offer lower and fairer prices." *See also* Farrell Declaration V.B. ("Proposed changes to the surcharging . . . are unlikely to effectively ensure competition among issuers or to significantly benefit merchants.").

[92] Farrell Declaration ¶ 85; Cook Declaration II.B. The cognizant reasons offered by Mr. Cook (surcharging is contrary to Walmart's business model ¶¶ 39-40, surcharging is operationally complex ¶¶ 41-43) are equally applicable to issuer level surcharging.

[93] Mr. Cook emphasizes the difficulty in implementing surcharging. Cook Declaration ¶¶ 41-43. As we discuss below, charging a single percentage fee for use of particular card types should be far less difficult than the varying "prices" currently charged at Walmart. Mr. Cook also emphasizes Walmart's commitment to its "Everyday Low Price" strategy. ¶ 39. Presumably, high merchant cost for credit card usage would impact Walmart's everyday prices, effectively raising the price paid by all customers, with those higher prices offset by rewards received by those customers using Premium cards. In this setting, it would seem that Walmart would be at the forefront of educating its customers that their costs and prices are adversely impacted by the Premium card users, and that to implement its Everyday Low Price policy, charges to those causing higher prices will be imposed. More generally, a commitment to everyday low prices does not imply non-varying prices. A firm committed to everyday low prices may adjust prices to local conditions and use targeted coupons, which are effectively a way of price discrimination. Moreover, Walmart is currently engaged in *net* price discrimination, by forcing those who use cash or debit cards to pay a higher net price than those who use a premium credit card. We note also that Walmart has a patent on technology that could remotely alter the price on a digital shelf tag depending on what items a specific customer already has in her cart (e.g., modifying the price of mayonnaise if you have tuna). *See, e.g.*, Walmart Just Patented a System That Lets Algorithms Push Prices. This suggests that Walmart is at least contemplating and/or becoming prepared for a change in policy.

account the dynamics of the marketplace discussed earlier, where issuers and networks would have incentives to offer cards that would be accepted.

75) Dr. Farrell's Figure 1, discussed above in the context of issuer and network card-type rejection, illustrates the relatively low expected loss of business (walk-aways) that makes surcharging unprofitable. What Dr. Farrell does not explore is the walk-away percentages for surcharging by issuer compared to surcharging by card type made available in the proposed Settlement, and that is the crucial issue.[94] As we explained above, rejecting or surcharging Premium cards compared to rejecting or surcharging issuer cards has the advantage of focusing on the problem high-cost, high-rewards cards, and limiting substitution to alternative Premium cards.[95] Thus, there is no sound basis for the Declarants' assumption that surcharging by issuer would be more beneficial to merchants than being able to surcharge a network's high-cost Premium cards.

76) <u>Discounting Reforms.</u> The proposed Settlement also expands merchants' opportunities to incentivize selection of a low-cost payment means via a discount. Discounting to motivate use of low-cost payments, using a carrot rather than a stick, should not lead to the walk-

[94] All Declarants emphasize that surcharging by network is not expected because of the large volume of sales (that is overstated by each Declarant) that could be impacted. *See, e.g.*, Farrell Declaration ¶¶ 37, 41; Levitin Declaration ¶¶ 113, 116; Cook Declaration ¶¶ 68, 70. However, they do not explore the economics of why this matters. Note that in the Farrell walk-away analysis, the profitability of card rejection (and by implication, surcharging) has no variable related to the volume of sales subject to the card rejection or surcharging. Indeed, whether rejecting or surcharging is profitable is unrelated to the volume of the transactions. However, as we explained in our November 2025 Declaration, "A failed experiment involving a subset of sales is simply another business expense; the prospect of a failed experiment involving all of the networks' credit cards in all of its stores might be a potential disaster such that the merchant would not risk giving it a try." Stiglitz-Leffler November 2025 Declaration ¶ 69.

[95] For surcharging by issuer, a customer preferring, for example, a Citibank Premium card could avoid the surcharge by switching to another issuer's Premium card with minimal rewards cost from the switch. This is recognized by Mr. Cook (Cook Declaration ¶ 40 "many customers today carry only Premium cards"). For customers who can switch to an alternative Premium card with issuer non-acceptance, a relatively lower walk-away rate is implied because switching from one typical Premium card to another typical Premium card implies no merchant benefit from the surcharging. Also, surcharging an issuer's card impacts both the problem Premium cards and the lower cost Standard cards. These impacts favor surcharging by card type.

away problem.[96] The proposed Settlement expands the discounting opportunities by allowing, clarifying, and requiring incorporation into the network rules the ability to discount by issuer.[97] Dr. Farrell, Mr. Levitin, and Mr. Cook dismiss this opportunity as being impractical because it requires two prices.[98] We see no basis for this expectation.

77) Consider Walmart as an example.[99] Walmart currently prices thousands of unique items in thousands of stores.[100] Walmart offers discounts on myriad products in its Walmart + program.[101] Walmart sells goods subject to state and local sales taxes with widely varying

---

[96] Mr. Cook implicitly argues that there is an embedded base problem with discounting. Cook Declaration ¶ 64 ("The inframarginal cost of launching a program designed to steer customers to lower-cost payment methods is significant. For example, if 20% of customers already use the preferred payment method, to drive even 1% more usage, the retailer would have to pay rewards to the 20% already using the preferred method."). However, there is little "embedded base" problem with discounting of Standard cards today because, there is currently very low usage of these cards. In addition, as merchants adopt more sophisticated data analysis and pricing algorithms they should increasingly be able to provide discounts to marginal rather than inframarginal customers.
Mr. Levitin argues that discounting or surcharging must be "of little value" to merchants because few merchants take advantage of the ability to discount cash or debit versus other payment means. Levitin Declaration ¶¶ 194-199. He asserts this results from the "administrative burden on the merchant" and asserts, with no basis or support, that the "impracticability of dual pricing is the reason that merchants have eschewed it . . ." Levitin Declaration ¶ 195. But he ignores the embedded user problem discussed above, and the restraints on discounting in the current environment. He also ignores the complex pricing already engaged in by many merchants. See below.

[97] Mastercard does not allow discounting by issuer. Until its April 28, 2026 update of its rules, Visa did not specify whether it allowed discounting by issuer. This resulted in issuer confusion with, for example, Target, a large and sophisticated merchant, believing such discounting was not allowed. See Stiglitz-Leffler Reply January 2026 Declaration ¶ 12 n.18.

[98] Farrell Declaration ¶ 47; Levitin Declaration ¶ 198; Cook Declaration ¶¶ 41-43.

[99] Mr. Cook "explains" that discounting by issuer "would . . . be a very difficult tool to implement for a large retailer like Walmart. Discounting would require differential pricing across all products in a store, which would create consumer confusion and demand substantial front-end merchant investment." Cook Declaration ¶ 8.b. We do not know what specific investment Mr. Cook has in mind, nor why Walmart would have to set different prices for all products rather than simply have a single percentage discount applicable to all products. And the gain to Walmart from discounting is substantial. For example, if Walmart could reduce its cost of credit cards by, for example, 50 basis points, it would save about $900 million per year. See Walmart Annual Report 2025 p. 78 (showing U.S. net revenue of $462.4 billion. $900 million is 50 bps X $462 billion X the credit card share of payments of 40%). Such savings would justify "substantial front-end investment."

[100] Cook Declaration ¶ 53.

[101] Walmart+ Membership - Walmart.com

rules by location,[102] motivating it to set different product prices by location. Walmart accepts EBT-SNAP (Electronic Benefits Transfer, Supplemental Nutrition Assistance Program). But only a subset of the goods sold by Walmart can be purchased with EBT and those goods vary by state.[103] Retailers also have begun implementing "surveillance," pricing in which the prices of specific goods are adjusted based on customer-specific data.[104] Implementing a discount on all purchases based on the network credit card type or card issuer should be far simpler than implementing the many varying pricing differentials already in place at large retailers. The Declarants understate the creativity of merchants and underestimate their abilities and incentives to take advantage of the new opportunities the proposed Settlement will make available for merchants to influence customers' choices of payments.[105]

78) Mr. Levitin claims that "discounting is often impractical for merchants."[106] His reason for this assertion is obscure. He notes that the cost difference between favored cards and disfavored cards "is likely to be relatively limited and unlikely to be more than 100 basis points."[107] From this observation, he asserts, with no evidence or basis, that "[a]ccordingly, it is hard to see how issuer-level discounting would be particularly effective at shifting cardholder behavior."[108] Contrary to Mr. Levitin's views, we believe customers and retailers

---

[102] In some states, basic grocery items are exempt from sales taxes, while "non-basic" grocery items are taxed. What counts as a basic grocery items varies by state. In addition, local governments impose sales taxes, further complicating the actual pricing of retailers such as Walmart.

[103] SNAP Food Restriction Waivers | Food and Nutrition Administration; The SNAP Ban: 2026 Retailer Guide to Banned Items | NRS

[104] FTC Surveillance Pricing Study Indicates Wide Range of Personal Data Used to Set Individualized Consumer Prices | Federal Trade Commission, January 2025 ("Initial staff findings show that retailers frequently use people's personal information to set targeted, tailored prices for goods and services . . ..").

[105] Mr. Levitin asserts that the "Proposed Settlement's steering mechanisms are a grossly impractical Rube Goldberg machine that disregards the operational and market details that are critical in making steering work." Levitin Declaration ¶¶ 51, 295. He does not explain what he means by a "Rube Goldberg machine" in the context of the credit card services market, and repeating this label does not make it correct. *See id.,* ¶¶ 52, 59, 61, 63, 67, 184, 235, 239, 237, 285. The proposed incenting of Standard cards to promote issuer competition is no more complex than, for example, customer specific "surveillance" pricing.

[106] Levitin Declaration ¶ 198.

[107] *Id*.

[108] *Id*.

will be motivated to change their behavior for the possibility of a one percent reduction in their costs. And if 100 basis points is considered below the level needed to motivate changes in consumer behavior, then merchants' surcharging 100 basis points for use of high-cost credit cards should not result in the walk-away problem.

79) Merchants' reluctance to discount is, at least in part, a result of the decades of anticompetitive restraints in the credit card services market. With the rate compression that has resulted from the one-sided issuer competition, there has also been little incentive for merchants to discount Standard credit cards. The practically available opportunity for discounting under the current rules is for the use of debit or cash. However, these payment means account for a substantial share, about 49%, of all payments.[109] Offering a discount for debit and/or cash is very unlikely to have a positive benefit to merchants. About 49% of the customers will receive a discount even though they would have used debit or cash regardless. There is, therefore, a substantial cost to the merchant from discounting to debit or cash.[110] The only benefit offsetting this cost would come from those customers that would switch from high-cost cards to debit or cash because of the discount. Given the existing prevalence of cash-debit payments, it is unlikely that sufficient credit card users would switch to cash-debit to make discounting profitable.

80) With the proposed Settlement in place, a different calculus exists. A merchant could discount for use of the lower cost Standard cards. There is only a small "embedded base" of Standard card users that would receive the discount even though they currently use this

---

[109] The Fed - Pay-by-Bank and the Merchant Payments Use Case: Benefits, risks and potential impacts on consumer payment behaviors in the U.S. (Debit accounted for about 30% and cash about 19% of all payments in 2023).

[110] Mr. Cook expresses concern the "discounts" will be funded by the merchant. Cook Declaration ¶ 8.b. He appears to mean that the merchant will achieve lower revenue because of the discount. However, the discounting unleased by the proposed Settlement is expected to be a discount for use of a low-cost Standard credit card. If the discount were effective in getting some customers to use the Standard card rather than their Premium card, the discount would be funded by the issuing banks through lower interchange and by Premium card users not receiving their "free" rewards. From the merchant's perspective, the discount is funded by the reduced fees to the card issuers.

payment means without the discount.[111] This makes the cost-benefit analysis tip towards the benefit from inducing switching, making discounting Standard card use economically attractive to merchants.[112] In addition, if post-Settlement a merchant has negotiated an even lower Standard interchange from an issuer to be the merchant's preferred Standard card, as discussed above, the likelihood that the discount would be profitable would be enhanced.[113]

---

[111] Given that currently merchants do not steer customers to debit, Dr. Farrell notes that "Professors Stiglitz and Leffler do not explain why a significantly smaller interchange differential between standard and premium cards [compared to debit and premium cards] would induce merchants to engage in the kind of steering required to achieve reductions in card acceptance costs." Farrell Declaration ¶ 78. As explained, the "embedded base" problem implies little or negative benefit to discounting the use of debit or cash. In the next paragraph of his Declaration, Dr. Farrell notes the potential costs to merchants of steering "those who strongly prefer a particular payment method or cannot easily substitute to other payment means–may not complete the transactions or may stop patronizing the merchant in the future." ¶ 79. Dr. Farrell ignores the fact that Standard credit cards have all the credit and fraud protection benefits of Premium cards. These cards should be much closer substitutes to one another than to debit cards. Thus, merchant discounting Standard cards to encourage their use has two advantages to discounting debit: i) a small embedded base, and ii) closer substitution suggesting greater elasticity.

[112] It would take a shift of only about [redacted]% or more of Visa and Mastercard Premium and Commercial card transactions to shift to Standard cards to make a 100 bps discount for use of a Standard credit card profitable. Calculated as follows: Standard card transactions are about [redacted]% of all transactions implying a cost of a 100 bps discount of 100 bps X [redacted]% X transaction amount. The benefit would be the difference of [redacted] bps between the interchange on Premium and Commercial cards of [redacted] bps less the average interchange on Standard cards of [redacted] bps. Hence, it would take about [redacted]% of all transactions to switch to Standard cards from Visa and Mastercard Premium plus Commercial card transactions to make the discount profitable. Premium plus Commercial transactions are [redacted]% of all transactions. Therefore, if only [redacted]% ([redacted]%/[redacted]%) or more of those transactions were shifted to Standard card transactions, it would be profitable.

[113] Mr. Cook mischaracterizes the profitability of discounting. Cook Declaration ¶ 60. He argues that "issuers will not exchange lower interchange rates for discounts in the real world," implying discounts will be unprofitable. *Id*. The embedded base problem described above explains why discounting to debit and/or cash is unlikely to be an effective threat until merchants have adopted sophisticated pricing mechanisms allowing them to target discounts to customers otherwise using Premium cards. And currently, with the rate compression of Premium and Standard cards, a Premium-Standard cost-based discount will have little impact. Under the proposed Settlement, a merchant can offer an issuer of a preferred Standard card both a higher margin than on any of its transactions that are switched from its Premium cards and, more importantly, more transactions from customers switching to the issuer's discounted Standard card from other issuers' cards.

81) <u>Consumer search costs and impediments to surcharging and/or discounting.</u> Dr. Farrell suggests that surcharging and/or discounting "raise[s] consumer search costs [which] might allow merchants to charge prices well above competitive levels."[114] He presents no evidence of the presence of these effects or their empirical relevance. Equally important, he ignores how rejecting an issuer's card would impact consumers' search costs. The effect on search costs from rejecting an issuer's card has an impact that is likely greater than from surcharging a card (with a surcharge, the consumer can take all the actions available with card rejection or pay the surcharge when that imposes lower cost than other alternatives). Thus, if surcharging increases consumer search costs thereby reducing firms' price elasticity (which is the economic mechanism underlying Dr. Farrell's purported supracompetitive price response),[115] then so would allowing merchants to decline issuers' cards.[116] Indeed, rejecting Premium cards results in a smaller array of prices than the array in Dr. Farrell's world.[117] Dr. Farrell also offers no perspective on the possible impact on search costs from the host of differential pricing methods already imposed by merchants. [118]

82) Perhaps more important, Declarants again fail to take into account full dynamic effects from the proposed Settlement. Currently, the array of prices across merchants needs to take into account the array of benefits that might be received under alternative payments mechanisms accepted by different merchants. The whole system has the effect of having markedly different prices at each store, depending on the payments mechanism used,

---

[114] Farrell Declaration ¶ 56.

[115] Dr. Farrell provides no evidence or theoretical framework showing that this is a significant problem.

[116] Assume, for example, that customers typically shop among three stores for food, Walmart, Kroger's, and their local bodega. With surcharging, they would face six different sets of prices. If Walmart doesn't honor Premium cards, they face five. The settlement reduces the complexity of their decision making and might accordingly even increase effective competition. By contrast, if Walmart doesn't accept certain issuer cards and Kroger and the bodega still do, the complexity of decision making has increased.

[117] This type of argument can be used to "justify" the suppression of competition — for example, having a single retail price for a good, set by the manufacturers, lowers search costs. But, of course, at the expense of competition.

[118] Pricing under current arrangements is already complex (e.g. loyal shopper discounts, paper coupons, digital discounts), and with electronic shelf labeling, retailers can and do change pricing daily or even hourly. <u>Do Digital Shelf Labels Change Prices While You Shop? | Monee - Budget & Expense Tracker</u>. Declarants do not show that the proposed changes would add in any significant way to the complexity.

making purchase decisions far more difficult and search costs far higher. The entire intent of the reforms of the Settlement is to narrow these differentials through the array of mechanisms provided in the Settlement. Because the Settlement moves the market towards a more competitive landscape, it will actually lower search costs.

83) Mr. Levitin also asserts, without evidence or analysis, that "dual-price posting [discounting or surcharging] is a feasible solution only for merchants that offer a limited array of items, such as gasoline stations that might have only three or four products for sale."[119] But if a merchant were to implement a fixed percentage discount for use of, for example, a Standard card or a fixed percentage surcharge for use of a Premium card, that is essentially a single subtraction or add-in to an invoice. This is a trivial complication in the context of the sophisticated pricing systems used by larger merchants. And such surcharges already are regularly and increasingly occurring in the U.S., as noted above, used especially by small businesses, who are likely to be the least sophisticated in terms of implementing "complex" pricing strategies.

84) Mr. Levitin assumes, contrary to reality, that all merchants discounting or surcharging card types are required to post two prices for each item sold.[120] In fact in the vast majority of states, the merchant must simply and clearly disclose the *percentage* discount or surcharge at the point of entry and at the point of sale.[121] In addition, the rapidly evolving technology of electronic shelf labels is being increasingly employed by larger retailers like Walmart, Kroger, Home Depot, and Safeway.[122] These digital shelf labels would make dual pricing simple if it is not already so.

---

[119] Levitin Declaration ¶ 195.

[120] Levitin Declaration ¶¶ 194-195.

[121] *See, e.g.*, Dual Pricing Compliance: A State-by-State Guide for 2025 | Garrett Integrations; Credit-Card-Surcharging-Guide-Final-PDF.pdf

[122] Walmart expects to have electronic shelf labels in all its stores by the end of this year. Walmart digital price tags are coming to every US store by end of 2026, cnbc.com (Mar. 21, 2016); See, also Kroger Electronic Shelf Labels: Rollout, Criticism, and Inflation Context in 2026 - News and Statistics - IndexBox; Grocery stores adopt digital price tags. Could your bill change?; How ESLs are Reshaping the Retail Experience; How The Home Depot is Bringing People Back to Stores with Omnichannel Innovations; retail-success-story-lowes-en-us.pdf

85) Regarding the potential value of those enhanced steering opportunities, Mr. Levitin suggests that even if merchants wished to take advantage of the ability to reject, discount, or surcharge by card type, they would not be able to do so because "merchants will lack the ability to identify card types."[123] However, we understand that, for purposes of rejecting cards by type, the ability to do so electronically already exists. The transaction will simply not be authorized when the cardholder with a premium card swipes/taps/dips. Also Mr. Levitin simply ignores the difficulties posed by the parallel problem of rejecting cards by issuer.

86) As to surcharging or discounting by card type, more than [redacted]% of Visa and Mastercard transactions today are online. Again, our understanding is that electronic card-type identification is already doable today for those transactions. Even as to the in-person transactions, we do not foresee significant problems with such card identification. Most Premium cards include the Premium identifiers such as "Signature," "Infinite," "World," or "World Elite." In addition, the proposed Settlement requires all new cards to clearly identify the card type. With an average card life of about four years, any cards that are not currently identifiable will become non-existent in a relatively short time. Thus, more than [redacted]% of transactions do not require visual identification, and any remaining identification problems will be completely solved within four years. Finally, competitive acquirers will have the economic incentive to provide their merchant customers with electronic means to identify card types.

87) Mr. Levitin and the other Declarants provide no evidence contrasting the problems posed by rejection by issuer versus rejection by card type. With the multiplicity of issuers,[124] all the problems he noted (with those not already solved addressed within the settlement) would be expected to be worse for his preferred solution. He simply does not address this question.

---

[123] Levitin Declaration ¶ 185.

[124] The are hundreds of issuers of Visa and Mastercards. *See* Levitin Declaration, Table 1 (showing the top with [redacted]% of purchase volume and the topo 30 with [redacted]%. This implies that the remaining [redacted]% is supplied by over 100 issuers).

88) All-outlets reforms. Mr. Levitin complains that the changes to the All-Outlets merchant restraints will not benefit all merchant types.[125] The revised All-Outlets rule will allow companies operating stores under different banners to have different card acceptance policies. For example, Kroger could continue to accept Premium cards at its upscale Harris Teeter stores, while declining Premium cards at its budget Ruler Foods. It can also use the proposed Settlement's pilot-program reforms to test alternative different non-acceptance approaches.

89) Mr. Levitin recognizes the competitive value of these changes to the All-Outlets restraint, but dismisses their significance.[126] Mr. Levitin asserts that the change in the "All-Outlets rules affect only merchants that operate multiple trade banners." He ignores the importance that these firms play in the economy. And he also ignores that the proposed Settlement allows merchants to use different steering mechanisms (but not to make different accept/reject decisions) for different stores within the same banner.[127] Thus, all merchants with multiple outlets (whether operating under a single or under multiple banners) can benefit from this rule reform.

90) Also, merchants can observe the "experiments" done by those with multiple outlets of different types, for example, surcharging in only one type of store or not accepting premium cards at stores under one banner. This will provide some information as to the success of different polices, giving increased confidence for other merchants to engage in such steering efforts themselves.

91) Buyer groups and merchant education. Mr. Levitin also dismisses the significance of the Merchant Buyer Groups provisions of the proposed Settlement, asserting "[t]his relief too is of no value."[128] He asserts that "[t]he ability to band together as buying groups is meaningful only if merchants have negotiating leverage with the Networks in the first place.

[125] Levitin Declaration ¶ 209.

[126] Levitin Declaration ¶ 208 (". . . this is a positive step for merchants, its impact is quite limited").

[127] Proposed Settlement ¶¶ 31, 33, 80, 82.

[128] Levitin Declaration ¶ 211.

If merchants had such leverage, then it would be magnified through group buying . . . but if the merchants have no leverage to begin with, there is nothing to magnify."[129] Mr. Levitin apparently believes that merchants, whether small or large, have no bargaining power such that increasing the size of a bargaining group will have no impact. But he is clearly incorrect. Larger merchants have been able to negotiate favorable interchange rates.[130]

92) The merits experts in this litigation, including Professor Stiglitz and the networks' economist, Kevin Murpy, documented many instances of [redacted] More generally, as shown in Table 1 of our November 2025 Declaration, negotiating merchants have achieved average interchange rates that are about [redacted] basis points below the posted rates. Thus, there is no basis for Mr. Levitin's claim that by aggregating the negotiating power of smaller merchants into buying groups, those groups could not achieve lower interchange fees.[132]

---

[129] Levitin Declaration ¶ 218. Mr. Levitin also questions the extent to which the proposed Settlement will in fact result in the networks engaging in good faith bargaining with buyer groups. We have no expertise in assessing such a legal-based claim and assume that such good faith bargaining will result from the Settlement.

[130] Mr. Levitin ignores the basic insights of modern game theory (the basis of the arguments put forward by Dr. Farrell) – credible threats are what underlie successful negotiations and the power of a threat of loss of transactions is dependent on the volume of sales at issue.

[131] Reply Report of Joseph E. Stiglitz, Oct. 11, 2019, ¶¶ 22-23; Expert Report of Kevin M. Murphy, June 10, 2019 ¶ 465. Mr. Cook suggests that "Walmart has tried to negotiate with the banks about these terms [interchange, authorization practices, chargeback practices, fraud controls] and been repeatedly rejected." Cook Declaration ¶ 13. [redacted] Mr. Cook also asserts that "Walmart gets nothing of value from the proposed settlement." Cook Declaration ¶ 24. This, of course, ignores the reduction in interchange to Walmart effective immediately and through year 5 from the rate reductions. [redacted] The rules reforms will significantly increase that leverage.

[132] Elsewhere in his Declaration, Mr. Levitin recognizes the current ability of merchants to negotiate favorable interchange rates. "Negotiated interchange rates demonstrate that it is possible to have individualized pricing for merchants . . .." Levitin Declaration ¶ 274. However, in discussing the impact of merchant groups, he ignores this fact.

93) There are further reasons, beyond those provided by standard game theory, that larger buying groups would have more negotiating power. Larger merchants typically have a payment specialist on staff to effectuate negotiating strategies that have resulted in significantly reduced interchange fees. Smaller merchants are unlikely to have the same level of expertise.[133] In recognition of this, the proposed Settlement includes the funding of a program to assist merchants in understanding and using the competitive tools opened up by the Settlement, including the benefits of joining a buying group. Mr. Levitin notes the "obstacles to merchants realizing what value [the Settlement] provides [relating] to merchants' need to maintain customer goodwill, and to avoid liability under state no-surcharging rules, and the costs of engaging in dual pricing or discounting or surcharging."[134] He fails to comprehend that the program is intended to educate merchants in how to avoid or minimize the costs of these "obstacles."

94) Mr. Levitin also fails to understand that merchants learn from each other. Some merchants, the most adept and innovative, will quickly explore the opportunities opened by the proposed Settlement. If those explorations appear successful, for example if they are continued over time, others will follow. As more merchants do so, consumer norms, already evolving to make surcharging and/or non-acceptance more acceptable, will shift to make it even more acceptable. This is part of the dynamics towards a more competitive landscape that the Settlement is intended to foster. The multifaceted opportunities offered by the proposed Settlement allow competitive and varied responses by merchants well beyond those from simply eliminating the honor-all-issuers rule.

95) <u>Summary and conclusion.</u> Mr. Levitin and Mr. Cook provide Summaries of how merchants may obtain lower interchange under the proposed Settlement, along with their reasons for believing this will not happen. This provides a convenient way for us to summarize why we disagree.

---

[133] Mr. Levitin notes that "Small merchants . . . [are] without any clear payments expertise . . . and lack dedicated personnel who deal solely with payments issue." Levitin Declaration ¶ 296. He ignores that the education program will help fill that void.

[134] Levitin Declaration ¶ 221.

96) Mr. Levitin summarizes his understanding of how we expect the proposed Settlement to increase competition and lower Visa and Mastercard merchant fees.[135] He offers ten features he asserts are required for competition to be unleashed, while casting doubt that these conditions will be satisfied, and correspondingly, that competition will be improved. We summarize in parentheses our reasons that we expect these features to in fact be obtainable.

A) "Merchants need to be able to identify cards by product type . . .." (As noted, [redacted]% of transactions are online, and most Premium cards currently carry the identifiers "Signature," "Infinite," "World," and "Elite." All new cards are required to be clearly identifiable both visually and electronically. New cards will fully substitute for existing cards in about four years.)

B) "Merchants need to have the POS technology to discriminate by product type." (Larger merchants are able to discriminate by details much finer than product type, such as individual customer features. Competitive acquirers will have incentives to assist smaller merchants in accomplishing this. Merchants also have to have POS technology to discriminate by issuer, if issuer competition is to be effective. As we have shown, this issuer level discrimination is likely to be more difficult to implement than card-type discrimination.)

C) "Merchants need to be able to push down interchange fees on Premium cards by discriminating against them, but Premium cards are [redacted]% or more of consumer card purchase volume. . .." (This is where Mr. Levitin made a significant error. Premium Visa cards account for about [redacted] percent of merchant transactions volume, and Mastercard Premium card transactions volume for about [redacted] percent, not the [redacted] percent and [redacted] percent that Mr. Levitin erroneously calculated. Merchants can elicit network competition by threatening rejection or surcharging of a single network's Premium cards. If it is credible to threaten card rejection or surcharging for Chase cards (with an [redacted] share of percent transactions volume), it should be credible to

[135] Levitin Declaration ¶ 237. He pejoratively labels this "the Rube Goldberg machine".

threaten surcharging or rejection of Mastercard Premium cards, and possibly Visa Premium cards.)

D) "Merchants need to be able to push down interchange fees on Commercial cards . . . but Commercial card purchasers cannot generally be substituted to consumer cards." (Mr. Levitin's assertion is contrary to the opinions of the plaintiffs' economists who testified on market definition. He provides no evidence of the absence of such substitution. He also improperly holds constant the nature of cards.)

E) "Merchants need to be able to push down interchange fees Network-wide by discriminating against the Networks, but if they do, they just drive more traffic to the other Networks . . . ." (Mr. Levitin ignores that the same would apply to declining particular issuers' cards. In addition, this ignores the economics of negotiation. As explained by Dr. Farrell, it is the credible threat of moving share away from an issuer that might drive interchange fees down. The same will be true for credibly threatening the networks.)

F) "Merchants need to be able to band together as buyer groups that the Networks will actually negotiate with . . . ." (We have trust that the Court can enforce the clear intent of the Settlement that the Networks bargain in good faith with merchant buyer groups as required in the Settlement. If the other provisions of the Settlement fail to achieve a more competitive landscape for smaller merchants, there will be strong incentives for the formation of such groups.)

G) The Networks need to . . . not create new product categories or increase Network fees . . .." (The overall effective rate rollbacks and rate caps will prevent the creation of new product categories that raise the overall interchange rate. The Network fees are presumed to be at the current profit maximizing level.[136] The Settlement will increase

[136] Mr. Levitin also notes that "nothing in the Proposed Settlement limits the fees the networks may themselves charge." Levitin Declaration ¶ 276. However, the networks already have the incentive to set the profit maximizing network fees, and Mr. Levitin offers no basis to expect that fee to increase because of the Settlement. Also, if this were a possibility, then the proposed Settlement provisions allowing card

both issuer and network competition. Hence, there is no economic expectation that the network fee will be increased, and good reasons to believe that the network fee will be decreased.)

H) The Networks need to not increase the Average Effective Interchange Rate in years 6-8 . . . to offset the reduction in years 1-5." (Absent the Settlement, the Networks and the issuers have the incentive to set the profit maximizing rates. There is no economic basis to expect that profit maximizing rates in years 6-8 will be higher than they would have been absent the proposed Settlement because of lower rates in years 1-5. To the contrary, if the relaxation of the merchant restraints as in the proposed Settlement have any impact on the interchange rates, the profit maximizing rates in years 6-8 will be lower than if the merchant restraints had been maintained. We expect that norms and consumer expectations will have changed, so that surcharging and discounting will be more extensive than now.)

I) "The issuers need to issue Standard cards, but they have no incentive to do so because without rewards they lose their primary method of attracting cardholders." (This confuses issuing cards and the use of cards. Issuers make greater margin on Standard cards than on Premium cards. This alone provides an incentive to issue the Standard cards. And if merchants effectuate programs favoring Standard cards, that incentive increases.)

J) The issuers need to . . . not reissue cards before identifiers are required . . . ." (This would be a clear and obvious anticompetitive action contrary to the requirement that the Networks "not circumvent or attempt to circumvent these commitments either directly or indirectly."[137] We apparently have greater faith in the Court's preventing such a blatant violation of Settlement commitments.)

---

type rejection and surcharging will increase network competition, increasing the significance of these provisions.

[137] Proposed Settlement ¶¶ 54, 103.

97) Mr. Levitin's conclusion from this summary is: "If all of this were to somehow happen, . . . it is still not clear that the Proposed Settlement would result in credit card interchange rates equilibrating at anything close to the competitive level."[138] But plaintiffs have not proposed a regulatory "solution" for high credit card fees, but rather to relax the network imposed restraints propping up those fees. The credit card services market will still be subject to its history of entrenched misinformation. The market may still be highly concentrated, which is the likely result of substantial network economies of scale. While we expect the Settlement's many reforms will push towards competitive interchange fees, some underlying impediments to competition will remain. In addition, none of the Declarants provide any analysis or support that their purported solution to the competitive problems – eliminating Honor-All-Issuers – would significantly help in achieving a more competitive outcome, or at least get closer than what will be achieved by the multiple provisions of the Settlement, which go well beyond removing a specific competitive restraint.)[139]

98) Mr. Cook also provides a summary of a six-step process that he believes the Settlement reforms must achieve to motivate lower interchange fees.[140] These are:

a. the spread between Premium and Standard cars will,

b. motivate merchants to steer away from Premium cards.

c. Customer resistance can be reduced with merchant-based rewards.

d. Pilot programs can be tested with little risk.

---

[138] Levitin Declaration ¶ 237.

[139] Mr. Levitin asserts, without evidence and no theoretical support, that absent issuer-level discrimination, defined as issuer level acceptance or surcharging, "there will not be competition among issuers for merchants' business." Levitin Declaration ¶ 238. Mr. Levitin ignores two crucial facts. First, network competition is a substitute for issuer competition, and the Settlement provides significant opportunities for merchants to increase network competition. Second, issuer-level discrimination includes issuer discounting. We have explained how issuer discounting in conjunction with the incentives created by increasing the interchange gap between Premium and Standard cards will stimulate issuer competition. Absent any analysis, Mr. Levitin asserts that "issuer level non-acceptance would be far more effective at forcing down interchange rates than any other steering method." Levitin Declaration ¶ 240. The analysis we provided above of the costs and benefits of issuer-level card rejection and network-level Premium or commercial card rejection is to the contrary.

[140] Cook Declaration ¶ 27.

e. providing information about the most effective mix of surcharges, discounts, and merchant rewards.

f. With reductions in Premium card use, the threat of rejecting of these cards can be an effective negotiating tool.

99) Mr. Cook writes as if his six-step list applies to all the proposed Settlement's reforms, and as if all merchants had to engage in all steps. That is not the case. For instance, it should be obvious that merchants that already engage in surcharging may feel that they don't need to engage in more experimentations. They already know the benefits. But while we believe that this process will significantly increase competition and drive down interchange fees, his litany applies only to one of the several mechanisms embedded in the Settlement, surcharging or discounting to drive cardholders to the new Standard card. Those steps are not required for merchants to reject Visa Premium cards, reject Visa Commercial cards, reject Mastercard Premium cards, reject Mastercard Commercial cards, reject digital wallets, differentiate by issuer per Appendix H of the proposed Settlement, surcharge by brand or product to recover the cost of acceptance (rather than to steer to other payment mechanisms), or discount by issuer without trying to steer to the Standard card.

100) As to the narrow issue he addresses – surcharging or discounting to steer customers to the new Standard card – Mr. Cook opines that "there is little chance merchants can or would follow this 'process' . . .."[141] He discusses three reasons for his skepticism. First, Mr. Cook emphasizes that "surcharging and discounting conflict with the business models of large national retailers like Walmart."[142] However, we expect retailers, including Walmart, to adopt business models that are the most profitable. Even if Mr. Cook were right about firms' current behavior (and he provides no evidence), we also expect creative merchants like Walmart to alter their business models as the economic realities of the market change.

---

[141] Cook Declaration ¶ 28.

[142] Cook Declaration ¶ 29. We expect Walmart to adopt the most profitable business model given the marketing tools available to it. A new policy such as "To ensure Everyday Low Prices, we offer Walmart rewards for use of Walmart partner credit cards" would seem consistent with the goals of Walmart's business model.

The reforms of the proposed Settlement alter the economic reality. Walmart, with its emphasis on fair and low pricing, seems ideally situated to take advantage of the new steering opportunities better linking its customers' payment decisions with the cost of those decisions.

101) Second, Mr. Cook is skeptical of merchant rewards programs because of customer loyalty to the existing issuer programs.[143] This ignores the substantial advantage the merchants have over issuers. The merchants deal with the customers at the point-of-sale. Their rewards can be immediate and custom tailored to the tastes, preferences, and buying patterns of the customers. An innovative retailer like Walmart selling goods across vast number of product categories again seems ideally situated to lead the market in adopting business strategies and merchant rewards overcoming the customer inertia engendered by years of anticompetitive merchant restraints imposed by the credit card companies. This is exactly what the large merchants' economic experts on the merits have emphasized.[144]

102) Finally, Mr. Cook opines that "Retailers are unlikely to engage in the pilots contemplated by the proposed settlement."[145] He argues that "it would be tremendously costly and cumbersome to establish a surcharging/discounting regime–and a customer rewards program–limited only to certain regions or stores . . ." Mr. Cook has misread the proposed Settlement. Only selective acceptance pilot programs are limited.[146] The proposed Settlement provides that, as to other steering mechanisms, merchants with multiple locations can try whatever they want, in whatever stores they want, for however long they want.[147] Regardless, pilot programs to assess the benefits of alternative discounting, surcharging, card rejection, and merchant rewards favor a retailer like Walmart. For Walmart, finding the best response to the new steering tools via such experiments can be

[143] Cook Declaration ¶ 30.

[144] *See, e.g.*, Expert Report of Jerry Hausman ¶¶ 387, 466; Reply Expert Report of Jerry Hausman ¶ 77; Expert Report of Robert Harris ¶¶ 60, 1067, 1090, 1103, 1207; Reply Expert Report of Robert Harris ¶¶ 636-637.

[145] Cook Declaration ¶ 31.

[146] If a merchant seeks to reject network card-types, it must do so at all stores of a given banner.

[147] Proposed Settlement ¶¶ 31, 33, 80, 82.

applied to its thousands of stores. While such experiments undoubtedly will have costs, the benefits are huge. Again, that is exactly why in the litigation in MDL 1720 the merchants and their economic experts emphasized the value of pilot programs and demanded the ability to conduct them.[148]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Joseph E. Stiglitz 10/14/2026

Keith B. Leffler, Ph.D. 10/14/2026

[148] *See, e.g.*, Expert Report of Robert Harris ¶ 1071 (“[redacted]”).