# Exhibit 2

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation<br><br>This Document Applies to | ) | |
| Barry's Cut Rate Stores, Inc., et al. v. Visa, Inc., et al., No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM), also now known as DDMB, Inc., et al. v. Visa, Inc., et al., No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM) | ) | **No. 05-md-01720 (BMC) (JAM)** |

**EXPERT REPORT OF SCOTT R. MURRAY**
Evaluation of the Survey Submitted by Mark Keegan

October 8, 2026

## I. INTRODUCTION AND ASSIGNMENT

1. My name is Scott Murray. I am a Principal at Global Economics Group LLC ("GEG"). I have been asked by counsel for the Equitable Relief Class to evaluate the survey conducted by Mark Keegan of Keegan & Donato Consulting, LLC, as described in his Declaration filed September 14, 2026 (the "Keegan Declaration"), and to assess whether that survey supports the conclusions Mr. Keegan draws from it.

2. Mr. Keegan states that he was retained by counsel for Walmart and that his study was designed "to determine the efficacy of the Notice Plan in communicating the existence and terms of the Prospective Settlement Agreement to Class Members." He concludes that Class Member awareness of the litigation and of the proposed settlement is "exceptionally low" and reports, among other findings, that only 7.8 percent of Class Members have seen or heard a notice describing the proposed resolution of this case.[1]

3. My opinions do not rest on the premise that online or nonprobability surveys are inherently unreliable; such surveys can be useful research tools. The questions I address are whether this particular sample has been shown to represent the Class, whether the questionnaire measures what Mr. Keegan says it measures, and whether the precision he reports is supported by the study. The materials I considered are listed in Appendix A. My opinions may be supplemented if additional information becomes available, including respondent-level data, provider-specific recruitment information, or project specifications.

## II. QUALIFICATIONS

4. I have more than 30 years of experience conducting economic, financial, and statistical analyses in complex litigation, regulatory proceedings, and strategic advisory engagements, with particular experience in financial services and payments. I am a Principal at Global Economics Group, which is an economic consulting firm providing economic, financial, statistical, and related analytical services in litigation, regulatory, and business matters.

[1] Keegan Declaration para. 1, 4, and 7.

5. I hold an MBA from the University of Chicago with concentrations in analytic finance, statistics, and accounting, and a Bachelor of Science in Economics from the University of Kansas. I began my career as a statistician at the U.S. International Trade Commission.

6. From 2015 through 2026, I was Senior Vice President and Head of Analytics at PYMNTS.com, a research and media organization focused on payments and commerce, where I built and directed its survey research and analytics practice. Through 2018, I personally designed and conducted the organization's survey research. As the program grew, I hired senior analysts who conducted surveys under my supervision, while I retained responsibility for survey design, sampling methodology, quality control, and interpretation of results. The program conducted more than 100 primary research studies annually, produced approximately 200 reports and data products each year, and was supported by a 25-person analytics organization that I built and led.

7. A significant portion of that research was directed to businesses and business decisionmakers in payments markets. For studies requiring specialized business respondents, including senior decision-makers, we used established research providers to recruit and interview qualified respondents, including through computer-assisted telephone interviewing.

8. In that work, I regularly evaluated the relationship between the achieved sample and the population about which conclusions were to be drawn. Depending on the study, respondents were sampled, stratified, or subsequently weighted using known or independently established characteristics of the relevant population, such as firm size, industry, or market segment, so that differences between the achieved sample and the target population did not improperly determine population-level estimates. My work at PYMNTS also required developing payment-specific question sequences that distinguish between payment forms, acceptance methods, and underlying funding sources because respondents frequently confuse them.

9. My earlier and subsequent work has included economic and statistical analysis supporting expert testimony, market definition and competition analysis, class-wide impact analysis, and damages, with extensive work on card networks and other payment systems. My curriculum vitae is attached as Appendix B.

10. GEG is being compensated for my time in connection with this engagement at a rate of $800 per hour. Neither GEG's compensation nor mine is contingent upon the substance of my opinions or the outcome of this case.

## III. SUMMARY OF OPINIONS

11. **Opinion 1: The survey's sample frame does not correspond to the Class, and there is no supportable basis on which the sample could represent it.** Mr. Keegan treats the "natural demographic fallout" produced by screening members of three online panels as the actual composition of the Class. He offers no independent benchmark supporting that assumption and applies no weighting. Nearly two-thirds of his sample—respondents his own tabulations label "General Population"—qualified through personal payment acceptance, many reporting relatively few transactions, and his screener does not reliably identify card acceptance.

12. **Opinion 2: The 7.8 percent notice finding is largely a product of question routing.** Only 123 of the 1,042 respondents were ever asked whether they had seen or heard a notice, and 81 of them (66 percent) said they had. The 919 respondents who were never asked the question are counted as not having seen the notice.

13. **Opinion 3: The survey measures later unaided recall, not exposure to the Notice Plan.** No respondent was shown any actual notice material. The survey therefore cannot distinguish Class Members who were never reached by the Notice Plan from those who were reached but could not later recall the litigation or the settlement terms.

14. **Opinion 4: The reported ±3.0 percent margin of error overstates the precision of the results.** It does not capture the principal sources of uncertainty in a nonprobability design, and it is incorrect even on its own terms for the small subgroups on which the key notice findings rest.

## IV. SURVEY RESEARCH CONCEPTS

15. Several survey-research terms are used throughout this report. I describe them briefly here.

16. *Target population*. The group about which a survey is intended to draw conclusions. Here, the target population is the Class: persons, businesses, and other entities that accepted Visa- or Mastercard-branded cards in the United States during the Class Period.

17. *Sample frame*. The list or source from which respondents are actually drawn. A survey can reliably draw conclusions about a target population only to the extent that the sample frame covers that population. Coverage error arises when members of the target population are missing from the frame, or are present in the frame in proportions that differ from the population.

18. *Nonprobability (opt-in) panel*. A pool of people who have volunteered to take surveys, typically in exchange for incentives. Because panel members select themselves, the probability that any member of the target population is included is unknown. Results from such panels can be projected to a target population only if the researcher demonstrates, through benchmarking or other validation, that the achieved sample reflects that population.

19. *Screener*. The initial questions used to determine whether a respondent is eligible, or qualifies, to take the survey. Respondents who do not qualify are terminated. A screener establishes eligibility; it does not establish that eligible respondents appear in the sample in the same proportions as in the target population.

20. *Click balancing and natural fallout*. Click balancing controls the demographic mix of people who begin a survey, typically to match U.S. Census proportions. "Natural fallout" refers to accepting whatever composition remains after the screener terminates non-qualifying respondents.

21. *Benchmarking, stratification, and weighting*. Benchmarking compares the achieved sample with independently established characteristics of the target population, such as firm size or industry. Stratification addresses composition at the design stage by sampling separately from defined subgroups. Weighting addresses it at the analysis stage by adjusting the influence of each respondent so that the weighted sample matches the population on the benchmark characteristics.

22. *Unaided recall and aided recognition*. Unaided recall asks respondents to retrieve information from memory without prompts. Aided recognition shows respondents the actual

material, such as a notice or advertisement, and asks whether they have seen it. Aided recognition is generally the more direct measure of whether a communication reached its audience.

23. *Margin of error*. A measure of the uncertainty that arises from random sampling in a probability sample. It does not measure coverage error, selection bias, or measurement error, and it is not generally applicable to nonprobability samples.

## V. OPINION 1: THE SAMPLE FRAME DOES NOT CORRESPOND TO THE CLASS

### A. The Sample Frame Was Online Panels, Not a Frame of Class Members

24. Mr. Keegan defines the relevant population as all persons, businesses, and other entities that accepted Visa- or Mastercard-branded cards in the United States during the Class Period. His sample frame, however, consisted of the online panels of Prodege, Veridata Insights, and Dynata, whose members received electronic invitations to the survey. The Declaration does not describe any merchant list, business-to-business sample frame, business-directory recruitment, or other effort to reach merchants outside those panels.[2]

25. Mr. Keegan's support for the representativeness of this sample frame consists of statements that the providers have "large and diverse sample frames and minimal risk of coverage and sample bias," that their panels are "balanced to the U.S. Census," and that he has used them for "hundreds of consumer research studies." These statements do not establish that the sample frame corresponds to the population of card-accepting merchants. The procedures described under "Bias Management" address the quality of responses from people who take the survey, not whether the right population was in the sample frame.[3]

26. The Class consists of persons, businesses, and other entities that accepted Visa or Mastercard cards. Mr. Keegan's sample frame, by contrast, consisted of individual members of online panels. The survey contains no frame of merchants; a business could enter the sample only through an individual panel member who worked for or owned that business, responded to the invitation, and passed the screener. Under that design, there is no basis for determining which merchants, or what share of the Class, the sample reaches. Because the sampling frame does not

---

[2] Keegan Declaration para. 21, 23, 33, 35, 37.
[3] Keegan Declaration para. 33–35, 40–49.

correspond to the Class, there is no supportable basis on which the resulting sample could represent the Class, and its percentages cannot reliably be projected to it.[4]

27. Several passages in the Declaration appear to have been carried over from consumer and trademark surveys. Mr. Keegan states that his sample is "projectable to the broader population of purchasers within the relevant market," and that disabling the browser back button ensured respondents' unbiased opinions "regarding the mark at issue." The survey instructions also tell respondents that the survey "makes use of images," although I have not identified any image in the questionnaire. These passages are consistent with a consumer-survey template being applied to a merchant population without documented adaptation to that population.[5]

**B. "Natural Demographic Fallout" Is Assumed to Be the Class Distribution**

28. Mr. Keegan instructed the panel vendors to use a balanced start, click balancing, and "natural demographic fallout." The definition of click balancing he cites explains that it matches those *beginning* the screener to predefined demographic characteristics, "generally census representation," "while not making firm assumptions about the demographics of the post-screened sample." Nothing in this design controls the composition of respondents who qualify.[6]

29. Mr. Keegan then assumes that whatever composition results from the screener is the correct one. He states that because the screener "confirmed that the study sample consisted of Class Members" and non-qualifying respondents were terminated, "the demographic characteristics of the survey sample are reflective of the natural composition of Class Members." He similarly states that targeting his three respondent categories "ensures that the survey sample contains and is representative of" all types of Class Members.[7]

30. That conclusion does not follow. A screener establishes whether each respondent is eligible; it does not establish the proportions of different types of eligible respondents. If the Class were 90 percent one type of merchant and 10 percent another, a sample split 50/50 between them

[4] See Baker, R., et al. (2010), "Research Synthesis: AAPOR Report on Online Panels," Public Opinion Quarterly, 74(4), 711–781, at 726 ("Without a well-defined sampling frame, the coverage error of resulting estimates is unknowable."), available at https://aapor.org/wp-content/uploads/2022/11/nfq048.pdf.
[5] Keegan Declaration para. 36, 41; Exhibit 3, Question 2.
[6] Keegan Declaration para. 36 and n.20.
[7] Keegan Declaration para. 25 and n.21.

would consist entirely of eligible respondents and still would not represent the Class. The post-screening mix here reflects who joined these panels, who responded to the invitations, and who passed the screener. By treating that unweighted fallout as the Class distribution, Mr. Keegan answers the representativeness question by assumption rather than by evidence. This matters where the characteristic on which the sample and the population differ is related to the survey outcome. Here there is every reason to expect that it is: awareness of merchant-fee litigation, and exposure to the Notice Plan, would be expected to differ between a person who occasionally accepts a Venmo payment and a payment decision-maker at an established merchant. Where reliable population characteristics are available, differences of this kind can be evaluated and, where appropriate, addressed through stratification or weighting. Mr. Keegan identifies no such population characteristics and provides no empirical basis for determining whether his achieved sample reflects the composition of the Class.

31. In my experience directing business survey research, the natural distribution of respondents obtained through a given recruitment method does not necessarily match the distribution of businesses in the population being studied. The standard practice is to compare the achieved sample with independently established characteristics of the population, such as firm size, industry, or segment, and to stratify or weight where they differ. Weighting is not required in every survey, but whether it is needed is an empirical question answered by benchmarking. Mr. Keegan offers no such benchmark and does not address weighting at all. Although he does not state whether the data were weighted, his tabulations show that they were not: each reported percentage equals the unweighted count divided by the unweighted base (for example, 81 of 1,042 respondents, or 7.8 percent, reported seeing notice).[8] The only sample characteristics he presents are general demographics—age, education, household income, gender, and region.[9] His questionnaire asked business respondents for the number of employees but not for revenue, and he does not compare either measure with any benchmark for U.S. businesses.[10]

**C. The Achieved Sample Makes This Assumption Consequential**

---

[8] Keegan Declaration Tables 2–5 and Exhibit 4.
[9] Keegan Declaration para. 85 and Table 1.
[10] Keegan Declaration Exhibit 3, Question 13.

32. Of the 1,042 respondents, 654 (62.8 percent) qualified through Mr. Keegan's Individual pathway, and his tabulations label them "General Population" respondents. They qualified by selecting "accepted payment for goods and/or services" from a list of activities and then indicating that they had accepted card, digital wallet, or online payments, including Visa or Mastercard. Of these 654 respondents, 463 (70.8 percent) had identified themselves as employees, business owners, or self-employed but did not qualify through the business pathway.[11]

33. Many of these respondents report limited payment-acceptance activity. At Question 18 of the survey, 359 Individual-pathway respondents (34.5 percent of the entire sample) reported accepting payment for 100 or fewer transactions since the beginning of 2021, and 454 (43.6 percent of the entire sample) reported 250 or fewer. Question 18 counts all transactions, not only Visa or Mastercard transactions, and was not used to terminate respondents.[12] No comparable volume question was asked of business respondents, and no respondent was asked what share of his or her transactions was paid with Visa or Mastercard cards.[13]

34. I express no opinion on whether any of these respondents are legally members of the Class. The methodological point is that Mr. Keegan provides no evidence that these groups occur in the Class in the proportions found in his sample, yet his Class-wide percentages give every respondent equal weight and are not reported separately by qualification pathway, so the effect of the sample mix on his headline figures cannot be assessed from the Declaration.

### D. The Screener Does Not Reliably Identify Card Acceptance

35. The screening questions used to qualify business respondents asked the wrong questions. To be included as Enterprise or Business Owner Class Members, respondents had to report involvement in "selecting a new credit and/or debit card issuing vendor or vendors" or "negotiating the terms of its account(s) with its current credit and/or debit card issuing vendor or vendors."[14] Card issuers are the banks that issue cards to cardholders. A merchant does not choose a card issuer when it decides to accept Visa or Mastercard cards; it selects an acquirer,

---

[11] Keegan Declaration para. 67; Exhibit 4, Question 5 and Question 14–Question 18. The 463 figure equals the 851 respondents who selected "Work for a company or organization," "Business owner / Principal," or "Self-employed" at Question 5, less the 388 respondents who qualified through the business pathway.
[12] Keegan Declaration para. 70 and Exhibit 4, Question 18.
[13] Keegan Declaration Exhibit 3.
[14] Keegan Declaration para. 24, 61–62, 64–65; Exhibit 3, Question 10.

processor, or payment facilitator. As worded, the question describes the person responsible for selecting cards their own company uses to pay for things and not their company's acceptance of cards to receive payments. It therefore risks accepting employees responsible for card use and excluding those responsible for card acceptance. All 388 respondents who qualified through the business pathway answered this question affirmatively.

36. In my experience conducting payment research, determining whether a respondent accepted a card requires distinguishing the payment method (e.g., card, cash, bank account) from the form factor or service used (e.g., physical card, digital wallet, mobile app). A respondent who accepted a payment through Apple Pay or Venmo may not know if the underlying payment method was a credit card, debit card, bank account, stored balance, or another payment method. Mr. Keegan's questionnaire does not make this distinction. Question 8 and Question 16 present "Credit cards," "Debit cards," "Digital wallet (e.g., Apple Pay, Google Pay)," and "Online payment service (e.g., Venmo, PayPal, Square)" as parallel options, and respondents selecting any of those categories are then asked which types of credit or debit cards they accepted, including Visa and Mastercard.[15] As a result, a respondent's report of accepting Visa or Mastercard cannot be assumed to be accurate.

## VI. OPINION 2: THE 7.8 PERCENT NOTICE FINDING IS LARGELY A PRODUCT OF QUESTION ROUTING

37. Respondents reached the notice question only by passing two earlier gates. Question 21 asked whether they were aware of any class action involving several companies, and 250 selected Visa and/or Mastercard. Question 22 asked those 250 to identify which Visa/Mastercard lawsuits they were aware of from a list of five case descriptions, and 123 selected this case. Only those 123 respondents were asked Question 25, which was whether they had seen or heard a notice describing a proposed resolution. The sequence is summarized below:[16]

---

[15] Keegan Declaration Exhibit 3, Question 8–Question 9 and Question 16–Question 17 and associated display logic.
[16] Keegan Declaration para. 30, 87–90 and Tables 2–5; Exhibit 3, Question 21–Question 27.

| Stage | Question | Respondents | Share of 1,042 |
|---|---|---|---|
| Completed survey | — | 1,042 | 100.0% |
| Aware of any Visa/Mastercard class action | 21 | 250 | 24.0% |
| Selected this case from list of Visa/Mastercard cases | 22 | 123 | 11.8% |
| Asked whether they had seen or heard a notice | 25 | 123 | 11.8% |
| Reported having seen or heard a notice | 25 | 81 | 7.8% |
| Asked about settlement terms | 27 | 81 | 7.8% |
| Never asked whether they had seen or heard a notice | — | 919 | 88.2% |

Source: Keegan Declaration Tables 2, 3, and 5; Exhibit 3 (display logic).

38. Of the 123 respondents actually asked Question 25, 81 (65.9 percent) said they had seen or heard a notice. Mr. Keegan divides those 81 by all 1,042 respondents to report 7.8 percent, and states that "more than 92 percent of Class Members did not report having seen or heard the notice describing the proposed resolution." That statement is accurate only in a literal sense: 919 of the 961 respondents in that group were never asked the question.[17]

39. Excluding those 919 respondents from the notice question assumes that anyone who could not, unprompted, recall a Visa/Mastercard class action and then pick this case out of a list of similar Visa/Mastercard cases could not have seen or heard the notice. That assumption is not tested. A merchant who saw an advertisement could reasonably fail to recall the litigation weeks later or fail to distinguish it from the other Visa/Mastercard cases listed. Many respondents in fact selected those other cases; for example, 109 selected a case concerning debit-card acceptance rules.[18]

40. The same denominator issue affects the settlement-terms finding. Mr. Keegan reports that "[o]nly three respondents (out of 1,042)" selected all three accurate settlement terms, but the settlement-terms question was shown only to the 81 respondents who reported seeing notice.[19]

41. Mr. Keegan's measure of accurate awareness also treats the belief that the settlement entitled them to a monetary payment as incorrect.[20] Twenty-one of the 81 respondents

[17] Keegan Declaration para. 90 and Table 5.
[18] Keegan Declaration Table 3.
[19] Keegan Declaration para. 96; Exhibit 3, Question 27 display logic.
[20] Keegan Declaration para. 94–96 and Table 7.

asked this question selected that option. A respondent who selected this option may have been aware of the parallel damages settlement; that response may reflect confusion between related settlements, but it does not establish a lack of understanding of, or exposure to, notice of this settlement, and treating it as inaccurate further understates the share of respondents with relevant awareness.

42. Accordingly, the 7.8 percent figure is better understood as the share of respondents who passed two litigation-awareness screens and then reported seeing notice. It is a combined measure of litigation recall and notice recall, not a measure of how many Class Members the Notice Plan reached.

## VII. OPINION 3: THE SURVEY MEASURES LATER RECALL, NOT EXPOSURE TO THE NOTICE PLAN

43. Mr. Keegan states that his study "provides a measure of the efficacy of the Notice Plan." The Notice Plan used print, digital, television, radio, and other media.[21]

44. At least four distinct concepts are relevant to notice effectiveness: (a) exposure—whether the communication reached the Class Member; (b) recognition—whether the Class Member recognizes the notice when shown it; (c) recall of the underlying litigation; and (d) knowledge of the settlement terms. Mr. Keegan's survey measures (c) and (d), and measures notice only through self-reported unaided recall among respondents who first passed the litigation-recall screens.

45. The survey does not include an aided-recognition measure. No respondent was shown any actual notice execution—a print or digital advertisement or the settlement website—and asked whether he or she recognized it. Such a measure would directly address the question the survey leaves unanswered: whether respondents encountered the communications that were actually disseminated.

46. Detailed knowledge of settlement terms is a further step removed from exposure. What a recipient retains depends on attention, interest, the time elapsed since the notice, and the complexity of the settlement. Here, the notice period ended no later than August 18, 2026, and the

[21] Keegan Declaration para. 3, 31.

survey was fielded in August and September 2026. Low recall of specific terms weeks later does not establish that the notice failed to reach Class Members.[22]

47. Recall and comprehension are not irrelevant. But because the survey cannot distinguish Class Members who were never exposed to the Notice Plan from those who were exposed but could not later recall it, the survey does not measure the efficacy of the Notice Plan in the way Mr. Keegan describes.

## VIII. OPINION 4: THE REPORTED MARGIN OF ERROR OVERSTATES THE PRECISION OF THE RESULTS

48. Mr. Keegan reports that his sample of 1,042 is associated with a maximum margin of error of ±3.0 percentage points at the 95 percent confidence level and that his findings are therefore presented "with a reasonable degree of scientific certainty." In the next paragraph, he acknowledges that confidence intervals are "technically not applicable to non-probability samples."[23]

49. A sampling margin of error describes uncertainty due to random sampling variation under a probability sampling design. It does not account for other potential sources of survey error, including coverage error, nonresponse or self-selection bias, differences in sample composition across panel sources, or measurement error. Moreover, for samples drawn from opt-in or other nonprobability panels, a conventional probability-based margin of sampling error is not generally applicable.[24] Increasing the sample size would narrow the margin of error but would not correct any of these problems. Professional survey standards provide that precision measures should be reported for nonprobability samples only where the underlying model is described and its assumptions are validated;[25] Mr. Keegan does neither.[26]

[22] Keegan Declaration para. 32 and n.15.
[23] Keegan Declaration para. 50–51.
[24] See Backer et al. (2010), at 726 (explaining that nonprobability panels generally lack a well-defined sampling frame, so that the coverage error of resulting estimate is unknowable).
[25] American Association for Public Opinion Research ("AAPOR"), The Code of Professional Ethics and Practices (as amended June 2026), § III.A.8(c), p. 7 ("Reports of non-probability sample surveys will only provide measures of precision if they are defined and accompanied by a detailed description of how the underlying model was specified, its assumptions validated, and the measure(s) calculated. Otherwise, include a statement that the sample was selected with a non-probability method and measures of precision are not provided and what the resulting impact may be on inference.").
[26] Keegan Declaration para. 50–51 and n.34.

50. The figure is also misstated on its own terms. Mr. Keegan states that the margin of error "for any given study finding will never exceed ±3.0 percent." That holds only for estimates based on all 1,042 respondents. Using his own formula, the margin of error is approximately ±5.0 points for the 388 business-pathway respondents, ±8.8 points for the 123 respondents asked about notice, and ±10.9 points for the 81 respondents asked where they saw the notice and what the settlement terms were.[27]

## IX. CONCLUSIONS

51. Mr. Keegan's sample was drawn from online panels with no sample frame of merchants. A business could enter the sample only incidentally, through an individual panel member who happened to work for or own it and who responded to the invitation and passed the screener. Because the Class is defined by card acceptance by persons, businesses, and other entities, there is no supportable basis on which a sample drawn this way could represent it. In addition, his screener does not reliably determine whether respondents in fact accepted Visa or Mastercard cards; his 7.8 percent notice figure counts as "not seen" the 88 percent of respondents who were never asked the notice question; his questionnaire measures later unaided recall rather than exposure to or recognition of the Notice Plan; and his reported margin of error does not reflect the study's actual uncertainty.

52. These problems do not offset one another, and none is captured by the reported margin of error. In particular, the routing treats respondents who did not pass the litigation-awareness questions as if they had not seen notice, even though they were never asked that question, and the survey provides no means of determining how many of those respondents may in fact have been exposed to the Notice Plan. The sample-composition and qualification issues create additional uncertainty concerning the population to which the resulting percentage can be projected. Several of these features, including the routing, the reliance on unaided recall, and the inclusion of respondents who may not have accepted Visa or Mastercard cards, would each tend to understate notice exposure. Mr. Keegan's survey therefore does not provide a reliable estimate of Notice Plan reach.

[27] Keegan Declaration n.34. Figures computed as $MOE=1.96\times\sqrt{p(1-p)/n}$ for $p=50\%$ and $n = 388, 123$, and 81.

53. For these reasons, in my opinion, the survey results describe only how these particular respondents answered this particular questionnaire. They do not provide a reliable estimate of Class-wide awareness, and they provide no reliable basis for assessing the efficacy of the Notice Plan.



Scott R. Murray
Principal, Global Economics Group
Dated: October 8, 2026

## APPENDIX A

## MATERIALS CONSIDERED

- Declaration of Mark Keegan, Keegan & Donato Consulting, LLC, In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, No. 05-md-01720 (E.D.N.Y.), Document 9991-3, filed September 14, 2026, including:
- Exhibit 1 — About Keegan & Donato Consulting, LLC
- Exhibit 2 — Questionnaire (Screen Shots)
- Exhibit 3 — Questionnaire (Editor Export)
- Exhibit 4 — Tabulated Data
- Exhibit 5 — Disposition of Contacts
- Kugler, M.B. and Henn, Jr., R.C. (2022), "Internet Surveys in Trademark Cases," in Diamond, S.S. & Swann, J.B. (eds.), Trademark and Deceptive Advertising Surveys: Law, Science, and Design, 2d ed., American Bar Association (as cited by Mr. Keegan)
- Baker, R., et al. (2010), "Research Synthesis: AAPOR Report on Online Panels," Public Opinion Quarterly, 74(4), 711–781
- American Association for Public Opinion Research (AAPOR), The Code of Professional Ethics and Practices (as amended June 2026), available at https://aapor.org/standards-and-ethics/
- All other documents cited in this report

# APPENDIX B

## CURRICULUM VITAE OF SCOTT R MURRAY