# Exhibit 3

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION**<br><br>**This Document Applies to:** | **No. 05-md-01720 (BMC) (JAM)** |
| ***Barry's Cut Rate Stores, Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM), also now known as *DDMB, Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM)** | |

**DECLARATION OF CAMERON R. AZARI, ESQ. REGARDING OBJECTIONS**

I, Cameron R. Azari, Esq., declare as follows:

1. My name is Cameron R. Azari, Esq. I have personal knowledge of the matters set forth herein, and I believe them to be true and correct.

2. I am a nationally recognized expert in the field of legal notice, and I have served as an expert in hundreds of federal and state cases involving class action notice plans.

3. I am a Senior Vice President with Epiq Class Action & Claims Solutions, Inc. ("Epiq") and the Managing Director of Epiq Legal Noticing (a.k.a. Hilsoft Notifications), a business unit of Epiq that specializes in designing, developing, analyzing, and implementing large-scale, un-biased, legal notification plans. Hilsoft Notifications was recently rebranded as Epiq Legal Noticing.

4. On June 13, 2026, the Court in its *Class Settlement Notice and Scheduling Order*, appointed Epiq as the Class Administrator. I previously executed my *Declaration of Cameron R. Azari, Esq., on Proposed Class Notice Plan for Superseding and Amended Class Settlement Agreement*, on November 9, 2025 ("Notice Plan Declaration") (Dkt. 9692-3), which described the Notice Plan, detailed Epiq's class action notice experience, and attached Epiq's curriculum vitae. I also provided my educational and professional experience relating to class actions and my ability to render opinions on overall adequacy of notice programs. Subsequently, I executed my *Declaration of Cameron R. Azari, Esq. Regarding Commencement of Class Notice Plan* on July 14, 2026, ("Commencement Declaration")

(Dkt. 9933-16), which confirmed that Epiq successfully commenced the Court approved Notice Plan in compliance with the Court's Preliminary Approval Order. In addition, I executed my *Declaration of Cameron R. Azari, Esq. Regarding Implementation and Adequacy of Class Notice Plan* on August 18, 2026, ("Implementation Declaration") (Dkt. 9956), which described the successful implementation of the Notice Plan and provided settlement administration statistics.

5. The Notice Plan was designed based on Epiq's experience providing notice to the Rule 23(b)(3) Class in this same litigation. Implementation Decl. ¶ 5.

6. The facts in this declaration are based on my personal knowledge, as well as information provided to me by my colleagues in the ordinary course of my business at Epiq and Epiq Legal Noticing.[1]

## OVERVIEW

7. I submit this declaration to respond to the objections to the Settlement that relate to notice. As the Court approved Class Administrator, Epiq is aware of 54 objections to the Settlement. Two objections raise arguments relating to notice: the objection of Walmart Inc. ("Walmart") (Dkt. 9991) and the objection of the National Association of Convenience Stores and Circle K Stores Inc. (together, "NACS") (Dkt. 10003). Both rely on the *Declaration of Mark Keegan* (Dkt. 9991-3) ("Keegan Declaration"), which reports the results of an online survey that Walmart's counsel commissioned.[2]

8. In summary, it is my opinion that:

(a) Neither objection challenges the design of the Notice Plan, the media selected, the content of the Notices, the measured reach and frequency, or the manner in which Epiq implemented the Notice Plan. Neither objection identifies any notice method that should have been used and was not.

(b) The measure of adequate notice is whether the notice effort was reasonably calculated to reach the Class and to give Class members an opportunity to learn about the Settlement and their right to object. It is not whether every Class member, weeks later, can recall having seen a notice or can identify the Settlement's terms from memory.

[1] Capitalized terms used herein have the same meaning as defined in the Settlement Agreement or in my Implementation Declaration.

[2] In this declaration, I address only the portions of the objections that relate to notice. I express no opinion on the merits, fairness, or adequacy of the Settlement's substantive terms, which are outside the scope of my role and expertise.

(c) The Keegan Declaration measures recall and awareness, not reach or the opportunity to see the notice. Its design and sample also cause it to understate the number of Class members who encountered the Notice, and its own data show that respondents who were asked about the Notice largely recalled it and identified the media channels the Notice Plan actually used.

(d) The Settlement provides for a separate, $21 million Merchant Education Program to educate merchants about the Settlement's provisions. Under the Settlement Agreement, that program begins after final approval, and it has not yet started. A survey of Class members' knowledge of Settlement terms taken before that program begins does not speak to the adequacy of the Notice.

(e) The Notice Plan was comprehensive. It reached an estimated 82.2% of all U.S. Business Owners and 84.8% of all U.S. Adults in Business and Finance Occupations, multiple times on average, using the same media approach as the (b)(3) notice program this Court approved, and it far exceeded what Rule 23 and due process require for a Rule 23(b)(2) settlement.

## <u>THE NOTICE-RELATED PORTIONS OF THE OBJECTIONS</u>

### <u>*The Keegan Declaration*</u>

9. Keegan was retained by Walmart's counsel to design and conduct an online survey of what Keegan defines as Class members. Keegan Decl. ¶ 1. The survey was fielded through three online panel vendors in August and September 2026 and produced 1,042 completed responses. *Id.* ¶¶ 32–33, 50. Keegan asserts that the survey "provides a measure of the efficacy of the Notice Plan in informing Class Members of the proposed settlement terms." *Id.* ¶ 31. Keegan summarizes their findings as follows:

> My study of 1,042 Class Members demonstrates that Class Member awareness of both the litigation and the proposed settlement is exceptionally low. Specifically, the study findings show, among other things, that:
>
> - 76.0 percent of Class Members have no awareness of any class action lawsuits against Visa and/or Mastercard;
> - 88.2 percent of Class Members have no awareness of this case;
> - 7.8 percent of Class Members indicated that they have seen or heard a notice describing a proposed resolution to the current case; and

*Keegan Declaration ¶ 7 (Dkt. 9991-3, Dkt. page 4), filed September 14, 2026.*

10. Keegan further reports that very few respondents could select the Settlement's specific terms from a multiple-choice list, and that some respondents believed the Settlement provides a monetary payment. *Id.* ¶¶ 7, 95–96.

***<u>The Walmart Objection</u>***

11. Walmart relies on the Keegan Declaration to argue that the Class's reaction to the Settlement weighs against approval. Walmart contends that about 11% of Class members know about the litigation and only 7.8% know about the Settlement, and that many in that group misunderstand its terms. In a footnote, Walmart also contends that I have "no direct evidence" of the number of Class members who actually saw or heard the Notice, or of the number who understood it, and that I "appear[] to infer" that Class members saw and understood the Notice:

> **E. The Class's Negative Reaction to the Settlement Underscores Its Unfairness**
>
> The reaction of the class to the Settlement also cuts against approval. A substantial survey of class members shows that very few (about 11%) even know about this litigation, and only 7.8% of class members know about the Settlement. Keegan ¶ 98. And even in that group, many misunderstand the Settlement's terms. *Id.* ¶ 99. Thus, the only direct study of class member

*Walmart Objection (Dkt. 9991, Dkt. page 24), filed September 14, 2026.*

> [13] Class Plaintiffs' notice expert has no direct evidence about the number of class members who actually saw (or heard), and of those the number that understood the notice. Doc. 9956. Instead, he appears to infer that class members must have seen and understood notices in various media. The evidence from Mr. Keegan's survey shows that most of the class did not see or hear the notice, much less understand the Settlement, far outweighs Class Plaintiffs' surmise.

*Walmart Objection (Dkt. 9991, Dkt. page 25, fn. 13), filed September 14, 2026.*

12. Walmart later cites the same survey in support of its due process argument, asserting that the Settlement would take effect "without most absent class members even knowing about it." Dkt. 9991, Dkt., page 27 (citing Keegan Decl. ¶¶ 97–100).

***<u>The NACS Objection</u>***

13. NACS likewise relies on the Keegan Declaration in its discussion of the Class's reaction. NACS asserts that the number of objectors has grown to "nearly a thousand or more," and

that "class survey data has revealed that the reason even more have not yet joined is that remaining class members are unaware of the settlement's provisions or very existence." Dkt. 10003, Dkt. page 44. NACS then argues that the Court should not treat Class members' silence as consent because, according to the survey, 88% of Class members are unaware of the lawsuit, fewer than 8% have seen a notice of the Settlement, and few respondents could accurately identify the Settlement's provisions:[3]

> The settling parties may point to the fact the class includes millions of merchants, most of whom have stayed silent during this approval process, but the Court should not lightly assume that silence is consent. Survey data reveals that the vast majority of the class is still unaware of this lawsuit at all, much less the details of the proposed settlement agreement. The Keegan Survey of class members found that 88% of class members do not even know that this lawsuit exists in the first place. Keegan Dec. Table 3, ¶ 98. Less than 8% said they had seen any notice of this proposed settlement, *id.* Table 5, and only a few survey respondents could accurately identify three provisions from the proposed settlement from a multiple-choice listing without picking provisions that do not exist in the settlement. *Id.* Table 4. For example, of the respondents who did indicate knowledge of the settlement agreement, some of them incorrectly believed that the proposal guarantees them a refund or would allow them to reject cards from particular issuers. *Id.*

*NACS Objection (Dkt. 10003, Dkt. page 51), filed September 14, 2026.*

14. Notably, neither objection disputes that the Notice Plan was implemented as the Court approved it; that it reached an estimated 82.2% of U.S. Business Owners with an average frequency of 4.5 times and 84.8% of U.S. Adults in Business and Finance Occupations with an average frequency of 4.1 times; that the Notices were written in plain language and published in eight languages; or that the Case Website, toll-free telephone number, email address, and postal address were available (and continue to be available) to every Class member who wished to learn more. Nor does either objection propose any additional or different notice method. Both objections rest instead on a single survey of what respondents recalled.

[3] NACS cites Table 4 of the Keegan Declaration for this point. Table 4 contains exemplar open-ended responses; the multiple-choice results on Settlement terms appear in Table 7. Keegan Decl. ¶¶ 89 & 95.

15. NACS's own account of the objections also bears on notice. NACS describes nearly a thousand merchants and trade associations, including many of the country's largest retailers and merchant trade groups, as having objected. Dkt. 10003, Dkt. page 44. Whatever the precise count, that level of participation reflects Class members who learned of the Settlement and used the objection process the Notices described. The Website Notice expressly told Class members they could object to the Settlement and to the "notice procedures." Website Notice, Frequently Asked Question and Answer 10.

**THE APPLICABLE NOTICE STANDARD**

16. The Settlement resolves claims of a mandatory class certified under Rule 23(b)(2), which seeks only equitable relief. For such a class, Rule 23 provides that the Court "may direct appropriate notice to the class."[4] For a proposed settlement, Rule 23 requires that the Court "direct notice in a reasonable manner to all class members who would be bound by the proposal."[5] These standards are more flexible than the standard for a Rule 23(b)(3) damages class, which calls for "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."[6]

17. The due process guidance a notice expert draws from the Supreme Court's decisions is that notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," and that the means employed must be "such as one desirous of actually informing the absentee might reasonably adopt to accomplish it."[7] In my experience, these standards are directed at the reasonableness of the notice effort. They do not require that every class member actually sees the notice, remembers it, or understands every term of a settlement, and I am not aware of any court-approved notice program in any case that has met such a test.

18. Consistent with this, the Federal Judicial Center ("FJC") identifies reach as "the lynchpin in an objective determination of the adequacy of a proposed notice effort," and explains that

[4] Fed. R. Civ. P. 23(c)(2)(A).

[5] Fed. R. Civ. P. 23(e)(1)(B).

[6] Fed. R. Civ. P. 23(c)(2)(B).

[7] *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314–15 (1950); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 (1974).

"[i]t is reasonable to reach between 70–95%."[8] Reach measures the opportunity to see the notice. It is the accepted, objective yardstick for media-based notice programs, and it is the measure I applied in designing the Notice Plan and in reporting on its implementation.

**THE NOTICE PLAN WAS COMPREHENSIVE**

19. As detailed in my Implementation Declaration, the Notice Plan reached approximately 82.2% of all U.S. Business Owners with an average frequency of 4.5 times, and 84.8% of all U.S. Adults in Business and Finance Occupations with an average frequency of 4.1 times. Implementation Decl. ¶¶ 8, 39. That reach sits well within the range the FJC describes as reasonable, and it was achieved without counting several components of the Notice Plan that are not measured, including the trade and specialty publications, local business journals, specialty language and targeted newspapers, U.S. Territory newspapers, sponsored search listings, and the Case Website. *Id.* ¶ 9.

20. The Notice Plan was broad and layered. It included seven national business publications; 13 trade and specialty publications; 55 local business journals covering all major U.S. metropolitan areas; 85 specialty language and targeted newspapers; and five U.S. Territory newspapers.[9] It also included a Digital Notice Campaign that generated approximately 759 million impressions across display networks, business websites, specialty language websites, *Facebook*, *Instagram*, *X*, *LinkedIn*, *Reddit*, *YouTube*, podcasts, and streaming TV; 4.4 million streaming radio spots and 1.3 million Digital Notices on *Pandora* and *Sirius XM*; and sponsored search listings on *Google*, *Yahoo!*, and *Bing* that were displayed 234,971 times. Implementation Decl. ¶¶ 21–23, 30. Notice was provided in English, Spanish, Chinese, Korean, Vietnamese, Japanese, Thai, and Russian. *Id.* ¶ 6.

21. The trade publications were selected to reach the specific merchant sectors in the Class, including the sectors the objectors represent. The Publication Notice ran as a full page in *Convenience Store News* and *C-Store Decisions*, and also appeared in *Mass Market Retailers*,

---

[8] Fed. Judicial Ctr., *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* 3 (2010).

[9] Implementation Declaration ¶¶ 11–30. The national business publications had a combined circulation of more than 2.2 million; the trade and specialty publications more than 500,000; the local business journals more than 675,000; the specialty language and targeted newspapers approximately 3.7 million; and the U.S. Territory newspapers 442,500. *Id.* ¶¶ 11, 24, 25, 27, 29.

*Supermarket News*, *Hardware Retailing*, and *Retail Merchandiser*, among others. Implementation Decl. ¶ 24.

22. Class members used the resources the Notice Plan made available. As of October 12, 2026, the Case Website received 211,477 unique sessions and presented 241,989 web pages; sponsored search listings had produced 10,191 clicks to the Case Website; the toll-free telephone number had received 216 calls; and Epiq had mailed 48 Long Form Notices on request.

***<u>The Notice Plan Followed the Approach of the Court-Approved (b)(3) Notice Program</u>***

23. For the claim phase of the (b)(3) settlement, Epiq's measured media plan targeted the same audiences used here, U.S. Adults who are Business Owners and U.S. Adults in Business and Finance Occupations (along with U.S. Adults 18+), and used the same categories of media: national business publications, trade and specialty publications, local business journals, specialty language publications, U.S. Territory newspapers, digital and social media notices, satellite and streaming radio, streaming television, sponsored search listings, and a case website in the same eight languages. That media plan reached 89.7% of U.S. Business Owners with an average frequency of 5.2 times and 89.4% of U.S. Adults in Business and Finance Occupations with an average frequency of 4.6 times.[10]

24. The (b)(3) program also included direct mail of more than 38 million Claim Forms, because (b)(3) Class members needed to file claims to receive payments from a $5.5 billion fund. Claim Phase Declaration ¶¶ 4, 11. That component was not applicable here. As I explained when the Court approved the Notice Plan, members of the Rule 23(b)(2) Class have already been certified as a class, have no claim forms or opt-out forms to return, and will automatically receive the benefits of the Settlement. Notice Plan ¶ 12. The Notices told Class members the same thing: if they do nothing, they "automatically benefit from the Visa and Mastercard rule changes" and "do not have to file any forms." Website Notice, "Your Legal Rights and Options in This Settlement;" *see id.* and Frequently Asked Question and Answer 18. The Notice Plan thus applied (to a settlement governed by the more flexible Rule 23(b)(2) standard) the same media approach the Court approved for the (b)(3) damages settlement.

---

[10] *Declaration of Cameron R. Azari, Esq., on Implementation of Claim Phase Notice*, executed August 15, 2025 ("Claim Phase Declaration") ¶¶ 4, 9, 11, 13, 52–55, 60, 65.

***Reach is a Calculation, Not an Inference***

25. Walmart's contention that my conclusions rest on "surmise" is mistaken. Reach and frequency are not inferences that Class members saw and understood the Notice. They are calculated using data sources and tools that the advertising industry and courts rely on, including MRI-Simmons readership and product usage data, Comscore online usage data, and Alliance for Audited Media circulation statements, together with software that removes duplication among audiences of the various media vehicles.[11] This is the methodology I described in the Notice Plan the Court approved, and the same methodology Epiq used for the (b)(3) notice program. I have never stated that every Class member saw or understood the Notice. No notice program can make that claim, and none is required to. The relevant question is whether the Notice Plan was reasonably calculated to reach the Class and provide an opportunity to learn more and to object. It was.

**THE KEEGAN SURVEY DOES NOT MEASURE THE ADEQUACY OF NOTICE**

***Recall is Not the Measure of Notice***

26. A class action notice is not a public information campaign, and it is not designed to make an entire class knowledgeable about a lawsuit or a settlement. Its purpose is to give class members a fair opportunity to see a notice, recognize that it may apply to them, and, if they are interested, follow up through the case website, toll-free number, or other resources for complete information. The Notices here were designed to do exactly that. They used the Long Form Notice headline so that Class members could self-identify, and every Notice directed readers to the Case Website. Implementation Decl. ¶¶ 19, 31–32, 37.

27. The Keegan survey asks a different question: whether a respondent, at an unspecified point in August or September 2026, could recall having seen or heard a notice.[12] Recall is not exposure. Here, the Digital Notice Campaign, streaming radio, and sponsored search listings ended on July 30, 2026, and most print placements ran in July. Implementation Decl. ¶¶ 11–30. The survey thus asked respondents to recall notices that, for most, they would have encountered weeks earlier.

---

[11] Notice Plan ¶¶ 16–18. References to the "Notice Plan" are to the Court-approved Notice Plan contained in Appendix C to the Settlement Agreement.

[12] Keegan Decl. ¶ 32 & fn. 15. Mr. Keegan states only that data collection took place "in August and September 2026" and does not disclose specific field dates.

28. The survey's own results illustrate the point. Only 24% of respondents said they were aware of *any* class action lawsuit involving Visa or Mastercard. Keegan Decl. ¶ 87. Yet in 2023 through 2025, in this same litigation, Epiq mailed more than 38 million Claim Forms to merchants in envelopes that announced, "It is time to file your claim for your share of the $5.5+ billion settlement," and ran a media campaign that reached 89.7% of U.S. Business Owners an average of 5.2 times.[13] The (b)(3) program was a massive notice effort that included one of the largest digital noticing campaigns ever implemented in a class action, and the Court approved it under the more demanding "best notice practicable" standard. That three-quarters of Mr. Keegan's respondents nonetheless report no awareness of any Visa or Mastercard class action does not show that the (b)(3) notice failed. It shows that a recall survey of this kind does not measure whether a notice program reached a class.

29. That is especially true for a Rule 23(b)(2) settlement. Class members do not need to file a claim, submit a form, or take any other action to receive the Settlement's benefits, and there is no right to opt out. Notice Plan ¶ 12. In my experience, a large share of class members who see a notice like this reasonably decide that no action is needed and do not pursue the matter further. That is a rational response to an adequate notice, not evidence of an inadequate one. In no case I have worked on has an entire class visited the case website or read the settlement documents, and that is not a realistic standard for any notice program.

***<u>The Survey's Design Understates Notice Exposure</u>***

30. The 7.8% figure on which both objections rely is not a measure of how many Class members saw the Notice. The survey asked about the Notice only after two prior recall screens. A respondent first had to select "Visa and/or Mastercard" from a list of companies involved in class action lawsuits, and then had to select a description of this case from a list of five lawsuit descriptions. Only respondents who passed both screens, 123 of 1,042, were ever asked whether they had seen or heard a notice.[14] The other 919 respondents, or 88.2% of the sample, were never asked. A respondent who saw a Notice, but who did not first recall this lawsuit by name and description, was counted as not having seen it.

---

[13] Claim Phase Declaration ¶¶ 11, 19–20, 65.

[14] Keegan Decl. ¶¶ 30, 76–81; *id.* Ex. 4 (Q25 base of 123 respondents).

31. Among the respondents who were actually asked, the results support the reach of the Notice Plan. Of the 123 respondents asked whether they had seen or heard a notice describing a proposed resolution of this case, 81, or 65.9%, said they had.[15] Those respondents most often identified the channels the Notice Plan actually used: social media (57), the Case Website or other websites (37), internet advertising (25), TV including streaming (25), and business magazines or journals (33 combined, print and digital).[16]

32. The same data also show the limits of recall as a measure. Among the 81 respondents who said they saw a notice, 14 said they saw it on a postcard or other mailing, eight on mass transit, and seven on outdoor signage. The Notice Plan used none of those media, as Mr. Keegan himself acknowledges. Keegan Decl. ¶ 91. The reports of a mailed notice may well reflect memories of the 38 million Claim Forms mailed in the (b)(3) settlement. Either way, respondents' memories of where and whether they saw a particular notice are imperfect, which is one reason the FJC and courts rely on reach rather than after-the-fact recall surveys to evaluate notice.

33. The survey also instructed respondents not to use the Internet or any other source when answering.[17] That removes the very mechanism the Notices were designed to use. The Notices summarized the Settlement and pointed Class members to the Case Website, where the Website Notice, Settlement Agreement, FAQs, and other documents were available in eight languages. A test of what respondents can recall without that resource does not measure whether the Notice gave Class members a reasonable opportunity to learn about the Settlement.

***The Survey Sample Does Not Match the Notice Plan's Target Audience***

34. The Court approved a Notice Plan targeted to U.S. Business Owners and U.S. Adults in Business and Finance Occupations, the people who make or influence card acceptance decisions for merchants. Notice Plan ¶ 20. Most of Mr. Keegan's sample fall outside that audience. Of his 1,042 respondents, 654, or 62.8%, did not qualify through employment or business ownership; his own tabulations label them "General Population" respondents. They qualified because they reported

[15] Keegan Decl. Ex. 4 (Q25: 81 of 123 respondents, or 65.9%).

[16] Keegan Decl. ¶ 91; *id.* Ex. 4 (Q26). Respondents could select more than one source.

[17] Keegan Decl. ¶ 75.

personally accepting payment for goods or services since 2021, and 80.4% of them reported accepting payment through an online payment service such as *Venmo*, *PayPal*, or *Square*. Of these 654 respondents, 237 (36.2%) reported accepting 50 or fewer payments over more than five years, including 82 who reported 10 or fewer.[18] The sample was drawn from general consumer online panels, and 47.6% of those who started the survey were screened out because they had not accepted payment for goods or services at all.[19] Whether such individuals are Class members is a legal question I do not address. But a sample in which nearly two-thirds of respondents are individuals of this kind is not a reliable measure of whether a notice program directed to business owners and business decision-makers reached its intended audience. Mr. Keegan does not report his awareness results separately for the business owner and enterprise respondents.

***<u>Understanding of Settlement Terms</u>***

35. Mr. Keegan's headline that "only three respondents" demonstrated awareness of the Settlement's terms counts only respondents who selected all three listed accurate terms and none of the two inaccurate terms, from memory and without reference to any source. Keegan Decl. ¶ 96. Measured against the respondents who were asked the question, those who reported seeing the Notice, nearly half (40 of 81, or 49.4%) correctly identified the Settlement's central acceptance provision, the ability to decline Commercial and/or Premium cards while accepting other cards, and 39.5% correctly identified the surcharging provision.[20] A notice is not designed to make class members memorize settlement terms. It is designed to provide a plain-language summary and direct class members to complete information, which the Notices here did. Implementation Decl. ¶ 37.

36. The belief of some respondents that the Settlement provides a monetary payment is not evidence of deficient notice either. Both the Publication Notice and the Website Notice state plainly that "[t]here is no monetary payment to" Class members in this Settlement, and both direct readers to the separate website for the (b)(3) cash settlement.[21] The (b)(3) settlement did provide

[18] Keegan Decl. Ex. 4 (Q14–Q18, displayed only to "General Population" respondents, n=654).

[19] Keegan Decl. Ex. 5 (Disposition of Contacts).

[20] Keegan Decl. Ex. 4 (Q27, base of 81 respondents).

[21] Settlement Agreement ¶ 15; Publication Notice (Settlement Agreement App. D1); Website Notice, Question 7 (Settlement Agreement App. D2).

monetary payments to merchants and, as described above, was the subject of a massive notice and claims campaign in 2023 through 2025. Some confusion between the two settlements in the same litigation, involving largely the same merchants, is not surprising, and it does not reflect any deficiency in the Notices here. Similarly, the Notices describe the Settlement's provisions permitting merchants to offer discounts that vary by card issuer, which may explain why some respondents selected an option describing the ability to decline cards from certain issuers. Website Notice, Frequently Asked Question and Answer 8; Settlement Agreement ¶¶ 19, 68.

**THE MERCHANT EDUCATION PROGRAM HAS NOT YET BEGUN**

37. The Notice's role was to inform the Class of the proposed Settlement and of Class members' right to object and be heard. It was not intended to be the means by which Class members learn to use the Settlement's new tools. The Settlement assigns that function to a separate Merchant Education Program, funded with $21 million, that will advise merchants and their processors, acquirers, and payments consultants on, among other things, the rules as modified by the Settlement, the benefits of the Settlement, the steering tools available to merchants, the formation of Merchant Buying Groups, and steering support in states that restrict surcharging. Settlement Agreement ¶¶ 9, 56–60, 105–109. The Notices told Class members about the program. Website Notice, Frequently Asked Question and Answer 8.

38. Under the Settlement Agreement, the Merchant Education Program begins "[f]ollowing the Settlement Approval Date," which occurs only after the Court enters its final approval order, and the $21 million is funded within 20 business days after that date.[22] Because the Merchant Education Program has not yet begun it is therefore unsurprising that a survey conducted before final approval, and before that program has started, found that relatively few respondents could identify specific Settlement terms. The objectors are aware of the program; their own declarants address it.[23] In effect, the objectors fault the Notice for not accomplishing what the Settlement assigns to a later, separate educational program. That is not a measure of the adequacy of the Notice.

---

[22] Settlement Agreement ¶¶ 1(ll), 9, 56, 105.

[23] *See* Cook Decl. (Dkt. 9991-1) ¶ 84; Levitin Decl. (Dkt. 10003-1) ¶¶ 28(f), 221–22.

## CONCLUSION

39. Nothing in the Walmart Objection, the NACS Objection, or the Keegan Declaration changes the opinions I expressed in my Implementation Declaration. The Notice Plan was comprehensive and was implemented as the Court approved. It reached an estimated 82.2% of U.S. Business Owners and 84.8% of U.S. Adults in Business and Finance Occupations, multiple times on average, through an extensive mix of print, digital, social media, audio, and search placements in eight languages, supported by a Case Website and toll-free number that gave every Class member easy access to complete information.

40. In my opinion, the Notice Plan provided appropriate notice under Rule 23(c)(2)(A) and notice in a reasonable manner under Rule 23(e)(1)(B); comported with the guidance for effective notice in the Manual for Complex Litigation, Fourth Edition, and the FJC's guidance; and satisfied the requirements of due process, including its "desire to actually inform" requirement. Indeed, the Notice Plan exceeded what is required to provide notice of a Rule 23(b)(2) settlement.

I declare under penalty of perjury of the law of the United States that the foregoing is true and correct.

Executed on October 12, 2026.

Beaverton, Oregon

Cameron R. Azari, Esq.