# Exhibit 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------x

05-MDL-1720(BMC)

IN RE:
PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

United States Courthouse
Brooklyn, New York

April 27, 2026
9:30 a.m.

-------------------------------x

TRANSCRIPT OF CIVIL CAUSE FOR CIVIL HEARING
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES

For Class Plaintiff: HILLIARD SHADOWEN LLP
BY: STEVE D. SHADOWEN, ESQ.

For Visa: HOLWELL SHUSTER & GOLDBERG LLP
BY: MICHAEL S. SHUSTER, ESQ.

For Mastercard: PAUL WEISS RIFKIND WHARTON & GARRISON LLP
BY: WILLIAM MICHAEL, ESQ.

Objectors: LEHOTSKY KELLER COHN
BY: MARY MILLER, ESQ.

EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
BY: DEBBIE GREENBERGER, ESQ.

(Continued on next page.)

(Appearances Continued)

Objectors: BOIES SCHILLER FLEXNER LLP
BY: JESSE PANUCCIO, ESQ.

HAUSFELD
BY: DANIEL P. WEICK, ESQ.

Court Reporter: Rivka Teich, CSR, RPR, RMR, FCRR
Phone: 718-613-2268
Email: RivkaTeich@gmail.com

Proceedings recorded by mechanical stenography. Transcript produced by computer-aided transcription.

(In open court.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Good morning have a seat.

THE COURTROOM DEPUTY: Good morning. Civil cause for civil hearing 05-MD-01720 in regards to Payment Card Interchange Fee and Merchant Discount Anti-trust Litigation.

State your appearance for the plaintiff and the defendant, main speakers only.

MR. SHADOWEN: Good morning, your Honor. Steve Shadowen on behalf of the class plaintiffs.

MR. SHUSTER: Good morning, your Honor. Michael Shuster for Visa.

MR. MICHAEL: Good morning, your Honor. William Michael for Mastercard.

THE COURT: Okay. First of all, I apologize for this voice. As you can hear, it's not my normal voice. I'll do the best I can.

We are on for a hearing and the objections to the preliminary approval of the 23(b)(2) settlement. I think there will be six objectors.

The way I'd like to proceed I'd like to have the plaintiffs first present the settlement general outlines. The plaintiffs can anticipate some the objections, if they want to, but I'm going to give them time to respond to them after I hear from the objectors. Then I'll hear from the defendants

on the same basis. And then I'll hear from the objectors. Then, like I said, I'll give a reply to the plaintiffs and the defendants as to what the objectors had to say.

Let's start with the plaintiffs.

MR. SHADOWEN: Thank you, your Honor. Steve Shadowen on behalf of the class plaintiffs.

I'd like to start first with a framework from the plaintiffs' perspective, your Honor. Your Honor, this settlement agreement, we believe, easily clears the bar to earn this Court's approval. It achieves nearly all the major reforms that this case set out to achieve, and it does so in the face of significant remaining litigation risk. The risk that we would not get a liability verdict. And further risk that if we do get a liability verdict, we won't get the additional reliefs that these objectors say they want. To put this settlement agreement's entire sweep of reforms at risk in pursuit of additional relief from the honor all issuer's rule. Additional relief that our economists say would bring limited or minimal additional benefit to the merchants, would be folly. The class plaintiffs ought not to do it. At a bear minimum, the class' judgment that we ought not to do it is clearly within the realm of the range of reasonable judgments.

Here is what is at stake. The problem that the merchants face is that their cost of accepting Visa and Mastercard payment cards is too high. So the settlement

agreement addresses that problem, tackles that problem, directly.

In the first reform of the honor all card rules in quarter of a century the merchants will not have to accept the network's highest price cards, the commercial cards and the premium cards.

The problem is that the prices are too high. The settlement responds by saying to the merchants, you don't have to take those high price cards. Or, if the merchants want to continue to accept those cards, they can instead charge their customers the cost of accepting those cards. And in an instant, we cover the merchant's entire cost of acceptance by surcharging the cards. The merchants will be allowed to do that regardless of whether or not the merchants accept or surcharge American Express, even though Amex's rules, rules that so far the Courts have blessed, prevent surcharging Amex cards. Or if the merchants want to continue to accept those cards and don't want to charge their customers for accepting them, the merchants can instead give a discount to the customer for using a lower priced card, including a lower priced card that this settlement agreement effectively creates; that is, a new standard or value card that has a fee that is more than 100 basis points lower than the premium cards.

In additional honor all cards reforms, the merchants

will not have to accept digital wallets, accounting 40 percent of online transactions just because those digital wallets contain a Visa or Mastercard credit card or debit card. And the merchant can prefer serving issuing banks cards. Merchants can engage in what is called issuer level differentiation in brick and mortar and in online payments.

All of this is supported by rate caps and roll backs to breeze the transition to a more competitive market. And by requirements that the networks make steering more affective by making the cards visually and digitally, electronically, identifiable to the merchant at the point of sale.

Also, has pilot programs, merchant education, support for buy-in groups.

And the settlement would also permit that dual pricing and provide additional support for the 4.5 percent of transactions that occur in states that restrict surcharging.

I will address the objectors' complaints in detail in response and maybe anticipate a little bit of them. But at a high level, your Honor, those objections misstate the law or they are based on a static rather than a dynamic view of industry, and still others are just simply factually inaccurate.

But your Honor, this motion is going to boil down to the substance of the settlements reforms and their reasonableness in light of the litigation risk.

Fundamentally, your Honor, the objectors demand that the class put at risk all of the agreed reforms, honor all products, surcharging regardless of Amex, issuer level discounting, issuer differentiation, honor all wallet reforms, the new value, the rate caps and roll backs, put all that at risk and pursue additional relief on honor all issuers.

The objectors say that the honor all issuers rules are, quote, "nakedly anti-competitive," end quote, flagrantly violate the anti-trust laws.

I appreciate their rhetoric. But there is a record in this MDL. And here is what the record shows. Chief judge Brodie has already concluded in her decision on summary judgment that the honor all issuers rule and the default interchange rates were going to be judged under the rule of reason, just like vertigo restraints. Judge Gleason, when previously examining the risk that the plaintiffs have in this case, concluded that the honor all cards rule, quote, "undeniably have significant pro-competitive affects."

And even with a liability verdict, your Honor, the honor all issuers relief is the relief that we're least likely to get at trial and to sustain on appeal.

No regulator anywhere in the world has required the dismantling of the network's honor all issuers rules.

More than that, your Honor, every four-party payment system in the world; that is, a payment system where there are

multiple issuers on the issuing side of the platform, every four-party payment system in the world, Debt card networks, credit card networks, networks with market power, networks without market power. Every one of them has an honor all issuers rule.

On top of all that, your Honor, Professor Stiglitz lits, our principle economist, says than given the other relief that is available to merchants in this settlement, the honor all issuers relief that the objectors want to us put everything at risk for would bring limited or minimal additional benefit to merchants. The settlement delivers nearly every bit of significant relief that the class sought. It is well within the range of relief that warrants this Court's approval.

So let me go through the principle forms of relief. I'll try not to anticipate too much, your Honor, but it may be hard to resist some the objections.

Starting with the honor all issuers products relief, the relief that merchants won't have to take commercial cards or premium cards. As I said, the fundamental problem that the merchants face is that their cost of acceptance is too high; those are the two categories of cards with the highest fees. And the sum of that says that the merchants will not have to take them. The merchants have long demanded exactly this relief. Our reply brief, footnotes 11, 12, 13, site the

merchant testimony in the record.

It's the first time in a quarter century that the honor all cards rules will be reformed, and this is very affective and easy to implement relief. Every merchant in every state, so it takes out of play the states with restricted surcharging that won't matter, this isn't surcharging. So even in those states, merchants will be able to decline these high priced cards. It's easy to communicate to customers, I'm sorry those are high priced cards, we don't take them. And it just takes a little bit of coding at the merchants' payment terminal to turn off that card. It's easy to implement easy to communicate.

THE COURT: You've got to admit, there will be some confusion among a consumer base that is used to seeing a Visa emblem or Mastercard emblem and, we're good to go once you see that, to realizing, we're not so good to go any more.

MR. SHADOWEN: There will be some is what referred to as friction; that is, the settlement tries to address that by requiring that the commercial label be prominent on the card so that consumers will learn as they go along. There will be some friction, your Honor, but compare that to the friction of the relief that the objectors want the honor all issuers. Somebody by walks in the store with a Visa card and it says on the door we take Visa, you get to the counter the clerk says, not that one, well the person behind me has one

from Chase, what do you mean, it's a premium card just like mine. So all this discounted relief is necessarily going to come with some amount of friction. We think this is going to be more understandable to consumer because it responds to reality. These are the highest priced cards and some merchants can just say, I'm sorry, I don't take that.

But the relief also creates this value card so that the merchant at the same time can say, I don't take that card but pick up an application right here at the end of the checkout for this new value card and I'll give you a discount every time you use that card instead. Necessarily some of friction, that's just the way markets work.

This relief, your Honor, on honor all cards is going to resolve a significant concern that Judge Brodie had. She said that in the prior 2024 settlement, she said: Despite the surcharging relief there, the merchants would still be faced with an all or nothing choice among card products.

That's no longer the case. It will no longer will be all or nothing. She was also concerned that that settlement relied so heavily on surcharging, that the surcharging was essentially the sole or principle relief. That's no longer the case. This is not a surcharging focused settlement.

She also said that the related reforms like buy-in groups, merchant education, those things were ineffectual

because the substantive relief was not sufficient. We think this response to that proper as well.

The objectors, your Honor, raise a concern about the volume of cards that the merchants would be declining if they declined especially the premium cards. Our response to that is that the merchant can make declining these cards a process rather than a one-time decision; that is, the merchant can start off by saying, I'm going to start surcharging the high priced cards, or I'm going to discount to use the standard card.

The settlement allows testing programs, pilot programs, where the merchant can look at their own customer base and say is this really going to work for these customers, how best can I do this. So it won't be a one-and-done decision, it will be a process.

Another fact in the marketplace, your Honor, that makes this more viable is what is called multi-homing; that is, 65 percent of customers carry two or more credit cards today. I think the young people who are carrying cards, this just means loading another card in your phone might have 20; but the fact is, 65 percent of customers have two or more cards so it won't be the end of the world for the merchant to say to someone I don't take that card pull out another one that you have in your wallet.

The other thing is, your Honor, that while it's true

that the current volume of transactions on the standard cards today is fairly low, about six to 8 percent for each of the networks, there are 40 percent of the active cards that are out there; that is, you can infer from that is not a lot of volume on them because everybody is using their rewards cards but they have a non-rewards card as a back up. So there are a lot of cards out there already.

Another issue on the volume of transactions that the merchants would be declining, your Honor, is that even looked at on a static basis, we talked about the dynamic that the merchant can actively change the volume that's out there by surcharging or discounting first, but even if you just look at the volumes of cards that are out there right now. Chase, Citibank and Capital One of the issuers, those three issuers, about 62 percent of the network's transactions volume. So the relief that the objectors want is the ability to decline those cards.

It turns out, the volume of transactions on those cards today is greater than or comparable to the volumes of Visa premium, Visa commercial, Mastercard premium, Mastercard commercial. In other words, it's not going to be any more difficult to decline in terms of the transaction volume that the merchant would be dealing with. It will not be any more difficult to decline the premium cards or the commercial cards as it would be to decline Chase cards, Citi card, Capital One

cards. That's true for Mastercard. Both its premium cards and it's commercial cards are comparable to or less than Chase, Capital One and Citi. With respect to Visa, their commercial cards are less than or comparable to those issuing banks. But it is true that Visa premium is about comparable to the Chase volume, and is greater than Citibank or Capital One. So the merchants would have some work to do to try to reduce their volume on Visa premium if the comparison is the volume of these banks. But the point is, this relief we have is, in terms of putting the merchant at risk for volume of business when they decline these cards, it's either less than in case of Mastercard or comparable to, in the case of Visa, compared to declining these issuing banks cards.

THE COURT: Do you want to save the rest for your reply?

MR. SHADOWEN: On that issue I will save it for reply.

I'm going to turn to surcharging. On the surcharging, your Honor, the surcharging relief, Judge Brodie found it was too limited and given the absence of other relief in the 2024 settlement. There is not an absence of other relief in this settlement, first of all. And second of all, the surcharging relief here is much more expanded compared to 2024.

The merchants can surcharge by brand, surcharge Visa

and Mastercard, surcharge by product, surcharge Visa signature, or surcharge by category, surcharge commercial surcharge premium. And the surcharging is permitted regardless of whether or not the merchant accepts or surcharges Amex or Discovery, or any other cards. We got rid of entirely the level playing field rule that effectively prevented or limited surcharging in the last settlement. Obviously the merchant that surcharges, immediately recovers through the surcharge the entire cost of acceptance. That merchant's cost of accepting that card on that transaction is zero.

The merchant can use surcharging instead of cost recovery mechanism as a steering mechanism to say to the customer, I'm going to have to surcharge that card but I won't have to if you use the debit card or if you use the new standard credit card.

Merchants can also test surcharging under the settlement agreement. WalMart, the objector here, and other merchants have demanded exactly this relief. The testimony is cited in our reply brief at footnotes 34 and 35. It is true that we don't have issuer level that's surcharging the Chase Visa card or the Citibank Visa card. But the fact of the matter is, the merchant needs the surcharge only once. Surcharging that card is recovering the entire cost of acceptance on that. And there are other mechanisms in the

settlement that foster issuer level competition. It doesn't need to be, and it isn't, through surcharging.

Just a word about friction on surcharging. Customers balk at the idea of being surcharged. I don't think what your experience is, but it's a common experience now that I think we're all over being put out with the surcharging.

THE COURT: I still don't like it.

MR. SHADOWEN: I don't think anyone does. I'd rather get something for free than have to pay for.

But the settlement allows the merchant to tell the customer why they are being surcharged. I think some people may be under the impression today that the merchant is trying to make money off of this, and the merchant is allowed to say I'm charging you less than this is costing me, or I'm charging you only what you're charging me. Don't use your premium card, use this other card.

I think it's really, as we just discussed, it's much a cultural issue as much as an economic issue. It's what you're used to. If you're used to thinking of this as free, then you're put out.

The discounting relief is broad and valuable. It's going extend the DOJ consent decree, which allowed discounting at the point of sale. But then we substantially expanded that by saying the DOJ says you can discount based on the product or the brand, we now have you can discount based on the

issuer. So this allows merchants to cut special deals with Chase or Citi or whoever to say, you lower my interchange rate on these transactions, I'll try to increase the volume by discounting, giving a discount at the point of sale for customers who use your credit card.

The objectors have said that the getting issuer level discounting was simply a clarification of what is already happening in the market. And that's not true. Chief Judge Brodie made a mistake in her opinion when she said it was a clarification, it's not. It's a clarification as to Visa; as to Mastercard, it's a change in the rule. We have that.

Our reply brief at page 28 really goes into the testimony of economic expert Harris. He was not our economist, he was an economist for the opt-out groups, the big retailers. He was adamant. He said, we want to be able to discount. So we got that relief.

I think with those, your Honor, those are the principle reforms.

There is also rate roll backs. If you want to learn about that, I am happy to talk about it, but it's pretty straightforward. All posted rates are capped for five years. People who, or merchants who paying negotiated rates, get a pro rata reduction in their rates. Then there is an overall affective rate has to come down by ten basis points.

THE COURT: What is the discrepancy between the ten basis points interchange rate reduction for five years and the release going for eight years?

MR. SHADOWEN: The release is geared to the rules reform. So the rules reform are for eight years, and we simply in negotiation as to how long the rate reductions were going to go. With one exception, your Honor; about half of the ten basis points overall effective rate reduction was devoted to the reduction on the new standard or value card. That reduction is going to eat up about five basis points of the ten. Because that really is more related to the rules, that rate relief is going to go the full eight years. So it's a little wonky, but that's what it is.

The overall affective rate is for five years; except that half of that is devoted to the new value card, that goes for eight years. Posted rates caps five years, pro rata reduction on negotiated rates five years.

Unless you have questions for me, your Honor, I'll be ready to respond to the objections.

THE COURT: No, thank you.

MR. SHUSTER: Good morning, your Honor. Michael Shuster for Visa.

Your Honor, the honor all cards relief here is unprecedented. In the over 60 years that the Visa network has existed, it's had a honor all cards rule. About 20 years ago

there was a split between credit and debit, but in the credit the honor all cards rule has provided, very simply, that if a merchant holds itself out as accepting Visa credit cards, then it must accept Visa credit cards.

Your Honor alluded to potential commercial consumer confusion, that's one of the reasons the rule is there. That rule is an article of faith with us. It gives consumers the power of choice in deciding what Visa credit card they want to use at the point of sale. And it accounts, in substantial part, for the success of our network. That, together with our innovations, together with quality of our network, accounts for the astonishing growth in Visa credit card transactions.

The rule, we think, is also good for merchants. Because the result of the rule and our network is to deliver to merchants in bulk and with great efficacy consumers who want to complete transactions using their Visa credit cards, whether it's a rewards card, whether it's a commercial card, or whether it's a standard card, a traditional card. So consumers have had the choice.

Now, for the first time ever merchants have that choice. That's a paradigm shift in the market and in our business. It represents a shift in choice from consumers, from card holders, to merchants. This is something merchants have wanted. They can now say to cardholders, I accept Visa cards but I won't accept your Visa signature card, your Visa

rewards card. I accept Visa cards, but I won't accept your Visa commercial card. If you have a Visa standard card, I'll accept that card, or I'll accept some other card. So that is a paradigm shift, the ability to accept or reject cards, Visa credit cards, is now the merchants' choice.

Now, we did not part with our honor all cards rule lightly. It's an article of faith for us. We relented on honor all cards; because, in rejecting the prior settlement, Judge Brodie gave the class negotiating leverage, and they used that leverage in hard-fought, protracted, granular negotiations to get that relief. It's extraordinary relief. We think that we have a strong conviction borne out from market data and long experience that the system as it is today delivers the most value to the most participants most efficiently.

In our view, eliminating the honor all cards rule weakens our system, and our product, and our brand, and therefore, our market position. So it's a big give. It is a big give. And it is a give for which merchants have been agitating for many years. This is not our idea, this is their idea.

We also think that -- and it's painful for us to make that give. In addition, to that though, in addition to transferring to merchants from consumers the power of choice in cards, there is a whole other suite of reforms.

So the standard card, which now has 125 basis point cap on it, that's an innovation in this settlement. I don't believe that idea has ever been floated before. That came from the class. That's something we agreed to.

Why is that significant? Because it gives merchants a powerful incentive to use their power of choice at the point of sale to try to steer cardholders to a standard card. They now have a card that is 100 basis points cheaper for them than it was before, and then our rewards cards and commercial cards. So they are getting that as well.

They are getting the power to surcharge at the point of sale. They are getting the power -- they have the power to discount at the point of sale. They can reject digital wallets, even if they accept our cards. That's another major dent in our honor all cards rule. They can pilot whether they want to reject cards or accept cards. They can accept cards selectively at certain outlets or under certain banners.

Then in addition to that, they are getting the rate relief, the principle form of which is 125 basis point cap. But which also includes on a transitional basis the average effective rate reduction and the caps on posted rates.

Those two elements of the settlement, the average affective rate reform and the cap on posted rates, those are there for transitional purposes. That's why they are there for five years. They are there to impose discipline on the

networks so that we don't raise rates during the period when these other reforms are going to take affect. That's why that relief is there.

Merchants say, you can manipulate rates up and down. Now we're capping posted rates for five years. And we're capping rates system-wide on an average basis and we've lowered them for ten years. So that's why that relief is there.

Now, I'm not going to get into all my arguments responding to the objectors. But I will say, this relief that we're talking about, at the point of sale to be able to reject Visa cards even as you hold yourself out as a merchant who accepts Visa cards, to be able to surcharge our cards, and all the other relief, the reason that's there is because that's what merchants have been agitating for for many years.

THE COURT: Is there a distinction between small merchants and large merchants?

MR. SHUSTER: Not for that purpose, your Honor. So even the largest merchants, even WalMart, has agitated for that relief. WalMart in its complaint, in its opt-out complaint, complained about rewards cards.

Mr. Cook, who submitted an affidavit here in support of WalMart's position complained about rewards card. In that affidavit, in paragraph 49 of that affidavit that WalMart submitted, he's also complained about the inability to

surcharge in sworn testimony here. In WalMart's two letters that they submitted to class counsel here, in the first of those letters they specifically say when they identify the types of relief that the class should attempt to secure, one of the forms of relief that they seek is surcharging.

Now they say, oh, no, we don't want surcharging. But it's right there in black and white. It's one of the forms of relief they asked the class to pursue.

This isn't our idea. We don't want Visa cards rejected at the point of sale. We don't want Visa cards surcharged, none of that is good for our business.

You can see the adds now, American Express can say, you want to make sure your rewards cards are accepted, get an American Express card.

I cringe saying that. I'm sure my client cringes hearing that, but that's the reality that we're facing.

To suggest this relief is inconsequential, is a bit rich.

Now, as the Court knows, is standard is fair, adequate, reasonable. The standard is not lopsided, total, and complete. It's fair, adequate, and reasonable. The standard could have been prescribed as substantially everything that the class could possibly hope for, but that's not the governing standard. It's also necessary, as the Court well knows, to evaluate the settlement in the context of,

first, the risks of delay and the length of litigation, right, that's in Rule 23(e)(2)(C)(i), and that's the first Grinnell factor.

THE COURT: It's very impressive that you can quote that.

MR. SHUSTER: I worked hard on that.

The Court also needs to take into account the risks for the class in securing a liability verdict and remedies. That's in that same provision I cited in the rule, and it's three of the Grinnell factors. Here, the risks for the class are substantial.

The objectors say that the class ran the table on summary judgment. No, it didn't. They did not run the table on summary judgment. Their expert put forward an opinion that a two-sided market analysis here would be inappropriate, that the only appropriate analysis is a one-sided market analysis that focuses on merchant acceptance only. We moved on that. We moved on that on the basis of the Second Circuit's holdings and the Supreme Court's holding in Ohio v. Amex. We won on that, they lost.

Now, that is of great significance because all you've heard from the objectors is about the merchants' cost of acceptance, but that is an incomplete and legally irrelevant analysis. The relevant analysis is what is happening in the two-sided market for Visa card transactions.

It's a two-sided price. What we'll show at trial is, and it's incontrovertible, cardholders pay a negative price for use of their cards in the aggregate. The combined price is no where near the price that the objectors keep citing to the Court.

Moreover, the combined price, the only legally relevant price, has been declining for several years. The Supreme Court pointed to that. It pointed to sky rocketing output, which it said: Tends to be inconsistent with the idea in anti-trust that they are supra-competitive prices.

The Supreme Court pointed out, and the Second Circuit in a different opinion, American Express is more expensive than we are for merchants. All of this is evidence that we would adduce at trial and that would give the class a steep hill to climb. It's knowing that, that class counsel and the class' economist took a flier on the one-sided market argument. Because they know that to make out anti-trust violation in the two-sided market, given the legal framework established by the Second Circuit and the Supreme Court and the incontrovertible record evidence, is a daunting task indeed. So they have risks, real risks.

And I'm sure the Court is aware, there was a bench trial in the Eastern District of New York in the American Express case. The Court entered judgment for American Express. The Second Circuit not only reversed but -- the Court entered judgment for the Government, I should say -- the

Second Circuit not only reversed but directed a judgment be entered for American Express. The Supreme Court agreed with the Second Circuit, but granted certain nonetheless to make sure there was no ambiguity as to what is the appropriate market analysis in this market. So that's liability.

Even if they get past that, they have to establish their remedy. Again, that's one of the factors Grinnell factor five and one of the factors in the rule. There is no guarantee whatsoever that they would secure the relief that the objectors are advocating for now.

Honor all issuers relief is a breakup of our network, that's what it is. If now cards from whole banks can be rejected, we don't have a network. We have some fragmentary product that will be inferior to other products that are out there in the market.

So the recent U.S. vs. Google case is a good example. There, the Government prevailed on liability but sought remedies that include, principally, divesture by Google, a break up of Google, divesture of Chrome, divesture of the android operating system. Despite winning on liability the Court said, no, I'm not granting that relief. That relief is too draconian.

Honor all issuers relief here would be too Draconian. It would break up our network. And it would cause injury to cardholders, and no corresponding benefit to

merchants that would remotely warrant such disproportionate and injurious relief. We dispute the proposition that honor all issuers is superior relief to the relief that the class has secured for merchants.

At the point of sale, a merchant does want to complete the transaction, after all. With the tools they have now they can say to a cardholder, I can't take your Visa rewards card because it's too expensive for me, your Chase Visa rewards card, but if you have a Chase Visa standard card or some other card I'll take that card.

With honor all issuers, the merchant is saying to the cardholder, you have a Chase card, I don't take Chase cards. Well, that's all the customer may have in their wallet. Consumers tend to have the cards from the banks that they bank with. So rejecting cards from an issuer all together, saying to the cardholder, if that's all you got in your wallet is Chase cards, I can't do business with you, risks alienating the customer and jeopardizing the transaction, more than the more nuanced approach of, I can't take your Visa Chase rewards card, I can take a Visa Chase standard card.

It's not superior relief. It's not the holy grail. And granting that relief would visit great harm on cardholders and on our network.

I have a lot more to say in response to objectors,

but I heard what the Court said that we'll get a chance to reply, so I'm going to leave it at that. Thank you.

THE COURT: Thank you.

Let me hear from the objectors.

MR. MICHAEL: Your Honor, I'm sorry. If I may on behalf of Mastercard.

THE COURT: Oh, sorry.

MR. MICHAEL: Thank you, your Honor. William Michael on behalf of Mastercard. I'll be brief.

I would like to address three-points this morning. The first is the risk to the class of continuing with this litigation and the uncertainty and delay that would go along with that. The second is the value that this settlement provides to all class members, which has to be weighed, as the Court knows, against that risk and uncertainty. And the third is eliminating the honor all issuers rule, would neither be beneficial nor realistic.

On the first point I want to start with what I'll submit to the Court you will not hear anyone here today dispute. Today more merchants in the United States accept payment cards than ever before. Consumers receive more rewards and benefits from using those cards than ever before. Consumers have more choices as to what cards to use, and the total output of card transactions in the United States is greater than it's ever been before. Those are the hallmarks

of a competitive market.

And under the Supreme Court's decision in Ohio vs. American Express, they pose serious legal and factual obstacles to the class in establishing liability and obtaining any injunction. The Amex Court explained that it was competition between card networks that had, quote, "spurred Visa and Mastercard to offer new premium card categories with higher rewards, and as a result output in the two-sided market for credit card transactions grew dramatically." And that was in 2018. Since then, output of card transactions and competition between card networks has grown even more dramatically as well. And that competitive outcome did not happen in spite of honor all cards and the other network rules that are being challenged in this action. As Amex explained, it happened, in part, because of those rules. Supreme Court held that so-called anti-steering rules promote competition between card networks, inter-brand competition, by creating a more welcomed and more frictionless experience for cardholders, and by increasing the rewards and benefits they get from using their cards.

So contrary to the objectors, this is not a case where plaintiffs are on some kind of glide path to establishing liability just because the case was not dismissed at summary judgment. Far from it. There are very serious legal and factual challenges that the class plaintiffs would

have to overcome to establish liability, let alone to get everything they might seek by way of an injunction, and let alone to defend any such rulings in their favor on appeal. And even in the best case scenario for plaintiffs, we're talking about several years of delay and uncertainty before any remedy would actually take affect.

Those factors weigh heavily in favor of settlement approval, particularly when considering the concrete and immediate benefits that this settlement offers to merchants.

I'll turn to that now. The notion that some of the objectors have argued that this settlement does nothing to modify the honor all cards rules could not be more wrong.

The settlement gives merchants tools they have never had before, to incentivize cardholders to use lower cost cards. You heard about this already from the class and from my colleague from Visa, but just to name a few. They can reject premium cards. They can reject commercial cards. They can surcharge up to their cost of acceptance on all cards, on only premium cards, or on only commercial cards. They can discount particular card products or particular issuing banks. They can run pilot programs, which they can use to put pressure on the networks while testing the affects of using those tools on their own businesses. And if the merchants did not already have an incentive to do those things, this settlement provides them an additional one in the form of the

rate caps and rate roll backs, particularly on standard cards.

Your Honor asked Mr.Shuster a question about do those forms of relief benefit large merchants the same way they benefit small merchants. And they do. The rules apply equally to all merchants; the relief benefits all merchants.

What the objectors like WalMart and Circle K say is that these tools are worthless to them. What they are really saying is that they plan to forego using those tools.

The Second Circuit in 2016, and Judge Brodie in 2024, both held that that is not a reason to reject settlement approval.

The issue that Judge Brodie pointed to, and the only distinctions in treatment of large merchants versus small merchants that she pointed to, had to do with essentially three things. One, that under the prior settlement the negotiated rate caps and roll backs did not apply to merchants who had their own negotiated deals where they had negotiated rates in place. This settlement addresses that directly and solves that issue by applying a pro rata reduction to any merchant who has a negotiated rate in place.

Judge Brodie also pointed to the fact that the surcharging relief, that was the focus of the prior settlement, did not apply to merchants who accepted American Express, which she said many large merchants tended to do and did not apply to merchants who operated in no surcharge

states. This is settlement addresses those directly as well. It addresses the first one by eliminating the level playing field requirement, so merchants are not constraint in their ability to surcharge by the acceptance of American Express. And for merchants who operate in no surcharge states, it provides alternative forms of relief that are the focus of this settlement; namely, the modifications to the honor all cards rule.

And what Judge Brodie said -- the Second Circuit said in its 2016 decision, that those alternative forms of relief, like modifying honor all cards, provided real and palpable and benefits. And Judge Brodie in footnote 53 of her opinion emphasized that a B2 class member need not avail herself of the benefit of a settlement to be deemed to have benefited from it. Here she wrote: It is incontrovertible that the merchants who opted out of the B3 class, which includes merchants like Circle K, benefit from the settlement in so far as the changes to the network's rules apply to them just like to everyone else.

So these are real benefits. And they are unprecedented benefits. At the same time, we certainly recognize that the use of these tools comes with trade offs, as your Honor touched on. There is less universal acceptance, less freedom for consumers to use the payment method of their choice, and fewer rewards of cardholders. That is the nature

of competition in a two-sided market, which brings me to my last point:

Why eliminating the honor all issuers rule would create dramatically more friction for cardholders without corresponding benefits for merchants and ultimately would harm competition. I want to spend just a moment on what the honor all issuers rule is and what it does.

This rule is fundamental to what it means to be in network like Mastercard. It ensures that when a merchant chooses to accept Mastercard, consumers can trust, as your Honor already mentioned, that any Mastercard they have in their wallet will work at that merchant, regardless of which bank issued the card.

The rule is also reciprocal. Mastercard issuers agree to honor all transactions using those cards by making payments on the cardholder's behalf. Just like merchants cannot reject certain issuers, if they accept Mastercard; issuers cannot reject certain merchants if they choose to issue Mastercard, regardless of whether they might think it's in their individual, economic interest to do so. In both cases, the purpose and the effect of the rules is the same, they maximize total volume of card transactions on the network and they promote competition between Mastercard and other networks and forms of payment.

What the objectors are proposing, in terms of

eliminating honor all card, replace that predictable system with chaos. A consumer assumer can walk into one store and merchant can say we accept Citi Mastercard, but not Chase. The merchant next door can say, we accept Chase Mastercard but not Citi. And the merchant across the street can say, we don't take Chase or Citi Mastercards, but we do accept Bank of America.

If you think about this in terms of the millions of merchants across the United States making individualized acceptance decisions with respect to each of the hundreds or thousands of issuers of cards, there are literally millions or billions of different permutations that you can think of. Even if the consumer carried 20 cards in their actual wallet or virtual wallet, as Mr. Shadowen referred to, which I would submit most consumers do not do, that wouldn't be enough because there is no way to predict which issuers Mastercard going to accept.

THE COURT: Why would Chase and BoA and Citi have such different terms in their cards that merchants would take one but not the other? Why is that likely to evolve that way?

MR. MICHAEL: The whole premise of the objectors' argument, as I understand it, is that they want to play one issuer off of another, and engage in individual negotiations where a merchant might go to a Chase, let's say, and say to them, I'll agree to accept only Chase Mastercard in my store

if you give me a really low interchange rate and I'll exclude Citi and Bank of America. So that's the type of negotiation that's being hypothesized. And if that were to occur, that would not in any way serve the benefit of increasing competition at the brand level, which is the competition that matters as far as the anti-trust laws are concerned, as the Supreme Court explained in American Express.

It also would not serve the purpose of maximizing total card output. What that would promote is inter-brand competition. So you've got Chase trying to edge out Citi out a particular merchant. Citi trying to edge out Bank of America at a different merchant. That's going to undercut the value of the Mastercard brand. It's going to say to consumers that one Mastercard is not equal to another. It's going to create confusion and lack of predictability, all of which undercuts inter-brand competition. It leads to less output of cards overall, and less competition between issuers to sign up cardholders. And to quote again from American Express: It is the promotion of inter-brand competition, after all, that is the primary purpose of the anti-trust laws.

That gets to the crux of why this additional relief, in addition to not being necessary, not actually being beneficial to merchants, on top of or in lieu of the other benefits that they are getting under this settlement would harm consumers and harm competition, the opposite of what

we're trying to do under the anti-trust laws.

To conclude, your Honor, this settlement strikes a reasonable balance of compromise. It provides merchants with powerful new tools to incentivize the use of lower-cost cards, if that's what they chose to do. But at same time, it does not eliminate some much of the value and foundation of the next work itself that you have end up hurting consumers and hurting competition. That is exactly what a fair, reasonable, and adequate settlement in this context should do, and we submit that's what this one does. Thank you, your Honor.

THE COURT: Thank you.

I'll say, having listened to defendants' counsel -- just an impression -- but it does occur to me maybe they should try the case instead of settling it. I may change my mind when I make a ruling on the settlement.

Let me hear from the objectors. I'll start with Circle K.

MS. MILLER: Mary Miller on behalf of objectors National Association of Convenience Stores and Circle K.

I want to start by saying we appreciate the Court's time today and willingness to hear from objectors on this proposed settlement.

At least as to NACS, Circle K, NRF and WalMart objectors, counsel has attempted to coordinate as much as possible to hopefully spare the Court having to hear

reputative arguments. I'll do my best to adhere to that today.

With that in mind, I'd like to cover three topics with my time with the Court this morning. I know that counsel for the other objectors I just listed, intend to focus on, among other things, the opt-out arguments relating to process issues, and then the arguments relating to the release.

First I'd like to start by talking about, pivoting back now that we heard from class counsel and defendants, pivoting back to what the overarching problem is with this proposed settlement. And it's the same problem that existed in the prior proposed settlements, and a key reason they were rejected by Judge Brodie or the Second Circuit. Most fundamentally, the proposed settlement leaves in intact the two core components of the anti-competitive scheme at the heart of this case. First, the network's ability to set fees centrally; in other words, to fix prices. And second, the lack of competition among issuer banks. Currently, issuer banks are bound together and do not have to compete against each other. If the settlement is adopted, that insulation from market forces will continue, this time with judicial approval.

THE COURT: Can you be more specific about that? It seems to me that to complain about having fixed interchange rates -- what is the alternative that isn't complete chaos?

MS. MILLER: Thank you, your Honor. There might be a little bit, in our view, an overstatement of what would happen if issuer banks were required to compete against each other with respect to rates. We site in our brief an article by Professor Economides, who is happily an economics professor. I think this concern is just totally speculative. As we note in our brief, the bilateral negotiations that would result if banks were required to compete against each other would not result in thousands and thousands of different contracts and chaos about what issuer bank is in agreement with what merchants and networks. I think in the article it notes that there is significant concentration among acquirers. 86 percent of all of Visa and Mastercard volume generated by the top ten issuers, so roughly, under his calculation, 90 contracts would generate 72 percent of all Mastercard and Visa volume. So I don't think this is a situation where if market forces were brought to bear we would be in some sort of chaos or there would be a break up of the networks. I think all that is somewhat hyperbole.

All that we're asking for is just the ability to be to have the negotiating power as merchants to go directly to issuer banks and negotiate the rate. I think without that -- and that's sort of why all the modification, the laundry list you heard all morning -- they can list a lot of things, but none of them operate on the area where the lever needs to be

applied to improve competition.

I think as a practical matter, as I just saying, none of the provisions meaningfully increase competition. They all can be undermined by defendants.

First starting with the proposed settlement allowing merchants to refuse categories of cards that proposed relief is illusory. As you heard, the vast majority of transaction value is a premium card. So an economically rational merchant is not going to want to say I'm declining the significant amount of business that I could have in my store under this scheme. So they are not really left with a choice, it's an all or nothing choice. If they decline premium rewards cards, they are faced with a huge reduction in business.

THE COURT: They can drive more people to standard cards.

MS. MILLER: I think the problem with that is that the mechanisms for them to do that are not nearly as powerful as plaintiffs and defendants would have you believe. I think all of the proposals really just put the onus on merchants to take what is an enormous transaction volume on premium rewards card and somehow convince consumers who have long been incentivized to use those reward cards to somehow shift to a lesser card where they don't get the rewards. I think it seems common sense and practical that a merchant is going to do that in a way that will have actual lasting affects in the

marketplace. So I think just the inability of merchants to reject the premium cards, it's not disputed the volumes, the networks and the plaintiffs don't concede this in their brief.

The other problem is that the networks can re-categorize any card. So this notion that after the settlement there will be a push for standard cards, nothing in the agreement prevents the networks from reclassifying a standard card as a premium card. You can look to the text of the agreement itself. For the sake of time, I will point the Court to paragraphs 22 and 71 of the proposed settlement, that's where it introduces the ability to decline at the product level. The ability to decline is defined by whatever the settlement defines, for example, a Visa branded premium consumer credit card. If you go to that definition, it's devoid of any substance. The response from the networks, oh, don't worry about that, it's industry practice for us to have certain rewards apply to certain cards. But there is nothing that holds them to do that. They can move the small number of standard cards that are out there into the premium bucket by saying, here this X reward, now you're in premium.

So I think the concern for many objectors is that they are not going to be able to actually -- even if the scheme did any work, which I would dispute that it does, there is nothing to keep the networks from preventing standard cards from growing as they say they could.

Also, I would point the Court -- this isn't just conjecture, I think you can look at, I would point the Court to Professor Hausman's merits report submitted in 2018, ECF 852617, paragraphs 197 and 198. He describes prior times when Visa and Mastercard engaged in this exact type of behavior.

So just to circle back -- I'm cognizant of my time -- on the steering mechanisms, I think we covered it a bit. Each one of them is a mechanism that the networks could later undue or undermine once the settlement is entered. For example, surcharging and discounting. Nothing in the proposed settlement defines either of those terms. So based on whatever the list price is, you can say that a merchant offering a higher or lower price is surcharging or discounting. So the notion that this discounting ability that operates on the issuers is somehow injecting competition in the market, is not accurate.

As for discounting I would point the Court to record evidence in the Hausman report at paragraph 481. There, he talks about there has been discounting in place for 13 years, I think with respect to Visa. He identified zero evidence, zero evidence, that issuer-level discounting had any impact on interchange or resulted in meaningful competition between issuers.

It's no coincidence, this is the one modification that is imposed at the issuer level because defendants know

it's meaningless.

Just to say a little more about that. I think the problem with a lot of the steering mechanisms is they are putting the onus on the merchants to correct, what I think I started my presentation with identifying, the two key anti-competitive practices at issue in this case. Essentially, what we've heard this morning is I think merchants have a lot of work to do, was something Visa's counsel said. There is something that doesn't make sense about requiring the merchants, who are arguably the ones being harmed by the anti-competitive scheme, to do the work and bear the burden of telling customers now, I'm going to surcharge you but it's because of the higher interchange fee. I don't know that many people walking into a store would really appreciate that they shouldn't blame the merchant, they should blame the network or the bank for the higher interchange fee and the reason why they are being charged.

THE COURT: It's really a glass half empty/glass half full kind of problem. If the merchants have would have too much trouble can address this, then it's not necessarily the anti-competitive measure that the plaintiffs have portrayed it as.

MS. MILLER: I guess I don't think that the merchants can easily address it. I think each of the proposals, the difference between a 1 percent surcharge and

3 percent surcharge, I don't think that's going to carry any real weight with a merchant who doesn't want to be in the position of declining customers or tell them to use a different card. I think the practical affect of these proposals -- I realize I'm out of time if I can finish that thought -- all of these practical proposals, plaintiffs' expert, Professor Stiglitz in his expert report, could not quantify what the affect of these, what the competitive affect of all of these proposals would be. The reason for that is because we just don't know, and they are likely to be negligible.

THE COURT: If this case went to trial and I was to issue your wish list of injunctive relief, we also would not know where it's going to go.

MS. MILLER: And we welcome that, your Honor. The last thing I would say before I sit down, is that this case is trial ready. It's been going on for 20 years. We're really eager to get that relief. I would say, based on the proposed settlement, we are in a better position going to trial and losing, than proceeding with the settlement with its expansive release that would be broader. I understand there would be preclusion issues at trial, but it would be broader than that. But it locks in to these completely meaningless relief provisions with a long period of release where we can't do anything about the interchange. So I think from our

perspective, it's been a hard fought litigation. We survived summary judgment, motion to dismiss, Daubert challenges. Of course every case has litigation risks, and there is always appellate risks, but I think given where we are with the settlement, that would be preferrable to us.

THE COURT: Okay. Thank you.

MS. MILLER: Thank you, your Honor.

THE COURT: I'll hear, I'm trying to go in alphabetical order, next would be National Retail.

MS. GREENBERGER: Thank you, your Honor. Good morning, Debbie Greenberger from Emery Celli on behalf of National Retail Federation and Retail Industry Leaders Association. We are objectors in this matter. We also were granted limited intervention to oppose the certification of B2 class.

My clients together represent thousands of merchants, hundreds of thousands of stores, $2.7 trillion in annual retail sales, big merchants, small merchants. And my clients themselves are members of the class because they accept Visa and Mastercard. So when you're thinking about the reaction of the class, which is the second Grinnell factor, my clients are two voices, but they are also speaking for a who's who of the merchant community.

And the class plaintiffs, the counsel who is appointed us, they've shut our clients out, shut the merchant

community out of this process, even as we offered our expertise to design the settlement that would meaningfully reform the payment system.

So today we're here at a place where the merchants who themselves are supposed to benefit from this system, are saying, this is not a meaningful reform. You just heard from Circle K, we'd be better off with a trial loss.

THE COURT: Be careful what you wish for.

MS. GREENBERGER: I want to explain, your Honor, why the merchants care so much about this issue.

So first, retail is very low profit margin. Visa and Mastercard are routinely posting 45, 50 percent net profit margins, retail one to 5 percent. So when you're talking one to 5 percent, an interchange fee of two to 3 percent it's the difference of being in the red and being in the black. It matters a lot. Those fees keep rising. More consumers are using their credit cards, especially post-COVID. And from our perspective, this market is broken. There is no meaningful competition, which is what would bring down the rates.

You heard a lot about why there is no meaningful competition, I'm not going back to that, I'm conscious of my time. But a lot of what we heard today from both the plaintiffs and the defendants, is basically we are all wrong, this is valuable relief. And I think the Court should ask itself, why would merchants be opposed to relief that is

supposed to help us. Do all of my clients and all the merchants they represent, every single one of them, just not know what is good for our own businesses? These are sophisticated companies. They have general counsel. They have experts in-house who have focused on the payment industry. We've heard a lot today about consumer friction and potential chaos; of course, my clients and their members don't want that. We are very focused on what reforms are workable on the ground, that's where my clients live every day. What reforms won't upset our consumers, that's where my clients live every day.

So when you hear, for example, defense counsel say, oh, WalMart does want this relief, look in black and white they said this. WalMart counsel will responds how that mischaracterizes. But that makes no sense. What is our ulterior motive to say we don't want relief if they think we really want it?

These are not new concerns. We have been objecting, we objected to the 2013 settlement, and ultimately convinced the Second Circuit to oppose that. We objected to the 2024 settlement. And again, convinced Judge Brodie to take the extraordinary step of not granting preliminary approval.

So the very fact that the parties are pushing a settlement that the class is so opposed to should set off alarm bells for this Court. The Second Circuit said the

reaction of the class is maybe the most important factor, which makes sense because a class action settlement is supposed to help the class.

THE COURT: Is it a fair characterization that you have the lead plaintiffs moving to approve the settlement and everybody else in the class is opposed to it? That's really the way you're conveying it.

MS. GREENBERGER: I think the vast majority of merchants are opposed to this, yes. And the lead plaintiffs, as a reminder, are five tiny businesses, a hair salon, a dentist. These are not plaintiffs that are representative of the class, that's part of why we opposed to the class certification. Even if it was appropriate to certify the class for trial, which we don't agree to, at the settlement stage it's very different. Because they are not getting the full relief they sought. This is all about making compromises. And these five merchants were not well-equipped to decide what compromises really work on the ground. We've heard, this is not a workable resolution.

So the defendant's incentives for a settlement are pretty clear. They want litigation peace, that's the term we heard for ten years. They don't want to fundamentally change their practices. They are saying something different today because they need to convince your Honor. But no defendant wants to fundamentally change their practices. And we quoted

extensively from Mastercard's own CEO when he was speaking to investors, when he, you know, had to be truthful or face security risks. Because the settlement doesn't touch honor all cards, Mastercard's competitive position will hold.

Then we have the plaintiffs who are also pushing the settlement. I don't want to speculate on anyone's motivation, but I want to remind the Court of three things.

Judge Brodie denied summary judgment in 2024. And since then, two years later, the plaintiffs have never asked the Court for a trial date. A few months after the summary judgment ruling, instead we got the 2024 proposed settlement. And even when that was rejected, still no request for a trial date.

We know the trials push settlement. Trials are what give plaintiffs leverage. We just saw this across the river. It seems like your Honor is aware in the just the weeks before a trial was scheduled before Judge Hellerstein the parties announced they had reached a settlement.

The second piece to have clear in the record is that defendants have agreed to pay class counsel a potential $206 million fee award; by any measure, a massive award, from 170 million in the 2024 settlement. And that number was reached without participation of the mediator, says in the last line of his declaration.

The third piece I spoke about it, I'll move quickly,

is the class representatives themselves, these tiny businesses, don't have the expertise to evaluate the settlement or cite rules for the entire merchant community.

I want to turn to my second concern here, which is the mandatory nature of this class. As I said earlier, we opposed the mandatory B2 settlement. But the size of this settlement is unprecedented. Every single business that takes credit cards is looped into it, not a single business can opt out, nobody can make business judgments for their own company about what works for them. As the Second Circuit said in rejecting the 2016 settlement: That it's mandatory, compounds and exacerbates the problems with the settlement.

We agree with that here today. The other important piece here is that this the rare case, I believe this is before your Honor's time, I'm sure you're well-familiar with the docket, where the defendants supported class certification, because this is what they have wanted all along.

THE COURT: It's not so unusual.

MS. GREENBERGER: Okay. In my experience it's more unusual, but your Honor has probably seen other cases. But I think it's consistent with what we have heard or seen, which is that they have wanted a get-out-of-jail card with the release.

Let me turn to the release. The release extends for

eight years after final approval so that's probably longer -- and all after appeals are done, well, into the 2030s, over a decade. And for that entire time, class members can't bring anti-trust claims for violations that occur even after the settlement is finalized. That's not what a release, and trial, a preclusion of judgment at trial would provide. This is much broader than that.

Part of why that type of release is so concerning is because, you heard it today, there was a lot of compromises that were made here. There is no one remedy that -- in a judgment, we could remove the offensive rules, we can remove honor all cards. But in the settlement, you saw, this is a massive settlement with a large number of compromises and creation of a new set of rules. Whether that new set of rules is workable on the ground, is workable for different merchants, anyone who decides it doesn't work for my business, they have no right to opt out. They are stuck.

If this was such a good deal, I would submit that the parties should be happy to include and opt-out. They should be confident the few merchants would exclude themselves. They should be happy to include it because it would help with approval. But they didn't, because they know this is a deeply, unpopular settlement. They are hoping that this Court will bind merchants regardless of how those sophisticated companies think their own affairs should be

managed.

One final point, your Honor, which is, how did we get here to the settlement that merchants say isn't workable, won't help their businesses, won't reduce interchange fees or inject meaningful competition. Part of how we got here is that the plaintiffs have shut the merchant community out of process.

As soon as they were appointed at class counsel, we reached out to them, me personally. They were our lawyers, we wanted them to do a good job. As I mentioned earlier, some of my clients members have a lot of expertise. Call it -- sorry, payments -- in-house experts. We said, look, I know you have these five tiny businesses as the named plaintiffs, they can't provide that expertise, let's provide it. We can enter into a confidentiality agreement. There was openness at first; ultimately, they refused. Never entered into a confidentiality agreement, never let us engage on what the terms of the settlement would be workable.

THE COURT: I'm going to cut you off only because I'm familiar with your point that they failed to take you up on your offer of communication.

MS. GREENBERGER: Thank you, your Honor. I'm aware of my time.

We ask that this Court disapprove the settlement, set this case down for trial, and we think it's likely we'll

come back to the table with a stronger settlement with that leverage; if not, we think it's more beneficial to have the trial. Thank you, your Honor.

THE COURT: Thank you. Next, WalMart.

MR. PANUCCIO: May it please the Court. Jesse Panuccio from Boies Schiller Flexner on behalf of WalMart.

Let me begin by thanking the Court for the opportunity to present our objections and for accommodating all of the objectors if they wanted to speak.

THE COURT: I have one question for you. How do you respond to the parties' accusation that part of what you're getting here, and now complaining about, is something that you have long asked for.

MR. PANUCCIO: Thank you, I was going to get to that. They point to one sentence from a declaration. But if you look at that same declaration that they pointed to, this is Mr. Cook's declaration, which is also 13 years old at this point, markets have changed and business conditions have changed. But even back then, this is what he said in paragraph 50: Since merchants must accept all issuers cards under honor all cards, all issuer cards under honor all cards, the banks have no incentive to compete for merchants. WalMart has tried get the banks to compete for its business; but because of the impact of this rule, WalMart's overtures have never been successful. It would be deeply concerning to

release merchant's ability to challenge these rules going forward.

THE COURT: Slow down.

MR. PANUCCIO: Of course.

From the outset, WalMart has always said the fundamental and most important problem, anti-competitive problem here, is the honor all cards rules. And in particular the way it works, to not allow merchants to spur competition among issuers. That has always been WalMart's position, it's WalMart's position today. But it's not just WalMart's position, it's also plaintiffs' expert's position. If you look at that declaration that they cited with their motion, I'll get to this, they say the most important anti-competitive restraint is the honor all cards rules. They say, that restraint has made a non-competitive marketplace. So it's not just us, it's their own declaration that they put in support of this motion. I hope that addresses your Honor's question.

You heard we tried to -- I'm going to focus on two issues today. First is that honor all issuers rule and second is the opt-out right.

Both this Court and Second Circuit have recognized that the challenge to the honor all cards rule is a key feature of this lawsuit. I can give citations, but it's in the order denying the first settlement, and it's in the 2016 Second Circuit, both are recognized as a key feature of the

case. Their experts in the declaration, Professor Stiglitz and Leffler, at paragraph 30, call this the most significant anti-competitive restraint.

So the honor all cards rule, honor all issuers is the most significant thing we are talking about in this case. And throughout this case, as I said, WalMart consistently explained that honor all issuers is the essential anti-competitive restraint that harms WalMart. Because it eliminates the ability to negotiate and drive competition.

Imagine, your Honor, if WalMart could not do business with Coca-Cola unless it also had to do business with Pepsi Company or Dr. Pepper, or anything else in the marketplace. Imagine if WalMart could not approach those other companies in the marketplace and negotiate with them individually.

Or on the other hand, imagine if all of the banks, all of the issuers, had to negotiate at once with WalMart and Amazon and Target and Circle K, and every other merchant out there who they couldn't do business with them. It's obvious that would be an anti-trust problem. That's the whole purpose of the antitrust laws, not to have that kind of horizontal arrangement.

But here, if WalMart wants to do business with Bank of America, it must do so with Chase, it must do so with Wells Fargo, it must do so with Citi, on the same terms regardless

of whether those companies, whether those banks are issuing the same products or not.

As your Honor pointed out in a question to maybe networks counsel or plaintiffs' counsel, they are not offering the same product. They have differences in fraud control, in charge back policies, in authorization practices. These are different products that are being offered by different issuers.

A settlement that forces WalMart to release all claims but leaves in place the core anti-competitive practice is not equitable to WalMart for entire segment of retailers most harmed by the restraint of trade.

This is what Judge Brodie had to say at docket entry 9342 at page 59: The fact that such relief has been consistently argued for, and would offer significantly more choice to all class members, suggests that the relief offered in this settlement falls short of the best possible recovery.

That remains true today. Because the honor all issuers is left in place, just as last time, the settlement provides the least benefits to the merchants with the most valuable claims, that's again a quote from the last order rejecting the last proposed settlement.

The settlement's proposed relief, your Honor, it is illusory. It replaces one honor all cards rule with three of them. So now you have an honor all cards rule at three

different product levels.

As a practical matter, you've heard from others and we explained in our papers, it will be impossible for retailers to exclude premium cards. But even if they could do it, eliminating a product is not a proper solution for anti-competitive conduct related to that product. The solution is to remove the restraint on trade related to that product. Making issuers actually compete, is what would create a market across the board and at each product level.

The Court recognized this point logically in the 2024 order. It said that surcharging relief at the product level is too limited to justify approval of the settlement because it does not address surcharging at the issuer level; meaning, that merchants still have no way to urge competition among banks. That is still going to be true here if there is a mandate in the settlement to honor all issuers.

Mr. Shadowen said in his presentation that there are mechanisms for issuer competition, so he kind of evaded that point. What are they? I don't think we've clearly heard in these presentations what the actual issuer level competition will be.

I'd like to address what the settling parties said here today and in their reply briefing specifically in response to our objections.

First, the plaintiffs argued at page 17 of their

reply that objectors cannot explain how the ability to decline all premium cards is useless, while the ability to decline particular issuers with similar volume is essential. You heard that again, that equivocation between type of card volume and issuer volume.

But that's easily explained. Declining all premium cards, even if it could be done -- we say it can't, just eliminates that product in the store. Being able to decline a single issuer's premium cards forces the issuer to compete with other issuers with respect to that product. Those who can compete, will survive; those who can't, won't be able to offer that product any more. But there will be Visa cards for many issuers, the issuers will have to compete. It's no answer to say, just eliminate that whole product in your store; versus, let issuers compete.

Second, the networks argue at page 16 of their brief that plaintiffs do not seek complete repeal of the honor all cards rules. That is wrong, your Honor. The complaint doesn't have any such limitation. But it's also the complete opposite of what this Court said in the class cert order, and the order denying first settlement. The whole point, when we said we don't think class should be certified, we want opt-out rights, what Judge Brodie said twice is, no, no, they are challenging what you want challenged. So this Court has made a contrary finding on multiple occasions.

Third, your Honor, at page 166 their reply brief the plaintiffs and their experts explain that the settlement reforms are sufficient because of the, quote, "process established." That there will be a process where we can drive competition among issuers.

But it's really important for the Court to look at that. I read it again last night on the plane just to make sure I understood what they were saying. It's a multi-part process.

First they say, that by fiat in the settlement, they are going to create a spread between the interchange rates for premium cards and standard cards, one that doesn't exist this the marketplace police they are going to create it by fiat. Then by this fiat spread, that's going to motivate cost to want to surcharge, even though we think it's bad for our business and customers won't want it, because they are creating enough spread that we'll economically have to do it.

And then they say, well, obviously you can't deploy that across your whole business if you're WalMart because what if it doesn't work and you lose a lot of customers. So they cite at paragraph 87 of the Stiglitz declaration, quote, "clever merchants can alleviate customer friction by setting up merchant-specific rewards programs to completely replace premium card rewards." So they know, they admit, that our customers will revolt and say I have these rewards cards, I've

been relying on them for years, I love these rewards, they are industry-wide. How do they reduce that customer friction? They say WalMart should set up its own rewards programs and replace what the premium cards are doing.

By this fiat, we now have to come up with a new system that we don't have. And all the merchants will have to do it, and it will be merchant-specific rewards programs.

Then they say, finally, then don't know if any of this will work, so what the merchants should do is they should rollout pilots in individual stores. So now we have to set up a rewards program for one store to see if it will work, to see if Rube Goldberg machine that they set up, will deliver the issuer-level competition we want.

It would be much simpler to simply enjoin the restraint of trade.

They also say, fourth argument, that DOJ and other regulators have not attacked and regulated the honor all cards rule. What regulators chose to regulate is not the law. In fact, that rationale would apply to every claim in this case, that's why there are claims. DOJ decisions about what practices to challenge are not law. They are often influenced by non-legal factors. Just look at the Live Nation case from last month, DOJ decided to settle that.

THE COURT: I will need you to wrap up.

MR. PANUCCIO: I want to address two very quick

issues, one is litigation risk.

Look at the Court's prior summary judgment orders. They are robust. They say this case is trial ready, the only thing left is the weight of the evidence not the theory.

Also, look at the Stiglitz declaration. They are clear that this restraint, the honor all cards rule has created significant anti-competitive markets.

Finally I'll say this. We've had three proposed settlements in this case, two have been rejected already, we're on the third, going back to the Second Circuit in 2016.

The Court said at class cert, you will have the opportunity to object in your interests, the plaintiffs have an opportunity to represent your interests. We're on the third go, they haven't. We should have an op-out right.

At this point I think it's a constitutional dimension. They say the Dukes case says you don't need B2 opt-outs, that paragraph of the Dukes case actually comes very close to saying it's probably unconstitutional not to have a B2 opt-out right. It says: In the context of a class action for money damages, we have held the absence of opt-out violates due process. While we have never held that to be so, where the monetary claims do not predominate; thus, serious possibility that it may be so provides an additional reason not to read that as a B2 case.

So, there are constitutional dimensions, your Honor.

The Court has discretion to allow opt-out rights. We would ask for that if this settlement is going forward.

THE COURT: One question for you. Your assumption seems to be that if plaintiffs went to trial and prevailed, or if you opted out and prevailed, the least you'd get is elimination of the honor all cards rule. If I end up being the judge on that case, would you opt out? Seems to me, I'd start looking at it from a perspective of carving away attributes of the honor all cards rule, not necessarily jumping the whole rule. In other words, I want to make as little change as possible to restore competition rather than go out it with a meat cleaver.

Why are you so sure that a judicial resolution in your favor wouldn't come somewhere near the settlement that has been reached here, even though I agree with you there is uncertainty as to how affective will be.

MR. PANUCCIO: A couple responses to that, your Honor.

One is, I think Ms. Miller made the point that the releases and what the go-forward, our ability to challenge things going forward would still be in tact even with a judicial order here. This is an eight to 15-year set of complicated new rules, not all of which we fully understand how they will work. Where a judicial order is typically much more targeted and singular.

But also, your Honor, I want to say we feel pretty confident what would happen at trial. Although they are not saying it right now, plaintiffs' experts feel that way as well. Here is what they said, this is docket 9692-5, speaking specifically about honor all cards: The restraints severely impede competition among issuers, paragraph 20. Paragraph 30, the most significant restraint.

Then, their main argument the networks have is, this was necessary to establish our networks. And what Professor Stiglitz and Leffler say about that is that was a chicken and egg problem. That was solved, quote, "decades ago", and these are now mature markets so you can't look at what happened 30, 40, 50 years ago to established networks and say, whatever your practices were at that time, they get to persist for ever.

I think respectfully think, your Honor, when the evidence came in, the Court would see that the honor all issuers is an anti-competitive practice and would be enjoined.

MR. SHADOWEN: Could I get the cite to the Stiglitz report?

MR. PANUCCIO: I'm referring to the declaration that was submitted with plaintiffs' motion to approve the settlement, the first motion, this declaration. The docket entry is 96 --

MR. SHADOWEN: Opening report?

MR. PANUCCIO: Opening. 9692-5. Thank you.

THE COURT: Okay. Then we have Yabla, et al.

MR. WEICK: Good morning, your Honor. May it please the Court. I'm Daniel Weick, I'm from Hausfeld LLP. I'm speaking on behalf of Yabla Inc. and the other merchant plaintiffs in the Visa debit litigation pending across the river before Judge Koeltl in the Southern District of New York.

Your Honor has heard pretty complicated arguments around the honor all cards rule, steering restrictions, setting under the settlement, and all of that. The reason we're here is because we're different.

Our case is an exclusionary conduct case focused entirely on the debit transaction routing services market. It's a case that follows on a DOJ investigation and complaint. And it focuses on Visa's exclusionary conduct to maintain its monopoly in the relevant market. It's used the carrot and stick approach, giving discounts or threatening high fees in order to induce acquiring banks and large merchants to enter into exclusive or partially exclusive routeing agreements that raise barriers to entry in that market. It's also entered into contracts with potential competitors to not compete against them.

Our case is very focused on that market. It's not about these merchant restraints. And so it really should not

be released here. It's a completely different case.

We know Visa's interpretation of the settlement release here, which releases all claims pertaining to merchant fees or related to merchant fees, would mean that our equitable relief claims before Judge Koeltl would be released, even though they would not be precluded by say a trial loss in this matter.

THE COURT: Isn't that a question for Judge Koeltl rather than me? If I decide to approve the settlement, then the affect of that release on your litigation would be something he would have to determine.

MR. WEICK: So far that's not how it's proceeded, your Honor. We've had this issue before with the damages class release, and that was developed by a motion before Chief Judge Brodie where she found that under the identical factual predicate doctrine our damages claims would not be released. So far, this has been an issue for the Court hearing the settlement. And in terms of our --

THE COURT: I know she did that. I have to think where that comes in. Because generally speaking, you don't know the impact of a settlement on another pending litigation, and it happens all the time that that has to be worked out in the other litigation. When I do it, it's kind of an advisory opinion, really, because that issue -- the motion to dismiss will be before Judge Koeltl based on res judicata.

MR. WEICK: I respectfully disagree, your Honor. I think there is a flow chart here. Where if Visa is right about the meaning of the release, then from our perspective the release in this case is inadequate. So that goes to whether or not the settlement can be approved, because adequate relief in our case would be some contain of restraint on Visa's exclusive dealings, some kind of restraint on Visa's entering deals with potential competitors not to compete with them; whereas, none of that is on the table here. So it's kind of understandable because plaintiffs counsel here this is not their case, they were not thinking of these claims, they weren't working out what is a fair release for these claims, they were working on the scope of the claims here in this MDL.

From our perspective, if Visa is wrong, then our issue -- there are a lot of other objections, and so if your Honor says, well, under the identical factual predicate doctrine has Judge Brodie found these claims are not released by this settlement, then that resolves our issue. But if he says right about the scope of the release, then we have a situation where we have not received any relief for these claims that are quite substantial. They are follow-on investigation from the federal Government. We think that they go to pretty core issues of competition in the debit transaction market specifically. So the debit relief here is pretty much downstream of just the relief from the honor all

cards rule and other relief that plaintiffs obtain in the proposed settlement here. It does not restrain any of the anti-competitive conduct that is identified in our case.

And on the question of the identical factual predicate, I think the summary judgment record is actually very helpful on that point. On page ten of ECF 8332, this is the equitable relief plaintiffs' opposition to Visa's motion for summary judgment on the monopolization claims.

The plaintiffs summarize their theory here. That by impeding price singles to cardholders, the merchants restraints have substantial impacts on the payment alternative; that is the closest economic substitute for credit card transactions, debit cards. With the merchant's restraints in place, cardholders are induced by rewards to favor use a credit card over other payment means. The merchant restraints precent the merchants from encouraging their customers to chose payment by debit card rather than by credit card, end quote.

So that's in focus on the satellite impact on debit of these various merchant restraints. It is not about the monopolization of the routeing services, which is at the center of our case, as Judge Brodie found in her opinion. And so for that reason, whether as a matter of adequacy of the relief for our case if Visa is right on its interpretation of the release, or as a matter of the identical factual predicate

doctrine which would include releasing our claims entirely, we object to the settlement.

THE COURT: Thank you.

I'll hear from plaintiff in reply.

MR. SHADOWEN: Your Honor, you've been very generous with your time. I'll try to go rat-a-tat to the extent I'm able to.

With respect to what I'll call NACS, National Association of Convenience Stores, they and WalMart raised a question of what is the issuer-level competition that is included in this settlement. So our first answer to that is we got honor all cards relief with respect to products. And the issuer-level competition is not an end of itself, what the merchants want in the end are lower costs of acceptance. We get there, primarily, a different way, through surcharging, discounting, and the honor all cards relief that we got. But in addition, there is in fact very substantial issuer-level competition engendered by the settlement.

First of all, for the first time both networks will be able to discount based upon the issuer of the card. Visa previously said that it allowed that going back to 2013, but they never put it their rules. We had very sophisticated merchants, I think we cite to their testimony, that didn't realize that they could discount Visa based on the issuer. Now, we're requiring Visa to put that in their rules.

Mastercard resisted issuer-level competition up until today. They never allowed it, and this settlement will require one to allow issuer-level discounting.

We also have, and this responds also to the merchant trade groups, suggesting that we didn't consult with merchants, that we shut out the merchant community. Nothing could be further from the truth.

As we say in our declaration and in our brief, there was a group of 70 large, medium, small merchants that we consistently coordinated with, at one point we were jointly negotiating with them. When we stopped that, we continued to consult with them. In addition to that, we hired our own consultants, people who worked inside of these companies, people who worked previously for Mastercard, hired as our consultants. To think -- to suggest that we did not consult with the merchant community is just beyond the pale.

But, specifically, one of the things we consulted with them on was how can we engender more issuer-level competition without breaking up the networks. And what we have is a reflected in Appendix H to the agreement, we refer to them as the scenarios, but it's basically various ways to differentiate based on the issuer sort of a gray area between, well, this is surcharging or is this discounting, especially as transactions move online.

One of the things that the agreement will allow is

for the merchant to cut a deal with a particular issuer to say, when you come to the landing page to check out online, we're going to feature your card. If somebody doesn't have that card, they are going to have to flip to another page on the landing page. And we can have communication there, get yourself a Chase Visa card in the future.

So we have 19 specific scenarios like that created and crafted very carefully, painstakingly, with the intimate coordination with some of the largest merchants in the nation.

They are upset that we didn't communicate with them. They are not the merchant community, with all due respect. We communicated directly with the payments people at large merchants.

Other ways to engender issuer competition, the new standard card. There is going to be scope here for the issuance of more of these new low-cost standard cards. And what we contemplate, and what we are consultants are telling this is doable, is that merchants will say to their customers, get yourself a new standard card, pick up an application right here at the end of the cash register for a Chase or a Citi or whoever. The merchant will cut deals with that particular issuer.

Another avenue for issuer-level competition is digital wallets. We now provide in the settlement, digital wallets I think are 40 percent already of online transactions

and there are more -- there are less than that, but additionally there are wallets used in brick and mortar stores. Digital wallets, the merchant will not have to accept a digital wallet just because it contains a Visa or Mastercard credit card or debit card. Meaning, if Chase comes out with its own digital wallet, and obviously it's only going to have its own Visa card in there, the merchant can say, I'm not taking any other digital wallet. That's the one I'm doing. If Chase you want to be the one who is digital wallet I take, the bidding is open. Citi is coming in half an hour from now.

You can engender issuer-level competition in many ways. You can discount. You can differentiate. You can cut a deal for the new standard card partner. And you can cut a deal with respect to digital wallets.

So concededly, it's not the focus of the settlement, but there is very substantial issuer-lever competition built in.

With respect to the volume of the cards, we've talked about the volume of the cards. Both in the briefing and in the comments today, you didn't hear any objector say that it was impractical to decline the commercial cards. They've always said the volume on the premium cards is too high. So already half of our relief they are conceding is practical and doable. As I previously noted, it's in the Stiglitz reply report where he goes through the numbers.

As to Mastercard, their premium cards already less volume than Chase, Citi, and Capital One, or at least comparable to. There is an issue with respect to Visa premium, it's comparable to the Chase volume but it's more than Citi and Capital One. So the merchants, they want to decline those cards they are going to have to get the volume down, if that's the standard.

They raised the question about reclassifying cards. I have to admit, I don't -- I literally don't understand it. If banks -- if issuers had an insensitive to switch even more traditional cards to premium cards, they would have already done it. We don't expect, there is no reason to think that all of a sudden now there is going to be this rush to convert more standard cards to premium card.

If there were such a rush, there are two points. One, the tools, the competitive tools that this settlement gives, would allow the merchants to push back against that. If somebody is trying to convert cards from standard to premium, then get busy surcharging premium, or discounting to the standard. It's not as if the issuers can come and do whatever they want, that's the whole point of the settlement, is to have tools for the merchants to push back against whatever they tried to do. That's point one.

Point two is, there is anti-circumvention provision in this agreement, depending upon what it is that they do and

how they try to do it, you can bet that class counsel are going to be in here before your Honor complaining about it and asking for a hearing. But in fact, there is no reason to believe there is going to be a mad rush to switch standard cards to premium.

And by the way, the issuing banks make more money net of the rewards on standard cards than they do on premium cards. Again, there simply no economic reason to think that that's going to happen.

THE COURT: Let me ask you this. I was interested in Ms. Greenberger's characterization that the lead plaintiffs here are effectively a small minority of the class that wants the settlement. And maybe I'm characterizing it wrong, but the impression I got was that the class overall is opposed to the settlement. Do you accept that characterization?

MR. SHADOWEN: Absolutely not. I think the people who object to the settlement are here in the courtroom today.

THE COURT: Yes, but their lawyers are here today, and then there are lawyers representing many potentially hundreds or thousands of merchants.

MR. SHADOWEN: So there are 12 million merchants. I think we'll know what the response of the class is when we send out notice and final hearing.

But especially, you can compare who is here today versus who was complaining to the last settlement. All the

major merchants that opted out of the last settlement, maybe they'll come charging in at final approval and object, but I don't think so.

THE COURT: Okay.

MR. SHADOWEN: No, I don't accept that characterization at all.

My own response to it, quite frankly, your Honor, is some people won't take yes for an answer. NACS talked about the history of discounting, that discounting hasn't worked I historically. As I mentioned, even sophisticated merchants didn't know that you could, that it was allowed under the Visa rules because they didn't put it in the rules.

Also there was rate compression. One of the reasons there hasn't been a lot of discounting is, it's crazy, but from the merchants' perspective there are only 45 basis points difference between what the merchants are paying today for a premium card versus a standard card. Even though the consumer is getting 150 basis points rewards on the premium card and none on the standard. So there wasn't from the merchants' perspective, am I going to have a whole program to discount to get people to move to this other traditional card so I can save 45 basis points? I don't think that's realistic. That's why we worked very hard and negotiated like the dickins to get that new standard card 100 basis points below the premium cards, to make it worthwhile for the merchant and to make it

doable in terms of their relationships with the consumers, that a merchant can say, here is a 1 percent discount for using this card. And I can throw in loyalty points on it, or whatever additionally that they want to do.

More discussion about friction. I think the way to think about friction is imposing a price, charging a price. It's friction either in granting someone a discount, friction in surcharging; but both of those things are just imposing a price.

Then the ultimate price is not accepting the card, the price is infinity. But the way to think about it is, what everybody is calling friction is simply using price signals to tell people what the social costs, what resources they are consuming by their choices and making them internalize those costs. That's what it is, the price system as work. That's all that friction is.

So, is there going to be -- how could you get -- how can a retailer avoid friction? They charge prices for everything. I'd like love to get a fur coat with no friction. I'd like to get it for free. That's not the way the markets work. That's all we're talking about doing here. This is an antitrust case.

THE COURT: It's a little more complicated. A fur coat you go into the store, you see the price. Visa, maybe you take it, maybe you don't. You see the decal on the door,

oh, my whole life Visa meant any Visa. You have to read the terms, you have to see which Visa. There is more information processing required than just looking at the price tag on an item.

MR. SHADOWEN: Fair enough, your Honor.

But behind that, how it's communicated to the customer, I grant you. But what is happening right now is the consumers are getting a false price signal. They think the cost of them of using their premium card is negative 1.5 percent. They think that's what that costs. It's not true. What it really costs is two and-a-half percent, it's just that the merchant is not allowed to make that real with the customer by actually imposing a cost either by discount or by surcharge on those cards.

I think that closes my comments on that.

With respect to NRF. I hear them complaining about process. We did meet with them in 2017 and 2018. After that, we switched to meeting with our consultants and directly with large and medium size merchants. She says the class representatives do not have expertise. Fair enough. But I haven't heard anyone say that the lawyers here and the consultants that we consulted with don't have the expertise, that we got hoodwinked, that we didn't understand what we were doing, if only we had met with them. We knew what we were doing, we had the consultants, and our judgment is this is an

outstanding result for the class in light of risks of litigation.

I want to correct one thing that Ms. Greenberger said. She said we never asked for a trial date. That's simply factually wrong. The first thing we did when the settlement got disapproved was to ask for a trial date. We did it jointly together with the defendants, we both wanted a trial date. Judge Brodie was silent, which we took to mean, get back to work on the settlement; whether or not that's what she meant, that's what happened.

Ms. Greenberger talked about a release, releasing claims for new violations that might occur between here and the next ten years. That's simply not true. What the release does is release claims for continuing conduct that are related to the same factual predicate, as the Court knows. There is no release for new violations.

With all these issues with respect to process, your Honor, they are not real. But even if they were real, I think the real answer is look at the substance of the agreement, and you shall know them by their fruits, look at the substance.

WalMart -- I had to ask for the citation. This was real, because I turned to what I thought he was referring to with respect to paragraph 30, that Dr. Stiglitz said the honor all cards rule is the most important rule. I thought, I must be looking at the wrong document. But it is the right

document.

When you look at it, it is in paragraph 30. It is in a section called: Evolution of the merchant restraints, historical restraints.

He simply says that in order to get the networks up and running it was necessary to have restraints and most significant were the networks' honor all cards rules. Most significant in the context of getting the network up and running, not most significant today.

But just by coincidence, I was looking around through the reports to make sure I had the right one, it's also in paragraph 30 in Dr. Stiglitz reply report. He does talk about what is the significant today.

Here is paragraph 30: The objectors argue that the cost of the honor all cards. Issuers have no incentive to negotiate directly with merchants. However, issuers incentives to make deals with merchants flows from merchants ability to be steer their customers to an issuer's card, rejecting an issuer's card is only one method to impose cost on an issuer to motivate negotiation of lower fees. And is likely to be no more affective than the opportunities created by the amended settlement. Dr. Stiglitz is zero that is inconsistent with our position.

We talked about it issuer-level competition. WalMart counsel contrasted negotiating with issuers if the

honor all issuers rule were relaxed. But he talks about honor all products, what we got is being you don't take that card.

Well, that's not the comparison at all. If a merchant -- you think WalMart goes in and says I'm no longer taking your Visa, your commercial cards, I'm no longer going to take your premium cards, that the next thing that happens WalMart turns off the switch? No. WalMart is going to be in there negotiating with Visa with respect to that, just like they would be negotiating with Chase. And it's roughly the same volume of cards at issue.

Nobody, whether Visa or whether it's Chase wants to lose that kind of volume. So there is going to be negotiations either way. Simply a false dichotomy.

WalMart poo-pooed the idea of merchant specific rewards. Again, there is a record in this case. And Dr. Harris, who was the expert not for us but for the Target group of plaintiffs, Target and lots of other major retailers, he was their expert. He was essentially banging his fist on the table saying, we want issuer-level discounting. And that will allow to us have merchant specific rewards.

It makes a lot of sense. Merchants are expert merchandizers. They know their customers. They know how to do this thing. An issuer-level discounts, and discounts generally, give the merchant the tools to work together with the issuer to say let's craft a loyalty program or some sort

of rewards jointly to both of us, enhance the experience for the customer.

That's not us making this up saying, oh, boy the merchants can do rewards; Dr. Harris demanded it on behalf of large merchants.

Counsel talks about Dukes all but saying that well there might be a constitutional right to opt out of a class. When you read exactly the language he was reading, it is absolutely clear the Court was talking about a settlement that includes money damages and equitable relief. They said, we said in the past if the money relief is dominant, you've got have an opt-out right. The quote he read is -- the Court leads into it by saying, but maybe even if the money is not dominant, there might be an opt-out right. But nobody has said there is an opt-out right when there is no monetary relief. And there is none here.

Visa debit plans. I think your Honor already put your finger on it. There is no need for the Court to consider the affect of this release right now. The Court of Appeals currently in the B3 case has before it, I think the briefing is done they are waiting on an argument date, on whether or not the release in the B3 case which is essentially, for all practical purposes, the same language as the release in our case, whether that's within the same factual predicate from the B3 case.

Moreover, in the Fikes case in the Court of Appeals said, I'm quoting 62 F.4th of 720, the Court said, the affect of the release, quote, "can await a case in which the issuer would directly affect the proceedings."

So same thing here, if an objector was saying don't approve this settlement on appeal because the release may have X affect. The Court says, no, we're approving it. And what X affect is, can be decided later when somebody asserts the release against the plaintiffs. So that's the first point.

The second point, I think this is really the key to the Visa debit objectors. They talk about the relief that, quote, "their clients got." Their clients were in our case. They are in our class. There is, for all practical purposes, 100 percent identity between the merchants that take Visa and Mastercard credit cards and those that take Visa and Mastercard debit cards. Moreover, our class representatives take both kinds. So the interest of our class representatives and our interest as their lawyers were completely aligned with those who are now the Visa debit plaintiffs.

So when we were negotiating, we negotiated relief for those clients. And the debit claims were simply one of a number of claims that we had and that we negotiated on. If the only relief that these merchants got was relief related to credit cards, it would have been perfectly adequate relief for the release of those debit claims. Those are the same

merchants with the same claims as our class plaintiffs. So that's point one. The relief is adequate as to those plaintiffs for the same reason it's adequate to everybody else.

But in fact, although the Visa debit plaintiffs deny it in their paper, we did get debit card relief. First of all, the relief that merchants got on their credit cards can be used as leverage to get better deals on debit cards as well. Moreover, the issuer differentiation, the scenarios that we talked about that we worked with the large merchants on, all of that relief it goes to debit cards as well as credit cards. By the way, it goes to Mastercard debit card as well as Visa debit cards.

The discounting relief, the ability to discount by an issuer, that relief is affective as to debit cards as well as credit cards.

The extension of the DOJ decent decree that covers debit cards as well as credit cards. The selective acceptance pilot programs, debit cards as well as credit cards. The all outlet reforms, that you don't have to take the same cards in different banner stores that you use, that relates to debit card as well as credit cards. Being able to do issuer-level discounting and otherwise in digital wallets, the digital wallets reform, debit cards included there as well. Buying groups, debit cards included. Merchant education, debit cards

included.

The class plaintiffs were completely aligned with those of these Visa debit plaintiffs. We got relief for those merchants, because all the merchants take Visa credit card and be debit cards. And in fact, beyond that there was debit specific relief. So you don't have to decide it now, but if you do decide it, the relief is more than adequate.

MR. SHADOWEN: Thank you, your Honor.

THE COURT: Thank you. Mr. Shuster.

MR. SHUSTER: Thank you, your Honor.

I want to start, if I may, the most astonishing thing I heard by the objectors. Counsel for Circle K said: This settlement is so bad, so bereft of any relief that we might as well go to trial and lose. Circle K was an opt-out from the damages settlement. Circle K had a case. That case was supposed to go to trial a week ago today, before Judge Hellerstein in the Southern District of New York. They could have tested these rules. They could have sought a jury verdict declaring these rules, finding these rules to violate the anti-trust laws. They decided to settle. They decided not to pursue that.

Now, they want to put the class, to have the class do the work they declined to do, to have the class roll the dice, which they declined to do, to have this class of over 10 million merchants sit and not get any relief, which they

declined to suggest themselves to. That's an extraordinary assertion by an objector here.

THE COURT: Maybe they got a settlement before Judge Hellerstein that they simply couldn't refuse.

MR. SHUSTER: Perhaps. But nonetheless, they had the chance to go to trial and test their claims, and they declined to do so.

The same is true for NACS. They were in the same group that settled.

And the same is true for WalMart. WalMart had an opt-out case. WalMart settled its case. It could have gone to trial, it chose not to.

And now to ask the Court to force this class to go to trial and to litigate, for what, another five or six years minimum just with a trial, a remedy's trial, an appeal, applications for cert. And to forego all this relief when they had the chance to pursue their argument that these rules violate the anti-trust laws and they declined to do so. And they settled. They didn't get everything they wanted either, that's what a settlement is.

Now they want to the right to opt-out. First of all, there is opt-outs and there is opt-outs. They opted out of the damages class and they were able to pursue their own damages claims; but they forewent the relief that the damages class got. That is an opt-out.

Here, if the class gets the relief, they are going to opt-out every single rules change and modification that is made here as to the class, they will get the benefit of.

What they really want is a free ride, which Courts have recognized when you are talking about opt-out rights. They want to get all of this and then go for more. No. That would not be equitable.

The class got a settlement here because it's a non-opt-out mandatory injunctive relief class. We settled a non-opt out mandatory injunctive relief case. That's why we have a provision in the settlement agreement that says, that if there is material modifications, including opt-outs, then the deal is off.

And so they are not asking for real opt-out. They just want to get everything that the class gets and then go for more.

Your Honor asked Ms. Miller for counsel for NACS and Circle K what is the alternative to default interchange. The answer was, that's a speculative concern, what would replace default interchange with.

It's not speculative. If there is no rule for -- if there is no default price, then there would have to be negotiated prices. 10 million merchants-plus, 10 million banks-plus, not a speculative concern, a real practical concern. And no one, ever, has articulated what could

possibly replace a default interchange rule that wouldn't end up being more inefficient, more expensive, fragmenting the system, and doing considerably more harm than good.

Your Honor said to Ms. Miller that merchants can drive more people to standard cards. That's one of the underlying premises of this settlement. That merchants will now have a potent -- and anti-trust is all about economic incentives. Merchants will now have a potent economic incentive to drive business to standard cards because of the innovative, first time ever, 125 basis point cap on interchange rates for standard cards.

And bank issuers will have an interest to capture more of that volume. It's not true that banks don't compete, they do compete. They compete for cardholders. They compete for cardholders, we compete with other networks. Banks would love to take volume away from other banks, have new customers, have stickier customers, that's their whole theory, then they have them for life.

The economic incentives, as the Court noted, are there.

Ms. Miller says we can reclassify cards to premiums, that's not how it works. It's not just the stroke of a dial or a push of a key stroke. We have criteria. We have requirements that banks have to meet before they can call cards premium cards. They have to confer certain level

benefits and provide certain kinds of services.

We can't just that standard card that's in your wallet that's now a premium card. That's not how it works either. The banks would have to issue new cards. They can't just reclassify a standard card as a premium card, that's not how it works.

Your Honor, said: Even if I granted injunctive relief there would be an uncertain outcome. That's what prompted the, well, we'd rather go to trial and lose remark. But it would be an uncertain outcome. And the Court would be right to be hesitant to grant draconian relief. As your Honor said, unlikely the Court is going to take a meat cleaver to the network.

Again, the merchants are speaking on their own behalf, and God bless them. But both for legal and practical purposes, this market involves cardholders. And I would say they are the elephant in the room, they are the multitude outside the room. And there is a lot of them, and they benefit from the system.

The last thing the Court would want to do, would be to degrade the product that they have and to cost them more money, more inconvenience for no real corresponding benefit to merchants.

Ms. Greenberger said for NRF and RLA, no defendants want to change their practices. No, we don't. We think the

system we have works fine. We are agreed to change our practices. We have committed ourselves contractually to change our practices, though.

The changes are going to be embedded in our rules. This is not something that leaves us room to maneuver. The networks are going to change their rules to provide for the freedoms and the optionality that merchants will now have under their settlement. So when they say we are saying something different to your Honor -- was the statement -- no, we're not. We think the system works great. We've agreed to modify it, and those modifications are real and they will be codified in our rules.

You heard the statement that the relief extends eight years well into the 2030s. The denial of the relief would also extend into the 2030s. That's where we'll be. We past the 20-year mark on this litigation. If it goes another four years, we'll be the at year 25; at some point there needs to be a resolution.

Mr. Panuccio said for WalMart that -- again, WalMart has never said, as far as I understood, it that it wanted changes to the honor all cards or surcharging rules. In objecting to the last settlement, WalMart said, the citation is in the class' reply brief at page 14, note 11, WalMart, quote, "particularly has an interest in eliminating a rolling back defendants honor all cards rules which would require

WalMart to accept for payment all manner of defendant's cards, including those that have interchange fees that are substantially higher than other cards."

So they did have an interest in reforming that rule, and they are getting that relief. Not that what WalMart or any other single merchant wants is by any remote means the test for whether when a class settlement is fair, adequate, reasonable and provides relief to the class as a whole.

Mr. Cook did also say that WalMart in his affidavit: WalMart has been forced to accept cards and new credit categories including rewards cards and commercial cards.

NACS, which says they don't want this relief, the general counsel of NACS testified before the United States Senate as follows, quote, "Because the fees are so much higher for some cards than for others, merchants very sensibly might want to accept some of them but not others." That's also at page 14 of the class' reply in note 12.

WalMart's own -- Mr. cook also testified in these proceedings, and Mr. Cook was the head of WalMart's payments and treasury function for a long time. Would WalMart like to surcharge, his answer, and I quote, "We'd like the right to surcharge, yes, absolutely." Under oath, that's Exhibit 16 to Mr. Shadowen's declaration at page 144.

Mr. Panuccio said also, we feel pretty confident what would happen at trial. But they settled their case.

WalMart says it doesn't belong in this class of merchants. There was a class action in 2005 relating to the Visa check case relating to alleged tying of credit and debit, WalMart was a class rep for the whole merchant class. They were a named class rep. There can't be an answer to that, that I was only there to represent myself or large merchants, that's not the way class representation works.

And finally, as to WalMart, in their letter January 10, 2025, that they included with their objection here, they sent a letter to class counsel. They said, we're writing to tell you all the things we think should be in the settlement. They have a list of a bunch of things that they think should be in here. A lot of those things they got. Some of those things they didn't get. That's the way the settlement works. But as far as getting some and not others, this is what they say on page one of their counsel's letter: We are not suggesting that a settlement would have to include all or even most of these potential provisions to meaningly increase competition.

Now they are saying something very different to the Court.

Let me make sure I get everything here.

Finally, your Honor, on the Visa debit objectors.

First, their case is preceding a case. It's in discovery, it's in consolidated discovery with the Department

of Justice case relating to the same underlying facts, that case is going.

This is a non-opt out case, so the debit objectors don't have any decision to make right now should they be in or should they be out. We are here on a preliminary approval motion, we're not here on a motion by us to enforce the release, which is where the Court might be in a position or where it needs to decide.

If their claims, they say they rest on a different factual predicate; either they do, or they don't.

And as the Second Circuit said in the Fikes Wholesale says case, 2023, affirming approval of the damages settlement: Decision on the scope of the release or some objectors were arguing that release was too broad, can await a proper case.

And that it's not a concern because the release has what the Court called a defacto severability clause. Which is a provision saying, like the release says here, that it applies only to the fullest extent, but only to the fullest extent of federal law. Which the Second Circuit said that language incorporates the identical factual predicate doctrine. So either they are within the scope of the release or not, but that's not a decision that this Court should, that this Court needs to or should make now.

The debit objectors say that the class did not

pursue the same claims and their claims arise from a different factual predicate, not an identical factual predicate.

First in their objection to your Honor they said that, this is at page 1202 of their objection: The fixed acquirer network fee is at the center of ongoing litigation by the merchant plaintiffs in the debit card litigation, they specify.

The class's prayer for relief in its complaint that's before the Court, in paragraph D: Wherefor plaintiffs respectfully pray that this Court enjoin Visa's fix acquire network fee.

In fact, that's only one of two specific very, very fact specific heads of relief that the class asks for, everything else is the sort of broad declarations that one would expect to see in a prayer for relief, tell the defendants not to continue to violate the anti-trust laws, and so forth.

Moreover, their allegations, we heard from counsel that they are claiming that, they are arguing about the Fanf, I showed the Court what the class said good about the Fanf. They say, their allegations involve alleged volume agreements with issuer. The class here alleged that to support its post-Durbin monopolization strategy, Visa entered into agreements with issuers to incent or require them to not implement PIN-less debit from PIN debit card networks such as

Star and Pulse.

They also argued in their summary judgment papers that Visa's volume discounts excluded rivals.

The debit objectors complain about digital wallets. The rule 23(b)(2) class allege that Visa had an anti-competitive scheme in mobile payments in the digital wallets space, including Visa's actions re Apple Pay, that's at paragraph 298.

Their claims arise from the identical factual predicate as the facts that support the claims that were resolved.

Finally, as Mr. Shadowen said, the settlement does provide relief to debit card plaintiffs. As Mr. Shadowen also said, they are not some special sub class within the class, they are just merchants. They happen to have a claim relating to debit cards -- either that claim will go forward or it won't, right now it is going forward -- but not a stand-alone class from the main class. They are merchants. They accept debit cards and credit cards, and they are getting the full measure of relief that is afforded under this settlement.

But in any event, there is all kinds of relief here that can fairly be said to extend to debit. Merchants can discount their preference debit cards on an issuer level. They can chose to allow acceptance of a debit and different tiers of credit. They can now make different decisions of

what they want to accept, that goes to debt too. They can debit, Visa debit at certain banners not others subject to the criteria set forth in the settlement agreement. They can pilot test non-acceptance of debit under the provisions of the settlement agreement. The honor all wallets rule, which is relaxed, they can reject wallets that include debit cards. They can use buy-in groups to try to get better rates on debit.

So there is more than sufficient relief in here as to debit. But in any event, that's really not the question and this really isn't the time to decide it.

And with that, I thank you, your Honor.

THE COURT: Thank you.

MR. MICHAEL: Your Honor, again William Michael for Mastercard.

I want to start by responding to Ms. Greenberger who referenced some statements by, or what she characterized as statements, by Mastercard CEO, Mr. Miebach on an investor call. The way she characterized it was that Mr. Miebach said that the settlement doesn't touch honor all cards. That's just inaccurate.

What Mr. Miebach emphasized on that call is that this settlement is all about balancing the interest, he said, between different parties. It's what he called a, quote, "thought through balance option." He said, it brings some

certainty on interchange levels to the merchants, and also some more choice on what cards to accept.

He was then asked, given the changes to the honor all cards rule, that are embedded in this settlement, what does that do to Mastercard's competitive positioning? He responded that Mastercard's competitive positioning is preserved. In other words, Mastercard still has the ability, as it should, to compete on an inter-brand level against Visa, American Express, Discover, and all the other payment options that consumers have available to them.

There is still an incentive for issuers to issue cards. There is still an incentive to cardholders to use cards to pay. And there is still an incentive for merchants to accept cards and provide a predictable experience in their stores for customers.

That is what is a fair and reasonable settlement should be trying to do.

Ms. Miller compared the default interchange rule to price fixing. Let me be very clear, this is not a price fixing case. There is no horizontal conspiracy that is alleged here between networks, and there couldn't be.

All of the plaintiffs claims are under the rule of reason. That's because all of the rules that are at issue in this case, and particularly the honor all issuers rule and default interchange, have recognized pro-competitive affects.

They are what allow the network to function as a network. And part of the point of a network, like Mastercard, is to avoid the need for individualized negotiations between the two sides. By avoiding that, what do you is create an incentive to maximize output and promote inter-brand competition. That is what default interchange and honor all issuers does.

And that's also the response to Ms. Miller when she says, well, a solution to this is just abolish those rules for the top ten issuers. WalMart in they papers said, you can abolish it for issuers with above $10 billion. First of all, issuers above $10 billion, you're still talking about over 100 issuers. Whether it's over 100 or the top ten, the point is the same, abolishing that rule is going to create more confusion, less predictability, and a worse experience for consumers. And it's going to affect the incentive of issuers to issue cards; and importantly, to invest in rewards and benefits for cardholders and channel their energies to competing for cardholders, which again, maximizes volume on the networks and promotes inter-brand competition, the kind of competition that the anti-trust laws care most about.

Ms. Miller also argued that the networks could get around the relief provided in the settlement by reclassifying cards from premium to standard. My colleagues already touched on this.

I want to emphasize that Mastercard cannot just, or

issuers, cannot reclassify a card from premium to standard or vice versa by changing the label. There are specific requirements that go along with premium cards. There is work that has to be done to offer a premium card. And there is a cost to it, because those cards come with rewards to cardholders. So this is not just a matter of changing the name on a card, even if there the incentive to do that, which there is not.

And as long as there are standard cards out there, what this settlement is doing providing merchants an incentive to steer towards those cards, which is what they say they want to do in order to lower their interchange costs. On top of all of that, you have the rate caps and the cap on the average affective rate, which is another check on the hypothetical that Ms. Miller alluded to of reclassifying cards. Because if you are going to raise the affective rate on one set of cards, then it's going to have to come down somewhere else in order to comply with that average affective break out.

Ms. Greenberger talked about the future release. That is seeking to relitigate an issue that the Second Circuit already decided in Fikes.

Fikes involved a settlement with a release that extended five years into the future. The Second Circuit found that was not a reason to reject the settlement. And Courts in this circuit have consistently held in cases like this that

such releases are permissible and do not violate public policy.

As to the effect on any particular situation involving a particular plaintiff that may arise in the future, the Second Circuit held it had no occasion to decide those issues because of the term of the settlement that limited the release to the fullest extent permitted by federal law. You have exactly that same term in this settlement.

Finally, with respect to a couple of the arguments that Mr. Panuccio made.

He again compared the affect of honor all issuers and default interchange to eliminate a competition between Coke, Pepsi and Dr. Pepper. That is not the an apt analogy. If you wanted to compare competition between Coke, Pepsi and Dr. Pepper to something at issue in this case, that would be Mastercard, Visa, and American Express. And what this settlement does is preserve the ability for that competition to take place.

He talked about banks offering different products. There was an argument in WalMart's paper about, well, what is a merchant's ability to address the problem of an under-performing issuer. Again, the response to that is inter-brand competition. Mastercard has just as much incentive, if not more, than a merchant does to address an underperforming issuer because that undermines the Mastercard

brand, and that's where competition takes place in this market.

Last, Mr. Panuccio quoted Judge Brodie as saying the prior settlement in her 2024 ruling provides the least benefit to the merchants with the most valuable claims, that's at page 37 of Judge Brodie's opinion. And what she was referring to there and specifically was the fact that under that prior settlement, the merchants who do not pay posted rates are unlikely to receive any benefit from the rate caps and roll backs. That again, has been addressed directly in this current proposed settlement by virtue of the pro rata reduction that merchants with negotiated rates get.

Unless the Court has any questions, I'll conclude there. Thank you, your Honor, for your time.

THE COURT: All right. Thank you everyone for the excellent arguments. I'm going to reserve decision. I'll get one out as quickly as I can. Thank you. We are adjourned.

(Whereupon, the matter was concluded.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Rivka Teich*
Rivka Teich, CSR RPR RMR FCRR
Official Court Reporter
Eastern District of New York