# Exhibit 7

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL No. 1720<br><br>Docket No. 05-md-01720-MKB-JO |
| BARRY'S CUT RATE STORES INC.; DDMB, INC. d/b/a EMPORIUM ARCADE BAR; DDMB 2, LLC d/b/a EMPORIUM LOGAN SQUARE; BOSS DENTAL CARE; RUNCENTRAL, LLC; CMP CONSULTING SERV., INC.; TOWN KITCHEN, LLC d/b/a TOWN KITCHEN & BAR; GENERIC DEPOT 3, INC. d/b/a PRESCRIPTION DEPOT; and PUREONE, LLC d/b/a SALON PURE,<br><br>Plaintiffs,<br><br>-v-<br><br>VISA, INC.; MASTERCARD INCORPORATED; MASTERCARD INTERNATIONAL INCORPORATED; BANK OF AMERICA, N.A.; BA MERCHANT SERVICES LLC (f/k/a DEFENDANT NATIONAL PROCESSING, INC.); BANK OF AMERICA CORPORATION; BARCLAYS BANK PLC; BARCLAYS BANK DELAWARE; BARCLAYS FINANCIAL CORP.; CAPITAL ONE BANK, (USA), N.A.; CAPITAL ONE F.S.B.; CAPITAL ONE FINANCIAL CORPORATION; CHASE BANK USA, N.A.; CHASE MANHATTAN BANK USA, N.A.; CHASE PAYMENTECH SOLUTIONS, LLC; JPMORGAN CHASE BANK, N.A.; JPMORGAN CHASE & CO.; CITIBANK (SOUTH DAKOTA), N.A.; CITIBANK N.A.; CITIGROUP, INC.; CITICORP; and WELLS FARGO & COMPANY,<br><br>Defendants. | |

**Expert Report of Joseph E. Stiglitz**

**October 5, 2018**

is the United States.[94] The product dimension identifies the set of products or services that would be reasonable alternatives to buyers faced with anticompetitive acts by a supplier.[95]

64. If the buyers (merchants and cardholders) of the network services of Visa and Mastercard have available many nearly equally preferred payment alternatives, then there is no economic concern that Visa or Mastercard can successfully engage in anticompetitive acts or charge supracompetitive prices. Credit cards are only one of many means of payment. Visa and Mastercard customers have the options of two other credit card providers — Discover Card or American Express[96] — in addition to using debit, ACH, checks or cash.[97] I first consider the substitution of other payment means for credit cards.

65. Credit cards allow completion of transactions between consumer cardholders and merchants. Credit cards are distinguished from other payment means because of the accompanying access to a line of credit. To accomplish credit card transactions, cardholders need to make the decision to use a credit card rather than debit, cash, check or ACH, and a merchant must make the decision to accept the credit card. (I refer to this decision as the merchant "acceptance decision.") The merchant's acceptance decision is derivative from the expected reactions of cardholders to that decision. A standard and well accepted approach for analysis of the reasonable substitutes is the "SSNIP" (**S**mall but **S**ignificant and **N**on-**T**ransitory **I**ncrease in **P**rice) test.[98] The SSNIP test considers the substitution reactions of buyers to a small

---

[94] For physical products, the geographical dimension of the relevant market is typically related to transportation costs. For example, control of the sales of gasoline on a corner is not likely to define a relevant market, as drivers at low cost can substitute to alternative gasoline stations by "transporting" themselves to other corners. However, control of supply in a metropolitan area would likely result in market power since the transportation costs out of metropolitan area are high both for buyers and sellers.

This case concerns merchants and customers in the United States, and control of payment means services in the United States would certainly result in market power.

[95] *See* Jonathan Baker, "Market Definition: An Analytical Overview," *74 Antitrust Law J.* 129, 133 (2007) (the "Horizontal Merger Guidelines define a market as a collection of products or services, and a geographic region, that would form a valuable monopoly. If it would be unprofitable for a hypothetical monopolist of a group of products within a region to raise price by a small but significant and non-transitory amount, because buyers would substitute to other products or locations, then the candidate (provisional) market is too small and must be expanded.").

[96] American Express was initially a charge card, granting credit only for the billing cycle. However, in 1987, it began issuing cards offering revolving credit.

[97] "Digital wallets" payments such as Apple Pay, Pay Pal and Samsung Pay are card-less payment systems based on use of others' debit or credit card networks. They are therefore not alternatives to or substitutes for debit or credit, but rather complements.

[98] *See* Merger Guidelines § 4.1.1.

increase in price for a product or set of products.[99] A price increase of 5% above the competitive level is considered to be a "small but significant" price increase.[100] If, in response to such a price increase, sufficient buyers switch to alternatives, the price increase will be unprofitable. In that case, a seller controlling the set of products will have no market power, and the set of products will not be a relevant product market. The relevant product market in that case must expand to include those substitutes that the buyers would switch to.

66. Consider the attempted imposition of a SSNIP by a hypothetical supplier of all general-purpose credit card network services ("GPCCNS"). By GPCCNS I mean the set of services that allow the electronic processing of transactions using credit cards. Assume a small price increase is imposed on merchants with the cardholder price being held constant.[101] Each merchant could respond by not accepting the cards, or alternatively, if not prevented by the Restraints, by imposing costs on cardholders for use of the cards.

67. If a merchant refuses to accept credit cards in response to a SSNIP, the merchant will save the SSNIP amount on all transactions for which the cardholders continue to make purchases by switching to an alternative payment means. However, the merchant will lose the margin it earns on any reduced purchases because it no longer accepts credit cards. I will illustrate the SSNIP exercise using a hypothetical "competitive" merchant fee of 60 basis points (bps) — .6%, of transaction amounts.[102] Using this hypothetical fee, a 5% increase would be 3 bps — .03% of the transaction amount.[103] Assume a merchant gross margin of 35% of the transaction amount.[104] In that case, if a merchant expected a loss in sales from those preferring use of credit cards of anything greater than 1/10 of one percent, it would not be profitable to reject the card.[105]

[99] The SSNIP test is also called the "hypothetical profit-maximizing monopolist" test because it hypothesizes control of the pricing of the considered set of products by a single supplier.

[100] The Merger Guidelines suggest this figure. *See id.*; Merger Guidelines Fig. 5.

[101] This is an increase in the total price of GPCCNS, which is the sum of the prices to both sides of the transaction. *Id.*

[102] The facts that I describe below suggest that a competitive merchant price for credit card transactions is below 60 basis points.

[103] At the competitive merchant fee, the merchant is assumed to be indifferent to credit card use or an alternative efficient payment means.

[104] This is the typical margin earned by grocery stores and pharmacies. As explained below, the loss in business that will lead to continued card acceptance (passing the SSNIP test) will be lower the greater is the merchants' gross margin.

[105] By rejecting the card, the merchant saves the SSNIP percentage on the credit card transactions (SSNIP * CC Transactions), with continuing customers shifting to an alternative payment means with an effective cost of 60 bps,

A hypothetical single supplier of credit card services would have market power, and GPCCNS would be a relevant economic product market.[106] Thus, it takes only a minimal expectation of loss of business from card rejection to imply some market power from control of credit cards.[107]

68. Rather than rejecting credit cards, a merchant could impose a cost on cardholders, either by charging for credit card use, or discounting for use of alternative payment means. A merchant's decision to impose costs on cardholders for credit card use in response to a SSNIP (rather than not accepting credit cards) also depends on the cardholders' expected reactions. By imposing a cost equal to the SSNIP, the merchant becomes indifferent to whether the cardholder substitutes to alternative payment means or continues to use a credit card. Cardholders for whom the card is the most efficient means of payment (considering the benefits of the access to the line of credit) would always prefer the SSNIP cost for the card use to non-acceptance. With a cost for card use, the cardholders would have the same non-acceptance options of switching payment means or switching merchants but also the additional option of paying the merchant-imposed usage cost. Therefore, the expected loss of business for the merchant in a world in which the merchant can impose a charge on consumers (using the SSNIP test) would be equal to or less than from card rejection. However, from the perspective of the hypothetical *single* GPCCNS supplier, merchants' pricing of credit card use makes it less likely that the SSNIP is profitable. Take a price increase that is above 5% but just below the level leading to merchant rejection. Considering only merchant rejection, assume that the SSNIP is profitable; the supplier has market power, and GPCCNS is a relevant product market. Consider, however, what happens when the merchant imposes a cost on credit card use corresponding to the merchant price. In that case, an increase in merchant price will not lead to a rejection of the credit card, but to an

---

but loses the gross margin percent on the lost transactions (GM% * Loss% * CC Transactions). The merchant will reject the credit cards only if the saving exceeds the loss; SSNIP * CC Transactions > GM% * Loss% * CC Transactions. Simplifying, the merchant will reject the cards only if Loss% < SSNIP / GM%. Thus, with a SSNIP of 3 bps and a GM% of 35%, the maximum Loss% for card rejection would be less than 1/10% of the CC Transaction amount. Note also that the higher the gross margin percent, the lower is the loss in business that would lead to continued card acceptance.

[106] The calculation is a form of "critical loss" analysis. See, e.g., Langenfeld and Lee, "Critical Loss in Evaluating Mergers" *Antitrust Bulletin* (Summer 2001), and Danger and Frech III, "Critical Thinking About 'Critical Loss' in Antitrust," *Antitrust Bulletin* (Summer 2001).

[107] The profit calculus of rejecting a payment means when faced with a SSNIP by the supplier does not depend on the number of customers preferring the card. If, however, there were some fixed costs associated with acceptance of a network's card, and these fixed costs were saved with rejection, the benefits from continuing to accept the card must exceed that fixed costs. In that case, a network with a smaller cardholder base would be more likely to be rejected than a larger network.

increase in the price charged for the use of the card. This would lead some customers to substitute to alternative payment means (rather than switching merchants), leading the SSNIP to be unprofitable to the credit card supplier. In that case, the credit card supplier would not have market power, and the GPCCNS embracing that single firm would not be a relevant product market. [redacted].

69. There is an additional and essential complication in evaluating the relevant economic product market that is related to the Merchant Restraints. In *American Express*, the Supreme Court links higher merchant fees with lower cardholder prices and increased cardholder loyalty.[108] If, as I discuss further below, the Restraints result in increased cardholder preference for the use of a particular credit card (e.g., because of increased differential rewards),[109] then the Restraints increase cardholders' response to the merchant's rejection of the credit card and/or the merchant imposing of costs on use of the credit card. This again may lead to a narrower relevant product market with the Restraints in place, than if the Restraints were absent. That is, the (smallest) group of firms which could collectively, profitably raise their prices is smaller—and indeed, a single firm (platform) can be defined as its own market.

70. The market definition exercise is typically done to determine whether there is market power sufficient to impose an anticompetitive restraint as well as to raise prices above costs.[110] In this case, [redacted]

[108] "To maintain the loyalty of its cardholders, Amex must continually invest in its rewards program. But, to fund those investments, Amex must charge merchants higher fees than its rivals." *American Express*, 138 S. Ct., at 2282. As I have discussed, the provision of credit card transactions services results in the expectation of profits from those making use of the credit. Rather than including this in the price of the credit card transactions, I take it into account in the assessment of the competitive total price of credit card transactions.

[109] What matters to customers is the value of marginal rewards. Even if two cards had the same rewards structure, individuals might choose to specialize in one or another if there are non-linearities in the value of rewards. For example, with airline miles, individuals typically wish to concentrate rewards in a particular airline. Thus, higher rewards, even without differentials in reward programs, lower cardholders' willingness to substitute among alternative credit cards.

[110] I show below that, given the market as it is today, the Merchant Restraints are unambiguously anticompetitive. That analysis says nothing about whether, at an earlier stage of development, the merchant constraints might have been justified, e.g. by solving the startup "chicken-egg" problem. This case only relates to periods well after the market was mature in the sense that I have defined it.

[redacted]

71. Consider, for example, a merchant deciding whether to accept credit cards in the early 1990s. Acceptance requires agreement to the Merchant Restraints. At that time, there were well established networks with many millions of cardholders. Some of those cardholders had rewards cards, others had automatic bill paying tied to their credit card, and most users had become accustomed to paying a single monthly bill utilizing credit card float. Consequently, these cardholders had become loyal to credit cards and to some extent to their preferred card. If a merchant considering credit card acceptance anticipated that such preference would lead to a minimal increase in business, acceptance with the restraints is profitable.[112] This is likely the case whether the Merchant Restraints were existing or were being newly imposed. Consider now a merchant that has been accepting Visa and/or Mastercard for years. That merchant agreed to the Merchant Restraints upon initial acceptance. And with the network well-established, the merchant is even less likely to drop out of the network—even were the network to increase its fees.[113]

72. In defining relevant product markets, the interchangeability of alternatives provides guidance.[114] Credit cards clearly have a feature that differentiates them from other payment means. Such differentiation limits interchangeability. For those cardholders who need consumer credit to engage in a transaction, payments by cash, debit or check are not reasonable

---

[111] That is, there is a non-competitive equilibrium, with the constraints in place, which entails the ability simultaneously to impose the constraints and to raise prices on merchants.

[112] This is the reverse of the profit exercise described above. That is, if a merchant earning a 35% margin expects a 1/10th of one percent or greater increase in business from accepting credit cards priced 5% above the competitive level (the costs of alternative payment means), acceptance will be profitable.

[113] These results hold whether the efficient price-pair necessary to establish the systems required the Restraints or not. History can play a role in determining the current equilibrium. With the systems well established and with many cardholders using rewards cards made possible by the Restraints, a hypothetical credit card monopolist could likely impose a SSNIP on the total price by increasing the merchant fees. Had the supplier attempted to charge the merchants such a fee at the time of its original acceptance, the merchant may have declined. However, after establishment of the system, cardholder loyalty supported by the Restraints has evolved, and what was an unprofitable SSNIP may well now be a profitable SSNIP.

[114] *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394–95 (1955) ("In considering what is the relevant market for determining the control of price and competition [for antitrust purposes], no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce…'").

alternatives.[115] The distinction between credit cards as a payment means and other payment means including cash, check, debit and ACH is well established and accepted. In *American Express*, the Supreme Court held that credit card transactions are in a different market than transactions using other payment means.[116] I also have the opinion that, in the current institutional arrangements, General-Purpose Credit Card Network Services (GPCCNS) is a relevant economic product market. A hypothetical monopolist that controlled all credit based electronic payments networks would be able to charge total fees above the competitive level.

73. I next consider whether there are narrower brand-level relevant economic product markets — markets for Visa GPCCNS and/or for Mastercard GPCCNS. If Visa and Mastercard cardholders carried alternative credit cards of different brands, and if the cardholders considered each to be very close substitutes, meaning that they were essentially indifferent between using one or the other, Visa or Mastercard would alone be unable to impose anticompetitive restraints as part of merchant acceptance.[117] Rather than accept the Merchant Restraints which result in higher retail goods prices and reduced merchant profits, the merchant would not accept the credit card. The merchant would lose no customers from card rejection, since its customers would just use another card.[118] Thus, if customers did not care whether Visa or Mastercard were accepted by a merchant because of the customers' ability to substitute to an equally preferred alternative credit card brand, neither Visa nor Mastercard would be in its own relevant product market, and each could not unilaterally impose restraints unless they were beneficial or neutral to individual merchants. If, however, cardholders did not consider paying with one credit card to be a reasonable alternative to paying with a card of another brand, then non-acceptance by a merchant

[115] Debit and checks could be close substitutes to credit cards if banks developed low-cost linked lines of credit that automatically added to the account balance as the funds were needed. To be close substitutes, the lines of credit would need to offer "float" over a six to eight-week payment cycle.

[116] E.g., 138 S. Ct., at 2281 ("… we will analyze the two-sided market for credit-card transactions as a whole to determine whether the plaintiffs have shown that Amex's antisteering provisions have anticompetitive effects.") In *American Express,* the District Court concluded that "[t]he evidence presented at trial also established that the relevant product market includes only general purpose credit and charge card network services, and does not extend to debit card network services" was not challenged. *Am. Express Co.*, 88 F. Supp. 3d, at 175. *See also*, *U.S. v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 338-39 (S.D.N.Y. 2001) (finding credit cards were in a separate market from other payment means).

[117] In the Competitive Impact section below, I consider the fact that each of the credit card networks imposes similar merchant restraints.

[118] Even if the cards were imperfect substitutes, simply letting customers know about the higher fees would induce some customers, concerned about excessive charges by the banks sector, to change their behavior.

are sufficient differences between Amex and the Visa/Mastercard facts so as to make the *American Express* framework inapplicable here.

87. In a market economy, prices are the principal means by which buyers are informed of the social costs of their consumption decisions. When purchase or sales decisions are made absent knowledge of prices, an inefficient allocation of resources is expected. The market's "invisible hand" cannot function when buyers or sellers lack appropriate information and incentives to guide their decisions. The Visa and Mastercard Merchant Restraints result in merchants' customers having no knowledge of the total price of alternative payment means. As a result, the cardholders make their payment means decisions based solely on the portion of the total price that they are aware of — the price on the cardholder side. Given card acceptance, the merchants have no effective means through which they can inform or influence those decisions. This leads to cardholders favoring high-rewards cards regardless of whether the value of the rewards exceeds the costs, eliminating competition that would push credit card networks to set an efficient cardholder/merchant price-pair. The Restraints leave merchants with no effective mechanism to push back against Visa and Mastercard's merchant prices.[134] Unable to affect credit card usage by pricing and other steering, merchants can resist price increases only by refusing to accept high cost cards (and, under the Honor-All-Cards rule, all other cards of the network) altogether. As demonstrated above, forcing merchants into an all-or-nothing accept/reject decision increases the market power of the GPCCNS suppliers.[135] The evidence discussed below shows that Visa and Mastercard exploited that market power.

[134] Visa and Mastercard both set "default" interchange rates that, absent an agreement to the contrary between an issuer and a merchant, will be the effective rates. With the Merchant Restraints in place, each issuing bank knows that: (1) reducing its own interchange fee below the network's "default" interchange fee will not result in increased sales because the merchant cannot use the lower price to steer customers; and (2) all the other issuing banks will have reached the same conclusion. Thus, as discussed further below, the Merchant Restraints eliminate the incentive for the individual issuing bank to reduce its own interchange fees below the default rate, with the result that the default rate is the *de facto* cooperatively-set fixed rate.

[135] *See, e.g., United States v. Visa*, 163 F. Supp. 2d 322, 340 (S.D.N.Y. 2001) ("In this regard, plaintiff has proven through the testimony of merchants that they cannot refuse to accept Visa and Mastercard even in the face of significant price increases because the cards are such preferred payment methods that customers would choose not to shop at merchants who do not accept them. . . In addition, both Visa and Mastercard have recently raised interchange rates charged to merchants a number of times, without losing a single merchant customer as a result.") (internal citations omitted; Deposition of Laura Mackenzie, Mar. 30, 2017, pp. 34,35; 43-44 ([redacted]); Statement of Objections, Cases Comp/34.579 Mastercard, Comp 36,518 EuroCommerce and Comp/38.580 Commercial Cards, MCI_MDL02_10137338, at MCI_MDL02_10137415-16 "[redacted]"); MCI_MDL02_10137457

promotional effort for that issuer's cards to lessen the adverse consumer reaction from non-acceptance of other cards. Such an exclusive acceptance policy would allow a merchant to provide relatively simple information as to acceptance, displaying a prominent sign such as "We Accept Only Bank of America Visa Cards." Other issuers would have strong incentives to prevent their loss of transactions by also offering low merchant prices. While such competition would be beneficial to the economy as a whole, it would be averse to the interests of the issuing banks as a whole. It would do what competition is supposed to do: drive down their profits.

*Default Interchange.*

136. As explained above, when a merchant is unable to influence cardholders' choice of the payment means, the Visa and Mastercard default interchange rates become the de facto price charged by all issuing banks. The cooperative price charged by the issuing banks is similar to what might have emerged from a more explicit price fixing agreement among the issuing banks.[207] The networks and banks try to justify the default interchange with the claim that it is needed to prevent a free-riding holdup problem by an issuer bank.[208] But any such problem exists only because merchants cannot influence the cardholders' decisions due to the no-steering and Honor-All-Cards rules. Even absent these constraints, setting default interchange fees remains anticompetitive by serving as a focal point to coordinate the supracompetitive pricing by the highly concentrated issuers.

137. With the no-steering and Honor-All-Cards rules eliminated, as I have suggested, the only economic justification for the default interchange rates are the contracting costs from merchants having to contract with the issuers. However, such contracting costs appear to be small, as currently large numbers of merchants contract with a number of payment platforms, including the four credit card providers, complementary add-on providers such as Apple Pay, Samsung Pay, and Pay Pal, and with various debit processors. Certainly, there are no significant contracting costs issues with merchants dealing with the large issuing banks such as Chase, Citi, Bank of America, Wells Fargo and others that account for more transactions than American Express or Discover. Therefore, the Default Interchange should be eliminated for such large

[207] If Visa or Mastercard attempted to control the interchange fee by setting a competitive default rate, the banks could threaten to shift card issuing to a provider that offered supracompetitive interchange.

[208] With the Honor-All-Cards rule in place, an issuing bank could attempt to set a very high interchange fee knowing that its card could not individually be rejected.

banks. The definition of large banks can follow that of the Durbin Amendment - banks with assets over $10 billion.[209]

*All Outlets Rule.*

138. This rule (actually, an interpretation of the Honor-All-Cards rule) required that a merchant accept Visa and Mastercard at all its stores, in all locations, and for all its store brands. As part of the private settlement in MDL 1720 in 2012, Visa and Mastercard both relaxed this rule somewhat, permitting a merchant to decline acceptance in some of its store brands. The rule remains anticompetitive to the extent that it does not allow selective non-acceptance by individual store location. For example, a store may be operating in locations where most customers shop based on price. In that location, non-acceptance may be the profitable decision. The All Outlets Rule effectively leverages market power system wide to force acceptance system wide. The All Outlets Rule should be permanently eliminated.

*Additional Relief.*

139. The decades long imposition of the Merchant Restraints that prevented merchants from providing any price signals to customers as to the high cost of credit card usage has resulted in norms of business behavior and customer habits and perceptions that will make it less likely for merchants to impose immediately an explicit price for credit card use after the Merchant Restraints are eliminated. Given the long history and custom of "free" use of premium credit cards (because of the Merchant Restraints), imposing a price would be viewed by many shoppers as "unfair." (Of course, these practices were the result of the anticompetitive restraints, but consumers do not know this.) Given the uncertainty about the customer responses, and accordingly the responses of other merchants, it is reasonable to expect merchants to have concern that charging for the use of a credit card may lead to many customers switching to competitors that do not impose a price on card use. The history, apparent business norms, perceptions of fairness, and habits of use thus result in high expected "elasticity" of switching, and greater uncertainty about the consequences of providing price signals through "charges", resulting in the likely perpetuation of a situation not dissimilar to that which exists today, for an unreasonably long period of time.

---

[209] Visa and Mastercard would continue to intermediate for the small banks. Merchants would be free to steer customers away from use of, or not accept, the small banks' cards if Visa or Mastercard set rates too high.