# Exhibit 8

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------- X

MASTER FILE 05-MD-1720

IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION

HIGHLY CONFIDENTIAL

This Document Relates to:

Target Corp., et al. v. Visa Inc., et al.

No. 13-cv-05745

----------------------------------------------------------------X

**EXPERT REPORT OF DR. ROBERT G. HARRIS**

assuming they are does not change my opinion regarding Visa's and Mastercard's market power. In these alternative relevant product markets for credit transactions and debit transactions, a structural or indirect analysis of market power proceeds along the same lines as already discussed. If Visa and Mastercard are each considered to be operating two-sided platforms resulting in "transactions" markets for credit and debit, it remains the case that the Competitive Restraints organize Visa and Mastercard and their issuers into cartels that replace competition for merchant acceptance. The market power of the cartels is exercised by extracting profits from merchants rather than from cardholders. Moreover, the shares and level of concentration in these two markets is identical to those for the relevant markets discussed earlier.

## D. Section VI: Direct Evidence Indicates That Visa and Mastercard Have Market Power

58. Market power can also be analyzed directly, without the need for defining relevant markets and inferring market power from market shares. My analysis of the direct evidence also leads to the conclusion that Visa and Mastercard each individually have market power over merchants with respect to both credit card acceptance and debit card acceptance.

59. Visa's and Mastercard's abilities to impose the Competitive Restraints on merchants are themselves direct evidence of market power. In a competitive market, the terms, conditions, and price (if any) at which a merchant agrees to accept a particular issuer's cards would be subject to negotiation. The absence of such negotiations or other competitive means of setting the terms of acceptance demonstrates Visa's and Mastercard's market power, which derives from the collective market power of issuing banks—their respective cartels. That is, Visa's and Mastercard's ability to impose the Competitive Restraints on merchants demonstrates that they have sufficient market power to do so.

60. Visa's and Mastercard's abilities to force merchants, through the Honor All Cards rules, to make an all-or-none acceptance decision with respect to Visa or Mastercard credit or debit cards is also direct evidence of market power. In economic terms, the all-or-none acceptance decision enforced by the Competitive Restraints effectively removes a merchant's ability to affect the marginal customer (those that would be most willing to switch to a different payment method if they had to directly pay for the cost imposed on merchants). In fact, the all-or-none decision is the result of the structural impediments to the substitution of interchangeability of credit and debit products. In this way, Visa and Mastercard eliminate much of merchants'

bargaining leverage, thereby enabling the cartel managers to set interchange and network fees higher than they could in a competitive environment.

61. Visa and Mastercard repeatedly have raised interchange fee and network fee prices, thereby increasing U.S. merchants' acceptance costs by billions of dollars per year, with effectively no loss in merchant acceptance. Their ability to do so in an industry with large economies of scale (i.e., high fixed costs), growing transaction volumes, and falling underlying technology costs is direct evidence of their substantial and continued market power over merchants. From 2004 to 2016, Visa's system-wide effective interchange fee for credit card transactions increased [redacted]%, from [redacted] basis points to [redacted] basis points. Effective interchange fee rates for Mastercard credit card transactions increased from [redacted] basis points in 2004 to [redacted] basis points in 2016, an [redacted]% increase. From 2004 to 2010 (just prior to the Durbin Amendment), Visa's Interlink effective interchange fee increased [redacted]%, from [redacted] basis points to [redacted] basis points. Maestro's system-wide effective interchange fee for PIN debit transactions increased [redacted]%, from [redacted] basis points to [redacted] basis points.

62. Visa's and Mastercard's merchant acquirer effective net network fees for debit and credit have increased significantly since 2004, and in particular since the networks' respective IPOs in 2008 and 2006. From 2004 to 2016, Visa's merchant acquirer effective net network fee for debit and credit card transactions has increased [redacted]%, from [redacted] basis points to [redacted] basis points. Mastercard's merchant acquirer effective net network fee increased more than [redacted]%, from [redacted] basis points to [redacted] basis points. These fee increases, against the backdrop of falling costs, are additional direct evidence of Visa's and Mastercard's market power over merchants.

63. Despite these substantial price increases by Visa and Mastercard, merchants cannot and have not stopped accepting Visa and Mastercard credit and debit cards. Since 2004, Visa and Mastercard collectively have increased annual U.S. merchant costs by over $[redacted] billion dollars, from $[redacted] billion in 2004 to $[redacted] billion in 2016 (including both price and volume increases). Despite these massive increases, Visa and Mastercard witnesses have struggled to identify even a small handful of merchants that have dropped acceptance.

64. Although Visa and Mastercard each individually have market power derived from the Competitive Restraints and other conduct, industry dynamics further reinforce it. The Visa and Mastercard cartels do not constrain each other's market power over merchants in the way that they would in a competitive market. They compete against one another and against American Express and Discover in a very limited way that in fact makes use of their market power over

107. Widespread merchant acceptance of credit and debit cards provides great value to Visa and Mastercard issuing banks. In particular, the profits that banks earn from credit and debit accounts are tied directly to card usage. Since the vast majority of that usage is for making retail purchases, it is vitally important to banks that their cards are broadly accepted for payment by merchants. Without broad acceptance, the cards would have less utility to credit and debit account holders, leading to lower usage and lower profits for banks. As explained in this report, the Competitive Restraints both ensure that Visa and Mastercard credit and debit cards are widely and fully accepted, and that Visa and Mastercard and their issuing banks extract for themselves the vast majority of the value that merchants provide to issuers.

### 1. General Purpose Credit Cards Are Used To Access Credit Accounts

[redacted]

[redacted]

45 [redacted]

46 [redacted]

[redacted]

[redacted]

[redacted]

47 [redacted]

48 [redacted]

49 [redacted]

50 See [redacted]

51 See [redacted]

[redacted]

---

[52] See [redacted]

[53] [redacted]

[redacted]

### 2. General Purpose Debit Cards Are Used To Access Demand Deposit Accounts

112. The debit card is an essential component of the DDA. Debit cards allow banks to offer cardholders an inexpensive and convenient means by which to access funds from their accounts.[56] When debit cards are used to make a purchase, the funds are deducted directly from the DDA. Debit cards can also be used to access cash directly from an automated teller machine (ATM), or to get cash-back at the point-of-sale when making a purchase.[57] Some DDAs extend credit in the form of overdraft protection programs, but the extension of credit is not a core or common aspect of a DDA account.[58]

---

54 [redacted]

55 [redacted]

56 [redacted]

57 [redacted] Whether a merchant grants cash-back on a purchase transaction is a decision made by the merchant. Merchants such as supermarkets that receive lots of cash commonly offer cash-back on debit card purchase transactions as a way of getting rid of excess cash. [redacted]

58 [redacted] “Data Point: Checking account overdraft,” Consumer Financial Protection Bureau, Jul. 2014, p. 9, https://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf (showing that only about 14% of checking account holders in a bank study had opted into overdraft protection).

203. As a result of this settlement, merchants that accepted Visa and Mastercard credit were no longer required to accept Visa and Mastercard signature debit as of January 1, 2004, and merchants that accepted Visa and Mastercard debit were no longer required to accept Visa and Mastercard signature credit. This introduced a limited amount of new competition into the debit card market because merchants that accepted Visa and Mastercard credit were now free for the first time to drop either credit or signature debit card acceptance without having to drop both.[185]

204. Some large merchants threatened to drop signature debit and a small number of merchants actually did. [redacted] Because of this limited introduction of competition, Visa and Mastercard were forced to lower their signature debit default interchange fee rates, particularly for large merchants, as both networks introduced volume tiered rates that were lower for large merchants.[189] For example, the Visa signature debit default interchange rate for large retail merchants fell from 125 basis

increases and Section IV.D.4.b) regarding the increase in Visa network fees immediately following the Visa Check settlement.

[185] The Competitive Restraints challenged in this case all remained in place.

[186] Mastercard Incorporated 2003 Form 10-K, https://www.sec.gov/Archives/edgar/data/1141391/000095012304002820/y94488e10vk.htm; [redacted]

[187] [redacted]

[188] [redacted]

[189] The term "default" interchange refers to the interchange fees set by Visa and Mastercard that apply to Visa and Mastercard transactions if the individual merchant and individual issuer do not have a separate agreement for interchange. However, the Competitive Restraints remove any incentive of issuers to negotiate any rate other than the "default" rate. As a result, Visa's and Mastercard's default interchange fees apply to the vast majority of their transactions. This issue is discussed in more detail in Section IV.C.1.

points plus 10 cents in April 2003 to 62 basis points plus 13 cents in April 2005, a reduction of 37% on a typical $40 debit card transaction. For large supermarkets, Visa's signature debit default interchange rate fell from 40 cents per transaction in April 2003 to 62 basis points plus 13 cents with a cap at 35 cents in April 2005, a reduction of 13% on a typical $40 transaction.[190] Mastercard's rate fell in similar fashion—the large retail merchant rates fell over 35% while large supermarket rates fell over 27%.[191] See **Exhibit 36**.

***(b) Large Bank Issuers Remove Rival PIN Debit Networks from Debit Cards***

[redacted]

[redacted]

---

[190] Overall, Visa's consumer signature debit card effective interchange fee rate fell [redacted]%, from [redacted] basis points in 2002 (the year before the settlement) to [redacted] basis points in 2005. See **Exhibit 13**.

[191] The Mastercard signature debit default interchange rate for large retail merchants fell from 140 basis points plus 10 cents in April 2003 to 70 basis points plus 15 cents in April 2004. For supermarkets, Mastercard's signature debit default interchange rate fell from 120 basis points in April 2003 to 70 basis points plus 15 cents with a cap at 35 cents in April 2004. Overall, Mastercard's signature debit card effective interchange fee rate fell [redacted]%, from [redacted] basis points pre-settlement to [redacted] basis points in 2005. See MCW_MDL_22222603 at '610.

[192] [redacted].

[193] [redacted]

### 1. Interchange Fees

321. As noted above, Visa and Mastercard set interchange fees that apply to transactions of *all* of their respective issuing banks. The networks describe the rates that they set as "default" rates, by which they mean that banks and merchants are free to negotiate and agree on any other rate but in the absence of such an agreement the default rate applies. But because the Honor All Cards rules require merchants to accept the cards of all banks, there is no incentive for any individual issuing bank to agree to an interchange fee lower than the default rates set by Visa and Mastercard.[316] Moreover, merchants cannot steer transactions to particular issuers thus disincentivizing an issuer from negotiating with a merchant for lower interchange in exchange for increased volume. As a result, the "default" rates are, in practical terms, *de facto* interchange rates.

322. The networks set the interchange fee on behalf of all of their card issuers collectively; thus, interchange fees do not vary by issuer. In other words, every Visa card issuer charges merchant acquirers exactly the same price for a given type of transaction. The same is true for Mastercard card issuers.

323. Visa and Mastercard each publish a schedule of these "default" interchange fees that are updated periodically, typically once or twice per year in April and/or October.[317] The level and structure of the interchange fee applying to any particular transaction can vary substantially depending on a number of factors:

- **The type of card:** whether it is a credit, signature debit, or PIN debit card.
- **The account holder type:** whether the card is designated as a consumer or a commercial card.
- **The reward card level designation:** for example, whether the network has designated the credit card as a Mastercard World Elite or Visa Signature Preferred card.

[316] See para 306, above.

[317] Prior to October 17, 2006 for Visa and November 1, 2006 for Mastercard, the networks' respective default interchange fee schedules were not publicly available. See VUSALITIIICID2-00741393; MCI_MDL02_11802977. See also Deposition of Steven Jonas (Mastercard), Apr. 23, 2008, p. 183.

of its revenue is derived from merchant fees that are proportional to spending. American Express's CEO testified [redacted][485] [redacted] of American Express revenues are generated from credit products on which cardholders are revolving a balance.[486]

443. This contrasts with Visa's and Mastercard's models, which are "lend centric." That is, the majority of Visa and Mastercard issuer revenue is derived from cardholder charges that are proportional to outstanding balances—interest charged to cardholders for unpaid balances on the cardholder's charges for a given billing period. This means that the majority of the revenue of Visa's and Mastercard's issuers is based on prices and fees that are not set by Visa and Mastercard. All of American Express' revenues are based on prices and fees that it sets.

444. American Express cardholders also skew more heavily towards rewards-based cards and/or corporate/business cards. For example, half of American Express's purchase volume is accounted for by commercial cards, as compared to less than [redacted] for Visa and Mastercard.[487]

## V. ANALYSIS OF RELEVANT MARKETS DEMONSTRATES THAT VISA AND MASTERCARD HAVE MARKET POWER

[redacted]

---

485 [redacted]

486 [redacted]

487 *The Nilson Report*, Issue 1114.

488 [redacted]

[redacted]

446. The delineation of relevant antitrust markets seeks to find the set of products (product market) and the geographic area (geographic market) within which are found the substitutes that most closely competitively constrain the Defendants' products. In economic terms, market definition is fundamentally about substitution: specifically, to which products and suppliers can

---

[redacted]

489 [redacted].

490 [redacted]

payment, even a small chance of losing a sale makes dropping acceptance of credit cards a losing proposition.[565]

530. The following example shows a comparison of what a typical merchant stands to gain or lose by dropping acceptance of credit cards. Consider a merchant that normally accepts $100 in credit card transactions per period, but then decides to stop accepting credit cards. This merchant's gross margin on sales is assumed to be 30%. When the merchant stops accepting credit cards, some of the customers that would have paid by credit card now pay with some other method of payment (e.g., cash, checks, debit cards, or a private-label store card). For those customers, the merchant will save some amount in acceptance costs, as those forms of payment are typically less expensive for the merchant than credit cards. However, some customers will leave without making a purchase. Those lost sales cost the merchant its 30% gross margin. In this example, if the merchant loses more than [redacted] of its sales, dropping acceptance of credit cards will have a net negative impact on profitability.[566]

531. Third, a "critical loss" analysis shows that the SSNIP would very likely be profitable. The critical loss is the minimum percentage loss in sales by the hypothetical monopolist that would

---

[565] See [redacted]

[566] The profit before dropping cards would be $100 * (30% gross margin - [redacted] average merchant discount rate). The profit after dropping cards would be ($100 - lost sales) * 30% gross margin. For lost sales of [redacted]% or more, the profit after dropping cards would be lower than the profit before dropping cards.

make the SSNIP unprofitable.[567] When the hypothetical monopolist raises price by a SSNIP, its profits increase by the amount of the price increase multiplied by the sales that it continues to make. But its profits decrease by the amount of its variable margin multiplied by the sales that it loses. The critical loss, therefore, is given by the formula: $\%\Delta Q = \%\Delta P / (m + \%\Delta P)$, where $\%\Delta Q$ is the percentage change in quantity sold, $\%\Delta P$ is the percentage change in price (SSNIP), and m is the hypothetical monopolist's variable margin. Assuming a 10% SSNIP and a variable margin of 75%, the critical loss in sales that would make the SSNIP unprofitable is 12%.[568] That is, if a hypothetical monopolist of credit cards raised price by 10%, the price increase would be profitable so long as the loss in sales remained below 12%. Using a 5% SSNIP, the critical loss would be 6%. Since historical price increases in this range have not resulted in any measureable loss in sales, I conclude that the actual loss in sales by the hypothetical monopolist would be well below the critical loss. This result supports my conclusion that credit card network services to merchants is a proper relevant market.

#### e) The HMT for Proposed Market of Debit Card Network Services to Merchants

532. In the case of debit, the proposed relevant market is debit card network services to merchants. The hypothetical monopolist is assumed to have a monopoly over the provision of debit card network services to merchants. In effect, I suppose that Visa, Mastercard, and other rival debit networks such as NYCE, Star, and PULSE, were all merged into a single monopoly provider of debit card network services to merchants. In performing the HMT, I ask whether this hypothetical monopolist could profitably raise its price to merchants.

533. The debit merchant discount fee and its three subcomponents—interchange fee, network fee, and acquirer/processor fee—have varied over the course of the relevant period. For purposes of the HMT, a reasonable starting point is to assume a merchant pays a merchant

---

[567] See, e.g., *Horizontal Merger Guidelines*, U.S. Department of Justice and the Federal Trade Commission, Aug. 19, 2010, § 4.1.3, https://www.justice.gov/atr/horizontal-merger-guidelines-08192010#5.

[568] Visa, Inc.'s gross margins have ranged from [redacted]% to [redacted]% since 2005. Mastercard's gross margins have ranged from [redacted]% to [redacted]% since 2005. (**Exhibit 53**.)

706. The Honor All Cards rules have several aspects that are intertwined. These aspects can be described as separate subordinate rules or functional elements of Honor All Cards. These aspects and their consequences are detailed below.

### a) Honor All Issuers

707. The Honor All Cards rules mean that a merchant must accept all Visa (or Mastercard) credit cards regardless of issuer. That is, the merchant must accept Chase Visa credit cards, Citibank Visa credit cards, Bank of America Visa credit cards, and so on. As a result, those banks do not need to compete against each other for merchant acceptance—the merchant must take all of their cards. This "Honor All Issuers" feature of the Honor All Cards rule requires an individual merchant to make an all-or-none decision: accept hundreds of millions of credit cards issued by thousands of card issuing banks or accept none. This artificial choice was originally and collectively created and enforced by the rival card issuing banks as a group when they owned and operated the Visa and Mastercard networks, and it continues today virtually unchanged.

708. The intent and effect of the rules is to artificially limit—and in most cases, effectively eliminate—an individual merchant's ability to negotiate lower prices or higher-quality service from card issuers. In contrast, a hallmark of a dynamic competitive market is the ability of a consumer to play rival suppliers off each other, in an effort to secure lower pricing and/or higher quality. The Honor All Issuers rules shut down this typical competitive process. With the Honor All Issuers rules in place, a card issuer knows that a merchant must accept the cards of all issuers—including its own cards—at the collectively set interchange fee price; thus, the card issuer, in theory, has no incentive to engage the merchant in a bilateral negotiation for card acceptance. In other words, since the Honor All Issuers rules require merchants to accept the cards of all banks, there is no incentive for any individual issuing bank to agree to an interchange fee lower than the default rates set by Visa and Mastercard.[807]

---

[807] Since the Honor All Issuers rules require merchants to accept the cards of all banks, there is no incentive for any individual issuing bank to agree to an interchange fee lower than the default rates set by Visa and Mastercard. See [redacted]

709. [redacted]

[redacted]

[redacted]

- [redacted]
- [redacted]

[redacted]

---

[redacted]

808 [redacted]

809 [redacted]

merchant acceptance in order to compete for consumers. An issuer could, for example, offer low or zero interchange fee rates in return for the merchant agreeing to accept all of its cards. This is the type of *quid pro quo* negotiation that is typical in competitive markets but absent in this market.[824] The end result of such competition would be lower merchant prices and true competitive balance between both sides of the two-sided platform, free of the distortive effects of the Honor All Cards rule and the other Competitive Restraints. With lower interchange fee (and network fee) rates in the but-for world, merchant acceptance likely would be even higher than it has been in the actual world.

### 2. Collectively-Set Default Interchange Fees

722. Visa and Mastercard each set the default interchange fee schedules on behalf of their member issuers; from an economic standpoint, this constitutes horizontal price fixing among banks that would otherwise be competitors for merchants' business. Visa and Mastercard and their issuers use the default interchange fees as a means of exercising their market power over merchants. As explained in Section VIII, I do not see any valid procompetitive rationale for default interchange. In a competitive market, default interchange would be unnecessary.

723. Even if the collective setting of default interchange fees were deemed to be not anticompetitive after considering any procompetitive justifications, the manner in which Visa and Mastercard use their power to set default interchange rates demonstrates that these default rates are used for anticompetitive ends. Even if there were some competitive necessity to have a true *default* rate as a back-up to competitively negotiated interchange agreements, Visa's and Mastercard's default rate schedules and other rate practices are not designed for such a role. Instead, they are used to actively manage a complex cartel.

#### a) Visa's and Mastercard's "Default" Interchange Fees Are *De Facto* Industry-Wide Interchange Fees Because Issuing Banks Have No Incentive to Negotiate Alternative Rates

724. As explained in Section IV.C., Visa and Mastercard each collectively set, on behalf of their issuers, a schedule of interchange rates that their card issuers agree to charge merchants.

---

[824] See [redacted]

So-called "default" interchange is a mechanism for each cartel's issuing bank members to set a common price to merchants. Visa and Mastercard have used the mechanism of default interchange to set prices on behalf of their cartel members, and to raise them over time. By keeping interchange fees high, Visa and Mastercard maintain incentives for their cartel member banks to remain in the cartel. Moreover, Visa and Mastercard, through various means, seek to reassure each of their members that they are not being disadvantaged in interchange in comparison to other banks, or in comparison to the other cartel.

725. The networks describe the rates that they set as "default" rates, by which they imply that banks and merchants are "free" to negotiate and agree on any other rate.[825] By that logic, the default rates apply only in the absence of such a bilateral agreement. In reality, however, such bilateral agreements for acceptance are rare. Because the Honor All Cards rules require merchants to accept the cards of all issuing banks, regardless of interchange rate, there is no incentive for any individual issuing bank to agree to an interchange rate lower than the default rates set by Visa and Mastercard.[826] Moreover, because of other rules, merchants cannot steer transactions to particular issuers, and so merchants cannot promise increased transaction volume in exchange for lower interchange rates.[827] This removes any incentive for an issuer to negotiate for lower interchange in exchange for increased volume. Visa's and Mastercard's initial prohibitions and subsequent limits on surcharging and discounting further reduce issuers' incentives to negotiate with merchants on interchange. As a result, the "default" interchange fees are *de facto* industry wide interchange fees.[828] Put differently, a fundamental role of the Visa and Mastercard networks is to set a collective interchange rate at which their card issuers agree to accept transactions, thus inhibiting interchange fee competition among card issuers.

---

[825] Deposition [redacted]

[826] Section VII.A.1.a).

[827] [redacted]

[828] Regarding the inability of merchants to negotiate Visa's and Mastercard's interchange fees, see interviews with [redacted]

[redacted]

### b) The Complexity of the Default Interchange Fee Schedule Highlights Its Role as a Cartel Coordination Mechanism that Facilitates Collusion

728. The notion that Visa's and Mastercard's published rates are merely defaults that are subject to negotiation is further belied by the complexity of Visa's and Mastercard's interchange rate schedules. These schedules each list dozens of different rates broken out by card type, merchant category or industry, whether the transaction is card present or card not present, and other transaction processing requirements. For example, Visa's default interchange rates for transactions that occur at utilities are lower than the rates for transactions at department stores because lower rates were necessary in order to persuade utilities to accept cards for payment. Since utilities' customers are generally captive, and have no choice but to pay their utility bills regardless of what forms of payment the utility accepts, credit card acceptance is not a necessity for utilities in the same way it is for many other types of merchants. Similarly, Visa publishes higher, "default" interchange rates for transactions where the card is not present at the point of sale (for example, for orders taken over the phone). In other words, Visa publishes a series of "default" interchange rates that vary with things like the elasticity of merchant demand, the risk of fraud, and so on.

729. These are precisely the kinds of factors that should spur issuer competition in the form of strategic price and quality differentiation. For example, in a more competitive environment, an issuer would compete on price to open up new sources of merchant demand (like utilities) and would compete on both price and quality to attract merchants with varying needs and preferences. The fact that Visa and Mastercard have each published a series of "default" rates for the kinds of situations that should engender issuer competition indicates that the "default" rates are really price signals that facilitate price coordination in place of price competition. This interpretation is reinforced by the fact that Visa and Mastercard have removed issuers' incentives to deviate from the coordinated prices through the Honor All Cards rules and associated restrictions on merchant acceptance, steering, discounting, and surcharging.

---

833 [redacted]

834 [redacted]

#### (2) Merchants' Ability To Negotiate for Lower Interchange Would Have Derived from Significantly Greater Opportunities To Steer Transactions to Preferred (Lower Cost) Forms of Payment

1066. In the but-for world, sophisticated large merchants would have had substantially greater bargaining advantage to negotiate lower Visa and Mastercard acceptance costs. Part of this advantage would have stemmed from their ability to steer or threaten to steer their customers from higher- to lower-cost forms of payment. Instead of facing the all-or-none choice that merchants face today with Visa and Mastercard card acceptance, merchants could have implemented policies to favor or disfavor specific cards. Such a policy could have involved specific card products, such as high-fee premium rewards cards, or cards of specific issuers, or both.[1213] Merchants' ability to shift volume between card products, networks, and issuers enables their negotiation of the best prices. Indeed, the history of the industry has shown that when incremental volume is at stake, networks and issuers are willing to accept very low, or even negative, interchange fees.[1214]

1067. There are many ways that merchants might have steered transaction volume in the absence of the Competitive Restraints. These could have included both carrots and sticks. For example, a merchant could have offered positive incentives to customers who used preferred forms of payment—also known as positive steering.[1215] Merchants also could engage in

---

[1213] For example, [redacted]

[1214] For example, private label and co-brand agreements often result in net payments from issuers and/or networks to merchants.

[1215] For example, merchants with store-branded cards commonly provide an incentive for the customer to open an account, e.g., a discount on the first purchase. [redacted]

negative steering—such as surcharging—that is intended to steer customers away from an alternative that is less preferred by the merchant. Some merchants may have favored positive steering, especially if their market research and in-store tests showed that consumers were more likely to respond to positive steering than negative steering.[1216]

1068. Merchants also could have used the leverage of selective acceptance—refusing to accept higher-cost Visa and Mastercard transactions.[1217] Under this scenario, a posted-price approach would have put the onus of differential acceptance back on the issuers. Suppose a merchant indicated to issuers that it would accept any transaction—without surcharge or other forms of discouragement—so long as the interchange was equal to or less than 35 cents. As discussed above, if the bank declined the transaction, the merchant could make clear at the point of sale that the issuer, rather than the merchant, was to blame for the failed transaction.

1069. Visa and Mastercard consistently have made it clear that they believe the value of their cards is highly dependent on ubiquitous acceptance.[1218] If true, then issuers would find it difficult to market cards that were not widely accepted and, accordingly, would have powerful incentives to make sure that every merchant accepted their cards. Even among its existing cardholders, if not widely accepted, the issuer's cards may fall from the top of wallet as cardholders shift their

---

[redacted]

[1216] Some merchants testified that they currently disfavor surcharging, but merchants have also testified that the merits of a given steering method in the but-for world could change, depending on the nature of competition in the but-for world. [redacted]

[1217] [redacted]

[1218] See Section VIII.B.

expect card issuers to react by modifying aspects of their credit card offerings and/or business operations.

1089. Issuers might have reacted to lower interchange fee rates by changing the level or structure of their cardholder rewards programs. Depending on the degree of the decrease in interchange fees in the but-for world, some issuers may have offered lower rewards on certain types of cards or limited the variety of rewards cards that they issue, such as issuing only travel and entertainment cards or merchant co-branded cards.[1238] Issuers also may have chosen to offer rewards based on outstanding card balances instead of transaction volume. Alternatively, issuers could have funded rewards by using some of their profits on credit accounts. Much of the growth in rewards has occurred after 2005, when Visa, and then Mastercard, imposed higher rewards-tiered interchange rates. In a but-for world, the levels of rewards may not have increased to the same degree, and consumers would not necessarily have come to expect some of the high rewards that they see today. In any event, credit card issuers need to differentiate their products to compete with other issuers for cardholders. Rewards are a way for them to do that and would have continued to be a viable strategy in the but-for world.

1090. On the other hand, the increased issuer competition in the but-for world would have tended to increase card issuer incentives to offer higher cardholder rewards and\or lower cardholder annual fees and APRs. In the but-for world there also would have been an incentive for issuers to partner with merchants on rewards programs. With lower interchange, merchants could have funded rewards that generated incremental sales for the merchant and for an issuer-partner (unlike current bank card rewards programs that generate cardholder loyalty only to the issuer, are indirectly funded by merchants via high interchange rates, but have no benefit for merchants).The net effect of these two dynamics in the but-for world is uncertain and may have varied by card issuer but, as described below, issuers would continue to have had strong incentives to offer high rewards (and keep annual fees low) in the but-for world even with lower interchange fee rates.[1239]

---

[1238] Issuers may consider a number of responses to reduced interchange. [redacted]

[1239] It is important to remember that in the but-for world there would be lower merchant acceptance fees for Visa/Mastercard transactions, which would in turn lead to lower retail prices paid by all consumers.

Again, card issuer rewards have no particular relationship with when merchants would choose to offer discounts.

1103. With the cost savings from lower Visa/Mastercard acceptance fees, merchants could have developed rewards offerings that were both merchant-specific and properly targeted to price-sensitive customers. Merchants might even partner with one or more card issuers, via bilateral agreements, to develop such a rewards program. Rewards programs designed in this way would efficiently generate true incremental sales for a merchant.

1104. Unlike GPPC rewards programs, which do not drive incremental sales to merchants, rewards programs designed by merchants are much more likely to result in actual incremental sales for the merchant. For example, JCPenney’s rewards program offers customers points toward future purchases based on their past spending. [redacted]

---

1266 [redacted]

1267 [redacted]

1268 [redacted]

driven interchange at least to the Moderate benchmarks, but more likely to the Competitive benchmarks.

1205. While the but-for world under the alternative scenario would likely have been substantially more competitive than the actual world, merchants would have had fewer ways in which to steer volume than in a fully competitive world. Namely, declining acceptance of certain Visa and Mastercard cards would not have been an available option. As a result, it is not certain that interchange fees would have been driven down as far in the alternative but-for world with Honor All Cards rules as they likely would have been in the primary but-for world. Accordingly, the more appropriate benchmarks to consider for the alternative, no-Honor All Cards but-for world are the Moderate and Ceiling benchmarks discussed above. In my opinion, interchange would have been no higher than the Ceiling benchmarks, but more likely would have been competed down to the Moderate benchmarks.

### 2. Co-brand Revenue in the But-for World

1206. Several of the Target Plaintiffs have or had Visa or Mastercard co-branded credit card programs during the period from 2004 to the present. Such programs earn revenue from interchange when the co-branded cards are used at stores outside of the merchant whose brand they bear. For example, when a [redacted] co-branded Visa card is used to buy gas at a gas station, the gas station pays Visa's interchange rate to [redacted] co-brand issuer partner, which in turn may share a portion of these proceeds with [redacted] In this way, it might be argued that some of the Target Plaintiffs "benefitted" from Visa's and Mastercard's high interchange fees.

1207. If the Target Plaintiffs enjoyed some "benefit" from Visa's and Mastercard's high interchange fees, I understand there may be legal reasons that this offset to damages is not appropriate for a calculation of antitrust damages. Putting aside any legal arguments, the idea that merchants would have earned less from their co-brand programs in the but-for world is an inappropriately narrow view. While interchange fees would have been lower in the but-for world, merchants and issuers would have had important additional opportunities in the but-for world to find value in partnering. Freedom from the Competitive Restraints would have meant that merchants could have done more to bring value to certain issuers' cards, and issuers could have done more to differentiate their offerings from those of other issuers. As a result, the value of co-brand programs could well have been higher in the but-for world, despite lower interchange.