# Exhibit 10

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | : | No. 05-md-1720(MKB)(JO) |
| This Document Relates To: | : | |
| ALL ACTIONS. | : | |

**EXPERT REPORT OF PROFESSOR JERRY HAUSMAN**

**October 5, 2018**

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

[redacted] than the average interest rate of a private student loan.[56]

77. Credit card lending has historically been very profitable. In 2016, Visa and Mastercard credit card issuers had a weighted average net interest margin (net interest income as a share of average balances) of [redacted] [redacted] than the weighted average net interest margin of 3% for U.S. banks.[58] Visa and Mastercard consumer credit card issuing has historically been very profitable for banks, with a weighted average return on equity (ROE) of [redacted] for consumer cards from 2004 to 2016, compared to a weighted average cost of equity (COE) of [redacted].[59]

78. Concentration in the credit card issuing market in the United States has increased over time. In 1995, the top ten issuers accounted for 55% of combined Visa/Mastercard credit card dollar volume. By 2003, that percentage had risen to 79%. In 2017, that concentration had increased to 85%. The increase in the concentration of issuers is shown in the chart below.[60]

**Share of Credit Dollar Volume**

| | 1995 | 1999 | 2003 | 2007 | 2011 | 2015 | 2017 |
|---|---|---|---|---|---|---|---|
| **Top 5 Issuers** | 40% | 60% | 61% | 73% | 71% | 69% | 72% |
| **Top 10 Issuers** | 55% | 74% | 79% | 84% | 83% | 83% | 85% |

[redacted]

56 *See* Expert Report of Maria Blanco.

57 *See* Blanco Report.

58 *See* Federal Reserve Bank of St. Louis Economic Research, *Net Interest Margin for all U.S. Banks*, *available at* https://fred.stlouisfed.org/series/USNIM.

59 *See* Blanco Report.

60 *The Nilson Report*, Issues 612 (Jan. 1996), 617 (Apr. 1996), 708 (Jan. 2000), 712 (Mar. 2000), 803 (Jan. 2004), 805 (Feb. 2004), 895 (Jan. 2008), 902 (May 2008), 989 (Feb. 2012), 1080 (Feb. 2016), 1081 (Feb. 2016), 1125 (Feb. 2018), 1126 (Feb. 2018). Ranked using charge volume in 1995, 1999, 2003 and total volume, which includes purchases and cash advances, in 2007, 2011, 2015, and 2017.



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

all NFC-based wallets that enable Visa or Mastercard cards, including Apple Pay, Google Pay, and Samsung Pay.

95. The HAC rules restrict how the banks that issue Visa and Mastercard cards compete for merchant acceptance. I discuss the competitive effects of these HAC rules in detail below.

**(ii) "Default" Interchange Schedules**

96. Visa and Mastercard both publish a complex schedule of interchange tables which they update twice a year. Under their rules, in the absence of a bilateral arrangement between the issuing bank and the acquiring bank (or merchants), the "default" interchange rate schedules will apply. As I discuss more fully below, there is no incentive for any issuer to reduce their interchange fee below the default interchange tables because the HAC rules require merchants to accept all Visa or Mastercard credit (or debit) cards issued by all member banks. That outcome is reinforced by the rules that bar steering by issuer, which I discuss below. For these reasons, the rates are not "default" rates; they are the rates that apply to Visa and Mastercard credit and debit transactions across all Visa and Mastercard issuers.

97. The level and structure of the interchange fee can vary based on a number of factors, including (among others): the type of card (consumer credit, signature debit or PIN debit, or type of commercial card); the rewards card designation (e.g., Mastercard World Elite or Visa Signature Preferred); the type of merchant (e.g., supermarket or e-commerce merchant); or the nature of the transaction (e.g., card-present versus card-not-present).

98. As discussed more fully below, Visa and Mastercard have traditionally justified the levels at which they set interchange as being necessary to "balance" both sides of their platform(merchant and cardholder). The record in this case shows otherwise. Visa and Mastercard do not "balance" their platforms when they set interchange. And high interchange is not necessary for their networks to function. As I discuss below, my conclusion is confirmed by the record in this case and foreign experience, including in Europe and Australia, where Visa and Mastercard have prospered at much lower



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

The relevant geographic market is not narrower than the U.S. because networks that compete in only one part of the U.S. are not good substitutes for networks that operate throughout the country and can service national merchants.

142. With regard to the product component of the relevant market, it is my view, as discussed below, that the competitive restraints in this case can be evaluated in the framework of four relevant product markets: (1) general purpose credit and charge card issuing; (2) general purpose debit card issuing; (3) general purpose credit/charge card network services to merchants; and (4) general purpose debit network services to merchants.

143. Given that Visa and Mastercard facilitate transactions that occur on a two-sided platform, an analysis of these four markets necessarily involves considering the network effects among them. Thus, although I believe it is appropriate to define issuing markets separately from merchant network services markets, my approach does not mean it is appropriate to ignore whether and how these markets relate.

144. The relevant product markets in this matter can, as an alternative, be analyzed as single transaction markets: (1) the market for general purpose credit and charge card transactions; and (2) the market for general purpose debit card transactions. My conclusions about market power and competitive effects are the same under both approaches.

### (i) General Purpose Credit and Charge Card Issuing

145. General purpose credit and charge card issuing in the United States is a relevant market. The "pay-later" nature of general purpose credit and charge cards supports this market definition. A hypothetical monopolist of general purpose credit and charge cards in the U.S. could profitably maintain a supra-competitive price because [redacted] In my view, this market does not include proprietary or store cards, whose functionality is limited to a single store or group of stores. Because of their limited functionality, such cards would not constrain a hypothetical monopolist of general purpose credit/charge cards from imposing supra-competitive prices.



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

146. Suppose a hypothetical monopolist of general purpose credit and charge card issuing increased financing costs by 5% (either by reducing the free float period or increasing the borrowing cost). This increase would likely be profitable because other payment methods—such as debit cards, cash, and checks—do not offer credit facilities or free float. High rates of revolving credit use are consistent with a sufficient number of credit card users continuing to use credit cards—rather than switching to debit cards—to make such a price increase profitable.[124] Second, even for transactors, general purpose credit and charge cards are better suited for large purchases by offering a free float period. [redacted]

147. [redacted] It is likely that a hypothetical monopolist of credit and charge card issuing could profitably increase prices to cardholders by reducing rewards by 5%. Cash, check, and debit cards generally do not offer rewards,[126] I would expect too few

---

124 Credit card lending represented 31% of unsecured consumer lending in the United States in 2011, and approximately 60% of credit card accounts made use of the credit feature in 2016. M. Vornovytskyy, A. Gottschaik and A. Smith, *Household Debt in the U.S.: 2000 to 2011*, U.S. Census, p. 3, *available at* https://www.census.gov/content/dam/Census/library/working-papers/2011/demo/debt-highlights-2011.pdf (last accessed Sept. 24, 2018); American Bankers Association, *Credit Card Market Monitor* (July 2018), p. 1 (approximately 60% of non-dormant account holders were revolvers and 40% were transactors in the first quarter of 2018), *available at* https://www.aba.com/Press/Documents/2018Q1CreditCardMonitor.pdf (last accessed Sept. 17, 2018).

125 Federal Reserve Bank of Philadelphia, *Consumer Credit & Payment Statistics* (Consumer Payments Snapshot – Credit Cards; Debit Cards) (reflecting average value of general purpose credit card transactions for 2015), *available at* https://www.philadelphiafed.org/consumer-finance-institute/statistics (last accessed Sept. 20, 2018); Board of Governors of the Federal Reserve System, *Interchange Fee Revenue, Covered Issuer Cost, and Covered Issuer and Merchant Fraud Loss Related to Debit Card Transactions: Data Tables* (rev'd as of Dec. 6, 2016), Table 1 (Purchase Transactions), *available at* https://www.federalreserve.gov/paymentsystems/files/regiireportsdata.pdf (last accessed Oct. 5, 2018).

126 *See, e.g.*, C. Greene, S. Schuh, and J. Stavins (2017): *The 2015 Survey of Consumer Payment Choice: Summary Results*, Research Data Reports, Federal Reserve Bank of Boston, Table 11 (T-16) (while 80.8% of consumers had debit cards, only 15.8% of those debit consumers had debit cards with rewards), *available at* https://www.bostonfed.org/publications/research-data-report/2017/the-2015-survey-of-consumer-payment-choice-summary-results.aspx (last accessed Sept. 20, 2018); [redacted]; O. Shy and J. Stavins, *Merchant steering of consumer payment choice: Evidence from a 2012 diary survey*, Working Papers, Federal Reserve Bank of Boston, No. 14-1, Federal Reserve Bank of

general purpose credit and charge card users to substitute other payment methods if rewards were lowered to render the reduction unprofitable for a hypothetical monopolist.

148. Suppose that a hypothetical monopolist of general purpose credit and charge card issuing attempted a SSNIP by reducing the free float period by 5% from 25 days to 23.8 days, reducing the value of rewards by 5%, and increasing the annual fee by 5% from $95 to $99.75.[127] Since alternative payment methods do not offer a free float period or rewards, the only economic incentives to switch away from credit cards would be the extra $4.75 per year in annual fees. I believe this increase in cost to the consumer would be too small to cause switching and, thus, the hypothetical monopolist would be able to profitably impose these price increases.

149. Merchant payment decisions in the actual world, which are derived from consumer demand for different forms of payment, support the conclusion that general purpose credit and charge card issuing is a relevant market. [redacted] The price difference between credit and debit interchange is evidence that credit/charge cards and debit cards are not in the same relevant market. If debit and credit were in the same market, a price change for debit should affect the price for credit. However, [redacted]

Boston, Boston, MA (2014), pp. 6-7 (only 1.7% of survey respondents said they received a discount for paying cash and 1.8% for paying with debit based on data from Boston Fed's 2012 Diary of Consumer Payment Choice survey), *available at* https://www.bostonfed.org/publications/research-department-working-paper/2014/merchant-steering-of-consumer-payment-choice-evidence-from-a-2012-diary-survey.aspx (last accessed Sept. 20, 2018).

127 I note that most credit cards issued in the U.S. do not carry an annual fee [redacted] I use $95 for illustrative purposes. $95 is the annual fee for the Chase Sapphire Preferred and Barclays AAdvantage Aviator Red World Elite Mastercard (*see* Chase, *Sapphire Preferred* (Annual Fee), *available at* https://creditcards.chase.com/rewards-credit-cards/chase-sapphire-preferred (last accessed Sept. 25, 2018); Barclays, *AAdvantage Aviator Red World Elite Mastercard* (Important Information, Annual Fee), *available at* https://cards.barclaycardus.com/cards/aadvantage-aviator-red-world-elite-mastercard.html (last accessed Sept. 25, 2018)).

128 The number of locations accepting Visa cards has increased from 5,700,000 in 2004 to 10,900,000 in 2017. The number of locations accepting Mastercard cards has increased from 5,600,000 in 2004 to 10,900,000 in 2017. *The Nilson Report*, Issues 828 (Feb. 2005) and 1125 (Feb. 2018).



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

[redacted]

### (ii) General Purpose Debit Card Issuing

150. There is also a relevant product market for the issuing of general purpose debit cards. In this market, the suppliers are debit card issuers and the customers are the end users of the cards, debit cardholders.

151. This market includes debit products that are authenticated by PIN or by signature. I discuss these products, and some critical differences between them, below. The substitutability of signature and PIN debit products is demonstrated by the fact that some merchants have been able to steer consumers from signature to PIN debit.[130]

152. Consumers do not view other payment methods as close substitutes for debit cards. Credit and charge cards are not close substitutes for many debit card users because credit/charge cards lack the budgeting benefits/spend control benefits of debit cards. Consumers who have reached their credit limit also cannot use their credit card further. Consumers also tend to use debit cards for smaller, everyday transactions—different types of transactions than consumers typically use credit or charge cards for.[131] This

---

[129] The Durbin Amendment reduced debit interchange fees per transaction by approximately 37%. In particular, the average pre-Durbin Amendment interchange fee per transaction across all debit networks and all issuers (for January 1-September 30, 2011) was $0.48; the post-Durbin Amendment average (for October 1-December 31, 2011) was $0.30 and, for each year thereafter, has fluctuated between $0.30 and $0.31. *See* Board of Governors of the Federal Reserve System, *Average Debit Card Interchange Fee by Payment Card Network* (data revised as of June 17, 2018), *available at* https://www.federalreserve.gov/paymentsystems/files/Avg_IF_by_PCN.pdf (last accessed Sept. 24, 2018); Board of Governors of the Federal Reserve System, *Interchange Fee Revenue, Covered Issuer Cost, and Covered Issuer and Merchant Fraud Loss Related to Debit Card Transactions: Data Tables* (rev'd as of Dec. 6, 2016), Table 5, *available at* https://www.federalreserve.gov/paymentsystems/files/regiireportsdata.pdf (last accessed Sept. 28, 2018). [redacted]

[130] [redacted]

[131] [redacted] TSYS, *2016 U.S. Consumer Payment Study,* p. 6 ("Debit is the preferred payment type for everyday spend transactions, such as supermarket/grocery, gas station and discount store purchases, as well as for bill payments. Credit is preferred for higher-dollar transactions and items that typically represent more



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### A. Direct Evidence of Visa's and Mastercard's Substantial Market Power in the Credit Market

#### (i) Centrally Managed Bank Cartels

174. As an initial matter, [redacted] Visa and Mastercard manage their respective cartels and facilitate the ability of their bank members to charge supra-competitive prices by insulating them from having to compete with each other for merchant acceptance. This structure confers substantial market power on Visa and Mastercard and their issuing banks. This conclusion holds whether one formally defines a relevant market for credit network services on the merchant side of the platform or a two-sided relevant market for credit transactions, as I discuss further below.

175. The Supreme Court in *Ohio v. Amex* discussed the structural advantages that Visa and Mastercard have enjoyed over American Express as a result of this historical structure. As the Supreme Court observed:

> "*Visa and MasterCard began as bank cooperatives and thus almost every bank that offers credit cards is in the Visa or MasterCard network. This makes it very likely that the average consumer carries, and the average merchant accepts, Visa or MasterCard. As a result, the vast majority of Amex cardholders have a Visa or MasterCard, but only a small number of Visa and Master-Card cardholders have an Amex. Indeed,* [redacted]

176. As a result of this structure, [redacted]

[153] *Ohio v Amex*, 138 S.Ct. at 2282.

[redacted] Visa and Mastercard's ability to present this Hobson's choice results from the asymmetry in power between thousands of banks negotiating collectively on one side, and an individual merchant negotiating on the other side. And this asymmetry has resulted in price increases that cost U.S. merchants (and U.S. consumers) billions of dollars each year throughout the relevant period.

177. Visa's and Mastercard's publication of complex rate schedules setting the interchange fees charged by their issuing bank members is one aspect of their cartel management role. As noted, Visa and Mastercard claim these schedules set only the "default" rates that would apply in the absence of a bilateral arrangement between the issuer and a merchant (or an acquirer). But [redacted] The default interchange rates, therefore, are not "default" rates in any meaningful sense. Instead they have been (and continue to be) the de facto interchange rates for almost all Visa and Mastercard transactions.[155] From an economic perspective, [redacted] Banks that compete for the issuance of credit or debit cards are paid the same interchange rates no matter the breadth or quality of the portfolios.

178. The Visa and Mastercard "default" interchange schedules set many different rates, broken out by such things as card type, merchant type, and transaction type. For example, Visa's published interchange rates for transactions that occur at utilities are lower than the rates for transactions at department stores because lower rates were

---

154 *See, e.g.*, [redacted] As discussed below, most ChaseNet agreements reflect the anticompetitive effects of the HAC/HAI rules because Chase priced the agreements to maintain its interchange revenue.

155 The only exceptions to this involve a limited number of custom agreements that reduced the interchange certain large merchants paid, and some ChaseNet/Chase Pay agreements.



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Home Depot and the merchants in the 7-Eleven Group given the nature of competition in their retail sectors.

383. I note, however, that the fact that merchants pass through higher acceptance costs to consumers does not mean that those costs have a neutral impact on the merchants' businesses. Rather, basic economics indicates that a merchant will lose sales as a result of higher prices (or reduced services) and, thus, be harmed by higher costs which lead to higher prices. As I discuss above, these higher prices have especially impacted the buying decisions of the less affluent most price-sensitive customers.

384. For these reasons, it is my conclusion that, by restraining competition, the HAC rules have increased (and continue to increase) the acceptance costs for merchants and the costs for transactions overall. The supra-competitive prices borne by merchants harmed their customers as the elevated costs of acceptance are reflected in higher prices and/or reduced services for goods and services. The lost sales caused by these elevated prices are not offset by the possibility that rewards might increase spending for some credit card users, but not for debit card users, cash users, or non-rewards credit card users. This outcome inflicts harm on the economy and all American consumers.

385. I note that this outcome has a particularly harmful effect on lower-income consumers who rely more heavily on cash, checks, or SNAP. Such consumers do not typically qualify for premium rewards cards and thus these higher prices would not be offset for them in any way. They are paying a (regressive) tax which they are least in the position to afford.

### E. Harm to Competition—Reduction in Product Quality and Variety

386. In addition to yielding lower prices, competition among issuing banks for merchant acceptance also would have resulted in more innovation in the marketplace and greater benefits, including different types of rewards or loyalty programs, benefiting both merchants and cardholders.

387. Issuers and merchants both have direct relationships with the end consumer. The cardholder is the merchant's customer, which has implications for the innovations that could result from issuing banks partnering with merchants. Both the issuer and the



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

merchant have important, but different, data on cardholder/consumer shopping behavior which could be utilized to provide value to the cardholder.

388. The merchant has basket level (or SKU level) data that shows what shoppers buy in its stores, and many merchants have loyalty programs that provide benefits targeted to their customers' shopping history.[475] The issuer, on the other hand, typically lacks access to the basket/SKU level data but has visibility into the other stores the cardholder frequents.[476] Issuer-merchant partnerships thus have the potential to combine this information to provide numerous cardholder benefits. In my opinion, without the agreement not to compete for merchant acceptance amongst issuers, competition among issuers and merchants would have generated these benefits for cardholders long ago. This harm to competition is a direct outgrowth of the HAC rules.

389. Visa executives agreed that its rules stopped differentiation at the issuer level that would have benefited cardholders. Former Visa CEO Charles Scharf, for example, told investors in 2013 that "if you go around and talk to most issuers, they would probably say there wasn't a lot of conversation that went on between the issuing and acquiring side, partially because of our rules that stood in the way of them working together to do something positive for the merchant."[477] Mr. Scharf was speaking in the context of the Visa rule change to permit the provision of immediate discounts by issuer at the POS,

---

475 [redacted]

476 [redacted]

477 Scharf (Visa) Dep. Ex. 17 (VISA14MDL1-01340443) at '456.



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

466. For these reasons, I see no procompetitive rationale for the HAC rules that outweighs my conclusion that the rules harm competition by eliminating issuer competition for merchant acceptance. The most effective way to stimulate that competition, and eliminate Visa's and Mastercard's substantial market power, is the elimination of the HAC rules. While I do not accept Visa and Mastercard's claimed justifications for the HAC rules, even if the rules were actually necessary in some fashion, they could be implemented in a manner less restrictive to competition, while protecting against the networks' claimed risk to consumers. Visa and Mastercard could maintain less restrictive HAC rules that would give merchants greater flexibility to stimulate issuer competition or resist the introduction of new higher priced cards. For example, less restrictive Visa and Mastercard HAC rules could require the acceptance of all issuers' cards while permitting the merchant complete flexibility to steer between the cards offered by different issuers. Under such an HAC rule, merchants would have the ability to surcharge by issuer, discount by issuer, and engage in preference programs by issuer at the POS. There would be no restrictions on issuers promoting their cards at the POS. Under this framework, the HAC rules would allow issuer steering and only require acceptance if the consumer insists on using the Visa or Mastercard card they initially offered. When Visa and Mastercard revised their rules pursuant to the DOJ consent decree to permit limited forms of discounting, their revised rules incorporated this concept. Merchants were permitted to discount or express a preference for Discover but were required to accept the Visa or Mastercard card offered if the consumer insists on that outcome.[624] This approach could be extended to permit greater issuer differentiation at the POS which would lead to increased issuer competition.

---

[624] *See, e.g.*, MCW_MDL_14725203 (MasterCard Rules (Dec. 7, 2011)) at '512-'513 (Rule 5.11.1 (Discrimination), Ch. 15—United States Region Rules) ("A Merchant may request or encourage a customer to use a payment card with an acceptance brand other than MasterCard or other form of payment *or a [MasterCard] Card of a different product type* . . . than the Card the consumer initially presents.") (emphasis added); *see also id.* at '528 (Rule 5.8.1 (Honor All Cards), Ch. 15a—United States Region Debit-related Rules) ("Merchants that choose to accept Debit MasterCard Cards must honor all valid Debit MasterCard Cards *without discrimination* . . . . Merchants that choose to accept Other Cards must honor all Other Cards *without discrimination* . . . .") (emphasis added); VISA14MDL-00031276 (Visa International Operating Regulations (Oct. 15, 2011)) at '936 (Visa Rule ID# 111011-010410-0008590 (Discount Offer – U.S. Region 5.2.D.2 (Updated)) ("**Effective 20 July 2011**, a U.S. Merchant may request or encourage a Cardholder to use a means of payment other than a Visa Card *or a Visa Card of a different product type* . . . than the Visa Card



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

doing just that, a model that could have succeeded but for the rules and conduct at issue in this case.

613. The record also shows large merchants exploring ways to lower their costs of acceptance, including by circumventing the dominant Visa and Mastercard networks in this time frame. Examples include Walmart's attempt to enter into direct relationships with large issuing banks, which started in the late 1990s and carried forward to the present. [redacted]

614. As discussed above, in a BFW without the HAC rules, certain large issuers would have had an independent economic self-interest in partnering with merchants to differentiate their products in the marketplace. In addition, category-influential merchants would have been able to stimulate issuer (and network) competition and reduce their costs of acceptance. That competition would have impacted both interchange and network fees, and as a result, I model damages for both of those fees.

615. Before I explain my BFW benchmarks more fully, I note several aspects of the BFW. First, while I do not believe default interchange would have been necessary in the BFW, my damages analysis would not change whether the default interchange rule is in place or not. If the HAC rules had been eliminated, and the default rates had become true default rates (as opposed to what they are in the actual world), merchants could have stimulated issuer (and network) competition for acceptance to reduce their acceptance

843 [redacted]

844 [redacted]



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

costs. As a result, to be conservative, I model a world without the HAC rules, but with default interchange intact.[845]

616. In a world without the HAC rules, merchants would have had the freedom to negotiate the terms of acceptance with any Visa or Mastercard issuer or groups of issuers, and issuers would have had incentives to conduct those negotiations. Merchants also would have been free to negotiate the terms of acceptance with Visa and Mastercard, and in those negotiations they would have had the freedom to accept any Visa or Mastercard product at prices and terms that made economic sense for their business. For the reasons detailed above, in my opinion in the BFW, merchants would have been able to utilize the forces of competition to reduce the cost of acceptance and deepen their relationships with issuers to benefit the merchant's and issuer's mutual customers. That dynamic would have started with large merchants and category-influential merchants, and would have extended beyond those merchants to other types of merchants.

617. It is important to note that in my BFW, Visa and Mastercard would have the ability to contractually negotiate Honor All Cards or Honor All Issuers requirements with merchants, provided that they did so without restricting in any way issuers' flexibility to contract directly with merchants. From a competitive effects perspective, I see such commercial arrangements as fundamentally different from imposing those requirements by rule. If merchants have meaningful leverage to stimulate issuer competition for acceptance—which I believe the elimination of the HAC rules would have given them—and issuer flexibility is preserved, I see nothing improper with Visa and Mastercard requesting HAC or HAI requirements for the term of their agreements with merchants as a condition of reducing interchange and network fees to merchants.

---

845 I also assume that all the other anti-steering rules, including the no-surcharging, no-discounting and anti-discrimination rules would not have been in effect. All the damages in this Scenario 1 (and 1A) flow from the HAC rules. Had the HAC rules not been in place, while the other anti-steering rules were in place, my damage calculation would be the same. In my view, had Visa and Mastercard eliminated the HAC/HAI rules they would not have been able to maintain the other anti-steering rules because merchants would have wanted complete flexibility to steer.



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER