# Exhibit 20

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------x

IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION :

No. 05-md-1720(MKB)(JO)

This Document Relates To: :

ALL ACTIONS. :

---------------------------------------------------------x

**REPLY EXPERT REPORT OF PROFESSOR JERRY HAUSMAN**

**October 11, 2019**

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

EXHIBIT
7
HAUSMAN
PENGAD 800-631-6989

the shopper entering the store, and would have included accurate displays in the window (if the merchant chooses) and at the POS.[253] Again, merchants have no interest in confusing their customers. As a result, the predicate assumption in Professor Elzinga's example is incorrect.

149. There is an additional problem with the DCEs' free-rider argument when it is applied to selective acceptance by Visa or Mastercard product types (like rewards cards or commercial cards). The DCEs ignore the fact that Visa or Mastercard could eliminate any consumer confusion caused by selective acceptance, to the extent there might be any, by creating sub-brands that could be easily communicated to cardholders. For decades, Mastercard has maintained the distinct Maestro brand and Visa has done the same with Interlink or Visa Electron.[254] Those products have different acceptance than Visa and Mastercard credit cards and the brands have communicated the differentiation to consumers. This experience indicates that both networks could eliminate any free-rider issue by creating brands or sub-brands that communicate acceptance by product type.

150. In attempting to justify the HAC rules, Professor Murphy discusses "network externalities" and merchant actions which he claims would reduce the value of the Visa and Mastercard networks for cardholders and for merchants.[255] That argument makes no economic sense. If a cardholder carrying a card from a non-accepted (or surcharged) issuer comes into a merchant's store, two things can happen, neither of which imposes a negative externality on the Visa or Mastercard networks or other merchants. First, the merchant could persuade the cardholder to switch to one of the

---

253 Real-world examples suggest that in the limited instances where merchants have stopped accepting certain cards, the merchants have provided customers ample notice and have not "baited and switched" them at the POS. For example, when Costco switched from American Express to Visa, it provided over a year's notice. *See, e.g.*, K. Sweet and C. Choi, *What to expect from Costco's new deal with Visa and Citi*, San Diego Union-Tribune (Mar. 2, 2015), *available at* https://www.sandiegouniontribune.com/business/sdut-what-to-expect-from-costcos-new-deal-with-visa-2015mar02-story.html. Also, when Kroger stopped accepting Visa credit cards at some of its banners, it provided one month's notice. *See, e.g.*, K. Schroeder, *Kroger drops Visa at some stores, explores options at others*, AJC.com (Mar. 3, 2019), *available at* www.ajc.com/news/national/kroger-drops-visa-some-stores-explores-options-others/PeiF3861yMwAzysW0rGg5K/. When Walmart discontinued acceptance of Visa credit cards in Canada, it provided a month-and-a-half's notice. *See, e.g.*, D. Tencer, *Walmart Canada Faces 'Gaping Self-Inflicted Wound' In Visa Dispute: Poll*, Huffington Post (July 8, 2016), *available* https://www.huffingtonpost.ca/2016/07/08/walmart-visa-canada_n_10890016.html.

254 MCW_MDL_00236116 at '118; VIF0127424 at '431.

255 Murphy ¶ 276ff.



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER